No. 23-60300

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

## TEXAS PETITIONERS' APPENDIX OF EXHIBITS IN SUPPORT OF MOTION TO STAY RESPONDENTS' FINAL ACTION, CONFIRM VENUE, AND HOLD CASE IN ABEYANCE

---

**June 26, 2023**

## LIST OF EXHIBITS IN APPENDIX

**Exhibit**                                          **Page Number**
                                                      **in Appendix**

1. Order, Doc. 269-2, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (per curiam) ("*Texas 2023*") ........................................................... A-1

2. Memorandum from Joseph Goffman, Principal Deputy Assistant Administrator, Office of Air and Radiation, *Notice of Forthcoming EPA Action to Address Judicial Stay Orders* (June 1, 2023) ("Goffman Memo") .................................................................. A-32

3. State Petitioners' Opposed Motion to Stay & Appendix, Docs. 31-1 & 31-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Mar. 3, 2023) ...................................................................................... A-34

4. Reply in Support of State Petitioners' Opposed Motion to Stay, Doc. 197, *Texas v. EPA*, No. 23-60069 (5th Cir. Apr. 10, 2023) ....................................................................................... A-281

5. Texas Industry Petitioners' Opposed Motion to Stay Final Action of the U.S. Environmental Protection Agency & Texas Industry Petitioners' Appendix of Exhibits in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency, Docs. 32-1 & 32-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Mar. 3, 2023) ............................................................................... A-301

6. Texas Industry Petitioners' Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency & Texas Industry Petitioners' Appendix of Exhibits in Support of Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency, Docs. 203-1 & 203-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Apr. 10, 2023)..................................... A-737

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 26th day of June, 2023. The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: June 26, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

**Exhibit 1: Order, Doc. 269-2, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (per curiam)**

# United States Court of Appeals for the Fifth Circuit

————————

No. 23-60069

————————

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, *Administrator, United States Environmental Protection Agency*,

*Respondents.*

A-2

---

Petition for Review of a Final Rule
by the Environmental Protection Agency
88 Fed. Reg. 9336-9384

---

## UNPUBLISHED ORDER

Before ENGELHARDT, WILSON, and DOUGLAS, *Circuit Judges*.

PER CURIAM:

There are five motions before us. The first two concern whether venue should be transferred to the D.C. Circuit. It should not; so, we DENY the motions. The third, fourth, and fifth motions concern whether the case should be stayed pending review of the EPA's disapproval of Texas's and Louisiana's State Implementation Plans. It should; so, we GRANT the three motions.

### I.

We first (A) detail the relevant statutory and regulatory background. Then we (B) describe the factual and procedural background.

### A.

The Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*, "establishes a comprehensive program for controlling and improving the nation's air quality." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). But unlike many other federal statutes, the CAA divides enforcement responsibility between the federal and State governments. *See Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*") ("The Clean Air Act is 'an experiment in cooperative federalism.'" (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001))); *see also New York v. United States*, 505 U.S. 144, 167–68 (1992) (listing a handful of similar statutes); *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 289 & n.30 (1981) (same). Namely, the EPA identifies air pollutants and sets air quality

standards, while the States implement those standards. 42 U.S.C. §§ 7408–10. Though the EPA and the States both have statutory responsibilities under the CAA, Congress gave the States "primary" authority in this context. *Id.* § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *id.* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ."); *see also Texas 2016*, 829 F.3d at 411 ("The structure of the Clean Air Act indicates a congressional preference that [S]tates, not EPA, drive the regulatory process.").

For its part, the EPA is required to set national ambient air quality standards ("NAAQS") for pollutants that "may reasonably be anticipated to endanger public health or welfare." *See* 42 U.S.C. §§ 7408, 7409. "Once a NAAQS has been promulgated, the [EPA] Administrator must [continue to] review the standard (and the criteria on which it is based) 'at five-year intervals' and make 'such revisions . . . as may be appropriate.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 462–63 (2001) (third alteration in original) (quoting 42 U.S.C. § 7409(d)(1)).

After the EPA promulgates or revises a NAAQS, "[e]ach State must submit a State Implementation Plan"—or "SIP"—"within three years of any new or revised NAAQS." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014) (citing 42 U.S.C. § 7410(a)(1)). Of course, SIPs need to comply with the CAA generally and the NAAQS specifically. *See* 42 U.S.C. § 7410(a)(2) (listing elements that must be included in all SIPs). But States otherwise have "wide discretion" in formulating their SIPs. *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976); *see also BCCA*, 355 F.3d at 822 ("[S]tates have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." (citation omitted)). Indeed: "So long as the ultimate effect of a State's choice of

emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever [approach] it deems best suited to its particular situation." *Train v. NRDC*, 421 U.S. 60, 79 (1975).

Next—after States submit their SIPs—the EPA conducts a "limited" review. *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) ("*Texas 2012*"). The Agency's review is "limited" in the sense that the CAA "confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("*Luminant 2012*") (citations omitted); *see also* 42 U.S.C. § 7410(k) (detailing the EPA's timeline for reviewing SIPs). "Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA *must* approve it." *Texas 2012*, 690 F.3d at 676 (emphasis added); *see* 42 U.S.C. § 7410(k)(3) ("[T]he [EPA] Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)). But if (and only if) a SIP is inadequate, "the Act requires the Agency to promulgate a Federal Implementation Plan"—or "FIP"—"within two years." *EME Homer*, 572 U.S. at 498 (citation omitted); *see* 42 U.S.C. § 7410(c)(1)(B); *see also Texas 2016*, 829 U.S. at 412 ("Only if the [S]tate has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a state-specific plan."). A FIP "fill[s] all or a portion of . . . an inadequacy in a [SIP]" and binds the State. 42 U.S.C. § 7602(y).

### B.

This case involves the EPA's 2015 revision of the ozone NAAQS. On October 26, 2015, the EPA lowered the allowable concentration of ozone in the ambient air from 75 parts per billion ("ppb") to 70 ppb. Ozone NAAQS, 80 Fed. Reg. 65,292 (Oct. 26, 2015).

That triggered the States' duty to craft SIPs implementing the revised NAAQS—including plans for compliance with the CAA's so-called "Good

No. 23-60069

Neighbor Provision." *See EME Homer*, 572 U.S. at 495–99. Because the wind is "heedless of state boundaries," pollution emitted in upwind States can undermine downwind States' ability to satisfy NAAQS. *Id.* at 495. To address this aspect of national air quality, Congress included the Good Neighbor Provision in the CAA. It requires that, in addition to meeting NAAQS emissions thresholds within a State's borders, SIPs must also "contain adequate provisions" prohibiting emissions in amounts that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I).[1] Although the EPA did not promulgate any regulations regarding the States' Good Neighbor obligations under the 2015 ozone NAAQS, *see* 42 U.S.C. § 7601(a), it did issue various memos designed to help States satisfy the Provision.[2]

---

[1] Areas where concentrations of regulated pollutants satisfy the NAAQS are called "attainment" areas, while those that don't are called "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i)–(ii).

[2] *See* Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) [hereinafter March 2018 Memo]; Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards* (Oct. 19, 2018) [hereinafter October 2018 Memo]; *see also* Notice of Availability of the EPA's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS, 82 Fed. Reg. 1,733 (Jan. 6, 2017) [hereinafter 2017 Data Announcement]. None, however, was supposed to be binding. *See* October 2018 Memo at 1 ("States may use this information when developing [SIPs] for the 2015 ozone NAAQS addressing the [G]ood [N]eighbor [P]rovision," but "[t]his document . . . does not impose binding, enforceable requirements on any party."); March 2018 Memo at 2–3, 6 (similar); 2017 Data Announcement at 1,735 ("[S]tates may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs.").

5

No. 23-60069

After the States submitted their SIPs, the EPA promulgated a final rule on February 13, 2023, disapproving more than 20 States' SIPs for lack of compliance with the Good Neighbor Provision. *See* Interstate Transport of Air Pollution for the 2015 8-Hour Ozone NAAQS, 88 Fed. Reg. 9,336 (Feb. 13, 2023) [hereinafter Final SIP Denial]. Then on March 15, 2023, the EPA signed the Federal Good Neighbor Plan for the 2015 Ozone NAAQS ("Final FIP"), which provides FIPs for 23 upwind States. Three of those States—Louisiana, Mississippi, and Texas, and a variety of other governmental and non-governmental entities therein—petitioned this court for review of the EPA's February 13, 2023 disapproval of their SIPs. *See* 42 U.S.C. § 7607(b).

Our court will consider those petitions in due course. Before us now are five prefatory motions: (1) the EPA's motion to transfer all petitions to the D.C. Circuit; (2) the EPA's motion to dismiss based on improper venue; (3) Texas-based petitioners' two motions to stay the Final SIP Denial as it relates to Texas; and (4) the State of Louisiana's motion to stay the Final SIP Denial as it relates to Louisiana. For the reasons that follow, we DENY the first two motions and GRANT the rest.

## II.

We begin with the EPA's motion to transfer venue to the D.C. Circuit under 42 U.S.C. § 7607(b)(1). We assess the "applicability" of § 7607(b)(1) *de novo* and without deference to the agency. *Texas 2016*, 829 F.3d at 417–21. Section 7607(b)(1) states, in relevant part:

> A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations promulgated, or final action taken, by the Administrator *under this chapter* may be filed only in the United States Court of Appeals for the District of Columbia. A petition

6

for review of the Administrator's action in approving or promulgating any implementation plan . . . or any other final action of the Administrator *under this chapter* . . . which is *locally or regionally applicable* may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is *based on a determination of nationwide scope or effect* and if in taking such action the Administrator *finds and publishes* that such action is based on such a determination.

42 U.S.C. § 7607(b)(1) (emphasis added).

In other words, the CAA's venue statute divides challenges to EPA "actions" into three general categories. First, "nationally applicable" actions—which must be filed in or transferred to the D.C. Circuit. Second, "locally or regionally applicable" actions—which must be filed in or transferred to the appropriate regional circuit. Third, locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" and accompanied by the EPA's published finding to that effect—which must be filed in or transferred to the D.C. Circuit. *See Texas 2016*, 829 F.3d at 419; *see also Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).

As a preliminary matter, the parties dispute what the relevant "action" is for purposes of § 7607(b)(1). We have said that § 7607(b)(1)'s use of "action" means "the rule or other final action taken by the agency that the petitioner seeks to prevent or overturn." *See Texas 2016*, 829 F.3d at 419.

However, such a broad articulation can be difficult to apply when the Agency takes multiple actions in a single rule. What guides us in those cases?[3]

We look primarily to the text of the statute. *See Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007); *CleanCOALition v. TXU Power*, 536 F.3d 469, 473–74 (5th Cir. 2008). The applicable statute (here the CAA) is the legal source of the agency's (here the EPA's) authority to take the challenged actions (here the SIP denials).[4] And the CAA makes clear that the EPA's relevant actions for purposes of the present litigation are its various SIP denials. Specifically, we consider how the EPA's Final SIP Denial fits into CAA's step-by-step procedure. First, the EPA sets NAAQS. 42 U.S.C. § 7409(b)(1). Next, "each State" submits its own SIP implementing those NAAQS. *Id.* § 7410(a). Then the EPA approves or disapproves *each State's* SIP. *See id.* 7410(k)(1)–(3) ("the State," singular). This final step is the relevant "action," and it is precisely what the EPA did here. As required by § 7410(k)(3), the EPA *separately considered and disapproved* Texas's SIP,

---

[3] The precise contours of the Petitioners' challenges do not define the relevant "action" for § 7607(b)(1)'s purposes. *See, e.g.*, *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) ("The nature of the regulation, not the challenge, controls."). Nor do the "practical effects" of the action. *Am. Rd. & Transp. Builders*, 705 F.3d at 456. Nor does the EPA's chosen method of publishing or labeling the action. *See Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979); *accord Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481 (2d Cir. 1972) ("[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." (citation omitted)). Accordingly, we do not consider these as guidance in deciding the motion before us.

[4] *See* 42 U.S.C. § 7607(b)(1)("final action . . . *under this chapter*" (emphasis added)); *ibid.* ("any other final action of the Administrator *under this chapter*" (emphasis added)). The phrase "under this chapter" in § 7607(b)(1) refers to the Chapter 85 of Title 42 (*i.e.*, the Clean Air Act). *See generally* 42 U.S.C. §§ 7501–7671q; 42 U.S.C. Ch. 85: Front Matter, Editorial Note ("Act July 14, 1955, ch. 360, 69 Stat. 322 , as amended, known as the Clean Air Act, which was formerly classified to chapter 15B (§1857 et seq.) of this title, was completely revised by Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 685, and was reclassified to this chapter.").

Louisiana's SIP, and Mississippi's SIP because (in its judgment) each failed to comply with the Good Neighbor Provision. Yes, the EPA packaged these disapprovals together with the disapprovals of eighteen other States in the Final SIP Denial. *See* 88 Fed. Reg. 9,336. But again, the EPA's chosen method of publishing an action isn't controlling. What controls is the CAA. And the CAA is very clear: The relevant unit of administrative action here is the EPA's individual SIP denials.

Having isolated the relevant EPA actions at issue, we next (A) explain why the EPA's SIP denials for Texas, Louisiana, and Mississippi are locally or regionally applicable. Then we (B) reject the EPA's argument that § 7607(b)(1)'s exception applies.

## A.

Under § 7607(b)(1), "nationally applicable" actions must be transferred to the D.C. Circuit, whereas "locally or regionally applicable" actions must not.

The question of whether the three EPA SIP disapprovals at issue are "nationally applicable" "turns on the legal impact" of the three SIP disapprovals. *Texas 2016*, 829 F.3d at 419; *see also, e.g.*, *Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. 2011) ("*Texas 2011*") (concluding a nationwide SIP call under 42 U.S.C. § 7410(k)(5) is nationally applicable); *Am. Rd. & Transp. Builders*, 705 F.3d at 455–56 (action disapproving California's SIP is locally applicable and must be filed in the Ninth Circuit); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) (observing that SIPs are "undisputedly regional action[s]" and "the nature of the regulation . . . controls").

Courts have long held that "SIP rulemakings" are the "prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals." *Am. Rd. & Transp. Builders*, 705 F.3d

at 455 (quotation and citation omitted); *accord Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 866 (D.C. Cir. 1996). That is unsurprising: the vast majority of actions involving SIPs are necessarily about individual States and are thus "purely local" and "undisputedly regional." *ATK Launch Sys., Inc.*, 651 F.3d at 1199. Of course, some final actions related to SIPs may be "nationally applicable"—such as when the EPA promulgates regulations that apply to *all* States equally, *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299–300 (1st Cir. 1989), or issues a SIP call, *see* 42 U.S.C. § 7410(k)(5), requiring States to revise their SIPs in light of a new requirement that applies to *all* States, *Texas 2011*, 2011 WL 710598, at *4. In those cases, transfer to the D.C. Circuit is appropriate because the actions uniformly apply to a broad swath of States. *See id.* (concluding that "Congress intended the D.C. Circuit to review matters on which national uniformity is desirable" as a means to take advantage of the D.C. Circuit's "administrative law expertise" and facilitate "the orderly development of the basic law under the Act," and because "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results" (quotations and citations omitted)).

But here, the "legal impact" of the three SIP disapprovals is plainly local or regional. Consider "the location of the persons or enterprises that the action[s] regulate[]." *Texas 2011*, 2011 WL 710598, at *3. The EPA's three SIP disapprovals at issue involve only the regulation of Texas, Louisiana, and Mississippi emission sources and have legal consequences only for Texas, Louisiana, and Mississippi facilities. The EPA doesn't point to a single example of our circuit (or any of our sister circuits) granting a similar motion to transfer a petition challenging a SIP approval/denial to the D.C. Circuit, and for good reason: the *State* Implementation Plans, of course, primarily involve individual *States*. Given that the "legal impact" of the EPA's three SIP disapprovals is in Texas, Louisiana, and Mississippi

respectively, we conclude that the EPA's actions at issue in this case are "locally or regionally applicable."

## B.

Next, the § 7601(b)(1) exception. To overcome the "default presumption" that petitions for review of locally or regionally applicable actions "may only be filed in the United States Court of Appeal for the appropriate circuit," *Texas 2016*, 829 F.3d at 419 (quoting 42 U.S.C. § 7607(b)(1)) (internal quotation omitted), the EPA must meet both prongs of the § 7601(b)(1) exception. Because the EPA can't meet the first, we need not consider the second.

To satisfy prong one, the EPA must show that the three SIP disapprovals here were "based on a determination of nationwide scope or effect." 42 U.S.C. § 7607(b)(1). And we must make an "independent assessment of the scope of the determinations." *Texas 2016*, 829 F.3d at 421. The EPA faces a steep hurdle given that SIP disapprovals are usually "highly fact-bound and particular to the individual [S]tate." *Id.* at 421 n.24. That is particularly true here where the EPA itself stated in the Final SIP Denial that each SIP was judged "in light of the *facts and circumstances of each particular state's submission.*" Final SIP Denial at 9,340 (emphasis added).

The EPA cannot meet its burden. Just like the SIP disapprovals at issue in *Texas 2016*, the three SIP disapprovals at issue here were plainly based "on a number of intensely factual determinations" unique to each State. 829 F.3d at 421. Tellingly, the Final Rule's explanations for the Texas, Louisiana, and Mississippi SIP denials rely on the individual EPA *regional* offices' assessments of the unique features of the Texas, Mississippi, and Louisiana SIPs. *See, e.g.*, Final SIP Denial at 9,343; *id.* at 9,354 (disapproving Texas's SIP based on Region 6's evaluation of the "individual" attributes of

Texas's SIP). Consider Texas, for example. The EPA's Region 6 determined: that Texas's use of the most recent three-year period (2012–2014) to identify downwind maintenance monitors "is less likely to successfully identify maintenance receptors than the EPA method," EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* 11 (Feb. 2022); that Texas's "modeling underestimates future ozone levels" in 2023, 87 Fed. Reg. at 9,829; and that Texas's multi-factor weight-of-evidence analysis was not sufficiently "compelling" to "counter" "EPA's [one-percent] contribution methodology," *id.* at 9,833–34. These "intensely factual determinations" do not have nationwide scope or effect because they all relate "to the particularities of the emission sources in Texas" and their alleged impact on downwind air quality. *Texas 2016*, 829 F.3d at 421.[5] The same pattern holds true for Louisiana and Mississippi.

---

[5] The dissent acknowledges that "the SIP process is generally highly fact-bound and particular to the individual state." *Post*, at 28 (quoting *Texas 2016*, 829 F.3d at 421 n.24). However, notes the dissent, "EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id.* (quoting *Texas 2016*, 829 F.3d at 421 n.24). True, in *Texas 2016*, we noted that "[a] determination that a national standard satisfies a particular requirement in each state *may* be a determination that has nationwide scope or effect." *Texas 2016*, 829 F.3d at 421 n.24 (emphasis added). But "may" implies the Court's discretion. On the facts before us, the intensely factual determinations do not have nationwide scope or effect.

No. 23-60069

Because the EPA fails to rebut the default presumption that locally or regionally applicable actions must not be transferred to the D.C. Circuit,[6] the EPA's transfer motion[7] is DENIED.[8]

### III.

Satisfied that venue is proper, we turn to the stay motions.

The Texas and Louisiana Petitioners ("Stay Petitioners") moved for a stay pending review of the EPA's Final SIP Denial. *See* Fed. R. App. P. 18. To prevail, they must satisfy this familiar four-prong test:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). We consider each prong in turn.

---

[6] The dissent contends that the EPA "*explicitly* chose to make" a published finding that the Final Rule was based on a determination of nationwide scope or effect. *Post*, at 29 (citing Final SIP Denial at 9,380-81). But the EPA's position on the matter is not determinative. "Because 'the determination of our jurisdiction is exclusively for the court to decide,'" we do not defer to the agency when determining venue. *Texas 2016*, 829 F.3d at 417–18 (citations omitted).

[7] The EPA also filed a motion to dismiss based on improper venue. For the reasons set forth above, venue in the Fifth Circuit is proper. Accordingly, the motion to dismiss is DENIED.

[8] Our decision today accords with that of the Eighth Circuit. *See Arkansas v. EPA*, No. 23-1320, ECF No. 5269098 (8th Cir. Apr. 25, 2023) (denying EPA's motion to transfer Arkansas's petition to the D.C. Circuit or dismiss for improper venue); *see also State of Utah v. U.S. Environmental Protection Agency*, No. 23-9509, ECF No. 10110851072 (10th Cir. Apr. 28, 2023) (referring respondents' motions to transfer petitions to the D.C. Circuit or dismiss for improper venue to merits panel).

## A.

First, likelihood of success on the merits. To prevail, Stay Petitioners must demonstrate that the EPA likely "acted arbitrarily, capriciously, or unlawfully." *Texas 2016*, 829 F.3d at 424–25; *see also Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) ("*Luminant 2013*") ("A petition to review the EPA's approval or disapproval of a SIP is governed by the Administrative Procedure Act. *See* 5 U.S.C. § 706.").

Stay Petitioners satisfy their burden in two ways. They (1) make a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA. And they (2) are likely to prevail on the claim that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information only available after Texas and Louisiana had submitted their SIPs.

### 1.

The EPA exceeded its authority under the CAA by giving undue weight to non-statutory factors when evaluating Stay Petitioners' SIPs. *See* 5 U.S.C. § 706(2)(A), (C) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see also Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ."). Under the CAA's cooperative federalism framework, Congress gave the States "'wide discretion' in formulating their SIPs, including the 'broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'" *Luminant 2013*, 714 F.3d 841 at 845 (first quoting *Union Elec.*, 427 U.S. at 250; then quoting *BCCA*, 355 F.3d at 822). The CAA, by contrast, "confines the EPA to the ministerial function

of reviewing SIPs for consistency with the Act's requirements." *Id.* at 846 (citing 42 U.S.C. § 7410(k)(3)).

The EPA exceeded its "ministerial" role. Rather than merely ensuring that Texas's and Louisiana's SIPs complied with the text of the CAA, *see* 42 U.S.C. § 7410(k)(3), the EPA instead subjected Stay Petitioners' submissions to a range of factors "not found in the Act," *Texas 2016*, 829 F.3d at 428. For example, "[t]he EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each [S]tate's [SIP] addressing the [Good Neighbor] [P]rovision for the 2015 ozone NAAQS." Final SIP Denial at 9,338. In its words:

> [T]he EPA has developed and used the following 4-step interstate transport framework to evaluate a [S]tate's [Good Neighbor] obligations . . . : (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

*Ibid.* This is one "permissible" way to effectuate the CAA's Good Neighbor Provision, *EME Homer*, 572 U.S. at 524 (holding as much in the FIP context), but it is by no means the only way. That is because the EPA's preferred "4-step framework" is nowhere to be found in the Good Neighbor Provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (only requiring that SIPs "contain adequate provisions" prohibiting emissions that will "contribute significantly to

nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]").

True, the EPA "recognized" in its Final SIP Denial "that [S]tates may be able to establish alternative approaches to addressing their [Good Neighbor] obligations for the 2015 ozone NAAQS that vary from [the 4-step] framework." Final SIP Denial at 9,340. But the Agency backtracks in the next breath: "deviation from [the 4-step] approach to ozone transport *must be substantially justified* and have a well-documented technical basis." *Ibid.* (emphasis added). Put differently: If a State wants to evaluate its Good Neighbor obligations in any way other than the EPA's 4-step approach, it must first "substantially justif[y]" that decision to the Agency. *Ibid.* If not violative of the CAA itself, this is at least inconsistent with the statute and jurisprudence applying it.

The EPA's approach inverts the CAA and "reflects a misapprehension by the EPA of its authorized role in the SIP-approval process." *Luminant 2012*, 675 F.3d at 928 n.8. The CAA's text and our precedent compel that "the EPA does not possess *any* discretionary authority in th[e] [SIP-approval] process. *Only* the states enjoy discretion in implementing the dictates of the CAA." *Ibid.* (emphasis added) (quotation and citations omitted); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA."). Of course, if the EPA were instead defending a FIP (a *Federal* Implementation Plan) the Agency would be entitled to exercise far more discretion in how to effectuate the Good Neighbor Provision—including by using its preferred 4-step framework. *E.g.*, *EME Homer*, 572 U.S. 489. But unless and until a SIP is lawfully denied, the State remains "primary." *Compare* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . is the primary responsibility of States . . . ."), *and id.* § 7407(a)

("Each State shall have the primary responsibility for assuring air quality . . . ."), *and Train*, 421 U.S. at 79 ("The Agency is plainly . . . relegated by the [CAA] to a secondary role . . . ."), *with* Final SIP Denial at 9,367 ("The EPA does not, however, agree with the comments' characterization of the EPA's role in the [S]tate-[f]ederal relationship as being 'secondary.'").

The EPA's imposition of its preferred 4-step framework is just one example of how the Agency "improperly failed to defer to [Stay Petitioners'] application of the [CAA]." *Texas 2016*, 829 F.3d at 428. Others abound—including the EPA's rejection of "Texas['s] . . . definition of maintenance receptors" and "Louisiana's . . . application of a higher contribution threshold than 1 percent of the NAAQS." Final SIP Denial at 9,356, 9,359; *cf.* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (offering no definition of "maintenance"); *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020) ("*Texas 2020*") ("[T]he text of the [CAA] does not require EPA to adopt a one-percent threshold."). In sum, because the "EPA's lack of deference to the [S]tate[s] inverts the agency's 'ministerial function' in this system of 'cooperative federalism,'" *Texas 2016*, 829 F.3d at 428 (citation omitted), Stay Petitioners have made a strong showing that the EPA acted unlawfully. *See also Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over [it] . . . ." (quotation omitted)).

2.

The EPA's actions are also constrained by the Administrative Procedure Act's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A). When an agency acts, it must "reasonably consider[] the relevant issues and reasonably explain[]" its actions. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citations omitted); *see also Michigan v. EPA*, 576 U.S. 743, 751–52 (2015) ("[A]gency action is lawful

only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." (internal quotations and citations omitted)). We cannot "substitute" our "own policy judgment for that of the agency." *Prometheus*, 141 S. Ct. at 1158. But we must still ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision." *Ibid.* The upshot is that we "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Stay Petitioners have demonstrated a strong likelihood of success on their claim that the EPA acted arbitrarily and capriciously. The EPA likely violated § 706(2)(A) when it based its SIP disapprovals in part on policies and modeling data developed *after* Texas and Louisiana had already submitted their SIPs and *after* the EPA's statutory deadline to act had expired. Two of those decisions are exemplars.

First, the EPA based its disapproval of Texas's SIP in part on policies that the EPA released on October 19, 2018—months after Texas submitted its SIP, and eighteen days after the October 1 deadline for all States to submit theirs. *See* October 2018 Memo; 42 U.S.C. § 7410(a)(1) (SIP deadline). Worse yet, the October 2018 Memo represented a material shift from earlier guidance, because it changed the EPA's previous March 2018 guidance by adding *new* hurdles for States to clear when identifying maintenance receptors—such as by proffering evidence of a downward trend in ozone concentrations at the site since 2011. October 2018 Memo at 4; *cf.* March 2018 Memo at A-2 (no such hurdles). The EPA disapproved Texas's SIP in part because of its failure to abide by the October 2018 Memo—which, to reiterate, was issued *after* the statutory deadline for Texas to submit its SIP.

Final SIP Denial at 9,364 ("[The] [S]tates' submissions did not meet the terms of the . . . October 2018 [Memo] addressing . . . maintenance receptors."); *see also id.* at 9,370 ("EPA evaluated [S]tate's [sic] analyses and found no [S]tate successfully applied the[] criteria [in the October 2018 Memo] to justify the use of one of these alternative approaches."). Such a "[s]udden . . . change" after the SIP submission window was likely arbitrary and capricious. *Smiley v. Citibank*, 517 U.S. 735, 742 (1996). That is particularly true where, as here, the EPA apparently disavowed its initial assurance that its after-the-statutory-deadline memo would "not impose binding, enforceable requirements on any party." October 2018 Memo at 1.

Second, the EPA also acted arbitrarily and capriciously by grounding its Final SIP Denial in modeling data that wasn't available when Louisiana and Texas submitted their SIPs. Louisiana's SIP submission was finalized on November 14, 2019; Texas submitted its SIP on August 17, 2018. Under the CAA, the EPA was required to "act on the submission[s]" by either approving or disapproving them "within 12 months." *See* 42 U.S.C. § 7410(k)(2). The EPA therefore had until November 14, 2020 to render a final decision on Louisiana's submission, and almost a year less for Texas's. Instead of rendering a timely decision, the EPA slow-walked for *years* beyond CAA's statutory deadline—finally acting on *February 13, 2022*. And when it eventually got around to evaluating Stay Petitioners' SIPs, the EPA did not use the modeling data that it had published on the eve of the SIP-submission deadline "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. Instead, it relied upon various significant changes to its modeling data that it adopted long *after* the statutory deadline. *See* Final SIP Denial at 9,366 (the "meteorology and boundary conditions used in modeling" became available in November 2020, the "updated emissions inventory files used in the current modeling were

publicly released" in September 2021, and the modeling software the EPA used was not public until December 2020).

At best, these choices evince a "clear error of judgment" on the EPA's part. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quotation omitted). And at worst they perpetrate a "surprise switcheroo" on both Texas and Louisiana. *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (Sentelle, J.); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) ("surprise switcheroo"). Agencies have wide discretion to deploy their expertise, but they cannot move the administrative goalpost in so doing. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." (quotation and alteration omitted)).

The EPA responds that the "Act does not prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions, even if that data was not available when a state submitted its SIP." *See also* Final SIP Denial at 9,366 ("It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions."). That response is unavailing for at least two reasons.

First, regardless of whether the CAA "prohibit[s] EPA from using the most accurate, up-to-date data," it was nevertheless arbitrary and capricious of the EPA to do so without giving due consideration to the reliance the EPA itself had engendered by publishing guidance and data that—in its words— was designed "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. The EPA isn't required to issue such guidance to help States discharge their obligations

under the Good Neighbor Provision. *See EME Homer*, 572 U.S. at 509–10; Final SIP Denial at 9,363–64. But when the EPA *does* issue such guidance and modeling data—like it did in March 2018—it must take due account of the State's "serious reliance interests" before "chang[ing] course." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). The EPA's failure to adequately consider the States' reliance interests before holding them to new guidance and modeling data issued long after the States were statutorily required to submit their SIPs was arbitrary and capricious.

Second, the EPA's decision to consider after-the-statutory-deadline information also "fail[ed] to account for 'relevant factors'"—namely, the CAA's system of cooperative federalism. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quoting *Marsh*, 490 U.S. 360 at 378). Congress decided that the States should "drive the regulatory process." *Texas 2016*, 829 F.3d at 411. This choice is clearly reflected throughout the CAA, such as the provisions cabining the Agency's decisional timeframe, 42 U.S.C. § 7410(k)(1)–(2), and the sections "confin[ing] the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements," *Luminant 2012*, 675 F.3d at 921; *e.g.*, 42 U.S.C. § 7410(k)(3) ("shall approve"). Here, however, the EPA ignored its statutory deadline by a measure of *years*; used that extra time to collect more data, issue novel guidance, and develop new modeling; denied Stay Petitioners' SIPs in part based on that new information; then created FIPs imposing the EPA's policy preferences on the States. Even if, as the EPA suggests, the CAA "does not [explicitly] prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions," the EPA must still recognize the tension between what it did and what the Act's system of cooperative federalism requires, then account for that "relevant factor[]," *Marsh*, 490 U.S. 360 at 378. Otherwise, the EPA could easily flout the CAA's deadlines with impunity, then leverage that disregard

to summarily reject SIPs based on the States' failure to consider information that only became available after the SIP-submission deadline.

In so thwarting the CAA, this would also transform the EPA's statutory role from that of a "ministerial" overseer to one of a freewheeling dictatorial regulator. *Luminant 2012*, 675 F.3d at 921; *see also Texas 2016*, 829 F.3d at 430 ("EPA may not use its own delay as an excuse for imposing burdens on [the States] that the [CAA] does not permit."); *Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over [it]." (quotation omitted)). Accordingly, Stay Petitioners have made a strong showing that the EPA "acted arbitrarily, capriciously, [and] unlawfully." *Texas 2016*, 829 F.3d at 424–25.

## B.

The remaining factors likewise favor a stay.

Stay Petitioners "will be irreparably injured absent a stay" of the EPA's Final SIP Denial. *Nken*, 556 U.S. at 426 (quotation omitted). The Final SIP Denial was the statutory prerequisite for the EPA to create the Final FIP and impose its preferred system of emissions controls and reductions on the States. 42 U.S.C. § 7410(c)(1)(B). As Stay Petitioners point out, those changes will soon become operative, including for the 2023 ozone season: "The EPA posted the [F]inal FIP on its website on March 15, 2023 . . . [and] has stated that it expects the FIP to be effective in June or July of 2023." And many regulated entities have already commenced compliance efforts or will soon be required to do so. *See* Final FIP at 420 (providing that certain of Stay Petitioners' facilities "will begin participating in the [FIP's] Group 3 trading program on May 1, 2023, regardless of the rule's effective date"); 87 Fed. Reg. 20,036 (Apr. 6, 2022) ("[Regulated entities] should begin engineering and financial planning *now* to be prepared to meet this

implementation timetable." (emphasis added)). The EPA's Final SIP Denial has thus already caused irreparable injury. Unless stayed, it will do even more harm.

First, "allowing the Final [SIP Denial] to stand pending the appeal would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas 2016*, 829 F.3d at 433.

Second, Stay Petitioners will be forced to spend billions of dollars in compliance costs to achieve the Final FIP's emissions-reduction targets. That includes the costs of buying new equipment and retrofitting existing equipment; installing, operating, and maintaining that machinery; and purchasing allowances (at greater cost) on the emissions-trading market. These harms are undoubtedly irreparable because—as the EPA does not contest—"[n]o mechanism here exists for the [Stay Petitioners] to recover the compliance costs they will incur." *Id.* at 434; *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (quotation and emphasis omitted)); *Texas 2016*, 829 F.3d at 433 ("The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, may also be sufficient to show irreparable injury." (quotation omitted)).

Third, the Final FIP will strain Texas's and Louisiana's power grids. That's particularly true here because the Final FIP will become operative in the middle of the summer 2023 peak load conditions. This simultaneous change to Stay Petitioners' emissions budgets alongside the increased seasonal demand on their power grids will dramatically increase the probability of price spikes and "load-shedding"—*i.e.*, as Stay Petitioners observe, "requir[ing] utilities to disconnect customers from the power grid

to avoid a system-wide blackout." And we have recognized that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Texas 2016*, 829 F.3d at 434.

Accordingly, Stay Petitioners have made a strong showing of irreparable harm. The EPA, by contrast, has not demonstrated that "issuance of the stay will substantially injure the[m]" or undermine the "public interest." *Nken*, 556 U.S. at 426 (quotation omitted). As Stay Petitioners point out, the EPA's multi-year delay in disapproving Texas's and Louisiana's SIPs undercuts any claim that time is of the essence when it comes to imposing the EPA's Final FIP. But time *is* of the essence with respect to "the public's interest in ready access to affordable electricity," *Texas 2016*, 829 F.3d at 405, and "a steady supply of electricity during the summer months," *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999).

## IV.

For the foregoing reasons, the EPA's motion to transfer all petitions to the D.C. Circuit and motion to dismiss for improper venue are DENIED. Stay Petitioners' three motions to stay the Final SIP Denial as it relates to Texas and Louisiana are GRANTED. Our ruling here concerns only the motion for transfer, the motion to dismiss, and the motions for stay pending review; "our determinations are for that purpose" only "and do not bind the merits panel." *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017).

Dana M. Douglas, *Circuit Judge*, dissenting:

The instant matter concerns the EPA's Final Rule of February 13, 2023, disapproving 21 States' SIPs for lack of compliance with the Good Neighbor Provision. 42 U.S.C. § 7607(b)(1) determines the proper venue for petitions for review of a final rule. Under its provisions, petitions for review of actions that are "nationally applicable" or that the EPA found and published based on determinations of "nationwide scope or effect" may be filed only in the D.C. Circuit. Here, the EPA applied a uniform national approach to evaluate state plans and ensure equity among them, making the Final Rule at issue nationally applicable on its face. But even assuming the Final Rule to be regional, the EPA made and published a finding that its Final Rule was based on a determination of "nationwide scope or effect." Because I find venue to be improper in this circuit, I dissent.

In its motion to dismiss or transfer the petitions, the EPA raises the threshold question of whether the petitions are properly adjudicated in this court or whether they belong in the D.C. Circuit under the judicial review provision of the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). The inquiry begins by determining if the challenged regulation is "nationally applicable" or "locally or regionally applicable." Applicability turns on "the legal impact of the action as a whole." *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (*"Texas 2016"*). Whether an action is "nationally applicable" is based on "the face of the rulemaking, rather than its practical effects." *Texas v. EPA*, 706 F. App'x 159, 163 (5th Cir. 2017) (*"Texas 2017"*) (quoting *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015)).

On its face, the Final Rule is nationally applicable. It applied a

consistent four-step interstate transport framework[9] to evaluate plans submitted by states across the country and disapproved of SIPs from 21 states throughout eight of the ten EPA Regions and ten federal judicial circuits. *See Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011) (transferring petition challenging an EPA action notifying 13 states that their SIPs were inadequate) ("*Texas 2011*"); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011) (transferring challenge to an action designating portions of 18 states as failing to comply with a NAAQS because it employed a single uniform regulatory approach across states nationwide); *S. Ill. Power Coop v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017) (transferring challenge to an action "of broad geographic scope containing air quality attainment designations covering 61 geographic regions across 24 states," which was "promulgated pursuant to a common, nationwide analytical method").

The face of the Final Rule indicates it is nationally applicable, but I am further convinced by the arguments raised by Petitioners in their motions to stay which clearly show that Petitioners are challenging a nationally applicable aspect of the Final Rule. Naturally, Texas, Louisiana, and Mississippi frame the challenged actions as particularized SIP denials to support their regional venue argument. However, their own briefing indicates that this is not the action the Petitioners are challenging. Instead,

---

[9] The EPA utilized a four-step framework to evaluate compliance with the Good Neighbor Provision for prior ozone NAAQS. The EPA (1) identified nonattainment and maintenance "receptors"; (2) identified upwind states that impact air quality problems in downwind states sufficiently such that the states are considered "linked"; (3) identified any necessary emissions reductions to eliminate each upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopted permanent and enforceable measures needed to achieve those emissions reductions. Final Rule, 88 Fed. Reg. 9336, 9338 (Feb. 13, 2023).

the State Petitioners' Opposed Motion to Stay challenges the Final Rule on a national scale. The State parties argue that the Final Rule is being challenged because "it fails to explain EPA's after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors," and "disregards the Act's cooperative federalism by denying the SIP based on emissions-modeling data available only *after* Texas [or insert any other state] was statutorily required to submit its SIP provisions." (emphasis in original).

Put differently, the State parties are challenging the EPA's actions of reversing a prior policy that applied to and impacted *all* the states and not providing necessary data to *all* the states prior to the statutory deadline to submit SIP revisions. When framed in the context of the State parties' *own* arguments against the agency action, it becomes clear that they are not challenging the denial of their state SIPs such that the legal impact is only felt in this region, but the framework in which the EPA determined denial was necessary to 21 states throughout this country. *See ATK Launch Systems, Inc.*, 651 F.3d at 1199-1200. Accordingly, the nature of Petitioners' challenge is inextricably intertwined with arguments applicable to challenges to *all other* SIP disapprovals in the Final Rule because they were based on a common EPA rationale and methodology that Petitioners now seek to attack.

The D.C. Circuit, then, is the proper venue for such a challenge. This is supported by our circuit's decision in *Texas 2011*. There, Texas argued its challenge to the SIP call implicated a local, rather than national, aspect of the rule. 2011 WL 7140598 at *4. However, our court noted that Texas's "merits argument in its motion to stay the SIP call challenge only national features of the rulemaking" including that the SIP call was procedurally unlawful. *Id.* We stated "[n]one of these issues turn on the particulars of the SIP Call's impact within this Circuit." *Id.* Likewise, here, none of the issues raised by Texas, Louisiana, and Mississippi turn on particulars within this circuit, but instead on EPA determinants of a national scale that should be

considered by the D.C. Circuit. *See also Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299-300 (1st Cir. 1989) (finding EPA regulations to be "nationally applicable" where they applied to any SIP "that ha[d] been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards" and the list of states governed by the regulations changed as SIPs were approved and disapproved by the EPA).

Accordingly, I would find that our venue inquiry ends there because the State Petitioners challenge nationally applicable regulations, and thus any challenges should be considered by the D.C. Circuit.

However, for the same reasons, this case satisfies the § 7601(b)(1) exception for actions that have nationwide scope or effect. The exception involves a two-pronged inquiry, and the majority finds that the EPA fails at prong one. The majority relies on the disapprovals being based "on a number of intensely factual determinations" which "do not have nationwide scope or effect" because they relate to particularities of emissions sources. However, as noted, although there may be factual determinations relevant to each state, the challenged action is the *nationally applied framework* in which the EPA reviewed the SIPs of all states and denied 21 of them.

The majority relies on *Texas 2016*, which also provides support for a finding of a nationwide scope or effect under the instant allegations. Specifically, *Texas 2016* provides that "[a]lthough the SIP process is generally highly fact-bound and particular to the individual state, EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id.* at 421, fn. 24. Moreover, "[a] determination that a national standard satisfies a particular requirement in each state may be a determination that has nationwide scope or effect." *Id.* That is precisely the case here.

To the second prong, in *Texas 2016*, the EPA explicitly did not make a finding that its Final Rule had a nationwide scope or effect, and thus, our court concluded that this venue was proper. Here, however, the EPA *explicitly* chose to make this finding, stating that its justification for the Final Rule is based on a determination of nationwide scope or effect. Final Rule, 88 Fed. Reg. 9,336, 9380-81 (Feb. 13, 2023) ("[T]o the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of 'nationwide scope or effect' within the meaning of CAA section 307(b)(1).").

Finally, it is clear from the briefing that these petitions concern "matters on which national uniformity is desirable" and raise the kinds of issues Congress intended for the D.C. Circuit to decide. *Texas 2011*, 2011 WL 710598, at *4. Petitioners here invite multiple circuits to concurrently review the merits of the same legal interpretation, policy decisions, and analytical methodology that the EPA applied consistently in a single agency action to SIPs throughout the United States. Courts may well reach inconsistent outcomes on matters of interstate pollution, which were clearly meant to be filed and considered together in the D.C. Circuit. This is not just a hypothetical problem—states in other circuits are bringing practically the same challenges, which are currently before the Eighth and Tenth Circuits. If this circuit were to determine that the underlying standard utilized by the EPA was wrong, this would impact the EPA's determinations in other states and would gut the underlying policy of the venue provision: uniformity in standards that have national effect and centralization of SIP review. *See id.* ("Centralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results.").

No. 23-60069

Having determined venue to be improper, I respectfully dissent, not finding it necessary to reach Petitioners' motions to stay.

**Exhibit 2: Memorandum from Joseph Goffman, Principal Deputy Assistant Administrator, Office of Air and Radiation, *Notice of Forthcoming EPA Action to Address Judicial Stay Orders* (June 1, 2023)**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

June 1, 2023

OFFICE OF
AIR AND RADIATION

**MEMORANDUM**

**SUBJECT:**    Notice of Forthcoming EPA Action to Address Judicial Stay Orders

**FROM:**    Joseph Goffman
Principal Deputy Assistant Administrator
Office of Air and Radiation

On February 13, 2023, EPA published a final action fully or partially disapproving state implementation plans (SIPs) submitted by 21 states to address the states' obligations under Clean Air Act section 110(a)(2)(D)(i)(I), commonly referred to as the "good neighbor" provision, with respect to the 2015 national ambient air quality standards (NAAQS) for ozone. *See* "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (February 13, 2023). Following that action, on March 15, 2023, EPA signed a separate final action, the "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," establishing federal implementation plan (FIP) requirements to address the states' good neighbor obligations consistent with EPA's obligation under Clean Air Act section 110(c)(1). A pre-publication version of this rule was made available on EPA's website[1] and the rule will soon publish in the *Federal Register*. The Good Neighbor Plan's requirements are set to take effect 60 days after the date of publication.

In May 2023, the United States Courts of Appeals for the Fifth and Eighth Circuits issued orders staying, pending judicial review, EPA's SIP disapproval action with respect to the SIPs submitted by Arkansas, Louisiana, Missouri, and Texas.[2] The United States Court of Appeals for the Sixth Circuit issued an administrative stay of EPA's SIP disapproval, staying EPA's action with respect to the SIP submitted by Kentucky pending a decision on Kentucky's motion for stay pending judicial review.[3] EPA's authority to establish the Good Neighbor Plan's requirements for sources in Arkansas, Kentucky, Louisiana, Missouri, and Texas stems from the disapproval of the states' SIPs. Accordingly, in recognition of the orders staying the SIP disapproval action as to Arkansas, Kentucky, Louisiana, Missouri, and Texas, EPA will take action in the near future that will ensure the Good Neighbor Plan's requirements issued to implement good neighbor obligations for the 2015 ozone NAAQS as to sources in Arkansas, Kentucky, Louisiana, Missouri and Texas will not take effect while the stays of the SIP disapproval action with respect to those states remain in place. This forthcoming action will become effective by no later than the effective date of the Good Neighbor Plan's requirements for sources in other states.

---

1 *See* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

2 *See* Unpublished Order, *Texas, et al. v. EPA, et al.*, No. 23-60069 (5th Cir. May 1, 2023) (staying SIP disapprovals for Louisiana and Texas), Unpublished Order, *Arkansas, et al. v. EPA, et al.*, No. 23-1320 (8th Cir. May 25, 2023) (staying SIP disapproval for Arkansas), and Unpublished Order, *Missouri v. EPA, et al.*, No. 23-1719 (8th Cir. May 26, 2023) and Unpublished Order, *Union Elec. Co. d/b/a Ameren Missouri v. EPA, et al.*, No. 23-1751 (8th Cir. May 26, 2023) (staying SIP disapproval for Missouri).

3 *See* Unpublished Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023) (administrative stay of SIP disapproval for Kentucky).

**Exhibit 3: State Petitioners' Opposed Motion to Stay & Appendix, Docs. 31-1 & 31-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Mar. 3, 2023)**

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO
CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS
ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE
MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY,
L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA
APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS
ASSOCIATION,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*.

## STATE PETITIONERS' OPPOSED MOTION TO STAY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

BILL DAVIS
Deputy Solicitor General
Bill.Davis@oag.texas.gov

MICHAEL R. ABRAMS
WILLIAM F. COLE
JOSEPH N. MAZZARA
Assistant Solicitors General

Counsel for State of Texas and Texas
Commission on Environmental Quality

# Certificate of Interested Persons

No. 23-60069

State of Texas; Texas Commission on Environmental Quality; Luminant Generation Company, L.L.C.; Coleto Creek Power, L.L.C.; Ennis Power Company, L.L.C.; Hays Energy, L.L.C.; Midlothian Energy, L.L.C.; Oak Grove Management Company, L.L.C.; Wise County Power Company, L.L.C.; Association of Electric Companies of Texas; BCCA Appeal Group; Texas Chemical Council; Texas Oil & Gas Association,

*Petitioners*,

*v.*

United States Environmental Protection Agency; Michael S. Regan, Administrator, United States Environmental Protection Agency,

*Respondents.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, petitioners, as governmental parties, need not furnish a certificate of interested persons.

/s/ Bill Davis
Bill Davis
*Counsel of Record for State of Texas and Texas Commission on Environmental Quality*

i

# TABLE OF CONTENTS

Certificate of Interested Persons ..................................................................i

Table of Contents ..........................................................................................ii

Table of Authorities ....................................................................................iii

Introduction ...................................................................................................1

Background .....................................................................................................2

    I.     Statutory Framework ......................................................................2

         A.    Operation of the Act's cooperative federalism .................. 2

         B.    The Act's "good neighbor" provision .............................. 4

    II.    Procedural History ..........................................................................6

         A.    EPA issues guidance for SIP revisions.............................. 6

         B.    Texas submits its SIP revisions .........................................7

         C.    EPA issues after-the-fact guidance regarding maintenance receptors . 8

         D.    EPA proposes disapproval of Texas's SIP, and TCEQ submits comments .............................................................. 9

         E.    EPA finalizes its disapproval of Texas's SIP revision ......................10

Stay Standard............................................................................................. 11

Argument..................................................................................................... 11

    I.     Petitioners Are Likely to Succeed on the Merits. ...................... 11

         A.    EPA failed to explain its reversal of previous policy regarding identification of maintenance receptors...........................................12

         B.    EPA's disapproval of Texas's SIP renders the Act's cooperative federalism a dead letter. ............................................. 16

    II.    The Remaining Stay Factors Favor Petitioners....................... 18

Conclusion...................................................................................................20

Certificate of Conference ......................................................................... 21

Certificate of Service ................................................................................. 21

Certificate of Compliance ......................................................................... 21

# Table of Authorities

**Page(s)**

**Cases:**

*Alaska Prof'l Hunters Ass'n v. FAA,*
  177 F.3d 1030 (D.C. Cir. 1999) ........................................................ 15

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2003) ....................................................... 3, 16

*Biden v. Texas,*
  10 F.4th 538 (5th Cir. 2021) ........................................................... 15

*Christopher v. SmithKline Beecham Corp.,*
  567 U.S. 142 (2012) ..................................................................... 1, 14

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ................................................................12, 15

*Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer,*
  833 F.3d 480 (5th Cir. 2016) ........................................................... 15

*EPA v. EME Homer City Generation, L.P.,*
  572 U.S. 489 (2014) ..........................................................................5

*ExxonMobil Pipeline Co. v. DOT,*
  867 F.3d 564 (5th Cir. 2017) ........................................................... 14

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ....................................................................... 13

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021) .................................................................... 11

*Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n,*
  790 F.2d 154 (D.C. Cir. 1986) ...........................................................1

*Luminant Generation Co. v. EPA,*
  675 F.3d 917 (5th Cir. 2012) ..............................................2-4, 16, 18

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ....................................................................... 12

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) ...................................................... 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................... 11

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................... 11, 18-19

iii

*Physicians for Soc. Resp. v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) ...................................................... 12-13

*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996) ...................................................................... 13

*Sw. Airlines Co. v. FERC*,
   926 F.3d 851 (D.C. Cir. 2019) ...................................................... 12-13

*Tate Access Floors, Inc. v. Interface Architecture Res., Inc.*,
   279 F.3d 1357 (Fed. Cir. 2002) .................................................... 19

*Tex. Oil & Gas Ass'n v. EPA*,
   161 F.3d 923 (5th Cir. 1998) ...................................................... 11, 18

*Texas v. EPA*,
   690 F.3d 670 (5th Cir. 2012) ...................................................... 4

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................... 3-5, 16, 18-19

*Train v. Nat. Res. Def. Council, Inc.*,
   421 U.S. 60 (1975) ...................................................................... 4

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976) .................................................................... 3

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
   985 F.3d 472 (5th Cir. 2021) .............................................. 12, 16, 18

*Veasey v. Abbott*,
   870 F.3d 387 (5th Cir. 2017) ...................................................... 19

*Wages & White Lion Invs. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................... 12

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) .................................................... 14

**Constitutional Provisions, Statutes, and Rules:**

5 U.S.C. § 706(2)(A) ........................................................................ 11

42 U.S.C.:
   § 7407(a) .............................................................................. 3, 16
   § 7407(d)(1)(A)(i)-(ii) ................................................................ 3
   § 7408(a) .................................................................................. 2
   § 7409(a) .................................................................................. 2
   § 7409(d)(1) ............................................................................ 2, 3
   § 7410(a)(1) ..................................................................... 3-4, 6, 16
   § 7410(a)(2) ............................................................................ 3-4

iv

§ 7410(a)(2)(D)(i)(I) ........................................................................ 1, 5
§ 7410(a)(2)(D)(i)(II) ........................................................................... 5
§ 7410(a)(2)(H) ................................................................................... 3
§ 7410(c)(1) ......................................................................................... 4
§ 7410(k)(1)-(2) ................................................................................. 17
§ 7410(k)(1)(B) ................................................................................... 4
§ 7410(k)(2)-(3) ................................................................................. 4
§ 7410(k)(3) ......................................................................................... 4
§ 7410(k)(5) ....................................................................................... 14
§ 7410(l) .............................................................................................. 4
§ 7501(2) ............................................................................................. 3

40 C.F.R.:
pt. 50 ................................................................................................... 6
§ 52.02(a) ............................................................................................ 4

Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292
  (Oct. 26, 2015) ................................................................................... 6

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone
  Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798
  (Feb. 22, 2022) ...................................................................... 7-10, 17

Fed. Implementation Plan Addressing Regl. Ozone Transport for the
  2015 Ozone Nat'l Ambient Air Quality Standard, 87 Fed. Reg.
  20,036 (Apr. 6, 2022) ................................................................. 5-6, 10

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone
  National Ambient Air Quality Standards, 88 Fed. Reg. 9,336
  (Feb. 13, 2023) ............................................................ 1, 10-11, 14, 17

Fed. R. App. P:
18 ......................................................................................................... 1
18(a)(2)(A)(i) ....................................................................................... 1
18(a)(2)(C) .......................................................................................... 1

## Other Authorities:

Consent Decree, *Sierra Club v. Michael S. Regan*, No. 3:22-cv-1992
  (N.D. Cal. Jan. 24, 2023) ................................................................. 19

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
  Planning and Standards, *Considerations for Identifying Maintenance
  Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate
  Transport State Implementation Plan Submissions for the 2015 Ozone
  National Ambient Air Quality Standards* (Oct. 19, 2018) .......................... 8-10, 14

Memorandum from Peter Tsirigotis, Director, Office of Air Quality
    Planning and Standards, *Information on the Interstate Transport State
    Implementation Plan Submissions for the 2015 Ozone National Ambient
    Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*
    (Mar. 27, 2018) .................................................................................. 6-10, 13-15
TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval*
    (Apr. 25, 2022) ............................................................................................10, 17
TCEQ, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State
    Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air
    Quality Standards (Aug. 2018) ..........................................................................7

A-41

Pursuant to Federal Rule of Appellate Procedure 18, petitioners the State of Texas and the Texas Commission on Environmental Quality ("TCEQ"), move for a stay pending review of the final action of the U.S. Environmental Protection Agency ("EPA") disapproving the State of Texas's State Implementation Plan ("SIP"), part of "Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule"). Seeking a stay from EPA would be impracticable given the imminence of harm and EPA's agreement to finalize a federal implementation plan ("FIP") by March 15, 2023. *See* Fed. R. App. P. 18(a)(2)(A)(i); *infra* Part II. On March 2, 2023, all parties were informed that this motion would be filed. *See* Fed. R. App. P. 18(a)(2)(C). The respondents oppose it. The other petitioners consent.

## Introduction

The Final Rule violates a bedrock principle of administrative law: agencies must "provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (alterations in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.)). In 2018, after years of complex work that tracked—and, in some instances, improved upon—EPA's existing methodologies and guidance, TCEQ submitted a revision of Texas's SIP to demonstrate compliance with the Clean Air Act's "good neighbor" provision, 42 U.S.C. § 7410(a)(2)(D)(i)(I).

EPA should have approved that SIP. Instead, EPA judged it using models and modes of analysis published *after* the SIP revision was due. But by then, Texas could

not redo its SIP, and the new, previously unannounced standards all but guaranteed a disapproval. Nothing in the Act or controlling precedent authorizes such arbitrary and capricious agency action.

The challenged part of the Final Rule should be stayed. Not only are Texas and TCEQ likely to succeed on the merits, but they face irreparable harm in the interim. The Final Rule is the predicate act to EPA's imposition of a FIP that will strain, to potentially devastating effect, Texas's economy and its electrical grid. For those reasons, the public interest and balance of harms tilt in Texas's favor. A stay pending review is therefore warranted.

## Background

## I.   Statutory Framework

The Clean Air Act is an "experiment in cooperative federalism" that "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012). Under this statutory structure, the federal government sets national ambient air quality standards ("NAAQS"), and the States develop and implement SIPs to enforce the NAAQS.

### A.  Operation of the Act's cooperative federalism

The Act first tasks EPA with identifying air pollutants and establishing NAAQS that set maximum allowable concentrations for pollutants that are harmful to public health and welfare. 42 U.S.C. §§ 7408(a), 7409(a). Every five years, EPA must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). An area that meets a NAAQS is

2

called an "attainment" area; an area that does not is a "nonattainment" area. *Id.* § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2).

Although the Act tasks EPA with setting NAAQS, it assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003); *see* 42 U.S.C. § 7407(a). "This division of responsibility between the states and the federal government 'reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government.'" *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (quoting *Luminant*, 675 F.3d at 921). It "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.*

To implement the NAAQS, "states must adopt and administer [SIPs]," *Luminant*, 675 F.3d at 921, which "provide[] for implementation, maintenance, and enforcement" of the NAAQS within their borders, 42 U.S.C. § 7410(a)(1). After EPA sets the NAAQS, States have three years to submit SIPs or SIP revisions specifying how they will meet the NAAQS for certain pollutants. *Id.* § 7407(a); *id.* § 7410(a)(1), (a)(2), (a)(2)(H). In discharging that obligation, States have "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and "'wide discretion in formulating [their SIPs]'" for meeting the NAAQS, *Luminant*, 675 F.3d at 921 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)). Indeed, "'[s]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it

3

deems best suited to its particular situation.'" *Texas*, 829 F.3d at 411 (quoting *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975)).

Consistent with this preference for state implementation and enforcement, the Act "confines EPA's role in implementing air quality standards 'to the ministerial function of reviewing SIPs for consistency with the Act's requirements.'" *Id.* (quoting *Luminant*, 675 F.3d at 921); 42 U.S.C. § 7410(a)(1), (*l*). Consequently, if a SIP meets the statutory requirements, "EPA *must* approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) (emphasis added); *see* 42 U.S.C. § 7410(k)(3) ("the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter" (emphasis added)); 40 C.F.R. § 52.02(a). "Only if the state has not complied with the requirements of the [Act] . . . does EPA assume the role of primary regulator by drafting a [FIP]." *Texas*, 829 F.3d at 412; *see* 42 U.S.C. § 7410(c)(1).

The Act requires EPA to take action on a SIP within 18 months of its submission. Congress directed EPA to determine, within the first six months, whether a SIP is technically and administratively complete. 42 U.S.C. § 7410(k)(1)(B). If EPA does not issue a completeness finding within six months, the SIP is deemed to meet the minimum criteria by operation of law. 42 U.S.C. § 7410(k)(1)(B). Upon its issuance of a completeness finding, EPA has—according to Congress—12 months to approve or deny the SIP. *Id.* § 7410(k)(2)-(3).

## B. The Act's "good neighbor" provision

The Act enumerates several substantive requirements for SIPs. *Id.* § 7410(a)(2). Relevant here is the Act's "good neighbor" provision, which requires "upwind

4

States to reduce emissions to account for pollution exported beyond their borders." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 499 (2014). The text of this provision requires that a SIP "contain adequate provisions" prohibiting emissions that "will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I). The next subsection requires a SIP to prohibit emissions that will "interfere with measures required to be included" in other States' SIPs "to prevent significant deterioration of air quality or to protect visibility." *Id.* § 7410(a)(2)(D)(i)(II); *see Texas*, 829 F.3d at 411 (involving action taken under subsection (a)(2)(D)(i)(II)).

To evaluate whether a SIP satisfies the good-neighbor provision, a four-step process has evolved through EPA's imposition of FIPs. As relevant here, the first step is "[i]dentifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors)." Fed. Implementation Plan Addressing Regl. Ozone Transport for the 2015 Ozone Nat'l Ambient Air Quality Standard, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022) (proposed rule). The process involves gathering historical data from downwind monitors and using modeling to assess future air-quality problems. *Id.* The second step is "determining which upwind states are 'linked' to these identified downwind receptors based on a numerical contribution threshold." *Id.* Under EPA's preferred approach, a State that contributes more than one percent of the NAAQS to a downwind State is "linked" to that State. *Id.* The third step, for any State "linked to downwind air quality problems," is "identifying upwind emissions on a statewide

5

basis that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS, considering cost- and air quality-based factors." *Id.* The fourth step, for any upwind State "found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS in any downwind state," is "implementing the necessary emissions reductions through enforceable measures." *Id.*

## II.  Procedural History

This case concerns EPA's October 2015 revision of the NAAQS for ozone, a pollutant at ground level. Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015); *see also* 40 C.F.R. pt. 50. In 2015, EPA replaced the preexisting ozone NAAQS of 0.075 parts per million (ppm) with a more stringent 0.070 ppm. NAAQS for Ozone, 80 Fed. Reg. at 65,293-65,294. EPA's October 2015 revision of the NAAQS triggered Texas's statutory obligation to revise its SIP within three years, or by October 1, 2018. 42 U.S.C. § 7410(a)(1).

### A.  EPA issues guidance for SIP revisions

In March 2018, seven months before Texas's statutory deadline to revise its SIP, EPA issued a guidance memorandum designed to "assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* at 2 (Mar. 27, 2018) ("2018 Transport Guidance") (App. A).

6

This memorandum provided two forms of guidance for flexible approaches to the transport analysis relevant here. First, to identify maintenance receptors at the first step of the four-step analysis, EPA recommended use of an alternative methodology to assess (a) receptors in areas at risk of exceeding the NAAQS (even if they do not currently violate the NAAQS) using an approach that does not rely on the projection of maximum design values and (b) receptors in clean areas where ozone formation is likely to occur but does not. *Id.* at A-2. Second, to carry out the modeling of future ozone emissions, EPA recommended that States utilize historical data gathered from the years 2009-2013. *Id.* at 6. Despite this guidance, EPA reassured States that they could "supplement the information provided in this memorandum with any additional information that they believe is relevant" and "choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs." *Id.*

## B.  Texas submits its SIP revisions

On August 17, 2018, TCEQ timely submitted revisions to Texas's SIP. *See* Tex. Comm'n on Env't Quality, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air Quality Standards (Aug. 2018) ("Texas SIP") (App. B).

Per EPA's March 2018 guidance, TCEQ "us[ed] a framework similar to EPA's 4-Step framework," 87 Fed. Reg. at 9,824, for assessing interstate pollution related to ozone but included "several key improvements." Texas SIP at 3-1. To determine its contributions to other States' pollution, TCEQ used historical data from the 2010-2014 period. *Id.* at 3-38. Then, to identify maintenance receptors, TCEQ used

7

the *most recent* three-year average design value from its modeling (i.e., the 2012-2014 period), whereas EPA recommended using the maximum of the three-year average design value (i.e., the highest value from the 2009-2011, 2010-2012, and 2011-2013 periods). *Id*. at 3-3, 3-39. TCEQ found that the most recent design value "reflect[ed] the current state of ozone concentrations in [a downwind] area and the impact of any maintenance plans that [we]re in place to prevent local emissions from causing an area to slip back into nonattainment[.]" *Id*. at 3-42.

## C. EPA issues after-the-fact guidance regarding maintenance receptors

On October 19, 2018—nineteen days *after* the statutory deadline for Texas to submit SIP revisions—EPA issued a memo providing updated expectations for what maintenance receptors States should use when determining their contributions to other States' pollution. Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, (Oct. 19, 2018) ("2018 Maintenance Receptor Memo") (App. C).

The 2018 Maintenance Receptor Memo materially changed EPA guidance given in the 2018 Transport Guidance for identifying maintenance receptors. In contrast to EPA's previous suggestion that States identify at-risk maintenance receptors and consistently clean receptors susceptible to ozone formation, the 2018 Maintenance Receptor Memo for the first time "recommended" that States find receptors in areas where ozone has been trending downward since 2011; that States take additional

8

steps when looking at receptors in clean areas beyond those described in the 2018 Transport Guidance; and that States identify receptors where "emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor." *Compare* 2018 Transport Guidance at A-2 *with* 2018 Maintenance Receptor Memo at 4. EPA stated, however, that the guidance contained in that memorandum was "not impos[ing] binding, enforceable requirements on any party" and that "State air agencies retain[ed] the discretion to develop good neighbor SIP revisions that differ[ed] from" the guidance in the 2018 Maintenance Receptor Memo. 2018 Maintenance Receptor Memo at 1. Nothing in the guidance otherwise indicated that compliance with EPA's new recommendations would be dispositive of a SIP submission.

### D. EPA proposes disapproval of Texas's SIP, and TCEQ submits comments

In February 2022, two years after EPA was statutorily required to act, EPA proposed a combined disapproval of Texas's, Oklahoma's, Louisiana's, and Arkansas's SIPs. Air Plan Disapproval; Arkansas, Louisiana, Oklahoma & Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) (proposed rule). Relevant here, EPA took issue with TCEQ's methodology for identifying maintenance receptors, concluding that its methodology failed to account for "meteorological variability in identifying those areas that" may currently be meeting the NAAQS but may struggle to maintain the NAAQS in the future. *Id.* at 9,826-9,829. EPA also criticized TCEQ's modeling methodology because it believed that TCEQ's use of a historical data set

from 2010-2014 "underestimate[d] future ozone levels" as compared to an "updated" set of data used by EPA from the years 2014-2018. *Id.* at 9,829-9,830. Even though EPA had not finally acted on Texas's SIP revisions, a mere month-and-a-half after proposing to deny the SIP, EPA published a proposed FIP for Texas. 87 Fed. Reg. at 20,036.

In response to the proposed SIP disapproval, TCEQ submitted comments identifying several problems with EPA's analysis. Relevant here, TCEQ pointed out that it was arbitrary and capricious for EPA to deny the SIP in part by relying on guidance issued *after* Texas submitted its SIP. *See* TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval* at 5-6 (Apr. 25, 2022) ("TCEQ Comments") (App. D). TCEQ also argued that it was arbitrary and capricious for EPA to deny the SIP in part by using modeling data from 2014-2018 that was not available to TCEQ until long after Texas's SIP revision deadline had passed. *Id.* at 6.

## E.  EPA finalizes its disapproval of Texas's SIP revision

On February 13, 2023, four years after its statutory deadline to act, EPA issued a final disapproval of Texas's SIP. 88 Fed. Reg. at 9,336. Contrary to its statements in the 2018 Maintenance Receptor Memo, EPA expressly disapproved Texas's SIP in part because Texas's identification of maintenance receptors "did not meet the terms of the . . . October 2018 memoranda." *Id.* at 9,340, 9,364. Similarly contradicting its 2018 Transport Guidance, EPA said that it was disapproving Texas's SIP because Texas used a model that relied on five years of data from 2010-2014, which

10

underestimated future ozone levels. *Id.* at 9,359-60. In attempting to justify this decision, EPA did not point to the statute or any regulation. It instead said that it was just "following the science." *Id.* at 9,364.

## Stay Standard

Courts consider four factors when determining whether to grant a stay: (1) likelihood of success on the merits; (2) the prospect of irreparable injury; (3) the possibility of harm to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). As explained below, each factor favors a stay here.

## Argument

### I.   Petitioners Are Likely to Succeed on the Merits.

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Agency action qualifies as arbitrary and capricious "'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Put simply, [the Court]

must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)). This review is "not toothless," and "after [*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020)], it has serious bite." *Wages & White Lion Invs. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).

EPA's final disapproval of Texas's SIP violates these foundational principles of administrative law in two ways. First, it fails to explain EPA's after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors. And second, it disregards the Act's cooperative federalism by denying the SIP based on emissions-modeling data available only *after* Texas was statutorily required to submit its SIP revisions.

## A. EPA failed to explain its reversal of previous policy regarding identification of maintenance receptors.

"It is axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020). "This foundational precept of administrative law is especially important where, as here, an agency changes course." *Id.* Consequently, "[r]easoned decision-making requires that when departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" *Id.* (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019)). In other words, when

12

an agency reverses "prior policy," it must provide a "detailed justification" for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) (plurality op.).

That is particularly true where the agency's new policy depends upon "factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515. Indeed, "[s]udden and unexplained change, or change that does not take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (cleaned up). But regardless of how "the agency justifies its new position, what it may not do is 'gloss[] over or swerve[] from prior precedents without discussion.'" *Physicians for Soc. Resp.*, 956 F.3d at 645 (quoting *Sw. Airlines*, 926 F.3d at 856).

EPA's disapproval of Texas's SIP revisions violates those principles. It is premised in part on the agency's rejection of a method for identifying maintenance receptors that EPA endorsed before Texas's submission of its SIP revisions, then changed *after* Texas submitted its SIP revisions. In its March 2018 guidance document, EPA instructed States to identify maintenance receptors by focusing on receptors found in maintenance areas that were at risk of nonattainment and receptors found in clean areas where ozone formation was likely to occur but did not. 2018 Transport Guidance at A-2. But in its October 2018 memorandum—issued *after* the deadline for submitting Texas's SIP revisions—EPA changed course, instructing States to use receptors located in areas where ozone has been trending downward since 2011 and receptors where "emissions are expected to continue to decline in the upwind and

13

downwind states out to the attainment date of the receptor." 2018 Maintenance Receptor Memo at 4. Critically, although EPA insisted in its October 2018 guidance that its instructions were not binding or enforceable, it relied on the standards articulated in that memorandum as a basis for denying Texas's SIP. *See* 88 Fed. Reg. at 9,364.

This is the definition of an "unfair surprise" that penalizes a party for "good-faith reliance" on an agency's prior positions. *Christopher*, 567 U.S. at 156-57; *see ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 580 (5th Cir. 2017). EPA offers no meaningful justification for its sudden and unexpected policy reversal beyond vague assertions that it was "following the science" and that Texas should have known that out-of-circuit cases "called into question" the 2018 Transport Guidance on which Texas relied. 88 Fed. Reg. at 9,364. Neither of those assertions has merit.

**1.**   "Following the science" is an empty phrase. It explains nothing about why EPA's tardy guidance addressing maintenance-receptor selection—guidance that EPA characterized as "[non]binding" and "[un]enforceable"—suddenly became binding, enforceable, and indeed dispositive four-and-a-half years after it was issued. The two cases that EPA claims "called into question" the 2018 Transport Guidance, and thus the science upon which Texas relied, are inapposite. If *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), and *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) (per curiam), had somehow changed the science and triggered EPA policy reversals affecting SIP submissions, EPA should have issued a SIP call under 42 U.S.C. § 7410(k)(5). EPA could have explained its policy reversal and requested revisions from States for their Transport SIPs. Had it done so, there would be no "surprise,"

14

and Texas would have "know[n] the rules by which the game [would] be played"— knowledge Texas was entitled to but did not receive. *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015).

Instead, EPA waited almost five years to inform Texas that its reliance on EPA's 2018 Transport Guidance was misplaced because the science had supposedly changed three years prior due to D.C. Circuit opinions in unrelated cases that, unsurprisingly, did not purport to announce any scientific discoveries. An agency must "give the person of ordinary intelligence a reasonable opportunity to know" what is required or prohibited, "so that he may act accordingly." *Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 488 (5th Cir. 2016). EPA failed to do that here.

**2.** Not only did EPA fail to provide a reasoned explanation for its policy reversal, it also failed to account for Texas's reliance interests. *See, e.g.*, *Regents*, 140 S. Ct. at 1913. EPA "was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. But EPA did not—and indicated no awareness that its policies may have "engendered serious reliance interests that must be taken into account." *Id.* at 1913. Failing to "adequately assess reliance interests," like those of Texas, made it "impossible" for EPA "to properly weigh the relevant interests against competing policy concerns while considering alternatives," as the APA requires. *Biden v. Texas*, 10 F.4th 538, 555 (5th Cir. 2021) (per curiam).

15

## B. EPA's disapproval of Texas's SIP renders the Act's cooperative federalism a dead letter.

The Act's cooperative federalism assigns the States "primary responsibility for ensuring that the ambient air meets the NAAQS for the identified pollutants." *BCCA Appeal Grp.*, 355 F.3d at 822; *see* 42 U.S.C. § 7407(a). Indeed, the Act confers "broad authority [on the States] to determine the methods and particular control strategies they will use to achieve the statutory requirements," *BCCA Appeal Grp.*, 355 F.3d at 822, and "'wide discretion in formulating [their] plan[s]'" for meeting the NAAQS, *Luminant*, 675 F.3d at 921. As noted, this division of responsibility "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government" and "indicates a congressional preference that states, not EPA, drive the regulatory process," *Texas*, 829 F.3d at 411.

EPA's disapproval of Texas's SIP revisions disregards that statutory structure. For that reason, it "fails to account for 'relevant factors' or evinces a 'clear error of judgment.'" *Univ. of Tex.*, 985 F.3d at 475. Indeed, EPA's disapproval of Texas's SIP leverages the agency's own disregard of its statutory deadline for acting on a SIP submission to disapprove the SIP based on data that was not available to Texas at the time the State was statutorily required to—and did—submit its revisions.

As described above, EPA's October 1, 2015, revision of the NAAQS triggered Texas's three-year deadline to revise its SIP, 42 U.S.C. § 7410(a)(1), and Texas timely submitted its revised SIP on August 17, 2018, *see* Texas SIP. Relevant here, TCEQ's SIP revisions reflected an assessment of the impact Texas's ozone emissions had on downwind States using modeling data from a five-year period from

2010-2014, Texas SIP at 3-3 to 3-6—an approach similar to what EPA recommended mere months before Texas's submission deadline. *See* 2018 Transport Guidance at 3-6. Following that approach, TCEQ concluded that "Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors." Texas SIP at 3-75.

Despite a maximum of 18 months to approve or deny the SIP, 42 U.S.C. § 7410(k)(1)-(2), EPA did not take action on Texas's timely SIP revisions until three years *after* the statutory deadline had passed. 87 Fed. Reg. at 9,798. By that time, EPA had accumulated a new data set on which to base its modeling: ozone emissions from the years 2014-2018. *Id.* at 9,828. And it used the information derived from that new data set, which included data from the same year that Texas's SIP revision was statutorily due, as a basis upon which to disapprove Texas's SIP. *Id.*

Commenters, including TCEQ, raised the fundamental impropriety of using data not available at the relevant time—and available to EPA only because of its characteristic failure to meet its statutory deadlines by a long shot—as a basis upon which to reject Texas's SIP. *See* TCEQ Comments at 6; 88 Fed. Reg. 9,366 (EPA's concession that this new data set was published in "November of 2020," seven months *after* EPA was statutorily required to approve or deny Texas's SIP). In response, EPA stated in the Final Rule that it should not be "prohibited from taking rulemaking action using the best information available to it at the time it takes such action." 88 Fed. Reg. at 9,366. And it concluded that "[n]othing in the [Act] suggests that the Agency must deviate from that general principle when acting on SIP submissions." *Id.*

If EPA's response were correct, the Act's cooperative-federalism framework would become little more than a suggestion. EPA could ignore its statutorily assigned deadlines with impunity, assemble new data after the expiration of a State's statutory deadline to act, reject a SIP revision based on inconsistency with the new data, and then impose a FIP that ensures a federal takeover of a State's economy.

That is not how Congress structured the Act. "EPA may not use its own delay as an excuse for imposing burdens on Texas that" the Act "does not permit." *Texas*, 829 F.3d at 430. And nothing in the Act authorizes EPA to second-guess TCEQ's technical analysis based on data that became available *after* Texas's statutory deadline to act. EPA's approach would invert the Act's structure by constricting the States' "wide discretion in formulating [their SIPs]" and expanding EPA's role from a "ministerial function of [timely] reviewing SIPs for consistency with the Act's requirements" to a freewheeling power to override state discretion on EPA's own preferred schedule, rather than Congress's. *Luminant*, 675 F.3d at 921. EPA's "fail[ure] to account for" these "'relevant factors,'" *Univ. of Tex.*, 985 F.3d at 475, and its "reli[ance] on factors which Congress has not intended it to consider," *Tex. Oil & Gas Ass'n*, 161 F.3d at 933, to substitute its judgment for Texas's was arbitrary and capricious.

## II. The Remaining Stay Factors Favor Petitioners.

Petitioners will be irreparably injured absent a stay. *See Nken*, 556 U.S. at 434. As explained above, allowing the SIP to take effect "would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas*, 829 F.3d at 433. Moreover, a SIP disapproval is the necessary condition for EPA's imposition of a

FIP—which EPA has legally bound itself to finalize in less than two weeks. *See* Consent Decree, *Sierra Club v. Michael S. Regan*, No. 3:22-cv-1992 (N.D. Cal. Jan. 24, 2023). Imposition of the FIP will lead to an onerous regulatory regime likely to result in a reduction of at least 10,800 MW of capacity, the disconnecting of customers from the electrical grid, and a strain on existing sources by a decreased ability to conduct planned periodic outages. Declaration of Dwayne W. "Woody" Rickerson (App. E). And it is black-letter law that "plant closures, the threat of grid instability and potential brownouts alone constitute irreparable injury to Texans." *Texas*, 829 F.3d at 434.

In contrast, EPA will suffer no harm if the SIP is stayed pending review. Indeed, if time really were of the essence, EPA would not have taken almost five years to disapprove Texas's SIP and impose a FIP. *See Tate Access Floors, Inc. v. Interface Architecture Res., Inc.*, 279 F.3d 1357, 1364 (Fed. Cir. 2002) (identifying the absence of a threat to public health as a significant factor favoring a preliminary injunction). Moreover, as Texas's SIP demonstrated, emissions from Texas do not significantly contribute to nonattainment in downwind States or interfere with maintenance of the 2015 ozone NAAQS. Texas SIP at 3-75.

Finally, the public interest also favors a stay. *See Nken*, 556 U.S. at 434. When, as here, a State seeks a stay pending appeal, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Moreover, preserving a functioning Texas power grid and the State's ability to deliver "ready access to affordable electricity," *Texas*, 829 F.3d at 435, outweighs any interest in enforcement of the disapproval of Texas's SIP and the imposition of a FIP.

<div style="text-align:center">19</div>

## Conclusion

The Court should stay, pending review, the part of the Final Rule that disapproves Texas's SIP.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Judd E. Stone II
Solicitor General

Brent Webster
First Assistant Attorney General

/s/ Bill Davis
Bill Davis
Deputy Solicitor General
Bill.Davis@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Michael R. Abrams
William F. Cole
Joseph N. Mazzara
Assistant Solicitors General

Counsel for State of Texas and
Texas Commission on
Environmental Quality

20

## Certificate of Conference

On March 2 and 3, 2023, counsel for the State of Texas and TCEQ conferred with counsel for all other parties. The respondents oppose the relief sought in this motion. The other petitioners consent to it.

/s/ Bill Davis
Bill Davis

## Certificate of Service

On March 3, 2023, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Bill Davis
Bill Davis

## Certificate of Compliance

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,150 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Bill Davis
Bill Davis

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO
CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS
ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE
MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY,
L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA
APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS
ASSOCIATION,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## APPENDIX

### Table of Contents

Tab

1. EPA, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) ("2018 Transport Guidance") ......................... A

2. Tex. Comm'n on Env't Quality, Fed. Clean Air Act Sections 110(A)(1) and (2) Transport State Implementation Plan Revision for the 2015 Ozone Nat. Ambient Air Quality Standards (Aug. 2018) ("Texas SIP") ...................................................... B

3. EPA, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, (Oct 18, 2018) ("2018 Maintenance Receptor Memo") ........................................................................... C

4. TCEQ, *Comments on the U.S. EPA's Air Plan Disapproval* 5-6 (Apr. 25, 2022) ("TCEQ Comments") ............................................................................... D

5. Declaration of Dwayne W. "Woody" Rickerson ("ERCOT Decl.") ................. E

**Tab A:**
**EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("2018 Transport Guidance")**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

MAR 27 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:** Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)

**FROM:** Peter Tsirigotis
Director

**TO:** Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide information to states and the Environmental Protection Agency Regional offices as they develop or review state implementation plans (SIPs) that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor" provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS). Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year 2023, including newly available contribution modeling results, and a discussion of elements previously used to address interstate transport. In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The information in this memorandum provides an update to the contribution modeling analyses provided in EPA's January 2017 Notice of Data Availability (NODA) of ozone transport modeling data for the 2015 ozone NAAQS and builds upon information provided in the October 2017 interstate transport memorandum.[1] The October 2017 memorandum provided projected ozone design values for 2023 based on EPA's updated nationwide ozone modeling with the primary goal of assisting states in completing good neighbor transport actions for the 2008 ozone NAAQS.

---

[1] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017). This memorandum also supplements the information provided in the memorandum, *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. Memorandum from Stephen D. Page, Director, U.S. EPA Office of Air Quality Planning and Standards, to Regional Air Division Directors, Regions 1–10, October 27, 2017. Available at *https://www.epa.gov/sites/production/files/2017-10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf.* (The October 27, 2017, memorandum includes links to all supporting documentation, including modeling and emissions technical support documents.)

Internet Address (URL) • http://www.epa.gov
Recycled/Recyclable • Printed with Vegetable Oil Based Inks on Recycled Paper (Minimum 25% Postconsumer)

EPA's goal in providing this information is to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.

### The Good Neighbor Provision

Under CAA sections 110(a)(l) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance and enforcement of each primary and secondary NAAQS. Section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP." Section 110(a)(2) identifies specific elements that each plan submission must meet. Conceptually, an infrastructure SIP provides assurance that a state's SIP contains the necessary structural requirements to implement the new or revised NAAQS, whether by demonstrating that the state's SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the plan provisions to meet the new standards.

In particular, CAA section 110(a)(2)(D)(i)(I) requires each state to submit to EPA new or revised SIPs that "contain adequate provisions ... prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." EPA often refers to section 110(a)(2)(D)(i)(I) as the good neighbor provision and to SIP revisions addressing this requirement as good neighbor SIPs.

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS, lowering the level of both the primary and secondary standards to 70 parts per billion (ppb).[2] Pursuant to CAA section 110(a), good neighbor SIPs are, therefore, due by October 1, 2018. As noted earlier, EPA intends that the information conveyed through this memorandum should assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

### Framework to Address the Good Neighbor Provision

Through the development and implementation of several previous rulemakings, including most recently the Cross-State Air Pollution Rule (CSAPR) Update,[3] EPA, working in partnership with states, established the following four-step framework to address the requirements of the good neighbor provision for ozone and fine particulate matter ($PM_{2.5}$) NAAQS: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those downwind air

---

[2] National Ambient Air Quality Standards for Ozone Final Rule, 80 FR 65292 (October 26, 2015).
[3] *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone (also known as the $NO_X$ SIP Call), 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule, 70 FR 25162 (May 12, 2005); CSAPR Final Rule, 76 FR 48208 (August 8, 2011); CSAPR Update for the 2008 Ozone NAAQS (CSAPR Update) Final Rule, 81 FR 74504 (October 26, 2016).

2

**3**

quality problems to warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in applying this framework or other approaches consistent with the CAA, various analytical approaches may be used to assess each step. EPA has undertaken several previous regional rulemakings applying this framework, and its analytical approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application.

This memo presents information regarding EPA's latest analysis for purposes of assisting states in developing SIPs for the 2015 ozone NAAQS, and, in doing so, generally follows approaches that EPA has taken in its regional rulemaking actions addressing prior ozone NAAQS. EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. In various discussions, states and other stakeholders have suggested specific approaches that may warrant further consideration, and have indicated that they may be exploring other approaches as well. Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Such potential flexibilities could apply to modeling conducted by states or to states' use of EPA's updated modeling presented here. Attachment A provides a preliminary list of potential flexibilities that may warrant further discussion. EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

## Air Quality Modeling Projection of 2023 Ozone Design Values

As noted previously and as described in more detail in both the 2017 NODA and the October 2017 memorandum, EPA uses modeling to identify potential downwind air quality problems. A first step in the modeling process is selecting a future analytic year that considers both the relevant attainment dates of downwind nonattainment areas impacted by interstate transport[4] and the timeframes that may be required for implementing further emissions reductions as expeditiously as practicable.[5] For the 2015 ozone NAAQS, EPA selected 2023 as the analytic year in our modeling analyses primarily because it aligns with the anticipated attainment year for Moderate ozone nonattainment areas.[6]

---

[4] *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that compliance timeframes for necessary emission reductions must consider downwind attainment deadlines).

[5] *See* October 2017 memorandum, pp. 4-6 (discussion of timing of controls).

[6] On November 16, 2017 (82 FR 54232), EPA established initial air quality designations for most areas in the United States. On December 22, 2017 (83 FR 651), EPA responded to state and tribal recommendations by indicating the anticipated area designations for the remaining portions of the U.S. In addition, EPA proposed the maximum attainment dates for nonattainment areas in each classification, which for Moderate ozone nonattainment is 6 years (81 FR 81276, November 17, 2016). Based on the expected timing for final designations, 6 years from the likely effective date for designations would be summer 2024. Therefore, the 2023 ozone season would be the last full ozone season before the 2024 attainment date.

3

4

As noted in the aforementioned October 2017 memorandum, EPA then used the Comprehensive Air Quality Model with Extensions (CAMx v6.40)[7] to model emissions in 2011 and 2023, based on updates provided to EPA from states and other stakeholders.[8] EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide. In projecting these future year design values, EPA applied its own modeling guidance,[9] which recommends using model predictions from the "3 x 3" array of grid cells surrounding the location of the monitoring site.[10] In light of comments on the January 2017 NODA and other analyses, EPA also projected 2023 design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. Briefly, in this alternative approach, EPA incorporated the flexibility of eliminating from the design value calculations those modeling data in grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation).[11] For each individual monitoring site, the base period 2009-2013 average and maximum design values, 2023 projected average and maximum design values based on both the "3 x 3" approach and the alternative approach affecting coastal sites, and 2014-2016 measured design values are provided in an attachment to the October 27 memorandum. The same information is available in Excel format at *https://www.epa.gov/airmarkets/october-2017-memo-and-information-interstate-transport-sips-2008-ozone-naaqs*.

In the CSAPR Update rulemaking process, EPA considered a combination of monitoring data and modeling projections to identify receptor sites that are projected to have problems attaining or maintaining the NAAQS.[12] Specifically, EPA identified nonattainment receptors as those monitoring sites with current measured values exceeding the NAAQS that also have projected (*i.e.*, in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. This included sites with current measured values below the NAAQS with projected average and maximum design values exceeding the NAAQS, and monitoring sites with projected average design values below the NAAQS but with projected maximum design values exceeding the NAAQS. The projected 2023 ozone design values and 2014-2016 measured design values for monitors in the United States have not changed since they were first presented in the October 2017 memorandum.

---

[7] CAMx v6.40 was the most recent public release version of CAMx at the time EPA updated its modeling in fall 2017. ("Comprehensive Air Quality Model with Extension version 6.40 User's Guide" Ramboll Environ, December 2016, *http://www.camx.com/*.)

[8] For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that we used for the NODA modeling, except that the photolysis rates files were updated to be consistent with CAMx v6.40. The NODA Air Quality Modeling Technical Support Document describing the modeling platform is available at *https://www.epa.gov/airmarkets/notice-data-availability-preliminary-interstate-ozone-transport-modeling-data-2015-ozone*.

[9] *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

[10] EPA's modeling uses 12 kilometer$^2$ grid cells.

[11] A model grid cell is identified as a "water" cell if more than 50 percent of the grid cell is water based on the 2006 National Land Cover Database. Grid cells that meet this criterion are treated as entirely over water in the Weather Research Forecast (WRF) modeling used to develop the 2011 meteorology for EPA's air quality modeling.

[12] *See* 81 FR 74530-74532 (October 26, 2016).

In this memorandum, EPA is identifying 2023 potential nonattainment and maintenance receptors with respect to the 2015 NAAQS, following its approach taken for previous NAAQS. This information is based on applying the CSAPR method for identifying potential nonattainment and maintenance receptors, and presents the design values in two ways: first, following the "3 x 3" approach to evaluating all sites, and second, following the modified approach for coastal monitoring sites in which "overwater" modeling data were not included in the calculation of future year design values. After incorporating these approaches, the modeling results suggest, based on the approach used for previous NAAQS, 11 monitoring sites outside of California as potential nonattainment receptors and 14 monitoring sites outside of California as potential maintenance receptors. *See* Attachment B for this receptor information.

## Air Quality Modeling of 2023 Contributions

After identifying potential downwind air quality problems by projecting base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide, EPA next performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique[13] to provide information regarding the expected contribution of 2023 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In the source apportionment model run, EPA tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (EPA combined emissions from all anthropogenic sectors in a given state);
- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);
- Initial and Boundary Concentrations – concentrations transported into the modeling domain from the lateral boundaries;
- Tribal Lands – the emissions from those tribal lands for which EPA has point source inventory data in the 2011 NEI (EPA did not model the contributions from individual tribes);
- Canada and Mexico – anthropogenic emissions from sources in those portions of Canada and Mexico included in the modeling domain (EPA did not separately model contributions from Canada or Mexico);
- Fires – combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms (*i.e.*, not by state).

EPA performed the CAMx source apportionment model simulation for the period May 1 through September 30 using the 2023 future base case emissions and 2011 meteorology for this

---

[13] As part of this technique, ozone formed from reactions between biogenic and anthropogenic VOC and $NO_X$ are assigned to the anthropogenic emissions.

5

time period.[14] EPA processed hourly contributions[15] from each tag to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2023 model simulation. This step was performed for those model grid cells containing monitoring sites to obtain 8-hour average contributions for each day at the location of each site. EPA then processed the model-predicted contributions on each day at each monitoring site location to identify the contributions on the subset of days in the 2023 modeling with the top 10 model-predicted maximum daily 8-hour average concentrations. The daily 8-hour average contributions on the top 10 concentration days in 2023 were applied in a relative sense to quantify the contributions to the 2023 average design value at each site.

In the CSAPR and CSAPR Update modeling efforts, EPA had used a slightly different approach by basing the average future year contribution on future year modeled values that exceeded the NAAQS or the top 5 days, whichever was greater. While technically sound, EPA's previous approach resulted in different contributions for an individual linkage depending on the level of the NAAQS. For the modeling effort described in this memorandum, EPA considered comments on the January 2017 NODA and developed and incorporated the flexibility of calculating the contribution metric using contributions on the top 10 future year days. As some commenters have indicated, this approach makes the contribution metric values more consistent across monitoring sites and more robust in terms of being independent of the level of the NAAQS. The contributions from each tag to each monitoring site identified as a potential nonattainment or maintenance receptor in 2023 are provided in Attachment C.[16]

**Conclusion**

States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis. EPA encourages collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and implementing a regionally consistent approach. We recommend that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs that address the good neighbor provision for the 2015 ozone NAAQS.

Finally, as indicated previously in this memorandum, in addition to the flexibilities already incorporated into EPA's modeling effort (*i.e.*, considering the removal of modeled values in "over water" grid cells and EPA's modified approach for calculating the contribution metric), EPA is

[14] *See* the October 2017 memorandum for a description of these model inputs.
[15] Ozone contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.
[16] Given stakeholder input on the 2017 NODA and other analyses, EPA elected to represent the contribution information in this memorandum using the alternative approach for projecting design values for sites in coastal areas.

6

A-71    **7**

evaluating whether states may have additional flexibilities as they work to prepare and submit approvable good neighbor SIPs for the 2015 ozone NAAQS (*see* Attachment A). EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Attachments

A. Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan
B. Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling
C. Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

7

## Attachment A

## Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan

The Environmental Protection Agency believes states may be able to consider certain approaches as they develop good neighbor state implementation plans (SIPs) addressing the 2015 ozone National Ambient Air Quality Standards (NAAQS). To that end, EPA has reviewed comments provided in various forums, including comments on EPA's January 2017 Notice of Data Availability (NODA) regarding ozone transport modeling data for the 2015 ozone NAAQS, and seeks feedback from interested stakeholders on the following concepts. This list is organized in the familiar four-step transport framework discussed on pages 2-3 of the memorandum above, but EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment is to identify potential flexibilities to inform SIP development and seek feedback on these concepts. EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

EPA has identified several guiding principles to consider when evaluating the appropriateness of the concepts introduced in this attachment, including:

- Supporting states' position as "first actors" in developing SIPs that address section 110(a)(2)(D) of the CAA;
- Consistency with respect to EPA's SIP actions is legally required by the statute and regulations (*see* CAA § 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated;
- Compliance with statutory requirements and legal precedent from court decisions interpreting the CAA requirements;
- Encouraging collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and applying a regionally consistent approach to identify and implement good neighbor obligations; and
- The potential value of considering different modeling tools or analyses in addition to EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem. The use of results from each alternative technique should be weighed in accordance with the scientific foundation, construct and limitations of the individual techniques.

EPA intends to reflect on feedback received on these concepts and communicate closely with air agencies as they prepare and submit SIPs to address the good neighbor provisions for the 2015 ozone NAAQS.

**Analytics**

- Consideration of appropriate alternate base years to those used in EPA's most recent modeling (*e.g.*, appropriate alternative base years should be selected consistent with EPA's air quality modeling guidance suggesting that years with meteorology conducive to ozone formation are appropriate).
- Consideration of an alternate future analytic year. EPA has identified 2023 as an appropriate analytic year to consider when evaluating transport obligations for the 2015 ozone NAAQS; however, another year may also be appropriate.
- Use of alternative power sector modeling consistent with EPA's emission inventory guidance.
- Consideration of state-specific information in identifying emissions sources [*e.g.*, electric generating units (EGUs) and non-EGUs] and controls (*e.g.*, combustion/process controls, post-combustion controls) that are appropriate to evaluate.

**Step 1 – Identify downwind air quality problems**

- Identification of maintenance receptors.
  - Evaluate alternative methodologies to give independent meaning to the term "interfere with maintenance" under CAA section 110(a)(2)(D)(i)(I).
  - Identify maintenance receptors that are at risk of exceeding the NAAQS (even if they do not currently violate the standard) using an alternative approach that does not rely on the projection of maximum design values.
  - Identify maintenance receptors where current, presumably "clean," measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future.
- Consideration of downwind air quality context.
  - Consider the role of designations issued in FY 2018 based on approved air quality monitors.
  - Assess current and projected local emissions reductions and whether downwind areas have considered and/or used available mechanisms for regulatory relief.
- Consideration of model performance.
  - Consider removal of certain data from modeling analysis for the purposes of projecting design values and calculating the contribution metric where data removal is based on model performance and technical analyses support the exclusion.

**Step 2 – Identify upwind states that contribute to those downwind air quality problems to warrant further review and analysis**

- Considerations related to determining contributions.
  - EPA has used the Anthropogenic Precursor Culpability Analysis (APCA) approach for the purpose of quantifying contribution to downwind receptors. We have received questions regarding the use of other modeling approaches (*e.g.*, Ozone Source Apportionment Technology, Decoupled Direct Method, and zero-out brute force sensitivity runs) to help quantify ozone impacts from upwind states.
- Considerations related to evaluating contributions (contributions contained in Attachment C are not based upon a particular significance threshold).
  - Establishing a contribution threshold based on variability in ozone design values that leverage some of the analytics and statistical data created to support the development of the Significant Impact Level for ozone.

      &minus;  Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem.

      &minus;  An evaluation of "collective contribution" in the receptor region to determine the extent to which a receptor is "transport influenced." The results of this analysis could be applied before assessing whether an individual state is linked to a downwind receptor (*i.e.*, above the contribution threshold).

**Step 3 – Identifying air quality, cost, and emission reduction factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any**

- Consideration of international emissions, in a manner consistent with EPA's Ozone Cooperative Compliance Task Force efforts to fully understand the role of background ozone levels and appropriately account for international transport.[17]
    - Develop consensus on evaluation of the magnitude of international ozone contributions relative to domestic, anthropogenic ozone contributions for receptors identified in step 1. As contained in Attachment C, EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.
    - Consider whether the air quality, cost, or emission reduction factors should be weighted differently in areas where international contributions are relatively high.
- For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
    - Consider control stringency levels derived through "uniform-cost" analysis of $NO_X$ reductions.
    - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.
- Considerations for states linked to maintenance receptors.
    - Consider whether the remedy for upwind states linked to maintenance receptors could be less stringent than for those linked to nonattainment receptors.
    - For example, consider whether upwind states could satisfy linkage(s) to maintenance receptors based on recent historic or base case emissions levels.

**Step 4 – Adopt permanent and enforceable measures needed to achieve emissions reductions (translating the control levels identified in Step 3 into enforceable emissions limits)**

- EPA welcomes concepts from stakeholders regarding Step 4, including potential EPA actions that could serve as a model as well as the relationship to previous transport rules.

---

[17] See *Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783* (October 25, 2017) and *Report to Congress on Administrative Options to Enable States to Enter into Cooperative Agreements to Provide Regulatory Relief for Implementing Ozone Standards* (August 14, 2017).

## Attachment B

## Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling

This attachment contains projected ozone design values at those individual monitoring sites that are projected to be potential nonattainment or maintenance receptors based on the Environmental Protection Agency's updated transport modeling for 2023. The scenario name for the updated modeling is "2023en." The data are in units of parts per billion (ppb).

The following data are provided in the table below:

1. Base period 2009 – 2013 average and maximum design values based on 2009 – 2013 measured data.

2. Projected 2023 average and maximum design values based on the "3 x 3" approach and a modified "3 x 3" approach in which model predictions in grid cells that are predominately water and that do not contain monitors are excluded from the projection calculations ("No Water"). Note that the modified approach only affects the projection of design values for monitoring sites in or near coastal areas.

3. 2016 ozone design values based on 2014 – 2016 measured data (N/A indicates that a 2016 design value is not available). The following Web site has additional information on the 2016 design values: *https://www.epa.gov/air-trends/air-quality-design-values#report*.

Note: A value of 70.9 ppb (or less) is considered to be in attainment of the 2015 ozone NAAQS, and a value of 71.0 ppb (or higher) is considered to be in violation of the 2015 ozone NAAQS.

Note also: Site 550790085 in Milwaukee Co., WI would be a nonattainment receptor using projected design values based on the "No Water" cell approach, but would not be a receptor with the "3 x 3" approach. Conversely, site 360850067 in Richmond Co., NY would be a nonattainment receptor using the "3 x 3" approach, but would not be a receptor with the "No Water" cell approach.

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 40130019 | AZ | Maricopa | 76.7 | 79 | 69.3 | 71.4 | 69.3 | 71.4 | 73 |
| 40131004 | AZ | Maricopa | 79.7 | 81 | 69.8 | 71.0 | 69.8 | 71.0 | 75 |
| 60190007 | CA | Fresno | 94.7 | 95 | 79.2 | 79.4 | 79.2 | 79.4 | 86 |
| 60190011 | CA | Fresno | 93.0 | 96 | 78.6 | 81.2 | 78.6 | 81.2 | 89 |
| 60190242 | CA | Fresno | 91.7 | 95 | 79.4 | 82.2 | 79.4 | 82.2 | 86 |
| 60194001 | CA | Fresno | 90.7 | 92 | 73.3 | 74.4 | 73.3 | 74.4 | 91 |
| 60195001 | CA | Fresno | 97.0 | 99 | 79.6 | 81.2 | 79.6 | 81.2 | 94 |
| 60250005 | CA | Imperial | 74.7 | 76 | 73.3 | 74.6 | 73.3 | 74.6 | 76 |
| 60251003 | CA | Imperial | 81.0 | 82 | 79.0 | 80.0 | 79.0 | 80.0 | 76 |
| 60290007 | CA | Kern | 91.7 | 96 | 77.7 | 81.3 | 77.7 | 81.3 | 87 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 60290008 | CA | Kern | 86.3 | 88 | 71.3 | 72.8 | 71.3 | 72.8 | 81 |
| 60290014 | CA | Kern | 87.7 | 89 | 74.1 | 75.2 | 74.1 | 75.2 | 84 |
| 60290232 | CA | Kern | 87.3 | 89 | 73.7 | 75.2 | 73.7 | 75.2 | 77 |
| 60295002 | CA | Kern | 90.0 | 91 | 75.9 | 76.8 | 75.9 | 76.8 | 87 |
| 60296001 | CA | Kern | 84.3 | 86 | 70.9 | 72.4 | 70.9 | 72.4 | 81 |
| 60311004 | CA | Kings | 87.0 | 90 | 71.7 | 74.2 | 71.7 | 74.2 | 84 |
| 60370002 | CA | Los Angeles | 80.0 | 82 | 73.3 | 75.1 | 73.3 | 75.1 | 88 |
| 60370016 | CA | Los Angeles | 94.0 | 97 | 86.1 | 88.9 | 86.1 | 88.9 | 96 |
| 60371201 | CA | Los Angeles | 90.0 | 90 | 79.8 | 79.8 | 79.8 | 79.8 | 85 |
| 60371701 | CA | Los Angeles | 84.0 | 85 | 78.1 | 79.1 | 78.1 | 79.1 | 90 |
| 60372005 | CA | Los Angeles | 79.5 | 82 | 72.3 | 74.6 | 72.3 | 74.6 | 83 |
| 60376012 | CA | Los Angeles | 97.3 | 99 | 85.9 | 87.4 | 85.9 | 87.4 | 96 |
| 60379033 | CA | Los Angeles | 90.0 | 91 | 76.3 | 77.2 | 76.3 | 77.2 | 88 |
| 60392010 | CA | Madera | 85.0 | 86 | 72.1 | 72.9 | 72.1 | 72.9 | 83 |
| 60470003 | CA | Merced | 82.7 | 84 | 69.9 | 71.0 | 69.9 | 71.0 | 82 |
| 60650004 | CA | Riverside | 85.0 | 85 | 76.7 | 76.7 | 76.7 | 76.7 | N/A |
| 60650012 | CA | Riverside | 97.3 | 99 | 83.6 | 85.1 | 83.6 | 85.1 | 93 |
| 60651016 | CA | Riverside | 100.7 | 101 | 85.2 | 85.5 | 85.2 | 85.5 | 97 |
| 60652002 | CA | Riverside | 84.3 | 85 | 72.4 | 73.0 | 72.4 | 73.0 | 81 |
| 60655001 | CA | Riverside | 92.3 | 93 | 79.5 | 80.1 | 79.5 | 80.1 | 87 |
| 60656001 | CA | Riverside | 94.0 | 98 | 78.3 | 81.6 | 78.3 | 81.6 | 91 |
| 60658001 | CA | Riverside | 97.0 | 98 | 87.0 | 87.9 | 87.0 | 87.9 | 94 |
| 60658005 | CA | Riverside | 92.7 | 94 | 83.2 | 84.4 | 83.2 | 84.4 | 91 |
| 60659001 | CA | Riverside | 88.3 | 91 | 73.7 | 75.9 | 73.7 | 75.9 | 86 |
| 60670012 | CA | Sacramento | 93.3 | 95 | 74.5 | 75.9 | 74.5 | 75.9 | 83 |
| 60675003 | CA | Sacramento | 86.3 | 88 | 69.9 | 71.3 | 69.9 | 71.3 | 79 |
| 60710005 | CA | San Bernardino | 105.0 | 107 | 96.2 | 98.1 | 96.2 | 98.1 | 108 |
| 60710012 | CA | San Bernardino | 95.0 | 97 | 84.1 | 85.8 | 84.1 | 85.8 | 91 |
| 60710306 | CA | San Bernardino | 83.7 | 85 | 76.2 | 77.4 | 76.2 | 77.4 | 86 |
| 60711004 | CA | San Bernardino | 96.7 | 98 | 89.8 | 91.0 | 89.8 | 91.0 | 101 |
| 60712002 | CA | San Bernardino | 101.0 | 103 | 93.1 | 95.0 | 93.1 | 95.0 | 97 |
| 60714001 | CA | San Bernardino | 94.3 | 97 | 86.0 | 88.5 | 86.0 | 88.5 | 90 |
| 60714003 | CA | San Bernardino | 105.0 | 107 | 94.1 | 95.8 | 94.1 | 95.8 | 101 |
| 60719002 | CA | San Bernardino | 92.3 | 94 | 80.0 | 81.4 | 80.0 | 81.4 | 86 |
| 60719004 | CA | San Bernardino | 98.7 | 99 | 88.4 | 88.7 | 88.4 | 88.7 | 104 |
| 60990006 | CA | Stanislaus | 87.0 | 88 | 74.8 | 75.7 | 74.8 | 75.7 | 83 |
| 61070006 | CA | Tulare | 81.7 | 85 | 69.1 | 71.9 | 69.1 | 71.9 | 84 |
| 61070009 | CA | Tulare | 94.7 | 96 | 76.1 | 77.2 | 76.1 | 77.2 | 89 |

B-2

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|---------------|---------------|------------------|------------------|------------------------|------------------------|-----------|
| 61072002 | CA | Tulare | 85.0 | 88 | 68.9 | 71.4 | 68.9 | 71.4 | 80 |
| 61072010 | CA | Tulare | 89.0 | 90 | 73.1 | 73.9 | 73.1 | 73.9 | 83 |
| 61112002 | CA | Ventura | 81.0 | 83 | 70.5 | 72.2 | 70.5 | 72.2 | 77 |
| 80050002 | CO | Arapahoe | 76.7 | 79 | 69.3 | 71.3 | 69.3 | 71.3 | N/A |
| 80350004 | CO | Douglas | 80.7 | 83 | 71.1 | 73.2 | 71.1 | 73.2 | 77 |
| 80590006 | CO | Jefferson | 80.3 | 83 | 71.3 | 73.7 | 71.3 | 73.7 | 77 |
| 80590011 | CO | Jefferson | 78.7 | 82 | 70.9 | 73.9 | 70.9 | 73.9 | 80 |
| 80690011 | CO | Larimer | 78.0 | 80 | 71.2 | 73.0 | 71.2 | 73.0 | 75 |
| 81230009 | CO | Weld | 74.7 | 76 | 70.2 | 71.4 | 70.2 | 71.4 | 70 |
| 90010017 | CT | Fairfield | 80.3 | 83 | 69.8 | 72.1 | 68.9 | 71.2 | 80 |
| 90013007 | CT | Fairfield | 84.3 | 89 | 71.2 | 75.2 | 71.0 | 75.0 | 81 |
| 90019003 | CT | Fairfield | 83.7 | 87 | 72.7 | 75.6 | 73.0 | 75.9 | 85 |
| 90099002 | CT | New Haven | 85.7 | 89 | 71.2 | 73.9 | 69.9 | 72.6 | 76 |
| 240251001 | MD | Harford | 90.0 | 93 | 71.4 | 73.8 | 70.9 | 73.3 | 73 |
| 260050003 | MI | Allegan | 82.7 | 86 | 69.0 | 71.8 | 69.0 | 71.7 | 75 |
| 261630019 | MI | Wayne | 78.7 | 81 | 69.0 | 71.0 | 69.0 | 71.0 | 72 |
| 360810124 | NY | Queens | 78.0 | 80 | 70.1 | 71.9 | 70.2 | 72.0 | 69 |
| 360850067 | NY | Richmond | 81.3 | 83 | 71.9 | 73.4 | 67.1 | 68.5 | 76 |
| 361030002 | NY | Suffolk | 83.3 | 85 | 72.5 | 74.0 | 74.0 | 75.5 | 72 |
| 480391004 | TX | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 74.0 | 74.9 | 75 |
| 481210034 | TX | Denton | 84.3 | 87 | 69.7 | 72.0 | 69.7 | 72.0 | 80 |
| 482010024 | TX | Harris | 80.3 | 83 | 70.4 | 72.8 | 70.4 | 72.8 | 79 |
| 482011034 | TX | Harris | 81.0 | 82 | 70.8 | 71.6 | 70.8 | 71.6 | 73 |
| 482011039 | TX | Harris | 82.0 | 84 | 71.8 | 73.6 | 71.8 | 73.5 | 67 |
| 484392003 | TX | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 72.5 | 74.8 | 73 |
| 550790085 | WI | Milwaukee | 80.0 | 82 | 65.4 | 67.0 | 71.2 | 73.0 | 71 |
| 551170006 | WI | Sheboygan | 84.3 | 87 | 70.8 | 73.1 | 72.8 | 75.1 | 79 |

B-3

## Attachment C

### Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

This attachment contains tables with the projected ozone contributions from 2023 anthropogenic nitrogen oxide and volatile organic compound emissions in each state to each potential nonattainment receptor and maintenance receptor (based on the 2015 ozone National Ambient Air Quality Standards) in the United States, following the approach for identification of such receptors EPA has used in the past, with slight modification.[18] In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling, including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from offshore sources, fires, biogenics, and contributions from initial and boundary concentrations.

The contribution information is provided in a three-part table for all of the projected receptors throughout the country, except California, and a separate three-part table for the projected receptors in California. For each monitoring site, we provide the site ID, county name, and state name in the first three columns of the table. This information is followed by columns containing the projected 2023 average and maximum design values based on the "No Water" cell approach. Next, in Parts 1 and 2 of each table, we provide the contributions from each state and the District of Columbia, individually. Finally, in Part 3 of each table, we provide the contributions from the Tribal lands, Canada and Mexico, offshore, fires, initial and boundary concentrations (Boundary), and biogenics categories. The units of the 2023 design values and contributions are parts per billion (ppb). Note that the contributions presented in these tables may not sum exactly to the 2023 average design value due to truncation of the contributions to two places to the right of the decimal.

---

[18] For the purposes of creating the contribution tables, data are provided for sites identified as potential nonattainment and maintenance receptors using projected design values based on the "No Water" cell approach. In addition, we provide the contributions to the Richmond Co., NY site that would be a nonattainment receptor in the "3 x 3" approach.

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 1)

| Site ID | County | State | 2023en Average | 2023en Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 25.19 | 0.00 | 1.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 27.40 | 0.00 | 2.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80350002 | Arapahoe | CO | 69.3 | 71.3 | 0.00 | 0.29 | 0.00 | 1.20 | 22.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.00 | 0.38 | 0.01 | 1.27 | 24.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.01 | 0.49 | 0.03 | 1.32 | 25.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.02 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.01 | 0.30 | 0.02 | 1.50 | 24.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.00 | 0.46 | 0.00 | 1.55 | 21.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.04 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.00 | 0.49 | 0.02 | 0.95 | 24.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.03 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.08 | 0.03 | 0.00 | 0.03 | 0.07 | 8.70 | 0.18 | 0.04 | 0.02 | 0.09 | 0.01 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.05 | 0.01 | 1.18 | 0.06 | 0.50 | 0.17 | 0.03 | 0.21 | 0.03 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 4.64 | 0.35 | 0.00 | 0.05 | 0.17 | 0.01 | 0.72 | 0.97 | 0.16 | 0.13 | 0.89 | 0.11 | 0.01 | 1.80 | 0.12 | 0.70 | 0.15 | 0.07 | 0.38 | 0.02 |
| 90013003 | Fairfield | CT | 73.0 | 75.9 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 3.71 | 0.40 | 0.08 | 0.05 | 0.17 | 0.01 | 0.67 | 0.83 | 0.17 | 0.13 | 0.79 | 0.11 | 0.00 | 2.17 | 0.10 | 0.63 | 0.14 | 0.07 | 0.37 | 0.02 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.06 | 0.04 | 0.08 | 0.05 | 0.08 | 9.10 | 0.30 | 0.00 | 0.02 | 0.07 | 0.02 | 0.46 | 0.50 | 0.16 | 0.14 | 0.32 | 0.08 | 0.01 | 1.37 | 0.18 | 0.73 | 0.19 | 0.04 | 0.29 | 0.04 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.31 | 0.07 | 0.17 | 0.07 | 0.12 | 0.00 | 0.03 | 0.65 | 0.11 | 0.32 | 0.03 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 0.00 | 22.60 | 0.00 | 0.79 | 0.13 | 0.08 | 0.59 | 0.04 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.35 | 0.08 | 1.64 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.18 | 0.03 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.70 | 0.00 | 0.00 | 0.00 | 3.32 | 0.11 | 0.40 | 2.61 | 0.06 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.11 | 0.07 | 0.27 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.05 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.00 | 0.02 | 0.00 | 20.39 | 0.31 | 0.09 | 0.92 | 0.08 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.11 | 0.06 | 0.09 | 0.08 | 0.11 | 0.57 | 0.38 | 0.05 | 0.07 | 0.16 | 0.03 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 0.00 | 1.56 | 0.24 | 1.26 | 0.17 | 0.04 | 0.38 | 0.05 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.24 | 0.08 | 0.13 | 0.09 | 0.12 | 0.27 | 0.43 | 0.05 | 0.09 | 0.28 | 0.02 | 0.80 | 0.92 | 0.23 | 0.21 | 0.84 | 0.16 | 0.00 | 1.74 | 0.03 | 0.98 | 0.12 | 0.08 | 0.46 | 0.03 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.06 | 0.12 | 0.08 | 0.11 | 0.83 | 0.22 | 0.04 | 0.04 | 0.12 | 0.03 | 0.64 | 0.69 | 0.20 | 0.20 | 0.49 | 0.13 | 0.01 | 1.24 | 0.04 | 0.94 | 0.18 | 0.06 | 0.39 | 0.06 |
| 483391004 | Brazoria | TX | 74.0 | 74.9 | 0.35 | 0.08 | 0.90 | 0.21 | 0.30 | 0.00 | 0.00 | 0.00 | 0.21 | 0.14 | 0.08 | 1.00 | 0.32 | 0.40 | 0.47 | 0.14 | 3.80 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.63 | 0.88 | 0.10 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.49 | 0.07 | 0.58 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.27 | 0.34 | 0.06 | 0.23 | 0.16 | 0.10 | 0.40 | 0.11 | 1.92 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.33 | 0.24 | 0.07 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.39 | 0.04 | 0.29 | 0.12 | 0.27 | 0.00 | 0.00 | 0.00 | 0.39 | 0.26 | 0.05 | 0.34 | 0.13 | 0.17 | 0.17 | 0.10 | 3.06 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.50 | 0.38 | 0.05 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.32 | 0.03 | 0.54 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.53 | 0.16 | 0.05 | 0.51 | 0.12 | 0.33 | 0.32 | 0.05 | 3.38 | 0.00 | 0.00 | 0.00 | 0.17 | 0.23 | 0.39 | 0.63 | 0.05 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.37 | 0.04 | 0.99 | 0.15 | 0.15 | 0.00 | 0.00 | 0.00 | 0.23 | 0.13 | 0.05 | 0.88 | 0.24 | 0.19 | 0.69 | 0.11 | 4.72 | 0.00 | 0.01 | 0.00 | 0.27 | 0.20 | 0.79 | 0.88 | 0.07 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.37 | 0.08 | 0.78 | 0.15 | 0.33 | 0.00 | 0.00 | 0.00 | 0.18 | 0.26 | 0.07 | 0.29 | 0.18 | 0.19 | 0.69 | 0.13 | 1.71 | 0.00 | 0.03 | 0.00 | 0.13 | 0.15 | 0.27 | 0.38 | 0.10 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.14 | 0.04 | 0.40 | 0.12 | 0.08 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.03 | 15.10 | 5.28 | 0.79 | 0.35 | 0.72 | 0.72 | 0.00 | 0.03 | 0.00 | 2.01 | 0.40 | 0.28 | 0.93 | 0.10 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.14 | 0.08 | 0.51 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.04 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 | 0.84 | 0.00 | 0.03 | 0.00 | 2.06 | 0.28 | 0.30 | 1.37 | 0.05 |

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 2)

| Site ID | County | State | 2023en Average | 2023en Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | VV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 80050032 | Arapahoe | CO | 69.3 | 71.3 | 0.34 | 0.33 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.30 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.04 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.32 | 0.32 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 1.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.00 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.41 | 0.31 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.02 | 0.83 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.81 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.36 | 0.38 | 0.00 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.94 | 1.04 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 1.03 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.37 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.40 | 1.05 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.88 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.27 | 0.24 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 1.05 | 0.54 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.58 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.06 | 0.00 | 0.01 | 6.24 | 0.04 | 17.31 | 0.29 | 0.07 | 1.04 | 0.15 | 0.00 | 5.11 | 0.01 | 0.06 | 0.03 | 0.15 | 0.30 | 0.03 | 0.01 | 1.27 | 0.02 | 0.68 | 0.00 | 0.07 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.07 | 0.01 | 0.02 | 6.94 | 0.06 | 14.12 | 0.40 | 0.07 | 1.84 | 0.21 | 0.00 | 6.32 | 0.02 | 0.11 | 0.02 | 0.31 | 0.44 | 0.04 | 0.01 | 1.51 | 0.01 | 1.10 | 0.24 | 0.08 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.07 | 0.01 | 0.02 | 7.75 | 0.06 | 15.80 | 0.43 | 0.06 | 1.60 | 0.21 | 0.01 | 6.56 | 0.02 | 0.12 | 0.02 | 0.28 | 0.45 | 0.04 | 0.01 | 1.91 | 0.01 | 1.14 | 0.20 | 0.08 |
| 90090002 | New Haven | CT | 69.9 | 72.6 | 0.09 | 0.01 | 0.03 | 5.06 | 0.04 | 15.03 | 0.32 | 0.15 | 1.17 | 0.24 | 0.01 | 4.87 | 0.02 | 0.04 | 0.04 | 0.12 | 0.41 | 0.04 | 0.02 | 1.26 | 0.04 | 0.61 | 0.25 | 0.10 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.13 | 0.01 | 0.00 | 0.07 | 0.09 | 0.16 | 0.42 | 0.07 | 2.77 | 0.35 | 0.02 | 4.32 | 0.00 | 0.11 | 0.04 | 0.43 | 0.74 | 0.05 | 0.00 | 5.05 | 0.04 | 2.78 | 0.24 | 0.12 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.16 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.09 | 0.19 | 1.31 | 0.01 | 0.05 | 0.00 | 0.04 | 0.05 | 0.65 | 2.39 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 1.95 | 0.12 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.17 | 0.03 | 0.00 | 0.01 | 0.08 | 0.06 | 0.20 | 0.12 | 3.81 | 0.62 | 0.05 | 0.18 | 0.00 | 0.05 | 0.04 | 0.27 | 1.12 | 0.09 | 0.00 | 0.16 | 0.07 | 0.23 | 1.08 | 0.18 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.12 | 0.02 | 0.06 | 8.57 | 0.07 | 13.55 | 0.35 | 0.12 | 1.88 | 0.32 | 0.02 | 7.16 | 0.04 | 0.09 | 0.05 | 0.13 | 0.58 | 0.07 | 0.00 | 1.56 | 0.03 | 1.01 | 0.38 | 0.14 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.12 | 0.02 | 0.00 | 10.53 | 0.09 | 6.57 | 0.37 | 0.09 | 2.05 | 0.36 | 0.01 | 10.41 | 0.00 | 0.10 | 0.04 | 0.36 | 0.70 | 0.07 | 0.00 | 1.67 | 0.06 | 1.54 | 0.30 | 0.12 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.02 | 0.01 | 8.88 | 0.06 | 18.11 | 0.23 | 0.20 | 1.76 | 0.34 | 0.03 | 6.86 | 0.00 | 0.05 | 0.05 | 0.22 | 0.60 | 0.07 | 0.02 | 0.99 | 0.06 | 0.81 | 0.25 | 0.14 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.23 | 0.06 | 0.00 | 0.00 | 0.18 | 0.00 | 0.04 | 0.06 | 0.06 | 0.90 | 0.05 | 0.01 | 0.00 | 0.04 | 0.05 | 0.28 | 26.00 | 0.14 | 0.00 | 0.02 | 0.06 | 0.02 | 0.40 | 0.27 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.08 | 1.23 | 0.03 | 0.04 | 0.00 | 0.09 | 0.03 | 0.14 | 26.69 | 0.10 | 0.00 | 0.05 | 0.05 | 0.04 | 0.08 | 0.25 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.08 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.14 | 0.04 | 0.05 | 0.20 | 0.03 | 0.02 | 0.00 | 0.14 | 0.03 | 0.26 | 25.62 | 0.08 | 0.00 | 0.06 | 0.03 | 0.05 | 0.07 | 0.14 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.04 | 0.04 | 0.05 | 0.68 | 0.02 | 0.01 | 0.00 | 0.10 | 0.03 | 0.09 | 25.66 | 0.07 | 0.00 | 0.03 | 0.03 | 0.03 | 0.22 | 0.15 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.19 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.05 | 0.58 | 0.03 | 0.01 | 0.00 | 0.03 | 0.04 | 0.30 | 22.82 | 0.08 | 0.00 | 0.02 | 0.04 | 0.01 | 0.28 | 0.20 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.30 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.06 | 0.10 | 1.71 | 0.05 | 0.05 | 0.00 | 0.08 | 0.07 | 0.15 | 27.64 | 0.15 | 0.00 | 0.05 | 0.09 | 0.05 | 0.13 | 0.28 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.04 | 0.23 | 0.87 | 0.76 | 0.02 | 0.33 | 0.00 | 0.02 | 0.03 | 0.31 | 1.22 | 0.04 | 0.00 | 0.12 | 0.09 | 0.05 | 13.39 | 0.09 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.06 | 0.03 | 0.00 | 0.00 | 0.14 | 0.02 | 0.04 | 0.10 | 1.10 | 0.95 | 0.04 | 0.41 | 0.00 | 0.02 | 0.02 | 0.31 | 1.65 | 0.06 | 0.00 | 0.10 | 0.07 | 0.64 | 9.09 | 0.12 |

C-3

Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 3)

| Site ID | County | State | 2023en Average | 2023en Maximum | Tribal | Canada/ Mexico | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.06 | 3.29 | 0.37 | 0.49 | 34.74 | 2.52 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.06 | 2.70 | 0.34 | 0.56 | 33.85 | 2.24 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.22 | 0.55 | 0.14 | 0.46 | 34.84 | 4.24 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.21 | 0.71 | 0.16 | 0.47 | 34.74 | 4.19 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.21 | 0.90 | 0.17 | 0.66 | 31.41 | 5.40 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.16 | 0.70 | 0.16 | 0.45 | 32.96 | 4.74 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.78 | 0.19 | 1.74 | 34.54 | 5.71 |
| 81230029 | Weld | CO | 70.2 | 71.4 | 0.23 | 1.04 | 0.15 | 1.57 | 31.11 | 6.08 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.00 | 1.64 | 0.65 | 0.20 | 16.73 | 3.28 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.01 | 1.35 | 1.93 | 0.34 | 17.17 | 4.01 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.01 | 1.37 | 1.96 | 0.33 | 17.00 | 4.09 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.01 | 1.58 | 2.15 | 0.22 | 17.17 | 4.13 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.01 | 0.79 | 0.32 | 0.42 | 15.28 | 5.32 |
| 260050003 | Allegan | MI | 70.0 | 71.7 | 0.02 | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.02 | 3.13 | 0.17 | 0.44 | 20.06 | 6.93 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.01 | 1.73 | 1.39 | 0.25 | 17.87 | 4.45 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.01 | 1.44 | 0.83 | 0.35 | 15.46 | 4.75 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.01 | 1.85 | 1.24 | 0.30 | 18.94 | 4.49 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.02 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.01 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.01 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.01 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.01 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.02 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.01 | 0.82 | 0.43 | 0.37 | 16.67 | 6.70 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.01 | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |

C-4

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 1)

| Site ID | County | State | 2023 Maximum | 2023 Average | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.4 | 79.2 | 0.00 | 0.16 | 0.00 | 35.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | Fresno | CA | 81.2 | 78.6 | 0.00 | 0.15 | 0.00 | 35.20 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | Fresno | CA | 82.2 | 79.4 | 0.00 | 0.21 | 0.00 | 31.98 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190243 | Fresno | CA | 74.4 | 73.3 | 0.00 | 0.03 | 0.00 | 34.20 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60350001 | Fresno | CA | 81.2 | 79.6 | 0.00 | 0.12 | 0.00 | 35.79 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 79.6 | 73.3 | 0.00 | 0.62 | 0.00 | 9.28 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60251003 | Imperial | CA | 74.6 | 73.0 | 0.00 | 0.67 | 0.00 | 11.34 | 0.07 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290007 | Kern | CA | 80.0 | 79.0 | 0.00 | 0.07 | 0.00 | 29.99 | 0.01 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | Kern | CA | 81.3 | 77.7 | 0.00 | 0.17 | 0.00 | 26.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290010 | Kern | CA | 72.8 | 71.3 | 0.00 | 0.11 | 0.00 | 31.54 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | Kern | CA | 75.2 | 74.1 | 0.00 | 0.03 | 0.00 | 32.66 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 75.2 | 73.7 | 0.00 | 0.13 | 0.00 | 28.33 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 76.8 | 75.9 | 0.00 | 0.16 | 0.00 | 28.50 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295001 | Kern | CA | 72.4 | 72.4 | 0.00 | 0.23 | 0.00 | 39.68 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 75.1 | 73.3 | 0.00 | 0.37 | 0.00 | 35.55 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371002 | Los Angeles | CA | 88.9 | 86.1 | 0.00 | 0.27 | 0.00 | 46.61 | 0.04 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.32 | 0.00 | 42.09 | 0.04 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | Los Angeles | CA | 79.1 | 78.1 | 0.00 | 0.42 | 0.00 | 37.59 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | Los Angeles | CA | 74.6 | 74.6 | 0.00 | 0.34 | 0.00 | 39.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | Los Angeles | CA | 72.3 | 72.3 | 0.00 | 0.20 | 0.00 | 25.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | Los Angeles | CA | 87.4 | 85.9 | 0.00 | 0.23 | 0.00 | 28.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | Madera | CA | 77.2 | 76.3 | 0.00 | 0.22 | 0.00 | 28.19 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 72.9 | 71.1 | 0.00 | 0.10 | 0.00 | 41.92 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650009 | Riverside | CA | 71.0 | 69.3 | 0.00 | 0.23 | 0.00 | 38.65 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.22 | 0.00 | 35.47 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.1 | 83.6 | 0.00 | 0.27 | 0.00 | 16.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 85.5 | 85.2 | 0.00 | 0.20 | 0.00 | 24.70 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60655001 | Riverside | CA | 73.0 | 72.4 | 0.00 | 0.17 | 0.00 | 39.14 | 0.03 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60656001 | Riverside | CA | 80.1 | 79.5 | 0.00 | 0.27 | 0.00 | 47.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | Riverside | CA | 81.6 | 78.3 | 0.00 | 0.17 | 0.00 | 45.60 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | Riverside | CA | 78.3 | 87.0 | 0.00 | 0.27 | 0.00 | 37.28 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | Riverside | CA | 87.0 | 73.7 | 0.00 | 0.25 | 0.00 | 36.51 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670010 | Sacramento | CA | 84.4 | 83.2 | 0.00 | 0.16 | 0.00 | 34.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 75.9 | 73.7 | 0.00 | 0.01 | 0.00 | 48.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710001 | San Bernardino | CA | 73.9 | 73.9 | 0.00 | 0.00 | 0.00 | 24.28 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | San Bernardino | CA | 98.1 | 96.1 | 0.00 | 0.23 | 0.00 | 48.09 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | San Bernardino | CA | 83.8 | 84.1 | 0.00 | 0.46 | 0.00 | 29.72 | 0.06 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 77.4 | 75.2 | 0.00 | 0.14 | 0.00 | 47.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 91.0 | 89.8 | 0.00 | 0.35 | 0.00 | 51.11 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 93.1 | 93.1 | 0.00 | 0.14 | 0.00 | 41.23 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 95.0 | 86.0 | 0.00 | 0.21 | 0.00 | 52.53 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 88.5 | 94.1 | 0.00 | 0.10 | 0.00 | 22.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719004 | San Bernardino | CA | 95.8 | 90.0 | 0.00 | 0.45 | 0.00 | 49.35 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60990006 | Stanislaus | CA | 81.4 | 80.0 | 0.00 | 0.10 | 0.00 | 34.16 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 88.7 | 88.4 | 0.00 | 0.03 | 0.00 | 7.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 75.7 | 74.8 | 0.00 | 0.06 | 0.00 | 23.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 71.9 | 69.1 | 0.00 | 0.07 | 0.00 | 30.91 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.9 | 73.1 | 0.00 | 0.03 | 0.00 | 30.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 72.2 | 70.5 | 0.00 | 0.32 | 0.00 | 29.51 | 0.06 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

C-5

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 2)

| Site ID | County | State | 2023 Average | 2023 Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.44 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.64 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.04 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60250007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.38 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.01 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.27 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.02 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.02 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.58 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.14 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.17 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60372012 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.11 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.18 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.07 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.19 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.03 | 0.00 | 0.00 | 0.36 | 0.00 | 0.00 | 0.05 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.15 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.03 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.24 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.02 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.28 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.04 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.02 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.03 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.19 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60658005 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60659001 | Riverside | CA | 83.2 | 83.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60670012 | Sacramento | CA | 73.7 | 73.7 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60675003 | Sacramento | CA | 74.5 | 74.5 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.03 |
| 60710025 | San Bernardino | CA | 69.9 | 75.3 | 1.00 | 0.44 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60710012 | San Bernardino | CA | 96.2 | 98.1 | 1.00 | 0.25 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60710306 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.13 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60711004 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.04 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 89.8 | 89.8 | 0.00 | 0.14 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.01 |
| 60714003 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60719002 | San Bernardino | CA | 95.8 | 95.8 | 0.00 | 0.20 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.28 | 0.05 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.04 |
| 60719004 | San Bernardino | CA | 80.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.07 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60990006 | Stanislaus | CA | 88.4 | 88.7 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 74.8 | 75.7 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.93 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 71.9 | 71.9 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 76.1 | 76.1 | 0.00 | 0.13 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 68.9 | 68.9 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 73.1 | 72.2 | 0.00 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |

C-6

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 3)

| Site ID | County | State | 2023 Average | 2023 Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.29 | 1.19 | 1.39 | 32.52 | 6.85 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.01 | 0.33 | 1.13 | 1.62 | 32.34 | 6.78 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.31 | 1.24 | 1.48 | 34.92 | 7.88 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.12 | 1.68 | 0.87 | 27.76 | 7.90 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.20 | 1.75 | 1.12 | 32.10 | 7.66 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.01 | 19.87 | 1.17 | 0.71 | 38.68 | 2.11 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.01 | 18.74 | 1.14 | 0.61 | 43.58 | 2.08 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.30 | 1.59 | 3.27 | 33.68 | 7.70 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.01 | 0.67 | 1.96 | 1.05 | 32.77 | 7.30 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.31 | 1.68 | 0.85 | 31.31 | 7.37 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.13 | 1.67 | 1.11 | 29.43 | 7.73 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.35 | 1.34 | 3.80 | 33.45 | 7.68 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.50 | 1.59 | 0.63 | 30.55 | 7.98 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.01 | 1.47 | 3.53 | 0.82 | 24.67 | 2.15 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.01 | 1.73 | 4.14 | 0.97 | 28.98 | 2.53 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.02 | 1.74 | 4.20 | 1.29 | 32.92 | 2.83 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.01 | 1.82 | 4.16 | 0.97 | 25.57 | 2.35 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.01 | 1.76 | 4.10 | 1.17 | 24.34 | 2.37 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.02 | 2.27 | 4.69 | 1.22 | 32.85 | 3.43 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.01 | 1.82 | 3.52 | 0.45 | 40.73 | 2.75 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.23 | 1.22 | 1.30 | 32.12 | 7.30 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.37 | 1.94 | 1.12 | 30.92 | 5.97 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.01 | 1.37 | 3.64 | 0.72 | 25.79 | 2.34 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 1.30 | 3.33 | 0.31 | 36.48 | 2.66 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 1.60 | 3.00 | 3.09 | 38.71 | 2.54 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.01 | 2.29 | 1.39 | 2.24 | 46.66 | 2.08 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.01 | 2.71 | 2.67 | 3.03 | 42.81 | 2.40 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 1.13 | 4.03 | 0.53 | 30.14 | 2.55 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.01 | 1.76 | 4.77 | 0.77 | 28.27 | 2.68 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.01 | 1.68 | 4.56 | 0.73 | 27.04 | 2.57 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 1.71 | 4.96 | 1.03 | 25.56 | 2.43 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.12 | 0.88 | 1.16 | 29.33 | 5.92 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.06 | 0.79 | 1.26 | 26.47 | 6.04 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 1.36 | 3.68 | 0.44 | 38.71 | 2.77 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.02 | 1.33 | 1.83 | 0.33 | 53.12 | 1.93 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.67 | 2.10 | 0.50 | 40.62 | 2.02 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.01 | 2.03 | 4.00 | 0.95 | 31.07 | 2.74 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 1.58 | 4.58 | 0.75 | 31.34 | 2.82 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.91 | 2.69 | 0.37 | 37.56 | 2.45 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.98 | 4.15 | 0.69 | 31.70 | 2.90 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.01 | 2.80 | 2.23 | 3.20 | 45.72 | 2.29 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.92 | 3.90 | 0.65 | 29.78 | 2.72 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.34 | 2.19 | 1.77 | 30.24 | 5.06 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.33 | 0.55 | 4.43 | 53.61 | 2.46 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.43 | 1.44 | 3.40 | 39.41 | 7.08 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.25 | 1.58 | 0.95 | 26.88 | 7.42 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.15 | 1.78 | 1.17 | 30.26 | 8.67 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.02 | 1.65 | 4.60 | 1.01 | 29.69 | 2.75 |

**T A B  B :**
**T E X .  C O M M ' N  O N  E N V ' T  Q U A L I T Y ,  F E D .  C L E A N  A I R  A C T**
**S E C T I O N S  110(A)(1)  A N D  (2)  T R A N S P O R T  S T A T E**
**I M P L E M E N T A T I O N  P L A N  R E V I S I O N  F O R  T H E  2015  O Z O N E  N A T .**
**A M B I E N T  A I R  Q U A L I T Y  S T A N D A R D S  (A U G .  2018)  ("T E X A S  S I P ")**

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
# AGENDA ITEM REQUEST
## for State Implementation Plan Revision Adoption

**AGENDA REQUESTED:** August 8, 2018

**DATE OF REQUEST:**  July 20, 2018

**INDIVIDUAL TO CONTACT REGARDING CHANGES TO THIS REQUEST, IF NEEDED:** Joyce Spencer-Nelson, (512) 239-5017

**CAPTION:  Docket No. 2017-1762-SIP.** Consideration of the adoption of the Federal Clean Air Act (FCAA), Section 110(a)(1) and 110(a)(2)(D) Transport State Implementation Plan (SIP) Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS).

The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). (Kristin Patton, Amy Browning) (Non-Rule Project No. 2017-039-SIP-NR)

Steve Hagle, P.E.

David Brymer

_____

_____

**Deputy Director**

**Division Director**

Joyce Nelson

_____

**Agenda Coordinator**

**Copy to CCC Secretary?  NO   X      YES**

# Texas Commission on Environmental Quality
## Interoffice Memorandum

**To:**           Commissioners                  **Date:**   July 20, 2018

**Thru:**        Bridget C. Bohac, Chief Clerk
Stephanie Bergeron Perdue, Interim Executive Director

**From:**      Steve Hagle, P.E., Deputy Director
Office of Air

**Docket No.:**  2017-1762-SIP

**Subject:**   Commission Approval for Adoption of Federal Clean Air Act (FCAA), §110(a)(1) and §110(a)(2)(D) Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)

                   2015 Ozone NAAQS Transport SIP Revision
                   Project No. 2017-039-SIP-NR

**Background and reason(s) for the SIP revision:**
On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). Infrastructure and transport SIP revisions to address the 2015 ozone NAAQS are due to the EPA by October 1, 2018.

**Scope of the SIP revision:**

**A.) Summary of what the SIP revision will do:**
The proposed SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP. This SIP revision provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

**B.) Scope required by federal regulations or state statutes:**
Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:
- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;
- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

Commissioners
Page 2
July 20, 2018

Re:  Docket No. 2017-1762-SIP


In addition, pursuant to FCAA, §110(a)(2)(D)(ii), the SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

Guidance on development and submission of infrastructure SIPs issued by the EPA on September 13, 2013[1] did not address §110(a)(2)(D)(i)(I), which specifically concerns interstate pollution transport affecting attainment and maintenance of the NAAQS. The EPA did not issue formal transport guidance prior to the development and proposal of this SIP revision. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP revisions for the 2015 ozone NAAQS.[2] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals. This SIP revision includes an analysis of required transport elements consistent with statutory requirements.

**C.) Additional staff recommendations that are not required by federal rule or state statute:**
None

**Statutory authority:**
The EPA published the final rule establishing the revised NAAQS for ozone in the *Federal Register* on October 26, 2015 (80 FR 65292). The authority to propose and adopt the SIP revision is derived from FCAA, §110, which requires states to submit SIP revisions that contain enforceable measures to achieve the NAAQS, and other general and specific authority in Texas Water Code, Chapters 5 and 7, and Texas Health and Safety Code, Chapter 382.

---

[1] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf
[2] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

Commissioners
Page 3
July 20, 2018

Re:  Docket No. 2017-1762-SIP

**Effect on the:**

**A.) Regulated community:**
No effects on the regulated community are anticipated. However, if the EPA were to issue a federal implementation plan (FIP) because the state failed to submit a SIP revision there could ultimately be significant effects on the regulated community.

**B.) Public:**
None

**C.) Agency programs:**
The SIP revision would have no new effect on agency programs.

**Stakeholder meetings:**
The proposed SIP revision went through a public review and comment period including one public hearing.

**Public comment:**
The commission offered a public hearing on the proposed SIP revision in Austin on April 10, 2018. Notice of the public hearing was published in the *Texas Register* and the *Austin American-Statesman*, *Dallas Morning News*, and *Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018 and closed on April 10, 2018. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. The comments generally concerned nonattainment designations, ongoing litigation, emissions, and control strategies. A summary of the comments and the TCEQ response is provided as part of the SIP revision in the Response to Comments.

**Significant changes from proposal:**
None

**Potential controversial concerns and legislative interest:**
Section 110(a)(2)(D) of the FCAA requires transport SIPs to contain adequate provisions to prevent emissions from interfering with visibility in another state. As part of the EPA's October 17, 2017 FIP to address best available retrofit technology (BART) requirements for Texas electric generating units, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the 1997 eight-hour ozone, 1997 $PM_{2.5}$ (annual and 24-hour), 2006 $PM_{2.5}$ (24-hour), 2008 eight-hour ozone, 2010 one-hour nitrogen dioxide, and 2010 one-hour sulfur dioxide NAAQS (82 FR 48324). The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA, §110(a)(2)(D)(II). Based on the finding that Texas meets the visibility transport provision for these other NAAQS under the BART FIP, along with the modeling analysis in the proposed SIP revision demonstrating that Texas does not significantly contribute to nonattainment or maintenance in another state for the 2015 ozone NAAQS, the fact that the EPA has not established a separate visibility standard for ozone, and because Texas is included in the Cross-State Air Pollution Rule (CSAPR) Update ozone season nitrogen oxides ($NO_x$) trading

Commissioners
Page 4
July 20, 2018

Re:  Docket No. 2017-1762-SIP

program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

Texas is included in the EPA's CSAPR Update Rule for ozone season $NO_x$, due to the EPA's disapproval of the portion of Texas' 2008 ozone infrastructure and transport SIP revision pertaining to the §110(a)(2)(D)(i)(I) interstate transport requirements and the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 2008 eight-hour ozone NAAQS in other states. While the CSAPR Update Rule does not specifically cover the 2015 ozone NAAQS, litigation over the rule is still ongoing and could potentially affect interstate transport requirements in the future.

**Does this SIP revision affect any current policies or require development of new policies?**
No

**What are the consequences if this SIP revision does not go forward? Are there alternatives to this SIP revision?**
Transport SIP revisions are required by §110(a) of the FCAA to be submitted within three years of the EPA promulgating the revised standard. The commission could choose to not comply with requirements to develop and submit a transport SIP revision to the EPA. However, if the required SIP revision is not submitted to the EPA by the October 1, 2018 deadline, the EPA has the authority to issue a finding of failure to submit requiring that the TCEQ submit the SIP revision within a specified time period and potentially imposing sanctions on the state. The EPA would be required to promulgate a FIP if the TCEQ failed to make the submission within two years, or by October 1, 2020.

**Key points in the SIP revision adoption schedule:**
    **Anticipated adoption date:** August 8, 2018
    **EPA due date:** October 1, 2018

**Agency contacts:**
Kristin Patton, SIP Project Manager, Air Quality Division, (512) 239-4907
Amy Browning, Staff Attorney, (512) 239-0891
Joyce Spencer-Nelson, *Texas Register* Rule/Agenda Coordinator, (512) 239-5017

cc:     Chief Clerk, 2 copies
        Executive Director's Office
        Jim Rizk
        Office of General Counsel
        Kristin Patton
        Joyce Spencer-Nelson

REVISIONS TO THE STATE OF TEXAS AIR QUALITY
IMPLEMENTATION PLAN CONCERNING FEDERAL CLEAN AIR
ACT SECTIONS 110(a)(1) AND (2) INFRASTRUCTURE

TRANSPORT DEMONSTRATION FOR OZONE



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13087
AUSTIN, TEXAS 78711-3087

**FEDERAL CLEAN AIR ACT, SECTIONS 110(A)(1) AND (2)
TRANSPORT STATE IMPLEMENTATION PLAN REVISION FOR
THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY
STANDARDS**

PROJECT NUMBER 2017-039-SIP-NR

Adoption
August 8, 2018

*This page intentionally left blank*

## EXECUTIVE SUMMARY

This revision to the state implementation plan (SIP) is intended to meet the infrastructure and transport requirements of the Federal Clean Air Act (FCAA), §110(a). States are required by FCAA, §110(a)(1) to submit SIP revisions providing for the implementation, maintenance, and enforcement of a new or revised National Ambient Air Quality Standard (NAAQS) within three years after promulgation. On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

FCAA, §110(a)(2)(A) through (M), lists the elements that infrastructure and transport SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D) for the 2015 ozone NAAQS. The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). This SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP and provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:

- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;

- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;

- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and

- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

To meet the requirements of FCAA, §110(a)(2)(D)(i)(I), this SIP revision includes an analysis of ozone design value and emissions trends in Texas, a modeling analysis of the impacts of Texas' emissions on other states, and a discussion of existing ozone control strategies to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state. Information regarding how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II) is provided in Chapter 4: *Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]*. Statements regarding

compliance with FCAA, §110(a)(2)(D)(ii) are provided in Chapter 5: *Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)].*

## SECTION V-A: LEGAL AUTHORITY

<u>General</u>

The Texas Commission on Environmental Quality (TCEQ) has the legal authority to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS) and to control the quality of the state's air, including maintaining adequate visibility.

The first air pollution control act, known as the Clean Air Act of Texas, was passed by the Texas Legislature in 1965. In 1967, the Clean Air Act of Texas was superseded by a more comprehensive statute, the Texas Clean Air Act (TCAA), found in Article 4477-5, Vernon's Texas Civil Statutes. The legislature amended the TCAA in 1969, 1971, 1973, 1979, 1985, 1987, 1989, 1991, 1993, 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, and 2017. In 1989, the TCAA was codified as Chapter 382 of the Texas Health and Safety Code.

Originally, the TCAA stated that the Texas Air Control Board (TACB) is the state air pollution control agency and is the principal authority in the state on matters relating to the quality of air resources. In 1991, the legislature abolished the TACB effective September 1, 1993, and its powers, duties, responsibilities, and functions were transferred to the Texas Natural Resource Conservation Commission (TNRCC). With the creation of the TNRCC, the authority over air quality is found in both the Texas Water Code and the TCAA. Specifically, the authority of the TNRCC is found in Chapters 5 and 7. Chapter 5, Subchapters A - F, H - J, and L, include the general provisions, organization, and general powers and duties of the TNRCC, and the responsibilities and authority of the executive director. Chapter 5 also authorizes the TNRCC to implement action when emergency conditions arise and to conduct hearings. Chapter 7 gives the TNRCC enforcement authority. In 2001, the 77th Texas Legislature continued the existence of the TNRCC until September 1, 2013, and changed the name of the TNRCC to the TCEQ. In 2009, the 81st Texas Legislature, during a special session, amended section 5.014 of the Texas Water Code, changing the expiration date of the TCEQ to September 1, 2011, unless continued in existence by the Texas Sunset Act. In 2011, the 82nd Texas Legislature continued the existence of the TCEQ until 2023.

The TCAA specifically authorizes the TCEQ to establish the level of quality to be maintained in the state's air and to control the quality of the state's air by preparing and developing a general, comprehensive plan. The TCAA, Subchapters A - D, also authorize the TCEQ to collect information to enable the commission to develop an inventory of emissions; to conduct research and investigations; to enter property and examine records; to prescribe monitoring requirements; to institute enforcement proceedings; to enter into contracts and execute instruments; to formulate rules; to issue orders taking into consideration factors bearing upon health, welfare, social and economic factors, and practicability and reasonableness; to conduct hearings; to establish air quality control regions; to encourage cooperation with citizens' groups and other agencies and political subdivisions of the state as well as with industries and the federal government; and to establish and operate a system of permits for construction or modification of facilities.

Local government authority is found in Subchapter E of the TCAA. Local governments have the same power as the TCEQ to enter property and make inspections. They also

may make recommendations to the commission concerning any action of the TCEQ that affects their territorial jurisdiction, may bring enforcement actions, and may execute cooperative agreements with the TCEQ or other local governments. In addition, a city or town may enact and enforce ordinances for the control and abatement of air pollution not inconsistent with the provisions of the TCAA and the rules or orders of the commission.

Subchapters G and H of the TCAA authorize the TCEQ to establish vehicle inspection and maintenance programs in certain areas of the state, consistent with the requirements of the Federal Clean Air Act; coordinate with federal, state, and local transportation planning agencies to develop and implement transportation programs and measures necessary to attain and maintain the NAAQS; establish gasoline volatility and low emission diesel standards; and fund and authorize participating counties to implement vehicle repair assistance, retrofit, and accelerated vehicle retirement programs.

<u>Applicable Law</u>
The following statutes and rules provide necessary authority to adopt and implement the state implementation plan (SIP). The rules listed below have previously been submitted as part of the SIP.

<u>Statutes</u>
All sections of each subchapter are included, unless otherwise noted.

| | |
|---|---|
| TEXAS HEALTH & SAFETY CODE, Chapter 382 | September 1, 2017 |
| TEXAS WATER CODE | September 1, 2017 |

Chapter 5: Texas Natural Resource Conservation Commission
    Subchapter A: General Provisions
    Subchapter B: Organization of the Texas Natural Resource Conservation
           Commission
    Subchapter C: Texas Natural Resource Conservation Commission
    Subchapter D: General Powers and Duties of the Commission
    Subchapter E: Administrative Provisions for Commission
    Subchapter F: Executive Director (except §§5.225, 5.226, 5.227, 5.2275,5.231, 5.232,
           and 5.236)
    Subchapter H: Delegation of Hearings
    Subchapter I: Judicial Review
    Subchapter J: Consolidated Permit Processing
    Subchapter L: Emergency and Temporary Orders (§§5.514, 5.5145, and 5.515 only)
    Subchapter M: Environmental Permitting Procedures (§5.558 only)

Chapter 7: Enforcement
    Subchapter A: General Provisions (§§7.001, 7.002, 7.0025, 7.004, and 7.005 only)
    Subchapter B: Corrective Action and Injunctive Relief (§7.032 only)
    Subchapter C: Administrative Penalties
    Subchapter D: Civil Penalties (except §7.109)
    Subchapter E: Criminal Offenses and Penalties: §§7.177, 7.179-7.183

## Rules

All of the following rules are found in 30 Texas Administrative Code, as of the following latest effective dates:

Chapter 7: Memoranda of Understanding, §§7.110 and 7.119

December 13, 1996 and May 2, 2002

Chapter 19: Electronic Reporting — March 15, 2007

Chapter 35: Subchapters A-C, K: Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions — July 20, 2006

Chapter 39: Public Notice, §§39.201; 39.401; 39.403(a) and (b)(8)-(10); 39.405(f)(1) and (g); 39.409; 39.411 (a), (b)(1)-(6), and (8)-(10) and (c)(1)-(6) and (d); 39.413(9), (11), (12), and (14); 39.418(a) and (b)(3) and (4); 39.419(a), (b), (d), and (e); 39.420(a), (b) and (c)(3) and (4); 39.423 (a) and (b); 39.601-39.605 — December 29, 2016

Chapter 55: Requests for Reconsideration and Contested Case Hearings; Public Comment, §§55.1; 55.21(a) - (d), (e)(2), (3), and (12), (f) and (g); 55.101(a), (b), and (c)(6) - (8); 55.103; 55.150; 55.152(a)(1), (2), and (6) and (b); 55.154; 55.156; 55.200; 55.201(a) - (h); 55.203; 55.205; 55.209, and 55.211 — December 29, 2016

Chapter 101: General Air Quality Rules — October 12, 2017

Chapter 106: Permits by Rule, Subchapter A — April 17, 2014

Chapter 111: Control of Air Pollution from Visible Emissions and Particulate Matter — August 3, 2017

Chapter 112: Control of Air Pollution from Sulfur Compounds — July 16, 1997

Chapter 113: Standards of Performance for Hazardous Air Pollutants and for Designated Facilities and Pollutants — May 14, 2009

Chapter 114: Control of Air Pollution from Motor Vehicles — December 29, 2016

Chapter 115: Control of Air Pollution from Volatile Organic Compounds — January 5, 2017

Chapter 116: Permits for New Construction or Modification — November 24, 2016

Chapter 117: Control of Air Pollution from Nitrogen Compounds — June 25, 2015

Chapter 118: Control of Air Pollution Episodes — March 5, 2000

Chapter 122: §122.122: Potential to Emit — February 23, 2017

iii

Chapter 122: §122.215: Minor Permit Revisions  June 3, 2001

Chapter 122: §122.216: Applications for Minor Permit Revisions  June 3, 2001

Chapter 122: §122.217: Procedures for Minor Permit Revisions  December 11, 2002

Chapter 122: §122.218: Minor Permit Revision Procedures for Permit Revisions Involving the Use of Economic Incentives, Marketable Permits, and Emissions Trading  June 3, 2001

## SECTION VI: CONTROL STRATEGY

A.  Introduction (No change)
B.  Ozone (No change)
C.  Particulate Matter (No change)
D.  Carbon Monoxide (No change)
E.  Lead (No change)
F.  Oxides of Nitrogen (No change)
G.  Sulfur Dioxide (No change)
H.  Conformity with the National Ambient Air Quality Standards (No change)
I.  Site Specific (No change)
J.  Mobile Sources Strategies (No change)
K.  Clean Air Interstate Rule (No change)
L.  Transport (Revised)
M.  Regional Haze (No change)

# TABLE OF CONTENTS

Executive Summary

Section V-A: Legal Authority

Section VI: Control Strategy

Table of Contents

List of Acronyms

List of Tables

List of Figures

List of Appendices

Chapter 1: General

    1.1 Background

    1.2 Introduction

    1.3 Health Effects

    1.4 Public Hearing and Comment Information

    1.5 Social and Economic Considerations

    1.6 Fiscal and Manpower Resources

Chapter 2: Ozone Data

    2.1 Introduction

    2.2 Ozone Design Value Trends in Texas

    2.3 Ozone Emissions Trends in Texas

        2.3.1 General

        2.3.2 Historical Emissions Inventory Trends

    2.4 Ozone Data Summary

Chapter 3: Significant Contribution to Nonattainment and Interference With Maintenance [FCAA, §110(a)(2)(D)(i)(I)]

    3.1 Introduction

    3.2 Step 1: Identification of Projected Nonattainment and Maintenance Monitors

        3.2.1 Modeling Domain

        3.2.2 Modeling Episode

            3.2.2.1 Meteorology of 2012

            3.2.2.2 Ozone Production in 2012

        3.2.3 Base Case Modeling

vi

**37**

3.2.3.1 Meteorological Modeling

3.2.3.2 Emissions Modeling

3.2.3.3 Initial and Boundary Conditions

3.2.3.4 Photochemical Modeling

3.2.4 Future Year Modeling

3.2.4.1 Emissions Modeling

3.2.4.2 Initial and Boundary Conditions

3.2.4.3 Photochemical Modeling

3.3 Step 2: Source Apportionment and Identification of Downwind Monitors Tagged For Further Review

3.3.1 Identification of Nonattainment Monitors for Further Review

3.3.2 Identification of Maintenance Monitors for Further Review

3.4 Step 3: Analysis to Determine if Texas Emissions Contribute Significantly to Nonattainment or Interfere with Maintenance at Tagged Monitors

3.4.1 Colorado Monitors

3.4.1.1 Eight-Hour Ozone Design Value Trends

3.4.1.2 Monitored Elevated Ozone Days

3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

3.4.1.5 Collective Interstate Contribution to the Future Design Value

3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

3.4.2 Arizona Monitor(s)

3.4.3 California Monitors

3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

3.4.3.2 Eight-Hour Ozone Design Value Trends

3.4.3.3 Monitored Elevated Ozone Days

3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

3.4.3.6 Collective Interstate Contribution to the Future Design Value

      3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

3.5 Conclusion

3.6 References

Chapter 4: Control Strategies

    4.1 Introduction

    4.2 Emissions Reductions from Electric Generating Units (EGU)

       4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

       4.2.2 Utility Electric Generation in East and Central Texas

       4.2.3 Senate Bill 7 (76th Texas Legislature)

    4.3 Emission Reductions from Other Sources

       4.3.1 East Texas Engines

       4.3.2 Mass Emissions Cap and Trade (MECT) Program

       4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

       4.3.4 Cement Kilns

    4.4 Additional Measures

       4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

       4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

       4.4.3 Consent Decrees with Refineries

       4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

       4.4.5 Texas Emissions Reduction Plan (TERP)

       4.4.6 Clean School Bus Program

       4.4.7 Local Initiatives

       4.4.8 Voluntary Measures

    4.5 2008 Ozone NAAQS SIP Revisions Adopted Since 2015

       4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

       4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

    4.6 Conclusions

Chapter 5: Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]

    5.1 Introduction

    5.2 PSD

5.3 Visibility Transport

Chapter 6: Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)]

6.1 Introduction

6.2 Interstate Pollution Abatement

6.2.1 Compliance with FCAA, §126(a)

6.2.2 Compliance with FCAA, §126(b) and (c)

6.3 International Air Pollution

6.3.1 Compliance with FCAA, §115

Chapter 7: Conclusions

Chapter 8: Future Revisions to the National Ambient Air Quality Standards (NAAQS)

## LIST OF ACRONYMS

| | |
|---|---|
| 3-D | three-dimensional |
| AD | attainment demonstration |
| APCA | Anthropogenic Culpability Precursor Analysis |
| AQS | Air Quality System |
| BART | best available retrofit technology |
| BEIS | Biogenic Emissions Inventory Systems |
| BPA | Beaumont-Port Arthur |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CEMS | continuous emissions monitoring system |
| CSAPR | Cross-State Air Pollution Rule |
| CST | Central Standard Time |
| CTM | Chemical Transport Model |
| DDM | Direct Decoupled Method |
| DERA | Diesel Emissions Reduction Act |
| DERI | Diesel Emissions Reduction Incentive Program |
| DFW | Dallas-Fort Worth |
| $DV_B$ | baseline design value |
| $DV_F$ | future year design value |
| EE | energy efficiency |
| EI | emissions inventory |
| EGF | electric generating facility |
| EGU | electric generating unit |
| EPA | United States Environmental Protection Agency |
| EPS3 | Emissions Processor System |
| ESL | Energy Systems Laboratory |
| FCAA | Federal Clean Air Act |
| FINN | Fire Inventory of NCAR |
| FIP | federal implementation plan |
| FR | *Federal Register* |
| FY | fiscal year |
| g/hp-hr | grams per horsepower-hour |

x

| | |
|---|---|
| GEOS | Goddard Earth Observing System |
| GHG | greenhouse gas |
| H-GAC | Houston-Galveston Area Council |
| HB | House Bill |
| HECT | Highly Reactive Volatile Organic Compounds Emissions Cap and Trade |
| HGB | Houston-Galveston-Brazoria |
| hp | horsepower |
| HRVOC | Highly Reactive Volatile Organic Compounds |
| HTAP | Hemispheric Transport of Air Pollution |
| HYSPLIT | Hybrid Single Particle Lagrangian Integrated Trajectory |
| km | kilometers |
| Kv | vertical diffusivity |
| LAI | Leaf Area Index |
| lb/MMBtu | pound per million British thermal units |
| m | meters |
| m AGL | meters above ground level |
| MB | mean bias |
| MDA8 | maximum daily average eight-hour (ozone concentration) |
| $MDV_F$ | maintenance future year design value |
| ME | mean error |
| MECT | Mass Emissions Cap and Trade |
| MW | megawatts |
| NAAQS | National Ambient Air Quality Standard |
| NCAR | National Center for Atmospheric Research |
| NCDC | National Climatic Data Center |
| NCEP | National Centers for Environmental Prediction |
| NMB | normalized mean bias |
| NME | normalized mean error |
| NOAA | National Oceanic and Atmospheric Administration |
| NODA | Notice of Data Availability |
| $NO_x$ | nitrogen oxides |
| NSR | New Source Review |
| $O_3$ | ozone |
| PM | particulate matter |

xi

| PM$_{2.5}$ | particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers |
| ppb | parts per billion |
| ppm | parts per million |
| PSD | prevention of significant deterioration |
| PUCT | Public Utility Commission of Texas |
| RACT | reasonably available control technology |
| RE | renewable energy |
| RFP | reasonable further progress |
| RMSE | root mean square error |
| RRF | relative response factor |
| SB | Senate Bill |
| SECO | State Energy Conservation Office |
| SIP | state implementation plan |
| SMOKE | Sparse Matrix Operation Kernel Emissions (System) |
| SO$_2$ | sulfur dioxide |
| TAC | Texas Administrative Code |
| TACB | Texas Air Control Board |
| TCAA | Texas Clean Air Act |
| TCEQ | Texas Commission on Environmental Quality (commission) |
| TCFP | Texas Clean Fleet Program |
| TERP | Texas Emissions Reduction Plan |
| THSC | Texas Health and Safety Code |
| TNGVGP | Texas Natural Gas Vehicle Grant Program |
| TNRCC | Texas Natural Resource Conservation Commission |
| tpd | tons per day |
| tpy | tons per year |
| TUC | Texas Utilities Code |
| TX$_{DVF}$ | Texas contribution to a monitor's future year design value |
| VOC | volatile organic compounds |
| WRF | Weather Research and Forecasting Model |

## LIST OF TABLES

Table 2-1:   2016 Eight-Hour Ozone Design Values by County in Texas

Table 3-1:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions

Table 3-2:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure

Table 3-3:   2015 Transport SIP Revision WRF Modeling Domain Definitions

Table 3-4:   2015 Transport SIP Revision WRF Modeling Domain Vertical Structure

Table 3-5:   WRF Model Configuration Parameters

Table 3-6:   Emissions Processing Modules

Table 3-7:   Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration

Table 3-8:   Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016

Table 3-9:   Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories

Table 3-10: Downwind Nonattainment Monitors Tagged for Further Review

Table 3-11: Downwind Maintenance Monitors Tagged for Further Review

Table 3-12: Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA

Table 3-13: Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor

Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors

Table 3-16: Number of HYSPLIT Back Trajectories at Each Tagged California Monitor

Table 3-17: Modeled Elevated Ozone Days in the Future Year

Table 3-18: Collective Interstate Contributions to Future Design Values at Tagged California Monitors

## LIST OF FIGURES

Figure 2-1:   2016 Eight-Hour Ozone Design Values by County in Texas

Figure 2-2:   Eight-Hour Ozone Design Values and Population by Area in Texas

Figure 2-3:   Statewide Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-4:   Statewide Historical VOC Emissions Trends in Tons per Year

Figure 2-5:   DFW 10-County Nonattainment Area Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-6:   DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year

Figure 2-7:   HGB Eight-County Nonattainment Area Historical $NO_x$ Emissions Trends in Tons per Year

Figure 2-8:   HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year

Figure 3-1:   Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain

Figure 3-2:   U.S. Drought Monitor Map of Texas for July 26, 2011

Figure 3-3:   May through October 2012 Statewide NCDC Temperature Ranks

Figure 3-4:   May through October 2012 Statewide NCDC Precipitation Ranks

Figure 3-5:   Change in Texas Drought Conditions from July 2011 to July 2012

Figure 3-6:   Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016

Figure 3-7:   Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain

Figure 3-8:   Matching of WRF and CAMx Vertical Layers

Figure 3-9:   Wind Speed Mean Bias for May through September 2012

Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012

Figure 3-11: Humidity Mean Bias for May through September 2012

Figure 3-12: Wind Speed Mean Absolute Error for May through September 2012

Figure 3-13: Two Meter Temperature Mean Absolute Error for May through September 2012

Figure 3-14: Humidity Mean Absolute Error for May through September 2012

Figure 3-15: Wind Speed RMSE for May through September 2012

Figure 3-16: Two Meter Temperature RMSE for May through September 2012

Figure 3-17: Humidity RMSE for May through September 2012

Figure 3-18: Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions

Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category

Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012

Figure 3-21: Initial Concentration on April 16, 2012 in the RPO_12km

Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-25: 2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites

Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites

Figure 3-28: Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region

Figure 3-29: Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category

Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-33: 2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-34: Baseline Design Value ($DV_B$) for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-35: 2023 Future Design Value ($DV_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-36: 2023 Maintenance Future Year Design Value ($MDV_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-37: APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-38: Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST

Figure 3-39: Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors

Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area

Figure 3-41: Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016

Figure 3-42: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors

xv

Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor

Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas

Figure 3-45: DDM Responsiveness of Ozone in July 2023 at Highland Reservoir

Figure 3-46: DDM Responsiveness of Ozone in August 2023 at Highland Reservoir

Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park

Figure 3-48: DDM Responsiveness of Ozone in August 2023 at Chatfield State Park

Figure 3-49: DDM Responsiveness of Ozone in July 2023 at Rocky Flats

Figure 3-50: DDM Responsiveness of Ozone in August 2023 at Rocky Flats

Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL

Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL

Figure 3-53: DDM Responsiveness of Ozone in July 2023 at Fort Collins-West

Figure 3-54: DDM Responsiveness of Ozone in August 2023 at Fort Collins-West

Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)

Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area

Figure 3-57: Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016

Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors

## LIST OF APPENDICES

| **Appendix** | **Appendix Name** |
|---|---|
| Appendix A | Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix B | Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix C | Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix D | Photochemical Modeling Protocol for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |

# CHAPTER 1: GENERAL

## 1.1 BACKGROUND

Information on the Texas state implementation plan (SIP) and a list of SIP revisions and other air quality plans adopted by the commission can be found on the Texas State Implementation Plan webpage (http://www.tceq.texas.gov/airquality/sip) on the Texas Commission on Environmental Quality's (TCEQ) website (http://www.tceq.texas.gov/).

## 1.2 INTRODUCTION

On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million (ppm) or 70 parts per billion (ppb) (80 *Federal Register* (FR) 65291, October 26, 2015). Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The TCEQ is addressing the infrastructure requirements of FCAA, §110(a)(2)(A) through (C) and (E) through (M) in a separate concurrent SIP revision (Project No. 2017-040-SIP-NR). Submittal of this SIP revision and the infrastructure SIP revision covering FCAA, §110(a)(2)(A) through (C) and (E) through (M) will fulfil the FCAA, §110(a)(1) requirement. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

Pursuant to FCAA, §110(a)(2)(D)(i), this transport SIP revision must contain adequate provisions that prohibit any source or other type of emissions activity within the state from emitting any NAAQS pollutants in amounts that will:

- contribute significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- interfere with the maintenance of the 2015 ozone NAAQS in any other state;
- interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

The EPA has historically failed to issue timely guidance to address transport requirements for previous NAAQS and did not issue formal guidance for states to use in developing transport SIP revisions for the 2015 ozone NAAQS prior to proposal of this SIP revision. In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide guidance before proceeding with SIP development, review, and submittal and must proceed without the EPA's formal guidance to develop submittals based on information available at the time. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP

revisions for the 2015 ozone NAAQS.[1] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals.

This SIP revision includes an analysis of required transport elements in FCAA, §110(a)(2)(D)(i) and (ii) consistent with statutory requirements and includes a technical demonstration and various Texas provisions that support the conclusion that Texas meets the requirements of each section. The TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.

## 1.3 HEALTH EFFECTS

On October 1, 2015, the EPA revised the primary and secondary eight-hour ozone NAAQS to 70 ppb (80 FR 65291). To support the 2015 ozone NAAQS, the EPA provided information that suggested that health effects may potentially occur at levels lower than the 2008 standard of 75 ppb. Breathing relatively high levels of ground-level ozone can cause acute respiratory problems like cough and decreases in lung function and can aggravate the symptoms of asthma. Repeated exposures to high levels of ozone can potentially make people more susceptible to allergic responses and lung inflammation.

Children are at a relatively higher risk from exposure to ozone when compared to adults since they breathe more air per pound of body weight than adults and because children's respiratory systems are still developing. Children also spend a considerable amount of time outdoors during summer and during the start of the school year (August through October) when high ozone levels are typically recorded. Adults most at risk from exposures to elevated ozone levels are people working or exercising outdoors and individuals with preexisting respiratory diseases.

## 1.4 PUBLIC HEARING AND COMMENT INFORMATION

The commission held a public hearing for this SIP revision on April 10, 2018 at 2:00 p.m. in Austin at the TCEQ Headquarters. Notice of the public hearing was published in

---

[1] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

1-2

the *Texas Register* as well as the *Austin American-Statesman, Dallas Morning News, and Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018, and closed on April 10, 2018. Written comments were accepted via mail, fax, or through the eComments (https://www6.tceq.texas.gov/rules/ecomments/) system. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. A summary of the comments and the TCEQ response is provided as part of this SIP revision in the Response to Comments.

## 1.5 SOCIAL AND ECONOMIC CONSIDERATIONS

Because rulemaking is not a part of this SIP revision, there are no changes that would impact society or the economy.

## 1.6 FISCAL AND MANPOWER RESOURCES

The TCEQ has determined that its fiscal and manpower resources are adequate and will not be adversely affected through the implementation of this plan.

## CHAPTER 2: OZONE DATA

**2.1 INTRODUCTION**

Ozone ($O_3$) is a secondary pollutant that is created through a photochemical reaction between oxygen ($O_2$), nitrogen oxides ($NO_x$), and volatile organic compounds (VOC). $NO_x$ refers to the combination of nitrogen oxide (NO) and nitrogen dioxide ($NO_2$). The following reactions show how $NO_x$, VOC, and $O_2$ react in the presence of sunlight (hv) to form $O_3$:

$$O_2 + NO_2 \overset{hv}{\leftrightarrow} O_3 + NO$$

$$NO + VOC \rightarrow NO_2$$

The amount of ozone formed depends on several factors. Meteorological conditions, such as wind direction and speed, temperature, mixing height, solar radiation, and other parameters, affect the rates at which ozone formation occurs. The types and the concentration of precursors present can affect net reactivity of precursor compounds found in a plume of emissions.

Precursor compounds, $NO_x$ and VOC, also exist under natural conditions. Ozone is created and destroyed on a natural cycle according to atmospheric conditions and chemical concentrations, even in the absence of additional anthropogenic precursor sources. This natural ozone formation is known as "natural background" ozone and is the starting point for measuring the contribution of ozone and precursors attributable to human activity. Within an urban area, not all ozone formation is necessarily caused by emissions produced locally because anthropogenic precursors, along with ozone formed by them, are often transported over long distances. Because the amount of ozone formed depends on so many other variables, it can be difficult to quantify the exact contribution from specific sources.

The United States Environmental Protection Agency (EPA) revised the eight-hour ozone National Ambient Air Quality Standard (NAAQS) to 0.070 parts per million (ppm) in 2015. On November 16, 2017, the EPA designated the majority of Texas as attainment/unclassifiable for the 2015 eight-hour ozone NAAQS (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018. This chapter discusses trends in ozone and ozone precursor emissions in Texas to demonstrate the progress the state has made towards achieving the NAAQS.

**52**

## 2.2 OZONE DESIGN VALUE TRENDS IN TEXAS

A design value is a statistic that is used to compare air quality data to the NAAQS. For eight-hour ozone, a design value is the three-year average of the fourth-highest daily-maximum eight-hour averaged ozone. The latest year in the three-year average is used to represent the design value for that three-year period. Design values are calculated at each ozone monitor and the monitor with the highest design value will set the design value for that area. Although the eight-hour ozone NAAQS is reported in ppm, design values in this chapter will be displayed in parts per billion (ppb) for ease of reading.

In 2016, Texas had 76 ozone monitoring sites in 34 counties that reported valid data to the EPA. Eight-hour ozone design values for 2016 are displayed in Figure 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas* and listed in Table 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas*. Figure 2-1 and Table 2-1 show that most Texas counties have 2016 design values below the 2015 ozone NAAQS of 70 ppb. Three areas of Texas: DFW, HGB, and San Antonio, have eight-hour ozone design values above 70 ppb.



**Figure 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

**Table 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

| CSA/CBSA | County | 2016 Eight-Hour Ozone Design Values (ppb) |
|---|---|---|
| Dallas—Fort Worth | Denton | 80 |
| Houston—The Woodlands | Harris | 79 |
| Houston—The Woodlands | Galveston | 76 |
| Houston—The Woodlands | Brazoria | 75 |
| Dallas—Fort Worth | Tarrant | 75 |
| Dallas—Fort Worth | Collin | 74 |
| San Antonio—New Braunfels | Bexar | 73 |
| Dallas—Fort Worth | Parker | 73 |
| Dallas—Fort Worth | Dallas | 72 |
| Dallas—Fort Worth | Johnson | 72 |
| Houston—The Woodlands | Montgomery | 72 |
| El Paso—Las Cruces | El Paso | 70 |
| Dallas—Fort Worth | Hood | 69 |
| Beaumont—Port Arthur | Jefferson | 68 |
| Killeen-Temple | Bell | 67 |
| Longview-Marshall | Gregg | 66 |
| Dallas—Fort Worth | Rockwall | 66 |
| Austin—Round Rock | Travis | 66 |
| Tyler-Jacksonville | Smith | 65 |
| Victoria—Port Lavaca | Victoria | 65 |
| Amarillo-Borger | Randall | 64 |
| Corpus Christi—Kingsville—Alice | Nueces | 64 |
| Beaumont—Port Arthur | Orange | 64 |
| Dallas—Fort Worth | Ellis | 63 |
| Waco | McLennan | 63 |
| No CSA | Brewster | 62 |
| Longview-Marshall | Harrison | 62 |
| Dallas—Fort Worth | Kaufman | 61 |
| Dallas—Fort Worth | Navarro | 61 |
| No CSA | Polk | 61 |
| Dallas—Fort Worth | Hunt | 60 |
| Brownsville-Harlingen-Raymondville | Cameron | 57 |
| McAllen-Edinburg | Hidalgo | 55 |
| Laredo | Webb | 54 |

Design value trends can be used to determine if various areas in Texas are making progress towards attainment of the ozone NAAQS. Eight-hour ozone design value trends by Texas area are displayed in Figure 2-2: *Eight-Hour Ozone Design Values and Population by Area in Texas*. Figure 2-2 shows that all areas of Texas have shown decreases in design values over the past 25 years. No area has seen an increase in eight-hour ozone design values. As mentioned above, in 2016 only three areas in Texas are measuring above the 2015 ozone NAAQS of 70 ppb. The largest ozone decreases

from 1991 through 2016 were observed in the HGB area, which had a 34% decrease in eight-hour ozone design values, and the Beaumont-Port Arthur (BPA) area, which had a 33% decrease in eight-hour ozone design values.



**Figure 2-2: Eight-Hour Ozone Design Values and Population by Area in Texas**

## 2.3 OZONE EMISSIONS TRENDS IN TEXAS

### 2.3.1 General

The Texas Commission on Environmental Quality (TCEQ) maintains an inventory of current information for sources of ozone precursor emissions ($NO_x$ and VOC) that identifies the types of emissions sources present in an area, the amount of each pollutant emitted, and the types of processes and control devices employed at each plant or source category. The total anthropogenic inventory of $NO_x$ and VOC emissions for an area is derived from estimates developed for three general categories of emissions sources: point, area, and mobile (both non-road and on-road). The emissions inventory also provides data for a variety of air quality planning tasks, including establishing baseline emissions levels, calculating reduction targets, developing control strategies to achieve emissions reductions, developing emissions inputs for air quality models, and tracking actual emissions reductions against established emissions growth and control budgets.

The most current emissions inventory (EI) data were analyzed as part of this ozone transport SIP revision. At the time of preparation of this SIP revision, the TCEQ was

2-4

planning the development of the 2017 periodic EI in accordance with the EPA's Air Emissions Reporting Requirements (40 Code of Federal Regulations Part 51, Subpart A). The calendar year 2014 periodic inventory was the most recent periodic inventory available to develop this SIP revision's EI.

Additionally, 10 years of anthropogenic emissions data (2005 through 2014) were analyzed to develop historical trend data. During this time, the EI for Texas and its two current ozone nonattainment areas (DFW and HGB) showed a significant decrease in ozone precursor emissions from all source categories; reductions range from 15 to 46%, as detailed in Section 2.3.2: *Historical Emissions Inventory Trends*. These reductions contributed to the attainment of both the one-hour and the 1997 eight-hour ozone NAAQS. These reductions were accomplished through a variety of federal, state, and local regulations and programs as detailed below.

### 2.3.2 Historical Emissions Inventory Trends

For the 10-year historical period up to and including 2014 (2005 through 2014), overall anthropogenic ozone precursor emissions in Texas as well as the DFW and HGB ozone nonattainment areas declined substantially. As demonstrated in Figure 2-3: *Statewide Historical $NO_x$ Emissions Trends in Tons per Year* and Figure 2-4: *Statewide Historical VOC Emissions Trends in Tons per Year*, anthropogenic $NO_x$ emissions decreased 35% and anthropogenic VOC emissions decreased 17% from 2005 through 2014. These emissions reductions were the result of regulations implemented at the federal, state, and local levels and innovative programs implemented by the TCEQ.

Both 30 Texas Administrative Code (TAC) Chapter 115: *Control of Air Pollution from Volatile Organic Compounds* and 30 TAC Chapter 117: *Control of Air Pollution from Nitrogen Compounds* regulations have significantly reduced overall ozone precursor emissions at both major and minor (point and area) industrial, commercial, and institutional sources in the DFW and HGB ozone nonattainment areas as well as other portions of the state (e.g., East Texas Combustion Rule).

The implementation of statewide or regional emissions banking and trading programs have also assisted in reducing ozone precursor emissions. For example, the Emissions Banking and Trading of Allowances program has implemented annual $NO_x$ emissions caps for grandfathered and electing electric generating facilities. Similarly, the Highly Reactive Volatile Organic Compound (HRVOC) Emissions Cap and Trade Program and the Mass Emissions Cap and Trade Program have specifically reduced HRVOC and $NO_x$ emissions, respectively, from point sources in the HGB area.

Innovative emissions reduction programs such as the Texas Emissions Reduction Plan and 30 TAC Chapter 114: *Control of Air Pollution from Motor Vehicles*, which includes programs such as the AirCheckTexas Drive a Clean Machine program and vehicle emissions testing, have also reduced mobile source emissions, the primary source of $NO_x$ emissions in the state.

The following graphs illustrate these trends statewide as well as in the DFW and HGB ozone nonattainment areas.



**Figure 2-3: Statewide Historical NO$_X$ Emissions Trends in Tons per Year**



**Figure 2-4: Statewide Historical VOC Emissions Trends in Tons per Year**

Similarly, Figure 2-5: *DFW 10-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year* and Figure 2-6: *DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year* demonstrate a marked 46% decrease in anthropogenic NO$_x$ emissions and a 15% decrease in anthropogenic VOC emissions from 2005 through 2014.



**Figure 2-5: DFW 10-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-6: DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

Finally, the HGB area shows significant overall progress in reducing anthropogenic emissions. As shown in Figure 2-7: *HGB Eight-County Nonattainment Area Historical NOx Emissions Trends in Tons per Year* and Figure 2-8: *HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year*, a 43% decrease in anthropogenic NOx emissions and a 37% decrease in anthropogenic VOC emissions has occurred from 2005 through 2014.



**Figure 2-7: HGB Eight-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-8: HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

## 2.4 OZONE DATA SUMMARY

Ozone data in Texas show that there are three areas that have eight-hour ozone design values above 70 ppb: DFW, HGB, and San Antonio. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values. The largest eight-hour ozone design value decreases from 1991 through 2016 were observed in the HGB and the BPA areas with decreases of 34% and 33%, respectively.

Statewide trend analysis using the 2005 through 2014 emissions shows a similar reduction in ozone precursor emissions: a 17% reduction in VOC emissions and a 35% reduction in $NO_x$ emissions. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone NAAQS and are expected to help the state in attaining the 2008 and 2015 NAAQS in the future.

## CHAPTER 3: SIGNIFICANT CONTRIBUTION TO NONATTAINMENT AND INTERFERENCE WITH MAINTENANCE [FCAA, §110(A)(2)(D)(i)(I)]

### 3.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(I) requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will contribute significantly to nonattainment of the National Ambient Air Quality Standards (NAAQS) for areas in other states or interfere with maintenance of the NAAQS in any other state. The purpose of FCAA's §110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, is to ensure that emissions in one state that contribute significantly to nonattainment or interfere with maintenance in another state are addressed appropriately.

For this SIP revision, the key aspect of fulfilling this obligation is to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state. The following sections utilize photochemical modeling and data analysis to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state.

The approach used by the Texas Commission on Environmental Quality (TCEQ) to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state is based partly on the United States Environmental Protection Agency's (EPA) *Notice of Data Availability of Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS* (2015 Transport NODA) published in the January 6, 2017 *Federal Register* (82 FR 1733), with several key improvements. The TCEQ used a three-step approach, detailed below, to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

> **Step 1:** Identify monitors projected to be in nonattainment or have maintenance issues in a future year.

> **Step 2:** Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Texas, tagging them for further review.

> **Step 3:** Determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2.

The EPA used a four-step framework, referred to as the Cross-State Air Pollution Rule (CSAPR) framework, to address the requirements of the "good neighbor" provision in the 2015 Transport NODA. From the 2015 Transport NODA, the four steps in the CSAPR framework are as follows (82 FR 1735):

> "[1] Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS);

3-1

[2] determining which states contribute to these problems in amounts sufficient to "link: them to the downwind air quality problems;

[3] for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS by quantifying upwind reductions in ozone precursor emissions and apportioning emissions reduction responsibility among upwind states; and

[4] for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, adopting SIPs or FIPs that eliminate such emissions."

The TCEQ's three-step process covers steps [1] and [2] of the four-step framework. Step 1 of the TCEQ's three-step process is the same as step [1] of the EPA's four-step framework. Steps 2 and 3 of the TCEQ's process together are equivalent to step [2] of the EPA's framework. Steps [3] and [4] of EPA's framework are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and are therefore not addressed in this SIP revision.

In the 2015 Transport NODA, upwind states with contributions greater than or equal to 0.7 ppb to a monitor's future year design value are linked to the downwind monitor. Once the linkages have been established, the portion of emissions from linked states that were determined by the EPA to have contributed significantly to nonattainment or interfere with maintenance are identified (Steps 2 and 3, respectively, of the EPA's four-step framework). The EPA's framework establishes the 1% of NAAQS threshold as the default definition of significant contribution to nonattainment or interference with maintenance. The TCEQ has maintained and noted in comments to EPA on its transport modeling, that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is inappropriate and incomplete.[2,3] In the 2015 Transport NODA, the EPA acknowledges that a contribution of 1% of the NAAQS from an upwind state alone does not determine whether the upwind state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state (FR 82 1740). The TCEQ believes that it is critical to determine if emissions from an upwind state contribute significantly to nonattainment or interfere with maintenance prior to the identification (and subsequent reduction) of such emissions.

---

[2] "Comments by the Texas Commission on Environmental Quality Regarding the Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Summary-on-EPA%E2%80%93HQ%E2%80%93OAR%E2%80%932016%E2%80%930751.pdf

[3] "Comments by the Texas Commission On Environmental Quality Regarding Disapproval of Air Quality Implementation Plans: Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Comments-on-EPA-R06-OAR-2012-0985.docx

In this SIP revision, the TCEQ is partially addressing its concern with the use of the 1% of NAAQS threshold as the definition of significant contribution to nonattainment by adding a step that uses a more comprehensive analysis to determine **if** emissions from an upwind state contribute **significantly** to nonattainment or interfere with maintenance.

For Step 1, the TCEQ used regional photochemical modeling to identify monitors projected to be in nonattainment or have maintenance issues in the future year. In Step 2, if the Texas contribution to a monitor's future year design value was greater than or equal to 1% of the NAAQS (i.e., 0.7 ppb) the monitor was tagged for further review. In Step 3, a comprehensive review of modeling and analysis of monitoring data was used to determine if emissions from Texas contributed significantly to nonattainment or interfered with maintenance for monitors tagged in Step 2.

## 3.2 STEP 1: IDENTIFICATION OF PROJECTED NONATTAINMENT AND MAINTENANCE MONITORS

The TCEQ used photochemical modeling, in accordance with the EPA's 2014 *Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM*$_{2.5}$*, and Regional Haze* (EPA Modeling Guidance)[4], to identify monitors projected to be in nonattainment in a future year. Photochemical modeling for ozone consists of using a regional Chemical Transport Model (CTM) with appropriate meteorological and emissions inputs, to simulate the formation and transport of ozone.

To assess the future attainment status of monitors, the EPA's Modeling Guidance uses modeling results in a relative sense. This relative approach is based on how the model responds to the change in emissions between a base year and a future year while holding meteorological inputs constant. For this SIP revision, the TCEQ used a 2012 base year and a 2023 future year to identify monitors projected to be in nonattainment or have maintenance issues in the future. The future year of 2023 was chosen based on the assumed attainment date for moderate nonattainment areas as detailed in EPA's 2015 Transport NODA.

The photochemical modeling process began with episode, base year, and domain selection. Base case and future year modeling was conducted, and results were interpreted to determine future year (2023) design values (DV$_F$) at monitoring sites in the modeling domain.

### 3.2.1 Modeling Domain

The geographic extent of the modeling domain used for the 2015 ozone NAAQS Transport SIP revision is shown in Figure 3-1: *Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain.* The domain includes the 48 contiguous states of the United States (U.S.), with parts of southern Canada and northern Mexico.

---

[4] https://www3.epa.gov/scram001/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf



**Figure 3-1: Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain**

The CTM used for this SIP revision is the Comprehensive Air Quality Model with Extensions (CAMx), version 6.40. CAMx is a three-dimensional grid-based Eulerian model designed to simulate the formation and transport of ozone and ozone precursor concentrations over regional and urban spatial scales. [5] The modeling domain, referred to as the rpo_12km domain, has a horizontal grid resolution of 12 kilometers (km) by 12 km and 29 vertical layers. The domain definitions are provided in *Table 3-1: 2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions.*

Table 3-2: *2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure* provides details of the modeling domain vertical layers such as the top and center height in meters Above Ground Level (m AGL) and thickness in meters (m).

---

[5] http://www.camx.com/about/default.aspx

**Table 3-1:  2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|---|---|---|---|---|---|
| National RPO Domain | (-2736,2592) | (-2088,1944) | 444 | 336 | rpo_12km |

**Table 3-2:  2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure**

| CAMx Layer | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|
| 29 | 18250 | 16445 | 3611 |
| 28 | 14639 | 13632 | 2015 |
| 27 | 12624 | 10786 | 3675 |
| 26 | 8949 | 7891 | 2115 |
| 25 | 6833 | 6289 | 1088 |
| 24 | 5746 | 5290 | 911 |
| 23 | 4835 | 4449 | 772 |
| 22 | 4063 | 3704 | 717 |
| 21 | 3346 | 3175 | 341 |
| 20 | 3005 | 2840 | 330 |
| 19 | 2675 | 2515 | 320 |
| 18 | 2355 | 2225 | 259 |
| 17 | 2096 | 1969 | 253 |
| 16 | 1842 | 1718 | 248 |
| 15 | 1595 | 1474 | 242 |
| 14 | 1353 | 1281 | 143 |
| 13 | 1210 | 1140 | 141 |
| 12 | 1069 | 1000 | 139 |
| 11 | 930 | 861 | 138 |
| 10 | 792 | 747 | 91 |
| 9 | 702 | 656 | 90 |
| 8 | 612 | 567 | 89 |
| 7 | 522 | 478 | 89 |
| 6 | 433 | 389 | 88 |
| 5 | 345 | 302 | 87 |
| 4 | 258 | 215 | 87 |
| 3 | 171 | 128 | 86 |
| 2 | 85 | 60 | 51 |
| 1 | 34 | 17 | 34 |

**3.2.2 Modeling Episode**

The modeling episode used for this SIP revision was the May 1 through September 30, 2012 period (May through September 2012). A robust modeling platform had been developed for May through September 2012 as part of the Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone NAAQS (HGB

3-5

AD SIP) that was adopted on December 15, 2016 by the commission and submitted to the EPA on December 29, 2016. The May through September 2012 episode was selected in accordance with the episode selection criteria specified in the EPA Modeling Guidance, details of which are documented in the section 3.4: *Episode Selection* of the HGB AD SIP.[6] The EPA, in its 2015 Transport NODA, used May 1 through September 30, 2011 period (May through September 2011) for its transport modeling. However, 2011 was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895 (Hoerling *et al.*, 2012). Figure 3-2: *U.S. Drought Monitor Map of Texas for July 26, 2011* shows the extent of the drought across the state.



**Figure 3-2: U.S. Drought Monitor Map of Texas for July 26, 2011**

The TCEQ has submitted comments on the unsuitability of the May through September 2011 episode for Texas ozone modeling in response to several EPA actions such as the

---

[6] Revisions to the State of Texas Air Quality Implementation Plan for the Control of Ozone Air Pollution, Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone Standard Nonattainment Area (pages 3-4 to 3-17)
https://www.tceq.texas.gov/assets/public/implementation/air/sip/hgb/HGB_2016_AD_RFP/AD_Adoption/16016SIP_HGB08AD_ado.pdf

EPA 2011 modeling platform,[7] EPA 2018 Modeling Platform,[8] EPA NODA on Updated Transport Modeling for the 2008 Ozone NAAQS[9] and the 2015 Transport NODA.[10]

3.2.2.1 Meteorology of 2012

Meteorology for the May through September 2012 period was analyzed for the rest of the contiguous U.S. The year 2012 had above average temperatures across most of the U.S., except in some states in the southeast. New Hampshire had their highest May through October average temperatures on record. The National Oceanic and Atmospheric Administration's (NOAA) National Climatic Data Center (NCDC) temperature rankings[11] for the May through October average temperature of 2012 relative to the years 1895 through 2012 are shown in Figure 3-3: *May through October 2012 Statewide NCDC Temperature Ranks*. The numbers in each state represent the numerical rank for that state for 2012. Among the NCDC climatic regions,[12] the Northeast had its warmest year on record for the years 1895 through 2012.

---

[7] TCEQ comments on EPA's "Notice of Availability of the EPA's 2011 Modeling Platform." Submitted 3/31/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#033114
[8] TCEQ comments on EPA's "Notice of Availability of the EPA's 2018 Modeling Platform." Submitted 6/24/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#062414
[9] TCEQ comments on EPA's Notice of Data Availability of the Updated Ozone Transport Modeling Data for the 2008 Ozone NAAQS. Submitted 10/15/15 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#101515
[10] TCEQ comments on EPA's "Preliminary Interstate Ozone Transport Modeling Data for 2015 Ozone NAAQS." Submitted 4/5/17 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#040517
[11] Explanation of Climatological Rankings available at https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition
[12] NCDC U.S. Climatic Region definitions are available at https://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php



**Figure 3-3: May through October 2012 Statewide NCDC Temperature Ranks**

Figure 3-4: *May through October 2012 Statewide NCDC Precipitation Ranks* shows the NCDC precipitation rankings for the May through October months of 2012 relative to the years 1895 through 2012. May through October 2012 had below normal or much below normal precipitation in most of the South and Northern Rockies and Plains and parts of the Upper Midwest and Ohio River Valley climate regions with a record driest year for Nebraska and Wyoming. However, the Northeast and parts of the Southeast had above normal or much above normal precipitation.



**Figure 3-4: May through October 2012 Statewide NCDC Precipitation Ranks**

The entire central portion of the U.S. was in some state of drought. However, the drought reported in Texas by July 2011 had diminished in severity by July 2012. Figure 3-5: *Change in Texas Drought Conditions from July 2011 to July 2012* shows the change in drought class from July 26, 2011 to July 24, 2012 with approximately 60 to 70% of Texas showing improvement by three to five drought classes statewide.



**Figure 3-5: Change in Texas Drought Conditions from July 2011 to July 2012**

3.2.2.2 Ozone Production in 2012

The TCEQ analyzed, similar to the EPA's analysis for its transport modeling,[13] the meteorologically adjusted ozone trends for the NCDC climate regions for May through September 2012. Figure 3-6: *Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016*[14] shows the meteorologically-adjusted ozone trends from 2000 through 2016. The 2010 through 2016 time period shows variation in ozone-conducive conditions across years and climate regions. The year 2012 was more conducive (relative to 2010 through 2016) for ozone formation in the Northeast, Upper Midwest, Northwest, Northern Rockies and Plains, and West regions while for the Ohio River Valley, South, Southeast, and Southwest climate regions 2011 was more conducive to ozone production. In the past the EPA has acknowledged that no single year will be representative of "typical" meteorological conditions for ozone for all regions of the U.S. (EPA, August 2016). Based on this analysis, the TCEQ concluded that the well-tested 2012 modeling platform is appropriate for use in this SIP revision.

---

[13] "Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Cross-State Air Pollution Rule Proposal", available at https://www.epa.gov/sites/production/files/2015-11/documents/air_quality_modeling_tsd_proposed_rule.pdf
[14] Data for this analysis shown in Figure 3-6 was obtained from the EPA's Air-Trends webpage (https://www.epa.gov/air-trends/trends-ozone-adjusted-weather-conditions)



**Figure 3-6: Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016**

3-11

### 3.2.3 Base Case Modeling

Base case modeling was used to evaluate the CTM's ability to replicate measured ozone and precursor concentrations. The adequacy of the model in replicating observations was assessed statistically and graphically. Satisfactory model performance in base case modeling provided a degree of confidence in the use of the model to predict future ozone concentrations and to evaluate transport impacts.

Base case modeling included the generation of initial and boundary conditions, emissions inputs and meteorological inputs for the May through September 2012 period needed by CAMx. Results of base case modeling included modeled ozone and precursor concentrations for every grid cell of the rpo_12km domain for every hour of May through September 2012. The base case modeling results were evaluated by comparisons with observed measurements at monitoring sites across the modeling domain. The model performance evaluation was iterative. Feedback from successive evaluations was incorporated to ensure that the model was adequately replicating observations throughout the modeling domain and episode. Details of the inputs generated for base case modeling are provided below.

#### 3.2.3.1 Meteorological Modeling

The TCEQ used the Weather Research and Forecasting Model (WRF) version 3.8.1 to create the May through September 2012 meteorological inputs for CAMx. The WRF domain was chosen to accommodate the CAMx domain shown in Figure 3-1. Figure 3-7: *Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain* shows the geographical extent of the WRF modeling domain, along with the CAMx domain for reference.



**Figure 3-7: Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain**

For the meteorological model, a single domain was used, referred to as na_12km, with horizontal grid resolution of 12 km x 12 km and 44 vertical layers. The WRF model domain definitions are provided in Table 3-3: *2015 Transport SIP Revision WRF Modeling Domain Definitions.* Table 3-4: *2015 Transport SIP Revision WRF Modeling Domain Vertical Structure* provides details of the WRF model domain vertical layers, such as heights and thickness. Figure 3-8: *Matching of WRF and CAMx Vertical Layers* shows how the vertical layers of WRF shown in Table 3-4 are matched to the vertical layers of CAMx shown in Table 3-2.

**Table 3-3:   2015 Transport SIP Revision WRF Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|---|---|---|---|---|---|
| North America Domain | (-2916,2916) | (-2304,2304) | 489 | 387 | na_12km |

**Table 3-4:   2015 Transport SIP Revision WRF Modeling Domain Vertical Structure**

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|---|
| 44 | 0.000 | 20581 | 20054 | 1054 |

3-13

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|---|
| 43 | 0.010 | 19527 | 18888 | 1278 |
| 42 | 0.025 | 18249 | 17573 | 1353 |
| 41 | 0.045 | 16896 | 16344 | 1103 |
| 40 | 0.065 | 15793 | 15215 | 1156 |
| 39 | 0.090 | 14637 | 14144 | 987 |
| 38 | 0.115 | 13650 | 13136 | 1029 |
| 37 | 0.145 | 12621 | 12168 | 906 |
| 36 | 0.175 | 11716 | 11245 | 941 |
| 35 | 0.210 | 10774 | 10294 | 962 |
| 34 | 0.250 | 9813 | 9379 | 867 |
| 33 | 0.290 | 8946 | 8550 | 792 |
| 32 | 0.330 | 8154 | 7790 | 729 |
| 31 | 0.370 | 7425 | 7128 | 594 |
| 30 | 0.405 | 6830 | 6551 | 559 |
| 29 | 0.440 | 6271 | 6007 | 528 |
| 28 | 0.475 | 5743 | 5492 | 501 |
| 27 | 0.510 | 5242 | 5037 | 410 |
| 26 | 0.540 | 4832 | 4636 | 393 |
| 25 | 0.570 | 4439 | 4250 | 378 |
| 24 | 0.600 | 4061 | 3878 | 365 |
| 23 | 0.630 | 3696 | 3520 | 352 |
| 22 | 0.660 | 3344 | 3173 | 341 |
| 21 | 0.690 | 3003 | 2838 | 330 |
| 20 | 0.720 | 2673 | 2513 | 320 |
| 19 | 0.750 | 2353 | 2224 | 259 |
| 18 | 0.775 | 2094 | 1967 | 253 |
| 17 | 0.800 | 1841 | 1717 | 247 |
| 16 | 0.825 | 1593 | 1472 | 242 |
| 15 | 0.850 | 1352 | 1280 | 143 |
| 14 | 0.865 | 1209 | 1138 | 141 |
| 13 | 0.880 | 1068 | 999 | 139 |
| 12 | 0.895 | 929 | 860 | 137 |
| 11 | 0.910 | 792 | 746 | 91 |
| 10 | 0.920 | 701 | 656 | 90 |
| 9 | 0.930 | 611 | 566 | 89 |
| 8 | 0.940 | 522 | 477 | 89 |
| 7 | 0.950 | 433 | 389 | 88 |
| 6 | 0.960 | 345 | 301 | 87 |
| 5 | 0.970 | 258 | 214 | 87 |
| 4 | 0.980 | 171 | 128 | 86 |
| 3 | 0.990 | 85 | 60 | 51 |
| 2 | 0.996 | 34 | 26 | 17 |
| 1 | 0.998 | 17 | 8 | 17 |
| 0 | 1.000 | 0 | 0 | 0 |



Figure 3-8: Matching of WRF and CAMx Vertical Layers

3-15

The initial and boundary conditions for WRF modeling were obtained from the GCIP (GEWEX (Global Energy and Water EXperiment) Continental-Scale International Project) NCEP (National Centers for Environmental Prediction) Eta data archive. Where data were missing from the GCIP NCEP Eta archive, data extracted from the NCEP North American Mesoscale model were used. More details regarding how missing data were handled is presented in Appendix A: *Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard*. To optimize performance, two types of nudging were utilized. The first type was analysis nudging, both three-dimensional (3-D) and surface. The 3-D analysis nudging was used to nudge the wind, temperature and moisture, while the surface analysis nudging was only used to nudge wind and temperature. The second type of nudging used was observational nudging, which used the radar profiler data for nudging aloft winds towards observed vertical profiles.

The selection of the final meteorological modeling configuration for May through September 2012 resulted from numerous sensitivity tests and model performance evaluation. The final WRF parameterization schemes and options selected are shown in Table 3-5: *WRF Model Configuration Parameters*. Details of the meteorological sensitivity tests are provided in Appendix A.

**Table 3-5: WRF Model Configuration Parameters**

| Domain | Nudging Type | PBL | Cumulus | Radiation | Land-Surface | Microphysics |
|--------|--------------|-----|---------|-----------|--------------|--------------|
| na_12km | 3-D, Surface Analysis, PX Soil Nudging, NPN and CAP Radar Profiler Observations | YSU | Multiscale Kain-Fritsch | RRTM / Dudhia | Pleim-Xiu | WSM5 |

WRF output was post-processed using the WRF2CAMx version 4.6 utility with the Community Multi-Scale Air Quality (CMAQ) modeling system vertical diffusivity (Kv) option to convert the WRF meteorological fields to the appropriate CAMx grid and input format. The 100 m Kv Patch program developed by Ramboll Environ[15] was used to modify the vertical diffusivity coefficients based on a land-use basis to maintain vertical mixing within the first 100 meters of the model over urban areas. Sub grid stratiform cloud diagnostics were applied to better simulate ultraviolet-attenuation in CAMx.

WRF model performance was evaluated for wind speed and direction, temperature, and humidity. Figure 3-9: *Wind Speed Mean Bias for May through September 2012*, Figure 3-10: *Two Meter Temperature Mean Bias for May through September 2012*, and Figure 3-11: *Humidity Mean Bias for May through September 2012* show the mean bias for wind speed, temperature, and humidity, respectively for May through September 2012 for each monitoring station across the na_12km domain.

---

[15] "Dallas-Fort Worth Modeling Support: Improving Vertical Mixing, Plume-in-Grid, and Photolysis Rates in CAMx", TCEQ Project report available at
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821110365FY1206-20120820-environ_dfw_modeling_support.pdf



**Figure 3-9: Wind Speed Mean Bias for May through September 2012**



**Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012**



**Figure 3-11: Humidity Mean Bias for May through September 2012**

Figure 3-9 shows that wind speed had a negative bias along the East Coast, Southeast, and western continental U.S., while eastern Texas, the Ohio River Valley, and the Great Lakes region had a positive bias. Mean bias for temperature in Figure 3-10 does not show strong geographical trends, although slightly more monitors in the western U.S. show a positive bias. Figure 3-11 shows that there was a positive bias for humidity at most monitoring stations in the domain, although a negative bias is seen over much of Oklahoma through eastern Kansas and into southern Nebraska, and also in parts of southern California.

Figure 3-12: *Wind Speed Mean Absolute Error for May through September 2012*, Figure 3-13: *Two Meter Temperature Mean Absolute Error for May through September 2012*, and Figure 3-14: *Humidity Mean Absolute Error for May through September 2012* show the mean absolute error for wind speed, temperature, and humidity, respectively for May through September 2012 at monitoring stations across the na_12km domain.



**Figure 3-12: Wind Speed Mean Absolute Error for May through September 2012**



**Figure 3-13: Two Meter Temperature Mean Absolute Error for May through September 2012**

3-19



**Figure 3-14: Humidity Mean Absolute Error for May through September 2012**

Figure 3-12 and Figure 3-13 show that the mean absolute error for wind speed and temperature, respectively, were lower in the eastern U.S. than western U.S. Figure 3-14 shows a more north/south regional difference for humidity, with monitors in the northern U.S. having less mean absolute error than monitors in the southern U.S.

Figure 3-15: *Wind Speed RMSE for May through September 2012*, Figure 3-16: *Two Meter Temperature RMSE for May through September 2012*, and Figure 3-17: *Humidity RMSE for May through September 2012* show the Root Mean Square Error (RMSE) for wind speed, temperature, and humidity, respectively, for May through September 2012 at monitoring stations across the na_12km domain.



**Figure 3-15: Wind Speed RMSE for May through September 2012**



**Figure 3-16: Two Meter Temperature RMSE for May through September 2012**



**Figure 3-17: Humidity RMSE for May through September 2012**

Similar to the Mean Absolute Error in Figures 3-12 through 3-14, Figure 3-15 and Figure 3-16 show an east/west regional trend with monitors in the east having lower RMSE than monitors in the west for wind speed and temperature, respectively, while Figure 3-17 shows that RMSE for humidity in the southern and central monitors are greater than RMSE for northern monitors.

Overall, WRF model performance for May through September 2012 was acceptable for the CTM input. More details regarding WRF model performance, including daily, monthly, and regional performance statistics, are presented in Appendix A.

3.2.3.2 Emissions Modeling

Emissions modeling is the process of creating CAMx-ready emissions inputs. For base case modeling, precursor emissions inputs are chemically speciated into the Carbon Bond 6 (CB6) chemical mechanism species used in CAMx, temporally allocated, and spatially distributed to 12 km grid cells for May through September 2012. The main ozone precursors are nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) while carbon monoxide (CO) plays a minor role in ozone formation. Though CO has very low reactivity and does not play a major role in controlling ozone formation, in this subsection details of CO modeling emissions inventories are presented as CO is a chemical species in the model.

Version 3.22 of the Emissions Processor System (EPS3) was used to prepare the gridded emissions inputs. Table 3-6: *Emissions Processing Modules* summarizes many of the steps taken to prepare the required emission files needed by CAMx and the software modules in EPS3 that were used for each step.

3-22

**Table 3-6:  Emissions Processing Modules**

| EPS3 Module | Description |
|---|---|
| PREAM | Prepare area and non-link based area and mobile source emissions for further processing |
| LBASE | Spatially allocate link-based mobile source emissions among grid cells |
| PREPNT | Group point source emissions into elevated and low-level categories for further processing |
| CNTLEM | Apply controls to model strategies, apply adjustments, make projections, etc. |
| TMPRL | Apply temporal profiles to allocate emissions by day type and hour |
| SPCEMS | Chemically speciate emissions into nitrogen oxide (NO), nitrogen dioxide ($NO_2$), and various CB6 VOC species |
| GRDEM | Spatially distribute emissions by grid cell using source category surrogates |
| MRGUAM | Merge and adjust multiple gridded files for model-ready input |
| PIGEMS | Assign Plume-in-Grid (PiG) emissions and merge elevated point source files |

Figure 3-18: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions* shows the total anthropogenic precursor emissions in the rpo_12km domain by major geographic region (Texas, Non-Texas U.S., southern Canada, northern Mexico, and Oceanic) on a sample 2012 summer weekday in tons per day.



**Figure 3-18:  Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions**

Emissions modeling includes preparing emissions inventories for anthropogenic emissions source categories such as stationary point sources (power plants, refineries,

etc.), area sources (dry cleaners, gas stations, etc.), on-road mobile sources (cars, trucks, etc.), non-road mobile sources (construction vehicles, lawn mowing equipment, etc.), off-road mobile sources (locomotives, commercial marine, aircraft, etc.), and oceanic (off-shore oil rigs and ocean-going vessels). Figure 3-19: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2012 summer weekday in tons per day.



**Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category**

Emissions inventories for natural emissions source categories, i.e., biogenic sources and fires, were also developed. Version 3.61 of the Biogenic Emissions Inventory System (BEIS) (Bash et al., 2016) within the Sparse Matrix Operation Kernel Emissions (SMOKE) System version 3.7[16] was used to create the biogenic emissions inventory. Figure 3-20: *Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012* shows a sample of biogenic VOC emissions in the rpo_12km domain.

---

[16] Available at https://www.cmascenter.org/smoke/



**Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012**

Wildfire emissions were estimated from the daily Fire Inventory from the National Center for Atmospheric Research (NCAR) (FINN) version 1.5 product for 2012 (Wiedinmyer, 2011). The FINN fire estimates were projected to the model grid and grouped together if fires were within 5 km of each other. Each fire was treated as a point source and processed using the EPS3 PREFIR, CHMSPL, TMPRL, and PSTFIR

3-25

modules following the methodology developed in a TCEQ project.[17] The fire emissions were temporally allocated according to the temperate North American diurnal cycle of fires from Mu et al. (2011).

Since the purpose of base case modeling is to evaluate the ability of the model to recreate a past episode, measured and reported emissions data from 2012 with the highest resolution available were relied upon to determine the spatial and temporal allocation of emissions in the modeling domain for each hour of the modeling episode. Details of the development and processing of emissions inventories for base case modeling are provided in Appendix B: *Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard*.

### 3.2.3.3 Initial and Boundary Conditions

In addition to emissions and meteorological inputs, CAMx requires initial and boundary conditions. Initial conditions refer to the state of the atmosphere in the rpo_12km domain at the start of the modeling episode. Boundary conditions refer to the state of the atmosphere at the five edges (North, South, East, West, and Top) of the rpo_12km domain.

The initial and boundary conditions were derived from the output of a three-dimensional global CTM, GEOS-Chem. The GEOS-Chem model simulates atmospheric chemical and physical processes driven by assimilated meteorological observations from the NASA's Goddard Earth Observing System (GEOS).[18] The TCEQ used a modified version of the standard GEOS-Chem version 10-01. The modifications were implemented by Ramboll Environ as part of TCEQ projects[19, 20] that updated the lightning $NO_x$ module (Travis et al., 2016; Zhang et al., 2014) and halogen chemistry (Sherwen et al., 2016; Yarwood et al., 2016), and fixed several model errors.

For the base case simulation, GEOS-Chem was run for 2012 with a grid resolution of 2.0 degrees latitude x 2.5 degrees longitude, using meteorology from the GEOS Model Version 5 (GEOS-5) and global anthropogenic emissions inventory for non-U.S. regions from the Hemispheric Transport of Air Pollution (HTAP) version 2. For U.S. emissions, the U.S. National Emission Inventory 2011 (2011 National Emissions Inventory) was used. GEOS-Chem results were used to provide one-way dynamic boundary concentrations at three-hour intervals and an initial concentration field for the CAMx simulations. Figure 3-21: *Initial Concentration on April 16, 2012 in the RPO_12km* shows a map of the initial ozone concentration field on 12 a.m., April 16, 2012 at the surface layer in the rpo_12km domain. April 16, 2012 is the start date of the CAMx

---

[17] "Boundary Condition and Fire Emissions Modeling", Tai *et al*, September 2008, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5820784005FY0810-20080831-environ-bcic_final_report.pdf
[18] GEOS-Chem Model, http://acmg.seas.harvard.edu/geos/
[19] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf
[20] "2013 Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, June 2017, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/582177144421-20170627-environ-2013_BC_GEOS_Chem.pdf

simulation with a ramp up period of April 16 through April 30 for the base case modeling.



**Figure 3-21: Initial Concentration on April 16, 2012 in the RPO_12km**

Figure 3-22: *2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-23: *2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-24: *2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-25: *2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show a samples of the 2012 east, west, north, and south, respectively, boundary conditions for the July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.



**Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-25:  2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3.2.3.4 Photochemical Modeling

The TCEQ used CAMx version 6.40,[21] with the following options:

- New gas-phase chemistry mechanism CB6 "revision 4," with condensed halogen chemistry and inline sea salt emissions (CB6r4h); and

- Wesely dry deposition scheme.

In addition to the meteorological, emissions, and initial and boundary condition inputs, CAMx needs spatially resolved surface characteristic parameters, albedo/haze/ozone (i.e., opacity), photolysis rates, and a file with chemistry parameters.

Surface characteristic parameters, including topographic elevation, Leaf Area Index (LAI), vegetative distribution, and water/land boundaries are input to CAMx via a land-use file. The land-use file provides the fractional contribution of 26 land-use categories per grid cell, as defined by Zhang et al (2003). The land use file was developed using version 3 of the Biogenic Emissions Land Use Database for areas outside the U.S. and the 2006 National Land Cover Dataset for the U.S. For Texas and surrounding states, updated land-use files developed by Texas A&M University (Popescu et al., 2012) were used. The land use file, in addition to the land-use categories, has LAI ratios. LAI is the ratio of total upper leaf surface of vegetation divided by the surface area of the land on which the vegetation grows. LAI is a dimensionless value, typically ranging from zero for bare ground to over seven for a dense forest. Monthly averaged LAI was created from the eight-day 1 km resolution MODIS MCD15A2 product.

Spatially resolved opacity and photolysis rates that are specific to the chemistry parameters for the CB6 mechanism are input to CAMx via a photolysis rates file and an opacity file. The chemistry parameters for the CB6 mechanism are provided in the

---

[21] User's Guide Comprehensive Air Quality Model with Extensions (CAMx), Version 6.30, Ramboll Environ, Inc., April 2016, available at http://www.camx.com/files/camxusersguide_v6-30.pdf

chemistry parameters file. Episode-specific satellite data from the Total Ozone Mapping Spectrometer were used to prepare the clear-sky photolysis rates and opacity files. Photolysis rates are internally adjusted by CAMx according to cloud and aerosol properties using the inline Tropospheric Ultraviolet Visible model.

The CAMx model configuration was applied to the 2012 base case using the episode-specific meteorological inputs, biogenic and anthropogenic emission inputs, and initial and boundary conditions described above. The CAMx modeling results were compared to the measured ozone and ozone precursor concentrations at all regulatory monitoring sites in the rpo_12km domain, which resulted in several modeling iterations to implement improvements to the meteorological modeling, emissions modeling, and subsequent CAMx modeling. Various configuration changes such as the choice of biogenic emission models, land-use model used in WRF modeling, impact of cloud assimilation, etc., were evaluated along with updates to various anthropogenic emissions categories.

Statistical metrics such as Mean Bias (MB), Mean Error (ME), Normalized Mean Bias (NMB), Normalized Mean Error (NME), and RMSE were calculated by comparing monitored (measured) and bi-linearly interpolated modeled ozone concentrations for all episode days and monitors. These statistical metrics were used to evaluate the different configurations and arrive at the final configuration used for the 2015 Ozone NAAQS Transport SIP revision.

Episode-wide model performance statistics and graphics for the final modeling configuration are presented below. Figure 3-26: *Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites* shows the mean bias for all the EPA Air Quality System (AQS)[22] monitoring sites for the May through September 2012 episode for days with observed Maximum Daily Average Eight-Hour (MDA8) ozone concentration greater than or equal to 60 ppb. Figure 3-26 shows that the mean biases for days with MDA8 greater than 60 ppb differ by region, with monitors along the East Coast showing positive bias while monitors on the West Coast show negative biases. Most monitors have a mean bias in the range of ± 5 ppb on high ozone days, which is acceptable model performance (Simon *et al.*,2012). Figure 3-27: *RMSE for May through September 2012 Episode at AQS Monitoring Sites* shows the RMSE for each of the AQS monitoring sites on days with observed MDA8 greater than 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, monitors along the northeast and the southwest coast had higher deviations with RMSE in the 16 to 20 ppb range. Table 3-7: *Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration* provides the statistical metrics for the May through September 2012 episode on days with observed MDA8 greater than 60 ppb for each of the NCDC Climate Regions.

---

[22] https://www.epa.gov/aqs



**Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites**

3-31



**Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites**

**Table 3-7: Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

Overall, the base case modeling showed reasonable model performance and is comparable with the EPA's modeling documented in the 2015 Transport NODA. Although the EPA had better performance in the Northeast climate region, in the South

3-32

climate region, which includes Texas and surrounding states, the TCEQ's modeling performed better than the EPA's. Detailed performance evaluation for the 2012 base case modeling episode is included in Appendix C: *Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard.*

### 3.2.4 Future Year Modeling

Future year modeling is used to predict ozone concentrations and calculate a $DV_F$ at each AQS monitor in the modeling domain in the future year, 2023. In future year modeling, the same modeling episode (May through September 2012) is used, but with projected future anthropogenic emissions. Future year modeling predicts the change in ozone concentrations due to changes in anthropogenic emissions in a future year while keeping the meteorological and natural emissions (biogenic and wildfires) inputs constant. Future year modeling answers the question: what would the ozone concentrations be in the future if the same meteorological conditions (that resulted in a high ozone episode in the past) were to repeat?

The meteorological inputs generated for May through September 2012 using the WRF model and described in section 3.2.3.1: *Meteorological Modeling* were used as inputs to the CTM in the future year modeling.

#### 3.2.4.1 Emissions Modeling

For future year modeling, emissions inventories were developed for the anthropogenic emissions source categories by applying growth and control factors to base year emissions. Growth and control factors are developed based on the projected growth in the demand for goods and services, along with the reduction in emissions expected from state, local, and federal control programs. Figure 3-28: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by major geographic region on a representative 2023 summer weekday in tons per day. Figure 3-29: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2023 summer weekday in tons per day.



**Figure 3-28: Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region**



**Figure 3-29: Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category**

Since biogenic emissions are dependent upon the meteorological conditions on a given day, the same episode-specific emissions that were used in the base case modeling

3-34

were also used in the 2023 future year modeling. Since future year wildfires cannot be predicted, the wildfire emissions inventory developed for the base case modeling was also used in the 2023 future year modeling. Details regarding the development of the 2023 emissions inventory, including projection tools, projection growth factors and federal/state/local rules and programs incorporated are provided in Appendix B.

3.2.4.2 Initial and Boundary Conditions

For future year modeling, updated 2023 initial and boundary conditions were developed by running GEOS-Chem again. The 2023 initial and boundary conditions were developed by using projected 2023 anthropogenic emissions inventories with the same GEOS-Chem meteorological and CTM configurations as the 2012 base case. The 2023 anthropogenic emissions were updated from the base year using projected growth factors. Emissions in North America (specifically, the continental U.S., southern Canada, and northern Mexico) were projected using the same methods used by the TCEQ to project anthropogenic emissions in the rpo_12km domain as explained in Appendix B. In all other areas of the GEOS-Chem domain, emissions projection factors from the Representative Concentration Pathway (RCP85) Database[23] were used to develop the 2023 anthropogenic emissions. Since the RCP85 data are only available at 5 or 10 year intervals (e.g., 2000, 2005, 2010, 2020, etc.), emission projections factors for 2023 were linearly interpolated from changes between the two nearest projection years. Details of the emissions projections methodology are available in the TCEQ Project FY2016-16 report *Updated Boundary Conditions for CAMx Modeling.*[24]

Figure 3-30: *2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-31: *2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-32: *2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-33: *2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show samples of the 2023 east, west, north and south boundary conditions for July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.

---

[23] https://tntcat.iiasa.ac.at/RcpDb/dsd?Action=htmlpage&page=welcome
[24] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf



**Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3-36



**Figure 3-33: 2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3.2.4.3 Photochemical Modeling

For future year modeling, the 2023 anthropogenic emissions inventories were input along with the 2012 meteorological, biogenic, and wildfire emissions to the CAMx model configuration detailed in the section 3.2.3: *Base Case Modeling*. The output of the future year modeling, ozone concentrations for each grid cell in the rpo_12km domain, was post-processed to obtain the 2023 $DV_F$ at each AQS monitor in the rpo_12km domain.

*Projected Nonattainment Monitors*

The methodology described in EPA Modeling Guidance was used to determine the 2023 $DV_F$ at each monitor in the rpo_12km domain. A monitor's $DV_F$ is calculated by multiplying the Relative Response Factor (RRF) by a baseline year design value ($DV_B$) as shown in *Equation 3-1: Future Year Design Value Calculation for a Monitor.*

$$DV_F = RRF \times DV_B$$

**Equation 3-1: Future Year Design Value Calculation for a Monitor**

The RRF is the ratio of the average future year modeled MDA8 ozone concentrations to the average base year modeled MDA8 ozone concentrations on the top 10 modeled MDA8 base year days. In accordance with EPA Modeling Guidance, the maximum concentration of the three-by-three grid cell array surrounding each monitor on the top 10 base year days with modeled MDA8 above 60 ppb was used to calculate the RRF for each monitor. The $DV_B$ is the average of the regulatory design values for the three consecutive years containing the base year, as shown in Figure 3-34: *Baseline Design Value ($DV_B$) for the 2015 Ozone NAAQS Transport SIP.*



**Figure 3-34: Baseline Design Value (DV$_B$) for the 2015 Ozone NAAQS Transport SIP Revision**

Figure 3-35: *2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain* shows a map of the rpo_12km domain with the 2023 DV$_F$ for each AQS monitor.



**Figure 3-35: 2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain**

*Projected Maintenance Monitors*

In Step 1, in addition to identifying the monitors projected to be in nonattainment in 2023 as described above, monitors projected to have maintenance issues were also identified. To identify monitors that could have maintenance issues in 2023, the TCEQ calculated Maintenance Future Year Design Values (MDV$_F$). The 2023 MDV$_F$ is calculated using the same equation presented in Equation 3-1, except that the DV$_B$ is the most recent, instead of the average, of the three regulatory design values containing the base year. Therefore, since 2012 is the base year, the 2014 design value that is the latest regulatory design value that contains the base year of 2012 is used as DV$_B$. For monitors with no regulatory 2014 design value, the 2013 or 2012 design values were used as applicable. The regulatory design values after 2014, namely 2015 and 2016, are not used since these design values do not include monitored data from the modeling base year of 2012.

The TCEQ's approach for identifying maintenance monitors differs from the approach used by the EPA in the 2015 Transport NODA. The EPA used the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$ to identify maintenance monitors. Both the EPA's approach and the TCEQ's approach account for three years of meteorological variability in their choice of DV$_B$ to identify maintenance monitors since a single design value is a three-year average of the annual fourth-highest MDA8 ozone concentration. The EPA's approach is to choose the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$

while the TCEQ's approach is to choose the latest of the three consecutive regulatory design values containing the base year as the $DV_B$. For the reasons described below, the TCEQ determined that the selection of the most recent $DV_B$ addresses all issues relevant for an independent assessment of maintenance; and therefore, provides a comprehensive assessment of the potential impacts of Texas emissions on potential maintenance monitors.

The EPA's approach to identify maintenance monitors provides independent meaning to "maintenance" by choosing a $DV_B$ that is different from the $DV_B$ used in the identification of nonattainment monitors. As discussed previously, EPA chooses the maximum $DV_B$. The EPA justified this approach by inappropriately under-weighting the role of emissions reductions in the inter-annual variability of design values. Inter-annual variability in design values is mainly a function of both meteorology and emissions. By choosing the maximum $DV_B$, EPA provides less weight to the impact of emission reductions over time at a particular monitor, without justification. The EPA's approach under-emphasizes emissions reductions and future maintenance plan requirements that provide for attainment and maintenance. The EPA's approach assumes that inter-annual variability in design values is mainly attributable to meteorological conditions and any downward trend in design value is due to meteorology not being conducive to ozone formation.

Despite meteorological inter-annual variability there is a well-documented[25] nationwide decrease in ozone design values over time with many monitors attaining and maintaining ever-tightening standards. A nonattainment monitor progresses into maintenance through emissions reductions, not through weather modification. Even accounting for meteorological conditions, ozone formation has been on a downward trajectory in most parts of the country. As shown in Figure 3-6, which depicts the meteorologically adjusted ozone trends for the NCDC climate regions for May through September (ozone season) for years 2000 through 2016, a downward trend in meteorologically adjusted ozone (the blue line) in the later years can be seen for most regions. Table 3-8: *Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016* shows how many monitors had either a maximum or a minimum eight-hour ozone design value for each year from 2007 through 2016, with the five years that are included in the three consecutive regulatory design values containing the base year used in TCEQ's modeling shaded in light blue.

**Table 3-8: Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016**

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|------|------|------|
| 2007 | 582 | 18 |
| 2008 | 106 | 4 |
| 2009 | 10 | 14 |
| 2010 | 24 | 67 |

---

[25] "Our Nation's Air – Status and Trends though 2015", Interactive web report available at https://gispub.epa.gov/air/trendsreport/2016/

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|------|---------------------------------------------------------------|---------------------------------------------------------------|
| 2011 | 5 | 44 |
| 2012 | 43 | 13 |
| 2013 | 18 | 47 |
| 2014 | 0 | 51 |
| 2015 | 6 | 362 |
| 2016 | 6 | 180 |

As seen in Table 3-8, the maximum design value occurs more often in the earlier years and the minimum design value occurs more often in later years, though not always the latest years. This further shows that ozone is decreasing despite changes in meteorology from year to year.

In addition, since the maximum design value in the set of three consecutive regulatory design values containing the base year tends to be the oldest design value, the EPA's choice for $DV_B$ can inappropriately emphasize ozone concentrations from the first year (which is farthest from the future year) of the five-year window through its contribution to the oldest of three design values.

The TCEQ approach provides independent meaning to maintenance monitors in a manner consistent with the FCAA's concept of maintenance areas as areas that were formerly in nonattainment and that have since attained the standard and will continue to maintain that status in the future because it accounts for both meteorological variability and the latest emissions impact on the monitor, which could be either increasing or decreasing. The concept of maintenance is forward looking and must account for meteorological variability, the emissions reductions that have occurred in the past (through the establishment of permanent and enforceable measures on major stationary sources and well as trends such as fleet turnover), and commitments regarding contingency measures to address future emission reductions necessary if the area violates the standard.

The EPA's approach would appear to be more appropriate if the goal is to maximize the likelihood that a monitor would attain the NAAQS in a particular future year, since ozone concentrations in a particular year are subject to random meteorological effects, but that is not the focus in the identification of maintenance monitors. Although meteorology plays a role in determining whether or not an attainment monitor maintains that status, the EPA's approach conflates two related but distinct concepts: the likelihood of *attaining* the standard in a future year and the ability of an attainment monitor to *maintain* that attainment status.

Since all nonattainment monitors are simultaneously maintenance monitors and any remedies devised to address nonattainment monitors would have to apply to maintenance monitors due to the overlapping nature of the two methods, another practical consequence of the EPA's approach is that it could easily lead to over-control as well as requiring upwind states to consider or implement controls when the downwind state in which the maintenance monitor is located does not have any obligations to control local emissions. Such an approach was already adopted in CSAPR

3-41

where the EPA treated maintenance monitors identically to the way it treated nonattainment monitors, both in linking states to specific monitors and devising emission limits for the linked states. This conflation of nonattainment and maintenance further results in there being effectively no independent meaning to "maintenance" as opposed to "nonattainment," contrary to *North Carolina v. Environmental Protection Agency,* 531 F.3d 896 (D.C. Cir. 2008) (*North Carolina*).

The TCEQ's recommended approach accounts for meteorological variability, while accounting for possible emissions reductions, since the latest design value itself consists of monitoring data from a three-year period. Using the latest of the three design values acknowledges the progress made by states but still accounts for any recent changes in ozone concentrations. The TCEQ method provides independent meaning of maintenance (*North Carolina*) in a manner that is consistent with the FCAA's concept of maintenance and without penalizing upwind states for old violations at monitors that have seen substantial reductions over a five-year period. By focusing on the latest design value, the approach also harmonizes the requirements of §175A, the maintenance plan requirement for areas that were formerly nonattainment with the requirements of FCAA, §110(a)(2)(D). Since the latest design value will reflect the current state of ozone concentrations in an area and the impact of any maintenance plans that are in place to prevent local emissions from causing an area to slip back into nonattainment, the TCEQ's approach will ensure that only monitors with maintenance issues that are truly driven by interstate transport are tagged as maintenance monitors. Due to the differences in the TCEQ's approach (including choice of base year) and the EPA's approach, the set of monitors projected to be maintenance in 2023 are, not unexpectedly, different from the monitors identified as maintenance monitors in the 2015 Transport NODA.

Figure 3-36: *2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain* shows the MDV$_F$ for all the AQS monitors in the rpo_12km domain.



**Figure 3-36:  2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain**

### 3.3 STEP 2: SOURCE APPORTIONMENT AND IDENTIFICATION OF DOWNWIND MONITORS TAGGED FOR FURTHER REVIEW

Section 3.2 detailed how photochemical modeling was used in the relative sense to identify monitors projected to be in nonattainment or have maintenance issues in 2023. In this section, details on Step 2 and the identification of the subset of monitors that might be impacted by Texas emissions from the approximately 1200 AQS monitors in the rpo_12km domain are presented. The subset of monitors tagged in Step 2 were further reviewed in Step 3 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at that monitor.

The Anthropogenic Culpability Precursor Analysis (APCA) tool was used to identify and tag the subset of downwind monitors that might be impacted by Texas emissions (and will be further reviewed in Step 3). APCA is a probing tool in CAMx that is used to apportion the modeled ozone concentration at each grid cell at each simulation hour to specific user-defined geographic regions and/or source categories. APCA does this by keeping track of the origin of the $NO_x$ and VOC precursors creating the ozone in each grid cell for each time step during the model run.

The APCA contribution categories chosen were to facilitate better understanding of interstate problems at the monitors within the rpo_12km domain. Since Step 2 is to identify monitors that might be impacted by Texas emissions, the TCEQ considered Texas anthropogenic emissions as a contribution category for this SIP revision. Anthropogenic emissions from other states in the continental U.S. were grouped together as one contribution category. Other contribution categories were chosen to

separate out the impacts of emissions that are not directly related to interstate problems such as biogenics, fires, ocean, etc. The following are source contribution categories that were used in the APCA model run:

- Texas Anthro – $NO_x$ and VOC emissions from Texas anthropogenic sources;

- Non-Texas U.S. Anthro – $NO_x$ and VOC emissions from anthropogenic sources in the 47 other states of the continental U.S.;

- Non-U.S. Anthro – $NO_x$ and VOC emissions from southern Canadian and northern Mexican anthropogenic sources included in the rpo_12km domain;

- Ocean Anthro – $NO_x$ and VOC emissions from ocean-going vessels and off-shore oil and gas platforms;

- Biogenic Emissions;

- Fires; and

- Initial and boundary conditions.

Figure 3-37: *APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP* shows a map of the APCA contribution categories with Texas in red, Non-Texas U.S. in pink, Non-U.S. in lavender, and Ocean in blue.



**Figure 3-37:  APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision**

The outputs of an APCA model run are the total modeled hourly concentration and the breakdown of the total concentration by each user-specified contribution category for each grid cell of the domain for each hour of the episode. For example, as part of the 2023 APCA simulation, for cell index [242, 78], which contains the Manvel Croix monitor, the hourly modeled ozone concentration is 72.21 ppb on episode day July 14 at 12:00 p.m. Central Standard Time (CST). The total ozone concentration of 72.21 ppb in the cell is apportioned to the specified contribution categories as shown in Table 3-9: *Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution* Categories.

**Table 3-9:  Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories**

| Category | Contribution |
| --- | --- |
| Texas anthropogenic emissions | 48.41 |
| Non-Texas U.S. anthropogenic emissions | 0.72 |
| Non-U.S. anthropogenic emissions | 0.25 |
| Ocean anthropogenic emissions | 7.71 |
| Fire emissions | 0.32 |
| Biogenic emissions | 4.91 |
| Boundary conditions | 9.90 |

3-45

Figure 3-38: *Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST* is a graphical representation of the breakdown of the total hourly modeled concentration in the grid cell containing the Manvel Croix monitor on July 14 (contained within the red box) at 12:00 p.m. CST (identified by a gold star) by each APCA contribution category.



**Figure 3-38: Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST**

In an APCA model run, the sum concentrations apportioned to each contribution category will always equal the total modeled concentration for each grid cell for each hour. APCA apportions ozone formed due to the interaction of biogenic and anthropogenic precursor emissions by recognizing that biogenic emissions as a non-controllable category. Therefore, APCA apportions/attributes ozone formed from such interactions to the anthropogenic precursor emissions. Details of how APCA results were used to tag downwind nonattainment and maintenance monitors for further review are presented in this section.

To identify nonattainment and maintenance monitors for further review, Texas contribution to the monitor's 2023 $DV_F$ (2023 $TX_{DVF}$) was evaluated. The following methodology was used to determine the 2023 $TX_{DVF}$.

1. Calculate the 2023 MDA8 total concentration for each grid cell for each episode day.

2. Calculate the 2023 MDA8 Texas contribution using the hourly apportioned concentration for Texas for each grid cell for each episode day, using contributions from the hours that comprised the MDA8 concentration for that day.

3. For each monitor, calculate the ratio of the average of the 2023 MDA8 Texas contribution to the average of the 2023 MDA8 total concentration from the same days and grid cells used in the 2023 $DV_F$ calculation for that monitor.

4. Calculate the 2023 $TX_{DVF}$ for each monitor by multiplying the 2023 $DV_F$ for that monitor by the ratio calculated in the previous step for that monitor.

3-46

In addition to determining $TX_{DVF}$, the contribution of each APCA category to the 2023 $DV_F$ for each AQS monitor in the rpo_12km domain was also calculated using the steps outlined above.

### 3.3.1 Identification of Nonattainment Monitors for Further Review

Two criteria were used to tag downwind nonattainment monitors for further review - a monitor's 2023 $DV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-10: *Downwind Nonattainment Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state and county, 2023 $DV_F$, and 2023 $TX_{DVF}$, of the downwind nonattainment monitors tagged for further review in Step 3.

**Table 3-10: Downwind Nonattainment Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 $DV_F$ (ppb) | 2023 $TX_{DVF}$ (ppb) |
|---|---|---|---|---|---|
| 80350004 | Chatfield State Park | Colorado | Douglas | 73 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 72 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 72 | 1.22 |
| 40038001 | Chiricahua National Monument | Arizona | Cochise | 71 | 1.06 |
| 60371201 | Reseda | California | Los Angeles | 80 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 80 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 87 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 88 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 84 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 71 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 76 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 91 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 82 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 94 | 0.74 |

### 3.3.2 Identification of Maintenance Monitors for Further Review

Two criteria were used to tag downwind maintenance monitors for further review – a monitor's 2023 $MDV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-11: *Downwind Maintenance Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state

and county, 2023 $MDV_F$, and 2023 $TX_{DVF}$, of the downwind maintenance monitors tagged for further review in Step 3.

**Table 3-11: Downwind Maintenance Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 $MDV_F$ (ppb) | 2023 $TX_{DVF}$ (ppb) |
|---|---|---|---|---|---|
| 80350004 | Chatfield State Park | Colorado | Douglas | 72 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 73 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 71 | 1.22 |
| 80050002 | Highland Reservoir | Colorado | Arapahoe | 71 | 1.15 |
| 60371201 | Reseda | California | Los Angeles | 78 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 82 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 86 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 85 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 83 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 72 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 77 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 90 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 79 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 91 | 0.74 |

Except for the Highland Reservoir (AQS ID: 80050002) monitor in Arapahoe County, Colorado, all the maintenance monitors are also nonattainment monitors.

In the 2015 Transport NODA, the EPA's modeling linked Texas to six monitors based solely because modeled contributions to a monitor's future year design value were greater than or equal to 0.7 ppb. Table 3 12: *Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA* shows the six monitors, the 2023 $DV_F$ and modeled Texas contributions to $DV_F$ from the EPA's modeling and the corresponding values determined using the TCEQ's modeling.

**Table 3-12: Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA**

| AQS ID | State | County | 2023 DV$_F$ in EPA Modeling (ppb) | 2023 TX$_{DVF}$ in EPA Modeling (ppb) | 2023 DV$_F$ in TCEQ Modeling (ppb) | 2023 TX$_{DVF}$ in TCEQ Modeling (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Michigan | Allegan | 68.8 | 2.49 | 71 | 0.59 |
| 551170006 | Wisconsin | Sheboygan | 71.0 | 1.92 | 70 | 0.73 |
| 240251001 | Maryland | Harford | 71.3 | 0.91 | 65 | 0.69 |
| 360850067 | New York | Richmond | 71.2 | 0.77 | 62 | 0.67 |
| 361030002 | New York | Suffolk | 71.3 | 0.71 | 67 | 0.63 |
| 80590011 | Colorado | Jefferson | 69.7 | 1.03 | 71 | 1.26 |

There are significant though not unexpected differences between the TCEQ's modeling results and the EPA's modeling results. For example, in the EPA's modeling, five of the six monitors linked to Texas were located in Eastern states, whereas all the monitors tagged for further review by the TCEQ's modeling are located in Western states.[26] The differences are due to key changes the TCEQ made to modeling inputs, analysis, and methodologies to address several critical concerns with the EPA's modeling and approach in the 2015 Transport NODA, as discussed in this SIP revision as well as the TCEQ's comments on the 2015 Transport NODA. Some of the changes include a different base year, a different EGU projection tool, changes to the methodology used to identify maintenance monitors, and changes to the methodology used to calculate Texas' contribution to downwind monitors. These changes are appropriate since there are no regulatory requirements that specify required modeling parameters for transport analysis. Further, as stated by the EPA in the 2015 Transport NODA, "The EPA believes that states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs…" (82 FR 1735); therefore, the TCEQ can make choices different than those made by the EPA as long as the modeling and analysis is technically justifiable. The TCEQ's modeling and analysis, though different from the EPA's modeling and analysis, are valid as they are within the CSAPR framework and follow sound scientific principles and the EPA Modeling Guidance, where applicable. Therefore, the TCEQ focused only on the monitors tagged for further review by TCEQ modeling and shown in Table 3-10 and Table 3-11 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance.

The downwind nonattainment and maintenance monitors tagged for further review are in three states: Arizona, California, and Colorado. To aid further review and analysis of the tagged monitors, APCA runs were conducted with additional contribution categories: California Anthro, Colorado Anthro, New Mexico Anthro, Kansas Anthro, Nebraska Anthro, Wyoming Anthro, Utah Anthro, California Anthro, Arizona Anthro, Nevada Anthro and Oregon Anthro. Figure 3-39: *Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors* shows all the geographic contribution regions used in the APCA runs for this 2015 Ozone NAAQS Transport SIP revision.

---

[26] Per the EPA, Eastern states include all states from Texas northward to North Dakota and eastward to the East Coast while the Western states include the 11 western contiguous states of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming (FR 82, 1737).



**Figure 3-39: Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors**

**3.4 STEP 3: ANALYSIS TO DETERMINE IF TEXAS EMISSIONS CONTRIBUTE SIGNIFICANTLY TO NONATTAINMENT OR INTERFERE WITH MAINTENANCE AT TAGGED MONITORS**

This section describes the analysis used to determine whether Texas emissions significantly contribute to nonattainment or interfere with maintenance at the sixteen downwind monitors that were tagged for further review in Step 2. To make this determination, a weight-of-evidence approach was used. Interstate transport is a complex problem and a nuanced approach that takes into consideration the factors relevant to the ozone conditions at the tagged monitors is required. Examples of factors considered include the current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, and the number of days with elevated ozone (observed and modeled).

Since there could be considerable variation in the characteristics of the ozone problem at each monitor, not all factors were considered or analyzed for every monitor. In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon *et al.*, 2012). The Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution **on several days with elevated**

**ozone**. Analysis is presented for each state with a tagged downwind monitor in the following sections.

### 3.4.1 Colorado Monitors

Modeling tagged four Colorado nonattainment monitors, as shown in Table 3-10, for further review. In addition to these monitors, modeling also tagged one Colorado maintenance monitor, the Highland Reservoir (AQS ID 080050002) monitor, as shown in Table 3-11 for further review.

Results of in-depth analysis leads to the conclusion that Texas emissions do not contribute to nonattainment or interfere with maintenance at the five Colorado monitors tagged for further review. The conclusion is based on design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, the collective interstate contribution to the future design values, and the responsiveness to Texas emissions at these monitors. Details of the analysis are presented in the following sections.

<u>3.4.1.1 Eight-Hour Ozone Design Value Trends</u>

Eight-hour ozone design value trends at the tagged monitors, along with the other monitors in the Denver-Aurora combined statistical area (CSA), are displayed in Figure 3-40: *Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area*. The Colorado monitors tagged for further review are highlighted in color while the other monitors in the Denver-Aurora CSA are in gray. The four nonattainment monitors tagged for further review have the highest eight-hour ozone design values in the Denver-Aurora CSA, ranging from 80 ppb at National Renewable Energy Labs to 75 ppb at Fort Collins West. The tagged maintenance monitor does not have valid eight-hour ozone in 2016, but its last valid eight-hour ozone design value, 79 ppb in 2013, was one of the five highest eight-hour ozone design values for that year. All other monitors except one, the Welch monitor, in the Denver-Aurora area, have eight-hour ozone design values below the 2015 ozone NAAQS. Overall, eight-hour ozone design values in the Denver-Aurora area have been decreasing from 2007 through 2016. Decreases observed are modest, ranging from a 2% to 10%.



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

3.4.1.2 Monitored Elevated Ozone Days

To investigate the contribution of Texas emissions to ozone at the tagged Colorado monitors, days that had elevated ozone at each of the five tagged monitors were identified. Any day with a monitored daily maximum eight-hour average ozone concentration greater than 70 ppb was considered an elevated ozone day. From 2012 through 2016 the number of elevated ozone days at the Colorado monitors ranged from a high of 116 days at Rocky Flats to a low of 46 days at Highland Reservoir. In order to better characterize the ozone problem at the Colorado monitors and have more days with elevated ozone, the number of years evaluated was increased from five to ten. Using ten years of data more than doubled the number of elevated ozone days at some of the monitors, with a high of 237 days at Rocky Flats and a low of 78 days at Highland Reservoir. The number of elevated ozone days at each tagged monitor from the past 10 years is shown in Figure 3-41: *Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016*. Figure 3-41 shows that the five monitors seem to have similar trends with varying levels of severity. Trends in elevated ozone days overall appear to be decreasing, with a peak occurring in 2012. Over the past 10 years, all five tagged monitors in Colorado observed the highest number of elevated ozone days in 2012. The Rocky Flats monitor historically observed the most elevated ozone days until the most recent two years (2015 and 2016), when the National Renewable Energy Labs monitor observed the highest number of elevated ozone days.

3-52

**113**



**Figure 3-41: Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016**

3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) back trajectory model was used to run 72-hour back trajectories for each elevated ozone day at each tagged monitor. A test run of back trajectories for the top 10 modeled high ozone days showed that some endpoints reached Texas only after 72 hours; therefore, it was determined that 72 hours was an appropriate length of time to determine whether air from Texas reaches Colorado on a given day. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to Colorado, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in Colorado. The filtering criteria ensured that the back trajectories used were those that capture air that would affect the ground level monitor. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are

summarized in Table 3-13: *Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor*.

**Table 3-13: Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|---|---|---|---|---|
| 80050002 | Highland Reservoir | 282 | 189 | 67% |
| 80350004 | Chatfield State Park | 594 | 367 | 62% |
| 80590006 | Rocky Flats | 846 | 578 | 68% |
| 80590011 | National Renewable Energy Labs-NREL | 624 | 380 | 61% |
| 80690011 | Fort Collins-West | 663 | 434 | 65% |

The filtered back trajectories are displayed on the map in Figure 3-42: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors*. For a trajectory (whether run forward or backward in time), the estimated location of the air parcel during each hour of the trajectory is referred to as an endpoint. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any detail for specific trajectories in the Colorado area, the map shows back trajectory end points that end in Texas. Out of the 1,948 back trajectories with 134,185 endpoints displayed in Figure 3-42, 116 back trajectories (6%) with a total of 2,019 endpoints (1.5%) reach Texas. Of those 2,019 endpoints, 912 are located within the mixing layer over Texas, meaning 0.68% of endpoints are located within the Texas mixing layer.



**Figure 3-42: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors**

Although most back trajectories do not reach Texas on elevated ozone days in Colorado, further analysis was necessary to indicate whether the days where trajectories that reached Texas had a significant impact on ozone levels in Colorado. To investigate further, the number of trajectories to reach Texas from Colorado were calculated for each year from 2007 through 2016. The number of trajectories reaching Texas from each monitor were then compared to the number of elevated eight-hour ozone days for each year. The results are shown in Figure 3-43: *Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor.* Figure 3-43 shows that the number of trajectories that reach Texas from Colorado varies by year. Most years from 2007 through 2016 show fewer than five, and some show zero trajectories that reach Texas. Of the trajectories that reach Texas from Colorado, 66% occurred during 2011 and 2012. This spike does not appear to be a pattern that repeats frequently. There were also many more elevated eight-hour ozone days observed in 2012 compared to other years. This may indicate that there were some unusual meteorological patterns that occurred that year that caused a more severe ozone season. There are years where few, if any, trajectories reach Texas and the number of elevated ozone days still remained high. For example, National Renewable Energy Labs had over 15 elevated eight-hour ozone days in 2007, 2008, 2015, and 2016, but only one trajectory reached Texas over those four years combined.



**Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor**

While the number of elevated ozone days can indicate the severity of an ozone season, the fourth-highest eight-hour ozone concentrations provide more information on how close the area is to attaining the standard. The fourth-highest eight-hour ozone values at the tagged Colorado monitors, along with the number of trajectories that reach Texas each year, are shown in Figure 3-44: *Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas*. Overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased. The increase in trajectories that reach Texas in 2012 did not appear to increase the fourth-highest eight-hour ozone values at the tagged Colorado monitors much, if at all. The fourth-highest eight-

hour ozone values in 2015 and 2016 remained above 70 ppb, even though those years observed no trajectories that reached Texas.



**Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas**

In summary, trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes, that start within Colorado's

mixing layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. Those filters showed that 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas. Further analysis of the trajectories by year showed that 66% of days where trajectories reached the Texas mixing layer occurred in 2011 and 2012. There are many years where no trajectories reach Texas from Colorado. In the years where no trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. Most importantly, the latest data (2015 and 2016) indicate that Texas was not upwind during any elevated ozone days at any of the five sites shown in Figure 3-44. Although air from Texas can reach Colorado, the air from Texas does not appear to significantly affect the ozone concentrations.

3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

The previous sections showed that although there is possible transport of air parcels from Texas to the Colorado monitors on some historical monitored elevated ozone days, the probability of such transport is small. In addition to monitored elevated ozone days in the past, contributions from Texas on projected future year elevated ozone days were also evaluated. The subset of 2023 days with modeled MDA8 greater than 70 ppb was identified, and the average modeled Texas contributions for this subset of days were computed. Table 3-14: *Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged Colorado monitors, and the percentage of Texas contribution in the MDA8s.

**Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors**

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

Table 3-14 shows that for the Colorado monitors, the expected average Texas contribution on projected future elevated ozone days is a small percentage of the projected average MDA8 on these days. The expected impact is not significant, since the average contribution is less than one ppb on very few days, especially when considering the uncertainties associated with model predictions.

### 3.4.1.5 Collective Interstate Contribution to the Future Design Value

The EPA has maintained that the nature of the interstate transport problem varies between the western and eastern states. In the EPA's 2015 Transport NODA, the EPA states "While the 1 percent screening threshold has been traditionally applied to evaluate upwind state linkages in eastern states where such collective contribution was identified, the EPA noted in the CSAPR Update Rule for the 2008 ozone NAAQS that, as to western states, there may be geographically specific factors to consider in determining whether the 1 percent screening threshold is appropriate. For certain receptors, where the collective contribution of emissions from one or more upwind states may not be a considerable portion of the ozone concentration at the downwind receptor, the EPA and states have considered, and could continue to consider, other factors to evaluate those states' planning obligation pursuant to the Good Neighbor provision" (FR 82, 1740). Although the TCEQ does not believe that 1% of the NAAQS is an appropriate threshold for determining significant contribution, it agrees that the collective contribution of interstate transport is an important factor in the overall evaluation. The EPA defines collective contribution as "...the total upwind states' contribution to ozone concentration (from linked[27] and unlinked states) based on modeling..."

The EPA has stated that the collective contribution metric is important to determine if interstate transport is a significant contributor to a monitor's nonattainment or maintenance problems.[28] The collective interstate contribution to the 2023 $DV_F$ for the tagged Colorado monitors was calculated. Table 3-15: *Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the five tagged Colorado monitors.

---

[27] The EPA uses the term "linked" to refer to downwind monitors that have contributions to future design value greater than 1% of the NAAQS from an upwind state.
[28] In approving Nevada's Inter-State Transport SIP the EPA states "One such factor that the EPA considers relevant to determining the nature of a projected receptor's interstate transport problem is the magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem" (81 FR 87859).

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

The collective interstate contribution at tagged Colorado monitors ranges from 9.32% to 10.27%. It is a small percentage and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%.[29] A significant portion of the tagged Colorado monitors' 2023 $DV_F$ is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions).

3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

Direct Decoupled Method (DDM)[30] is a probing tool available in CAMx that estimates the responsiveness of ozone formation to small changes in any input parameter. The DDM method calculates for each grid cell in the domain for each simulation hour the first-order differential for ozone formation due to changes in a specific input parameter(s). DDM results can explain the responsiveness of ozone formation due to marginal changes of any input parameter. DDM results should be interpreted with care, since the method only calculates the first-order differential which assumes a linear response. Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation.

DDM was used to gauge the responsiveness of ozone formation to Texas $NO_x$ emissions at the tagged Colorado monitors. For regional ozone problems and long-range transport, $NO_x$ emissions play a major role. As part of the CSAPR final rule the EPA stated, "Authoritative assessments of ozone control approaches have concluded that, for reducing regional scale ozone transport, a $NO_x$ control strategy is most effective, whereas VOC reductions are generally most effective locally, in more dense urbanized areas" (76 FR 48222). For these reasons, the TCEQ focused on Texas $NO_x$

---

[29] "Technical Support Document Evaluation of the Arizona Infrastructure SIP for 2008 O3 Transport (CAA 110(a)(2)(D)), U.S. EPA, Region 9, March 15, 2016, page 8 and footnotes 26 and 27.
[30] CAMx User Guide, page 177 available at http://www.camx.com/files/camxusersguide_v6-40.pdf

emissions while using DDM to evaluate the responsiveness of ozone formation at the tagged Colorado monitors.

Because it is resource intensive to use the DDM tool, it was run for a subset of the episode months, July and August, for the 2023 future year. July and August were chosen because they had the highest number of the top 10 days that went into the 2023 $DV_F$ calculation for the tagged Colorado monitors. In addition to responsiveness to Texas $NO_x$ emissions, responsiveness to Colorado $NO_x$ emissions was also calculated at the tagged monitors. Since DDM calculates the responsiveness of ozone to $NO_x$ emissions, the DDM values can be negative, indicating the destruction of ozone due to $NO_x$ titration.

A series of figures showing the DDM results for each of the tagged Colorado monitors are presented below. Each figure depicts, for every hour of every day for the July and August episode months, the 2023 modeled eight-hour average of ozone responsiveness at a tagged monitor to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources excluding boundary conditions ("Other $NO_x$" emissions) as line graphs in blue, purple, and orange, respectively. The ozone responsiveness in ppb is shown on the primary axis to the left. In addition to the hourly eight-hour average ozone responsiveness, each figure has the hourly modeled 2023 eight-hour average ozone concentration in ppb for the July and August episode months, depicted by a green line graph with circle markers on the secondary axis to the right. The 2015 ozone NAAQS is shown as a black line. Both the ozone responsiveness and the modeled ozone are from the grid cell where the monitor is located.

Figure 3-45: *DDM Responsiveness of Ozone in July 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources (excluding boundary conditions) in the rpo_12km domain for the month of July.



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In the month of July, Highland Reservoir (AQS ID: 80050002) had two elevated ozone days (July 11 and 22) and on both days, the modeled eight-hour ozone at the monitor is significantly more responsive to Colorado $NO_x$ and "Other $NO_x$" emissions than to Texas $NO_x$ emissions. This is a critical observation because the responsiveness of

ozone at this monitor to Texas NOx emissions remains flat throughout the month with little change between days with and without elevated ozone.

Figure 3-46: *DDM Responsiveness of Ozone in August 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas NOx emissions, Colorado NOx emissions, and NOx emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of August.



**Figure 3-46:  DDM Responsiveness of Ozone in August 2023 at Highland Reservoir**

Similar to the July results, the responsiveness of eight-hour ozone to Texas NOx emissions at Highland Reservoir (AQS ID: 80050002) is near zero and stays flat in the month of August. Figure 3-45 and Figure 3-46 show that the modeled eight-hour ozone at Highland Reservoir (AQS ID: 80050002) is not responsive to Texas NOx emissions, during the period studied.

Figure 3-47: *DDM Responsiveness of Ozone in July 2023 at Chatfield State Park* shows the responsiveness of ozone at Chatfield State Park (AQS ID 80350004) to Texas NOx emissions, Colorado NOx emissions, and NOx emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of July while Figure 3-48: *DDM Responsiveness of Ozone in August 2023 at Chatfield State Park* does the same for the month of August. Chatfield State Park has fewer elevated ozone days than Highland Reservoir but shows a similar pattern of very limited responsiveness to Texas NOx emissions.



**Figure 3-47:  DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**



**Figure 3-48:  DDM Responsiveness of Ozone in August 2023 at Chatfield State Park**

Figure 3-49: *DDM Responsiveness of Ozone in July 2023 at Rocky Flats* and Figure 3-50: *DDM Responsiveness of Ozone in August 2023 at Rocky Flats* show the responsiveness of ozone at Rocky Flat (AQS ID: 80590006) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively.

Rocky Flats (AQS ID: 80590006) shows a small (approximately 2 ppb) responsiveness to Texas $NO_x$ emissions in mid to late July. However, when ozone at the monitor is responsive to Texas $NO_x$ emissions, elevated ozone was not observed except for a minor response on one day, July 23.



**Figure 3-49: DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50: DDM Responsiveness of Ozone in August 2023 at Rocky Flats**

Figure 3-51: *DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL* and Figure 3-52: *DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL* show the responsiveness of ozone at National Renewable Energy Labs – NREL (AQS ID: 80590011) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. In this case, there appears to be some minor responsiveness to Texas' $NO_x$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied the degree of responsiveness is overwhelmed by the responsiveness to Colorado $NO_x$ and "Other $NO_x$" emissions.



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**

Figure 3-53: *DDM Responsiveness of Ozone in July 2023 at Fort Collins-West* and Figure 3-54: *DDM Responsiveness of Ozone in August 2023 at Fort Collins-West* show the responsiveness of ozone at Fort Collins-West (AQS ID: 80690011) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. At Fort Collins-West the highest ozone days recorded in July or August were well below 71 ppb, so while ozone peak concentrations showed marginal responsiveness to Texas $NO_x$ emissions on a few days, clearly there was no significant contribution during this period.



**Figure 3-53:  DDM Responsiveness of Ozone in July 2023 at Fort Collins-West**



**Figure 3-54:  DDM Responsiveness of Ozone in August 2023 at Fort Collins-West**

Both at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Fort Collins-West (AQS ID: 80690011), the same pattern of ozone responsiveness to Texas $NO_x$ emissions as the other three tagged Colorado monitors was observed.

In summary, though the DDM analysis may on occasion exhibit a limited responsiveness (two ppb or less) to Texas $NO_x$ emissions at the tagged Colorado monitors, the instances where this occurs are infrequent and rarely coincide with elevated ozone. Of the 62 days that DDM was estimated, the number of days that met the condition of having elevated ozone (MDA8 greater than 70 ppb) and appreciable responsiveness (greater than 1 ppb) ranged from three days at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Rocky flats (AQS ID: 80590006) to zero days at Fort Collins-West (AQS ID: 80690011). In virtually all events, responsiveness to Texas $NO_x$ emissions is dwarfed by that of Colorado $NO_x$ and "Other $NO_x$" emissions.

3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

Analysis of the design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, total interstate contribution, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_x$ emissions leads to the

conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

### 3.4.2 Arizona Monitor(s)

Modeling tagged the Chiricahua National Monument (AQS ID: 040038001) monitor in Cochise County, Arizona as a nonattainment monitor with a $TX_{DVF}$ of 1.06 ppb. A survey of the monitor's recent design values shows that the monitor is currently attaining the 2015 eight-hour ozone NAAQS with a design value of 68 and 65 ppb in 2015 and 2016, respectively. In addition, the monitor has never been designated a nonattainment monitor and has been in attainment of both the 1997 and 2008 eight-hour ozone standards. Figure 3-55: *Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)* shows the design value trends for the monitor.



**Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Since the monitor is already in attainment of the 2015 Eight-Hour Ozone NAAQS, it can be concluded that emissions from Texas do not significantly contribute to nonattainment at this downwind monitor. As detailed in subsection 2.3.2, *Historical Emissions Inventory Trends*, anthropogenic ozone precursor emissions in Texas have decreased significantly due to several federal, state, and local regulations. Since ozone precursor emissions in Texas, particularly $NO_x$, are projected to stay capped or decrease and the design value at this monitor is currently significantly below the 2015 ozone NAAQS (65 ppb in 2016), emissions from Texas are not expected to interfere with maintenance of the 2015 ozone NAAQS.

### 3.4.3 California Monitors

Modeling tagged 10 monitors in California, as shown in Table 3-10 and Table 3-11, for further review to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the

monitors. The tagged monitors are in the Los Angeles-South Coast Air Basin (South Coast) and the Los Angeles–San Bernardino (Western Mojave Desert) nonattainment areas.

After extensive analysis, it was concluded that Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 California monitors tagged in Step 2. Analysis included review of the conceptual model developed by the South Coast Air Basin for eight-hour ozone at these monitors, and considered design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, and the collective interstate contribution to the future design values at these monitors. Details of the analysis are presented in the following sections.

### 3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

Both the South Coast and the Western Mojave Desert nonattainment areas have had persistent nonattainment issues and have been designated nonattainment for every federal one-hour and eight-hour ozone NAAQS (1997 and 2008). The ozone problems in the Western Mojave Desert nonattainment area are largely due to transport from the South Coast and San Joaquin Valley.[31] For the South Coast nonattainment area, the EPA,[32] quoting the South Coast Air Quality Management District, described the meteorological conditions that would contribute to ozone formation as follows:

> "The topography and climate of Southern California combine to make the Basin an area of high air pollution potential. During the summer months, a warm air mass frequently descends over the cool, moist marine layer produced by the interaction between the ocean's surface and the lowest layer of the atmosphere. The warm upper layer forms a cap over the cool marine layer and inhibits the pollutants in the marine layer from dispersing upward. In addition, light winds during the summer further limit ventilation. Furthermore, sunlight triggers the photochemical reactions which produce ozone. The region experiences more days of sunlight than any other major urban area in the nation except Phoenix."

> "The Basin's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. The average wind speed for Los Angeles is the lowest of the nation's ten largest urban areas. In addition, the summertime maximum mixing height (an index of how well pollutants can be dispersed vertically in the atmosphere)

---

[31] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –San Bernardino Counties (West Mojave Desert), pages 7 and 8 of 11. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf

[32] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –South Coast Air Basin, page 7 of 13. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf

in Southern California averages the lowest in the U.S. The Southern California area is also an area with abundant sunshine, which drives the photochemical reactions which form pollutants such as ozone. In the Basin, high concentrations of ozone are normally recorded during the spring and summer months."

### 3.4.3.2 Eight-Hour Ozone Design Value Trends

Eight-hour ozone design value trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA are displayed in Figure 3-56: *Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area*. The tagged California monitors are highlighted in color while the other monitors in the Los Angeles CSA are in gray. The 10 monitors tagged in Step 2 had eight-hour ozone design values, ranging from 101 ppb to 80 ppb in 2016. The Los Angeles CSA had design values ranging from 108 ppb to 63 ppb in 2016, and thus, none of the 10 tagged monitors recorded the highest eight-hour ozone design value for the CSA in 2016. Eight-hour ozone design values in the area have decreased overall for the past 10 years. The 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

### 3.4.3.3 Monitored Elevated Ozone Days

To investigate the Texas contribution to ozone in California, days that had elevated ozone were identified at each of the 10 monitors tagged in Step 2. Any day with a monitored MDA8 ozone concentration greater than 70 ppb was considered an elevated ozone day. The number of elevated ozone days at each tagged monitor from the past five years is shown in Figure 3-57: *Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors*. As Figure 3-57 shows, the trends in the number of elevated ozone days at the 10 monitors vary. Trends in elevated ozone days overall appear to be flat. The Redlands (AQS ID: 60714003) monitor consistently observed the largest number of elevated ozone days, which ranged from a low of 76 days in 2015 to a high of 98 days in 2012. The Pomona (AQS ID: 60371701), Barstow (AQS ID: 60710001), and Reseda (AQS ID: 60371201) monitors observed the least number of elevated ozone days in the area, with Barstow (AQS ID: 60710001) observing only 18, the lowest number, of elevated ozone days in 2015.



**Figure 3-57: Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016**

### 3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified in the previous section were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYSPLIT back trajectory model was used to run 72-hour back trajectories for each elevated ozone

day at each tagged monitor. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to California, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in California. The conceptual model of ozone formation outlined for these monitors discusses the significance of the mixing layer height. Per the conceptual model, the area has very low mixing heights and a low-level subsidence inversion that prevents air transported into the basin from mixing to the surface. The filtering criteria ensured that the back trajectories used are those that capture air that would affect the ground level monitor. Due to the geography and topography of the Los Angeles area, many back trajectories hit the ground after several hours back. In addition, on many days, the mixing layer at the tagged monitors was below 1,000 m AGL, which eliminated the trajectories that were run at higher altitudes. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are summarized in Table 3-16: *Number of HYSPLIT Back Trajectories at Each Tagged California Monitor.*

**Table 3-16: Number of HYSPLIT Back Trajectories at Each Tagged California Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|--------|-----------|----------------------------:|------------------------------------------------------:|------------------------------------------------------:|
| 60371201 | Reseda | 447 | 45 | 10% |
| 60371701 | Pomona | 567 | 44 | 8% |
| 60376012 | Santa Clarita | 1011 | 155 | 15% |
| 60658001 | Rubidoux | 936 | 201 | 21% |
| 60658005 | Mira Loma (Van Buren) | 894 | 0 | 0% |
| 60710001 | Barstow | 504 | 228 | 45% |
| 60710306 | Victorville-Park Avenue | 750 | 259 | 35% |
| 60711004 | Upland | 960 | 90 | 9% |
| 60714001 | Hesperia-Olive Street | 939 | 244 | 26% |
| 60714003 | Redlands | 1371 | 394 | 29% |

A large number of back trajectories were run for each tagged monitor, as shown in Table 3-16; however, few of the back trajectories met the filter criteria. One monitor, Mira Loma (AQS ID: 60658005) had no back trajectories out of 894 that met the criteria. These results show the difficulty in simulating conditions where an air parcel travels from Texas and ends within the mixing layer of the Los Angeles area on an

elevated ozone day. This may indicate that there are not many situations when air from Texas travels to the mixing layer over Los Angeles.

The endpoints for the filtered back trajectories are displayed on the map in Figure 3-58: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors*. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any trajectory detail in the California area, the map clearly shows very few back-trajectory end points end in Texas. Out of the 1,660 back trajectories with 113,467 endpoints displayed in Figure 3-58, only 10 back trajectories with a total of 59 endpoints reach Texas. Of those 10 back trajectories, only 2 back trajectories and 4 endpoints are located within the mixing layer over Texas. Of those two back trajectories that span from California to the mixing layer over Texas, one started at the Rubidoux (AQS ID: 60658001) monitoring site and the other started at the Upland (AQS ID: 60711004) monitoring site. This represents 0.3% of the elevated ozone days from 2012 through 2016 at each monitor.



**Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors**

While it appears that air from Texas can reach the Los Angeles area, based upon trajectory analysis, this transport seems to occur very infrequently.

In summary, trajectory analysis of transport from Texas to Los Angeles indicates that emissions from Texas are very unlikely to affect ozone concentrations in the mixing layer over Los Angeles on high ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes that start within California's mixing layer, do not hit the surface, and have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas could affect the ozone in California. Those filters showed that only 0.03% of days were affected at the Rubidoux and Upland monitors; therefore, Texas does not appear to hinder California's progress toward attaining the 2015 ozone NAAQS.

3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

Contributions from Texas to projected future year elevated ozone days at the tagged California monitors were evaluated. Similar to the analysis for Colorado monitors, the

subset of 2023 days with modeled MDA8 greater than 70 ppb was identified and the average modeled Texas contributions for this subset of days for each of the 10 tagged California monitors was computed.

Table 3-17: *Modeled Elevated Ozone Days in the Future Year* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged California monitors, and the percentage of Texas contribution to the MDA8s.

**Table 3-17: Modeled Elevated Ozone Days in the Future Year**

| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
|---|---|---|---|---|---|
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

Table 3-17 shows that the calculated average Texas contribution on projected future elevated ozone days is less than 1% of the projected average MDA8 at all of the monitors on these days.

3.4.3.6 Collective Interstate Contribution to the Future Design Value

The TCEQ calculated the collective interstate contributions[34] to the future design values for the tagged California monitors. Table 3-18: *Collective Interstate Contributions to Future Design Values at Tagged California Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the 10 tagged California monitors.

---

[33] The average Texas contribution on Future Elevated Ozone days for this monitor was 0.00035 ppb which was rounded to 0.00 ppb.
[34] The collective contribution metric was calculated using the same methodology as used to calculate Texas contribution in section 3.3.

**Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors**

| AQS ID | Site Name | Percentage of 2023 DV$_F$ from Background Contribution | Percentage of 2023 DV$_F$ from Collective Interstate Contribution | Percentage of 2023 DV$_F$ from Intra-State Contribution |
|---|---|---|---|---|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

Based on the detailed analysis at the tagged California monitors, the design value trends, back trajectory analysis on elevated ozone days, average Texas modeled contributions on projected future elevated ozone days, and collective interstate contributions to future design values, Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 tagged California monitors.

**3.5 CONCLUSION**

Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors. Modeling was used to project the nonattainment and maintenance status of downwind monitors in 2023. Among monitors projected to be in nonattainment or have maintenance issues, 16 monitors were tagged for further review, one in Arizona, 10 in California, and five in Colorado. Several factors were examined, such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions. Based on this rigorous analysis, it was concluded that emissions from Texas do not

contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at the tagged downwind monitors.

## 3.6 REFERENCES

Bash, J., Baker, K., Beaver, M., 2016. Evaluation of improved land use and canopy representation in BEIS v3.61 with biogenic VOC measurements in California, *Geoscientific Model Development*, 9, 2191–2207.

Henderson, B.H., Akhtar, F., Pye, H.O.T., Napelenok, S.L., Hutzell, W.T., 2014. A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hoerling, M., Kumar, A., Dole, R., Nielson-Gammon, J., Eischeid, J., Perlwitz. J., Quan, X., Zhang, T., Pegion, P., and Chen, M., 2012. Anatomy of an Extreme Event. *Journal of Climate.*, 29, 2811-2832, doi: 10.1175/JCLI-D-12-00270.1.

Mu, M., et al. (2011), Daily and 3-hourly variability in global fire emissions and consequences for atmospheric model predictions of carbon monoxide, *J. Geophys. Res.*,116, D24303, doi:10.1029/2011JD016245.

Sherwen, T., M.J., Evans, L.J., Carpenter, S.J., Andrews, R.T., Lidster, B., Dix, T.K., Koenig, R., Sinreich, I., Ortega, R., Volkamer, A., and Saiz-Lopez. 2016. Iodine's impact on tropospheric oxidants: a global model study in GEOS-Chem. *Atmospheric Chemistry and Physics*, 16(2), pp.1161-1186.

Simon, H., Baker, K.R., and Phillips, S.B., 2012. Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, 2012., *Atmospheric Environment*, v61, 124-139. doi: 10.1016/j.atmosenv.2012.07.012.

Stein, A.F., Draxler, R.R, Rolph, G.D., Stunder, B.J.B., Cohen, M.D., and Ngan, F., 2015. NOAA's HYSPLIT atmospheric transport and dispersion modeling system, *Bull. Amer. Meteor. Soc.*, 96, 2059-2077, http://dx.doi.org/10.1175/BAMS-D-14-00110.1.

Travis, K., Jacob, D.J., Fisher, J.A., Kim, P. S., Marais, E.A., Zhu, L., Yu, K., Miller, C.C., Yantosca, R.M., Sulprizio, M.P., Thompson, A.M., Wennberg, P.O., Crounse, J.D., St. Clair, J.M., Cohen, R.C., Laughner, J.L., Dibb, J.E., Hall, S.R., Ullmann, K., Wolfe, G.M., Pollack, I.B., Peischl, J., Neuman, J.A, Zhou, X. 2016. Why do models overestimate surface ozone in the Southeast United States? *Atmos. Chem. Phys.*, 16, 13561-13577, doi:10.5194/acp-16-13561-2016.

Yantosca, B., Sulprizio, M., Yannetti, M., Lundgren, L., Xu, J., 2015. GEOS-Chem v10-01 Online User's Guide. Atmospheric Chemistry Modeling Group, School of Engineering and Applied Sciences, Harvard University, Cambridge, MA. (Available at http://acmg.seas.harvard.edu/geos/doc/man/ ).

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Yarwood, G., T. Sakulyanontvittaya, U. Nopmongcol, B. Koo. 2014. Ozone Depletion by Bromine and Iodine over the Gulf of Mexico. Final Report for Work Order No. 582-11-10365-FY14-12.

Wiedinmyer, C., Akagi, S. K., Yokelson, R. J., Emmons, L. K., Al-Saadi, J. A., Orlando, J. J., and Soja, A. J., 2011. The Fire INventory from NCAR (FINN): a high resolution global model to estimate the emissions from open burning, *Geosci. Model Dev.*, 4, 625-641, doi:10.5194/gmd-4-625-2011, 2011.

**138**

# CHAPTER 4: CONTROL STRATEGIES

## 4.1 INTRODUCTION

On November 16, 2017, the United States Environmental Protection Agency (EPA) made the first round of designations for the 2015 eight-hour ozone National Ambient Air Quality Standards (NAAQS), designating 205 of the 254 counties in Texas as attainment/unclassifiable, effective January 16, 2018 (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018.

Attainment demonstration state implementation plan (SIP) revisions for any areas designated as nonattainment for the 2015 eight-hour ozone NAAQS would not be due until after this transport SIP revision is submitted to the EPA. Because designations for Texas under the 2015 eight-hour ozone NAAQS have not been completed, attainment demonstration SIP revision due dates have not been established and potential controls have not yet been contemplated. However, Texas has implemented stringent and innovative regulations that address emissions of nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) from a wide variety of major and minor source types under previous NAAQS. This chapter describes control measures for the DFW and HGB nonattainment areas as well as other areas of the state.

## 4.2 EMISSIONS REDUCTIONS FROM ELECTRIC GENERATING UNITS (EGU)

### 4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

The rules in 30 Texas Administrative Code (TAC) Chapter 117, Subchapter C establish $NO_x$ emission specifications for utility electric generation for each ozone nonattainment area in Texas. These rules apply to each electric generating facility that generates electric energy for compensation, and is owned or operated by a municipality or Public Utility Commission of Texas (PUCT) regulated utility or any of its successors, regardless of whether the successor is a municipality or is regulated by the PUCT.

In the HGB area, the owner or operator of each affected utility boiler, auxiliary steam boiler, or stationary gas turbine must demonstrate compliance with the $NO_x$ emission specifications through a system cap and participation in the HGB area Mass Emissions Cap and Trade (MECT) Program. Affected sources were required to comply with the MECT Program rules beginning January 1, 2002, and comply with the system cap requirements by March 31, 2004. Additional information about the MECT Program is available in Section 4.3.2: *Mass Emissions Cap and Trade (MECT) Program.*

In the DFW area, each utility boiler that is part of a large system[35] must meet a $NO_x$ emission rate of 0.033 pound per million British thermal units (lb/MMBtu) heat input, and each utility boiler that is part of a small system must meet a $NO_x$ emission rate of 0.06 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates may be demonstrated on a daily average basis, a system-wide heat input weighted average basis for utility boilers that are part of a large system, or through the use of emission credits. Affected sources were required to comply with the rules by March 1, 2009.

In the Beaumont-Port Arthur (BPA) 1997 eight-hour ozone maintenance area, each utility boiler must meet a $NO_x$ emission rate of 0.10 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates must be demonstrated on a daily average through the use of either a system cap or emission credits. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.2 Utility Electric Generation in East and Central Texas

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from utility electric generation in Atascosa, Bastrop, Bexar, Brazos, Calhoun, Cherokee, Fannin, Fayette, Freestone, Goliad, Gregg, Grimes, Harrison, Henderson, Hood, Hunt, Lamar, Limestone, Marion, McLennan, Milam, Morris, Nueces, Parker, Red River, Robertson, Rusk, Titus, Travis, Victoria, and Wharton Counties. The rules apply to each utility electric power boiler and stationary gas turbine (including duct burners used in turbine exhaust ducts) that generate electric energy for compensation; is owned by an electric cooperative, independent power producer, municipality, river authority, or public utility; and was placed into service before December 31, 1995. Utility electric power boilers must meet a $NO_x$ emission rate of 0.14 lb/MMBtu for gas-fired units and 0.165 lb/MMBtu for coal-fired units. Stationary gas turbines (including duct burners used in turbine exhaust ducts) must meet an annual average $NO_x$ emission rate of 0.14 lb/MMBtu for units subject to Texas Utilities Code (TUC), §39.264 (except §39.264(i)) or 0.15 lb/MMBtu for units not subject to TUC, §39.264 and units designated in accordance with TUC, §39.264(i). Compliance with the $NO_x$ emission rates is based on average heat input for a calendar year. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.3 Senate Bill 7 (76th Texas Legislature)

Senate Bill (SB) 7 from the 1999 76th Texas Legislature, requires grandfathered, or unpermitted, electric generating facilities (EGFs) and other EGFs that choose to participate to achieve a 50% reduction in $NO_x$ emissions and a 25% reduction in sulfur dioxide ($SO_2$) emissions from the 1997 emission levels. The reductions were implemented via participation in a cap and trade program in which participating EGFs are required to surrender allowances equivalent to the actual emissions each control period. For grandfathered EGFs, the allowance allocations were determined using the following emission rates: 0.14 lb $NO_x$/MMBtu and 1.38 lb $SO_2$/MMBtu in the East Texas region, and 0.195 lb $NO_x$/MMBtu in the West Texas and El Paso regions. For electing EGFs, the allowance allocations were equal to the emissions reported to the EPA's Acid

---

[35] A large utility system is defined in 30 TAC Chapter 117 as: all boilers, auxiliary steam boilers, and stationary gas turbines that are located in the DFW eight-hour ozone nonattainment area, and were part of one electric power generating system on January 1, 2000, that had a combined electric generating capacity equal to or greater than 500 megawatts.

Rain Program in 1997, or if unavailable, by a method approved by the executive director not to exceed any annual emission limitation authorized under Chapter 116, Subchapter B or an applicable state or federal requirement. There are no coal-fired EGFs located in the West Texas and El Paso regions that are subject to the Emissions Banking and Trading Allowances Program. The SB 7 requirements were implemented through rules in 30 TAC Chapter 101, Subchapter H, Division 2 and became effective January 11, 2000. The initial control period for this program began on May 1, 2003.

## 4.3 EMISSION REDUCTIONS FROM OTHER SOURCES

### 4.3.1 East Texas Engines

The rules in 30 TAC Chapter 117, Subchapter E, Division 4 limit $NO_x$ emissions from certain engines located in Anderson, Brazos, Burleson, Camp, Cass, Cherokee, Franklin, Freestone, Gregg, Grimes, Harrison, Henderson, Hill, Hopkins, Hunt, Lee, Leon, Limestone, Madison, Marion, Morris, Nacogdoches, Navarro, Panola, Rains, Robertson, Rusk, Shelby, Smith, Titus, Upshur, Van Zandt, and Wood Counties. The rules apply to stationary, gas-fired, reciprocating internal combustion engines rated 240 horsepower (hp) and larger. Rich-burn internal combustion engines rated less than 500 hp must limit $NO_x$ emissions to 1.0 grams per horsepower-hour (g/hp-hr). Rich-burn engines rated 500 hp or greater must limit $NO_x$ emissions to 0.60 g/hp-hr for landfill gas-fired engines or 0.50 g/hp-hr for all other rich-burn engines. Affected sources were required to comply with the rules by March 1, 2010.

The East Texas combustion rules reduce $NO_x$ emissions and ozone air pollution transport into the DFW area. While these rules are part of the May 2007 DFW Attainment Demonstration SIP Revision for the 1997 eight-hour ozone NAAQS, the Northeast Texas area also benefits from $NO_x$ reductions resulting from the rules. Using photochemical modeling sensitivity studies, the Texas Commission on Environmental Quality (TCEQ) estimated that implementation of the rules results in an overall reduction of approximately 22.4 tons per day (tpd) of $NO_x$ emissions in the 33 counties subject to the rules by March 1, 2010. The TCEQ estimated the rules benefit the DFW area by reducing ozone by an average of 0.1 to 0.2 parts per billion.

### 4.3.2 Mass Emissions Cap and Trade (MECT) Program

The MECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 3 establish a mandatory annual $NO_x$ emission cap on sites in the HGB 1997 eight-hour ozone nonattainment area that are either a major source of $NO_x$ with facilities subject to the $NO_x$ emissions specifications in 30 TAC §117.310 or §117.1210, or have an uncontrolled design capacity to emit at least 10.0 tons per year (tpy) of $NO_x$ from facilities subject to 30 TAC §117.2010. Affected facilities include: utility boilers, auxiliary steam boilers, or stationary gas turbines; industrial, commercial, or institutional boilers and process heaters; stationary gas turbines; stationary internal combustion engines; fluid catalytic cracking units (including carbon monoxide boilers, carbon monoxide furnaces, and catalyst regenerator vents); boilers and industrial furnaces that were regulated as existing facilities by the EPA under 40 Code of Federal Regulations Part 266, Subpart H (as in effect on June 9, 1993); duct burners used in turbine exhaust ducts; pulping liquor recovery furnaces; lime kilns; lightweight aggregate kilns; heat treating furnaces and reheat furnaces; magnesium chloride fluidized bed dryers; and incinerators.

The MECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of $NO_x$ emissions. The MECT Program cap was implemented on January 1, 2002 at historical emission levels with mandatory $NO_x$ reductions increasing over time until achieving the final cap on April 1, 2007. Affected facilities that do not meet the criteria for receiving an allocation of allowances must use allowances allocated to facilities already participating in the program to cover annual $NO_x$ emissions. The projected 2018 MECT cap is 39,866.1 tpy of $NO_x$ emissions.

### 4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

The HRVOC rules in 30 TAC Chapter 115, Subchapter H are performance-based, emphasizing monitoring, recordkeeping, reporting, and enforcement rather than establishing individual unit emission rates. The rules apply to HRVOC emissions from flares, process vents, cooling towers, and fugitive emission sources. In addition to the monitoring requirements, affected sources in Harris County must meet an annual HRVOC emission cap and a site-wide short-term HRVOC limit of 1,200 lb/hour from any flare, vent, pressure relief valve, cooling tower, or any combination thereof. Affected sources in Harris County must demonstrate compliance with these HRVOC emission limits through participation in the HECT Program.

The HECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 6 establish a mandatory annual HRVOC emission cap on sites in Harris County with the potential to emit greater than 10.0 tpy of HRVOC from facilities subject to 30 TAC Chapter 115, Subchapter H, Division 1 or Division 2. These facilities include vent gas streams, flares, and cooling tower heat exchange systems. Affected sites in Harris County are required to participate in the HECT Program. The program was implemented on January 1, 2007.

The HECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of HRVOC emissions. The HECT Program cap was established at a level demonstrated as necessary to allow the HGB area to attain the one-hour ozone standard along with a 5% compliance margin to account for potential emissions variations. The total initial cap was 3,451.5 tpy.

Allowances allocated from 2007 through 2010 were based on historical levels of activity reported by affected sites. For 2011 and beyond, a site's allocation was determined by multiplying the total HECT cap by an industry-sector factor and a site-specific factor. The industry-sector factor was determined by grouping sites into sectors and determining each site's proportion based on actual emissions. The site-specific factor was based on a site's uncontrolled emissions as a proportion of the total uncontrolled emissions from all sites in that industry sector. The reallocation includes a mandatory 10% cap reduction implemented during 2014, with additional 5% reductions implemented at the start of each control period for 2015, 2016, and 2017. The final HECT Program cap is set at 2,588.6 tpy for 2017 and all subsequent control periods. Affected sites that do not receive an allocation of allowances must obtain and use allowances allocated to sites already participating in the program to cover annual HRVOC emissions.

### 4.3.4 Cement Kilns

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from cement kilns in Bexar, Comal, Ellis, Hays, and McLennan Counties. The rules require cement kilns in Bexar, Comal, Hays, and McLennan Counties to reduce $NO_x$ emissions 30% below 1996 levels or to meet a $NO_x$ emissions cap of 6.0 pounds of $NO_x$ per ton of cement clinker produced (lb $NO_x$/ton of clinker) for wet kilns; 5.1 lb $NO_x$/ton of clinker for dry kilns; 3.8 lb $NO_x$/ton of clinker for preheater kilns; and 2.8 lb $NO_x$/ton of clinker for preheater-precalciner or precalciner kilns. Affected sources were required to comply with the rules by May 1, 2005. The rules also require cement kilns located in Ellis County to meet an ozone season $NO_x$ emission source cap.

Ash Grove Cement Company operated three kilns in Ellis County, with an established source cap under §117.3123 of 4.4 tpd. However, a 2013 consent decree between Ash Grove and the EPA required by September 10, 2014 the shutdown of two kilns and reconstruction of kiln #3 with selective non-catalytic reduction (SNCR) with an emission limit of 1.5 lb $NO_x$/ton of clinker and a 12-month rolling tonnage limit for $NO_x$ of 975 tpy. The reconstructed kiln is a dry kiln with year-round SNCR operation. The redesign allows 949,000 tpy of clinker, or 1.95 tpd of $NO_x$, which is well below the 4.4 tpd source cap. Ash Grove's enforceable limit continues to be 4.4 tpd, although actual emissions are expected to be below the consent decree limit. Any modifications or new construction would be required to meet nonattainment new source review with best available control technology requirements, and would be subject to the same 1.5 lb $NO_x$/ton of clinker emission limit in the New Source Performance Standards for Portland Cement Plants. It would also be subject to other regulatory requirements, including the National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry.

TXI Operations, LP currently operates one dry preheater/precalciner kiln #5. The permitted capacity of this kiln is 2,800,000 tons of clinker per year, and it has a permitted emission factor of 1.95 lb $NO_x$/ton of clinker. Based on these permit limits, this kiln is therefore limited to a maximum of 7.48 tpd $NO_x$, compared to the current §117.3123 source cap of 7.9 tpd $NO_x$. Kiln #5 typically operates well below the source cap, at an average emission factor below 1.5 lb $NO_x$/ton of clinker.

### 4.4 ADDITIONAL MEASURES

### 4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

Among its various efforts to improve air quality in Texas, the TCEQ continues to promote two voluntary programs in cooperation with the EPA: SmartWay Transport Partnership and Blue Skyways Collaborative.

The SmartWay Transport Partnership is a market-driven partnership aimed at helping businesses move goods in the cleanest most efficient way possible. This is a voluntary EPA program primarily for the freight transport industry that promotes strategies and technologies to help improve fleet efficiency while also reducing air emissions.

There are over 3,000 SmartWay partners in the U.S., including most of the nation's largest truck carriers, all the Class 1 rail companies, and many of the top Fortune 500 companies. Since its founding, SmartWay has reduced oil consumption by 170.3 million barrels and prevented the release of 1,458,000 tons of $NO_x$ and 59,000 tons of

particulate matter into the atmosphere.[36] Ports in the U.S. rely on SmartWay's Port Drayage Truck program to help reduce pollution in and around major national ports. The Port of Houston Authority's (PHA) partnership with the Environmental Defense Fund and the Houston-Galveston Area Council (H-GAC) in the Port Drayage Truck Bridge Loan Program received $9 million from the EPA's Diesel Emissions Reduction Act (DERA) SmartWay Program in 2009. On average, four trucks a month, or about 50 trucks a year, were approved for replacement funding.

In April 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $1,669,560, had a total commitment of more than $2.5 million. A total of 24 trucks were replaced that operate at the Port of Houston. This included replacing 13 on-road over the road trucks that are only used inside the PHA's Turning Basin terminal. The replacement trucks were on-road terminal tractors, with model year 2015 engines, which are built and designed to work on marine terminals. The other 11 trucks replaced with this grant were older on-road terminal tractors that operate in and around PHA's Barbours Cut and Bayport container terminals. The replacements for these trucks were also on-road terminal tractors with model year 2016 engines.

In February 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $900,000, had a total commitment of $1.8 million. It is expected, that at the end of this grant, 17 drayage trucks will be replaced. The funding will provide for replacement trucks powered by certified engines that are model year 2011 or newer, which are estimated to be 90% cleaner. These drayage trucks operate in the Port of Houston and along the Houston Ship Channel. The replacement trucks will also have Global Positioning System units to collect data on idling and port operations, which will allow fleet owners and operators to gauge opportunities for additional fuel savings and emissions reduction.

Approximately 170 Texas companies are SmartWay partners. The SmartWay Transport Partnership will continue to benefit the HGB area by reducing emissions as more companies and affiliates join, and additional idle reduction, trailer aerodynamic kits, low-rolling resistance tire, and retrofit technologies are incorporated into SmartWay-verified technologies.

The Blue Skyways Collaborative was created to encourage voluntary air emission reductions by planning or implementing projects that use innovations in diesel engines, alternative fuels, and renewable energy technologies applicable to on-road and non-road sources. The Blue Skyways Collaborative partnerships include international, federal, state, and local governments, non-profit organizations, environmental groups, and private industries.

### 4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

Energy efficiency (EE) measures are typically programs that reduce the amount of electricity and natural gas consumed by residential, commercial, industrial, and municipal energy consumers. Examples of EE measures include: increasing insulation in homes; installing compact fluorescent light bulbs; and replacing motors and pumps

---

[36] https://www.epa.gov/smartway/learn-about-smartway

with high efficiency units. Renewable energy (RE) measures include programs that generate energy from resources that are replenished or are otherwise not consumed as with traditional fuel-based energy production. Examples of renewable energy include wind energy and solar energy projects.

Texas leads the nation in RE generation from wind. As of the first quarter 2018, Texas has 22,799 megawatts (MW) of installed wind generation capacity,[37] 25% of all installed wind capacity in the United States (U.S.). Texas' total net electrical generation from renewable wind generators in 2016 was 57.5 million megawatt-hours (MWh), approximately 25% of the total wind net electrical generation for the U.S. In 2017, total net electrical generation from renewable wind generators in Texas was 67.0 million MWh,[38] approximately 17% more than in 2016.

While EE/RE measures are beneficial and do result in lower overall emissions from fossil fuel-fired power plants in Texas, emission reductions resulting from these programs are not explicitly included in photochemical modeling for SIP purposes because local efficiency or renewable energy efforts may not result in local emissions reductions or may be offset by increased demand in electricity. The complex nature of the electrical grid makes accurately quantifying emission reductions from EE/RE measures difficult. At any given time, it is impossible to determine exactly where a specific user's electricity was produced.

While specific emission reductions from EE/RE measures are not provided in the SIP, persons interested in estimates of energy savings and emission reductions from EE/RE measures can access additional information and reports from the Texas A&M Engineering Experiment Station's Energy Systems Laboratory (ESL) website (http://esl.tamu.edu/). The reports submitted to the TCEQ regarding EE/RE measures are available under Texas Emissions Reduction Plan (TERP) Letters and Reports.

Finally, the Texas Legislature has enacted a number of EE/RE measures and programs. The following is a summary of Texas EE/RE legislation since 1999.

76th Texas Legislature, 1999

- SB 7
- House Bill (HB) 2492
- HB 2960

77th Texas Legislature, 2001

- SB 5
- HB 2277
- HB 2278
- HB 2845

---

[37] U.S. Department of Energy, National Renewable Energy Laboratory, https://windexchange.energy.gov/maps-data/321
[38] U.S. Department of Energy, Energy Information Administration, https://www.eia.gov/electricity/data/browser/

4-7

78th Texas Legislature, 2003

- HB 1365 (Regular Session)

79th Texas Legislature, 2005

- SB 20 (First Called Session)
- HB 2129 (Regular Session)
- HB 2481 (Regular Session)

80th Texas Legislature, 2007

- SB 12
- HB 66
- HB 3070
- HB 3693

81st Texas Legislature, 2009

- None

82nd Texas Legislature, 2011

- SB 898 (Regular Session)
- SB 924 (Regular Session)
- SB 981 (Regular Session)
- SB 1125 (Regular Session)
- SB 1150 (Regular Session)
- HB 51 (Regular Session)
- HB 362 (Regular Session)

83rd Texas Legislature, 2013

- None

84th Texas Legislature, 2015

- SB 1626
- HB 1736

85th Texas Legislature, 2017

- HB 1571 (Regular Session)

*Renewable Energy*

SB 5, 77th Texas Legislature, 2001, set goals for political subdivisions in affected counties to implement measures to reduce energy consumption from existing facilities by 5% each year for five years from January 1, 2002 through January 1, 2006. In 2007, the 80th Texas Legislature passed SB 12, which extended the timeline set in SB 5

4-8

through 2007 and made the annual 5% reduction a goal instead of a requirement. The State Energy Conservation Office (SECO) is charged with tracking the implementation of SB 5 and SB 12. Also during the 77th Texas Legislature, the ESL, part of the Texas Engineering Experiment Station, Texas A&M University System, was mandated to provide an annual report on EE/RE efforts in the state as part of the TERP under Texas Health and Safety Code (THSC), §388.003(e).

The 79th Texas Legislature, 2005, Regular and First Called Sessions, amended SB 5 through SB 20, HB 2129, and HB 2481 to add, among other initiatives, renewable energy initiatives that require: 5,880 MW of generating capacity from renewable energy by 2015; the TCEQ to develop a methodology for calculating emission reductions from renewable energy initiatives and associated credits; the ESL to assist the TCEQ in quantifying emissions reductions from EE/RE programs; and the PUCT to establish a target of 10,000 MW of installed renewable technologies by 2025. Wind power producers in Texas exceeded the renewable energy generation target by installing over 10,000 MW of wind electric generating capacity by 2010.

HB 2129, 79th Texas Legislature, 2005, Regular Session, directed the ESL to collaborate with the TCEQ to develop a methodology for computing emission reductions attributable to use of RE and for the ESL to annually quantify such emission reductions. HB 2129 directed the Texas Environmental Research Consortium to use the Texas Engineering Experiment Station to develop this methodology. With the TCEQ's guidance, the ESL produces an annual report, *Statewide Air Emissions Calculations from Energy Efficiency, Wind and Renewables*, detailing these efforts.

In addition to the programs discussed and analyzed in the ESL report, local governments may have enacted measures beyond what has been reported to SECO and the PUCT. The TCEQ encourages local political subdivisions to promote EE/RE measures in their respective communities and to ensure these measures are fully reported to SECO and the PUCT.

SB 981, 82nd Texas Legislature, 2011, Regular Session, allows a retail electric customer to contract with a third party to finance, install, or maintain a distributed renewable generation system on the customer's side of the electric meter, regardless of whether the customer owns the installed system. SB 981 also prohibits the PUCT from requiring registration of the system as an electric utility if the system is not projected to send power to the grid.

HB 362, 82nd Texas Legislature, 2011, Regular Session, helps property owners install solar energy devices such as electric generating solar panels by establishing requirements for property owners associations' approval of installation of solar energy devices. HB 362 specifies the conditions that property owners associations may and may not deny approval of installing solar energy devices.

SB 1626, 84th Texas Legislature, 2015, modifies the provisions established by HB 362 from the 82nd Texas Legislature, 2011, Regular Session, regarding property owners associations' authority to approve and deny installations of solar energy devices such as electric generating solar panels. HB 362 included an exception that allowed developers to prohibit installation of solar energy devices during the development

period. SB 1626 limits the exception during the development period to developments with 50 or fewer units.

*Residential and Commercial Building Codes and Programs*

THSC, Chapter 388, Texas Building Energy Performance Standards, as adopted in SB 5 of the 77th Texas Legislature, 2001, Regular Session, states in §388.003(a) that single-family residential construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Residential Code. The Furnace Pilot Light Program includes energy savings accomplished by retrofitting existing furnaces. Also included is a January 2006 federal mandate raising the minimum Seasonal Energy Efficiency Ratio (SEER) for air conditioners in single-family and multi-family buildings from 10 to 13.

THSC, Chapter 388, as adopted in SB 5 of the 77th Texas Legislature, 2001, states in §388.003(b) that non-single-family residential, commercial, and industrial construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Energy Conservation Code.

HB 51, 82nd Legislature, 2011, Regular Session, requires municipalities to report implementation of residential and commercial building codes to SECO.

HB 1736, 84th Texas Legislature, 2015, updates THSC §388.003 to adopt, effective September 1, 2016, the energy efficiency chapter of the International Residential Code as it existed on May 1, 2015. HB 1736 also establishes a schedule by which SECO could adopt updated editions of the International Residential Code in the future, not more often than once every six years.

*Federal Facility EE/RE Projects*

Federal facilities are required to reduce energy use by Presidential Executive Order 13123 and the Energy Policy Act of 2005 (Public Law 109-58 EPACT20065).

*Political Subdivisions Projects*

SECO funds loans for energy efficiency projects for state agencies, institutions of higher education, school districts, county hospitals, and local governments. Political subdivisions in nonattainment and affected counties are required by SB 5, 77th Texas Legislature, 2001, to report EE/RE projects to SECO. These projects are typically building systems retrofits, non-building lighting projects, and other mechanical and electrical systems retrofits such as municipal water and waste water treatment systems.

*Electric Utility Sponsored Programs*

Utilities are required by SB 7, 76th Texas Legislature, 1999, and SB 5, 77th Texas Legislature, 2001, to report demand-reducing energy efficiency projects to the PUCT (see THSC, §386.205 and Texas Utilities Code (TUC), §39.905). These projects are typically air conditioner replacements, ventilation duct tightening, and commercial and industrial equipment replacement.

SB 1125, 82nd Texas Legislature, 2011, Regular Session, amended the TUC, §39.905 to require energy efficiency goals to be at least 30% of annual growth beginning in 2013. The metric for the energy efficiency goal remains at 0.4% of peak summer demand when a utility program accrues that amount of energy efficiency. SB 1150, 82nd Texas Legislature, 2011, Regular Session, extended the energy efficiency goal requirements to utilities outside the Electric Reliability Council of Texas area.

*State Energy Efficiency Programs*

HB 3693, 80th Texas Legislature, 2007, amended the Texas Education Code, Texas Government Code, THSC, and TUC. The bill:

- requires state agencies, universities and local governments to adopt energy efficiency programs;

- provides additional incentives for electric utilities to expand energy conservation and efficiency programs;

- includes municipal-owned utilities and cooperatives in efficiency programs;

- increases incentives and provides consumer education to improve efficiency programs; and

- supports other programs such as revision of building codes and research into alternative technology and renewable energy.

HB 51, 82nd Texas Legislature, 2011, Regular Session, requires new state buildings and major renovations to be constructed to achieve certification under an approved high-performance design evaluation system.

HB 51 also requires, if practical, that certain new and renovated state-funded university buildings comply with approved high-performance building standards.

SB 898, 82nd Texas Legislature, 2011, Regular Session, extended the existing requirement for state agencies, state-funded universities, local governments, and school districts to adopt energy efficiency programs with a goal of reducing energy consumption by at least 5% per state fiscal year (FY) for 10 state FYs from September 1, 2011 through August 31, 2021.

SB 924, 82nd Texas Legislature, 2011, Regular Session, requires all municipally owned utilities and electric cooperatives that had retail sales of more than 500,000 MWh in 2005 to report each year to SECO information regarding the combined effects of the energy efficiency activities of the utility from the previous calendar year, including the utility's annual goals, programs enacted to achieve those goals, and any achieved energy demand or savings goals.

HB 1571, 85th Texas Legislature, 2017, Regular Session, expanded Education Code and Government Code provisions for local governmental entities, schools, and state agencies entering into energy saving performance contracts by authorizing the entities to use any available money to pay the provider for energy or water conservation

measures. Previously, only money other than money borrowed from the state could be used to pay for such conservation measures.

### 4.4.3 Consent Decrees with Refineries

The EPA's National Petroleum Refinery Initiative[39] has resulted in multi-issue settlement agreements with the nation's major petroleum refineries. As of October 2016, 112 refineries representing more than 95% of total domestic refining capacity are under settlement. The EPA consent decrees limit emissions from fluidized catalytic cracking units, sulfur recovery units, heaters and boilers, and flares. The EPA estimates that full implementation of the current settlements will result in more than 95,000 tpy of $NO_x$ emission reductions. The EPA also anticipates VOC emission reductions will result from consent decree requirements that reduce hydrocarbon flaring including:

- installing continuous emissions monitoring systems (CEMS) or predictive emissions monitoring systems;
- operating a flare gas recovery system to control continuous or routine flaring;
- limiting flaring to only process upset gases, fuel gas released as a result of relief valve leakage, or gas released due to a malfunction; and
- eliminating the routes of generated fuel gases and monitoring the flare with CEMS or a flow meter.

### 4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

In March 2005, the EPA issued CAIR to address EGU emissions that transport from one state to another. The rule incorporated the use of three cap and trade programs to reduce $SO_2$ and $NO_x$: the ozone-season $NO_x$ trading program, the annual $NO_x$ trading program, and the annual $SO_2$ trading program.

Texas was not included in the ozone season $NO_x$ program but was included for the annual $NO_x$ and $SO_2$ programs. As such, Texas was required to make necessary reductions in annual $SO_2$ and $NO_x$ emissions from new and existing EGUs to demonstrate that emissions from Texas do not contribute to nonattainment or interfere with maintenance of the 1997 particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers ($PM_{2.5}$) NAAQS in another state. CAIR consisted of two phases for implementing necessary $NO_x$ and $SO_2$ reductions. Phase I addressed required reductions from 2009 through 2014. Phase II was intended to address reductions in 2015 and thereafter.

In July 2006, the commission adopted a SIP revision to address how the state would meet emissions allowance allocation budgets for $NO_x$ and $SO_2$ established by the EPA to meet the federal obligations under CAIR. The commission adopted a second CAIR-related SIP revision in February 2010. This revision incorporated various federal rule revisions that the EPA had promulgated since the TCEQ's initial submittal. It also incorporated revisions to 30 TAC Chapter 101 resulting from legislation during the 80th Texas Legislature, 2007.

---

[39] https://www.epa.gov/enforcement/petroleum-refinery-national-case-results

A December 2008 court decision found flaws in CAIR but kept CAIR requirements in place temporarily while directing the EPA to issue a replacement rule. In July 2011, the EPA finalized CSAPR to meet Federal Clean Air Act (FCAA) requirements and respond to the court's order to issue a replacement program. Texas was included in CSAPR for ozone season $NO_x$, annual $NO_x$, and annual $SO_2$ due to the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 1997 eight-hour ozone NAAQS and the 1997 $PM_{2.5}$ NAAQS in other states. As a result of numerous EGU emission reduction strategies already in place in Texas, the annual and ozone season $NO_x$ reduction requirements from CSAPR were relatively small but still significant. CSAPR required an approximate 7% reduction in annual $NO_x$ emissions and less than 5% reduction in ozone season $NO_x$ emissions.

On August 21, 2012, the U.S. Court of Appeals for the District of Columbia (D.C.) Circuit vacated CSAPR. Under the D.C. Circuit Court's ruling, CAIR remained in place until the EPA developed a valid replacement.

The EPA and various environmental groups petitioned the Supreme Court of the United States to review the D.C. Circuit Court's decision on CSAPR. On April 29, 2014, a decision by the Supreme Court reversed the D.C. Circuit and remanded the case. On October 23, 2014, the D.C. Circuit lifted the CSAPR stay and on November 21, 2014, the EPA issued rulemaking, which shifted the effective dates of the CSAPR requirements to account for the time that had passed after the rule was stayed in 2011. Phase 1 of CSAPR took effect January 1, 2015 and Phase 2 began January 1, 2017. On July 28, 2015, the D.C. Circuit Court ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_x$ budgets for Texas were invalid because they required over control of Texas emissions, and remanded these budgets back to the EPA without vacatur.

On January 22, 2015, the EPA issued a memorandum to provide information on how it intends to implement FCAA interstate transport requirements for the 2008 ozone NAAQS. The EPA provided preliminary modeling results for 2018, which show contribution to nonattainment of the 2008 ozone NAAQS in the HGB area from sources outside of Texas. On July 23, 2015, the EPA issued a notice of data availability regarding updated ozone transport modeling results for a 2017 attainment year.

On June 27, 2016, the EPA issued a memorandum outlining the agency's approach for responding to the D.C. Circuit's July 2015 remand of the Phase 2 $SO_2$ emissions budgets, providing a choice of two paths for states with remanded budgets. Under the first path, states could voluntarily continue to participate in CSAPR at the state's current Phase 2 $SO_2$ and annual $NO_x$ budget levels through a SIP revision. Under the second path, if a state does not choose to participate in CSAPR, the EPA would initiate rulemaking by fall of 2016 to remove the state's sources from CSAPR's $SO_2$ and annual $NO_x$ programs and address any remaining interstate transport or regional haze obligations on a state-by-state basis. On November 10, 2016, the EPA published a proposed rule to remove Texas sources from the CSAPR $SO_2$ and annual $NO_x$ trading programs. The EPA also proposed to determine that, following withdrawal of the federal implementation plan (FIP) requirements, sources in Texas will not contribute significantly to nonattainment or interfere with maintenance of the 1997 $PM_{2.5}$ NAAQS in any other state and that the EPA therefore will have no obligation to issue new FIP requirements for Texas sources to address transport for the 1997 $PM_{2.5}$ NAAQS (81 FR

78954). The rule was finalized, effective immediately, on September 29, 2017 (82 FR 45481).

On September 7, 2016, the EPA signed the final CSAPR Update Rule for the 2008 eight-hour ozone standard. The EPA's modeling shows that emissions from within Texas no longer significantly contribute to downwind nonattainment or interference with maintenance for the 1997 eight-hour ozone NAAQS even without implementation of the original CSAPR ozone season $NO_x$ emissions budget. Accordingly, sources in Texas are no longer subject to the emissions budget calculated to address the 1997 eight-hour ozone NAAQS. However, this rule finalized a new ozone season $NO_x$ emissions budget for Texas to address interstate transport with respect to the 2008 eight-hour ozone NAAQS. This new budget became effective for the 2017 ozone season, the same period in which the Phase 2 budget that was invalidated by the court was scheduled to become effective.

CSAPR budgets for Texas may be subject to change in the future based on any additional rulemaking to address remanded budgets or changes resulting from further appeals.

### 4.4.5 Texas Emissions Reduction Plan (TERP)

The TERP program was created in 2001 by the 77th Texas Legislature to provide grants to offset the incremental costs associated with reducing $NO_x$ emissions from high-emitting heavy-duty internal combustion engines on heavy-duty vehicles, non-road equipment, marine vessels, locomotives, and some stationary equipment.

The primary emissions reduction incentives are awarded under the Diesel Emissions Reduction Incentive Program (DERI). DERI incentives are awarded to projects to replace, repower, or retrofit eligible vehicles and equipment to achieve $NO_x$ emission reductions in Texas ozone nonattainment areas and other counties identified as affected counties under the TERP program where ground-level ozone is a concern.

From 2001 through August 2017, $1,088,390,866 in DERI grants were awarded for projects projected to help reduce an estimated 179,427 tons of $NO_x$ over the life of the projects. This includes $448,288,693 going to activities in the HGB area and $377,422,749 to activities in the DFW area, with an estimated 78,445 tons of $NO_x$ reduced in the HGB area and 62,731 tons of $NO_x$ reduced in the DFW area over the life of the projects.

Three other incentive programs under the TERP program will result in the reduction in $NO_x$ emissions in the DFW and HGB areas, as well as other TERP areas.

The Drayage Truck Incentive Program was established in 2013 to provide grants for the replacement of drayage trucks operating in and from seaports and rail yards located in nonattainment areas. The name of this program was recently changed to the Seaport and Rail Yard Areas Emissions Reduction Program, and replacement or repower of cargo handling equipment was added to the eligible project list. Through August 2017, the program awarded $6,209,424, with an estimated 357 tons of $NO_x$ reduced over the life of the projects. In the HGB area the funding totaled $5.56 million, with projects estimated to reduce up to 325 tons of $NO_x$, over the life of the projects.

$542,061 was awarded to projects in the DFW area, with an estimated 27 tons of $NO_x$ reduced over the life of the projects.

The Texas Clean Fleet Program (TCFP) was established in 2009 to provide grants for the replacement of light-duty and heavy-duty diesel vehicles with vehicles powered by alternative fuels, including: natural gas, liquefied petroleum gas, hydrogen, methanol (85% by volume), or electricity. This program is for larger fleets, therefore applicants must commit to replacing at least 10 eligible diesel-powered vehicles with qualifying alternative fuel or hybrid vehicles. From 2009 through August 2017, over $58.16 million in TCFP grants were awarded for projects to help reduce an estimated 660 tons of $NO_x$ over the life of the projects. Over $22.9 million in TCFP grants were awarded to projects in the HGB area, with an estimated 216 tons of $NO_x$ reduced over the life of the projects, and over $16.3 million was awarded in the DFW area, with an estimated 245 tons of $NO_x$ reduced over the life of the projects.

The Texas Natural Gas Vehicle Grant Program (TNGVGP) was established in 2011 to provide grants for the replacement of medium-duty and heavy-duty diesel vehicles with vehicles powered by natural gas. This program may include grants for individual vehicles or multiple vehicles. The majority of the vehicle's operation must occur in the Texas nonattainment areas, other counties designated as affected counties under the TERP, and the counties in and between the triangular area between Houston, San Antonio, and DFW. From 2011 through August 2017, over $41.9 million in TNGVGP grants were awarded for projects to help reduce an estimated 1,493 tons of $NO_x$ over the life of the projects. Over $10.59 million in TNGVGP grants were awarded to projects in the HGB area, with an estimated 310 tons of $NO_x$ reduced over the life of the projects, and over $14.6 million was awarded to projects in the DFW area, with an estimated 529 tons of $NO_x$ reduced of the life of the projects.

### 4.4.6 Clean School Bus Program

HB 3469, 79th Texas Legislature, 2005, Regular Session, established the Clean School Bus Program, which provides monetary incentives for school districts in the state for reducing emissions of diesel exhaust from school buses through retrofit of older school buses with diesel oxidation catalysts, diesel particulate filters, and closed crankcase filters. As of August 2017, the TCEQ Clean School Bus Program had reimbursed approximately $34.6 million in grants for over 7,500 retrofit activities. This amount included $4.7 million in federal funds. As a result of recent legislative changes, this program will include replacement of older school buses with newer, lower-emitting models going forward.

### 4.4.7 Local Initiatives

Local strategies in the DFW nonattainment area are being implemented by the North Central Texas Council of Governments and local strategies in the HGB nonattainment area are being implemented by H-GAC. Due to the continued progress of these measures, additional air quality benefits are expected to be gained that will further reduce precursors to ground level ozone formation. A summary of local strategies for the DFW nonattainment area is included in Appendix H: *Local Initiatives Submitted by the North Central Texas Council of Governments* of the DFW 2008 Eight-Hour Ozone Attainment Demonstration for the 2017 Attainment Year and information on local

measures in the HGB nonattainment area is available on the Houston-Galveston Area Council website (http://www.h-gac.com/home/residents.aspx).

### 4.4.8 Voluntary Measures

While the oil and natural gas industry is required to install controls either due to state or federal requirements, the oil and natural gas industry has in some instances voluntarily implemented additional controls and practices to reduce VOC emissions from oil and natural gas operations in the DFW nonattainment area as well as other areas of the state. Examples of these voluntary efforts include: installing vapor recovery units on condensate storage tanks; using low-bleed natural gas actuated pneumatic devices; installing plunger lift systems in gas wells to reduce gas well blowdown emissions; and implementing practices to reduce VOC emissions during well completions (i.e., "Green Completions"). The EPA's Natural Gas STAR Program provides details on these and other practices recommended by the EPA as voluntary measures to reduce emissions from oil and natural gas operations and improve efficiency. Additional information on the EPA Natural Gas STAR Program may be found on the EPA's Natural Gas STAR Program webpage (http://www.epa.gov/gasstar/).

### 4.5 2008 OZONE NAAQS SIP REVISIONS ADOPTED SINCE 2015

All Texas SIP revisions are available on the Texas SIP Revisions webpage (http://www.tceq.texas.gov/airquality/sip/sipplans.html).

Since 2015, Texas has adopted several SIP revisions to further address the 2008 eight-hour ozone standard in the DFW and HGB areas. These latest SIP revisions and plans are detailed in this section.

### 4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

On June 3, 2015, the commission adopted two revisions to the Texas SIP for the DFW 2008 eight-hour ozone moderate nonattainment area: the DFW 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision and the DFW 2008 Eight-Hour Ozone Reasonable Further Progress (RFP) SIP Revision. On December 7, 2016, the EPA published final approval of the DFW RFP SIP revision (81 FR 88124). Following proposal of these SIP revisions, the attainment date for the DFW 2008 eight-hour ozone moderate nonattainment area changed from December 31, 2018 to July 20, 2018 as a result of the December 23, 2014 D.C. Circuit Court ruling and the EPA's final 2008 ozone standard SIP requirements rule. Because the attainment year ozone season is the ozone season immediately preceding a nonattainment area's attainment date, the attainment year for the DFW moderate nonattainment area also changed from 2018 to 2017. As a result of the change in the attainment year, it was necessary for the TCEQ to develop a revised attainment demonstration. The DFW 2008 eight-hour ozone nonattainment area attainment demonstration SIP revision for the 2017 attainment year was adopted by the commission on July 6, 2016. On June 14, 2017, the EPA approved part of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance and nonattainment new source review are met in the DFW area for the 2008 ozone NAAQS (82 FR 22291), effective on September 12, 2017. On September 22, 2017, the EPA conditionally approved the TCEQ's cement kiln $NO_x$ RACT analysis for TXI Operations, LP (82 FR 44320) predicated on the TCEQ's commitment to establish the permitted emission limit of 1.95 lb $NO_x$/ton of clinker for kiln #5 in the SIP. The TCEQ committed to the EPA in a letter

dated July 29, 2016 to prepare a SIP revision containing the 1.95 lb NO$_x$/ton of clinker limit for TXI Operations, LP and subsequently submit the SIP revision to the EPA if it is approved by the commission. In the September 22, 2017 final rule, the EPA also fully approved NO$_x$ RACT for all other affected sources in the 10-county DFW 2008 eight-hour ozone nonattainment area. The EPA published final approval of VOC RACT on December 21, 2017 (82 FR 60546). On May 3, 2018 the EPA proposed approval of the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and motor vehicle emissions budgets (83 FR 19483).

### 4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

On December 15, 2016, the commission adopted two revisions to the Texas SIP for the HGB 2008 eight-hour ozone moderate nonattainment area: the HGB 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision (Non-Rule Project No. 2016-016-SIP-NR) and the HGB 2008 Eight-Hour Ozone RFP SIP Revision (Non-Rule Project No. 2016-017-SIP-NR). These SIP revisions were adopted to meet federal obligations for the 2008 eight-hour ozone NAAQS for a moderate nonattainment area with a July 20, 2018 attainment deadline and a 2017 attainment year. The attainment demonstration SIP revision incorporated revisions to 30 TAC Chapter 115 to update reasonably available control technology for VOC storage tanks in the HGB area. The SIP and rule revisions were submitted to the EPA on December 29, 2016. On May 15, 2017, the EPA approved Section 4.9 of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance, nonattainment new source review, and emission statements for large stationary point sources are met in the HGB area for the 2008 ozone NAAQS (82 FR 22291). On June 6, 2017, the EPA published its finding that the motor vehicle emissions budgets in the HGB RFP SIP revision are adequate and must be used for transportation conformity determinations in the HGB area (82 FR 26091). These budgets became effective June 21, 2017. On May 29, 2018, the EPA published proposed approval of elements of the HGB attainment demonstration SIP revision, specifically, the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and MVEBs (83 FR 24446).

### 4.6 CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions that are federally enforceable through SIP revisions. These measures have resulted in significant decreases in eight-hour ozone design values in Texas. Any additional control strategies necessary to address requirements for the 2015 eight-hour ozone NAAQS will be evaluated when attainment demonstration and RFP SIP revisions are developed and implemented.

## CHAPTER 5: PREVENTION OF SIGNIFICANT DETERIORATION AND VISIBILITY TRANSPORT [FCAA, §110(A)(2)(D)(i)(II)]

## 5.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(II), requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD) or interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility. The following sections provide information on how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II).

## 5.2 PSD

Texas has a SIP-approved PSD and nonattainment New Source Review (NSR) permitting program that contains requirements for sources of air pollutants to obtain an approved permit before beginning construction of a facility and before modifying an existing facility. The Texas Commission on Environmental Quality (TCEQ) has established rules governing the enforcement of control measures, including attainment plans and permitting programs that regulate construction and modification of stationary sources.

On January 6, 2014, the United States Environmental Protection Agency (EPA) published approval of Texas' public participation requirements for air quality permits (79 FR 551).[40] On November 10, 2014, the EPA published partial approval of the October 2010 and April 2014 SIP submittals that revise Texas' PSD program to provide for the regulation of greenhouse gas (GHG) emissions and clarify the applicability of best available control technology for all PSD permit applications (79 FR 66626).[41] The EPA also approved revisions to the NSR permitting program as consistent with federal requirements for PSD permitting of GHG emissions. Although the EPA originally disapproved the Texas infrastructure SIP for the 1997 eight-hour ozone, and for the 1997 and 2006 $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) for not containing provisions for the permitting of GHGs, on September 4, 2015 the EPA published a direct final rule in the *Federal Register* (FR) to correct the Code of Federal Regulations to reflect that Texas now has a SIP-approved GHG permitting program (80 FR 53467). The rule became effective November 3, 2015.

On June 12, 2015, in response to a petition for rulemaking from the Sierra Club, the EPA finalized a SIP call related to provisions in SIPs concerning how air agency rules in EPA-approved SIPs treat excess emissions during periods of startup, shutdown, and malfunction (SSM) of industrial source process or emission control equipment. Although not one of the states named in the Sierra Club's petition, the EPA's final rule included Texas. The State of Texas and the TCEQ disagree with the EPA that the TCEQ's

---

[40] Approval and Promulgation of Implementation Plans; Texas; Prevention of Significant Deterioration; Greenhouse Gas Tailoring Rule Revisions, 79 FR 66626 (November 10, 2014).
[41] Approval and Promulgation of Implementation Plans; Texas; Public Participation for Air Quality Permit Applications, 79 FR 551 (January 6, 2014).

SIP-approved affirmative defense rule for certain excess emissions is substantially inadequate to meet FCAA requirements and are challenging the EPA's SIP call.

The following chapters of 30 Texas Administrative Code (TAC) contain rules relevant for this federal requirement:

Chap. 35      Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions; Subchapters A, B, C, K

Chap. 39      Public Notice

Chap. 55      Requests for Reconsideration and Contested Case Hearings; Public Notice

Chap. 101      General Air Quality Rules

Chap. 106      Permits by Rule, Subchapter A, General Requirements

Chap. 112      Control of Air Pollution from Sulfur Compounds

Chap. 115      Control of Air Pollution from Volatile Organic Compounds

Chap. 116      Control of Air Pollution by Permits for New Construction or Modification

Chap. 117      Control of Air Pollution from Nitrogen Compounds

Texas has a robust, SIP-approved permitting program and therefore has met the infrastructure requirements of §110(a)(2)(D)(i)(II).

## 5.3 VISIBILITY TRANSPORT

On December 16, 2014, the EPA published a proposed rule to partially disapprove the Texas 2009 Regional Haze SIP revision and issue a federal implementation plan (FIP) (79 FR 74818). The EPA also proposed to approve the Texas Best Available Retrofit Technology (BART) rule for non-electric generating units (EGUs), and replace the TCEQ's reliance on the Clean Air Interstate Rule (CAIR) with a FIP implementing the Cross-State Air Pollution Rule (CSAPR) in Texas for BART for EGUs.[42] On January 5, 2016, the EPA partially approved (for non-EGU BART) and partially disapproved the Texas SIP and adopted a FIP for the reasonable progress goals and long-term strategy requirements that were disapproved. The EPA did not finalize the EGU BART portion of the proposal. On July 15, 2016, the 5th Circuit stayed EPA's FIP of the Texas Regional Haze Rule.

Because of litigation since the 2009 Texas Regional Haze SIP submission, EGUs are no longer covered under CAIR or subsequent program provisions; and the EPA did not finalize the disapproval of Texas EGU BART on January 5, 2016. In accordance with a consent decree, the EPA published a proposed BART FIP on January 4, 2017 covering

---

[42] The D.C. Circuit lifted the stay on CSAPR and the EPA began implementing the rule on January 1, 2015. However, on July 28, 2015 the D.C. Circuit ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_X$ budgets for Texas were invalid because they required overcontrol of Texas emissions, and remanded these budgets back to the EPA without vacatur.

EGUs. The consent decree required the EPA to sign a final FIP in September 2017. On September 29, 2017, the EPA Administrator signed a FIP to address BART requirements for Texas EGUs, specifically with regard to nitrogen oxides ($NO_x$), particulate matter (PM), and sulfur dioxide ($SO_2$). The final rule was published in the *Federal Register* on October 17, 2017 (82 FR 48324). Additionally, on September 29, 2017, the EPA finalized a rule withdrawing Texas from the CSAPR Group 2 $SO_2$ and Annual $NO_x$ Programs (82 FR 45481). The BART FIP relies on Texas' participation in the CSAPR Ozone Season $NO_x$ Program to fulfill $NO_x$ BART. Because Texas is no longer participating in the CSAPR Group 2 $SO_2$ Program, CSAPR cannot be relied upon to satisfy $SO_2$ BART. Therefore, the FIP establishes an $SO_2$ trading program that applies to select Texas EGUs. The EPA approved the TCEQ's PM screening for EGUs from the 2009 Texas Regional Haze SIP submittal, eliminating the need to require controls for PM BART. Additionally, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the following NAAQS: 1997 eight-hour ozone; 1997 $PM_{2.5}$ (annual and 24-hour); 2006 $PM_{2.5}$ (24-hour); 2008 eight-hour; 2010 one-hour nitrogen dioxide; and 2010 one-hour $SO_2$. The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA §110(a)(2)(D)(i)(II).

Regional haze program requirements include progress reports due to the EPA every five years, to demonstrate progress toward the visibility goal. The 2014 Five-Year Regional Haze Progress Report SIP Revision was submitted to the EPA in March 2014. On January 10, 2017, the EPA published the final Regional Haze Rule Amendments (82 FR 3078) extending the SIP submittal deadline for the second planning period from July 31, 2018 to July 31, 2021 and adjusting the interim progress report submission deadline so that second progress reports would be due by January 31, 2025. The following SIP submittal would be due in 2028 and then every 10 years thereafter, through 2064.

The following chapter of 30 TAC contains rules relevant for this federal requirement:

Chap. 101   General Air Quality Rules

Chap. 122   Subchapter E, Division 2, Clean Air Interstate Rule

Chap. 115   Control of Air Pollution from Volatile Organic Compounds

Chap. 116   Control of Air Pollution by Permits for New Construction or Modification

Chap. 117   Control of Air Pollution from Nitrogen Compounds

The modeling analysis in this SIP revision demonstrates that Texas does not contribute to nonattainment or interfere with maintenance in another state for the 2015 ozone NAAQS. The EPA has not established a separate visibility standard for ozone because ozone does not directly impair visibility or substantially produce or contribute to the production of the secondary air contaminants that cause visibility impairment or regional haze. Particulate matter, rather than ozone, is the pollutant primarily responsible for visibility impairment at Class I areas covered by the Regional Haze Rule. Emissions from Texas EGUs that potentially contribute to both ozone nonattainment and visibility impairment are already controlled under the ozone

NAAQS, BART under the Regional Haze Rule, and interstate transport obligations. Texas is also subject to the ozone season $NO_x$ budget under the CSAPR Update Rule for the 2008 ozone standard. Based on the finding that emissions from Texas do not interfere with measures to protect visibility in nearby states, Texas meets the visibility transport provision for six other NAAQS under the BART FIP (82 FR 48324). When considered alongside the modeling analysis in this SIP revision, and Texas' inclusion in the CSAPR Update Rule ozone season $NO_x$ trading program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

## CHAPTER 6: INTERSTATE POLLUTION ABATEMENT AND INTERNATIONAL AIR POLLUTION [FCAA, §110(A)(2)(D)(ii)]

### 6.1 INTRODUCTION

The requirements of Federal Clean Air Act (FCAA), §110(a)(2)(D)(ii) are satisfied by demonstrating compliance with the applicable requirements of FCAA, §126(a), 126(b) and (c), and 115.

### 6.2 INTERSTATE POLLUTION ABATEMENT

#### 6.2.1 Compliance with FCAA, §126(a)

Under section 126(a)(1) of the FCAA, a state implementation plan (SIP) must contain provisions requiring each new or modified major source required by FCAA title I part C to be subject to prevention of significant deterioration (PSD) permitting to notify neighboring air agencies of potential impacts from the source. Per guidance on development and submission of infrastructure SIPs issued by the United States Environmental Protection Agency (EPA) on September 13, 2013,[43] the EPA considers the notification by the permitting authority to satisfy the requirement of FCAA, §126(a)(1)(A) that a new or modified major source subject to part C notify neighboring air agencies of its potential downwind impact. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source.

#### 6.2.2 Compliance with FCAA, §126(b) and (c)

The required content of an infrastructure SIP with respect to FCAA, §110(a)(2)(D)(ii) is affected by sections 126(b) and 126(c) of the FCAA only if: (1) the Administrator has, in response to a petition, made a finding under section 126(b) of the FCAA that emissions from a source or sources within the air agency's jurisdiction emit prohibited amounts of air pollution relevant to the new or revised NAAQS for which the infrastructure SIP submission is being made; and (2) under section 126(c) of the FCAA, the Administrator has required the source or sources to cease construction, cease or reduce operations, or comply with emissions limitations and compliance schedule requirements for continued operation.

No source or sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS.

### 6.3 INTERNATIONAL AIR POLLUTION

#### 6.3.1 Compliance with FCAA, §115

Section 115 of the FCAA authorizes the EPA Administrator to require a state to revise its SIP under certain conditions to alleviate international transport into another country. When acting on an infrastructure SIP submission for a new or revised NAAQS, the EPA will look to whether the Administrator has made a finding with respect to

---

[43] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Mult ipollutant_FINAL_Sept_2013.pdf

emissions of the particular NAAQS pollutant and its precursors, if applicable. There are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

# CHAPTER 7: CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions and these measures have resulted in significant decreases in eight-hour ozone design values in Texas. Statewide trend analysis of ozone precursor emissions from 2005 through 2014 shows a 17% reduction in volatile organic compounds and a 35% reduction in nitrogen oxides. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone National Ambient Air Quality Standards (NAAQS) and are expected to help the state attain the 2008 and 2015 NAAQS in the future. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values with the greatest decreases observed in the Houston-Galveston-Brazoria and Beaumont-Port Arthur areas with decreases of 34% and 33% respectively.

The modeling analysis provided in this state implementation plan (SIP) revision demonstrates that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors in 2023. Factors such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions were examined for 16 monitors projected to be in nonattainment or projected to have maintenance issues in other states. Based on this modeling analysis, it is concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.

Additionally, Texas has a robust, SIP-approved new source review permitting program and therefore has met the Federal Clean Air Act (FCAA) infrastructure requirements relating to prevention of significant deterioration (PSD). The Texas Commission on Environmental Quality has also determined that Texas meets the visibility transport provisions for the 2015 ozone NAAQS as the state is not contributing significantly to nonattainment or maintenance issues in any other state, the EPA has not established a separate visibility standard for ozone, Texas is subject to the ozone season $NO_x$ budget under the Cross-State Air Pollution Rule Update, and the EPA has made a finding that Texas meets the visibility transport provision for six other NAAQS under the Best Available Retrofit Technology FIP.

Finally, Texas meets the FCAA requirements related to interstate pollution abatement and international air pollution. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source, no sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS, and there are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

In conclusion, this SIP revision demonstrates that Texas meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i)(I) as well as the requirements of FCAA, §110(a)(2)(D)(i)(II) for prevention of significant deterioration and visibility transport and the interstate pollution abatement and international air pollution requirements of FCAA, §110(a)(2)(D)(ii).

## CHAPTER 8: FUTURE REVISIONS TO THE NATIONAL AMBIENT AIR QUALITY STANDARDS (NAAQS)

Federal Clean Air Act (FCAA), §110(a)(1) requires states to submit state implementation plans within three years after the promulgation of new or revised NAAQS to meet the requirements of FCAA, §110(a)(2), including FCAA, §110(a)(2)(D), relating to interstate transport. Therefore, if the NAAQS are revised in the future, the Texas Commission on Environmental Quality will need to take the adequate steps relating to the interstate transport of air pollution.

*Appendices Available Upon Request*

Kristin Patton
kristin.patton@tceq.texas.gov
512.239.4907

**RESPONSE TO COMMENTS RECEIVED CONCERNING THE
TRANSPORT STATE IMPLEMENTATION PLAN (SIP)
REVISION FOR THE 2015 EIGHT-HOUR OZONE
STANDARD**

The Texas Commission on Environmental Quality (commission or TCEQ) conducted a public hearing in Austin on April 10, 2018, at 2:00 p.m. During the comment period, which closed on April 10, 2018, the commission received comments from the Lone Star Chapter of the Sierra Club (Sierra Club).

**TABLE OF CONTENTS**
General Comments
Emissions
Control Strategies

**GENERAL COMMENTS**
Sierra Club commented that the final 2015 Ozone NAAQS Transport SIP revision should include the latest information on nonattainment area designations.

**The TCEQ has updated the SIP revision to include the latest available information related to final area designations for the 2015 ozone NAAQS.**

Sierra Club commented that many EPA rules and decisions are under ongoing litigation and that the SIP revision should be updated for any changes resulting from existing litigation.

**The SIP revision includes the latest information related to ongoing litigation available at the time of development. As noted in Section 1.2: *Introduction* of the SIP revision, the TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.**

**EMISSIONS**
Sierra Club suggested that historical $NO_x$ emission trends for Bexar County or the greater San Antonio area be included in the SIP revision.

**$NO_x$ emissions trends for Bexar County and the greater San Antonio area are included as part of the statewide trends discussed in the SIP revision in Section 2.3.2: *Historical Emissions Inventory Trends.* The request for additional emission trend analysis specific to Bexar County or the San Antonio area is outside the scope of this SIP revision.**

Sierra Club commented that the SIP revision should address the extent to which coal plants in northeastern Texas could impact ozone in nearby states, specifically Oklahoma and Arkansas.

**The TCEQ's modeling indicates there are no projected nonattainment or maintenance monitors in Oklahoma and Arkansas for the 2015 ozone NAAQS. Any ozone impacts on Oklahoma or Arkansas specifically from coal-fired power plants in northeastern Texas beyond the requirements of FCAA, §110(a)(2)(D) are not relevant for the purposes of this transport SIP revision. Further analysis presented in this SIP revision was limited to the tagged projected nonattainment and/or maintenance monitors in Arizona, California, and Colorado and determined that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at these downwind monitors or in any other state.**

CONTROL STRATEGIES

Sierra Club commented that the SIP revision should include a discussion about control strategies on oil and gas and what is being done to limit ozone formation as a result of oil and gas emissions, particularly in the Permian Basin.

**The SIP revision includes a discussion of existing control strategies related to oil and gas emissions in Chapter 4: *Control Strategies.* Additional controls are not addressed in this SIP revision as Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.**

## ORDER ADOPTING
## REVISIONS TO THE STATE IMPLEMENTATION PLAN

**Docket No. 2017-1762-SIP**
**Project No. 2017-039-SIP-NR**

On August 8, 2018, the Texas Commission on Environmental Quality (Commission), during a public meeting, considered adoption of revisions to the State Implementation Plan (SIP). The Commission adopts the Transport SIP Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS). The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). Under Tex. Health & Safety Code Ann. §§ 382.011, 382.012, and 382.023 (West 2016), the Commission has the authority to control the quality of the state's air and to issue orders consistent with the policies and purposes of the Texas Clean Air Act, Chapter 382 of the Tex. Health & Safety Code. Notice of the proposed SIP revision was published for comment in the March 23, 2018, issue of the *Texas Register* (43 TexReg 1907).

Pursuant to 40 Code of Federal Regulations § 51.102 and after proper notice, the Commission conducted a public hearing to consider the SIP revision. Proper notice included prominent advertisement in the areas affected at least 30 days prior to the date of the hearing. A public hearing was held in Austin on April 10, 2018.

The Commission circulated hearing notices of its intended action to the public, including interested persons, the Regional Administrator of the EPA, and all applicable local air pollution control agencies. The public was invited to submit data, views, and recommendations on the proposed SIP revision, either orally or in writing, at the hearing or during the comment period. Prior to the scheduled hearing, copies of the proposed SIP revision were available for public inspection at the Commission's central office and on the Commission's website.

Data, views, and recommendations of interested persons regarding the proposed SIP revision were submitted to the Commission during the comment period, and were considered by the Commission as reflected in the analysis of testimony incorporated by reference to this Order. The Commission finds that the analysis of testimony includes the names of all interested groups or associations offering comment on the proposed SIP revision and their position concerning the same.

IT IS THEREFORE ORDERED BY THE COMMISSION that the revisions to the SIP incorporated by reference to this Order are hereby adopted. The adopted revisions to the SIP are incorporated by reference in this Order as if set forth at length verbatim in this Order.

IT IS FURTHER ORDERED BY THE COMMISSION that on behalf of the Commission, the Chairman should transmit a copy of this Order, together with the adopted revisions to the SIP, to the Regional Administrator of EPA as a proposed revision to the Texas SIP pursuant to the Federal Clean Air Act, codified at 42 U.S. Code Ann. §§ 7401 - 7671q, as amended.

If any portion of this Order is for any reason held to be invalid by a court of competent jurisdiction, the invalidity of any portion shall not affect the validity of the remaining portions.

TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

_____
Bryan W. Shaw, Ph.D., P.E., Chairman

_____
Date Signed

TAB C:
EPA, CONSIDERATIONS FOR IDENTIFYING MAINTENANCE RECEPTORS FOR USE IN CLEAN AIR ACT SECTION 110(A)(2)(D)(I)(I) INTERSTATE TRANSPORT STATE IMPLEMENTATION PLAN SUBMIS-SIONS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS, (OCT 18, 2018) ("2018 MAINTENANCE RECEPTOR MEMO")



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

OCT **19** 2018

## MEMORANDUM

**SUBJECT:**   Considerations for Identifying Maintenance Receptors for Use in Clean Air Act
Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan
Submissions for the 2015 Ozone National Ambient Air Quality Standards

**FROM:**   Peter Tsirigotis
Director

**TO:**   Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to present information that states may consider as they evaluate the status of monitoring sites that the Environmental Protection Agency (EPA) identified as potential maintenance receptors with respect to the 2015 ozone National Ambient Air Quality Standards (NAAQS) based on EPA's 2023 modeling.[1] States may use this information when developing state implementation plans (SIPs) for the 2015 ozone NAAQS addressing the good neighbor provision in Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). In brief, this document discusses (1) using alternative technical methods for projecting whether future air quality warrants identifying monitors as maintenance receptors and (2) considering current monitoring data when identifying monitoring sites that, although projected to be in attainment, as described below, should be identified as maintenance receptors because of the risk that they could exceed the NAAQS due to year-to-year (*i.e.*, inter-annual) variability in meteorological conditions.

This document does not substitute for provisions or regulations of the CAA, nor is it a regulation itself. Rather, it provides recommendations for states using the included analytical information in developing SIP submissions, and for EPA Regional offices in acting on them. Thus, it does not impose binding, enforceable requirements on any party. State air agencies retain the discretion to develop good neighbor SIP revisions that differ from this guidance.

Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by EPA to approve

---

[1] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/2015-ozone-naaqs-mem.*

a particular SIP revision will only be made based on the requirements of the statute following an air agency's final submission of the SIP revision to EPA and after appropriate notice and opportunity for public review and comment. Interested parties may raise comments about the appropriateness of the application of this guidance to a particular SIP revision. EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.

**Introduction**

CAA section 110(a)(2)(D)(i)(I), otherwise known as the good neighbor provision, requires states to prohibit emissions "which will contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any" NAAQS. EPA has historically used a 4-step framework to determine upwind state obligations (if any) under the good neighbor provision for regional pollutants like ozone: (1) identify downwind areas, referred to as "receptors," expected to have problems attaining or maintaining the NAAQS; (2) identify upwind states that contribute to those downwind air quality problems and warrant further review and analysis; (3) identify the emissions reductions (if any) necessary to eliminate an upwind state's significant contribution to nonattainment and/or interference with maintenance of the NAAQS in the downwind areas, considering cost and air quality factors; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in developing their SIP revisions for the 2015 ozone NAAQS, states have flexibility to follow this framework or develop alternative frameworks to evaluate interstate transport obligations, so long as a state's chosen approach has adequate technical justification and is consistent with the requirements of the CAA.

At Step 1, EPA has historically used base year and future year air quality modeling coupled with base period measured ozone design values to project design values to a future analytic year.[2] In a memo issued in March 2018, EPA released updated modeling, which uses 2011 as the base year and 2023 as the future analytic year, to evaluate interstate transport for the 2015 ozone NAAQS.[3] As part of EPA's 2023 modeling analysis, EPA projected the average and maximum base period 2009 – 2013 design values to 2023.[4,5] EPA evaluated the projected 2023 design values in combination with measured 2016 design values using the same methodology used in the Cross-State Air Pollution Rule Update (CSAPR Update)[6] to identify receptors with anticipated potential nonattainment and maintenance issues with respect to the 2015 ozone NAAQS in 2023. Under the CSAPR Update methodology, those sites that are violating the NAAQS based on 2016 design values (*i.e.*, currently not attaining) and that also have projected 2023 *average* design values that exceed the NAAQS (*i.e.*, 2023 average design values of 71 parts per billion (ppb) or greater) are

---

[2] Air Quality Modeling Technical Support Document for the Final Cross State Air Pollution Rule Update (August 2016). *https://www.epa.gov/airmarkets/air-quality-modeling-technical-support-document-final-cross-state-air-pollution-rule*.

[3] Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (March 2018). *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015*.

[4] The base period includes the three design values that contain 2011 monitoring data (*i.e.*, 2009-2011, 2010-2012, and 2011-2013).

[5] The base period maximum design value is the highest of the three design values in the period 2009-2013.

[6] *See* 81 FR 74504 (October 26, 2016).

identified as potential nonattainment receptors in 2023.[7] Under the CSAPR Update methodology, those sites with a 2023 *maximum* 3-year design value that exceeds the NAAQS are identified as potential maintenance receptors. This methodology considers the effects of inter-annual variability in ozone-conducive meteorology to identify sites that may have difficulty maintaining the ozone NAAQS. A projected maximum design value that exceeds the NAAQS indicates that when meteorology is conducive to ozone formation, the receptor struggles with maintenance of the standard. Under the CSAPR Update methodology, maintenance-only receptors therefore include both (1) those sites with projected average and maximum design values above the NAAQS that are currently measuring clean data and (2) those sites with projected average design values below the level of the NAAQS but with projected maximum design values of 71 ppb or greater.[8]

**Considerations for Identifying Maintenance Receptors**

The D.C. Circuit's decision in *North Carolina v. EPA* requires that EPA and the states identify separate nonattainment and maintenance receptors to give independent significance to the "contribute significantly" and "interfere with maintenance" clauses of the good neighbor provision when identifying downwind air quality problems that must be addressed.[9] In particular, the court held that the good neighbor provision requires states to address emissions that interfere with maintenance in downwind areas struggling to meet the NAAQS despite air quality modeling projecting attainment.[10] While the court did not specify a particular methodology for identifying downwind areas that would struggle to maintain the NAAQS, the court cited the state petitioner's demonstration regarding historic variability in ozone concentrations in areas otherwise projected to attain the NAAQS in support of its holding.[11]

In rules promulgated after *North Carolina*, EPA has relied on projections of base period maximum design values to identify those sites that are at risk of being nonattainment in the future due to inter-annual variability in ozone-conducive meteorology, as indicated above. EPA acknowledges that there may be other valid methodologies for identifying such areas. However, consistent with the holding in *North Carolina*, EPA believes that any alternative methods used to identify maintenance receptors must be different than those used to identify nonattainment receptors and should demonstrate that the alternative method considers variability in meteorological conditions that are conducive for ozone formation in the area containing the monitoring site.

---

[7] In determining compliance with the NAAQS, EPA truncates ozone design values to integer values. For example, EPA truncates a design value of 70.9 ppb to 70 ppb, which is attainment. Similarly, EPA considers design values at or above 71.0 ppb to be violations of the 2015 ozone NAAQS.

[8] The nonattainment receptors are also identified as maintenance receptors because the maximum design values for each of these sites is always greater than or equal to the average design value.

[9] 531 F.3d 896, 909-911 (2008).

[10] *Id.*

[11] *Id.* at 909.

3

**Flexibilities Related to Identifying Maintenance Receptors**

In response to comments received through stakeholder outreach, EPA has identified two potential flexibilities that states may use to identify maintenance receptors with an appropriate technical demonstration. First, EPA believes that states may, in some cases, eliminate a site as a maintenance receptor if the site is currently measuring clean data. Second, EPA believes that a state may, in some cases, use a design value from the base period that is not the maximum design value.[12] For either of these alternative methods to satisfy the D.C. Circuit's instruction to consider areas struggling to meet the NAAQS, EPA would expect states to include with their SIP demonstration technical analyses showing that:

(1) meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections;
(2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of nitrogen oxide (NOx) and volatile organic compounds (VOC) have also decreased); and
(3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor.

The intent of these analyses is to demonstrate that monitoring sites that would otherwise be identified as maintenance receptors under the CSAPR Update approach, as previously described, are not likely to violate the NAAQS in the future analytic year. EPA expects that, with such analyses, the state could justify exclusion of a monitoring site as a maintenance receptor, notwithstanding modeling projections showing a maximum design value exceeding the 2015 ozone NAAQS.

To assist states with the recommended analyses, EPA is providing the following information related to analyzing meteorological conduciveness and ozone and emissions trends:

(1) information on meteorological conduciveness for ozone formation based on regional and state-level historical and current climatological data for summertime monthly and seasonal temperature (*see* Attachment A);
(2) a data file containing ozone design values for individual monitoring sites nationwide for the years 2008 through 2017 and for 2023, based on EPA's modeling. This information is available on EPA's website at: *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0*; and
(3) a data file containing state-level annual NOx and VOC emissions from anthropogenic sources with a breakout by major source category, for individual years from 2011 through 2017 and for 2023, based on EPA's projections. This information is available on EPA's website at:

---

[12] Stakeholder comments on potential 2015 NAAQS transport flexibilities can be found at *https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015*.

*https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015-0.*

States developing the technical analyses necessary to support use of the flexibilities described in this memo are encouraged to supplement EPA-provided information with additional data (as appropriate) to support a showing that a specific monitoring site is not at risk of exceeding the NAAQS in the future. For example, states may show that such a site should not be identified as a maintenance receptor by providing (1) a more refined analysis of meteorological conduciveness that considers additional relevant or more locally tailored meteorological parameters, (2) a more temporally or spatially refined emissions trends analysis, and/or (3) an analysis of historical ozone trends that considers, in addition to the design value, trends in other ozone metrics such as annual 4th high 8-hour daily maximum ozone concentrations and the number of days with measured exceedances of the 2015 NAAQS.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Chris Werner at (919) 541-5133, *werner.christopher@epa.gov* for any other information.

Attachment

5

Attachment A

Information on Meteorological Conduciveness
for Ozone Formation

A-1

Meteorological conditions including temperature, humidity, winds, solar radiation, and vertical mixing affect the formation and transport of ambient ozone concentrations. Ozone is more readily formed on warm, sunny days when the air is stagnant and/or when the winds are favorable for transport from upwind source areas. Conversely, ozone production is more limited on days that are cloudy, cool, rainy, and windy (*http://www.epa.gov/airtrends/weather.html*). Statistical modeling analyses have shown that temperature and certain other meteorological variables are highly correlated with the magnitude of ozone concentrations (Camalier, et al., 2007).[1] The overall extent to which meteorological conditions vary from year-to-year (*i.e.*, inter-annual variability) depends on the nature of large scale meteorological drivers such as the strength and position of the jet stream. Inter-annual cycles in the jet stream contribute to inter-annual variability in the degree to which summertime meteorological conditions are favorable for ozone formation within a particular region. Meteorological conditions that frequently correspond with observed 8-hour daily maximum concentrations greater than the National Ambient Air Quality Standards (NAAQS) are referred to as being conducive to ozone formation.

This attachment contains information to help evaluate whether particular summers had ozone-conducive or unconducive meteorology within the 10-year period 2008 through 2017. Information is provided on a state-by-state basis and for individual regions (*see* Figure 1).

- Table A-1 contains tabular summaries of the difference (*i.e.*, anomaly[2]) of monthly average temperature compared to the long-term average.[3]
- Figure A-2 contains maps of the 3-month (June, July, August) statewide anomalies and rank[4] for average temperature compared to the long-term average.
- Figure A-3 contains maps showing spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017 (maps are unavailable for years prior to 2011).
- Figure A-4 contains graphical summaries of the total number of cooling degree days for the 3-month period June through August in each region.

The above tabular and graphic information was obtained from the NOAA National Centers for Environmental Information (NCEI) at *https://www.ncdc.noaa.gov/temp-and-precip/us-maps/* and *https://www.ncdc.noaa.gov/cag/.*

---

[1] Additional references related to ozone formation and meteorology are provided on page A-3.

[2] "The term temperature anomaly means a departure from a reference value or long-term average. A positive anomaly indicates that the observed temperature was warmer than the reference value, while a negative anomaly indicates that the observed temperature was cooler than the reference value."
*https://www.ncdc.noaa.gov/monitoring-references/faq/anomalies.php*.

[3] Note that because of the relatively large inter-annual variability in certain meteorological conditions such as temperature and precipitation, long-term "average" conditions, usually referred to as "normal," are often the mathematical mean of extremes and thus, "average" or "normal" values of temperature or precipitation should not necessarily be considered as representing "typical" conditions.

[4] "In order to place each month and season into historical context, the National Centers for Environmental Information assigns ranks for each geographic area (division, state, region, etc.) based on how the temperature or precipitation value compares with other values throughout the entire record when sorted from lowest to highest value. In other words, the numeric rank value within the area represents the position or location of the sorted value throughout the historical record (1895-present)." *https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition*.

A-2

In general, below average temperatures are an indication that meteorological conditions are unconducive for ozone formation, whereas above average temperatures are an indication that meteorology is conducive to ozone formation. Within a particular summer season, the degree that meteorology is conducive for ozone formation can vary from region to region and fluctuate with time within a particular region. For example, the temperature-related information presented below suggests that summer meteorology was generally conducive for ozone formation in 2010, 2011, 2012, and 2016 in most regions. In contrast, the summer of 2009 was generally unconducive for ozone formation, overall, in most regions. In addition, the summers of 2013 and 2014 were not particularly conducive for ozone formation in the Upper Midwest, Ohio Valley, South, Southeast.

Additional information on the relationships between ozone and meteorological conditions can be found in the following publications:

Blanchard et al., 2010 - *NMOC, ozone, and organic aerosol in the southeastern United States, 1999-2007: 2. Ozone trends and sensitivity to NMOC emissions in Atlanta, GA.*
Reinforces the relationship between temperature, relative humidity and winds to ozone formation.
*https://www.sciencedirect.com/science/article/pii/S1352231010005996?via%3Dihub*

Blanchard et al., 2014 - *Ozone in the southeastern United States: An observation-based model using measurements from the SEARCH network.*
Update to the 2007 paper by Camalier with data from the SEARCH network from 2002-2011.
*https://www.sciencedirect.com/science/article/pii/S1352231014001022?via%3Dihub*

Bloomer et al., 2009 – *Observed relationships of ozone air pollution with temperature and emissions.*
Statistical analysis of 21 years of ozone and temperature data (1987-2008). From a climate scenario perspective, authors examine the climate penalty or how ozone levels change as temperature changes. Reinforces the standing that as temperature increases, ozone concentrations increase, but indicates that due to decreasing emissions, the rate is slower in future scenarios.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1029/2009GL037308*

Kavassalis & Murphy, 2017 - *Understanding ozone-meteorology correlations: A role for dry deposition.*
Authors observe the strong correlation between temperature and relative humidity, but work to understand other reasoning why models under predict the strength of the correlation between relative humidity and ozone. Includes a statistical analysis of 28 years of data and examines vapor pressure deficit and dry deposition as factors. Reinforces meteorological conditions that lead to high ozone days.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2016GL071791*

Reddy & Pfister, 2016 - *Meteorological Factors contributing to the interannaul variability of midsummer surface ozone in Colorado, Utah, and other western US States.*

Authors found strong correlation between 500-mb and 7008-mb patterns, surface temperature, and zonal winds with the resulting high 8-hour daily maximum ozone values.
*https://agupubs.onlinelibrary.wiley.com/doi/full/10.1002/2015JD023840*

Tawfik and Steiner, 2013 - *A proposed physical mechanism for ozone-meteorology correlations using land-atmosphere coupling regimes.*
Discusses the north-south gradient of temperature and relative humidity correlations with ozone formation. Examines 17 years of ozone, NOx, and isoprene measurements.
*https://linkinghub.elsevier.com/retrieve/pii/S1352231013001672*

White et al., 2007 - *Comparing the impact of meteorological variability on surface ozone during the NEAQS (2002) and ICARTT (2004) field campaigns.*
Authors found that while deep boundary layers are noted during periods of elevated ozone, this is likely due to being coincident with other meteorological factors (high temperatures, high pressure systems, low winds).
*https://agupubs.onlinelibrary.wiley.com/doi/10.1029/2006JD007590*

Zhang et al., 2017 – *Quantifying the relationship between air pollution events and extreme weather events.*
Authors examined ozone from 1980-2009 and built a statistical model to examine the impacts of extreme meteorological events on extreme air quality conditions. Found ozone extremes have decreased over the last 30 years, more rapidly recently, but remain highly correlated to extreme temperature events. Highest correlation was found in the eastern United States (U.S.).
*https://www.sciencedirect.com/science/article/pii/S0169809516306093?via%3Dihub*

A-4

Figure 1. U.S. climate regions.
*http://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php*



Table A-1. Temperature anomalies by month for May through September for each climate region for the years 2008 through 2017.[1]

| 2008 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | C | W | W | C | N |
| Southeast | C | WW | N | C | N |
| Ohio Valley | C | W | C | C | N |
| Upper Midwest | C | N | N | N | W |
| South | N | W | N | C | CC |
| Northern Rockies | C | C | N | N | N |
| Southwest | N | W | W | W | N |
| Northwest | N | N | W | W | N |
| West | N | W | W | WW | W |

[1]Unshaded boxes with the "N" marker represent near-normal temperatures that fall within the interquartile range. Blue colors indicate cooler than normal conditions, with the number of "C"s indicating the degree of the anomaly. CCC = coolest on record, CC = coolest 10th percentile, C = coolest 25th percentile. Red colors indicate warmer than normal conditions, with the number of "W"s indicating the degree of the anomaly. WWW = warmest on record, WW = warmest 10th percentile, W = warmest 25th percentile. N/A = data not available. More on the definition of temperature ranks can be found at:

*https://www.ncdc.noaa.gov/monitoring-content/monitoring-references/dyk/images/ranking-definition-legend.png.*

| 2009 | May | Jun | Jul | Aug | Sep |
|------|-----|-----|-----|-----|-----|
| Northeast | N | C | CC | W | C |
| Southeast | N | W | CC | N | N |
| Ohio Valley | N | W | CC | C | N |
| Upper Midwest | N | C | CC | C | W |
| South | N | W | N | N | C |
| Northern Rockies | N | C | C | C | WW |
| Southwest | WW | C | W | W | W |
| Northwest | W | C | WW | W | WW |
| West | WW | C | W | N | WWW |

| 2010 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | W | WW | W | W |
| Southeast | WW | W | WW | WW | W |
| Ohio Valley | W | WW | W | WW | N |
| Upper Midwest | W | N | W | WW | C |
| South | W | WW | N | WW | W |
| Northern Rockies | C | N | N | W | N |
| Southwest | C | W | W | W | WWW |
| Northwest | CC | C | N | N | W |
| West | CC | W | W | N | W |

| 2011 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | WW |
| Southeast | N | WW | WW | WW | N |
| Ohio Valley | N | W | WW | W | C |
| Upper Midwest | N | N | WW | W | W |
| South | N | WW | WWW | WWW | N |
| Northern Rockies | C | N | W | W | W |
| Southwest | C | W | WW | WWW | W |
| Northwest | CC | C | C | W | WW |
| West | C | C | N | W | WW |

| 2012 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | WW | N | WW | W | N |
| Southeast | WW | C | WW | N | N |
| Ohio Valley | WW | N | WW | N | C |
| Upper Midwest | W | W | WW | N | N |
| South | WW | W | WW | N | N |
| Northern Rockies | W | W | WW | W | W |
| Southwest | WW | WW | W | WW | W |
| Northwest | N | C | W | WW | W |
| West | W | W | N | WWW | WW |

| 2013 | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|
| Northeast | W | W | WW | N | N |
| Southeast | C | W | C | C | N |
| Ohio Valley | N | N | C | C | N |
| Upper Midwest | N | N | N | N | N |
| South | C | W | C | N | W |
| Northern Rockies | N | N | N | W | WW |
| Southwest | W | WW | W | W | W |
| Northwest | W | W | WW | WW | WW |
| West | W | WW | WW | N | W |

A-7

| **2014** | **May** | **Jun** | **Jul** | **Aug** | **Sep** |
|---|---|---|---|---|---|
| **Northeast** | W | W | N | N | W |
| **Southeast** | W | W | C | N | W |
| **Ohio Valley** | N | W | CC | N | N |
| **Upper Midwest** | N | W | CC | N | N |
| **South** | N | N | C | N | N |
| **Northern Rockies** | N | C | N | N | N |
| **Southwest** | N | W | W | C | WW |
| **Northwest** | W | W | WW | W | W |
| **West** | W | W | WW | N | WW |

| **2015** | **May** | **Jun** | **Jul** | **Aug** | **Sep** |
|---|---|---|---|---|---|
| **Northeast** | WWW | N | N | W | WW |
| **Southeast** | W | WW | W | N | N |
| **Ohio Valley** | W | W | N | C | W |
| **Upper Midwest** | N | N | N | N | WWW |
| **South** | C | N | W | N | WW |
| **Northern Rockies** | C | WW | N | N | WW |
| **Southwest** | C | WW | C | WW | WWW |
| **Northwest** | W | WWW | W | W | N |
| **West** | N | WWW | C | WW | WW |

| **2016** | **May** | **Jun** | **Jul** | **Aug** | **Sep** |
|---|---|---|---|---|---|
| **Northeast** | N | W | W | WWW | WW |
| **Southeast** | N | W | WW | WW | WW |
| **Ohio Valley** | N | W | W | W | WW |
| **Upper Midwest** | N | W | N | W | WW |
| **South** | C | W | WW | N | W |
| **Northern Rockies** | N | WW | N | N | W |
| **Southwest** | C | WWW | WW | N | N |
| **Northwest** | W | WW | C | W | N |
| **West** | N | WW | W | W | N |

| **2017** | **May** | **Jun** | **Jul** | **Aug** | **Sep** |
|---|---|---|---|---|---|
| **Northeast** | N | W | N | N | WW |
| **Southeast** | N | N | W | N | N |
| **Ohio Valley** | N | N | W | CC | N |
| **Upper Midwest** | N | W | N | C | WW |
| **South** | C | N | W | C | N |
| **Northern Rockies** | N | W | WW | N | W |
| **Southwest** | N | WW | WW | W | W |
| **Northwest** | W | W | WW | WWW | W |
| **West** | W | WW | WW | WW | N |

A-8

Figure A-2. Statewide average temperature ranks for the period June through August for the years 2008 through 2017. Note that the NCEI changed the display format of temperature rank maps beginning in 2014.















A-13

Figure A-3. Spatial fields of daily maximum temperature anomalies (percentiles) for the period June through August for the years 2011 through 2017. Note that the NCDC began creating these maps in 2011.







A-15





A-16





A-17

**191**

Figure A-4. Cooling degree days for June through August for each climate region. Note that (1) data are provided back to 1990 and (2) the range of the y-axis differs in some cases by climate region.







A-19









A-21





A-22

**TAB D:**
**TCEQ, COMMENTS ON THE U.S. EPA'S AIR PLAN**
**DISAPPROVAL 5-6 (APR. 25, 2022) ("TCEQ COMMENTS)**

Jon Niermann, *Chairman*

Emily Lindley, *Commissioner*

Bobby Janecka, *Commissioner*

Toby Baker, *Executive Director*



# Texas Commission on Environmental Quality

*Protecting Texas by Reducing and Preventing Pollution*

April 25, 2022

United States Environmental Protection Agency
Docket ID No. EPA-R06-OAR-2021-0801
[Submitted electronically through www.regulations.gov]

Re:     Comments on the United States Environmental Protection Agency's (EPA's) Air Plan
        Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air
        Pollution for the 2015 Eight-Hour Ozone National Ambient Air Quality Standards
        (NAAQS), Docket ID No. EPA-R06-OAR-2021-0801

Dear Ms. Fuerst:

The Texas Commission on Environmental Quality (TCEQ) appreciates the opportunity to
comment on the EPA's Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas;
Interstate Transport of Air Pollution for the 2015 Eight-Hour Ozone NAAQS. Detailed comments
on the guidance are enclosed. If there are any questions concerning the TCEQ's comments,
please contact Donna Huff, Deputy Director, Air Quality Division, at 512-239-6628 or
donna.huff@tceq.texas.gov.

Sincerely,

Toby Baker
Executive Director

Enclosure

**COMMENTS BY THE TEXAS COMMISSION ON ENVIRONMENTAL QUALITY REGARDING AIR PLAN DISAPPROVAL; ARKANSAS, LOUISIANA, OKLAHOMA, AND TEXAS; INTERSTATE TRANSPORT OF AIR POLLUTION FOR THE 2015 EIGHT-HOUR OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS**

## I. SUMMARY OF NOTICE

On February 22, 2022, the United States Environmental Protection Agency (EPA) released for comment its proposal to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma, and Texas regarding interstate transport for the 2015 eight-hour ozone national ambient air quality standard (NAAQS). On March 11, 2022 the EPA issued the Agency's proposed Federal Implementation Plan (FIP)[1] to address 26 states' obligations to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone NAAQS in other states.

The Texas Commission on Environmental Quality (TCEQ) is providing the following comments on the proposed action.

## II. COMMENTS

### A. General

**The TCEQ opposes the proposed partial disapproval of Texas' transport SIP revision for the 2015 eight-hour ozone NAAQS pertaining to the federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(I) requirement to address interstate transport.**

The EPA proposes to disapprove the portion of Texas' 2015 Ozone NAAQS Transport SIP Revision, submitted to the EPA on August 17, 2018, pertaining to the FCAA, §110(a)(2)(D)(i)(I) requirement to address the interstate transport of air pollution that will significantly contribute to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in other states. The transport analysis provided by the TCEQ in its August 17, 2018, submittal fully addressed the transport requirements of FCAA, §110(a)(2)(D)(i)(I) and for this reason, and as discussed in the TCEQ's other comments below, the TCEQ opposes any disapproval of its 2015 Ozone NAAQS Transport SIP Revision.

**The EPA failed to issue guidance in a timely manner for states to use in developing transport SIP revisions for the 2015 eight-hour ozone NAAQS. It is unreasonable and arbitrary for the EPA to require state SIP revisions to include recommendations from memoranda and/or guidance issued after states have submitted their revisions.**

Developing a SIP revision is a years long process that requires complex technical analysis and compliance with lengthy procedural requirements. Texas timely submitted its 2015 Ozone NAAQS Transport SIP Revision on August 17, 2018, to meet the October 1, 2018, statutory deadline for states to submit infrastructure and transport SIP revisions for the 2015 eight-hour ozone NAAQS. Thirty-one days before

---

[1] https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs

the SIP revisions were statutorily required to be submitted, the EPA issued its Analysis of Contribution Thresholds Memo on August 31, 2018. Eighteen days after this statutory deadline, the EPA further issued its Considerations for Identifying Maintenance Receptors Memo[2] (Maintenance Receptor Guidance) on October 18, 2018. It is unreasonable and arbitrary for the EPA to expect, much less require, that states comply with the recommendations in these guidance documents that were issued either mere days before the deadline or after the deadline considering that SIP revisions are complex and time consuming endeavors.

Texas' transport SIP revision was developed prior to these late issued EPA memos. Texas reasonably relied on EPA's September 13, 2013, guidance on development and submission of infrastructure SIPs since that was the only formal guidance available at the time to assist Texas in development of its SIP revision in order to meet the statutory deadline for submittal.

In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide updated guidance before proceeding with SIP development, review, and submittal; states must proceed to develop submittals based on information available at the time. It is unreasonable to expect states to review and/or incorporate recommendations after a SIP revision has been submitted. As a result of the EPA's lack of timely updated transport guidance for the 2015 eight-hour ozone standard, Texas was forced to expend effort and resources to develop its SIP revision without fully knowing how the EPA would evaluate Texas' transport obligation.

The EPA has previously taken the position that failure to timely submit a SIP revision is sufficient reason for the EPA to issue a FIP. Therefore, states must diligently develop SIP revisions to meet those statutory deadlines. The EPA's failure to update its guidance in a timely manner for the development of transport SIP revisions was arbitrary and unreasonable because states cannot delay and must develop these revisions with guidance currently available. The EPA's actions put states in the untenable position of developing SIP revisions without knowing what the EPA might expect, or simply accepting that EPA will impose its own requirements in a potential FIP. This is an absurd result of the EPA's failure to issue timely guidance.

Finally, guidance documents are non-binding recommendations that have not gone through formal rulemaking. The EPA has consistently failed to promulgate a rule that would instruct states in how, exactly, they should evaluate and meet potential transport actions, much less provide such a rule in a timely fashion that would allow states to meet the statutory requirement to demonstrate they have met their transport obligations within three years of promulgation of a new standard. For example, the EPA could have included criteria for evaluating transport obligations in the promulgation of the 2015 ozone NAAQS itself, and yet made no mention of how states should consider or meet transport obligations. In the absence of either such a rule, or even timely guidance, states such as Texas have tried to meet a target that the EPA has not defined. Furthermore, if the EPA had proposed and finalized a rule that specified requirements for transport at the same time that it proposed or even when it finalized the 2015 ozone NAAQS, states would have been able to evaluate such requirements

---

[2] https://www.epa.gov/sites/default/files/2018-10/documents/maintenance_receptors_flexibility_memo.pdf

and provide appropriate feedback to the EPA on any such rule. That is the purpose of the rulemaking process. The EPA's failure to provide states this opportunity through the rulemaking process without the threat of an already proposed FIP continues to circumvent the cooperative federalism structure that Congress developed in the FCAA.

**The EPA prematurely prepared a proposed FIP before finalizing action on Texas' timely submitted SIP revision to address 2015 eight-hour ozone standard interstate transport requirements.**

Texas submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. The EPA had over three years to review the SIP revision prior to proposing the February 22, 2022, disapproval of the FCAA, §110(a)(2)(D)(i)(I) interstate transport elements. Further, the EPA has developed a proposed FIP before the proposed disapproval is final. Under FCAA §110(c)(1), the Administrator shall promulgate a FIP at any time within two years *after* the Administrator "disapproves a State Implementation Plan in whole or in part, unless the State corrects the deficiency, and the Administrator approves the plan or plan revisions, before the Administrator promulgates such a Federal Implementation Plan." EPA has not yet disapproved the Texas transport SIP, and yet has clearly signaled that it intends to include Texas in such a FIP directly upon finalizing the disapproval action. Although the Supreme Court has recognized that "disapproval of a SIP, without more, triggers EPA's obligation to issue a FIP" and this action can occur "at any time" within those two years (*EPA v. EME Homer City Generation LP, et. al.,* 572 US 489, 490 (2014)), in this instance EPA has not disapproved Texas' SIP. And unlike the fact pattern in EME Homer, Texas has not had an opportunity to challenge the EPA's disapproval of that SIP. Although EPA is under no obligation to wait two years to issue a FIP, it does have to comply with the congressional scheme. The disapproval of the SIP triggers EPA's authority to issue the FIP. In this case, EPA is indeed "altering Congress' SIP and FIP schedule." *Id.* at 491.

The EPA has conducted extensive work to include Texas in a proposed FIP to address interstate transport for Texas under the 2015 eight-hour ozone standard before disapproval of Texas SIP. Although the EPA proposed disapproving the Texas SIP submittal one month prior to the proposed FIP, there has been no final action on that proposal. Additionally, there was no indication from EPA during the years of work that went into the development of this FIP that the Texas SIP was inadequate, nor was Texas afforded any opportunity to correct the deficiencies that EPA believes are present in the SIP. Had the EPA reviewed the 2015 Ozone NAAQS Transport SIP Revision before developing a proposed FIP, the purpose of which is to correct deficiencies in such a SIP, Texas would have had the opportunity contemplated by the FCAA to correct any problems with its SIP in a timely fashion and avoid the imposition of the FIP.

This is clearly distinguishable from the argument in *EME Homer City* that was dismissed by the Supreme Court. The Court said that EPA did not have to give states an opportunity to correct a SIP before issuing the FIP. Instead, in the present case EPA is stating that they not only can, but "must necessarily be able to" propose a FIP before taking final action to disapprove a SIP. That was not the holding in *EME Homer City* and is inconsistent with the Congress' SIP and FIP schedule in the FCAA.

3

**201**

**The EPA failed to provide Texas with formal comments on the adequacy of its analysis during the public comment period for the SIP revision.**

The EPA did not comment on the adequacy of the TCEQ's analysis during the public comment period for the 2015 Ozone Transport SIP Revision. The TCEQ and EPA Region 6 participated in discussions regarding the proposed SIP revision, and the TCEQ answered questions from the EPA on the planned SIP submittal and provided additional data to the EPA. The EPA did not indicate that the information provided failed to address its concerns. The lack of EPA comment did not allow the TCEQ to address the issues outlined in the EPA's proposed disapproval in the adopted 2015 Ozone Transport SIP revision.

*B. Technical*

**The TCEQ has provided a sufficient technical basis for its use of an alternative methodology to identify maintenance monitors.**

The EPA claims that the TCEQ did not provide sufficient technical justification for its approach and that the TCEQ's use of the latest monitored design value did not account for inter-annual variability in ozone conducive conditions. The EPA observes that the TCEQ's maintenance monitor identification methodology accounts for variations in meteorological conditions only over a three-year period compared to the five-year period accounted for in the EPA's method. The EPA does not provide sufficient justification for why five years of meteorological conditions adequately capture inter-annual variability while three years cannot. The latest three years best describe the ozone conditions closest to the future year. The EPA also does not address the fact that the modeled future design values are based on a single base year that is explicitly modeled and are therefore most impacted by the meteorological conditions in that single base year. It should be noted that both the TCEQ's method and the EPA's method use a single base year. The TCEQ's method used the latest three-year design value to reflect the most recent atmospheric conditions of each area, considering meteorology and emissions information.

The EPA states that since the EPA method identifies more monitors as maintenance monitors it is the more rigorous method. However, the "Good Neighbor" provision is not intended to be an exercise to find the greatest number of monitors likely to have air quality issues but to find the monitors mostly likely to have air quality issues due to significant contribution from upwind states.

The EPA further analyzed 21 monitors that had contributions greater than 0.7 ppb in either TCEQ or EPA modeling. The EPA claims that the TCEQ's methodology was flawed because the future year nonattainment design value (determined based on the use of average of three monitored design values as base design value, DVB) is less than the future year maintenance design value (determined based on the use of the latest of three monitored design values as DVB). The EPA discusses in detail how the difference between the nonattainment and maintenance design value in TCEQ's methodology is smaller than the difference in EPA's methodology. However, the EPA fails to discuss that of the 21 monitors, 15 monitors that were identified as maintenance monitors by the EPA's methodology were also identified as maintenance monitors by TCEQ's methodology. In addition, the EPA fails to provide justification on why maintenance design values being lower than nonattainment design values is troubling. For a monitor

4

to have maintenance issues, the future year design value only needs to exceed the standard of 70 ppb not the nonattainment design value.

The EPA further states that the TCEQ's methodology identified a monitor that would be nonattainment but not maintenance as proof that the TCEQ methodology is flawed. However, the EPA does not provide any justification for why every monitor that is modeled nonattainment should also be a maintenance monitor. If, as the EPA contends, monitors face maintenance issues solely due to inter-annual variability of meteorological conditions, it is also possible that the monitors could attain the standard due to favorable meteorology. In practice, a maintenance monitor should only have a transport linkage if it is in an area redesignated as attainment and a subsequent exceedance was shown to be caused by a transport issue, despite local controls and contingency measures. Otherwise, any reductions that might be required from upwind states to help that particular monitor maintain the standard would be overcontrol on the part of EPA.

Overall, the EPA fails to adequately justify its claim that the TCEQ did not provide sufficient technical basis for its use of an alternative methodology.

**The EPA should not disapprove the TCEQ's Transport SIP Revision based on the TCEQ's use of an alternative methodology for identifying maintenance monitors. The TCEQ's method for identifying maintenance monitors aligns with criteria regarding monitored design value trends specified in the *EPA's Maintenance Receptor Guidance* for the use of an alternative maintenance monitor selection method and is scientifically defensible.**

Despite the EPA issuing the Maintenance Receptor Guidance until after the statutory SIP revision submission deadline has passed and thus, depriving the TCEQ of this information during the preparation of Texas' SIP revision, the TCEQ did show that ozone concentrations have been trending downward since 2011 at monitoring sites for which the TCEQ modeling showed linkages. Such a trend is a condition in the Maintenance Receptor Guidance for states to choose an alternative maintenance monitor selection method. The EPA's disapproval conflates instances in which a design value is greater than the previous year with lack of a downward trend. The TCEQ contends that a downward trend of design values since 2011 can have individual design values that are higher than design values in the previous year and still comprise a downward trend over a longer period. The EPA appears to have misunderstood the TCEQ's reasons for choosing the 2014 regulatory design value as the DVB when estimating modeled future year maintenance design values. The TCEQ chose the 2014 regulatory design value because it was the latest design value and best represented current conditions and not because it is the lowest.

Further, for the monitors the EPA linked to Texas based on its 2016v2 modeling, only five of the seven monitors have valid design values in 2014. Out of those five, three had their highest design values in 2014. Emissions trends from the EPA's National Emissions Inventory (NEI) in Illinois and Wisconsin, where the seven monitors are located, show consistent decreases from 2010 through 2020. The EPA's meteorologically-adjusted ozone trends show that ozone values in the Central and East North Central United States, where the linked monitors are located, are much higher in 2012 due to meteorology, which was represented explicitly in the TCEQ's modeling. However, there hasn't been a consecutive three-year period from 2000 through 2020 that has had ozone conducive conditions similar to 2012. Therefore, if TCEQ had

followed the EPA's methodology, TCEQ would have used the 2012 monitored regulatory design value as the DVB, which would have ignored the downward trend in design values and resulted in the misidentification of monitors as maintenance monitors.

**The TCEQ disagrees with the EPA's use of updated 2016 base year modeling to evaluate TCEQ's Transport SIP submittal since the modeling data was unavailable at the time TCEQ developed its SIP revision.**

The EPA's use of modeling platform and monitoring data that was unavailable at the time TCEQ developed its Transport SIP revision is arbitrary and unreasonable. The TCEQ submitted its 2015 Ozone NAAQS Transport SIP Revision to the EPA on August 17, 2018. EPA did not issue the modeling platform it uses in this proposed disapproval until September 2021 (which included the 2016 base year), nearly three years after the statutory deadline for SIP revisions submissions. Obviously, TCEQ did not have access to this modeling platform and data when it developed its SIP revision. However, the TCEQ did use the latest modeling data it had available and made significant improvements on EPA's method. Additionally, the EPA has issued no rules regarding the use of EPA's modeling and monitoring data in the development of Transport SIP revisions.

The only other modeling data available at the time the TCEQ started developing its Transport SIP revision was the EPA's 2011-base year modeling. For monitors identified by EPA as nonattainment or maintenance and linked to Texas in 2023, the TCEQ modeled 2023 design values are similar to the preliminary modeling EPA conducted for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment, as seen in Table 1, *EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling.* This 2011-base modeling by the EPA is similar to the TCEQ's modeling and also shows attainment with the 2015 NAAQS for the monitors EPA identifies as maintenance or nonattainment linkages in its 2016v2 modeling. In fact, for four of the five monitors for which comparable 2010-2012 monitoring data exist, the TCEQ modeled 2023 design values are higher than the EPA 2011-base modeled design values. The TCEQ contends that the difference in base year and increased projection time may explain the lower TCEQ 2023 design values compared with EPA 2023 design values based on 2016 base year modeling. In Table 1 below, the EPA nonattainment design value is based on the average of the three design values in the five-year base year period and the maintenance design value is based on the maximum of these three design values. If the EPA had acted on the TCEQ's SIP submission in a timely manner, the only available data would have been the EPA's 2011-base modeling. Therefore, it is arbitrary and unreasonable for the EPA to evaluate the TCEQ's submission based upon data that was unavailable to the TCEQ during the development and submittal of its SIP revision.

**Table 1: EPA and TCEQ Modeled Design Values in 2023 from EPA 2016, EPA 2011, and TCEQ 2012 Modeling**

| Receptor (Site ID, County, State) | Nonattainment / Maintenance (EPA 2016v2 2023) | EPA 2016v2: 2023 Nonattainment/ Maintenance Design Value (ppb) | EPA 2011v6.3: 2023[3] Nonattainment/ Maintenance Design Value (ppb) | TCEQ 2012: 2023 Nonattainment/ Maintenance Design Value (ppb) |
|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 63.3/65.1 | 60/58 |
| 170310032, Cook County, IL | Maintenance | 69.6/73.4 | 57.6/60.0 | 68/66 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 56.6/58.4 | 64/62 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 54.1/57.0 | 66/65 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 59.7/61.9 | 67/66 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No 2010-2012 monitoring data | No 2010-2012 monitoring data |

Based on this information, if the EPA had relied on modeling conducted for 2023 using emission information available when the TCEQ was required to submit its SIP revision, such as the 2011v6.3 platform, it would not have identified the monitors listed above as nonattainment or maintenance monitors because modeled 2023 design values were below 71 ppb.

Analysis of the EPA and TCEQ modeling also shows greater difference between the predicted 2023 design values and the observed 2020 design values as the prediction time lengthens. Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower) shows that the mean difference across common monitors decreases from -6.20 ppb for a 12-year prediction time, to -6.08 for an 11-year prediction, to -4.34 for a seven-year prediction time. The shaded interquartile range of the distribution also tightens with decreasing prediction time, indicating uniformly better prediction. Note that the TCEQ 2012 modeling shows a similar design value difference to the EPA 2011 modeling indicating similar performance. The difference in design values is largely explained by the shorter prediction time, as seen in Figure 2, Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction, where the TCEQ 2012 modeling

---

[3] EPA 2011v6.3 data are from https://www.epa.gov/sites/default/files/2016-12/2015_o3_naaqs_preliminary_transport_assessment_design_values_contributions.xlsx

is shown as the eleven-year prediction length roughly on the linear trend of the three models.



Figure 1. Difference in Design Value Predicted in 2023 versus Observed in 2020. Predictions are from the EPA 2011 modeling (upper left), TCEQ 2012 modeling (upper right), and EPA 2016 modeling (lower)

8



Figure 2. Difference in Design Value Predicted in 2023 versus Observed in 2020 versus Length of Prediction

The TCEQ chose to use a 2012 base year since it was the most comprehensive, non-anomalous, and best modeling platform available when the modeling needed to commence to meet the SIP development and submittal deadlines.

**The TCEQ disagrees with EPA's claim that it does not use the 0.7 ppb contribution threshold as the 'sole' determinant of significant contribution from upwind states because the EPA evaluated potential emission reductions in upwind states to determine whether potential emissions reductions are significant to downwind monitors.**

The EPA claims that by evaluating if a state has sufficient emission reductions to remove the 0.7 ppb contribution to a downwind nonattainment or maintenance monitor, the EPA's 4-step methodology does not use the 0.7 ppb as the 'sole' determinant of significant contribution and that EPA's methodology is similar to the TCEQ's weight of evidence methodology. However, the EPA is conflating the ability to mitigate contributions with whether the contribution itself is significant in its approach. The potential for emissions reductions should not be used as justification for significant contribution. Significant contribution should be established prior to determining if emissions reductions are needed as the TCEQ did in its transport analysis. Further, the TCEQ's use of a weight of evidence approach to determine significant contribution is consistent with the EPA's modeling guidance, "*Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze*" (EPA Modeling Guidance) and the approach laid out in "*Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions,*" (179B Guidance) where a determination of significant contribution is made if sources outside of a nonattainment area impact a nonattainment area in the context of a 179B demonstration. When air quality modeling is used in the context of attainment and 179B demonstrations, the EPA requires states to provide supplemental analysis to support the modeling results, such as local factors

9

and emission trends. However, in the context of the "Good Neighbor" provision, the EPA dismisses the additional analyses provided by the TCEQ as qualitative assessments that, while informative, do not provide quantitative assessments. The EPA's reliance on chemical transport models as the sole arbiter of significant contribution contradicts its own modeling guidance, which states that "...supplemental analyses may provide information which may provide further support for the outcome of the modeled test or *may indicate a different outcome than the modeled test.*"[4] (Emphasis added.) It should be noted that the 179B Guidance is prescriptive and lays out a weight of evidence approach that relies on more than source apportionment modeling results to determine impacts from international sources. The EPA's heavy reliance on source apportionment modeling and disregard of additional evidence in the context of interstate transport is arbitrary and inconsistent with its guidance on international transport.

**The TCEQ's methodology for determining future contributions is consistent with EPA guidance.**

The EPA Modeling Guidance provides details on the model values and the grid cells to use when estimating the future year design value as part of the modeled attainment test. The TCEQ's methodology to determine a state's contribution to the future aligns with the method used to estimate future year design values. The TCEQ's methodology is internally consistent as the grid cell and top ten days used in the design value calculation are the same as those used to estimate the source (state) contribution. The TCEQ's methodology follows the EPA modeling guidance while the EPA's methodology does not. The TCEQ has repeatedly raised concerns about the EPA's method to determine future year contributions since the EPA approach does not align with the calculation of the future year nonattainment and maintenance design values with respect to the model grid cell and top ten days used.

The TCEQ reiterates that the EPA should only use contributions from days in the calculation of the relative response factor when calculating an upwind state's contributions to future design values. Using one set of days to calculate the future year design value that is the basis for a monitor's future attainment status (attainment/maintenance/nonattainment) and a different set to determine the states' contribution to that design value is inconsistent and arbitrary.

Further, the EPA uses concentrations from the grid cell containing the monitor to determine state contributions while using concentrations at the grid cell with the maximum modeled concentration in a "3x3" array centered on the monitor when calculating design values. The EPA's approach could result in the use of modeled concentrations from different grid cell locations potentially disconnecting the future year contributions from the future year design values.

The TCEQ's approach uses modeled concentrations from the grid cell on the days that were used in the design value calculation to determine future year contributions. The TCEQ's method is consistent, and the EPA failed to provide a rational justification for its concerns with regards to the TCEQ's approach.

---

[4] Page 170 of the EPA Modeling Guidance, https://www.epa.gov/sites/production/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf

**The EPA did not consider all of the information provided to it by the TCEQ. The TCEQ disagrees with the potential concerns that the EPA raises with regards to the TCEQ's modeling of electric generating units and boundary conditions.**

The EPA in the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" discusses potential concerns about the electric generating unit (EGU) emissions and boundary conditions in TCEQ's modeling. The EPA fails to acknowledge the additional analysis provided to the EPA via email on June 6, 2016, detailing the differences in 2023 EGU emissions by state in the TCEQ modeling with the various EGU emissions projections available at the time TCEQ's SIP was developed. The comparison showed that the EGU emissions included in TCEQ's modeling were comparable to emissions in EPA's Engineering Analysis and the latest emissions available in the Air Market's Program Database. The EPA also fails to acknowledge that the TCEQ provided additional information summarizing the change in modeled ozone contribution at monitors attributable to boundary conditions when boundary conditions accounted for changes in future year emissions. The EPA did not request additional analyses or express concerns with TCEQ's modeling after the additional information was provided in June 2018.

**The EPA mischaracterizes the purpose and analytic details in the TCEQ's weight of evidence, invalidating the EPA's conclusions regarding the impact of Texas emissions.**

In the "*EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document*" the EPA states that the TCEQ used its weight of evidence to counter the modeling results. This is a misinterpretation of the purpose of the weight of evidence. The TCEQ used the weight of evidence not to determine if Texas contributed *at all* to linked monitors but rather to determine if Texas contributes to those monitors *significantly and persistently.*

In addition, the following errors in the EPA's Technical Support Document (TSD) make its SIP disapproval invalid.

- On pages 81-86 of the TSD, the EPA states concerns with the trajectory parameters used by the TCEQ. The TCEQ's trajectory parameters were set at ranges typically used for analyses of this kind. This is not a legitimate basis for disapproval since the EPA did not provide specific guidance on acceptable parameters for this application. In other applications (for example the Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions), the EPA has provided specific trajectory parameters required for approval.

- The EPA incorrectly describes the start time of the TCEQ's trajectories. The EPA states "TCEQ used the 1st hour of the 8-hour exceedance as the start time" (page 82). The Texas SIP clearly states on page 3-53 that "The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory." The EPA's concerns regarding the start time of trajectories are based on an erroneous reading of the document and thus should not be considered in evaluating the Texas SIP revision.

- On page 82, the EPA states that the TCEQ should have also used an additional 100 meters above ground level (m AGL) start height for the trajectories; however, trajectories with too low of a start height may hit the ground. Once a

trajectory hits the ground it loses accuracy and may no longer provide useful data, especially when considering the distance between the source and receptor in the TCEQ's analysis. The National Oceanic and Atmospheric Administration (NOAA) recommends start heights that are located in the middle of the planetary boundary layer. Start heights at 500 m AGL are well within these standard parameters; therefore, disagreement regarding trajectory start height is not a legitimate reason to discount the TCEQ analysis or disapprove this Texas SIP revision.

- The TCEQ used scientifically appropriate filtering criteria on its trajectories. As stated above, NOAA recommends start heights located in the middle of the mixing layer. Trajectories that hit the ground may be inaccurate and removing them to analyze more significant trajectories was appropriate in the context of the weight of evidence analysis. All trajectory endpoints that met these two criteria were presented regardless of whether they were in the mixing layer over Texas. The analysis only filtered endpoints within the mixing layer over Texas as an additional analysis to describe trajectories that show more meaningful transport patterns. The EPA has no scientific basis for concluding that the TCEQ inappropriately filtered trajectories.

**T**AB **E:**
**D**ECLARATION OF **D**WAYNE **W. "W**OODY**" R**ICKERSON,
**V**ICE **P**RESIDENT OF **S**YSTEM **P**LANNING **&**
**W**EATHERIZATION FOR **E**LECTRIC **R**ELIABILITY **C**OUNCIL
OF **T**EXAS, **I**NC. (**ERCOT D**ECL.)

## DECLARATION OF
## DWAYNE W. "WOODY" RICKERSON

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I have worked at ERCOT for the past 22 years. I have a Bachelor of Sciences degree in Electrical Engineering from New Mexico State University and a Master of Engineering in Engineering Management from the University of Colorado. I am providing this declaration on behalf of ERCOT.

2. I am submitting this declaration because it is my understanding that the Environmental Protection Agency (EPA)'s disapproval of the Texas state implementation plan (SIP) for addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS) could allow EPA to implement the federal implementation plan (FIP) that EPA proposed in April 2022 and that is expected to be adopted by EPA in final form on March 15, 2023. As further explained in this declaration, I am concerned that the implementation of the EPA's FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season (defined to be May 1, 2023 through September 30, 2023).

### Background: ERCOT's Role in Managing Texas's Electric Grid and Electricity Market

3. ERCOT is the independent system operator (ISO) designated by the Public Utility Commission of Texas for the purpose of managing the ERCOT transmission grid, which serves approximately 26 million customers in the State of Texas.

4. In its role as the ISO, ERCOT is tasked with a number of critical functions, including "ensur[ing] the reliability and adequacy of the regional electrical network" and administering the wholesale electricity market. Texas Utilities Code section 39.151(a)(2), (4). One of the most important ways ERCOT ensures system reliability is by managing the flow of electric power on the grid every moment of every day. ERCOT performs this function by dispatching each of hundreds of generators located across the system to match the system demand of these customers at all times, while also observing the physical limits of the transmission lines that transport that power.

5. ERCOT is also registered with the North American Electric Reliability Corporation (NERC) as the sole Reliability Coordinator and Balancing Authority for the ERCOT region under the reliability framework in section 215 of the Federal Power Act. In these roles, ERCOT has the ultimate responsibility to direct the operation of the ERCOT power grid to ensure generation and load are balanced and to take all appropriate actions needed to ensure the security of the grid during emergency conditions.

6. ERCOT does not engage in advocacy except where its core functions, including electric grid reliability, may be affected. ERCOT's interests in this matter are limited to the reliable operation of the ERCOT grid.

7. Under the statutory design of the ERCOT wholesale electricity market, generation owners bear the risk of investment when deciding the timing and location of new generation or the retirement of existing generation based on market conditions. ERCOT cannot mandate construction of new generation. Rather, the ERCOT market is designed to provide financial signals to generation companies to develop adequate generation capacity. As part of its responsibilities, ERCOT evaluates the impacts to grid reliability of possible and pending changes in generation capacity.

1

**Risks Associated with Growth in Renewable Generation**

8. Because the ERCOT wholesale market relies on market forces to ensure generation sufficiency, investment dollars tend to favor investments that have the greatest rates of return. For at least the past decade, federal tax incentives for investment in renewable generation have been the primary factor leading investors to strongly favor wind and solar projects to meet the growing demand in the ERCOT region.

9. Whereas wind and solar generators accounted for less than 1% of the total generating capacity in 2007, those generators now account for a combined 40% of the total generating capacity and produce 39% of the energy in the ERCOT region.

10. Wind and solar generation also account for approximately 21,683 MW, or 69%, of the approximately 31,287 MW in generation capacity that is currently proposed to interconnect in the ERCOT region within the next three years, while gas-fired generating units account for only 5%, and coal units account for zero percent of the generation capacity that is proposed to interconnect.

11. Increases in generation capacity from renewables alone are not adequate to supply the future electric energy demands of a growing 26 million customer base in ERCOT. Wind and solar generating units are intermittent sources of generation. During daylight hours, cloud cover can cause fluctuations in solar energy production. Solar energy production also dissipates rapidly in the evening and is nonexistent at night. Wind generation will also vary with weather patterns, time of day, and seasons.

12. Together, the variability of wind and solar power production creates the need for replacement energy that must come from dispatchable sources such as gas and coal units. Battery energy storage devices do not currently have enough installed capacity in the ERCOT grid to provide this replacement energy. The forecasted installation of new batteries in the next three years will not meet the projected demand.

13. Replacement energy from dispatchable sources must also be able to increase and decrease quickly. This ramping capability is needed to match the variability associated with wind and solar energy production. If the amount of dispatchable generation capacity is reduced due to increased emissions limits, the risk that ERCOT will not be able to meet its load demands increases.

**Imminent Harm to ERCOT Reliability for Ozone Season 2023**

14. It is my understanding that the EPA's proposed FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the Summer 2023 Ozone Season, which is defined as May 1, 2023 through September 30, 2023. This reduction in NOx emission allowances will impact the operation of the gas and coal facilities that are needed to manage the reliability of the grid because gas and coal units produce NOx as a byproduct of generating electricity.

15. Based on data provided to ERCOT by a subset of owners of coal and gas-fired generating units regarding the impacts in the reductions of these allowances, those units would need to reduce their capacity by 26% during summer of 2023.

16. The units for which these owners provided data collectively represented units that have already installed Selective Catalytic Reduction (SCR) technology as well as units that do not currently have SCR technology. Consequently, for this data sample, while some lower-emitting units would be expected to increase generation for summer of 2023 in order for higher-emitting units to run less, a

2

26% total reduction in capacity was predicted for this subset of units as a whole.

17. ERCOT extrapolated the data from this subset of coal- and gas-fired generating unit owners to understand possible system-wide impacts. ERCOT evaluated the roughly 12,281 megawatts (MW) of generation in the ERCOT footprint that have been identified as being required to install SCR technology by 2026 to meet the EPA's proposed FIP emissions for that year. Assuming those units that currently lack SCR technology are units that would need to reduce emissions in 2023, using the 26% reduction in capacity noted above, ERCOT calculated that under EPA's proposed FIP, there could be a 3,193 MW reduction in thermal capacity for summer of 2023 for the ERCOT system (26% of 12,281 MW.)

18. For Ozone Season 2022, the tightest reserve capacity margin in ERCOT occurred on July 13, 2022 at 3:23 p.m. At that time, ERCOT had 2,408 MW of capacity reserves. If the July 13, 2022 conditions were to occur again in 2023, it is expected that a 3,193 MW reduction in thermal capacity would require ERCOT to direct at least 1785 MW of firm load-shedding in order to maintain 1000 MW of operating reserves. When ERCOT directs firm load-shedding, utilities are required to disconnect customers from the power grid in order to avoid a system-wide blackout.

19. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be five times greater than it would be without the reduction of capacity. (The peak load day is the day in ERCOT's long-term load forecast for summer 2023 that ERCOT has the highest load. The 4 p.m. hour is the hour forecasted to be the peak demand hour in that same forecast for summer 2023. Therefore, if load meets or exceeds that forecasted peak demand, the chance of load-shedding would be five times greater than it would be without the reduction in capacity.)

20. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be two and a half times greater than it would be without the reduction of capacity.

21. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would enter Emergency Energy Alert 1 (EEA1)—which means that operating reserves for the Texas grid have dropped below 2,300 megawatts and are not expected to recover within 30 minutes—would be four times as large. Note that during EEA1, there are no controlled outages, but ERCOT can acquire additional resources during capacity scarcity conditions as well as issue calls for conservation.

22. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would enter EEA1 would double.

23. EPA uses an Integrated Planning Model (IPM) to project future conditions in the electricity market, including unit-specific summer generation expectations. The EPA model results that take into account the impacts of the proposed FIP for 2023 are located on EPA's website at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0161m under the spreadsheet labeled "Proposed Rule RPE File." Column A of that spreadsheet can be filtered for only the year 2023. Column B, "Region Group," can be filtered for only the ERCOT region. Column V "Generation Summer GWh," shows many units for which EPA has assumed will have zero output under the 2023 FIP. When units that have a non-zero output, and therefore are assumed to be operating in summer 2023, are deleted from the sum of column AW "Dispatchable Capacity MW," the remainder for column AW, and therefore what is assumed by EPA to ***not*** operate in summer 2023 because of the FIP, sums to 17,611 MW. However, this number appears to double-count three units

3

with a total output of 2,568 MW.  Subtracting this apparent error from the 17,611 MW amount results in a total of 15,044 MW.

24. Therefore, while ERCOT has evaluated the effects of a reduction in capacity of 3,193 MW for summer 2023, this number actually appears to be quite conservative. EPA's own data indicates a 15,044 MW reduction in capacity for ERCOT for summer 2023.

25. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, it is even more likely that ERCOT would need to direct firm load-shedding. ERCOT estimates that under this scenario during the 4 p.m. hour on a peak load day, the likelihood of needing to direct firm load-shedding would be 77 times greater than it would be without the reduction of capacity.

26. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, ERCOT estimates that under this scenario during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be eight times greater than without the reduction of capacity.

27. While paragraphs 19-26 address impacts on a single peak load day, it should be noted that numerous non-peak load days from May 1, 2023 through September 30, 2023 will experience similar probabilities that ERCOT would need to direct firm load-shedding.

28. While the above impacts have addressed 2023 system-wide impacts that can be extrapolated from the data provided or available to ERCOT, a reduction in capacity from generators, even when ERCOT has a large enough reserve margin to meet demand, can cause additional stress on the system, leading to operational problems. In effect, this additional stress can mean that even when ERCOT has sufficient generation to meet demand, it may be unable to deploy power to the customers that need it because there are not sufficient available transmission paths to deliver that energy.

29. Based on data provided by a subset of owners of coal- and gas-fired generating units regarding the impacts in the reductions of these allowances, ERCOT determined that the reductions in generating capacity would also cause local and regional reliability issues due to overloads of multiple transmission elements.  ERCOT's analysis showed that some of these overloads could not be addressed by existing generation redispatch and would result in some amount of regional firm load-shedding to address these reliability issues. Regional firm load-shedding is used to address specific transmission overloads.  This differs from firm loadshedding that may be directed to balance generation and load across an entire grid.

30. These overload issues would also limit ERCOT's ability to deliver available generation capacity using the existing transmission system to address the unavailability of the coal- and gas-fired generating units. This, in turn, would exacerbate the system-wide impacts that are described in paragraphs 14-27.

## Harm to ERCOT Reliability beyond Ozone Season 2023

31. ERCOT has been informed by owners of coal- and gas-fired generating units that the proposed FIP's mandate that owners of certain generating units must install SCR technology by 2026 would be prohibitively expensive and would therefore lead these generation owners to retire their units.

32. ERCOT understands that as much as 10,800 MW of capacity in the ERCOT region—8,200 MW of coal-fired generation and 2,600 MW of gas-fired generation—is at risk of retirement due to the SCR mandate, a loss of thermal capacity that could have catastrophic consequences for the electric grid in

2026.

33. The risks associated with the retirements of these units include but are not limited to: the increase in probability that ERCOT will need to direct utilities to shed firm load (i.e., to disconnect customers from the grid) to ensure the reliability of the remaining electric system; the reduced availability of outages for the remaining thermal generation fleet; the reduction in system inertia; and the impact on transmission flows and associated reliability problems.

34. ERCOT performed a study to quantify this risk for summer 2026, assuming the retirement of 10,800 MW of coal and gas generation. In this assessment, ERCOT used its Operating Reserve Risk Model to run 10,000 simulations of conditions during this period. ERCOT's assessment concluded that the probability of the supply of generation being inadequate to serve the demand on the grid during the 7 to 8 p.m. window at some point in summer 2026 increased from 4.5% to 40%.

35. Therefore, while solar energy is dissipating fairly rapidly in the evening, ERCOT will have an approximately nine times greater risk of having insufficient generation to meet demand in 2026 if the proposed FIP is finalized. This vulnerability is most pronounced between 7 to 8 p.m. but extends to other hours of the day.

36. While ERCOT has produced the above data for 2026, ERCOT anticipates that the mandate that owners of certain units must install SCR technology by 2026 could lead to retirement of coal- and gas-fired generating units prior to 2026, causing a gradual increase in the risk of having insufficient generation to meet demand.

**<u>Conclusion</u>**

37. In my opinion, the proposed FIP poses an imminent harm to the reliability of the ERCOT grid in summer of 2023 and in later years.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on March 2, 2023.


  /s/ D. W. Rickerson

Dwayne W. "Woody" Rickerson
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.

**Exhibit 4: Reply in Support of State Petitioners' Opposed Motion to Stay, Doc. 197, *Texas v. EPA*, No. 23-60069 (5th Cir. Apr. 10, 2023)**

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO
CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS
ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE
MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY,
L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA
APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS
ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD
COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI
DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER
COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

## REPLY IN SUPPORT OF STATE PETITIONERS' OPPOSED MOTION TO STAY

# TABLE OF CONTENTS

Table of Contents .................................................................................i

Table of Authorities...........................................................................ii

Introduction.........................................................................................1

Argument..............................................................................................2

   I.     Petitioners Are Likely to Succeed on the Merits. ......................2

        A.     TCEQ's own data and modeling do not show that Texas has violated its good-neighbor obligations...............................3

        B.     EPA acted arbitrarily and capriciously by disapproving Texas's SIP in part by relying on after-the-fact guidance. .......................... 4

        C.     EPA's disapproval violates the Act's cooperative federalism. .............7

   II.    The Remaining Stay Factors Favor Petitioners.........................9

Conclusion........................................................................................ 11

Certificate of Service....................................................................... 12

Certificate of Compliance ............................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Azar v. Allina Health Servs.*,
  139 S. Ct. 1804 (2019) ...................................................................... 1

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................... 1

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) .................................................................... 2, 7

*EME Homer City Generation, L.P. v. EPA*,
  696 F.3d 7 (D.C. Cir. 2012) ............................................................... 9

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ........................................................................... 6

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ....................................................................... 8, 9

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ........................................................................... 2

*Sierra Club v. EPA*,
  671 F.3d 955 (9th Cir. 2012) ............................................................. 7

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ........................................... 1, 6, 7, 8, 9

*Wages & White Lion Invs., L.L.C. v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ........................................................... 6

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ....................................................... 7, 8

**Statutes:**

5 U.S.C. § 706(2)(A) ............................................................................. 2

42 U.S.C.:
  § 7410(a)(2)(D)(i)(I) ..................................................................... 3, 10
  § 7410(c)(1) ........................................................................................ 8
  § 7410(c)(1)(B) .................................................................................. 9
  § 7410(k)(5) ................................................................................... 7, 8

A-284

**Other Authorities:**

Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; In-
    terstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l
    Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) ..................4

Air Plan Disapprovals; Interstate Transport of Air Pollution for the
    2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 88 Fed.
    Reg. 9,336 (Feb. 13, 2023) ................................................................1, 4, 5, 6, 11

EPA, Federal "Good Neighbor Plan" for the 2015 Ozone Nat'l
    Ambient Air Quality Standards (Mar. 15, 2023), *available at*
    https://tinyurl.com/3ykesfm4 ..........................................................................2

A-285

# Introduction

Federal administrative agencies must provide "regulated parties fair warning of the conduct [a regulation] prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). EPA's disapproval of Texas's State Implementation Plan ("SIP") violates that principle. It depends on guidance, models, and modes of analysis that became available *after* Texas was statutorily required to submit its SIP. That "surprise switcheroo," *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019), vitiates core principles of administrative law and disregards the Clean Air Act's cooperative federalism, *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

EPA defends the agency's actions by arguing that Texas misunderstands the basis for its disapproval. But the part of the rule that Texas challenges belies EPA's shifting claims about the reasons for its actions. *See* Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 88 Fed. Reg. 9,336, 9,364, 9,370 (Feb. 13, 2023) ("Final Rule"). And EPA struggles to explain how, consistent with the Act's cooperative federalism, it can hold a State to the Act's SIP-revision deadline but ignore its own statutory deadline and use after-acquired data and guidance to disapprove a State's timely submission.

EPA's arbitrary-and-capricious actions doom the challenged part of the Final Rule. And because the rule's implementation threatens irreparable harm to the State's economy and power grid, the equities and public interest favor entering a stay pending review by this Court. Texas respectfully requests that relief, or else an

administrative stay, by May 1, 2023—the date by which EPA intends to subject Texas facilities to the rule "regardless of the rule's effective date." *See* EPA, Federal "Good Neighbor Plan" for the 2015 Ozone Nat'l Ambient Air Quality Standards 420 (Mar. 15, 2023), *available at* https://tinyurl.com/3ykesfm4.

<div align="center">

**ARGUMENT**

</div>

## I. Petitioners Are Likely to Succeed on the Merits.

EPA's disapproval of Texas's SIP constitutes quintessential arbitrary-and-capricious agency action, *see* 5 U.S.C. § 706(2)(A), for at least two reasons. First, without any "detailed justification," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), or accounting for reliance interests, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020), EPA altered its policy regarding how States should identify maintenance receptors *after* Texas submitted its SIP—and then disapproved the SIP in part based on that after-the-fact guidance. *See* Mot. 12-15. Second, by basing its disapproval on emissions-modeling data that were available only after Texas was statutorily required to submit its SIP revisions, EPA violated the structural principles of cooperative federalism undergirding the Act. *See id.* at 16-18.

In addition to reasserting (at 15-16) its venue argument, which fails for the reasons Texas previously explained, *see* Doc. 102, EPA makes three overarching rejoinders. None withstands scrutiny.

<div align="center">

2

</div>

## A. TCEQ's own data and modeling do not show that Texas has violated its good-neighbor obligations.

EPA's lead argument (at 19) is that "Texas's own data, modeling, and methodology showed that Texas was linked to both nonattainment and maintenance receptors at Steps 1 and 2" of EPA's preferred four-step analytical framework, so "regardless of which data, modeling, or methodology is used, Texas's contribution to downwind nonattainment is not in dispute." That is a sleight-of-hand. Emissions from Texas, like emissions from most upwind States, are present in downwind States. But the statutory language at issue requires a SIP to contain adequate provisions to prohibit emissions that "contribute *significantly* to nonattainment," or that interfere with maintenance, of the NAAQS in other States. 42 U.S.C. § 7410(a)(2)(D)(i)(I) (emphasis added). The *significance* of Texas emissions' contribution to nonattainment in downwind States, and the degree to which they interfere with maintenance in such States, was hotly disputed; Texas disagrees that TCEQ's own data, modeling, and methodology demonstrate significant contributions to nonattainment, or interference with maintenance, in downwind States. *See, e.g.*, Appendix D to Texas State Petitioners' Stay Motion at 6-12 ("TCEQ Comments"); *see also* Appendix B to Texas State Petitioners' Stay Motion at 3-41, 3-42, 3-75 ("Texas SIP").

EPA responds (at 20-22) by arguing that "Texas's failure to 'conduct an adequate Step 3 analysis' was EPA's basis for disapproval—not the flaws EPA identified in [its] data, modeling, and methodology," so the Court should overlook its administrative-law violations at earlier steps of the analysis. But EPA errs at the outset by

embracing a rigid construction of its concededly non-binding four-step transport framework. As EPA has acknowledged, its framework "allow[s] for some methodological variation," and "states have some flexibility in developing analytical methods within this framework" or in developing an "alternative framework." 88 Fed. Reg. 9,338.

TCEQ employed a similar, but not identical, approach here, with its "Steps 2 and 3" approximating EPA's Step 2. *See* Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798, 9,824 (Feb. 22, 2022) ("Proposed Rule"). And even under EPA's four-step framework, the analysis at each step is not hermetically sealed off from the others. To the contrary, the inputs at Steps 1 and 2 for identifying maintenance receptors and assessing linkages are relevant to the outputs produced at Steps 3 and 4 in determining whether emissions are interfering with maintenance of the NAAQS in downwind States such that emissions reductions are required. Were it otherwise, EPA would not have spent six of its ten pages of analysis erroneously criticizing TCEQ's data, methodologies, and modeling and faulting TCEQ for supposedly underestimating future emissions. 87 Fed. Reg. 9,826-31.

## B. EPA acted arbitrarily and capriciously by disapproving Texas's SIP in part by relying on after-the-fact guidance.

EPA next claims (at 26) that it did not act arbitrarily or capriciously because it did not reject TCEQ's methodology for identifying maintenance receptors as inconsistent with the standards announced in its after-the-fact October 2018 guidance. But

4

EPA stated in the Final Rule that "states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively." 88 Fed. Reg. 9,364. EPA now characterizes that statement (at 26 n.10) as a mere "response to comments regarding why [it] was not required to provide states a second opportunity to submit SIPs." Yet as the Final Rule states, it was also a response to "comments argu[ing] that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions." 88 Fed. Reg. 9,363. And EPA later explained that "EPA evaluated state's [sic] analyses and found no state successfully applied the[] criteria [in the October 2018 guidance] to justify the use of one of these alternative approaches." 88 Fed. Reg. 9,370. So the assertion (at 26) that Texas cannot show that "EPA reject[ed] Texas's method for being inconsistent with the October 2018 memo" fails.

Similarly flawed is EPA's argument (at 28) that there is nothing inconsistent between the pre-SIP-submission March 2018 guidance and the post-SIP-submission October 2018 guidance. The March 2018 guidance suggested that States could identify maintenance receptors "using an alternative approach that does not rely on the projection of maximum design values" and in locations "where current, presumably 'clean,' measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation." Appendix A to Texas State Petitioners' Stay Motion at A-2 ("2018 Transport Guidance"). Yet in the October 2018 guidance, EPA added the requirement that, for a State to "use a design value . . . that is not the maximum design value" or eliminate a site as a maintenance receptor, EPA

5

"*would expect* states to include with their SIPs" evidence that "ozone concentrations have been trending downward at the site since 2011." Appendix C to Texas State Petitioners' Stay Motion at 4 ("2018 Maintenance Receptor Memo") (emphasis added).

That is a material change. The October 2018 memorandum added a new SIP requirement for States to meet before they could rely on an alternative method for identifying maintenance receptors: evidence of a downward trend in ozone concentrations at the site of the receptor since 2011. And despite EPA's assurance that nothing in the October 2018 guidance imposed "binding, enforceable requirements on any party," 2018 Maintenance Receptor Memo at 1, the agency nevertheless disapproved Texas's SIP in part because of a failure to "meet the terms of the . . . October 2018 memoranda addressing . . . maintenance receptors." 88 Fed. Reg. 9,364; *accord* 88 Fed. Reg. 9,370. That is the height of arbitrary-and-capricious action: it "pull[s] a surprise switcheroo on regulated entities" like Texas. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1138 (5th Cir. 2021).

EPA falls back (at 28) on the argument that Texas could not have legitimately relied on the March and October 2018 memoranda because they were not "guidance." That misses the point. It is *EPA* that should not have used the guidance to disapprove Texas's SIP after representing it as nonbinding. 88 Fed. Reg. 9,364. EPA failed to recognize that its earlier representations "may have engendered serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (citation omitted). The bare assertion that States should not have relied on EPA's representations about the nonbinding nature of its guidance

6

documents is no substitute for "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and weigh[ing] any such interests against competing policy concerns." *Regents*, 140 S. Ct. at 1915.

## C. EPA's disapproval violates the Act's cooperative federalism.

EPA also doubles down (at 22-25) on the argument that it appropriately disapproved Texas's SIP based in part on modeling and data not available to TCEQ at the time of the statutory deadline for SIP revisions. EPA's principal point is that nothing in the Act prohibits it from using "the most accurate, up-to-date data." Resp. 23. Yet Texas does not contend that EPA "must" confine itself to outdated data, which was what Delaware unsuccessfully argued in *Wisconsin v. EPA*, 938 F.3d 303, 321-22 (D.C. Cir. 2019) (per curiam), and EPA unsuccessfully argued in *Sierra Club v. EPA*, 671 F.3d 955, 963-65 (9th Cir. 2012).

Instead, Texas argues that EPA's decision to disapprove Texas's SIP based on data and modeling that was unavailable to TCEQ at the time the State was statutorily required to submit its SIP violates the Act's structure of cooperative federalism. *See* Mot. at 16-18. If EPA wanted to rely on that data, which were available only because EPA missed its own statutory deadline for acting on the SIP by a long shot, then EPA should have issued a SIP call to allow Texas to address that new information in the first instance. *See* 42 U.S.C. § 7410(k)(5). To hold otherwise would impermissibly allow EPA to "use its own delay as an excuse for imposing burdens on Texas that" the Act "does not permit." *Texas*, 829 F.3d at 430. And it would subvert Congress's

7

"preference that states, not EPA, drive the regulatory process" by rewriting the statute, which assigns EPA only the "ministerial function of reviewing SIPs for consistency with the Act's requirements." *Id.* at 411.

EPA's response (at 24, 29 & n.11) is that Texas's only remedy was to sue the agency to force it to adhere to its statutory deadlines because EPA's authority to issue a SIP call is wholly "discretionary." *But see* 42 U.S.C. § 7410(k)(5) ("shall"). The "structure" of the Act, *Wisconsin*, 938 F.3d at 317-18, defeats that response. "[A]n experiment in cooperative federalism," the Act assigns States "the primary responsibility for implementing" the NAAQS through SIPs—a task over which the States retain "wide discretion." *Texas*, 829 F.3d at 411 (citation omitted). "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator." *Id.* at 412. A SIP call was the only statutorily permissible means for EPA to bring the new data into the picture. Surprising the State with those data through a SIP disapproval long after EPA's own deadline had passed clashes with the Act's core structure. This Court should not condone a federal takeover of the Texas economy by allowing EPA to flout a statutory deadline that is a key piece of the Act's cooperative federalism.

The Supreme Court's decision in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014), is not to the contrary. *Contra* Resp. 29 n.11. *EME Homer* explains that, once EPA validly disapproves a SIP, nothing in the Act requires EPA to give the State a second chance to issue a compliant SIP before issuing a Federal Implementation Plan ("FIP"); instead, section 7410(c)(1) allows EPA to act "at any time"

8

within two years of the disapproval. 572 U.S. at 509. But here, Texas does not challenge EPA's FIP, but rather the disapproval of Texas's SIP. Mot. 1. The Act's cooperative federalism is at its zenith at the SIP stage. *See generally Texas*, 829 F.3d at 411.

## II. The Remaining Stay Factors Favor Petitioners.

EPA's response confirms that the equities favor Texas. EPA's core argument (at 30-31) is that disapproval of Texas's SIP does not require the State "to do *anything* and thus itself effects no irreparable harm"—and that if Texas wants to challenge the FIP, it must wait until the FIP is published.

But allowing the SIP disapproval to take effect "would disrupt the system of cooperative federalism enshrined in the Clean Air Act," which by itself constitutes irreparable injury, as EPA appears (at 31 n.12) to concede. *Texas*, 829 F.3d at 433. And the SIP disapproval is, of course, the legal prerequisite to EPA's imposition of a FIP, 42 U.S.C. § 7410(c)(1)(B), that will threaten Texas's economy and electrical grid. *See* Mot. at 19. EPA anticipates the FIP will be published later this month. Ex. 8 to EPA's Opposition ¶ 22 (Birnbaum Declaration). But EPA is wrong that Petitioners must wait to challenge the FIP. As Judge Rogers explained in an earlier stage of the *EME Homer* litigation, if States "wish to avoid enforcement of the Transport Rule FIPs because they contend EPA's SIP disapprovals were in error, the proper course is to seek a stay of EPA's disapprovals." *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 44 n.6 (D.C. Cir. 2012) (Rogers, J., dissenting).

That may be why EPA retreats (at 32) to an argument that the final FIP "alleviated" any harms associated with the FIP by extending certain deadlines for compliance. Yet the incremental changes in the final FIP do not eliminate the harms that will be visited on Texas's economy and electrical grid in mere months absent a stay. *See* Supplemental Declaration of Dwayne W. Rickerson ¶¶ 4-8.

Finally, EPA argues (at 36) that the balance of equities and public interest militate against a stay, which would allow Texas power plants, "among the highest emitters of ozone precursors in the United States," to continue emitting while neighboring States will be required to lower their emissions. But Texas's level of emissions just reflects its status as the second-largest State in the Union and the top energy producer. It says nothing about whether, under the Act, Texas "contribute[s] significantly," 42 U.S.C. § 7410(a)(2)(D)(i)(I), to nonattainment or interferes with maintenance of the NAAQS in downwind States—a contention that TCEQ vigorously disputes. *See* Texas SIP at 3-41, 3-42, 3-75; TCEQ Comments at 12. EPA's sudden preference for haste, moreover, is inconsistent with the agency's nearly four-year delay in acting on Texas's SIP, thus undercutting its claim that a stay, pending review by this Court, will cause harm.

10

## Conclusion

The Court should stay, pending review, the part of the Final Rule that disapproves Texas's SIP.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

/s/ Bill Davis
Bill Davis
Deputy Solicitor General
Bill.Davis@oag.texas.gov

Michael R. Abrams
William F. Cole
Joseph N. Mazzara
Assistant Solicitors General

Counsel for State of Texas and
Texas Commission on
Environmental Quality

11

## Certificate of Service

On April 10, 2023, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Bill Davis
Bill Davis

## Certificate of Compliance

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,595 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Bill Davis
Bill Davis

A-297

**Exhibit A**

# SUPPLEMENTAL DECLARATION OF
# DWAYNE W. "WOODY" RICKERSON, P.E.

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I am providing this Supplemental Declaration on behalf of ERCOT.

2. I previously provided a Declaration dated March 2, 2023 regarding ERCOT's analysis of the impacts of the Environmental Protection Agency's (EPA) *proposed* federal implementation plan (FIP) addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS).

3. The EPA posted the *final* FIP on its website on March 15, 2023. The EPA has stated that it expects the FIP to be effective in June or July of 2023.

4. I am submitting this Supplemental Declaration to provide an update to ERCOT's analysis in light of EPA's issuance of the final FIP. Although the final FIP makes a number of incremental changes to the proposed FIP, my assessment is that those incremental changes do not alter my conclusion that the EPA's final FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season.

5. As explained in my previous Declaration, it is my understanding that the EPA's final FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the 2023 Ozone Season. It is also my understanding that the FIP cannot become effective until 60 days after the final FIP has been published in the *Federal Register*, which has not yet occurred. Due to this timing requirement, at least some portion of the 2023 Ozone Season will be prorated to reflect the applicability of existing emissions limits prior to the effective date of the final FIP. This uncertainty makes it difficult to predict the exact final emissions budget for 2023 Ozone Season, but the EPA's final FIP estimates a statewide NOx emissions budget for Texas of 40,124 tons, which is about 5% higher than the 38,284 tons originally proposed by the EPA, but well below the current budget of 51,251 tons that has applied in Texas since 2017.

6. According to data provided to ERCOT by a subset of owners of coal- and gas-fired generating units collectively representing approximately half of the coal- and gas-fired generation fleet in the ERCOT region, if the units operated by these entities were operated in Ozone Season 2023 in the same manner that they were operated in Ozone Season 2022, then the total capacity value of the generating units that would exhaust their emissions allowances by August 1, 2023 would be 6,566 MW—even under the more generous unit-specific allowances under the final FIP and the proration of the new, lower emissions budgets after the effective date of the FIP. Because this figure only accounts for some units, it is almost certainly lower than it would be if the same assumptions were made for all units operating in the ERCOT region. I have estimated that if 6,566 MW were unavailable during Summer 2023 peak load conditions, then the likelihood of load shed in ERCOT would be four times greater than it would be in the absence of the final FIP. Although the EPA suggests there will be enough banked or remaining allowances in the ERCOT market that could be purchased to cover the emissions of any units that run out of allowances in 2023, this appears to assume that owners of units that have exhausted their allotments will themselves hold sufficient banked allowances to run their units, or that unit owners with remaining allowances (banked or otherwise) would prefer to sell them instead of retaining them for their own continued operations or for future disposition. While it is possible that banked or remaining allowances may be available, I do not believe that can be concluded with certainty.

7.  The changes in the final FIP also do not resolve my concern that, with summer operating conditions typically experienced in the ERCOT region, ERCOT would be required to direct firm load-shedding if generators are required to operate under the emissions limits established in the FIP.  This conclusion is illustrated by considering the example of a reoccurrence of 2022 conditions in 2023.  As I noted in my initial Declaration, for Ozone Season 2022, the tightest reserve capacity margin occurred on July 13, 2022 at 3:23 p.m., when ERCOT had 2,408 MW of capacity reserves. If ERCOT experienced the same reserve capacity margin at any point in Ozone Season 2023, a reduction in capacity of 6,566 MW would require ERCOT to direct firm load-shedding.  A load-shedding directive would require utilities to disconnect customers from the power grid to avoid a system-wide blackout.  Disconnecting customers from the power grid during extreme summer conditions—such as the severe heat that was observed on the afternoon of July 13, 2022—can threaten human life and health.

8.  Based on the data provided by generation owners in the ERCOT region and ERCOT's independent analysis of this data, I conclude that the final FIP continues to pose an imminent risk of harm to the reliability of the ERCOT grid.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 7, 2023.


/s/ D. Woody Rickerson

Dwayne W. "Woody" Rickerson, P. E.
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.

2

**Exhibit 5: Texas Industry Petitioners' Opposed Motion to Stay Final Action of the U.S. Environmental Protection Agency & Texas Industry Petitioners' Appendix of Exhibits in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency, Docs. 32-1 & 32-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Mar. 3, 2023)**

No. 23-60069

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO
CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS
ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE
MANAGEMENT COMPANY LLC; WISE COUNTY POWER
COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF
TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS
OIL & GAS ASSOCIATION,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, United States Environmental
Protection Agency,

Respondents.

---

TEXAS INDUSTRY PETITIONERS'
OPPOSED MOTION TO STAY FINAL ACTION
OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

**March 3, 2023**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

- Abrams, Michael R., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Association of Electric Companies of Texas (Petitioner)

  The Association of Electric Companies of Texas ("AECT") represents electric generators, transmission & distribution utilities, fully-integrated utilities and retail electric providers that span Texas. Its members generate power from diverse resources, including natural gas, coal, wind and solar, plus investments in energy storage.

- Balch & Bingham LLP (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Baker Botts L.L.P. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Barber, Julia B. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- BCCA Appeal Group (Petitioner)

  BCCA Appeal Group is a Texas non-profit corporation whose mission is to support the goals of environmental protection and a strong economy. Its members own and operate industrial facilities in Texas. The Group was formed from the Business Coalition for Clean Air. The Group played a key role in the successful attainment strategies that have achieved real and sustained progress

on air quality goals in Texas. BCCA Appeal Group continues to evaluate and pursue regulatory decisions that are based on sound science and achieve environmental and air quality goals while maintaining a strong economy.

- Brookfield Asset Management Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- Coleto Creek Power, LLC (Petitioner)

- Cole, Williams F., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Davis, Bill, Deputy Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Ennis Power Company, LLC (Petitioner)

- Garland, Merrick B., Attorney General, United States Department of Justice (Counsel for Respondents)

- Gidiere, P. Stephen III (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Hays Energy, LLC  (Petitioner)

- Kelly, Daniel J. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Vice President and Deputy General Counsel for Vistra Corp.)

- Kim, Todd, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice (Counsel for Respondents)

- Kuryla, Matthew L. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Lee, Jin Hyung (Counsel for Respondents)

- Luminant Generation Company LLC (Petitioner)

- Mazzara, Joseph N., Assistant Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Midlothian Energy, LLC (Petitioner)

- Mitchell, David W. (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Senior Counsel, Environmental for Vistra Corp.)

- Moore, C. Grady III (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Moore, Stephanie Zapata (Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC and Executive Vice President and General Counsel for Vistra Corp.)

- Nance, Earthea (Regional Administrator for Respondent United States Environmental Protection Agency)

- Oak Grove Management Company LLC (Petitioner)

- Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Paxton, Ken, Attorney General of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Prieto, Jeffrey M. (General Counsel for Respondent United States Environmental Protection Agency)

- Regan, Michael S., Administrator, United States Environmental Protection Agency (Respondent)

- State of Texas (Petitioner)

- Stone, Judd, Solicitor General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Streett, Aaron M. (Counsel for Petitioners AECT, BCCA Appeal Group, TCC, and TXOGA)

- Texas Chemical Council (Petitioner)

  The Texas Chemical Council ("TCC") represents approximately 70 companies who own or operate more than 200 manufacturing and research facilities across the state of Texas. Its members have invested more than $150 billion in physical assets in the state, directly employ more than 75,000 Texans, and indirectly employ over 500,000 Texans. The Texas chemical industry represents the #1 non-energy Texas export with over $45 billion in exports annually and pays more than $1.5 billion in state and local taxes each year.

- Texas Commission on Environmental Quality (Petitioner)

- Texas Oil & Gas Association (Petitioner)

  The Texas Oil & Gas Association ("TXOGA") is a statewide trade association representing every facet of the Texas oil and gas industry including small independents and major producers. Collectively, the membership of TXOGA produces in excess of 80 percent of Texas' crude oil and natural gas, operates over 80 percent of the state's refining capacity, and is responsible for the vast majority of the state's pipelines. In fiscal year 2022, the oil and natural gas industry supported 443,000 direct jobs and paid $24.7 billion in state and local taxes and state royalties, funding schools, roads and first responders.

- The Vanguard Group, Inc. (together with its affiliates and managed entities owns 10% or more of Vistra Corp.'s stock)

- United States Environmental Protection Agency (Respondent)

- Vistra Asset Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Corp. (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Intermediate Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Vistra Operations Company LLC (Parent company of Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC)

- Webster, Brent, First Assistant Attorney General, Office of the Attorney General for the State of Texas (Counsel for Petitioners State of Texas and Texas Commission on Environmental Quality)

- Wise County Power Company, LLC (Petitioner)

Respectfully submitted,

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

v

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................ i

TABLE OF CONTENTS ................................................................ vi

TABLE OF AUTHORITIES ................................................................ vii

LIST OF EXHIBITS IN APPENDIX ................................................................ xi

GLOSSARY ................................................................ xii

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 4

I.      Statutory and Regulatory Background ................................................................ 4

II.     Texas's State Implementation Plan ................................................................ 5

    A.      The 2015 Ozone NAAQS ................................................................ 5

    B.      Texas's Interstate Transport SIP ................................................................ 6

    C.      EPA Region 6's Determinations Regarding Texas's SIP ................................................................ 8

    D.      EPA's Final Disapproval ................................................................ 9

III.    EPA's Federal Implementation Plan for Texas ................................................................ 9

STANDARD OF REVIEW ................................................................ 10

ARGUMENT ................................................................ 11

I.      Petitioners Are Likely to Succeed on the Merits ................................................................ 11

    A.      EPA's Disapproval Is Unlawful Because EPA Failed to Defer to Texas's Approach to Complying with the Clean Air Act ................................................................ 11

    B.      EPA's Disapproval Is Unlawful Because it Is Based on Non-Statutory Factors ................................................................ 13

    C.      EPA's Rejection of Texas's Weight-of-Evidence Analysis Is Unlawful ................................................................ 15

    D.      EPA's Use of "Ballpark Estimates" to Reject Texas's SIP Was Arbitrary and Capricious ................................................................ 16

II.     Petitioners Will Suffer Irreparable Harm Absent a Stay ................................................................ 18

III.    The Balance of Harms and the Public Interest Favor a Stay ................................................................ 21

CONCLUSION ................................................................ 21

CERTIFICATE OF CONFERENCE ................................................................ 24

CERTIFICATE OF COMPLIANCE ................................................................ 25

CERTIFICATE OF SERVICE ................................................................ 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*BCCA Appeal Grp. v. EPA*,
  355 F.3d 817 (5th Cir. 2003) ........................................................... 4

*Burgess v. Fed. Deposit Ins. Corp.*,
  871 F.3d 297 (5th Cir. 2017) ......................................................... 18

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ....................................................................... 17

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
  45 F.4th 846 (5th Cir. 2022) ......................................................... 11

*Enter. Int'l Inc. v. Corp. Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) ......................................................... 18

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ......................................................................... 4

*Fla. Power & Light Co. v. Costle*,
  650 F.2d 579 (5th Cir. 1981) ..................................................... 4, 16

*La. Envtl. Action Network v. EPA*,
  382 F.3d 575 (5th Cir. 2004) ......................................................... 16

*Luminant Generation Co. LLC v. EPA*,
  675 F.3d 917 (5th Cir. 2012) ............................... 1, 4, 11, 12, 13

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983) ................................................................... 11, 17

*Nken v. Holder*,
  556 U.S. 418 (2009) ....................................................................... 10

*North Carolina v. EPA*,
  531 F.3d 896 (D.C. Cir. 2008) ....................................................... 14

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943) ................................................................. 13

*Sierra Club v. Ga. Power Co.*,
 180 F.3d 1309 (11th Cir. 1999) ............................................ 21

*Texas v. EPA*,
 829 F.3d 405 (5th Cir. 2016) ........................................ *passim*

*Texas v. EPA*,
 983 F.3d 826 (5th Cir. 2020) ......................................... 4, 15

*Tex. Oil & Gas Ass'n v. EPA*,
 161 F.3d 923 (5th Cir. 1998) ............................................. 11

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ........................................................... 18

*Train v. Nat. Res. Def. Council, Inc.*,
 421 U.S. 60 (1975) ........................................................ 5, 12

*Union Elec. Co. v. EPA*,
 427 U.S. 246 (1976) ............................................................. 4

## Federal Statutes

42 U.S.C. §7401(a)(3) ................................................................. 4

42 U.S.C. §7409 .......................................................................... 4

42 U.S.C. §7410(a) .................................................................... 16

42 U.S.C. §7410(a)(1) ................................................................. 5

42 U.S.C. §7410(a)(2) ................................................... 3, 13, 16

42 U.S.C. §7410(a)(2)(D)(i) ........................................................ 5

42 U.S.C. §7410(a)(2)(D)(i)(I) ........................................... 13, 14

42 U.S.C. §7410(c)(1) ................................................................. 9

A-310

42 U.S.C. §7410(c)(1)(B) ........................................................................ 9

42 U.S.C. §7505a .................................................................................. 14

**Federal Regulations**

40 C.F.R. §51.308 ................................................................................. 14

40 C.F.R. §§51.1300-51.1318 ................................................................. 14

40 C.F.R. Part 51, App. W, §1.a. ........................................................... 17

40 C.F.R. §97.810 ................................................................................. 21

**Federal Register**

80 Fed. Reg. 65,292 (Oct. 26, 2015) ........................................................ 5

81 Fed. Reg. 296 (Jan. 5, 2016) ............................................................... 2

82 Fed. Reg. 1,733 (Jan. 6, 2017) ........................................................ 5, 6

87 Fed. Reg. 9,798 (Feb. 22, 2022) ................................................*passim*

87 Fed. Reg. 20,036 (April 6, 2022) .........................................9, 10, 19

88 Fed. Reg. 9,336 (Feb. 13, 2023) ...............................................*passim*

**Miscellaneous**

Fed. R. App. P. 18(a)(2) ......................................................................... 1

Consent Decree, *Sierra Club v. Regan*, No. 3:22-cv-1992 (N.D. Cal. Jan. 24, 2023) ................................................................................................ 1

EPA, *Infrastructure SIP Requirements and Guidance*, *available at* https://www.epa.gov/air-quality-implementation-plans/infrastructure-sip-requirements-and-guidance ("EPA Infrastructure SIP Guidance") ............................................................... 5

ix

EPA, *NO$_X$ Control Retrofit Cost Tool Fleetwide Assessment Proposed CSAPR 2015 NAAQS*, No. EPA-HQ-OAR-2021-0668-0113 (Apr. 5, 2022), *available at* https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0113 ("EPA Control Cost Assessment") ...................... 10

EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* (Feb. 2022) ("Region 6 Texas TSD") ....................................8, 15, 17, 18

EPA, *Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, EPA-452/D-22-001 at 4-1 (Feb. 2022) ("RIA") ................................................................................................ 10

Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018), *available at* https://tinyurl.com/4x2pp8u8 ("2018 Transport Guidance") .............................................................................. 6

Memorandum from Stephen D. Page, Director, Office of Air Quality Planning and Standards, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)* (Sept. 13, 2013), *available at* https://tinyurl.com/2p8c7885 ("Page Memo") ...................................................................................................... 5

TCEQ, *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)*, Docket No. 2017-1762-SIP (Aug. 8, 2018), *available at* https://tinyurl.com/yc53rkrf ("Texas SIP") .............................................................................6, 7, 8, 21

x

# LIST OF EXHIBITS IN APPENDIX

**Exhibit**                                                    **Page Number**
                                                                **in Appendix**

TCEQ, *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)*, Docket No. 2017-1762-SIP (Aug. 8, 2018) ("Texas SIP") .................................................................. 1

EPA, Proposed Rule, *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9,798 (Feb. 22, 2022) ....................................................................................................... 148

EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* (Feb. 2022) ("Region 6 Texas TSD") ................................... 187

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023) ..................................................................... 288

Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT) ("Rickerson Decl.") ............................................................... 338

Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado River Authority ("Price Decl.") .......................................... 344

Declaration of Dudley Zahn, Vice President, NRG Energy, Inc. ("Zahn Decl.") .......................................................................................... 353

Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp. ("Talley Decl.") ..................................... 363

Declaration of Jacob Krautsch, Senior Director of Environmental, Energy Transfer LP ("Krautsch Decl.") ............................................................ 389

## <u>GLOSSARY</u>

**CAA or the Act**   Clean Air Act

**EPA**   United States Environmental Protection Agency

**ERCOT**   Electric Reliability Council of Texas

**FIP**   Federal Implementation Plan

**MW**   Megawatts

**NAAQS**   National Ambient Air Quality Standards

**NO$_X$**   Nitrogen Oxides

**ppb**   Parts per billion

**SIP**   State Implementation Plan

**TCEQ**   Texas Commission on Environmental Quality

**Texas Industry Petitioners**   Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, Texas Oil & Gas Association, Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC

Pursuant to Federal Rule of Appellate Procedure 18(a)(2), Texas Industry Petitioners respectfully move the Court to stay the U.S. Environmental Protection Agency's ("EPA") final action disapproving the State of Texas's Clean Air Act State implementation plan ("SIP") published on February 13, 2023. *See* 88 Fed. Reg. 9,336, 9,359-60 (Feb. 13, 2023).[1]

## INTRODUCTION

This case concerns EPA's latest attempt to usurp the State of Texas's authority under the Clean Air Act's cooperative federalism framework and force billions of dollars of unnecessary costs on Texas's energy infrastructure. Texas spent years developing its plan to address the Act's interstate transport requirements for the new 2015 ozone National Ambient Air Quality Standards ("NAAQS"). Because Texas's plan complies with the Act, EPA had one job: approve it. EPA had other plans—a *federal* implementation plan ("FIP") filled with its own policy preferences. But this Court's precedent draws a clear line: "With regard to implementation, the Act confines the EPA to the ministerial function of reviewing [state plans] *for consistency with the Act's requirements*." *Luminant Generation Co. LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (emphasis added). EPA has stepped over that line here in judging Texas's plan, basing its disapproval on *non-statutory* factors—like EPA's "4-Step" method for developing

---

[1] Moving first before the agency would be impracticable given the imminent harm caused by EPA's disapproval, *see* Fed. R. App. P. 18(a)(2)(A)(i), and would be futile given EPA's agreement with Sierra Club to finalize a federal plan by March 15, 2023. *See* Consent Decree at 4, *Sierra Club v. Regan*, No. 3:22-cv-1992 (N.D. Cal. Jan. 24, 2023).

1

federal plans found nowhere in the statute or duly-promulgated regulations—and second-guessing the State's weighing of admittedly relevant factors to assess downwind contribution.  This is familiar territory for this Court.  *See Texas v. EPA*, 829 F.3d 405, 424-36 (5th Cir. 2016) (granting stay of EPA disapproval of visibility/regional haze portion of Texas's interstate transport plan[2]).  As before, EPA's actions here are unlawful, and its disapproval of Texas's plan should be stayed and ultimately vacated.

EPA's disapproval triggers a federal plan that EPA predicts will drive Texas power plants to shut down, thus risking the reliability of the Texas power grid.  In this latest chapter, EPA targets many of the same power plants as before—efforts that were stopped by this Court's timely intervention.  *Id.* at 433-36 (holding Petitioners would be irreparably harmed absent a stay where EPA's action "impose[d] $2 billion in costs on power companies, businesses, and consumers").  Now, EPA extends its reach to other Texas business sectors to impose the same types of unnecessary costs that threaten economic development and growth in the State.  This harm is imminent—EPA says its new mandates will take effect *this summer* and instructed companies to begin costly expenditures *now* to meet its aggressive compliance schedule.

---

[2] EPA's SIP disapproval that this Court stayed in the Texas Regional Haze case included EPA's disapproval of the visibility portion of Texas's interstate transport SIP addressing ozone.  *See* 81 Fed. Reg. 296, 296 (Jan. 5, 2016) ("EPA is also disapproving portions of several separate infrastructure SIP revisions submitted by Texas … regarding interference with other states' programs for visibility protection (*interstate visibility transport*) triggered by the issuance of the … 1997 ozone NAAQS[.]") (emphasis added).

2

Undeterred, EPA has raised the stakes with its legal position here. Not only does it disregard the Clean Air Act's cooperative federalism framework, EPA now openly contends that the Supreme Court and this Court's precedent reinforcing that framework does not bind EPA because it is either outdated or simply does not apply to interstate transport. *See* 88 Fed. Reg. at 9,367-68 ("[EPA deference] to state choices" under "the *Train-Virginia* line of cases" is "inappropriate in the context of addressing interstate pollution" and "pre-date" the Act's 1990 amendments). But the interstate transport requirements are part of the same statutory provision as other State plan requirements, *see* 42 U.S.C. §7410(a)(2), and there is no indication in the statutory text or otherwise that Congress intended to upend the normal order for interstate transport. This Court applies the same standard of review whether or not interstate transport is involved. *See Texas*, 829 F.3d at 411-12 (applying *Train* and its progeny to EPA disapproval of Texas interstate transport plan).

Because Petitioners are likely to succeed on the merits of their challenge to EPA's disapproval, have demonstrated irreparable and immediate injury if a stay is not granted, and have shown that the balance of harms and the public interest weigh in favor of a stay, the motion for stay should be granted.

3

# BACKGROUND

## I.    Statutory and Regulatory Background

The Clean Air Act "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821-22 (5th Cir. 2003). "Congress chose a balanced scheme of state-federal interaction to implement the goals of the Act." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981). Within this framework, "air pollution prevention … is the primary responsibility of States and local governments." 42 U.S.C. §7401(a)(3).

For its part, EPA's job is to set NAAQS for certain pollutants, including ozone.[3] *See id.* §7409(a)-(b). After EPA does so, States develop SIPs to implement the NAAQS and demonstrate compliance "with the Act's requirements." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 507 (2014). The statute provides "each state 'wide discretion in formulating its plan' for achieving the air quality standards set by EPA." *Texas*, 829 F.3d at 411 (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976)).

EPA's role in reviewing SIPs is narrow and limited. "With regard to implementation, the Act confines the EPA to the ministerial function of reviewing [state plans] for consistency with the Act's requirements." *Luminant*, 675 F.3d at 921.

---

[3] Ground-level ozone ($O_3$) is not emitted directly by human activities but is formed when nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) react in the atmosphere with sunlight. *See Texas v. EPA*, 983 F.3d 826, 830 (5th Cir. 2020).

4

EPA may not substitute its own judgment for that of the State, nor can it lawfully disapprove a SIP based on non-statutory factors. *Texas*, 829 F.3d at 426-28. Only if the SIP does not meet a statutory requirement "may [EPA] devise and promulgate a specific plan of its own." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975).

The statutory provision at issue here is the "interstate transport" provision, 42 U.S.C. §7410(a)(2)(D)(i), which contains four "prongs" that States must address— 1) "significant contribution"; 2) "interference with maintenance"; 3) "prevention of significant deterioration"; and 4) "protection of visibility." *See* Page Memo at 30-35 (listing the four prongs of the "interstate pollution transport" provision, 42 U.S.C. §7410(a)(2)(D)(i)); *see also* EPA Infrastructure SIP Guidance (listing the four "Interstate transport" prongs of 42 U.S.C. §7410(a)(2)(D)(i)).

## II.    Texas's State Implementation Plan

### A.    The 2015 Ozone NAAQS

In 2015, EPA lowered the ozone NAAQS to 70 ppb, 80 Fed. Reg. 65,292 (Oct. 26, 2015), triggering a deadline of October 1, 2018, for States to submit their SIPs. 42 U.S.C. §7410(a)(1). EPA did not promulgate regulations containing requirements that States must follow in addressing the interstate transport provision in their SIPs.

Instead, over one year later, in January 2017, EPA published modeling data "intended to help inform state efforts to address interstate transport with respect to the 2015 ozone NAAQS." 82 Fed. Reg. 1,733, 1,735 (Jan. 6, 2017). EPA explained "that

5

states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs." *Id.*

EPA also issued a guidance memorandum (not regulations) in March 2018 that explained that States *could* "us[e] EPA's analytical approach" from EPA's prior FIPs, "somewhat different analytical approaches within these steps," "or alternative frameworks." 2018 Transport Guidance at 3. EPA explained that States "may supplement the information provided in this memorandum with any additional information that they believe is relevant." *Id.* at 6.

## B.    Texas's Interstate Transport SIP

TCEQ adopted its plan and timely submitted it to EPA on August 17, 2018. *See* 87 Fed. Reg. 9,798, 9,824 (Feb. 22, 2022). TCEQ's plan includes regional photochemical modeling of Texas emissions and analysis of the impact on ozone concentrations in downwind States. *Id.* at 9,825. TCEQ used the same model as EPA had in its 2017 modeling—the Comprehensive Air Quality Model with Extensions (CAMx). Texas SIP at 3-4.

TCEQ also "us[ed] a framework similar to EPA's 4-Step framework [for FIPs]," 87 Fed. Reg. at 9,824, but "with several key improvements," Texas SIP at 3-1. **First**, using CAMx modeling, TCEQ identified monitors in other States that were projected in 2023 either to be in nonattainment ("nonattainment monitors") or have maintenance issues ("maintenance monitors"). TCEQ used EPA's method to identify nonattainment monitors, *id.* at 3-37, but for maintenance monitors TCEQ used the *most*

6

*recent* three-year design value as the base case for its modeling (*i.e.*, the 2012-2014 period) instead of EPA's *maximum* and outdated three-year design value (*i.e.*, 2009-2011, 2010-2012, or 2011-2013). *Id.* at 3-39.[4] TCEQ found that the most recent data "reflect[s] the current state of ozone concentrations [and] the impact of any maintenance plans that are in place to prevent local emissions from causing an area to slip back into nonattainment." *Id.* at 3-42.

**Second**, TCEQ identified monitors potentially linked to Texas emissions using the contribution threshold recommended in EPA's guidance—one percent of the NAAQS or 0.7 ppb. *Id.* at 3-2. If TCEQ's modeling predicted a Texas contribution at or above 0.7 ppb, the monitor was identified for further review. *Id.* at 3-3.

**Finally**, TCEQ conducted a multi-factor weight-of-evidence analysis to determine whether Texas emissions significantly contribute to nonattainment or interfere with maintenance at the identified monitors. *Id.* at 3-47 to 3-50. Because "[i]nterstate transport is a complex problem," TCEQ considered "factors relevant to the ozone conditions at the [downwind] monitors," including "design value trends, the meteorological conditions that lead to high ozone formation at the monitor, and the number of days with elevated ozone." *Id.* at 3-50. Based on these factors, TCEQ found

---

[4] "A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS." 87 Fed. Reg. at 9,800 n.8.

that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in those areas. *Id.* at 3-50 to 3-76.

### C.    EPA Region 6's Determinations Regarding Texas's SIP

On February 22, 2022—*after* EPA's 18-month statutory deadline to act passed—EPA's Region 6 proposed to disapprove Texas's SIP as to prongs 1 and 2 of the interstate transport requirement. *See* 87 Fed. Reg. at 9,798. Region 6 found that because TCEQ used different analytical approaches than EPA, Texas's plan "does not meet the State's interstate transport obligations." *Id.* at 9,834. Region 6's determinations that formed the basis for the disapproval were set out in a Texas-only Technical Support Document. *See* Region 6 Texas TSD.

**First**, the Region determined that TCEQ's use of the most recent three-year period (2012-2014) to identify downwind maintenance monitors "is less likely to successfully identify maintenance receptors than the EPA method." *Id.* at 11. **Second**, Region 6 determined that "TCEQ's modeling underestimates future ozone levels" in 2023 as compared to Region 6's "ballpark estimate" for 2023. 87 Fed. Reg. at 9,829; Region 6 Texas TSD at 38-41. **Third**, Region 6 determined that TCEQ's multi-factor weight-of-evidence analysis was not sufficiently "compelling" to "counter" "EPA's [one-percent] contribution methodology" from EPA's FIPs. 87 Fed. Reg. at 9,833-34; Region 6 Texas TSD at 78.

8

### D.     EPA's Final Disapproval

On February 13, 2023, EPA published its final disapproval of Texas's SIP.  88 Fed. Reg. at 9,359-60.  EPA's Texas disapproval was published in a consolidated notice that included disapprovals of eighteen other States' SIPs, which explained that each was judged "in light of the facts and circumstances of each particular state's submission" and "the contents of each individual state's submission were evaluated on their own merits."  *Id.* at 9,337, 9,340, 9,354.  As to Texas's SIP, EPA's disapproval is based on the determinations by Region 6.  *Id.* at 9,359-60.

## III.    EPA's Federal Implementation Plan for Texas

EPA's disapproval of Texas's SIP is the statutory prerequisite to EPA's authority to issue a FIP.  42 U.S.C. §7410(c)(1)(B).  Although EPA is to issue a FIP "within 2 years *after*" it disapproves a SIP, *id.* §7410(c)(1), here, EPA issued a proposed FIP *before* it disapproved Texas's SIP, *see* 87 Fed. Reg. 20,036 (April 6, 2022).  EPA intends to finalize the FIP by March 15, 2023.  *See supra* note 1.

EPA's forthcoming FIP will restrain operations of Texas power plants starting in May 2023 by imposing new emission reductions for nitrogen oxides ($NO_X$).  87 Fed. Reg. at 20,040, 20,099-20,101.  These reductions are implemented in two phases.  In the first, in May 2023, Texas's $NO_X$ emissions budget will be reduced to 38,284 tons— a 27% reduction from the current budget.  *Id.* at 20,044.  In the second, EPA would further reduce Texas's budget in 2026 to 21,946 tons—a 58% reduction.  *Id.*  This reduction is based largely on EPA's assumption that over 30 Texas generating units

9

would install costly new emissions control equipment (called selective catalytic reduction ("SCR") controls) that would be operational by 2026. *Id.* at 20,089; Rickerson Decl. ¶17 (12,281 MW of Texas generation required to install SCR). The cost to install this additional equipment is estimated by EPA to be approximately $40 to $332 million *per unit*. *See* EPA Control Cost Assessment ("SCR_horz" and "SCR_gas_horz" tabs).

EPA modeled the impact of its proposed FIP on the Texas power grid. *See* RIA at App. 3-B & Ch. 4. For the ERCOT region in Texas, EPA's proposed-rule modeling predicted that generating units totaling approximately 15,000 MW of capacity will not operate in 2023 and that the bulk of these units will permanently shut down. *See* Rickerson Decl. ¶¶23, 32; Price Decl. ¶11; Talley Decl. ¶36.

## STANDARD OF REVIEW

This Court considers four factors in deciding whether to stay agency action pending review: (1) likelihood of success on the merits, (2) irreparable harm to the movant, (3) balance of the harms between the petitioner and respondent, and (4) whether relief would serve the public interest. *Texas*, 829 F.3d at 424 (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)).

## ARGUMENT

## I.    Petitioners Are Likely to Succeed on the Merits

Petitioners will succeed on the merits.  Under the Clean Air Act, this Court will invalidate EPA's action if it is "not permitted by the statute" or is "arbitrary [or] capricious[.]"  *Texas*, 829 F.3d at 425-26; *see also Luminant*, 675 F.3d at 925 (standard of review of Clean Air Act actions mirrors standards under Administrative Procedure Act).  Agency action "is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)); *see Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 (5th Cir. 2022) (this Court's review of agency action is "not toothless"; rather, "it has serious bite" (internal quotations and citations omitted)).

## A.    EPA's Disapproval Is Unlawful Because EPA Failed to Defer to Texas's Approach to Complying with the Clean Air Act

This Court's precedent setting out the respective roles of States and EPA in the SIP process extends back over four decades.  Consistently, this Court has held that "the Clean Air Act limits EPA to a deferential role," that EPA must accord "deference" to "Texas's application of the [Act's] statutory factors," and that EPA acts *ultra vires* when

11

it disapproves a SIP based on requirements "not found in the Act." *Texas*, 829 F.3d at 428 (citing, *inter alia*, *Florida Power & Light*). In recent years, the Court has further corrected EPA's "misapprehension" of "its authorized role in the SIP-approval process," noting that "EPA does not possess *any* 'discretionary authority'" at the SIP stage and that "[*o*]*nly* the [S]tates enjoy discretion in implementing the dictates of the CAA." *Luminant*, 675 F.3d at 928 n.8 (emphases added).

EPA has not gotten the message. Look no further than the SIP disapproval here, where EPA says that it "believe[s] that deviation from a *nationally consistent approach* to ozone transport"—*i.e.*, EPA's policy preferences embodied in its FIP—"must be *substantially justified* and have a well-documented basis that is consistent with [the Act] and relevant case law." 88 Fed. Reg. at 9,340 (emphases added). Thus, EPA disapproved Texas's SIP because it "deviat[ed] from" EPA's "nationally consistent approach" in a way that was not "substantially justified" in EPA's view. *See id.* And EPA candidly states, contrary to the Supreme Court and this Court's repeated admonitions, that it "disagrees that it is obligated to defer to [S]tates' choices in the development of good neighbor SIP submissions." *Id.* at 9,375; *contra Texas*, 829 F.3d at 428 (EPA "failed to defer to Texas's application of the [Act's] statutory factors" in interstate visibility transport SIP). And that it does not play a "secondary" role at the SIP stage. 88 Fed. Reg. at 9,367; *contra Train*, 421 U.S. at 79 (EPA "is relegated by the Act to a secondary role"). It even says that the Supreme Court and this Court's precedents mandating EPA's deference to Texas's approach are "particularly

12

inappropriate in the context of addressing interstate pollution," 88 Fed. Reg. at 9,367, even though these cases interpret the *same* provision of the Act—42 U.S.C. §7410(a)(2). *See Texas*, 829 F.3d at 411 (applying *Train*, *Union Electric*, *Florida Power & Light*, and *Luminant* precedent to EPA disapproval of Texas interstate visibility transport SIP). These pure legal errors led EPA astray and alone warrant stay and ultimate vacatur. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (agency action "may not stand if the agency has misconceived the law").

## B. EPA's Disapproval Is Unlawful Because it Is Based on Non-Statutory Factors

EPA's disapproval is also unlawful because EPA did not limit its review of Texas's plan "for consistency with the Act's requirements." *Luminant*, 675 F.3d at 921.

A prime example is EPA's rejection of Texas's approach to "maintenance" monitors—not based on any *statutory* requirement, but based on Region 6's determination that TCEQ's approach in its *State* plan was not the same as EPA's approach in *federal* plans. 88 Fed. Reg. at 9,359-60 (citing 87 Fed. Reg. at 9,824-29 ("TCEQ also used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023.")). EPA claimed that TCEQ did not "give[] meaning to the CAA's instruction" regarding "interfering with the maintenance of the NAAQS in another state." 87 Fed. Reg. at 9,826. But the statutory language does not give *any* "instruction" on *how* to identify maintenance monitors. *See* 42 U.S.C. §7410(a)(2)(D)(i)(I). Instead, the statute simply requires the State to give meaning to

*both* prongs. *See id.* ("contribute significantly to nonattainment in, *or* interfere with maintenance") (emphasis added); *see also North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) ("[§7410(a)(2)(D)(i)(I)] is written in the disjunctive").

EPA concedes that TCEQ's methodology meets this requirement. 87 Fed. Reg. at 9,825 (TCEQ separately identified receptors "projected to be in nonattainment" *or* "projected to have problems attaining and maintaining the 2015 ozone NAAQS"); *id.* Table TX-1 (showing both nonattainment and maintenance monitors). And by accounting for the *most recent* emission reductions resulting from maintenance plans issued by the downwind States, TCEQ's methodology gives full meaning to the "maintenance" prong of the statutory requirement.[5]

Nor do EPA regulations require any particular methodology for identifying maintenance monitors. EPA issued regulations establishing SIP requirements for some aspects of the 2015 ozone NAAQS, but they do *not* include requirements for interstate transport, much less for identifying "maintenance" monitors. *See* 40 C.F.R. §§51.1300-51.1318. EPA also issued regulations establishing requirements for SIPs as to prong 4 of the interstate transport provision (visibility/regional haze), *see Texas*, 829 F.3d at 412 (discussing 40 C.F.R. §51.308), but EPA has not done so for prongs 1 or 2. Because neither the statute nor EPA's duly-promulgated regulations require EPA's preferred

---

[5] A "maintenance" area is an area previously designated as nonattainment but now in attainment and subject to a maintenance plan issued by its home State. *See* 42 U.S.C. §7505a.

"maintenance" methodology, EPA's disapproval on that basis was unlawful.  *Id.* at 429

("Given the absence of a regulation or statute requiring [EPA's preferred

approach] . . . EPA's disapproval . . . was arbitrary and capricious.").

### C.    EPA's Rejection of Texas's Weight-of-Evidence Analysis Is Unlawful

EPA also unlawfully rejected Texas's weight-of-evidence approach to

determining "significant contribution" based on Region 6's determination that TCEQ's

approach was not consistent with EPA's bright-line one-percent threshold from prior

FIPs.  *See* 87 Fed. Reg. at 9,831-34.   But, as this Court has already held, EPA's "one-

percent threshold" is non-statutory and "does not appear in the text of [the interstate

transport] provision."  *Texas*, 983 F.3d at 839.   And, this Court has also found that a

multi-factor weight-of-evidence test, as Texas used here, is consistent with the statute

and a reasonable method of assessing downwind contribution to ozone nonattainment,

given the complex nature of ozone transport.  *See id.* at 839-40 ("EPA has successfully

used a multi-factor balancing test to assess [ozone] attainment designations for years.").

EPA's disapproval turns cooperative federalism on its head.  EPA claims that

Texas's SIP did not provide "substantial evidence that counters . . . the contribution

analysis using EPA's [one-percent] contribution methodology."  Region 6 Texas TSD

at 78.   And EPA says it would impose the one-percent threshold absent a "compelling

policy reason to adopt" a different one.  88 Fed. Reg. at 9,374.  But the Clean Air Act

does not require Texas to "counter[]" EPA's preferred approach with "substantial

evidence," nor does it authorize EPA to judge a SIP based on a FIP. EPA must defer to SIPs that comply with the Act, not reject SIPs merely because they do not identify a "compelling" reason to deviate from EPA's non-statutorily-mandated approach.

EPA's approach of comparing Texas's SIP to prior FIPs—as opposed to statutory requirements—is unlawful. The question whether EPA can use a one-percent threshold *in a FIP* is fundamentally different from the question whether such a threshold can serve as the default presumption for judging *a SIP*. EPA's review of SIP revisions is cabined and delineated by 42 U.S.C. §7410(a). *Fla. Power & Light Co.*, 650 F.2d at 586-87 (explaining statutory standards for EPA review of SIPs). That provision lists the statutory requirements for SIPs. 42 U.S.C. §7410(a)(2). Notably absent from the list is any requirement that a SIP conform to the requirements of a FIP developed by EPA. *Id.* Because EPA's disapproval "relied on factors which Congress has not intended it to consider" (*i.e.*, EPA's FIP), the disapproval is unlawful and must be vacated. *La. Envtl. Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004) (internal quotations and citation omitted).

## D.    EPA's Use of "Ballpark Estimates" to Reject Texas's SIP Was Arbitrary and Capricious

EPA's rejection of Texas's air quality modeling was arbitrary and capricious. TCEQ performed its modeling using the most up-to-date version of the same model that EPA had used—the CAMx model—and *more recent* emissions data than EPA had used. 87 Fed. Reg. at 9,825. EPA did not dispute that TCEQ used the correct model,

16

nor did it find that TCEQ violated any modeling protocols in EPA's regulations that "provide[] air quality modeling techniques that should be applied to State Implementation Plan (SIP) submittals." 40 C.F.R. Part 51, App. W, §1.a.

Nevertheless, EPA disapproved Texas's SIP because the Region determined that "TCEQ's modeling is likely underestimating future ozone [levels]." Region 6 Texas TSD at 41; 88 Fed. Reg. at 9,359 (citing Region 6 Texas TSD). To make that determination, the Region did not assess TCEQ's modeling for compliance with EPA's modeling regulations. Instead, it compared Texas's modeling results to a "ballpark estimate" of 2023 ozone conditions. Region 6 Texas TSD at 40. But Region 6 conceded that its "ballpark estimate" was "*not as exact* as developing new modeling"; "*not usable* in any other CAA action"; and not even "*a defensible basis* on which to reach any conclusions regarding future air quality conditions." *Id.* at 40 & n.23 (emphases added).

These concessions render EPA's disapproval unlawful. EPA's factual findings must be "supported by substantial evidence." *Texas*, 829 F.3d at 425. To withstand review, EPA "must examine the relevant data and *articulate a satisfactory explanation* for its action including a '*rational* connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (emphases added)). By basing its disapproval on a "ballpark estimate" that was admittedly not "a defensible basis" for "any conclusions regarding future air quality

17

conditions," Region 6 Texas TSD at 40 & n.23, EPA utterly failed to meet that standard here.

## II.   Petitioners Will Suffer Irreparable Harm Absent a Stay

Petitioners will be irreparably harmed absent a stay.  As this Court has explained, "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts[.]'" *Texas*, 829 F.3d at 433-34 (quoting *Enter. Int'l Inc. v. Corp. Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).  Where "[n]o mechanism . . . exists for the [movant] to recover the compliance costs they will incur," the irreparable harm requirement is met.  *Id.* at 434; *see Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017) ("An injury is 'irreparable' . . . if it cannot be undone through monetary remedies." (internal citations and alterations omitted)).  "Indeed, 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" *Texas*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)) (emphasis in original).

Here, EPA's unlawful disapproval—which triggers EPA's imminent FIP—is presently causing an array of irreparable harms, including: **1)** costs of equipment and engineering for new SCR—Price Decl. ¶¶26-27, Talley Decl. ¶29, Zahn Decl. ¶¶15-17; **2)** insufficient allowance allocations for critical summer 2023 operations—Zahn Decl. ¶18; Talley Decl. ¶23, Price Decl. ¶19; **3)** dramatically increased allowance prices—Price Decl. ¶¶28-31, Talley Decl. ¶¶18-19; **4)** expenditures to optimize existing equipment

18

for 2023 ozone season—Zahn Decl. ¶¶20-22, Talley Decl. ¶¶20-22; and **5)** and altered and irreversible trading decisions and market disruption—Talley Decl. ¶25; Price Decl. ¶28. These harms flow from EPA's SIP disapproval—without the disapproval, there would be no FIP. 88 Fed. Reg. at 9,361 ("[T]he state[] and the EPA [must] assure that necessary emissions reductions are achieved ... by the 2023 ozone season[.]"); 87 Fed. Reg. at 20,058 (EPA "will not finalize a FIP for [Texas] unless and until the EPA formally finalizes disapproval[] of [its] SIP"); *Texas*, 829 F.3d at 425 (considering, for stay motion, "injury" that "flow[s] from the [FIP]" "because EPA only has the power to promulgate a [FIP] if it disapproves the [SIP]").

The harms will accelerate in the coming months. EPA has instructed companies to begin work "now" on the installation of billions of dollars of emissions control equipment to meet EPA's compliance schedule. 87 Fed. Reg. at 20,101. Construction of the new equipment involves massive expenditures, extensive coordination, and long lead-times for planning, design, engineering, procurement, permitting, and actual construction. Talley Decl. ¶30 ($1.2 billion for new SCRs); Price Decl. ¶¶26-27 (over $723 million for new SCRs); Zahn Decl. ¶17 (over $1 billion for new SCRs). These expenditures cannot be recovered from EPA or ratepayers, Talley Decl. ¶¶26, 31; Zahn Decl. ¶¶9-10, 24, and will force unit retirements according to EPA, Rickerson Decl. ¶¶32, 36; Price Decl. ¶11; Talley Decl. ¶36. The harms extend beyond the electricity sector. Krautsch Decl. §III (over $57-$118 million additional costs for natural-gas pipeline company). Thus, just as before, "[t]he tremendous costs of the emissions

19

controls impose a substantial financial injury on the petitioner power companies which, in this circuit, 'may also be sufficient to show irreparable injury.'" *See Texas*, 829 F.3d at 433 (internal citation omitted).

Further, the Electric Reliability Council of Texas ("ERCOT")—the independent system operator that manages the power grid for 26 million customers in Texas—has determined that EPA's disapproval will endanger the reliability of the ERCOT grid in the summer of 2023—another form of irreparable harm. Rickerson Decl. ¶37. ERCOT has concluded that, under EPA's projections for the summer of 2023, the likelihood that ERCOT would "need[] to direct firm load-shedding would be 77 times greater than it would be without the reduction of capacity." *Id.* ¶25. With "load-shedding," customers are disconnected "from the power grid in order to avoid a system-wide blackout." *Id.* ¶18. Beyond 2023, ERCOT concludes that the "loss of thermal capacity" expected from the retirement of units mandated by EPA to install costly SCR ("as much as 10,800 MW of capacity") "could have catastrophic consequences for the electric grid in 2026," including "an approximately nine times greater risk of having insufficient generation to meet demand in 2026[.]" *Id.* ¶¶32, 35. Even before 2026, "ERCOT anticipates that the mandate that owners of certain units must install SCR technology by 2026 could lead to retirement of coal- and gas-fired generating units prior to 2026." *Id.* ¶36. These impacts constitute additional irreparable harm. *See Texas*, 829 F.3d at 433 (forced retirement of 8,400 MW of capacity justified stay).

20

## III.    The Balance of Harms and the Public Interest Favor a Stay

The remaining factors favor a stay.  The public interest in maintaining air quality will be protected during a stay.  As Texas demonstrated in its SIP, emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in downwind areas, and facilities in Texas are subject to myriad emission control requirements that will not be impacted by a stay.  Texas SIP at 7-1.  Texas power plants will remain subject to federally-enforceable $NO_X$ reductions.  *See* 40 C.F.R. §97.810.   And EPA itself concedes "that ozone levels generally trend downward," even without the further reductions EPA is mandating.  87 Fed. Reg. at 9,827.

On the other hand, if a stay is not granted, there is a substantial risk to the economic viability of Texas power plants and the reliability of the electricity grid in Texas in the critical summer months.  Rickerson Decl. ¶¶17-18, 29, 32, 36.  For this reason alone, a stay is warranted.  *See Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999) ("[A] steady supply of electricity during the summer months, especially in the form of air conditioning to the elderly, hospitals and day care centers, is critical.").

## CONCLUSION

For these reasons, the Court should stay EPA's disapproval and prohibit EPA from taking any action in reliance on that disapproval pending conclusion of these proceedings.

21

Dated: March 3, 2023

Respectfully submitted,

s/ P. Stephen Gidiere III
P. Stephen Gidiere III
C. Grady Moore III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
Daniel J. Kelly
Senior Vice President & Deputy General
Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC*

22

<u>s/ Aaron M. Streett</u>
Aaron M. Streett
Matthew L. Kuryla
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522
aaron.streett@bakerbotts.com

*Counsel for Petitioners Association of Electric Companies of Texas, BCCA Appeals Group, Texas Chemical Council, and Texas Oil & Gas Association*

23

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to Fifth Circuit Rule 27.4, the undersigned counsel conferred with the counsel for the other parties regarding this motion.  Counsel for Respondent has stated that Respondents oppose the motion.  Counsel for State Petitioners has stated that State Petitioners consent to the motion.

Dated: March 3, 2023

<div align="right">
s/ P. Stephen Gidiere III
<br>
<i>Counsel for Luminant Petitioners</i>
</div>

24

## **CERTIFICATE OF COMPLIANCE**

The undersigned counsel states that this motion complies with Fed. R. App. P. 27(d)(2)(A) because it contains 5,188 words, excluding the items allowed to be excluded pursuant to Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This motion also complies with typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: March 3, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic

service are being served with a copy of this document via the Court's CM/ECF system

on this 3rd day of March, 2023.


s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

26

No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC;  ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

## TEXAS INDUSTRY PETITIONERS'
## APPENDIX OF EXHIBITS
## IN SUPPORT OF
## MOTION TO STAY FINAL ACTION
## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

**March 3, 2023**

A-341

# LIST OF EXHIBITS IN APPENDIX

**Exhibit**                                                    **Page Number**
                                                              **in Appendix**

TCEQ, *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)*, Docket No. 2017-1762-SIP (Aug. 8, 2018) ("Texas SIP") .................................................. 1

EPA, Proposed Rule, *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9,798 (Feb. 22, 2022) ....................................................................................... 148

EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* (Feb. 2022) ("Region 6 Texas TSD") ................................... 187

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023) ....................................................... 288

Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT) ("Rickerson Decl.") ............................................................. 338

Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado River Authority ("Price Decl.") ........................................... 344

Declaration of Dudley Zahn, Vice President, NRG Energy, Inc. ("Zahn Decl.") ........................................................................................... 353

Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp. ("Talley Decl.") ..................................... 363

Declaration of Jacob Krautsch, Senior Director of Environmental, Energy Transfer LP ("Krautsch Decl.") ........................................................... 389

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 3rd day of March, 2023.  The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.


Dated: March 3, 2023




s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

**TCEQ,** *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS),* **Docket No. 2017-1762-SIP (Aug. 8, 2018)**

# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
# AGENDA ITEM REQUEST
## for State Implementation Plan Revision Adoption

**AGENDA REQUESTED:** August 8, 2018

**DATE OF REQUEST:**   July 20, 2018

**INDIVIDUAL TO CONTACT REGARDING CHANGES TO THIS REQUEST, IF NEEDED:** Joyce Spencer-Nelson, (512) 239-5017

**CAPTION: Docket No. 2017-1762-SIP.** Consideration of the adoption of the Federal Clean Air Act (FCAA), Section 110(a)(1) and 110(a)(2)(D) Transport State Implementation Plan (SIP) Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS).

The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). (Kristin Patton, Amy Browning) (Non-Rule Project No. 2017-039-SIP-NR)


Steve Hagle, P.E.                                    David Brymer

_____         _____
**Deputy Director**                                  **Division Director**


Joyce Nelson

_____
**Agenda Coordinator**



**Copy to CCC Secretary?  NO   X      YES**

# Texas Commission on Environmental Quality
## Interoffice Memorandum

**To:**        Commissioners                    **Date:**   July 20, 2018

**Thru:**      Bridget C. Bohac, Chief Clerk
               Stephanie Bergeron Perdue, Interim Executive Director

**From:**      Steve Hagle, P.E., Deputy Director
               Office of Air

**Docket No.:** 2017-1762-SIP

**Subject:**   Commission Approval for Adoption of Federal Clean Air Act (FCAA),
               §110(a)(1) and §110(a)(2)(D) Transport State Implementation Plan (SIP)
               Revision for the 2015 Ozone National Ambient Air Quality Standards
               (NAAQS)

               2015 Ozone NAAQS Transport SIP Revision
               Project No. 2017-039-SIP-NR

## Background and reason(s) for the SIP revision:
On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). Infrastructure and transport SIP revisions to address the 2015 ozone NAAQS are due to the EPA by October 1, 2018.

## Scope of the SIP revision:

### A.) Summary of what the SIP revision will do:
The proposed SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP. This SIP revision provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

### B.) Scope required by federal regulations or state statutes:
Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:
- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;
- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;
- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and
- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

Commissioners
Page 2
July 20, 2018

Re:  Docket No. 2017-1762-SIP


In addition, pursuant to FCAA, §110(a)(2)(D)(ii), the SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

Guidance on development and submission of infrastructure SIPs issued by the EPA on September 13, 2013[1] did not address §110(a)(2)(D)(i)(I), which specifically concerns interstate pollution transport affecting attainment and maintenance of the NAAQS. The EPA did not issue formal transport guidance prior to the development and proposal of this SIP revision. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP revisions for the 2015 ozone NAAQS.[2] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals. This SIP revision includes an analysis of required transport elements consistent with statutory requirements.

**C.) Additional staff recommendations that are not required by federal rule or state statute:**
None

**Statutory authority:**
The EPA published the final rule establishing the revised NAAQS for ozone in the *Federal Register* on October 26, 2015 (80 FR 65292). The authority to propose and adopt the SIP revision is derived from FCAA, §110, which requires states to submit SIP revisions that contain enforceable measures to achieve the NAAQS, and other general and specific authority in Texas Water Code, Chapters 5 and 7, and Texas Health and Safety Code, Chapter 382.

---

[1] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf

[2] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

Commissioners
Page 3
July 20, 2018

Re:  Docket No. 2017-1762-SIP


**Effect on the:**

**A.) Regulated community:**
No effects on the regulated community are anticipated. However, if the EPA were to issue a federal implementation plan (FIP) because the state failed to submit a SIP revision there could ultimately be significant effects on the regulated community.

**B.) Public:**
None

**C.) Agency programs:**
The SIP revision would have no new effect on agency programs.

**Stakeholder meetings:**
The proposed SIP revision went through a public review and comment period including one public hearing.

**Public comment:**
The commission offered a public hearing on the proposed SIP revision in Austin on April 10, 2018. Notice of the public hearing was published in the *Texas Register* and the *Austin American-Statesman*, *Dallas Morning News*, and *Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018 and closed on April 10, 2018. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. The comments generally concerned nonattainment designations, ongoing litigation, emissions, and control strategies. A summary of the comments and the TCEQ response is provided as part of the SIP revision in the Response to Comments.

**Significant changes from proposal:**
None

**Potential controversial concerns and legislative interest:**
Section 110(a)(2)(D) of the FCAA requires transport SIPs to contain adequate provisions to prevent emissions from interfering with visibility in another state. As part of the EPA's October 17, 2017 FIP to address best available retrofit technology (BART) requirements for Texas electric generating units, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the 1997 eight-hour ozone, 1997 $PM_{2.5}$ (annual and 24-hour), 2006 $PM_{2.5}$ (24-hour), 2008 eight-hour ozone, 2010 one-hour nitrogen dioxide, and 2010 one-hour sulfur dioxide NAAQS (82 FR 48324). The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA, §110(a)(2)(D)(II). Based on the finding that Texas meets the visibility transport provision for these other NAAQS under the BART FIP, along with the modeling analysis in the proposed SIP revision demonstrating that Texas does not significantly contribute to nonattainment or maintenance in another state for the 2015 ozone NAAQS, the fact that the EPA has not established a separate visibility standard for ozone, and because Texas is included in the Cross-State Air Pollution Rule (CSAPR) Update ozone season nitrogen oxides ($NO_x$) trading

program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

Texas is included in the EPA's CSAPR Update Rule for ozone season $NO_x$, due to the EPA's disapproval of the portion of Texas' 2008 ozone infrastructure and transport SIP revision pertaining to the §110(a)(2)(D)(i)(I) interstate transport requirements and the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 2008 eight-hour ozone NAAQS in other states. While the CSAPR Update Rule does not specifically cover the 2015 ozone NAAQS, litigation over the rule is still ongoing and could potentially affect interstate transport requirements in the future.

**Does this SIP revision affect any current policies or require development of new policies?**
No

**What are the consequences if this SIP revision does not go forward? Are there alternatives to this SIP revision?**
Transport SIP revisions are required by §110(a) of the FCAA to be submitted within three years of the EPA promulgating the revised standard. The commission could choose to not comply with requirements to develop and submit a transport SIP revision to the EPA. However, if the required SIP revision is not submitted to the EPA by the October 1, 2018 deadline, the EPA has the authority to issue a finding of failure to submit requiring that the TCEQ submit the SIP revision within a specified time period and potentially imposing sanctions on the state. The EPA would be required to promulgate a FIP if the TCEQ failed to make the submission within two years, or by October 1, 2020.

**Key points in the SIP revision adoption schedule:**
    **Anticipated adoption date:** August 8, 2018
    **EPA due date:** October 1, 2018

**Agency contacts:**
Kristin Patton, SIP Project Manager, Air Quality Division, (512) 239-4907
Amy Browning, Staff Attorney, (512) 239-0891
Joyce Spencer-Nelson, *Texas Register* Rule/Agenda Coordinator, (512) 239-5017

cc:    Chief Clerk, 2 copies
       Executive Director's Office
       Jim Rizk
       Office of General Counsel
       Kristin Patton
       Joyce Spencer-Nelson

REVISIONS TO THE STATE OF TEXAS AIR QUALITY
IMPLEMENTATION PLAN CONCERNING FEDERAL CLEAN AIR
ACT SECTIONS 110(a)(1) AND (2) INFRASTRUCTURE

TRANSPORT DEMONSTRATION FOR OZONE



TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
P.O. BOX 13087
AUSTIN, TEXAS 78711-3087

**FEDERAL CLEAN AIR ACT, SECTIONS 110(A)(1) AND (2)
TRANSPORT STATE IMPLEMENTATION PLAN REVISION FOR
THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY
STANDARDS**

PROJECT NUMBER 2017-039-SIP-NR

Adoption
August 8, 2018

*This page intentionally left blank*

# EXECUTIVE SUMMARY

This revision to the state implementation plan (SIP) is intended to meet the infrastructure and transport requirements of the Federal Clean Air Act (FCAA), §110(a). States are required by FCAA, §110(a)(1) to submit SIP revisions providing for the implementation, maintenance, and enforcement of a new or revised National Ambient Air Quality Standard (NAAQS) within three years after promulgation. On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

FCAA, §110(a)(2)(A) through (M), lists the elements that infrastructure and transport SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D) for the 2015 ozone NAAQS. The remaining infrastructure requirements of FCAA, §110(a)(2)(A) through (M) are addressed in a separate SIP revision (Project No. 2017-040-SIP-NR). This SIP revision documents how the transport elements listed in FCAA, §110(a)(2)(D) are currently addressed in the Texas SIP and provides a detailed technical demonstration and other supporting information to meet the interstate transport requirements of FCAA, §110(a)(2)(D)(i) and (ii).

Pursuant to FCAA, §110(a)(2)(D)(i), this SIP revision must contain several elements that provide supporting information demonstrating that Texas is:

- not contributing significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;

- not interfering with the maintenance of the 2015 ozone NAAQS in any other state;

- not interfering with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and

- not interfering with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

To meet the requirements of FCAA, §110(a)(2)(D)(i)(I), this SIP revision includes an analysis of ozone design value and emissions trends in Texas, a modeling analysis of the impacts of Texas' emissions on other states, and a discussion of existing ozone control strategies to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state. Information regarding how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II) is provided in Chapter 4: *Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]*. Statements regarding

compliance with FCAA, §110(a)(2)(D)(ii) are provided in Chapter 5: *Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)].*

## SECTION V-A: LEGAL AUTHORITY

General

The Texas Commission on Environmental Quality (TCEQ) has the legal authority to implement, maintain, and enforce the National Ambient Air Quality Standards (NAAQS) and to control the quality of the state's air, including maintaining adequate visibility.

The first air pollution control act, known as the Clean Air Act of Texas, was passed by the Texas Legislature in 1965. In 1967, the Clean Air Act of Texas was superseded by a more comprehensive statute, the Texas Clean Air Act (TCAA), found in Article 4477-5, Vernon's Texas Civil Statutes. The legislature amended the TCAA in 1969, 1971, 1973, 1979, 1985, 1987, 1989, 1991, 1993, 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, and 2017. In 1989, the TCAA was codified as Chapter 382 of the Texas Health and Safety Code.

Originally, the TCAA stated that the Texas Air Control Board (TACB) is the state air pollution control agency and is the principal authority in the state on matters relating to the quality of air resources. In 1991, the legislature abolished the TACB effective September 1, 1993, and its powers, duties, responsibilities, and functions were transferred to the Texas Natural Resource Conservation Commission (TNRCC). With the creation of the TNRCC, the authority over air quality is found in both the Texas Water Code and the TCAA. Specifically, the authority of the TNRCC is found in Chapters 5 and 7. Chapter 5, Subchapters A - F, H - J, and L, include the general provisions, organization, and general powers and duties of the TNRCC, and the responsibilities and authority of the executive director. Chapter 5 also authorizes the TNRCC to implement action when emergency conditions arise and to conduct hearings. Chapter 7 gives the TNRCC enforcement authority. In 2001, the 77th Texas Legislature continued the existence of the TNRCC until September 1, 2013, and changed the name of the TNRCC to the TCEQ. In 2009, the 81st Texas Legislature, during a special session, amended section 5.014 of the Texas Water Code, changing the expiration date of the TCEQ to September 1, 2011, unless continued in existence by the Texas Sunset Act. In 2011, the 82nd Texas Legislature continued the existence of the TCEQ until 2023.

The TCAA specifically authorizes the TCEQ to establish the level of quality to be maintained in the state's air and to control the quality of the state's air by preparing and developing a general, comprehensive plan. The TCAA, Subchapters A - D, also authorize the TCEQ to collect information to enable the commission to develop an inventory of emissions; to conduct research and investigations; to enter property and examine records; to prescribe monitoring requirements; to institute enforcement proceedings; to enter into contracts and execute instruments; to formulate rules; to issue orders taking into consideration factors bearing upon health, welfare, social and economic factors, and practicability and reasonableness; to conduct hearings; to establish air quality control regions; to encourage cooperation with citizens' groups and other agencies and political subdivisions of the state as well as with industries and the federal government; and to establish and operate a system of permits for construction or modification of facilities.

Local government authority is found in Subchapter E of the TCAA. Local governments have the same power as the TCEQ to enter property and make inspections. They also

<center>i</center>

may make recommendations to the commission concerning any action of the TCEQ that affects their territorial jurisdiction, may bring enforcement actions, and may execute cooperative agreements with the TCEQ or other local governments. In addition, a city or town may enact and enforce ordinances for the control and abatement of air pollution not inconsistent with the provisions of the TCAA and the rules or orders of the commission.

Subchapters G and H of the TCAA authorize the TCEQ to establish vehicle inspection and maintenance programs in certain areas of the state, consistent with the requirements of the Federal Clean Air Act; coordinate with federal, state, and local transportation planning agencies to develop and implement transportation programs and measures necessary to attain and maintain the NAAQS; establish gasoline volatility and low emission diesel standards; and fund and authorize participating counties to implement vehicle repair assistance, retrofit, and accelerated vehicle retirement programs.

Applicable Law
The following statutes and rules provide necessary authority to adopt and implement the state implementation plan (SIP). The rules listed below have previously been submitted as part of the SIP.

Statutes
All sections of each subchapter are included, unless otherwise noted.
    TEXAS HEALTH & SAFETY CODE, Chapter 382      September 1, 2017
    TEXAS WATER CODE      September 1, 2017

Chapter 5: Texas Natural Resource Conservation Commission
    Subchapter A: General Provisions
    Subchapter B: Organization of the Texas Natural Resource Conservation
        Commission
    Subchapter C: Texas Natural Resource Conservation Commission
    Subchapter D: General Powers and Duties of the Commission
    Subchapter E: Administrative Provisions for Commission
    Subchapter F: Executive Director (except §§5.225, 5.226, 5.227, 5.2275, 5.231, 5.232,
        and 5.236)
    Subchapter H: Delegation of Hearings
    Subchapter I: Judicial Review
    Subchapter J: Consolidated Permit Processing
    Subchapter L: Emergency and Temporary Orders (§§5.514, 5.5145, and 5.515 only)
    Subchapter M: Environmental Permitting Procedures (§5.558 only)

Chapter 7: Enforcement
    Subchapter A: General Provisions (§§7.001, 7.002, 7.0025, 7.004, and 7.005 only)
    Subchapter B: Corrective Action and Injunctive Relief (§7.032 only)
    Subchapter C: Administrative Penalties
    Subchapter D: Civil Penalties (except §7.109)
    Subchapter E: Criminal Offenses and Penalties: §§7.177, 7.179-7.183

Rules

All of the following rules are found in 30 Texas Administrative Code, as of the following latest effective dates:

Chapter 7: Memoranda of Understanding, §§7.110 and 7.119
December 13, 1996 and May 2, 2002

Chapter 19: Electronic Reporting
March 15, 2007

Chapter 35: Subchapters A-C, K: Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions
July 20, 2006

Chapter 39: Public Notice, §§39.201; 39.401; 39.403(a) and (b)(8)-(10); 39.405(f)(1) and (g); 39.409; 39.411 (a), (b)(1)-(6), and (8)-(10) and (c)(1)-(6) and (d); 39.413(9), (11), (12), and (14); 39.418(a) and (b)(3) and (4); 39.419(a), (b), (d), and (e); 39.420(a), (b) and (c)(3) and (4); 39.423 (a) and (b); 39.601-39.605
December 29, 2016

Chapter 55: Requests for Reconsideration and Contested Case Hearings; Public Comment, §§55.1; 55.21(a) - (d), (e)(2), (3), and (12), (f) and (g); 55.101(a), (b), and (c)(6) - (8); 55.103; 55.150; 55.152(a)(1), (2), and (6) and (b); 55.154; 55.156; 55.200; 55.201(a) - (h); 55.203; 55.205; 55.209, and 55.211
December 29, 2016

Chapter 101: General Air Quality Rules
October 12, 2017

Chapter 106: Permits by Rule, Subchapter A
April 17, 2014

Chapter 111: Control of Air Pollution from Visible Emissions and Particulate Matter
August 3, 2017

Chapter 112: Control of Air Pollution from Sulfur Compounds
July 16, 1997

Chapter 113: Standards of Performance for Hazardous Air Pollutants and for Designated Facilities and Pollutants
May 14, 2009

Chapter 114: Control of Air Pollution from Motor Vehicles
December 29, 2016

Chapter 115: Control of Air Pollution from Volatile Organic Compounds
January 5, 2017

Chapter 116: Permits for New Construction or Modification
November 24, 2016

Chapter 117: Control of Air Pollution from Nitrogen Compounds
June 25, 2015

Chapter 118: Control of Air Pollution Episodes
March 5, 2000

Chapter 122: §122.122: Potential to Emit
February 23, 2017

iii

Chapter 122: §122.215: Minor Permit Revisions                    June 3, 2001

Chapter 122: §122.216: Applications for Minor Permit Revisions    June 3, 2001

Chapter 122: §122.217: Procedures for Minor Permit Revisions    December 11, 2002

Chapter 122: §122.218: Minor Permit Revision Procedures for Permit
Revisions Involving the Use of Economic Incentives, Marketable
Permits, and Emissions Trading                                   June 3, 2001

## SECTION VI: CONTROL STRATEGY

A.  Introduction (No change)
B.  Ozone (No change)
C.  Particulate Matter (No change)
D.  Carbon Monoxide (No change)
E.  Lead (No change)
F.  Oxides of Nitrogen (No change)
G.  Sulfur Dioxide (No change)
H.  Conformity with the National Ambient Air Quality Standards (No change)
I.  Site Specific (No change)
J.  Mobile Sources Strategies (No change)
K.  Clean Air Interstate Rule (No change)
L.  Transport (Revised)
M.  Regional Haze (No change)

# TABLE OF CONTENTS

Executive Summary

Section V-A: Legal Authority

Section VI: Control Strategy

Table of Contents

List of Acronyms

List of Tables

List of Figures

List of Appendices

Chapter 1: General

    1.1 Background

    1.2 Introduction

    1.3 Health Effects

    1.4 Public Hearing and Comment Information

    1.5 Social and Economic Considerations

    1.6 Fiscal and Manpower Resources

Chapter 2: Ozone Data

    2.1 Introduction

    2.2 Ozone Design Value Trends in Texas

    2.3 Ozone Emissions Trends in Texas

        2.3.1 General

        2.3.2 Historical Emissions Inventory Trends

    2.4 Ozone Data Summary

Chapter 3: Significant Contribution to Nonattainment and Interference With Maintenance [FCAA, §110(a)(2)(D)(i)(I)]

    3.1 Introduction

    3.2 Step 1: Identification of Projected Nonattainment and Maintenance Monitors

        3.2.1 Modeling Domain

        3.2.2 Modeling Episode

            3.2.2.1 Meteorology of 2012

            3.2.2.2 Ozone Production in 2012

        3.2.3 Base Case Modeling

      3.2.3.1 Meteorological Modeling

      3.2.3.2 Emissions Modeling

      3.2.3.3 Initial and Boundary Conditions

      3.2.3.4 Photochemical Modeling

   3.2.4 Future Year Modeling

      3.2.4.1 Emissions Modeling

      3.2.4.2 Initial and Boundary Conditions

      3.2.4.3 Photochemical Modeling

3.3 Step 2: Source Apportionment and Identification of Downwind Monitors Tagged For Further Review

   3.3.1 Identification of Nonattainment Monitors for Further Review

   3.3.2 Identification of Maintenance Monitors for Further Review

3.4 Step 3: Analysis to Determine if Texas Emissions Contribute Significantly to Nonattainment or Interfere with Maintenance at Tagged Monitors

   3.4.1 Colorado Monitors

      3.4.1.1 Eight-Hour Ozone Design Value Trends

      3.4.1.2 Monitored Elevated Ozone Days

      3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

      3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

      3.4.1.5 Collective Interstate Contribution to the Future Design Value

      3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

      3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

   3.4.2 Arizona Monitor(s)

   3.4.3 California Monitors

      3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

      3.4.3.2 Eight-Hour Ozone Design Value Trends

      3.4.3.3 Monitored Elevated Ozone Days

      3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

      3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

      3.4.3.6 Collective Interstate Contribution to the Future Design Value

3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

3.5 Conclusion

3.6 References

Chapter 4: Control Strategies

4.1 Introduction

4.2 Emissions Reductions from Electric Generating Units (EGU)

4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

4.2.2 Utility Electric Generation in East and Central Texas

4.2.3 Senate Bill 7 (76th Texas Legislature)

4.3 Emission Reductions from Other Sources

4.3.1 East Texas Engines

4.3.2 Mass Emissions Cap and Trade (MECT) Program

4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

4.3.4 Cement Kilns

4.4 Additional Measures

4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

4.4.3 Consent Decrees with Refineries

4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

4.4.5 Texas Emissions Reduction Plan (TERP)

4.4.6 Clean School Bus Program

4.4.7 Local Initiatives

4.4.8 Voluntary Measures

4.5 2008 Ozone NAAQS SIP Revisions Adopted Since 2015

4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

4.6 Conclusions

Chapter 5: Prevention of Significant Deterioration and Visibility Transport [FCAA, §110(a)(2)(D)(i)(II)]

5.1 Introduction

5.2 PSD

5.3 Visibility Transport

Chapter 6: Interstate Pollution Abatement and International Air Pollution [FCAA, §110(a)(2)(D)(ii)]

6.1 Introduction

6.2 Interstate Pollution Abatement

6.2.1 Compliance with FCAA, §126(a)

6.2.2 Compliance with FCAA, §126(b) and (c)

6.3 International Air Pollution

6.3.1 Compliance with FCAA, §115

Chapter 7: Conclusions

Chapter 8: Future Revisions to the National Ambient Air Quality Standards (NAAQS)

**LIST OF ACRONYMS**

| | |
|---|---|
| 3-D | three-dimensional |
| AD | attainment demonstration |
| APCA | Anthropogenic Culpability Precursor Analysis |
| AQS | Air Quality System |
| BART | best available retrofit technology |
| BEIS | Biogenic Emissions Inventory Systems |
| BPA | Beaumont-Port Arthur |
| CAIR | Clean Air Interstate Rule |
| CAMx | Comprehensive Air Quality Model with Extensions |
| CEMS | continuous emissions monitoring system |
| CSAPR | Cross-State Air Pollution Rule |
| CST | Central Standard Time |
| CTM | Chemical Transport Model |
| DDM | Direct Decoupled Method |
| DERA | Diesel Emissions Reduction Act |
| DERI | Diesel Emissions Reduction Incentive Program |
| DFW | Dallas-Fort Worth |
| $DV_B$ | baseline design value |
| $DV_F$ | future year design value |
| EE | energy efficiency |
| EI | emissions inventory |
| EGF | electric generating facility |
| EGU | electric generating unit |
| EPA | United States Environmental Protection Agency |
| EPS3 | Emissions Processor System |
| ESL | Energy Systems Laboratory |
| FCAA | Federal Clean Air Act |
| FINN | Fire Inventory of NCAR |
| FIP | federal implementation plan |
| FR | *Federal Register* |
| FY | fiscal year |
| g/hp-hr | grams per horsepower-hour |

x

| | |
|---|---|
| GEOS | Goddard Earth Observing System |
| GHG | greenhouse gas |
| H-GAC | Houston-Galveston Area Council |
| HB | House Bill |
| HECT | Highly Reactive Volatile Organic Compounds Emissions Cap and Trade |
| HGB | Houston-Galveston-Brazoria |
| hp | horsepower |
| HRVOC | Highly Reactive Volatile Organic Compounds |
| HTAP | Hemispheric Transport of Air Pollution |
| HYSPLIT | Hybrid Single Particle Lagrangian Integrated Trajectory |
| km | kilometers |
| Kv | vertical diffusivity |
| LAI | Leaf Area Index |
| lb/MMBtu | pound per million British thermal units |
| m | meters |
| m AGL | meters above ground level |
| MB | mean bias |
| MDA8 | maximum daily average eight-hour (ozone concentration) |
| $MDV_F$ | maintenance future year design value |
| ME | mean error |
| MECT | Mass Emissions Cap and Trade |
| MW | megawatts |
| NAAQS | National Ambient Air Quality Standard |
| NCAR | National Center for Atmospheric Research |
| NCDC | National Climatic Data Center |
| NCEP | National Centers for Environmental Prediction |
| NMB | normalized mean bias |
| NME | normalized mean error |
| NOAA | National Oceanic and Atmospheric Administration |
| NODA | Notice of Data Availability |
| $NO_x$ | nitrogen oxides |
| NSR | New Source Review |
| $O_3$ | ozone |
| PM | particulate matter |

xi

| | |
|---|---|
| PM$_{2.5}$ | particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers |
| ppb | parts per billion |
| ppm | parts per million |
| PSD | prevention of significant deterioration |
| PUCT | Public Utility Commission of Texas |
| RACT | reasonably available control technology |
| RE | renewable energy |
| RFP | reasonable further progress |
| RMSE | root mean square error |
| RRF | relative response factor |
| SB | Senate Bill |
| SECO | State Energy Conservation Office |
| SIP | state implementation plan |
| SMOKE | Sparse Matrix Operation Kernel Emissions (System) |
| SO$_2$ | sulfur dioxide |
| TAC | Texas Administrative Code |
| TACB | Texas Air Control Board |
| TCAA | Texas Clean Air Act |
| TCEQ | Texas Commission on Environmental Quality (commission) |
| TCFP | Texas Clean Fleet Program |
| TERP | Texas Emissions Reduction Plan |
| THSC | Texas Health and Safety Code |
| TNGVGP | Texas Natural Gas Vehicle Grant Program |
| TNRCC | Texas Natural Resource Conservation Commission |
| tpd | tons per day |
| tpy | tons per year |
| TUC | Texas Utilities Code |
| TX$_{DVF}$ | Texas contribution to a monitor's future year design value |
| VOC | volatile organic compounds |
| WRF | Weather Research and Forecasting Model |

## LIST OF TABLES

Table 2-1:   2016 Eight-Hour Ozone Design Values by County in Texas

Table 3-1:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions

Table 3-2:   2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure

Table 3-3:   2015 Transport SIP Revision WRF Modeling Domain Definitions

Table 3-4:   2015 Transport SIP Revision WRF Modeling Domain Vertical Structure

Table 3-5:   WRF Model Configuration Parameters

Table 3-6:   Emissions Processing Modules

Table 3-7:   Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration

Table 3-8:   Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016

Table 3-9:   Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories

Table 3-10:  Downwind Nonattainment Monitors Tagged for Further Review

Table 3-11:  Downwind Maintenance Monitors Tagged for Further Review

Table 3-12:  Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA

Table 3-13:  Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor

Table 3-14:  Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

Table 3-15:  Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors

Table 3-16:  Number of HYSPLIT Back Trajectories at Each Tagged California Monitor

Table 3-17:  Modeled Elevated Ozone Days in the Future Year

Table 3-18:  Collective Interstate Contributions to Future Design Values at Tagged California Monitors

## LIST OF FIGURES

Figure 2-1:  2016 Eight-Hour Ozone Design Values by County in Texas
Figure 2-2:  Eight-Hour Ozone Design Values and Population by Area in Texas
Figure 2-3:  Statewide Historical NO$_x$ Emissions Trends in Tons per Year
Figure 2-4:  Statewide Historical VOC Emissions Trends in Tons per Year
Figure 2-5:  DFW 10-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year
Figure 2-6:  DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year
Figure 2-7:  HGB Eight-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year
Figure 2-8:  HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year
Figure 3-1:  Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain
Figure 3-2:  U.S. Drought Monitor Map of Texas for July 26, 2011
Figure 3-3:  May through October 2012 Statewide NCDC Temperature Ranks
Figure 3-4:  May through October 2012 Statewide NCDC Precipitation Ranks
Figure 3-5:  Change in Texas Drought Conditions from July 2011 to July 2012
Figure 3-6:  Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016
Figure 3-7:  Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain
Figure 3-8:  Matching of WRF and CAMx Vertical Layers
Figure 3-9:  Wind Speed Mean Bias for May through September 2012
Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012
Figure 3-11: Humidity Mean Bias for May through September 2012
Figure 3-12: Wind Speed Mean Absolute Error for May through September 2012
Figure 3-13: Two Meter Temperature Mean Absolute Error for May through September 2012
Figure 3-14: Humidity Mean Absolute Error for May through September 2012
Figure 3-15: Wind Speed RMSE for May through September 2012
Figure 3-16: Two Meter Temperature RMSE for May through September 2012
Figure 3-17: Humidity RMSE for May through September 2012
Figure 3-18: Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions
Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category
Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012

Figure 3-21: Initial Concentration on April 16, 2012 in the RPO_12km

Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-25: 2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites

Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites

Figure 3-28: Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region

Figure 3-29: Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category

Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-33: 2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day

Figure 3-34: Baseline Design Value (DV$_B$) for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-35: 2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-36: 2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain

Figure 3-37: APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision

Figure 3-38: Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST

Figure 3-39: Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors

Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area

Figure 3-41: Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016

Figure 3-42: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors

Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor

Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas

Figure 3-45: DDM Responsiveness of Ozone in July 2023 at Highland Reservoir

Figure 3-46: DDM Responsiveness of Ozone in August 2023 at Highland Reservoir

Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park

Figure 3-48: DDM Responsiveness of Ozone in August 2023 at Chatfield State Park

Figure 3-49: DDM Responsiveness of Ozone in July 2023 at Rocky Flats

Figure 3-50: DDM Responsiveness of Ozone in August 2023 at Rocky Flats

Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL

Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL

Figure 3-53: DDM Responsiveness of Ozone in July 2023 at Fort Collins-West

Figure 3-54: DDM Responsiveness of Ozone in August 2023 at Fort Collins-West

Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)

Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area

Figure 3-57: Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016

Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors

LIST OF APPENDICES

| Appendix | Appendix Name |
|---|---|
| Appendix A | Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix B | Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix C | Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |
| Appendix D | Photochemical Modeling Protocol for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard |

## CHAPTER 1: GENERAL

**1.1 BACKGROUND**

Information on the Texas state implementation plan (SIP) and a list of SIP revisions and other air quality plans adopted by the commission can be found on the Texas State Implementation Plan webpage (http://www.tceq.texas.gov/airquality/sip) on the Texas Commission on Environmental Quality's (TCEQ) website (http://www.tceq.texas.gov/).

**1.2 INTRODUCTION**

On October 1, 2015, the United States Environmental Protection Agency (EPA) revised the primary and secondary NAAQS for ozone to an eight-hour standard of 0.070 parts per million (ppm) or 70 parts per billion (ppb) (80 *Federal Register* (FR) 65291, October 26, 2015). Within three years of the promulgation of any new or revised NAAQS, FCAA, §110(a)(1) requires states to submit a SIP revision to provide for the implementation, maintenance, and enforcement of the NAAQS. Section 110(a)(2)(A) through (M), lists the elements that the SIP submissions must contain. This SIP revision specifically addresses transport requirements under FCAA, §110(a)(2)(D). The TCEQ is addressing the infrastructure requirements of FCAA, §110(a)(2)(A) through (C) and (E) through (M) in a separate concurrent SIP revision (Project No. 2017-040-SIP-NR). Submittal of this SIP revision and the infrastructure SIP revision covering FCAA, §110(a)(2)(A) through (C) and (E) through (M) will fulfil the FCAA, §110(a)(1) requirement. Infrastructure and transport SIP revisions to address the 2015 Ozone NAAQS are due to the EPA by October 1, 2018.

Pursuant to FCAA, §110(a)(2)(D)(i), this transport SIP revision must contain adequate provisions that prohibit any source or other type of emissions activity within the state from emitting any NAAQS pollutants in amounts that will:

- contribute significantly to nonattainment of the 2015 ozone NAAQS for areas in other states;

- interfere with the maintenance of the 2015 ozone NAAQS in any other state;

- interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD); and

- interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility.

In addition, pursuant to FCAA, §110(a)(2)(D)(ii), this SIP revision must provide information demonstrating compliance with the applicable requirements of FCAA, §126 and §115 relating to interstate and international pollution abatement.

The EPA has historically failed to issue timely guidance to address transport requirements for previous NAAQS and did not issue formal guidance for states to use in developing transport SIP revisions for the 2015 ozone NAAQS prior to proposal of this SIP revision. In order to meet statutory deadlines, states do not have the option of waiting for the EPA to provide guidance before proceeding with SIP development, review, and submittal and must proceed without the EPA's formal guidance to develop submittals based on information available at the time. On March 27, 2018, the EPA issued a memo to provide information to assist states' efforts to develop transport SIP

revisions for the 2015 ozone NAAQS.[1] The memo notes that in developing transport SIP revisions, states have flexibility to follow the four-step transport framework or alternative frameworks, so long as the chosen approach has adequate technical justification and is consistent with the requirements of the FCAA. The memo also includes a preliminary list of potential flexibilities in analytical approaches for developing transport SIP revisions that may warrant further discussion between the EPA and states. Although this transport SIP revision was developed prior to the EPA's memo, the approach used in developing this SIP revision is consistent with the EPA memo providing states with flexibility in their technical work and submittals.

This SIP revision includes an analysis of required transport elements in FCAA, §110(a)(2)(D)(i) and (ii) consistent with statutory requirements and includes a technical demonstration and various Texas provisions that support the conclusion that Texas meets the requirements of each section. The TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.

## 1.3 HEALTH EFFECTS

On October 1, 2015, the EPA revised the primary and secondary eight-hour ozone NAAQS to 70 ppb (80 FR 65291). To support the 2015 ozone NAAQS, the EPA provided information that suggested that health effects may potentially occur at levels lower than the 2008 standard of 75 ppb. Breathing relatively high levels of ground-level ozone can cause acute respiratory problems like cough and decreases in lung function and can aggravate the symptoms of asthma. Repeated exposures to high levels of ozone can potentially make people more susceptible to allergic responses and lung inflammation.

Children are at a relatively higher risk from exposure to ozone when compared to adults since they breathe more air per pound of body weight than adults and because children's respiratory systems are still developing. Children also spend a considerable amount of time outdoors during summer and during the start of the school year (August through October) when high ozone levels are typically recorded. Adults most at risk from exposures to elevated ozone levels are people working or exercising outdoors and individuals with preexisting respiratory diseases.

## 1.4 PUBLIC HEARING AND COMMENT INFORMATION

The commission held a public hearing for this SIP revision on April 10, 2018 at 2:00 p.m. in Austin at the TCEQ Headquarters. Notice of the public hearing was published in

---

[1] Memorandum from Peter Tsirigotis, Director of the Office of Air Quality Planning and Standards, March 27, 2018, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. EPA Office of Air Quality Planning and Standards. https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

the *Texas Register* as well as the *Austin American-Statesman, Dallas Morning News, and Houston Chronicle* newspapers.

The public comment period opened on March 9, 2018, and closed on April 10, 2018. Written comments were accepted via mail, fax, or through the <u>eComments</u> (https://www6.tceq.texas.gov/rules/ecomments/) system. During the comment period, staff received comments from the Lone Star Chapter of the Sierra Club. A summary of the comments and the TCEQ response is provided as part of this SIP revision in the Response to Comments.

## 1.5 SOCIAL AND ECONOMIC CONSIDERATIONS

Because rulemaking is not a part of this SIP revision, there are no changes that would impact society or the economy.

## 1.6 FISCAL AND MANPOWER RESOURCES

The TCEQ has determined that its fiscal and manpower resources are adequate and will not be adversely affected through the implementation of this plan.

1-3

## CHAPTER 2: OZONE DATA

### 2.1 INTRODUCTION

Ozone ($O_3$) is a secondary pollutant that is created through a photochemical reaction between oxygen ($O_2$), nitrogen oxides ($NO_x$), and volatile organic compounds (VOC). $NO_x$ refers to the combination of nitrogen oxide (NO) and nitrogen dioxide ($NO_2$). The following reactions show how $NO_x$, VOC, and $O_2$ react in the presence of sunlight (hv) to form $O_3$:

$$O_2 + NO_2 \overset{hv}{\leftrightarrow} O_3 + NO$$

$$NO + VOC \rightarrow NO_2$$

The amount of ozone formed depends on several factors. Meteorological conditions, such as wind direction and speed, temperature, mixing height, solar radiation, and other parameters, affect the rates at which ozone formation occurs. The types and the concentration of precursors present can affect net reactivity of precursor compounds found in a plume of emissions.

Precursor compounds, $NO_x$ and VOC, also exist under natural conditions. Ozone is created and destroyed on a natural cycle according to atmospheric conditions and chemical concentrations, even in the absence of additional anthropogenic precursor sources. This natural ozone formation is known as "natural background" ozone and is the starting point for measuring the contribution of ozone and precursors attributable to human activity. Within an urban area, not all ozone formation is necessarily caused by emissions produced locally because anthropogenic precursors, along with ozone formed by them, are often transported over long distances. Because the amount of ozone formed depends on so many other variables, it can be difficult to quantify the exact contribution from specific sources.

The United States Environmental Protection Agency (EPA) revised the eight-hour ozone National Ambient Air Quality Standard (NAAQS) to 0.070 parts per million (ppm) in 2015. On November 16, 2017, the EPA designated the majority of Texas as attainment/unclassifiable for the 2015 eight-hour ozone NAAQS (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018. This chapter discusses trends in ozone and ozone precursor emissions in Texas to demonstrate the progress the state has made towards achieving the NAAQS.

## 2.2 OZONE DESIGN VALUE TRENDS IN TEXAS

A design value is a statistic that is used to compare air quality data to the NAAQS. For eight-hour ozone, a design value is the three-year average of the fourth-highest daily-maximum eight-hour averaged ozone. The latest year in the three-year average is used to represent the design value for that three-year period. Design values are calculated at each ozone monitor and the monitor with the highest design value will set the design value for that area. Although the eight-hour ozone NAAQS is reported in ppm, design values in this chapter will be displayed in parts per billion (ppb) for ease of reading.

In 2016, Texas had 76 ozone monitoring sites in 34 counties that reported valid data to the EPA. Eight-hour ozone design values for 2016 are displayed in Figure 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas* and listed in Table 2-1: *2016 Eight-Hour Ozone Design Values by County in Texas*. Figure 2-1 and Table 2-1 show that most Texas counties have 2016 design values below the 2015 ozone NAAQS of 70 ppb. Three areas of Texas: DFW, HGB, and San Antonio, have eight-hour ozone design values above 70 ppb.



**Figure 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

**Table 2-1: 2016 Eight-Hour Ozone Design Values by County in Texas**

| CSA/CBSA | County | 2016 Eight-Hour Ozone Design Values (ppb) |
|---|---|---|
| Dallas—Fort Worth | Denton | 80 |
| Houston—The Woodlands | Harris | 79 |
| Houston—The Woodlands | Galveston | 76 |
| Houston—The Woodlands | Brazoria | 75 |
| Dallas—Fort Worth | Tarrant | 75 |
| Dallas—Fort Worth | Collin | 74 |
| San Antonio—New Braunfels | Bexar | 73 |
| Dallas—Fort Worth | Parker | 73 |
| Dallas—Fort Worth | Dallas | 72 |
| Dallas—Fort Worth | Johnson | 72 |
| Houston—The Woodlands | Montgomery | 72 |
| El Paso—Las Cruces | El Paso | 70 |
| Dallas—Fort Worth | Hood | 69 |
| Beaumont—Port Arthur | Jefferson | 68 |
| Killeen-Temple | Bell | 67 |
| Longview-Marshall | Gregg | 66 |
| Dallas—Fort Worth | Rockwall | 66 |
| Austin—Round Rock | Travis | 66 |
| Tyler-Jacksonville | Smith | 65 |
| Victoria—Port Lavaca | Victoria | 65 |
| Amarillo-Borger | Randall | 64 |
| Corpus Christi—Kingsville—Alice | Nueces | 64 |
| Beaumont—Port Arthur | Orange | 64 |
| Dallas—Fort Worth | Ellis | 63 |
| Waco | McLennan | 63 |
| No CSA | Brewster | 62 |
| Longview-Marshall | Harrison | 62 |
| Dallas—Fort Worth | Kaufman | 61 |
| Dallas—Fort Worth | Navarro | 61 |
| No CSA | Polk | 61 |
| Dallas—Fort Worth | Hunt | 60 |
| Brownsville-Harlingen-Raymondville | Cameron | 57 |
| McAllen-Edinburg | Hidalgo | 55 |
| Laredo | Webb | 54 |

Design value trends can be used to determine if various areas in Texas are making progress towards attainment of the ozone NAAQS. Eight-hour ozone design value trends by Texas area are displayed in Figure 2-2: *Eight-Hour Ozone Design Values and Population by Area in Texas*. Figure 2-2 shows that all areas of Texas have shown decreases in design values over the past 25 years. No area has seen an increase in eight-hour ozone design values. As mentioned above, in 2016 only three areas in Texas are measuring above the 2015 ozone NAAQS of 70 ppb. The largest ozone decreases

from 1991 through 2016 were observed in the HGB area, which had a 34% decrease in eight-hour ozone design values, and the Beaumont-Port Arthur (BPA) area, which had a 33% decrease in eight-hour ozone design values.



**Figure 2-2: Eight-Hour Ozone Design Values and Population by Area in Texas**

## 2.3 OZONE EMISSIONS TRENDS IN TEXAS

### 2.3.1 General

The Texas Commission on Environmental Quality (TCEQ) maintains an inventory of current information for sources of ozone precursor emissions ($NO_x$ and VOC) that identifies the types of emissions sources present in an area, the amount of each pollutant emitted, and the types of processes and control devices employed at each plant or source category. The total anthropogenic inventory of $NO_x$ and VOC emissions for an area is derived from estimates developed for three general categories of emissions sources: point, area, and mobile (both non-road and on-road). The emissions inventory also provides data for a variety of air quality planning tasks, including establishing baseline emissions levels, calculating reduction targets, developing control strategies to achieve emissions reductions, developing emissions inputs for air quality models, and tracking actual emissions reductions against established emissions growth and control budgets.

The most current emissions inventory (EI) data were analyzed as part of this ozone transport SIP revision. At the time of preparation of this SIP revision, the TCEQ was

planning the development of the 2017 periodic EI in accordance with the EPA's Air Emissions Reporting Requirements (40 Code of Federal Regulations Part 51, Subpart A). The calendar year 2014 periodic inventory was the most recent periodic inventory available to develop this SIP revision's EI.

Additionally, 10 years of anthropogenic emissions data (2005 through 2014) were analyzed to develop historical trend data. During this time, the EI for Texas and its two current ozone nonattainment areas (DFW and HGB) showed a significant decrease in ozone precursor emissions from all source categories; reductions range from 15 to 46%, as detailed in Section 2.3.2: *Historical Emissions Inventory Trends*. These reductions contributed to the attainment of both the one-hour and the 1997 eight-hour ozone NAAQS. These reductions were accomplished through a variety of federal, state, and local regulations and programs as detailed below.

### 2.3.2 Historical Emissions Inventory Trends

For the 10-year historical period up to and including 2014 (2005 through 2014), overall anthropogenic ozone precursor emissions in Texas as well as the DFW and HGB ozone nonattainment areas declined substantially. As demonstrated in Figure 2-3: *Statewide Historical $NO_x$ Emissions Trends in Tons per Year* and Figure 2-4: *Statewide Historical VOC Emissions Trends in Tons per Year*, anthropogenic $NO_x$ emissions decreased 35% and anthropogenic VOC emissions decreased 17% from 2005 through 2014. These emissions reductions were the result of regulations implemented at the federal, state, and local levels and innovative programs implemented by the TCEQ.

Both 30 Texas Administrative Code (TAC) Chapter 115: *Control of Air Pollution from Volatile Organic Compounds* and 30 TAC Chapter 117: *Control of Air Pollution from Nitrogen Compounds* regulations have significantly reduced overall ozone precursor emissions at both major and minor (point and area) industrial, commercial, and institutional sources in the DFW and HGB ozone nonattainment areas as well as other portions of the state (e.g., East Texas Combustion Rule).

The implementation of statewide or regional emissions banking and trading programs have also assisted in reducing ozone precursor emissions. For example, the Emissions Banking and Trading of Allowances program has implemented annual $NO_x$ emissions caps for grandfathered and electing electric generating facilities. Similarly, the Highly Reactive Volatile Organic Compound (HRVOC) Emissions Cap and Trade Program and the Mass Emissions Cap and Trade Program have specifically reduced HRVOC and $NO_x$ emissions, respectively, from point sources in the HGB area.

Innovative emissions reduction programs such as the Texas Emissions Reduction Plan and 30 TAC Chapter 114: *Control of Air Pollution from Motor Vehicles*, which includes programs such as the AirCheckTexas Drive a Clean Machine program and vehicle emissions testing, have also reduced mobile source emissions, the primary source of $NO_x$ emissions in the state.

The following graphs illustrate these trends statewide as well as in the DFW and HGB ozone nonattainment areas.



**Figure 2-3: Statewide Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-4: Statewide Historical VOC Emissions Trends in Tons per Year**

Similarly, Figure 2-5: *DFW 10-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year* and Figure 2-6: *DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year* demonstrate a marked 46% decrease in anthropogenic NO$_x$ emissions and a 15% decrease in anthropogenic VOC emissions from 2005 through 2014.



**Figure 2-5:  DFW 10-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-6: DFW 10-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

Finally, the HGB area shows significant overall progress in reducing anthropogenic emissions. As shown in Figure 2-7: *HGB Eight-County Nonattainment Area Historical NOx Emissions Trends in Tons per Year* and Figure 2-8: *HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year*, a 43% decrease in anthropogenic NOx emissions and a 37% decrease in anthropogenic VOC emissions has occurred from 2005 through 2014.



**Figure 2-7: HGB Eight-County Nonattainment Area Historical NO$_x$ Emissions Trends in Tons per Year**



**Figure 2-8: HGB Eight-County Nonattainment Area Historical VOC Emissions Trends in Tons per Year**

2-9

## 2.4 OZONE DATA SUMMARY

Ozone data in Texas show that there are three areas that have eight-hour ozone design values above 70 ppb: DFW, HGB, and San Antonio. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values. The largest eight-hour ozone design value decreases from 1991 through 2016 were observed in the HGB and the BPA areas with decreases of 34% and 33%, respectively.

Statewide trend analysis using the 2005 through 2014 emissions shows a similar reduction in ozone precursor emissions: a 17% reduction in VOC emissions and a 35% reduction in $NO_x$ emissions. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone NAAQS and are expected to help the state in attaining the 2008 and 2015 NAAQS in the future.

## CHAPTER 3: SIGNIFICANT CONTRIBUTION TO NONATTAINMENT AND INTERFERENCE WITH MAINTENANCE [FCAA, §110(A)(2)(D)(i)(I)]

### 3.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(I) requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will contribute significantly to nonattainment of the National Ambient Air Quality Standards (NAAQS) for areas in other states or interfere with maintenance of the NAAQS in any other state. The purpose of FCAA's §110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, is to ensure that emissions in one state that contribute significantly to nonattainment or interfere with maintenance in another state are addressed appropriately.

For this SIP revision, the key aspect of fulfilling this obligation is to determine if emissions from Texas contribute significantly to nonattainment or interfere maintenance of the 2015 eight-hour ozone NAAQS in another state. The following sections utilize photochemical modeling and data analysis to demonstrate that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in another state.

The approach used by the Texas Commission on Environmental Quality (TCEQ) to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state is based partly on the United States Environmental Protection Agency's (EPA) *Notice of Data Availability of Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS* (2015 Transport NODA) published in the January 6, 2017 *Federal Register* (82 FR 1733), with several key improvements. The TCEQ used a three-step approach, detailed below, to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

> **Step 1:** Identify monitors projected to be in nonattainment or have maintenance issues in a future year.

> **Step 2:** Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Texas, tagging them for further review.

> **Step 3:** Determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2.

The EPA used a four-step framework, referred to as the Cross-State Air Pollution Rule (CSAPR) framework, to address the requirements of the "good neighbor" provision in the 2015 Transport NODA. From the 2015 Transport NODA, the four steps in the CSAPR framework are as follows (82 FR 1735):

> "[1] Identifying downwind receptors that are expected to have problems attaining or maintaining clean air standards (i.e., NAAQS);

[2] determining which states contribute to these problems in amounts sufficient to "link: them to the downwind air quality problems;

[3] for states linked to downwind air quality problems, identifying upwind emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS by quantifying upwind reductions in ozone precursor emissions and apportioning emissions reduction responsibility among upwind states; and

[4] for states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, adopting SIPs or FIPs that eliminate such emissions."

The TCEQ's three-step process covers steps [1] and [2] of the four-step framework. Step 1 of the TCEQ's three-step process is the same as step [1] of the EPA's four-step framework. Steps 2 and 3 of the TCEQ's process together are equivalent to step [2] of the EPA's framework. Steps [3] and [4] of EPA's framework are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state and are therefore not addressed in this SIP revision.

In the 2015 Transport NODA, upwind states with contributions greater than or equal to 0.7 ppb to a monitor's future year design value are linked to the downwind monitor. Once the linkages have been established, the portion of emissions from linked states that were determined by the EPA to have contributed significantly to nonattainment or interfere with maintenance are identified (Steps 2 and 3, respectively, of the EPA's four-step framework). The EPA's framework establishes the 1% of NAAQS threshold as the default definition of significant contribution to nonattainment or interference with maintenance. The TCEQ has maintained and noted in comments to EPA on its transport modeling, that an arbitrary threshold of 1% of the NAAQS for significant contribution to nonattainment or interference with maintenance is inappropriate and incomplete.[2,3] In the 2015 Transport NODA, the EPA acknowledges that a contribution of 1% of the NAAQS from an upwind state alone does not determine whether the upwind state significantly contributes to nonattainment or interferes with maintenance of a NAAQS to a downwind state (FR 82 1740). The TCEQ believes that it is critical to determine if emissions from an upwind state contribute significantly to nonattainment or interfere with maintenance prior to the identification (and subsequent reduction) of such emissions.

---

[2] "Comments by the Texas Commission on Environmental Quality Regarding the Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone National Ambient Air Quality Standard", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Summary-on-EPA%E2%80%93HQ%E2%80%93OAR%E2%80%932016%E2%80%930751.pdf

[3]"Comments by the Texas Commission On Environmental Quality Regarding Disapproval of Air Quality Implementation Plans: Interstate Transport of Air Pollution for the 2008 Ozone National Ambient Air Quality Standards", available at https://www.tceq.texas.gov/assets/public/agency/nc/air/TCEQ-Comments-on-EPA-R06-OAR-2012-0985.docx

In this SIP revision, the TCEQ is partially addressing its concern with the use of the 1% of NAAQS threshold as the definition of significant contribution to nonattainment by adding a step that uses a more comprehensive analysis to determine **if** emissions from an upwind state contribute **significantly** to nonattainment or interfere with maintenance.

For Step 1, the TCEQ used regional photochemical modeling to identify monitors projected to be in nonattainment or have maintenance issues in the future year. In Step 2, if the Texas contribution to a monitor's future year design value was greater than or equal to 1% of the NAAQS (i.e., 0.7 ppb) the monitor was tagged for further review. In Step 3, a comprehensive review of modeling and analysis of monitoring data was used to determine if emissions from Texas contributed significantly to nonattainment or interfered with maintenance for monitors tagged in Step 2.

## 3.2 STEP 1: IDENTIFICATION OF PROJECTED NONATTAINMENT AND MAINTENANCE MONITORS

The TCEQ used photochemical modeling, in accordance with the EPA's 2014 *Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze* (EPA Modeling Guidance)[4], to identify monitors projected to be in nonattainment in a future year. Photochemical modeling for ozone consists of using a regional Chemical Transport Model (CTM) with appropriate meteorological and emissions inputs, to simulate the formation and transport of ozone.

To assess the future attainment status of monitors, the EPA's Modeling Guidance uses modeling results in a relative sense. This relative approach is based on how the model responds to the change in emissions between a base year and a future year while holding meteorological inputs constant. For this SIP revision, the TCEQ used a 2012 base year and a 2023 future year to identify monitors projected to be in nonattainment or have maintenance issues in the future. The future year of 2023 was chosen based on the assumed attainment date for moderate nonattainment areas as detailed in EPA's 2015 Transport NODA.

The photochemical modeling process began with episode, base year, and domain selection. Base case and future year modeling was conducted, and results were interpreted to determine future year (2023) design values (DV$_F$) at monitoring sites in the modeling domain.

### 3.2.1 Modeling Domain

The geographic extent of the modeling domain used for the 2015 ozone NAAQS Transport SIP revision is shown in Figure 3-1: *Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain*. The domain includes the 48 contiguous states of the United States (U.S.), with parts of southern Canada and northern Mexico.

---

[4] https://www3.epa.gov/scram001/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf



**Figure 3-1: Map of 2015 Ozone NAAQS Transport SIP Revision CTM Modeling Domain**

The CTM used for this SIP revision is the Comprehensive Air Quality Model with Extensions (CAMx), version 6.40. CAMx is a three-dimensional grid-based Eulerian model designed to simulate the formation and transport of ozone and ozone precursor concentrations over regional and urban spatial scales.[5] The modeling domain, referred to as the rpo_12km domain, has a horizontal grid resolution of 12 kilometers (km) by 12 km and 29 vertical layers. The domain definitions are provided in *Table 3-1: 2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions.*

Table 3-2: *2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure* provides details of the modeling domain vertical layers such as the top and center height in meters Above Ground Level (m AGL) and thickness in meters (m).

---

[5] http://www.camx.com/about/default.aspx

3-4

**Table 3-1:  2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|---|---|---|---|---|---|
| National RPO Domain | (-2736,2592) | (-2088,1944) | 444 | 336 | rpo_12km |

**Table 3-2:  2015 Ozone NAAQS Transport SIP Revision CAMx Modeling Domain Vertical Structure**

| CAMx Layer | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|
| 29 | 18250 | 16445 | 3611 |
| 28 | 14639 | 13632 | 2015 |
| 27 | 12624 | 10786 | 3675 |
| 26 | 8949 | 7891 | 2115 |
| 25 | 6833 | 6289 | 1088 |
| 24 | 5746 | 5290 | 911 |
| 23 | 4835 | 4449 | 772 |
| 22 | 4063 | 3704 | 717 |
| 21 | 3346 | 3175 | 341 |
| 20 | 3005 | 2840 | 330 |
| 19 | 2675 | 2515 | 320 |
| 18 | 2355 | 2225 | 259 |
| 17 | 2096 | 1969 | 253 |
| 16 | 1842 | 1718 | 248 |
| 15 | 1595 | 1474 | 242 |
| 14 | 1353 | 1281 | 143 |
| 13 | 1210 | 1140 | 141 |
| 12 | 1069 | 1000 | 139 |
| 11 | 930 | 861 | 138 |
| 10 | 792 | 747 | 91 |
| 9 | 702 | 656 | 90 |
| 8 | 612 | 567 | 89 |
| 7 | 522 | 478 | 89 |
| 6 | 433 | 389 | 88 |
| 5 | 345 | 302 | 87 |
| 4 | 258 | 215 | 87 |
| 3 | 171 | 128 | 86 |
| 2 | 85 | 60 | 51 |
| 1 | 34 | 17 | 34 |

### 3.2.2 Modeling Episode

The modeling episode used for this SIP revision was the May 1 through September 30, 2012 period (May through September 2012). A robust modeling platform had been developed for May through September 2012 as part of the Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone NAAQS (HGB

AD SIP) that was adopted on December 15, 2016 by the commission and submitted to the EPA on December 29, 2016. The May through September 2012 episode was selected in accordance with the episode selection criteria specified in the EPA Modeling Guidance, details of which are documented in the section 3.4: *Episode Selection* of the HGB AD SIP.[6] The EPA, in its 2015 Transport NODA, used May 1 through September 30, 2011 period (May through September 2011) for its transport modeling. However, 2011 was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895 (Hoerling *et al.*, 2012). Figure 3-2: *U.S. Drought Monitor Map of Texas for July 26, 2011* shows the extent of the drought across the state.



**Figure 3-2: U.S. Drought Monitor Map of Texas for July 26, 2011**

The TCEQ has submitted comments on the unsuitability of the May through September 2011 episode for Texas ozone modeling in response to several EPA actions such as the

---

[6] Revisions to the State of Texas Air Quality Implementation Plan for the Control of Ozone Air Pollution, Houston-Galveston Brazoria Attainment Demonstration SIP revision for the 2008 Eight-hour Ozone Standard Nonattainment Area (pages 3-4 to 3-17)
https://www.tceq.texas.gov/assets/public/implementation/air/sip/hgb/HGB_2016_AD_RFP/AD_Adoption/16016SIP_HGB08AD_ado.pdf

EPA 2011 modeling platform,[7] EPA 2018 Modeling Platform,[8] EPA NODA on Updated Transport Modeling for the 2008 Ozone NAAQS[9] and the 2015 Transport NODA.[10]

### 3.2.2.1 Meteorology of 2012

Meteorology for the May through September 2012 period was analyzed for the rest of the contiguous U.S. The year 2012 had above average temperatures across most of the U.S., except in some states in the southeast. New Hampshire had their highest May through October average temperatures on record. The National Oceanic and Atmospheric Administration's (NOAA) National Climatic Data Center (NCDC) temperature rankings[11] for the May through October average temperature of 2012 relative to the years 1895 through 2012 are shown in Figure 3-3: *May through October 2012 Statewide NCDC Temperature Ranks*. The numbers in each state represent the numerical rank for that state for 2012. Among the NCDC climatic regions,[12] the Northeast had its warmest year on record for the years 1895 through 2012.

---

[7] TCEQ comments on EPA's "Notice of Availability of the EPA's 2011 Modeling Platform." Submitted 3/31/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#033114
[8] TCEQ comments on EPA's "Notice of Availability of the EPA's 2018 Modeling Platform." Submitted 6/24/14 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#062414
[9] TCEQ comments on EPA's Notice of Data Availability of the Updated Ozone Transport Modeling Data for the 2008 Ozone NAAQS. Submitted 10/15/15 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#101515
[10] TCEQ comments on EPA's "Preliminary Interstate Ozone Transport Modeling Data for 2015 Ozone NAAQS." Submitted 4/5/17 and available at https://www.tceq.texas.gov/agency/nc/Air_Issues.html/#040517
[11] Explanation of Climatological Rankings available at https://www.ncdc.noaa.gov/monitoring-references/dyk/ranking-definition
[12] NCDC U.S. Climatic Region definitions are available at https://www.ncdc.noaa.gov/monitoring-references/maps/us-climate-regions.php



**Figure 3-3: May through October 2012 Statewide NCDC Temperature Ranks**

Figure 3-4: *May through October 2012 Statewide NCDC Precipitation Ranks* shows the NCDC precipitation rankings for the May through October months of 2012 relative to the years 1895 through 2012. May through October 2012 had below normal or much below normal precipitation in most of the South and Northern Rockies and Plains and parts of the Upper Midwest and Ohio River Valley climate regions with a record driest year for Nebraska and Wyoming. However, the Northeast and parts of the Southeast had above normal or much above normal precipitation.



**Figure 3-4: May through October 2012 Statewide NCDC Precipitation Ranks**

The entire central portion of the U.S. was in some state of drought. However, the drought reported in Texas by July 2011 had diminished in severity by July 2012. Figure 3-5: *Change in Texas Drought Conditions from July 2011 to July 2012* shows the change in drought class from July 26, 2011 to July 24, 2012 with approximately 60 to 70% of Texas showing improvement by three to five drought classes statewide.



**Figure 3-5: Change in Texas Drought Conditions from July 2011 to July 2012**

3.2.2.2 Ozone Production in 2012

The TCEQ analyzed, similar to the EPA's analysis for its transport modeling,[13] the meteorologically adjusted ozone trends for the NCDC climate regions for May through September 2012. Figure 3-6: *Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016*[14] shows the meteorologically-adjusted ozone trends from 2000 through 2016. The 2010 through 2016 time period shows variation in ozone-conducive conditions across years and climate regions. The year 2012 was more conducive (relative to 2010 through 2016) for ozone formation in the Northeast, Upper Midwest, Northwest, Northern Rockies and Plains, and West regions while for the Ohio River Valley, South, Southeast, and Southwest climate regions 2011 was more conducive to ozone production. In the past the EPA has acknowledged that no single year will be representative of "typical" meteorological conditions for ozone for all regions of the U.S. (EPA, August 2016). Based on this analysis, the TCEQ concluded that the well-tested 2012 modeling platform is appropriate for use in this SIP revision.

---

[13] "Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Cross-State Air Pollution Rule Proposal", available at https://www.epa.gov/sites/production/files/2015-11/documents/air_quality_modeling_tsd_proposed_rule.pdf
[14] Data for this analysis shown in Figure 3-6 was obtained from the EPA's Air-Trends webpage (https://www.epa.gov/air-trends/trends-ozone-adjusted-weather-conditions)

3-10



**Figure 3-6: Meteorologically-Adjusted Ozone Trends for NCDC Climate Regions for 2000 through 2016**

### 3.2.3 Base Case Modeling

Base case modeling was used to evaluate the CTM's ability to replicate measured ozone and precursor concentrations. The adequacy of the model in replicating observations was assessed statistically and graphically. Satisfactory model performance in base case modeling provided a degree of confidence in the use of the model to predict future ozone concentrations and to evaluate transport impacts.

Base case modeling included the generation of initial and boundary conditions, emissions inputs and meteorological inputs for the May through September 2012 period needed by CAMx. Results of base case modeling included modeled ozone and precursor concentrations for every grid cell of the rpo_12km domain for every hour of May through September 2012. The base case modeling results were evaluated by comparisons with observed measurements at monitoring sites across the modeling domain. The model performance evaluation was iterative. Feedback from successive evaluations was incorporated to ensure that the model was adequately replicating observations throughout the modeling domain and episode. Details of the inputs generated for base case modeling are provided below.

#### 3.2.3.1 Meteorological Modeling

The TCEQ used the Weather Research and Forecasting Model (WRF) version 3.8.1 to create the May through September 2012 meteorological inputs for CAMx. The WRF domain was chosen to accommodate the CAMx domain shown in Figure 3-1. Figure 3-7: *Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain* shows the geographical extent of the WRF modeling domain, along with the CAMx domain for reference.

3-12



| WRF Domain | CAMx Domain |

**Figure 3-7: Map of 2015 Ozone NAAQS Transport SIP Revision Meteorological Modeling Domain**

For the meteorological model, a single domain was used, referred to as na_12km, with horizontal grid resolution of 12 km x 12 km and 44 vertical layers. The WRF model domain definitions are provided in Table 3-3: *2015 Transport SIP Revision WRF Modeling Domain Definitions*. Table 3-4: *2015 Transport SIP Revision WRF Modeling Domain Vertical Structure* provides details of the WRF model domain vertical layers, such as heights and thickness. Figure 3-8: *Matching of WRF and CAMx Vertical Layers* shows how the vertical layers of WRF shown in Table 3-4 are matched to the vertical layers of CAMx shown in Table 3-2.

**Table 3-3: 2015 Transport SIP Revision WRF Modeling Domain Definitions**

| Domain | Easting Range (km) | Northing Range (km) | Number of Cells (Easting) | Number of Cells (Northing) | Short Name |
|--------|--------------------|--------------------|---------------------------|----------------------------|------------|
| North America Domain | (-2916,2916) | (-2304,2304) | 489 | 387 | na_12km |

**Table 3-4: 2015 Transport SIP Revision WRF Modeling Domain Vertical Structure**

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|-----------|-------------|-------------|----------------|---------------|
| 44 | 0.000 | 20581 | 20054 | 1054 |

3-13

| WRF Layer | Sigma Level | Top (m AGL) | Center (m AGL) | Thickness (m) |
|---|---|---|---|---|
| 43 | 0.010 | 19527 | 18888 | 1278 |
| 42 | 0.025 | 18249 | 17573 | 1353 |
| 41 | 0.045 | 16896 | 16344 | 1103 |
| 40 | 0.065 | 15793 | 15215 | 1156 |
| 39 | 0.090 | 14637 | 14144 | 987 |
| 38 | 0.115 | 13650 | 13136 | 1029 |
| 37 | 0.145 | 12621 | 12168 | 906 |
| 36 | 0.175 | 11716 | 11245 | 941 |
| 35 | 0.210 | 10774 | 10294 | 962 |
| 34 | 0.250 | 9813 | 9379 | 867 |
| 33 | 0.290 | 8946 | 8550 | 792 |
| 32 | 0.330 | 8154 | 7790 | 729 |
| 31 | 0.370 | 7425 | 7128 | 594 |
| 30 | 0.405 | 6830 | 6551 | 559 |
| 29 | 0.440 | 6271 | 6007 | 528 |
| 28 | 0.475 | 5743 | 5492 | 501 |
| 27 | 0.510 | 5242 | 5037 | 410 |
| 26 | 0.540 | 4832 | 4636 | 393 |
| 25 | 0.570 | 4439 | 4250 | 378 |
| 24 | 0.600 | 4061 | 3878 | 365 |
| 23 | 0.630 | 3696 | 3520 | 352 |
| 22 | 0.660 | 3344 | 3173 | 341 |
| 21 | 0.690 | 3003 | 2838 | 330 |
| 20 | 0.720 | 2673 | 2513 | 320 |
| 19 | 0.750 | 2353 | 2224 | 259 |
| 18 | 0.775 | 2094 | 1967 | 253 |
| 17 | 0.800 | 1841 | 1717 | 247 |
| 16 | 0.825 | 1593 | 1472 | 242 |
| 15 | 0.850 | 1352 | 1280 | 143 |
| 14 | 0.865 | 1209 | 1138 | 141 |
| 13 | 0.880 | 1068 | 999 | 139 |
| 12 | 0.895 | 929 | 860 | 137 |
| 11 | 0.910 | 792 | 746 | 91 |
| 10 | 0.920 | 701 | 656 | 90 |
| 9 | 0.930 | 611 | 566 | 89 |
| 8 | 0.940 | 522 | 477 | 89 |
| 7 | 0.950 | 433 | 389 | 88 |
| 6 | 0.960 | 345 | 301 | 87 |
| 5 | 0.970 | 258 | 214 | 87 |
| 4 | 0.980 | 171 | 128 | 86 |
| 3 | 0.990 | 85 | 60 | 51 |
| 2 | 0.996 | 34 | 26 | 17 |
| 1 | 0.998 | 17 | 8 | 17 |
| 0 | 1.000 | 0 | 0 | 0 |



Figure 3-8: Matching of WRF and CAMx Vertical Layers

The initial and boundary conditions for WRF modeling were obtained from the GCIP (GEWEX (Global Energy and Water EXperiment) Continental-Scale International Project) NCEP (National Centers for Environmental Prediction) Eta data archive. Where data were missing from the GCIP NCEP Eta archive, data extracted from the NCEP North American Mesoscale model were used. More details regarding how missing data were handled is presented in Appendix A: *Meteorological Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard*. To optimize performance, two types of nudging were utilized. The first type was analysis nudging, both three-dimensional (3-D) and surface. The 3-D analysis nudging was used to nudge the wind, temperature and moisture, while the surface analysis nudging was only used to nudge wind and temperature. The second type of nudging used was observational nudging, which used the radar profiler data for nudging aloft winds towards observed vertical profiles.

The selection of the final meteorological modeling configuration for May through September 2012 resulted from numerous sensitivity tests and model performance evaluation. The final WRF parameterization schemes and options selected are shown in Table 3-5: *WRF Model Configuration Parameters*. Details of the meteorological sensitivity tests are provided in Appendix A.

**Table 3-5:  WRF Model Configuration Parameters**

| Domain | Nudging Type | PBL | Cumulus | Radiation | Land-Surface | Microphysics |
|--------|-------------|-----|---------|-----------|--------------|--------------|
| na_12km | 3-D, Surface Analysis, PX Soil Nudging, NPN and CAP Radar Profiler Observations | YSU | Multiscale Kain-Fritsch | RRTM / Dudhia | Pleim-Xiu | WSM5 |

WRF output was post-processed using the WRF2CAMx version 4.6 utility with the Community Multi-Scale Air Quality (CMAQ) modeling system vertical diffusivity (Kv) option to convert the WRF meteorological fields to the appropriate CAMx grid and input format. The 100 m Kv Patch program developed by Ramboll Environ[15] was used to modify the vertical diffusivity coefficients based on a land-use basis to maintain vertical mixing within the first 100 meters of the model over urban areas. Sub grid stratiform cloud diagnostics were applied to better simulate ultraviolet-attenuation in CAMx.

WRF model performance was evaluated for wind speed and direction, temperature, and humidity. Figure 3-9: *Wind Speed Mean Bias for May through September 2012*, Figure 3-10: *Two Meter Temperature Mean Bias for May through September 2012*, and Figure 3-11: *Humidity Mean Bias for May through September 2012* show the mean bias for wind speed, temperature, and humidity, respectively for May through September 2012 for each monitoring station across the na_12km domain.

---

[15] "Dallas-Fort Worth Modeling Support: Improving Vertical Mixing, Plume-in-Grid, and Photolysis Rates in CAMx", TCEQ Project report available at
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821110365FY1206-20120820-environ_dfw_modeling_support.pdf



**Figure 3-9: Wind Speed Mean Bias for May through September 2012**



**Figure 3-10: Two Meter Temperature Mean Bias for May through September 2012**

3-17



**Figure 3-11:  Humidity Mean Bias for May through September 2012**

Figure 3-9 shows that wind speed had a negative bias along the East Coast, Southeast, and western continental U.S., while eastern Texas, the Ohio River Valley, and the Great Lakes region had a positive bias. Mean bias for temperature in Figure 3-10 does not show strong geographical trends, although slightly more monitors in the western U.S. show a positive bias. Figure 3-11 shows that there was a positive bias for humidity at most monitoring stations in the domain, although a negative bias is seen over much of Oklahoma through eastern Kansas and into southern Nebraska, and also in parts of southern California.

Figure 3-12: *Wind Speed Mean Absolute Error for May through September 2012*, Figure 3-13: *Two Meter Temperature Mean Absolute Error for May through September 2012*, and Figure 3-14: *Humidity Mean Absolute Error for May through September 2012* show the mean absolute error for wind speed, temperature, and humidity, respectively for May through September 2012 at monitoring stations across the na_12km domain.



**Figure 3-12:  Wind Speed Mean Absolute Error for May through September 2012**



**Figure 3-13:  Two Meter Temperature Mean Absolute Error for May through September 2012**



**Figure 3-14:  Humidity Mean Absolute Error for May through September 2012**

Figure 3-12 and Figure 3-13 show that the mean absolute error for wind speed and temperature, respectively, were lower in the eastern U.S. than western U.S. Figure 3-14 shows a more north/south regional difference for humidity, with monitors in the northern U.S. having less mean absolute error than monitors in the southern U.S.

Figure 3-15: *Wind Speed RMSE for May through September 2012*, Figure 3-16: *Two Meter Temperature RMSE for May through September 2012*, and Figure 3-17: *Humidity RMSE for May through September 2012* show the Root Mean Square Error (RMSE) for wind speed, temperature, and humidity, respectively, for May through September 2012 at monitoring stations across the na_12km domain.

3-20



**Figure 3-15:  Wind Speed RMSE for May through September 2012**



**Figure 3-16:  Two Meter Temperature RMSE for May through September 2012**

3-21



**Figure 3-17: Humidity RMSE for May through September 2012**

Similar to the Mean Absolute Error in Figures 3-12 through 3-14, Figure 3-15 and Figure 3-16 show an east/west regional trend with monitors in the east having lower RMSE than monitors in the west for wind speed and temperature, respectively, while Figure 3-17 shows that RMSE for humidity in the southern and central monitors are greater than RMSE for northern monitors.

Overall, WRF model performance for May through September 2012 was acceptable for the CTM input. More details regarding WRF model performance, including daily, monthly, and regional performance statistics, are presented in Appendix A.

### 3.2.3.2 Emissions Modeling

Emissions modeling is the process of creating CAMx-ready emissions inputs. For base case modeling, precursor emissions inputs are chemically speciated into the Carbon Bond 6 (CB6) chemical mechanism species used in CAMx, temporally allocated, and spatially distributed to 12 km grid cells for May through September 2012. The main ozone precursors are nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) while carbon monoxide (CO) plays a minor role in ozone formation. Though CO has very low reactivity and does not play a major role in controlling ozone formation, in this subsection details of CO modeling emissions inventories are presented as CO is a chemical species in the model.

Version 3.22 of the Emissions Processor System (EPS3) was used to prepare the gridded emissions inputs. Table 3-6: *Emissions Processing Modules* summarizes many of the steps taken to prepare the required emission files needed by CAMx and the software modules in EPS3 that were used for each step.

3-22

**Table 3-6: Emissions Processing Modules**

| EPS3 Module | Description |
|---|---|
| PREAM | Prepare area and non-link based area and mobile source emissions for further processing |
| LBASE | Spatially allocate link-based mobile source emissions among grid cells |
| PREPNT | Group point source emissions into elevated and low-level categories for further processing |
| CNTLEM | Apply controls to model strategies, apply adjustments, make projections, etc. |
| TMPRL | Apply temporal profiles to allocate emissions by day type and hour |
| SPCEMS | Chemically speciate emissions into nitrogen oxide (NO), nitrogen dioxide ($NO_2$), and various CB6 VOC species |
| GRDEM | Spatially distribute emissions by grid cell using source category surrogates |
| MRGUAM | Merge and adjust multiple gridded files for model-ready input |
| PIGEMS | Assign Plume-in-Grid (PiG) emissions and merge elevated point source files |

Figure 3-18: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions* shows the total anthropogenic precursor emissions in the rpo_12km domain by major geographic region (Texas, Non-Texas U.S., southern Canada, northern Mexico, and Oceanic) on a sample 2012 summer weekday in tons per day.



**Figure 3-18: Base Case Representative Day Total Anthropogenic Precursor Emissions by Geographic Regions**

Emissions modeling includes preparing emissions inventories for anthropogenic emissions source categories such as stationary point sources (power plants, refineries,

etc.), area sources (dry cleaners, gas stations, etc.), on-road mobile sources (cars, trucks, etc.), non-road mobile sources (construction vehicles, lawn mowing equipment, etc.), off-road mobile sources (locomotives, commercial marine, aircraft, etc.), and oceanic (off-shore oil rigs and ocean-going vessels). Figure 3-19: *Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2012 summer weekday in tons per day.



| | NOx | VOC | CO |
|---|---|---|---|
| ● Oceanic | 4028.42 | 413.11 | 581.49 |
| ■ Points | 12,871.68 | 5,191.00 | 11,582.17 |
| ■ Area Sources | 9,713.09 | 21,383.64 | 15,789.00 |
| ■ Off-Road | 3544.90 | 254.55 | 1929.31 |
| ■ Non-Road | 7,066.29 | 6,650.39 | 60,348.29 |
| ■ On Road | 19,161.21 | 8,026.27 | 86,110.92 |

**Figure 3-19: Base Case Representative Day Total Anthropogenic Precursor Emissions by Source Category**

Emissions inventories for natural emissions source categories, i.e., biogenic sources and fires, were also developed. Version 3.61 of the Biogenic Emissions Inventory System (BEIS) (Bash et al., 2016) within the Sparse Matrix Operation Kernel Emissions (SMOKE) System version 3.7[16] was used to create the biogenic emissions inventory. Figure 3-20: *Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012* shows a sample of biogenic VOC emissions in the rpo_12km domain.

---

[16] Available at https://www.cmascenter.org/smoke/



**Figure 3-20: Biogenic VOC Emissions in RPO_12km Domain on July 18, 2012**

Wildfire emissions were estimated from the daily Fire Inventory from the National Center for Atmospheric Research (NCAR) (FINN) version 1.5 product for 2012 (Wiedinmyer, 2011). The FINN fire estimates were projected to the model grid and grouped together if fires were within 5 km of each other. Each fire was treated as a point source and processed using the EPS3 PREFIR, CHMSPL, TMPRL, and PSTFIR

3-25

modules following the methodology developed in a TCEQ project.[17] The fire emissions were temporally allocated according to the temperate North American diurnal cycle of fires from Mu et al. (2011).

Since the purpose of base case modeling is to evaluate the ability of the model to recreate a past episode, measured and reported emissions data from 2012 with the highest resolution available were relied upon to determine the spatial and temporal allocation of emissions in the modeling domain for each hour of the modeling episode. Details of the development and processing of emissions inventories for base case modeling are provided in Appendix B: *Emissions Modeling for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard.*

### 3.2.3.3 Initial and Boundary Conditions

In addition to emissions and meteorological inputs, CAMx requires initial and boundary conditions. Initial conditions refer to the state of the atmosphere in the rpo_12km domain at the start of the modeling episode. Boundary conditions refer to the state of the atmosphere at the five edges (North, South, East, West, and Top) of the rpo_12km domain.

The initial and boundary conditions were derived from the output of a three-dimensional global CTM, GEOS-Chem. The GEOS-Chem model simulates atmospheric chemical and physical processes driven by assimilated meteorological observations from the NASA's Goddard Earth Observing System (GEOS).[18] The TCEQ used a modified version of the standard GEOS-Chem version 10-01. The modifications were implemented by Ramboll Environ as part of TCEQ projects[19, 20] that updated the lightning $NO_x$ module (Travis et al., 2016; Zhang et al., 2014) and halogen chemistry (Sherwen et al., 2016; Yarwood et al., 2016), and fixed several model errors.

For the base case simulation, GEOS-Chem was run for 2012 with a grid resolution of 2.0 degrees latitude x 2.5 degrees longitude, using meteorology from the GEOS Model Version 5 (GEOS-5) and global anthropogenic emissions inventory for non-U.S. regions from the Hemispheric Transport of Air Pollution (HTAP) version 2. For U.S. emissions, the U.S. National Emission Inventory 2011 (2011 National Emissions Inventory) was used. GEOS-Chem results were used to provide one-way dynamic boundary concentrations at three-hour intervals and an initial concentration field for the CAMx simulations. Figure 3-21: *Initial Concentration on April 16, 2012 in the RPO_12km* shows a map of the initial ozone concentration field on 12 a.m., April 16, 2012 at the surface layer in the rpo_12km domain. April 16, 2012 is the start date of the CAMx

---

[17] "Boundary Condition and Fire Emissions Modeling", Tai *et al*, September 2008,
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5820784005FY0810-20080831-environ-bcic_final_report.pdf
[18] GEOS-Chem Model, http://acmg.seas.harvard.edu/geos/
[19] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016,
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf
[20] "2013 Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, June 2017,
https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/582177144421-20170627-environ-2013_BC_GEOS_Chem.pdf

simulation with a ramp up period of April 16 through April 30 for the base case modeling.



**Figure 3-21:  Initial Concentration on April 16, 2012 in the RPO_12km**

Figure 3-22: *2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-23: *2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-24: *2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-25: *2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show a samples of the 2012 east, west, north, and south, respectively, boundary conditions for the July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.

3-27



**Figure 3-22: 2012 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-23: 2012 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-24: 2012 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-25:  2012 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3.2.3.4 Photochemical Modeling

The TCEQ used CAMx version 6.40,[21] with the following options:

- New gas-phase chemistry mechanism CB6 "revision 4," with condensed halogen chemistry and inline sea salt emissions (CB6r4h); and

- Wesely dry deposition scheme.

In addition to the meteorological, emissions, and initial and boundary condition inputs, CAMx needs spatially resolved surface characteristic parameters, albedo/haze/ozone (i.e., opacity), photolysis rates, and a file with chemistry parameters.

Surface characteristic parameters, including topographic elevation, Leaf Area Index (LAI), vegetative distribution, and water/land boundaries are input to CAMx via a land-use file. The land-use file provides the fractional contribution of 26 land-use categories per grid cell, as defined by Zhang et al (2003). The land use file was developed using version 3 of the Biogenic Emissions Land Use Database for areas outside the U.S. and the 2006 National Land Cover Dataset for the U.S. For Texas and surrounding states, updated land-use files developed by Texas A&M University (Popescu et al., 2012) were used. The land use file, in addition to the land-use categories, has LAI ratios. LAI is the ratio of total upper leaf surface of vegetation divided by the surface area of the land on which the vegetation grows. LAI is a dimensionless value, typically ranging from zero for bare ground to over seven for a dense forest. Monthly averaged LAI was created from the eight-day 1 km resolution MODIS MCD15A2 product.

Spatially resolved opacity and photolysis rates that are specific to the chemistry parameters for the CB6 mechanism are input to CAMx via a photolysis rates file and an opacity file. The chemistry parameters for the CB6 mechanism are provided in the

---

[21] User's Guide Comprehensive Air Quality Model with Extensions (CAMx), Version 6.30, Ramboll Environ, Inc., April 2016, available at http://www.camx.com/files/camxusersguide_v6-30.pdf

3-29

chemistry parameters file. Episode-specific satellite data from the Total Ozone Mapping Spectrometer were used to prepare the clear-sky photolysis rates and opacity files. Photolysis rates are internally adjusted by CAMx according to cloud and aerosol properties using the inline Tropospheric Ultraviolet Visible model.

The CAMx model configuration was applied to the 2012 base case using the episode-specific meteorological inputs, biogenic and anthropogenic emission inputs, and initial and boundary conditions described above. The CAMx modeling results were compared to the measured ozone and ozone precursor concentrations at all regulatory monitoring sites in the rpo_12km domain, which resulted in several modeling iterations to implement improvements to the meteorological modeling, emissions modeling, and subsequent CAMx modeling. Various configuration changes such as the choice of biogenic emission models, land-use model used in WRF modeling, impact of cloud assimilation, etc., were evaluated along with updates to various anthropogenic emissions categories.

Statistical metrics such as Mean Bias (MB), Mean Error (ME), Normalized Mean Bias (NMB), Normalized Mean Error (NME), and RMSE were calculated by comparing monitored (measured) and bi-linearly interpolated modeled ozone concentrations for all episode days and monitors. These statistical metrics were used to evaluate the different configurations and arrive at the final configuration used for the 2015 Ozone NAAQS Transport SIP revision.

Episode-wide model performance statistics and graphics for the final modeling configuration are presented below. Figure 3-26: *Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites* shows the mean bias for all the EPA Air Quality System (AQS)[22] monitoring sites for the May through September 2012 episode for days with observed Maximum Daily Average Eight-Hour (MDA8) ozone concentration greater than or equal to 60 ppb. Figure 3-26 shows that the mean biases for days with MDA8 greater than 60 ppb differ by region, with monitors along the East Coast showing positive bias while monitors on the West Coast show negative biases. Most monitors have a mean bias in the range of ± 5 ppb on high ozone days, which is acceptable model performance (Simon *et al.*,2012). Figure 3-27: *RMSE for May through September 2012 Episode at AQS Monitoring Sites* shows the RMSE for each of the AQS monitoring sites on days with observed MDA8 greater than 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, monitors along the northeast and the southwest coast had higher deviations with RMSE in the 16 to 20 ppb range. Table 3-7: *Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration* provides the statistical metrics for the May through September 2012 episode on days with observed MDA8 greater than 60 ppb for each of the NCDC Climate Regions.

---

[22] https://www.epa.gov/aqs



**Figure 3-26: Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites**



**Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites**

**Table 3-7: Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration**

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

Overall, the base case modeling showed reasonable model performance and is comparable with the EPA's modeling documented in the 2015 Transport NODA. Although the EPA had better performance in the Northeast climate region, in the South

3-32

climate region, which includes Texas and surrounding states, the TCEQ's modeling performed better than the EPA's. Detailed performance evaluation for the 2012 base case modeling episode is included in Appendix C: *Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard.*

## 3.2.4 Future Year Modeling

Future year modeling is used to predict ozone concentrations and calculate a $DV_F$ at each AQS monitor in the modeling domain in the future year, 2023. In future year modeling, the same modeling episode (May through September 2012) is used, but with projected future anthropogenic emissions. Future year modeling predicts the change in ozone concentrations due to changes in anthropogenic emissions in a future year while keeping the meteorological and natural emissions (biogenic and wildfires) inputs constant. Future year modeling answers the question: what would the ozone concentrations be in the future if the same meteorological conditions (that resulted in a high ozone episode in the past) were to repeat?

The meteorological inputs generated for May through September 2012 using the WRF model and described in section 3.2.3.1: *Meteorological Modeling* were used as inputs to the CTM in the future year modeling.

### 3.2.4.1 Emissions Modeling

For future year modeling, emissions inventories were developed for the anthropogenic emissions source categories by applying growth and control factors to base year emissions. Growth and control factors are developed based on the projected growth in the demand for goods and services, along with the reduction in emissions expected from state, local, and federal control programs. Figure 3-28: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by major geographic region on a representative 2023 summer weekday in tons per day. Figure 3-29: *Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category* shows the total projected anthropogenic precursor emissions in the rpo_12km domain by source category for a sample 2023 summer weekday in tons per day.

3-33



**Figure 3-28:  Future Year Representative Day Total Anthropogenic Precursor Emissions by Geographic Region**



**Figure 3-29:  Future Year Representative Day Total Anthropogenic Precursor Emissions by Source Category**

Since biogenic emissions are dependent upon the meteorological conditions on a given day, the same episode-specific emissions that were used in the base case modeling

<div style="text-align:center">3-34</div>

were also used in the 2023 future year modeling. Since future year wildfires cannot be predicted, the wildfire emissions inventory developed for the base case modeling was also used in the 2023 future year modeling. Details regarding the development of the 2023 emissions inventory, including projection tools, projection growth factors and federal/state/local rules and programs incorporated are provided in Appendix B.

## 3.2.4.2 Initial and Boundary Conditions

For future year modeling, updated 2023 initial and boundary conditions were developed by running GEOS-Chem again. The 2023 initial and boundary conditions were developed by using projected 2023 anthropogenic emissions inventories with the same GEOS-Chem meteorological and CTM configurations as the 2012 base case. The 2023 anthropogenic emissions were updated from the base year using projected growth factors. Emissions in North America (specifically, the continental U.S., southern Canada, and northern Mexico) were projected using the same methods used by the TCEQ to project anthropogenic emissions in the rpo_12km domain as explained in Appendix B. In all other areas of the GEOS-Chem domain, emissions projection factors from the Representative Concentration Pathway (RCP85) Database[23] were used to develop the 2023 anthropogenic emissions. Since the RCP85 data are only available at 5 or 10 year intervals (e.g., 2000, 2005, 2010, 2020, etc.), emission projections factors for 2023 were linearly interpolated from changes between the two nearest projection years. Details of the emissions projections methodology are available in the TCEQ Project FY2016-16 report *Updated Boundary Conditions for CAMx Modeling.*[24]

Figure 3-30: *2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-31: *2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day*, Figure 3-32: *2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day*, and Figure 3-33: *2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day* show samples of the 2023 east, west, north and south boundary conditions for July 18, 2012 episode day for the three-hour window of 12 p.m. to 3 p.m.

---

[23] https://tntcat.iiasa.ac.at/RcpDb/dsd?Action=htmlpage&page=welcome
[24] "Updated Boundary Conditions for CAMx Modeling", Nopmongcol *et al*, July 2016, https://www.tceq.texas.gov/assets/public/implementation/air/am/contracts/reports/pm/5821662241FY1615-20160729-environ-GEOSChem_BC_for_CAMx.pdf



**Figure 3-30: 2023 East Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-31: 2023 West Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-32: 2023 North Boundary Condition Cross-Section for July 18, 2012 Episode Day**



**Figure 3-33:  2023 South Boundary Condition Cross-Section for July 18, 2012 Episode Day**

3.2.4.3 Photochemical Modeling

For future year modeling, the 2023 anthropogenic emissions inventories were input along with the 2012 meteorological, biogenic, and wildfire emissions to the CAMx model configuration detailed in the section 3.2.3: *Base Case Modeling*. The output of the future year modeling, ozone concentrations for each grid cell in the rpo_12km domain, was post-processed to obtain the 2023 $DV_F$ at each AQS monitor in the rpo_12km domain.

*Projected Nonattainment Monitors*

The methodology described in EPA Modeling Guidance was used to determine the 2023 $DV_F$ at each monitor in the rpo_12km domain. A monitor's $DV_F$ is calculated by multiplying the Relative Response Factor (RRF) by a baseline year design value ($DV_B$) as shown in *Equation 3-1: Future Year Design Value Calculation for a Monitor.*

$$DV_F = RRF \times DV_B$$

**Equation 3-1: Future Year Design Value Calculation for a Monitor**

The RRF is the ratio of the average future year modeled MDA8 ozone concentrations to the average base year modeled MDA8 ozone concentrations on the top 10 modeled MDA8 base year days. In accordance with EPA Modeling Guidance, the maximum concentration of the three-by-three grid cell array surrounding each monitor on the top 10 base year days with modeled MDA8 above 60 ppb was used to calculate the RRF for each monitor. The $DV_B$ is the average of the regulatory design values for the three consecutive years containing the base year, as shown in Figure 3-34: *Baseline Design Value ($DV_B$) for the 2015 Ozone NAAQS Transport SIP.*

3-37



**Figure 3-34:  Baseline Design Value (DV$_B$) for the 2015 Ozone NAAQS Transport SIP Revision**

Figure 3-35: *2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain* shows a map of the rpo_12km domain with the 2023 DV$_F$ for each AQS monitor.

3-38



**Figure 3-35:  2023 Future Design Value (DV$_F$) for the AQS Monitors in the RPO_12km Domain**

*Projected Maintenance Monitors*

In Step 1, in addition to identifying the monitors projected to be in nonattainment in 2023 as described above, monitors projected to have maintenance issues were also identified. To identify monitors that could have maintenance issues in 2023, the TCEQ calculated Maintenance Future Year Design Values (MDV$_F$). The 2023 MDV$_F$ is calculated using the same equation presented in Equation 3-1, except that the DV$_B$ is the most recent, instead of the average, of the three regulatory design values containing the base year. Therefore, since 2012 is the base year, the 2014 design value that is the latest regulatory design value that contains the base year of 2012 is used as DV$_B$. For monitors with no regulatory 2014 design value, the 2013 or 2012 design values were used as applicable. The regulatory design values after 2014, namely 2015 and 2016, are not used since these design values do not include monitored data from the modeling base year of 2012.

The TCEQ's approach for identifying maintenance monitors differs from the approach used by the EPA in the 2015 Transport NODA. The EPA used the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$ to identify maintenance monitors. Both the EPA's approach and the TCEQ's approach account for three years of meteorological variability in their choice of DV$_B$ to identify maintenance monitors since a single design value is a three-year average of the annual fourth-highest MDA8 ozone concentration. The EPA's approach is to choose the maximum of the three consecutive regulatory design values containing the base year as the DV$_B$

3-39

while the TCEQ's approach is to choose the latest of the three consecutive regulatory design values containing the base year as the $DV_B$. For the reasons described below, the TCEQ determined that the selection of the most recent $DV_B$ addresses all issues relevant for an independent assessment of maintenance; and therefore, provides a comprehensive assessment of the potential impacts of Texas emissions on potential maintenance monitors.

The EPA's approach to identify maintenance monitors provides independent meaning to "maintenance" by choosing a $DV_B$ that is different from the $DV_B$ used in the identification of nonattainment monitors. As discussed previously, EPA chooses the maximum $DV_B$. The EPA justified this approach by inappropriately under-weighting the role of emissions reductions in the inter-annual variability of design values. Inter-annual variability in design values is mainly a function of both meteorology and emissions. By choosing the maximum $DV_B$, EPA provides less weight to the impact of emission reductions over time at a particular monitor, without justification. The EPA's approach under-emphasizes emissions reductions and future maintenance plan requirements that provide for attainment and maintenance. The EPA's approach assumes that inter-annual variability in design values is mainly attributable to meteorological conditions and any downward trend in design value is due to meteorology not being conducive to ozone formation.

Despite meteorological inter-annual variability there is a well-documented[25] nationwide decrease in ozone design values over time with many monitors attaining and maintaining ever-tightening standards. A nonattainment monitor progresses into maintenance through emissions reductions, not through weather modification. Even accounting for meteorological conditions, ozone formation has been on a downward trajectory in most parts of the country. As shown in Figure 3-6, which depicts the meteorologically adjusted ozone trends for the NCDC climate regions for May through September (ozone season) for years 2000 through 2016, a downward trend in meteorologically adjusted ozone (the blue line) in the later years can be seen for most regions. Table 3-8: *Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016* shows how many monitors had either a maximum or a minimum eight-hour ozone design value for each year from 2007 through 2016, with the five years that are included in the three consecutive regulatory design values containing the base year used in TCEQ's modeling shaded in light blue.

**Table 3-8: Maximum and Minimum Eight-Hour Ozone Design Values for All U.S. Monitors for Each Year from 2007 through 2016**

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|------|---------------------------------------------------------------|---------------------------------------------------------------|
| 2007 | 582 | 18 |
| 2008 | 106 | 4 |
| 2009 | 10 | 14 |
| 2010 | 24 | 67 |

---

[25] "Our Nation's Air – Status and Trends though 2015", Interactive web report available at https://gispub.epa.gov/air/trendsreport/2016/

3-40

| Year | Number of Monitors with Maximum Eight-Hour Ozone Design Value | Number of Monitors with Minimum Eight-Hour Ozone Design Value |
|---|---|---|
| 2011 | 5 | 44 |
| 2012 | 43 | 13 |
| 2013 | 18 | 47 |
| 2014 | 0 | 51 |
| 2015 | 6 | 362 |
| 2016 | 6 | 180 |

As seen in Table 3-8, the maximum design value occurs more often in the earlier years and the minimum design value occurs more often in later years, though not always the latest years. This further shows that ozone is decreasing despite changes in meteorology from year to year.

In addition, since the maximum design value in the set of three consecutive regulatory design values containing the base year tends to be the oldest design value, the EPA's choice for $DV_B$ can inappropriately emphasize ozone concentrations from the first year (which is farthest from the future year) of the five-year window through its contribution to the oldest of three design values.

The TCEQ approach provides independent meaning to maintenance monitors in a manner consistent with the FCAA's concept of maintenance areas as areas that were formerly in nonattainment and that have since attained the standard and will continue to maintain that status in the future because it accounts for both meteorological variability and the latest emissions impact on the monitor, which could be either increasing or decreasing. The concept of maintenance is forward looking and must account for meteorological variability, the emissions reductions that have occurred in the past (through the establishment of permanent and enforceable measures on major stationary sources and well as trends such as fleet turnover), and commitments regarding contingency measures to address future emission reductions necessary if the area violates the standard.

The EPA's approach would appear to be more appropriate if the goal is to maximize the likelihood that a monitor would attain the NAAQS in a particular future year, since ozone concentrations in a particular year are subject to random meteorological effects, but that is not the focus in the identification of maintenance monitors. Although meteorology plays a role in determining whether or not an attainment monitor maintains that status, the EPA's approach conflates two related but distinct concepts: the likelihood of *attaining* the standard in a future year and the ability of an attainment monitor to *maintain* that attainment status.

Since all nonattainment monitors are simultaneously maintenance monitors and any remedies devised to address nonattainment monitors would have to apply to maintenance monitors due to the overlapping nature of the two methods, another practical consequence of the EPA's approach is that it could easily lead to over-control as well as requiring upwind states to consider or implement controls when the downwind state in which the maintenance monitor is located does not have any obligations to control local emissions. Such an approach was already adopted in CSAPR

where the EPA treated maintenance monitors identically to the way it treated nonattainment monitors, both in linking states to specific monitors and devising emission limits for the linked states. This conflation of nonattainment and maintenance further results in there being effectively no independent meaning to "maintenance" as opposed to "nonattainment," contrary to *North Carolina v. Environmental Protection Agency,* 531 F.3d 896 (D.C. Cir. 2008) (*North Carolina*).

The TCEQ's recommended approach accounts for meteorological variability, while accounting for possible emissions reductions, since the latest design value itself consists of monitoring data from a three-year period. Using the latest of the three design values acknowledges the progress made by states but still accounts for any recent changes in ozone concentrations. The TCEQ method provides independent meaning of maintenance (*North Carolina*) in a manner that is consistent with the FCAA's concept of maintenance and without penalizing upwind states for old violations at monitors that have seen substantial reductions over a five-year period. By focusing on the latest design value, the approach also harmonizes the requirements of §175A, the maintenance plan requirement for areas that were formerly nonattainment with the requirements of FCAA, §110(a)(2)(D). Since the latest design value will reflect the current state of ozone concentrations in an area and the impact of any maintenance plans that are in place to prevent local emissions from causing an area to slip back into nonattainment, the TCEQ's approach will ensure that only monitors with maintenance issues that are truly driven by interstate transport are tagged as maintenance monitors. Due to the differences in the TCEQ's approach (including choice of base year) and the EPA's approach, the set of monitors projected to be maintenance in 2023 are, not unexpectedly, different from the monitors identified as maintenance monitors in the 2015 Transport NODA.

Figure 3-36: *2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain* shows the MDV$_F$ for all the AQS monitors in the rpo_12km domain.



**Figure 3-36:  2023 Maintenance Future Year Design Value (MDV$_F$) for the AQS Monitors in the RPO_12km Domain**

### 3.3 STEP 2: SOURCE APPORTIONMENT AND IDENTIFICATION OF DOWNWIND MONITORS TAGGED FOR FURTHER REVIEW

Section 3.2 detailed how photochemical modeling was used in the relative sense to identify monitors projected to be in nonattainment or have maintenance issues in 2023. In this section, details on Step 2 and the identification of the subset of monitors that might be impacted by Texas emissions from the approximately 1200 AQS monitors in the rpo_12km domain are presented. The subset of monitors tagged in Step 2 were further reviewed in Step 3 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at that monitor.

The Anthropogenic Culpability Precursor Analysis (APCA) tool was used to identify and tag the subset of downwind monitors that might be impacted by Texas emissions (and will be further reviewed in Step 3). APCA is a probing tool in CAMx that is used to apportion the modeled ozone concentration at each grid cell at each simulation hour to specific user-defined geographic regions and/or source categories. APCA does this by keeping track of the origin of the NO$_x$ and VOC precursors creating the ozone in each grid cell for each time step during the model run.

The APCA contribution categories chosen were to facilitate better understanding of interstate problems at the monitors within the rpo_12km domain. Since Step 2 is to identify monitors that might be impacted by Texas emissions, the TCEQ considered Texas anthropogenic emissions as a contribution category for this SIP revision. Anthropogenic emissions from other states in the continental U.S. were grouped together as one contribution category. Other contribution categories were chosen to

3-43

separate out the impacts of emissions that are not directly related to interstate problems such as biogenics, fires, ocean, etc. The following are source contribution categories that were used in the APCA model run:

- Texas Anthro – $NO_x$ and VOC emissions from Texas anthropogenic sources;

- Non-Texas U.S. Anthro – $NO_x$ and VOC emissions from anthropogenic sources in the 47 other states of the continental U.S.;

- Non-U.S. Anthro – $NO_x$ and VOC emissions from southern Canadian and northern Mexican anthropogenic sources included in the rpo_12km domain;

- Ocean Anthro – $NO_x$ and VOC emissions from ocean-going vessels and off-shore oil and gas platforms;

- Biogenic Emissions;

- Fires; and

- Initial and boundary conditions.

Figure 3-37: *APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP* shows a map of the APCA contribution categories with Texas in red, Non-Texas U.S. in pink, Non-U.S. in lavender, and Ocean in blue.

3-44



**Figure 3-37:  APCA Geographic Regions for the 2015 Ozone NAAQS Transport SIP Revision**

The outputs of an APCA model run are the total modeled hourly concentration and the breakdown of the total concentration by each user-specified contribution category for each grid cell of the domain for each hour of the episode. For example, as part of the 2023 APCA simulation, for cell index [242, 78], which contains the Manvel Croix monitor, the hourly modeled ozone concentration is 72.21 ppb on episode day July 14 at 12:00 p.m. Central Standard Time (CST). The total ozone concentration of 72.21 ppb in the cell is apportioned to the specified contribution categories as shown in Table 3-9: *Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution* Categories.

**Table 3-9:  Apportion of Total Ozone Concentration for cell index [242, 78] on episode day July 14 at 12:00 p.m. CST to Contribution Categories**

| Category | Contribution |
|---|---|
| Texas anthropogenic emissions | 48.41 |
| Non-Texas U.S. anthropogenic emissions | 0.72 |
| Non-U.S. anthropogenic emissions | 0.25 |
| Ocean anthropogenic emissions | 7.71 |
| Fire emissions | 0.32 |
| Biogenic emissions | 4.91 |
| Boundary conditions | 9.90 |

3-45

Figure 3-38: *Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST* is a graphical representation of the breakdown of the total hourly modeled concentration in the grid cell containing the Manvel Croix monitor on July 14 (contained within the red box) at 12:00 p.m. CST (identified by a gold star) by each APCA contribution category.



**Figure 3-38:  Breakdown of Total Hourly Modeled Ozone Concentration by APCA Contribution Categories for the Manvel Croix Monitor Grid Cell on July 14 at 12:00 p.m. CST**

In an APCA model run, the sum concentrations apportioned to each contribution category will always equal the total modeled concentration for each grid cell for each hour. APCA apportions ozone formed due to the interaction of biogenic and anthropogenic precursor emissions by recognizing that biogenic emissions as a non-controllable category. Therefore, APCA apportions/attributes ozone formed from such interactions to the anthropogenic precursor emissions. Details of how APCA results were used to tag downwind nonattainment and maintenance monitors for further review are presented in this section.

To identify nonattainment and maintenance monitors for further review, Texas contribution to the monitor's 2023 $DV_F$ (2023 $TX_{DVF}$) was evaluated. The following methodology was used to determine the 2023 $TX_{DVF}$.

1. Calculate the 2023 MDA8 total concentration for each grid cell for each episode day.

2. Calculate the 2023 MDA8 Texas contribution using the hourly apportioned concentration for Texas for each grid cell for each episode day, using contributions from the hours that comprised the MDA8 concentration for that day.

3. For each monitor, calculate the ratio of the average of the 2023 MDA8 Texas contribution to the average of the 2023 MDA8 total concentration from the same days and grid cells used in the 2023 $DV_F$ calculation for that monitor.

4. Calculate the 2023 $TX_{DVF}$ for each monitor by multiplying the 2023 $DV_F$ for that monitor by the ratio calculated in the previous step for that monitor.

3-46

In addition to determining $TX_{DVF}$, the contribution of each APCA category to the 2023 $DV_F$ for each AQS monitor in the rpo_12km domain was also calculated using the steps outlined above.

### 3.3.1 Identification of Nonattainment Monitors for Further Review

Two criteria were used to tag downwind nonattainment monitors for further review - a monitor's 2023 $DV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-10: *Downwind Nonattainment Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state and county, 2023 $DV_F$, and 2023 $TX_{DVF}$, of the downwind nonattainment monitors tagged for further review in Step 3.

**Table 3-10: Downwind Nonattainment Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 DV$_F$ (ppb) | 2023 TX$_{DVF}$ (ppb) |
|---|---|---|---|---|---|
| 80350004 | Chatfield State Park | Colorado | Douglas | 73 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 72 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 72 | 1.22 |
| 40038001 | Chiricahua National Monument | Arizona | Cochise | 71 | 1.06 |
| 60371201 | Reseda | California | Los Angeles | 80 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 80 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 87 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 88 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 84 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 71 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 76 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 91 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 82 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 94 | 0.74 |

### 3.3.2 Identification of Maintenance Monitors for Further Review

Two criteria were used to tag downwind maintenance monitors for further review – a monitor's 2023 $MDV_F$ is greater than or equal to 71 ppb and the monitor's 2023 $TX_{DVF}$ is greater than or equal to 0.7 ppb. Table 3-11: *Downwind Maintenance Monitors Tagged for Further Review*, sorted by state, provides details such as AQS ID, site name, state

and county, 2023 $MDV_F$, and 2023 $TX_{DVF}$, of the downwind maintenance monitors tagged for further review in Step 3.

**Table 3-11: Downwind Maintenance Monitors Tagged for Further Review**

| AQS ID | Site Name | State | County | 2023 $MDV_F$ (ppb) | 2023 $TX_{DVF}$ (ppb) |
|---|---|---|---|---|---|
| 80350004 | Chatfield State Park | Colorado | Douglas | 72 | 1.42 |
| 80590006 | Rocky Flats | Colorado | Jefferson | 73 | 1.26 |
| 80590011 | National Renewable Energy Labs-NREL | Colorado | Jefferson | 71 | 1.26 |
| 80690011 | Fort Collins-West | Colorado | Larimer | 71 | 1.22 |
| 80050002 | Highland Reservoir | Colorado | Arapahoe | 71 | 1.15 |
| 60371201 | Reseda | California | Los Angeles | 78 | 0.76 |
| 60371701 | Pomona | California | Los Angeles | 82 | 0.72 |
| 60376012 | Santa Clarita | California | Los Angeles | 86 | 0.9 |
| 60658001 | Rubidoux | California | Riverside | 85 | 0.73 |
| 60658005 | Mira Loma (Van Buren) | California | Riverside | 83 | 0.71 |
| 60710001 | Barstow | California | San Bernardino | 72 | 0.84 |
| 60710306 | Victorville-Park Avenue | California | San Bernardino | 77 | 0.81 |
| 60711004 | Upland | California | San Bernardino | 90 | 0.88 |
| 60714001 | Hesperia-Olive Street | California | San Bernardino | 79 | 0.86 |
| 60714003 | Redlands | California | San Bernardino | 91 | 0.74 |

Except for the Highland Reservoir (AQS ID: 80050002) monitor in Arapahoe County, Colorado, all the maintenance monitors are also nonattainment monitors.

In the 2015 Transport NODA, the EPA's modeling linked Texas to six monitors based solely because modeled contributions to a monitor's future year design value were greater than or equal to 0.7 ppb. Table 3 12: *Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA* shows the six monitors, the 2023 $DV_F$ and modeled Texas contributions to $DV_F$ from the EPA's modeling and the corresponding values determined using the TCEQ's modeling.

3-48

**Table 3-12: Monitors Linked to Texas by EPA Modeling in the 2015 Transport NODA**

| AQS ID | State | County | 2023 $DV_F$ in EPA Modeling (ppb) | 2023 $TX_{DVF}$ in EPA Modeling (ppb) | 2023 $DV_F$ TCEQ Modeling (ppb) | 2023 $TX_{DVF}$ in TCEQ Modeling (ppb) |
|---|---|---|---|---|---|---|
| 260050003 | Michigan | Allegan | 68.8 | 2.49 | 71 | 0.59 |
| 551170006 | Wisconsin | Sheboygan | 71.0 | 1.92 | 70 | 0.73 |
| 240251001 | Maryland | Harford | 71.3 | 0.91 | 65 | 0.69 |
| 360850067 | New York | Richmond | 71.2 | 0.77 | 62 | 0.67 |
| 361030002 | New York | Suffolk | 71.3 | 0.71 | 67 | 0.63 |
| 80590011 | Colorado | Jefferson | 69.7 | 1.03 | 71 | 1.26 |

There are significant though not unexpected differences between the TCEQ's modeling results and the EPA's modeling results. For example, in the EPA's modeling, five of the six monitors linked to Texas were located in Eastern states, whereas all the monitors tagged for further review by the TCEQ's modeling are located in Western states.[26] The differences are due to key changes the TCEQ made to modeling inputs, analysis, and methodologies to address several critical concerns with the EPA's modeling and approach in the 2015 Transport NODA, as discussed in this SIP revision as well as the TCEQ's comments on the 2015 Transport NODA. Some of the changes include a different base year, a different EGU projection tool, changes to the methodology used to identify maintenance monitors, and changes to the methodology used to calculate Texas' contribution to downwind monitors. These changes are appropriate since there are no regulatory requirements that specify required modeling parameters for transport analysis. Further, as stated by the EPA in the 2015 Transport NODA, "The EPA believes that states may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs…" (82 FR 1735); therefore, the TCEQ can make choices different than those made by the EPA as long as the modeling and analysis is technically justifiable. The TCEQ's modeling and analysis, though different from the EPA's modeling and analysis, are valid as they are within the CSAPR framework and follow sound scientific principles and the EPA Modeling Guidance, where applicable. Therefore, the TCEQ focused only on the monitors tagged for further review by TCEQ modeling and shown in Table 3-10 and Table 3-11 to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance.

The downwind nonattainment and maintenance monitors tagged for further review are in three states: Arizona, California, and Colorado. To aid further review and analysis of the tagged monitors, APCA runs were conducted with additional contribution categories: California Anthro, Colorado Anthro, New Mexico Anthro, Kansas Anthro, Nebraska Anthro, Wyoming Anthro, Utah Anthro, California Anthro, Arizona Anthro, Nevada Anthro and Oregon Anthro. Figure 3-39: *Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors* shows all the geographic contribution regions used in the APCA runs for this 2015 Ozone NAAQS Transport SIP revision.

---

[26] Per the EPA, Eastern states include all states from Texas northward to North Dakota and eastward to the East Coast while the Western states include the 11 western contiguous states of Arizona, California, Colorado, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, and Wyoming (FR 82, 1737).



**Figure 3-39:  Map of Additional APCA Geographic Regions Based on Location of Tagged Monitors**

### 3.4 STEP 3: ANALYSIS TO DETERMINE IF TEXAS EMISSIONS CONTRIBUTE SIGNIFICANTLY TO NONATTAINMENT OR INTERFERE WITH MAINTENANCE AT TAGGED MONITORS

This section describes the analysis used to determine whether Texas emissions significantly contribute to nonattainment or interfere with maintenance at the sixteen downwind monitors that were tagged for further review in Step 2. To make this determination, a weight-of-evidence approach was used. Interstate transport is a complex problem and a nuanced approach that takes into consideration the factors relevant to the ozone conditions at the tagged monitors is required. Examples of factors considered include the current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, and the number of days with elevated ozone (observed and modeled).

Since there could be considerable variation in the characteristics of the ozone problem at each monitor, not all factors were considered or analyzed for every monitor. In addition, the use of 1% of the NAAQS threshold for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS since the more stringent 0.7 ppb threshold is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling (Simon *et al.*, 2012). The Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution **on several days with elevated**

**ozone**. Analysis is presented for each state with a tagged downwind monitor in the following sections.

### 3.4.1 Colorado Monitors

Modeling tagged four Colorado nonattainment monitors, as shown in Table 3-10, for further review. In addition to these monitors, modeling also tagged one Colorado maintenance monitor, the Highland Reservoir (AQS ID 080050002) monitor, as shown in Table 3-11 for further review.

Results of in-depth analysis leads to the conclusion that Texas emissions do not contribute to nonattainment or interfere with maintenance at the five Colorado monitors tagged for further review. The conclusion is based on design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, the collective interstate contribution to the future design values, and the responsiveness to Texas emissions at these monitors. Details of the analysis are presented in the following sections.

3.4.1.1 Eight-Hour Ozone Design Value Trends

Eight-hour ozone design value trends at the tagged monitors, along with the other monitors in the Denver-Aurora combined statistical area (CSA), are displayed in Figure 3-40: *Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area*. The Colorado monitors tagged for further review are highlighted in color while the other monitors in the Denver-Aurora CSA are in gray. The four nonattainment monitors tagged for further review have the highest eight-hour ozone design values in the Denver-Aurora CSA, ranging from 80 ppb at National Renewable Energy Labs to 75 ppb at Fort Collins West. The tagged maintenance monitor does not have valid eight-hour ozone in 2016, but its last valid eight-hour ozone design value, 79 ppb in 2013, was one of the five highest eight-hour ozone design values for that year. All other monitors except one, the Welch monitor, in the Denver-Aurora area, have eight-hour ozone design values below the 2015 ozone NAAQS. Overall, eight-hour ozone design values in the Denver-Aurora area have been decreasing from 2007 through 2016. Decreases observed are modest, ranging from a 2% to 10%.



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

3.4.1.2 Monitored Elevated Ozone Days

To investigate the contribution of Texas emissions to ozone at the tagged Colorado monitors, days that had elevated ozone at each of the five tagged monitors were identified. Any day with a monitored daily maximum eight-hour average ozone concentration greater than 70 ppb was considered an elevated ozone day. From 2012 through 2016 the number of elevated ozone days at the Colorado monitors ranged from a high of 116 days at Rocky Flats to a low of 46 days at Highland Reservoir. In order to better characterize the ozone problem at the Colorado monitors and have more days with elevated ozone, the number of years evaluated was increased from five to ten. Using ten years of data more than doubled the number of elevated ozone days at some of the monitors, with a high of 237 days at Rocky Flats and a low of 78 days at Highland Reservoir. The number of elevated ozone days at each tagged monitor from the past 10 years is shown in Figure 3-41: *Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016*. Figure 3-41 shows that the five monitors seem to have similar trends with varying levels of severity. Trends in elevated ozone days overall appear to be decreasing, with a peak occurring in 2012. Over the past 10 years, all five tagged monitors in Colorado observed the highest number of elevated ozone days in 2012. The Rocky Flats monitor historically observed the most elevated ozone days until the most recent two years (2015 and 2016), when the National Renewable Energy Labs monitor observed the highest number of elevated ozone days.

3-52



**Figure 3-41:  Number of Elevated Eight-Hour Ozone Days at the Tagged Colorado Monitors for the years 2007 through 2016**

3.4.1.3 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) back trajectory model was used to run 72-hour back trajectories for each elevated ozone day at each tagged monitor. A test run of back trajectories for the top 10 modeled high ozone days showed that some endpoints reached Texas only after 72 hours; therefore, it was determined that 72 hours was an appropriate length of time to determine whether air from Texas reaches Colorado on a given day. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to Colorado, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in Colorado. The filtering criteria ensured that the back trajectories used were those that capture air that would affect the ground level monitor. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are

summarized in Table 3-13: *Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor.*

**Table 3-13: Number of HYSPLIT Back Trajectories at Each Tagged Colorado Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|---|---|---|---|---|
| 80050002 | Highland Reservoir | 282 | 189 | 67% |
| 80350004 | Chatfield State Park | 594 | 367 | 62% |
| 80590006 | Rocky Flats | 846 | 578 | 68% |
| 80590011 | National Renewable Energy Labs-NREL | 624 | 380 | 61% |
| 80690011 | Fort Collins-West | 663 | 434 | 65% |

The filtered back trajectories are displayed on the map in Figure 3-42: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors.* For a trajectory (whether run forward or backward in time), the estimated location of the air parcel during each hour of the trajectory is referred to as an endpoint. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any detail for specific trajectories in the Colorado area, the map shows back trajectory end points that end in Texas. Out of the 1,948 back trajectories with 134,185 endpoints displayed in Figure 3-42, 116 back trajectories (6%) with a total of 2,019 endpoints (1.5%) reach Texas. Of those 2,019 endpoints, 912 are located within the mixing layer over Texas, meaning 0.68% of endpoints are located within the Texas mixing layer.

3-54



**Figure 3-42:  HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged Colorado Monitors**

Although most back trajectories do not reach Texas on elevated ozone days in Colorado, further analysis was necessary to indicate whether the days where trajectories that reached Texas had a significant impact on ozone levels in Colorado. To investigate further, the number of trajectories to reach Texas from Colorado were calculated for each year from 2007 through 2016. The number of trajectories reaching Texas from each monitor were then compared to the number of elevated eight-hour ozone days for each year. The results are shown in Figure 3-43: *Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor.* Figure 3-43 shows that the number of trajectories that reach Texas from Colorado varies by year. Most years from 2007 through 2016 show fewer than five, and some show zero trajectories that reach Texas. Of the trajectories that reach Texas from Colorado, 66% occurred during 2011 and 2012. This spike does not appear to be a pattern that repeats frequently. There were also many more elevated eight-hour ozone days observed in 2012 compared to other years. This may indicate that there were some unusual meteorological patterns that occurred that year that caused a more severe ozone season. There are years where few, if any, trajectories reach Texas and the number of elevated ozone days still remained high. For example, National Renewable Energy Labs had over 15 elevated eight-hour ozone days in 2007, 2008, 2015, and 2016, but only one trajectory reached Texas over those four years combined.

3-55



**Figure 3-43: Number of Trajectories that Reach Texas and the Number of Elevated Eight-Hour Ozone Days at Each Tagged Colorado Monitor**

While the number of elevated ozone days can indicate the severity of an ozone season, the fourth-highest eight-hour ozone concentrations provide more information on how close the area is to attaining the standard. The fourth-highest eight-hour ozone values at the tagged Colorado monitors, along with the number of trajectories that reach Texas each year, are shown in Figure 3-44: *Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas*. Overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased. The increase in trajectories that reach Texas in 2012 did not appear to increase the fourth-highest eight-hour ozone values at the tagged Colorado monitors much, if at all. The fourth-highest eight-

3-56

hour ozone values in 2015 and 2016 remained above 70 ppb, even though those years observed no trajectories that reached Texas.



**Figure 3-44: Fourth-Highest Eight-Hour Ozone and the Number of Trajectories that Reach Texas**

In summary, trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes, that start within Colorado's

3-57

mixing layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. Those filters showed that 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas. Further analysis of the trajectories by year showed that 66% of days where trajectories reached the Texas mixing layer occurred in 2011 and 2012. There are many years where no trajectories reach Texas from Colorado. In the years where no trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. Most importantly, the latest data (2015 and 2016) indicate that Texas was not upwind during any elevated ozone days at any of the five sites shown in Figure 3-44. Although air from Texas can reach Colorado, the air from Texas does not appear to significantly affect the ozone concentrations.

### 3.4.1.4 Texas Contributions on Projected Future Year Elevated Ozone Days

The previous sections showed that although there is possible transport of air parcels from Texas to the Colorado monitors on some historical monitored elevated ozone days, the probability of such transport is small. In addition to monitored elevated ozone days in the past, contributions from Texas on projected future year elevated ozone days were also evaluated. The subset of 2023 days with modeled MDA8 greater than 70 ppb was identified, and the average modeled Texas contributions for this subset of days were computed. Table 3-14: *Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged Colorado monitors, and the percentage of Texas contribution in the MDA8s.

**Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors**

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

Table 3-14 shows that for the Colorado monitors, the expected average Texas contribution on projected future elevated ozone days is a small percentage of the projected average MDA8 on these days. The expected impact is not significant, since the average contribution is less than one ppb on very few days, especially when considering the uncertainties associated with model predictions.

3.4.1.5 Collective Interstate Contribution to the Future Design Value

The EPA has maintained that the nature of the interstate transport problem varies between the western and eastern states. In the EPA's 2015 Transport NODA, the EPA states "While the 1 percent screening threshold has been traditionally applied to evaluate upwind state linkages in eastern states where such collective contribution was identified, the EPA noted in the CSAPR Update Rule for the 2008 ozone NAAQS that, as to western states, there may be geographically specific factors to consider in determining whether the 1 percent screening threshold is appropriate. For certain receptors, where the collective contribution of emissions from one or more upwind states may not be a considerable portion of the ozone concentration at the downwind receptor, the EPA and states have considered, and could continue to consider, other factors to evaluate those states' planning obligation pursuant to the Good Neighbor provision" (FR 82, 1740). Although the TCEQ does not believe that 1% of the NAAQS is an appropriate threshold for determining significant contribution, it agrees that the collective contribution of interstate transport is an important factor in the overall evaluation. The EPA defines collective contribution as "...the total upwind states' contribution to ozone concentration (from linked[27] and unlinked states) based on modeling..."

The EPA has stated that the collective contribution metric is important to determine if interstate transport is a significant contributor to a monitor's nonattainment or maintenance problems.[28] The collective interstate contribution to the 2023 $DV_F$ for the tagged Colorado monitors was calculated. Table 3-15: *Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the five tagged Colorado monitors.

---

[27] The EPA uses the term "linked" to refer to downwind monitors that have contributions to future design value greater than 1% of the NAAQS from an upwind state.

[28] In approving Nevada's Inter-State Transport SIP the EPA states "One such factor that the EPA considers relevant to determining the nature of a projected receptor's interstate transport problem is the magnitude of ozone attributable to transport from all upwind states collectively contributing to the air quality problem" (81 FR 87859).

**Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors**

| Site Name | AQS ID | Percentage of 2023 $DV_F$ from Background Contribution | Percentage of 2023 $DV_F$ from Collective Interstate Contribution | Percentage of 2023 $DV_F$ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

The collective interstate contribution at tagged Colorado monitors ranges from 9.32% to 10.27%. It is a small percentage and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%.[29] A significant portion of the tagged Colorado monitors' 2023 $DV_F$ is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions).

### 3.4.1.6 Direct Decoupled Method and Analysis of MDA8 Ozone Responsiveness to Texas Emissions

Direct Decoupled Method (DDM)[30] is a probing tool available in CAMx that estimates the responsiveness of ozone formation to small changes in any input parameter. The DDM method calculates for each grid cell in the domain for each simulation hour the first-order differential for ozone formation due to changes in a specific input parameter(s). DDM results can explain the responsiveness of ozone formation due to marginal changes of any input parameter. DDM results should be interpreted with care, since the method only calculates the first-order differential which assumes a linear response. Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation.

DDM was used to gauge the responsiveness of ozone formation to Texas $NO_x$ emissions at the tagged Colorado monitors. For regional ozone problems and long-range transport, $NO_x$ emissions play a major role. As part of the CSAPR final rule the EPA stated, "Authoritative assessments of ozone control approaches have concluded that, for reducing regional scale ozone transport, a $NO_x$ control strategy is most effective, whereas VOC reductions are generally most effective locally, in more dense urbanized areas" (76 FR 48222). For these reasons, the TCEQ focused on Texas $NO_x$

---

[29] "Technical Support Document Evaluation of the Arizona Infrastructure SIP for 2008 O3 Transport (CAA 110(a)(2)(D)), U.S. EPA, Region 9, March 15, 2016, page 8 and footnotes 26 and 27.
[30] CAMx User Guide, page 177 available at http://www.camx.com/files/camxusersguide_v6-40.pdf

3-60

emissions while using DDM to evaluate the responsiveness of ozone formation at the tagged Colorado monitors.

Because it is resource intensive to use the DDM tool, it was run for a subset of the episode months, July and August, for the 2023 future year. July and August were chosen because they had the highest number of the top 10 days that went into the 2023 $DV_F$ calculation for the tagged Colorado monitors. In addition to responsiveness to Texas $NO_x$ emissions, responsiveness to Colorado $NO_x$ emissions was also calculated at the tagged monitors. Since DDM calculates the responsiveness of ozone to $NO_x$ emissions, the DDM values can be negative, indicating the destruction of ozone due to $NO_x$ titration.

A series of figures showing the DDM results for each of the tagged Colorado monitors are presented below. Each figure depicts, for every hour of every day for the July and August episode months, the 2023 modeled eight-hour average of ozone responsiveness at a tagged monitor to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources excluding boundary conditions ("Other $NO_x$" emissions) as line graphs in blue, purple, and orange, respectively. The ozone responsiveness in ppb is shown on the primary axis to the left. In addition to the hourly eight-hour average ozone responsiveness, each figure has the hourly modeled 2023 eight-hour average ozone concentration in ppb for the July and August episode months, depicted by a green line graph with circle markers on the secondary axis to the right. The 2015 ozone NAAQS is shown as a black line. Both the ozone responsiveness and the modeled ozone are from the grid cell where the monitor is located.

Figure 3-45: *DDM Responsiveness of Ozone in July 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources (excluding boundary conditions) in the rpo_12km domain for the month of July.



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In the month of July, Highland Reservoir (AQS ID: 80050002) had two elevated ozone days (July 11 and 22) and on both days, the modeled eight-hour ozone at the monitor is significantly more responsive to Colorado $NO_x$ and "Other $NO_x$" emissions than to Texas $NO_x$ emissions. This is a critical observation because the responsiveness of

3-61

ozone at this monitor to Texas $NO_x$ emissions remains flat throughout the month with little change between days with and without elevated ozone.

Figure 3-46: *DDM Responsiveness of Ozone in August 2023 at Highland Reservoir* shows the responsiveness of ozone at the Highland Reservoir monitor (AQS ID: 80050002) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of August.



**Figure 3-46:  DDM Responsiveness of Ozone in August 2023 at Highland Reservoir**

Similar to the July results, the responsiveness of eight-hour ozone to Texas $NO_x$ emissions at Highland Reservoir (AQS ID: 80050002) is near zero and stays flat in the month of August. Figure 3-45 and Figure 3-46 show that the modeled eight-hour ozone at Highland Reservoir (AQS ID: 80050002) is not responsive to Texas $NO_x$ emissions, during the period studied.

Figure 3-47: *DDM Responsiveness of Ozone in July 2023 at Chatfield State Park* shows the responsiveness of ozone at Chatfield State Park (AQS ID 80350004) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the month of July while Figure 3-48: *DDM Responsiveness of Ozone in August 2023 at Chatfield State Park* does the same for the month of August. Chatfield State Park has fewer elevated ozone days than Highland Reservoir but shows a similar pattern of very limited responsiveness to Texas $NO_x$ emissions.



**Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**



**Figure 3-48: DDM Responsiveness of Ozone in August 2023 at Chatfield State Park**

Figure 3-49: *DDM Responsiveness of Ozone in July 2023 at Rocky Flats* and Figure 3-50: *DDM Responsiveness of Ozone in August 2023 at Rocky Flats* show the responsiveness of ozone at Rocky Flat (AQS ID: 80590006) to Texas $NO_x$ emissions, Colorado $NO_x$ emissions, and $NO_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively.

Rocky Flats (AQS ID: 80590006) shows a small (approximately 2 ppb) responsiveness to Texas $NO_x$ emissions in mid to late July. However, when ozone at the monitor is responsive to Texas $NO_x$ emissions, elevated ozone was not observed except for a minor response on one day, July 23.



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50:  DDM Responsiveness of Ozone in August 2023 at Rocky Flats**

Figure 3-51: *DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL* and Figure 3-52: *DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL* show the responsiveness of ozone at National Renewable Energy Labs – NREL (AQS ID: 80590011) to Texas NO$_x$ emissions, Colorado NO$_x$ emissions, and NO$_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. In this case, there appears to be some minor responsiveness to Texas' NO$_x$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied the degree of responsiveness is overwhelmed by the responsiveness to Colorado NO$_x$ and "Other NO$_x$" emissions.



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**

Figure 3-53: *DDM Responsiveness of Ozone in July 2023 at Fort Collins-West* and Figure 3-54: *DDM Responsiveness of Ozone in August 2023 at Fort Collins-West* show the responsiveness of ozone at Fort Collins-West (AQS ID: 80690011) to Texas NO$_x$ emissions, Colorado NO$_x$ emissions, and NO$_x$ emissions from other sources in the rpo_12km domain (excluding boundary conditions) for the months of July and August, respectively. At Fort Collins-West the highest ozone days recorded in July or August were well below 71 ppb, so while ozone peak concentrations showed marginal responsiveness to Texas NO$_x$ emissions on a few days, clearly there was no significant contribution during this period.

3-65



**Figure 3-53:  DDM Responsiveness of Ozone in July 2023 at Fort Collins-West**



**Figure 3-54:  DDM Responsiveness of Ozone in August 2023 at Fort Collins-West**

Both at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Fort Collins-West (AQS ID: 80690011), the same pattern of ozone responsiveness to Texas $NO_x$ emissions as the other three tagged Colorado monitors was observed.

In summary, though the DDM analysis may on occasion exhibit a limited responsiveness (two ppb or less) to Texas $NO_x$ emissions at the tagged Colorado monitors, the instances where this occurs are infrequent and rarely coincide with elevated ozone. Of the 62 days that DDM was estimated, the number of days that met the condition of having elevated ozone (MDA8 greater than 70 ppb) and appreciable responsiveness (greater than 1 ppb) ranged from three days at National Renewable Energy Labs-NREL (AQS ID: 80590011) and Rocky flats (AQS ID: 80590006) to zero days at Fort Collins-West (AQS ID: 80690011). In virtually all events, responsiveness to Texas $NO_x$ emissions is dwarfed by that of Colorado $NO_x$ and "Other $NO_x$" emissions.

3.4.1.7 Conclusion of Weight-of-Evidence Analysis of the Tagged Colorado Monitors

Analysis of the design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, total interstate contribution, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_x$ emissions leads to the

3-66

conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

### 3.4.2 Arizona Monitor(s)

Modeling tagged the Chiricahua National Monument (AQS ID: 040038001) monitor in Cochise County, Arizona as a nonattainment monitor with a $TX_{DVF}$ of 1.06 ppb. A survey of the monitor's recent design values shows that the monitor is currently attaining the 2015 eight-hour ozone NAAQS with a design value of 68 and 65 ppb in 2015 and 2016, respectively. In addition, the monitor has never been designated a nonattainment monitor and has been in attainment of both the 1997 and 2008 eight-hour ozone standards. Figure 3-55: *Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)* shows the design value trends for the monitor.



**Figure 3-55:  Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Since the monitor is already in attainment of the 2015 Eight-Hour Ozone NAAQS, it can be concluded that emissions from Texas do not significantly contribute to nonattainment at this downwind monitor. As detailed in subsection 2.3.2, *Historical Emissions Inventory Trends*, anthropogenic ozone precursor emissions in Texas have decreased significantly due to several federal, state, and local regulations. Since ozone precursor emissions in Texas, particularly $NO_x$, are projected to stay capped or decrease and the design value at this monitor is currently significantly below the 2015 ozone NAAQS (65 ppb in 2016), emissions from Texas are not expected to interfere with maintenance of the 2015 ozone NAAQS.

### 3.4.3 California Monitors

Modeling tagged 10 monitors in California, as shown in Table 3-10 and Table 3-11, for further review to determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the

monitors. The tagged monitors are in the Los Angeles-South Coast Air Basin (South Coast) and the Los Angeles–San Bernardino (Western Mojave Desert) nonattainment areas.

After extensive analysis, it was concluded that Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 California monitors tagged in Step 2. Analysis included review of the conceptual model developed by the South Coast Air Basin for eight-hour ozone at these monitors, and considered design value trends, number of monitored elevated ozone days, back trajectory analysis on elevated ozone days, average modeled contributions from modeled future elevated ozone days, and the collective interstate contribution to the future design values at these monitors. Details of the analysis are presented in the following sections.

### 3.4.3.1 Conceptual Model of Eight-Hour Ozone Formation at Tagged California Monitors

Both the South Coast and the Western Mojave Desert nonattainment areas have had persistent nonattainment issues and have been designated nonattainment for every federal one-hour and eight-hour ozone NAAQS (1997 and 2008). The ozone problems in the Western Mojave Desert nonattainment area are largely due to transport from the South Coast and San Joaquin Valley.[31] For the South Coast nonattainment area, the EPA,[32] quoting the South Coast Air Quality Management District, described the meteorological conditions that would contribute to ozone formation as follows:

> "The topography and climate of Southern California combine to make the Basin an area of high air pollution potential. During the summer months, a warm air mass frequently descends over the cool, moist marine layer produced by the interaction between the ocean's surface and the lowest layer of the atmosphere. The warm upper layer forms a cap over the cool marine layer and inhibits the pollutants in the marine layer from dispersing upward. In addition, light winds during the summer further limit ventilation. Furthermore, sunlight triggers the photochemical reactions which produce ozone. The region experiences more days of sunlight than any other major urban area in the nation except Phoenix."

> "The Basin's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. The average wind speed for Los Angeles is the lowest of the nation's ten largest urban areas. In addition, the summertime maximum mixing height (an index of how well pollutants can be dispersed vertically in the atmosphere)

---

[31] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –San Bernardino Counties (West Mojave Desert), pages 7 and 8 of 11. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf

[32] "Technical Support Document for 2008 Ozone NAAQS Designations", Technical Analysis for Los Angeles –South Coast Air Basin, page 7 of 13. Accessed 8/22/2017 at https://www3.epa.gov/region9/air/ozone/pdf/R9_CA_AllTechAnalyses_FINAL2.pdf

in Southern California averages the lowest in the U.S. The Southern California area is also an area with abundant sunshine, which drives the photochemical reactions which form pollutants such as ozone. In the Basin, high concentrations of ozone are normally recorded during the spring and summer months."

### 3.4.3.2 Eight-Hour Ozone Design Value Trends

Eight-hour ozone design value trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA are displayed in Figure 3-56: *Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area*. The tagged California monitors are highlighted in color while the other monitors in the Los Angeles CSA are in gray. The 10 monitors tagged in Step 2 had eight-hour ozone design values, ranging from 101 ppb to 80 ppb in 2016. The Los Angeles CSA had design values ranging from 108 ppb to 63 ppb in 2016, and thus, none of the 10 tagged monitors recorded the highest eight-hour ozone design value for the CSA in 2016. Eight-hour ozone design values in the area have decreased overall for the past 10 years. The 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).



**Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area**

3-69

### 3.4.3.3 Monitored Elevated Ozone Days

To investigate the Texas contribution to ozone in California, days that had elevated ozone were identified at each of the 10 monitors tagged in Step 2. Any day with a monitored MDA8 ozone concentration greater than 70 ppb was considered an elevated ozone day. The number of elevated ozone days at each tagged monitor from the past five years is shown in Figure 3-57: *Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors*. As Figure 3-57 shows, the trends in the number of elevated ozone days at the 10 monitors vary. Trends in elevated ozone days overall appear to be flat. The Redlands (AQS ID: 60714003) monitor consistently observed the largest number of elevated ozone days, which ranged from a low of 76 days in 2015 to a high of 98 days in 2012. The Pomona (AQS ID: 60371701), Barstow (AQS ID: 60710001), and Reseda (AQS ID: 60371201) monitors observed the least number of elevated ozone days in the area, with Barstow (AQS ID: 60710001) observing only 18, the lowest number, of elevated ozone days in 2015.



**Figure 3-57:  Number of Elevated Eight-Hour Ozone Days at the Tagged California Monitors for the years 2012 through 2016**

### 3.4.3.4 Back Trajectory Analysis on Elevated Ozone Days

The elevated ozone days identified in the previous section were used as a starting point to examine back trajectories from the tagged monitors. NOAA's HYSPLIT back trajectory model was used to run 72-hour back trajectories for each elevated ozone

day at each tagged monitor. The time of daily maximum one-hour ozone on the elevated eight-hour ozone day was used as the starting hour for each trajectory. If the maximum one-hour ozone occurred over multiple hours, then multiple trajectories were run, using each different hour as the starting hour. Three starting heights were used, 500 m AGL, 1000 m AGL, and 1500 m AGL.

To look for probable cases where pollution from Texas was transported to California, back trajectories were filtered for the following two conditions: back trajectories that did not hit the surface (zero m AGL) at any time during the 72-hour run, and back trajectories that started within the HYSPLIT calculated mixing layer in California. The conceptual model of ozone formation outlined for these monitors discusses the significance of the mixing layer height. Per the conceptual model, the area has very low mixing heights and a low-level subsidence inversion that prevents air transported into the basin from mixing to the surface. The filtering criteria ensured that the back trajectories used are those that capture air that would affect the ground level monitor. Due to the geography and topography of the Los Angeles area, many back trajectories hit the ground after several hours back. In addition, on many days, the mixing layer at the tagged monitors was below 1,000 m AGL, which eliminated the trajectories that were run at higher altitudes. The total number of HYSPLIT back trajectories and the number of trajectories that meet the filtering criteria are summarized in Table 3-16: *Number of HYSPLIT Back Trajectories at Each Tagged California Monitor.*

**Table 3-16: Number of HYSPLIT Back Trajectories at Each Tagged California Monitor**

| AQS ID | Site Name | Number of Back Trajectories | Number of Back Trajectories that Meet Filter Criteria | Percent of Back Trajectories that Meet Filter Criteria |
|---|---|---|---|---|
| 60371201 | Reseda | 447 | 45 | 10% |
| 60371701 | Pomona | 567 | 44 | 8% |
| 60376012 | Santa Clarita | 1011 | 155 | 15% |
| 60658001 | Rubidoux | 936 | 201 | 21% |
| 60658005 | Mira Loma (Van Buren) | 894 | 0 | 0% |
| 60710001 | Barstow | 504 | 228 | 45% |
| 60710306 | Victorville-Park Avenue | 750 | 259 | 35% |
| 60711004 | Upland | 960 | 90 | 9% |
| 60714001 | Hesperia-Olive Street | 939 | 244 | 26% |
| 60714003 | Redlands | 1371 | 394 | 29% |

A large number of back trajectories were run for each tagged monitor, as shown in Table 3-16; however, few of the back trajectories met the filter criteria. One monitor, Mira Loma (AQS ID: 60658005) had no back trajectories out of 894 that met the criteria. These results show the difficulty in simulating conditions where an air parcel travels from Texas and ends within the mixing layer of the Los Angeles area on an

elevated ozone day. This may indicate that there are not many situations when air from Texas travels to the mixing layer over Los Angeles.

The endpoints for the filtered back trajectories are displayed on the map in Figure 3-58: *HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors*. The green endpoints represent an air parcel that is located above the mixing layer while the purple endpoints represent an air parcel that is located within the mixing layer. It is important to know which endpoints are located within the mixing layer because an endpoint in the mixing layer would demonstrate a clearer case of emissions at that location being transported to the starting location. Although it is difficult to see any trajectory detail in the California area, the map clearly shows very few back-trajectory end points end in Texas. Out of the 1,660 back trajectories with 113,467 endpoints displayed in Figure 3-58, only 10 back trajectories with a total of 59 endpoints reach Texas. Of those 10 back trajectories, only 2 back trajectories and 4 endpoints are located within the mixing layer over Texas. Of those two back trajectories that span from California to the mixing layer over Texas, one started at the Rubidoux (AQS ID: 60658001) monitoring site and the other started at the Upland (AQS ID: 60711004) monitoring site. This represents 0.3% of the elevated ozone days from 2012 through 2016 at each monitor.

3-72



**Figure 3-58: HYSPLIT Back Trajectory Endpoints that Meet Filter Criteria from the Tagged California Monitors**

While it appears that air from Texas can reach the Los Angeles area, based upon trajectory analysis, this transport seems to occur very infrequently.

In summary, trajectory analysis of transport from Texas to Los Angeles indicates that emissions from Texas are very unlikely to affect ozone concentrations in the mixing layer over Los Angeles on high ozone days. Although trajectory analysis can have uncertainty (Stein et al. 2017), the large data set examined greatly reduces the uncertainty related to small sample sizes. Filtering the back trajectories by only looking at trajectories during elevated ozone episodes that start within California's mixing layer, do not hit the surface, and have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas could affect the ozone in California. Those filters showed that only 0.03% of days were affected at the Rubidoux and Upland monitors; therefore, Texas does not appear to hinder California's progress toward attaining the 2015 ozone NAAQS.

3.4.3.5 Texas Contributions on Projected Future Year Elevated Ozone Days

Contributions from Texas to projected future year elevated ozone days at the tagged California monitors were evaluated. Similar to the analysis for Colorado monitors, the

3-73

subset of 2023 days with modeled MDA8 greater than 70 ppb was identified and the average modeled Texas contributions for this subset of days for each of the 10 tagged California monitors was computed.

Table 3-17: *Modeled Elevated Ozone Days in the Future Year* shows the number of days with modeled MDA8 greater than 70 ppb, the average eight-hour Texas ozone contribution, the average MDA8 for each of the tagged California monitors, and the percentage of Texas contribution to the MDA8s.

**Table 3-17: Modeled Elevated Ozone Days in the Future Year**

| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
|---|---|---|---|---|---|
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.23 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

Table 3-17 shows that the calculated average Texas contribution on projected future elevated ozone days is less than 1% of the projected average MDA8 at all of the monitors on these days.

### 3.4.3.6 Collective Interstate Contribution to the Future Design Value

The TCEQ calculated the collective interstate contributions[34] to the future design values for the tagged California monitors. Table 3-18: *Collective Interstate Contributions to Future Design Values at Tagged California Monitors* provides the percentage of interstate, intra-state, and background contributions to the future design values at the 10 tagged California monitors.

---

[33] The average Texas contribution on Future Elevated Ozone days for this monitor was 0.00035 ppb which was rounded to 0.00 ppb.
[34] The collective contribution metric was calculated using the same methodology as used to calculate Texas contribution in section 3.3.

**Table 3-18:  Collective Interstate Contributions to Future Design Values at Tagged California Monitors**

| AQS ID | Site Name | Percentage of 2023 DV$_F$ from Background Contribution | Percentage of 2023 DV$_F$ from Collective Interstate Contribution | Percentage of 2023 DV$_F$ from Intra-State Contribution |
|--------|-----------|---------|---------|---------|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.22% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 58.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.55% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

### 3.4.3.7 Conclusion of the Weight-of Evidence Analysis of the Tagged California Monitors

Based on the detailed analysis at the tagged California monitors, the design value trends, back trajectory analysis on elevated ozone days, average Texas modeled contributions on projected future elevated ozone days, and collective interstate contributions to future design values, Texas emissions do not significantly contribute to nonattainment or interfere with maintenance at the 10 tagged California monitors.

## 3.5 CONCLUSION

Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors. Modeling was used to project the nonattainment and maintenance status of downwind monitors in 2023. Among monitors projected to be in nonattainment or have maintenance issues, 16 monitors were tagged for further review, one in Arizona, 10 in California, and five in Colorado. Several factors were examined, such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions. Based on this rigorous analysis, it was concluded that emissions from Texas do not

contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at the tagged downwind monitors.

## 3.6 REFERENCES

Bash, J., Baker, K., Beaver, M., 2016. Evaluation of improved land use and canopy representation in BEIS v3.61 with biogenic VOC measurements in California, *Geoscientific Model Development*, 9, 2191–2207.

Henderson, B.H., Akhtar, F., Pye, H.O.T., Napelenok, S.L., Hutzell, W.T., 2014. A Database and Tool for Boundary Conditions for Regional Air Quality Modeling: Description and Evaluations, *Geoscientific Model Development*, **7**, 339-360.

Hoerling, M., Kumar, A., Dole, R., Nielson-Gammon, J., Eischeid, J., Perlwitz. J., Quan, X., Zhang, T., Pegion, P., and Chen, M., 2012. Anatomy of an Extreme Event. *Journal of Climate*., 29, 2811-2832, doi: 10.1175/JCLI-D-12-00270.1.

Mu, M., et al. (2011), Daily and 3-hourly variability in global fire emissions and consequences for atmospheric model predictions of carbon monoxide, *J. Geophys. Res.*,116, D24303, doi:10.1029/2011JD016245.

Sherwen, T., M.J., Evans, L.J., Carpenter, S.J., Andrews, R.T., Lidster, B., Dix, T.K., Koenig, R., Sinreich, I., Ortega, R., Volkamer, A., and Saiz-Lopez. 2016. Iodine's impact on tropospheric oxidants: a global model study in GEOS-Chem. *Atmospheric Chemistry and Physics*, 16(2), pp.1161-1186.

Simon, H., Baker, K.R., and Phillips, S.B., 2012. Compilation and interpretation of photochemical model performance statistics published between 2006 and 2012, 2012., *Atmospheric Environment*, v61, 124-139. doi: 10.1016/j.atmosenv.2012.07.012.

Stein, A.F., Draxler, R.R, Rolph, G.D., Stunder, B.J.B., Cohen, M.D., and Ngan, F., 2015. NOAA's HYSPLIT atmospheric transport and dispersion modeling system, *Bull. Amer. Meteor. Soc.*, 96, 2059-2077, http://dx.doi.org/10.1175/BAMS-D-14-00110.1.

Travis, K., Jacob, D.J., Fisher, J.A., Kim, P. S., Marais, E.A., Zhu, L., Yu, K., Miller, C.C., Yantosca, R.M., Sulprizio, M.P., Thompson, A.M., Wennberg, P.O., Crounse, J.D., St. Clair, J.M., Cohen, R.C., Laughner, J.L., Dibb, J.E., Hall, S.R., Ullmann, K., Wolfe, G.M., Pollack, I.B., Peischl, J., Neuman, J.A, Zhou, X. 2016. Why do models overestimate surface ozone in the Southeast United States? *Atmos. Chem. Phys.*, 16, 13561-13577, doi:10.5194/acp-16-13561-2016.

Yantosca, B., Sulprizio, M., Yannetti, M., Lundgren, L., Xu, J., 2015. GEOS-Chem v10-01 Online User's Guide. Atmospheric Chemistry Modeling Group, School of Engineering and Applied Sciences, Harvard University, Cambridge, MA. (Available at http://acmg.seas.harvard.edu/geos/doc/man/ ).

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Yarwood, G., T. Sakulyanontvittaya, U. Nopmongcol, B. Koo. 2014. Ozone Depletion by Bromine and Iodine over the Gulf of Mexico. Final Report for Work Order No. 582-11-10365-FY14-12.

Wiedinmyer, C., Akagi, S. K., Yokelson, R. J., Emmons, L. K., Al-Saadi, J. A., Orlando, J. J., and Soja, A. J., 2011. The Fire INventory from NCAR (FINN): a high resolution global model to estimate the emissions from open burning, *Geosci. Model Dev.*, 4, 625-641, doi:10.5194/gmd-4-625-2011, 2011.

# CHAPTER 4: CONTROL STRATEGIES

## 4.1 INTRODUCTION

On November 16, 2017, the United States Environmental Protection Agency (EPA) made the first round of designations for the 2015 eight-hour ozone National Ambient Air Quality Standards (NAAQS), designating 205 of the 254 counties in Texas as attainment/unclassifiable, effective January 16, 2018 (82 *Federal Register* (FR) 54232). On June 4, 2018, the EPA published final designations for all remaining areas of the state except the eight counties comprising the San Antonio area (83 FR 25776). The EPA finalized nonattainment designations for Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Tarrant, and Wise Counties in the Dallas-Fort Worth (DFW) area and Brazoria, Chambers, Fort Bend, Galveston, Harris, and Montgomery Counties in the Houston-Galveston-Brazoria (HGB) area. The EPA designated all remaining counties as attainment/unclassifiable. On March 19, 2018, the EPA sent a 120-day letter to the State of Texas regarding designations for the San Antonio area, proposing to designate Atascosa, Bandera, Comal, Guadalupe, Kendall, Medina, and Wilson Counties as attainment/unclassifiable and Bexar County as "at best" unclassifiable. Final designations for the San Antonio area are expected by July 17, 2018.

Attainment demonstration state implementation plan (SIP) revisions for any areas designated as nonattainment for the 2015 eight-hour ozone NAAQS would not be due until after this transport SIP revision is submitted to the EPA. Because designations for Texas under the 2015 eight-hour ozone NAAQS have not been completed, attainment demonstration SIP revision due dates have not been established and potential controls have not yet been contemplated. However, Texas has implemented stringent and innovative regulations that address emissions of nitrogen oxides ($NO_x$) and volatile organic compounds (VOC) from a wide variety of major and minor source types under previous NAAQS. This chapter describes control measures for the DFW and HGB nonattainment areas as well as other areas of the state.

## 4.2 EMISSIONS REDUCTIONS FROM ELECTRIC GENERATING UNITS (EGU)

### 4.2.1 Utility Electric Generation in Ozone Nonattainment Areas

The rules in 30 Texas Administrative Code (TAC) Chapter 117, Subchapter C establish $NO_x$ emission specifications for utility electric generation for each ozone nonattainment area in Texas. These rules apply to each electric generating facility that generates electric energy for compensation, and is owned or operated by a municipality or Public Utility Commission of Texas (PUCT) regulated utility or any of its successors, regardless of whether the successor is a municipality or is regulated by the PUCT.

In the HGB area, the owner or operator of each affected utility boiler, auxiliary steam boiler, or stationary gas turbine must demonstrate compliance with the $NO_x$ emission specifications through a system cap and participation in the HGB area Mass Emissions Cap and Trade (MECT) Program. Affected sources were required to comply with the MECT Program rules beginning January 1, 2002, and comply with the system cap requirements by March 31, 2004. Additional information about the MECT Program is available in Section 4.3.2: *Mass Emissions Cap and Trade (MECT) Program.*

In the DFW area, each utility boiler that is part of a large system[35] must meet a $NO_x$ emission rate of 0.033 pound per million British thermal units (lb/MMBtu) heat input, and each utility boiler that is part of a small system must meet a $NO_x$ emission rate of 0.06 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates may be demonstrated on a daily average basis, a system-wide heat input weighted average basis for utility boilers that are part of a large system, or through the use of emission credits. Affected sources were required to comply with the rules by March 1, 2009.

In the Beaumont-Port Arthur (BPA) 1997 eight-hour ozone maintenance area, each utility boiler must meet a $NO_x$ emission rate of 0.10 lb/MMBtu heat input. Compliance with the $NO_x$ emission rates must be demonstrated on a daily average through the use of either a system cap or emission credits. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.2 Utility Electric Generation in East and Central Texas

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from utility electric generation in Atascosa, Bastrop, Bexar, Brazos, Calhoun, Cherokee, Fannin, Fayette, Freestone, Goliad, Gregg, Grimes, Harrison, Henderson, Hood, Hunt, Lamar, Limestone, Marion, McLennan, Milam, Morris, Nueces, Parker, Red River, Robertson, Rusk, Titus, Travis, Victoria, and Wharton Counties. The rules apply to each utility electric power boiler and stationary gas turbine (including duct burners used in turbine exhaust ducts) that generate electric energy for compensation; is owned by an electric cooperative, independent power producer, municipality, river authority, or public utility; and was placed into service before December 31, 1995. Utility electric power boilers must meet a $NO_x$ emission rate of 0.14 lb/MMBtu for gas-fired units and 0.165 lb/MMBtu for coal-fired units. Stationary gas turbines (including duct burners used in turbine exhaust ducts) must meet an annual average $NO_x$ emission rate of 0.14 lb/MMBtu for units subject to Texas Utilities Code (TUC), §39.264 (except §39.264(i)) or 0.15 lb/MMBtu for units not subject to TUC, §39.264 and units designated in accordance with TUC, §39.264(i). Compliance with the $NO_x$ emission rates is based on average heat input for a calendar year. Affected sources were required to comply with the rules by May 1, 2005.

### 4.2.3 Senate Bill 7 (76th Texas Legislature)

Senate Bill (SB) 7 from the 1999 76th Texas Legislature, requires grandfathered, or unpermitted, electric generating facilities (EGFs) and other EGFs that choose to participate to achieve a 50% reduction in $NO_x$ emissions and a 25% reduction in sulfur dioxide ($SO_2$) emissions from the 1997 emission levels. The reductions were implemented via participation in a cap and trade program in which participating EGFs are required to surrender allowances equivalent to the actual emissions each control period. For grandfathered EGFs, the allowance allocations were determined using the following emission rates: 0.14 lb $NO_x$/MMBtu and 1.38 lb $SO_2$/MMBtu in the East Texas region, and 0.195 lb $NO_x$/MMBtu in the West Texas and El Paso regions. For electing EGFs, the allowance allocations were equal to the emissions reported to the EPA's Acid

---

[35] A large utility system is defined in 30 TAC Chapter 117 as: all boilers, auxiliary steam boilers, and stationary gas turbines that are located in the DFW eight-hour ozone nonattainment area, and were part of one electric power generating system on January 1, 2000, that had a combined electric generating capacity equal to or greater than 500 megawatts.

Rain Program in 1997, or if unavailable, by a method approved by the executive director not to exceed any annual emission limitation authorized under Chapter 116, Subchapter B or an applicable state or federal requirement. There are no coal-fired EGFs located in the West Texas and El Paso regions that are subject to the Emissions Banking and Trading Allowances Program. The SB 7 requirements were implemented through rules in 30 TAC Chapter 101, Subchapter H, Division 2 and became effective January 11, 2000. The initial control period for this program began on May 1, 2003.

## 4.3 EMISSION REDUCTIONS FROM OTHER SOURCES

### 4.3.1 East Texas Engines

The rules in 30 TAC Chapter 117, Subchapter E, Division 4 limit $NO_x$ emissions from certain engines located in Anderson, Brazos, Burleson, Camp, Cass, Cherokee, Franklin, Freestone, Gregg, Grimes, Harrison, Henderson, Hill, Hopkins, Hunt, Lee, Leon, Limestone, Madison, Marion, Morris, Nacogdoches, Navarro, Panola, Rains, Robertson, Rusk, Shelby, Smith, Titus, Upshur, Van Zandt, and Wood Counties. The rules apply to stationary, gas-fired, reciprocating internal combustion engines rated 240 horsepower (hp) and larger. Rich-burn gas-fired internal combustion engines rated less than 500 hp must limit $NO_x$ emissions to 1.0 grams per horsepower-hour (g/hp-hr). Rich-burn engines rated 500 hp or greater must limit $NO_x$ emissions to 0.60 g/hp-hr for landfill gas-fired engines or 0.50 g/hp-hr for all other rich-burn engines. Affected sources were required to comply with the rules by March 1, 2010.

The East Texas combustion rules reduce $NO_x$ emissions and ozone air pollution transport into the DFW area. While these rules are part of the May 2007 DFW Attainment Demonstration SIP Revision for the 1997 eight-hour ozone NAAQS, the Northeast Texas area also benefits from $NO_x$ reductions resulting from the rules. Using photochemical modeling sensitivity studies, the Texas Commission on Environmental Quality (TCEQ) estimated that implementation of the rules results in an overall reduction of approximately 22.4 tons per day (tpd) of $NO_x$ emissions in the 33 counties subject to the rules by March 1, 2010. The TCEQ estimated the rules benefit the DFW area by reducing ozone by an average of 0.1 to 0.2 parts per billion.

### 4.3.2 Mass Emissions Cap and Trade (MECT) Program

The MECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 3 establish a mandatory annual $NO_x$ emission cap on sites in the HGB 1997 eight-hour ozone nonattainment area that are either a major source of $NO_x$ with facilities subject to the $NO_x$ emissions specifications in 30 TAC §117.310 or §117.1210, or have an uncontrolled design capacity to emit at least 10.0 tons per year (tpy) of $NO_x$ from facilities subject to 30 TAC §117.2010. Affected facilities include: utility boilers, auxiliary steam boilers, or stationary gas turbines; industrial, commercial, or institutional boilers and process heaters; stationary gas turbines; stationary internal combustion engines; fluid catalytic cracking units (including carbon monoxide boilers, carbon monoxide furnaces, and catalyst regenerator vents); boilers and industrial furnaces that were regulated as existing facilities by the EPA under 40 Code of Federal Regulations Part 266, Subpart H (as in effect on June 9, 1993); duct burners used in turbine exhaust ducts; pulping liquor recovery furnaces; lime kilns; lightweight aggregate kilns; heat treating furnaces and reheat furnaces; magnesium chloride fluidized bed dryers; and incinerators.

The MECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of $NO_x$ emissions. The MECT Program cap was implemented on January 1, 2002 at historical emission levels with mandatory $NO_x$ reductions increasing over time until achieving the final cap on April 1, 2007. Affected facilities that do not meet the criteria for receiving an allocation of allowances must use allowances allocated to facilities already participating in the program to cover annual $NO_x$ emissions. The projected 2018 MECT cap is 39,866.1 tpy of $NO_x$ emissions.

### 4.3.3 Highly Reactive Volatile Organic Compounds (HRVOC) Rules and HRVOC Emissions Cap and Trade (HECT) Program

The HRVOC rules in 30 TAC Chapter 115, Subchapter H are performance-based, emphasizing monitoring, recordkeeping, reporting, and enforcement rather than establishing individual unit emission rates. The rules apply to HRVOC emissions from flares, process vents, cooling towers, and fugitive emission sources. In addition to the monitoring requirements, affected sources in Harris County must meet an annual HRVOC emission cap and a site-wide short-term HRVOC limit of 1,200 lb/hour from any flare, vent, pressure relief valve, cooling tower, or any combination thereof. Affected sources in Harris County must demonstrate compliance with these HRVOC emission limits through participation in the HECT Program.

The HECT Program rules in 30 TAC Chapter 101, Subchapter H, Division 6 establish a mandatory annual HRVOC emission cap on sites in Harris County with the potential to emit greater than 10.0 tpy of HRVOC from facilities subject to 30 TAC Chapter 115, Subchapter H, Division 1 or Division 2. These facilities include vent gas streams, flares, and cooling tower heat exchange systems. Affected sites in Harris County are required to participate in the HECT Program. The program was implemented on January 1, 2007.

The HECT Program cap is enforced by the allocation, trading, and banking of allowances. An allowance is the equivalent of 1.0 ton of HRVOC emissions. The HECT Program cap was established at a level demonstrated as necessary to allow the HGB area to attain the one-hour ozone standard along with a 5% compliance margin to account for potential emissions variations. The total initial cap was 3,451.5 tpy.

Allowances allocated from 2007 through 2010 were based on historical levels of activity reported by affected sites. For 2011 and beyond, a site's allocation was determined by multiplying the total HECT cap by an industry-sector factor and a site-specific factor. The industry-sector factor was determined by grouping sites into sectors and determining each site's proportion based on actual emissions. The site-specific factor was based on a site's uncontrolled emissions as a proportion of the total uncontrolled emissions from all sites in that industry sector. The reallocation includes a mandatory 10% cap reduction implemented during 2014, with additional 5% reductions implemented at the start of each control period for 2015, 2016, and 2017. The final HECT Program cap is set at 2,588.6 tpy for 2017 and all subsequent control periods. Affected sites that do not receive an allocation of allowances must obtain and use allowances allocated to sites already participating in the program to cover annual HRVOC emissions.

### 4.3.4 Cement Kilns

The rules in 30 TAC Chapter 117, Subchapter E, Division 1 limit $NO_x$ emissions from cement kilns in Bexar, Comal, Ellis, Hays, and McLennan Counties. The rules require cement kilns in Bexar, Comal, Hays, and McLennan Counties to reduce $NO_x$ emissions 30% below 1996 levels or to meet a $NO_x$ emissions cap of 6.0 pounds of $NO_x$ per ton of cement clinker produced (lb $NO_x$/ton of clinker) for wet kilns; 5.1 lb $NO_x$/ton of clinker for dry kilns; 3.8 lb $NO_x$/ton of clinker for preheater kilns; and 2.8 lb $NO_x$/ton of clinker for preheater-precalciner or precalciner kilns. Affected sources were required to comply with the rules by May 1, 2005. The rules also require cement kilns located in Ellis County to meet an ozone season $NO_x$ emission source cap.

Ash Grove Cement Company operated three kilns in Ellis County, with an established source cap under §117.3123 of 4.4 tpd. However, a 2013 consent decree between Ash Grove and the EPA required by September 10, 2014 the shutdown of two kilns and reconstruction of kiln #3 with selective non-catalytic reduction (SNCR) with an emission limit of 1.5 lb $NO_x$/ton of clinker and a 12-month rolling tonnage limit for $NO_x$ of 975 tpy. The reconstructed kiln is a dry kiln with year-round SNCR operation. The redesign allows 949,000 tpy of clinker, or 1.95 tpd of $NO_x$, which is well below the 4.4 tpd source cap. Ash Grove's enforceable limit continues to be 4.4 tpd, although actual emissions are expected to be below the consent decree limit. Any modifications or new construction would be required to meet nonattainment new source review with best available control technology requirements, and would be subject to the same 1.5 lb $NO_x$/ton of clinker emission limit in the New Source Performance Standards for Portland Cement Plants. It would also be subject to other regulatory requirements, including the National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry.

TXI Operations, LP currently operates one dry preheater/precalciner kiln #5. The permitted capacity of this kiln is 2,800,000 tons of clinker per year, and it has a permitted emission factor of 1.95 lb $NO_x$/ton of clinker. Based on these permit limits, this kiln is therefore limited to a maximum of 7.48 tpd $NO_x$, compared to the current §117.3123 source cap of 7.9 tpd $NO_x$. Kiln #5 typically operates well below the source cap, at an average emission factor below 1.5 lb $NO_x$/ton of clinker.

## 4.4 ADDITIONAL MEASURES

### 4.4.1 SmartWay Transport Partnership and the Blue Skyway Collaborative

Among its various efforts to improve air quality in Texas, the TCEQ continues to promote two voluntary programs in cooperation with the EPA: SmartWay Transport Partnership and Blue Skyways Collaborative.

The SmartWay Transport Partnership is a market-driven partnership aimed at helping businesses move goods in the cleanest most efficient way possible. This is a voluntary EPA program primarily for the freight transport industry that promotes strategies and technologies to help improve fleet efficiency while also reducing air emissions.

There are over 3,000 SmartWay partners in the U.S., including most of the nation's largest truck carriers, all the Class 1 rail companies, and many of the top Fortune 500 companies. Since its founding, SmartWay has reduced oil consumption by 170.3 million barrels and prevented the release of 1,458,000 tons of $NO_x$ and 59,000 tons of

particulate matter into the atmosphere.[36] Ports in the U.S. rely on SmartWay's Port Drayage Truck program to help reduce pollution in and around major national ports. The Port of Houston Authority's (PHA) partnership with the Environmental Defense Fund and the Houston-Galveston Area Council (H-GAC) in the Port Drayage Truck Bridge Loan Program received $9 million from the EPA's Diesel Emissions Reduction Act (DERA) SmartWay Program in 2009. On average, four trucks a month, or about 50 trucks a year, were approved for replacement funding.

In April 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $1,669,560, had a total commitment of more than $2.5 million. A total of 24 trucks were replaced that operate at the Port of Houston. This included replacing 13 on-road over the road trucks that are only used inside the PHA's Turning Basin terminal. The replacement trucks were on-road terminal tractors, with model year 2015 engines, which are built and designed to work on marine terminals. The other 11 trucks replaced with this grant were older on-road terminal tractors that operate in and around PHA's Barbours Cut and Bayport container terminals. The replacements for these trucks were also on-road terminal tractors with model year 2016 engines.

In February 2015, the EPA awarded the PHA with a DERA grant of nearly $900,000. This grant award, with matching funds of $900,000, had a total commitment of $1.8 million. It is expected, that at the end of this grant, 17 drayage trucks will be replaced. The funding will provide for replacement trucks powered by certified engines that are model year 2011 or newer, which are estimated to be 90% cleaner. These drayage trucks operate in the Port of Houston and along the Houston Ship Channel. The replacement trucks will also have Global Positioning System units to collect data on idling and port operations, which will allow fleet owners and operators to gauge opportunities for additional fuel savings and emissions reduction.

Approximately 170 Texas companies are SmartWay partners. The SmartWay Transport Partnership will continue to benefit the HGB area by reducing emissions as more companies and affiliates join, and additional idle reduction, trailer aerodynamic kits, low-rolling resistance tire, and retrofit technologies are incorporated into SmartWay-verified technologies.

The Blue Skyways Collaborative was created to encourage voluntary air emission reductions by planning or implementing projects that use innovations in diesel engines, alternative fuels, and renewable energy technologies applicable to on-road and non-road sources. The Blue Skyways Collaborative partnerships include international, federal, state, and local governments, non-profit organizations, environmental groups, and private industries.

### 4.4.2 Energy Efficiency and Renewable Energy (EE/RE) Measures

Energy efficiency (EE) measures are typically programs that reduce the amount of electricity and natural gas consumed by residential, commercial, industrial, and municipal energy consumers. Examples of EE measures include: increasing insulation in homes; installing compact fluorescent light bulbs; and replacing motors and pumps

---

[36] https://www.epa.gov/smartway/learn-about-smartway

with high efficiency units. Renewable energy (RE) measures include programs that generate energy from resources that are replenished or are otherwise not consumed as with traditional fuel-based energy production. Examples of renewable energy include wind energy and solar energy projects.

Texas leads the nation in RE generation from wind. As of the first quarter 2018, Texas has 22,799 megawatts (MW) of installed wind generation capacity,[37] 25% of all installed wind capacity in the United States (U.S.). Texas' total net electrical generation from renewable wind generators in 2016 was 57.5 million megawatt-hours (MWh), approximately 25% of the total wind net electrical generation for the U.S. In 2017, total net electrical generation from renewable wind generators in Texas was 67.0 million MWh,[38] approximately 17% more than in 2016.

While EE/RE measures are beneficial and do result in lower overall emissions from fossil fuel-fired power plants in Texas, emission reductions resulting from these programs are not explicitly included in photochemical modeling for SIP purposes because local efficiency or renewable energy efforts may not result in local emissions reductions or may be offset by increased demand in electricity. The complex nature of the electrical grid makes accurately quantifying emission reductions from EE/RE measures difficult. At any given time, it is impossible to determine exactly where a specific user's electricity was produced.

While specific emission reductions from EE/RE measures are not provided in the SIP, persons interested in estimates of energy savings and emission reductions from EE/RE measures can access additional information and reports from the Texas A&M Engineering Experiment Station's Energy Systems Laboratory (ESL) website (http://esl.tamu.edu/). The reports submitted to the TCEQ regarding EE/RE measures are available under Texas Emissions Reduction Plan (TERP) Letters and Reports.

Finally, the Texas Legislature has enacted a number of EE/RE measures and programs. The following is a summary of Texas EE/RE legislation since 1999.

76th Texas Legislature, 1999

- SB 7
- House Bill (HB) 2492
- HB 2960

77th Texas Legislature, 2001

- SB 5
- HB 2277
- HB 2278
- HB 2845

---

[37] U.S. Department of Energy, National Renewable Energy Laboratory, https://windexchange.energy.gov/maps-data/321
[38] U.S. Department of Energy, Energy Information Administration, https://www.eia.gov/electricity/data/browser/

78th Texas Legislature, 2003

- HB 1365 (Regular Session)

79th Texas Legislature, 2005

- SB 20 (First Called Session)
- HB 2129 (Regular Session)
- HB 2481 (Regular Session)

80th Texas Legislature, 2007

- SB 12
- HB 66
- HB 3070
- HB 3693

81st Texas Legislature, 2009

- None

82nd Texas Legislature, 2011

- SB 898 (Regular Session)
- SB 924 (Regular Session)
- SB 981 (Regular Session)
- SB 1125 (Regular Session)
- SB 1150 (Regular Session)
- HB 51 (Regular Session)
- HB 362 (Regular Session)

83rd Texas Legislature, 2013

- None

84th Texas Legislature, 2015

- SB 1626
- HB 1736

85th Texas Legislature, 2017

- HB 1571 (Regular Session)

*Renewable Energy*

SB 5, 77th Texas Legislature, 2001, set goals for political subdivisions in affected counties to implement measures to reduce energy consumption from existing facilities by 5% each year for five years from January 1, 2002 through January 1, 2006. In 2007, the 80th Texas Legislature passed SB 12, which extended the timeline set in SB 5

4-8

through 2007 and made the annual 5% reduction a goal instead of a requirement. The State Energy Conservation Office (SECO) is charged with tracking the implementation of SB 5 and SB 12. Also during the 77th Texas Legislature, the ESL, part of the Texas Engineering Experiment Station, Texas A&M University System, was mandated to provide an annual report on EE/RE efforts in the state as part of the TERP under Texas Health and Safety Code (THSC), §388.003(e).

The 79th Texas Legislature, 2005, Regular and First Called Sessions, amended SB 5 through SB 20, HB 2129, and HB 2481 to add, among other initiatives, renewable energy initiatives that require: 5,880 MW of generating capacity from renewable energy by 2015; the TCEQ to develop a methodology for calculating emission reductions from renewable energy initiatives and associated credits; the ESL to assist the TCEQ in quantifying emissions reductions from EE/RE programs; and the PUCT to establish a target of 10,000 MW of installed renewable technologies by 2025. Wind power producers in Texas exceeded the renewable energy generation target by installing over 10,000 MW of wind electric generating capacity by 2010.

HB 2129, 79th Texas Legislature, 2005, Regular Session, directed the ESL to collaborate with the TCEQ to develop a methodology for computing emission reductions attributable to use of RE and for the ESL to annually quantify such emission reductions. HB 2129 directed the Texas Environmental Research Consortium to use the Texas Engineering Experiment Station to develop this methodology. With the TCEQ's guidance, the ESL produces an annual report, *Statewide Air Emissions Calculations from Energy Efficiency, Wind and Renewables*, detailing these efforts.

In addition to the programs discussed and analyzed in the ESL report, local governments may have enacted measures beyond what has been reported to SECO and the PUCT. The TCEQ encourages local political subdivisions to promote EE/RE measures in their respective communities and to ensure these measures are fully reported to SECO and the PUCT.

SB 981, 82nd Texas Legislature, 2011, Regular Session, allows a retail electric customer to contract with a third party to finance, install, or maintain a distributed renewable generation system on the customer's side of the electric meter, regardless of whether the customer owns the installed system. SB 981 also prohibits the PUCT from requiring registration of the system as an electric utility if the system is not projected to send power to the grid.

HB 362, 82nd Texas Legislature, 2011, Regular Session, helps property owners install solar energy devices such as electric generating solar panels by establishing requirements for property owners associations' approval of installation of solar energy devices. HB 362 specifies the conditions that property owners associations may and may not deny approval of installing solar energy devices.

SB 1626, 84th Texas Legislature, 2015, modifies the provisions established by HB 362 from the 82nd Texas Legislature, 2011, Regular Session, regarding property owners associations' authority to approve and deny installations of solar energy devices such as electric generating solar panels. HB 362 included an exception that allowed developers to prohibit installation of solar energy devices during the development

4-9

period. SB 1626 limits the exception during the development period to developments with 50 or fewer units.

*Residential and Commercial Building Codes and Programs*

THSC, Chapter 388, Texas Building Energy Performance Standards, as adopted in SB 5 of the 77th Texas Legislature, 2001, Regular Session, states in §388.003(a) that single-family residential construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Residential Code. The Furnace Pilot Light Program includes energy savings accomplished by retrofitting existing furnaces. Also included is a January 2006 federal mandate raising the minimum Seasonal Energy Efficiency Ratio (SEER) for air conditioners in single-family and multi-family buildings from 10 to 13.

THSC, Chapter 388, as adopted in SB 5 of the 77th Texas Legislature, 2001, states in §388.003(b) that non-single-family residential, commercial, and industrial construction must meet the energy efficiency performance standards established in the energy efficiency chapter of the International Energy Conservation Code.

HB 51, 82nd Legislature, 2011, Regular Session, requires municipalities to report implementation of residential and commercial building codes to SECO.

HB 1736, 84th Texas Legislature, 2015, updates THSC §388.003 to adopt, effective September 1, 2016, the energy efficiency chapter of the International Residential Code as it existed on May 1, 2015. HB 1736 also establishes a schedule by which SECO could adopt updated editions of the International Residential Code in the future, not more often than once every six years.

*Federal Facility EE/RE Projects*

Federal facilities are required to reduce energy use by Presidential Executive Order 13123 and the Energy Policy Act of 2005 (Public Law 109-58 EPACT20065).

*Political Subdivisions Projects*

SECO funds loans for energy efficiency projects for state agencies, institutions of higher education, school districts, county hospitals, and local governments. Political subdivisions in nonattainment and affected counties are required by SB 5, 77th Texas Legislature, 2001, to report EE/RE projects to SECO. These projects are typically building systems retrofits, non-building lighting projects, and other mechanical and electrical systems retrofits such as municipal water and waste water treatment systems.

*Electric Utility Sponsored Programs*

Utilities are required by SB 7, 76th Texas Legislature, 1999, and SB 5, 77th Texas Legislature, 2001, to report demand-reducing energy efficiency projects to the PUCT (see THSC, §386.205 and Texas Utilities Code (TUC), §39.905). These projects are typically air conditioner replacements, ventilation duct tightening, and commercial and industrial equipment replacement.

SB 1125, 82nd Texas Legislature, 2011, Regular Session, amended the TUC, §39.905 to require energy efficiency goals to be at least 30% of annual growth beginning in 2013. The metric for the energy efficiency goal remains at 0.4% of peak summer demand when a utility program accrues that amount of energy efficiency. SB 1150, 82nd Texas Legislature, 2011, Regular Session, extended the energy efficiency goal requirements to utilities outside the Electric Reliability Council of Texas area.

*State Energy Efficiency Programs*

HB 3693, 80th Texas Legislature, 2007, amended the Texas Education Code, Texas Government Code, THSC, and TUC. The bill:

- requires state agencies, universities and local governments to adopt energy efficiency programs;

- provides additional incentives for electric utilities to expand energy conservation and efficiency programs;

- includes municipal-owned utilities and cooperatives in efficiency programs;

- increases incentives and provides consumer education to improve efficiency programs; and

- supports other programs such as revision of building codes and research into alternative technology and renewable energy.

HB 51, 82nd Texas Legislature, 2011, Regular Session, requires new state buildings and major renovations to be constructed to achieve certification under an approved high-performance design evaluation system.

HB 51 also requires, if practical, that certain new and renovated state-funded university buildings comply with approved high-performance building standards.

SB 898, 82nd Texas Legislature, 2011, Regular Session, extended the existing requirement for state agencies, state-funded universities, local governments, and school districts to adopt energy efficiency programs with a goal of reducing energy consumption by at least 5% per state fiscal year (FY) for 10 state FYs from September 1, 2011 through August 31, 2021.

SB 924, 82nd Texas Legislature, 2011, Regular Session, requires all municipally owned utilities and electric cooperatives that had retail sales of more than 500,000 MWh in 2005 to report each year to SECO information regarding the combined effects of the energy efficiency activities of the utility from the previous calendar year, including the utility's annual goals, programs enacted to achieve those goals, and any achieved energy demand or savings goals.

HB 1571, 85th Texas Legislature, 2017, Regular Session, expanded Education Code and Government Code provisions for local governmental entities, schools, and state agencies entering into energy saving performance contracts by authorizing the entities to use any available money to pay the provider for energy or water conservation

measures. Previously, only money other than money borrowed from the state could be used to pay for such conservation measures.

### 4.4.3 Consent Decrees with Refineries

The EPA's National Petroleum Refinery Initiative[39] has resulted in multi-issue settlement agreements with the nation's major petroleum refineries. As of October 2016, 112 refineries representing more than 95% of total domestic refining capacity are under settlement. The EPA consent decrees limit emissions from fluidized catalytic cracking units, sulfur recovery units, heaters and boilers, and flares. The EPA estimates that full implementation of the current settlements will result in more than 95,000 tpy of $NO_x$ emission reductions. The EPA also anticipates VOC emission reductions will result from consent decree requirements that reduce hydrocarbon flaring including:

- installing continuous emissions monitoring systems (CEMS) or predictive emissions monitoring systems;
- operating a flare gas recovery system to control continuous or routine flaring;
- limiting flaring to only process upset gases, fuel gas released as a result of relief valve leakage, or gas released due to a malfunction; and
- eliminating the routes of generated fuel gases and monitoring the flare with CEMS or a flow meter.

### 4.4.4 Clean Air Interstate Rule (CAIR) and Cross-State Air Pollution Rule (CSAPR)

In March 2005, the EPA issued CAIR to address EGU emissions that transport from one state to another. The rule incorporated the use of three cap and trade programs to reduce $SO_2$ and $NO_x$: the ozone-season $NO_x$ trading program, the annual $NO_x$ trading program, and the annual $SO_2$ trading program.

Texas was not included in the ozone season $NO_x$ program but was included for the annual $NO_x$ and $SO_2$ programs. As such, Texas was required to make necessary reductions in annual $SO_2$ and $NO_x$ emissions from new and existing EGUs to demonstrate that emissions from Texas do not contribute to nonattainment or interfere with maintenance of the 1997 particulate matter with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers ($PM_{2.5}$) NAAQS in another state. CAIR consisted of two phases for implementing necessary $NO_x$ and $SO_2$ reductions. Phase I addressed required reductions from 2009 through 2014. Phase II was intended to address reductions in 2015 and thereafter.

In July 2006, the commission adopted a SIP revision to address how the state would meet emissions allowance allocation budgets for $NO_x$ and $SO_2$ established by the EPA to meet the federal obligations under CAIR. The commission adopted a second CAIR-related SIP revision in February 2010. This revision incorporated various federal rule revisions that the EPA had promulgated since the TCEQ's initial submittal. It also incorporated revisions to 30 TAC Chapter 101 resulting from legislation during the 80th Texas Legislature, 2007.

---

[39] https://www.epa.gov/enforcement/petroleum-refinery-national-case-results

A December 2008 court decision found flaws in CAIR but kept CAIR requirements in place temporarily while directing the EPA to issue a replacement rule. In July 2011, the EPA finalized CSAPR to meet Federal Clean Air Act (FCAA) requirements and respond to the court's order to issue a replacement program. Texas was included in CSAPR for ozone season $NO_x$, annual $NO_x$, and annual $SO_2$ due to the EPA's determination that Texas significantly contributes to nonattainment or interferes with maintenance of the 1997 eight-hour ozone NAAQS and the 1997 $PM_{2.5}$ NAAQS in other states. As a result of numerous EGU emission reduction strategies already in place in Texas, the annual and ozone season $NO_x$ reduction requirements from CSAPR were relatively small but still significant. CSAPR required an approximate 7% reduction in annual $NO_x$ emissions and less than 5% reduction in ozone season $NO_x$ emissions.

On August 21, 2012, the U.S. Court of Appeals for the District of Columbia (D.C.) Circuit vacated CSAPR. Under the D.C. Circuit Court's ruling, CAIR remained in place until the EPA developed a valid replacement.

The EPA and various environmental groups petitioned the Supreme Court of the United States to review the D.C. Circuit Court's decision on CSAPR. On April 29, 2014, a decision by the Supreme Court reversed the D.C. Circuit and remanded the case. On October 23, 2014, the D.C. Circuit lifted the CSAPR stay and on November 21, 2014, the EPA issued rulemaking, which shifted the effective dates of the CSAPR requirements to account for the time that had passed after the rule was stayed in 2011. Phase 1 of CSAPR took effect January 1, 2015 and Phase 2 began January 1, 2017. On July 28, 2015, the D.C. Circuit Court ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_x$ budgets for Texas were invalid because they required over control of Texas emissions, and remanded these budgets back to the EPA without vacatur.

On January 22, 2015, the EPA issued a memorandum to provide information on how it intends to implement FCAA interstate transport requirements for the 2008 ozone NAAQS. The EPA provided preliminary modeling results for 2018, which show contribution to nonattainment of the 2008 ozone NAAQS in the HGB area from sources outside of Texas. On July 23, 2015, the EPA issued a notice of data availability regarding updated ozone transport modeling results for a 2017 attainment year.

On June 27, 2016, the EPA issued a memorandum outlining the agency's approach for responding to the D.C. Circuit's July 2015 remand of the Phase 2 $SO_2$ emissions budgets, providing a choice of two paths for states with remanded budgets. Under the first path, states could voluntarily continue to participate in CSAPR at the state's current Phase 2 $SO_2$ and annual $NO_x$ budget levels through a SIP revision. Under the second path, if a state does not choose to participate in CSAPR, the EPA would initiate rulemaking by fall of 2016 to remove the state's sources from CSAPR's $SO_2$ and annual $NO_x$ programs and address any remaining interstate transport or regional haze obligations on a state-by-state basis. On November 10, 2016, the EPA published a proposed rule to remove Texas sources from the CSAPR $SO_2$ and annual $NO_x$ trading programs. The EPA also proposed to determine that, following withdrawal of the federal implementation plan (FIP) requirements, sources in Texas will not contribute significantly to nonattainment or interfere with maintenance of the 1997 $PM_{2.5}$ NAAQS in any other state and that the EPA therefore will have no obligation to issue new FIP requirements for Texas sources to address transport for the 1997 $PM_{2.5}$ NAAQS (81 FR

78954). The rule was finalized, effective immediately, on September 29, 2017 (82 FR 45481).

On September 7, 2016, the EPA signed the final CSAPR Update Rule for the 2008 eight-hour ozone standard. The EPA's modeling shows that emissions from within Texas no longer significantly contribute to downwind nonattainment or interference with maintenance for the 1997 eight-hour ozone NAAQS even without implementation of the original CSAPR ozone season $NO_x$ emissions budget. Accordingly, sources in Texas are no longer subject to the emissions budget calculated to address the 1997 eight-hour ozone NAAQS. However, this rule finalized a new ozone season $NO_x$ emissions budget for Texas to address interstate transport with respect to the 2008 eight-hour ozone NAAQS. This new budget became effective for the 2017 ozone season, the same period in which the Phase 2 budget that was invalidated by the court was scheduled to become effective.

CSAPR budgets for Texas may be subject to change in the future based on any additional rulemaking to address remanded budgets or changes resulting from further appeals.

### 4.4.5 Texas Emissions Reduction Plan (TERP)

The TERP program was created in 2001 by the 77th Texas Legislature to provide grants to offset the incremental costs associated with reducing $NO_x$ emissions from high-emitting heavy-duty internal combustion engines on heavy-duty vehicles, non-road equipment, marine vessels, locomotives, and some stationary equipment.

The primary emissions reduction incentives are awarded under the Diesel Emissions Reduction Incentive Program (DERI). DERI incentives are awarded to projects to replace, repower, or retrofit eligible vehicles and equipment to achieve $NO_x$ emission reductions in Texas ozone nonattainment areas and other counties identified as affected counties under the TERP program where ground-level ozone is a concern.

From 2001 through August 2017, $1,088,390,866 in DERI grants were awarded for projects projected to help reduce an estimated 179,427 tons of $NO_x$ over the life of the projects. This includes $448,288,693 going to activities in the HGB area and $377,422,749 to activities in the DFW area, with an estimated 78,445 tons of $NO_x$ reduced in the HGB area and 62,731 tons of $NO_x$ reduced in the DFW area over the life of the projects.

Three other incentive programs under the TERP program will result in the reduction in $NO_x$ emissions in the DFW and HGB areas, as well as other TERP areas.

The Drayage Truck Incentive Program was established in 2013 to provide grants for the replacement of drayage trucks operating in and from seaports and rail yards located in nonattainment areas. The name of this program was recently changed to the Seaport and Rail Yard Areas Emissions Reduction Program, and replacement or repower of cargo handling equipment was added to the eligible project list. Through August 2017, the program awarded $6,209,424, with an estimated 357 tons of $NO_x$ reduced over the life of the projects. In the HGB area the funding totaled $5.56 million, with projects estimated to reduce up to 325 tons of $NO_x$, over the life of the projects.

4-14

$542,061 was awarded to projects in the DFW area, with an estimated 27 tons of $NO_x$ reduced over the life of the projects.

The Texas Clean Fleet Program (TCFP) was established in 2009 to provide grants for the replacement of light-duty and heavy-duty diesel vehicles with vehicles powered by alternative fuels, including: natural gas, liquefied petroleum gas, hydrogen, methanol (85% by volume), or electricity. This program is for larger fleets, therefore applicants must commit to replacing at least 10 eligible diesel-powered vehicles with qualifying alternative fuel or hybrid vehicles. From 2009 through August 2017, over $58.16 million in TCFP grants were awarded for projects to help reduce an estimated 660 tons of $NO_x$ over the life of the projects. Over $22.9 million in TCFP grants were awarded to projects in the HGB area, with an estimated 216 tons of $NO_x$ reduced over the life of the projects, and over $16.3 million was awarded in the DFW area, with an estimated 245 tons of $NO_x$ reduced over the life of the projects.

The Texas Natural Gas Vehicle Grant Program (TNGVGP) was established in 2011 to provide grants for the replacement of medium-duty and heavy-duty diesel vehicles with vehicles powered by natural gas. This program may include grants for individual vehicles or multiple vehicles. The majority of the vehicle's operation must occur in the Texas nonattainment areas, other counties designated as affected counties under the TERP, and the counties in and between the triangular area between Houston, San Antonio, and DFW. From 2011 through August 2017, over $41.9 million in TNGVGP grants were awarded for projects to help reduce an estimated 1,493 tons of $NO_x$ over the life of the projects. Over $10.59 million in TNGVGP grants were awarded to projects in the HGB area, with an estimated 310 tons of $NO_x$ reduced over the life of the projects, and over $14.6 million was awarded to projects in the DFW area, with an estimated 529 tons of $NO_x$ reduced of the life of the projects.

### 4.4.6 Clean School Bus Program

HB 3469, 79th Texas Legislature, 2005, Regular Session, established the Clean School Bus Program, which provides monetary incentives for school districts in the state for reducing emissions of diesel exhaust from school buses through retrofit of older school buses with diesel oxidation catalysts, diesel particulate filters, and closed crankcase filters. As of August 2017, the TCEQ Clean School Bus Program had reimbursed approximately $34.6 million in grants for over 7,500 retrofit activities. This amount included $4.7 million in federal funds. As a result of recent legislative changes, this program will include replacement of older school buses with newer, lower-emitting models going forward.

### 4.4.7 Local Initiatives

Local strategies in the DFW nonattainment area are being implemented by the North Central Texas Council of Governments and local strategies in the HGB nonattainment area are being implemented by H-GAC. Due to the continued progress of these measures, additional air quality benefits are expected to be gained that will further reduce precursors to ground level ozone formation. A summary of local strategies for the DFW nonattainment area is included in Appendix H: *Local Initiatives Submitted by the North Central Texas Council of Governments* of the DFW 2008 Eight-Hour Ozone Attainment Demonstration for the 2017 Attainment Year and information on local

4-15

measures in the HGB nonattainment area is available on the [Houston-Galveston Area Council](http://www.h-gac.com/home/residents.aspx) website (http://www.h-gac.com/home/residents.aspx).

### 4.4.8 Voluntary Measures

While the oil and natural gas industry is required to install controls either due to state or federal requirements, the oil and natural gas industry has in some instances voluntarily implemented additional controls and practices to reduce VOC emissions from oil and natural gas operations in the DFW nonattainment area as well as other areas of the state. Examples of these voluntary efforts include: installing vapor recovery units on condensate storage tanks; using low-bleed natural gas actuated pneumatic devices; installing plunger lift systems in gas wells to reduce gas well blowdown emissions; and implementing practices to reduce VOC emissions during well completions (i.e., "Green Completions"). The EPA's Natural Gas STAR Program provides details on these and other practices recommended by the EPA as voluntary measures to reduce emissions from oil and natural gas operations and improve efficiency. Additional information on the EPA Natural Gas STAR Program may be found on the EPA's [Natural Gas STAR Program](http://www.epa.gov/gasstar/) webpage (http://www.epa.gov/gasstar/).

### 4.5 2008 OZONE NAAQS SIP REVISIONS ADOPTED SINCE 2015

All Texas SIP revisions are available on the [Texas SIP Revisions](http://www.tceq.texas.gov/airquality/sip/sipplans.html) webpage (http://www.tceq.texas.gov/airquality/sip/sipplans.html).

Since 2015, Texas has adopted several SIP revisions to further address the 2008 eight-hour ozone standard in the DFW and HGB areas. These latest SIP revisions and plans are detailed in this section.

### 4.5.1 DFW 2008 Eight Hour Ozone SIP Revisions

On June 3, 2015, the commission adopted two revisions to the Texas SIP for the DFW 2008 eight-hour ozone moderate nonattainment area: the DFW 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision and the DFW 2008 Eight-Hour Ozone Reasonable Further Progress (RFP) SIP Revision. On December 7, 2016, the EPA published final approval of the DFW RFP SIP revision (81 FR 88124). Following proposal of these SIP revisions, the attainment date for the DFW 2008 eight-hour ozone moderate nonattainment area changed from December 31, 2018 to July 20, 2018 as a result of the December 23, 2014 D.C. Circuit Court ruling and the EPA's final 2008 ozone standard SIP requirements rule. Because the attainment year ozone season is the ozone season immediately preceding a nonattainment area's attainment date, the attainment year for the DFW moderate nonattainment area also changed from 2018 to 2017. As a result of the change in the attainment year, it was necessary for the TCEQ to develop a revised attainment demonstration. The DFW 2008 eight-hour ozone nonattainment area attainment demonstration SIP revision for the 2017 attainment year was adopted by the commission on July 6, 2016. On June 14, 2017, the EPA approved part of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance and nonattainment new source review are met in the DFW area for the 2008 ozone NAAQS (82 FR 22291), effective on September 12, 2017. On September 22, 2017, the EPA conditionally approved the TCEQ's cement kiln $NO_x$ RACT analysis for TXI Operations, LP (82 FR 44320) predicated on the TCEQ's commitment to establish the permitted emission limit of 1.95 lb $NO_x$/ton of clinker for kiln #5 in the SIP. The TCEQ committed to the EPA in a letter

dated July 29, 2016 to prepare a SIP revision containing the 1.95 lb $NO_x$/ton of clinker limit for TXI Operations, LP and subsequently submit the SIP revision to the EPA if it is approved by the commission. In the September 22, 2017 final rule, the EPA also fully approved $NO_x$ RACT for all other affected sources in the 10-county DFW 2008 eight-hour ozone nonattainment area. The EPA published final approval of VOC RACT on December 21, 2017 (82 FR 60546). On May 3, 2018 the EPA proposed approval of the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and motor vehicle emissions budgets (83 FR 19483).

### 4.5.2 HGB 2008 Eight-Hour Ozone SIP Revisions

On December 15, 2016, the commission adopted two revisions to the Texas SIP for the HGB 2008 eight-hour ozone moderate nonattainment area: the HGB 2008 Eight-Hour Ozone Attainment Demonstration SIP Revision (Non-Rule Project No. 2016-016-SIP-NR) and the HGB 2008 Eight-Hour Ozone RFP SIP Revision (Non-Rule Project No. 2016-017-SIP-NR). These SIP revisions were adopted to meet federal obligations for the 2008 eight-hour ozone NAAQS for a moderate nonattainment area with a July 20, 2018 attainment deadline and a 2017 attainment year. The attainment demonstration SIP revision incorporated revisions to 30 TAC Chapter 115 to update reasonably available control technology for VOC storage tanks in the HGB area. The SIP and rule revisions were submitted to the EPA on December 29, 2016. On May 15, 2017, the EPA approved Section 4.9 of the attainment demonstration SIP revision that describes how FCAA requirements for vehicle inspection and maintenance, nonattainment new source review, and emission statements for large stationary point sources are met in the HGB area for the 2008 ozone NAAQS (82 FR 22291). On June 6, 2017, the EPA published its finding that the motor vehicle emissions budgets in the HGB RFP SIP revision are adequate and must be used for transportation conformity determinations in the HGB area (82 FR 26091). These budgets became effective June 21, 2017. On May 29, 2018, the EPA published proposed approval of elements of the HGB attainment demonstration SIP revision, specifically, the attainment demonstration, reasonably available control measures analysis, contingency measures plan, and MVEBs (83 FR 24446).

### 4.6 CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions that are federally enforceable through SIP revisions. These measures have resulted in significant decreases in eight-hour ozone design values in Texas. Any additional control strategies necessary to address requirements for the 2015 eight-hour ozone NAAQS will be evaluated when attainment demonstration and RFP SIP revisions are developed and implemented.

## CHAPTER 5: PREVENTION OF SIGNIFICANT DETERIORATION AND VISIBILITY TRANSPORT [FCAA, §110(A)(2)(D)(i)(II)]

## 5.1 INTRODUCTION

The Federal Clean Air Act (FCAA), §110(a)(2)(D)(i)(II), requires states to submit a state implementation plan (SIP) revision that contains adequate provisions to prohibit any source or other type of emissions activity within the state from emitting any air pollutants in amounts that will interfere with measures required to meet an implementation plan for any other state related to prevention of significant deterioration (PSD) or interfere with measures required to meet the implementation plan for any other state related to regional haze and visibility. The following sections provide information on how Texas meets the requirements of FCAA, §110(a)(2)(D)(i)(II).

## 5.2 PSD

Texas has a SIP-approved PSD and nonattainment New Source Review (NSR) permitting program that contains requirements for sources of air pollutants to obtain an approved permit before beginning construction of a facility and before modifying an existing facility. The Texas Commission on Environmental Quality (TCEQ) has established rules governing the enforcement of control measures, including attainment plans and permitting programs that regulate construction and modification of stationary sources.

On January 6, 2014, the United States Environmental Protection Agency (EPA) published approval of Texas' public participation requirements for air quality permits (79 FR 551).[40] On November 10, 2014, the EPA published partial approval of the October 2010 and April 2014 SIP submittals that revise Texas' PSD program to provide for the regulation of greenhouse gas (GHG) emissions and clarify the applicability of best available control technology for all PSD permit applications (79 FR 66626).[41] The EPA also approved revisions to the NSR permitting program as consistent with federal requirements for PSD permitting of GHG emissions. Although the EPA originally disapproved the Texas infrastructure SIP for the 1997 eight-hour ozone, and for the 1997 and 2006 $PM_{2.5}$ National Ambient Air Quality Standards (NAAQS) for not containing provisions for the permitting of GHGs, on September 4, 2015 the EPA published a direct final rule in the *Federal Register* (FR) to correct the Code of Federal Regulations to reflect that Texas now has a SIP-approved GHG permitting program (80 FR 53467). The rule became effective November 3, 2015.

On June 12, 2015, in response to a petition for rulemaking from the Sierra Club, the EPA finalized a SIP call related to provisions in SIPs concerning how air agency rules in EPA-approved SIPs treat excess emissions during periods of startup, shutdown, and malfunction (SSM) of industrial source process or emission control equipment. Although not one of the states named in the Sierra Club's petition, the EPA's final rule included Texas. The State of Texas and the TCEQ disagree with the EPA that the TCEQ's

---

[40] Approval and Promulgation of Implementation Plans; Texas; Prevention of Significant Deterioration; Greenhouse Gas Tailoring Rule Revisions, 79 FR 66626 (November 10, 2014).
[41] Approval and Promulgation of Implementation Plans; Texas; Public Participation for Air Quality Permit Applications, 79 FR 551 (January 6, 2014).

SIP-approved affirmative defense rule for certain excess emissions is substantially inadequate to meet FCAA requirements and are challenging the EPA's SIP call.

The following chapters of 30 Texas Administrative Code (TAC) contain rules relevant for this federal requirement:

Chap. 35    Emergency and Temporary Orders and Permits; Temporary Suspension or Amendment of Permit Conditions; Subchapters A, B, C, K

Chap. 39    Public Notice

Chap. 55    Requests for Reconsideration and Contested Case Hearings; Public Notice

Chap. 101    General Air Quality Rules

Chap. 106    Permits by Rule, Subchapter A, General Requirements

Chap. 112    Control of Air Pollution from Sulfur Compounds

Chap. 115    Control of Air Pollution from Volatile Organic Compounds

Chap. 116    Control of Air Pollution by Permits for New Construction or Modification

Chap. 117    Control of Air Pollution from Nitrogen Compounds

Texas has a robust, SIP-approved permitting program and therefore has met the infrastructure requirements of §110(a)(2)(D)(i)(II).

## 5.3 VISIBILITY TRANSPORT

On December 16, 2014, the EPA published a proposed rule to partially disapprove the Texas 2009 Regional Haze SIP revision and issue a federal implementation plan (FIP) (79 FR 74818). The EPA also proposed to approve the Texas Best Available Retrofit Technology (BART) rule for non-electric generating units (EGUs), and replace the TCEQ's reliance on the Clean Air Interstate Rule (CAIR) with a FIP implementing the Cross-State Air Pollution Rule (CSAPR) in Texas for BART for EGUs.[42] On January 5, 2016, the EPA partially approved (for non-EGU BART) and partially disapproved the Texas SIP and adopted a FIP for the reasonable progress goals and long-term strategy requirements that were disapproved. The EPA did not finalize the EGU BART portion of the proposal. On July 15, 2016, the 5th Circuit stayed EPA's FIP of the Texas Regional Haze Rule.

Because of litigation since the 2009 Texas Regional Haze SIP submission, EGUs are no longer covered under CAIR or subsequent program provisions; and the EPA did not finalize the disapproval of Texas EGU BART on January 5, 2016. In accordance with a consent decree, the EPA published a proposed BART FIP on January 4, 2017 covering

---

[42] The D.C. Circuit lifted the stay on CSAPR and the EPA began implementing the rule on January 1, 2015. However, on July 28, 2015 the D.C. Circuit ruled that the 2014 annual $SO_2$ budgets and the 2014 ozone season $NO_X$ budgets for Texas were invalid because they required overcontrol of Texas emissions, and remanded these budgets back to the EPA without vacatur.

EGUs. The consent decree required the EPA to sign a final FIP in September 2017. On September 29, 2017, the EPA Administrator signed a FIP to address BART requirements for Texas EGUs, specifically with regard to nitrogen oxides ($NO_x$), particulate matter (PM), and sulfur dioxide ($SO_2$). The final rule was published in the *Federal Register* on October 17, 2017 (82 FR 48324). Additionally, on September 29, 2017, the EPA finalized a rule withdrawing Texas from the CSAPR Group 2 $SO_2$ and Annual $NO_x$ Programs (82 FR 45481). The BART FIP relies on Texas' participation in the CSAPR Ozone Season $NO_x$ Program to fulfill $NO_x$ BART. Because Texas is no longer participating in the CSAPR Group 2 $SO_2$ Program, CSAPR cannot be relied upon to satisfy $SO_2$ BART. Therefore, the FIP establishes an $SO_2$ trading program that applies to select Texas EGUs. The EPA approved the TCEQ's PM screening for EGUs from the 2009 Texas Regional Haze SIP submittal, eliminating the need to require controls for PM BART. Additionally, the EPA disapproved portions of the Texas SIP with regard to interstate visibility transport for the following NAAQS: 1997 eight-hour ozone; 1997 $PM_{2.5}$ (annual and 24-hour); 2006 $PM_{2.5}$ (24-hour); 2008 eight-hour; 2010 one-hour nitrogen dioxide; and 2010 one-hour $SO_2$. The EPA also made a finding that the BART alternatives adopted as the FIP meet the interstate visibility transport requirements for these NAAQS under FCAA §110(a)(2)(D)(i)(II).

Regional haze program requirements include progress reports due to the EPA every five years, to demonstrate progress toward the visibility goal. The 2014 Five-Year Regional Haze Progress Report SIP Revision was submitted to the EPA in March 2014. On January 10, 2017, the EPA published the final Regional Haze Rule Amendments (82 FR 3078) extending the SIP submittal deadline for the second planning period from July 31, 2018 to July 31, 2021 and adjusting the interim progress report submission deadline so that second progress reports would be due by January 31, 2025. The following SIP submittal would be due in 2028 and then every 10 years thereafter, through 2064.

The following chapter of 30 TAC contains rules relevant for this federal requirement:

Chap. 101     General Air Quality Rules

Chap. 122     Subchapter E, Division 2, Clean Air Interstate Rule

Chap. 115     Control of Air Pollution from Volatile Organic Compounds

Chap. 116     Control of Air Pollution by Permits for New Construction or Modification

Chap. 117     Control of Air Pollution from Nitrogen Compounds

The modeling analysis in this SIP revision demonstrates that Texas does not contribute to nonattainment or interfere with maintenance in another state for the 2015 ozone NAAQS. The EPA has not established a separate visibility standard for ozone because ozone does not directly impair visibility or substantially produce or contribute to the production of the secondary air contaminants that cause visibility impairment or regional haze. Particulate matter, rather than ozone, is the pollutant primarily responsible for visibility impairment at Class I areas covered by the Regional Haze Rule. Emissions from Texas EGUs that potentially contribute to both ozone nonattainment and visibility impairment are already controlled under the ozone

NAAQS, BART under the Regional Haze Rule, and interstate transport obligations. Texas is also subject to the ozone season $NO_x$ budget under the CSAPR Update Rule for the 2008 ozone standard. Based on the finding that emissions from Texas do not interfere with measures to protect visibility in nearby states, Texas meets the visibility transport provision for six other NAAQS under the BART FIP (82 FR 48324). When considered alongside the modeling analysis in this SIP revision, and Texas' inclusion in the CSAPR Update Rule ozone season $NO_x$ trading program, it is concluded that Texas meets the visibility transport provision for the 2015 ozone NAAQS as well.

## CHAPTER 6: INTERSTATE POLLUTION ABATEMENT AND INTERNATIONAL AIR POLLUTION [FCAA, §110(A)(2)(D)(ii)]

### 6.1 INTRODUCTION

The requirements of Federal Clean Air Act (FCAA), §110(a)(2)(D)(ii) are satisfied by demonstrating compliance with the applicable requirements of FCAA, §126(a), 126(b) and (c), and 115.

### 6.2 INTERSTATE POLLUTION ABATEMENT

### 6.2.1 Compliance with FCAA, §126(a)

Under section 126(a)(1) of the FCAA, a state implementation plan (SIP) must contain provisions requiring each new or modified major source required by FCAA title I part C to be subject to prevention of significant deterioration (PSD) permitting to notify neighboring air agencies of potential impacts from the source. Per guidance on development and submission of infrastructure SIPs issued by the United States Environmental Protection Agency (EPA) on September 13, 2013,[43] the EPA considers the notification by the permitting authority to satisfy the requirement of FCAA, §126(a)(1)(A) that a new or modified major source subject to part C notify neighboring air agencies of its potential downwind impact. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source.

### 6.2.2 Compliance with FCAA, §126(b) and (c)

The required content of an infrastructure SIP with respect to FCAA, §110(a)(2)(D)(ii) is affected by sections 126(b) and 126(c) of the FCAA only if: (1) the Administrator has, in response to a petition, made a finding under section 126(b) of the FCAA that emissions from a source or sources within the air agency's jurisdiction emit prohibited amounts of air pollution relevant to the new or revised NAAQS for which the infrastructure SIP submission is being made; and (2) under section 126(c) of the FCAA, the Administrator has required the source or sources to cease construction, cease or reduce operations, or comply with emissions limitations and compliance schedule requirements for continued operation.

No source or sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS.

### 6.3 INTERNATIONAL AIR POLLUTION

### 6.3.1 Compliance with FCAA, §115

Section 115 of the FCAA authorizes the EPA Administrator to require a state to revise its SIP under certain conditions to alleviate international transport into another country. When acting on an infrastructure SIP submission for a new or revised NAAQS, the EPA will look to whether the Administrator has made a finding with respect to

---

[43] Memorandum from Stephen D. Page, Director of the Office of Air Quality Planning and Standards, September 13, 2013, *Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2)*. EPA Office of Air Quality Planning and Standards. https://www3.epa.gov/airquality/urbanair/sipstatus/docs/Guidance_on_Infrastructure_SIP_Elements_Multipollutant_FINAL_Sept_2013.pdf

emissions of the particular NAAQS pollutant and its precursors, if applicable. There are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

# CHAPTER 7: CONCLUSIONS

Texas has numerous control measures in place to address ozone precursor emissions and these measures have resulted in significant decreases in eight-hour ozone design values in Texas. Statewide trend analysis of ozone precursor emissions from 2005 through 2014 shows a 17% reduction in volatile organic compounds and a 35% reduction in nitrogen oxides. These reductions have assisted the state in attaining both the one-hour and 1997 eight-hour ozone National Ambient Air Quality Standards (NAAQS) and are expected to help the state attain the 2008 and 2015 NAAQS in the future. Over the past 25 years, all areas in Texas have observed some decrease in eight-hour ozone design values with the greatest decreases observed in the Houston-Galveston-Brazoria and Beaumont-Port Arthur areas with decreases of 34% and 33% respectively.

The modeling analysis provided in this state implementation plan (SIP) revision demonstrates that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS at any downwind monitors in 2023. Factors such as design value trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to Texas emissions were examined for 16 monitors projected to be in nonattainment or projected to have maintenance issues in other states. Based on this modeling analysis, it is concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.

Additionally, Texas has a robust, SIP-approved new source review permitting program and therefore has met the Federal Clean Air Act (FCAA) infrastructure requirements relating to prevention of significant deterioration (PSD). The Texas Commission on Environmental Quality has also determined that Texas meets the visibility transport provisions for the 2015 ozone NAAQS as the state is not contributing significantly to nonattainment or maintenance issues in any other state, the EPA has not established a separate visibility standard for ozone, Texas is subject to the ozone season $NO_x$ budget under the Cross-State Air Pollution Rule Update, and the EPA has made a finding that Texas meets the visibility transport provision for six other NAAQS under the Best Available Retrofit Technology FIP.

Finally, Texas meets the FCAA requirements related to interstate pollution abatement and international air pollution. Texas has a SIP-approved PSD permitting program that contains requirements for the permitting authority to notify air agencies whose lands may be affected by emissions from that source, no sources within Texas are the subject of an active finding under section 126 of the FCAA with respect to the 2015 ozone NAAQS, and there are no final findings under section 115 of the FCAA against the State of Texas with respect to the 2015 ozone NAAQS.

In conclusion, this SIP revision demonstrates that Texas meets the interstate transport requirements of FCAA, §110(a)(2)(D)(i)(I) as well as the requirements of FCAA, §110(a)(2)(D)(i)(II) for prevention of significant deterioration and visibility transport and the interstate pollution abatement and international air pollution requirements of FCAA, §110(a)(2)(D)(ii).

## CHAPTER 8: FUTURE REVISIONS TO THE NATIONAL AMBIENT AIR QUALITY STANDARDS (NAAQS)

Federal Clean Air Act (FCAA), §110(a)(1) requires states to submit state implementation plans within three years after the promulgation of new or revised NAAQS to meet the requirements of FCAA, §110(a)(2), including FCAA, §110(a)(2)(D), relating to interstate transport. Therefore, if the NAAQS are revised in the future, the Texas Commission on Environmental Quality will need to take the adequate steps relating to the interstate transport of air pollution.

*Appendices Available Upon Request*

Kristin Patton
kristin.patton@tceq.texas.gov
512.239.4907

## RESPONSE TO COMMENTS RECEIVED CONCERNING THE TRANSPORT STATE IMPLEMENTATION PLAN (SIP) REVISION FOR THE 2015 EIGHT-HOUR OZONE STANDARD

The Texas Commission on Environmental Quality (commission or TCEQ) conducted a public hearing in Austin on April 10, 2018, at 2:00 p.m. During the comment period, which closed on April 10, 2018, the commission received comments from the Lone Star Chapter of the Sierra Club (Sierra Club).

**TABLE OF CONTENTS**
General Comments
Emissions
Control Strategies

**GENERAL COMMENTS**
Sierra Club commented that the final 2015 Ozone NAAQS Transport SIP revision should include the latest information on nonattainment area designations.

**The TCEQ has updated the SIP revision to include the latest available information related to final area designations for the 2015 ozone NAAQS.**

Sierra Club commented that many EPA rules and decisions are under ongoing litigation and that the SIP revision should be updated for any changes resulting from existing litigation.

**The SIP revision includes the latest information related to ongoing litigation available at the time of development. As noted in Section 1.2: *Introduction* of the SIP revision, the TCEQ acknowledges that proposed changes to federal regulations may have future impacts on how the TCEQ meets the requirements of FCAA, §110(a)(2)(D); however, this SIP revision reflects the methods and means by which Texas meets these requirements at the time this SIP revision was developed. Should future federal rule changes necessitate state rule changes, the TCEQ will act appropriately at that time.**

**EMISSIONS**
Sierra Club suggested that historical $NO_x$ emission trends for Bexar County or the greater San Antonio area be included in the SIP revision.

**$NO_x$ emissions trends for Bexar County and the greater San Antonio area are included as part of the statewide trends discussed in the SIP revision in Section 2.3.2: *Historical Emissions Inventory Trends.* The request for additional emission trend analysis specific to Bexar County or the San Antonio area is outside the scope of this SIP revision.**

Sierra Club commented that the SIP revision should address the extent to which coal plants in northeastern Texas could impact ozone in nearby states, specifically Oklahoma and Arkansas.

**The TCEQ's modeling indicates there are no projected nonattainment or maintenance monitors in Oklahoma and Arkansas for the 2015 ozone NAAQS. Any ozone impacts on Oklahoma or Arkansas specifically from coal-fired power plants in northeastern Texas beyond the requirements of FCAA, §110(a)(2)(D) are not relevant for the purposes of this transport SIP revision. Further analysis presented in this SIP revision was limited to the tagged projected nonattainment and/or maintenance monitors in Arizona, California, and Colorado and determined that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at these downwind monitors or in any other state.**

CONTROL STRATEGIES

Sierra Club commented that the SIP revision should include a discussion about control strategies on oil and gas and what is being done to limit ozone formation as a result of oil and gas emissions, particularly in the Permian Basin.

**The SIP revision includes a discussion of existing control strategies related to oil and gas emissions in Chapter 4: *Control Strategies*. Additional controls are not addressed in this SIP revision as Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 eight-hour ozone NAAQS in any other state.**

**ORDER ADOPTING**
**REVISIONS TO THE STATE IMPLEMENTATION PLAN**

**Docket No. 2017-1762-SIP**
**Project No. 2017-039-SIP-NR**

On August 8, 2018, the Texas Commission on Environmental Quality (Commission), during a public meeting, considered adoption of revisions to the State Implementation Plan (SIP). The Commission adopts the Transport SIP Revision for the 2015 ozone National Ambient Air Quality Standards (NAAQS). The SIP revision outlines the requirements of FCAA, Section 110(a)(2)(D)(i) and (ii) and the Texas provisions supporting the requirements for the 2015 ozone NAAQS. The revision also includes a technical demonstration to support the determination that Texas meets the interstate transport requirements of Section 110(a)(2)(D)(i)(I). The infrastructure requirements of FCAA, Section 110(a)(2)(A) through (C) and (E) through (M) are addressed in a separate SIP revision (Non-Rule Project No. 2017-040-SIP-NR). Under Tex. Health & Safety Code Ann. §§ 382.011, 382.012, and 382.023 (West 2016), the Commission has the authority to control the quality of the state's air and to issue orders consistent with the policies and purposes of the Texas Clean Air Act, Chapter 382 of the Tex. Health & Safety Code. Notice of the proposed SIP revision was published for comment in the March 23, 2018, issue of the *Texas Register* (43 TexReg 1907).

Pursuant to 40 Code of Federal Regulations § 51.102 and after proper notice, the Commission conducted a public hearing to consider the SIP revision. Proper notice included prominent advertisement in the areas affected at least 30 days prior to the date of the hearing. A public hearing was held in Austin on April 10, 2018.

The Commission circulated hearing notices of its intended action to the public, including interested persons, the Regional Administrator of the EPA, and all applicable local air pollution control agencies. The public was invited to submit data, views, and recommendations on the proposed SIP revision, either orally or in writing, at the hearing or during the comment period. Prior to the scheduled hearing, copies of the proposed SIP revision were available for public inspection at the Commission's central office and on the Commission's website.

Data, views, and recommendations of interested persons regarding the proposed SIP revision were submitted to the Commission during the comment period, and were considered by the Commission as reflected in the analysis of testimony incorporated by reference to this Order. The Commission finds that the analysis of testimony includes the names of all interested groups or associations offering comment on the proposed SIP revision and their position concerning the same.

IT IS THEREFORE ORDERED BY THE COMMISSION that the revisions to the SIP incorporated by reference to this Order are hereby adopted. The adopted revisions to the SIP are incorporated by reference in this Order as if set forth at length verbatim in this Order.

IT IS FURTHER ORDERED BY THE COMMISSION that on behalf of the Commission, the Chairman should transmit a copy of this Order, together with the adopted revisions to the SIP, to the Regional Administrator of EPA as a proposed revision to the Texas SIP pursuant to the Federal Clean Air Act, codified at 42 U.S. Code Ann. §§ 7401 - 7671q, as amended.

        If any portion of this Order is for any reason held to be invalid by a court of
competent jurisdiction, the invalidity of any portion shall not affect the validity of the
remaining portions.


                                        TEXAS COMMISSION ON
                                        ENVIRONMENTAL QUALITY


                                        _____
                                        Bryan W. Shaw, Ph.D., P.E., Chairman


                                        _____
                                        Date Signed

**EPA, Proposed Rule,** *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,* **87 Fed. Reg. 9,798 (Feb. 22, 2022)**


**9798** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R06–OAR–2021–0801, EPA–HQ–OAR–2021–0663; FRL–9338–01–R6]**

### Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma and Texas regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard (NAAQS). This provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The "good neighbor" or "interstate transport" requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. This disapproval, if finalized, will establish a 2-year deadline for the EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless the EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** Written comments must be received on or before April 25, 2022.

**ADDRESSES:** You may send comments, identified as Docket No. EPA–R06–OAR–2021–0801, by any of the following methods: Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments or via email to *fuerst.sherry@epa.gov.* Include Docket ID No. EPA–R06–OAR–2021–0801 in the subject line of the message.

*Instructions:* All comments submitted must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any

personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Sherry Fuerst, EPA Region 6 Office, AR–SI, 214–665–6454, *fuerst.sherry@epa.gov.* We encourage the public to submit comments via *https://www.regulations.gov,* as there will be a delay in processing mail and no courier or hand deliveries will be accepted. Please call or email the contact above if you need alternative access to material indexed but not provided in the docket.

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket ID No. EPA–R06–OAR–2021–0801, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R06–OAR–2021–0801 contains information specific to Arkansas, Louisiana, Oklahoma, and Texas, including the notice of proposed rulemaking, submittals from the states, and the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).

Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action, including Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, and Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R06–OAR–2021–0801. For additional submission methods, please contact Sherry Fuerst, 214–665–6454, *fuerst.sherry@epa.gov.* For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.* Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets.*

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our Federal partners so that we can respond rapidly as conditions change regarding COVID–19.

The index to the dockets for this action, Docket No. EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663, are available electronically at *https://www.regulations.gov.* While all documents in the docket are listed in the index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

Throughout this document, "we," "us," and "our" means the EPA.

### Table of Contents

I. Background
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Regulatory Process
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS
    1. Selection of Analytic Year
    2. Step 1 of the 4-Step Interstate Transport Framework
    3. Step 2 of the 4-Step Interstate Transport Framework

149

4. Step 3 of the 4-Step Interstate Transport Framework
5. Step 4 of the 4-Step Interstate Transport Framework
II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ADEQ SIP Submission
1. Evaluation of Information Provided by ADEQ Regarding Step 1
2. Evaluation of Information Provided by ADEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas
4. Evaluation of Information Provided by ADEQ Regarding Step 3
5. Evaluation of Information Provided by ADEQ Regarding Step 4
6. Conclusion
III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the LDEQ SIP Submission
1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana
3. Evaluation of Information Provided by LDEQ Regarding Step 3
4. Evaluation of Information Provided by LDEQ Regarding Step 4
5. Conclusion
IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the ODEQ SIP Submission
1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2
2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma
3. Evaluation of Information Provided by ODEQ Regarding Step 3
4. Evaluation of Information Provided by ODEQ Regarding Step 4
5. Conclusion
C. Impact on Areas of Indian Country
V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission
A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS
B. EPA Evaluation of the TCEQ SIP Submission
1. Evaluation of Information Provided by TCEQ Regarding Step 1
i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors
ii. Evaluation of the TCEQ Modeling
2. Evaluation of Information Provided by TCEQ Regarding Step 2
3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas
4. Evaluation of Information Provided by TCEQ Regarding Step 3
5. Evaluation of Information Provided by TCEQ Regarding Step 4
6. Conclusion
VI. Proposed Action
VII. Statutory and Executive Order Reviews

# I. Background

## A. Description of Statutory Background

On October 1, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "interstate transport" or "good neighbor" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two requirements, often referred to as "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of the EPA's 4-Step Interstate Transport Regulatory Process

The EPA is using the 4-Step interstate transport framework (or 4-Step framework) described in detail below to evaluate states' SIP submittals

addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] and the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] the EPA, working in partnership with states, developed the following 4-Step framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.*, nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (*i.e.*, downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

---

[1] "National Ambient Air Quality Standards for Ozone", Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

[3] *See North Carolina* v. *EPA*, 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] *See* "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals", 76 FR 48208 (Aug. 8, 2011).

[5] *See* "Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS", 81 FR 74504 (Oct. 26, 2016).

[6] In 2019, the D.C. Circuit Court of Appeals remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA*, 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA*, 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to the CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "NO$_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

**9800** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values (DVs)[8] which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone DVs for the identified downwind nonattainment and maintenance receptors, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected ozone design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which we requested comment on preliminary interstate ozone transport data including projected ozone DVs and interstate contributions for 2023 using a 2011 base year platform.[9] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 NAAQS.[10] On October 27, 2017, we released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[11] On March 27,

2018, we issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-Step framework.[12] The March 2018 memorandum also included the then newly available contribution modeling data to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-Step framework.[13] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-Step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-Step interstate transport framework.[14]

Since the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state

collaborative project.[15] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that the EPA had used to project ozone DVs and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone DVs and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[16] *See* 85 FR 68964, 68981. Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected DVs and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[17]

Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model[18] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, which is included in Docket ID No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling of the 2016v2 emissions using the most recent publicly released version of the Comprehensive Air-quality Model with extensions (CAMx) photochemical modeling, version 7.10.[19] The EPA now proposes to rely on the air quality modeling performed using CAMx, version 7.10, and the newly available 2016v2 emissions platform in evaluating states' submissions with respect to Steps

---

[8] A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are typically used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. *See https://www.epa.gov/air-trends/air-quality-design-values#report.*

[9] *See* ''Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS)'', 82 FR 1733 (January 6, 2017).

[10] 82 FR at 1735.

[11] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', October 27, 2017, (''October 2017 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/*

*interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', March 27, 2018, (''March 2018 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[13] The March 2018 memorandum, however, provided, ''While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the interstate transport provision. Any such determination would be made through notice-and-comment rulemaking.''

[14] *See* EPA memorandums, ''Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', August 31, 2018 (''August 2018 memorandum''), and ''Considerations for Identifying Maintenance Receptors for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', October 19, 2018 (''October 2018 memorandum''), available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[15] The results of this modeling, as well as the underlying modeling files, are included in Docket ID No. EPA–HQ–OAR–2021–0663.

[16] *See* 85 FR 68964, 68981 (Oct. 30, 2020).

[17] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, available in Docket ID No. EPA–HQ–OAR–2021–0663 for this action.

[18] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[19] Ramboll Environment and Health, January 2021, *www.camx.com.*

**Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules　　9801

1 and 2 of the 4-Step framework and generally referenced within this action as 2016v2 modeling for 2023. By using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking. Sections II–V of this action and the Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions, included in Docket ID No. EPA–HQ–OAR–2021–0663 for this proposal, contain additional detail on the EPA's 2016v2 modeling. In this action, the EPA is inviting public comment on this updated 2023 modeling, which uses a 2016v2 emissions platform. Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Sections II–V of this action, we evaluate how the states used air quality modeling information in their submissions.

*D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS*

The EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the 1998 NO$_X$ SIP Call [20] have necessitated the application of a uniform framework of policy judgments in order to ensure an "efficient and equitable" approach. *See*

*EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

The EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[21] However, the EPA made clear in Attachment A that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [22] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [23] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, the EPA will review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year,

definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy analysis.

1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[24] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating interstate transport air quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). 938 F.3d at 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the interstate transport provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable

---

[20] *See* 63 FR 57356. The NO$_X$ SIP Call required 22 eastern states and the District of Columbia to submit state implementation plans (SIPs) that set statewide ozone season NOx budgets that would reduce emissions of NO$_X$.

[21] March 2018 memorandum, Attachment A.
[22] *Id.* at A–1.
[23] *Id.*

[24] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

attainment date,[25] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[26] The EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR at 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal the EPA proposes to use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to

have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-Step framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, we proceed to the next step of our 4-Step framework by identifying the upwind state's contribution to those receptors.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. The EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[27]

For the purpose of this proposal, the EPA identifies "nonattainment" receptors as those monitoring sites that are projected to have average DVs in 2023 that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored DVs. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[28]

In addition, in this proposal, the EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[29] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air

quality was determined by evaluating the "maximum" future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum DV is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average DVs above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official DVs. In addition, those monitoring sites with projected average DVs below the NAAQS, but with projected maximum DVs above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official DVs.

### 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not significantly contribute to

---

[25] We note that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the 4-Step interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[26] *See* CAA section 181(a); 40 CFR 51.1303; "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

[27] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[28] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[29] *See* 76 FR 48208 (August 8, 2011). CSAPR Update and Revised CSAPR Update also used this approach. See 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost of controls as part of a multifactor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I). The EPA is proposing to continue to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. For ozone, as the EPA found in the Clean Air Interstate Rule (CAIR), CSAPR, and CSAPR Update, a portion of the nonattainment problem from anthropogenic sources in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of upwind states. The EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518. *See also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR); 76 FR at 48237–38 (for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at

Step 2 using the alternative threshold, the EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

## 4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor analysis of potential emissions controls. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where the EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by preparing a multifactor assessment that evaluates additional available control opportunities. While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[30]

## 5. Step 4 of the 4-Step Interstate Transport Framework

In Step 4, states (or the EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary in Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked in Steps 1 and 2 to rely on an emissions control measure in Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions. . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

## II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 10, 2019, the Arkansas Division of Environmental Quality (ADEQ) of the Arkansas Department of Energy and Environment made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The ADEQ SIP submission provided an analysis of Arkansas's air emissions impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that the State's air emissions will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind monitors projected to be in nonattainment and/or have maintenance issues in 2023 (Step 1), ADEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA modeling results included with the March 2018 memorandum provide: (1) Projected

---

[30] As examples of general approaches for how such an analysis could be conducted for

sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NO$_X$ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

average DV and maximum DV for the future year 2023 (fy 2023) for ozone monitors projected to be potential nonattainment or maintenance receptors in the 48 contiguous States and (2) the expected contribution of State emissions to the projected ozone concentrations at each ozone monitor.

At Step 2, ADEQ identified those states to which Arkansas contributes emissions and then applied a 1 ppb contribution threshold to determine projected nonattainment and/or maintenance receptors in other states that might be significantly impacted by emissions from Arkansas. ADEQ provided three rationales as a basis to support their decision to rely on a 1 ppb contribution threshold. First, ADEQ cited to the August 2018 memorandum [31] that compares the collective contribution captured by three different contribution thresholds: 1 Percent of the NAAQS, 1 ppb, and 2 ppb. ADEQ summarized the August 2018 memorandum and concluded that the 1 percent and 1 ppb contribution thresholds are generally comparable. Second, ADEQ referenced an April 2018 memorandum [32] in which the EPA examined the use of a significant impact level (SIL) value of 1 ppb for determining whether a proposed prevention of significant deterioration (PSD) source causes or contributes to a violation of the corresponding 2015 ozone NAAQS. Despite recognizing that a contribution threshold is not the same as a significance level, ADEQ claimed that a contribution threshold and significance level are sufficiently analogous to support the use of a 1 ppb contribution threshold. The final rationale ADEQ provided was based on the consistency with the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, Appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. ADEQ noted that the 1 percent contribution threshold of 0.7 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in Appendix U truncates monitor values of 0.7 ppb to 0 ppb.

As stated previously, ADEQ identified all potential nonattainment and maintenance receptors for fy 2023 showing a contribution of emissions from Arkansas.[33] These receptors are included in Table AR–1.

TABLE AR–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ARKANSAS BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|
| 260050003, Allegan, MI | 69 | 71.7 | 1.64 |
| 482011039, Harris, TX | 71.8 | 73.5 | 0.99 |
| 480391004, Brazoria, TX | 74 | 74.9 | 0.90 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 0.78 |
| 481210034, Denton, TX | 69.7 | 72 | 0.58 |
| 482011034, Harris, TX | 70.8 | 71.6 | 0.54 |
| 551170006, Sheboygan, WI | 72.8 | 75.1 | 0.51 |
| 550790085, Milwaukee, WI | 71.2 | 73 | 0.40 |
| 482010024, Harris, TX | 70.4 | 72.8 | 0.29 |
| 261630019, Wayne, MI | 69 | 71 | 0.27 |
| 240251001, Harford, MD | 70.9 | 73.3 | 0.17 |
| 90019003, Fairfield, CT | 73 | 75.9 | 0.13 |
| 90013007, Fairfield, CT | 71 | 75 | 0.13 |
| 361030002, Suffolk, NY | 74 | 75.5 | 0.12 |
| 360810124, Queens, NY | 70.2 | 72 | 0.09 |
| 90099002, New Haven, CT | 69.9 | 72.6 | 0.08 |
| 90010017, Fairfield, CT | 68.9 | 71.2 | 0.07 |
| 80590006, Jefferson, CO | 71.3 | 73.7 | 0.03 |
| 80590011, Jefferson, CO | 70.9 | 73.9 | 0.02 |
| 81230009, Weld, CO | 70.2 | 71.4 | 0.02 |
| 80350004, Douglas, CO | 71.1 | 73.2 | 0.01 |

Based on a 1 ppb contribution threshold, ADEQ identified only one fy 2023 projected maintenance receptor, Allegan County, MI, and no fy 2023 projected nonattainment receptors linked to Arkansas. ADEQ also cited other modeling performed by TCEQ and Midwest Ozone Group, which showed that when different modeling protocols were employed, future year DV projections and contributions could differ considerably. ADEQ therefore elected to consider other evidence regarding its linkage to air quality in Allegan County, MI. Specifically, ADEQ analyzed back trajectory information to infer that there is no consistent or persistent relationship between elevated ozone days in Allegan County, MI and air traveling through Arkansas. ADEQ assessed wind patterns on elevated ozone days—days with a maximum daily average 8-hour ozone (MDA8) greater than 70.9 ppb in Allegan County,

[31] "Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", August 31, 2018, available in Docket ID No. EPA–HQ–OAR–2021–0663 or at https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.

[32] See EPA memorandum from Peter Tsirigotis, Director of the Office of Air Quality planning and Standards, April 17, 2018, "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program" ("SILs Guidance" or "April 2018 memorandum"), available at: https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf.

[33] Table AR–1 lists all sites that the EPA projected to have a fy 2023 average DV or fy 2023 maximum DV greater than 70.9 ppb in our March 2018 memorandum. As Arkansas stated in the SIP submission, the EPA considers sites matching these criteria to be projected nonattainment areas and projected maintenance areas, respectively. ADEQ ranked these sites by Arkansas's potential contribution, which the EPA determined based on the daily eight-hour average contributions on the top ten concentration days in 2023.

**Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules    9805

MI. ADEQ used the National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[34] model to evaluate wind back trajectories from over a 10-year period (2008–2017).[35] Over the course of the 10-year period, ADEQ identified 95 elevated ozone days (MDA8 > 70.9 ppb) for the Allegan County, MI monitor.[36] Next, ADEQ identified the maximum ozone value within these elevated ozone days.[37] Using HYSPLIT, ADEQ ran 72-hour back trajectories using the hour of the maximum ozone value for each elevated day as the back trajectory start time. To consider the effects of vertical variations in wind flows on transport patterns, ADEQ used the following starting heights above ground level: 100m, 500m, 1000m, and 1500m. ADEQ obtained 40 km grid meteorological data for the back trajectory analysis using Eta Data Assimilation System (EDAS) data.[38] In total, ADEQ ran 152 back trajectories for each mixing height.[39] ADEQ filtered the back trajectories to determine whether further analysis is warranted using two criteria. First, ADEQ filtered out back trajectories that had a starting hour mixing height below the back trajectory start height because ADEQ asserted these air parcels would not have reached ambient air[40] at the Allegan County, MI monitor site. Second, ADEQ filtered out any back trajectory that did not have a path through any portion of Arkansas. After ADEQ applied their filter criteria, 41 out of 608 back trajectories (6.74%) remained from 22 out of the 95 elevated ozone days (23%) examined. Of the 10 years examined, ADEQ also found that air passing through Arkansas only reached Allegan County, MI on four or more days in one year: 2012.[41] For 2012, HYSPLIT analyses indicated 14 Arkansas-Allegan County, MI linked back trajectories for 7 days in total in 2012, whereas for 2011, 2013, 2014, and 2016 the HYSPLIT analyses indicated three, two, zero and one days with Arkansas-Allegan County, MI linked back trajectories, respectively. For the 10 years ADEQ's performed HYSPLITs, ADEQ's HYSPLIT analysis indicated on average 2.2 days per year had trajectories with Arkansas-Allegan County, MI linked back trajectories. ADEQ also noted that these trajectories passed through other states and through Metropolitan Statistical Areas (MSAs)[42] both before and after traversing through Arkansas. Specifically, ADEQ stated that 37 trajectories passed through the Chicago-Naperville-Elgin, IL–IN–WI MSA prior to reaching Allegan County, MI. Based on these results, ADEQ concluded that other states and MSAs were more likely to have influenced ozone concentrations at the Allegan County, MI monitor on the days with back trajectories linked to Arkansas.

In Step 3, ADEQ also considered air quality trends in Allegan County, MI, emission trends in other upwind states, relative contribution from other upwind states, and cost factors. ADEQ presented that ozone DVs in Allegan County, MI fluctuated over the 2008–2017 period with higher concentration occurring from 2012 through 2014 but declining since 2014. ADEQ also mentioned that despite the most recent 2017 DV for the Allegan County monitor continuing to show an exceedance of the 2015 ozone NAAQS, the EPA-projected 2023 ozone average DV at the Allegan County, MI monitor, based on data provided in the March 2018 memorandum, is 69.0 ppb, which would be in attainment of the 2015 ozone NAAQS in 2023.

Next, ADEQ included an evaluation of the relative contribution and the emission trends from the eight states[43] with contributions greater than 1 ppb to the Allegan County, MI receptor. The emission trends evaluation examined ozone precursors, nitrogen oxides ($NO_X$) and volatile organic compounds (VOC), from 2011 to 2017 and the model projected fy 2023 emissions level. ADEQ noted that the two states with the highest contributions to Allegan County, MI—Illinois and Indiana—have both experienced year-over-year decreases in $NO_X$ emissions in excess of 20,000 tons of $NO_X$ reduced per year. Arkansas had also experienced decreases in $NO_X$ emissions each evaluated year and emitted less $NO_X$ than any other of the potentially linked states. In addition, ADEQ referenced the EPA projections showing that most potentially linked states will continue to realize reductions in $NO_X$, as well as VOCs, through 2023. ADEQ confirmed that based on this analysis, the overall general trends of $NO_X$ and VOC emissions are declining from Arkansas and the other linked states. The continuation of trends in the emissions reductions observed, particularly from Illinois and Indiana, are anticipated by ADEQ to result in air quality improvements in Allegan County, MI.

In terms of cost analysis, ADEQ focused only on the cost of $NO_X$ controls at electric generating units (EGUs) in the State because EGUs are the largest source of $NO_X$ emissions that ADEQ regulates. In its analysis, ADEQ found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR and selective noncatalytic reduction, SNCR) at EGUs exceed the EPA's cost thresholds used for the CSAPR and CSAPR Update rules.[44] Based on ADEQ's evaluation of the evidence, ADEQ concluded that no additional controls beyond pre-existing

---

[34] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

[35] ADEQ analyzed ten years of HYSPLIT back trajectories to examine potential relationships between elevated ozone days at the Allegan County, MI monitor and emissions from Arkansas. In the SIP submission ADEQ stated their rationale for looking at an extended period of time is to gain a more complete picture of how Arkansas's emissions might contribute to elevated ozone in Allegan County, MI, rather than relying entirely on the EPA's modeling simulation, which is based on a single base year.

[36] See the AirNow-Tech website at *https://www.airnowtech.org/*. AirNow-Tech is a website for air quality data management analysis, and decision support used by the Federal, State, Tribal, and local air quality organizations.

[37] If the same maximum eight-hour value occurred multiple times a day, ADEQ evaluated all incidences of the value for that day.

[38] EDAS is an intermittent data assimilation system that uses successive three-hour model forecasts to generate gridded meteorological fields that reflect observations covering the continental United States. EDAS is accessible at *https://ready.arl.noaa.gov/edas40.php*.

[39] Mixing heights (m), defined as the height above ground level of the layer adjacent to the ground over which an emitted or entrained inert non-buoyant tracer will be mixed by turbulence.

[40] Ambient air is the "portion of the atmosphere, external to buildings, to which the general public has access." 40 CFR 50.1(e).

[41] The number of days in a given year and the number of consecutive years is of particular relevance for the ozone NAAQS, which is calculated based the annual fourth-highest daily maximum eight-hour concentration averaged over three consecutive years.

[42] MSA is defined as a geographic region with a high population density at its core and close economic ties throughout the area.

[43] The eight linked states include Illinois, 42%; Indiana, 15%; Michigan, 7%; Missouri, 6%; Texas, 5%; Wisconsin, 4%; Oklahoma, 3% and Arkansas, 4%. The remaining contribution is labeled at "Other". The linkages are based on the EPA's modeling results that are attached to the March 2018 memorandum.

[44] The EPA's Revised CSAPR Update, 86 FR 23054 (April 20, 2021), states ". . . EPA adjusted its representative cost for optimizing existing SNCR control to $1,800 per ton in response to comments received on the proposed rule . . . EPA views $1,600 per ton for optimization of existing SCR control and installation of state-of-the are $NO_X$ combustion controls and $1,800 per ton for optimization of existing SNCRs as comparable for policy purposes." ADEQ's screening analysis using the EPA tools (referencing the EPA's Air Pollution Control Cost Estimation Spreadsheet for SCR) shows that cost-effectiveness values for ozone-season operation of SCR and SNCR are: $12,605–$31,580/ton for SCR and $4,221–$45,581 for SNCR. ADEQ notes that any costs imposed to install controls at the examined EGUs would be passed on to Arkansas ratepayers.

state and Federal regulations were warranted for Arkansas sources to satisfy interstate transport obligations for the 2015 ozone NAAQS.

Based on the determinations made by ADEQ at Steps 1 through 3, ADEQ did not include any new control measures in the SIP submission to reduce ozone precursor emissions as part of a Step 4 analysis.

## B. EPA Evaluation of the ADEQ SIP Submission

The EPA is proposing to find that ADEQ's October 10, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework, and the EPA is therefore proposing to disapprove ADEQ's SIP submission.

### 1. Evaluation of Information Provided by ADEQ Regarding Step 1

At Step 1 of the 4-Step framework, ADEQ relied on the EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in Section I of this action, the EPA has recently performed updated modeling using the 2016v2 platform to evaluate interstate transport of ozone for a fy 2023.[45] The EPA proposes to primarily rely on the EPA's modeling using the 2016v2 platform (EPA 2016v2 modeling), to identify projected nonattainment and maintenance receptors in fy 2023. Updating the base period from 2011 (base period used in data included in the March 2018 memorandum) to a more recent year (2016) allows for better projections of which monitors will have problems attaining and/or maintaining the 2015 ozone NAAQS and factors in more recent base year DVs. The EPA notes that with a switch from 2011 base period meteorology to 2016 base period meteorology, it is normal and expected that the potential downwind nonattainment or maintenance receptors would change due to the different weather patterns that occurred in the different base periods, which impacts both the transport of pollutants from upwind states and what receptors have

higher monitored values within nonattainment/maintenance regions.[46] Modeling using both the 2011 and 2016 based years consistently project that certain areas will have problems attaining and/or maintaining the 2015 ozone NAAQS including receptors in Texas.

### 2. Evaluation of Information Provided by ADEQ Regarding Step 2

As noted earlier, ADEQ utilized a 1 ppb threshold at Step 2 to identify whether the State was "linked" to a projected downwind nonattainment or maintenance receptor. ADEQ identified linkages for Arkansas to one 2023 projected maintenance receptor, Allegan County, MI, and no 2023 projected nonattainment receptors.

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the state's submittal. Instead, ADEQ cited to the EPA's SILs Guidance as a basis to support the use of a 1 ppb threshold; however, ADEQ did not explain the relevance of the SILs Guidance to ADEQ's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS. The SILs Guidance is not applicable to

the interstate transport provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold. In any case, both the EPA's most recent modeling, EPA 2016v2 modeling, and the modeling relied on by ADEQ in its SIP submittal, indicate that the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While the EPA does not, in this action, propose to approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, (as shown in Table AR–2) the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could

---

[45] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[46] We note that ADEQ identified additional modeling performed by TCEQ and Midwest Ozone Group, but simply concluded that different modeling can lead to differences in DV projections and ozone contributions of these two alternative modeling analyses, only TCEQ's modeling using a 2012 base year identified receptors in Texas that projected different DVs for the Texas receptors identified in the EPA's 2011 base year. We discuss the EPA's review of the TCEQ's modeling elsewhere in this action and the Technical Support Document for this action "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801), but we do conclude that TCEQ and recent monitoring data indicate that there are problematic receptors that are expected to be either nonattainment or maintenance receptors in 2023 including the Texas receptors identified in our March 2018 memorandum with Arkansas linkages.

support approval.[47] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[48] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant

equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[49] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018

memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

ADEQ included information in its SIP submission regarding back trajectories, emissions trends, and EGU cost controls to conclude that emissions from Arkansas should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a persistent and consistent pattern of contribution from the State. While it is not entirely clear whether ADEQ was analyzing these factors under Step 2 or Step 3, the EPA is evaluating such arguments under Step 3, as we view these statements in the SIP submission to speak to whether or not a contribution is "significant" once a linkage is established.

### 3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023 (EPA 2016v2 modeling). This data was examined to determine if Arkansas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table AR–2, the data[50] indicate that in 2023, emissions from Arkansas contribute greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas: Denton County (Monitor ID. 481210034), Brazoria County (Monitor ID. 480391004), Harris County (Monitor ID. 482010055, Monitor ID. 482011034,

---

[47] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[48] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[49] *See* August 2018 memorandum, at page 4.

[50] Design values and contributions at individual monitoring sites nationwide are provided in the file: 2016v2_DVs_state_contributions.xlsx which is included in docket ID No. EPA-HQ-OAR-2021–0663.

and Monitor ID. 482011035).[51][52] Therefore, based on the EPA's evaluation of the information submitted by ADEQ, and based on the EPA model 2016v2 results for 2023, the EPA proposes to find that Arkansas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE AR–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH ARKANSAS LINKAGES IN 2023 BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 70.4 | 72.2 | 0.76 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 1.39 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 1.00 |
| 482011034, Harris, TX | Maintenance | 70.3 | 71.6 | 1.38 |
| 482011035, Harris, TX | Maintenance | 68.0 | 71.6 | 1.34 |

We recognize that the results of the EPA modeling released in the March 2018 memorandum (2011 base year) and the EPA 2016v2 modeling (2016 base year) identified different receptors and linkages at Steps 1 and 2 of the 4-Step framework. These differing results about receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In doing so, we are not considering our own earlier modeling results included in EPA's March 2018 memorandum to be of equal reliability relative to more recent EPA 2016v2 modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

### 4. Evaluation of Information Provided by ADEQ Regarding Step 3

At Step 3 of the 4-Step framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

ADEQ included in their SIP submission a further analysis of its modeled linkage to Allegan, MI (the only linked receptor it analyzed, based on its application of a 1 ppb threshold). Arkansas stated that the purpose and its conclusion of this analysis was that it would not contribute significantly to the Allegan, MI monitor because the state's emissions did not result in a consistent and persistent pattern of ozone contribution. As stated earlier, EPA 2016v2 modeling projects that the Allegan County, MI receptor will be attaining and is not expected to have difficulty maintaining the standard in 2023. As such, the EPA is not relying on the comparative analysis of emissions trends that ADEQ provided in order to conclude that Arkansas's emissions do not contribute significantly to a nonattainment or maintenance problem in Allegan, MI. We note however, that ADEQ's SIP submission and response to comments do not clearly define what ADEQ considers to be persistent and consistent pattern of contribution. Rather, the SIP submission simply states that contribution should be deemed "significant" only if there is a persistent and consistent pattern of several days with elevated ozone.

To be clear, the modeling establishing linkages of Arkansas to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from Arkansas to other states. That is because EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor[53] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels (ten days is preferred with a minimum of five days). The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to

---

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Arkansas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in docket EPA–HQ–OAR–2021–0663.

[52] Allegan County Monitor ID. 260050003 is not a receptor in 2023 in the EPA 2016v2 modeling. 2023 avg DV is 67.3 ppb and 2023 Max. DV is 68.4 ppb, so the Allegan County monitor is not a receptor in 2023 for nonattainment or maintenance.

[53] The relative response factor (RRF) is a ratio developed using the modeled changes between the base case and future case for high ozone modeled days. Typically, the 10 highest MDA8 modeled days in the base case are found and the maximum value from the 3x3 grid centered on the monitor for each day is used to calculate a 10-day average base case modeled value. Then a similar concentration average is developed for same 10 base case days and the same grid cell that provided the base case concentration to calculate a future year 10-day average modeled value using the future year modeling results. The RRF is then calculated by using this future year 10-day average model value divided by the base case 10-day average model value to develop a ratio representing the change in modeled ozone. The RRF is then multiplied times the base DV value to result in a projected future year DV.

estimate impacts on the days with highest projected ozone levels. The EPA's approach, as detailed in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA–HQ–OAR–2021–0663, does this by estimating the average fy 2023 impact from an upwind state on the days with the highest projected ozone levels at the downwind nonattainment or maintenance receptor. The days chosen to analyze the future impacts are chosen initially by the selecting the ten highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not ten days above 65 ppb at a potential receptor, the number of days above 65 ppb are used as long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in fy 2023 are not calculated. The base and future year modeling for these five to ten days is then used to project fy 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For the same five to ten days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the five to ten days to result in the average contribution from the upwind area.

As mentioned previously, ADEQ used HYSPLIT back trajectories to assess wind patterns on elevated ozone days in an attempt to demonstrate that there is not persistent and consistent pattern of contribution from Arkansas to the Allegan County, MI receptor. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentration at the end point monitor. The horizontal and vertical areas that potentially contribute to the end point concentration grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT

centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. Chemical transport models, such as the one relied upon by Arkansas to establish the linkage between Arkansas and those downwind receptors in the first instance, do take these factors into account and therefore provide a more robust assessment of ozone contribution.

During ADEQ's public comment period, the EPA submitted comments noting concerns regarding the methodology ADEQ used in their HYSPLIT back trajectories analysis.[54] While we are not providing a detailed evaluation of ADEQ's HYSPLIT analysis in this rulemaking, we do note that our review identified a number of concerns with how ADEQ screened out a number of back trajectories, which invalidates ADEQ's conclusions.[55] While we disagree with ADEQ's methodologies and conclusions, we note that ADEQ's

HYSPLIT back trajectory information did not show that the base years used in the EPA modeling (2011 and 2016) demonstrated an unusual amount of transport of air parcels from Arkansas to nonattainment or maintenance receptors in downwind states (*i.e.,* the modeling years used by the EPA do not skew the results toward finding linkages).[56] Therefore, although Arkansas asserted that its additional air quality factor analysis using back trajectory analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone," the modeled linkage at Step 2 is a superior approach for assessing the persistence of a state's contribution. It is superior because it is based on the average of the contributions on the five to ten highest ozone days. Considering the form of the standard, this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard. The modeling is also a better method because it accounts for dispersion while back trajectory analysis as performed by Arkansas only shows the centerline of air parcel travel and otherwise will leave out days when Arkansas would have contributed to downwind problems. Finally, because the modeling accounts for dispersion and chemical reactions, it can provide a quantitative estimate of contribution.

ADEQ also contested the significance of its modeled contribution above 1 ppb based on the relatively larger contributions of other upwind states to the receptor to which it was linked. The EPA disagrees that a state's small contribution relative to other upwind states is a permissible basis for finding no obligation under the interstate transport provision. CAA 110(a)(2)(D)(i)(I) requires states and the EPA to address interstate transport of air pollution that *contributes to* downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve

---

[54] The EPA reviewed the ADEQ SIP submission and provided comments during the State's public comment period for the proposed SIP action. The EPA's comment letter and ADEQ's response to comments are included in ADEQ's October 19, 2019, SIP submission, which is available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[55] Concerns included removing of HYSPLIT back trajectories based on start height, the start time that Arkansas used for the back trajectories and removing of back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing. Texas also screened their HYPSLIT back trajectories similarly to Arkansas and we have further discussed our concerns and why such screening invalidates conclusions from the HYSPLIT back trajectory analyses. *See* EPA's review and conclusions in discussion of TCEQ's HYSPLIT analyses in the "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[56] ADEQ's summary of trajectories indicated that 2011 had three linked back trajectories and 2016 had one linked back trajectories and the EPA calculated the average for 2008–2017 in ADEQ's table was 2.2 linked back trajectories per year.

downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own "significant contribution" or "interference" with the ability of other states to attain or maintain the NAAQS. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3d 303 at 323–324. The court viewed these arguments as essentially an argument "that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d 303 at 324. The court explained that "an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* At 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (D.C. Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County.*"). Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states also contribute some amount of pollution to the same receptors to which the state is linked.

ADEQ did not provide additional analysis for other receptors to which it was linked above 1 percent in the air quality modeling upon which it relied, and to which it continues to be linked in EPA 2016v2 modeling. To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general

approach (*i.e.,* Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. As discussed below, ADEQ did not conduct an adequate analysis in their SIP submission. We therefore propose that ADEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Arkansas failed to adequately do so.

In analyzing potential additional $NO_X$ controls, ADEQ found that additional controls on its EGUs would exceed the cost-effectiveness thresholds identified in the CSAPR and CSAPR Update rules. For the cost analysis, Arkansas only focused on the potential costs of $NO_X$ controls for EGUs. As stated above, Arkansas found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR, and selective noncatalytic reduction, SNCR) at electric generating units (EGUs) exceed EPA's cost thresholds used for the CSAPR and CSAPR Update rules. Based on the projected cost of these controls relative to the thresholds used in those two prior EPA rules, Arkansas concluded that no new controls beyond those Federal and State regulations already in existence were cost-effective, especially considering that Allegan County, MI is projected to be in attainment with the 2015 ozone NAAQS

and Arkansas's small contribution relative to other states potentially linked to Allegan County, MI based on EPA's modeling.

Arkansas's analysis is inadequate because its focus is only on EGUs.[57] *See Wisconsin,* 938 F.3d at 318–20. We also find Arkansas's conclusions as to the availability of cost-effective controls for EGUs to be inadequate. Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. ADEQ's submission failed to provide a justification for why the $1400/ton threshold used in the CSAPR Update is appropriate to rely on for the 2015 ozone NAAQS. ADEQ's analysis does not consider any air quality impacts of assessed controls at downwind receptors. As stated above, assessing cost-effectiveness in the context of ozone transport requires more than just assessing the cost of controls per ton of $NO_X$ removed. As such, ADEQ's assessment of the cost of controls and reliance on the marginal cost threshold of $1,400/ton used for the CSAPR Update is inadequate. Furthermore, EPA 2016v2 modeling captures all existing CSAPR trading programs in the baseline and confirms that these control programs were not sufficient to eliminate Arkansas's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

---

[57] In 2017, National Emission Inventory (NEI) $NO_X$ emissions from EGU sources represent 56% percent of the total $NO_X$ emissions categories in Arkansas that report emissions to the NEI. *See* AR NOx.xlsx datasheet included in the Regional docket for this action (Docket ID No. EPA–R06–OAR– 2021–0801).

5. Evaluation of Information Provided by ADEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for the development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. ADEQ's SIP submission, which looked only at additional $NO_X$ controls at EGUs and dismissed such controls as not cost-effective relative to the thresholds established in earlier EPA transport rules, did not constitute an adequate emission reduction analysis at Step 3. Based on its conclusions, ADEQ did not revise its SIP to include any emission reductions. As a result, the EPA proposes to disapprove ADEQ's submittal on the separate, additional basis that Arkansas has not developed or included permanent and enforceable emissions reductions in its SIP necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

6. Conclusion

Based on the EPA's evaluation of ADEQ's SIP submission, the EPA is proposing to find that ADEQ's October 19, 2019, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

### III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On November 13, 2019, the Louisiana Department of Environmental Quality

(LDEQ) made a SIP submission addressing the State of Louisiana's interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided LDEQ's analysis of Louisiana's impact to downwind states and concluded that emissions from Louisiana will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

The LDEQ's SIP submission provided an analysis of Louisiana's air emissions impact to downwind states using a 3-Step alternative framework similar to the EPA's 4-Step framework. LDEQ's 3-Step alternative framework includes: Step 1: Identify monitors projected to be in nonattainment or have maintenance issues in a future year; Step 2: Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review; and, Step 3: Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2. LDEQ noted that its Step 1 is identical to the EPA's Step 1, and its Steps 2 and 3 are equivalent to the EPA's Step 2. Louisiana further noted that Steps 3 and 4 of the EPA's 4-Step framework are relevant only if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

LDEQ's Step 1 was to identify downwind monitors projected to be in nonattainment and/or have maintenance issues in future year 2023 (fy 2023). At this step, LDEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA March 2018 modeling results provided: (1) Projected average DV and maximum DV for 2023 for the ozone monitors (or "receptors") in the 48 contiguous states and (2) the expected contribution of

state emissions to the projected ozone concentrations at each ozone monitor.

LDEQ used a contribution threshold of 1 ppb in LDEQ's Step 2 to identify projected nonattainment and/or maintenance receptors in other states that might be impacted by emissions from Louisiana and tagged them for further review. To support a 1 ppb contribution threshold, LDEQ's submission stated that a 1 percent threshold is inappropriate because that value is not detectable by a monitor and the value of 1 percent of the 2015 ozone NAAQS would be truncated to zero if calculated in accordance with the method for determining DVs for the ozone NAAQS. LDEQ also stated that the more stringent threshold of 1 percent of the NAAQS (0.7 ppb) is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.[58] Based on LDEQ's approach of evaluating linkages at the 1 ppb threshold, five Texas receptors were identified by Louisiana for analysis. The Texas receptors and corresponding receptor data presented in Louisiana's SIP are summarized further in this notice in Table LA–1.[59] The March 2018 memorandum identified monitors in Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin as potential nonattainment and maintenance-only receptors linked to emissions from Louisiana based on 1 percent of the NAAQS threshold. However, Louisiana did not include the Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin receptors in the State's analysis because the March 2018 memorandum shows that Louisiana's projected modeled contribution values to each receptor is less than 1 ppb.

TABLE LA–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY LOUISIANA BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 Average DV (ppb)[60] | 2023 Maximum DV (ppb)[61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 480391004, Brazoria, TX | 74.0 | 74.9 | 3.80 |

[58] The Louisiana SIP submittal did not provide a specific citation to the Simon et al., 2012 reference to support this assertion. However, we believe the reference is associated with the following article: Simon, H., Baker, K.R., Phillips, S., 2012. "Compilation and interpretation of photochemical model performance statistics published between

2006 and 2012". Atmospheric Environment 61, 124–139.

[59] The five potential nonattainment and maintenance receptor monitors identified by LDEQ are from the Dallas-Fort Worth and Houston-Galveston-Brazoria, TX nonattainment areas for the

2015 ozone NAAQS. The Louisiana SIP submittal appears to have inadvertently omitted Harris County, TX Monitor ID No. 482011034 for analysis. EPA's March 2018 memorandum identified this monitor as a maintenance receptor with a contribution of 3.38 ppb from Louisiana emissions.

**9812**    **Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

Table LA–1—Projected Nonattainment and Maintenance Receptors Identified by Louisiana Based on the EPA's March 2018 Memorandum—Continued

| Receptor (site ID, county, state) | 2023 Average DV (ppb)[60] | 2023 Maximum DV (ppb)[61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 482011039, Harris, TX | 71.8 | 73.5 | 4.72 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 |
| 481210034, Denton, TX | 69.7 | 72.0 | 1.92 |
| 482010024, Harris, TX | 70.4 | 72.8 | 4.72 |

For LDEQ's Step 3, Louisiana stated that an air emission contribution from the State should only be considered significant if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In trying to determine whether there is a persistent and consistent pattern of contribution, LDEQ analyzed seasonal weather patterns, surface wind directions, and periodic back trajectories. LDEQ used the National Oceanic and Atmospheric Administration (NOAA) Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[62] model to perform 99 back trajectories for exceedances from the receptor monitors identified in Table LA–1 for 2016, 2017, and 2018. Based on an analysis of the HYSPLIT results, LDEQ stated that approximately 28% of the trajectories travel in or through Louisiana, and only 8% of those back trajectories originate in the State. The SIP submission also stated that a comparison of the EPA's modeled contribution between Texas and Louisiana monitors indicates that a far greater proportion of the total ozone detected in Louisiana originates in Texas rather than vice versa. Therefore, Louisiana concluded that the impact from the State's air emissions was insignificant to the overall attainment at the receptor monitors identified in Table LA–1 and does not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

*B. EPA Evaluation of the LDEQ SIP Submission*

The EPA is proposing to find that LDEQ's November 13, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport

framework, and the EPA is therefore proposing to disapprove Louisiana's SIP submission.

1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2

At Step 1 of the 4-Step interstate transport framework, LDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. At Step 2 of the 4-Step interstate transport framework, LDEQ relied on the EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. LDEQ additionally utilized a 1 ppb threshold at Step 2 to identify whether the state was "linked" to a projected downwind nonattainment or maintenance receptor. As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. In any case, the State is projected to contribute greater than both the 1 percent and the alternative 1 ppb thresholds to receptors in Texas, regardless of whether we look at LDEQ's analysis (which relied on the EPA's older modeling) or updated modeling the EPA has performed in advance of this proposal. As seen in the tables LA–1 and LA–2, Louisiana contributes nearly five times the 1 ppb threshold to nonattainment or maintenance receptors in Texas. Therefore, while the EPA does not, in this action, approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

The EPA here shares further evaluation of its experience since the

issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[63] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[64] The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be

---

[60] Information added from the EPA's March 2018 memorandum.

[61] *Id.*

[62] *See* FN 34.

---

[63] *See* August 2018 memorandum, at page 4.

[64] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The Agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[65] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is not a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.*, roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[66] in the EPA's updated modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not at this time rescinding the August 2018 memorandum. The basis for a proposed disapproval of LDEQ's SIP submission with respect to the Step 2 analysis we believe is warranted under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on public comments received and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023.[67] This data was examined to determine if Louisiana contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table LA–2, the data[68] indicate that in 2023, emissions from Louisiana contributed greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas.[69] Therefore, based on the EPA's evaluation of the information submitted by LDEQ, and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Louisiana is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 482010024, Harris, TX | Nonattainment | 75.2 | 76.8 | 4.31 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 5.39 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 7.03 |

[65] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[66] *See* August 2018 memorandum, at page 4.

[67] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[68] DVs and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[69] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform, which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Louisiana had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone DVs and Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING—Continued

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX ............................ | Maintenance .................................................... | 70.4 | 72.2 | 3.22 |
| 482011034, Harris, TX ................................ | Maintenance .................................................... | 70.3 | 71.6 | 4.93 |
| 482011035, Harris, TX ................................ | Maintenance .................................................... | 68.0 | 71.6 | 4.77 |

3. Evaluation of Information Provided by LDEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements) to determine whether, and to what degree, emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment, or interfere with maintenance of" the NAAQS in any other state. LDEQ did not conduct such

an analysis in their SIP submission. Instead LDEQ interpreted the Act's requirements as only requiring an analysis of emission reductions where there was a "consistent and persistent" pattern of contribution and conducted an air-quality-only analysis in order to refute such a pattern. We propose to find that LDEQ was required to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant, and we propose to disapprove its submission because LDEQ did not do so.

As noted, LDEQ stated in its SIP submission that emissions from Louisiana should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a "persistent and consistent" pattern of contribution from the State. The SIP submission does not explain what LDEQ considers to be a persistent and consistent pattern of contribution, even after the LDEQ received a comment during its state comment period that requested that the LDEQ define "persistent and consistent" in terms of impacts on downwind states. The LDEQ responded, "Louisiana has defined the pattern and has provided back trajectories on those monitored exceedances for the 2016–2018 ozone seasons, which will show that the definition is applicable to the conclusion." [70] We do not agree that this suffices as an explanation as to why LDEQ does not need to further analyze its potential emission reductions under Step 3 before determining it has no statutory obligation under the interstate transport provision. In the case of Louisiana, modeling in the March 2018 memorandum and the EPA's more recent 2016v2 modeling both project that receptors in the Houston-Galveston-Brazoria (HGB) and Dallas-Fort Worth (DFW) ozone nonattainment areas in Texas will have difficulty attaining or maintaining the 2015 ozone NAAQS, and Louisiana's contribution to these

areas exceed both a 1 percent or a 1 ppb threshold. While linkages to specific receptors may change with updated modeling, both modeling analyses consistently show emissions from Louisiana impact both downwind nonattainment receptors and downwind maintenance receptors in Texas.

The LDEQ SIP submission stated that Louisiana's contribution should be deemed "significant" per CAA section 110(a)(2)(D)(i)(I) only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. LDEQ asserted that its linkages to Texas do not warrant further analysis because, according to LDEQ, emissions from Louisiana do not persistently and consistently contribute on several days of elevated ozone. However, the EPA modeling that LDEQ relied upon to demonstrate linkages in the first instance already establishes that there is a consistent and persistent pattern of contribution from Louisiana to Texas receptors on elevated ozone days. The EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor [71] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels. The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to estimate impacts on the days with highest projected ozone levels. The days chosen to analyze the future impacts are chosen initially by the selecting the 10 highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not 10 days above 65 ppb at a potential receptor, the number of days above 65 ppb are used so long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in 2023 are not calculated. The base and future year modeling for these

---

[70] See LDEQ SIP Submission, Appendix A, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[71] See FN 53.

5–10 days are then used to project 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For these same 5–10 days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the 5–10 days to result in the average contribution from the upwind area.

LDEQ's air quality analysis used to dismiss its linkages to Texas receptors as not "significant" consists of an evaluation of seasonal weather patterns, surface wind directions, and periodic back trajectories. The State's weather pattern analysis relied on large-scale weather patterns as they relate to commonly observed wind directions rather than weather patterns and conditions that are specifically conducive to ozone formation or tied to specific days when high ozone was monitored in the downwind areas. General weather pattern discussions that are not associated with specific ozone episodes are not generally informative of interstate transport decisions. It is necessary to investigate specific instances of high ozone, because as discussed previously, violations of the ozone standard can be driven by as few as 4 days per year because the compliance with the standard is evaluated based on the average of the fourth high value measured each of three consecutive years.

LDEQ's wind rose analysis is based on surface sites in the Dallas-Fort Worth areas, Houston-Galveston-Brazoria areas, and other areas in Texas and Louisiana, but the analysis does not address transport winds between Louisiana and the Texas areas with receptors on high ozone days at the identified receptors. There are several limitations associated with LDEQ's wind rose analysis: (1) Wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate ozone transport; (2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; (3) wind directions change temporally over the range of time involved in ozone transport from Louisiana to Texas; and (4) the wind roses are based on wind data measured throughout the year, not just during either ozone season or monitored ozone episode days. In addition, as discussed previously, LDEQ's wind rose analysis is not limited to the wind conditions that are conducive to high ozone, so it does not

provide information directly pertinent to when ozone is high at areas in Texas and whether Louisiana is a contributing area during those specific times.

LDEQ also included 99 back trajectory analyses during the 2016, 2017, and 2018 years for the dates of ozone exceedances at the monitors referenced in Table LA–1 of this action. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. LDEQ's HYSPLIT back trajectory analysis for 2016, 2017, and 2018 showed that on high ozone days in Texas at the receptors identified by the EPA in the 2018 memorandum that 28% of the trajectories passed through Louisiana. LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions but did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would be contributing areas. LDEQ's trajectory analysis

confirmed that Louisiana is an upwind area for the receptors in Texas often enough to potentially contribute to nonattainment or interfere with maintenance. The analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses (i.e., the EPA's modeling results in the March 2018 memorandum and EPA 2016v2 model).

Photochemical modeling simulations for ozone interstate transport assessment is relied upon by the EPA to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales. Photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For the 2015 ozone NAAQS interstate transport analysis, the EPA performed nationwide, state-level ozone source apportionment modeling using CAMx to quantify the contribution of $NO_X$ and VOC emissions from all sources in each state to project 2023 ozone concentrations at ozone monitoring sites. Detailed information for the EPA's modeling may be found in the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663.

LDEQ concluded in the SIP submittal, citing an article [72] published in 2012, that the use of 1 percent of the standard for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS. LDEQ's reasoning for this conclusion is that the more stringent 0.7 ppb threshold "is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling." First, the EPA does not use the 1 percent threshold as the sole definition of significant contribution; at Step 2 of the analysis, the 1 percent threshold is used to identify contributions between states and downwind problem areas for further analysis at Step 3. Second, photochemical transport models such as CAMx have been extensively peer reviewed and used to support SIPs and explore relationships between inputs and air quality impacts in the U.S. and beyond. The EPA works to continually develop and update both the guidelines

---

[72] Simon et al., supra FN 58.

**9816** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

on using modeling results and the latest versions of photochemical model platforms to support scientific assessments and regulatory determinations. Prior to using photochemical modeling to support a regulatory assessment, a model performance evaluation is completed to establish a benchmark to assess how accurately the model predicts observed concentrations and to identify model limitations. The model performance evaluation provides a better understanding of the model's limitations and biases and serves as a diagnostic evaluation for further model development and improvement. As discussed in Section I of this document and the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663, the EPA follows the most recent established modeling guidance and provides with this action the updated modeling analysis based on the recent CAMx model update. By using the most recent 2016v2 photochemical modeling enhancements (EPA 2016v2 modeling) results are more representative of the projected local and regional air quality as it is based on more recent emission estimates with fewer years between the base case year (2016) and the future year (2023). In addition, to reduce the impact of any potential biases or errors, the EPA uses the modeling results in a relative sense rather than rely on absolute model predictions.[73]

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state. For example, on a specific day the modeled vs. monitored ozone value may differ by 2 ppb but that is relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all the 2 ppb, in the above example, to the estimated impact from a single state as the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor and natural background emissions.

In sum, the EPA disagrees that the estimates of potential error in the models estimates of total ozone, call into question the use of 1 percent as a threshold for linkage. As noted earlier, in the case of Louisiana, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present at both threshold levels. As to Louisiana's conclusion that the impacts from Louisiana's emissions are not persistent, the contribution analysis is the average impact for at least 5 days and up to 10 days for the 2016 base period which is sufficiently persistent considering the first through fourth day monitored values set the monitored DV.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results means that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Louisiana is linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.*, Louisiana was linked to a different set of receptors in one modeling run versus another). These results indicates that Louisiana's emissions were substantial enough to generate linkages at Steps 1 and 2 to at least some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

### 4. Evaluation of Information Provided by LDEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, LDEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at

Step 4. To the extent that LDEQ discussed emissions reductions, the State only provided a summary of existing already implemented enforceable control regulations. The EPA's 2016v2 modeling analyses have already accounted for the implementation of the regulations cited by LDEQ's submission—including the CSAPR rulemakings and prior regional rulemakings—and even with those reductions in place, the modeling results consistently show receptors that are projected to be in nonattainment or to struggle with maintenance, and Louisiana contributing to those receptors. Relying only on the existing enforceable control regulations is insufficient to address the Louisiana air emission contributions to linked downwind air quality problems. As a result, the EPA proposes to disapprove LDEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

### 5. Conclusion

Based on the EPA's evaluation of LDEQ's SIP submission, the EPA is proposing to find that LDEQ's November 13, 2019, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

## IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 25, 2018, the Oklahoma Department of Environmental Quality (ODEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided ODEQ's analysis of their impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that emissions from Oklahoma will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind air quality problems that are linked to emissions

---

[73] *See* ''Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$ and Regional Haze'', Nov. 29, 2018, at 101, available at *https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf* (''2018 Air Quality Modeling Guidance''). *See also* ''Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze'', Dec. 3, 2014, at 97–98, available at *https://www.epa.gov/sites/default/files/2020-10/documents/draft-o3-pm-rh-modeling_guidance-2014.pdf* (''2014 Draft Air Quality Modeling Guidance'').

*Federal Register* / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules        **9817**

from Oklahoma and therefore warrant further review and analysis (Steps 1 and 2), ODEQ used EPA interstate transport modeling results found in the March 2018 memorandum. The EPA modeling results projected: (1) An average DV and a maximum DV for the year 2023 for ozone monitors in the 48 contiguous States and (2) the expected contribution from emissions in each state to the ozone concentrations at each ozone monitor.

ODEQ used the information from the March 2018 EPA memorandum to

identify six downwind nonattainment and maintenance receptors [74] with a contribution from Oklahoma of 1 percent of the 2015 ozone NAAQS (0.70 parts ppb) or greater. ODEQ then applied a 1 ppb threshold to remove from further analysis three receptors with a contribution from Oklahoma of less than 1 ppb. ODEQ noted that the possibility of using an alternative contribution threshold was one of the areas of flexibility identified in the March 2018 EPA memorandum and discussed further in the August 2018

EPA memorandum. To support its alternative contribution threshold, ODEQ referenced an EPA memorandum from April 17, 2018, which recommended a Significant Impact Level (SIL) for ozone of 1.0 ppb for proposed sources subject to the Prevention of Significant Deterioration (PSD) permitting program.[75] Table OK–1 provides information on the six nonattainment and maintenance receptors identified by ODEQ, including the three receptors ODEQ identified for further analysis.

TABLE OK–1—NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ODEQ BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) | ODEQ's step 1 and 2 determination |
|---|---|---|---|---|
| 260050003, Allegan, MI ................................. | 69.0 | 71.7 | 1.31 | Maintenance receptor identified for further analysis. |
| 481210034, Denton, TX ................................. | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX ................................. | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX ............................... | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 550790085, Milwaukee, WI .......................... | 71.2 | 73.0 | 0.76 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 551170006, Sheboygan, WI .......................... | 72.8 | 75.1 | 0.95 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

ODEQ further evaluated the two Texas receptors (Tarrant County and Denton County) and the receptor in Allegan County, MI. ODEQ did not further evaluate the contribution from Oklahoma to the receptors in Brazoria County, TX, Milwaukee County, WI, and Sheboygan County, WI because the contributions from Oklahoma to these receptors were less than 1 ppb.

For the two remaining Texas receptors, ODEQ returned to Steps 1 and 2 of the 4-Step interstate transport framework using modeling performed by the Texas Commission on Environmental Quality (TCEQ). The TCEQ modeling results are included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801). ODEQ stated that the primary difference between the EPA modeling and the TCEQ modeling is that the TCEQ modeling used 2012 as the "base year" for assessing interstate transport

of ozone pollution in 2023 whereas the EPA modeling used 2011 as the base year for that assessment. In addition, the ODEQ stated that TCEQ used a method different from the EPA's method to identify whether a monitor would have trouble maintaining the 2015 ozone NAAQS (*i.e.*, a maintenance receptor). To identify maintenance receptors, TCEQ calculated a "maintenance future year (fy) DV" by projecting to 2023 the most recent regulatory DV that contains the base year (*i.e.*, the 2012–2014 DV for a base year of 2012), whereas the EPA's methodology for identifying maintenance receptors uses the maximum DV, which is the highest monitored DV from among the three DVs that contain the base year (*i.e.*, the 2009–2011, 2010–2012 and 2011–2013 DVs for a base year of 2011).

To assess whether Oklahoma is linked to nonattainment of the 2015 ozone standard at the Denton and Tarrant

County sites, ODEQ switched to using the 2023 average DV projected by TCEQ rather than the EPA's projected average DVs. The ODEQ noted that the projected 2023 average DV was 68 ppb for the Denton County site and 66 ppb for the Tarrant County site based on the TCEQ modeling. ODEQ then claimed that these results demonstrate that both of these sites are in attainment in 2023.

To assess whether Oklahoma interferes with maintenance of the 2015 ozone standard at these two sites, ODEQ used (1) the Texas method to calculate a "maintenance future year DV" for 2023 and (2) a maximum DV calculated using the highest of the three base year DVs multiplied by a relative response factor derived from TCEQ's modeling (*i.e.*, EPA's method for identifying maintenance receptors but using TCEQ's modeling rather than EPA's modeling). This assessment is summarized in Table OK–2.

---

[74] Nonattainment receptors are monitoring sites that are anticipated to have problems attaining and maintaining the 2015 ozone NAAQS (*i.e.*, average

projected 2023 DV greater than 70.9 ppb). Maintenance receptors are monitoring sites that are anticipated to have problems maintaining the 2015

ozone NAAQS (*i.e.*, maximum projected 2023 DV greater than 70.9 ppb).

[75] *See* FN 32.

**9818** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

TABLE OK–2—SUMMARY OF TCEQ MODELING (2012 BASE PERIOD) USED BY ODEQ TO ASSESS MAINTENANCE RECEPTORS

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) (EPA method)* | Maintenance DV (ppb)(TCEQ method) | ODEQ's step 1 and step 2 determination |
|---|---|---|---|---|
| 481210034 Denton, TX ................. | 68 | 70.7 | 65.9 | Future DVs project no attainment or maintenance problems. |
| 484392003 Tarrant, TX ................. | 66 | 69.9 | 62.4 | Future DVs project no attainment or maintenance problems. |

* These values are not based on calculations made by the EPA. ODEQ calculated these values by using the maximum DV for the 2010–2014 5-year period (i.e., the highest of the DVs in 2012, 2013, and 2014) multiplied by relative response factor for the receptor obtained from TCEQ's modeling.

ODEQ noted in their assessment that based on the TCEQ modeling and TCEQ definition of maintenance receptor, it is expected that the Denton and Tarrant sites will not experience nonattainment or maintenance problems in 2023. Because ODEQ claimed that the Denton and Tarrant County sites will not be nonattainment or maintenance receptors in 2023, ODEQ did not analyze potential emissions reductions at Step 3 to address its contribution to these two sites.

With respect to the remaining receptor at Allegan County, MI, ODEQ provided an analysis of projected 2023 DVs for this site and information on emissions trends in Oklahoma to assert that emissions from Oklahoma do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the Allegan County, MI site.

ODEQ noted that (1) the DV for the Allegan County, MI site has had a substantial reduction in the last 6 years from 84 ppb in 2012 to 73 ppb in 2017, a 1.8 ppb per year decrease, on average and (2) the Allegan County, MI site is substantially influenced by mobile sources from the Chicago area and these emissions are expected to be greatly reduced in the near future, by roughly a 1 ppb per year decrease, leading to attainment of the 2015 ozone standard. The ODEQ then calculated a projected 2023 maintenance DV for the Allegan County, MI site using the EPA's method, but assuming that the base year was 2016 rather than 2011, as in the EPA's modeling or 2012 as in the TCEQ modeling. The ODEQ noted that the maximum DV in the 2016-centered base period (i.e., 2014–2016, 2015–2017, and 2016–2018) was 75 ppb at the Allegan County, Michigan site. The ODEQ then calculated the difference between the 2011-centered base period maximum DV of 86 ppb and the 2023 projected maximum DV of 71.7 ppb, using data from the EPA's modeling. The ODEQ calculated a ''ppb per year'' reduction of 1.1917 ppb per year, based on the 14.3 ppb difference between the 2011-centered and 2023 maximum DVs over the 12 years from 2011 to 2023. Finally, ODEQ applied the 1.1917 ppb per year value to the 2016-centered maximum DV of 75 ppb to estimate a 2023 maximum DV of 66.66 ppb.

ODEQ also asserted that the relatively small contribution from Oklahoma (3% of total upwind state contributions) combined with the distance between Oklahoma sources and the Allegan County, Michigan site, warrants a focus on nearby states with greater proportional contributions as the most prudent approach to addressing interstate transport of ozone precursors for this receptor.

The ODEQ also provided the anthropogenic $NO_X$ and VOC data of Oklahoma's emissions from EPA's emission trends and modeling to demonstrate an anticipated substantial reduction of $NO_X$ and VOC from 2011 to 2023: (1) Reductions of $NO_X$ from 405,000 to 235,000 tons per year and (2) reductions of VOC from 414,000 to 295,000 tons per year.[76] ODEQ noted these reductions should result in considerable reductions in ozone concentrations. The ODEQ stated that due to the emissions reductions required by rules like CSAPR, the 2016 CSAPR Update, and the regional haze requirements, the $NO_X$ emissions from electric generation in Oklahoma have dropped significantly during the ozone season from 38,285 tons per year in 2011 to 10,435 tons per year in 2017. ODEQ also stated that changes in the Southwest Power Pool[77], building of

additional windfarms, and electric utilities installing solar generation facilities have led to Oklahoma $NO_X$ emissions reductions; and that any additional $NO_X$ reductions from the electric generation section would require more costly emissions controls. ODEQ concluded that the existing controls in Oklahoma have resulted in significant decreases in ozone DVs in Oklahoma and that additional controls would not be cost-effective. Given their conclusions, ODEQ did not adopt additional controls to reduce ozone precursor emissions (Step 4).

*B. EPA Evaluation of the ODEQ SIP Submission*

The EPA is proposing to find that ODEQ's October 25, 2018, SIP submission does not demonstrate that the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework have been met. The EPA is therefore proposing to disapprove ODEQ's submission.

1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2

As noted earlier, ODEQ first used the information from the EPA's March 2018 memorandum to identify nonattainment and maintenance receptors with a contribution from Oklahoma of 0.70 ppb or greater (i.e., ODEQ identified receptors that would be deemed nonattainment and maintenance receptors under the EPA's methodology for Steps 1 and 2). ODEQ then utilized a 1 ppb threshold and elected not to further analyze any receptors to which it did not contribute greater than 1 ppb.

[76] ODEQ used the EPA's emissions data shared alongside the October 2018 memorandum, ''state-sector_annual_emissions_data_1.xlsx'' available at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[77] The Southwest Power Pool is a regional electric transmission organization regulated by the Federal Energy Regulatory Commission whose purpose is promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the provision of electric transmission services. It manages electric transmission in portions of fourteen states: Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming. *See* 18 CFR 35.34 and *https://www.ferc.gov/electric-power-markets.*

**Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

ODEQ provided further evaluation of the State's emissions to those receptors to which Oklahoma contributes greater than 1 ppb (*i.e.,* Allegan County, MI, Denton County, TX and Tarrant County, TX).

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the ODEQ's submittal. Instead, ODEQ's SIP submission justified the State's use of a 1 ppb threshold based on the threshold's use in the SILs Guidance.[78] ODEQ did not explain the relevance of the SILs Guidance to Oklahoma's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS, and it is not applicable to the interstate transport provision, which requires states to eliminate emissions that contribute significantly or interfere with maintenance of the NAAQS at known, ongoing, or projected air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals

for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[79] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[80] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional

implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[81] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of

---

[78] *See* FN 32.

[79] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[80] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[81] *See* August 2018 memorandum, at page 4.

fully addressing interstate transport. Accord 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments.) Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

In any case, as discussed in the following subsection, based on the EPA's most recent modeling, the State is projected to contribute greater than both the one percent and alternative 1 ppb thresholds at the Denton County, TX receptor, (Monitor ID. 481210034). Based on the EPA's modeling results included in the March 2018 memorandum, Oklahoma was also projected to contribute 1.23 ppb to the Denton County, TX receptor. (In the EPA 2016v2 modeling the Allegan County, MI and Tarrant County, TX receptors are not projected to have problems attaining or maintaining the 2015 ozone NAAQS). Even under ODEQ's own analysis, the State was linked to receptors with contributions exceeding 1 ppb. Therefore, based on Oklahoma's linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework is inconsequential to our proposed action on the state's SIP.

In the remainder of this section, EPA evaluates ODEQ's conclusions that emissions from Oklahoma do not contribute to nonattainment or interfere with maintenance at receptors in Tarrant County, TX (Monitor ID. 484392003) and Denton County, TX (Monitor ID. 481210034). We evaluate ODEQ's conclusions as to the Allegan, MI (Monitor ID. 260050003) in Section IV.B.3 of this action.

With regard to the Denton County and Tarrant County, TX receptors cited in ODEQ's submission, ODEQ chose to rely on the TCEQ's modeling and methodology, instead of the EPA modeling, and trends in ozone DVs and emissions to conclude that these monitoring sites will be in attainment by 2023 and will not have a problem maintaining the 2015 ozone NAAQS. As noted in Section IV.A of this action, ODEQ used modeling results from the TCEQ along with the TCEQ alternative method for identifying maintenance receptors to claim that using the TCEQ modeling and methods, the Denton County and Tarrant County monitors would not have a problem maintaining the NAAQS in 2023. The ODEQ supplemented that analysis by citing the downward trend in NO$_X$ and VOC emissions in Oklahoma. ODEQ also provided TCEQ modeling and emissions data for the Dallas-Fort Worth nonattainment area to show that mobile sources represent the largest emissions category in this area and that emissions from this sector have declined since 2005 and are expected to continue to decline in the future. As described in Table OK–2, ODEQ (1) provided the average 2023 DV for the Denton County, TX receptor from the TCEQ modeling and (2) used TCEQ modeling data with a 2012 base year to calculate a 2023 maintenance DV of 65.9 ppb (using the TCEQ methodology for identifying maintenance receptors) and a 2023 maximum DV of 70.7 ppb (using the EPA methodology for identifying maintenance receptors, combined with TCEQ's modeling results). ODEQ relied on this information, which is based on TCEQ modeling with a 2012 base year, to conclude that the Denton County, TX and Tarrant County, TX monitors would not have problems attaining and maintaining the 2015 ozone NAAQS.

ODEQ's SIP submission (or TCEQ, to the extent that Oklahoma is merely incorporating and relying on Texas' submission) does not adequately explain or justify how relying on TCEQ's method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. EPA proposes to find that ODEQ has provided no sound technical basis (either on its own or through reliance on Texas) for how its chosen methodology gives meaning to the CAA's instruction that states submit interstate transport SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In North Carolina v. EPA, 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase ''interfere with maintenance'' in the interstate transport provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year, but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did not adequately protect ''[a]reas that find themselves barely meeting attainment.'' Id. at 910. Consequently, the EPA has developed a methodology, used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. See 76 FR at 48227–28. EPA's approach to addressing maintenance receptors was upheld in the EME Homer City litigation. See 795 F.3d 118, 136–37. It was also upheld in Wisconsin. 938 F.3d at 325–26. In Wisconsin, the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. Id. at 327.

In order to explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality.

The EPA's air quality modeling guidance has long recommended developing a base DV (i.e., the DV that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (e.g., if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[82] The average of these three DVs is then multiplied by a relative response factor[83] to generate an average DV for the future year.[84] If a receptor's average

---

[82] See FN 73.

[83] See FN 53.

[84] While it is not critical to this discussion, for purposes of explanation, the relative response factor is a fractional change that represents how ozone at a given receptor responds to changes in emissions when all other variables are constant. For more explanation of the RRF, please see 2018 Air Quality Modeling Guidance or 2014 Draft Air Quality Modeling Guidance.

**Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules    **9821**

future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average DV (e.g., in the 2011 example, if 2009–2011 had the highest DV of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest DV to generate a projected future maximum DV. Where a receptor's maximum DV exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of variable conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year DV to project a receptor's average DV in the future year. For maintenance receptors, however, TCEQ elected not to examine variability in DVs over a five-year period by using the highest DV of the three DVs making up the base year DV. Instead, TCEQ (and by extension, ODEQ), used only the most recent DV of the three DVs, regardless of whether the most recent DV was highest or lowest. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [85] TCEQ in its submission does not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given meteorological variability. In fact, because TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions, Texas' methodology appears to be aimed at *limiting* receptors which could be identified as maintenance receptors, compared to the EPA's methodology, which was designed to identify those

areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions.

As discussed further in the EPA Region 6 TSD [86] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (i.e., 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many

receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment method as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. Further, it is unreasonable to have a method that would not identify nonattainment receptors also as maintenance receptors.

Again, EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. Neither TCEQ nor ODEQ addressed in their SIP submissions whether the three years that comprise the most recent DV (i.e., 2012, 2013, and 2014) had meteorological conditions conducive for formation of high ozone concentrations. On the other hand, the EPA methodology can identify variations in ozone levels that might result in difficulty in maintaining the standard over a longer period of time. The TCEQ method will only identify areas that have difficulty maintaining the standard for a single design value period and, as a result, does not address the meteorological variability issue sufficiently.

In its SIP submittal, ODEQ contended that, based on TCEQ's use of a 2012 base year, and using TCEQ's air quality modeling, even if Texas had used the EPA's method of identifying maintenance receptors, the projected maximum DVs for the Denton County and Tarrant County receptors would be 70.7 ppb and 69.9 ppb, respectively, which are considered to be in attainment of the 2015 ozone NAAQS in 2023. However, this conclusion relied upon a relative response factor derived from the TCEQ modeling and TCEQ's modeling results, which are discussed in more detail in Section V of this action and in the EPA Region 6 TSD.[87] TCEQ's modeled projections for 2023 including nonattainment and maintenance values (using either TCEQ' or EPA's methodology) are much lower than recent monitored values (2018–2020 DV and preliminary 2019–2021 DVs) [88] for

---

[85] TCEQ submission at 3–39 to 3–40, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[86] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket No. EPA–R06–OAR–2021–0801.

[87] Id.

[88] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at Continued

many monitors and the amount of further DV reductions needed to match TCEQ's modeling is more than is reasonably expected to occur for many monitors/receptors. This underestimation of future DVs results in mis-identifying these two receptors and other receptors as not being nonattainment or maintenance receptors. Specifically, these two receptors would need to have at least a 3–4 ppb decrease in the next 2–3 years just to attain the 2015 Ozone NAAQS in 2023. As discussed in the EPA Region 6 TSD, TCEQ's previous DFW Attainment Demonstration SIP includes long-term DV trends analysis that indicates that DFW DVs decrease approximately 1 ppb per year.[89] Moreover, as discussed in Section IV.B.2 of this action, the EPA's updated modeling, which relies upon more recent data and the latest information on emissions reductions, indicates that the maximum design value in 2023 for the Denton County receptor is 72.2 ppb. Recent monitored air quality data at the Denton receptor are consistent with the EPA's projections that this is an area that will struggle to maintain the 2015 ozone NAAQS in 2023; the 2020 DV for Denton was 72 ppb.[90]

Finally, in its submittal, ODEQ pointed to the significant reductions in emissions that have occurred in the State, but the EPA believes these reductions have already been accounted for in the most recent modeling; therefore, even with these reductions, the Denton County, TX receptor is projected to struggle with maintenance of the 2015 ozone NAAQS in 2023.

### 2. Results of the EPA's Step 1 and Step 2 Modeling Analysis and Findings for Oklahoma

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 platform to project DVs and contributions for 2023. This data was examined to determine if Oklahoma contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table OK–3, the most recent modeling data [91] indicate that in 2023, emissions from Oklahoma contribute greater than one percent of the standard to maintenance-only receptors in Denton County, TX and in Cook County, IL. Oklahoma is not linked to any nonattainment receptors in EPA's most recent modeling (EPA 2016v2 modeling). Therefore, based on the EPA's evaluation of the information submitted by ODEQ and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Oklahoma is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE OK–3—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH OKLAHOMA LINKAGES IN 2023 BASED ON EPA 2016v2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2020 DV | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) |
|---|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 72 | 70.4 | 72.2 | 1.19 |
| 170310032, Cook, IL | Maintenance | 74 | 69.8 | 72.4 | 0.75 |

### 3. Evaluation of Information Provided by ODEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. at 519. While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. ODEQ did not conduct such an analysis in their SIP submission.

As noted earlier, ODEQ provided some data on emissions and already implemented emissions reductions for sources in Oklahoma and stated that the 2016 CSAPR Update is the only reasonable control warranted based on Oklahoma's limited contributions to the Michigan and Texas receptors. Thus, Oklahoma relied on its EGUs being subject to the CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1400/ton (2011$) for the 2008 ozone NAAQS) to argue that it had already implemented all cost-effective emissions reductions, and had no additional statutory

---

[89] EPA also analyzed trends using AQS data, See EPA Region 6 TSD.

the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

[90] DVs and contributions at individual monitoring sites nationwide are provide in the file: "2016v2_DVs_state_contributions.xlsx" which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[91] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted above. That modeling showed that Oklahoma had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR–2021–0663.

obligation to prohibit emissions under CAA section 110(a)(2)(D)(i)(I) with respect to the 2015 ozone NAAQS.

The EPA disagrees with ODEQ's conclusions for the following reasons: First, the CSAPR Update did not regulate non-electric generating units, and thus this analysis is incomplete. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS.

In addition, the most recent EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate Oklahoma's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

Finally, relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on FIP measures to meet SIP requirements. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

In addition, ODEQ's submission included a weight of evidence evaluation of its contribution to the Allegan County, MI receptor to conclude that it does not contribute significantly to nonattainment or maintenance at the receptor.

The EPA disagrees with respect to ODEQ's assertion regarding the relatively small contribution of emissions from Oklahoma to the Allegan County, MI receptor compared to emissions from other upwind states such as Illinois. Whether emissions from other states or countries also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is contributing significantly to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

Further, the court in *Wisconsin* explained that downwind jurisdictions often may need to heavily rely on emissions reductions from upwind states in order to achieve attainment of the NAAQS, 938 F.3d at 316–17; such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached by the relevant deadline, *Maryland,* 958 F.3d at 1204. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other sources of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3dat 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.*at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss.*

*Comm'n on Envtl. Quality* v. *EPA,*790 F.3d 138, 163 n. 12 (D.C. Cir. 2015) (observing that the argument the "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County*."). Therefore, a state is not excused from eliminating its significant contribution on the basis that other upwind states also contribute some amount of pollution to the same receptors to which the state is linked.

As explained in Section IV.A of this action, ODEQ's weight of evidence also concluded that the Allegan receptor would be attaining the NAAQS in 2023 based on an analysis that assumed a projection of a linear reduction in DVs across a 12-year period (2011 to projected 2023 values), and then applied that annual reduction (1.1917 ppb/year) to the receptor's 2016-centered base maximum DV (75 ppb). The EPA does not necessarily agree that the assumptions made in Oklahoma's weight-of-evidence analysis are reasonable; however, because the updated modeling also shows that Allegan County, MI is no longer a receptor in 2023, we propose to find such assumptions are inconsequential to our action on Oklahoma's SIP.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* Oklahoma was linked to a different set of receptors in one modeling run versus another). These results indicate that emissions from Oklahoma are substantial enough to generate linkages at Steps 1 and 2 to at least some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

We therefore propose that ODEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine

whether its contributions were significant. Because ODEQ failed to perform this analysis, we propose to disapprove its submission.

4. Evaluation of Information Provided by ODEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, ODEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove ODEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

5. Conclusion

Based on the EPA's evaluation of ODEQ's SIP submission, the EPA is proposing to find that the portion of ODEQ's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions which will interfere with maintenance of the 2015 ozone NAAQS in any other state.

*C. Impact on Areas of Indian Country*

Following the U.S. Supreme Court decision in *McGirt* v *Oklahoma,* 140 S Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described below. In addition, the State only sought approval to the extent that such approval is necessary for the State to administer a program in light of *Oklahoma Dept. of Environmental*

*Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[92]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all of the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country. As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe.

The EPA's approval under SAFETEA expressly provided that to the extent the EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by the EPA's approval of Oklahoma's SAFETEA request.[93] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).[94]

[92] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian reservations. *ODEQ* did not, however, substantively address any request under the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until the EPA's decision, described in this section, on October 1, 2020.

[93] The EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the State. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by the EPA's approval of Oklahoma's SAFETEA request.

[94] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020 SAFETEA approval. *See https://www.epa.gov/ok/proposed-withdrawal-and-reconsideration-and-supporting-information.* The EPA is engaging in further consultation with tribal governments and expects to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020 approval is the subject of a pending challenge in federal court. *Pawnee Nation of Oklahoma* v *Regan,* No. 20–9635 (10th Cir.). The EPA may make further changes to

As explained earlier, the EPA is proposing to find that the portion of Oklahoma's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions which will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and the EPA's October 1, 2020, SAFETEA approval, this disapproval if finalized as proposed will extend to areas of Indian country in Oklahoma where the State has SIP planning authority.

**V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission**

*A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On August 17, 2018, the Texas Commission on Environmental Quality (TCEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided TCEQ's analysis of their impact to downwind states using a framework similar to EPA's 4-Step framework and concluded that emissions from Texas will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

In the submittal, TCEQ provided the steps they used to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other States: (1) Identify monitors projected to be in nonattainment or have maintenance issues in future year 2023; (2) identify for further review projected nonattainment and/or maintenance monitors in other states that are impacted by emissions from Texas; and (3) determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors identified in TCEQ Step 2. TCEQ stated that their Step 1 is the same as EPA's Step 1 and that their Steps 2 and 3 are equivalent to EPA's Step 2. TCEQ used a

the approval of Oklahoma's program to reflect the outcome of the proposed withdrawal and reconsideration of the October 1, 2020 SAFETEA approval. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country before the finalization of this proposed rule, such a change may affect the scope of the EPA's final action on the proposed rule.

contribution threshold of one percent of the NAAQS (0.7 ppb) in their Step 2 analysis to identify nonattainment and/ or maintenance monitors in other states that are impacted by emissions from Texas. TCEQ further stated that EPA's Steps 3 and 4 are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state. Because Texas TCEQ concluded that it has no such emissions, EPA's Steps 3 and 4 are not addressed in the SIP submission.

To identify monitors projected to be in nonattainment or have maintenance issues in 2023, (EPA Step 1 and TCEQ Step 1), TCEQ conducted its own regional photochemical modeling using a 2012 base year. TCEQ's modeling and EPA's modeling differ in significant respects, which are discussed in detail in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).[95] In particular, TCEQ used a 2012 base year, stating that (1) the year 2012 had above average temperatures across most of the U.S., except in some states in the southeast and (2) the year 2011, (which was used by the EPA in the NODA published on January 6, 2017

and the October 2017 updated modeling data for 2023),[96] was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895. TCEQ's modeling also used some different emissions estimates for the base year and future year 2023 emissions, including different future year emissions for EGUs. There were also some differences in methods used in the model results analysis and the model performance evaluation. TCEQ also used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023. TCEQ used only the most recent DV containing the base year 2012, (*i.e.,* the monitored DV for 2012–2014), to project a 2023 "maintenance DV" for assessing whether a monitor would have maintenance issues. The EPA's methodology uses the maximum of the three consecutive regulatory DVs containing the base year, which is the highest monitored DV from among the three DVs that contain the 2011 base year (*i.e.,* the 2009–2011 DV, 2010–2012 DV or and 2011–2013 DV that all contain modeled base year of 2011), to project a 2023 maximum DV for

assessing whether a monitor would have maintenance issues. Texas explained that it chose to define maintenance receptors in this way to capture more recent emission reductions. The SIP submittal also included a discussion of why TCEQ believes their approach for identifying maintenance receptors is appropriate. The TCEQ modeling and differences with the EPA modeling is discussed in detail in the EPA Region 6 TSD for this action.

Based on their modeling, TCEQ provided: (1) A table of downwind receptors projected to be in nonattainment of the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater and (2) a table of downwind maintenance receptors projected to have problems attaining and maintaining the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater. TCEQ identified these receptors for further analysis. The nonattainment and maintenance receptors provided by TCEQ are listed in Table TX–1. TCEQ noted that except for Arapahoe County, CO (Monitor ID. 80050002) all the maintenance receptors are also nonattainment receptors.

TABLE TX–1—PROJECTED 2023 NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY TCEQ MODELING USING 2012 BASE YEAR

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maintenance DV (TCEQ method) | Texas contribution (ppb) |
|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 |
| 80050002, Arapahoe, CO | *70 | 71 | 1.15 |
| 40038001, Cochise, AZ | 71 | **69 | 1.06 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 |

*TCEQ did not include this value in their SIP narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contributions.

** TCEQ did not provide this calculation. The EPA used TCEQ's modeling information to calculate this value using the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012–2014 DV (0.983 X 71 ppb, truncation applied).

TCEQ also noted that in the EPA's 2017 Transport NODA, the EPA's modeling linked Texas to six receptors

based on the receptors being identified as nonattainment or maintenance receptors and based on a 0.7 ppb

contribution threshold. TCEQ provided a table of those monitors along with the EPA and TCEQ modeling results for

---

[95] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf)

included in Docket ID No. EPA–R06–OAR–2021– 0801.

[96] The NODA and the October 2017 modeling are discussed in Section I.C of this action.

those receptors (Table TX–2).[97] TCEQ stated that the differences are due to changes the TCEQ made to modeling inputs (primarily the different base year of 2012 versus the EPA's 2011),

analysis, and methodologies (primarily TCEQ's alternate maintenance receptor methodology), see the EPA Region 6 TSD included in the Regional docket for this action (Docket ID No. EPA–R06–

OAR–2021–0801) for more details. With exception of the Jefferson County, CO receptor (Monitor ID. 80590011) TCEQ did not further review its linkages to any of the receptors in Table TX–2.

TABLE TX–2—TCEQ INFORMATION ON RECEPTORS LINKED TO TEXAS BY EPA MODELING IN THE TRANSPORT NODA PUBLISHED ON JANUARY 6, 2017

| Receptor (site ID, county, state) | EPA 2023 average DV (ppb) | EPA Texas contribution (ppb) | TCEQ 2023 average DV (ppb) | TCEQ Texas contribution (ppb) |
|---|---|---|---|---|
| 260050003, Allegan, MI | 68.8 | 2.49 | 71 | 0.59 |
| 551170006, Sheboygan, WI | 71.0 | 1.92 | 70 | 0.73 |
| 240251001, Harford, MD | 71.3 | 0.91 | 65 | 0.69 |
| 360850067, Richmond, NY | 71.2 | 0.77 | 62 | 0.67 |
| 361030002, Suffolk, NY | 71.3 | 0.71 | 67 | 0.63 |
| 80590011, Jefferson, CO | 69.7 | 1.03 | 71 | 1.26 |

TCEQ then used a weight of evidence approach to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the receptors listed in Table TX–1. TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. Consideration was given to factors such as DV trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors. Our evaluation of the TCEQ submission is further discussed in Section V.B and in the EPA Region 6 TSD for this action.

*B. EPA Evaluation of the TCEQ SIP Submission*

Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

1. Evaluation of Information Provided by TCEQ Regarding Step 1

As explained in Section I of this action, at Step 1 of the 4-Step interstate transport framework, the EPA identifies

monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.*, nonattainment and maintenance receptors). In executing this step, TCEQ elected to rely on their own modeling and methodology for identifying receptors. The EPA is evaluating the TCEQ's modeling and methodology here at Step 1.

i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors

As discussed in Section V.A of this action, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. TCEQ has not adequately explained or justified how its method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. The EPA proposes to find that TCEQ has not provided a sufficient technical basis for how its chosen methodology gives meaning to the CAA's instruction that states submit good neighbor SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA*, 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase "interfere with maintenance" in the good neighbor provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did

not adequately protect "[a]reas that find themselves barely meeting attainment." *Id.* at 910. Consequently, the EPA has developed a methodology, as described elsewhere in this action and used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. The EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin*. 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as the EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

To explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality. The EPA's air quality modeling guidance has long recommended developing a base design value (DV) [98] (*i.e.*, the design value that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.*, if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[99] The

---

[97] TCEQ SIP Submission, at page 3–49 (Table 3–12).

[98] *See* FN 8.

[99] *See* FN 73.

*Federal Register* / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules    9827

average of these three DVs is then multiplied by a relative response factor (RRF) [100] to generate an average DV for the future year. If a receptor's average future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average design value (*e.g.,* in the 2011 example, if 2009–2011 had the highest design value of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest design value to generate a projected future maximum design value. Where a receptor's maximum design value exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year design value to project a receptor's average design value in the future year. For its maintenance receptors, however, TCEQ used only the most recent design value of the set of three DVs, regardless of whether the most recent design value was highest or lowest, instead of considering variability in conditions over a five-year period, or using the highest DV of the three DVs making up the base year design value. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [101] However, TCEQ in its submission does not explain how this methodology takes into account meteorological variability in identifying those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

TCEQ argued that the 3-year DV used includes some meteorological

variability. Unfortunately, the three years of variation that TCEQ accounted for is already built into the structure of the standard. Thus, the TCEQ method gave no consideration to the variability between calculated DVs which provides a direct indication of the difficulty a receptor will have in maintaining the standard. In other words, to determine whether a receptor will have difficulty maintaining the standard, one must consider the variation in the metric that will be used to determine compliance with the standard. An indication of the variability of a metric cannot be determined by only considering a single estimate of that metric.

TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions. TCEQ's methodology, however, limits receptors which could be identified as maintenance receptors, compared to the EPA's methodology largely because it only looks at one design value period rather than selecting the maximum of the three DV periods EPA's methodology considers. Thus, TCEQ's methodology greatly reduces the probability that meteorological conditions which make it difficult to maintain the standard will be considered. As discussed further below, the effects of emissions trends are already captured through other aspects of the methodology to identify receptors. So, in trying to give more weight to emission reductions, by selecting only one design value (2012–2014) for its base year, TCEQ's methodology did not give any consideration to interannual variability in ozone-conducive meteorology as does the EPA's method.

The EPA's methodology, using the maximum DV which accounts for the variability in ozone concentrations and DVs due to changes in meteorology over the five years of the base year DV period, was designed to identify those areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions. TCEQ claimed that the EPA's method undervalues changes in air quality due to emission reductions and overvalues changes due to variation in meteorology. TCEQ pointed out that emissions nationwide are generally trending downward as a result of Federal motor vehicle standards and other technological improvements. The EPA agrees that ozone levels generally trend downward, but there is not a steady decline from year to year in ozone concentrations. Rather, ozone levels tend to vary from year to year with some years showing an increase instead of a decrease mainly due to inter-annual variability in ozone-

conducive meteorology.[102] The variation of DVs at individual monitors from year to year can be significant, even where emissions trend downwards. The EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP submission and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology.[103] This is precisely why it is important to consider highly variable meteorology and its influence on DVs—the issue at the heart of the D.C. Circuit's finding on "interference with maintenance" in *North Carolina.* Areas that are required under the Act to attain by an attainment date may fail to attain because of a combination of both local emissions, upwind emissions, and ozone conducive meteorology, among other factors. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind state and the EPA obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.").

In addition, TCEQ claimed that its use of the 2012–2014 DV (*i.e.,* the most recent in the 5-year base period it examined) is more reliable than the EPA's method, because that more recent DV accounts for both emission reductions and because there is a shorter interval between the monitored DV and the projected DV. As we note elsewhere, the TCEQ's base year modeled inventory is 2012 emissions and the TCEQ's model projections for 2023 include the expected emission reductions from 2012 thru 2014 and to 2023. By just using the 2012–2014 DV data, TCEQ claimed they are giving weight to emission reductions during the final base years where EPA's method does not. The effect of emission reductions, however, is already factored in the method since the modeling projection to 2023 is explicitly designed to project the changes in ozone due to emission reductions from the 2012 base year emission levels. So, in fact, the EPA method does give weight to emission reductions. Furthermore, since

---

[100] *See* FN 53.
[101] TCEQ SIP submission at 3–39 to 3–40.

[102] *See* EPA Region 6 TSD, included in Docket ID No. EPA–R06–OAR–2021–0801.
[103] *Id.*

**9828** Federal Register / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

TCEQ agrees that the average of the DVs based on 2010–2014 ozone levels are reliable enough to use in the identification of nonattainment receptors, it is unclear how the 2012–2014 period is deemed more reliable for the maintenance test since the modeled emissions are still for 2012. We also note, as discussed throughout this action, the EPA has updated its modeling to use a 2016 base year—that is, a five year period spanning 2014–2018, and applied its methodology for defining maintenance receptors using that five year base period. Using a more recent base period (EPA's 2016v2) provides the most recent design values, shorter period of projection (2016 to 2023 versus a 2011 or 2012 base year) and a more accurate basis for projections of future air quality. We note that the EPA undertook a large collaborative multi-year effort with states (including TCEQ) and other stakeholders input and review in developing the 2016v2 emission inventories. By virtue of this update, any monitored DV used by the EPA to identify maintenance receptors in this action accounts for more recent emission reductions and provides a shorter interval between base year monitored DV and the projected future analytic year.

As discussed further in the EPA Region 6 TSD [104] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the

maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (*i.e.,* 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment test as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. It is also unreasonable to have a test that would not identify nonattainment receptors also as maintenance receptors.

TCEQ also made several additional assertions in support of their conclusion that their method for identifying maintenance receptors was the better reading of the CAA, compared to the EPA's. TCEQ claimed that its approach was more consistent with the CAA's concept of maintenance as areas that were formerly nonattainment and that have since attained and will continue to maintain by accounting for: (1) Emissions reductions occurring in the later design values of the base DV period; (2) ''commitments regarding contingency measures to address future emission reductions;'' and (3) the impact of any maintenance plans that are in place. TCEQ also asserted that the EPA's approach conflates the likelihood of attaining the standard in a future year and the ability of an attainment monitor to maintain that attainment status. Specifically, TCEQ argued that because any remedies devised to address nonattainment monitors would have to apply to maintenance monitors, a

practical consequence of the EPA's approach is that it could lead to over-control and that it might require upwind states to consider or implement controls when the downwind state in which the monitor is located does not have any obligations to control local emissions. TCEQ argued that this ''conflation'' of nonattainment and maintenance results in there being no independent meaning to ''maintenance.''

With respect to the first of these assertions from TCEQ, we note that TCEQ's methodology for identifying receptors (like the EPA's) is entirely distinct from ozone designations under the Clean Air Act; neither TCEQ nor the EPA take current or presumed future designations of areas into account, and any implementation requirements like a maintenance plan under CAA section 175A, in identifying receptors. TCEQ's discussion, therefore, of maintenance plan contingency measures or maintenance plans generally is irrelevant and misplaced. None of the areas to which Texas is linked in the EPA 2016v2 modeling has been redesignated to attainment for the 2015 ozone NAAQS, and none of the areas to which Texas is linked in its own modeling has been redesignated to attainment for that NAAQS. We also fail to see how TCEQ's approach to identifying maintenance receptors differs in any relevant respect from the EPA's approach with regard to the alleged ''conflation'' of projecting attainment in a future year rather than the ability of an attainment receptor to maintain attainment. Both TCEQ and the EPA identify maintenance receptors based on projections of air quality in a future year to determine whether the receptor will have difficulty attaining or maintaining the standard. TCEQ's arguments about overcontrol based on the application of a uniform remedy to states linked to both nonattainment and maintenance receptors were also not germane; in this case, TCEQ had identified *no* remedy to apply whatsoever because it had failed to identify that the emissions from Texas cause a problem in the first instance. The D.C. Circuit has already rejected the idea that the application of a uniform control to both nonattainment and maintenance receptors is on its face overcontrol or impermissible under the interstate transport provision. *See Wisconsin,* 938 F.3d at 327. Based on our evaluation of TCEQ's approach to identify maintenance receptors for 2023, we propose to find the State's approach is inadequate as it does not sufficiently identify maintenance receptors. Further, TCEQ had not explained how its

---

[104] ''EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document'' (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

approach meets the statutory requirement to address areas that, even if meeting the NAAQS, may struggle to maintain the standard in years where conditions are conducive to ozone formation. Rather, the TCEQ had created its own approach to identify these areas that they describe as designed to account for the most emission reductions possible—*i.e.*, the most recent DV of the three under analysis; an approach that likely under-identifies areas that will struggle to maintain the NAAQS and that certainly is not designed to capture potential air quality problems.

ii. Evaluation of the TCEQ Modeling

As discussed in Section V.A of this action, TCEQ conducted regional photochemical modeling to identify nonattainment and maintenance receptors in 2023 using a 2012 base year. As discussed further in the EPA Region 6 TSD, we have several concerns with the reliability of TCEQ's modeling results. States are free to develop their own modeling, but that modeling must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of that technical demonstration when determining whether the Act's requirements are met.

The TCEQ's modeling underestimates future ozone levels. When the TCEQ 2023 projected concentrations are compared to 2020 and preliminary 2021 monitor values, it is clear that the TCEQ modeling is projecting an unusual decline in ozone levels without there being an unusual level of emission reductions to support the decline. The EPA compared recent monitoring values and reasonably anticipated decreases in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023. These underestimations also result in smaller projected contributions from Texas

emissions to downwind states. See EPA Region 6 TSD for full analysis details.

One analysis included in the EPA Region 6 TSD examined the average amount of improvement that would have to occur for the 9 monitors with the highest measured design values in the Dallas-Ft. Worth and Houston-Galveston-Brazoria nonattainment areas (those with an observed 2018–2020 DV of 74 ppb or greater) to reach the level of ozone projected by the TCEQ modeling. The average decrease needed by 2023 to meet TCEQ's 2023 projected DVs is 7.56 ppb. Improvements of this magnitude do not occur in three years unless there is an unusually large change in emissions or a large change in meteorological conduciveness for ozone generation. TCEQ did not identify any large emission reductions not already accounted for in the modeling to be implemented in the 2021–2023 timeframe nor is the EPA aware of such a change. This information supports our finding that that TCEQ's modeling is underestimating future ozone levels in the two nonattainment areas in Texas that make up a large proportion of the total ozone and a large portion of emissions of ozone pre-cursors that transport to downwind areas. This underestimation of future year ozone levels from Texas emissions can cause both an underestimation of ozone in downwind areas and also an underestimation of Texas's impact on downwind State's ozone nonattainment and maintenance receptors.

TCEQ's modeling also underestimates 2023 ozone levels outside of the State of Texas including areas of interest in California, Colorado and the Midwest Region (Illinois, Wisconsin, and Michigan). The EPA discusses this underprediction for all of these areas in the EPA Region 6 TSD. In Table TX–3, we present only the results for the Midwest Region along with the EPA's modeling prediction. We note that TCEQ's 2023 modeled DVs are significantly lower than the EPA's 2023 modeled DVs. The table also provides

recent monitored 2020 DVs and preliminary 2021 DVs, which shows that recent monitored ozone concentrations are significantly higher than TCEQ's modeling projected for 2023. TCEQ's ozone DVs for these receptors would need to drop on the order of 7–15 ppb in two to three years for TCEQ's projections to bear out. As noted previously, this would require an unusual amount of emission reductions without any control measures identified of sufficient magnitude. We note that the EPA's projected 2023 ozone DVs based on EPA 2016v2 modeling show ozone DVs that are also lower than recent monitoring data. However, EPA 2016v2 modeling projections are much closer to anticipated 2023 ozone levels as compared to TCEQ's modeling. This indicates that the EPA's modeling is more accurate in identifying nonattainment and/or maintenance receptors in the Midwest Region. While the TCEQ modeling projects much lower overall ozone levels for the Midwest Region in 2023, the modeling does tend to corroborate the projected amount emissions that Texas may be contributing to projected ozone levels at 5 of the 7 nonattainment and maintenance receptors identified in the EPA's modeling.[105] Thus, despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest Region are greater than 0.7 ppb (*i.e.*, 1 percent of the 2015 ozone NAAQS). Table TX–3 provides information on those receptors, including the amount of contribution attributed to emissions from Texas based on EPA's 2016v2 modeling and TCEQ's modeling. Despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest are greater than 0.7 ppb (*i.e.*, 1 percent of the 2015 ozone NAAQS).

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016v2 MODELING

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6. |
| 170310032, Cook, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31. |
| 170314201, Cook, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25. |
| 170317002, Cook, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22. |

[105] We note that for two of the Wisconsin receptors, TCEQ's modeling does not provide information to generate 2023 DVs, so only 5 of the 7 monitors can be compared.

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016v2 MODELING—Continued

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 550590019, Kenosha, WI .... | Nonattainment ...................... | 72.8/73.7 | 67/66 ............ | 74/74 | 1.72 | 1.44. |
| 550590025, Kenosha, WI .... | Maintenance ......................... | 69.2/72.3 | No data*** .... | 74/72 | 1.81 | No data.*** |
| 551010020, Racine, WI ....... | Nonattainment ...................... | 71.3/73.2 | No data*** .... | 73/73 | 1.34 | No data.*** |

* TCEQ did not provide sufficient data and analysis of the meteorology for the 2010–2014 period to support their claim that 2012–2014 period was a worst-case combination of meteorology compared to the 2010–2012 and 2011–2013 periods. If the future DV projected from this highest value is below the standard, one can be reasonably certain the receptor will not have difficulty maintaining the standard and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to identify maintenance receptors than the EPA method. See https://www.epa.gov/air-trends/air-quality-design-values

** Preliminary 2019–2021 DVs. Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

*** Kenosha, WI Monitor ID. 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013–2015. Racine, WI Monitor ID. 551010020 was installed on April 14, 2014 so the first three year DV available is 2015–2017. TCEQ's modeling used monitored DV data for 2010–2012, 2011–2013, and 2012–2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

The EPA investigated TCEQs modeling and the underestimation for the future year. See the EPA Region 6 TSD for further information on our review. Our review indicated some underestimation bias in the base case and general model performance concerns but nothing that was a clear cause of the much lower 2023 DVs that TCEQ's modeling is projecting. For the EPA's 2016 base year modeling, the EPA undertook a large collaborative multi-year effort with states (including Texas) and other stakeholder input in developing the 2016 emission inventories including 2016v2, so that the EPA's modeling would be based on the best data available. Using a 2016 base year also provides a more recent platform that shortens the number of years to project emission changes, reducing uncertainties in the 2023 projection compared to TCEQ's projection from a 2012 base to 2023 or the EPA's earlier 2011 base year modeling. Use of a more recent 2016 base year also allows for the use of monitored DVs from a more recent period. The combination of these and other issues discussed in the EPA Region 6 TSD result in less model uncertainty compared to TCEQ's 2012 base year modeling and has provided a better estimate of 2023 ozone levels and therefore, we believe a more reliable tool for predicting which areas of the country will be nonattainment or have difficulty maintaining the standard as well as assessing contributions from upwind states.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors. As discussed above and in the EPA Region 6 TSD, the TCEQ's modeling is underestimating projected ozone levels in the Midwest Region for 2023. If TCEQ's 2023 modeled DVs were closer to recent observed monitoring data and anticipated 2023 monitored DVs, TCEQ would likely have also identified nonattainment and/or maintenance receptors in the Midwest Region.

To summarize, TCEQ did its own modeling at Step 1. Our analysis shows that TCEQ's modeling likely underestimates ozone levels at potential receptors and that TCEQ's methodology for identifying maintenance receptors used to identify maintenance receptors fails to reasonably identify areas that will have difficulty maintaining the NAAQS.

2. Evaluation of Information Provided by TCEQ Regarding Step 2

TCEQ, like the EPA, used a 1 percent of the ozone NAAQS (or 0.7 ppb) as the "linkage" threshold to identify states as "linked" for contributions it made to areas with projected air quality problems. Although TCEQ asserted that the EPA treats the 1 percent threshold as the threshold by which the EPA determines "significant contribution" this is in fact incorrect. The EPA, like TCEQ, uses the 1 percent contribution threshold to identify those linkages between a contributing upwind state and a receptor projected to have air quality problems that warrant further review and additional analysis. We therefore endorse TCEQ' use of the 1 percent contribution threshold to identify linkages requiring further analysis. However, because we propose to disapprove TCEQ's identification of nonattainment and/or maintenance receptors (at Step 1) due to underestimations in TCEQ's modeling and their unsupported methodology of identifying maintenance receptors, their submission as to Step 2 is also flawed. We note, however, that even in its own modeling, TCEQ has identified nonattainment and/or maintenance receptors to which it contributed more than 1 percent of the NAAQS (i.e., identified linkages warranting additional analysis at Step 3).

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas

As described in Section I and elsewhere in this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project design values and contributions for 2023. This data was examined to determine if Texas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table TX–4, the data [106] indicate that in 2023, emissions from Texas are projected to contribute greater than 1 percent of the standard to both

[106] Design values and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in docket ID No. EPA–HQ–OAR–2021–0663.

181

nonattainment and maintenance-only receptors in the Chicago, IL–IN–WI nonattainment area (4 Cook County, IL receptors and 2 Kenosha County, WI receptors) and the Milwaukee, WI nonattainment area (one Racine County receptor).[107]

TABLE TX–4—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH TEXAS LINKAGES BASED ON EPA 2016v2

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Texas contribution (ppb) |
|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6 | 73.4 | 0.86 |
| 170310032, Cook, IL | Maintenance | 69.8 | 72.4 | 1.46 |
| 170314201, Cook, IL | Maintenance | 69.9 | 73.4 | 1.15 |
| 170317002, Cook, IL | Maintenance | 70.1 | 73.0 | 1.58 |
| 550590019, Kenosha, WI | Nonattainment | 72.8 | 73.7 | 1.72 |
| 550590025, Kenosha, WI | Maintenance | 69.2 | 72.3 | 1.81 |
| 551010020, Racine, WI | Nonattainment | 71.3 | 73.2 | 1.34 |

We recognize that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA or the State's methodology for identifying receptors or linkages is inherently unreliable. Rather, the three separate modeling runs all indicated: (1) There were receptors that would struggle with nonattainment or maintenance in the future; and (2) Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). These results indicate that emissions from Texas were substantial enough to generate linkages at Steps 1 and 2 to some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of emissions from Texas should be deemed "significant." In doing so, we are not agreeing with the methods and assumptions contained in TCEQ's modeling (see previous discussion and the EPA Region 6 TSD included in the docket for this proposal for further discussion on evaluation of that modeling), or that we consider our own

earlier modeling to be of equal reliability relative to more recent modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in the EPA's most recent set of modeling (EPA 2016v2), that information provides further evidence, not less, in support of a conclusion that the State is required to proceed to Step 3 to further evaluate its emissions.

Therefore, based on the EPA's evaluation of the information submitted by TCEQ and based on the EPA 2016v2 modeling results for 2023, the EPA proposes to find that Texas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

4. Evaluation of Information Provided by TCEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, considering multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport

framework) when identifying emissions contributions that the Agency has determined to be "significant" (contribution to nonattainment or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. TCEQ did not demonstrate such an analysis in their SIP submission. We therefore propose that TCEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

Instead, as noted in Section V.A of this action, TCEQ interpreted the Act's requirements as only requiring an

---

[107] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted in Section I of this action. That modeling showed that Texas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in

2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

**9832** **Federal Register** / Vol. 87, No. 35 / Tuesday, February 22, 2022 / Proposed Rules

analysis of emission reductions where "there is a persistent and consistent pattern of contribution on several days with elevated ozone." TCEQ asserted that it would make the determination of whether such pattern existed based on a weight-of-evidence approach that takes into consideration air quality factors such as: Current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, the number of days with elevated observed ozone, back trajectories, Texas' relative contribution on modeled high ozone days, Texas' contribution as part of the collective interstate contribution to future modeled DVs, alternate contribution method analysis, and model sensitivity runs to reductions of Texas' emissions on receptors. However, TCEQ stated that it did not consider or analyze all factors for every monitor. Thus, different factors were analyzed for the receptors in different regions (Colorado, Arizona, and Southern California). The EPA has reviewed the different factors that TCEQ provided for each of the regions in the EPA Region 6 TSD, but we will provide a brief summary of the evaluation below. TCEQ also asserted that use of the 1 percent threshold as the "sole" definition of significant contribution for the 2015 ozone NAAQS is inappropriate. Based on the application of selected factors for each of the monitors to which TCEQ's modeling found that it was linked, TCEQ concluded that none of its contributions to any other states were significant.

As explained above, TCEQ has mischaracterized the EPA's interpretation of the CAA in stating that the EPA defines significant contribution "solely" using a 1 percent threshold. The EPA, like TCEQ, uses the 1 percent threshold to identify areas for further analysis. The difference is that the EPA in past analyses has examined potential emission reductions in linked upwind states and the air quality impacts at downwind receptors that would result from the implementation of those reductions to assess which contributions are "significant." This interpretation of significant contribution, as discussed above, has been upheld by the Supreme Court and the D.C. Circuit.

As an initial matter, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail

above in Section II.B.4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but a minimum 5 days) at a given receptor. Given the ozone standard is an average of the fourth high value from each of three years, the EPA technique, also used by Texas, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard.

The EPA reviewed TCEQ's evaluation of the current attainment status of the monitors and design value trends, and concludes, as described in more detail in the EPA Region 6 TSD, that the provided information does not support the large decreases in ozone levels that TCEQ's modeling projects will occur by 2023. The analysis for California and Colorado receptors provides evidence that TCEQ's photochemical modeling is overestimating the ozone reductions expected at these receptors between 2012 and 2023 and actually presents evidence that more nonattainment and/or maintenance receptors should have been identified.

The EPA also reviewed the trends in the number of high ozone days per year provided by TCEQ for Colorado and California. While this data supports that the number of ozone exceedance days is improving, neither the analysis of the number of high ozone days in Colorado or California provide any evidence to refute the TCEQ's photochemical modeling results that show these areas should be considered nonattainment and/or maintenance receptors. TCEQs modeling overestimates ozone reductions yet still shows Texas linked to receptors at both nonattainment and maintenance levels in 2023.

The TCEQ cited a conceptual model of ozone formation for areas in Southern California. TCEQ indicated that Southern California is isolated and transport into the basin is unlikely on a frequent basis, but this information does not refute the TCEQ's modeling. As discussed in Section III.B.3 of this action, photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. TCEQ's modeling showed transport at 10 monitors having contributions greater than 0.7 ppb on average for the 5–10 days used in the modeling analyses. Considering the form of the standard,

this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard.

TCEQ used the National Oceanic and Atmospheric Administration (NOAA) HYSPLIT [108] model to produce back trajectories for all the monitored ozone exceedance days (2007–2016) for the five receptors in Colorado and 10 receptors in Southern California to evaluate how many of the back trajectories went through Texas. TCEQ also used data from these back trajectories to do an endpoint count analysis. We note that we have several concerns with how TCEQ performed the back trajectories including start time and heights, length (number of hours) of the back trajectory, inappropriate removal of some back trajectories based on start height, center-line height touch down, and trajectory center-line height when over Texas, and inappropriate counting of trajectories by not considering that the center-line represents the centerline of a much wider area of air parcels that could have reached the monitor/receptor. Due to these concerns, as discussed in more detail in the EPA Region 6 TSD, the EPA finds the results of TCEQ's back trajectory and endpoint analysis flawed (underestimates back trajectories that reach Texas) and do not provide evidence that refutes the TCEQ photochemical modeling analysis results.

We note that even valid back trajectories are of limited use as HYSPLIT simply estimates the path a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint (monitor) grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas for those areas, to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model

[108] See FN 34.

"linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. It is interesting to note that TCEQ's analysis of the back trajectories indicates that the 2012 meteorology used by TCEQ seemed to yield more back trajectories that reach Texas than most years for many of the Colorado receptors. This seems to be consistent with TCEQ identifying linkages to Colorado when the EPA's modeling of 2016 does not.

TCEQ performed an alternate contribution analysis for the ten California receptors and the five Colorado receptors using all days modeled in 2023 that had values over 70 ppb rather than focus on just the 5–10 highest values under the EPA's technique. Particularly for California, this meant many more days could be included in the average which had the effect of showing a smaller estimated contribution. We believe it is appropriate to focus on the highest values as these are the ones that ultimately will have to be reduced for the standard to be attained. As discussed in the EPA Region 6 TSD, the EPA's review of TCEQ's alternate contribution method analysis for California and Colorado receptors is that it does not provide substantial evidence that refutes the TCEQ's photochemical modeling analysis results, including the contribution analysis using the EPA's contribution methodology.

TCEQ provided an analysis of collective interstate contribution to the 2023 DV for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27%. The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58%. TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are

small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of relative contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in EPA's modeling to receptors in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I) downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

TCEQ also performed photochemical modeling analysis using the Direct Decoupled Method (DDM) tool for receptors in Colorado. DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) resulting from changes in NO$_X$ emissions from all Texas' NO$_X$ emissions. The DDM modeling does show some response to Texas NO$_X$ emissions but from the scale it is hard to discern the level of response but it appears to be in the 0–2 ppb range in general with some values in the 0.2 –2 ppb range for modeled values over 60 ppb. Since the modeling has underprediction and underestimation

issues, these values could be higher. Not surprisingly, the DDM tool shows that monitors in Colorado are much more responsive to intra-state reductions than reductions in Texas. That said, the results of the DDM tool showing only a relatively small response to reductions is not inconsistent with the finding that Texas emissions contribute significantly to elevated readings in Colorado. As has been discussed elsewhere, the EPA believes a contribution of 1 percent of the standard is an appropriate threshold such that further analysis is warranted.

Overall, these additional analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[109] In fact, the monitored ozone design value trends provide evidence that future year modeled ozone levels are underestimated by TCEQ's modeling and there are likely more receptors that should have been identified with additional potential linkages. Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by a modeled linkage at Step 2.

In addition, EPA 2016v2 modeling using 2016 base year meteorology indicates linkages from Texas to receptors in the Midwest Region but does not indicate impacts from Texas emissions on the Colorado and other western receptors identified by TCEQ. With a different base period such as TCEQ's 2012 base period meteorology and the EPA's 2016 base period meteorology, it is not uncommon that the potential downwind nonattainment or maintenance receptors can change. These differing results about receptors and linkages can be affected by the varying meteorology from year to year and the selection of different base years, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would

[109] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014–2016 and 2015–2017 DVs are each 65 ppb; 2016–2018, 2017–2019, and 2018–2020 DVs are 66 ppb; and preliminary 2019–2021 DV is 66 ppb.

struggle with nonattainment or maintenance in the future, and (2) that Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

In sum, the EPA's more recent and robust 2016 base year modeling platform indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the west. As discussed, the EPA does not find the additional weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues. We therefore propose that Texas was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

5. Evaluation of Information Provided by TCEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. Texas indicated that because a number of counties in its state had been designated nonattainment for the 2015 ozone NAAQS, there could be attainment demonstration and potential controls contemplated in association with those nonattainment designations.[110]

---

[110] Pointing to anticipated upcoming emission reductions, even if they were not included in the analysis at Steps 1 and 2, is not sufficient as a Step 3 analysis, for the reasons discussed in Section V.B.4 of this section. In this section, we explain that to the extent such anticipated reductions are not included in the SIP and rendered permanent and

However, the State's interstate transport submission did not revise its SIP to identify any specific emission reductions, nor did it include a revision to its SIP to ensure any such reductions were permanent and enforceable. The other control measures identified in TCEQ's submission are, as noted by TCEQ, already adopted and implemented measures and do not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required). As a result, the EPA proposes to disapprove TCEQ's submittal on the separate, additional basis that the Texas has not included permanent and enforceable emissions reductions in its SIP as necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

6. Conclusion

Based on the EPA's evaluation of TCEQ's SIP submission, the EPA is proposing to find that the Texas August 17, 2018, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

VI. Proposed Action

We are proposing to disapprove the SIP submissions from Arkansas, Louisiana, Oklahoma, and Texas pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states. Under CAA section 110(c)(1), the disapprovals would establish a 2-year deadline for the EPA to promulgate FIPs for these states to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS in other states, unless the EPA approves SIPs that meet these requirements. Disapproval does not start a mandatory sanctions clock for Arkansas, Louisiana, Oklahoma, or Texas.

---

enforceable, reliance on such anticipated reductions is also insufficient at Step 4.

VII. Statutory and Executive Order Reviews

A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget for review

B. Paperwork Reduction Act (PRA)

This proposed action does not impose an information collection burden under the PRA because it does not contain any information collection activities

C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

D. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This proposed action disapproving the portion of Oklahoma's SIP submission addressing the State's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS will apply to certain areas of Indian country as discussed in Section IV.C of this action, and, therefore, has tribal implications as specified in E.O. 13175 (65 FR 67249, November 9, 2000). However, this proposed action will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This proposed action will not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This proposed action will

also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes (May 4, 2011), the EPA will offer consultation to tribal governments whose lands are located within the exterior boundaries of the State of Oklahoma that may be affected by this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

*H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

*K. CAA Section 307(b)(1)*

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[111]

The EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 ozone NAAQS for four states, which are located in three different Federal judicial circuits. It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.,* implementation of interstate transport requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-Step framework for assessing interstate transport obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016 base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of the 4-Step framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-Step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[112] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[113]

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

*Authority:* 42 U.S.C. 7401 *et seq.*

Dated: February 1, 2022.

**Earthea Nance,**

*Regional Administrator, Region 6.*

[FR Doc. 2022–02961 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[111] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[112] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[113] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should the EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

**EPA Region 6,** *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* **(Feb. 2022)**

EPA REGION 6


2015 8-HOUR OZONE TRANSPORT SIP PROPOSAL


TECHNICAL SUPPORT DOCUMENT


FDMS Docket No. EPA-R06-OAR-2021-0801



February 2022



By

Erik Snyder

Lead Regional Air Quality Modeler

EPA Region 6 – Dallas, TX

# Contents

Introduction ........................................................................................................ 3

1. Maintenance Receptor Methodology ............................................................. 4

    1.a. Use of Single DV To Project Maintenance Receptors ......................... 4

    1.b. Review of History of EPA's Guidance ............................................... 10

    1.c. Relative Effects of Long-Term Emissions Trends .............................. 12

    1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data ........... 31

2. Potential Underestimation of Projected Design Values and Model Performance Evaluation ......
.................................................................................................................... 38

    2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW &
HGB receptors and High DV monitors .................................................... 39

    2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas . 44

    2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the
Midwest and West.................................................................................. 51

    2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors  57

    2.e. Summary ......................................................................................... 66

3. Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and
nonattainment receptors ................................................................................. 67

4.      Other Potential Modeling Concerns................................................. 72

    4.a. EGU Emissions ................................................................................ 72

    4.b. Contribution Calculation.................................................................. 73

    4.c. Future Year Boundary Conditions .................................................... 76

5. TCEQ Other Factor Analysis (Weight of Evidence) ...................................... 76

    5.a. TCEQ indicated that there are problems with DV trends ................... 78

    5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors
in the Denver and Southern California areas. ........................................... 81

    5.c. TCEQ Back Trajectory Analysis ...................................................... 81

    5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb. ........................ 86

    5.e. Collective Interstate Contribution to Future DV .............................. 89

    5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in
Colorado.............................................................................................. 92

    5.g. Southern California Ozone Conceptual Model .................................. 97

    5.h. Summary ......................................................................................... 97

6. EPA Summary ............................................................................................. 99

**Introduction**

This Technical Support Document (TSD) provides additional analysis of the Texas Commission on Environmental Quality's (TCEQ) air quality modeling relied upon in its August 17, 2018, State Implementation Plan (SIP) submission addressing interstate transport obligations for the 2015 ozone national ambient air quality standards (NAAQS). As discussed in the notice of proposed disapproval, the EPA has identified several concerns with the reliability of TCEQ's modeling and the application of those modeling results in assessing Texas's potential contributions to downwind ozone. States are free to develop their own modeling in support of SIP submissions. That modeling, its application, and other technical analyses must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of each state's technical demonstration when determining whether the Clean Air Act's (the Act, or CAA) requirements are met. Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. *See* Federal Register Notice, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-hour Ozone National Ambient Air Quality Standards" (Docket ID No. EPA-R06-OAR-2021-0801; proposed action). Certain legal, policy, and technical bases for that determination are discussed in the preamble of the notice of proposed disapproval. In addition, the Oklahoma Department of Environmental Quality (ODEQ) also relied on TCEQ's modeling analysis in their SIP. Thus, the EPA's concerns with TCEQ's modeling also impact the approvability of the Oklahoma 2015 Ozone Transport SIP. The EPA's further assessment and evaluation of the reliability of the technical demonstration in TCEQ's SIP is discussed in this

document. In Section 1, we evaluate TCEQ's maintenance receptor methodology. In Section 2, we analyze TCEQ's modeling results, both future year projections and base case model performance. In Section 3, we provide results of EPA's modeling and analyze results of TCEQ's modeling compared with recent monitoring data. In Section 4, we analyze other potential concerns with TCEQ's modeling analysis. In Section 5, we evaluate TCEQ's other factors analysis. In Section 6, we summarize our technical evaluation.

## 1.    Maintenance Receptor Methodology

As discussed in Section V.A of the notice of proposed disapproval, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. This section of the TSD provides further discussion as to why the EPA proposes TCEQ has not provided a sufficient technical basis for its chosen method. In subsection 1.a, we evaluate the effect of using TCEQ's approach and find that it produces anomalous results. In subsection 1.b, we review the history of EPA's modeling guidance recommending the use of a 5-year (i.e., spanning three design values) rather than a 3-year (i.e., only one design value) base period. In subsection 1.c, we evaluate inter-annual variation in design values (DVs) due to meteorological variability and long-term ozone trends due to emissions trends. In subsection 1.d, we analyze meteorological adjusted ozone concentrations for the 2010-2014 period.

### 1.a. Use of Single DV To Project Maintenance Receptors

As explained in the preamble, in defining maintenance receptors, TCEQ used only the most recent DV of the set of three DVs it relied on for its base period modeling, regardless of whether that most recent design value was the highest of the three. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest

DV "takes into consideration both meteorological variability (since the latest regulatory design value is itself an average of the fourth highest measured concentrations for three years) and any emissions reductions that might have occurred."[1] However, as discussed below, the EPA does not believe this approach adequately takes into account meteorological variability in identifying those areas that are projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

To develop a better technical understanding of the effects of TCEQ's approach (in addition to those reasons presented in the preamble), the EPA conducted a review of potential receptors to which Texas has been linked in differing modeling analyses. The EPA identified 21 potential receptors to which Texas contributed 0.7 parts per billion (ppb) or more in either EPA's 2016v2-based modeling for 2023, or TCEQ's 2012-based modeling for 2023. The EPA then evaluated the results of using TCEQ's alternate maintenance methodology. To identify nonattainment receptors, the nonattainment methodology calculates 2023 average DVs (also referred to as 2023 Nonattainment DVs) using the 5-year center weighted average ambient design values centered on the base modeling years and the Relative Response factors (RRFs).[2]

In Table 1.1 below, the EPA compiled the 2023 average DVs used for identifying nonattainment receptors, for potential receptors in Illinois, Wisconsin, Colorado, Arizona, and California. The EPA then utilized TCEQ's 2012-based modeling results to obtain the data needed to calculate 2023 maintenance DVs using TCEQ's approach.

---

[1] TCEQ Interstate Transport State Implementation Plan Revision for the 2015 Ozone National Ambient Air Quality Standards, August 17, 2018 (TCEQ SIP Submission) at pages 3-39 to 3-40.
[2] The approach used by TCEQ for identifying nonattainment receptors is consistent with EPA's air quality modeling guidance. U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, Research Triangle Park, NC, included in Docket ID No. EPA-HQ-OAR-2021-0663.

Of the identified 21 receptors, 15 receptors would have 2023 DVs based on TCEQ's methodology for identifying *maintenance* receptors that are lower than the 2023 average DVs at these same locations using the methodology for identifying *nonattainment* receptors. This is highly anomalous since the maintenance methodology should result in either equal or slightly higher 2023 DVs than the methodology to identify future year nonattainment receptors in order to capture conditions under which areas expected to be in attainment may still struggle to maintain the NAAQS. The EPA found that, under TCEQ's method, of these 15 receptors, three have 2023 maintenance DVs that are 3 ppb lower than their 2023 nonattainment methodology DVs, five have 2023 maintenance DVs that are 2 ppb lower than their 2023 nonattainment methodology DVs, and seven receptors have 2023 maintenance DVs that are 1 ppb lower than their 2023 nonattainment methodology DVs. In fact, TCEQ's method identified one receptor in their SIP submission as a nonattainment receptor in 2023 that it separately characterized under its maintenance methodology as not having a problem maintaining the NAAQS.

In comparison, using the EPA's maintenance methodology and EPA's 2016v2 modeling results all 21 2023 maintenance DVs have maximum DVs that are equal to or up to 4 ppb higher than the 2023 nonattainment DVs. (Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology.) Under the EPA's methodology all nonattainment receptors are also considered to be maintenance receptors.

**Table 1.1 Comparison of Nonattainment methodology (Avg DV) and Maintenance methodology results for receptors identified by EPA and TCEQ in modeling of 2012 and 2016 base case years.**

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | -1 | 71 | 72 | 1 |
| 80590006, Jefferson, CO | 72 | 73 | 1 | 72 | 73 | 1 |
| 80590011, Jefferson, CO | 71 | 71 | 0 | 73 | 74 | 1 |
| 80690011, Larimer, CO | 72 | 71 | -1 | 71 | 72 | 1 |
| 80050002, Arapahoe, CO | 70* | 71 | 1 | 68 | 68 | 0 |
| 40038001, Cochise, AZ | 71 | 69** | -2 | - | - | - |
| 60371201, Los Angeles, CA | 80 | 78 | -2 | 82 | 85 | 3 |
| 60371701, Los Angeles, CA | 80 | 82 | 2 | 85 | 88 | 3 |
| 60376012, Los Angeles, CA | 87 | 86 | -1 | 91 | 93 | 2 |
| 60658001, Riverside, CA | 88 | 85 | -3 | 89 | 90 | 1 |
| 60658005, Riverside, CA | 84 | 83 | -1 | 87 | 90 | 3 |
| 60710001, San Bernardino, CA | 71 | 72 | 1 | 74 | 75 | 1 |
| 60710306, San Bernardino, CA | 76 | 77 | 1 | 76 | 78 | 2 |
| 60711004, San Bernardino, CA | 91 | 90 | -1 | 97 | 100 | 3 |
| 60714001, San Bernardino, CA | 82 | 79 | -3 | 82 | 83 | 1 |
| 60714003, San Bernardino, CA | 94 | 91 | -3 | 95 | 98 | 3 |
| 170310001, Cook, IL | 60 | 58 | -2 | 69 | 73 | 4 |
| 170310032, Cook, IL | 68 | 66 | -2 | 69 | 72 | 3 |
| 170314201, Cook, IL | 64 | 62 | -2 | 69 | 73 | 4 |

[3] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

[4] Projected DVs were not calculated for the Cochise monitor in EPA's modeling because the 2016 base year model predictions did not meet the criteria in EPA's modeling guidance for calculating a valid RRF.

| Receptor (AQS Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb) | TCEQ DV Delta (Maintenance - Average) (ppb) | EPA 2023 Average DV (ppb)[3] | EPA 2023 Maximum DV (ppb)[4] | EPA DV Delta (Maximum - Avg) (ppb) |
|---|---|---|---|---|---|---|
| 170317002, Cook, IL | 66 | 65 | -1 | 70 | 73 | 3 |
| 550590019, Kenosha, WI | 67 | 66 | -1 | 72 | 73 | 1 |
| 550590025, Kenosha, WI | No data*** | No data*** | No data*** | 69 | 72 | 3 |
| 551010020, Racine, WI | No data*** | No data*** | No data*** | 71 | 73 | 2 |

\* TCEQ did not include this value in their SIP submission narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contribution.

\*\* Calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

\*\*\* Monitors were installed in 2013 and 2014 so they did not have a 3-year DV period (2012-2014) or previous years, so no projections of future year DVs are possible with TCEQ's modeling. Kenosha 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine 551010020 was installed April 14, 2014 so the first three-year DV available is 2015-2017

NOTE: TCEQ's SIP reported projected 2023 DVs as whole numbers. Consistent with the EPA's modeling guidance, the EPA reported projected DVs with one digit to the right of the decimal. For comparison with TCEQ's SIP data, the EPA DVs were truncated to whole numbers for the purpose of the analysis in this TSD. Note that including one digit to the right of the decimal in both the TCEQ and the EPA data would result in a slight difference in outcome in terms of the magnitude of the differences between the average DVs and the corresponding TCEQ maintenance DVs and the EPA's maximum DVs; however, TCEQ's maintenance methodology still results in values lower than nonattainment methodology DVs for many receptors.

In short, because TCEQ's maintenance methodology uses only the most recent DV from its base period 2014 DV (that includes 2012-2014 monitoring data)[5], this very frequently results in "maintenance" DVs at potential receptors that are lower than the 2023 "nonattainment" DVs. TCEQ did not explain this anomalous result. These findings also tend to suggest that the three years that comprise the 2014 design values (i.e., 2012, 2013, and 2014) used in TCEQ's analysis may not have had meteorological conditions particularly conducive for formation of high ozone concentrations. This calls into question whether 2012-2014 would be an appropriate time period for use in projecting whether an area could have difficulty maintaining the standard under ozone conducive meteorology. The EPA's analysis in this TSD confirms that the 2012 to 2014 time period is not particularly conducive to ozone formation, at least for many receptors compared to the other 3-year DV periods of 2012 DV (2010-2012 monitoring data) and 2013 DV (2011-2013 monitoring data). See subsection 1.d below for analysis of meteorology adjusted values for monitors in the continental U.S for 2010-2014. The consequence of TCEQ's maintenance method, as demonstrated by our analysis, is that it often results in lower projected DVs than TCEQ's nonattainment method for the same receptors. This indicates that TCEQ's method often fails to account for conditions when an area would have difficulty maintaining the standard. From a technical perspective, it is unreasonable and internally inconsistent to apply a methodology that identifies receptors as being in nonattainment while at the same time concluding that same receptor will not have a problem maintaining the NAAQS. The EPA finds that the TCEQ methodology does not adequately identify conditions when receptors would have difficulty maintaining the NAAQS.

---

[5] For nomenclature purposes, the 3-year design value is referred to by the last year of the averaging period. That is, DV 2014 represents ozone air quality data averaged over 2012, 2013, and 2014.

### 1.b. Review of History of EPA's Guidance

Since 2007 and up through its current 2018 version, the EPA's modeling guidance for attainment demonstrations and other analyses has recommended the use of a 5-year center weighted average DV (i.e., the average of the three DVs that include the modeled year). The development of this guidance reflects the EPA's longstanding understanding that meteorological variability should be accounted for in the projection of future design values for the purpose of evaluating whether or not a particular monitoring site is expected to attain the NAAQS in a future year.

The EPA's modeling guidance for 8-hour ozone NAAQS attainment demonstrations (1999-2007) initially considered using a 3-year period that included the modeled year (i.e., the emissions-inventory year modeled) as the middle year of the 3-year period.[6] However, the EPA ultimately recommended using five consecutive years with the modeled being the middle year (i.e., covering the three DVs that include the base year) to consider potential variability in meteorological/ozone conduciveness and emissions. The EPA analyzed the variability of using this 5-year center-weighted average method compared with using a 3-year average DV and found that the 5-year center-weighted approach was more stable and had a lower standard deviation.[7] Using 5 years of measured data provides a more robust estimate of future design

---

[6] "Draft Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-Hour Ozone NAAQS", EPA-454/R-99-004, May 1999; "Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hour Ozone NAAQS", EPA-454/R-05-002, October 2005; and "Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone PM2.5, and Regional Haze", EPA-454/B-07-002, April 2007.

[7] The April 2007 guidance states on page 23, "Additionally, the average design value will be more stable (less year to year variability) than any single design value period. An analysis of recent ambient design value data at 471 ozone monitors, over the period 1993-2004, shows that the median standard deviation of design values was 3.3 ppb whereas the standard deviation of the 5 year weighted average design values was 2.4 ppb (Timin, 2005a). Also, moving from the period ending in 2003 to the period ending in 2004, the median change in the ozone design values was 4.0 ppb. The median change in the 5 year weighted average ozone design values was only 0.8 ppb (there was not a long enough data record to do the same analyses for PM2.5). These analyses show that the average design values are clearly more stable and will therefore provide a 'best estimate' baseline year design value (DVBI) for use in future year model projections."

values that are not solely influenced by the particular meteorological conditions that occurred during the three years centered on the base year of emissions. In this respect, using 5 years of measured data is expected to provide ozone DVs that average out the effects of interannual variability in meteorological conditions on ozone concentrations. The guidance also notes that one may want to consider selecting a base design value this is the highest of the relevant base period design values to ensure attainment even in periods with meteorological conditions especially conducive to high ozone concentrations. Consistent with this guidance, the EPA's use of the maximum DV during the 5-year base period is intended to identify areas that may have difficulty maintaining the NAAQS under ozone conducive meteorological conditions.

While it is not mandatory to follow the EPA's modeling guidance, the different approach used by TCEQ lacked adequate justification. TCEQ did not support their claim that there were large reductions in emissions occurring between 2010 and 2014 that would yield lower DVs in 2012-2014 compared to 2010-2012 or 2011-2013 thus making these earlier DVs inappropriate to use for determining a maintenance receptor. Furthermore, TCEQ did not provide sufficient data and analysis of the 2010-2014 period to support their claim that the 2012-2014 period reflects higher ozone-conducive meteorology compared to the 2010-2012 and 2011-2013 periods. By comparison, under the EPA's approach, if the future DV projected from the maximum base period DV is below the NAAQS, one can be reasonably certain the receptor will not have difficulty maintaining the standard due to fluctuations in meteorology and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to successfully identify maintenance receptors than the EPA method.

### 1.c. Relative Effects of Long-Term Emissions Trends

TCEQ asserts that the EPA's maintenance methodology puts too much weight on meteorological variation and not enough weight on emissions changes (i.e., specifically, alleged emissions reductions). TCEQ asserts that the last DV in the period should be used based on the premise that ozone-precursor emissions always trend downward, and therefore, the last DV in the period will always capture the most likely emissions levels going forward. The EPA explained in the preamble why this is not necessarily justified and why TCEQ's method may effectively "double count" emissions trends (because such trends are already accounted for in making the future year projection). To further examine TCEQ's assertion that only the last DV period including the modeled base year should be used in the maintenance methodology, the EPA reviewed a number of ozone DV trends to assess long-term average changes in ozone due to emission changes, including several that were included in TCEQ's SIP submission for this action and in two previous attainment demonstration SIP submissions for the Dallas-Fort Worth Nonattainment Area (DFW) and the Houston-Galveston-Brazoria Nonattainment Area (HGB).[8] TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors in Colorado, Arizona, and Southern California. TCEQ used this information to indicate that ozone levels are decreasing, as shown in the figures below, and further discussed in Section 5. The EPA also looked at monitoring trends for the most recent 10 years of data (2011 DV up to 2020 DV) using ozone monitoring data from the EPA's

---

[8] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 (DFW AD SIP) and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020 (HGB AD SIP). The EPA, in this action, is not evaluating the suitability of the modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 NAAQS. Rather, the EPA is simply examining long-term air quality trends that have occurred in both the Dallas-Fort Worth area as well as the Houston-Galveston-Brazoria area. The EPA will evaluate the suitability of modeling presented by TCEQ for purposes of demonstrating attainment of the 2008 Ozone NAAQS in a separate action.

Air Quality System (AQS). The EPA used these data to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 9 years or more) that may be mainly attributable to overall changes in ozone-precursor emissions.

In general, as shown in the figures below, our evaluation of monitor data for Dallas-Fort Worth and Houston-Galveston-Brazoria as well as at receptors to which TCEQ is linked (that have been identified either by the EPA or TCEQ) in Colorado, Arizona, Southern California, and Midwest Region (Illinois, Michigan, and Wisconsin) demonstrates that the long-term average annual decreases in ozone expected to be the result of emissions reductions are generally on the order of 0-1 ppb/year at monitors in these areas. However, variations in monitored DVs do not always trend downward from year to year and sometimes increase by 2 to 4 ppb from one year to the next. These variations are likely due to inter-annual variations in meteorological conditions which the EPA's method is designed to capture (although this analysis cannot rule out the possibility that short-term increases and decreases in ozone DVs may, in part, be the result of countervailing economic factors that affect short-term or localized emissions increases and decreases).

*DFW and HGB Areas*

For the DFW area, looking at Figures 1.1 and 1.2 (obtained from the DFW attainment demonstration SIP submission),[9] the long-term DFW DV[10] trend is less than 1 ppb/year[11] from 1991 to 2015 (see Figure 1.1) and 1.1 ppb/year from 1997 to 2014 (see Figure 1.2). Focusing on these time periods is a way to assess the average change in ozone DVs due to long-term changes

---

[9] *See* DFW AD SIP, Figure 1-1 at page 1-4 and Figure 5-1 at page 5-5.

[10] DFW DV is the highest DV at any regulatory monitor in the DFW Nonattainment Area, so it can be a different monitor year-to-year that sets the DFW Nonattainment area DV.

[11] *See* DFW AD SIP, at page 1-3. 2015 DV was 83 ppb and 1991 DV was 105 ppb. (105ppb-83ppb)/(24 years)= 0.917 ppb/year.

in emissions. The EPA also evaluated trends in more recent monitoring data. For DFW, we started with the 2012 DV (2010-2012 monitoring data) as there were some emission reductions from a previous DFW ozone SIP that had compliance dates in early 2010. Based on the trends shown in Figure 1.3, the DVs at most of the monitors that are currently monitoring nonattainment, based on 2018-2020 DVs, have been decreasing at approximately 1 ppb/year for the last 9 years of DVs.[12]

---

[12] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.1 – TCEQ's Figure 1-1: One-Hour and 8-Hour Ozone Design Values
from 1991 to 2015 and Population in the DFW Area,
*from* DFW 2008 8-Hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.2 – TCEQ's Figure 5-1: One-Hour and 8-Hour Ozone DVs in the DFW Area
from 1997 through 2014
*from* DFW 2008 8-hour Attainment Demonstration SIP (July 6, 2016).



Figure 1.3 – 8-hour Ozone DV trends at DFW Monitors, 2012-2020.



For the Houston-Galveston-Brazoria area, TCEQ implemented multiple emission reductions for both nitrogen oxides (NO$_X$) and a subset of volatile organic compounds (VOCs) that resulted in large decreases of ozone from 2000 to 2007 in this area. In this regard, the EPA is evaluating trends for DVs from 2010 to 2020. For HGB, looking at Figures 1.4, 1.5, and 1.6 (obtained from the HGB attainment demonstration SIP)[13] the long-term HGB DV trend at most monitors and DV trends at the monitors in the HGB area with higher ozone DVs from 2009 to 2018 shows a decline of less than 1.0 ppb/year. The EPA also evaluated the trends using the most recent DVs (2020 DVs) in Figure 1.7. In Figure 1.7, the DVs at most of the higher HGB

---

[13] *See* HGB AD SIP, Figure 1-1 at page 1-11, Figure 5-1 at page 5-7, and Figure 5-5 at page 5-8.

area monitors (2018, 2019, and 2020 DVs greater than 70 ppb) are decreasing at 1 ppb/year or

less for the last 10 years of DVs (2011-2020 DVs).[14]

Figure 1.4 – TCEQ's Figure 1-1: Ozone DVs and Population in HGB Area,
*from*
TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020).



---

[14] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

Figure 1.5 – TCEQ's Figure 5-4: 8-Hour and One-Hour Ozone DVs in the HGB Area
*from*
TCEQ's HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.6 – TCEQ's Figure 5-5: Eight-Hour Ozone DVs by Monitor in the HGB Area
*from*
HGB Serious Area Attainment Demonstration SIP Revision for 2008 Ozone (2020)



Figure 1.7 – 8-hour Ozone DV Trends at Monitors in HGB, 2011-2020



*Potential receptors outside of Texas*

As mentioned above, TCEQ provided ozone trends analysis in their SIP submission for this action for the areas where TCEQ's modeling identified potential receptors (Colorado, Arizona, and Southern California) to indicate that ozone levels are decreasing as shown in the Figures below. The EPA analyzed TCEQ's trends analysis to assess the magnitude of year-to-year variation in ozone levels compared to the long-term trend in ozone levels (i.e., 10 years or more) that may be attributed to overall changes in ozone-precursor emissions. The EPA also analyzed DV trends using the most recent DVs for the last 10 years for receptors outside the State of Texas identified by the EPA's 2011 base year modeling, the EPA's 2016 base year (2016v2) modeling analyses, and/or TCEQ's modeling (2012 base year). These potential

receptor areas are located in Colorado, Arizona, Southern California, and the Midwest Region (specifically, Illinois, Wisconsin, and Michigan).

For the Colorado receptors identified in TCEQ's modeling, this analysis shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. See Figure 3-40 from TCEQ's transport SIP submission (included as Figure 1.8 below). The EPA also examined the trends at the Colorado receptors identified in TCEQ's modeling using the most recent DVs. This analysis is reflected in Figure 1.9, which shows that the DVs at Colorado receptors have either increased or slightly decreased at less than 0.5 ppb/year for the last 10 years of DVs (2011-2020 DVs).[15]

---

[15] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.___

Figure 1.8 – 8-hour Ozone DVs for Monitors in the Denver-Aurora Area
*from* TCEQ's SIP Submission Figure 3-40



**Figure 3-40: Eight-Hour Ozone Design Values for Monitors in the Denver-Aurora Area**

Figure 1.9 – Denver Nonattainment Area DV Trends at Receptors Identified
in TCEQ Modeling for 2023



For the Arizona receptor identified in TCEQ's modeling, TCEQ's SIP Figure 3-55
(included as Figure 1.10 below) shows ozone DVs from 2007-2016 decreased less than 1
ppb/year on average but had increases or decreases of several ppb from one year to the next. The
EPA also examined the trends at the Arizona receptor identified in TCEQ's modeling using the
most recent DVs available (see Figure 1.11) which shows that the DVs at the Arizona receptor
have decreased at less than 1.0 ppb/year on average for the last 10 years of DVs (2011-2020
DVs).[16]

---

[16] *Id.*

Figure 1.10 DV Tends from 2007 through 2016 for Chiricahua National Monument Monitor *from* TCEQ's SIP Submission Figure 3-55



**Figure 3-55: Design Value Trends from 2007 through 2016 for Chiricahua National Monument (AQS ID: 040038001)**

Figure 1.11 – Arizona DV Trend at Receptor Identified in TCEQ Modeling for 2023



At the California receptors identified in TCEQ's modeling, TCEQ's SIP Figure 3-56 (included as Figure 1.12 below) shows ozone DVs from 2007-2016 decreased less than 1 ppb/year on average. The EPA also evaluated the trends at the California receptors identified in TCEQ's modeling using the most recent DVs (see Figure 1.13), which show that the DVs at the California receptors identified by TCEQ have either increased or slightly decreased at less than 0.5 ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[17]

---

[17] *Id.*

Figure 1.12 – 8-Hour Ozone DV for Monitors in Los Angeles Area
*from* TCEQ's SIP Figure 3-56



Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area

Figure 1.13 – Southern California Receptors DV trends at Receptors
Identified in TCEQ Modeling for 2023



Using the most recent DVs, the EPA examined the trends at the monitoring sites in the

Chicago IL-IN-WI Nonattainment Area in Illinois and in Wisconsin that were identified as

receptors in EPA's 2016v2 modeling (see Figure 1.14). This figure shows that the DVs at these

receptors have either increased or have decreased at less than 0.7 ppb/year on average for the last

10 years of DVs (2011-2020 DVs).[18]

---

[18] *Id.*

Figure 1.14 – Chicago IL-IN-WI Nonattainment Area DV Trends at Receptors
Identified in EPA's 2016v2 Modeling for 2023



The EPA evaluated the trends at the previously identified potential Wisconsin and
Michigan receptors in the EPA's March 2018 memorandum using the most recent DVs in Figure
1.15, which show that the DVs at Sheboygan County, Wisconsin and Allegan County, Michigan
receptors identified previously in EPA's 2011 modeling have decreased approximately 1
ppb/year on average for the last 10 years of DVs (2011-2020 DVs).[19]

---

[19] *Id.*

Figure 1.15 – Wisconsin and Michigan DV Trends at Receptors Identified in EPA's 2011
Base Year Modeling for 2023



Conclusions of this analysis: Reviewing this information in total, the long-term average

decreases in ozone due to emissions reductions are usually on the order of 0-1 ppb/year at

monitors in DFW and HGB, and at the receptors that have been identified in Colorado, Arizona,

Southern California, and Midwest Region (Illinois and Wisconsin). However, critically, the

evidence presented here demonstrates that there can be wide variations in monitored ozone DVs

from year to year. These year-to-year variations in DVs are not always toward lower ozone DVs,

and sometimes DVs can increase by 2-4 ppb from one year to the next. These variations may be

primarily due to meteorological variations. We note for instance that TCEQ's monitored trends

figure for the Arizona receptor it identified shows increases of 2 ppb and 3 ppb annually, from 66

ppb to 73 ppb. That is a 7 ppb increase over three years from 2009 to 2012. Large annual

fluctuations upward in DVs such as this demonstrate the degree of variation that is possible in DV due to meteorological differences between different three-year design value periods, and/or may indicate increasing emissions activity in upwind states or from local sources. In either case, however, this analysis demonstrates that it cannot simply be assumed, as TCEQ's analysis suggests, that ozone levels will only continue to decline or always track with the general, long-term emissions trends.

### 1.d. Meteorological Adjusted Trends Analysis of 2010-2014 Monitored Ozone Data

A recent analysis was published that included updated techniques to analyze trends in continental U.S ozone concentrations adjusted for interannual variability in meteorological conditions (Wells, et al.).[20] This analysis adjusted long-term trends in monitored maximum daily average 8-hour (MDA8) ozone concentrations for meteorological effects using various statistical and mathematical methods in order to get a better estimate of the long-term changes in ozone concentrations due to changes in precursor emissions such as nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs). This analysis included meteorological adjusted MDA8 ozone values (mean, median, 90th percentile, and 98th percentile) for monitors in the continental U.S for each year from 2010 through 2014. Of particular note is the 98th percentile values as they would correspond with the 4th High MDA8 monitored ozone that is used in the calculation of DVs. In Figure 1.16 (a-e) below are maps showing the magnitude of the adjustments in the May to September MDA8 ozone concentrations for each year, with monitoring site locations colored according to the difference between the adjusted and observed trend values. Red dots represent

---

[20] Wells, Benjamin; Dolwick, Pat; Eder, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon; "Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions." *Atmospheric Environment* 248 (2021) 118234; Wells, Benjamin; Dolwick, Pat; Eder, Brian; Evangelista, Mark; Foley, Kristen; Mannshardt, Elizabeth; Misenis, Chris; Weishampel, Anthon "Supplemental Information for: Improved Estimation of Trends in U.S. Ozone Concentrations Adjusted for Interannual Variability in Meteorological Conditions."

downward adjustments of MDA8 ozone concentrations when meteorological conditions were more favorable to ozone formation than normal, while blue dots represent upward adjustments of MDA8 ozone concentrations when meteorological conditions were less favorable to ozone formation than normal. Figures 1.16 (a-e) are for the years 2010, 2011, 2012, 2013 and 2014 respectively. In each Figure, 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations are shown. In other words, the red dots in the images below indicate when monitored ozone levels at a particular monitor are higher due to ozone conducive meteorological conditions, while blue dots indicate when monitored ozone levels are lower at a particular monitor due to meteorological conditions unfavorable for ozone formation. Since the DVs are calculated using the 98th percentile values and the 90th percentile is representative of other relatively high ozone monitored values, these are the values we focus on for this analysis as they are most relevant to the policy concerns of identifying maintenance receptors.

It is noteworthy that while 2012, the year TCEQ selected as its base year, was conducive to ozone formation in the upper Midwest area around Lake Michigan (Illinois, Wisconsin, and Michigan), 2013 and especially 2014 were not conducive to ozone formation. 2014 was the least conducive year for ozone formation in the upper Midwest area around Lake Michigan of the 2010 through 2014 period. The years 2010 and 2011 both appear to have had meteorological conditions more conducive to ozone formation in the area where the EPA has identified receptors in the EPA's 2011 base case and 2016v2 modeling compared to 2013 and 2014. The 2012 DV (2010-2012 monitoring data) or 2013 DV (2011-2013 monitoring data) both seem to have had meteorological conditions more conducive to ozone formation than the 2014 DV (2012-2014 monitoring data). This may partially explain why TCEQ's methodology, which relied solely on the 2014 DV, failed to identify receptors in this region using its maintenance methodology.

Figure 1.16(a) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2010



Figure 1.16(b) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2011



Figure 1.16(c) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2012



Figure 1.16(d) – Maps showing the magnitude of the adjustments in May to September 90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2013



Figure 1.16(e) – Maps showing the magnitude of the adjustments in May to September  90th percentile (top), and 98th percentile (bottom) MDA8 ozone concentrations for the year 2014



**2.    Potential Underestimation of Projected Design Values and Model Performance Evaluation**

As discussed in this section and in Section 3, below, the EPA has analyzed TCEQ's future-year model projections for the DFW and HGB areas within Texas and also at downwind areas in Colorado, Arizona, Southern California, Illinois, Wisconsin, and Michigan to which Texas contributes at or above 1 percent of the NAAQS in the EPA's 2011 base case modeling, and/or the EPA's 2016v2 modeling, and/or TCEQ's modeling. The EPA also compared TCEQ's 2023 projections with recent DVs (2020) and preliminary DVs (2021) in these areas together with potential changes in DVs in the next two to three years. The results of this comparison indicate that TCEQ's projections likely underestimate future ozone levels. TCEQ's projected ozone concentrations in 2023 are much lower than measured DVs in 2020 and preliminary 2021 DVs without there being an unusual level of emission reductions to support the projected sharp decline in DVs. The EPA compared recent monitoring values and reasonably anticipated decreases (e.g., on the order of approximately 0-1 ppb/year – see discussion on ozone trends in Section 1 above) in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023.

In subsection 2.a, we evaluate the potential underestimation of TCEQ's DFW and HGB 2023 modeled DVs based on a comparison to recent monitoring and potential DV changes assuming that the average long-term trend in DVs continues over the next 2-3 years. In subsection 2.b, we evaluate the potential underestimation of TCEQ's 2023 modeled DVs in downwind areas (Chicago Nonattainment Area, Wisconsin, Colorado, Arizona, and Southern California) that have receptors identified in either the EPA or TCEQ's modeling compared with recent monitoring and potential DV changes assuming that the average long-term trend in DVs

continues over the next 2-3 years.  In subsections 2.c. and 2.d. we review TCEQ's 2012 base case model performance in the DFW and HGB areas and in downwind receptor areas (Chicago NAA, Wisconsin, Colorado, Arizona and Southern California) to assess whether TCEQ's modeling platform provides technically sound data for projecting future year ozone design values and interstate contributions. In subsection 2.e, we summarize the findings of the EPA's review in this Section 2.

### 2.a. Potential Underestimation in TCEQ's Modeling 2023 Future year projections at DFW & HGB receptors and High DV monitors

TCEQ's modeling includes projections of future year 2023 design values for monitors within the large metropolitan areas of DFW and HGB, both of which continue to monitor ozone nonattainment and have been designated as 2015 8-hour ozone nonattainment areas. TCEQ has previously developed attainment demonstration SIP submissions for both of the HGB and DFW nonattainment areas.[21] TCEQ also included in these previous attainment demonstration SIPs long-term ozone monitored DV trend analysis for both the HGB and DFW areas that indicate the average annual decrease in ozone DVs was approximately 1 to 1.2 ppb/year.[22] In Section 1, above, the EPA's analysis  in Section 1 above of the most recent 9 years of DVs in DFW and 10 years of DVs in HGB indicate a similar trend of 1 ppb/year or less. Using these DV monitored (not modeled) trends indicates that emissions decreases between 2020 and 2023 could potentially be anticipated to result in a drop in ozone concentrations of approximately 3-4 ppb at most receptors if no variability in meteorology is considered and no large emission reduction

---

[21] TCEQ's "Dallas-Fort Worth (DFW) Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone Standard Nonattainment Area" Adopted July 6, 2016 and TCEQ's "Houston-Galveston-Brazoria Serious Classification Attainment Demonstration State Implementation Plan Revision for the 2008 Eight-Hour Ozone National Ambient Air Quality Standard", Adopted March 4, 2020.
[22] *Id.*

programs are implemented in Texas or on a national level.[23] That is to say, without significant

unexpected reductions beyond the effects of existing control measures, a 3-4 ppb decline in

ozone concentrations during this 3-year period is the most that could be anticipated at

DFW/HGB monitors. To assess if TCEQ's ozone transport modeling is potentially

underestimating future year 2023 modeled DVs in DFW and HGB areas, the EPA compared

2020 monitored DVs (2018-2020 monitored data) at several of the typically higher ozone

monitors in the DFW and HGB area with TCEQ's projected 2023 DVs in Table 2.1. While not

as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023

DVs (nor appropriate for use in any other context), using the general 3-4 ppb approximation

provides a ballpark estimate to evaluate whether TCEQ's modeling might be underestimating

2023 future DVs. As can be seen in Table 2.1, there are many monitors in DFW and HGB that

would need a drop in ozone DVs over the next 3 years of > 5 ppb (values of -5 ppb or more in

the far right column) to reach TCEQ's 2023 modeled projected levels. The EPA also evaluated

just the 2023 DVs for monitors with 2020 DVs ≥ 74 ppb (2018-2020 monitored DV), and for the

monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that

had a 2020 DV ≥ 71 ppb and also the subset of these monitors with a 2020 DV ≥ 74 ppb. For

monitors with a 2020 DV ≥ 74 ppb, ozone concentrations would have to drop by 3-4 ppb for

these monitors to attain by 2023. For the 15 monitors that TCEQ projected to be attaining in

2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs

---

[23] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

needed to match TCEQ's 2023 projection is 8.0 ppb. For the eight monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.25 ppb, and they would have to drop at least 3-4 ppb (up to 8-9 ppb) to have a DV of 70 ppb.[24] In other words, for all the monitors with the highest 2020 monitored DVs, TCEQ's modeling projections of 2023 would necessitate average reductions in DVs over this three year period of 9.25 ppb, much larger than the 3-4 ppb that would be  considered as a possible upper bound based on an extrapolation of long-term trends. Drops in 8-hour ozone DVs on average of 7.56 ppb over three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see multiple trends analysis figures in Section 1). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. This analysis supports a finding that TCEQ's modeling is likely underestimating future ozone DVs in the two nonattainment areas in Texas.

---

[24] Due to the uncertainty with using the whole number DVs, the truncation method used at the end of the DV calculation impacts the exact value. For a monitor with a 2020 DV of 74 ppb it would take at least a value of 3 ppb or greater and could be 4 ppb or more prior to truncation.

**Table 2.1 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored Data from AQS 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|-------|--------|--------|----------------------------------------|----------------------------------------|-------------------------------------------------------|
| Texas | Brazoria | 480391004 | 78 | 73 | 5 |
| Texas | Brazoria | 480391016 | 60 | 65 | -5 |
| Texas | Collin | 480850005 | 66 | 75 | -9 |
| Texas | Dallas | 481130069 | 64 | 69 | -5 |
| Texas | Dallas | 481130075 | 63 | 74 | -11 |
| Texas | Dallas | 481130087 | 61 | 69 | -8 |
| Texas | Denton | 481210034 | 68 | 72 | -4 |
| Texas | Denton | 481211032 | 66 | 72 | -6 |
| Texas | Ellis | 481390016 | 60 | 64 | -4 |
| Texas | Ellis | 481391044 | 57 | 63 | -6 |
| Texas | Galveston | 481671034 | 67 | 74 | -7 |
| Texas | Harris | 482010024 | 68 | 79 | -11 |
| Texas | Harris | 482010026 | 66 | 69 | -3 |
| Texas | Harris | 482010029 | 67 | 73 | -6 |
| Texas | Harris | 482010046 | 66 | 64 | 2 |
| Texas | Harris | 482010047 | 69 | 72 | -3 |
| Texas | Harris | 482010051 | 68 | 70 | -2 |
| Texas | Harris | 482010055 | 68 | 76 | -8 |
| Texas | Harris | 482010062 | 72 | 67 | 5 |
| Texas | Harris | 482010066 | 68 | 69 | -1 |
| Texas | Harris | 482010416 | 72 | 73 | -1 |
| Texas | Harris | 482011015 | 64 | 67 | -3 |
| Texas | Harris | 482011034 | 71 | 73 | -2 |
| Texas | Harris | 482011035 | 68 | 70 | -2 |
| Texas | Harris | 482011039 | 74 | 78 | -4 |
| Texas | Harris | 482011050 | 68 | 70 | -2 |
| Texas | Johnson | 482510003 | 62 | 73 | -11 |
| Texas | Kaufman | 482570005 | 58 | 64 | -6 |
| Texas | Montgomery | 483390078 | 64 | 74 | -10 |
| Texas | Tarrant | 484390075 | 65 | 75 | -10 |
| Texas | Tarrant | 484391002 | 63 | 72 | -9 |
| Texas | Tarrant | 484392003 | 66 | 73 | -7 |
| Texas | Tarrant | 484393009 | 68 | 76 | -8 |
| Texas | Tarrant | 484393011 | 62 | 69 | -7 |
| | | | | Avg ALL | -4.97 |
| | | | | Avg if 2020 DV ≥ 74 ppb | -7.56 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥71 ppb | | -8.00 |
| | | | Avg if TCEQ 2023 DV <71 ppb but 2020 DV ≥74 ppb | | -9.25 |

We also note that ODEQ relied on TCEQ's future year 2023 modeled DVs at three nonattainment/maintenance receptors in their SIP submission. Oklahoma was linked to these three receptors in the EPA's previous modeling results included in the EPA's March 2018 memorandum. These monitors included 2 monitors in the DFW area (Tarrant County AQS ID 484392003 and Denton County AQS ID 481210034) and one monitor in the HGB area (Brazoria County AQS ID 480391004). The EPA's 2016v2 modeling indicates that Oklahoma is linked to the Denton County monitor (AQS ID 48120034) that is identified as a maintenance receptor. Included as Table 2.2 is information from the Oklahoma 2015 Ozone Transport SIP submission that utilized information from the EPA's March 2018 memorandum on Transport Modeling Results.

**Table 2.2 Oklahoma's Transport SIP Information Referring to Linkages to Texas Receptors (EPA March 2018 memorandum)**

| Receptor (Site ID, County, State) | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Oklahoma Contribution (ppb) | Oklahoma's Step 1 and 2 Determination |
|---|---|---|---|---|
| 481210034, Denton, TX | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

From Table 2.1 we note that the two receptors in the DFW area (based on EPA's March 2018 memorandum) are currently monitoring nonattainment with a 2020 DV of 72 ppb at the Denton County maintenance receptor and a 2020 DV of 73 ppb at the Tarrant County

nonattainment receptor. TCEQ projected 2023 DVs of 68 ppb for the Denton County monitor and 66 ppb for the Tarrant County nonattainment receptor. We note that the nonattainment receptor in HGB (Brazoria County AQS ID 480391004) is currently monitoring a 73 ppb (2020 DV) but was projected to be 78 ppb in TCEQ's 2023 modeled projections. We note that in the HGB area the maximum monitored values can vacillate between monitors depending upon the variations in local and synoptic meteorology from one year to the next. Based on most recent DVs at these three monitors, it is possible that they may reach attainment by 2023; however even if they attain, it is likely that they would be close to the NAAQS, and therefore, may still be considered maintenance receptors. A drop of 3 ppb (1 ppb/year) would result in DVs of 70 ppb at two monitors and 69 ppb at the Denton monitor. As discussed above, TCEQ's 2023 model projections for these three monitors raises likely underestimation concerns for the two DFW monitors and raises concerns with the adequacy of relying on TCEQ's modeling to conclude that the two DFW monitors are not at least maintenance receptors in 2023 for which Oklahoma is linked. The EPA's more recent modeling (2016v2) also indicates Oklahoma is linked to the Denton monitor which is identified as a maintenance receptor.

### 2.b. Potential Underestimation in TCEQ's 2023 Future year projections at downwind areas

As discussed above, absent variability in meteorology and any unexpectedly large local/regional/national implementation of emission reductions, the drop in monitored ozone DVs from 2020 to 2023 would be expected to be at most 3-4 ppb, based on an assumed continuation of long-term trends at large nonattainment metropolitans that have been identified in TCEQ's modeling or the EPA's 2011 and 2016v2 modeling. (Once again, we emphasize that this estimate serves as a bounding exercise in this technical analysis and does not reflect any legal or policy judgments regarding whether even this degree of reduction in ozone concentrations is reasonable

to assume for any given receptor.) While not as exact as developing new modeling of emission changes from 2020 to 2023 to project 2023 DVs, using the general 3-4 ppb figure provides a ballpark estimate to evaluate if TCEQ's modeling might be underpredicting 2023 future DVs at areas in the Chicago, IL/Wisconsin/Michigan area; the Denver, CO area; Cochise County, AZ receptor; and Southern California areas.[25] We note that in our evaluation of the most recent DV trends in these areas that the annual average change from 2010 to 2020 DVs ranged from increasing to decreasing at most approximately 1 ppb/year, so use of 3-4 ppb is an indicator of the most by which DVs could potentially be estimated to drop between 2020 and 2023. Further, the trends data for these areas indicate the change will likely be less than a 3-4 ppb decrease for many monitors. To assess if TCEQ's modeling is potentially underestimating future year 2023 modeled DVs in these downwind areas, the EPA has compared 2020 monitored DVs at many typically higher ozone monitors in these areas with TCEQ's projected 2023 DVs in Table 2.3, Table 2.4, and Table 2.5.

---

[25] We use this ballpark figure here only as a bounding assumption relevant to an analytical exercise establishing why the TCEQ modeling submitted in its transport SIP submittal likely under-projects future ozone concentrations. The 3 to 4 ppb figure does not represent any analysis or conclusions regarding actual emissions reductions in Texas or any other state. The EPA has no basis to assume even this level of reduction in ozone concentrations will actually occur, nor is this estimate based on any assessment of the effects of permanent and enforceable emissions reductions in any SIP or FIP or resulting from any other known or upcoming CAA requirements. As such, this estimate is not usable in any other CAA action, nor would it be a defensible basis on which to reach any conclusions regarding future air quality conditions, without far greater technical and legal analysis than the Agency can provide at this time.

**Table 2.3 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (IL, WI, & MI)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Chicago and Downwind areas in Wisconsin and Michigan | | | | | |
| Illinois | Cook | 170310001 | 60 | 75 | -15 |
| Illinois | Cook | 170310032 | 68 | 74 | -6 |
| Illinois | Cook | 170310076 | 61 | 69 | -8 |
| Illinois | Cook | 170311003 | 60 | 73 | -13 |
| Illinois | Cook | 170311601 | 61 | 71 | -10 |
| Illinois | Cook | 170314002 | 61 | 71 | -10 |
| Illinois | Cook | 170314007 | 57 | 71 | -14 |
| Illinois | Cook | 170314201 | 64 | 77 | -13 |
| Illinois | Cook | 170317002 | 66 | 75 | -9 |
| Michigan | Allegan | 260050003 | 71 | 73 | -2 |
| Wisconsin | Door | 550290004 | 64 | 72 | -8 |
| Wisconsin | Kenosha | 550590019 | 67 | 74 | -7 |
| Wisconsin | Manitowoc | 550710007 | 65 | 70 | -5 |
| Wisconsin | Milwaukee | 550790010 | 58 | 62 | -4 |
| Wisconsin | Milwaukee | 550790085 | 66 | 70 | -4 |
| Wisconsin | Sheboygan | 551170006 | 70 | 75 | -5 |
| | | | | Avg ALL | -8.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -9.17 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | -10.00 |
| | | | | Avg if TCEQ 2023 <71 ppb but 2020 DV ≥ 74 ppb | -9.17 |

**Table 2.4 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (CO)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV - TCEQ 2023 DV (ppb) |
|-------|--------|--------|:---:|:---:|:---:|
| Denver and downwind areas in Colorado |
| Colorado | Adams | 80013001 | 65 | 69 | -4 |
| Colorado | Arapahoe | 80050002 | 70 | 77 | -7 |
| Colorado | Arapahoe | 80050006 | 66 | 71 | -5 |
| Colorado | Boulder | 80130011 | 67 | 74 | -7 |
| Colorado | Denver | 80310002 | 57 | 70 | -13 |
| Colorado | Douglas | 80350004 | 73 | 81 | -8 |
| Colorado | Jefferson | 80590005 | 68 | 71 | -3 |
| Colorado | Jefferson | 80590006 | 72 | 79 | -7 |
| Colorado | Jefferson | 80590011 | 71 | 80 | -9 |
| Colorado | Larimer | 80690007 | 69 | 70 | -1 |
| Colorado | Larimer | 80690011 | 72 | 75 | -3 |
| Colorado | Larimer | 80691004 | 65 | 67 | -2 |
| Colorado | Weld | 81230009 | 70 | 70 | 0 |
| | | | | Avg ALL | -5.31 |
| | | | | Avg if Current DV ≥ 74 ppb | -6.83 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | -5.50 |
| | | | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | -7.00 |

**Table 2.5 TCEQ Projected Future 2023 DVs Compared to 2020 Monitored DVs (AZ & CA)**

| State | County | AQS ID | TCEQ 2023 Future Design Value-DV (ppb) | Monitored 2020 DV (ppb) | Delta in 3 years 2020 Monitor DV – TCEQ 2023 DV (ppb) |
|---|---|---|---|---|---|
| Arizona | Cochise | 40038001 | 71 | 66 | 4 |
| California | Los Angeles | 60370002 | 74 | 97 | -23 |
| California | Los Angeles | 60370016 | 87 | 107 | -20 |
| California | Los Angeles | 60370113 | 59 | 70 | -11 |
| California | Los Angeles | 60371103 | 63 | 76 | -13 |
| California | Los Angeles | 60371201 | 80 | 92 | -12 |
| California | Los Angeles | 60371302 | 52 | 64 | -12 |
| California | Los Angeles | 60371602 | 70 | 78 | -8 |
| California | Los Angeles | 60371701 | 80 | 88 | -8 |
| California | Los Angeles | 60372005 | 72 | 93 | -21 |
| California | Los Angeles | 60375005 | 57 | 62 | -5 |
| California | Los Angeles | 60376012 | 87 | 101 | -14 |
| California | Riverside | 60650012 | 85 | 99 | -14 |
| California | Riverside | 60650016 | 63 | 78 | -15 |
| California | Riverside | 60651016 | 87 | 99 | -12 |
| California | Riverside | 60652002 | 75 | 84 | -9 |
| California | Riverside | 60655001 | 78 | 88 | -10 |
| California | Riverside | 60656001 | 78 | 94 | -16 |
| California | Riverside | 60658001 | 88 | 96 | -8 |
| California | Riverside | 60658005 | 84 | 98 | -14 |
| California | Riverside | 60659001 | 73 | 87 | -14 |
| California | San Bernardino | 60710001 | 71 | 81 | -10 |
| California | San Bernardino | 60710005 | 96 | 90 | 6 |
| California | San Bernardino | 60710012 | 83 | 90 | -7 |
| California | San Bernardino | 60710306 | 76 | 83 | -7 |
| California | San Bernardino | 60711004 | 91 | 106 | -15 |
| California | San Bernardino | 60712002 | 94 | 102 | -8 |
| California | San Bernardino | 60714001 | 82 | 87 | -5 |
| California | San Bernardino | 60714003 | 94 | 114 | -20 |
| California | San Bernardino | 60719002 | 79 | 86 | -7 |
| California | San Bernardino | 60719004 | 88 | 110 | -22 |
| | | | | Avg ALL | -11.29 |
| | | | Avg if Current DV ≥ 74 ppb | | -12.07 |
| | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 71 ppb | | | -12.00 |
| | | Avg if TCEQ 2023 < 71 ppb but 2020 DV ≥ 74 ppb | | | -12.00 |

As can be seen in Tables 2.3, 2.4, 2.5 there are many monitors in these downwind areas that would need a drop in ozone DVs over the next 3 years of ≥ 5 ppb (values of -5 ppb or more in the far-right column) to reach TCEQ's 2023 modeled projected levels. For each of these downwind areas, the EPA also examined the TCEQ modeled 2023 DVs for monitors with 2020 DVs ≥ 74 ppb, and for the monitors that TCEQ projected to be attaining (DV < 71 ppb) EPA examined all monitors that had a 2020 DV ≥ 71 ppb, and also the subset of these monitors with a 2020 DV ≥ 74 ppb. This DV concentration was chosen since a 2020 DV of 74 ppb or less would drop to a DV below the NAAQS with a 3 to 4 ppb reduction between 2020 and 2023. However even if these monitors show attainment in 2023, it is likely that their DVs would be close to the NAAQS, and therefore, may still be considered maintenance receptors.[26]

For the subset of monitors in Illinois, Wisconsin, and Michigan with 2020 DVs ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the 11 monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs ≥ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 10.0 ppb. For the six monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 9.17 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas do not typically occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section

---

[26] The EPA is not concluding that the sites identified by TCEQ are or are not "receptors" for purposes of ozone interstate transport policy. Rather, we are analyzing the technical reliability of the TCEQ modeling to project future design values.

1.c). TCEQ did not identify any such large emission reductions to be implemented in the 2021-2023 timeframe. Based on this information, TCEQ's modeling is likely underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, and Michigan. These underestimations likely prevented TCEQ from identifying nonattainment/maintenance receptors. The EPA's modeling results included in the March 2018 memorandum and/or EPA's 2016v2 modeling collectively have identified nonattainment/maintenance receptors in the Chicago area of Illinois and downwind areas in Wisconsin and Michigan that have or had projected linkages to emissions from Texas (Texas's contribution was greater than 0.7 ppb).

As can be seen in Table 2.4, for the monitors in Colorado with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 6.83 ppb, which is more than the 3-4 ppb that could be anticipated at most for monitors in these areas. For the four monitors that TCEQ projected to be attaining in 2023 (red font in table) and had a 2020 DVs $\geq$ 71 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 5.50 ppb. For the two monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 7.00 ppb, and they would have to drop a minimum of 3-4 ppb (up to 7 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 7 ppb or more in three years at multiple monitors in this area would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see Figures in Section 1.c).

As can be seen in Table 2.5, for the monitors in Southern California with 2020 DVs $\geq$ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.07 ppb, which is more than the 3-4 ppb (see Section 1) that could be anticipated at most for

monitors in these areas. For the three monitors that TCEQ projected to be attaining in 2023 and had a 2020 DV of ≥ 74 ppb, the average amount of decrease in DVs needed to match TCEQ's 2023 projection is 12.00 ppb, and they would have to drop a minimum of 5-6 ppb (up to 8 ppb) to have a DV of 70 ppb. Drops in 8-hour ozone DVs on average of 9.17 ppb or more in three years at many monitors in these areas would not typically be expected to occur unless there is an unexpectedly large change in emissions and/or large change in meteorological conduciveness for ozone generation (see figures in Section 1.c).

Based on this information, TCEQ's modeling appears to be underestimating future ozone levels at monitors/receptors in Illinois, Wisconsin, Michigan, Colorado, and Southern California areas, and these underestimations may have prevented TCEQ from identifying nonattainment/maintenance receptors. Even with the underestimation of projected DVs, TCEQ identified several nonattainment/maintenance receptors in Colorado and California with linkages to Texas with contributions ≥ 0.7 ppb. The EPA's modeling results included in the March 2018 memorandum also identified nonattainment/maintenance receptors in the greater Denver area of Colorado (Jefferson County) that also had linkages to emissions from Texas. (Texas' contribution was greater than 0.7 ppb).

### 2.c. Model Performance Evaluation of TCEQ's 2012 base case at downwind areas in the Midwest and West.

TCEQ included a Model Performance Evaluation (MPE) analysis of their 2012 base case modeling in their SIP submission and in an Appendix to the SIP submission "Appendix C – Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard." TCEQ included MPE by climate regions of the U.S. Included as Figure 2.1 below is TCEQ's Table 3-7 in their SIP submission which provides statistical model performance evaluation metrics for

TCEQ's 2012 base case modeling. The EPA reviewed the information in the appendix as well as model performance information available on TCEQ's websites.[27]

The EPA agrees with findings by TCEQ in Appendix C that model performance varied across the U.S. and that TCEQ's 2012 base case under predicted the high end of the distribution of observed MDA8 ozone concentrations in the Midwest and West, including the Chicago area, Southeast Wisconsin, Denver, Arizona, and Southern California areas.[28] These areas include sites that were identified in TCEQ's modeling and in the EPA's 2016v2 modeling as nonattainment/maintenance receptors.

Overall, the modeling indicates some model underestimation in the Upper Midwest, Ohio Valley, Southwest (includes Colorado monitors), and in the West (includes Southern California) regions. While this is mostly within typical ranges seen for Continental U.S. chemical transport modeling, underestimation bias may play some role in the much lower 2023 DVs that TCEQ's modeling is projecting at a number of potential receptor sites.

---

[27] TCEQ's Model Performance Evaluation was reviewed for downwind areas using information from TCEQ's websites (hyperlinks are embedded): 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov.
[28] TCEQ SIP Submission, Table 3-7 at page 3-32; TCEQ SIP Submission "Appendix C Photochemical Model Performance Evaluation for the Transport State Implementation Plan Revision for the 2015 Eight-Hour Ozone National Ambient Air Quality Standard."

Figure 2.1 - TCEQ's SIP Submission Table 3-7 Model performance evaluation statistical metrics by Region for TCEQ's 2012 base case

Table 3-7:  Statistical Model Performance Evaluation Metrics for TCEQ's 2015 Ozone NAAQS Transport SIP Revision Configuration

| Climate Region | No. of Obs | MB (ppb) | ME (ppb) | NMB (%) | NME (%) | RMSE (ppb) |
|---|---|---|---|---|---|---|
| Northeast | 5281 | 4.1 | 8.4 | 5.9 | 12.2 | 11.0 |
| Ohio Valley | 9861 | -2.5 | 6.8 | -3.6 | 10.0 | 8.5 |
| Upper Midwest | 2950 | -6.2 | 8.3 | -8.9 | 11.9 | 9.9 |
| Southeast | 3203 | 3.1 | 6.8 | 4.7 | 10.2 | 8.8 |
| South | 5020 | -3.9 | 6.5 | -5.7 | 9.6 | 8.1 |
| Southwest | 7215 | -5.5 | 7.1 | -8.4 | 10.8 | 9.0 |
| Northern Rockies | 1084 | -7.5 | 8.6 | -11.8 | 13.4 | 10.4 |
| Northwest | 193 | -7.0 | 8.2 | -10.9 | 12.7 | 10.2 |
| West | 10672 | -9.2 | 10.4 | -13.1 | 14.9 | 12.7 |
| National | 45479 | -3.9 | 8.0 | -5.7 | 11.7 | 10.1 |

We have included two figures from TCEQ's SIP submission that show Mean Bias and Root Mean Square Error (RMSE) for each monitor in the domain. Included as Figure 2.2 is TCEQ's Figure 3-26 in their SIP submission, which provides mean bias for May through September 2012 at all of the EPA Air Quality System (AQS) monitoring sites for days with observed MDA8 ozone concentration ≥ 60 ppb. Figure 2.2 shows that the mean biases for days with MDA8 ozone concentrations ≥ 60 ppb differ by region, but at a number of monitors in the Chicago, southeastern Wisconsin, Denver, Arizona, and southern California areas, TCEQ's modeling has a negative mean bias.

Figure 2.3 (TCEQ's Figure 3-27 in their SIP submission) provides RMSE[29] for the May through September 2012 at AQS Monitoring Sites for each of the days with observed MDA8 > 60 ppb. The RMSE at most monitors in the modeling domain were in the range of 6 to 12 ppb. However, many monitors in the Midwest, including in the Chicago area and southeastern

---

[29] Root Mean Square Error (RMSE): This performance statistic (in units of ppb or micrograms per cubic meter($\mu g/m^3$)) is a measure of the average distance between predicted and observed values. It is calculated as the standard deviation of the difference between modeled and observed values

Wisconsin as well as monitors in Arizona and California, have higher deviations with RMSE in the 8 to 14 ppb range.

Figure 2.2 – TCEQ's SIP Submission Figure 3-26 showing Mean Bias at each monitor



Figure 3-26:  Mean Bias for the May through September 2012 Episode at AQS Monitoring Sites

Figure 2.3 – TCEQ's SIP Figure 3-27 showing Root Mean Square Error (RMSE) at each monitor



**Figure 3-27: RMSE for May through September 2012 Episode at AQS Monitoring Sites**

The EPA examined TCEQ's model performance at monitors in Cook County, Illinois, Wisconsin, and Michigan that were identified in EPA's 2011-based modeling and its 2016v2 modeling as receptors to which Texas contributes $\geq 1$ percent of the NAAQS. TCEQ's modeling underestimates MDA8 ozone at these monitors and TCEQ's modeling also underestimates observed values at key monitor/receptors in Colorado. Even with these underprediction concerns, TCEQ's modeling analysis still identified 4 nonattainment/maintenance receptors in Colorado including the Jefferson County (AQS ID 80590011), which the EPA also identified as a receptor with Texas linkage in modeling results included in our March 2018 memorandum. The ability of TCEQ's modeling to replicate the highest days both in Texas and at downwind areas is important to having an adequate modeling analysis to both assess potential nonattainment/maintenance receptors and linkages to upwind states. Both the EPA's modeling included in the March 2018 memorandum and TCEQ's modeling identified nonattainment/maintenance receptors in Jefferson County, CO. We also note that TCEQ's analysis also identified one additional receptor in Jefferson County, CO, one monitor in Larimer County, CO, and one receptor in Douglas County, CO with linkage impacts greater than 0.7 ppb from Texas emissions.

TCEQ's modeling also underestimates observed values at key monitor/receptors in Arizona and California that TCEQ identified as nonattainment and/or maintenance receptors with linkages to Texas. TCEQ did identify Texas emissions as having impacts of more than 0.7 ppb, and thus, linked to some nonattainment/maintenance receptors in Arizona and California.

The EPA finds that although TCEQ's modeling under predicts the highest measured MDA8 concentrations in downwind areas, including downwind areas that have been identified by TCEQ or EPA's 2016v2 modeling to have nonattainment/maintenance receptors, overall model performance does not indicate that TCEQ's modeling was egregiously flawed. That is,

the results of the base year model performance provided by TCEQ in their submittal does not appear to be a clear factor contributing to the likely underestimation of future year 2023 model-predicted DVs.

### 2.d. Model Performance Evaluation of TCEQ's 2012 base case at DFW and HGB monitors

In this section we present an evaluation of TCEQ's 2012 base case model performance in the DFW & HGB areas. We conducted this analysis to identify if there were any serious problems with TCEQ's 2012 base year model performance that might potentially affect the projection of future year DVs. TCEQ provides some model performance evaluation data for their 2012 base case modeling for this transport SIP on a website,[30] which the EPA used to generate the figures below, indicating some low bias at key monitor/receptors in the DFW and HGB area (Figures 2.4 a-f). The EPA has provided a time series using TCEQ's model performance information that indicates the observed Maximum Daily Average 8-hour ozone (MDA8) value in red and modeled value in blue for two monitors in the DFW area and one in the HGB area that were identified in the EPA's March 2018 memorandum that Oklahoma was linked (AQS ID 481210034 Denton County, AQS ID 484392003 Tarrant County, and AQS ID 480391004 Brazoria County). We also evaluated three additional monitors (Eagle Mountain Lake, Grapevine, and Frisco) in the DFW area, which are among the monitors that often have the highest DVs the DFW area. These figures also include quantile-quantile (Q-Q) scatter plots, comparing observed to modeled MDA8.In Table 2.6 the EPA provides statistical metrics for this

---

[30] TCEQ's Model Performance Evaluation was reviewed for DFW, HGB, and downwind areas using information from TCEQ's websites: 2015 Ozone NAAQS Transport SIP Modeling - Interactive Bar Chart - Texas Commission on Environmental Quality - www.tceq.texas.gov
 and 2015 Ozone NAAQS Transport SIP Modeling - Model Performance Statistics by Area and Day - Texas Commission on Environmental Quality - www.tceq.texas.gov

subset of DFW area monitors and for some of the HGB area monitors including the Manvel

Croix monitor (AQS ID 480391004) that typically have the highest DVs in the HGB area.

Figure 2.4(a) – Brazoria County – Manvel Croix Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(b) – Denton County – Denton Airport South Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(c) – Tarrant County – FAA Site Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(d) – Tarrant County – Eagle Mountain Lake Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(e) – Tarrant County – Grapevine Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Figure 2.4(f) – Collin County – Frisco Time Series MDA8
Observed (red) and Modeled (blue) and Scatter Q-Q plots





Table 2.6 Model Performance Statistics for Select DFW and HGB monitors including sites identified as receptors
in EPA's March 2018 Memorandum and EPA's 2016v2 modeling

| | | Select DFW Sites : Data with Observed ≥ 60 ppb | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Site** | **Valid Data** | **Mo ppb** | **Mm ppb** | **MB ppb** | **ME ppb** | **RMSE ppb** | **NMB %** | **NME %** | **FB %** | **FE %** | **R2** |
| Frisco | 480850005 | 68 | 69.25 | 65.49 | -3.76 | 6.43 | 7.95 | -5.43 | 9.28 | -5.66 | 9.55 | 0.345 |
| Denton Airport South | 481210034 | 51 | 69.82 | 65.92 | -3.91 | 5.20 | 6.99 | -5.60 | 7.44 | -5.86 | 7.73 | 0.529 |
| Eagle Mtn. Lake | 483670081 | 45 | 67.20 | 61.19 | -6.01 | 6.86 | 7.92 | -8.94 | 10.21 | -9.40 | 10.69 | 0.501 |
| FAA | 484390075 | 41 | 68.07 | 65.04 | -3.04 | 5.60 | 6.79 | -4.46 | 8.22 | -4.67 | 8.56 | 0.495 |
| Grapevine | 484392003 | 51 | 68.20 | 66.15 | -2.05 | 4.67 | 6.03 | -3.00 | 6.85 | -3.14 | 7.05 | 0.532 |
| | | | | | | | | | | | | |
| | | Select HGB Sites : Data with Observed ≥ 60 ppb | | | | | | | | | |
| Brazoria -Manvel Croix | 480391004 | 36 | 72.25 | 66.9 | -5.35 | 8.44 | 11.08 | -7.40 | 11.68 | -6.80 | 11.39 | 0.566 |
| Harris - Aldine | 482010024 | 18 | 68.00 | 72.76 | 4.76 | 6.37 | 8.61 | 6.99 | 9.37 | 6.47 | 8.90 | 0.424 |
| Harris - Northwest | 482010029 | 24 | 70.04 | 66.2 | -3.84 | 5.10 | 7.70 | -5.49 | 7.29 | -5.74 | 7.54 | 0.547 |
| Harris - Bayland Park | 482010055 | 28 | 70.39 | 72.76 | 2.37 | 6.03 | 7.98 | 3.36 | 8.57 | 3.28 | 8.18 | 0.537 |
| Harris -Deer Park #2 | 482011035 | 20 | 68.35 | 72.35 | 4.00 | 9.19 | 10.8 | 5.85 | 13.45 | 6.13 | 13.03 | 0.215 |

The time series and scatter/Q-Q plots along with the performance statistics show that there is a tendency for some underprediction of high observed ozone levels at these DFW and HGB monitors. However, overall, the ozone model performance statistics in Table 2.6 for the TCEQ 2012 modeling at these monitors are within or close to the ranges found in other recent peer-reviewed photochemical model applications (e.g., Simon et al, 2012 and Emory et al, 2017).[31,32] In this respect, base year model performance does not appear to be a factor in the potential under prediction of 2023 DVs at DFW and HGB area monitors.

### 2.e. Summary

TCEQ's 2023 future year projections may understate anticipated ozone levels at high ozone monitors in DFW and HGB and also in areas downwind of Texas including the Chicago area and downwind receptors in Wisconsin and Michigan, greater Denver area of Colorado, and in Southern California, as shown above by comparing 2020 monitored DVs to the projected 2023 DVs and examining the amount of ozone reductions that would be necessary to meet those projections compared with reasonably anticipated DV reductions based on long-term monitored DV trends. These likely underestimations in 2023 DVs may have prevented TCEQ from identifying nonattainment/maintenance receptors in the Chicago area and downwind receptors in Wisconsin and Michigan. Despite the underprediction, TCEQ's modeling did identify a number of receptors in Colorado and California that Texas emissions were linked (contribution equal or greater than 0.70 ppb).

---

[31] Simon, H., K.R. Baker, and S.B. Phillips, 2012. Compilation and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012, *Atmospheric Environment*, 61, 124-139.

[32] Emery, C., Z. Liu, A. Russell, M. T. Odom, G. Yarwood, and N. Kumar, 2017. Recommendations on Statistics and Benchmarks to Assess Photochemical Model Performance. *J. Air and Waste Management Association*, 67, 582-598.

TCEQ's 2012 base case modeling tends to underestimate high MDA8 ozone concentrations at ozone monitors in the DFW and HGB areas and also at monitors in the Chicago, IL area (as well as downwind receptors in Wisconsin and Michigan), the greater Denver area of Colorado, and in Southern California to which Texas is linked in TCEQ's modeling and/or EPA's modeling. However, in view EPA's modeling guidance section 4.1 and as discussed above, the magnitude of MDA8 ozone bias in TCEQ's modeling in Texas and for downwind receptors is unlikely to have been a factor in the underestimating of projected DVs by TCEQ.

**3.      Comparison of TCEQ and EPA 2023 future modeling and identified maintenance and nonattainment receptors**

As described in the notice of proposed disapproval, the EPA has recently updated its air quality modeling for transport using the 2016v2 emissions platform. Using 2016 as a base year shortens the number of years to project ozone concentrations in 2023, compared to TCEQ's projection from a 2012 base year or the EPA's earlier projection from a 2011 base year. Also, using 2016 as a base year versus 2012 or 2011 allows for the use of monitored DVs from a more recent period. The combination of starting with more recent base period DVs and shortening the length of time between the base year and the future year provides more certainty compared to TCEQ's 2012-based or the EPA's 2011-based modeling. Thus, the 2016-based modeling is expected to provide more reliable projection of receptors and contributions in 2023.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors.

In Table 3.1, the EPA provides the projected 2023 average and maximum DVs based on EPA's 2016v2 modeling, and projected average and maintenance DVs based on TCEQ's modeling for the nonattainment and/or maintenance receptors to which Texas is linked (Texas contributions of ≥ 0.7 ppb) based on EPA's 2016v2 modeling. This table also includes the contributions to these receptors from TCEQ's modeling and EPA's 2016v2 modeling, as well as the 2020 DVs and preliminary 2021 DVs at these receptors.[33]

---

[33] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

**Table 3.1 Projected 2023 Nonattainment/Maintenance Receptors Identified by EPA Using EPA's 2016 base year modeling**

| Receptor (Site ID, County, State) | Nonattainment/Maintenance (EPA 2023) | EPA: 2023 Average DV/Maximum DV (ppb) | TCEQ: 2023 Average DV/Maintenance DV (ppb) | 2020 DV/Preliminary 2021 DV** (ppb) | EPA: Texas Contribution (ppb) | TCEQ: Texas Contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook County, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6 |
| 170310032, Cook County, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31 |
| 170314201, Cook County, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25 |
| 170317002, Cook County, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22 |
| 550590019, Kenosha County, WI | Nonattainment | 72.8/73.7 | 67/66 | 74/74 | 1.72 | 1.44 |
| 550590025, Kenosha County, WI | Maintenance | 69.2/72.3 | No data* | 74/72 | 1.81 | No data* |
| 551010020, Racine County, WI | Nonattainment | 71.3/73.2 | No data* | 73/73 | 1.34 | No data* |

* Kenosha AQS ID 550590025 was installed and began operating May 13, 2013, so the first three-year DV available is 2013-2015. Racine AQS ID 551010020 was installed on April 14, 2014 so the first three year DV available is 2015-2017. TCEQ's modeling used monitored DV data for 2010-2012, 2011-2013, and 2012-2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by the EPA.

The likely underestimation of anticipated 2023 DVs in the Midwest is a concern, especially in light of the fact that TCEQ did not identify any receptors in the Chicago area and downwind of Chicago areas of Wisconsin and Michigan while the EPA did identify receptors in these areas.

*Cook County, IL*

As shown in Table 3.1, the EPA identified four receptors as maintenance receptors in Cook County, IL. TCEQ's 2023 nonattainment DVs are 9-15 ppb lower than recent monitoring data. The four monitors that the EPA's 2016v2 modeling identified as maintenance receptors to which Texas is linked, all have 2020 DVs ≥ 74 ppb that would need their DVs to drop from a minimum 3-4 ppb up to 7 ppb in the next 3 years. Based on the trends analysis included in Section 1, typical ozone DV changes (no large changes in emissions and/or meteorology ozone conduciveness) would be anticipated to be 0-3 ppb for 3 years, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. TCEQ's modeling did not identify these four receptors as nonattainment and/or maintenance receptors. In TCEQ's modeling they project 2023 nonattainment DVs of 60 to 68 ppb for the four maintenance receptors that the EPA identified (2016v2), where EPA's 2023 nonattainment DVs range from 69 to 70 ppb for the four receptors. EPA's projected 2023 nonattainment DVs are higher than TCEQ's projected 2023 nonattainment DVs and closer to the recently monitored data. The EPA identified all four receptors as maintenance receptors. TCEQ's maintenance DVs, using only the 2012-2014 monitored DVs, projected 2023 maintenance DVs between 58 ppb and 66 ppb, which is 1 to 2 ppb lower than TCEQ's nonattainment DVs. As discussed above, TCEQ's methodology for identifying maintenance receptors does not identify areas that may struggle with maintaining the standard in

the face of inter-annual variability in ozone-conducive conditions. It is worth noting that if TCEQ's modeling had identified any of these four receptors as maintenance receptors, TCEQ's modeling estimates contributions from Texas sources ranging from 1.22 ppb to 1.6 ppb, and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

*Wisconsin*

As shown in Table 3.1, the EPA identified two receptors as nonattainment receptors and one as a maintenance receptor in Wisconsin. As footnoted in Table 3.1, TCEQ modeled a 2012 base case so TCEQ's modeling can only be used for monitors that had a one or more valid DVs in the 2010-2014 period. Only the Kenosha County AQS ID 550590019 monitor had a valid DV during this time, as the other two monitors were not installed until 2013-2014. The EPA's modeling uses a 2016 base case, so the EPA had valid DVs for all three monitors in Wisconsin to project 2023 DVs. TCEQ's projected nonattainment DV is 5 ppb lower than EPA's 2023 nonattainment DV and 7 ppb lower than recent monitored data. The three monitors that the EPA's 2016v2 modeling identified as a nonattainment and/or maintenance receptors to which Texas is linked have 2020 DVs of 73ppb, 74ppb, and 74 ppb and preliminary 2021 DV of 72 ppb, 73 ppb, and 74 ppb. TCEQ's modeling only had projections for one of these receptors but did not identify it as a nonattainment and/or maintenance receptor. Again, TCEQ's maintenance methodology proved to be less stringent than the nonattainment methodology and resulted in the maintenance methodology DV being 1 ppb lower than the nonattainment methodology DV. It is worth noting that if TCEQ's modeling had identified the one Wisconsin receptor that they had valid base DVs as nonattainment or maintenance, TCEQ's modeling indicated that contributions

from Texas sources was 1.44 ppb and therefore Texas would have been linked to these receptors for further analysis of potential emission reductions.

Overall, TCEQ's modeling resulted in no receptors being identified in the Illinois, Wisconsin, Michigan areas. The analysis here shows that by comparing current measured DVs that are only 2 to 3 years from 2023 with the TCEQ 2023 DVs used for identifying maintenance receptors, it is clear that the TCEQ method is flawed. TCEQ claims that five receptors will not have a problem maintaining the NAAQS when, in fact, the current DVs for these five sites are 4 to 7 ppb above the NAAQS using 2020 DVs and 1 to 5 ppb above the NAAQS using preliminary 2021 DVs, indicating that it is unlikely that all these monitors will attain the NAAQS and would likely need even more ozone DV decreases to not be considered a maintenance receptor. While the TCEQ modeling projects lower overall ozone levels for these areas in 2023, TCEQ's modeling does tend to corroborate the amount of projected impact that emissions from Texas may be contributing to 5 of the 7 nonattainment and maintenance receptors identified by the EPA's most recent air quality modeling, EPA MP2016v2 modeling, as having a Texas contribution greater than or equal to one percent of the 2015 ozone NAAQS (0.7 ppb). The EPA MP2016v2 modeling found that Texas is linked to nonattainment and maintenance receptors in Cook County Illinois, and Wisconsin Counties (Kenosha and Racine).

## 4. Other Potential Modeling Concerns

### 4.a. EGU Emissions

TCEQ did not use the latest EGU emissions available at the time they proposed the SIP that incorporated reductions from the CSAPR Update/latest ERTAC projections in their modeling. It is unclear if this made any substantial changes in the modeling analysis without updating the EGU emissions and redoing the modeling.

#### *4.b. Contribution Calculation*

TCEQ used an alternate methodology for calculating contributions in determining the contributions from Texas emissions at each monitor Texas identified as a receptor in Colorado, Arizona, and Southern California.

To understand the differences, we first describe the EPA's method for calculating the contribution from an upwind state's emissions at downwind monitors. We note that in the Federal Register Notice Section II.B.4 and Section III.B.3, that is also referred to elsewhere in the Federal Register Notice, there is an error in describing how the EPA calculates future year 2023 contributions. The EPA's approach for calculating contributions is summarized below followed by a more detailed four step description of the methodology. For more details on how EPA calculates contributions see the "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions".[34]

The EPA's approach for calculating 2023 average contribution metric values at individual monitoring sites is to first average daily contributions on the days with the highest predicted MDA8 ozone concentrations in the grid cell containing the monitor based on the air quality modeling for 2023 and then calculate the ratio of the average contribution to the corresponding average MDA8 concentration across the selected days. The resulting ratio is applied to the projected 2023 design value to provide contribution metric values for each state at each monitoring site nationwide. As part of this method, contributions and concentrations are selected from the days with the top-10 MDA8 ozone concentrations in 2023. Note that EPA does not calculate contributions for those monitoring sites where there are fewer than 5 days with 2023 MDA8 ozone concentrations $\geq$ 60 ppb for that monitor.

---

[34] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663

For clarity and further analysis of the differences with TCEQ's methodology we are including a more detailed four step description of the EPA's methodology (see "Air Quality Modeling TSD for 2015 Ozone NAAQS Transport SIP Proposed Actions").[35]

(1) For the model grid cells containing an ozone monitoring site, calculate the 8-hour average contribution from each source tag[36] to each monitoring site for the time period of the 8-hour daily maximum modeled (i.e., MDA8) concentration on each day in 2023;

(2) Average the MDA8 concentrations for each of the top 10 modeled ozone concentration days in 2023 and average the 8-hour contributions for each of these same days for each tag;[37]

(3) Divide the 10-day average contribution for each tag by the corresponding 10-day average concentration to obtain a Relative Contribution Factor (RCF) for each tag for each monitoring site;

(4) Multiply the 2023 average design values by the corresponding RCF to produce the average contribution metric values at each monitoring site in 2023.

TCEQ's methodology differs in that it selects 2023 contributions from the days with the highest MDA8 ozone concentrations in 2012, not 2023 as in EPA's method. In addition, TCEQ selects contributions from among the 3 x 3 set of model grid cells including and adjacent to the

---

[35] This TSD can be found in Docket ID No. EPA-HQ-OAR-2021-0663.

[36] A "tag" is a contribution category. For example, in the state-by-state source apportionment model run, we "tagged" anthropogenic NOx and VOC emissions for individual states to track the formation of ozone from these emissions.

[37] When calculating the contribution metric values EPA applied a criterion that 5 or more of the top 10 model-predicted concentration days must have MDA8 concentrations >= 60 ppb in the future year in order to calculate a valid contribution metric. The criterion of having at least 5 days with MDA8 ozone concentrations >= 60 ppb was chosen to avoid including contributions on days that are well below the NAAQS in the calculation of the contribution metric. Using 5 days with MDA8 ozone >= 60 ppb aligns with recommendations in EPA's air quality modeling guidance for projecting future year design values, as described above. The EPA did not calculate contribution metric values for any monitor that did not meet this criterion.

grid cell containing the monitor based on whatever grid cells are included in the calculation of projected design values. The EPA's method, on the other hand, uses 2023 contributions from just the grid cell containing the monitor.

More specifically, TCEQ's methodology differs from step 1, above, in that they use the contribution for the cell that had the maximum 2012 MDA8 value from a 3x3 matrix centered around the grid cell that has the monitor, whereas the EPA uses the contribution for the cell that includes the monitor. Note TCEQ is using the 2012 modeled values for selecting the MDA8 value. TCEQ's methodology differs in step 2 in that they use the 10 highest MDA8 days in the 2012 modeling instead of the EPA's method that uses the 10 highest MDA8 days in the 2023 modeling. One artifact of TCEQ's method is that the modeled contributions used to calculate the average contribution metric may be based on contributions on different days and in different grid cells than EPA's method.

TCEQ's also uses 2012 modeled values in step 3 to calculate the Relative Contribution Factor and in step 4 to produce the average contribution metric using the 2012 total modeled concentration values. Whereas the EPA uses the 2023 data in steps 3 and 4.

It is unclear how the methodological differences ultimately affect the contribution values and which receptors Texas is linked compared to the EPA's methodology. As noted in Section 3 for receptors that EPA identified in Illinois and Wisconsin, TCEQ's contribution method did result in contributions that were relatively similar in magnitude compared to EPA's 2016v2 contribution results. The EPA does not agree with TCEQ's use of the 2012 modeled days for selecting the days in 2023 to calculated contribution. Regardless of this issue, TCEQ's methodology  did identify contributions above 0.7 ppb at nonattainment/maintenance receptors in Colorado, Arizona, and Southern California.

### *4.c. Future Year Boundary Conditions*

In generating their future year boundary conditions, TCEQ used estimated 2023 emissions from the Representative Concentration Pathway (RCP) scenario 8.5 developed by the Intergovernmental Panel on Climate Change (IPCC). This includes some estimated changes based on climate modeling. The EPA typically has not seen adjustment in future year boundary conditions for climate changes included in SIP modeling; without a modeling sensitivity analysis, the actual impact cannot be quantified. The actual impact is expected to be a relatively small contribution to the total modeled concentrations in TCEQ's transport SIP modeling and would not be expected to significantly change the total modeled concentrations.

### 5.    TCEQ Other Factor Analysis (Weight of Evidence)

TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. To try and assess persistent and consistent patterns, TCEQ did some additional analysis of several different factors such as DV trends, number of elevated ozone days, back trajectory analyses on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, consideration of conceptual model of downwind area, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.

### *TCEQ Summary*

For Colorado receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated

ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, alternate contribution method analysis, and the responsiveness of ozone formation at the tagged Colorado monitors to Texas $NO_X$ emissions. TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in Colorado.

For California receptors, TCEQ provided analysis of: current attainment status and design value trends, number of days with elevated observed ozone, back trajectory analysis on elevated ozone days, the modeled contributions on expected elevated ozone days, collective interstate contribution, TCEQ evaluated these factors in a general weight of evidence approach and concluded that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California.

While these additional factors can be informative to supplement an air quality modeling-based analysis of some of the complexities of ozone formation in downwind areas, how ozone is changing in those areas, areas that may contribute to downwind areas, modeled contributions from upwind areas, and potential responsiveness to upwind changes in emissions, most of these analyses do not provide the quantitative assessment that chemical transport modeling with source contribution analyses that air quality modeling provides. Chemical transport modeling is the most technically credible tool available to project future year ozone levels, contributions from upwind states, and frequency of the impacts of upwind states.

The EPA has reviewed these analyses that TCEQ provided in a Weight of Evidence approach for receptors in Colorado and California and found significant concerns with some of the analyses. Specifically, the EPA's assessment of the totality of TCEQ's Weight of Evidence

factors for Colorado and California receptors is that they were in conclusive or do not provide sufficient, substantial evidence that counters the results of photochemical modeling, including the contribution analysis using EPA's contribution methodology. The EPA does not concur with TCEQ's conclusion that Texas emissions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the tagged monitors in California. The EPA has included some comments, concerns, and limitations with using these factors that Texas used to negate the findings of the chemical transport model below.

### 5.a. TCEQ indicated that there are problems with DV trends

TCEQ provided analyses of recent DV trends at the 4 Colorado monitors that TCEQ identified as nonattainment/maintenance receptors. TCEQ stated that 2013 was a high monitored ozone year but that the most recent DVs at the time of their SIP submittal (2016 DVs) at most monitors show attainment and long-term ozone decreases are modest for the time evaluated (see Figure 1.8 above that is TCEQ's SIP Figure 3-40).

TCEQ also provided analyses of recent DV trends at the tagged California monitors along with the other monitors located in the Los Angeles CSA. These trends are displayed in TCEQ's SIP Figure 3-56: Eight-Hour Ozone Design Values for Monitors in the Los Angeles Area that is included above (see Figure 1.12 above that is TCEQ's SIP Figure 3-56). TCEQ colored the tagged California monitors and used gray coloring for the other monitors in the Los Angeles CSA. The 10 monitors tagged had eight-hour ozone design values ranging from 101 ppb to 80 ppb in 2016. TCEQ indicated that 8-hour ozone DVs values in the area have decreased overall for the past 10 years and the 10 monitors tagged for further review have observed eight-hour ozone design value decreases from 2007 through 2016 ranging from 13% at Reseda (AQS ID: 60371201) to 5% at Victorville-Park Avenue (AQS ID: 60710306).

The most recent monitoring data and trends are useful to help identify whether the monitors are currently near or above the 8-hour ozone NAAQS. See Figures 1.9 and 1.13, above, and Table 5.1 below, which includes the 2021 preliminary DV.[38] We note that the AQS ID 80590011 (Jefferson County, Colorado) monitor 2016 DV is similar to the 2012 monitor DV despite four more years of fleet turnover in the Denver area. Overall, the DV trends show that ozone levels are reducing at a slow pace. Based on the data for the Colorado monitors and the ten California area monitors identified by TCEQ as receptors, the 2020 DVs and the long-term trends do not clearly show that the receptors in California or Colorado are expected to be below the NAAQS, and thus, not be potential nonattainment or maintenance receptors in 2023. The modeling trends analysis for California and Colorado receptors do not provide evidence that these receptors will attain by 2023.

---

[38] EPA Analysis of 8-hour Ozone monitor trends. Data and calculations available in "Ozone_Trends_R6_TSD.xlsx" included in Docket ID No. EPA-R06-OAR-2021-0801.

**Table 5.1  2020 DV and Preliminary 2021 DV and TCEQ 2023 projections and contributions for receptors identified by TCEQ**

| Receptor (Monitor ID, County, State) | TCEQ 2023 Average DV (ppb) | TCEQ 2023 Maintenance DV (ppb)* | Texas Contribution (ppb) | 2020 DV / Preliminary 2021 DV** (ppb) |
|---|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 | 81/83 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 | 79/81 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 | 80/83 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 | 75/77 |
| 80050002, Arapahoe, CO | 70*** | 71 | 1.15 | 77/80 |
| 40038001, Cochise, AZ | 71 | 69**** | 1.06 | 66/66 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 | 92/87 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 | 88/90 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 | 101/101 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 | 96/95 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 | 98/97 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 | 81/77 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 | 83/83 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 | 106/103 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 | 87/87 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 | 114/114 |

    * Uses TCEQ's Maintenance receptor methodology that EPA has concerns (see Section 1 on maintenance receptor methodology discussion).
    ** 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA.
    *** From TCEQ spreadsheet of future 2023 DVs with state contributions.
    **** TCEQ did not provide calculations for this receptor so EPA calculated from the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012-2014 DV (0.983 X 71 ppb, truncation applied).

### 5.b. TCEQ evaluated the number of elevated ozone days (over 70 ppb) annually for monitors in the Denver and Southern California areas.

For the greater Denver area Colorado, TCEQ provided number of days over 70 ppb trends for 2007-2016 indicating decreases in the number of such days over the long-term and that 2012 was the highest year in terms of the number of exceedance days at the five monitors evaluated. However, in 2016 3 of 5 monitors had more than 10 days of monitored exceedances and one monitor had more exceedances in 2016 than it had in 2014 and 2015. TCEQ also provided a similar analysis of trends in California for 2012 thru 2016, which shows a general decrease in monitored ozone days above 70 ppb from 2012 for most of the 10 monitors tagged by TCEQ's modeling, but most monitors still have 30-95 monitored exceedance days (MDA8 > 70 ppb) in 2016. This data supports that the number of ozone exceedance days are improving but neither the Colorado nor California analysis of number of exceedance days annually provide any evidence to refute the photochemical modeling analysis results.

### 5.c. TCEQ Back Trajectory Analysis

TCEQ provided multi-year back trajectory analyses (2012-2016) for all the monitored ozone exceedance days at the five monitors in Colorado and at the 10 monitors in Southern California using National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT)[39]. TCEQ performed 72-hour back trajectories for both Colorado and California monitors. Given the large distance from Texas to Colorado and Texas to California, 120-hour back trajectories should have been considered. Most

---

[39] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

of the Colorado back trajectories only reached central or northern Texas so longer back trajectories should have been completed (see TCEQ SIP submission, Figure 3-42). TCEQ used start heights of 500 m Above Ground Level (AGL), 1000 m AGL, and 1500 m AGL. The EPA would also recommend running a 100 m AGL start height as well since both areas have complex terrain nearby or in the potential pathways that could result in different back trajectory paths due to the difference in meteorology between 100 m AGL and 500 m AGL. Another concern is that TCEQ used the 1st hour of the 8-hour exceedance as the start time instead of mid 8-hour or highest 1-hour number as the start time. The EPA typically uses a mid-8-hour or later start time, or runs multiple trajectories with varying start times as the transport patterns often change throughout the monitored 8-hour exceedance. Not running multiple hours for the start time, or at least the highest 1-hour or the middle of the 8-hour period when monitored 1-hour values are typically higher than the 1st hour of the 8-hour period, results in uncertainty and a general concern that the analysis is not complete. This translates into a concern that trajectories provided by TCEQ are incomplete and may not be representative of transport patterns that occurred during monitored 8-hr ozone exceedances because of the way TCEQ structured and performed the HYSPLIT analyses that results in only a limited set of trajectories. For example, just the trajectory length time results in a number of trajectories for Colorado and California that could have crossed Texas if a longer trajectory time had been used.

TCEQ also screened the back trajectories out if they touched the ground at some point and also screened out any trajectories that were not below the Planetary Boundary Layer (PBL) over Texas. TCEQ also screened out back trajectories if the back trajectory start height at the point above the receptor was above the PBL. The EPA has multiple concerns with the screening out of trajectories that TCEQ performed.

Before we explain our specific concerns with the screening out of back trajectories, it is important to understand what HYSPLIT back trajectories represent and their limitations. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported from a particular location at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas. Nor does the HYPSLIT centerline have to be below the PBL over Texas as the vertical spread area on the centerline for distances of 300 to 600 miles or more would most likely be below the PBL even if the centerline was well above the PBL. Likewise, even if a centerline is indicated as touching down, that adds some uncertainty but does not void the back trajectory. Given the distance from Texas to Colorado receptors and Texas to California receptors, it is unclear how many back trajectories TCEQ inappropriately screened out when the centerline was close to Texas such that the horizontal spread area could encompass areas of Texas but did not directly cross any parts of Texas. In addition, Figure 3-42 in TCEQ's SIP submission indicates that many of the 72-hour trajectories that pass over Texas end before they have fully traversed Texas. Some of these trajectories may have been screened out because they were not below the PBL, but may have been below the mix layer in Texas and thus retained for the analysis if longer than 72-hour

trajectories had been performed. Starting the back trajectories with only the 1st hour of the 8-hour ozone exceedance means that the trajectory is started when the PBL is usually the lowest. With a later start hour (middle of the 8-hour, multiple start hours, etc.) the PBL would be higher in most cases. Thus, the TCEQ only using the 1st hour may have resulted in back trajectories not being performed or being screened out when a later start time would have resulted in a back trajectory that passed TCEQ's screening based on start height and PBL. Regardless, the EPA does not agree with screening out of trajectories as TCEQ has done in their analysis. The multiple ways that TCEQ inappropriately screened out trajectories, along with the several other issues mentioned above, limits the information that can be gleaned from TCEQ's HYSPLIT and Endpoint trajectory analysis for receptors in Colorado and California.

The EPA finds back trajectory analysis can be potentially useful as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of contributions from upwind states to downwind receptors.

For Colorado, TCEQ proffered that their trajectory analysis of transport from Texas to Colorado indicates that emissions from Texas are unlikely to affect ozone concentrations in the mixing layer over Colorado on elevated ozone days and Texas contribution should not be deemed significant. TCEQ asserted that filtering the back trajectories by only looking at trajectories from the beginning of elevated ozone episodes, that start within Colorado's mixing

layer, that do not hit the surface, and that have endpoints within Texas' mixing layer is an attempt to find a clear case where emissions in Texas would affect the ozone in Colorado. TCEQ concluded that, using those filters, 6% of elevated ozone days in Colorado had trajectories that reached the mixing layer in Texas, and 66% of those days during the 2007-2016 period occurred in 2011 and 2012. The EPA finds this analysis is flawed by the way TCEQ performed the HYSPLIT back trajectories and by the inappropriate screening out of back trajectories. TCEQ concluded that there are many years where no back trajectories reach Texas from Colorado and that in the years where TCEQ determined that no back trajectories reached Texas, the tagged monitors still observed a high number of elevated ozone days and fourth-highest eight-hour ozone concentrations above 70 ppb. The EPA finds these conclusions to be inadequately supported due to the way TCEQ performed and generated the back trajectories and TCEQ's excessive use of filters. For these reasons, EPA also disagrees with TCEQ's conclusion that Texas may not be upwind in 2015 and 2016 during any elevated ozone days at any of the five sites shown in Figure 3-44 of TCEQ's SIP submission. The EPA notes that endpoint analysis and percentage of endpoints generally provides limited value but due to the concerns with the overall back trajectory analysis, the EPA finds little value in the endpoint analysis that TCEQ provided.

TCEQ did indicate that there were also many more elevated eight-hour ozone days observed in 2012 compared to other years and that this may indicate that there were some unusual meteorological patterns that occurred in 2012 that resulted in a more severe ozone season. TCEQ noted that overall, trends in the fourth-highest eight-hour ozone concentrations have only slightly decreased at the Colorado receptors that TCEQ identified. The EPA concludes that TCEQ's HYSPLIT back trajectory analysis for the Colorado receptors is flawed and does

not in itself provide sufficient evidence to counter the results of TCEQ's modeling regarding the downwind distance of interstate transport due to emissions from Texas.

For California, TCEQ performed a similar HYSPLIT back trajectory analysis for ozone exceedance days at the 10 monitors that TCEQ identified in Southern California to which TCEQ found Texas potentially linked. TCEQ performed the HYPSLITs the same way that they did for the Colorado receptors including the inappropriate screening of trajectories, and other issues discussed above in review of TCEQ's back trajectory and endpoint analysis for ozone exceedances for the Colorado receptors.

For the same reasons the EPA finds TCEQ's Colorado back trajectory and endpoint analyses flawed, we conclude that TCEQ's HYSPLIT back trajectory and endpoint analyses for the California receptors is flawed and does not provide evidence rebutting TCEQ's photochemical modeling that Texas may be linked to these California receptors.

### 5.d. Texas contribution on all days in 2023 with ozone greater than 70 ppb.

TCEQ evaluated contributions from Texas on projected future year elevated ozone days in their chemical transport modeling. TCEQ evaluated the subset of 2023 days with modeled MDA8 greater than 70 ppb, and TCEQ calculated the average modeled Texas contributions for this subset of days (i.e., the "TX-ALT" method). Table 3-14 in TCEQ's SIP submission is included below as Table 5.2. TCEQ also provided this same analysis for the receptors identified in Southern California and included the results in its SIP submission in Table 3-17, which is included below as Table 5.3.

**Table 5.2 TCEQ evaluation of Texas contribution to 2023 modeled days with MDA8 values greater than 70 ppb at receptors in Colorado**

Table 3-14: Modeled Elevated Ozone Days in the Future Year at the Tagged Colorado Monitors

| Site Name | AQS ID | Number of Future Elevated Days | Average Texas Contribution on Future Elevated Ozone Days (ppb) | Average MDA8 on Future Elevated Ozone Days (ppb) | Percentage of Texas Contribution in MDA8 |
|---|---|---|---|---|---|
| Chatfield State Park | 80350004 | 9 | 0.77 | 73.05 | 1.06% |
| Rocky Flats | 80590006 | 10 | 0.89 | 73.64 | 1.21% |
| National Renewable Energy Labs-NREL | 80590011 | 11 | 0.86 | 74.09 | 1.16% |
| Fort Collins-West | 80690011 | 2 | 0.56 | 73.06 | 0.77% |
| Highland Reservoir | 80050002 | 8 | 0.52 | 73.80 | 0.71% |

TCEQ proffered in assessing this information that for the Colorado monitors, the expected average Texas contribution using all days greater than 70 ppb is a small percentage of the projected average MDA8 on these days. As a result, TCEQ argued that these impacts are not significant, since the average contribution is less than one ppb for all the monitors and high ozone occurs on relatively few days (2-11 days). TCEQ further discounted these results by alleging that there are uncertainties associated with model predictions.

**Table 5.3 TCEQ evaluation of Texas contribution to 2023 modeled days
with MDA8 values greater than 70 ppb at receptors in Southern California**

Table 3-17: Modeled Elevated Ozone Days in the Future Year

| Site Name | AQS ID | Number of Elevated Days in 2023 | Average Texas Contribution on Elevated Ozone Days in 2023 (ppb) | Average MDA8 on Elevated Ozone Days in 2023 (ppb) | Percentage of Texas Contributions in MDA8 |
|---|---|---|---|---|---|
| Reseda | 60371201 | 9 | 0.53 | 73.33 | 0.73% |
| Pomona | 60371701 | 60 | 0.26 | 76.87 | 0.35% |
| Santa Clarita | 60376012 | 13 | 0.41 | 73.94 | 0.56% |
| Rubidoux | 60658001 | 57 | 0.30 | 77.67 | 0.39% |
| Mira Loma (Van Buren) | 60658005 | 57 | 0.30 | 77.67 | 0.39% |
| Barstow | 60710001 | 1 | 0.00[33] | 70.82 | 0.00% |
| Victorville-Park Avenue | 60710306 | 5 | 0.19 | 72.24 | 0.27% |
| Upland | 60711004 | 57 | 0.31 | 77.21 | 0.41% |
| Hesperia-Olive Street | 60714001 | 12 | 0.24 | 73.50 | 0.32% |
| Redlands | 60714003 | 54 | 0.29 | 77.12 | 0.38% |

For California monitors, TCEQ indicated that the calculated average Texas contribution on projected future elevated ozone days (2023 modeled days with MDA8 greater than 70 ppb) is less than 1% of the projected average MDA8 at all of the monitors on these days.

As stated earlier in Section 4 of this TSD, TCEQ's methodology for calculating contributions from Texas to downwind receptors is based on the average contribution on the same days and grid cells that TCEQ used for calculating RRFs to project base period DVs to 2023. Specifically, in that method, TCEQ used the 2023 contributions for the top 10 days (with a minim of five days) in the 2012 modeling among the 3 x 3 matrix of grid cells that include and surround the location of the monitoring (i.e., the "TX-Primary" method). The EPA's concerns with this method are described in Section 4.b, above. For comparison with this alternative contribution analysis that uses all days with modeled 2023 MDA8 values over 70 ppb (TX-ALT

method), contributions based on TCEQ's TX-Primary method using 5 to 10 days for these Colorado and California receptors is included in Table 5.1 above. The EPA notes that there are large differences in contributions at individual receptors in Colorado and, in particular, California between the two methods. Both methods demonstrate that Texas contributes above the 1 percent of the NAAQS threshold to receptors Colorado. However, this is not the case for the California receptors where the contributions based on the TX-ALT method are below the 1 percent threshold to all receptors to which Texas was linked using the TX-Primary method. For example, the contributions from Texas to the Reseda, CA receptor are 0.76 ppb and 0.53 ppb using the TX-Primary and TX-ALT-based methods, respectively. In addition, the contributions to the Hesperia-Olive Street receptor are 0.86 ppb and 0.23 ppb using the TX-Primary and TX-ALT-based methods, respectively. For both receptors, the TX-Primary contributions represent the average contribution in 2023 over approximately the top-10 modeled days whereas the TX-ALT method represents the average contribution for all days with 2023 MDA8 values above 70 ppb. Thus, the only known difference between the two methods is the number of days used in calculating the average contribution and that TX-ALT only uses days with 2023 modeled MDA8 values > 70 ppb (without a minimum or maximum number of days) which is different than TX-Primary method. In their submittal, TCEQ did not provide any explanation for the large inconsistencies in contributions between the two methods at these and other sites. These inconsistencies call into question the ability of either or both of the TCEQ methods to provide technically credible robust estimates of 2023 contributions from Texas to downwind receptors.

### 5.e. Collective Interstate Contribution to Future DV

TCEQ provided an analysis of collective interstate contribution to the 2023 DVs for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27% of the corresponding 2023 DV (see Table 5.3

below). The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58% of the corresponding 2023 DV (see Table 5.4 below). TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of collective contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, the EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. The EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). The EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in the EPA's modeling to receptors

in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I), downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

**Table 5.3 – Collective Interstate Contribution to Future DVs at Tagged Colorado Monitors** *from* **TCEQ's SIP Table 3-15**

Table 3-15: Collective Interstate Contribution to Future Design Value at Tagged Colorado Monitors

| Site Name | AQS ID | Percentage of 2023 DV₁ from Background Contribution | Percentage of 2023 DV₁ from Collective Interstate Contribution | Percentage of 2023 DV₁ from Intra-State Contribution |
|---|---|---|---|---|
| Chatfield State Park | 80350004 | 62.12% | 9.86% | 25.44% |
| Rocky Flats | 80590006 | 60.57% | 10.21% | 26.88% |
| National Renewable Energy Labs-NREL | 80590011 | 60.33% | 10.27% | 27.04% |
| Fort Collins-West | 80690011 | 67.42% | 9.32% | 20.88% |
| Highland Reservoir | 80050002 | 62.47% | 9.88% | 25.28% |

**Table 5.4 – Collective Interstate Contribution to Future Design Value at Tagged California Monitors *from* TCEQ's SIP Table 3-18**

Table 3-18:   Collective Interstate Contributions to Future Design Values at Tagged California Monitors

| AQS ID | Site Name | Percentage of 2023 DV$_F$ from Background Contribution | Percentage of 2023 DV$_F$ from Collective Interstate Contribution | Percentage of 2023 DV$_F$ from Intra-State Contribution |
|---|---|---|---|---|
| 60371201 | Reseda | 32.49% | 3.62% | 52.55% |
| 60371701 | Pomona | 30.88% | 4.05% | 54.87% |
| 60376012 | Santa Clarita | 37.41% | 3.60% | 49.00% |
| 60658001 | Rubidoux | 29.27% | 3.20% | 57.20% |
| 60658005 | Mira Loma (Van Buren) | 29.22% | 3.20% | 57.20% |
| 60710001 | Barstow | 38.53% | 4.58% | 30.64% |
| 60710306 | Victorville-Park Avenue | 36.58% | 3.98% | 49.53% |
| 60711004 | Upland | 30.74% | 4.22% | 54.69% |
| 60714001 | Hesperia-Olive Street | 32.09% | 3.97% | 53.35% |
| 60714003 | Redlands | 29.70% | 3.25% | 57.19% |

The maximum collective interstate contribution to the future design value is 4.58% at the Barstow (AQS ID: 60710001) monitor, which is insignificant compared to the intra-state contribution of 30.64%. A similar trend is seen at all 10 of the tagged monitors, thereby supporting the conclusion that interstate transport does not contribute significantly to nonattainment at these monitors.

### 5.f. TCEQ also performed Direct Decoupled Method (DDM) modeling for receptors in Colorado.

DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) from changes in NO$_X$ emissions in this case. As TCEQ noted in their SIP (page 3-60), "Ozone formation is highly non-linear and therefore DDM results are only useful for a limited range of input perturbations, about ±15% of the input parameter value in a given simulation." TCEQ indicated that they used DDM to gauge the responsiveness (i.e., percent change in ozone per percent change in emissions) of Texas NOx

emissions at tagged Colorado monitors. From the analysis provided in the SIP and spreadsheet[40] of DDM it appears that TCEQ used the DDM responsiveness factors to estimate the impacts of 100 percent of NOx emissions in Texas which is well beyond ±15% of Texas emissions which TCEQ states is the useful limit for applying DDM. DDM is typically used to see what an additional reduction in emissions might yield in ozone reductions, but not as a method to estimate the impacts from 100% of the emissions from a given state. In their SIP, TCEQ provided the DDM timeseries plots below (See Figure 5.1). Below we describe the results of the DDM analysis that TCEQ provided in their submittal. Because TCEQ's application of DDM is outside the range that would provide credible results, as indicated by TCEQ in their submittal, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[40] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

Figure 5.1 – TCEQ DDM results for select monitors



**Figure 3-51: DDM Responsiveness of Ozone in July 2023 at National Renewable Energy Labs-NREL**



**Figure 3-52: DDM Responsiveness of Ozone in August 2023 at National Renewable Energy Labs-NREL**



**Figure 3-47: DDM Responsiveness of Ozone in July 2023 at Chatfield State Park**

Figure 5.1 (continued) – TCEQ DDM results for select monitors



**Figure 3-49:  DDM Responsiveness of Ozone in July 2023 at Rocky Flats**



**Figure 3-50:  DDM Responsiveness of Ozone in August 2023 at Rocky Flats**



**Figure 3-45:  DDM Responsiveness of Ozone in July 2023 at Highland Reservoir**

In their submittal, TCEQ indicated that Rocky Flats (AQS ID: 80590006) shows approximately 2 ppb impact from Texas $NO_X$ emissions (100% of Texas NOx emissions) in mid to late July. TCEQ continued that  when ozone at the monitor is responsive to Texas $NO_X$ emissions, elevated ozone was not modeled except for a minor response on one day, July 23. TCEQ summarized their DDM modeling analysis indicating that there is some minor impacts from Texas's $NO_X$ emissions on two high ozone days in the third week of July, but similar to other Colorado monitors studied, the magnitude of the impact is much smaller than the impact from Colorado $NO_X$ and "Other $NO_X$" emissions. TCEQ also summarized that for the days with MDA8 greater than 70 ppb and at least 1 ppb or greater impact there were three days that met these criteria at 2 monitors (NREL and Rocky Flats)  these 2 criteria.

The DDM modeling does show some impact of Texas $NO_X$ emissions but from the scale in the Figures it is hard to discern the magnitude. EPA analyzed TCEQ's information and the impact from Texas $NO_X$ emissions ranges from 0 to1.89 ppb range for 2023 modeled ozone values $\geq 60$ ppb.[41] The DDM modeling does show much larger impact from the Colorado $NO_X$ group and Other $NO_X$ group (which represents all other NOx sources in the modeling other than Texas and Colorado), but the impact from the Texas $NO_X$ group is not zero for some days with modeled MDA8 ozone over 60 ppb. TCEQ's analysis of the number of days with Texas contribution to MDA8 values over 70 ppb used a 1 ppb threshold, which is not consistent with using 0.7 ppb for contribution that TCEQ utilized in identifying receptors that are linked to Texas. Again, the EPA considers the results of the DDM analysis to be of limited value and not as technically sound as the contribution data based on source apportionment modeling.

---

[41] TCEQ_DDM_fy2023_CO_EPA_Review.xlsx

### 5.g. Southern California Ozone Conceptual Model

TCEQ briefly discussed conceptual model for ozone in Southern California indicating the topography and climate of the area's severe air pollution problem is a consequence of the combination of emissions from the nation's second largest urban area and meteorological conditions that are adverse to the dispersion of those emissions. TCEQ asserted that the unique features of Southern California result in the Southern California basin area make it a relative isolated area. We note that TCEQ's modeling already takes into account the unique meteorological, topographical, and amount of local emissions in Southern California and in the rest of the Continental U.S. (CONUS) including Texas emissions. TCEQ's assessment of the Southern California conceptual model does not provide substantial evidence that refutes the photochemical modeling analysis results.

### 5.h. Summary

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. TCEQ provided an Other Factor/Weight of Evidence analysis in support of their position that contributions from Texas were not "significant". Overall, these additional Other Factors/Weight of Evidence analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[42] Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that

---

[42] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014-2016 and 2015-2017 DVs are each 65 ppb; 2016-2018, 2017-2019, and 2018-2020 DVs are 66 ppb; and preliminary 2019-2021 DV is 66 ppb.

analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by the EPA's and TCEQ's air quality modeling. Specifically, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail above in Section 4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but at a minimum 5 days) at a given receptor. As noted in the EPA's air quality modeling guidance, since DVs are based on the seasonal 4th high observed values, the EPA technique of using the average impacts for 5-10 days, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard. We note that TCEQ used the same methodology of up to 10 days but at a minimum of 5 days, with differing calculations methods (See Section 4) to identify nonattainment and/or maintenance receptors and contribution at those receptors.

In addition, the contributions based on the EPA's 2011-based modeling and 2016v2 modeling indicate that Texas is linked to receptors in the Midwest Region but not to receptors in Arizona and California  identified by TCEQ. Given that there are wide unexplained differences in the contributions from Texas to downwind receptors, particularly in California between the two contribution methods used by TCEQ in their SIP submittal, we cannot speculate as to the factor(s) leading to differences in contributions between the EPA's modeling and TCEQ's modeling. Regardless, the contributions to downwind receptors based on the two TCEQ methods and the EPA's modeling results are consistent in showing that Texas's emissions were substantial enough to generate linkages to downwind receptors, under varying assumptions and

meteorological conditions, even if the precise set of linkages changed between the different sets of modeling

    As noted above, TCEQ indicated that Texas' contributions should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In this regard, modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas is linked to downwind nonattainment and/or maintenance receptors. We think this common result indicates that Texas's emissions were substantial enough to generate linkages to various downwind receptors, under varying assumptions and meteorological conditions which provides a further indication that there is a persistent pattern of Texas' emissions contributing above a 1% to ozone at downwind nonattainment and/or maintenance receptors. In sum, the EPA's more recent 2016 base year modeling platform (2016v2) indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the West. As discussed, the EPA does not find the additional factors/weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues.

## 6.    EPA Summary

    The EPA has reviewed TCEQ's modeling, alternate maintenance receptor methodology, recent monitoring data and long-term ozone trends, whether there is underestimation bias in TCEQ's modeling, and TCEQ's Weight of Evidence analyses (or "other factors" analyses). Overall, we find the TCEQ's alternate maintenance receptor methodology to be flawed and not acceptable because it fails to identify receptors that may have difficulty maintaining the standard

in the future. We identified that TCEQ's modeling understated the magnitude of projected 2023 design values to the extent that TCEQ's analysis likely resulted in not correctly identifying nonattainment and/or maintenance receptors in Illinois, Wisconsin, Michigan. EPA 2016v2 modeling identified nonattainment and/or maintenance receptors in Illinois and Wisconsin with Texas's contributions more than 1% and TCEQ's modeling also indicated that Texas's contribution was more than 1% at these same receptors.

The contributions calculated from TCEQ's two contribution methods result in very different contribution values and is so inconsistent that it calls into question the validity of either or both methods and TCEQ provides no explanation for the large differences in the outcome of the two methods. TCEQ's Other factors/WOE analysis does not provide sufficient compelling technically supported information to counter the conclusions from photochemical modeling in terms of linkages from Texas to downwind receptors.

TCEQ indicated that Texas contribution should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. We note that modeling for three different years of meteorology (2011, 2012, and 2016) have all indicated that Texas was linked to downwind nonattainment and/or maintenance receptors. We think this consistent result indicates that Texas's emissions are substantial enough to link Texas to downwind receptors, under varying assumptions and meteorological conditions which further indicates that there is a persistent pattern of Texas' emissions contributing above 1 % to ozone at downwind nonattainment and/or maintenance receptors.

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023)

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

[EPA–HQ–OAR–2021–0663; EPA–R02–OAR–2021–0673; EPA–R03–OAR–2021–0872; EPA–R03–OAR–2021–0873; EPA–R04–OAR–2021–0841; EPA–R05–OAR–2022–0006; EPA–R06–OAR–2021–0801; EPA–R07–OAR–2021–0851; EPA–R08–OAR–2022–0315; EPA–R09–OAR–2022–0394; EPA–R09–OAR–2022–0138; FRL–10209–01–OAR]

**Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule; final agency action.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or the Agency) is finalizing the disapproval of State Implementation Plan (SIP) submissions for 19 states regarding interstate transport and finalizing a partial approval and partial disapproval of elements of the SIP submission for two states for the 2015 8-hour ozone national ambient air quality standards (NAAQS). The "good neighbor" or "interstate transport" provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. Disapproving a SIP submission establishes a 2-year deadline for the EPA to promulgate Federal Implementation Plans (FIPs) to address the relevant requirements, unless the EPA approves a subsequent SIP submission that meets these requirements. Disapproval does not start a mandatory sanctions clock. The EPA is deferring final action at this time on the disapprovals it proposed for Tennessee and Wyoming.

**DATES:** The effective date of this final rule is March 15, 2023.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663. Additional supporting materials associated with this final action are included in certain regional dockets.

*See* the memo "Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions" in the docket for this action. All documents in the dockets are listed in the index. Although listed in the index, some information is not publicly available, *i.e.*, confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional information.

**FOR FURTHER INFORMATION CONTACT:** General questions concerning this document should be addressed to Mr. Thomas Uher, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C539–04, 109 TW Alexander Drive, Research Triangle Park, NC 27711; telephone number: (919) 541–5534; email address: *uher.thomas@epa.gov*.

**SUPPLEMENTARY INFORMATION:** Throughout this document "we," "us," and "our" refer to the EPA.

References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified.

**I. General Information**

*A. How can I get copies of this document and other related information?*

The EPA established a Headquarters docket for this action under Docket ID No. EPA–HQ–OAR–2021–0663 and several regional dockets. All documents in the docket are listed in the electronic indexes, which, along with publicly available documents, are available at *https://www.regulations.gov*. Publicly available docket materials are also available in hard copy at the Air and Radiation Docket and Information Center, EPA/DC, William Jefferson Clinton West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC. Some information in the docket may not be publicly available via the online docket due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets*.

The EPA also established dockets in each of the EPA Regional offices to help

support the proposals that are now being finalized in this national action. These include all public comments, technical support materials, and other files associated with this final action. Each regional docket contains a memorandum directing the public to the headquarters docket for this final action. While all documents in regional dockets are listed in the electronic indexes at *https://www.regulations.gov*, some information may not be publicly available via the online dockets due to docket file size restrictions, such as certain modeling files, or content (*e.g.*, CBI). Please contact the EPA Docket Center Services for further information.

*B. How is the preamble organized?*

**Table of Contents**

I. General Information
  A. How can I get copies of this document and other related information?
  B. How is the preamble organized?
  C. Where do I go if I have state-specific questions?
II. Background and Overview
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Framework
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
III. The EPA's Updated Air Quality and Contribution Analysis
  A. Description of Air Quality Modeling for the Final Action
  B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors
  C. Air Quality Modeling To Quantify Upwind State Contributions
IV. Summary of Bases for Disapproval
  A. Alabama
  B. Arkansas
  C. California
  D. Illinois
  E. Indiana
  F. Kentucky
  G. Louisiana
  H. Maryland
  I. Michigan
  J. Minnesota
  K. Mississippi
  L. Missouri
  M. Nevada
  N. New Jersey
  O. New York
  P. Ohio
  Q. Oklahoma
  R. Texas
  S. Utah
  T. West Virginia
  U. Wisconsin
V. Response to Key Comments
  A. SIP Evaluation Process
  B. Application of the 4-Step Interstate Transport Framework
  C. Good Neighbor Provision Policy
VI. Statutory and Executive Orders Reviews
  A. Executive Orders 12866: Regulatory Planning and Executive Order 13563:

Improving Regulation and Regulatory Review
B. Paperwork Reduction Act (PRA)
C. Regulatory Flexibility Act (RFA)
D. Unfunded Mandates Reform Act of 1995 (UMRA)
E. Executive Order 13132: Federalism
F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
I. National Technology Transfer and Advancement Act (NTTAA)
J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

K. Congressional Review Act (CRA)
L. Judicial Review

*C. Where do I go if I have state-specific questions?*

The following table identifies the states covered by this final action along with an EPA Regional office contact who can respond to questions about specific SIP submissions.

| Regional offices | States |
|---|---|
| EPA Region 2: Kenneth Fradkin, Air and Radiation Division/Air Programs Branch, EPA Region 2, 290 Broadway, 25th Floor, New York, NY 10007. | New Jersey, New York. |
| EPA Region 3: Mike Gordon, Planning and Implementation Branch, EPA Region III, 1600 JFK Boulevard, Philadelphia, Pennsylvania 19103. | Maryland, West Virginia. |
| EPA Region 4: Evan Adams, Air and Radiation Division/Air Planning and Implementation Branch, EPA Region IV, 61 Forsyth Street SW, Atlanta, Georgia 30303. | Alabama, Kentucky, Mississippi. |
| EPA Region 5: Olivia Davidson, Air & Radiation Division/Air Programs Branch, EPA Region V, 77 W. Jackson Boulevard, Chicago, Illinois 60604–3511. | Indiana, Illinois, Michigan, Minnesota, Ohio, Wisconsin. |
| EPA Region 6: Sherry Fuerst, Air and Radiation Division, EPA Region 6, 1201 Elm Street, Suite 500, Dallas, Texas 75270. | Arkansas, Louisiana, Oklahoma, Texas. |
| EPA Region 7: William Stone, Air and Radiation Division, Air Quality Planning Branch, EPA Region VII, 11201 Renner Boulevard, Lenexa, Kansas 66219. | Missouri. |
| EPA Region 8: Adam Clark, Air and Radiation Division, EPA, Region VIII, Mailcode 8ARD–IO, 1595 Wynkoop Street, Denver, Colorado 80202. | Utah. |
| EPA Region 9: Tom Kelly, Air and Radiation Division, EPA Region IX, 75 Hawthorne St., San Francisco, California 94105. | California, Nevada. |

## II. Background and Overview

The following provides background for the EPA's final action on these SIP submissions related to the interstate transport requirements for the 2015 8-hour ozone NAAQS (2015 ozone NAAQS).

*A. Description of Statutory Background*

On October 1, 2015, the EPA promulgated a revision to the ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm) for the 8-hour standard.[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions[2] meeting the applicable requirements of section 110(a)(2).[3] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate

transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[4]

On February 22, 2022, the EPA proposed to disapprove 19 good neighbor SIP submissions from the States of Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, Ohio, Oklahoma, Tennessee, Texas, West Virginia, and Wisconsin.[5]

On May 24, 2022, the EPA proposed to disapprove four additional good neighbor SIP submissions from the States of California, Nevada, Utah, and Wyoming.[6] On October 25, 2022, the EPA proposed to disapprove a new good neighbor SIP submission from Alabama submitted on June 21, 2022.[7] The EPA is deferring action on the proposals related to the good neighbor SIP submissions from Tennessee and Wyoming at this time. As explained in the notifications of proposed disapproval, the EPA's justification for each of these proposals applies uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.*, implementation of good neighbor requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country. The EPA's final action is likewise based on this common core of determinations. As indicated at proposal, the EPA is taking a consolidated, single final action

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] The terms "submission," "revision," and "submittal" are used interchangeably in this document.

[3] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under CAA section 110(a)(2) are referred to as infrastructure requirements.

[4] *See North Carolina* v. *EPA*, 531 F.3d 896, 909–11 (D.C. Cir. 2008) (*North Carolina*).

[5] 87 FR 9545 (February 22, 2022) (Alabama, Mississippi, Tennessee); 87 FR 9798 (February 22, 2022) (Arkansas, Louisiana, Oklahoma, Texas); 87 FR 9838 (February 22, 2022) (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin); 87 FR 9498

(February 22, 2022) (Kentucky); 87 FR 9484 (February 22, 2022) (New Jersey, New York); 87 FR 9463 (February 22, 2022) (Maryland); 87 FR 9533 (February 22, 2022) (Missouri); 87 FR 9516 (February 22, 2022) (West Virginia).

[6] 87 FR 31443 (May 24, 2022) (California); 87 FR 31485 (May 24, 2022) (Nevada); 87 FR 31470 (May 24, 2022) (Utah); 87 FR 31495 (May 24, 2022) (Wyoming).

[7] 87 FR 64412 (October 25, 2022) (Alabama). Alabama withdrew its original good neighbor SIP submission on April 21, 2022. *Id.* at 64419.

on the proposed SIP disapprovals.[8] Included in this document is final action on 2015 ozone NAAQS interstate transport SIPs addressing CAA section 110(a)(2)(D)(i)(I) for Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Texas, Utah, West Virginia, and Wisconsin. The 2015 ozone NAAQS interstate transport SIP submissions addressing CAA section 110(a)(2)(D)(i)(I) for Tennessee and Wyoming will be addressed in a separate action.

### B. Description of the EPA's 4-Step Interstate Transport Framework

The EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each state's implementation plan submission addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior NAAQS in several regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[9] the Cross-State Air Pollution Rule Update (CSAPR Update)[10] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[11]

Shaped through the years by input from state air agencies[12] and other stakeholders on EPA's prior interstate transport rulemakings and SIP actions,[13] as well as a number of court decisions, the EPA has developed and used the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

The general steps of this framework allow for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings. This also means states have some flexibility in developing analytical methods within this framework (and may also attempt to justify an alternative framework altogether). The four steps of the framework simply provide a reasonable organization to the analysis of the complex air quality challenge of interstate ozone transport. As discussed further throughout this document, the EPA has organized its evaluation of the states' SIP submissions around this analytical framework (including the specific methodologies within each step as evolved over the course of the CSAPR rulemakings since 2011), but where states presented alternative approaches either to the EPA's methodological approaches within the framework, or organized their analysis in some manner that differed from it entirely, we have evaluated those analyses on their merits or, in some cases, identified why even if those approaches were acceptable, the state still does not have an approvable SIP submission as a whole.

### C. Background on the EPA's Ozone Transport Modeling Information

In general, the EPA has performed nationwide air quality modeling to project ozone design values, which are used in combination with measured data to identify nonattainment and maintenance receptors at Step 1. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors at Step 2, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling projected contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected design values, contributions, and information relevant to air agencies for evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[14] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 ozone NAAQS.[15] On October 27, 2017, the EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and was intended to provide information to assist states' efforts to develop SIP submissions to address interstate transport obligations for the 2008 ozone NAAQS.[16] On March 27, 2018, the EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the

---

[8] In its proposals, the EPA stated "The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect." E.g., 87 FR 9463, 9475 n.51.

[9] See Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[10] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[11] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). Wisconsin v. EPA, 938 F.3d 303, 313 (D.C. Cir. 2019) (Wisconsin). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of CSAPR Update in Wisconsin and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in New York v. EPA, 781 F. App'x. 4 (D.C. Cir. 2019).

[12] See 63 FR 57356, 57361 (October 27, 1998).

[13] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "$NO_X$ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

[14] See Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[15] See 82 FR 1733, 1735 (January 6, 2017).

[16] See Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 ("October 2017 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.

October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-step interstate transport framework.[17] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-step interstate transport framework.[18] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[19]

Following the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[20] This collaborative project was a multi-year

joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated, 2011-based platform that the EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the notice of proposed rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[21] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform were also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[22]

Following the final Revised CSAPR Update, the EPA made further updates to the 2016-based emissions platform to include updated onroad mobile emissions from Version 3 of the EPA's Motor Vehicle Emission Simulator (MOVES) model (MOVES3)[23] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other inventory improvements. The construct of the updated emissions platform, 2016v2, is described in the "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform," hereafter known as the 2016v2 Emissions Modeling TSD, and is included in Docket No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling using the 2016v2 emissions to provide projections of ozone design values and contributions in 2023 that reflect the effects on air quality of the 2016v2 emissions platform. The results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework at the proposal stage of this action. By using the 2016v2 modeling results, the EPA used the most current

and technically appropriate information for the proposed rulemakings that were issued earlier in 2022.

The EPA invited and received comments on the 2016v2 emissions inventories and modeling that were used to support proposals related to 2015 ozone NAAQS interstate transport. (The EPA had earlier published the emissions inventories on its website in September of 2021 and invited initial feedback from states and other interested stakeholders.[24]) In response to these comments, the EPA made a number of updates to the 2016v2 inventories and model design to construct a 2016v3 emissions platform which was used to update the air quality modeling. The EPA made additional updates to its modeling in response to comments as well. The EPA is now using this updated modeling to inform its final action on these SIP submissions. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in Section III and in the TSD titled "Air Quality Modeling TSD for the 2015 8-hour ozone NAAQS Transport SIP Final Actions", hereafter known as the Final Action AQM TSD.[25][26] Additional details related to the updated 2016v3 emissions platform are located in the TSD titled "Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the 2016v3 Emissions Modeling TSD, included in Docket ID No. EPA–HQ–OAR–2021–0663.[27]

*D. The EPA's Approach To Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS*

The EPA is applying a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submissions for the 2015 ozone NAAQS under CAA section 110(a)(2)(D)(i)(I). These policy judgments conform with relevant case law and past agency practice as reflected in CSAPR and related rulemakings. Employing a nationally consistent approach is

---

[17] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[18] The March 2018 memorandum, however, provided, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking." March 2018 memorandum at 2.

[19] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018 ("August 2018 memorandum"); Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 ("October 2018 memorandum"), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[20] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[21] *See* 85 FR 68964, 68981 (October 30, 2020).

[22] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[23] 86 FR 1106. Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[24] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[25] *See* Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663

[26] References to section numbers in roman numeral refer to sections of this preamble unless otherwise specified, and references to section numbers in numeric form refer to the Response to Comments document for this final action included in the docket.

[27] *See* 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the NO$_X$ SIP Call have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EPA* v. *EME Homer City Generation, LP,* 572 U.S. 489, 519 (2014) (*EME Homer City*). Some comments on EPA's proposed SIP disapprovals claim the EPA is imposing non-statutory requirements onto SIPs or that the EPA must allow states to take inconsistent approaches to implementing good neighbor requirements. Both views are incorrect; the EPA's use of its longstanding framework to evaluate these SIP submissions reflects a reasonable and consistent approach to implementing the requirements of CAA section 110(a)(2)(D)(i)(I), while remaining open to alternative approaches states may present. These comments are further addressed in Section V and the Response to Comment (RTC) document contained in the docket for this action, Docket ID No. EPA–HQ–OAR–2021–0663.

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submission.[28] In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with CAA obligations and relevant case law. Where states submitted SIP submissions that rely on any such potential concepts

as the EPA or others may have identified or suggested in the past, the EPA evaluated whether the state adequately justified the technical and legal basis for doing so. For example, the EPA has considered the arguments put forward by Alabama, Missouri, Ohio, Oklahoma, Texas, and Utah related to alternative methods of identifying receptors.[29] The EPA also has considered the arguments attempting to justify an alternative contribution threshold at Step 2 pursuant to the August 2018 memorandum made by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah,[30] as well as criticisms of the 1 percent of the NAAQS contribution threshold made by Nevada and Ohio.[31] These topics are further addressed in Section V.B as well as the RTC document.

The EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to interstate transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development. However, the EPA made clear in both the March 2018 memorandum [32] and in Attachment A that the list of ideas was not endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders."[33] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[34] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on one or more of these ideas in support of their SIP submissions, the EPA reviewed their technical and legal justifications for doing so.[35]

The remainder of this section describes the EPA's analytical framework with respect to analytic year, definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[36] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating ozone transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b) *Maryland* v.

---

[28] March 2018 memorandum at 3 ("EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within this steps) or alternative framework, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA."); August 2018 memorandum at 1 ("The EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation."); October 2018 memorandum at 1 ("Following the recommendations in this guidance does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP.").

[29] 87 FR 64421–64422 (Alabama); 87 FR 9540–9541 (Missouri); 87 FR 9869–9870 (Ohio); 87 FR 9820–9822 (Oklahoma); 87 FR 9826–9829 (Texas); and 87 FR 31480–31481 (Utah).

[30] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9509–9510 (Kentucky); 87 FR 9815–9816 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9544 (Missouri); 87 FR 9819 (Oklahoma); 87 FR 31478 (Utah).

[31] 87 FR 31492 (Nevada); 87 FR 9871 (Ohio).

[32] "In addition, the memorandum is accompanied by Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches for developing a good neighbor SIP that may warrant further discussion between EPA and states." March 2018 memorandum at 1.

[33] March 2018 memorandum, Attachment A at A–1.

[34] *Id.*

[35] E.g., 87 FR 64423–64425 (Alabama); 87 FR 31453–31454 (California); 87 FR 9852–9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9508, 9515 (Kentucky); 87 FR 9861–9862 (Michigan); 87 FR 9869–9870 (Ohio); 87 FR 9798, 9818–9820 (Oklahoma); 87 FR 31477–31481 (Utah); 87 FR 9526–9527 (West Virginia).

[36] For attainment dates for the 2015 ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

*EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020) (*Maryland*). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable attainment date,[37] which at the time of EPA's proposed and final actions on the SIPs addressed in this action is the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[38] Thus, 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA's modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submissions using the information available at the time it takes such action,

and it is now past 2021. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin,* 938 F.3d at 322 (rejecting Delaware's argument that the EPA should have used an analytic year of 2011 instead of 2017). Consequently, in this proposal the EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, the EPA proceeds to the next step of the 4-step interstate transport framework by identifying which upwind states contribute to those receptors above the contribution threshold.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina.*[39]

The EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the analytic year (*i.e.,* 2023).[40]

In addition, the EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015) (*EME Homer City II*).[41] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those

---

[37] The EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[38] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[39] *See North Carolina,* 531 F.3d at 910–11 (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[40] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data

and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable the EPA's approach to defining nonattainment in CAIR).

[41] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

As discussed further in Section III.B., in response to comments, the Agency has also taken a closer look at measured ozone levels at monitoring sites in 2021 and 2022 for the purposes of informing the identification of additional receptors in 2023. We find there is a basis to consider certain sites with elevated ozone levels that are not otherwise identified as receptors to be an additional type of maintenance-only receptor given the likelihood that ozone levels above the NAAQS could persist at those locations through at least 2023. We refer to these as violating-monitor maintenance-only receptors ("violating monitors"). For purposes of this action, we use this information only in a confirmatory way for states that are otherwise found to be linked using the modeling-based methodology. The EPA intends to take separate action to address states that are linked only to one or more violating-monitor receptors.

3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.*, 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not contribute significantly to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated pursuant to the requirements of CAA section 110(a)(2)(D)(i)(I).

In this final action, the EPA relies in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone

NAAQS (*i.e.*, 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and Revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS, and in the EPA's proposals for this action. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in the CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions, typically from multiple upwind states and, in some cases, substantially larger contributions from a subset of particular upwind states, along with contributions from in-state sources. The EPA's analysis shows that much of the ozone transport problem being analyzed in this action is still the result of the collective impacts of contributions from upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74518; *see also* 86 FR 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48237–38, for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognizes that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold in their SIP submission, and where that state determined that it was not linked at Step 2 using the alternative threshold, the EPA evaluated whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission. The states covered by this action that rely on a contribution threshold other than 1 percent of the NAAQS in their 2015 ozone NAAQS good neighbor SIP submission are Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan,

Mississippi, Missouri, Oklahoma, and Utah. Ohio also criticized the 1 percent of the NAAQS threshold, though it acknowledged it was linked above either a 1 percent of the NAAQS or 1 ppb contribution threshold. Nevada also criticized the 1 percent of the NAAQS contribution threshold, but ultimately relied on it to support its submission.

In the proposals for this action, the EPA evaluated each states' support for the use of an alternative threshold at Step 2 (*e.g.*, 1 ppb), and additionally shared its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. The EPA solicited comment on the subject as it considered the appropriateness of rescinding the memorandum.[42] The EPA received numerous comments related to both the EPA's evaluation of SIP submissions relying on an alternative threshold, and the EPA's experience with alternative thresholds. The EPA is not, at this time rescinding the August 2018 memorandum; however, for purposes of evaluating contribution thresholds for the 2015 ozone NAAQS, the EPA continues to find the use of an alternative threshold problematic for the reasons stated at proposal. Regardless of the EPA's position on the August 2018 memorandum, the EPA continues to find that the arguments put forth in the SIP submissions of by Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Oklahoma, and Utah, as well as arguments in comments received on these actions, to be inadequate. *See* Section V.B.7 and the RTC Document for additional detail.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution and interference with maintenance, at Step 3, a multifactor assessment of potential emissions controls is conducted for states linked at Steps 1 and 2. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if

---

[42] *See, e.g.,* 87 FR 9551.

adequately supported. In general, where the EPA's or state-provided alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for SIP approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the future year projected air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s) despite these existing controls, but that state believes it has no outstanding good neighbor obligations, the EPA expects the state to provide sufficient justification to support a conclusion by the EPA that the state has adequate provisions prohibiting "any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will" "contribute significantly to nonattainment in, or interfere with maintenance by," any other State with respect to the NAAQS. *See* CAA section 110(a)(2)(D)(i)(I). While the EPA has not prescribed a particular method for this assessment, as many commenters note, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[43] The EPA responds to comment on issues related to Step 3 in Section V.B.8. and in the RTC document.

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or the EPA) develop permanent and federally-enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with

maintenance of the NAAQS.[44] For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions. . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

**III. The EPA's Updated Air Quality and Contribution Analysis**

As noted in Section II, the EPA relied in part on its 2016v2 emissions platform-based air quality modeling to support its proposed interstate transport actions taken in 2022. Following receipt of comments, the EPA updated this modeling, incorporating new information received to create the 2016v3 emissions inventory and making additional updates to improve model performance. Using the 2016v3 emissions inventory, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2015 ozone NAAQS.

This section presents a summary of the methodology and results of the 2016v3 modeling of 2023, along with the application of the EPA's Step 1 and Step 2 methodology for identifying receptors and upwind states that contribute to those receptors. We also explain that current measured ozone levels based on data for 2021 and preliminary data for 2022 at other monitoring sites (*i.e.,* monitoring sites that are not projected to be receptors in 2023 based on air quality modeling) confirm the likely continuation of elevated ozone levels in 2023 at these locations and confirm that nearly all upwind states in this action are also linked to one or more of these monitors.

While all of this information compiled by the EPA (both the modeling and monitoring data) plays a critical role in the basis for this final action, the EPA has also thoroughly evaluated the modeling information and other analyses and arguments presented by the upwind states in their SIP submittals. Our evaluation of the states' analyses was generally set forth in the

proposals, and the EPA in this final action has responded to comments on our evaluation of the various information and arguments made by states. The EPA's final decision to disapprove these states' SIP submittals is based on our evaluation of the entire record, recognizing that states possess the authority in the first instance to propose how they would address their significant contribution to air quality problems in other states. Nonetheless, as explained in the proposals, and in this document and supporting materials in the docket, we conclude that no state included in this action effectively demonstrated that it will not be linked to at least one air quality receptor in 2023, and none of these states' various arguments for alternative approaches ultimately present a satisfactory basis for the EPA to approve these states' SIP submissions.

*A. Description of Air Quality Modeling for the Final Action*

In this section, the Agency describes the air quality modeling performed consistent with Steps 1 and 2 of the 4-step interstate transport framework to (1) Identify locations where it expects nonattainment or maintenance problems with respect to the 2015 ozone NAAQS for the 2023 analytic year, and (2) quantify the contributions from anthropogenic emissions from upwind states to downwind ozone concentrations at monitoring sites projected to be in nonattainment or have maintenance problems for the 2015 ozone NAAQS in 2023. This section includes information on the air quality modeling platform used in support of the final SIP disapproval action with a focus on the base year and future base case emissions inventories. The EPA also provides the projection of 2023 ozone concentrations and the interstate contributions for 8-hour ozone. The Final Action AQM TSD in Docket ID No. EPA–HQ–OAR–2021–0663 contains more detailed information on the air quality modeling aspects supporting our final action on these SIP submissions.

1. Public Review of Air Quality Modeling Information for the Proposed Action

The EPA provided several opportunities to comment on the emissions modeling platform and air quality modeling results that were used for the proposed SIP submission actions. On September 20, 2021, the EPA publicly released via our web page updated emissions inventories (2016v2) and requested comment from states and

---

[43] Because no state included new enforceable emissions control measures in the submissions under review here, we focus our analysis on whether states justified that no additional controls were required. As examples of general approaches for how a Step 3 analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NO_X SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

[44] The EPA notes that any controls included in an approved SIP are federally-enforceable.

MJOs on these data.[45] In January 2022, the EPA released air quality modeling results including projected ozone design values and contributions from 2023 based on the 2016v2 emissions. At that time the EPA indicated its intent to use these data to support upcoming transport rulemakings. Then, on February 22, 2022, the EPA published proposed disapprovals for 19 interstate transport SIP submissions using the modeling data released in January 2022 and the emissions inventories shared in September 2021.[46] The EPA provided a 60-day comment period on these proposals. On May 24, 2022, the EPA proposed disapprovals for an additional four states' interstate transport SIP submissions using the same modeling platform, and provided a 62-day comment period.[47] The EPA provided a 30-day comment period beginning on October 25, 2022, on the proposed disapproval of Alabama's June 21, 2022, SIP submission, which relied on the same modeling platform as the other noted proposals.[48] In addition to its proposed disapprovals, the EPA also proposed approval of Iowa's, Arizona's, and Colorado's SIP submissions using the 2016v2 modeling and provided 30-day comment periods. 87 FR 9477 (February 22, 2022) (Iowa); 87 FR 37776 (June 24, 2022) (Arizona); and 87 FR 27050 (May 6, 2022) (Colorado).

2. Overview of Air Quality Modeling Platform

The EPA used version 3 of the 2016-based modeling platform (i.e., 2016v3) for the air quality modeling for this final SIP disapproval action. This modeling platform includes 2016 base year emissions from anthropogenic and natural sources and future year projected anthropogenic emissions for 2023.[49] The emissions data contained in the 2016v3 platform represent an update to the 2016 version 2 inventories used for the proposal modeling.

The air quality modeling for this final disapproval action was performed for a modeling region (i.e., modeling domain) that covers the contiguous 48 states using a horizontal resolution of 12 x 12 km. The EPA used the CAMx version 7.10 for air quality modeling which is the same model that the EPA used for the proposed rule air quality modeling.[50] Additional information on the 2016-based air quality modeling platform can be found in the Final Action AQM TSD.

*Comments:* Commenters noted that the 2016 base year summer maximum daily average 8-hour (MDA8) ozone predictions from the proposal modeling were biased low compared to the corresponding measured concentrations in certain locations. In this regard, commenters said that model performance statistics for a number of monitoring sites, particularly those in portions of the West and in the area around Lake Michigan, were outside the range of published performance criteria for normalized mean bias (NMB) and normalized mean error (NME) of less than plus or minus 15 percent and less than 25 percent, respectively.[51] Commenters say the EPA must investigate the factors contributing to low bias and make necessary corrections to improve model performance in the modeling supporting final SIP actions. Some commenters said that the EPA should include $NO_X$ emissions from lightning strikes and assess the treatment of other background sources of ozone to improve model performance for the final action. Additional information on the comments on model performance can be found in the RTC document for this final SIP disapproval action.

*EPA Response:* In response to these comments the EPA examined the temporal and spatial characteristics of model under prediction to investigate the possible causes of under prediction of MDA8 ozone concentrations in different regions of the U.S. in the proposal modeling. The EPA's analysis indicates that the under prediction was most extensive during May and June with less bias during July and August in most regions of the U.S. For example, in the Upper Midwest region model under prediction was larger in May and June compared to July through September. Specifically, the normalized mean bias for days with measured concentrations greater than or equal to 60 ppb

improved from a 21.4 percent under prediction for May and June to a 12.6 percent under prediction in the period July through September. As described in the AQM TSD, the seasonal pattern in bias in the Upper Midwest region improves somewhat gradually with time from the middle of May to the latter part of June. In view of the seasonal pattern in bias in the Upper Midwest and in other regions of the U.S., the EPA focused its investigation of model performance on model inputs that, by their nature, have the largest temporal variation within the ozone season. These inputs include emissions from biogenic sources and lightning $NO_X$, and contributions from transport of international anthropogenic emissions and natural sources into the U.S. Both biogenic and lightning $NO_X$ emissions in the U.S. dramatically increase from spring to summer.[52][53] In contrast, ozone transported into the U.S. from international anthropogenic and natural sources peaks during the period March through June, with lower contributions during July through September.[54][55] To investigate the impacts of the sources, the EPA conducted sensitivity model runs which focused on the effects on model performance of adding $NO_X$ emissions from lightning strikes, using updated biogenic emissions, and using an alternative approach (described in more detail later in this section) for quantifying transport of ozone and precursor pollutants into the U.S. from international anthropogenic and natural sources. In the air quality modeling for proposal, the amount of transport from international sources was based on a simulation of the hemispheric version of the Community Multi-scale Air Quality

---

[45] https://www.epa.gov/air-emissions-modeling/2016v2-platform.

[46] These proposals are listed in footnote 5 of this action.

[47] The EPA also relied on this same modeling data to support proposed Federal Implementation Plans (FIPs) resolving interstate transport obligations for 27 states for the 2015 ozone NAAQS. 87 FR 20036 (April 6, 2022). The EPA allowed 60 days to receive comments on the proposed FIP rule, including acceptance of comment on the 2016v2 emissions inventory-based modeling platform. The EPA then allowed for an additional 15 days via an extension of the comment period. 87 FR 29108 (May 12, 2022).

[48] 87 FR 64412, 64413.

[49] The 2016v3 platform also includes projected emissions for 2026. However, the 2026 data are not applicable and were not used in this final action.

[50] Ramboll Environment and Health, January 2021, https://www.camx.com.

[51] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[52] Guenther, A.B.: 1997. Seasonal and spatial variations in natural volatile organic compound emissions. Ecol. Appl. 7, 34–45. http://dx.doi.org/10.1890/1051-0761(1997)007[0034:SASVIN]2.0.CO;2. Guenther, A., Hewitt, C.N., Erickson, D., Fall, R.

[53] Kang D, Mathur R, Pouliot GA, Gilliam RC, Wong DC. Significant ground-level ozone attributed to lightning-induced nitrogen oxides during summertime over the Mountain West States. NPJ Clim Atmos Sci. 2020 Jan 30;3:6. doi: 10.1038/s41612-020-0108-2. PMID: 32181370; PMCID: PMC7075249.

[54] Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonnesen GS, Russell AG, Henze DK, Langford AO, Lin M, Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elementa (Wash DC). 2018;6(1):56. doi: 10.1525/elementa.309. PMID: 30364819; PMCID: PMC6198683.

[55] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, N. Possiel, G. Pouliot, B. Timin, K.W. Appel, 2019. Global Sources of North American Ozone. Presented at the 18th Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 21–23, 2019.

Model (H–CMAQ)[56] for 2016. The outputs from this hemispheric modeling were then used to provide boundary conditions for the national scale air quality modeling at proposal.[57] Overall, H–CMAQ tends to under predict daytime ozone concentrations at rural and remote monitoring sites across the U.S. during the spring of 2016 whereas the predictions from the GEOS-Chem global model[58] were generally less biased.[59] During the summer of 2016 both models showed varying degrees of over prediction with GEOS-Chem showing somewhat greater over prediction, compared to H–CMAQ. In view of those results, the EPA examined the impacts of using GEOS-Chem as an alternative to H–CMAQ for providing boundary conditions for the modeling supporting this final action.

For the lightning $NO_X$, biogenics, and GEOS-Chem sensitivity runs, the EPA reran the proposal modeling using each of these inputs, individually. Results from these sensitivity runs indicate that each of the three updates provides an improvement in model performance. However, by far the greatest improvement in modeling performance is attributable to the use of GEOS-Chem. In view of these results the EPA has included lightning $NO_X$ emissions, updated biogenic emissions, and international transport from GEOS-Chem in the air quality modeling supporting final SIP actions. Details on the results of the individual sensitivity runs can be found in the AQM TSD. For the air quality modeling supporting final SIP actions, model performance based on days in 2016 with measured

MDA8 ozone greater than or equal to 60 ppb is considerably improved (*i.e.,* less bias and error) compared to the proposal modeling in nearly all regions. For example, in the Upper Midwest, which includes monitoring sites along Lake Michigan, the normalized mean bias improved from a 19 percent under prediction to a 6.9 percent under prediction and in the Southwest region, which includes monitoring sites in Denver, Las Cruces, El Paso, and Salt Lake City, normalized mean bias improved from a 13.6 percent under prediction to a 4.8 percent under prediction.[60] In all regions, the normalized mean bias and normalized mean error statistics for high ozone days based on the modeling supporting final SIP actions are within the range of performance criteria benchmarks (*i.e.,* less than plus or minus 15 percent for normalized mean bias and less than 25 percent for normalized mean error).[61] Additional information on model performance information is provided in the AQM TSD. In summary, the EPA included emissions of lightning $NO_X$, as requested by commenters, and investigated and addressed concerns about model performance for the modeling supporting final SIP actions.

### 3. Emissions Inventories

The EPA developed emissions inventories to support air quality modeling for this final action, including emissions estimates for EGUs, non-EGU point sources (*i.e.,* stationary point sources), stationary nonpoint sources, onroad mobile sources, nonroad mobile sources, other mobile sources, wildfires, prescribed fires, and biogenic emissions that are not the direct result of human activities. The EPA's air quality modeling relies on this comprehensive set of emissions inventories because emissions from multiple source categories are needed to model ambient air quality and to facilitate comparison of model outputs with ambient measurements.

Prior to the modeling of air quality, the emissions inventories must be processed into a format that is appropriate for the air quality model to use. To prepare the emissions inventories for air quality modeling, the EPA processed the emissions

inventories using the Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System version 4.9 to produce the gridded, hourly, speciated, model-ready emissions for input to the air quality model. Additional information on the development of the emissions inventories and on data sets used during the emissions modeling process are provided in the document titled "Technical Support Document (TSD): Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform," hereafter known as the "2016v3 Emissions Modeling TSD." This TSD is available in the docket for this action.[62]

### 4. Foundation Emissions Inventory

The 2016v3 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022, in addition to data retained from the Inventory Collaborative 2016 version 1 (2016v1) Emissions Modeling Platform, released in October 2019. The 2016v1 platform was developed through a national collaborative effort between the EPA and state and local agencies along with MJOs. The 2016v2 platform used to support the proposed action included updated data, models and methods as compared to 2016v1. The 2016v3 platform includes updates implemented in response to comments along with other updates to the 2016v2 platform such as corrections and the incorporation of updated data sources that became available prior to the 2016v3 inventories being developed. Several commenters noted that the 2016v2 platform did not include $NO_X$ emissions that resulted from lightning strikes. To address this, lightning $NO_X$ emissions were computed and included in the 2016v3 platform.

For this final action, the EPA developed emissions inventories for the base year of 2016 and the projected year of 2023. The 2023 inventories represent changes in activity data and of predicted emissions reductions from on-the-books actions, planned emissions control installations, and promulgated Federal measures that affect anthropogenic emissions. The 2016 emissions inventories for the U.S. primarily include data derived from the 2017 National Emissions Inventory (2017

---

[56] Mathur, R., Gilliam, R., Bullock, O.R., Roselle, S., Pleim, J., Wong, D., Binkowski, F., and 1 Streets, D.: Extending the applicability of the community multiscale air quality model to 2 hemispheric scales: motivation, challenges, and progress. In: Steyn DG, Trini S (eds) Air 3 pollution modeling and its applications, XXI. Springer, Dordrecht, pp 175–179, 2012.

[57] Boundary conditions are the concentrations of pollutants along the north, east, south, and west boundaries of the air quality modeling domain. Boundary conditions vary in space and time and are typically obtained from predictions of global or hemispheric models. Information on how boundary conditions were developed for modeling supporting EPA's final SIP actions can be found in the AQM TSD.

[58] I. Bey, D.J. Jacob, R.M. Yantosca, J.A. Logan, B.D. Field, A.M. Fiore, Q. Li, H.Y. Liu, L.J. Mickley, M.G. Schultz. Global modeling of tropospheric chemistry with assimilated meteorology: model description and evaluation. J. Geophys. Res. Atmos., 106 (2001), pp. 23073–23095, 10.1029/2001jd000807.

[59] Henderson, B.H., P. Dolwick, C. Jang, A., Eyth, J. Vukovich, R. Mathur, C. Hogrefe, G. Pouliot, N. Possiel, B. Timin, K.W. Appel, 2022. Meteorological and Emission Sensitivity of Hemispheric Ozone and $PM_{2.5}$. Presented at the 21st Annual Conference of the UNC Institute for the Environment Community Modeling and Analysis System (CMAS) Center, October 17–19, 2022.

[60] A comparison of model performance from the proposal modeling to the final modeling for individual monitoring sites can be found in the docket for this final action.

[61] Christopher Emery, Zhen Liu, Armistead G. Russell, M. Talat Odman, Greg Yarwood & Naresh Kumar (2017) Recommendations on statistics and benchmarks to assess photochemical model performance, Journal of the Air & Waste Management Association, 67:5, 582–598, DOI: 10.1080/10962247.1265027.

[62] *See* Preparation of Emissions Inventories for the 2016v3 North American Emissions Modeling Platform TSD, also available at *https://www.epa.gov/air-emissions-modeling/2016v3-platform*.

NEI [63] and data specific to the year of 2016. The following sections provide an overview of the construct of the 2016v3 emissions and projections. The fire emissions were unchanged between the 2016v2 and 2016v3 emissions platforms. For the 2016v3 platform, the biogenic emissions were updated to use the latest available versions of the Biogenic Emissions Inventory System and associated land use data to help address comments related to a degradation in model performance in the 2016v2 platform as compared to the 2016v1 platform. Details on the construction of the inventories are available in the 2016v3 Emissions Modeling TSD. Details on how the EPA responded to comments related to emissions inventories are available in the RTC document for this action.

Development of emissions inventories for annual $NO_X$ and sulfur dioxide ($SO_2$) emissions for EGUs in the 2016 base year inventory are based primarily on data from continuous emissions monitoring systems (CEMS) and other monitoring systems allowed for use by qualifying units under 40 CFR part 75, with other EGU pollutants estimated using emissions factors and annual heat input data reported to the EPA. For EGUs not reporting under part 75, the EPA used data submitted to the NEI by state, local, and tribal agencies. The final action inventories include updates made in response to comments on the proposed actions including the proposed SIP submission disapprovals and the proposed FIP. The Air Emissions Reporting Rule, (80 FR 8787; February 19, 2015), requires that Type A point sources large enough to meet or exceed specific thresholds for emissions be reported to the EPA via the NEI every year, while the smaller Type B point sources must only be reported to EPA every 3 years. In response to comments, emissions data for EGUs that did not have data submitted to the NEI specific to the year 2016 were filled in with data from the 2017 NEI. For more information on the details of how the 2016 EGU emissions were developed and prepared for air quality modeling, *see* the 2016v3 Emissions Modeling TSD.

The EPA projected 2023 baseline EGU emissions using version 6 of the Integrated Planning Model (IPM) (*www.epa.gov/airmarkets/powersector-modeling*). IPM, developed by ICF Consulting, is a state-of-the-art, peer-reviewed, multi-regional, dynamic, deterministic linear programming model

of the contiguous U.S. electric power sector. It provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. The EPA has used IPM for over two decades to better understand power sector behavior under future business-as-usual conditions and to evaluate the economic and emissions impacts of prospective environmental policies. The model is designed to reflect electricity markets as accurately as possible. The EPA uses the best available information from utilities, industry experts, gas and coal market experts, financial institutions, and government statistics as the basis for the detailed power sector modeling in IPM. The model documentation provides additional information on the assumptions discussed here as well as all other model assumptions and inputs.[64] The EPA relied on the same model platform as in the proposals but made substantial updates to reflect public comments on near-term fossil fuel market price volatility and updated fleet information reflecting Summer 2022 U.S. Energy Information Agency (EIA) 860 data, unit-level comments, and additional updates to the National Electric Energy Data System (NEEDS) inventory.

The IPM version 6—Updated Summer 2021 Reference Case incorporated recent updates through the summer 2022 to account for updated Federal and state environmental regulations (including Renewable Portfolio Standards (RPS), Clean Energy Standards (CES) and other state mandates), fleet changes (committed EGU retirements and new builds), electricity demand, technology cost and performance assumptions from recent data for renewables adopting from National Renewable Energy Lab (NREL's) Annual Technology Baseline 2020 and for fossil sources from the EIA's Annual Energy Outlook (AEO) 2020. Natural gas and coal price projections reflect data developed in fall 2020 but updated in summer 2022 to capture near-term price volatility and current market conditions. The inventory of EGUs provided as an input to the model was the NEEDS fall 2022 version and is available on the EPA's website.[65] This version of NEEDS reflects announced retirements and

under construction new builds known as of early summer 2022. This projected base case accounts for the effects of the final Mercury and Air Toxics Standards rule, CSAPR, the CSAPR Update, the Revised CSAPR Update, New Source Review enforcement settlements, the final Effluent Limitation Guidelines (ELG) Rule, the Coal Combustion Residual (CCR) Rule, and other on-the-books Federal and state rules (including renewable energy tax credit extensions from the Consolidated Appropriations Act of 2021) through early 2021 impacting emissions of $SO_2$, $NO_X$, directly emitted particulate matter, carbon dioxide ($CO_2$), and power plant operations. It also includes final actions, up through the Summer 2022, the EPA has taken to implement the Regional Haze Rule and best available retrofit technology (BART) requirements. Documentation of IPM version 6 and NEEDS, along with updates, is in Docket ID No. EPA–HQ–OAR–2021–0663 and available online at *https://www.epa.gov/airmarkets/power-sector-modeling*.

Non-EGU point source emissions are mostly consistent with those in the proposal modeling except where they were updated in response to comments. Several commenters mentioned that point source emissions carried forward from 2014 NEI were not the best estimates of 2017 emissions. Thus, emissions sources in 2016v2 that had been projected from the 2014 NEI in the proposal were replaced with emissions based on the 2017 NEI. Point source emissions submitted to the 2016 NEI or to the 2016v1 platform development process specifically for the year 2016 were retained in 2016v3.

The 2023 non-EGU point source emissions were grown from 2016 to 2023 using factors based on AEO 2022 and reflect emissions reductions due to known national and local rules, control programs, plant closures, consent decrees, and settlements that could be computed as reductions to specific units by July 2022.

Aircraft emissions and ground support equipment at airports are represented as point sources and are based on adjustments to emissions in the January 2021 version of the 2017 NEI. The EPA developed and applied factors to adjust the 2017 airport emissions to 2016 and 2023 based on activity growth projected by the Federal Aviation Administration Terminal Area Forecast 2021,[66] the latest available version at the time the factors were developed.

---

[63] *https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-technical-support-document-tsd.*

[64] Detailed information and documentation of the EPA's Base Case, including all the underlying assumptions, data sources, and architecture parameters can be found on the EPA's website at: *https://www.epa.gov/airmarkets/power-sector-modeling.*

[65] *Available at https://www.epa.gov/airmarkets/national-electric-energy-data-system-needs-v6.*

[66] *https://www.faa.gov/data_research/aviation/taf/.*

Emissions at rail yards were represented as point sources. The 2016 rail yard emissions are largely consistent with the 2017 NEI rail yard emissions. The 2016 and 2023 rail yard emissions were developed through the 2016v1 Inventory Collaborative process. Class I rail yard emissions were projected based on the AEO freight rail energy use growth rate projections for 2023 with the fleet mix assumed to be constant throughout the period.

The EPA made multiple updates to point source oil and gas emissions in response to comments. For the 2016v3 modeling, the point source oil and gas emissions for 2016 were based on the 2016v2 point inventory except that most 2014 NEI-based emissions were replaced with 2017 NEI emissions. Additionally, in response to comments, state-provided emissions equivalent to those in the 2016v1 platform were used for Colorado, and some New Mexico emissions were replaced with data backcast from 2020 to 2016. To develop inventories for 2023 for the 2016v3 platform, the year 2016 oil and gas point source inventories were first projected to 2021 values based on actual historical production data, then those 2021 emissions were projected to 2023 using regional projection factors based on AEO 2022 projections. This was an update from the 2016v2 approach in which actual data were used only through the year 2019, because 2021 data were not yet available. $NO_X$ or VOC reductions resulting from co-benefits to New Source Performance Standards (NSPS) for Stationary Reciprocating Internal Combustion Engines (RICE) are reflected, along with Natural Gas Turbine and Process Heater NSPS $NO_X$ controls and Oil and Gas NSPS VOC controls. In some cases, year 2019 point source inventory data were used instead of the projected future year emissions except for the Western Regional Air Partnership (WRAP) states of Colorado, New Mexico, Montana, Wyoming, Utah, North Dakota, and South Dakota. The WRAP future year inventory [67] was used in these WRAP states in all future years except in New Mexico where the WRAP base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the recent oil and gas rule in the New Mexico Administrative code 20.2.50 [68] were also included. Details on the development of the projected point

and nonpoint oil and gas emissions inventories are available in the 2016v3 Emissions Modeling TSD in Docket ID No. EPA–HQ–OAR–2021–0663.

Onroad mobile sources include exhaust, evaporative, and brake and tire wear emissions from vehicles that drive on roads, parked vehicles, and vehicle refueling. Emissions from vehicles using regular gasoline, high ethanol gasoline, diesel fuel, and electric vehicles were represented, along with buses that used compressed natural gas. The EPA developed the onroad mobile source emissions for states other than California using the EPA's Motor Vehicle Emissions Simulator (MOVES). MOVES3 was released in November 2020 and has been followed by some minor releases that improved the usage of the model but that do not have substantive impacts on the emissions estimates. For 2016v2, MOVES3 was run using inputs provided by state and local agencies through the 2017 NEI where available, in combination with nationally available data sets to develop a complete inventory. Onroad emissions were developed based on emissions factors output from MOVES3 run for the year 2016, coupled with activity data (*e.g.,* vehicle miles traveled and vehicle populations) representing the year 2016. The 2016 activity data were provided by some state and local agencies through the 2016v1 process, and the remaining activity data were derived from those used to develop the 2017 NEI. The onroad emissions were computed within SMOKE by multiplying emissions factors developed using MOVES with the appropriate activity data. Prior to computing the final action emissions for 2016, updates to some onroad inputs were made in response to comments and to implement corrections. Onroad mobile source emissions for California were consistent with the updated emissions data provided by the state for the final action.

The 2023 onroad emissions reflect projected changes to fuel properties and usage, along with the impact of the rules included in MOVES3 for each of those years. MOVES emissions factors for the year 2023 were used. A comprehensive list of control programs included for onroad mobile sources is available in the 2016v3 Emissions Modeling TSD. Year 2023 activity data for onroad mobile sources were provided by some state and local agencies, and otherwise were projected to 2023 by first projecting the 2016 activity to year 2019 based on county level vehicle miles traveled (VMT) from the Federal Highway Administration. The VMT were held flat from 2019 to 2021 to

account for pandemic impacts, and then projected from 2021 to 2023 using AEO 2022-based factors.[69] Recent updates to inspection and maintenance programs in North Carolina and Tennessee were reflected in the MOVES inputs for the modeling supporting this final action. The 2023 onroad mobile emissions were computed within SMOKE by multiplying the respective emissions factors developed using MOVES with the year-specific activity data. Prior to computing the final action emissions for 2023, the EPA made updates to some onroad inputs in response to comments and to implement corrections.

The commercial marine vessel (CMV) emissions in the 2016 base case emissions inventory for this action were based on those in the 2017 NEI. Factors were applied to adjust the 2017 NEI emissions backward to represent emissions for the year 2016. The CMV emissions are consistent with the emissions for the 2016v1 platform CMV emissions released in February 2020 although, in response to comments, the EPA implemented an improved process for spatially allocating CMV emissions along state and county boundaries for the modeling supporting this final action.

The EPA developed nonroad mobile source emissions inventories (other than CMV, locomotive, and aircraft emissions) for 2016 and 2023 from monthly, county, and process level emissions output from MOVES3. Types of nonroad equipment include recreational vehicles, pleasure craft, and construction, agricultural, mining, and lawn and garden equipment.[70] The nonroad emissions for the final action were unchanged from those at the proposal. The nonroad mobile emissions control programs include reductions to locomotives, diesel engines, and recreational marine engines, along with standards for fuel sulfur content and evaporative emissions. A comprehensive list of

---

[67] *http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.*

[68] *https://www.env.nm.gov/air-quality/ozone-draft-rule/* and *https://www.srca.nm.gov/parts/title20/20.002.0050.html.*

[69] VMT data for 2020 were the latest available at the time of final rule data development but were heavily impacted by the pandemic and unusable to project to 2023; in addition, it was determined that chaining factors based on AEO 2020 and AEO2021 obtain the needed factors led to unrealistic artifacts, thus only AEO 2022 data were used.

[70] Line haul locomotives are also considered a type of nonroad mobile source but the emissions inventories for locomotives were not developed using MOVES3. Year 2016 and 2023 locomotive emissions were developed through the 2016v1 process, and the year 2016 emissions are mostly consistent with those in the 2017 NEI. The projected locomotive emissions for 2023 were developed by applying factors to the base year emissions using activity data based on AEO freight rail energy use growth rate projections along with emissions rates adjusted to account for recent historical trends.

control programs included for mobile sources is available in the 2016v3 Emissions Modeling TSD.

For stationary nonpoint sources, some emissions in the 2016 base case emissions inventory come directly from the 2017 NEI, others were adjusted from the 2017 NEI to represent 2016 levels, and the remaining emissions including those from oil and gas, fertilizer, and solvents were computed specifically to represent 2016. Stationary nonpoint sources include evaporative sources, consumer products, fuel combustion that is not captured by point sources, agricultural livestock, agricultural fertilizer, residential wood combustion, fugitive dust, and oil and gas sources. The emissions sources derived from the 2017 NEI include agricultural livestock, fugitive dust, residential wood combustion, waste disposal (including composting), bulk gasoline terminals, and miscellaneous non-industrial sources such as cremation, hospitals, lamp breakage, and automotive repair shops. A recent method to compute solvent VOC emissions was used.[71]

Where comments were provided about projected control measures or changes in nonpoint source emissions, those inputs were first reviewed by the EPA. Those found to be based on reasonable data for affected emissions sources were incorporated into the projected inventories for 2023 to the extent possible. Where possible, projection factors based on the AEO used data from AEO 2022, the most recent AEO at the time available at the time the inventories were developed. Federal regulations that impact the nonpoint sources were reflected in the inventories. Adjustments for state fuel sulfur content rules for fuel oil in the Northeast were included along with solvent controls applicable within the northeast ozone transport region (OTR) states. Details are available in the 2016v3 Emissions Modeling TSD.

Nonpoint oil and gas emissions inventories for many states were developed based on outputs from the 2017 NEI version of the EPA Oil and Gas Tool using activity data for year 2016. Production-related emissions data from the 2017 NEI were used for Oklahoma, 2016v1 emissions were used for Colorado and Texas production-related sources to respond to comments. Data for production-related nonpoint oil and gas emissions in the States of Colorado, Montana, New Mexico, North Dakota, South Dakota, Utah, and Wyoming were obtained from the

WRAP baseline inventory.[72] A California Air Resources Board-provided inventory was used for 2016 oil and gas emissions in California. Nonpoint oil and gas inventories for 2023 were developed by first projecting the 2016 oil and gas inventories to 2021 values based on actual production data. Next, those 2021 emissions were projected to 2023 using regional projection factors by product type based on AEO 2022 projections. A 2017–2019 average inventory was used for oil and natural gas exploration emissions in 2023 everywhere except for California and in the WRAP states in which data from the WRAP future year inventory [73] were used. NO$_X$ and VOC reductions that are co-benefits to the NSPS for RICE are reflected, along with Natural Gas Turbines and Process Heaters NSPS NO$_X$ controls and NSPS Oil and Gas VOC controls. The WRAP future year inventory was used for oil and natural gas production sources in 2023 except in New Mexico where the WRAP Base year emissions were projected using the EIA historical and AEO forecasted production data. Estimated impacts from the New Mexico Administrative Code 20.2.50 were included.

### B. Air Quality Modeling To Identify Nonattainment and Maintenance Receptors

This section describes the air quality modeling and analyses that the EPA performed in Step 1 to identify locations where the Agency expects there to be nonattainment or maintenance receptors for the 2015 ozone NAAQS in 2023. Where the EPA's analysis shows that an area or site does not fall under the definition of a nonattainment or maintenance receptor in 2023, that site is excluded from further analysis under the EPA's good neighbor framework.

### 1. Approach for Identifying Receptors

In the proposed actions, the EPA applied the same approach used in the CSAPR Update and the Revised CSAPR Update to identify nonattainment and maintenance receptors for the 2008 ozone NAAQS.[74] The EPA's approach gives independent effect to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in North Carolina. Further, in its decision on the remand of CSAPR from the Supreme Court in the EME Homer City II case, the

D.C. Circuit confirmed that the EPA's approach to identifying maintenance receptors in CSAPR comported with the court's prior instruction to give independent meaning to the "interfere with maintenance" prong in the good neighbor provision.[75]

In the CSAPR Update and the Revised CSAPR Update, the EPA identified nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the NO$_X$ SIP Call and CAIR, where the EPA defined nonattainment receptors as those areas that both currently monitor nonattainment and that the EPA projects will be in nonattainment in the future compliance year.

The Agency explained in the NO$_X$ SIP Call and CAIR and then reaffirmed in the CSAPR Update that the EPA has the most confidence in our projections of nonattainment for those counties that also measure nonattainment for the most recent period of available ambient data. The EPA separately identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that accounts for historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. The EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (i.e., ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (e.g., dominant wind direction, temperatures, and air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

---

[71] https://doi.org/10.5194/acp-21-5079-2021.

[72] http://www.wrapair2.org/pdf/WRAP_OGWG_Report_Baseline_17Sep2019.pdf.

[73] http://www.wrapair2.org/pdf/WRAP_OGWG_2028_OTB_RevFinalReport_05March2020.pdf.

[74] See 86 FR 23078–79.

[75] EME Homer City II, 795 F.3d at 136.

Therefore, applying this methodology for this action, the EPA assessed the magnitude of the maximum projected design values for 2023 at each receptor in relation to the 2015 ozone NAAQS and, where such a value exceeds the NAAQS, the EPA determined that receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City II*.[76] That is, monitoring sites with a maximum design value that exceeds the NAAQS are projected to have maintenance problems in the future analytic years.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to receptors that are not also nonattainment receptors. Consistent with the concepts for maintenance receptors, as described earlier, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official certified design values.[77]

*Comment:* The EPA received comments claiming that the projected design values for 2023 were biased low compared to recent measured data. Commenters noted that a number of monitoring sites that are projected to be below the NAAQS in 2023 based on the EPA's modeling for the proposed action are currently measuring nonattainment based on data from 2020 and 2021. One commenter requested that the EPA determine whether its past modeling tends to overestimate or underestimate actual observed design values. If EPA finds that the agency's model tends to underestimate future year design values, the commenter requests that EPA re-run its ozone modeling, incorporating parameters that account for this tendency.

*EPA Response:* In response to comments, the EPA compared the projected 2023 design values based on the proposal modeling to recent trends in measured data. As a result of this analysis, the EPA agrees that current data indicate that there are monitoring sites at risk of continued nonattainment in 2023 even though the model projected average and maximum design values at these sites are below the NAAQS (*i.e.*, these sites would not be modeling-based receptors at Step 1). While the EPA has confidence in the reliability of the modeling for projecting air quality conditions and contributions in future years, it would not be reasonable to ignore recent measured ozone levels in many areas that are clearly not fully consistent with certain concentrations in the Step 1 analysis for 2023. Therefore, the EPA has developed an additional maintenance-only receptor category, which includes what we refer to as "violating monitor" receptors, based on current ozone concentrations measured by regulatory ambient air quality monitoring sites.

Specifically, the EPA has identified monitoring sites with measured 2021 and preliminary 2022 design values *and* 4th high maximum daily 8-hour average (MDA8) ozone in both 2021 and 2022 (preliminary data) that exceed the NAAQS as having the greatest risk of continuing to have a problem attaining the standard in 2023. These criteria sufficiently consider measured air quality data so as to avoid including monitoring sites that have measured nonattainment data in recent years but could reasonably be anticipated to not have a nonattainment or maintenance problem in 2023, in line with our modeling results. Our methodology is intended only to identify those sites that have sufficiently poor ozone levels that there is clearly a reasonable expectation that an ozone nonattainment or maintenance problem will persist in the 2023 ozone season. Moreover, the 2023 ozone season is so near in time that recent measured ozone levels can be used to reasonably project whether an air quality problem is likely to persist. We view this approach to identifying additional receptors in 2023 as the best means of responding to the comments on this issue in this action, while also identifying all transport receptors.

For purposes of this action, we will treat these violating monitors as an additional type of maintenance-only receptor. We acknowledge that traditional modeling plus monitoring methodology we used at proposal and in prior ozone transport rules would otherwise have identified such sites as being in attainment in 2023. Because

our modeling did not identify these sites as receptors, we do not believe it is sufficiently certain that these sites will be in nonattainment that they should be considered nonattainment receptors. In the face of this uncertainty in the record, we regard our ability to consider such sites as receptors for purposes of good neighbor analysis under CAA section 110(a)(2)(D)(i)(I) to be a function of the requirement to prohibit emissions that interfere with maintenance of the NAAQS; even if an area may be projected to be in attainment, we have reliable information indicating that there is a clear risk that attainment will not in fact be achieved in 2023. Thus, our authority for treating these sites as receptors at Step 1 in 2023 flows from the responsibility in CAA section 110(a)(2)(i)(I) to prohibit emissions that interfere with maintenance of the NAAQS. *See, e.g., North Carolina,* 531 F.3d at 910–11 (failing to give effect to the interfere with maintenance clause "provides no protection for downwind areas that, *despite EPA's predictions,* still find themselves struggling to meet NAAQS due to upwind interference . . . .") (emphasis added). Recognizing that no modeling can perfectly forecast the future, and "a degree of imprecision is inevitable in tackling the problem of interstate air pollution," this approach in the Agency's judgement best balances the need to avoid both "under-control" and "overcontrol," *EME Homer City,* 572 U.S. at 523. The EPA's analysis of these additional receptors further is explained in Section III.C.

However, because we did not propose to apply this expansion of the basis for regulation under the good neighbor provision receptor-identification methodology as the sole basis for finding an upwind state linked, in this action we are only using this receptor category on a confirmatory basis. That is, for states that we find linked based on our traditional modeling-based methodology in 2023, we find in this final analysis that the linkage at Step 2 is strengthened and confirmed if that state is also linked to one or more "violating-monitor" receptors. If a state is only linked to a violating-monitor receptor in this final analysis, we are deferring taking final action on that state's SIP submittal. This is the case for the State of Tennessee. Among the states that previously had their transport SIPs approved for the 2015 ozone NAAQS, the EPA has also identified a linkage to violating-monitor receptors for the State of Kansas. The EPA intends to further review its air quality modeling results and recent measured ozone levels, and we intend to address these states' good

[76] *EME Homer City II,* 795 F.3d at 136.

[77] *See https://www.epa.gov/air-trends/air-quality-design-values* for design value reports. At the time of this action, the most recent reports of certified design values available are for the calendar year 2021. The 2022 values are considered "preliminary" and therefore subject to change before certification.

neighbor obligations as expeditiously as practicable in a future action.

2. Methodology for Projecting Future Year Ozone Design Values

Consistent with the EPA's modeling guidance, the 2016 base year and future year air quality modeling results were used in a relative sense to project design values for 2023.[78] That is, the ratios of future year model predictions to base year model predictions are used to adjust ambient ozone design values up or down depending on the relative (percent) change in model predictions for each location. The EPA's modeling guidance recommends using measured ozone concentrations for the 5-year period centered on the base year as the air quality data starting point for future year projections. This average design value is used to dampen the effects of inter-annual variability in meteorology on ozone concentrations and to provide a reasonable projection of future air quality at the receptor under average conditions. In addition, the Agency calculated maximum design values from within the 5-year base period to represent conditions when meteorology is more favorable than average for ozone formation. Because the base year for the air quality modeling used in this final action is 2016, measured data for 2014–2018 (i.e., design values for 2016, 2017, and 2018) were used to project average and maximum design values in 2023.

The ozone predictions from the 2016 and future year air quality model simulations were used to project 2016–2018 average and maximum ozone design values to 2023 using an approach similar to the approach in the EPA's guidance for attainment demonstration modeling. This guidance recommends using model predictions from the 3 x 3 array of grid cells surrounding the location of the monitoring site to calculate a Relative Response Factor (RRF) for that site. However, the guidance also notes that an alternative array of grid cells may be used in certain situations where local topographic or geographical feature (e.g., a large water body or a significant elevation change) may influence model response.

The 2016–2018 base period average and maximum design values were multiplied by the RRF to project each of these design values to 2023. In this manner, the projected design values are grounded in monitored data, and not the absolute model-predicted future year

concentrations. Following the approach in the CSAPR Update and the Revised CSAPR Update, the EPA also projected future year design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. In this alternative approach, the EPA eliminated from the RRF calculations the modeling data in those grid cells that are dominated by water (i.e., more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (i.e., if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation). The choice of more than 50 percent of the grid cell area as water as the criteria for identifying overwater grid cells is based on the treatment of land use in the Weather Research and Forecasting model (WRF). Specifically, in the WRF meteorological model those grid cells that are greater than 50% overwater are treated as being 100 percent overwater. In such cases the meteorological conditions in the entire grid cell reflect the vertical mixing and winds over water, even if part of the grid cell also happens to be over land with land-based emissions, as can often be the case for coastal areas. Overlaying land-based emissions with overwater meteorology may be representative of conditions at coastal monitors during times of on-shore flow associated with synoptic conditions or sea-breeze or lake-breeze wind flows. But there may be other times, particularly with off-shore wind flow, when vertical mixing of land-based emissions may be too limited due to the presence of overwater meteorology. Thus, for our modeling the EPA projected average and maximum design values at individual monitoring sites based on both the "3 x 3" approach as well as the alternative approach that eliminates overwater cells in the RRF calculation for near-coastal areas (i.e., "no water" approach). The projected 2023 design values using both the "3 x 3" and "no-water" approaches are provided in the docket for this final action. Both approaches result in the same set of receptors in 2023. That is, monitoring sites that are identified as receptors in 2023 based on the "3 x 3" approach are also receptors based on the "no water" approach.

Consistent with the truncation and rounding procedures for the 8-hour ozone NAAQS, the projected design values are evaluated after truncation to integers in units of ppb. Therefore, projected design values that are greater than or equal to 71 ppb are considered to be violating the 2015 ozone NAAQS.

For those sites that are projected to be violating the NAAQS based on the average design values in 2023, the Agency examined the measured design values for 2021, which are the most recent official measured design values at the time of this final action.

As noted earlier, the Agency proposes to identify nonattainment receptors in this rulemaking as those sites that are violating the NAAQS based on current measured air quality through 2021 and have projected average design values of 71 ppb or greater. Maintenance-only receptors include both: (1) Those sites with projected average design values above the NAAQS that are currently measuring clean data (i.e., ozone design values below the level of the 2015 ozone NAAQS in 2021) and (2) those sites with projected average design values below the level of the NAAQS, but with projected maximum design values of 71 ppb or greater. In addition to the maintenance-only receptors, ozone nonattainment receptors are also maintenance receptors because the projected maximum design values for each of these sites is always greater than or equal to the average design value. Further, as explained previously in this section, the EPA identifies certain monitoring sites as "violating monitor" maintenance-only receptors based on 2021 and 2022 measured ozone levels.

The monitoring sites that the Agency projects to be nonattainment and maintenance receptors for the ozone NAAQS in the 2023 base case are used for assessing the contribution of emissions in upwind states to downwind nonattainment and maintenance of the 2015 ozone NAAQS as part of this final action.

3. 2023 Nonattainment and Maintenance-Only Receptors for the Final Action

In this section we provide information on modeling-based design values and measured data for monitoring sites identified as nonattainment or maintenance-only receptors in 2023 for this final action. Table III.B–1 of this action contains the 2016-centered base period average and maximum 8-hour ozone design values, the 2023 projected average and maximum design values and the measured 2021 design values for monitoring sites that are projected to be nonattainment receptors in 2023. Table III.B–2 of this action contains this same information for monitoring sites that are projected to be maintenance-only receptors in 2023, based on air quality modeling. Table III.B–3 of this action contains the 2023 projected average and maximum design values and 2021 design values and 4th high

---

[78] U.S. Environmental Protection Agency, 2018. Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze, Research Triangle Park, NC. *https://www.epa.gov/scram/state-implementation-plan-sip-attainment-demonstration-guidance.*

MDA8 ozone concentrations and preliminary 2020 design values and 4th high MDA8 ozone concentrations for monitoring sites identified as violating monitor maintenance-only receptors. The design values for all monitoring sites in the U.S. are provided in the docket for this action. Additional details on the approach for projecting average and maximum design values are provided in the AQM TSD.

TABLE III.B–1—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED NONATTAINMENT RECEPTORS [a]

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 060650016 ................ | CA | Riverside ................ | 79.0 | 80.0 | 72.2 | 73.1 | 78 |
| 060651016 ................ | CA | Riverside ................ | 99.7 | 101 | 91.0 | 92.2 | 95 |
| 080350004 ................ | CO | Douglas ................ | 77.3 | 78 | 71.3 | 71.9 | 83 |
| 080590006 ................ | CO | Jefferson ................ | 77.3 | 78 | 72.8 | 73.5 | 81 |
| 080590011 ................ | CO | Jefferson ................ | 79.3 | 80 | 73.5 | 74.1 | 83 |
| 090010017 ................ | CT | Fairfield ................ | 79.3 | 80 | 71.6 | 72.2 | 79 |
| 090013007 ................ | CT | Fairfield ................ | 82.0 | 83 | 72.9 | 73.8 | 81 |
| 090019003 ................ | CT | Fairfield ................ | 82.7 | 83 | 73.3 | 73.6 | 80 |
| 481671034 ................ | TX | Galveston ................ | 75.7 | 77 | 71.5 | 72.8 | 72 |
| 482010024 ................ | TX | Harris ................ | 79.3 | 81 | 75.1 | 76.7 | 74 |
| 490110004 ................ | UT | Davis ................ | 75.7 | 78 | 72.0 | 74.2 | 78 |
| 490353006 ................ | UT | Salt Lake ................ | 76.3 | 78 | 72.6 | 74.2 | 76 |
| 490353013 ................ | UT | Salt Lake ................ | 76.5 | 77 | 73.3 | 73.8 | 76 |
| 551170006 ................ | WI | Sheboygan ................ | 80.0 | 81 | 72.7 | 73.6 | 72 |

[a] 2016-centered base period average design values and projected average and maximum design values are reported with 1 digit to the right of the decimal, as recommended in the EPA's modeling guidance. The 2016 maximum design values and 2021 design values are truncated to integer values consistent with ozone design value reporting convention in appendix U of 40 CFR part 50.

TABLE III.B–2—AVERAGE AND MAXIMUM 2016-CENTERED AND 2023 BASE CASE 8-HOUR OZONE DESIGN VALUES AND 2021 DESIGN VALUES (PPB) AT PROJECTED MAINTENANCE-ONLY RECEPTORS

| Monitor ID | State | County | 2016 centered average | 2016 centered maximum | 2023 average | 2023 maximum | 2021 |
|---|---|---|---|---|---|---|---|
| 040278011 ................ | AZ | Yuma ................ | 72.3 | 74 | 70.4 | 72.1 | 67 |
| 080690011 ................ | CO | Larimer ................ | 75.7 | 77 | 70.9 | 72.1 | 77 |
| 090099002 ................ | CT | New Haven ................ | 79.7 | 82 | 70.5 | 72.6 | 82 |
| 170310001 ................ | IL | Cook ................ | 73.0 | 77 | 68.2 | 71.9 | 71 |
| 170314201 ................ | IL | Cook ................ | 73.3 | 77 | 68.0 | 71.5 | 74 |
| 170317002 ................ | IL | Cook ................ | 74.0 | 77 | 68.5 | 71.3 | 73 |
| 350130021 ................ | NM | Dona Ana ................ | 72.7 | 74 | 70.8 | 72.1 | 80 |
| 350130022 ................ | NM | Dona Ana ................ | 71.3 | 74 | 69.7 | 72.4 | 75 |
| 350151005 ................ | NM | Eddy ................ | 69.7 | 74 | 69.7 | 74.1 | 77 |
| 350250008 ................ | NM | Lea ................ | 67.7 | 70 | 69.8 | 72.2 | 66 |
| 480391004 ................ | TX | Brazoria ................ | 74.7 | 77 | 70.4 | 72.5 | 75 |
| 481210034 ................ | TX | Denton ................ | 78.0 | 80 | 69.8 | 71.6 | 74 |
| 481410037 ................ | TX | El Paso ................ | 71.3 | 73 | 69.8 | 71.4 | 75 |
| 482010055 ................ | TX | Harris ................ | 76.0 | 77 | 70.9 | 71.9 | 77 |
| 482011034 ................ | TX | Harris ................ | 73.7 | 75 | 70.1 | 71.3 | 71 |
| 482011035 ................ | TX | Harris ................ | 71.3 | 75 | 67.8 | 71.3 | 71 |
| 530330023 ................ | WA | King ................ | 73.3 | 77 | 67.6 | 71.0 | 64 |
| 550590019 ................ | WI | Kenosha ................ | 78.0 | 79 | 70.8 | 71.7 | 74 |
| 551010020 ................ | WI | Racine ................ | 76.0 | 78 | 69.7 | 71.5 | 73 |

In total, in 2023 there are a total of projected 33 modeling-based receptors nationwide including 14 nonattainment receptors in 9 different counties and 19 maintenance-only receptors in 13 additional counties (Harris County, TX, has both nonattainment and maintenance-only receptors).

As shown in Table III.B–3 of this action, there are 49 monitoring sites that are identified as "violating-monitor" maintenance-only receptors in 2023. As noted earlier in this section, the EPA uses the approach of considering "violating-monitor" maintenance-only receptors as confirmatory of the proposal's identification of receptors and does not implicate additional linked states in this final action, Rather, using this approach serves to strengthen the analytical basis for our Step 2 findings by establishing that many upwind states covered in this action are also projected to contribute above 1 percent of the NAAQS to these additional "violating monitor" maintenance-only receptors.

TABLE III.B–3—AVERAGE AND MAXIMUM 2023 BASE CASE 8-HOUR OZONE, AND 2021 AND PRELIMINARY 2022 DESIGN VALUES (PPB) AND 4TH HIGH CONCENTRATIONS AT VIOLATING MONITORS[a]

| Monitor ID | State | County | 2023 average | 2023 maximum | 2021 | 2022 P | 2021 4th high | 2022 P 4th high |
|---|---|---|---|---|---|---|---|---|
| 40070010 | AZ | Gila | 67.9 | 69.5 | 77 | 76 | 75 | 74 |
| 40130019 | AZ | Maricopa | 69.8 | 70.0 | 75 | 77 | 78 | 76 |
| 40131003 | AZ | Maricopa | 70.1 | 70.7 | 80 | 80 | 83 | 78 |
| 40131004 | AZ | Maricopa | 70.2 | 70.8 | 80 | 81 | 81 | 77 |
| 40131010 | AZ | Maricopa | 68.3 | 69.2 | 79 | 80 | 80 | 78 |
| 40132001 | AZ | Maricopa | 63.8 | 64.1 | 74 | 78 | 79 | 81 |
| 40132005 | AZ | Maricopa | 69.6 | 70.5 | 78 | 79 | 79 | 77 |
| 40133002 | AZ | Maricopa | 65.8 | 65.8 | 75 | 75 | 81 | 72 |
| 40134004 | AZ | Maricopa | 65.7 | 66.6 | 73 | 73 | 73 | 71 |
| 40134005 | AZ | Maricopa | 62.3 | 62.3 | 73 | 75 | 79 | 73 |
| 40134008 | AZ | Maricopa | 65.6 | 66.5 | 74 | 74 | 74 | 71 |
| 40134010 | AZ | Maricopa | 63.8 | 66.9 | 74 | 76 | 77 | 75 |
| 40137020 | AZ | Maricopa | 67.0 | 67.0 | 76 | 77 | 77 | 75 |
| 40137021 | AZ | Maricopa | 69.8 | 70.1 | 77 | 77 | 78 | 75 |
| 40137022 | AZ | Maricopa | 68.2 | 69.1 | 76 | 78 | 76 | 79 |
| 40137024 | AZ | Maricopa | 67.0 | 67.9 | 74 | 76 | 74 | 77 |
| 40139702 | AZ | Maricopa | 66.9 | 68.1 | 75 | 77 | 72 | 77 |
| 40139704 | AZ | Maricopa | 65.3 | 66.2 | 74 | 77 | 76 | 76 |
| 40139997 | AZ | Maricopa | 70.5 | 70.5 | 76 | 79 | 82 | 76 |
| 40218001 | AZ | Pinal | 67.8 | 69.0 | 75 | 76 | 73 | 77 |
| 80013001 | CO | Adams | 63.0 | 63.0 | 72 | 77 | 79 | 75 |
| 80050002 | CO | Arapahoe | 68.0 | 68.0 | 80 | 80 | 84 | 73 |
| 80310002 | CO | Denver | 63.6 | 64.8 | 72 | 74 | 77 | 71 |
| 80310026 | CO | Denver | 64.5 | 64.8 | 75 | 77 | 83 | 72 |
| 90079007 | CT | Middlesex | 68.7 | 69.0 | 74 | 73 | 78 | 73 |
| 90110124 | CT | New London | 65.5 | 67.0 | 73 | 72 | 75 | 71 |
| 170310032 | IL | Cook | 67.3 | 69.8 | 75 | 75 | 77 | 72 |
| 170311601 | IL | Cook | 63.8 | 64.5 | 72 | 73 | 72 | 71 |
| 181270024 | IN | Porter | 63.4 | 64.6 | 72 | 73 | 72 | 73 |
| 260050003 | MI | Allegan | 66.2 | 67.4 | 75 | 75 | 78 | 73 |
| 261210039 | MI | Muskegon | 67.5 | 68.4 | 74 | 79 | 75 | 82 |
| 320030043 | NV | Clark | 68.4 | 69.4 | 73 | 75 | 74 | 74 |
| 350011012 | NM | Bernalillo | 63.8 | 66.0 | 72 | 73 | 76 | 74 |
| 350130008 | NM | Dona Ana | 65.6 | 66.3 | 72 | 76 | 79 | 78 |
| 361030002 | NY | Suffolk | 66.2 | 68.0 | 73 | 74 | 79 | 74 |
| 390850003 | OH | Lake | 64.3 | 64.6 | 72 | 74 | 72 | 76 |
| 480290052 | TX | Bexar | 67.1 | 67.8 | 73 | 74 | 78 | 72 |
| 480850005 | TX | Collin | 65.4 | 66.0 | 75 | 74 | 81 | 73 |
| 481130075 | TX | Dallas | 65.3 | 66.5 | 71 | 71 | 73 | 72 |
| 481211032 | TX | Denton | 65.9 | 67.7 | 76 | 77 | 85 | 77 |
| 482010051 | TX | Harris | 65.3 | 66.3 | 74 | 73 | 83 | 72 |
| 482010416 | TX | Harris | 68.8 | 70.4 | 73 | 73 | 78 | 71 |
| 484390075 | TX | Tarrant | 63.8 | 64.7 | 75 | 76 | 76 | 77 |
| 484391002 | TX | Tarrant | 64.1 | 65.7 | 72 | 77 | 76 | 80 |
| 484392003 | TX | Tarrant | 65.2 | 65.9 | 72 | 72 | 74 | 72 |
| 484393009 | TX | Tarrant | 67.5 | 68.1 | 74 | 75 | 75 | 75 |
| 490571003 | UT | Weber | 69.3 | 70.3 | 71 | 74 | 77 | 71 |
| 550590025 | WI | Kenosha | 67.6 | 70.7 | 72 | 73 | 72 | 71 |
| 550890008 | WI | Ozaukee | 65.2 | 65.8 | 71 | 72 | 72 | 72 |

[a] 2022 preliminary design values are based on 2022 measured MDA8 concentrations provided by state air agencies to the EPA's Air Quality System (AQS), as of January 3, 2023.

## C. Air Quality Modeling To Quantify Upwind State Contributions

This section documents the procedures the EPA used to quantify the impact of emissions from specific upwind states on ozone design values in 2023 for the identified downwind nonattainment and maintenance receptors. The EPA used CAMx photochemical source apportionment modeling to quantify the impact of emissions in specific upwind states on downwind nonattainment and maintenance receptors for 8-hour ozone.

CAMx employs enhanced source apportionment techniques that track the formation and transport of ozone from specific emissions sources and calculates the contribution of sources and precursors to ozone for individual receptor locations. The benefit of the photochemical model source apportionment technique is that all modeled ozone at a given receptor location in the modeling domain is tracked back to specific sources of emissions and boundary conditions to fully characterize culpable sources.

The EPA performed nationwide, state-level ozone source apportionment modeling using the CAMx Ozone Source Apportionment Technology/ Anthropogenic Precursor Culpability Analysis (OSAT/APCA) technique [79] to quantify the contribution of 2023 $NO_X$ and VOC emissions from all sources in each state to the corresponding projected ozone design values in 2023 at

[79] As part of this technique, ozone formed from reactions between biogenic VOC and $NO_X$ with anthropogenic $NO_X$ and VOC are assigned to the anthropogenic emissions.

air quality monitoring sites. The CAMx OSAT/APCA model run was performed for the period May 1 through September 30 using the projected future base case emissions and 2016 meteorology for this time period. In the source apportionment modeling the Agency tracked (i.e., tagged) the amount of ozone formed from anthropogenic emissions in each state individually as well as the contributions from other sources (e.g., natural emissions).

In the state-by-state source apportionment model run, the EPA tracked the ozone formed from each of the following tags:

• States—anthropogenic $NO_X$ emissions and VOC emissions from individual state (emissions from all anthropogenic sectors in a given state were combined);

• Biogenics—biogenic $NO_X$ and VOC emissions domain-wide (i.e., not by state);

• Boundary Concentrations— concentrations transported into the air quality modeling domain;

• Tribes—the emissions from those tribal lands for which the Agency has point source inventory data emissions modeling platform (EPA did not model the contributions from individual tribes);

• Canada and Mexico— anthropogenic emissions from those sources in the portions of Canada and Mexico included within the modeling domain (the EPA did not model the contributions from Canada and Mexico separately);

• Fires—combined emissions from wild and prescribed fires domain-wide (i.e., not by state); and

• Offshore—combined emissions from offshore marine vessels and offshore drilling platforms within the modeling domain.

The contribution modeling provided contributions to ozone from anthropogenic $NO_X$ and VOC emissions in each state, individually. The contributions to ozone from chemical reactions between biogenic $NO_X$ and VOC emissions were modeled and assigned to the "biogenic" category. The contributions from wildfire and prescribed fire $NO_X$ and VOC emissions were modeled and assigned to the "fires" category. That is, the contributions from the "biogenic" and "fires" categories are not assigned to individual states nor are they included in the state contributions.

For the Step 2 analysis, the EPA calculated a contribution metric that considers the average contribution on the 10 highest ozone concentration days (i.e., top 10 days) in 2023 using the same approach as the EPA used in the proposed action and in the Revised CSAPR Update.[80] This average contribution metric is intended to provide a reasonable representation of the contribution from individual states to projected future year design values, based on modeled transport patterns and other meteorological conditions generally associated with modeled high ozone concentrations at the receptor. An average contribution metric constructed in this manner ensures the magnitude of the contributions is directly related to the magnitude of the ozone design value at each site.

The analytic steps for calculating the contribution metric for the 2023 analytic year are as follows:

(1) Calculate the 8-hour average contribution from each source tag to individual ozone monitoring site for the time period of the 8-hour daily maximum modeled concentrations in 2023;

(2) Average the contributions and average the concentrations for the top 10 modeled ozone concentration days in 2023;

(3) Divide the average contribution by the corresponding average concentration to obtain a Relative Contribution Factor (RCF) for each monitoring site;

(4) Multiply the 2023 average design value by the 2023 RCF at each site to produce the average contribution metric values in 2023; [81]

(5) Truncate the average contribution metric values to two digits to the right of the decimal for comparison to the 1 percent of the NAAQS screening threshold (0.70 ppb)

The resulting contributions from each tag to each monitoring site in the U.S. for 2023 can be found in the docket for this final action. Additional details on the source apportionment modeling and the procedures for calculating contributions can be found in the AQM TSD. The EPA's response to comments on the method for calculating the contribution metric can be found in the RTC document for this final action.

The largest contribution from each state that is the subject of this final action to modeled 8-hour ozone nonattainment and modeling-based maintenance receptors in downwind states in 2023 are provided in Table III.C–1 of this action. The largest contribution from each state to the additional "violating monitor" maintenance-only receptors is provided in Table III.C–2 of this action. All states that are linked to one or more nonattainment or maintenance-only receptors are also linked to one or more violating monitor maintenance receptors, except for Minnesota.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Alabama | 0.75 | 0.65 |
| Arkansas | 0.94 | 1.21 |
| California | 35.27 | 6.31 |
| Illinois | 13.89 | 19.09 |
| Indiana | 8.90 | 10.03 |
| Kentucky | 0.84 | 0.79 |
| Louisiana | 9.51 | 5.62 |

[80] The use of daily contributions on the top 10 concentration days for calculating the average contribution metric is designed to be consistent with the method specified in the modeling guidance in terms of the number of days to use when projecting future year design values.

[81] Note that a contribution metric value was not calculated for any receptor at which there were fewer than 5 days with model-predicted MDA8 ozone concentrations greater than or equal to 60 ppb in 2023. Eliminating from the Step 2 evaluation any receptors for which the modeling does not meet this criterion ensures that upwind state

contributions are based on the days with the highest ozone projections. This criterion is consistent with the criterion for projecting design values, as recommended in the EPA's modeling guidance. In the modeling for this final action, the monitoring site in Seattle, Washington (530330023), was the only receptor that did not meet this criterion.

TABLE III.C–1—LARGEST CONTRIBUTION BY STATE TO DOWNWIND 8-HOUR OZONE NONATTAINMENT AND MAINTENANCE RECEPTORS IN 2023 (ppb)—Continued

| Upwind state | Largest contribution to a downwind nonattainment receptor | Largest contribution to a downwind maintenance-only receptor |
|---|---|---|
| Maryland | 1.13 | 1.28 |
| Michigan | 1.59 | 1.56 |
| Minnesota | 0.36 | 0.85 |
| Mississippi | 1.32 | 0.91 |
| Missouri | 1.87 | 1.39 |
| Nevada | 1.11 | 1.13 |
| New Jersey | 8.38 | 5.79 |
| New York | 16.10 | 11.29 |
| Ohio | 2.05 | 1.98 |
| Oklahoma | 0.79 | 1.01 |
| Texas | 1.03 | 4.74 |
| Utah | 1.29 | 0.98 |
| West Virginia | 1.37 | 1.49 |
| Wisconsin | 0.21 | 2.86 |

TABLE III.C–2—LARGEST CONTRIBUTION TO DOWNWIND 8-HOUR OZONE "VIOLATING MONITOR" MAINTENANCE-ONLY RECEPTORS (ppb)

| Upwind State | Largest contribution to a downwind violating monitor maintenance-only receptor |
|---|---|
| Alabama | 0.79 |
| Arkansas | 1.16 |
| California | 6.97 |
| Illinois | 16.53 |
| Indiana | 9.39 |
| Kentucky | 1.57 |
| Louisiana | 5.06 |
| Maryland | 1.14 |
| Michigan | 3.47 |
| Minnesota | 0.64 |
| Mississippi | 1.02 |
| Missouri | 2.95 |
| Nevada | 1.11 |
| New Jersey | 8.00 |
| New York | 12.08 |
| Ohio | 2.25 |
| Oklahoma | 1.57 |
| Texas | 3.83 |
| Utah | 1.46 |
| West Virginia | 1.79 |
| Wisconsin | 5.10 |

## IV. Summary of Bases for Disapproval

As explained in Section II, the EPA relies on the 4-step interstate transport framework to evaluate obligations under CAA section 110(a)(2)(D)(i)(I). At proposal, the EPA used this framework to guide its evaluation of each state's SIP submission. While the EPA used this framework to maintain a nationally consistent and equitable approach to interstate transport, the contents of each individual state's submission were evaluated on their own merits, and the EPA considered the facts and information, including information from the Agency, available to the state at the time of its submission, in addition to

more recent air quality and contribution information. Here we provide a brief, high level overview of the SIP submissions and the EPA's evaluation and key bases for disapproval. These summaries are presented for ease of reference and to direct the public to the most relevant portions of the proposals and final rule record for further information. The full basis for the EPA's disapprovals is available in relevant **Federal Register** notifications of proposed disapproval for each state, in the technical support documents informing the proposed and final action, and in the responses to comments in Section V and the RTC document. In general, except as otherwise noted, the comments and updated air quality information did not convince the Agency that a change from proposal was warranted for any state. The exceptions are that the EPA is deferring action at this time on the proposed disapprovals for Tennessee and Wyoming. Further, the EPA is finalizing partial approvals of prong 1 ("significant contribution to nonattainment") for Minnesota and Wisconsin because they are linked only to maintenance-only receptors; the EPA is finalizing a partial disapproval with respect to prong 2 ("interference with maintenance") obligations for these two states.

### A. Alabama

In the 2016v3 modeling, Alabama is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor. It is also linked to one violating-monitor maintenance-only receptor. Its highest-level contribution is 0.75 ppb to Galveston County, Texas (AQS Site ID 481671034).[82] A full

[82] The highest-magnitude downwind contribution from each state is based on the contributions to

summary of Alabama's June 21, 2022, SIP submission, as well as Alabama's previous submission history, was provided in the proposed SIP submission disapproval.[83] In its submission, Alabama advocated for discounting maintenance receptors through use of historical data trends. The EPA finds Alabama's approach is not adequately justified.[84] The EPA disagrees with Alabama's assessment of the 2016v2 modeling,[85] and further responds to comments on model performance in Section III. The EPA disagrees with Alabama's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2,[86] and further addresses the relevance of "significant impact levels" within the Prevention of Significant Deterioration program ("PSD SILs") in Section V.B.6. The EPA found technical flaws in Alabama's back trajectory analysis.[87] The State did not conduct an adequate Step 3 analysis, and the EPA identified several unsupported assertions in the SIP submission.[88] Alabama also argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[89] The EPA further addresses arguments related to

modeling-based receptors and does not consider the contributions to violating-monitor maintenance-only receptors. Each state's maximum contribution to downwind violating-monitor maintenance-only receptors is available in the Final Action AQM TSD.

[83] 87 FR 64419–64421.
[84] Id. at 64421–64422.
[85] Id. at 64422–64423.
[86] Id. at 64423–64424.
[87] Id. at 64424–64425.
[88] Id. at 64425–64426.
[89] Id.

mobile sources in Section V.C.1.[90] Additionally, as explained in Section V.B.9,[91] reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3. The State included no permanent and enforceable emissions controls in its SIP submission.[92] We provide further response to comments regarding Alabama's SIP submission in the RTC document. The EPA is finalizing disapproval of Alabama's interstate transport SIP submission for the 2015 ozone NAAQS.

*B. Arkansas*

In the 2016v3 modeling, Arkansas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and five maintenance-only receptors. It is also linked to seven violating-monitor maintenance-only receptor. Its highest-level contribution is 1.21 ppb to Brazoria County Texas (AQS Site ID 480391004). A full summary of Arkansas's October 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[93] The EPA disagrees with Arkansas's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses the relevance of PSD SILs in Section V.B.6.[94] The EPA also found technical flaws in Arkansas's "consistent and persistent" claims and back trajectory analysis,[95] and legal flaws in the state's arguments related to relative contribution.[96] The State did not conduct an adequate Step 3 analysis.[97] Arkansas argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[98] Further, the state's reliance on the cost-effectiveness thresholds in the CSAPR and CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[99] The State included no permanent and enforceable controls in its SIP submission.[100] We provide further response to comments regarding Arkansas's SIP submission in the RTC document. The EPA is finalizing disapproval of Arkansas's interstate

transport SIP submission for the 2015 ozone NAAQS.

*C. California*

In the 2016v3 modeling, California is projected to be linked above 1 percent of the NAAQS to eight nonattainment receptors and four maintenance-only receptors. It is also linked to 26 violating-monitor maintenance-only receptor. Its highest-level contribution is 35.27 ppb to the nonattainment receptor located on the Morongo Band of Missions Indians reservation (AQS Site ID 060651016).[101] A full summary of California's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[102] The EPA found technical and legal flaws in California's geographic, meteorological, wildfire, and trajectories analysis, and the State's arguments related to local, international, and non-anthropogenic emissions.[103] The EPA further addresses the topic of international emissions in Section V.C.2. The State did not conduct an adequate Step 3 analysis.[104] California in its SIP submission argued that it had already implemented all cost-effective controls. However, California provided an insufficient evaluation of additional control opportunities to support such a conclusion.[105] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015

ozone NAAQS.[106] California included no permanent and enforceable emissions controls in its SIP submission[107] and argued that interstate transport is fundamentally different in the western U.S. than in the eastern U.S., to which the EPA responds in Section V.C.3.[108] We provide further response to comments regarding California's SIP submission in the RTC document. The EPA is finalizing disapproval of California's interstate transport SIP submission for the 2015 ozone NAAQS.

*D. Illinois*

In the 2016v3 modeling, Illinois is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and three maintenance-only receptors. It is also linked to six violating-monitor maintenance-only receptor. Its highest-level contribution is 19.09 ppb to Kenosha County, Wisconsin (AQS Site ID 550590019). A full summary of Illinois's May 21, 2019, SIP submission was provided in the proposed SIP submission disapproval.[109] The EPA disagrees with Illinois's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[110] The state did not conduct an adequate Step 3 analysis.[111] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[112] The EPA also found technical and legal flaws in Illinois' arguments related to "on-the-way" controls, participation in the Lake Michigan Air Directors Consortium (LADCO), and international contributions.[113] The EPA further addresses the topic of international contribution in Section V.C.2. Further, as explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[114] The State included no permanent and enforceable controls in its SIP submission.[115] We provide further response to comments regarding Illinois's SIP submission in the RTC document. The EPA is finalizing disapproval of Illinois's interstate

---

[90] *See also* id. at 64425–64426.

[91] *See also* id. at 64426.

[92] Id.

[93] 87 FR 9798, 9803–9806 (February 22, 2022).

[94] Id. at 9806–9807.

[95] Id. at 9808–9809.

[96] Id. at 9809–9810.

[97] Id. at 9809–9810.

[98] Id. at 9810.

[99] Id.

[100] Id. at 9811.

[101] We note that, consistent with the EPA's prior good neighbor actions in California, the regulatory ozone monitor located on the Morongo Band of Mission Indians ("Morongo") reservation is a projected downwind receptor in 2023. *See* monitoring site 060651016 in Table V.D–1. of this action. We also note that the Temecula, California, regulatory ozone monitor is a projected downwind receptor in 2023 and in past regulatory actions has been deemed representative of air quality on the Pechanga Band of Luiseño Indians ("Pechanga") reservation. *See, e.g.,* Approval of Tribal Implementation Plan and Designation of Air Quality Planning Area; Pechanga Band of Luiseño Mission Indians, 80 FR 18120, at 18121–18123 (April 3, 2015); *see also* monitoring site 060650016 in Table V.D–1. of this action. The presence of receptors on, or representative of, the Morongo and Pechanga reservations does not trigger obligations for the Morongo and Pechanga Tribes. Nevertheless, these receptors are relevant to the EPA's assessment of any linked upwind states' good neighbor obligations. *See, e.g.,* Approval and Promulgation of Air Quality State Implementation Plans; California; Interstate Transport Requirements for Ozone, Fine Particulate Matter, and Sulfur Dioxide, 83 FR 65093 (December 19, 2018). Under 40 CFR 49.4(a), tribes are not subject to the specific plan submittal and implementation deadlines for NAAQS-related requirements, including deadlines for submittal of plans addressing transport impacts. We also note that California's maximum contribution to a downwind state receptor is 6.31 ppb in Yuma County, Arizona (AQS Site ID 040278011).

[102] 87 FR 31448–31452.

[103] Id. at 31454–31457, 31460.

[104] Id. at 31458–31461.

[105] Id. at 31458.

[106] Id. at 31458–31459.

[107] Id. at 31461.

[108] *See also* id. at 31453.

[109] Id. at 9845.

[110] Id. at 9852–9853.

[111] Id. at 9853–9855.

[112] Id. at 9853.

[113] Id. at 9853–9854.

[114] *See also* id. at 9854.

[115] Id. at 9855.

transport SIP submission for the 2015 ozone NAAQS.

### E. Indiana

In the 2016v3 modeling, Indiana is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to 10 violating-monitor maintenance receptors. Its highest-level contribution is 10.03 ppb to Racine County, Wisconsin (AQS Site ID 551010020). A full summary of Indiana's November 2, 2018, SIP submission was provided in the proposed SIP submission disapproval.[116] The EPA disagrees with Indiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[117] The State did not conduct an adequate Step 3 analysis.[118] The EPA found technical and legal flaws in Indiana's arguments related to ozone concentration and design value trends, the timing of expected source shutdowns, local emissions, international and offshore contributions, Indiana's portion of contribution, and Indiana's back trajectory analysis.[119] The EPA further addresses the topic of international emissions in Section V.C.2. Indiana argued that it would not be cost-effective to implement controls on non-EGUs. However, the State included an insufficient evaluation of additional emissions control opportunities, for any type of source, to support that conclusion.[120] The EPA also confirmed that EGU shutdowns identified by Indiana were included in the 2016v2 modeling,[121] and if they were valid and not included in the 2016v2 modeling, then they were incorporated into the 2016v3 modeling as explained in Section III and the 2016v3 Emissions Modeling TSD. Further, in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements.[122] The State included no permanent and enforceable emissions controls in its SIP submission.[123] We provide further response to comments regarding Indiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Indiana's interstate transport SIP submission for the 2015 ozone NAAQS.

### F. Kentucky

In the 2016v3 modeling, Kentucky is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance-only receptor. Its highest-level contribution based on the 2016v3 modeling is 0.84 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Kentucky's January 11, 2019, SIP submission was provided in the proposed SIP submission disapproval.[124] Although the EPA's 2016v3 modeling indicated a highest-level contribution below 1 ppb, the EPA disagrees with Kentucky's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[125] Further, Kentucky is linked above 1 ppb to a violating-monitor receptor. The EPA addresses the relevance of the PSD SILs in Section V.B.6. The Commonwealth did not conduct an adequate Step 3 analysis.[126] The EPA found technical and legal flaws in Kentucky's arguments related to the level and timing of upwind versus downwind-state responsibilities, $NO_X$ emissions trends and other air quality information, and back-trajectory analyses.[127] The EPA also found technical and legal flaws in certain State-level comments submitted by Midwest Ozone Group and attached to Kentucky's submission, including arguments related to international emissions.[128] The EPA further addresses the topics of international emissions in Section V.C.2. Kentucky in its SIP submission also argued that it had already implemented all cost-effective controls. However, the Commonwealth included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[129] As explained in Section V.B.9., states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[130] The EPA also confirmed in the proposed SIP submission disapproval that EGU shutdowns identified by Kentucky were included in the 2016v2 modeling, and yet Kentucky was still linked in that

modeling.[131] Kentucky in its SIP submission advocated for lower interstate ozone transport responsibility for states linked only to maintenance-only receptors. The EPA finds Kentucky's arguments in this regard inadequately supported.[132] The Commonwealth included no permanent and enforceable emissions controls in its SIP submission.[133] We provide further response to comments regarding Kentucky's SIP submission in the RTC document. The EPA is finalizing disapproval of Kentucky's interstate transport SIP submission for the 2015 ozone NAAQS.

### G. Louisiana

In the 2016v3 modeling, Louisiana is projected to be linked above 1 percent of the NAAQS to two nonattainment receptors and five maintenance-only receptor. It is also linked to 10 violating-monitor maintenance-only receptor. Its highest-level contribution is 9.51 ppb to Galveston County Texas (AQS Site ID 481671034). A full summary of Louisiana's November 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[134] The EPA disagrees with Louisiana's arguments for application of a higher contribution threshold than 1 percent of the NAAQS and disagrees with Louisiana's criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[135] The EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4. Louisiana did not conduct an adequate Step 3 analysis.[136] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[137] The EPA also found technical flaws in Louisiana's "consistent and persistent" claims, assessment of seasonal weather patterns, surface wind directions, and back trajectory analysis.[138] The State included no permanent and enforceable controls in its SIP submission.[139] We provide further response to comments regarding Louisiana's SIP submission in the RTC document. The EPA is finalizing disapproval of Louisiana's interstate transport SIP submission for the 2015 ozone NAAQS.

---

[116] Id. at 9845–9847.
[117] Id. at 9855–9856.
[118] Id. at 9857–9861.
[119] Id. at 9858–9861.
[120] Id. at 9857–9858.
[121] Id. at 9858–9859.
[122] See also id. at 9861.
[123] Id.

[124] 87 FR 9498, 9503–9507 (February 22, 2022).
[125] Id. at 9509–9510.
[126] Id. at 9511–9515.
[127] Id. at 9512–9514.
[128] Id. at 9508, 9515. The state also did not explain its own views regarding the relevance of these materials to its submission. Id.
[129] Id. at 9511–9512.
[130] See also id. at 9512.

[131] Id. at 9511–9512.
[132] Id. at 9514–9515.
[133] Id. at 9515.
[134] Id. at 9811–9812.
[135] Id. at 9812, 9815–9816.
[136] Id. at 9814–9816.
[137] Id. at 9814. 9816.
[138] Id. at 9814–9816.
[139] Id. at 9816.

## H. Maryland

In the 2016v3 modeling, Maryland is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 1.28 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of Maryland's October 16, 2019, SIP submission was provided in the proposed SIP submission disapproval.[140] The state did not conduct an adequate Step 3 analysis.[141] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[142] Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[143] The EPA also confirmed in the proposed SIP submission disapproval that state emissions controls and regulations identified by Maryland were generally included in the 2016v2 modeling, and yet Maryland was still linked in that modeling.[144] The State included no permanent and enforceable controls in its SIP submission.[145] We provide further response to comments regarding Maryland's SIP submission in the RTC document. The EPA is finalizing disapproval of Maryland's interstate transport SIP submission for the 2015 ozone NAAQS.

## I. Michigan

In the 2016v3 modeling, Michigan is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and six maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.59 to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Michigan's March 5, 2019, SIP submission was provided in the proposed SIP submission disapproval.[146] The EPA disagrees with Michigan's arguments for application of a higher contribution threshold than 1 percent of the NAAQS as well as criticisms of a 1 percent of the NAAQS contribution threshold at Step 2.[147] The

EPA further addresses technical comments on the 1 percent of the NAAQS contribution threshold in Section V.B.4 and addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[148] Michigan argued in its SIP submission that additional controls would be premature and burdensome. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[149] The EPA found technical and legal flaws in Michigan's arguments related to upwind-state obligations as to maintenance-only receptors, international emissions, relative contribution, apportionment, and upwind versus downwind-state responsibilities.[150] The EPA further addresses the topics of mobile sources and international emissions in Sections V.C.1 and V.C.2, respectively. The EPA also confirmed in the proposed SIP submission disapproval that the EGU retirements identified by Michigan as not included in the 2011-based EPA modeling, as well as various Federal rules, were included in the 2016v2 modeling, and yet Michigan was still linked in that modeling.[151] The State included no permanent and enforceable emissions controls in its SIP submission.[152] We provide further response to comments regarding Michigan's SIP submission in the RTC document. The EPA is finalizing disapproval of Michigan's interstate transport SIP submission for the 2015 ozone NAAQS.

## J. Minnesota

In the 2016v3 modeling, Minnesota is projected to be linked above 1 percent of the NAAQS to one maintenance-only receptor. It is not linked to a violating-monitor maintenance-only receptor. Its highest-level contribution is 0.85 ppb to Cook County, Illinois (AQS Site ID 170310001). A full summary of Minnesota's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[153] Because Minnesota was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, comments argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. Although

the EPA acknowledges that Minnesota's Step 3 analysis was insufficient in part because the State assumed it was not linked at Step 2, this is ultimately inadequate to support a conclusion that the State's sources do not interfere with maintenance of the 2015 ozone NAAQS in other states in light of more recent air quality analysis.[154] The State included no permanent and enforceable emissions controls in its SIP submission.[155] We provide further response to comments regarding Minnesota's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Minnesota's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Minnesota is not linked to any nonattainment receptors.[156] The EPA is finalizing a partial approval of Minnesota's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## K. Mississippi

In the 2016v3 modeling, Mississippi is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and two maintenance-only receptors. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.32 ppb to Galveston County, Texas (AQS Site ID 481671034). A full summary of Mississippi's September 3, 2019, SIP submission was provided in the proposed SIP submission disapproval.[157] In its submission, Mississippi advocated for discounting receptors through use of historical data trends. The EPA finds Mississippi's approach is not adequately justified.[158] In the 2011-based modeling, Mississippi's contribution to receptors was above 1 percent of the NAAQS, but below 1 ppb. The EPA disagrees with Mississippi's arguments for application of a higher contribution threshold than

---

[140] Id. at 9469.
[141] Id. at 9470–9473.
[142] Id. at 9471, 9473.
[143] See also id. at 9471, 9473 n.46, 9474.
[144] Id. at 9472–9473.
[145] Id. at 9473–9474.
[146] Id. at 9847–9848.
[147] Id. at 9861–9862.

[148] Id. at 9863–9867.
[149] Id. at 9864.
[150] Id. at 9864–9867.
[151] Id. at 9866.
[152] Id. at 9867.
[153] Id. at 9867.

[154] Id. at 9868–9869.
[155] Id. at 9869.
[156] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the state is linked only to a maintenance-only receptor (prong 2). EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these states are receiving partial approvals and partial disapprovals.
[157] 87 FR 9554.
[158] Id. at 9556.

1 percent of the NAAQS at Step 2,[159] and further addresses the relevance of the PSD SILs in Section V.B.6. The state did not conduct a Step 3 analysis.[160] The State included no evaluation of additional emissions control opportunities in its SIP submission.[161] The State included no permanent and enforceable emissions controls in its SIP submission.[162] We provide further response to comments regarding Mississippi's SIP submission in the RTC document. The EPA is finalizing disapproval of Mississippi's interstate transport SIP submission for the 2015 ozone NAAQS.

### L. Missouri

In the 2016v3 modeling, Missouri is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 1.87 ppb to Sheboygan County, Wisconsin (AQS Site ID 551170006). A full summary of Missouri's June 10, 2019, SIP submission was provided in the proposed SIP submission disapproval.[163] In its submission, Missouri advocated for discounting certain maintenance receptors through use of historical data trends. The EPA finds Missouri's approach is not adequately justified.[164] The EPA disagrees with Missouri's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2, and further addresses comments regarding the August 2018 memorandum in Section V.B.7.[165] The State did not conduct a Step 3 analysis.[166] The State included no evaluation of additional emissions control opportunities in its SIP submission.[167] The State included no permanent and enforceable emissions controls in its SIP submission.[168] We provide further response to comments regarding Missouri's SIP submission in the RTC document. The EPA is

finalizing disapproval of Missouri's June 10, 2019, interstate transport SIP submission for the 2015 ozone NAAQS.

### M. Nevada

In the 2016v3 modeling, Nevada is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to one violating-monitor maintenance receptor. Its highest-level contribution is 1.13 ppb to Weber County, Utah (AQS Site ID 490570002). A full summary of Nevada's October 1, 2018, SIP submission was provided in the proposed SIP submission disapproval.[169] Because Nevada was not projected to be linked to any receptor in 2023 in the EPA's 2011-based modeling, commenters on the proposed SIP submission disapproval argued that the EPA must approve the SIP submission and not rely on new modeling. The EPA responds to these comments in Section V.A.4. The EPA also responds to technical criticisms of the 1 percent of the NAAQS contribution threshold and the relevance of the PSD SILs in Section V.B.4 and in Section V.B.6, respectively. The State did not conduct a Step 3 analysis.[170] The State included no evaluation of additional emissions control opportunities in its SIP submission.[171] The State included no additional emissions controls in its SIP submission.[172] We provide response to comments specific to interstate transport policy in the western U.S. in Section V.C.3. We provide further response to comments regarding Nevada's SIP submission in the RTC document. The EPA is finalizing disapproval of Nevada's interstate transport SIP submission for the 2015 ozone NAAQS.

### N. New Jersey

In the 2016v3 modeling, New Jersey is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to three violating-monitor maintenance receptors. Its highest-level contribution is 8.38 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of New Jersey's May 13, 2019, SIP submission was provided in the proposed SIP submission disapproval.[173] The State did not conduct an adequate Step 3 analysis.[174]

New Jersey argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[175] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[176] The State included no permanent and enforceable emissions controls in its SIP submission.[177] We provide further response to comments regarding New Jersey's SIP submission in the RTC document. The EPA is finalizing disapproval of New Jersey's interstate transport SIP submission for the 2015 ozone NAAQS.

### O. New York

In the 2016v3 modeling, New York is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to two violating-monitor maintenance receptors. Its highest-level contribution is 16.10 ppb to Fairfield County, Connecticut (AQS Site ID 090010017). A full summary of New York's September 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[178] The state did not conduct an adequate Step 3 analysis.[179] New York argued in its SIP submission that existing controls were sufficient to address the State's good neighbor obligations. However, the state included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[180] The State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[181] The State included no permanent and enforceable emissions controls in its SIP submission.[182] We provide further response to comments regarding New York's SIP submission in the RTC document. The EPA is finalizing disapproval of New York's interstate transport SIP submission for the 2015 ozone NAAQS.

### P. Ohio

In the 2016v3 modeling, Ohio is projected to be linked above 1 percent of the NAAQS to four nonattainment receptors and five maintenance-only

---

[159] Id. at 9557.
[160] Id. at 9558.
[161] Id.
[162] Id.
[163] Id. at 9538–9540.
[164] Id. at 9540–9541.
[165] See also id. at 9541–9544.
[166] Id. at 9544.
[167] Id.
[168] We note that in comments, Missouri indicated its intent to submit a new SIP submission to the EPA, which would re-evaluate good neighbor obligations based on its 2016v2 linkages and provide an analysis that would include emissions reductions requirements. The EPA received this submission on November 1, 2022. The EPA explains its consideration of this new submission as separate SIP submission in the RTC document for this final action.

[169] 87 FR 31485, 31492–31493 (May 24, 2022).
[170] Id. at 31493.
[171] Id.
[172] Id.
[173] Id. at 9490–9491.
[174] Id. at 9496.

[175] Id.
[176] Id.
[177] Id. at 9496–9497.
[178] Id. at 9489–9490.
[179] Id. at 9492–9494.
[180] Id. at 9493.
[181] Id. at 9493–9494.
[182] Id. at 9494–9495.

receptors. It is also linked to nine violating-monitor maintenance receptors. Its highest-level contribution is 2.05 ppb to Fairfield County, Connecticut (AQS Site ID 090019003). A full summary of Ohio's September 28, 2018, SIP submission was provided in the proposed SIP submission disapproval.[183] In its submission, Ohio advocated for use of the Texas Commission on Environmental Quality (TCEQ)'s definition of maintenance receptors. The EPA finds that TCEQ's definition is legally and technically flawed,[184] and as a result Ohio's approach is also not adequately justified.[185] The EPA further evaluates TCEQ's technical arguments in a TSD prepared by regional modeling staff.[186] The EPA disagrees with Ohio's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[187] The EPA responds to technical criticisms of the 1 percent of the NAAQS contribution threshold in Section V.B.4. The State did not conduct an adequate Step 3 analysis.[188] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[189] The EPA found technical deficiencies in Ohio's unsubstantiated claims that emissions are overestimated.[190] The EPA also confirmed in the proposed SIP submission disapproval that several EGU and non-EGUs identified by Ohio were included in the 2016v2 modeling, and yet Ohio was still linked in that modeling.[191] The EPA summarizes the emissions inventories used in the 2016v3 modeling in Section III.A. Further, as explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[192] The EPA finds legal flaws and deficiencies in Ohio's arguments related to upwind versus downwind-state responsibilities, the role of international emissions, relative contribution, and overcontrol.[193] The EPA discusses international emissions in Section V.C.2. The EPA disagrees with Ohio's arguments related to mobile

sources.[194] We further address this topic in Section V.C.1. Ohio also argued in its SIP submission that it had already implemented all cost-effective controls. However, the state included no evaluation of additional emissions control opportunities to support such a claim.[195] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[196] The State included no permanent and enforceable emissions controls in its SIP submission.[197] We provide further response to comments regarding Ohio's SIP submission in the RTC document. The EPA is finalizing disapproval of Ohio's interstate transport SIP submission for the 2015 ozone NAAQS.

*Q. Oklahoma*

In the 2016v3 modeling, Oklahoma is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and one maintenance-only receptor. It is also linked to eight violating-monitor maintenance receptors. Its highest-level contribution is 1.01 ppb to Denton County, Texas (AQS Site ID 481210034). A full summary of Oklahoma's October 25, 2018, SIP submission was provided in the proposed SIP submission disapproval.[198] In its submission, Oklahoma advocated for use of TCEQ's definition of maintenance receptors and modeling to discount receptors in Texas. The EPA finds that TCEQ's definition is legally and technically flawed[199] and, as a result, Oklahoma's approach is also not adequately justified.[200] The EPA further evaluates TCEQ's technical arguments in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal TSD (Evaluation of TCEQ Modeling TSD) prepared by regional modeling staff.[201] Comments argued against the use of updated modeling where linkages in the EPA's 2011-based modeling and later iterations of EPA modeling differ. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP disapproval,[202] and further responds to comments on the use of updated modeling in Section V.A.4. The EPA disagrees with Oklahoma's arguments for application of a higher contribution

threshold than 1 percent of the NAAQS at Step 2[203] and further addresses comments regarding the relevance of the PSD SILs in Section V.B.6. The State did not conduct an adequate Step 3 analysis.[204] Oklahoma argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of additional emissions control opportunities to support such a conclusion.[205] As explained in Section V.B.9, states may not rely on non-SIP measures to meet SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[206] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for the more protective 2015 ozone NAAQS.[207] The EPA finds legal flaws in Oklahoma's argument related to collective contribution.[208] The State included no permanent and enforceable emissions controls in its SIP submission.[209] We provide further response to comments regarding Oklahoma's SIP submission in the RTC document. The EPA is finalizing disapproval of Oklahoma's interstate transport SIP submission for the 2015 ozone NAAQS.

*R. Texas*

In the 2016v3 modeling, Texas is projected to be linked above 1 percent of the NAAQS to one nonattainment receptor and nine maintenance-only receptors. It is also linked to ten violating-monitor maintenance-only receptor. Its highest-level contribution is 4.74 ppb to Dona Ana County, New Mexico (AQS Site ID 350130021). A full summary of Texas's August 17, 2018, SIP submission was provided in the proposed SIP submission disapproval,[210] and additional details were provided in the Evaluation of TCEQ Modeling TSD. The EPA identified several technical flaws in TCEQ's modeling and analysis of modeling results.[211] In its submission, Texas advocated for use of its own definition of maintenance receptors and modeling. The EPA finds Texas's approach inadequately justified and

[183] Id. at 9849–9851.
[184] Id. at 9826–9829.
[185] Id. at 9869–9870.
[186] 2015 8-Hour Ozone Transport SIP Proposal TSD, in Docket ID No. EPA–R06–OAR–2021–0801 (hereinafter Evaluation of TCEQ Modeling TSD).
[187] Id. at 9871.
[188] Id. at 9871–9875.
[189] Id. at 9871–9875.
[190] Id. at 9872.
[191] Id.
[192] *See also* id. at 9874–9875.
[193] Id. at 9873–9874.

[194] Id.
[195] Id. at 9872–9873.
[196] Id. at 9874.
[197] Id. at 9875.
[198] Id. at 9816–9818.
[199] Id. at 9826–9829.
[200] Id. at 9820–9822.
[201] Evaluation of TCEQ Modeling TSD in Docket ID No. EPA–R06–OAR–2021–0801.
[202] 87 FR 9823.

[203] Id. at 9819.
[204] Id. at 9822–9824.
[205] Id. at 9822–9824.
[206] *See also* id. at 9822–9823.
[207] Id.
[208] Id. at 9823.
[209] Id. at 9824.
[210] Id. at 9824–9826.
[211] Id. at 9829–9830; Evaluation of TCEQ Modeling TSD.

legally and technically flawed.[212] The EPA further evaluated TCEQ's technical arguments in the Evaluation of TCEQ Modeling TSD. In comment on the proposal, Texas pointed to differences in linkages in the EPA's 2011-based modeling and 2016v2 modeling. The EPA addressed the change in identified linkages between the 2011-based modeling and the 2016v2 modeling in the proposed SIP submission disapproval,[213] and further responds to comments on the use of updated modeling in Section V.A.4. The State did not conduct an adequate Step 3 analysis.[214] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[215] The EPA found technical flaws in Texas's arguments related to ''consistent and persistent'' claims and its other assessments, including analysis of back trajectories.[216] The State included no permanent and enforceable emissions controls in its SIP submission.[217] We provide further response to comments regarding Texas's SIP submission in the RTC document. The EPA is finalizing disapproval of Texas's interstate transport SIP submission for the 2015 ozone NAAQS.

*S. Utah*

In the 2016v3 modeling, Utah is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.29 ppb to Douglas County, Colorado (AQS Site ID 080350004). A full summary of Utah's January 29, 2020, SIP submission was provided in the proposed SIP submission disapproval.[218] In its submission, Utah argued that certain receptors in Colorado should not be counted as receptors for the purpose of 2015 ozone NAAQS interstate transport, but Utah's explanation is insufficient to discount those receptors.[219] The EPA disagrees with Utah's arguments for application of a higher contribution threshold than 1 percent of the NAAQS at Step 2.[220] Utah suggested in its SIP submission that interstate transport is fundamentally different in the western U.S. than in the

eastern U.S., an argument we have previously rejected and respond to further in Section V.C.3.[221] The State did not conduct an adequate Step 3 analysis.[222] The State included an insufficient evaluation of additional emissions control opportunities in its SIP submission.[223] The EPA finds technical and legal flaws in the State's arguments related to relative contribution, international and non-anthropogenic emissions, and the relationship of upwind versus downwind-state responsibilities.[224] The EPA further addresses the topics of international emissions in Section V.C.2 and wildfires in the RTC document. The EPA also confirmed in the proposed SIP submission disapproval that several anticipated controls identified by Utah were included in the 2016v2 modeling, and yet Utah was still linked in that modeling.[225] The State included no permanent and enforceable emissions controls in its SIP submission.[226] We provide further response to comments regarding Utah's SIP submission in the RTC document. The EPA is finalizing disapproval of Utah's interstate transport SIP submission for the 2015 ozone NAAQS.

*T. West Virginia*

In the 2016v3 modeling, West Virginia is projected to be linked above 1 percent of the NAAQS to three nonattainment receptors and one maintenance-only receptor. It is also linked to four violating-monitor maintenance receptors. Its highest-level contribution is 1.49 ppb to New Haven County, Connecticut (AQS Site ID 090099002). A full summary of West Virginia's February 4, 2019, SIP submission was provided in the proposed SIP submission disapproval.[227] The EPA finds technical and legal flaws in the State's examination of back trajectories and arguments related to mobile sources and international emissions.[228] The EPA further addresses the topics of mobile sources and international emissions in Section V.C.1 and in Section V.C.2, respectively. The State did not conduct an adequate Step 3 analysis.[229] West Virginia argued in its SIP submission that it had already implemented all cost-effective controls. However, the State included an insufficient evaluation of

additional emissions control opportunities to support such a conclusion.[230] The EPA also confirmed in the proposed SIP submission disapproval that specific EGU shutdowns identified by West Virginia were included in the 2016v2 modeling, which continued to show West Virginia was linked at Step 2.[231] As explained in Section V.B.9, a state may not rely on non-SIP measures to satisfy SIP requirements, and reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[232] Further, the State's reliance on the cost-effectiveness threshold in the CSAPR Update is insufficient for a more protective NAAQS.[233] The State included no permanent and enforceable emissions controls in its SIP submission.[234] We provide further response to comments regarding West Virginia's SIP submission in the RTC document. The EPA is finalizing disapproval of West Virginia's interstate transport SIP submission for the 2015 ozone NAAQS.

*U. Wisconsin*

In the 2016v3 modeling, Wisconsin is projected to be linked above 1 percent of the NAAQS to three maintenance-only receptors. It is also linked to five violating-monitor maintenance receptors. Its highest-level contribution is 2.86 ppb to Cook County, Illinois (AQS Site ID 170314201). A full summary of Wisconsin's September 14, 2018, SIP submission was provided in the proposed SIP submission disapproval.[235] The State did not assess in its SIP submission whether the state was linked at Step 2,[236] and did not conduct an adequate Step 3 analysis.[237] The State included an insufficient evaluation of additional emissions control opportunities.[238] Further, as explained in Section V.B.9, reliance on prior transport FIPs such as the CSAPR Update is not a sufficient analysis at Step 3.[239] The EPA found additional inadequacies and legal flaws in Wisconsin's disagreement.[240] The State included no permanent and enforceable emissions controls in its SIP submission.[241] We provide further response to comments regarding

---

[212] 87 FR 9826–9829.

[213] Id. at 9831.

[214] Id. at 9831–9834.

[215] Id. at 9831, 9834.

[216] Id. at 9832–9833, Evaluation of TCEQ Modeling TSD.

[217] 87 FR 9834.

[218] Id. at 31475–31477.

[219] Id. at 31480–31481.

[220] Id. at 31478.

[221] *See also* id. at 31479–31481, 31482.

[222] Id. at 31481–31483.

[223] Id. at 31482

[224] Id. at 31481–31483.

[225] Id. at 31483.

[226] Id.

[227] Id. at 9522–9524.

[228] Id. at 9526–9527, 9528.

[229] Id. at 9527–9532.

[230] Id. at 9528–9529.

[231] Id. at 9529–9530.

[232] *See also* id. at 9530–9532.

[233] Id. at 9531.

[234] Id. at 9532.

[235] Id. at 9851.

[236] Id. at 9875.

[237] Id. at 9875–9876.

[238] Id. at 9876.

[239] *See also* id.

[240] Id.

[241] Id. at 9876–9877.

Wisconsin's SIP submission in the RTC document. Although EPA proposed to disapprove both prong 1 and prong 2 of Wisconsin's SIP submission, the present record, including the results of the 2016v3 modeling, indicates that Wisconsin is not linked to any nonattainment receptors.[242] The EPA is finalizing a partial approval of Wisconsin's interstate transport SIP submission for the 2015 ozone NAAQS as to prong 1 and a partial disapproval as to prong 2.

## V. Response to Key Comments

The EPA received numerous comments on the proposed action which are summarized in the RTC document along with the EPA's responses to those comments in Docket ID No. EPA–HQ–OAR–2021–0663. Each comment in its entirety is available in the relevant regional docket(s) for this action.[243] The following sections summarize key comments and the EPA's responses.

### A. SIP Evaluation Process

1. Relationship Between Timing of Proposals To Disapprove SIPs and Promulgate FIPs

*Comment:* Comments alleged generally that the timing of the EPA's proposed actions on the SIP submissions in relation to proposed FIPs was unlawful, unfair, or both. Some comments claimed that the sequence of the EPA's actions is improper, unreasonable, or bad policy. Several commenters asserted that because the EPA proposed FIPs (or, according to some, promulgated FIPs, which is not factually correct) prior to finalizing disapproval of the state SIP submission, the EPA allegedly exceeded its statutory authority and overstepped the states' primary role in addressing the good neighbor provision under CAA section 110.[244]

*EPA Response:* The EPA disagrees. The EPA has followed the Clean Air Act provisions, which prescribe specified maximum amounts of time for states to make SIP submissions, for the EPA to act on those submissions, and for the EPA to promulgate FIPs if necessary, but do not prohibit the EPA from acting before that time elapses. Nothing relieves the EPA from its statutory obligation to take final action on complete SIP submissions before the Agency within the timeframes prescribed by the statute.[245] The EPA's proposed FIP does not constitute the ''promulgation'' of a FIP because the proposed FIP is not a final action that imposes any requirements on sources or states. And although the EPA's FIP authority is not at issue in this action, the EPA notes the Agency has been clear that it will not finalize a FIP for any state until predicate authority is established for doing so under CAA section 110(c)(1). 87 FR 20036, 20057 (April 6, 2022) (''The EPA is proposing this FIP action now to address twenty-six states' good neighbor obligations for the 2015 ozone NAAQS, but the EPA will not finalize this FIP action for any state unless and until it has issued a final finding of failure to submit or a final disapproval of that state's SIP submission.''). The EPA strongly disagrees that *proposing* a FIP prior to proposing or finalizing disapproval of a SIP submission oversteps the Agency's authority. Indeed, the ability to propose a FIP before finalizing a SIP disapproval follows ineluctably from the structure of the statute, which, as the Supreme Court recognized in *EME Homer City,* does not oblige the EPA ''to wait two years or postpone its [FIP] action even a single day.'' 572 U.S. at 509. If the EPA can finalize a FIP immediately upon disapproving a SIP, then surely the EPA must have the authority to propose that FIP before taking final action on the SIP submission. *Accord Oklahoma* v. *U.S.*

*EPA,* 723 F.3d 1201, 1223 (10th Cir. 2013).

It is true that the EPA would not be legally authorized to *finalize* a FIP for any state unless and until the EPA formally *finalizes* a disapproval of that state's SIP submission (or makes a finding of failure to submit for any state that fails to make a complete SIP submission), per CAA section 110(c), but the EPA has not yet finalized a FIP for any state for good neighbor obligations for the 2015 ozone NAAQS. Further, the sequencing of our actions here is consistent with the EPA's past practice in our efforts to timely address good neighbor obligations. For example, at the time the EPA proposed the CSAPR Update FIPs in December of 2015, we had not yet proposed action on several states' SIP submissions but finalized those SIP disapproval actions prior to finalization of the FIP.[246]

Additional comments on cooperative federalism are addressed in Section V.B.5.

Further, The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone ''as expeditiously as practical'' and in no event later than the next relevant downwind attainment dates found in CAA section 181(a),[247] and states and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[248] It is important for the states and the EPA to assure that necessary emissions reductions are achieved, to the extent feasible, by the 2023 ozone season to assist downwind areas with meeting the August 3, 2024, attainment deadline for Moderate nonattainment areas. Further, the D.C. Circuit in *Wisconsin* emphasized that the EPA has the authority under CAA section 110 to structure its actions so as to ensure necessary reductions are achieved by the downwind attainment

---

[242] The EPA received a comment that it would be arbitrary and capricious for the EPA to finalize a full disapproval of Tennessee's good neighbor SIP submission (both prong 1 and prong 2) if EPA concluded the State is linked only to a maintenance-only receptor (prong 2).The EPA is deferring final action on Tennessee's good neighbor SIP submission, but in reviewing linkages in the 2016v3 modeling we determined that Minnesota and Wisconsin are not linked above 1 percent of the NAAQS to any nonattainment receptors (prong 1) but are linked to maintenance-only receptors (prong 2); these States are receiving partial approvals and partial disapprovals.

[243] *See* the memo ''Regional Dockets Containing Additional Supporting Materials for Final Action on 2015 Ozone NAAQS Good Neighbor SIP Submissions'' in the docket for this action, for a list of all regional dockets.

[244] The EPA notes the commenters' reference to FIPs is to proposed good neighbor FIPs for the 2015 ozone NAAQS that were proposed separately from this rulemaking action. 87 FR 20036 (April 6, 2022).

[245] Although the EPA anticipates responding to comments related to the EPA's FIP authority in a separate FIP rulemaking, the EPA notes with regard to the procedural timing concerns raised in comments on this action that the Supreme Court confirmed in *EME Homer City Generation,* ''EPA is not obliged to wait two years or postpone its action even a single day: The Act empowers the Agency to promulgate a FIP 'at any time' within the two-year limit.'' 572 U.S. 489 at 509. The procedural timeframes under CAA section 110 do not function to establish a norm or expectation that the EPA must or should use the full amount of time allotted, particularly when doing so would place the Agency in conflict with the more ''central'' statutory objective of meeting the NAAQS attainment deadlines in the Act. *EME Homer City,* 572 U.S. 489, 509 (2014). *See also Wisconsin,* 938 F.3d at 318, 322; *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002) (*Sierra Club*).

[246] The proposed CSAPR Update was published on December 3, 2015, and included proposed FIPs for Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin. 80 FR 75705. At that time, the EPA had not yet even proposed action on good neighbor SIP submissions for the 2008 ozone NAAQS from Indiana, Louisiana, New York, Ohio, Texas, and Wisconsin; however, the EPA subsequently proposed and finalized these disapprovals before finalizing the CSAPR Update FIPs, published on October 26, 2016 (81 FR 74504). *See* 81 FR 38957 (June 15, 2016) (Indiana); 81 FR 53308 (August 12, 2016) (Louisiana); 81 FR 58849 (August 26, 2016) (New York); 81 FR 38957 (June 15, 2016) (Ohio); 81 FR 53284 (August 12, 2016) (Texas); 81 FR 53309 (August 12, 2016) (Wisconsin).

[247] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12.

[248] *See Wisconsin,* 938 F.3d at 320.

dates,[249] the next of which for the 2015 ozone NAAQS is now the Moderate area attainment date of August 3, 2024.[250] The court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural whereas the attainment schedule is "central to the regulatory scheme[.]"[251] Thus, the sequence and timing of the EPA's action in disapproving these SIP submissions is informed by the need to ensure that any necessary good neighbor obligations identified in the separate FIP rulemaking are implemented as expeditiously as practicable and no later than the next attainment date. As explained in our proposed disapproval, analysis (and, if possible, implementation) of good neighbor obligations should begin in the 2023 ozone season. *See, e.g.,* 87 FR 9798, 9801–02 (Feb. 22, 2022). Indeed, states' and the EPA's analysis would have been more appropriately aligned with 2020, rather than 2023 (as had been presented in the EPA's March 2018 memorandum[252]), corresponding with the 2021 Marginal area attainment date. However, that clarification in legal obligations was not established by case law until 2020. *See Maryland,* 958 F.3d at 1203–04.

In short, nothing in the language of CAA section 110(c) prohibits the EPA from proposing a FIP as a backstop, to be finalized and implemented only in the event that a SIP submission is first found to be deficient and final disapproval action on the SIP submission is taken. Such an approach is a reasonable and prudent means of assuring that the statutory obligation to reduce air pollution affecting the health and welfare of those living in downwind states is implemented without delay, either via a SIP, or where such plan is deficient, via a FIP. The sequencing of the EPA's actions here is therefore reasonably informed by its legal obligations under the CAA, including in recognition of the fact that the implementation of necessary emissions reductions to eliminate

significant contribution and thereby protect human health and welfare is already several years delayed. The EPA shares additional responses related to the timing of 2015 ozone NAAQS good neighbor actions in Section V.A.

*Comment:* Some comments allege the EPA is depriving States of the opportunity to target specific emissions reductions opportunities, or the opportunity to revise their submissions at any point in the future.

*EPA Response:* The EPA disagrees. The EPA has repeatedly emphasized that states have the freedom at any time to develop a revised SIP submission and submit that to the EPA for approval, and this remains true. *See* 87 FR 20036, 20051 (April 6, 2022); 86 FR 23054, 23062 (April 30, 2021); 81 FR 74504, 74506 (Oct. 26, 2016). In the proposed FIPs, as in prior transport actions, the EPA discusses a number of ways in which states could take over or replace a FIP, *see* 87 FR 20036, 20149–51 (Section VII.D: "Submitting A SIP"); *see also id.* at 20040 (noting as one purpose in proposing the FIP that "this proposal will provide states with as much information as the EPA can supply at this time to support their ability to submit SIP revisions to achieve the emissions reductions the EPA believes necessary to eliminate significant contribution"). If, and when, the EPA receives a SIP submission that satisfies the requirements of CAA section 110(a)(2)(D)(i)(I), the Agency will take action to approve that SIP submission.

*Comment:* Some commenters assert that the EPA is disapproving SIP submissions for the sole purpose of pursuing an alleged objective of establishing nation-wide standards in FIPs. Other commenters point to the proposed FIPs to make arguments that the EPA's decision to finalize disapproval of the SIPs is an allegedly foregone conclusion or that the EPA has allegedly failed to provide the opportunity for meaningful public engagement on the proposed disapproval of the SIPs.

*EPA Response:* The EPA disagrees as the facts do not support this assertion. To date, the EPA has approved 24 good neighbor SIPs for the 2015 ozone NAAQS: Alaska,[253] Colorado,[254] Connecticut,[255] Delaware,[256] District of Columbia,[257] Florida,[258] Georgia,[259]

Hawaii,[260] Idaho,[261] Iowa,[262] Kansas,[263] Maine,[264] Massachusetts,[265] Montana,[266] Nebraska,[267] New Hampshire,[268] North Carolina,[269] North Dakota,[270] Oregon,[271] Rhode Island,[272] South Carolina,[273] South Dakota,[274] Vermont,[275] and Washington.[276]

The policy judgments made by the EPA in all actions on 2015 ozone NAAQS good neighbor SIP submissions, including approval actions, reflect consistency with relevant good neighbor case law and past agency practice implementing the good neighbor provision as reflected in the original CSAPR, CSAPR Update, Revised CSAPR Update, and related rulemakings. Employing a nationally consistent approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport dating back to the $NO_X$ SIP Call [63 FR 57356 (October 27, 1998)] have necessitated the application of a uniform framework of policy judgments to ensure an "efficient and equitable" approach. *See EME Homer City,* 572 U.S. at 519. In any case, the approach of the proposed transport FIP is not the subject of this SIP disapproval. This rulemaking does not impose any specific emissions control measures on the states. Nor is the EPA disapproving these SIP submittals because they did not follow exactly the control strategies in the proposed FIP—the EPA has repeatedly indicated openness to alternative approaches to addressing interstate pollution obligations, but for reasons explained elsewhere in the rulemaking record, the EPA finds that none of the states included in this action submitted approvable approaches to addressing those obligations.

The EPA disputes the contentions that the FIP proposal itself indicates that the EPA did not earnestly examine the SIP submissions for compliance with the CAA or have an appropriate rationale

---

[249] *Wisconsin,* 938 F.3d at 318 ("When EPA determines a State's SIP is inadequate, the EPA presumably must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory timeframe gives the EPA more time to formulate the FIP.") (citing *Sierra Club,* 294 F.3d at 161).

[250] *See* CAA section 181(a); 40 CFR 51.1303; Additional Area Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[251] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and, therefore, not 'central to the regulatory scheme.'") (citing *Sierra Club,* 294 F.3d at 161).

[252] *See* March 2018 memorandum.

[253] 84 FR 69331 (December 18, 2019).
[254] 87 FR 61249 (October 11, 2022).
[255] 86 FR 71830 (December 20, 2021).
[256] 85 FR 25307 (May 1, 2020).
[257] 85 FR 5570 (January 31, 2020).
[258] 86 FR 68413 (December 2, 2021).
[259] Id.

[260] 86 FR 73129 (December 27, 2021).
[261] 85 FR 65722 (October 16, 2020).
[262] 87 FR 22463 (April 15, 2022).
[263] 87 FR 19390 (April 4, 2022).
[264] 86 FR 45870 (August 17, 2021).
[265] 85 FR 5572 (January 31, 2020).
[266] 87 FR 21578 (April 12, 2022).
[267] 85 FR 21325 (April 17, 2020).
[268] 86 FR 45870 (August 17, 2021).
[269] 86 FR 68413 (December 2, 2021).
[270] 85 FR 20165 (April 10, 2020).
[271] 84 FR 22376 (May 17, 2019).
[272] 86 FR 70409 (December 10, 2021).
[273] 86 FR 68413 (December 2, 2021).
[274] 85 FR 67653 (October 26, 2021).
[275] 85 FR 34357 (June 4, 2020).
[276] 83 FR 47568 (September 20, 2018).

for proposing to disapprove certain SIP submissions. The EPA also disputes that the FIP proposal indicates that the EPA did not intend to consider comments on the proposed disapprovals. Comments making claims the EPA did not follow proper administrative procedure have been submitted utilizing the very notice and comment process these comments claim the EPA is skipping, and these claims are factually unsupported. Comments related to the length of the comment period and claims of "pretext" are addressed in the RTC document.

*Comment:* Several comments pointed out how hard many states have worked to develop an approvable SIP submission.

*EPA Response:* The EPA acknowledges and appreciates states' efforts to develop approvable SIPs. Cooperative federalism is a cornerstone of CAA section 110, and the EPA strives to collaborate with its state partners. The timing of the EPA's 2015 ozone NAAQS good neighbor actions is not in any way intended to call into question any state's commitment to develop approvable SIPs. The EPA evaluated each SIP submission on its merits. The EPA relies on collaboration with state air agencies to ensure SIP submissions are technically and legally defensible, and the Agency's action here is in no way meant to undermine that collaboration between state and Federal partners respecting SIP development.

*Comment:* Several comments make various arguments about when the EPA can finalize FIPs. Some commenters argue that CAA section 110(c)(1) guarantees states an additional two years to correct their SIP submissions before the EPA finalizes a FIP. Others argue that the notice and comment requirements of the Administrative Procedures Act mandate that the EPA finalize a SIP submission disapproval before proposing a FIP. One commenter suggested that a state must be allowed to fully exhaust its judicial remedies to challenge a SIP submission disapproval before the EPA can promulgate a FIP. Commenters also raise concerns about the analysis and requirements in the proposed FIPs.

*EPA Response:* Comments opining on when the EPA is legally authorized to propose or finalize a FIP are outside the scope of this action. While the EPA acknowledges that the Agency has no obligation or authority to finalize a FIP until finalizing a disapproval of a SIP submission or determining that a state failed to submit a complete SIP submission (CAA section 110(c)(1)), this action is limited to determining whether the covered SIP submissions meet the requirements of CAA section

110(a)(2)(D)(i)(I). For the same reason, comments criticizing specific substantive requirements or implementation timelines in the proposed FIPs are beyond the scope of this action.

### 2. Requests for Additional Time To Revise SIP Submissions

*Comment:* Some commenters argue that the EPA must or should delay action on these SIP submissions so that states can reexamine and resubmit SIP submissions. Other commenters argue that states must be given more time to re-examine and resubmit their SIP submission for various reasons, including the substantive requirements in the proposed FIPs.

*EPA Response:* The EPA notes that there is no support in the Clean Air Act for such a delay. CAA section 110(a)(1) requires states to adopt and submit SIP submissions meeting certain requirements including the requirements of CAA section 110(a)(2)(D)(i)(I), "within 3 years (or such shorter period as the Administrator prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof)." CAA section 110(a)(1). The submission deadline clearly runs from the date of promulgation of the NAAQS, which for the 2015 ozone NAAQS was October 1, 2015. 80 FR 65291 (Oct. 26, 2015). In addition, while the Administrator is given authority to prescribe a period shorter than three years for the states to adopt and submit such SIP submissions, the Act does not give the Administrator authority to lengthen the time allowed for CAA section 110(a)(2) submissions. And the EPA would be in violation of court-ordered deadlines if it deferred taking final action beyond January 31, 2023, for all but two of the states covered by this action.[277]

Comments asserting that the EPA must give more time to states to correct deficiencies and re-submit conflict with the controlling caselaw in that they would elevate the maximum timeframes allowable within the procedural framework of CAA section 110 over the attainment schedule of CAA section 181 that the D.C. Circuit has now held multiple times must be the animating focus in the timing of good neighbor obligations. The D.C. Circuit in *Wisconsin* held that states and the EPA are obligated to fully address good neighbor obligations for ozone "as expeditiously as practical" and in no

event later than the next relevant downwind attainment dates found in CAA section 181(a),[278] and the EPA may not delay implementation of measures necessary to address good neighbor requirements beyond the next applicable attainment date without a showing of impossibility or necessity.[279] Further, the court pointed out that the CAA section 110 schedule of SIP and FIP deadlines is procedural, and while the EPA has complied with the mandatory sequence of actions required under section 110 here, we are mindful of the court's observation that, as compared with the fundamental substantive obligations of title I of the CAA to attain and maintain the NAAQS, the maximum timeframes allotted under section 110 are less "central to the regulatory scheme[.]"[280]

*Comment:* Other comments take the position that states are owed a second opportunity to submit SIP submissions before the EPA takes final action for various reasons, including claims that the EPA failed to issue adequate guidance or is otherwise walking back previously issued guidance. They allege that a state cannot choose controls to eliminate significant contribution until the EPA quantifies the contribution. Other comments argue that the EPA should not or cannot base the disapprovals on alleged shifts in policy that occurred after the Agency received the SIP submissions.

*EPA Response:* The EPA disagrees that the Agency was required to issue guidance or quantify individual states' level of significant contribution for 2015 ozone NAAQS good neighbor obligations, because as noted in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[281] The Agency issued three memoranda in 2018 to provide modeling results and some ideas to states in the development of their SIP submissions. However, certain aspects of those discussions were specifically

---

[277] The EPA has no court-ordered deadline to take final action on the good neighbor SIP submission from Alabama dated June 21, 2022, or Utah's good neighbor SIP submission.

[278] *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12). On May 19, 2020, the D.C. Circuit in *Maryland,* applying the *Wisconsin* decision, held that the EPA must assess air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland,* 958 F.3d at 1203–04.

[279] *See Wisconsin,* 938 F.3d at 320.

[280] *Wisconsin,* 938 F.3d at 322 ("Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.'") (citing *Sierra Club,* 294 F.3d at 161).

[281] *EME Homer City,* 572 U.S. at 510.

identified as not constituting agency guidance (especially Attachment A to the March 2018 memorandum, which comprised an unvetted list of outside stakeholders' ideas). Further, states' submissions did not meet the terms of the August or October 2018 memoranda addressing contribution thresholds and maintenance receptors, respectively. (*See* Section V.B for further discussion of these memoranda.) We acknowledge that the EPA reassessed air quality and states' contribution levels through additional modeling before proposing action on these SIP submissions. But that is not in any way an effort to circumvent the SIP/FIP process; rather it is an outcome of the reality that the EPA updated its modeling platform from a 2011 to a 2016 base year and updated its emissions inventory information along with other updates. There is nothing improper in the Agency improving its understanding of a situation before taking action, and the Agency reasonably must be able to act on SIP submissions using the information available at the time it takes such action. Those updates have not uniformly been used to disapprove SIPs—the new modeling for instance supported the approval of Montana's and Colorado's SIPs.[282] Nor has the new modeling prevented states from submitting new SIP submissions based on that modeling. For instance, the State of Alabama withdrew its prior submission in April of 2022, following our proposed disapproval, and submitted a new submission (further updated in June of 2022) analyzing the 2016v2 modeling used at proposal. The EPA is acting on that new submission and evaluating the new arguments the State developed regarding the more recent modeling. Nonetheless, as explained in the EPA's proposed disapproval of Alabama's new submission and in Section IV.A, the new arguments that Alabama has presented in its more recent submission do not lead the EPA to a contrary conclusion that its SIP submission should be approved.[283] This demonstrates two points contrary to commenters' contentions: first, the EPA is following the science and is making nationally consistent determinations at Steps 1 and 2, based on its review of each state's submission; and second, the fact that states made submissions based on the 2011-based modeling results presented in the March 2018

memorandum rather than on the most recent modeling results is not prejudicial to the outcome of the EPA's analysis, as our action on Alabama's more recent submission evaluating the State's arguments with respect to the newer, 2016-based modeling makes clear.

Contrary to commenters' arguments, the EPA had no obligation to issue further guidance, define obligations, or otherwise clarify or attempt to interpret states' responsibilities since the issuance of the 2018 memoranda, prior to acting on these SIP submissions. States themselves were aware or should have been aware of the case law developments in *Wisconsin* and in *Maryland*, which called into question the EPA's use of 2023 as the analytical year in the March 2018 memorandum. Those decisions were issued in 2019 and 2020 respectively, yet no state moved to amend or supplement their SIP submissions with analysis of an earlier analytical year or to otherwise bring their analyses into conformance with those decisions (*e.g.*, through fuller analysis of non-EGU emissions reduction potential or through treatment of international contribution). Given the Supreme Court's 2014 holding in *EME Homer City*, 572 U.S. at 508–510, which reversed a D.C. Circuit holding that the EPA *was* obligated to define good neighbor obligations,[284] states had no reason to expect the EPA would be obligated to issue further guidance to clarify requirements in the wake of those decisions. The EPA agrees with those commenters who point out that states have the first opportunity to assess and address obligations in implementing the NAAQS, but with that understanding in mind, it is notable that prior to the proposed disapprovals in February of 2022, no state moved to amend or supplement their SIP submission as the case law on good neighbor obligations evolved or in response to new modeling information as it became available.

Further, the EPA has evaluated state SIP submissions on the merits of what is contained in the submission, not the use of any particular modeling platform. The EPA disagrees with commenters' assertions that the EPA has proposed disapproval of a state's proposed SIP due to the use of a particular modeling platform. As noted previously, the EPA approved state SIP submissions that have used the earlier modeling. The EPA did not reach its conclusion to disapprove states' SIP submissions based on the use of the 2016v2

emissions platform standing alone. Use of that platform, or any other modeling platform, is not *ipso facto* grounds for disapproval at all. As evident in the proposed disapprovals and summarized in Section IV, the EPA evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission.

3. Alleged Harm to States Caused by Time Between SIP Submission and the EPA's Action

*Comment:* Many comments pointed to the EPA's statutory deadlines to take action on the SIP submissions to argue that the EPA's delay harmed the upwind state's interests because now the EPA may conclude they need to reduce their emissions to satisfy their good neighbor obligations in the separate FIP rulemaking whereas had the EPA acted by statutory deadlines using the older modeling, they might have had their SIP submissions approved. Some commenters suggest that the EPA never gave the state SIP submissions the appropriate review or suggest that the EPA's review of the SIP submissions was prejudiced by the FIP it had proposed.

*EPA Response:* The EPA acknowledges that the Agency's statutory deadlines to take final action on these SIP submissions generally fell in 2020 and 2021. However, the delay in acting caused no prejudice to the upwind states. First, this action to disapprove SIP submissions itself will not impose any requirements or penalties on any state or sources within that state. Second, these delays have primarily had the effect of deferring relief to downwind states and their citizens from excessive levels of ozone pollution under the good neighbor provision. Further, the EPA has generally had a practice of correcting its action on good neighbor SIP submittals if later information indicates that a prior action was in error—thus, it is not the case that simply having obtained an approval based on earlier modeling would have meant a state would be forever insulated from later being subject to corrective or remedial good neighbor actions. *See, e.g.,* 86 FR 23056, 23067–68 (April 30, 2021) (error correcting Kentucky's approval to a disapproval and promulgating FIP addressing Kentucky's outstanding 2008 ozone NAAQS good neighbor obligations); 87 FR 20036, 20041 (April 6, 2022) (proposing error correction for Delaware's 2015 ozone NAAQS SIP approval to a disapproval based on updated air quality modeling). Finally, there is no basis in the CAA to use the Agency's own delay as a basis to nullify

---

[282] 87 FR 6095, 6097 at n. 15 (February 3, 2022) (Montana proposal); 87 FR 27050, 27056 (May 6, 2022) (Colorado, proposal), 87 FR 61249 (October 11, 2022) (Colorado, final).

[283] 87 FR 64412 (October 25, 2022).

[284] *EME Homer City Generation, L.P.* v. *EPA*, 696 F.3d 7 (D.C. Cir. 2012) (*EME Homer City I*).

the authority granted in the Act to address the nation's air pollution problems, as the statute itself contains other forms of adequate remedy. CAA section 304(a)(2) provides for judicial recourse where there is an alleged failure by the agency to perform a nondiscretionary duty, and that recourse is for the Agency to be placed on a court-ordered deadline to address the relevant obligations. *Accord Oklahoma,* 723 F.3d at 1223–24; *Montana Sulphur and Chemical Co.* v. *U.S. EPA,* 666 F.3d 1174, 1190–91 (9th Cir. 2012).

*Comment:* Some comments contend that the EPA's delay in acting on SIP submissions was a deliberate attempt to circumvent the SIP/FIP process, unduly burden the states, or to defer making information available to states. Comments allege that the EPA intentionally stalled an evaluative action until the perceived "facts" of the situation changed such that the analyses submitted by states were rendered outdated.

*EPA Response:* The EPA disagrees with both allegations. In this respect, it is important to review the recent history of the EPA's regulatory actions and litigation with respect to good neighbor obligations for both the 2008 and 2015 ozone NAAQS, and in particular, the substantial additional workload the Agency took on in the wake of the remand of the CSAPR Update in *Wisconsin.* In 2018, as the EPA issued the memoranda cited by commenters and planned to shift its focus to implementing the 2015 standards, it also issued the CSAPR Close-out, which made an analytical finding that there were no further obligations for 21 states for the 2008 standards following the CSAPR Update. 83 FR 65878 (Dec. 21, 2018). However, contrary to the EPA's understanding that it had fully addressed good neighbor obligations for the 2008 ozone NAAQS, the D.C. Circuit's decisions in *Wisconsin* (remanding the CSAPR Update) and in *New York* (vacating the CSAPR Close-out), forced the Agency to quickly pivot back to addressing remaining obligations under the 2008 standards. *Wisconsin* v. *EPA,* 938 F.3d 303 (D.C. Cir. 2019); *New York* v. *EPA,* 781 F. App'x 4 (D.C. Cir. 2019). The EPA was subject to renewed deadline suit litigation under CAA section 304, which led to a March 15, 2021, deadline to take final action on several states whose FIPs had been remanded and were incomplete in the wake of the CSAPR Close-out vacatur. *New Jersey* v. *Wheeler,* 475 F.Supp.3d 308 (S.D.N.Y. 2020). Throughout 2020 and 2021, the EPA was therefore focused on an

unexpected rulemaking obligation to complete good neighbor requirements as to the states with remanded CSAPR Update FIPs. This led to the EPA proposing and then issuing an economically significant, major rule assessing additional EGU emissions reduction obligations as well as presenting updated air quality modeling analysis using novel techniques and presenting information on a host of non-EGU industrial sources for the first time, *i.e.,* the Revised CSAPR Update, 86 FR 23054 (April 30, 2021). That rule is now currently subject to judicial review in the D.C. Circuit, *Midwest Ozone Group* v. *EPA,* No. 21–1146 (D.C. Cir. argued Sept. 28, 2022).[285] The EPA has also been in the process of reviewing and acting upon many states' good neighbor SIPs where the available information indicates that an approval of the state's submission was appropriate.[286]

Finally, the Agency needed time to review and evaluate the SIP submissions in a coordinated fashion to act on all the states' submissions in a consistent manner. As the EPA explained in the proposed disapproval action, consistency in defining CAA obligations is critically important in the context of addressing a regional-scale pollutant like ozone. *See, e.g.,* 87 FR 9807 n.48. Through coordinated development of the bases for how the Agency could act on the SIP submissions, while also evaluating the contours of a potential Federal plan to implement obligations where required, the EPA sequenced its deliberations and decision making to maximize efficient, consistent, and timely action, in recognition of the need to implement any necessary obligations "as

expeditiously as practicable."[287] The downsides of commenters' policy preference in favor of giving states another opportunity to develop SIP submissions, or in first acting on each SIP submission before proposing a FIP, are that such a sequence of actions would have led to multiple years of additional delay in addressing good neighbor obligations. Even if such a choice was available to the Agency using the CAA section 110(k)(5) SIP call mechanism, it was entirely reasonable for the EPA to decline to use that mechanism in this instance. (EPA further addresses comments in support of a SIP call approach in the RTC document.)

In short, commenters' notion that the EPA was deliberately or intentionally deferring or delaying action on these SIP submissions to circumvent any required legal process or reach any specific result is simply incorrect. Commenters have not supplied any evidence to support the claim either that any legal process was circumvented or that the Agency's conduct was in bad faith. *See Biden* v. *Texas,* 142 S.Ct. 2528, 2546–47 (2022) (presumption of regularity attends agency action absent a "strong showing of bad faith or improper behavior") (citing *Citizens to Protect Overton Park* v. *Volpe,* 401 U.S. 302, 420 (1971); *SEC* v. *Chenery,* 318 U.S. 80, 87 (1943)).

4. Use of Updated Modeling

*Comment:* Comments allege that by relying on modeling not available at the time of SIP submission development, the EPA "moved the goal post." Comments note the timeframes set out for action on SIPs, citing section 110 of the Act, and allege that by failing to act on SIP submissions in a timely manner and basing such actions on new modeling, the EPA imposes an arbitrary and capricious standard. Comments state that the EPA should not disapprove a SIP based on data not available to states during development of the SIP submissions or to the EPA during the period statutorily allotted for the EPA to take final action on SIP submissions.

*EPA Response:* In response to comments' claims that the EPA has inappropriately changed states' obligations for interstate transport by relying on updated modeling not available to states at the time they prepared their SIP submissions, the EPA disagrees. As an initial matter, the EPA disagrees with comment's claiming that the agency expected state air agencies to develop a SIP submission based on

---

[285] During this time, the EPA also fulfilled its obligations to act on several petitions brought by downwind states under section 126(b) of the CAA. These actions culminated in litigation and ultimately adverse decisions in *Maryland* and *New York* v. *EPA. Maryland v,* 958 F.3d; *New York* v. *EPA,* 964 F.3d 1214, 2020 WL 3967838 (D.C. Cir. 2020). Further review and action on these remands remains pending before the agency.

[286] In chronological order: 83 FR 47568 (September 20, 2018) (Washington); 84 FR 69331 (December 18, 2019) (Alaska); 84 FR 22376 (May 17, 2019) (Oregon); 85 FR 5570 (January 31, 2020) (Washington, DC); 85 FR 5572 (January 31, 2020) (Massachusetts); 85 FR 20165 (April 10, 2020) (North Dakota); 85 FR 21325 (April 17, 2020) (Nebraska); 85 FR 25307 (May 1, 2020) (Delaware); 85 FR 34357 (June 4, 2020) (Vermont); 85 FR 65722 (October 16, 2020) (Idaho); 85 FR 67653 (October 26, 2020) (South Dakota); 86 FR 45870 (August 17, 2021) (Maine and New Hampshire); 86 FR 68413 (December 2, 2021) (Florida, Georgia, North Carolina, and South Carolina); 86 FR 70409 (December 10, 2021) (Rhode Island); 86 FR 71830 (December 20, 2021) (Connecticut); 86 FR 73129 (December 27, 2021) (Hawaii); 87 FR 19390 (April 4, 2022) (Kansas); 87 FR 21578 (April 12, 2022) (Montana); 87 FR 22463 (April 15, 2022) (Iowa); and 87 FR 61249 (October 11, 2022) (Colorado).

[287] CAA section 181(a); *Wisconsin,* 938 F.3d at 313–14 (citing *North Carolina,* 531 F.3d at 911–12).

some unknown future data. The EPA recognizes that states generally developed their SIP submissions with the best available information at the time of their development. As stated in the proposals, the EPA did not evaluate states' SIP submissions based solely on the 2016v2 emissions platform (or the 2016v3 platform, which incorporates comments generated during the public comment period on the proposed SIP actions and which supports these final SIP disapproval actions). We evaluated the SIP submissions based on the merits of the arguments put forward in each SIP submission, which included any analysis put forward by states to support their conclusions. Thus, we disagree with commenters who allege the Agency has ignored the information provided by the states in their submissions. Indeed, the record for this action reflects our extensive evaluation of states' air quality and contribution analyses. *See* generally Section IV, which summarizes our evaluation for each state.

We disagree with commenters who advocate that the EPA's evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions. It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions. While CAA section 110(k)(2) specifies a time period in which the Administrator is to act on a state submission, neither this provision nor any other provision of the CAA specifies that the remedy for the EPA's failure to meet a statutory deadline is to arrest or freeze the information the EPA may consider to what was available at the time of a SIP submission deadline under CAA section 110. Indeed, in the interstate transport context, this would lead to an anomalous result. For example, the D.C. Circuit rejected an argument made by Delaware against the CSAPR Update air quality analysis that the EPA was limited to reviewing air quality conditions in 2011 (rather than 2017) at the time of the statutory deadline for SIP submittals. The court explained,

Delaware's argument leans too heavily on the SIP submission deadline. SIP submission deadlines, unlike attainment deadlines, are "procedural" and therefore not "central to the regulatory scheme." *Sierra Club,* 294 F.3d at 161. Nor can Delaware's argument be reconciled with the text of the Good Neighbor Provision, which prohibits upwind States from emitting in amounts "which *will*" contribute to downwind nonattainment. 42 U.S.C. 7410(a)(2)(D)(i) (emphasis added). Given the use of the future tense, it would be anomalous for EPA to subject upwind States to good neighbor obligations in 2017 by considering which downwind States were once in nonattainment in 2011.

*Wisconsin,* 903 F.3d at 322. By the same token, here, holding the EPA to a consideration only of what information states had available regarding the 2023 analytic year at the time of their SIP submissions or at the time of a deadline under CAA section 110, would likewise elevate the "procedural" deadlines of CAA section 110 above the substantive requirements of the CAA that are "central to the regulatory scheme." Doing so here would force the Agency to act on these SIP submissions knowing that more recent refined, high quality, state-of-the-science modeling and monitoring data would produce a different result in our forward-looking analysis of 2023 than the information available in 2018. Nothing in the CAA dictates that the EPA must be forced into making substantive errors in its good neighbor analysis on this basis.

We relied on CAMx Version 7.10 and the 2016v2 emissions platform to make updated determinations regarding which receptors would likely exist in 2023 and which states are projected to contribute above the contribution threshold to those receptors. As explained in the preamble of the EPA's proposed actions and further detailed in the document titled "Air Quality Modeling TSD: 2015 Ozone National Ambient Air Quality Standards Proposed Interstate Transport Air Plan Disapproval" and 2016v2 Emissions Inventory TSD, both available in Docket ID no. EPA–HQ–OAR–2021–0663, the 2016v2 modeling built off previous modeling iterations used to support the EPA's action on interstate transport obligations. The EPA continuously refines its modeling to ensure the results are as indicative as possible of air quality in future years. This includes adjusting our modeling platform and updating our emissions inventories to reflect current information.

Additionally, we disagree with comments claiming that the 2016v2 modeling results were sprung upon the states with the publication of the proposed disapprovals. The EPA has been publishing a series of data and modeling releases beginning as early as the publication of the 2016v1 modeling with the proposed Revised CSAPR Update in November of 2020, which could have been used to track how the EPA's modeling updates were potentially affecting the list of possible receptors and linkages for the 2015 ozone NAAQS in the 2023 analytic year. The 2016-based meteorology and boundary conditions used in the modeling have been available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the current modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on our website since that time.[288] The CAMx modeling software that the EPA used has likewise been publicly available for over a year. CAMx version 7.10 was released by the model developer, Ramboll, in December 2020. On January 19, 2022, we released on our website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.[289]

By providing the 2016 meteorology and boundary conditions (used in the 2016v1 version) in fall of 2020, and by releasing updated emissions inventory information used in 2016v2 in September of 2021,[290] states and other interested parties had multiple opportunities prior to the proposed disapprovals in February of 2022 to consider how our modeling updates could affect their status for purposes of evaluating potential linkages for the 2015 ozone NAAQS. Further, by using the updated modeling results, the EPA is using the most current and technically appropriate information for this rulemaking. This modeling was not performed to "move the goal posts" for states but meant to provide updated emissions projections, such as additional emissions reductions for EGUs following promulgation of the Revised CSAPR Update for the 2008 ozone NAAQS, more recent information on plant closures and fuel switches, and sector trends, including non-EGU sectors. The construct of the 2016v2 emissions platform is described in the 2016v2 Emissions Modeling TSD contained in Docket ID No. EPA–HQ–OAR–2021–0663.

Finally, comments related to the timing of the EPA's action to disapprove these SIP submissions are addressed in Section V.A.1. The EPA notes the statute provides a separate remedy for agency action unlawfully delayed. In section 304 of the CAA, there is a

---

[288] *See https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

[289] *See https://www.epa.gov/scram/photochemical-modeling-applications.*

[290] *https://www.epa.gov/air-emissions-modeling/2016v2-platform.*

process for filing suit against the EPA for its failure to comply with a non-discretionary statutory duty under the CAA. The appropriate remedy in such cases is an order to compel agency action, not a determination that the agency, by virtue of missing a deadline, has been deprived of or constrained in its authority to act. *See Oklahoma,* 723 F.3d at 1224 ("[W]hen 'there are less drastic remedies available for failure to meet a statutory deadline'—such as a motion to compel agency action— 'courts should not assume that Congress intended the agency to lose its power to act.' The Court 'would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'") (cleaned up) (quoting *Brock* v. *Pierce County,* 476 U.S. 253, 260 (1986)).

*Comment:* Comments state that it is inappropriate for the EPA to revise its emissions inventory and to conduct new air quality modeling without allowing an appropriate opportunity for stakeholder review and comment and that the EPA must allow public comment on any updated (*i.e.,* 2016v3) modeling prior to use by the EPA in a final action. Comments claim that the EPA must withdraw the proposed disapproval and provide states time to develop new SIP submissions based on the updated information.

*EPA Response:* The EPA has evaluated a wide range of technical information and critiques of its 2016v2 emissions inventory and modeling platform following a solicitation of public feedback as well the public comment period on this action (and the proposed FIP action) and has responded to those comments and incorporated updates into the version of the modeling being used in this final action (2016v3). *See* Section III, the Final Action AQM TSD, and Section 4 of the RTC document for further discussion.

The EPA's development of and reliance on newer modeling to confirm modeling used at the proposal stage is in no way improper and is simply another iteration of the EPA's longstanding scientific and technical work to improve our understanding of air quality issues and causes going back decades. Where the 2016v3 modeling produced a potentially different outcome for states from proposal, that is reflected in this action (*e.g.,* our deferral of final action on Tennessee and Wyoming's SIP submissions).

*Comment:* Comments allege that EPA's modeling results have been inconsistent, questioning the reliability of the results.

*EPA Response:* Although some commenters indicate that our modeling iterations have provided differing outcomes and are therefore unreliable, this is not what the overall record indicates. Rather, in general, although the specifics of states' linkages may change slightly, our modeling overall has provided consistent outcomes regarding which states are linked to downwind air quality problems. For example, the EPA's modeling shows that most states that were linked to one or more receptors using the 2011-based platform (*i.e.,* the March 2018 data release) are also linked to one or more receptors using the newer 2016-based platform. Because each platform uses different meteorology (*i.e.,* 2011 and 2016) it is not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology.

In addition, although a state may be linked to a different set of receptors, states are often linked to receptors in the same area that has a persistent air quality problem. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but this does not indicate that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, for many states these separate modeling runs all indicated: (i) that there would be receptors in areas that would struggle with nonattainment or maintenance in the future, and (ii) that the state was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or a state was linked to different receptors in one modeling run versus another).

The EPA interprets this common result as indicative that a state's emissions have been substantial enough to generate linkages at Step 2 to varying sets of downwind receptors generated under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of a particular state's emissions should be deemed "significant." We also note that only four states included in the proposed disapprovals went from being unlinked to being linked between the 2011-based modeling provided in the March 2018 memorandum and the 2016v2-based modeling—Alabama, Minnesota, Nevada, and Tennessee.

5. Cooperative Federalism and the EPA's Authority

*Comment:* Many comments point to the concept of cooperative federalism as embodied in the CAA to make various arguments as to why the EPA cannot or should not be allowed to exercise its independent judgment in evaluating the arguments presented by the states in the SIP submissions, and some also argue that the EPA must approve each state's submission in deference to how states choose to interpret the CAA requirements they must meet.

*EPA Response:* The CAA establishes a framework for state-Federal partnership to implement the NAAQS based on cooperative federalism. Under the general model of cooperative federalism, the Federal Government establishes broad standards or goals, states are given the opportunity to determine how they wish to achieve those goals, and if states choose not to or fail to adequately implement programs to achieve those goals, a Federal agency is empowered to directly regulate to achieve the necessary ends. Under the CAA, once the EPA establishes or revises a NAAQS, states have the obligation and opportunity in the first instance to develop an implementation plan under CAA section 110 and the EPA will approve SIP submissions under CAA section 110 that fully satisfy the requirements of the CAA. This sequence of steps is not in dispute.

The EPA does not, however, agree with the comments' characterization of the EPA's role in the state-Federal relationship as being "secondary" such that the EPA must defer to state choices heedless of the substantive objectives of the Act; such deference would be particularly inappropriate in the context of addressing interstate pollution. The EPA believes that the comments fundamentally misunderstand or inaccurately describe this action, as well as the "'division of responsibilities' between the states and the federal government" they identify in CAA section 110 citing the *Train-Virginia* line of cases [291] and other cases.[292]

---

[291] *See Virginia* v. *EPA,* 108 F.3d 1397, 1407 (D.C. Cir. 1997) (*Virginia*) (quoting *Train* v. *Natural Resources Defense Council, Inc.,* 421 U.S. 60, 79 (1975) (*Train*)). The "Train-Virginia line of cases" are named for the U.S. Supreme Court case *Train,* 421 U.S. and to the D.C. Circuit case *Virginia,* 108 F.3d. The D.C. Circuit has described these cases as defining a "federalism bar" that generally recognizes states' ability to select emissions control measures in their SIPs so long as CAA requirements are met. *See, e.g., Michigan* v. *EPA,* 213 F.3d 663, 687 (D.C. Cir. 2000) (*Michigan*).

[292] *Union Elec. Co.* v. *EPA,* 427 U.S. 246 (1976), *Am. Elec. Power Co.* v. *Connecticut,* 565 U.S. 410 (2011), *Fla. Power & Light* v. *Costle,* 650 F.2d 579
Continued

Those cases, some of which pre-date the CAA amendments of 1990 resulting in the current Good Neighbor Provision,[293] stand only for the proposition that the EPA must approve state plans *if* they meet the applicable CAA requirements. But these cases say nothing about what those applicable requirements are. The EPA is charged under CAA section 110 with reviewing states' plans for compliance with the CAA and approving or disapproving them based on EPA's determinations. Thus, the EPA must ultimately determine whether state plans satisfy the requirements of the Act or not. Abundant case law reflects an understanding that the EPA must evaluate SIP submissions under the CAA section 110(k)(2) and (3).[294] If they are deficient, the EPA must so find, and become subject to the obligation to directly implement the relevant requirements through a Federal implementation plan under CAA section 110(c), unless EPA approves an applicable SIP first.[295]

The EPA responds in greater detail to these comments in the RTC document.

6. Availability of Guidance for SIP Submissions

*Comment:* Comments contend the EPA failed to issue guidance in a timely fashion by releasing its August 2018 memorandum 31 days prior to when SIPs addressing interstate ozone transport were due and issuing the October 2018 memorandum 18 days after those SIPs were due. Some comments additionally claim that it is unreasonable for the EPA to disapprove SIP submissions based on standards that were not defined, mandated, or required by official guidance.

*EPA Response:* Comments' contention is unsupported by the statute or applicable case law. Regarding the need for the EPA's guidance in addressing good neighbor obligations, in *EME Homer City,* the Supreme Court clearly held that "nothing in the statute places the EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations."[296]

Nonetheless, as comments point out, the EPA issued three "memoranda" in 2018 to provide some assistance to states in developing these SIP submissions. In acting on the SIP submissions in this action, the EPA is neither rescinding nor acting inconsistently with the memoranda—to the extent the memoranda constituted agency guidance (not all the information provided did constitute guidance), information or ideas in the memoranda had not at that time been superseded by case law developments, and the memoranda's air quality and contribution data had not at that time been overtaken by updated modeling and other updated air quality information. While comments specific to each of those memoranda are addressed elsewhere in this record, we note in brief that each memorandum made clear that the EPA's action on SIP submissions would be through a separate notice-and-comment rulemaking process and that SIP submissions seeking to rely on or take advantage of any information or concepts in these memoranda would be carefully reviewed against the relevant legal requirements and technical information available to the EPA at the time it would take such rulemaking action.

B. Application of the 4-Step Interstate Transport Framework

1. Analytic Year

*Comment:* One comment asserted that 2023 is not an appropriate analytical year because, according to the commenter, the EPA and at least some downwind states have not in fact implemented mandatory emissions control requirements associated with their nonattainment areas, and *North Carolina* and *Wisconsin* require that upwind and downwind state obligations must be implemented "on par." The comment also characterizes the EPA's invocation of *Maryland* as an inappropriate shifting of regulatory burden to upwind states.

*EPA Response:* This is an incorrect interpretation of the D.C. Circuit's holdings in *North Carolina, Wisconsin,* and *Maryland,* which held that the EPA and the states must align good neighbor obligations to the extent possible with the downwind areas' attainment dates. These are set by the statute and remain fixed regardless of whether downwind areas are delayed in implementing their own obligations. It would be unworkable to expect that upwind states' obligations could be perfectly aligned with each downwind area's actual timetable for implementing the relevant emissions controls, and no court has held that this is the EPA's or the states' obligation under the good neighbor provision. Further, this ignores the fact that upwind states must also address their interference with maintenance of the NAAQS, as well as the *Maryland* court's holding that good neighbor obligations should be addressed by the Marginal area attainment date for ozone under subpart 2 of part D of title I of the CAA. Both circumstances may involve situations in which the home state for an identified downwind receptor does not have a specific obligation to plan for and implement specific emissions controls while an upwind state may nonetheless be found to have good neighbor obligations. But, as the *Maryland* court recognized, the absence of specific enumerated requirements does not mean the downwind state does not have a statutorily binding obligation subject to burdensome regulatory consequences: "Delaware must achieve attainment 'as expeditiously as practicable,'" and "an upgrade from a marginal to a moderate nonattainment area carries significant consequences . . . ." *Maryland,* 958 F.3d at 1204.

Further, where any downwind-state delays are unreasonable or violate statutory timeframes, the CAA provides recourse to compel the completion of such duties in CAA section 304, not to defer the elimination of significant contribution and thereby expose the public in downwind areas to the elevated pollution levels caused in part by upwind states' pollution. Regardless, in this action, 2023 aligns with the Moderate area attainment date in 2024, and all of the downwind nonattainment areas corresponding to receptor locations identified at Step 1 in this action are already classified as being in Moderate nonattainment or have been reclassified to Moderate and the relevant states face obligations to submit

---

(5th Cir. 1981), *Bethlehem Steel Corp.* v. *Gorsuch,* 742 F.2d 1028 (7th Cir. 1984), *Concerned Citizens of Bridesburg* v. *EPA,* 836 F.2d 777 (3d Cir. 1987), *North Carolina,* 531 F.3d 896, *Luminant,* 675 F.3d 917 (5th Cir. 2012), *Luminant Co. LLC* v. *EPA,* 714 F.3d 841 (5th. Cir. 2013), *North Dakota* v. *EPA,* 730 F.3d 750 (8th. Cir. 2013), *EME Homer City II,* 795 F.3d 118 (D.C. Cir. 2015), and *Texas* v. *USEPA,* 829 F.3d 405 (5th Cir. 2016).

[293] The 1970 version of the Act required SIPs to include "adequate provisions for intergovernmental cooperation" concerning interstate air pollution. CAA section 110(a)(2)(E), 84 Stat. 1681, 42 U.S.C. 1857c–5(a)(2)(D). In 1977, Congress amended the Good Neighbor Provision to direct States to submit SIP submissions that included provisions "adequate" to "prohibit[] any stationary source within the State from emitting any air pollutant in amounts which will . . . prevent attainment or maintenance [of air quality standards] by any other State." CAA section 108(a)(4), 91 Stat. 693, 42 U.S.C. 7410(a)(2)(E) (1976 ed., Supp. II). Congress again amended the Good Neighbor Provision in 1990 to its current form.

[294] *See, e.g., Virginia,* 108 F.3d at 1406. *See also, e.g., Western Energy* v. *EPA,* 608 Fed. App'x 1, 3 (D.C. Cir. 2015] ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed [good neighbor] SIP.") (emphasis added); *Oklahoma,* 723 F.3d at 1209 (upholding the EPA's disapproval of "best available retrofit technology" (BART) SIP, noting BART "does not differ from other parts of the CAA—states have the ability to create SIPs, but they are subject to EPA review").

[295] *EME Homer City Generation,* 572 U.S. at 508–510.

[296] *EME Homer City,* 572 U.S. at 510.

SIP submissions and implement reasonably available control technologies (RACT) by January 1, 2023. *See* 87 FR 60897, 60899 (October 7, 2022). The EPA further responds to this comment in the RTC document.

## 2. Attachment A to the March 2018 Memorandum

*Comment:* Comments state that states conducted their analyses based on the flexibilities listed in Attachment A of the March 2018 Memorandum. Comments cite the part of the memorandum where the EPA notes that "in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using [the] EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA." Comments state that the EPA's disapproval of SIP submissions that took advantage of the flexibilities is arbitrary and capricious because the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission too late in the SIP submission process and because, in disapproving these SIPs, the EPA is applying a consistent set of policy judgments across all states.

*EPA Response:* Comments mistakenly view Attachment A to the March 2018 memorandum releasing modeling results as constituting agency guidance. The EPA further disagrees with commenters' characterization of the EPA's stance regarding the "flexibilities" listed (without analysis) in Attachment A. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[297] However, the EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" from outside parties on which the EPA sought "feedback from interested stakeholders."[298] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed later are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."[299] Attachment A to the March 2018 memorandum, therefore, does not constitute agency

guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. The EPA emphasized in this memorandum that any such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal.[300] As stated in the proposed SIP disapprovals,[301] the March 2018 memorandum provided that, "While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision." [302] In this final SIP disapproval action, the EPA again affirms that certain concepts included in Attachment A to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS.

In response to comments' claims that since the time transport SIP submissions were submitted to the EPA for review, the EPA has changed, without communication, its consideration of what is deemed to be the "necessary provisions" required for an approvable SIP submission, the EPA disagrees. As comments note, and as stated in the proposed disapproval notifications, the EPA recognizes that states have discretion to develop their own SIP transport submissions and agrees that states are not bound to using the 4-step interstate transport framework the EPA has historically used. However, states must then provide sufficient justification and reasoning to support their analytical conclusions and emissions control strategies. *See, e.g.,* 87 FR 9798, 9801. In the SIP submissions being disapproved in this action, no state provided any enforceable emissions control strategies for approval into their SIP. The EPA has evaluated the merits of each state's arguments as to why no additional emissions reduction requirements are needed to satisfy their obligations under CAA section 110(a)(2)(D)(i)(I) for the more protective 2015 ozone NAAQS. While the EPA used its own 4-step interstate

transport framework as a guide for its review to ensure a consistent and equitable evaluation of each states' submissions, the EPA has also considered states' individual arguments without predetermining the EPA's conclusions about the state's transport obligations.

It was never the Agency's intent in sharing Attachment A that states would invoke one or more of the potential "flexibilities" that outside parties advocated for as a basis for concluding that no additional emissions controls were necessary to address interstate transport for the more protective 2015 ozone NAAQS without proper justification. Nothing in Attachment A suggested that was the Agency's intended objective. Indeed, where certain approaches identified in Attachment A might have produced analytical conclusions requiring upwind states to reduce their emissions, no state invoking Attachment A followed through with implementing those controls. We observe this dynamic at work in Kentucky's submission, because Kentucky appended comments from the Midwest Ozone Group to its submission that demonstrated that applying a "weighted" approach to allocating upwind-state responsibility at Step 3 would have resulted in an emissions control obligation on Kentucky's sources, yet the State offered no explanation in its submittal why it was not adopting that approach or even what its views on that approach were. *See* 87 FR 9515. As another example, Michigan cited Attachment A to the March 2018 in developing a methodology for calculating significant contribution under which Michigan would have been responsible for eliminating up to 0.12 ppb of contribution to downwind receptors; however, the State suggested that uncertainty caused by modeling "noise" was too great to either require emissions reductions or demonstrate that Michigan had any linkages to receptors at all. *See* 87 FR 9860–9861. However, this explanation did not, as an analytical matter, demonstrate a level of scientific uncertainty which might allow for ignoring the results,[303]

---

[297] March 2018 memorandum, Attachment A.
[298] *Id.*
[299] *Id.*

[300] March 2018 memorandum.
[301] E.g., 87 FR 9487.
[302] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018, available in docket EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[303] Scientific uncertainty may only be invoked to avoid comporting with the requirements of the CAA when "the scientific uncertainty is so profound that it precludes . . . reasoned judgment" *Massachusetts* v. *EPA,* 127 S.Ct. 1438 (2007). *See Wisconsin,* 938 F.3d at 318–19 ("Scientific uncertainty, however, does not excuse EPA's failure to align the deadline for eliminating upwind States' significant contributions with the deadline for downwind attainment of the NAAQS."). *See also EME Homer City,* 795 F.3d at 135–36 ("We will not invalidate EPA's predictions solely because there might be discrepancies between those predictions Continued

particularly when the Agency has implemented good neighbor requirements at levels of "significant contribution" comparable to or even less than 0.12 ppb. *See Wisconsin,* 938 F.3d at 322–23 (rejecting Wisconsin's argument that it should not face good neighbor obligations for the 2008 ozone NAAQS on the basis that its emission reductions would only improve a downwind receptor by two ten-thousandths of a part per billion).

The EPA continues to neither endorse the "flexibilities" in Attachment A, nor stakes a position that states are precluded from relying on these concepts in the development of their good neighbor SIP submissions, assuming they could be adequately justified both technically and legally. This has been demonstrated through the EPA's extensive evaluation of the merits of each states' SIP submissions, including their attempted use of flexibilities and derivatives of the EPA's historically adopted 4-step interstate transport framework.[304]

### 3. Step 1: October 2018 Memorandum

*Comments:* Comments claimed that the EPA is not honoring its October 2018 memorandum, which they claim would allow for certain monitoring sites identified as maintenance-only receptors in the EPA's methodology to be excluded as receptors based on historical data trends. They assert that the EPA is inappropriately disapproving SIP submissions where the state sufficiently demonstrated certain monitoring sites should not be considered to have a maintenance problem in 2023.

*EPA Response:* The October 2018 memorandum recognized that states may be able to demonstrate in their SIPs that conditions exist that would justify treating a monitoring site as not being a maintenance receptor despite results from our modeling methodology identifying it as such a receptor. The EPA explained that this demonstration could be appropriate under two circumstances: (1) the site currently has "clean data" indicating attainment of the 2015 ozone NAAQS based on measured air quality concentrations, or (2) the state believes there is a technical

reason to justify using a design value from the baseline period that is lower than the maximum design value based on monitored data during the same baseline period. To justify such an approach, the EPA anticipated that any such showing would be based on an analytical demonstration that: (1) Meteorological conditions in the area of the monitoring site were conducive to ozone formation during the period of clean data or during the alternative base period design value used for projections; (2) ozone concentrations have been trending downward at the site since 2011 (and ozone precursor emissions of $NO_X$ and VOC have also decreased); and (3) emissions are expected to continue to decline in the upwind and downwind states out to the attainment date of the receptor. EPA evaluated state's analyses and found no state successfully applied these criteria to justify the use of one of these alternative approaches. The air quality data and projections in Section III indicate that trends in historic measured data do not necessarily support adopting a less stringent approach for identifying maintenance receptors for purposes of the 2015 ozone NAAQS. In fact, as explained in Section III, the EPA has found in its analysis for this final action that, in general, recent measured data from regulatory ambient air quality ozone monitoring sites suggest a number of receptors with elevated ozone levels will persist in 2023 even though our traditional methodology at Step 1 did not identify these monitoring sites as receptors in 2023. Thus, the EPA is not acting inconsistently with that memorandum—the factual conditions that would need to exist for the suggested approaches of that memorandum to be applicable have not been demonstrated as being applicable or appropriate based on the relevant data.

We further respond to comments related to the identification of receptors at Step 1 the RTC document.

### 4. Step 2: Technical Merits of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Several comments contend that for technical reasons, the 0.70 ppb threshold is inappropriate for determining whether a state is linked to a downwind receptor at Step 2 of the 4-step interstate transport framework. Comments state that the degree to which errors exist in modeling ozone concentrations and contributions make it inappropriate for a threshold as low as 0.70 ppb to be used. Some comments further state that the 0.70 ppb threshold is inappropriate because the

concentration threshold is lower than what monitoring devices are capable of detecting. Comments reference the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone, for support. Comments note that the 1 percent contribution threshold of 0.70 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in appendix U truncates monitor values of 0.70 ppb to 0 ppb.

*EPA Response:* The EPA disagrees that a 1 percent of the NAAQS contribution threshold at Step 2 is "inappropriate" for the 2015 ozone NAAQS due to modeling biases and errors. The explanation for how the 1 percent contribution threshold was originally derived is available in the 2011 CSAPR rulemaking. *See* 76 FR 48208, 48236–38 (Aug. 8, 2011). The EPA has effectively applied a 1 percent of the NAAQS threshold to identify linked upwind states in three prior FIP rulemakings and numerous state-specific actions. The D.C. Circuit has declined to establish bright line criteria for model performance. In upholding the EPA's approach to evaluating interstate transport in CSAPR, the D.C. Circuit held that it would not "invalidate EPA's predictions solely because there might be discrepancies between those predictions and the real world. That possibility is inherent in the enterprise of prediction." *EME Homer City II,* 795 F.3d at 135. The court continued to note that "the fact that a 'model does not fit every application perfectly is no criticism; a model is meant to simplify reality in order to make it tractable.' " *Id.* at 135–36 (quoting *Chemical Manufacturers Association* v. *EPA,* 28 F.3d 1259, 1264 (DC Cir. 1994). *See also Sierra Club* v. *EPA,* 939 F.3d 649, 686–87 (5th Cir. 2019) (upholding the EPA's modeling in the face of complaints regarding an alleged "margin of error," noting challengers face a "considerable burden" in overcoming a "presumption of regularity" afforded "the EPA's choice of analytical methodology") (citing *BCCA Appeal Grp.* v. *EPA,* 355 F.3d 817, 832 (5th Cir. 2003)).

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state.[305] For example, on a specific day

---

and the real world. That possibility is inherent in the enterprise of prediction.").

[304] Nor in the course of this evaluation has the EPA uniformly ruled out the concepts in Attachment A. For example, we noted at proposal that California's identification of a flexibility in Attachment A related to excluding certain air quality data associated with atypical events may be generally consistent with the EPA's modeling guidance, but this does not affect the ultimate determination that California's SIP is not approvable. *See* 87 FR 31454.

[305] See, *e.g.,* 87 FR 9798 at 9816.

the modeled versus monitored ozone value may differ by 2 ppb but that is a relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all of the 2 ppb discrepancy in the earlier example to the estimated impact from a single state because the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor, and natural background emissions.

To address comments that compare the 0.70 ppb threshold to the Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, appendix U, the EPA notes that the comment is mistaken in applying criteria related to the precision of monitoring data to the modeling methodology by which we project contributions when quantifying and evaluating interstate transport at Step 2. Indeed, contributions by source or state cannot be derived from the total ambient concentration of ozone at a monitor at all but must be apportioned through modeling. Under our longstanding methodology for doing so, the contribution values identified from upwind states are based on a robust assessment of the average impact of each upwind state's ozone-precursor emissions over a range of scenarios, as explained in the Final Action AQM TSD. This analysis is in no way connected with or dependent on monitoring instruments' precision of measurement. *See EME Homer City II,* 795 F.3d 118, 135–36 ("'[A] model is meant to simplify reality in order to make it tractable.'").

5. Step 2: Justification of a 1 Percent of the NAAQS Contribution Threshold

*Comment:* Comments contend that the EPA has not provided enough basis for reliance on the 0.70 ppb threshold, claiming that its use is therefore arbitrary and capricious.

*EPA Response:* The EPA is finalizing its proposed approach of consistently using a 1 percent of the NAAQS contribution threshold at Step 2. This approach ensures both national consistency across all states and consistency and continuity with our prior interstate transport actions for other NAAQS. Comments have not established that this approach is either unlawful or arbitrary and capricious.

The 1 percent threshold is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update and

revised CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. The EPA continues to find 1 percent to be an appropriate threshold. For ozone, as the EPA found in CAIR, CSAPR, and CSAPR Update, a portion of the nonattainment and maintenance problems in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and other sources. The EPA's analysis shows that much of the ozone transport problem being analyzed for purposes of evaluating 2015 ozone NAAQS SIP obligations is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Where a great number of geographically dispersed emissions sources contribute to a downwind air quality problem, which is the case for ozone, EPA believes that, in the context of CAA section 110(a)(2)(D)(i)(I), a state-level threshold of 1 percent of the NAAQS is a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributers. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR 74504, 74518. *See also* 86 FR 23054, 23085 (reviewing and explaining rationale from CSAPR, 76 FR 48208, 48236–38, for selection of 1 percent threshold).

Further, the EPA notes that the role of the Step 2 threshold is limited and just one step in the 4-Step interstate transport framework. It serves to screen in states for further evaluation of emissions control opportunities applying a multifactor analysis at Step 3. Thus, as the Supreme Court has recognized, the contribution threshold essentially functions to exclude states with "de minimis" impacts. *EME Homer City,* 572 U.S. at 500.

*Comment:* Commenters contend that the EPA cannot use the 1 percent threshold as a determination for significance.

*EPA Response:* To clarify, the EPA does not use the 1 percent of the NAAQS threshold as the definition of "significance." Rather, a state's contribution equals or exceeds the 1 percent of the NAAQS threshold, the EPA expects states to further evaluate their emissions to determine whether their emissions constitute significant contribution or interference with maintenance. The contribution threshold is a screening threshold to identify states which may be "contributing" to an out of state receptor. The EPA has maintained this interpretation of the relevant statutory language across many rulemakings, though commenters continue to confuse the Step 2 threshold with a determination of "significance," which it is not. *See EME Homer City,* 572 U.S. at 500–502 (explaining the difference between the "screening" analysis at Steps 1 and 2 whereby the EPA "excluded as de minimis any upwind State that contributed less than one percent of the . . . NAAQS" and the "control" analysis at Step 3 whereby the EPA determined "cost thresholds" to define significance).

Further, the EPA's air quality and contribution modeling for ozone transport is based on application of the model in a relative sense rather than relying upon absolute model predictions. All models have limitations resulting from uncertainties in inputs and scientific formulation. To minimize the effects of these uncertainties, the modeling is anchored to base period measured data in the EPA's guidance approach for projecting design values. Notably, the EPA also uses our source apportionment modeling in a relative sense when calculating the average contribution metric (used to identify linkages). In this method the magnitude of the contribution metric is tied to the magnitude of the projected average design value which is tied to the base period average measured design value. The EPA's guidance has recommended against applying bright-line criteria for judging whether statistical measures of model performance constitute acceptable or unacceptable model performance.

The Agency continues to find that this method using the CAMx model to evaluate contributions from upwind states to downwind areas is reliable. The agency has used CAMx routinely in previous notice and comment transport rulemakings to evaluate contributions relative to the 1 percent threshold for both ozone and $PM_{2.5}$. In fact, in the original CSAPR, the EPA found that "[t]here was wide support from commenters for the use of CAMx as an

appropriate, state-of-the science air quality tool for use in [Cross-State Air Pollution] Rule. There were no comments that suggested that the EPA should use an alternative model for quantifying interstate transport.'' 76 FR 48229 (August 8, 2011). In this action, the EPA has taken a number of steps based on comments and new information to ensure to the greatest extent the accuracy and reliability of its modeling projections at Step 1 and 2, as discussed elsewhere in this document.

### 6. Step 2: Prevention of Significant Deterioration Significant Impact Levels

*Comment:* Several comments insist that when identifying an appropriate linkage threshold at Step 2 of the 4-step framework, the EPA should consider or rely on the 1 ppb significant impact level (SIL) for ozone used as part of the prevention of significant deterioration PSD permitting process. Comments reference the EPA's April 17, 2018, guidance memorandum, ''Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program'' (SIL guidance), as well as the EPA's March 2018 memorandum's Attachment A flexibilities to lend support to their opinion that the 1 ppb SIL should also be used to determine linkages at Step 2.

*EPA Response:* The EPA's SIL guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program. This program applies in areas that have been designated attainment of the NAAQS and is intended to ensure that such areas remain in attainment even if emissions were to increase as a result of new sources or major modifications to existing sources located in those areas. This purpose is different than the purpose of the good neighbor provision, which is to assist downwind areas (in some cases hundreds or thousands of miles away) in resolving ongoing nonattainment of the NAAQS or difficulty maintaining the NAAQS through eliminating the emissions from other states that are significantly contributing to those problems. In addition, as discussed earlier, the purpose of the Step 2 threshold within the EPA's interstate transport framework for ozone is to broadly sweep in all states contributing to identified receptors above a de minimis level in recognition of the collective-contribution problem associated with regional-scale ozone transport. The threshold used in the context of PSD SIL serves an entirely different purpose, and so it does not follow that they should be

made equivalent. Further, comments incorrectly associate the EPA's Step 2 contribution threshold with the identification of ''significant'' emissions (which does not occur until Step 3), and so it is not the case that the EPA is interpreting the same term differently.

The EPA has previously explained this distinction between the good neighbor framework and PSD SILs. *See* 70 FR 25162, 25190–25191 (May 12, 2005); 76 FR 48208, 48237 (August 8, 2011). Importantly, the implication of the PSD SIL threshold is not that single-source contribution below this level indicates the absence of a contribution or that no emissions control requirements are warranted. Rather, the PSD SIL threshold addresses whether further, more comprehensive, multi-source review or analysis of air quality impacts are required of the source to support a demonstration that it meets the criteria for a permit. A source with estimated impacts below the PSD SIL may use this to demonstrate that it will not cause or contribute (as those terms are used within the PSD program) to a violation of an ambient air quality standard, but is still subject to meeting applicable control requirements, including best available control technology, designed to moderate the source's impact on air quality.

Moreover, other aspects of the technical methodology in the SIL guidance compared to the good neighbor framework make a direct comparison between these two values misleading. For instance, in PSD permit modeling using a single year of meteorology the maximum single-day 8-hour contribution is evaluated with respect to the SIL. The purpose of the contribution threshold at Step 2 of the 4-step good neighbor framework is to determine whether the average contribution from a collection of sources in a state is small enough not to warrant any additional control for the purpose of mitigating interstate transport, even if that control were highly cost effective. Using a 1 percent of the NAAQS threshold is more appropriate for evaluating multi-day average contributions from upwind states than a 1 ppb threshold applied for a single day, since that lower value of 1 percent of the NAAQS will capture variations in contribution. If EPA were to use a single day reflecting the maximum amount of contribution from an upwind state to determine whether a linkage exists at Step 2, comments' arguments for use of the PSD SIL might have more force. However, that would likely cause more states to become linked, not less. And in any case, consistent with the method in our modeling guidance for projecting

future attainment/nonattainment, the good neighbor methodology of using multiple days provides a more robust approach to establishing that a linkage exists at the state level than relying on a single day of data.

### 7. Step 2: August 2018 Memorandum

*Comment:* Comments assert that in the August 2018 memorandum the EPA committed itself to approving SIP submissions from states with contributions below 1 ppb, and so now the EPA should or must approve the good neighbor SIP submission from any state with a contribution below 1 ppb, either based on modeling available at the time of the state's SIP submission or at any time.

*EPA Response:* These comments mischaracterize the content and the EPA's application of August 2018 memorandum. Further, the EPA disputes that the EPA misled states or that the EPA has not appropriately reviewed SIP submissions from states that attempted to rely on an alternative contribution threshold at Step 2.

Specifically, the EPA's August 2018 memorandum provided an analysis regarding ''the degree to which certain air quality threshold amounts capture the collective amount of upwind contribution from upwind states.'' [306] It interpreted ''that information to make recommendations about what thresholds *may* be appropriate for use in'' SIP submissions (emphasis added).[307] Specifically, the August 2018 memorandum said, ''Because the amount of upwind collective contribution capture with the 1 percent and the 1 ppb thresholds is generally comparable, overall, we believe it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-step framework in developing their SIP revisions addressing the good neighbor provision for the 2015 ozone NAAQS.'' (emphasis added).[308] Thus, the text of the August 2018 memorandum does not guarantee that any state with a contribution below 1 ppb has an automatically approvable good neighbor SIP. In fact, the August 2018 memorandum indicated that ''[f]ollowing these recommendations does not ensure that EPA will approve a SIP revision in all instances where the recommendations are followed, as the guidance may not apply to the facts and circumstances underlying a particular SIP. Final decisions by the EPA to approve a particular SIP revision will

[306] August 2018 memorandum, page 1.

[307] August 2018 memorandum, page 1.

[308] August 2018 memorandum, page 4.

only be made based on the requirements of the statute and will only be made following an air agency's final submission of the SIP revision to the EPA, and after appropriate notice and opportunity for public review and comment.'' [309] The August 2018 memorandum also stated, ''EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation.'' [310] The EPA's assessment of every SIP submission that invoked the August 2018 memorandum considered the particular arguments raised by the state.[311]

*Comment:* Some comments allege that the EPA representatives led the states to believe that their SIP submission would be approved on the basis of a 1 ppb contribution threshold. The comments further claim that the EPA has now since reversed course on its August 2018 memorandum and imposed new requirements on states that were not included in the EPA's guidance. One comment suggested EPA switched position without explanation from the August 2018 guidance to its proposed disapprovals, which it viewed as unlawful under *FCC* v. *Fox TV Stations, Inc.,* 556 U.S. 502 (2009).

*EPA Response:* As an initial matter, we note that the salience of these comments is limited to only a handful of states. The August 2018 memorandum made clear that the Agency had substantial doubts that any threshold greater than 1 ppb (such as 2 ppb) would be acceptable, and the Agency is affirming that a threshold higher than 1 ppb would not be justified under any circumstance for purposes of this action. No comment provided a credible basis for using a threshold even higher than 1 ppb. So this issue is primarily limited to the difference between a 0.70 ppb threshold and a 1.0 ppb threshold. Therefore, we note that this issue is only relevant to a small number of states whose only contributions to any receptor are above 1 percent of the NAAQS but lower than 1 ppb. Under the 2016v3 modeling of 2023 being used in this final action, those states with contributions that fall between 0.70 ppb and 1 ppb included in this action are Alabama, Kentucky, and Minnesota.

The EPA disagrees with comments' claims that the Agency has reversed course on applying the August 2018 memorandum. In line with the memorandum, the EPA evaluated every justification put forward by every state covered by this SIP disapproval action that attempted to justify an alternative threshold under the August 2018 memorandum, which are Alabama,[312] Arkansas,[313] Illinois,[314] Indiana,[315] Kentucky,[316] Louisiana,[317] Michigan,[318] Mississippi,[319] Missouri,[320] and Oklahoma,[321] and Utah.[322] The EPA also addressed criticisms of the 1 percent of the NAAQS contribution threshold made by Ohio [323] and Nevada.[324] (The topic of the EPA's input during state's SIP-development processes is further discussed in the RTC document.)

For this reason, the EPA disagrees with comment that case law reviewing changes in agency positions as articulated in *FCC* v. *Fox TV Stations, Inc.,* is applicable to this action. The Agency has not imposed a requirement that states must use a 1 percent of the NAAQS threshold (which would reflect a change in position from the August 2018 memorandum). Rather, under the terms of the August 2018 memorandum, the Agency has found that Alabama, Arkansas, Illinois, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah have not made a sufficient showing that the use of an alternative contribution threshold is justified for those States. Even if it were found that the Agency's position had fundamentally changed between this rulemaking action and the August 2018 memorandum (which we do not concede to be the case), we do not believe that any state had a legitimate reliance interest that would be sufficient to overcome the countervailing public interest that is served in declining to approve a state's use of the 1 ppb threshold where the state did not have adequate technical justification. First, neither states nor the emissions sources located in those states have incurred any compliance costs based on the August 2018 memorandum. Second, it

is not clear that any states invested much of their own public resources in developing state-specific arguments in support of a 1 ppb threshold. As the EPA observed at proposal, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the EPA's proposed approval of Iowa's SIP submittal, ''the *EPA expended its own resources to attempt to supplement the information submitted by the state,* in order to more thoroughly evaluate the state-specific circumstances that could support approval.'' E.g., 87 FR 9806–07 (emphasis added). The EPA emphasizes again that it was the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. *Id.*

We acknowledge that certain states may have assumed the EPA would approve SIP submissions from states whose contribution to any receptor was below 1 ppb, but that assumption reflected a misunderstanding of the August 2018 memorandum, and in any case, an assumption is not, as a legal matter, the same thing as a reliance interest.

The EPA is not formally rescinding the August 2018 memorandum in this action or at this time, but since guidance memoranda are not binding in the first place, it is not required that agencies must ''rescind'' a guidance the moment it becomes outdated or called into question. As the Agency made clear in the August 2018 memorandum, all of EPA's proposals for action on interstate transport SIP submissions are subject to rulemaking procedure, including public notice and comment, before the EPA makes a final decision.

Although the EPA is not formally revoking the August 2018 memorandum at this time, and we have separately found that no state successfully established a basis for use of a 1 ppb threshold, we also continue to believe, as set forth in our proposed disapprovals, that national ozone transport policy associated with addressing obligations for the 2015 ozone NAAQS is not well-served by allowing for less protective thresholds at Step 2. Furthermore, the EPA disagrees that national consistency is an inappropriate consideration in the context of interstate ozone transport. The Good Neighbor provision, CAA section 110(a)(2)(D)(i)(I), requires for a unique degree of concern for consistency, parity, and equity across

[309] August 2018 memorandum, page 1.

[310] August 2018 memorandum, page 1.

[311] 87 FR 64423–64424 (Alabama); 87 FR 9806–9807 (Arkansas); 87 FR 9852–9853 (Illinois); 87 FR 9855–9856 (Indiana); 87 FR 9508–9511 (Kentucky); 87 FR 9812–9813 (Louisiana); 87 FR 9861–9862 (Michigan); 87 FR 9557 (Mississippi); 87 FR 9541–9543 (Missouri); 87 FR 31492 (Nevada); 87 FR 9870–9871 (Ohio); 87 FR 9818–9820 (Oklahoma); 87 FR 31477–31451 (Utah).

[312] 87 FR 64423–64424.

[313] 87 FR 9806–9807.

[314] 87 FR 9852–9853.

[315] 87 FR 9855–9856.

[316] 87 FR 9508–9511.

[317] 87 FR 9812–9813.

[318] 87 FR 9861–9862.

[319] 87 FR 9557.

[320] 87 FR 9541–9543.

[321] 87 FR 9818–9820.

[322] 87 FR 31477–31451.

[323] 87 FR 9870–9871.

[324] 87 FR 31492.

state lines.[325] For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on the EPA's review of good neighbor SIP submissions to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns. The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's SIP submission at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. While alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emissions controls while other states with a similar level of contribution would proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

One comment suggested that the EPA could address this potentially inequitable outcome by simply adopting a 1 ppb contribution threshold for all states. However, the August 2018 memorandum did not conclude that 1 ppb would be appropriate for all states, and the EPA does not view that conclusion to be supported at present. The EPA recognized in the August 2018 memorandum that on a nationwide basis there was some similarity in the amount of total upwind contribution captured between 1 percent and 1 ppb. However, while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold for

every state. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum; in the EPA's 2016v2 and 2016v3 modeling, the amount lost is 5 percent). Further, this logic has no end point. A similar observation could be made with respect to any incremental change. For example, should the EPA next recognize a 1.2 ppb threshold because that would only cause some small additional loss in capture of upwind state contribution as compared to 1 ppb? If the only basis for moving to a 1 ppb threshold is that it captures a "similar" (but actually smaller) amount of upwind contribution, then there is no basis for moving to that threshold at all. Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with maintenance of the NAAQS in other states as well as the broad, regional nature of the collective contribution problem with respect to ozone, we continue to find no compelling policy reason to adopt a new threshold for all states of 1 ppb.

It also is unclear why use of a 1 ppb threshold would be appropriate for all states under a more protective NAAQS when a 1 percent of the NAAQS contribution threshold has been used for less protective NAAQS. To illustrate, a state contributing greater than 0.75 ppb but less than 1 ppb to a receptor under the 2008 ozone NAAQS was "linked" at Step 2 using the 1 percent of the NAAQS contribution threshold, but if a 1 ppb threshold were used for the 2015 ozone NAAQS, then that same state would not be "linked" to a receptor at Step 2 under a NAAQS that is set to be more protective of human health and the environment. Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less protective ozone NAAQS), is an important consideration. Continuing to use a 1 percent of NAAQS approach ensures that if the NAAQS are revised and made more protective, an appropriate increase in stringency at Step 2 occurs, to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport obligations. See 76 FR 48208, 48237–38.

One comment identified that if the EPA were to use a 1 percent of the

NAAQS contribution threshold, the EPA would be obligated to seek feedback on that contribution threshold through a public notice and comment process. The EPA's basis and rationale for every SIP submission covered by this final SIP disapproval action, including the use of a 1 percent of the NAAQS contribution threshold, was in fact presented for public comment. The EPA received, and is addressing in this action, many detailed comments about contribution thresholds. Further, the EPA's application of a 1 percent of the NAAQS threshold has been consistently used in notice-and-comment rulemakings beginning with the CSAPR rulemaking in 2010–2011 and including both FIP actions (CSAPR Update and Revised CSAPR Update) and numerous actions on ozone transport SIP submissions. In each case, the 1 percent of the NAAQS threshold was subject to rigorous vetting through public comment and the Agency's response to those comments, including through analytical evaluations of alternative thresholds. See, e.g., 81 FR 74518–19. By contrast, the August 2018 memorandum was not issued through notice-and-comment rulemaking procedures, and the EPA was careful to caveat its utility and ultimate reliability for that reason.

*Comment:* Some comments claim that the EPA is applying the August 2018 memorandum inconsistently based on the EPA's actions with regard to action good neighbor SIP submissions from Iowa and Oregon for the 2015 ozone NAAQS and Arizona's good neighbor SIP submission for the 2008 ozone NAAQS.

*EPA Response:* The EPA disagrees that there is any such inconsistency. The EPA withdrew a previously proposed approval of Iowa's SIP submission where the Agency had attempted to substantiate the use of a 1 ppb contribution threshold, and re-proposed and finalized approval of that SIP based on a different rationale using a 1 percent of the NAAQS contribution threshold. 87 FR 9477 (Feb. 22, 2022); 87 FR 22463 (April 15, 2022). As explained earlier in this section, this experience of the EPA attempting to justify 1 ppb for a state through additional air quality analysis, where the state had not conducted an analysis the Agency considered to be sufficient is part of the reason the Agency is moving away from attempting to justify use of this alternative contribution threshold.

The EPA also disputes the claim that Oregon and Arizona were the only states "allowed" to use a 1 ppb threshold. The EPA approved Oregon's SIP submission for the 2015 ozone NAAQS on May 17,

---

[325] The EPA notes that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

2019, and both Oregon and the EPA relied on a 1 percent of the NAAQS contribution threshold. 84 FR 7854, 7856 (March 5, 2019) (proposal); 84 FR 22376 (May 17, 2019) (final). In our FIP proposal for the 2015 ozone NAAQS, the EPA explained it was not proposing to conduct an error correction for Oregon even though updated modeling indicated Oregon contributed above 1 percent of the NAAQS to monitors in California, because the specific monitors in California are not interstate ozone transport "receptors" at Step 1. *See* 87 FR 20036, 20074–20075 (April 6, 2022). The EPA solicited public comment on its approach to Oregon's contribution to California receptors as part of the 2015 ozone NAAQS transport FIP development, and the Agency has not yet taken final action on that FIP. In 2016, the EPA previously approved Arizona's good neighbor SIP for the earlier 2008 ozone NAAQS based on a similar rationale with regard to certain monitors in California in 2016. 81 FR 15200 (March 22, 2016) (proposal); 81 FR 31513 (May 19, 2016) (final rule). The Agency's view with respect to its evaluation of both Arizona and Oregon is that specific monitors in California are not interstate ozone transport "receptors" at Step 1. The EPA has not approved or applied an alternative Step 2 threshold for any state.

Comments related to the specific circumstances of an individual state and/or its arguments put forth in its SIP submission as it pertains to the August 2018 Memorandum are further addressed in the RTC document.

8. Step 3: States' Step 3 Analyses for the 2015 Ozone NAAQS

*Comment:* Comments state that the EPA has not provided any guidance on what an appropriate Step 3 analysis would entail, and therefore any decision where the Agency rejects a Step 3 analysis is arbitrary and capricious. One comment claims that not a single state has successfully made a Step 3 demonstration leading to an approvable interstate transport SIP for the 2015 ozone NAAQS. Comments note that there is no requirement in the CAA that states must complete an analysis similar to the EPA's, and the EPA cannot substitute its own judgment for that of the state's in crafting a SIP. Rather, the EPA is obligated to defer to state choices. One comment asserts that the EPA is required to interpret the term "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." Another comment claims the EPA is

intentionally exploiting the Supreme Court decision in *EME Homer City* to justify any requirements it deems necessary to further Federal policy decisions. Some comments identify that some states did not conduct a Step 3 analysis in their submitted SIPs because, using the flexibilities provided in the 2018 memoranda, these states concluded in Step 1 and Step 2 that no controls were required. One comment suggests that the EPA propose an 18-month period to allow these states to proceed with Steps 3 and 4.

*EPA Response:* The EPA disagrees that it is obligated to defer to states' choices in the development of good neighbor SIP submissions. As required by the Act, the EPA has evaluated each of the SIP submissions for compliance with the CAA, including whether an adequate Step 3 analysis was conducted—or whether states had offered an approvable alternative approach to evaluating their good neighbor obligations—and found in each case that what these states submitted was not approvable. The Supreme Court has recognized that the EPA is not obligated to provide states with guidance before taking action to disapprove a SIP submission. *EME Homer City,* 572 U.S. at 508–10. Nonetheless, throughout the entire history of the EPA's actions to implement the good neighbor provision for ozone, starting with the 1998 $NO_X$ SIP Call, we have consistently adopted a similar approach at Step 3 that evaluates emissions reduction opportunities for linked states applying a multifactor analysis. States could have performed a similar analysis of emissions control opportunities. The EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings; however, SIPs addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, States seeking to rely on an alternative approach to defining "significance" must use an approach that comports with the statute's objectives to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. Further, the approach selected must be reasonable and technically justified. Therefore,

while the EPA does not direct states to use a particular framework, nonetheless, each state must show that its decision-making was based on a "technically appropriate or justifiable" evaluation.

Further, the Agency has a statutory obligation to review and approve or disapprove SIP submittals according to the requirements of the Clean Air Act. *See* CAA section 110(k)(3). And the Agency is empowered to interpret those statutory requirements and exercise both technical and policy judgment in acting on SIP submissions. Indeed, the task of allocating responsibility for interstate pollution particularly necessitates Federal involvement. *See EME Homer City,* 572 U.S. at 514 ("The statute . . . calls upon the Agency to address a thorny causation problem: How should EPA allocate among multiple contributing upwind States responsibility for a downwind State's excess pollution?"); *see also Wisconsin,* 938 F.3d at 320. Further, we have consistently disapproved states' good neighbor SIP submissions addressing prior ozone NAAQS when we have found those states linked through our air quality modeling and yet the state failed to conduct an analysis of emissions control opportunities, or such analysis was perfunctory or otherwise unsatisfactory. We have been upheld in our judgment that such SIPs are not approvable. *See Westar Energy* v. *EPA,* 608 Fed. App'x 1, 3 (DC Cir. 2015) ("EPA acted *well within the bounds* of its delegated authority when it disapproved of Kansas's proposed SIP.") (emphasis added).

With respect to the assertion that no state has successfully avoided a FIP with an approvable Step 3 analysis, we note first that at this time, no final FIP addressing the 2015 ozone NAAQS has been promulgated. More directly to the point, no state submission that is the subject of this disapproval action offered any additional emissions control measures. While it is conceivable that a Step 3 analysis may result in a determination that no individual controls are needed, EPA expects that such circumstances will generally be rare, else the CAA's interstate transport provisions are rendered ineffective. For example, the EPA determined in the CSAPR Update that even though the District of Columbia and Delaware were linked to out of state receptors at Steps 1 and 2 of the 4-step interstate transport framework, no additional control measures were required of either jurisdiction. As to the District of Columbia, we found that there were no affected EGU sources that would fall under the CSAPR Update's control program. For Delaware, we found that

there were no emissions reductions available from any affected sources for any of the emissions control stringencies that were analyzed. *See* 81 FR 74504, 74553. No state's submission covered in this action contained an emissions control analysis that would allow for these types of conclusions to be reached for all of its sources.[326] States generally did not conduct any comparative analysis of available emissions control strategies—nor did they prohibit any additional ozone-precursor emissions.

We are unclear what another comment intends in asserting that the EPA is required to interpret "significant contribution" in a manner "which ties contribution to an amount which contributes significantly to downwind maintenance or nonattainment problems." The EPA disagrees that: (1) It has imposed or mandated a specific approach to Step 3 in this action, (2) this action established a particular level of emissions reduction that states were required to achieve, or (3) it mandated a particular methodology for making such a determination. To the extent the comment suggests that the Agency cannot mandate that states use cost as a method of allocating responsibility in their transport SIPs, first, the Agency has not done so. Further, as to whether cost could be used as a permissible method of allocating responsibility, the comment ignores the Supreme Court's holding to the contrary in *EME Homer City,* 572 U.S. at 518, and the D.C. Circuit's earlier holding to the same effect in *Michigan,* 213 F.3d at 687–88, both of which upheld the EPA's approach of using uniform cost-effectiveness thresholds to allocate upwind state responsibilities under the good neighbor provision for prior NAAQS. While this approach may be reasonable to apply again for the 2015 ozone NAAQS (and the EPA has proposed to do so in the proposed FIP action published on April 6, 2022), the EPA did not impose such a requirement on states in developing SIP submissions, nor is the EPA finding any SIP submission not approvable based on a failure to use this particular methodology.

In its March 2018 memorandum, Attachment A, the Agency acknowledged that there could be multiple ways of conducting a Step 3 analysis. The Agency did not endorse any particular approach and noted the Attachment was merely a list of stakeholder ideas that the EPA was not recommending any state follow. The apparent result of this "flexibility," however, was that no state presented a Step 3 analysis that resulted in including any enforceable emissions reductions to address good neighbor obligations for the 2015 ozone NAAQS in their interstate transport SIP submittals. Likewise, the comment here did not include information or analysis establishing that any particular alternative Step 3 approach should have been approved or that any state performed such an analysis in a manner that would have addressed "significant contribution" even in the manner the comment appears to be suggesting.

Notably, materials appended to one State's SIP submission, developed by the Midwest Ozone Group (MOG), did present an analysis applying an approach to "significant contribution" that was based on calculating a proportional share of each state's contribution to a downwind receptor, and this methodology would have imposed on that State's, Kentucky's, sources an obligation to eliminate 0.02 ppb of ozone at the relevant receptor. *See* 87 FR 9507. While the EPA does not endorse or here evaluate the merits of such an approach, it is noteworthy that the State in that instance did not adopt that approach, did not impose that obligation on its sources through enforceable measures by revising its SIP, and offered no explanation for its decision not to do so. *See id.* 9516 ("This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal and did not provide an explanation for why it was rejecting this approach to allocating upwind emissions reductions, even though it appended this recommendation to its SIP submittal.").

### 9. Step 4: Attempt To Rely on FIPs in a SIP Submission

*Comment:* One comment states that FIPs or other Federal emissions control measures do not have to be incorporated into and enforceable under state law to be an approvable SIP measure. They view it as acceptable for a state to rely in its SIP Submission on the emissions reductions achieved by prior ozone transport FIPs, such as the CSAPR Update or the Revised CSAPR Update, as a permissible means of achieving emissions reductions to eliminate significant contribution for the 2015 ozone NAAQS.

*EPA Response:* The EPA disagrees. As the EPA has noted on page 16 of our September 2013 memorandum "Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act sections 110(a)(1) and 110(a)(2)" (2013 Infrastructure SIP Guidance): "a FIP is not a state plan and thus cannot serve to satisfy the state's obligation to submit a SIP." [327] Indeed, the general principle that measures relied on to meet states' CAA obligations must be part of the SIP has been recognized by courts, such as in *Committee for a Better Arvin,* 786 F.3d 1169 (9th Cir. 2015).

This principle is grounded in the recognition that if such measures are not rendered enforceable within the SIP itself, then they may be modified or amended in ways that would undermine the basis for the state's reliance on them, while the approved SIP itself would purport to have addressed the relevant obligation merely by outdated reference to that modified or nonexistent control measure residing outside the SIP. For example, to be credited for attainment demonstration purposes, requirements that may otherwise be federally enforceable (such as new source review permit limits or terms in federally enforceable consent orders), must be in the state's implementation plan so that they could not later be changed without being subject to the EPA's approval. This principle is instrumental to ensuring that states cannot take credit for control measures that might be changed (even by the EPA itself) without the EPA's required approval action under CAA section 110, which includes the obligation to ensure there is no interference or backsliding with respect to all applicable CAA requirements. *See* CAA section 110(l). *See also Montana Sulfur and Chemical Co.* v. *EPA,* 666 F.3d 1174, 1195–96 (9th Cir. 2012) ("The EPA correctly reads 42 U.S.C. 7410(a)(2) as requiring states to include enforceable emissions limits and other control measures *in the plan itself.*") (emphasis in original); 40 CFR 51.112(a) ("Each plan must demonstrate that the measures, rules, and regulations *contained in it* are adequate to provide for the timely attainment and

---

[326] We note that California's SIP submission is not approvable at Step 3, despite the fact that the EPA has not identified $NO_X$ emissions control opportunities at the state's EGUs. Nonetheless, the SIP submission is not approvable because the state attempted to rely on the CSAPR Update cost threshold to justify a no-control determination when that threshold was in relation to a partial remedy for a less protective NAAQS, and even if it could be reasonably concluded that no emissions reductions are appropriate at EGUs in California, the SIP submission did not conduct an adequate analysis of emissions control opportunities at its non-EGU industrial sources. *See* 87 FR 31459–60.

[327] Guidance on Infrastructure State Implementation Plan (SIP) Elements under Clean Air Act Sections 110(a)(1) and 110(a)(2), September 13, 2013 (available at *https://www.epa.gov/sites/default/files/2015-12/documents/guidance_on_infrastructure_sip_elements_multipollutant_final_sept_2013.pdf*).

maintenance of the national standard that it implements.'') (emphasis added).

The EPA has applied this same interpretation in implementing other infrastructure SIP requirements found in CAA section 110(a)(2). For example, in implementing CAA section 110(a)(2)(C), (D)(i)(II), (D)(ii), and (J) relating to the permitting program for PSD, the EPA has developed FIPs that incorporate by reference provisions codified at 40 CFR 51.21, and some states have taken delegation of that FIP to implement the relevant requirements. But the EPA does not and cannot approve the state as having met these infrastructure SIP elements, even by virtue of taking delegation of the FIP. *See, e.g.,* 83 FR 8818, 8820 (March 1, 2018). Likewise, under one of the pathways presented in our 2013 Infrastructure SIP Guidance, the EPA does not approve SIPs addressing interstate visibility transport obligations under CAA section 110(a)(2)(D)(i)(II) (''prong 4'') until the state itself has a fully approved regional haze plan, and states cannot rely on the CSAPR ''better than BART'' FIPs to meet their prong 4 requirements until they have replaced that FIP with an approved SIP. *See, e.g.,* 84 FR 13800, 13801 (April 8, 2019); 84 FR 43741, 43744 (Aug. 22, 2019).

The comment does not provide contrary examples where the EPA has approved, as a SIP-based emissions control program, requirements that are established through Federal regulation or other types of emissions control programs that are outside the SIP. It is true that in the first two steps of the 4-step interstate transport framework, the EPA conducts air quality modeling based on emissions inventories reflective of on-the-books state and Federal emissions control requirements, to make determinations about air quality conditions and contribution levels that can be anticipated *in the baseline* in a future analytic year. If the comment's examples were intended to reference this consideration of Federal measures in prior actions on SIP submittals, the EPA agrees that it does consider such measures at these steps of its analysis, and the EPA has consistently taken this approach throughout its prior ozone transport actions. But here we are discussing Step 3 and 4 of the framework, where states that have been found to contribute to downwind nonattainment and maintenance problems, *e.g.,* are linked at Steps 1 and 2 to an out of state receptor, would need to evaluate their continuing emissions to determine what if any of those emissions should be deemed ''significant'' (*e.g.,* Step 3) and eliminated through enforceable

emissions control requirements (*e.g.,* Step 4). The EPA is not aware of any good neighbor SIP submission that it has approved where a state purported to eliminate its significant contribution (*e.g.,* satisfy Steps 3 and 4) simply by referring to Federal measures that were not included in its SIP and enforceable as a matter of state law. Finally, it bears emphasizing that the EPA's assessment of the 2015 ozone transport SIPs has already accounted for the emissions-reducing effects of both the CSAPR Update and the Revised CSAPR Update in its baseline air quality modeling at Steps 1 and 2, and so pointing to either of those rules as measures that would eliminate significant contribution at Step 3, for purposes of the 2015 ozone NAAQS, would be impermissible double-counting.

## C. Good Neighbor Provision Policy

### 1. Mobile Source Emissions

*Comment:* Several comments assert that mobile source emissions within the home state of the location of receptors are the primary source of nonattainment problems in downwind areas. Some comments additionally state that a larger portion of their own upwind state emissions is from mobile source emissions. These comments request that the EPA focus on these emissions sources rather than stationary sources to reduce ongoing nonattainment problems. These comments claim mobile sources are federally regulated and, therefore, the EPA bears the responsibility to either take action to reduce mobile source emissions nationwide or encourage downwind states to implement strategies to reduce their own local mobile source emissions.

*Response:* The EPA recognizes that nationwide, mobile sources represent a large portion of ozone-precursor emissions and, as such, would be expected to have a large impact on nonattainment and maintenance receptors.

The EPA has been regulating mobile source emissions since it was established as a Federal agency in 1970 and is committed to continuing the effective implementation and enforcement of current mobile source emissions standards and evaluating the need for additional standards.[328] The

EPA believes that the $NO_X$ reductions from its Federal programs are an important reason for the historical and long-running trend of improving air quality in the United States. The trend helps explain why the overall number of receptors and severity of ozone nonattainment problems under the 1997 and 2008 ozone NAAQS have declined. As a result of this long history, $NO_X$ emissions from onroad and nonroad mobile sources have substantially decreased and are predicted to continue to decrease into the future as newer vehicles and engines that are subject to the more recent and more stringent standards and engines replace older vehicles and engines.[329]

The EPA included mobile source emissions in the 2016v2 modeling used to support the proposal of these SIP disapproval actions to help determine state linkages at Steps 1 and 2 of the 4-step interstate transport framework and has done likewise in its 2016v3 modeling. However, whether mobile source emissions are a large portion of an upwind or downwind state's $NO_X$ emissions, and whether they represent a large portion of the contribution to downwind nonattainment and maintenance receptors, does not answer the question regarding the adequacy of an upwind state's SIP submission. The question is whether ''any source or other type of emissions activity'' (in the collective) in an upwind state is contributing significantly to downwind receptors, *see* CAA section 110(a)(2)(D)(i). A state's transport SIP must include a technical and adequate justification to support its conclusion that the state has satisfied its interstate transport obligations for the 2015 ozone NAAQS.

To the extent that comments argue that mobile source emissions should be the focus of emissions reductions for the purposes of resolving interstate transport obligations, states could have provided such an analysis for how mobile source reductions might achieve necessary reductions. *See, e.g.,* 70 FR 25209. However, states conducted no such analysis of methods or control techniques that could be used to reduce mobile source emissions, instead claiming that states cannot control mobile source emissions, as this is a federally-regulated sector, or states cannot reasonably control these emissions. States do have options, however, to reduce emissions from certain aspects of their mobile source

---

[328] On December 20, 2022, the EPA finalized more stringent emissions standards for $NO_X$ and other pollutants from heavy-duty vehicles and engines, beginning with model year 2027. *See https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-and-related-materials-control-air-pollution.* The EPA is also developing new multi-pollutant standards for light-

and medium-duty vehicles as well as options to address pollution from locomotives.

[329] *https://gispub.epa.gov/air/trendsreport/2022/#home.*

sectors, and to the extent a state is attributing its contribution to out of state receptors to its mobile sources, it could have conducted an analysis of possible programs or measures that could achieve emissions reductions from those sources. (For example, a general list of types of transportation control measures can be found in CAA section 108(f).[330])

State-specific issues raised by comments are further addressed in the RTC document.

2. International Contributions

*Comment:* Several comments state that international emissions contribute to nonattainment and maintenance receptors downwind, and these emissions are not within the jurisdiction of the states. They advocate for the EPA should considering this when acting on SIP submissions. Some comments claim that, in the west, international contributions are even greater than in eastern portions of the U.S. and support their notion that the EPA's evaluation of interstate transport should take special consideration of unique regional factors when determining upwind state obligations, or that the Agency should otherwise explain why it is still inappropriate to factor in higher international contributions, as the Agency has done in Oregon's case.

*Response:* The EPA responded to similar arguments related to international emissions included in the SIP submissions of Arkansas, California, Illinois, Indiana, Kentucky, Michigan, Missouri, Ohio, Utah, Wyoming, and West Virginia in the proposed disapprovals.[331] No comments on the proposed disapprovals provided new information to indicate the EPA's initial assessment was incorrect. These comments' reasoning related to international emissions is inapplicable to the requirements of CAA section 110(a)(2)(D)(i)(I). The good neighbor provision requires states and the EPA to address interstate transport of air pollution that significantly contributes

to downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is typically not relevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. (Only in rare cases has EPA concluded that certain monitoring sites should not be considered receptors at Step 1 due to the very low collective upwind-state contribution at those receptors. *See* the RTC document.) States are not obligated under CAA section 110(a)(2)(D)(i)(I) to act alone to reduce emissions in amounts sufficient to resolve a downwind receptor's nonattainment or maintenance problem. Rather, states are obligated to eliminate their own "significant contribution" to that receptor or "interference" with the ability of other states to attain or maintain the NAAQS. The statutory standard is, fundamentally, one of contribution, not causation.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See Wisconsin,* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Id.* at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (DC Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (DC Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in Catawba County"). Therefore, a state is not excused from eliminating its significant contribution on the basis that

international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

To the extent comments compare the influence of international emissions with the EPA's treatment of receptors in California to which Oregon contributes greater than 0.70 ppb, the EPA responds to these comments in the RTC document.

3. Western Interstate Transport Policy

*Comment:* Several comments argue that the EPA should consider an alternative approach to evaluating interstate transport in the western U.S. Comments assert there are considerations unique to the western states, such as increased background, international, and wildfire contributions to ozone concentrations in the west. Some commenters believe a "case-by-case" assessment is more appropriate for evaluating western states' interstate transport obligations, as they claim the EPA had done for the 2008 ozone standards. They additionally argue that the EPA modeling is not able to accurately project ozone concentrations in the west because of these factors, along with the west's unique topographical influence on ozone transport.

*Response:* The EPA disagrees that either its nationwide photochemical grid modeling or the 4-step interstate transport framework for ozone cannot generally be applied to states in the western region of the U.S. and has maintained that position consistently throughout numerous actions.[332] Though at times the EPA has found it appropriate to examine more closely discreet issues for some western states,[333] the 4-step interstate transport framework itself is appropriate for assessing good neighbor obligations of western states in the absence of those circumstances. The EPA evaluated the contents of the western states' SIP submissions covered by this action on the merits of the information the states provided. As described at proposal and reiterated in Section IV, the EPA is finalizing its disapproval of California,

---

[330] In making this observation, the EPA is not suggesting that mobile source emissions reductions are necessarily required to address a state's good neighbor obligations, but merely pointing out that if the state itself attributes the problem to mobile sources, then it is reasonable to expect that further analysis of such control strategies would be explored.

[331] 87 FR 9798, 9809–9810 (Feb. 22, 2022) (Arkansas); 87 FR 31443, 31460–31461 (May 24, 2022) (California); 87 FR 9854 (Illinois); 87 FR 9859–9860 (Indiana); 87 FR 9498, 9508 (Feb. 22, 2022) (Kentucky); 87 FR 9838, 9865 (Michigan); 87 FR 9533, 9543 (Feb. 22, 2022) (Missouri); 87 FR 9838 at 9874 (Ohio); 87 FR 31470, 31482 (May 24, 2022) (Utah); 87 FR 9516, 9527 (Feb. 22, 2022) (West Virginia); 87 FR 31495, 31507 (May 24, 2022) (Wyoming).

[332] For a discussion of this history, *see* for example 87 FR 31480–81 (proposed disapproval of Utah SIP submission) and 87 FR 31453–56 (proposed disapproval of California SIP submission).

[333] *See, e.g.,* Approval of Arizona's 2008 ozone NAAQS interstate transport SIP submission, 81 FR 15200 (March 22, 2016) (Step 1 analysis concluding certain monitors in California should not be considered interstate transport receptors for purposes of the good neighbor provision for the 2008 ozone NAAQS); *see also* 87 FR 61249, 61254–55 (Oct. 11, 2022) (in approving Colorado's interstate transport SIP for the 2015 ozone NAAQS, analyzing unique issues associated with wintertime inversion conditions in certain western areas).

Nevada, and Utah's SIP submissions. This final determination is based on these evaluations, as well as the EPA's 2016v2 and 2016v3 modeling following stakeholder feedback.

The EPA continues to find it appropriate to rely on the results of its nationwide modeling in the western U.S., despite comments concerning the ability for the EPA's modeling to accurately project ozone concentrations and contributions in western states, as well as its ability to support the EPA's 4-step framework for assessing interstate transport. The EPA's nationwide photochemical grid modeling considers multiple complex factors, including those raised in comments, such as terrain complexities, variability in emissions (*e.g.*, wildfire emissions), meteorology, and topography. While the EPA continues to believe its 2016v2 modeling performs equally as well in both the west and the east, the EPA has adjusted its 2016v3 modeling to ensure its predictions more closely replicate the relative magnitude of concentrations and day-to-day variability that are characteristic of observed 8-hour daily maximum ozone concentrations in each region, as explained in Section III.A and the RTC document. As such, the EPA continues to find its modeling reliable for characterizing ozone concentrations and contribution values in the western U.S. Further responses regarding the reliability of the EPA's modeling in the western U.S. is provided in the RTC document.

The EPA disagrees with comments noting that the Agency took an alternative approach for western states when assessing interstate transport obligations under the 2008 ozone NAAQS. As explained in our proposed disapproval of California's 2015 ozone NAAQS interstate transport SIP submission, while the EPA has in limited circumstances found unique issues associated with addressing ozone transport in western states, the EPA has consistently applied the 4-step interstate transport framework in western states, as it has done here, and has identified ozone transport problems in the west that are similar to those in the east.[334][335] At proposal, the EPA addressed states' arguments regarding the impact of unique factors such as topography and, as part of the EPA's evaluation of the contents of the SIP submission, provided explanation as to why the EPA found the states' arguments did not

support their conclusions regarding long range transport of ozone in the west.[336]

While comments point to relatively higher level of contributions from non-anthropogenic, local, or international contributions in the west as reason for evaluating interstate transport differently in the west, a state is not excused from eliminating its significant contribution due to contributions from these sources, where the data shows that anthropogenic emissions from upwind states also contribute collectively to identified receptors at levels that indicate there to be an interstate contribution problem as well. As stated in Section V.C.2, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked. This same principle applies broadly to other arguments as to which emissions are the "cause" of the problem; the good neighbor provision established a contribution standard, not a but-for causation standard. *See Wisconsin,* 938 F.3d at 323–25.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Orders 12866: Regulatory Planning and Executive Order 13563: Improving Regulation and Regulatory Review

This action is not a significant regulatory action and was, therefore, not submitted to the Office of Management and Budget for review.

### B. Paperwork Reduction Act (PRA)

This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act. This final action does not establish any new information collection requirement apart from what is already required by law. This finding relates to the requirement in the CAA for states to submit SIPs under CAA section 110(a)(2)(D)(i)(I) addressing interstate transport obligations associated with the 2015 ozone NAAQS.

### C. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. This action is disapproving SIP submissions for not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

### D. Unfunded Mandates Reform Act of 1995 (UMRA)

This action does not contain any unfunded mandate as described in UMRA 2 U.S.C. 1531–1538 and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### E. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the National Government and the states, or on the distribution of power and responsibilities among the various levels of government.

### F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action has tribal implications. However, this action does not impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This action includes disapproving the portion of Oklahoma's SIP submission addressing the state's good neighbor obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS and applies to certain areas of Indian country as discussed in Section IV.C of the proposed action, "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 Ozone National Ambient Air Quality Standards" (87 FR 9798 at 9824, February 2, 2022). However, this action does not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This action will also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. A summary of that

---

[334] 87 FR 31443, 31453.

[335] 81 FR 74503, 74523.

[336] *See, e.g.,* 87 FR 31443, 31457. The EPA evaluated California's qualitative consideration of unique topographic factors that may influence the transport of emissions from sources within the state to downwind receptors in Colorado and Arizona. The EPA concluded that the State's arguments do not present sufficient evidence that called into question the results of the EPA's modeling.

consultation is provided in the file "2015 Ozone Transport OK Tribal Consultation Meeting Record 3–3–2022," in the docket for this action.

## G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive order. This action is not subject to Executive Order 13045 because it merely disapproves SIP submissions as not containing the necessary provisions to satisfy interstate transport requirements under CAA section 110(a)(2)(D)(i)(I).

## H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

## I. National Technology Transfer and Advancement Act (NTTAA)

This rulemaking does not involve technical standards.

## J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 FR 7629, Feb. 16, 1994) directs Federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority populations and low-income populations to the greatest extent practicable and permitted by law. The EPA defines environmental justice (EJ) as "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." The EPA further defines the term fair treatment to mean that "no group of people should bear a disproportionate burden of environmental harms and risks, including those resulting from the negative environmental consequences of industrial, governmental, and commercial operations or programs and policies."

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to review state choices, and approve those choices if they meet the minimum criteria of the Act. As articulated in this final action, the EPA is determining that certain SIPs do not meet certain minimum requirements, and the EPA is disapproving those SIPs. Specifically, this action disapproves certain SIP submissions as not containing the necessary provisions to satisfy "good neighbor" requirements under CAA section 110(a)(2)(D)(i)(I). The EPA did not perform an EJ analysis and did not consider EJ in this action. The CAA and applicable implementing regulations neither prohibit nor require such an evaluation. In a wholly separate regulatory action, the EPA will fully address the CAA "good neighbor" requirements under section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS as it regards the SIP disapprovals included in this final action. Consideration of EJ is not required as part of this action, and there is no information in the record inconsistent with the stated goal of E.O. 12898 of achieving EJ for people of color, low-income populations, and Indigenous peoples.

## K. Congressional Review Act (CRA)

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

## L. Judicial Review

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[337]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this final action, the EPA is applying a uniform legal interpretation and common, nationwide analytical methods with respect to the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., "good neighbor" requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone NAAQS. Based on these analyses, the EPA is disapproving SIP submittals for the 2015 ozone NAAQS for 21 states located across a wide geographic area in eight of the ten CAA Regions and ten Federal judicial circuits. Given that on its face this action addresses implementation of the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in evaluating the submitted SIPs, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this final action, the EPA is interpreting and applying section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here the same, nationally consistent 4-step interstate transport framework for assessing obligations for the 2015 ozone NAAQS that it has applied in other nationally applicable rulemakings, such as CSAPR, the CSAPR Update, and the Revised CSAPR Update. The EPA is relying on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels at Step 1 and Step 2 of that 4-step framework and applying a nationally uniform approach to the identification of nonattainment and

---

[337] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or

effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

maintenance receptors across the entire geographic area covered by this final action.[338] The EPA has also evaluated each state's arguments for the use of alternative approaches or alternative sets of data with an eye to ensuring national consistency and avoiding inconsistent or inequitable results among upwind states (*i.e.,* those states for which good neighbor obligations are being evaluated in this action) and between upwind and downwind states (*i.e.,* those states that contain receptors signifying ozone nonattainment or maintenance problems).

The Administrator finds that this is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of agency resources. The EPA's responses to comments on the appropriate venue for petitions for review are contained in the RTC document.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the **Federal Register**. Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit by April 14, 2023.

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Michael S. Regan,**
*Administrator.*

For the reasons set forth in the preamble, 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart B—Alabama

■ 2. Section 52.56 is added to read as follows:

### § 52.56   Control strategy: Ozone.

(a) The state implementation plan (SIP) revision submitted on June 21, 2022, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

(b) [Reserved]

## Subpart E—Arkansas

■ 3. Section 52.174 is amended by adding paragraph (b) to read as follows:

### § 52.174   Control strategy and regulations: Ozone.

\*   \*   \*   \*   \*

(b) The portion of the SIP submittal from October 10, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart F—California

■ 4. Section 52.223 is amended by adding paragraph (p)(7) to read as follows:

### § 52.223   Approval status.

\*   \*   \*   \*   \*

(p) \* \* \*

(7) The interstate transport requirements for Significant Contribution to Nonattainment (Prong 1) and Interstate Transport—Interference with Maintenance (Prong 2) of Clean Air Act (CAA) section 110(a)(2)(D)(i)(I).

■ 5. Section 52.283 is amended by adding paragraph (h) to read as follows:

### § 52.283   Interstate Transport.

\*   \*   \*   \*   \*

(h) *2015 ozone NAAQS.* The 2018 Infrastructure SIP Revision, submitted on October 1, 2018, does not meet the following specific requirements of Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS).

(1) The requirements of CAA section 110(a)(2)(D)(i)(I) regarding significant contribution to nonattainment of the 2015 ozone NAAQS in any other State and interference with maintenance of the 2015 ozone NAAQS by any other State.

(2) [Reserved]

## Subpart O—Illinois

■ 6. Section 52.720 is amended in the table in paragraph (e), under the heading "Section 110(a)(2) Infrastructure Requirements," by revising the entry for "2015 Ozone NAAQS Infrastructure Requirements" to read as follows:

### § 52.720   Identification of plan.

\*   \*   \*   \*   \*

(e) \* \* \*

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| \* | \* | \* | \* | \* |
| Section 110(a)(2) Infrastructure Requirements | | | | |

---

[338] In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See*  H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

EPA-APPROVED ILLINOIS NONREGULATORY AND QUASI-REGULATORY PROVISIONS—Continued

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| 2015 Ozone NAAQS Infrastructure Requirements. | Statewide ... | 5/16/2019 and 9/22/2020. | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements under 110(a)(2) have been approved except (D)(i)(I) Prongs 1, 2, which are disapproved, and no action has been taken on (D)(i)(II) Prong 4. |

## Subpart P—Indiana

■ 7. Section 52.770 is amended in the table in paragraph (e) by adding an entry for "Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS" after the entry for "Section 110(a)(2) Infrastructure Requirements for the 2008 8-Hour Ozone NAAQS" to read as follows:

### § 52.770   Identification of plan.

*    *    *    *    *

(e) *    *    *

EPA-APPROVED INDIANA NONREGULATORY PROVISIONS AND QUASI-REGULATORY PROVISIONS

| Title | Indiana date | EPA approval | Explanation |
|---|---|---|---|
| * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | 11/2/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | All CAA infrastructure elements have been approved except (D)(i)(I) Prongs 1 and 2, which are disapproved, and no action has been taken on the visibility portion of (D)(i)(II). |
| * | * | * | * |

## Subpart S—Kentucky

■ 8. Section 52.930 is amended by adding paragraph (n) to read as follows:

### § 52.930   Control strategy: Ozone.

*    *    *    *    *

(n) *Disapproval.* The state implementation plan (SIP) revision submitted on January 11, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart T—Louisiana

■ 9. Section 52.996 is amended by adding paragraph (b) to read as follows:

### § 52.996   Disapprovals.

*    *    *    *    *

(b) The SIP submittal from November 13, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart V—Maryland

■ 10. Section 52.1076 is amended by adding paragraph (gg) to read as follows:

### § 52.1076   Control strategy plans for attainment and rate-of-progress: Ozone.

*    *    *    *    *

(gg) *Disapproval.* EPA is disapproving Maryland's October 16, 2019, State Implementation Plan (SIP) revision intended to address the Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS).

## Subpart X—Michigan

■ 11. Section 52.1170 is amended in the table in paragraph (e), under the heading "Infrastructure," by revising the entry for "Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS" to read as follows:

### § 52.1170   Identification of plan.

*    *    *    *    *

(e) *    *    *

EPA-APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure** | | | | |

EPA-Approved Michigan Nonregulatory and Quasi-Regulatory Provisions—Continued

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date | EPA approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 3/8/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | *Approved CAA elements:* 110(a)(2)(A), (B), (C), (D)(i)(II) Prong 3, D(ii), (E)(i), (F), (G), (H), (J), (K), (L), and (M). *Disapproved CAA elements:* 110(a)(2)(D)(i)(I) Prongs 1 and 2, and 110(a)(2)(D)(i)(II) Prong 4. No action on CAA element 110(1)(2)(E)(ii). |
| * | * | * | * | * |

## Subpart Y—Minnesota

■ 12. Section 52.1220 is amended in the table in paragraph (e) by revising the entry for ''Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS'' to read as follows:

**§ 52.1220    Identification of plan.**

*    *    *    *    *

(e) * * *

EPA-Approved Minnesota Nonregulatory Provisions

| Name of nonregulatory SIP provision | Applicable geographic or non-attainment area | State submittal date/ effective date | EPA approved date | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 Ozone NAAQS. | Statewide ... | 10/1/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Fully approved for all CAA elements except transport elements of (D)(i)(I) Prong 2, which are disapproved, and no action has been taken on the visibility protection requirements of (D)(i)(II). |

## Subpart Z—Mississippi

■ 13. Section 52.1273 is amended by adding paragraph (b) read as follows:

**§ 52.1273    Control strategy: Ozone.**

*    *    *    *    *

(b) *Disapproval.* The state implementation plan (SIP) revision submitted on September 3, 2019, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart AA—Missouri

■ 14. Section 52.1323 is amended by adding paragraph (p) to read as follows:

**§ 52.1323    Approval status.**

*    *    *    *    *

(p) For the 2015 8-hour ozone NAAQS:

(1) *Disapproval.* Missouri state implementation plan (SIP) revision submitted on June 10, 2019, to address the Clean Air Act (CAA) infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is

disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

## Subpart DD—Nevada

■ 15. Section 52.1472 is amended by adding paragraph (k) to read as follows:

**§ 52.1472    Approval status.**

*    *    *    *    *

(k) *2015 8-hour ozone NAAQS.* The SIP submittal from October 1, 2018, is disapproved for Clean Air Act (CAA) section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the NDEP, Clark County, and Washoe County portions of the Nevada SIP submission.

## Subpart FF—New Jersey

■ 16. Section 52.1586 is amended by adding paragraph (c) and reserved paragraph (d) to read as follows:

**§ 52.1586    Section 110(a)(2) infrastructure requirements.**

*    *    *    *    *

(c) *2015 8-hour ozone NAAQS*—(1) *Disapproval.* New Jersey SIP revision submitted on May 13, 2019, to address

the CAA infrastructure requirements of section 110(a)(2) for the 2015 8-hour ozone NAAQS, is disapproved for section 110(a)(2)(D)(i)(I) (prongs 1 and 2).

(2) [Reserved]

(d) [Reserved]

## Subpart HH—New York

■ 17. Section 52.1683 is amended by adding paragraph (v) to read as follows:

**§ 52.1683    Control strategy: Ozone.**

*    *    *    *    *

(v) *Disapproval.* The portion of the SIP revision submitted on September 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) (prongs 1 and 2) for the 2015 ozone NAAQS is disapproved.

## Subpart KK—Ohio

■ 18. Section 52.1870 is amended in the table in paragraph (e), under ''Infrastructure Requirements,'' by revising the entry for ''Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS'' to read as follows:

§ 52.1870  **Identification of plan.**    (e) * * *

\*   \*   \*   \*   \*

### EPA-Approved Ohio Nonregulatory and Quasi-Regulatory Provisions

| Title | Applicable geographic or non-attainment area | State date | EPA approval | Comments |
|---|---|---|---|---|
| * | * | * | * | * |
| **Infrastructure Requirements** | | | | |
| Section 110(a)(2) infrastructure requirements for the 2015 ozone NAAQS. | Statewide ... | 9/28/2018 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Approved CAA elements: 110(a)(2)(A), (B), (C), (D)(i)(II) prongs 3 and 4, (E), (F), (G), (H), (J), (K), (L), and (M). Elements (D)(i)(I) prongs 1 and 2 are disapproved. |
| * | * | * | * | * |

## Subpart LL—Oklahoma

■ 19. Section 52.1922 is amended by adding paragraph (c) to read as follows:

### § 52.1922  Approval status.

\*   \*   \*   \*   \*

(c) The portion of the SIP submittal from October 25, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone national ambient air quality standards (NAAQS) is disapproved.

## Subpart SS—Texas

■ 20. Section 52.2275 is amended by:
■ a. Removing the first paragraph (m); and
■ b. Adding paragraph (o).

The addition reads as follows:

### § 52.2275  Control strategy and regulations: Ozone.

\*   \*   \*   \*   \*

(o) *Disapproval.* The portion of the SIP submittal from September 12, 2018, addressing Clean Air Act section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS is disapproved.

## Subpart XX—West Virginia

■ 21. Section 52.2520 is amended in the table in paragraph (e) by adding the entry "Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS" at the end of the table to read as follows:

### § 52.2520  Identification of plan.

\*   \*   \*   \*   \*

(e) * * *

| Name of non-regulatory SIP revision | Applicable geographic area | State submittal date | EPA approval date | Additional explanation |
|---|---|---|---|---|
| * | * | * | * | * |
| Section 110(a)(2) Infrastructure Requirements for the 2015 8-Hour Ozone NAAQS. | Statewide ... | 2/4/2019 | 2/13/2023, [INSERT **FEDERAL REGISTER** CITATION]. | Disapproval—EPA is disapproving West Virginia's February 4, 2019, State Implementation Plan (SIP) revision intended to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone national ambient air quality standard (NAAQS). |

## Subpart YY—Wisconsin

■ 22. Section 52.2591 is amended by adding paragraph (l) to read as follows:

### § 52.2591  Section 110(a)(2) infrastructure requirements.

\*   \*   \*   \*   \*

(l) *Partial approval/disapproval.* In a September 14, 2018, submission, WDNR certified that the State has satisfied the infrastructure SIP requirements of section 110(a)(2)(A) through (H), and (J) through (M) for the 2015 ozone NAAQS. For section 110(a)(2)(D)(i)(I), prong 1 is approved and prong 2 is disapproved.

EPA did not take action on any other elements. We will address the remaining requirements in a separate action.

[FR Doc. 2023–02407 Filed 2–10–23; 8:45 am]

**BILLING CODE 6560–50–P**

**Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT)**

## DECLARATION OF
## DWAYNE W. "WOODY" RICKERSON

1.  I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I have worked at ERCOT for the past 22 years. I have a Bachelor of Sciences degree in Electrical Engineering from New Mexico State University and a Master of Engineering in Engineering Management from the University of Colorado. I am providing this declaration on behalf of ERCOT.

2.  I am submitting this declaration because it is my understanding that the Environmental Protection Agency (EPA)'s disapproval of the Texas state implementation plan (SIP) for addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS) could allow EPA to implement the federal implementation plan (FIP) that EPA proposed in April 2022 and that is expected to be adopted by EPA in final form on March 15, 2023.  As further explained in this declaration, I am concerned that the implementation of the EPA's FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season (defined to be May 1, 2023 through September 30, 2023).

### Background: ERCOT's Role in Managing Texas's Electric Grid and Electricity Market

3.  ERCOT is the independent system operator (ISO) designated by the Public Utility Commission of Texas for the purpose of managing the ERCOT transmission grid, which serves approximately 26 million customers in the State of Texas.

4.  In its role as the ISO, ERCOT is tasked with a number of critical functions, including "ensur[ing] the reliability and adequacy of the regional electrical network" and administering the wholesale electricity market. Texas Utilities Code section 39.151(a)(2), (4).  One of the most important ways ERCOT ensures system reliability is by managing the flow of electric power on the grid every moment of every day.  ERCOT performs this function by dispatching each of hundreds of generators located across the system to match the system demand of these customers at all times, while also observing the physical limits of the transmission lines that transport that power.

5.  ERCOT is also registered with the North American Electric Reliability Corporation (NERC) as the sole Reliability Coordinator and Balancing Authority for the ERCOT region under the reliability framework in section 215 of the Federal Power Act. In these roles, ERCOT has the ultimate responsibility to direct the operation of the ERCOT power grid to ensure generation and load are balanced and to take all appropriate actions needed to ensure the security of the grid during emergency conditions.

6.  ERCOT does not engage in advocacy except where its core functions, including electric grid reliability, may be affected. ERCOT's interests in this matter are limited to the reliable operation of the ERCOT grid.

7.  Under the statutory design of the ERCOT wholesale electricity market, generation owners bear the risk of investment when deciding the timing and location of new generation or the retirement of existing generation based on market conditions. ERCOT cannot mandate construction of new generation. Rather, the ERCOT market is designed to provide financial signals to generation companies to develop adequate generation capacity. As part of its responsibilities, ERCOT evaluates the impacts to grid reliability of possible and pending changes in generation capacity.

1

**Risks Associated with Growth in Renewable Generation**

8.  Because the ERCOT wholesale market relies on market forces to ensure generation sufficiency, investment dollars tend to favor investments that have the greatest rates of return. For at least the past decade, federal tax incentives for investment in renewable generation have been the primary factor leading investors to strongly favor wind and solar projects to meet the growing demand in the ERCOT region.

9.  Whereas wind and solar generators accounted for less than 1% of the total generating capacity in 2007, those generators now account for a combined 40% of the total generating capacity and produce 39% of the energy in the ERCOT region.

10. Wind and solar generation also account for approximately 21,683 MW, or 69%, of the approximately 31,287 MW in generation capacity that is currently proposed to interconnect in the ERCOT region within the next three years, while gas-fired generating units account for only 5%, and coal units account for zero percent of the generation capacity that is proposed to interconnect.

11. Increases in generation capacity from renewables alone are not adequate to supply the future electric energy demands of a growing 26 million customer base in ERCOT. Wind and solar generating units are intermittent sources of generation. During daylight hours, cloud cover can cause fluctuations in solar energy production. Solar energy production also dissipates rapidly in the evening and is nonexistent at night. Wind generation will also vary with weather patterns, time of day, and seasons.

12. Together, the variability of wind and solar power production creates the need for replacement energy that must come from dispatchable sources such as gas and coal units. Battery energy storage devices do not currently have enough installed capacity in the ERCOT grid to provide this replacement energy. The forecasted installation of new batteries in the next three years will not meet the projected demand.

13. Replacement energy from dispatchable sources must also be able to increase and decrease quickly. This ramping capability is needed to match the variability associated with wind and solar energy production. If the amount of dispatchable generation capacity is reduced due to increased emissions limits, the risk that ERCOT will not be able to meet its load demands increases.

**Imminent Harm to ERCOT Reliability for Ozone Season 2023**

14. It is my understanding that the EPA's proposed FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the Summer 2023 Ozone Season, which is defined as May 1, 2023 through September 30, 2023. This reduction in NOx emission allowances will impact the operation of the gas and coal facilities that are needed to manage the reliability of the grid because gas and coal units produce NOx as a byproduct of generating electricity.

15. Based on data provided to ERCOT by a subset of owners of coal and gas-fired generating units regarding the impacts in the reductions of these allowances, those units would need to reduce their capacity by 26% during summer of 2023.

16. The units for which these owners provided data collectively represented units that have already installed Selective Catalytic Reduction (SCR) technology as well as units that do not currently have SCR technology. Consequently, for this data sample, while some lower-emitting units would be expected to increase generation for summer of 2023 in order for higher-emitting units to run less, a

2

26% total reduction in capacity was predicted for this subset of units as a whole.

17. ERCOT extrapolated the data from this subset of coal- and gas-fired generating unit owners to understand possible system-wide impacts. ERCOT evaluated the roughly 12,281 megawatts (MW) of generation in the ERCOT footprint that have been identified as being required to install SCR technology by 2026 to meet the EPA's proposed FIP emissions for that year. Assuming those units that currently lack SCR technology are units that would need to reduce emissions in 2023, using the 26% reduction in capacity noted above, ERCOT calculated that under EPA's proposed FIP, there could be a 3,193 MW reduction in thermal capacity for summer of 2023 for the ERCOT system (26% of 12,281 MW.)

18. For Ozone Season 2022, the tightest reserve capacity margin in ERCOT occurred on July 13, 2022 at 3:23 p.m.  At that time, ERCOT had 2,408 MW of capacity reserves.  If the July 13, 2022 conditions were to occur again in 2023, it is expected that a 3,193 MW reduction in thermal capacity would require ERCOT to direct at least 1785 MW of firm load-shedding in order to maintain 1000 MW of operating reserves.  When ERCOT directs firm load-shedding, utilities are required to disconnect customers from the power grid in order to avoid a system-wide blackout.

19. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be five times greater than it would be without the reduction of capacity.  (The peak load day is the day in ERCOT's long-term load forecast for summer 2023 that ERCOT has the highest load. The 4 p.m. hour is the hour forecasted to be the peak demand hour in that same forecast for summer 2023. Therefore, if load meets or exceeds that forecasted peak demand, the chance of load-shedding would be five times greater than it would be without the reduction in capacity.)

20. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be two and a half times greater than it would be without the reduction of capacity.

21. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 4 p.m. hour on a peak load day, the likelihood that ERCOT would enter Emergency Energy Alert 1 (EEA1)—which means that operating reserves for the Texas grid have dropped below 2,300 megawatts and are not expected to recover within 30 minutes—would be four times as large.  Note that during EEA1, there are no controlled outages, but ERCOT can acquire additional resources during capacity scarcity conditions as well as issue calls for conservation.

22. With 3,193 MW less thermal capacity available in summer of 2023, ERCOT estimates that during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would enter EEA1 would double.

23. EPA uses an Integrated Planning Model (IPM) to project future conditions in the electricity market, including unit-specific summer generation expectations. The EPA model results that take into account the impacts of the proposed FIP for 2023 are located on EPA's website at https://www.regulations.gov/document/EPA-HQ-OAR-2021-0668-0161m under the spreadsheet labeled "Proposed Rule RPE File."  Column A of that spreadsheet can be filtered for only the year 2023.  Column B, "Region Group," can be filtered for only the ERCOT region.  Column V "Generation Summer GWh," shows many units for which EPA has assumed will have zero output under the 2023 FIP.  When units that have a non-zero output, and therefore are assumed to be operating in summer 2023, are deleted from the sum of column AW "Dispatchable Capacity MW," the remainder for column AW, and therefore what is assumed by EPA to **not** operate in summer 2023 because of the FIP, sums to 17,611 MW. However, this number appears to double-count three units

3

with a total output of 2,568 MW. Subtracting this apparent error from the 17,611 MW amount results in a total of 15,044 MW.

24. Therefore, while ERCOT has evaluated the effects of a reduction in capacity of 3,193 MW for summer 2023, this number actually appears to be quite conservative. EPA's own data indicates a 15,044 MW reduction in capacity for ERCOT for summer 2023.

25. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, it is even more likely that ERCOT would need to direct firm load-shedding. ERCOT estimates that under this scenario during the 4 p.m. hour on a peak load day, the likelihood of needing to direct firm load-shedding would be 77 times greater than it would be without the reduction of capacity.

26. If ERCOT were to have 15,044 MW less thermal capacity available in summer of 2023, ERCOT estimates that under this scenario during the 7 p.m. hour on a peak load day, the likelihood that ERCOT would need to direct firm load-shedding would be eight times greater than without the reduction of capacity.

27. While paragraphs 19-26 address impacts on a single peak load day, it should be noted that numerous non-peak load days from May 1, 2023 through September 30, 2023 will experience similar probabilities that ERCOT would need to direct firm load-shedding.

28. While the above impacts have addressed 2023 system-wide impacts that can be extrapolated from the data provided or available to ERCOT, a reduction in capacity from generators, even when ERCOT has a large enough reserve margin to meet demand, can cause additional stress on the system, leading to operational problems. In effect, this additional stress can mean that even when ERCOT has sufficient generation to meet demand, it may be unable to deploy power to the customers that need it because there are not sufficient available transmission paths to deliver that energy.

29. Based on data provided by a subset of owners of coal- and gas-fired generating units regarding the impacts in the reductions of these allowances, ERCOT determined that the reductions in generating capacity would also cause local and regional reliability issues due to overloads of multiple transmission elements. ERCOT's analysis showed that some of these overloads could not be addressed by existing generation redispatch and would result in some amount of regional firm load-shedding to address these reliability issues. Regional firm load-shedding is used to address specific transmission overloads. This differs from firm loadshedding that may be directed to balance generation and load across an entire grid.

30. These overload issues would also limit ERCOT's ability to deliver available generation capacity using the existing transmission system to address the unavailability of the coal- and gas-fired generating units. This, in turn, would exacerbate the system-wide impacts that are described in paragraphs 14-27.

### **Harm to ERCOT Reliability beyond Ozone Season 2023**

31. ERCOT has been informed by owners of coal- and gas-fired generating units that the proposed FIP's mandate that owners of certain generating units must install SCR technology by 2026 would be prohibitively expensive and would therefore lead these generation owners to retire their units.

32. ERCOT understands that as much as 10,800 MW of capacity in the ERCOT region—8,200 MW of coal-fired generation and 2,600 MW of gas-fired generation—is at risk of retirement due to the SCR mandate, a loss of thermal capacity that could have catastrophic consequences for the electric grid in

4

2026.

33. The risks associated with the retirements of these units include but are not limited to: the increase in probability that ERCOT will need to direct utilities to shed firm load (i.e., to disconnect customers from the grid) to ensure the reliability of the remaining electric system; the reduced availability of outages for the remaining thermal generation fleet; the reduction in system inertia; and the impact on transmission flows and associated reliability problems.

34. ERCOT performed a study to quantify this risk for summer 2026, assuming the retirement of 10,800 MW of coal and gas generation. In this assessment, ERCOT used its Operating Reserve Risk Model to run 10,000 simulations of conditions during this period. ERCOT's assessment concluded that the probability of the supply of generation being inadequate to serve the demand on the grid during the 7 to 8 p.m. window at some point in summer 2026 increased from 4.5% to 40%.

35. Therefore, while solar energy is dissipating fairly rapidly in the evening, ERCOT will have an approximately nine times greater risk of having insufficient generation to meet demand in 2026 if the proposed FIP is finalized. This vulnerability is most pronounced between 7 to 8 p.m. but extends to other hours of the day.

36. While ERCOT has produced the above data for 2026, ERCOT anticipates that the mandate that owners of certain units must install SCR technology by 2026 could lead to retirement of coal- and gas-fired generating units prior to 2026, causing a gradual increase in the risk of having insufficient generation to meet demand.

**<u>Conclusion</u>**

37. In my opinion, the proposed FIP poses an imminent harm to the reliability of the ERCOT grid in summer of 2023 and in later years.


I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on March 2, 2023.


  /s/ D. W. Rickerson

Dwayne W. "Woody" Rickerson
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.

**Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado River Authority**

No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,**

Petitioners

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents

---

## DECLARATION IN SUPPORT OF

## ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS'

## MOTION TO STAY FINAL ACTION

## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

1

## DECLARATION OF KENNETH C. PRICE

1. I am the Chief Operating Officer (COO) of the Lower Colorado River Authority (LCRA). As COO, I oversee LCRA activities related to electric power generation. I provide this declaration in support of the Association of Electric Companies of Texas' motion to stay the disapproval of the Texas State Implementation Plan (SIP) good neighbor provisions for the 2015 ozone standard. The disapproval of this SIP will have highly damaging and irreparable impacts on LCRA's operations, as described below. This declaration is based on my personal knowledge of facts and analysis conducted by me and my staff.

2. I have been responsible for LCRA's activities related to electric power generation since I joined the company in 2014. When I joined in 2014, my original title was Chief Commercial Officer. In 2021, I was named as Executive Vice President of Generation and Telecommunications, and in 2022, I was named as Chief Operating Officer.

3. Before joining LCRA, I worked for Luminant and its predecessor companies for 34 years. My final role was as Senior Director of Power Operations. In my time at Luminant, I held several roles where I was responsible for or involved in analyzing the impacts on Luminant's generation fleet from proposed environmental laws or rules.

4. I graduated with a Bachelor of Science degree in Electrical Engineering from the University of Texas at Austin. I also am a senior member and member of the honor society of the Institute of Electrical and Electronics Engineers (IEEE). I was a licensed professional engineer in the state of Texas for over 30 years.

## LCRA ELECTRIC GENERATING UNIT FLEET

5. LCRA is a Texas conservation and reclamation district. It has no taxing authority and operates solely on utility revenues and fees generated from supplying energy, water and community services. LCRA and its affiliates supply wholesale electricity to more than 38 retail utilities, including cities and electric cooperatives that serve more than 1 million people in 55 counties. LCRA's well-rounded generation portfolio includes combined-cycle gas-fired plants, a traditional natural gas-fired power plant, a coal-fired plant, a gas peaker plant, and renewable energy.

6. LCRA's generation fleet resides entirely in the Electric Reliability Council of Texas (ERCOT) power region. LCRA owns approximately 3,000 MW total generating capacity. The LCRA Fayette Power Project (FPP, also known as Sam Seymour in some EPA data files), located in Fayette County, Texas, is a coal-fired electric generating facility consisting of three electric-generating units

2

(EGUs), two of which are co-owned by the City of Austin. LCRA also owns a share of the Sandy Creek Energy Station in McLennan County, a facility with a single coal-fired EGU. The LCRA Sim Gideon Power Plant (SGP) consists of three natural gas-fired steam EGUs. The LCRA Thomas C. Ferguson Power Plant and Lost Pines 1 Power Project (LP1) are combined-cycle combustion turbine plants. The LCRA Winchester Power Park consists of four simple cycle combustion turbines.

7.  LCRA provides power to its wholesale electric customers affordably, reliably, and in compliance with all applicable environmental requirements, and takes pride in being a good steward of the environment. LCRA has made major investments in its generation assets and in pollution controls required to operate those assets in compliance with applicable environmental requirements.

8.  LCRA is a member of the Association of Electric Companies of Texas (AECT).

**IMPACT OF EPA DISAPPROVAL OF TEXAS STATE IMPLEMENTATION PLAN**

9.  EPA published its final disapproval of the Texas SIP regarding ozone transport, also called the "good neighbor" SIP, on February 13, 2023. This disapproval was proposed on February 22, 2022, with a comment period ending April 25, 2022.

10. Well before the Texas SIP disapproval was finalized, and even prior to the end of the comment period on the proposed disapproval, EPA published a proposed Federal Implementation Plan (proposed FIP) on April 6, 2022. It is clear that these two actions are inextricably linked. The direct result of EPA's disapproval of the Texas SIP is EPA's adoption of a FIP similar to the one proposed. It is expected that EPA will adopt this FIP in March 2023 with requirements beginning May 1, 2023.

11. EPA's disapproval of the SIP and subsequent FIP adoption will have a dramatic impact on the electric grid in Texas. The requirement that almost all existing electric generating facilities limit their nitrogen oxide (NOx) emissions to levels only achievable by installing selective catalytic reduction (SCR), and for some plants not achievable even then, is beyond any level of NOx reductions required of the electric industry under any prior program. Due to the great cost of these controls and the uncertainty of the market, it is anticipated that a significant number of units would retire early instead of attempting to meet the aggressive emission rates EPA requires.

12. Following the disapproval of the Texas SIP and adoption of the FIP, Texas EGUs would have their total allowance budget reduced from 52,301 under the current CSAPR program to 38,284 in 2023, a 27% reduction. Then in 2026, the budget would be reduced further to 21,946, which is a reduction of

43% between 2023 and 2026. These large reductions are expected to reduce the number of allowances available and increase the price of allowances dramatically.

13. The Texas SIP contained an extensive demonstration of compliance with the good neighbor requirements of the CAA. It concluded that Texas EGUs do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state's downwind monitors. That conclusion was based in part on the current extensive NOx emission controls already in place for EGUs, including the current Cross-State Air Pollution Rule (CSAPR), Group 2.

14. The impact of EPA's disapproval of the SIP and adoption of the proposed FIP will require immediate action on the part of existing EGUs to comply with the new requirements. The installation of control equipment is a process that can take years to complete. EPA explained in the proposed FIP that to achieve the lower emission budgets in 2026, "source owners and operators . . . should begin engineering and financial planning now to be prepared to meet this implementation timetable."[1]

15. Even those sources that do make the significant expenditures to install or upgrade selective catalytic reduction controls, will still likely need to purchase allowances in the trading market. Currently Texas trades in the Group 2 Trading program but would be moved to Group 3 which has tended to have higher prices and more scarcity even prior to the FIP proposal.

## LCRA UNIT IMPACTS

16. The most immediate impacts of the EPA actions to the LCRA EGU fleet occur as the result of allowance allocation reductions associated with FPP, the larger unit at SGP (referred to as SGP3) and the two combined-cycle gas turbines at LP1. The proposed FIP imposes the allowance reductions based on the assumption that SCR is installed or upgraded on these LCRA units.

17. All of the allocation numbers below use numbers EPA included in spreadsheets made available with the FIP proposal. They do not attempt to include the proposed dynamic budget/generation shifting component which would further disadvantage coal and gas steam units like FPP and SGP3.

18. EPA identifies a baseline emission rate for the three FPP coal units of 3,523 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the proposed FIP, EPA projects that FPP would be reduced to 3,140 allowances in 2023. The 2026 allowances would be

---

[1] 87 Fed. Reg. at 21,101 (April 6, 2022).

4

reduced further to 1,467 in 2026 by assuming that the units would meet a NOx emission rate of 0.05 lb/MMBtu after installing SCR. This represents a reduction in allowances of 58% from its highest emission rate during the baseline years.

19. Given these projected reductions in allowances, the LCRA units would run out of allowances during their control season if they operate as they did in 2021 and do not install or optimize SCR. The control period runs from May 1 to Sept 30. The chart below demonstrates the date each unit would have to shut down under those circumstances if they could not obtain additional allowances:

| LCRA Unit | Baseline TPY (2017 – 2021 highest rate) | 2023 Allowances | 2026 Allowances | Date 2026 Allowances Run Out based on operations in 2021 |
|-----------|------------------------------------------|-----------------|-----------------|-----------------------------------------------------------|
| FPP1 | 1202 | 1084 | 498 | August 10 |
| FPP2 | 1355 | 1186 | 561 | August 6 |
| FPP3 | 966 | 870 | 408 | August 8 |
| SGP3 | 416 | 220 | 44 | July 1 |
| LP1 Unit 1 | 47 | 20 | 20 | August 15 |
| LP1 Unit 2 | 50 | 21 | 21 | August 17 |

20. EPA identifies a baseline emission rate for the SGP3 gas unit of 416 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the proposed FIP, EPA projects that SGP3 would be reduced to 220 allowances in 2023. The 2026 allowances would be reduced further to 44 in 2026 by assuming that the units would meet a NOx emission rate of 0.03 lb/MMBtu after installing SCR. This represents a reduction in allowances of 89% from its highest emission rate during the baseline years.

21. EPA identifies a baseline emission rate for the two combined cycle gas units at LP1 of 97 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. EPA projects that the LP1 allowances will be reduced in 2023 to 41 allowances by assuming that the units would meet a NOx emission rate of 0.012 lb/MMBtu after optimization of the existing SCR system already in operation. This represents a reduction of 58% from its highest emission rate during the baseline years.

5

## TIMELINE OF CONTROL INSTALLATION

22. If LCRA were to install SCR controls on FPP and/or SGP3, LCRA must start that process immediately in order to have the installation complete by May 1, 2026. LCRA would need to hire contractors to design the new units, and to place major equipment orders immediately, in order to complete the planned installations. Once equipment orders are placed, cancellation penalties will apply if LCRA changes course.

23. The timeline set up by the proposed FIP to require that as many as 196 units nationwide install SCR by 2026 is untenable. While EPA evaluates how long it would take an individual plant to install this equipment, it does not adequately consider the supply chain and workforce issues associated with so many units doing the same work at one time.

24. EPA assumes a timetable of 36 months for installation of SCR. However, in a report[2] prepared for the American Public Power Association (APPA) and which APPA submitted to EPA during the FIP comment period, a review of 18 SCR installations demonstrates that the typical time necessary for installation on one unit is 40 months. However, plants with multiple units typically require 45 months. Other plants took as long as 62 months to complete installation. LCRA believes the APPA report reflects a more realistic timeline, especially for plants operated by public entities who typically have more obstacles for new capital projects.

25. Installation of SCR technology has significantly decreased over the last decade, raising the question whether there is enough expertise and supply to ramp back up before 2026. The proposed FIP would require that as many as 196 units nationwide install SCR by the May 1, 2026 deadline. Given today's serious supply chain and labor shortage issues, the schedule imposed by EPA is infeasible.

## COST OF CONTROLS

26. According to EPA's own cost evaluation in the proposed FIP, the cost of installing SCR at the three FPP units is $662,157,342 in 2021 dollars. Further, operation and maintenance of the SCR at the three FPP units will run per year $11,150,622 in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2026.

---

[2] J. Edward Cichanowicz, James Marchetti, Michael C. Hein, and Shirley Rivera, Technical Comments on Control Technology Options and Emission Allocations Proposed by the Environmental Protection Agency in Support of the Proposed 2015 Ozone NAAQS Transport Rule at [8] (June17, 2022) (Technical Report).

6

Given this high cost, EPA concludes in its proposed FIP that FPP will not install SCR as it is cost prohibitive due to the limited emission reductions possible from the emissions which are already relatively low.

27. According to EPA's own cost evaluation in the FIP, the cost of installing SCR at SGP3 is $61,196,310 in 2021 dollars. Further, operation and maintenance of the SCR is $644,112 in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2026.

## COST OF ALLOWANCES

28. Since EPA's proposal of the FIP in April 2022, the CSAPR NOx allowance market has fluctuated greatly. This year we saw allowance prices go as high as $50,000 for Group 3 in August 2022 following the FIP proposal. Currently prices seem to have settled just below $20,000, a threefold increase over pre-FIP proposal prices, but more volatility is anticipated with the adoption of the FIP.

29. Given the great volume of reductions required by the FIP, it is anticipated that allowances may not be readily available in the future. Given the current uncertainty, there is an incentive for EGUs to hold onto allowances for future use as opposed to selling them.

30. The three FPP coal unit allocations would be significantly lower than their highest NOx emission rate between 2017-2021 of 3523 tons. In 2023 it would receive 3140 allowances, which is 383 tons below that baseline. Further in 2026, based on the assumption that the units would meet a NOx emission rate of 0.05 lb/MMBtu, the units would receive 1467 allowances, which is 2056 less than the highest baseline rate. Assuming that these allowances are available in the marketplace, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, that would cost as much as $102,800,000 per year to make up the difference.

31. The SGP3 gas unit allocations would be significantly lower that its highest NOx emission rate between 2017-2021 of 416 tons. In 2023 it would receive 220 allowances, which is to 196 allowances below that baseline. Further in 2026, based on the assumption that the unit would meet a NOx emission rate of 0.03 lb/MMBtu, it would receive 44 allowances which is 372 less than the highest baseline rate. Assuming that these allowances are available in the marketplace, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, that would cost as much as $18,600,000 per year to make up the difference.

7

## CONCLUSION

32. For the reasons described above, LCRA is facing imminent and substantial harm by the disapproval of the Texas good neighbor SIP.

I, Kenneth C. Price, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of March, 2023.

Kenneth C. Price

8

**Declaration of Dudley Zahn, Vice President, NRG Energy, Inc.**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners, | ) ) ) | Case No. 23-60069 |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| Respondents. | ) | |

## DECLARATION OF DUDLEY ZAHN

1.      I am a Vice President at NRG Energy, Inc (NRG), which owns NRG Texas Power LLC ("NRG Texas"), which in turn owns power plants in Texas.  NRG Texas is a member of the Association of Electric Companies of Texas (AECT), and I am providing this declaration in support of AECT's motion to stay the disapproval of the Texas State Implementation Plan (SIP) rule promulgated by the U.S. Environmental Protection Agency (EPA or the Agency) on February 13, 2023. *See Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule").

This declaration is based on my personal knowledge and analysis conducted by my colleagues and me.

2.      The Final Rule, if not stayed, would impose substantial costs on NRG Texas during the next 12-18 months and would further impact the long-term economic viability of several of NRG Texas's electric generating units. The impact of the rule and the harm it will cause NRG Texas are detailed below.

## MY BACKGROUND

3.      As Vice President, Gulf Asset Management at NRG, I am familiar with the Texas electricity market and NRG Texas's business, day-to-day operations, financial matters, the value of its assets, and its underlying books and records.

## SUMMARY OF IRREPARABLE HARMS CAUSED BY EPA'S FINAL RULE

4.      On February 13, 2023, EPA published the Final Rule, clearing the path for the Agency to implement the proposed Federal Implementation Plan (FIP), *see* 87 Fed. Reg. 20,036 (Apr. 6, 2022), to expand and make more stringent its Group 3 $NO_X$ Ozone Season Trading Program. According to the proposed FIP, EPA would "not finalize a FIP for any of these states unless and until the EPA formally finalizes disapprovals of their SIP submittals." *Id.* at 20,058; *see also* 42 U.S.C. § 7410(c)(1). In other words, but for the Final Rule, the FIP would not apply to Texas. EPA has treated the proposed FIP as if it is a foregone conclusion that requires expenditures even before being promulgated in final form.  In it, EPA explained that to achieve the lower emission budgets in 2026, "source owners and operators . . . **should begin engineering and financial planning now** to be prepared to meet this implementation timetable."  87 Fed. Reg. at 20,101 (emphasis added).

2

5.      Texas is currently part of EPA's Group 2 $NO_X$ Ozone Season Trading Program.  The proposed FIP, if adopted and upheld, would move Texas to a revised Group 3 $NO_X$ Ozone Season Trading Program with more stringent budgets (developed by assuming the rapid installation of additional control mechanisms for electric generating units (EGUs)), including the imposition of a daily "backstop" emissions rate for certain large coal-fired EGUs in 2024 and all large coal-fired EGUs in 2027.

6.      Starting May 1, 2023, Texas EGUs would be subject to a $NO_X$ ozone season budget 27% less than under the current Group 2 Trading Program—from 52,301 tons to 38,284 tons.  EPA bases Texas's 2023 budget on generation shifting and on $NO_X$ reductions that EPA assumes can be achieved through "optimization" on certain units' existing $NO_X$ controls.   If this requirement is adopted and upheld, units that cannot conduct the work in the minimal time allotted by EPA, or cannot achieve the level of reduction that EPA requires, will be required to purchase additional allowances to cover any shortage (if they are available) or reduce their thermal generation in a market that is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability, or a combination of both.

7.       For 2026, EPA's SIP disapproval and proposed FIP relies on EPA's assumption that dozens of units in Texas will be able to achieve $NO_X$ reductions through the installation and operation of new and costly selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls or by shifting generation from higher emitting units to lower emitting units or renewables (if they are available).  If this requirement is adopted and upheld, units that cannot conduct the work in the time allotted by EPA, or cannot achieve the level of reduction EPA anticipates, would be required to purchase additional allowances to cover any shortage (if they are available) and/or reduce the thermal generation of electricity (*i.e.*, de-rate or retire) in a market that

is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability.

8.    The Final Rule, if upheld, will have significant impacts on NRG Texas's operations and the cost to service retail customers in Texas.  As detailed below, these harms will occur in 2023 and 2024 without a stay. In summary, EPA's rule would:

    a.    Require substantial compliance costs to operate under restricted $NO_X$ budgets.

    b.    Place significant financial burden on generators that seek to comply with the Final Rule by fast tracking large-scale, capital-intensive construction projects to meet EPA's exceedingly stringent $NO_X$ budgets in 2026 and daily backstop limits.

    c.    Exacerbate the current strain on ERCOT and the need for thermal generation by requiring hundreds of millions of dollars of capital investment which operate in a competitive wholesale market with no guarantee of cost recovery or rate of return on investment.

9.    These harms would be irreversible if generating units retired in anticipation of or as the result of the Final Rule.  Likewise, NRG Texas would be irreparably harmed if forced to take actions to continue operations with no reasonable means of recovering those costs and no feasible means to implement those projects by the compliance deadline.  NRG Texas cannot recover these costs from EPA or through regulated rates.  Capital investment decisions such as those needed to comply with environmental regulations are risk-adjusted and justified based on competitive wholesale market prices. Without a stay of the Final Rule, irreparable harm could occur well in advance of the deadlines for meeting the mandated emission limitations.

10.    The ability to maintain a reliable portfolio of thermal generation resources is set by market forces, not by regulated rates. NRG Texas operates in the Texas market overseen by the Electric Reliability Council of Texas (ERCOT). The ERCOT market is unique in its competitive market design. Lying wholly within the boundaries of the state, Texas restructured the electric market to

convert Texas's investor-owned utilities from a traditional rate-regulated structure into a "deregulated" competitive market at both the wholesale and retail levels. NRG Texas does not have captive customers and no assurance it can recover the costs associated with the Final Rule from "ratepayers." Instead, those costs are borne by NRG and directly impact the economic viability and ability to operate the electric generating units at issue.

## NRG TEXAS'S OPERATIONS AND ECONOMIC IMPACT

11.     NRG Texas is the second largest power generation company in Texas. NRG Texas's generating portfolio is made up of a combination of coal, nuclear, and natural gas. NRG Texas's nuclear and coal units are considered "baseload" units that operate at high capacity throughout the year. NRG Texas's natural gas units include steam boilers, combined cycle, and simple cycle turbine units that are typically used as supply when demand is greater than the baseload units' capabilities. Thus, due to these unique physical and economical characteristics, the electricity generated by NRG Texas's coal and gas-fired units without SCR installed—which are affected by the Final Rule—cannot simply be replaced by NRG Texas's other units.

12.     NRG Texas's coal and gas-fueled generating units significantly affected by the Final Rule are located at five generating plants (W.A. Parish, Limestone, T.H. Wharton, Cedar Bayou, and Greens Bayou) in multiple counties.

13.     NRG Texas provides electricity to Texas consumers and businesses within ERCOT, the independent system operator, which manages the state's unique competitive power market and the electric power grid that serves the majority of the state. The ERCOT market is a "power island" contained within Texas and separated from neighboring interconnections by asynchronous ties that limit imports and exports to and from the ERCOT market.

14.     Texas's economic growth (as measured by gross state product year-over-year growth) has been one of the highest in the United States, and Texas's electric consumption has followed its growth. The state of Texas relies upon access to affordable, reliable generation to continue to fuel its economic expansion. NRG Texas's generating units are critical to the reliable operation of the ERCOT grid, and ERCOT relies heavily on NRG Texas to meet the area's increasing demand. In the summer of 2022, for example, the hourly demand on the ERCOT system broke the all-time peak record three times in one week, and NRG Texas plants was a major contributor in supplying electricity critical to the grid at the time.

## THE FINAL RULE'S REQUIREMENTS FOR TEXAS

### *Installation of Costly Controls*

15.     EPA assumes that the EGU owners will make investment decisions and begin incurring costs now, even before finalization of the FIP, to install post-combustion controls to meet the stricter environmental limits by 2026.

16.     Retrofit of SCRs as proposed in the FIP would likely take more than three years. This minimum lead-time does not provide for potential delays in equipment fabrication and delivery due to high demand, weather-related delays due to high winds, storms, or extreme weather conditions, or site-specific conditions.  In other words, retrofits may not be possible within the timeframe set forth in the proposed FIP.

17.     The installation of SCRs on the affected NRG units would cost over $1 billion.  A substantial portion of that cost would be required to be expended in 2023 in order to meet EPA's unrealistic compliance timeframe.

## NRG TEXAS ALLOWANCE ALLOCATIONS AND CAPACITY REDUCTIONS

6

18.     The proposed FIP provides for an allocation of 3,336 allowances to NRG Texas's facilities in 2026, *4,938 allowances fewer* than actual emissions in 2022. The facilities most affected are:

| Account Name | 2022 Ozone Season NOx (tons) | 4--Year Max | 2023 Group 3 Allocation | 2026 Group 3 Allocation | 2023 Capacity Reduction | 2026 Capacity Reduction |
|---|---|---|---|---|---|---|
| Limestone | 3679.1 | 3679.1 | 2267 | 888 | -38% | -76% |
| Cedar Bayou | 866 | 866 | 576 | 359 | -33% | -59% |
| Greens Bayou | 262 | 262 | 79 | 31 | -70% | -88% |
| T H Wharton | 480 | 480 | 176 | 104 | -63% | -78% |
| W A Parish | 2603 | 3192 | 3063 | 1607 | -4% | -50% |

19.     In the proposed FIP, EPA incorrectly assumed that Limestone was equipped with SNCR and assumed that Limestone will "optimize" its non-existent SNCR by the 2023 ozone season.  As a result, EPA greatly overestimated Limestone's ability to achieve the proposed 2023 and 2026 Group 3 Allocations.

20.     The cost to "optimize" existing controls is also significant and potential recovery of investments highly speculative.  EPA assumes reductions from these optimizations will be complete by the start of the 2023 ozone season.  Specifically, such reductions are built into Texas's ozone season $NO_X$ budget that will begin to apply on May 1, 2023.  EPA's assumptions regarding emission rates are unrealistic, with EPA assuming that NRG Texas units can reduce its $NO_X$ by an additional 26% compared to 2022 emission rates and relying on those rates when setting budgets.

21.     To meet EPA's proposed FIP timeline, optimization efforts have already begun.  If EPA's disapproval of Texas's SIP is not stayed, NRG Texas must continue to take significant and costly steps, even prior to the FIP being finalized, to achieve the reductions identified by EPA by May 1, 2023.  If EPA's SIP disapproval is later vacated by the Court, the cost of this work cannot be recovered because of the structure of the deregulated competitive energy market in which NRG Texas operates.

22.     EPA has identified six of NRG Texas's units for optimization of their SCRs.  To perform this optimization, NRG Texas must evaluate existing permit limits, the units' existing ammonia injection systems, and the units' current SCR catalyst activity levels.  Testing must be performed to determine whether additional ammonia injection effectively reduces $NO_X$ rates and can be maintained without exceeding existing ammonia slip permit limits.  It could take months to perform an SCR optimization assessment, which includes gathering design and operational information and completing testing. Through that assessment, NRG Texas may determine that hardware changes are necessary for the existing ammonia injection systems or that layers of catalyst must be replaced to meet the emission rates EPA has assumed in establishing Texas's budget.  Given the 2023 ozone season is less than two months away, any hardware or catalyst changes that have not already been started are not feasible to be completed before the expected compliance date.

23.     Even if it were possible to perform all optimization efforts that EPA has assumed for the 2023 ozone season (which NRG Texas maintains is not possible), other flaws in the EPA's budget-setting process for 2023, in addition to EPA's assumed generation shifting, results in a shortage of $NO_X$ allowances based on what is necessary for anticipated generation needs.  This shortage will particularly harm NRG Texas's units that operate during critical peak demand periods.

24.     Costs resulting from EPA's significantly more stringent emission budgets, including new SCR costs, the cost of "optimizing" existing SCRs or SNCRs, or the cost of purchasing additional allowances, cannot be recovered from EPA or others if EPA's SIP disapproval is later determined to be unlawful.  Because of the deregulated nature of the ERCOT market, there is no mechanism for NRG Texas to recover costs it spends in the near-term in preparation for compliance with the

8

FIP (which would not apply but for EPA's disapproval of Texas's SIP) even if the Court ultimately vacates EPA's disapproval.

I, Dudley Zahn, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __3rd__ day of March 2023.

_____

Dudley Zahn,
Vice President, Gulf Asset Management
NRG Energy, Inc.

**Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp.**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Petitioners, | ) ) |
| v. | ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) |
| Respondents. | ) |

Case No. 23-60069

## DECLARATION OF RANDALL J. TALLEY

1.     I am the Vice President of Solid Fuels and Environmental Trading at Vistra Corp. (Vistra), a leading Fortune 500 integrated retail electricity and power generation company based in Irving, Texas.  I have worked for Vistra and its predecessors for 22 years, with roles in risk management, structuring and quantitative analysis, and commercial trading prior to my current role.

2.      I have over 17 years of experience in fundamental analysis, strategy, and trading of environmental commodities such as the Cross-State Air Pollution Rule (CSAPR) NOx allowances.  As Vice President of Solid Fuels and Environmental Trading, my team has the responsibility of leading strategies to optimize the use of environmental credits to maximize the gross margin of Vistra's generation fleet. Above all, my team must analyze the needs of the generation fleet and ensure that the adequate number of allowances are held for surrender.

3.      I am providing this declaration in support of the motion to stay the U.S. Environmental Protection Agency's (EPA) disapproval of Texas's interstate transport state implementation plan (SIP) for the 2015 ozone National Ambient Air Quality Standards (NAAQS) filed by Luminant Petitioners[1] in the case.  EPA's disapproval will irreparably harm Luminant and its operations, as described below.

4.      This declaration is based on my personal knowledge of facts and information available at this time and analyses conducted by me and my staff and colleagues.  I reserve the right to revise or update this declaration should new information become available.

---

[1] The Luminant Petitioners are indirect subsidiaries of Vistra.  They are: Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC (collectively "Luminant" in this declaration).

2

## LUMINANT'S OPERATIONS IN THE STATE OF TEXAS

5.    Luminant currently owns and/or operates 15,793 megawatts (MW) of installed fossil generation capacity in Texas, which includes approximately 11,293 MW fueled by natural gas and 4,500 MW fueled by coal.  This capacity is located at a total of 55 electric generating units (EGUs) at 17 sites in Texas.  All 55 of these EGUs are subject to additional regulation, and thus increased compliance costs, as a result of EPA's disapproval of Texas's SIP, as discussed below. Since 2018, Luminant has retired approximately 4,100 MW of coal-fueled generation capacity in ERCOT, including the Monticello, Big Brown, and Sandow power plants, which resulted in the reduction of over 8,000 tons of ozone season $NO_X$ emissions in Texas.

6.    Luminant's entire generating portfolio in Texas is 18,791 MW, which includes 2,400 MW of nuclear generation and 498 MW of solar and energy storage. Luminant is also one of the largest wind purchasers in Texas.  Luminant employs approximately 3,500 full-time employees and contracts with independent contractors to work at Luminant's facilities in the State of Texas.  Luminant spends approximately $2 billion annually in the form of salaries, taxes, fuel, maintenance, and other operating and capital expenditures, and its impact on gross state product and gross domestic product is substantial.

7.    In 2022, Luminant provided approximately 18.7% of the electricity dispatched to Texas consumers and businesses by the Electric Reliability Council of

3

Texas (ERCOT), the independent system operator that manages the state's unique competitive power market and the electric power grid that serves the majority of the state. The ERCOT market is a "power island" contained within Texas and separated from neighboring interconnections by asynchronous ties that limit imports and exports to and from the ERCOT market. The State of Texas relies upon access to affordable, reliable generation to continue to fuel its economic expansion and that of the United States. Luminant's generating units are critical to the reliable operation of the ERCOT grid, and ERCOT relies heavily on Luminant to meet the area's demand. Just this past summer, for example, the hourly demand on the ERCOT system broke the all-time peak record ten times in the span of two months. Demand ultimately peaked at 80,038 MW on July 20, 2022,[2] with Luminant plants making over 18,000 MW available to the grid at the time.

### TEXAS'S SIP ADDRESSES THE 2015 OZONE NAAQS

8.    In October 2015, EPA revised the primary and secondary ozone NAAQS to establish a new 8-hour standard of 70 parts per billion (ppb). Under the Clean Air Act, the State of Texas was required to submit a revised SIP to address the new ozone NAAQS within three years, by October 2018. As part of this obligation,

---

[2] ERCOT, *Item 6: Summer 2022 Operational and Market Review*, at 2 (Oct. 18, 2022), *available at* https://www.ercot.com/files/docs/2022/10/11/6%20Summer%202022%20Operational%20and%20Market%20Review.pdf.

Texas was required to ensure that its SIP contained adequate provisions to prohibit emissions from the State of Texas from contributing significantly to nonattainment in, or interference with maintenance by, any other state with respect to the revised NAAQS.  This is commonly referred to as the "good neighbor" provision.  Texas satisfied this requirement, submitting its SIP to EPA on August 17, 2018.

9.   To support Texas's SIP, Texas performed extensive modeling based on all available data, including modeling emissions from Luminant's EGUs. Texas's comprehensive modeling demonstrated that emissions from Texas, including Luminant's EGUs, do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors.  Accordingly, Texas's SIP submittal did not require any further reductions from sources in Texas; however, as Texas explained in its SIP submittal, many limitations and controls are already in place to address ozone precursor emissions at sources in Texas, including Luminant's EGUs.

10.   For example, among other things, EGUs in Texas are currently subject to EPA's Cross-State Air Pollution Rule (CSAPR) Group 2 Ozone Season $NO_X$ budgets.  EPA established this CSAPR Group 2 allowance trading program through a Federal Implementation Plan in October 2016 to address states' "good neighbor" obligations with respect to the 2008 ozone NAAQS.  Under this obligation, EPA established an emission budget for sources in Texas of 52,301 tons of $NO_X$ to ensure

such sources were not contributing significantly to nonattainment in, or interfering with maintenance by, any other state with respect to the 2008 ozone NAAQS. 40 C.F.R. § 97.810(a)(20)(i). Therefore, under Texas's most recent SIP, sources would continue to operate in compliance with the existing requirements applicable to ozone precursors, such as EPA's CSAPR Group 2 ozone season $NO_X$ budgets.

11.    Despite Texas's legally and technically sound SIP addressing the interstate transport requirements for the 2015 ozone NAAQS, EPA has unlawfully disapproved Texas's SIP. If EPA had approved Texas's SIP, sources in Texas would continue to be subject to their existing $NO_X$ limitations, and additional reductions would not be required. However, because EPA has disapproved Texas's SIP, EPA now has the legal obligation to promulgate a Federal Implementation Plan (FIP) for Texas. In fact, EPA presupposed the outcome of its SIP review process by proposing a FIP well before the outcome of its SIP review process. EPA says it will finalize a FIP after it finalizes disapproval of a SIP, as it has now done for Texas. S*ee* 87 Fed. Reg. 20,036, 20,058 (Apr. 6, 2022). EPA's FIP would impose substantial additional emission restrictions and costly compliance measures at Texas sources, including Luminant's EGUs. That proposed FIP made clear that "source owners and operators . . . should begin engineering and financial planning now," even before the FIP was finalized. *Id.* at 20,101. EPA will finalize that FIP in March 2023 and impose these new requirements starting just two months later in May 2023.

6

**EPA'S FIP FOR TEXAS**

12.   In its proposed FIP, EPA establishes more restrictive ozone season $NO_X$ budgets for Texas starting in May 2023 with further reductions beginning in 2026. EPA's new $NO_X$ emission budget for Texas starting in May 2023 is a 27% reduction from Texas's existing ozone season $NO_X$ budget—from 52,301 tons to 38,284 tons. *Id.* at 20,044.  EPA bases this 2023 budget in part on the amount of $NO_X$ reductions that EPA projects can be achieved by Texas units by conducting "optimization" work on their existing $NO_X$ controls.  Units that cannot conduct the work, or cannot achieve the reductions projected by EPA, will be forced to purchase additional allowances on the open market, if available, or reduce the generation of electricity (*i.e.*, de-rate) or a combination of both.

13.   EPA's FIP would further require a 58% reduction from Texas's existing $NO_X$ budget in 2026, down to 21,946 tons.  *Id.*  EPA bases this budget in part on the amount of $NO_X$ reductions that EPA projects will be achieved at Texas units by the installation of new and exorbitantly costly post-combustion emission controls—namely, the installation and operation of new selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls—or the shifting of generation from higher emitting units to lower emitting units or renewables and thus the loss of revenue.  Units that cannot conduct the work, or cannot achieve the reductions projected by EPA, will be forced to purchase additional allowances on

7

the open market, if available, and/or reduce the generation of electricity (*i.e.*, de-rate or retire).

14.    The following table shows the 17 Luminant plants in Texas that would be regulated by EPA's FIP as a result of EPA's SIP disapproval and the remedy for each plant that EPA assumes in its FIP.

**Luminant Power Plants Impacted by EPA's Texas SIP Disapproval**

| Facility | Number of Units | Type of Units | Capacity (in MW)[3] | EPA FIP Remedy |
|---|---|---|---|---|
| Coleto Creek | 1 | Existing Coal Steam | 648 | New SCR |
| Decordova | 4 | Existing Combustion Turbine | 282 | Generation Shifting |
| Ennis | 1 | Existing Combined Cycle | 359.5 | Optimize SCR |
| Forney | 6 | Existing Combined Cycle | 1,786 | Generation Shifting |
| Graham | 2 | Existing Oil/Gas Steam | 624 | New SCR |
| Hays | 4 | Existing Combined Cycle | 844 | Optimize SCR |
| Lake Hubbard | 2 | Existing Oil/Gas Steam | 915 | Optimize SCR |
| Lamar | 4 | Existing Combined Cycle | 1,036 | -- |
| Martin Lake | 3 | Existing Coal Steam | 2,410 | New SCR |
| Midlothian Energy | 6 | Existing Combined Cycle | 1,602 | Optimize SCR |
| Morgan Creek | 6 | Existing Combustion Turbine | 402 | Generation Shifting |
| Oak Grove | 2 | Existing Coal Steam | 1,710 | Generation Shifting |
| Odessa-Ector | 4 | Existing Combined Cycle | 1,043 | -- |
| Permian Basin | 5 | Existing Combustion Turbine | 321 | Generation Shifting |
| Stryker Creek | 2 | Existing Oil/Gas Steam | 669 | Generation Shifting |
| Trinidad | 1 | Existing Oil/Gas Steam | 235 | Generation Shifting |
| Wise County | 2 | Existing Combined Cycle | 680 | Optimize SCR |
| **Total** | | | **15,567** | |

15.   In addition to the significant reduction in allowances that would be imposed on Texas in the FIP, operations of Texas units are further limited by other aspects of

---

[3] These capacity values are taken from EPA's Integrated Planning Model (IPM), with the exception of Trinidad, which is not included in EPA's IPM. *See EPA, IPM Runs: Air Quality Modeling Base*

the FIP. The State of Texas has an "assurance level" equal to its budget plus a 21%
variability limit[4]—that is, sources in Texas would be penalized if emissions from the
State as a whole exceed 46,323 tons of $NO_X$ during the 2023 ozone season. This
represents a significant reduction from the assurance level of 63,284 tons under the
State's current obligations.[5] Under the FIP, in the event emissions from the State
exceed 46,323 tons, operators whose sources exceeded their respective share of the
assurance level would be penalized and required to surrender three allowances for
every one ton emitted above that level. Moreover, EPA's FIP includes multiple
other new draconian "enhancements" beyond the existing regulations. Specifically,
EPA has added unit-specific backstop daily emission rates, a revised emissions
budget-setting process (called "Dynamic Budgeting"), secondary emission limits,
and an annual recalibration of banked allowances. These new requirements will
further limit operations of Texas units and further ratchet down the emissions budget
allocated to Texas units.

---

*Case Overview File*, Doc. No. EPA-HQ-OAR-2021-0668-0157 (Apr. 5, 2022) (unit-specific
information provided in "ParsedFile EPA620 BC 1k 2023 06 07 2021").

[4] 87 Fed. Reg. at 20,209.

[5] 40 C.F.R. § 97.810(b)(20).

**EPA'S DISAPPROVAL OF TEXAS'S SIP IS CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF 2023 BUDGET IMPACTS**

16.    Under EPA's FIP, which EPA will issue in March 2023 as a result of its disapproval of Texas's SIP, sources in Texas will be moved from CSAPR Group 2 to the more restrictive CSAPR Group 3, with a $NO_X$ budget that has been reduced by 27% starting less than two months from now.   EPA assumes immediate reductions for the 2023 ozone season will be available through the optimization of SCRs and SNCRs at units in Texas as well as generation shifting from higher emitting units to lower emitting units or renewables.

17.    As a result of this immediate budget reduction, Luminant's ability to plan for its summer 2023 operations is severely limited.   Luminant and other Texas generators are faced with the choices of scrambling to attempt to "optimize" existing emissions control equipment over the next few months, purchasing costly emission allowances, limiting their operations during the ozone season (*i.e.*, de-rating), or a combination of all three.

18.    If operators seek to purchase emission allowances rather than undertake changes at the source, they face a significant cost of compliance. The cost of emission allowances has skyrocketed, at least partially as a result of EPA's FIP. When EPA issued the proposed FIP in early 2022, market participants anticipated dramatic changes to operations in order to comply with EPA's actions and the price

of allowances spiked.  For example, on December 30, 2021, before EPA proposed to disapprove Texas's SIP or proposed a FIP, Group 2 and Group 3 ozone season $NO_X$ allowances traded at $166.25 per ton and $3,175 per ton, respectively. However, allowance prices increased substantially during 2022 in large measure due to limitations in the trading market and uncertainty over the upcoming regulations. Group 2 and 3 allowance prices traded as high as approximately $5,000 per ton and $47,000 per ton, respectively, in August 2022.  Therefore, by acquiring additional allowances rather than seeking to undertake costly optimization measures—if allowances are even available in the market—the cost of compliance for sources radically increases.

19.    The dramatic increase in allowance costs is illustrated by EPA's treatment of Luminant's Martin Lake Plant.  Martin Lake has an operating capacity of 2,250 MW—enough to power about 1.125 million homes in normal conditions and 450,000 homes in periods of peak demand.  Martin Lake's ozone season $NO_X$ emissions from 2017 (the year the current budgets went into effect) to 2022 averaged 4,237 tons per year,[6] but Martin Lake's 2023 $NO_X$ budget under EPA's FIP is expected to be only 3,248 tons.[7]

---

[6] EPA's Clean Air Markets Database, https://campd.epa.gov/.

[7] EPA, *Unit-level Allocations and Underlying Data for the Proposed Rule* (Apr. 2022), *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs ("Proposed 2015 NAAQS Allocations" tab).

20.    The cost to seek to "optimize" existing controls is also substantial and cannot be recovered.  EPA claims that 14 EGUs at Luminant's facilities are able to optimize their SCR, and EPA relies on reductions from these optimizations when establishing Texas's ozone season $NO_X$ budget that will begin to apply in May.[8]  EPA makes unrealistic assumptions that all units can achieve very stringent rates and is setting budgets assuming that Luminant units can reduce their $NO_X$ emissions by an additional 16 to 54% compared to 2021 emission rates.

21.    If EPA's disapproval of Texas's SIP is not stayed, Luminant must take steps, even prior to the FIP being finalized, to achieve the reductions identified by EPA by May 1, 2023.  If EPA's SIP disapproval is later vacated by the Court, the cost of this work cannot be recovered from EPA.  And, because ERCOT is a deregulated competitive energy market, versus a regulated rate-recovery system, Luminant cannot recover these costs from ratepayers either.

22.    Specifically, to optimize the SCRs at the 14 units, Luminant is evaluating all applicable emission limits, existing ammonia injection systems, and overall SCR catalyst activity levels.  Testing is necessary to validate whether increased ammonia usage is effective and can be maintained without exceeding ammonia slip limits in permits and state regulations.  The assessment phase of SCR optimization could take

---

[8] *See* EPA, *Appendix A: Proposed Rule State Emission Budget Calculations and Engineering Analytics* (Mar. 2022), *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs ("Unit 2023" tab).

months to gather all design and operational information and complete testing. This assessment could lead to the determination that ammonia injection system hardware changes are needed or replacement catalyst is necessary to meet the assumptions that EPA has used to establish budgets. Any hardware or catalyst changes are not feasible to complete before the expected compliance date less than two months away.

23. Even if it was feasible to fully optimize the SCRs at Luminant's units by May 1, 2023, EPA's budget-setting process for 2023, including flaws in model inputs and generation shifting, directly leads to a shortage of $NO_X$ allowances as compared to what is necessary for anticipated generation needs and specifically impairs Luminant's units that operate during critical peak demand periods. For the 2023 ozone season, fifteen of Luminant's peaking units are allocated 43 to 97% fewer allowances than what was needed for the 2022 ozone season due EPA's projected generation shifting. These units are increasingly being relied on by ERCOT for reliability purposes during periods of extreme cold in the winter or heat in the summer, and often times are required to run. Additionally, with the increase of wind and solar (renewable, non-dispatchable) units, these units have had increased requirements to sit at their lowest output for ERCOT's grid reliability. If Luminant's peaking units are called on to run in 2023 in a manner similar to how they operated in 2022, each of these units would run out of allowances well before the end of the

14

ozone season, which is also the critical summer period in Texas, as shown in the table below:

| Plant | Unit | Ozone Season NOx Tons | | Date Allocations Run Out in 2022 if 2023 Budget in Place |
|---|---|---|---|---|
| | | 2022 Actual | Proposed 2023 Budget[9] | |
| Lake Hubbard | 1 | 97.25 | 48 | 7/15/2022 |
| Graham | 1 | 90.35 | 31 | 7/11/2022 |
| Graham | 2 | 115.80 | 66 | 8/5/2022 |
| Morgan Creek | CT1 | 23.59 | 1 | 5/13/2022 |
| Morgan Creek | CT2 | 20.79 | 1 | 5/13/2022 |
| Morgan Creek | CT3 | 19.15 | 1 | 5/13/2022 |
| Morgan Creek | CT4 | 20.09 | 1 | 5/13/2022 |
| Morgan Creek | CT5 | 18.90 | 1 | 5/13/2022 |
| Morgan Creek | CT6 | 19.77 | 1 | 5/13/2022 |
| Stryker Creek | 1 | 66.67 | 16 | 7/1/2022 |
| Trinidad | 9 | 68.93 | 31 | 7/19/2022 |
| Decordova | CT1 | 86.18 | 3 | 5/11/2022 |
| Decordova | CT2 | 43.37 | 2 | 5/13/2022 |
| Decordova | CT3 | 75.52 | 2 | 5/6/2022 |
| Decordova | CT4 | 53.13 | 2 | 5/13/2022 |
| **Total** | | **819.49** | **207** | |

24.    Absent a stay, Luminant will be forced to undertake efforts immediately to mitigate the impacts from the significant budget reductions.   This includes

---

[9] EPA, *Unit-level Allocations and Underlying Data for the Proposed Rule* (Apr. 2022), *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs ("Proposed 2015 NAAQS Allocations" tab).

combustion tuning activities at many of the units in question, as well as other units, to help mitigate the impact. The cost of the combustion tuning activities alone will be approximately $700,000. Additional costs are expected to be incurred, as it is likely some of these units will need to operate during periods in which they are uneconomic (*i.e.*, when costs to operate exceed energy revenues) to perform the tuning activities.

25.     Moreover, Luminant is currently making and will continue to make irreversible trading decisions as a result of EPA's disapproval of Texas's SIP. As noted above, there is significant uncertainty in the trading market resulting from the new regulatory obligations and limitations in the proposed FIP. Not only has this uncertainty arisen as a result of the more stringent budgets, but EPA's draconian "enhancements" to its new program cause even greater uncertainty. Specifically, EPA's "dynamic budgeting," wherein EPA will readjust state budgets every year beginning in 2025 based on a prior year's operations, prevents any source from knowing with certainty what its allocations in 2025 and future years will be. Therefore, operators are incentivized not to sell allowances to ensure a sufficient supply for future years; however, operators face an opposing force from EPA's "allowance bank recalibration." EPA's recalibration will "reset the total quantity of banked allowances for the Group 3 trading program" held in all allowance accounts to 10.5% of the total of all states' emission budgets each year. 87 Fed. Reg. at

16

20,109.  As a result, sources may lose allowances held in their account if the total amount of banked Group 3 allowances nationwide exceeds EPA's 10.5% threshold.  As a result, operators are in an untenable situation—attempting to navigate these competing interests while being forced to make irreversible trading decisions now as a result of these new requirements.

26.    None of these costs—the cost of "optimization," the cost of additional boiler tuning, the cost of additional allowances, or costs associated with foregone opportunities—can be recovered from EPA, rate payers, or others if EPA's SIP disapproval is later determined to be unlawful.  Because Luminant operates in a deregulated competitive energy market, there is no way that Luminant can recover costs expended now to prepare for compliance with a FIP or costs to comply during the 2023 ozone season, even if EPA's disapproval of Texas's SIP is later overturned.

### EPA'S DISAPPROVAL OF TEXAS'S SIP IS ALSO CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF EVEN MORE STRINGENT BUDGET REDUCTIONS IN 2026

27.    There are additional unrecoverable costs as a result of EPA's even more stringent 2026 emission budgets if EPA's SIP disapproval is not stayed. EPA's FIP will require sources to immediately begin taking steps to prepare for significant changes to compliance obligations that EPA has proposed for the 2026 ozone season. Specifically, EPA projects its FIP would produce an ozone season $NO_X$ budget of 21,946 tons for Texas in 2026, a 58% reduction from Texas's 2022 ozone season

17

NO$_X$ budget of 52,301 tons and a 43% reduction from Texas's 2023 ozone season NO$_X$ budget of 38,284 tons.  Texas's further reduction in budget is primarily driven by EPA's assumption of the installation of new SCRs.

28.    As shown in the table below, EPA has targeted five units at Luminant's facilities that it assumes will have to install a new SCR to comply with its FIP, and EPA relies on reductions from these retrofits when establishing Texas's ozone season NO$_X$ budget that will begin to apply in May 2026.  Specifically, EPA identifies a reduction from 2021 actual emissions of 3,914 tons of NO$_X$ attributable to these retrofits in establishing the 2026 budget.  Although these significant reductions are not expected to take place for three years, EPA explained in its proposed FIP that to achieve the lower emission budgets in 2026 source owners must "begin engineering and financial planning *now* to be prepared to meet [EPA's] implementation timetable." *Id*. at 20,101 (emphasis added).  Therefore, sources are faced with a Hobson's choice: begin steps now to install costly emission control equipment that may not be necessary, make plans to cease operations of certain sources during the ozone season, or purchase costly allowances, if any such allowances are even available.  Any of these would be unrecoverable sunk costs if EPA's SIP disapproval is overturned by the Court.

29.    To rely on the first option and install a new SCR, sources must begin initiating design studies now.  EPA itself previously found it may take between 2 and 4 years

to retrofit a single EGU with a new SCR and, in its proposed FIP, EPA explains

sources should start taking engineering and financial planning steps now to ensure

compliance on EPA's timeline.  First, a feasibility study would be necessary, which

would cost hundreds of thousands of dollars and take at least six months to perform.

The study would result in conceptual designs, preliminary cost estimates, and an

estimate of the timelines to complete final design, procure equipment, construct the

new systems, and commission the equipment.  If found to be an economically viable

option, detailed engineering studies and permitting activities would then commence.

30.   According to EPA's own cost evaluation,[10] installation of SCRs on the

Luminant units identified by EPA for retrofit would, in EPA's estimation, exceed

one billion dollars in total project costs, as shown in the table below.

---

[10] EPA, *NOx Control Retrofit Cost Tool Fleetwide Assessment Proposed CSAPR 2015 NAAQS*, Doc. No. EPA-HQ-OAR-2021-0668-0113 (Apr. 2022).

## Cost Evaluation of SCR at Luminant Units
## Identified by EPA for Retrofit

| Unit | Type of Unit | EPA FIP Remedy | EPA's Projected Total Project Cost Estimate of Remedy |
|---|---|---|---|
| Coleto Creek Unit 1 | Coal Steam | New SCR | $227.4 million |
| Graham Unit 2 | O/G Steam | New SCR | $65.2 million |
| Martin Lake Unit 1 | Coal Steam | New SCR | $312.5 million |
| Martin Lake Unit 2 | Coal Steam | New SCR | $309.9 million |
| Martin Lake Unit 3 | Coal Steam | New SCR | $310.5 million |
| **Totals** | | | $1.2 billion |

Luminant believes that these estimates are low especially given the age of these units, the site-specific challenges of installing SCRs on the three side-by-side units at Martin Lake, and the lost generation that would be incurred by additional or extended plant outages needed to incorporate the new SCR systems. Further, EPA's evaluation projects over $20 million per year in operation and maintenance costs for the SCRs at these units.

31.   Even if EPA's SIP disapproval is overturned by the Court one year from now, initial costs would likely amount to millions of dollars in unrecoverable costs. It is clear that sources cannot wait until litigation over EPA's disapproval of Texas's SIP is resolved before they must begin making costly, unrecoverable compliance decisions.

20

32.    In the event sources do not take steps now to install costly SCRs, companies may be required to idle certain sources during the ozone season; however, this option also requires immediate planning.  If forced to idle units, substantial planning would be needed with varying implementation costs based upon the expected length that the unit would be idled and the individual unit design.  Some considerations that must be addressed are the steps necessary to protect the boilers, turbines, and generation from corrosion and electrical damage while the unit is not operating.  Planning would also include proper handling and long-term storage of water, chemicals, fuel and other commodities.  Finally, plant labor expenses would continue regardless of whether generation or revenue was being produced.  All of the items listed above are just a small fraction of the details that would need to be evaluated and planned for if a unit were to idle over the ozone season.  Ozone season in Texas is generally peak demand season, with the highest prices for generation.  Therefore, idling during the ozone season—from May through September—would likely make many units uneconomic and force their early retirement, which appears to be EPA's goal with this disapproval of Texas's SIP and issuance of the FIP as shown by EPA's modeling discussed further below.

33.    Further, even though CSAPR has historically been a trading program, and sources could acquire additional allowances rather than install new controls, such an approach will be significantly more limited under EPA's FIP.  Due to the increasing

21

stringency of the ozone season NO$_X$ budgets, in addition to the new, restrictive features introduced in EPA's FIP, operational flexibility through the trading program will be severely limited.  Luminant has to plan for a limited allowance market and high allowance costs, and this must be accounted for in the dispatch planning of the fleet.  Additionally, if allowances are unavailable and insufficient allowances are held by Luminant, penalties could come into play that strip allocations from future years and limit future operations.

34.    Therefore, Luminant is taking steps now to comply with near-term and long-term obligations under EPA's FIP, which sources in Texas would not be subject to but for EPA's disapproval of Texas's SIP.  Even if the disapproval of Texas's SIP is ultimately overturned, Luminant faces immediate and irreparable harm, as Luminant will have undertaken significant compliance efforts and costs that cannot later be recovered.

35.    EPA's modeling projects the retirement of many of Luminant's units in the near-term.  EPA modeled the proposed rule scenario using its Integrated Planning Model (IPM), and that model projects significant shutdowns of units in Texas even before 2026.  IPM, in EPA's words, is "a state-of-the-art, peer-reviewed, dynamic linear programming model that can be used to project power sector behavior under future business-as-usual conditions and to examine prospective air pollution control policies throughout the contiguous United States for the entire electric power

22

system."[11]  EPA used IPM to project likely future electricity market conditions with and without the proposed FIP for the 2015 ozone NAAQS.  Luminant is unable to run the proprietary IPM model itself and, thus, can only review the modeling results that EPA has made available and EPA's conclusions.

36.     As to Luminant in particular, EPA's IPM modeling for its "Proposed Rule Case"[12] shows that eight facilities cease operating by 2025, with 3,091 MW of Luminant's units no longer operating in 2023 and an additional 3,133 MW no longer operating by 2025 as shown below:

---

[11] EPA, *Regulatory Impact Analysis for Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard*, at 4-11 (Feb. 2022).

[12] *See* EPA, *IPM Runs: Proposed Rule Files*, Doc. No. EPA-HQ-OAR-2021-0668-0161 (Apr. 5, 2022) (unit-specific information provided in "Proposed Rule RPE File").

### Luminant Facilities That Cease Operation By 2025
### Under EPA's Modeling of FIP

| Plant (Unit ID from IPM) | Dispatchable Capacity per IPM (in MWs) | Cease Operation by 2023 | Cease Operation by 2025 |
|---|---|---|---|
| Coleto Creek (2716) | 648 | X | |
| Graham (2443 and 2444) | 624 | X | |
| Lake Hubbard (2312 and 2549) | 915 | X | |
| Martin Lake (2623) | 2,410 | | X |
| Morgan Creek (1073) | 402 | | X |
| Permian Basin (1074) | 321 | | X |
| Stryker Creek (2317 and 2321) | 669 | X | |
| Trinidad (not listed in IPM) | 235 | X | |
| **Total MW:** | **6,224** | | |

This means that—according to EPA—over 30% of Luminant's existing Texas generation will be shuttered within the next few years. This only emphasizes the immediate and irreparable harm that Luminant—and the Texas economy and consumers in ERCOT—face as a result of EPA's disapproval of Texas's SIP.

24

I, Randall J. Talley, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 2nd day of March, 2023.

Randall J. Talley
Vice President, Solid Fuels and
Environmental Trading
Vistra Corp.

**Declaration of Jacob Krautsch, Senior Director of Environmental, Energy Transfer LP**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| **STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY, LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION** )<br><br>Petitioners, )<br><br>v. )<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,** )<br><br>Respondents. ) | Case No. 23-60069 |

## DECLARATION OF JACOB KRAUTSCH

I, Jacob Krautsch, am the Senior Director of Environmental at Energy Transfer LP[1]. As the Sr. Director of Environmental, I manage the environmental support group for Energy Transfer LP. I am providing this declaration in support of Texas Industry Petitioners' Motion to Stay Final Action of the U.S. Environmental Protection Agency (EPA) related to EPA's disapproval of Texas's interstate transport state implementation plan (SIP) for the 2015 ozone National Ambient Air Quality Standards (NAAQS) (Petitioner's Motion). Energy Transfer is a member of the Texas Oil & Gas Association (TxOGA), one of the Petitioners above. EPA's actions described in Petitioner's Motion will result in irreparable harm to Energy Transfer's operations, as set forth below. This declaration is based on my personal knowledge of facts and information available at this time and analysis conducted by me and my staff. I reserve the right to revise or update this declaration should new information become available.

---

[1] This Declaration is provided by me for Energy Transfer LP, on behalf of itself and its subsidiaries and affiliates, collectively referred to herein as Energy Transfer.

1

## I.      Company and Assets in Texas

Energy Transfer is, *inter alia*, involved in the "pipeline transportation of natural gas" as addressed in EPA's proposed Federal Implementation Plan (FIP), 87 Fed. Reg. 20,036 (Apr. 6, 2022), addressing regional ozone transport for the 2015 ozone national ambient air quality standards (NAAQS). Energy Transfer's pipeline transportation of natural gas, which places the company within the category of a non-EGU, includes operation of its natural gas fired two stroke lean burn (2SLB), four stroke lean burn (4SLB), and four stroke rich burn (4SRB) spark-ignited reciprocating internal combustion engines (RICE) at pipeline compressor stations in Texas. As a result, EPA's efforts to disapprove Texas' SIP and institute EPA's FIP directly affects Energy Transfer.

## II.     What Texas SIP Disapproval Means to non-EGUs

EPA can only finalize the proposed FIP upon final disapproval of Texas's SIP. *See* 42 U.S.C. 7410(c)(1). EPA has treated the FIP as if it is a foregone conclusion that requires expenditures even before finalization. EPA explained in the proposed FIP that to achieve the lower emission budgets in 2026, "source owners and operators . . . should begin engineering and financial planning *now* to be prepared to meet this implementation timetable." 87 Fed. Reg. at 21,101 (emphasis added). As a result, costs associated with planning, engineering, permitting and procurement of controls and/or engines if EPA's SIP disapproval or FIP is later held invalid will produce irreparable harm associated with compliance that will be suffered immediately by Texas non-EGUs. Such costs are either nonrecoverable or only recoverable through increased customer rates.

## III.    Specific Harm to Energy Transfer, a Texas Non-EGU

To meet the proposed FIP's NOx emissions reductions for non-EGU sources, it is necessary for Energy Transfer to make expenditures and to begin budgeting, planning, engineering, and construction on controls immediately. For the reasons described herein, full satisfaction of the proposed FIP's 2026 compliance deadlines will nonetheless remain uncertain even if efforts to comply begin immediately. The harm caused to Energy Transfer by the same is irreparable in nature as it leads to both non-monetary harm and monetary harm which cannot be calculated, as set forth below.

A.      Control Costs, NOx Performance Testing, and Monitoring are Monetary Harms to Energy Transfer which Cannot be Calculated

1.      Energy Transfer estimates 25 of its natural gas fired 2SLB engines in Texas will require additional controls or complete engine replacement. Although the precise costs associated with the work necessary for these 2SLB engines cannot be calculated, the estimated cost is $57 million to $118 million, depending on whether the engine technology involved for each engine has available controls or if the engine must be replaced to meet the FIP requirements. This will require an engine-by-engine review and analysis. The cost and timing for completion of work would be further impacted by supply chain concerns discussed below.

In addition to the $57 million to $118 million costs related to 2SLB engines in Texas, additional expenditures associated with controls made necessary by EPA's

proposed FIP for Energy Transfer's natural gas fired 4SRB and 4SLB engines will also be required immediately. The number of affected engines cannot be easily calculated as evaluation of the engines to determine whether each satisfies the FIP's requirements or if additional controls or replacements are necessary will require extensive time. In total, Energy Transfer has 309 4SRB and 862 4SLB engines in Texas, the costs for controls or replacements for which are not easily calculable.

2.      In addition to control costs or engine replacement costs, NOx performance testing expenditures will be necessary according to EPA's proposed FIP for all applicable engines in Texas. The costs associated with such NOx performance testing for Energy Transfer's applicable engines, however, is not easily calculable given that the types of controls to be added and engines to be replaced cannot yet be ascertained for the reasons set forth above, but there will undoubtedly be costs associated with the same.

3.      EPA's proposed FIP also contains requirements related to monitoring engine operation and fuel consumption, and continuous parametric monitoring systems which will require additional expenditures that are not easily calculable because of the currently undetermined number of applicable engines and resulting needs related to added controls or engine replacements.

B.    Implementation, Supply Chain, and Reliability Issues are Non-Monetary Harms to Energy Transfer

1.      Implementation of the changes by 2026 as necessitated by EPA's proposed FIP for Texas is not feasible. For each affected engine (of which Energy Transfer has many as set forth above), the implementation process requires budgeting, planning, engineering, and construction (with associated outages). While this is non-monetary harm, it is significant and irreparable nonetheless as it will result in Energy Transfer's inability to comply with the regulation EPA proposed by failing to meet the 2026 deadline for all Texas engines.

2.      Further, all impacted companies involved in "pipeline transportation of natural gas will be vying for the same equipment and contractor resources which were limited at best even prior to EPA's proposal of the FIP. These supply chain issues, coupled with the time required to obtain necessary permits which may be triggered after the planning and engineering is complete, will require a longer lead time than available under the proposed FIP. The FIP applies to several states, not just Texas, which will further exacerbate supply chain issues while also driving up costs due to the increased demand created by the EPA FIP's 2026 deadline for all applicable sources in each of those states. Therefore, the resulting supply chain issues are also significant, irreparable, non-monetary harm to Energy Transfer.

3.      Lastly, extended outages necessary for installing controls or replacing engines pursuant to the EPA SIP disapproval and FIP will be unavoidable and thereby reduce throughput throughout Texas, potentially leading to reliability issues

3

which may result from inability to satisfy FERC requirements and/or meet customer delivery obligations. This harm certainly is significant and irreparable, albeit non-monetary in nature.

While Energy Transfer cannot calculate the full scale of the impact, it has been able to articulate the above-referenced immediate and irreparable harm to Energy Transfer as a result of EPA's disapproval of the Texas SIP and proposal of EPA's FIP as it pertains to Energy Transfer's Texas operations. To the extent that a small portion of the harms can be calculated however, the monetary harm resulting from the same is estimated to be between $57 million and $118 million, which will further increase as the evaluation of what is necessary for each applicable engine to come into compliance is complete.

I, Jacob Krautsch, declare under penalty of perjury that the foregoing is true and correct. Executed this 2ⁿᵈ day of March, 2023.

Jacob Krautsch
Sr. Director, Environmental
Energy Transfer

**Exhibit 6: Texas Industry Petitioners' Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency & Texas Industry Petitioners' Appendix of Exhibits in Support of Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency, Docs. 203-1 & 203-2, *Texas v. EPA*, No. 23-60069 (5th Cir. Apr. 10, 2023)**

No. 23-60069

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL
QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO
CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS
ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE
MANAGEMENT COMPANY LLC; WISE COUNTY POWER
COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF
TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS
OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI
DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI
POWER COMPANY; STATE OF LOUISIANA; LOUISIANA
DEPARTMENT OF ENVIRONMENTAL QUALITY,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, United States Environmental
Protection Agency,

Respondents.

TEXAS INDUSTRY PETITIONERS'
REPLY IN SUPPORT OF MOTION TO STAY FINAL ACTION
OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

April 10, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ....................................................................... ii

LIST OF EXHIBITS IN APPENDIX ........................................................ iv

GLOSSARY ................................................................................................. v

ARGUMENT ............................................................................................... 1

I.      The Texas Stay Motions Should Be Decided by May 1 ....................... 1

II.     Petitioners Are Likely to Succeed on the Merits ................................. 1

        A.      In *EME Homer*, the Supreme Court Confirmed That Texas—Not
                EPA—Is Delegated the Discretion to Apply the Good Neighbor
                Provision in its SIP ................................................................... 2

        B.      EPA May Not Lawfully Superimpose its "4-Step" Framework on
                Texas's SIP ................................................................................ 3

        C.      Texas's Application of the "Maintenance" Prong Tracks the Statute ...... 4

        D.      EPA Unlawfully Rejected TCEQ's Weight-of-Evidence Approach ........ 5

        E.      EPA's Use of "Ballpark Estimates" Was Arbitrary and Capricious ......... 8

III.    Petitioners Will Suffer Irreparable Harm Absent a Stay ........................ 8

IV.     The Balance of Harms and the Public Interest Favor a Stay ................ 10

CONCLUSION ........................................................................................... 11

CERTIFICATE OF COMPLIANCE ....................................................... 13

CERTIFICATE OF SERVICE ................................................................. 14

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*EME Homer City Generation, L.P. v. EPA,*
 696 F.3d 7 (D.C. Cir. 2012) ........................................................................... 7, 9

*EME Homer City Generation, L.P. v. EPA,*
 795 F.3d 118 (D.C. Cir. 2015) ...................................................................... 3, 6

*EPA v. EME Homer City Generation, L.P.,*
 572 U.S. 489 (2014) ........................................................................................ 2, 3

*Exelon Wind 1, L.L.C. v. Nelson,*
 766 F.3d 380 (5th Cir. 2014) ............................................................................. 4

*Luminant Generation Co. v. EPA,*
 675 F.3d 917 (5th Cir. 2012) ........................................................................... 3, 4

*Midwest Ozone Grp. v. EPA,*
 61 F.4th 187 (D.C. Cir. 2023) ............................................................................ 7

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
 463 U.S. 29 (1983) .............................................................................................. 8

*SEC v. Chenery Corp.,*
 318 U.S. 80 (1943) .............................................................................................. 3

*Texas v. EPA,*
 829 F.3d 405 (5th Cir. 2016) ..................................................................... 1, 4, 10

*Texas v. EPA,*
 983 F.3d 826 (5th Cir. 2020) ............................................................................. 6

*Univ. of Tex. M.D. Anderson v. U.S. Dep't of Health & Human Servs.,*
 985 F.3d 472 (5th Cir. 2021) ............................................................................. 6

**Federal Statutes**

42 U.S.C. §7410(c)(1)(B) ........................................................................................ 8

42 U.S.C. §7505a .................................................................................... 4

**Federal Regulations**

40 C.F.R. §97.810(a)(2) ......................................................................... 10

**Federal Register**

87 Fed. Reg. 9,798 (Feb. 22, 2022) ................................................... 4, 10

88 Fed. Reg. 9,336 (Feb. 13, 2023) ......................................................... 6

**Miscellaneous**

EPA, *Federal "Good Neighbor Plan"* (Mar. 15, 2023), *available at* https://tinyurl.com/2k2e3nwb) ("Final FIP") ....................................... 1

EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* (Feb. 2022) ("Region 6 Texas TSD") ................................... 7, 8

Order, *EME Homer City Generation L.P. v. EPA*, No. 11-1302 (D.C. Cir. Dec. 30, 2011) ...................................................................................... 3

Order Granting Stay, *R.J. Reynolds Vapor Co. v. FDA*, No. 23-60037 (5th Cir. Mar. 23, 2023) ............................................................................... 10

TCEQ, *Transport State Implementation Plan (SIP) Revision for the 2015 Ozone National Ambient Air Quality Standards (NAAQS)*, Docket No. 2017-1762-SIP (Aug. 8, 2018), *available at* https://tinyurl.com/yc53rkrf ("Texas SIP") ................................................................................. 4, 5, 6

# LIST OF EXHIBITS IN APPENDIX

**Exhibit**                                                    **Page Number**
                                                                **in Appendix**

Supplemental Declaration of Dwayne W. "Woody" Rickerson, Vice
 President of System Planning & Weatherization, Electric Reliability
 Council of Texas (ERCOT) (Apr. 7, 2023) ("Rickerson Supp.") ........................ 1

Declaration of Kenneth C. Price, Chief Operating Officer, Lower
 Colorado River Authority (Apr. 6, 2023) ("Price Decl.") ..................................... 4

Supplemental Declaration of Dudley Zahn, Vice President, NRG Energy,
 Inc. (Apr. 10, 2023) ("Zahn Supp.") ....................................................................... 13

Supplemental Declaration of Randall J. Talley, Vice President, Solid Fuels
 and Environmental Trading, Vistra Corp. (Apr. 10, 2023) ("Talley
 Supp.") .......................................................................................................................... 21

Declaration of Jacob Krautsch, Senior Director of Environmental, Energy
 Transfer LP (Apr. 10, 2023) ("Krautsch Decl.") ................................................... 31

Declaration of Kevin Pollo, Vice President of Energy Supply & Market
 Operations, CPS Energy (Apr. 7, 2023) ("Pollo Decl.").................................... 36

## **GLOSSARY**

| | |
|---|---|
| **CAA or the Act** | Clean Air Act |
| **EPA** | United States Environmental Protection Agency |
| **ERCOT** | Electric Reliability Council of Texas |
| **FIP** | Federal Implementation Plan |
| **NAAQS** | National Ambient Air Quality Standards |
| **NO$_X$** | Nitrogen Oxides |
| **SIP** | State Implementation Plan |
| **TCEQ** | Texas Commission on Environmental Quality |
| **Texas Industry Petitioners** | Association of Electric Companies of Texas, BCCA Appeal Group, Texas Chemical Council, Texas Oil & Gas Association, Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC |

## ARGUMENT

### I.    The Texas Stay Motions Should Be Decided by May 1

The Court should not delay ruling on Texas Petitioners' stay motions based on EPA's claim that "Compliance will not start on May 1, 2023." Doc. 179 at 34 ("Opp."). That is a ruse. The Final FIP provides that Texas facilities "will begin participating in" the more stringent "Group 3 trading program on May 1, 2023, regardless of the rule's effective date." Final FIP at PDF p. 420. Thus, even with EPA's promise to later "prorate[]" budgets (at 34)—which will not redress Petitioners' harm (*infra* at pp. 8-10)—a ruling—or at least an administrative stay—before May 1 is necessary to maintain the status quo and prevent EPA from imposing the new Group 3 provisions.

Nor does EPA's venue motion mean that "Movants are not entitled to relief of any kind." Opp. at 2. This Court is the proper venue. Doc. 102 at 1. Even with EPA's venue objection, this Court unquestionably has jurisdiction and the "power to consider the motion for a stay." *Texas v. EPA*, 829 F.3d 405, 418 (5th Cir. 2016). Accordingly, this Court's practice has been to decide stay motions before, or alongside, venue motions. *See, e.g.*, *id.*; Doc. 102 at 19 (citing cases). EPA gives no justification for a different approach here.

### II.    Petitioners Are Likely to Succeed on the Merits

For multiple independent reasons, Petitioners are likely to succeed on the merits.

A-744

## A. In *EME Homer*, the Supreme Court Confirmed That Texas—Not EPA—Is Delegated the Discretion to Apply the Good Neighbor Provision in its SIP

EPA defends its Texas SIP disapproval based almost entirely on its selective reading of the Supreme Court's decision in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014), which involved challenges by Texas and others to an EPA good neighbor *FIP*—the "Transport Rule." Opp. at 2-5, 17, 25, 29, 37. EPA contends that "the Supreme Court discerned in the Good Neighbor Provision 'a delegation of authority to EPA to select from reasonable options[,]' and upheld as reasonable the very framework for evaluating state plans that EPA employed in this rule [*i.e.*, EPA's '4-Steps']." Opp. at 2.

Not so. *EME Homer* dealt exclusively with EPA's promulgation of *federal* implementation plans, not SIPs. *See EME Homer*, 572 U.S. at 503. EPA's antecedent SIP disapprovals, which had largely gone "unchallenged," were not even before the Supreme Court. *Id.* at 503 n.11, & 507 ("[The] State respondents' challenge is not that EPA's disapproval of any particular SIP was erroneous."). Thus, *EME Homer* does not help EPA here.

Quite the opposite, the Supreme Court confirmed that, for SIPs, the "delegation of authority" that EPA claims for itself (at 2) runs to the State, not EPA. The Supreme Court explained that its references to "EPA's task" in issuing FIPs should be construed to refer to States in the SIP context because "the Good Neighbor Provision is initially directed to upwind States." *EME Homer*, 572 U.S. at 514 & n.15. *EME Homer* is thus

2

consistent with this Court's precedent that, at the SIP stage, "[o]nly the [S]tates enjoy discretion in implementing the [Act]." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 928 n.8 (5th Cir. 2012). Because EPA "misconceived the law" on this crucial point, its disapproval "may not stand" and should be stayed (just as the Transport Rule was stayed in *EME Homer*[1]). *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

### B. EPA May Not Lawfully Superimpose its "4-Step" Framework on Texas's SIP

Because *EME Homer* did not concern SIPs, it is irrelevant that, according to EPA (at 17-18), "[t]he Supreme Court has held that EPA's 4-step framework provides a permissible and workable approach for implementing these [good neighbor] requirements." While EPA's framework may (or may not) be permissible for a particular FIP, Texas has the discretion to adopt a *different* "permissible and workable" approach under its statutory SIP authority.

The Supreme Court confirmed as much by holding that Texas was delegated the authority to address interstate transport in the first instance in a SIP *without* "EPA's input." *EME Homer*, 572 U.S. at 509-10 ("When Congress elected to make EPA's input a prerequisite to state action under the Act, it did so expressly," but it did not "include[] a similar direction in [the good neighbor] section."). Thus, in exercising its independent

---

[1] It should not be lost here that the D.C. Circuit **granted** Texas's motion to stay the Transport Rule, *see* Order, *EME Homer City Generation L.P. v. EPA*, No. 11-1302 (D.C. Cir. Dec. 30, 2011), after which Texas **prevailed** on the merits of its argument that EPA's FIP unlawfully over-controlled Texas sources. *See EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 129 (D.C. Cir. 2015).

3

statutory authority under 42 U.S.C. §7410(a), Texas may interpret and apply the good neighbor provision and select the "permissible and workable" approach for its SIP, no less than EPA may for FIPs. *Luminant*, 675 F.3d at 928 n.8; *see also Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 394-95 (5th Cir. 2014) (deferring to Texas PUC implementation of federal statute).

*EME Homer*, then, does not provide the statutory hook that EPA seeks. Without that hook, it is left empty-handed. Since EPA has no good neighbor regulations that bind States (Doc. 32-1 at 14), this case is not only "comparable" (at 19) to the Texas Regional Haze case—where this Court stayed EPA's disapproval of Texas's SIP in the "absence of a regulation or statute requiring [EPA's preferred approach]"—it is on all fours. *Texas*, 829 F.3d at 429.

## C.    Texas's Application of the "Maintenance" Prong Tracks the Statute

EPA's disapproval claimed that TCEQ failed to "give[] meaning to the CAA's instruction" regarding "interfering with maintenance" (87 Fed. Reg. 9,798, 9,826 (Feb. 22, 2022)), but its brief now accepts that "the Act provides no [such] instruction." Opp. at 25. And EPA's brief ignores entirely the statutory provision that "gives meaning" to the term "maintenance"—42 U.S.C. §7505a—which TCEQ used to identify "maintenance" monitors. Texas SIP at 3-42. Because TCEQ's approach was consistent

4

with that statutory provision (Doc. 32-1 at 6-7, 14)—a point that EPA does not contest—EPA could not legally disapprove it.

EPA insists that it disapproved Texas's method "because it failed to comport with [*North Carolina v. EPA*]." Opp. at 26. Yet EPA does not dispute that Texas's SIP did, in fact, give both prongs independent effect and separately identified both "nonattainment" and "maintenance" receptors. Doc. 32-1 at 14. And it cites nothing in *North Carolina* or elsewhere for its contention (at 27) that using "the latest three years" of data means that Texas's SIP did not account for variability or independently identify maintenance monitors, which Texas's SIP unquestionably did. *See* Texas SIP at 3-39–3-42.

**D.    EPA Unlawfully Rejected TCEQ's Weight-of-Evidence Approach**

EPA contends that it lawfully disapproved Texas's SIP based on "Texas's failure to 'conduct an adequate Step 3 analysis.'" Opp. at 20. But TCEQ was not required to, and did not, conduct a "Step 3 analysis" under EPA's rigid framework. *See* Texas SIP at 3-2.

EPA's actual disagreement is with TCEQ's "weight-of-evidence approach to determining 'significant contribution'" (at 20) instead of blindly applying EPA's bright-line one-percent threshold. Contrary to its litigating position (at 20), EPA *does* "use[] the 1% contribution threshold to define 'significance.'" In EPA's own words: "If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS . . . the state does not contribute significantly to nonattainment or interfere

5

with maintenance of the NAAQS in the downwind states." *See* 88 Fed. Reg. 9,336, 9,342 (Feb. 13, 2023). It is not simply "a screening threshold" (at 20)—in reality, a one-percent contribution establishes definitively, for EPA, that "th[e] upwind State [has] 'contributed significantly.'" *EME Homer*, 795 F.3d at 125. As EPA's brief concedes (at 21), that is why EPA rejected out-of-hand Texas's approach of further evaluating the "significance" of its contribution to downwind receptors with a modeled one-percent linkage.

EPA tries to side-step that issue in this Court because the "one-percent threshold does not appear in the text of [the interstate transport] provision," *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020), and thus cannot be imposed on Texas. And because TCEQ's weight-of-evidence approach is consistent with the statute and a reasonable method of assessing downwind contribution to ozone nonattainment, *see id.* at 839-40, EPA is left with no valid basis for its disapproval. Indeed, TCEQ was simply following an approach that EPA had *approved* for other States. Texas SIP at 3-59 & n.28 (relying on EPA approval of Nevada good neighbor SIP); *see also Univ. of Tex. M.D. Anderson v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must 'treat like cases alike.'").

As a last resort, EPA's brief claims that the "*actual* reason" for its disapproval was that Texas's "'weight-of-evidence' analysis was technically flawed" (at 22)— despite having argued just two pages earlier that "EPA's basis for disapproval [was]

6

not the flaws EPA identified in Texas's data, modeling, and methodology" (at 20). Notwithstanding counsel's post hoc conflicting characterizations, the actual reason that EPA gave *in the record* for rejecting TCEQ's weight-of-evidence analysis was not any technical flaws, but rather EPA's technical *judgment* that TCEQ had not provided "substantial evidence that counters . . . the contribution analysis using EPA's [one-percent] contribution methodology."  Region 6 Texas TSD at 77-78.

But EPA cites no support for its authority to disapprove Texas's SIP based on EPA's different technical judgment about the same data.  TCEQ is delegated the authority under the Act to make its own technical judgments in the SIP context, and reviewing courts properly look to the technical judgment of "the agency to which [the job] was delegated"—here, TCEQ.  *See Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023).  EPA identifies no modeling protocols that TCEQ did not follow.  And TCEQ is widely-recognized as an authoritative source on complex photochemical modeling of interstate transport of emissions.  *Id.* at 190 n.2 (citing TCEQ on photochemical modeling); *see also EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 49 & n.13 (D.C. Cir. 2012) ("State air quality divisions are no strangers to complex air quality and meteorological modeling of interstate transport of emissions."  "To cite one example: the State of Texas." (Rogers, J, dissenting)), *rev'd on other grounds*, 572 U.S. 489 (2014).  There is no basis for second-guessing TCEQ's technical expertise here.

### E.   EPA's Use of "Ballpark Estimates" Was Arbitrary and Capricious

EPA does not dispute that it judged the accuracy of Texas's photochemical modeling against "ballpark estimates" that its own Regional Modeler concluded were not "a defensible basis on which to reach any conclusions regarding future air quality conditions."   Region 6 Texas TSD at 40 & n.23.   Simply renaming them now as "bounding assumptions" (at 29) does not cure EPA's clear error or provide a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (internal quotations and citation omitted).

## III.   Petitioners Will Suffer Irreparable Harm Absent a Stay

EPA's argument that Petitioners have not demonstrated irreparable harm rests on two claims: 1) EPA's disapproval "does not require Movants to do *anything* and thus itself effects no irreparable harm"; and 2) "Movants' harm allegations focus on the *proposed* FIP, . . . which is materially different from the Final FIP." Opp. at 30-31.   Both are wrong.

First, EPA's disapproval directly causes Texas Industry Petitioners' irreparable harm because it is the sole source of EPA's authority to impose its FIP, which it has now done. 42 U.S.C. §7410(c)(1)(B).   Contrary to EPA's claim (at 31), Texas Petitioners need not also seek review of EPA's not-yet-published FIP.   That exact question has been asked and answered.   As Judge Rogers explained in her dissent in *EME Homer*: "If Georgia, Kansas, Ohio wish to avoid enforcement of the Transport Rule FIPs because they contend EPA's SIP disapprovals were in error, the proper course is to

seek a stay of EPA's disapprovals in their [separate] pending cases; if granted, a stay would eliminate the basis upon which EPA may impose FIPs on those States." *EME Homer*, 696 F.3d at 44 n.6 (Rogers, J. dissenting).  That is what Texas Petitioners have done here.

Second, the Final FIP is substantially the same as the proposed FIP and produces the same harms.  Rickerson Supp. ¶¶4, 6 ("imminent harm to the reliability of the ERCOT grid" and four times greater likelihood of load shed in summer 2023 under Final FIP); Pollo Decl. ¶¶5, 30 (millions of dollars in unrecoverable costs in next six months for municipally-owned utility); Talley Supp. ¶¶4, 11-12 (insufficient allowance allocations for summer 2023 and increased allowance costs); Price Decl. ¶¶26-31 (installation of SCR and increased allowance cost); Zahn Supp. ¶9 (costs in 2023 for SCR); Krautsch Decl. §III.A.1 (over $34-40 million for pipeline company).

These harms occur even according to EPA's own declarant, who establishes that the Final FIP, like the proposal:  **1)** allocates Texas units *fewer* allowances than under the current Group 2 program, even under a "prorated" "transitional" budget (*compare* Birnbaum Decl. ¶77, Tbl.1 (42,758 tons), *with* Doc. 32-2 at 368, ¶10 (52,301 tons)); **2)** requires Texas units to "optimiz[e] existing post-combustion controls" "starting in 2023," "requir[ing] increased frequency or quantity of delivered chemical reagents" (Birnbaum Decl. ¶¶28, 44); **3)** is based on costly new SCR, the "engineering studies, conceptual design, schedule, specifications, and cost estimates" for which must be conducted now (*id.* ¶51); **4)** has altered company trading decisions through an

9

"allowance price signal" causing companies to "maintain or increase" their allowance holdings instead of trading (*id.* ¶56); **5)** has resulted in higher allowances prices "reflect[ing] market participants anticipating a final regulation similar to the [proposed]" (*id.* ¶65); **and 6)** will cause "retail electricity prices" to rise (*id.* ¶59).

Conceding these harms, EPA argues instead that the "emissions reductions through the Final FIP are 'readily achievable'" "within two months or less." Opp. at 33, 35; *see also* Birnbaum Decl. ¶¶45, 47. But achievability is not the standard. What EPA does not explain is how any of these costs can be recovered or actions undone when its disapproval of Texas's SIP is later found unlawful. Here, "[n]o mechanism . . . exists for the [movant] to recover the compliance costs they will incur," *Texas*, 829 F.3d at 433-34, nor is there any "suggestion [that Texas Petitioners] could overcome the [EPA's] sovereign immunity to recover costs," Order Granting Stay, *R.J. Reynolds Vapor Co. v. FDA*, No. 23-60037, at 15-16 (5th Cir. Mar. 23, 2023).

## IV.    The Balance of Harms and the Public Interest Favor a Stay

While EPA's brief claims that a "stay w[ill] leave no law on the books to address [Texas's] harmful emissions" (at 36), its own declarant concedes that "[a]ll the Texas units that will participate in the [new] Trading Program already participate in another CSAPR trading program." Birnbaum Decl. ¶20. Thus, even with a stay, Texas power plants will remain subject to federally-enforceable $NO_X$ reductions that are "on the books," *see* 40 C.F.R. §97.810(a)(20), and ozone levels will continue to "trend downward," 87 Fed. Reg. at 9,827.

## <u>CONCLUSION</u>

For these reasons and those in Texas Petitioners' stay motions, the Court should stay EPA's disapproval and prohibit EPA from taking any action based on it, including reducing the current Group 2 allowance allocations to Texas facilities or moving them to the Group 3 program, pending the conclusion of these proceedings.

Dated: April 10, 2023

Respectfully submitted,

s/ P. Stephen Gidiere III
P. Stephen Gidiere III
Julia B. Barber
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

Stephanie Z. Moore
Executive Vice President & General Counsel
Daniel J. Kelly
Senior Vice President & Deputy General
Counsel
David W. Mitchell
Senior Counsel, Environmental
VISTRA CORP.
6555 Sierra Drive
Irving, Texas 75039

*Counsel for Petitioners Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC*

11

s/ Aaron M. Streett
Aaron M. Streett
Matthew L. Kuryla
BAKER BOTTS L.L.P.
910 Louisiana St.
Houston, Texas 77002
Tel.: (713) 229-1234
Fax: (713) 229-1522
aaron.streett@bakerbotts.com

*Counsel for Petitioners Association of Electric Companies of Texas, BCCA Appeals Group, Texas Chemical Council, and Texas Oil & Gas Association*

12

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel states that this reply complies with Fed. R. App. P. 27(d)(2)(C) because it contains 2,599 words, excluding the items allowed to be excluded pursuant to Fed. R. App. P. 32(f), as counted by a word processing system and, therefore, is within the word limit. This reply also complies with typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionally spaced typeface in 14-point Garamond font.

The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 10, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

13

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 10th day of April, 2023.


s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

14

No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

---

## TEXAS INDUSTRY PETITIONERS'
## APPENDIX OF EXHIBITS
## IN SUPPORT OF
## REPLY IN SUPPORT OF MOTION TO STAY FINAL ACTION
## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

**April 10, 2023**

## <u>LIST OF EXHIBITS IN APPENDIX</u>

<u>Exhibit</u>                                    <u>Page Number</u>
                                            <u>in Appendix</u>

Supplemental Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT) (Apr. 7, 2023) ("Rickerson Supp.") ........................ 1

Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado River Authority (Apr. 6, 2023) ("Price Decl.") ..................................... 4

Supplemental Declaration of Dudley Zahn, Vice President, NRG Energy, Inc. (Apr. 10, 2023) ("Zahn Supp.") ........................................................ 13

Supplemental Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp. (Apr. 10, 2023) ("Talley Supp.") ................................................................................................. 21

Declaration of Jacob Krautsch, Senior Director of Environmental, Energy Transfer LP (Apr. 10, 2023) ("Krautsch Decl.") ................................... 31

Declaration of Kevin Pollo, Vice President of Energy Supply & Market Operations, CPS Energy (Apr. 7, 2023) ("Pollo Decl.") ...................................... 36

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on this 10th day of April, 2023. The undersigned counsel also certifies that, pursuant to paragraph A(6) of this Court's ECF Filing Standards, (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: April 10, 2023

s/ P. Stephen Gidiere III
*Counsel for Luminant Petitioners*

A-760

**Supplemental Declaration of Dwayne W. "Woody" Rickerson, Vice President of System Planning & Weatherization, Electric Reliability Council of Texas (ERCOT) (Apr. 7, 2023)**

## SUPPLEMENTAL DECLARATION OF
## DWAYNE W. "WOODY" RICKERSON, P.E.

1. I am the Vice President of System Planning & Weatherization for Electric Reliability Council of Texas, Inc. (ERCOT), where I am responsible for transmission planning, generator interconnection activities, weatherization inspections, and resource adequacy analyses. I am providing this Supplemental Declaration on behalf of ERCOT.

2. I previously provided a Declaration dated March 2, 2023 regarding ERCOT's analysis of the impacts of the Environmental Protection Agency's (EPA) *proposed* federal implementation plan (FIP) addressing regional ozone transport under the 2015 National Ambient Air Quality Standard (NAAQS).

3. The EPA posted the *final* FIP on its website on March 15, 2023. The EPA has stated that it expects the FIP to be effective in June or July of 2023.

4. I am submitting this Supplemental Declaration to provide an update to ERCOT's analysis in light of EPA's issuance of the final FIP. Although the final FIP makes a number of incremental changes to the proposed FIP, my assessment is that those incremental changes do not alter my conclusion that the EPA's final FIP could result in imminent harm to the reliability of the ERCOT grid for the 2023 Ozone Season.

5. As explained in my previous Declaration, it is my understanding that the EPA's final FIP will reduce the availability of allowances for nitrogen oxides (NOx) emissions from electric generation facilities for the 2023 Ozone Season. It is also my understanding that the FIP cannot become effective until 60 days after the final FIP has been published in the *Federal Register*, which has not yet occurred. Due to this timing requirement, at least some portion of the 2023 Ozone Season will be prorated to reflect the applicability of existing emissions limits prior to the effective date of the final FIP. This uncertainty makes it difficult to predict the exact final emissions budget for 2023 Ozone Season, but the EPA's final FIP estimates a statewide NOx emissions budget for Texas of 40,124 tons, which is about 5% higher than the 38,284 tons originally proposed by the EPA, but well below the current budget of 51,251 tons that has applied in Texas since 2017.

6. According to data provided to ERCOT by a subset of owners of coal- and gas-fired generating units collectively representing approximately half of the coal- and gas-fired generation fleet in the ERCOT region, if the units operated by these entities were operated in Ozone Season 2023 in the same manner that they were operated in Ozone Season 2022, then the total capacity value of the generating units that would exhaust their emissions allowances by August 1, 2023 would be 6,566 MW—even under the more generous unit-specific allowances under the final FIP and the proration of the new, lower emissions budgets after the effective date of the FIP. Because this figure only accounts for some units, it is almost certainly lower than it would be if the same assumptions were made for all units operating in the ERCOT region. I have estimated that if 6,566 MW were unavailable during Summer 2023 peak load conditions, then the likelihood of load shed in ERCOT would be four times greater than it would be in the absence of the final FIP. Although the EPA suggests there will be enough banked or remaining allowances in the ERCOT market that could be purchased to cover the emissions of any units that run out of allowances in 2023, this appears to assume that owners of units that have exhausted their allotments will themselves hold sufficient banked allowances to run their units, or that unit owners with remaining allowances (banked or otherwise) would prefer to sell them instead of retaining them for their own continued operations or for future disposition. While it is possible that banked or remaining allowances may be available, I do not believe that can be concluded with certainty.

1

7.  The changes in the final FIP also do not resolve my concern that, with summer operating conditions typically experienced in the ERCOT region, ERCOT would be required to direct firm load-shedding if generators are required to operate under the emissions limits established in the FIP.  This conclusion is illustrated by considering the example of a reoccurrence of 2022 conditions in 2023.  As I noted in my initial Declaration, for Ozone Season 2022, the tightest reserve capacity margin occurred on July 13, 2022 at 3:23 p.m., when ERCOT had 2,408 MW of capacity reserves. If ERCOT experienced the same reserve capacity margin at any point in Ozone Season 2023, a reduction in capacity of 6,566 MW would require ERCOT to direct firm load-shedding.  A load-shedding directive would require utilities to disconnect customers from the power grid to avoid a system-wide blackout.  Disconnecting customers from the power grid during extreme summer conditions—such as the severe heat that was observed on the afternoon of July 13, 2022—can threaten human life and health.

8.  Based on the data provided by generation owners in the ERCOT region and ERCOT's independent analysis of this data, I conclude that the final FIP continues to pose an imminent risk of harm to the reliability of the ERCOT grid.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on April 7, 2023.


/s/ D. Woody Rickerson

Dwayne W. "Woody" Rickerson, P. E.
Vice President of System Planning & Weatherization
Electric Reliability Council of Texas, Inc.

**Declaration of Kenneth C. Price, Chief Operating Officer, Lower Colorado River Authority (Apr. 6, 2023)**

No. 23-60069

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC;
ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC;
OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER**

**COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL
GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION,**

**Petitioners**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN,
Administrator, United States Environmental Protection Agency,**

**Respondents**

---

## DECLARATION IN SUPPORT OF

## ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS'

## MOTION TO STAY FINAL ACTION

## OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY

---

# DECLARATION OF KENNETH C. PRICE

1. I am the Chief Operating Officer (COO) of the Lower Colorado River Authority (LCRA). As COO, I oversee LCRA activities related to electric power generation. I provide this declaration in support of the Association of Electric Companies of Texas' motion to stay the disapproval of the Texas State Implementation Plan (SIP) good neighbor provisions for the 2015 ozone standard. The disapproval of this SIP will have highly damaging and irreparable impacts on LCRA's operations, as described below. This declaration is based on my personal knowledge of facts and analysis conducted by me and my staff.

2. I have been responsible for LCRA's activities related to electric power generation since I joined the company in 2014. When I joined in 2014, my original title was Chief Commercial Officer. In 2021, I was named as Executive Vice President of Generation and Telecommunications, and in 2022, I was named as Chief Operating Officer.

3. Before joining LCRA, I worked for Luminant and its predecessor companies for 34 years. My final role was as Senior Director of Power Operations. In my time at Luminant, I held several roles where I was responsible for or involved in analyzing the impacts on Luminant's generation fleet from proposed environmental laws or rules.

4. I graduated with a Bachelor of Science degree in Electrical Engineering from the University of Texas at Austin. I also am a senior member and member of the honor society of the Institute of Electrical and Electronics Engineers (IEEE). I was a licensed professional engineer in the state of Texas for over 30 years.

5. This Declaration has been updated to reflect the EPA adoption of the Federal Implementation Plan (FIP)[1], and replaces my previous declaration. Nothing in the adoption changes the reality that LCRA is facing imminent and substantial harm by the disapproval of the Texas good neighbor SIP.

## LCRA ELECTRIC GENERATING UNIT FLEET

6. LCRA is a Texas conservation and reclamation district. It has no taxing authority and operates solely on utility revenues and fees generated from supplying energy, water and community services. LCRA and its affiliates supply wholesale electricity to more than 42 retail utilities, including cities and electric cooperatives that serve more than 1 million people in 77 counties. LCRA's well-rounded

---

[1] Pre-publication of "Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards" released on EPA website March 15, 2023.

2

generation portfolio includes combined-cycle gas-fired plants, a traditional natural gas-fired power plant, a coal-fired plant, a gas peaker plant, and renewable energy.

7.  LCRA's generation fleet resides entirely in the Electric Reliability Council of Texas (ERCOT) power region. LCRA owns approximately 3,000 MW total generating capacity. The LCRA Fayette Power Project (FPP, also known as Sam Seymour in some EPA data files), located in Fayette County, Texas, is a coal-fired electric generating facility consisting of three electric-generating units (EGUs), two of which are co-owned by the City of Austin. LCRA also owns a share of the Sandy Creek Energy Station in McLennan County, a facility with a single coal-fired EGU. The LCRA Sim Gideon Power Plant (SGP) consists of three natural gas-fired steam EGUs. The LCRA Thomas C. Ferguson Power Plant and Lost Pines 1 Power Project (LP1) are combined-cycle combustion turbine plants. The LCRA Winchester Power Park consists of four simple cycle combustion turbines.

8.  LCRA provides power to its wholesale electric customers affordably, reliably, and in compliance with all applicable environmental requirements, and takes pride in being a good steward of the environment. LCRA has made major investments in its generation assets and in pollution controls required to operate those assets in compliance with applicable environmental requirements.

9.  LCRA is a member of the Association of Electric Companies of Texas (AECT).

## IMPACT OF EPA DISAPPROVAL OF TEXAS STATE IMPLEMENTATION PLAN

10. EPA published its final disapproval of the Texas SIP regarding ozone transport, also called the "good neighbor" SIP, on February 13, 2023. This disapproval was proposed on February 22, 2022, with a comment period ending April 25, 2022.

11. Well before the Texas SIP disapproval was finalized, and even prior to the end of the comment period on the proposed disapproval, EPA published a proposed Federal Implementation Plan (proposed FIP) on April 6, 2022. It is clear that these two actions are inextricably linked. The direct result of EPA's disapproval of the Texas SIP is EPA's adoption of a FIP. On March 15, 2023, EPA released a pre-publication version of the adopted FIP titled, "Federal "Good Neighbor Plan for the 2015 Ozone National Ambient Air Quality Standards."

12. EPA's disapproval of the SIP and subsequent FIP adoption will have a dramatic impact on the electric grid in Texas. The requirement that almost all existing electric generating facilities limit their nitrogen oxide (NOx) emissions to levels only achievable by installing selective catalytic

3

reduction (SCR), and for some plants not achievable even then, is beyond any level of NOx reductions required of the electric industry under any prior program. Due to the great cost of these controls and the uncertainty of the market, it is anticipated that a significant number of units would retire early instead of attempting to meet the aggressive emission rates EPA requires.

13. Following the disapproval of the Texas SIP and adoption of the FIP, Texas EGUs would have their total allowance budget reduced from 52,301 under the current CSAPR program to 40,134 in 2023, a 23% reduction. Then in 2027, the budget would be reduced further to 23,009, which is a reduction of 43% between 2023 and 2027. These large reductions are expected to reduce the number of allowances available and increase the price of allowances dramatically.

14. The Texas SIP contained an extensive demonstration of compliance with the good neighbor requirements of the CAA. It concluded that Texas EGUs do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in another state's downwind monitors. That conclusion was based in part on the current extensive NOx emission controls already in place for EGUs, including the current Cross-State Air Pollution Rule (CSAPR), Group 2.

15. The impact of EPA's disapproval of the SIP and adoption of the FIP requires immediate action on the part of existing EGUs to comply with the new requirements. The installation of control equipment is a process that can take years to complete. EPA explained in the proposed FIP that to achieve the lower emission budgets in 2026, "source owners and operators . . . should begin engineering and financial planning now to be prepared to meet this implementation timetable."[2]

16. Even those sources that do make the significant expenditures to install or upgrade selective catalytic reduction controls will still likely need to purchase allowances in the trading market. Currently Texas trades in the Group 2 Trading program but would be moved to Group 3, which has tended to have higher prices and more scarcity even prior to the FIP proposal.

## LCRA UNIT IMPACTS

17. The most immediate impacts of the EPA actions to the LCRA EGU fleet occur as the result of allowance allocation reductions associated with the three coal-fired units at FPP and the three gas-fired units at SGP. The FIP imposes allowance reductions based on the assumption that SCR is

---

[2] 87 Fed. Reg. at 21,101 (April 6, 2022).

installed on these LCRA units.  Additional impacts occur to several LCRA units resulting from the shrinking Texas budget, especially for units without SCR, including the three gas units at SGP.

18. All of the allocation numbers below use numbers EPA included in spreadsheets made available with the FIP.

19. EPA identifies a maximum emission rate for the three FPP coal units of 3,523 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the FIP, FPP would be reduced to 2,791 allowances in 2023. EPA did not provide estimated unit allowances for years 2026 and beyond, therefore, the following numbers are based upon LCRA's best allocation estimates, with assumptions including 2021 unit emission rates, no allowances are purchased, and published preset Texas allowance budgets remain unchanged through 2029. The FPP allowances would be reduced further to 1,467 in 2026, as EPA shrinks the Texas budget based on the assumption that half of the applicable units would meet a NOx emission rate of 0.05 lb/MMBtu after installing SCR. In 2027, the FPP allowances would again be reduced, this time to approximately 1,050 as EPA further shrinks the Texas  budget based on the assumption that the other half of the applicable units will install SCR and will coal-fired units will be capped at an 0.08 lb/MMBtu assumed rate. This represents a reduction in FPP 2027 allowances of 70% from its highest emission rate during the baseline years.

20. EPA identifies a maximum emission rate for the SGP gas units of 597 tons based on the highest NOx emissions during ozone seasons between 2017 and 2021. Under the FIP, SGP would be reduced to 261 allowances in 2023. The SGP allowances would be reduced further to 142 in 2026 and to 74 in 2027. EPA shrinks the Texas budget in 2026 and 2027 by assuming that half of the applicable units would meet a NOx emission rate of 0.05 lb/MMBtu after installing SCR in 2026 and the other half in 2027. This represents a reduction in SGP allowances of 88% from its highest emission rate during the baseline years.

21. Given these projected reductions in allowances, the LCRA units will run out of allowances during their control season (from May 1 to Sept 30) if they operate as they did in 2022 and do not install or optimize SCR. The chart below demonstrates the date each unit would have to shut down under those circumstances if they could not obtain additional allowances. It is important to note that the gas units at Sim Gideon (SGP) have been relied upon in recent years to protect grid reliability but the units will deplete their allocations early in ozone season 2023, and earlier in future years.

5

| LCRA Unit | Maximum TPY (2017 – 2021 highest rate) | 2023 Allowances (Date depleted) | 2026 Estimated Allowances (Date depleted) | 2027 Estimated Allowances (Date depleted) |
|---|---|---|---|---|
| SGP1 | 98 | 42 (July 8) | 20 (Jun3 6) | 11 (May 15) |
| SGP2 | 83 | 48 (July 23) | 25 (June 23) | 13 (June 5) |
| SGP3 | 416 | 171 (July 28) | 97 (June 23) | 50 (May 26) |
| FPP1 | 1202 | 991 | 602 (Sept. 2) | 360 (July 28) |
| FPP2 | 1355 | 1026 | 667 (Aug. 5) | 398 (June 28) |
| FPP3 | 966 | 774 (Sept. 23) | 491 (July 27) | 292 (June 21) |

## TIMELINE OF CONTROL INSTALLATION

22. If LCRA were to install SCR controls on FPP and/or SGP3, LCRA must start that process immediately in order to have the installation complete by May 1, 2027. LCRA would need to hire contractors to design the new units and to place major equipment orders immediately, in order to complete the planned installations.  Once equipment orders are placed, cancellation penalties will apply if LCRA changes course.

23. The timeline set up by the FIP to require that as many as 211 units nationwide install SCR by 2027 is untenable. While EPA evaluates how long it would take an individual plant to install this equipment, it does not adequately consider the supply chain and workforce issues associated with so many units doing the same work at one time.

24. EPA assumes a timetable of 36 - 48 months for installation of SCR. However, in a report[3] prepared for the American Public Power Association (APPA) and which APPA submitted to EPA during the FIP comment period, a review of 18 SCR installations demonstrates that the typical time necessary for installation on one unit is 40 months. However, plants with multiple units typically require 45 months. Other plants took as long as 62 months to complete installation. LCRA believes the APPA report reflects a more realistic timeline, especially for plants operated by public entities who typically have more obstacles for new capital projects.

25. Installation of SCR technology has significantly decreased over the last decade, raising the question whether there is enough expertise and supply to ramp back up before 2027. The FIP would require

---

[3] J. Edward Cichanowicz, James Marchetti, Michael C. Hein, and Shirley Rivera, Technical Comments on Control Technology Options and Emission Allocations Proposed by the Environmental Protection Agency in Support of the Proposed 2015 Ozone NAAQS Transport Rule at [8] (June17, 2022) (Technical Report).

6

that as many as 211 units nationwide install SCR by the May 1, 2027 deadline. Given today's serious supply chain and labor shortage issues, the schedule imposed by EPA is infeasible.

## COST OF CONTROLS

26. According to EPA's own cost evaluation in the proposed FIP, the cost of installing SCR at the three FPP units is $662,157,342 in 2021 dollars. Further, operation and maintenance of the SCR at the three FPP units will run $11,150,622 per year in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2027. Given this high cost, EPA concludes in its proposed FIP that FPP will not install SCR as it is cost prohibitive due to the limited emission reductions possible from the emissions which are already relatively low.

27. According to EPA's own cost evaluation in the FIP, the cost of installing SCR at SGP3 is $61,196,310 in 2021 dollars. Further, operation and maintenance of the SCR is $644,112 in 2021 dollars. LCRA believes these numbers to be on the low side given the current high inflation rate as well as competition for equipment and contractors. Much of that money must be committed immediately to have installation complete by May 2027.

## COST OF ALLOWANCES

28. Since EPA's proposal of the FIP in April 2022, the CSAPR NOx allowance market has fluctuated greatly. This year, we saw allowance prices go as high as $50,000 for Group 3 in August 2022 following the FIP proposal. Currently, prices seem to have settled just below $20,000, a threefold increase over pre-FIP proposal prices, but more volatility is anticipated with the adoption of the FIP.

29. Given the great volume of reductions required by the FIP, it is anticipated that allowances may not be readily available in the future. Given the current uncertainty, there is an incentive for EGUs to hold onto allowances for future use as opposed to selling them.

30. The three FPP coal unit allocations would be significantly lower than their highest NOx emission rate between 2017-2021 of 3523 tons. In 2023, it would receive 2791 allowances, which is 732 tons below that maximum. Further, in 2027, based on the allowance cap associated with a NOx emission rate of 0.08 lb/MMBtu, the units would receive 1,050 allowances, which is 2473 less than the highest baseline rate. Assuming that these allowances are available in the marketplace and do not

<center>7</center>

cause an exceedance of the state variability limit, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, would cost LCRA as much as $123,650,000 per year to make up the difference.

31. The SGP gas unit allocations would be significantly lower that its highest NOx emission rate between 2017-2021 of 597 tons. In 2023, they would receive 261 allowances, which is 336 allowances below that maximum. Further, in 2027, they are estimated to receive 74 allowances which is 523 less than the highest baseline rate. Assuming that these allowances are available in the marketplace and do not cause an exceedance of the state variability limit, and pricing them conservatively at $50,000/ton which is a price seen recently after EPA proposed the FIP, would cost LCRA as much as $26,150,000 per year to make up the difference.

## CONCLUSION

32. For the reasons described above, LCRA is facing imminent and substantial harm by the disapproval of the Texas good neighbor SIP.

I, Kenneth C. Price, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 6th day of April, 2023.

Kenneth C. Price

8

**Declaration of Dudley Zahn, Vice President, NRG Energy, Inc. (Apr. 10, 2023)**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners, | ) ) | |
| | ) | Case No. 23-60069 |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) | |
| Respondents. | ) | |

**SUPPLEMENTAL DECLARATION OF DUDLEY ZAHN**

1.       I am a Vice President at NRG Energy, Inc (NRG), which owns NRG Texas Power LLC ("NRG Texas"), which in turn owns power plants in Texas.  NRG Texas is a member of the Association of Electric Companies of Texas (AECT), and I am providing this supplemental declaration in support of AECT's motion to stay the disapproval of the Texas State Implementation Plan (SIP) rule promulgated by the U.S. Environmental Protection Agency (EPA or the Agency) on February 13, 2023. *See Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9,336 (Feb. 13, 2023)

("Final Rule"). This declaration is based on my knowledge and analysis conducted by my colleagues and me.

2.      As Vice President, Gulf Asset Management at NRG, I am familiar with the Texas electricity market and NRG Texas's business, day-to-day operations, financial matters, the value of its assets, and its underlying books and records.

3.      This declaration supplements and affirms my declaration in support of AECT's motion to stay the Final Rule, filed on March 3, 2023, in light of EPA's release of the final Federal Implementation Plan (FIP) addressing interstate transport for the 2015 ozone National Ambient Air Quality Standards (NAAQS) (the "Final FIP").[1] The Final FIP made changes to several aspects of the control regime. These changes do not materially change the harms to NRG Texas, should the Final Rule be upheld, as detailed below.

4.      The Final FIP will go into effect 60 days after publication in the *Federal Register*. EPA uses an estimated effective date of June 3, 2023—33 days after the start of the 2023 ozone season. Starting on the effective date of the Final FIP, EPA would be subject to a significantly reduced ozone season budget.

5.      Assuming EPA's estimated effective date, Texas EGUs would be subject to a $NO_X$ ozone season budget 18% less than under the current Cross-State Air Pollution Rule ("CSAPR") $NO_X$ Ozone Season Group 2 Trading Program—52,301 to 42,758 allowances. EPA bases Texas's 2023 budget on $NO_X$ reductions that EPA assumes can be achieved through "optimization" of certain units' existing $NO_X$ controls. If this requirement is adopted and upheld, units that cannot conduct the work in the minimal time allotted by EPA, or cannot achieve the level of reduction EPA

---

[1] The pre-publication version of the Final FIP was released on March 15, 2023 and is available at: https://www.epa.gov/system/files/documents/2023-03/FRL%208670-02-OAR_Good%20Neighbor_Final_20230314_Signature_ADMIN%20%281%29.pdf

2

anticipates, will be required to purchase additional allowances to cover any shortage (if they are available) or reduce their thermal generation in a market that is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability, or a combination of both.

6.      Beginning in 2026, the Final FIP relies on EPA's assumption that dozens of units in Texas will be able to achieve $NO_X$ reductions through the installation and operation of new and exorbitantly costly selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls.  While EPA has finalized a phased approach—requiring half of the reductions from installation of post-combustion controls in 2026 and the remaining half in 2027—this change to the Final FIP does not meaningfully affect the date by which units would need to install SCR (May 1, 2026) to meet EPA's significantly reduced 2026 budget.  EPA's preset Texas budget for 2026 would be a 40% reduction from the current Group 2 trading program.  If this requirement is adopted and upheld, units that cannot conduct the work in the time allotted by EPA, or cannot achieve the level of reduction EPA anticipates, would be required to purchase additional allowances to cover any shortage (if they are available) and/or reduce the generation of electricity (*i.e.*, de-rate or retire) in a market that is actively reviewing various mechanisms to ensure sufficient thermal dispatchable resources are available to maintain a standard of reliability.

7.      EPA assumes that the EGU owners will make investment decisions and begin incurring costs now, even before the effective date of the FIP, to install post-combustion controls to meet the stricter $NO_X$ budget by 2026.   In my prior declaration, I noted that the proposed FIP stated that generators "should begin engineering and financial planning now" (*i.e.*, before the promulgation of the final rule).  87 Fed. Reg. at 20,101 (emphasis added).  EPA has reiterated that position in the Final FIP, stating that the proposed FIP provided a year of notice to generators that

"they should begin engineering and financial planning (steps that can be taken prior to any capital investment) to be prepared to meet this implementation timetable." *See* Final FIP at PDF page 347. While EPA has added additional language in the Final FIP that these steps allegedly do not require capital investment, they nonetheless require NRG Texas and other generators to incur costs as described below and in my prior declaration.

8.      As discussed in my earlier declaration, retrofit of SCRs as finalized in the FIP would likely take more than three years. This minimum lead-time does not provide for potential delays in equipment fabrication and delivery due to high demand, weather-related delays due to high winds, storms, or extreme weather conditions, or site-specific conditions. In other words, retrofits may not be possible within the timeframe set forth in the Final FIP.

9.      The installation of SCRs on the affected NRG units is estimated to cost over $1 billion. A substantial portion of that cost would be required to be expended in 2023 in order to meet EPA's unrealistic compliance timeframe.

10.     The cost to "optimize" existing controls is also significant and potential recovery of investments highly speculative. EPA assumes reductions from these optimizations will be complete by the effective date of the Final Rule. Specifically, such reductions are built into Texas's ozone season $NO_X$ budget that will go into effect following publication of the Final Rule. EPA's assumptions regarding emission rates are unrealistic, with EPA assuming that NRG Texas units can reduce their $NO_X$ by an additional 21% compared to historic emission rates.

11.     Based on EPA's estimated prorated budget for 2023, the estimated allocation to NRG's Texas units is 6,920 in 2023, 1,831 fewer than the baseline shown in the chart below. NRG Texas would see a 21% allowance reduction from the baseline. As indicated in the chart below, the baseline is based on the most recent ozone season emissions data available (2022) with the notable

exception of the W A Parish station.  Because W A Parish Unit 8 did not operate during the 2022 ozone season due to an incident that damaged the steam turbine generator, 2022 emissions data were not representative for W A Parish going forward, as NRG is working diligently to bring that unit back to service.

| Account Name | Ozone Season NOx (tons) | Year | Pro-Rated 2023 Group 3 Allocation | 2027 Group 3 Allocation | 2023 NOx Reductions | 2027 NOx Reductions |
|---|---|---|---|---|---|---|
| Limestone | 3679.1 | 2022 | 2581 | 1297 | -30% | -65% |
| Cedar Bayou | 866 | 2022 | 576 | 344 | -33% | -60% |
| Greens Bayou | 262 | 2022 | 89 | 45 | -66% | -83% |
| T H Wharton | 480 | 2022 | 194 | 103 | -60% | -79% |
| W A Parish | 3192 | 2021 | 3132 | 1798 | -2% | -44% |
| San Jacinto Steam Electric Station | 44.9 | 2022 | 68 | 41 | 51% | -9% |
| Gregory Power Facility | 57.2 | 2022 | 81 | 48 | 42% | -16% |
| Cottonwood Energy Project | 120 | 2022 | 145 | 145 | 21% | 21% |
| Cedar Bayou 4 | 50 | 2022 | 54 | 32 | 8% | -36% |
| | 8751.2 | | 6920 | 3853 | -21% | -56% |

12.    Based on the Final FIP, the estimated allocation to NRG Texas's units is 3,853 allowances in 2027, 4,898 allowances fewer than the historic baseline in the chart above, a 56% allowance reduction from the baseline.

13.    EGUs cannot rely on banked allowances or allowance trading to make up this allowance shortfall.  First, it is still unknown what number of "banked" allowances units hold because EPA will convert banked Group 2 allowances to Group 3 allowances in August 2023 at a yet to be determined conversion ratio.  The conversion will significantly reduce the number of banked allowances available.  Without factoring in proration and assuming no changes to the number of allowances, EPA estimates that the conversion factor would be 6.5 Group 2 allowances for every one Group 3 allowance.  On May 1—the start of the 2023 ozone season—generators will not know

the quantity of their own banked allowances. Second, there is no certainty that generators will trade any of their banked or surplus allowances. EPA has finalized a process that would recalibrate the number of banked allowances to a set target amount every year thereby decreasing the number of allowances that are able to be banked over time. Consequently, there is significant uncertainty in whether banked allowances will be sufficient for compliance and whether any allowances will be available in the market for facilities with an initial allowance shortfall.

14.    Texas's variability limit further compounds this issue and adds uncertainty to the availability of allowances in the market. The variability limit is, at a minimum, 21 percent of Texas's budget. Exceedance of Texas's assurance level (the state budget plus the variability limit) may result in increased surrender requirements and potentially enforcement action for certain sources. Because sources do not know how much other sources in the state are emitting, sources may be unwilling to exceed their initial allowance allocations because of the risk of assurance level exceedance.

15.    As stated in my prior declaration and reiterated here, costs resulting from EPA's significantly more stringent emission budgets, including new SCR costs, the cost of "optimizing" existing SCRs or SNCRs, or the cost of purchasing additional allowances, cannot be recovered from EPA or others if EPA's disapproval of Texas's SIP is later determined to be unlawful. Because of the deregulated nature of the ERCOT market, there is no mechanism for NRG Texas to recover costs it spends in the near-term in preparation for compliance with the FIP (which would not apply but for EPA's disapproval of Texas's SIP) even if the Court ultimately vacates EPA's disapproval.

16.    The Final Rule, if upheld, will have significant impacts on NRG Texas's operations and the cost to service retail customers in Texas. These harms are irreversible and imminent. As

detailed below and in my earlier declaration, these harms will begin to occur in 2023 and 2024 without a stay.  In summary, EPA's rule would:

    a.    Require substantial compliance costs to operate under restricted $NO_X$ budgets.

    b.    Place significant financial burden on generators that seek to comply with the Final Rule by fast tracking large-scale, capital-intensive construction projects to meet EPA's exceedingly stringent $NO_X$ budgets beginning in 2026.

    c.    Exacerbate the current strain on ERCOT and the need for thermal generation by requiring hundreds of millions of dollars of capital investment which operate in a competitive wholesale market with no guarantee of cost recovery or rate of return on investment.

I, Dudley Zahn, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of April 2023.

_____

Dudley (Skip) Zahn,
Vice President, Gulf Asset Management
NRG Texas Power LLC.

7

**Supplemental Declaration of Randall J. Talley, Vice President, Solid Fuels and Environmental Trading, Vistra Corp. (Apr. 10, 2023)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 23-60069 ) ) |
| Petitioners, | ) ) |
| v. | ) ) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) |
| Respondents. | ) |

**SUPPLEMENTAL DECLARATION OF RANDALL J. TALLEY**

1.    I am the Vice President of Solid Fuels and Environmental Trading at Vistra

Corp. (Vistra), a leading Fortune 500 integrated retail electricity and power

generation company based in Irving, Texas.  I previously provided a declaration in

support of the motion to stay the U.S. Environmental Protection Agency's (EPA)

disapproval of Texas's interstate transport state implementation plan (SIP) for the

2015 ozone National Ambient Air Quality Standards (NAAQS) filed by Luminant

Petitioners[1] in the case.  EPA has since signed its final Federal Implementation Plan

(FIP) for Texas.[2]  Although EPA made minor changes in its final FIP, the irreparable

harm to Luminant and its operations that will occur as a result of EPA's disapproval

of Texas's SIP remains substantially the same, as detailed in my prior declaration

and below.

2.     This declaration is based on my personal knowledge of facts and information

available at this time and analyses conducted by me and my staff and colleagues.

## EPA'S FINAL FIP FOR TEXAS

3.     EPA signed its final FIP for Texas on March 15, 2023.  The key components

of EPA's final FIP remain substantially the same as in its proposed FIP.

4.     In the FIP, EPA has finalized a more restrictive ozone season $NO_X$ budget for

Texas starting in the 2023 ozone season of 40,134 tons, a 23% reduction from

---

[1] The Luminant Petitioners are indirect subsidiaries of Vistra.  They are: Luminant Generation Company LLC, Coleto Creek Power, LLC, Ennis Power Company, LLC, Hays Energy, LLC, Midlothian Energy, LLC, Oak Grove Management Company LLC, and Wise County Power Company, LLC (collectively "Luminant" in this declaration).

[2] EPA, *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards* (Mar. 15, 2023), *available at* https://tinyurl.com/2k2e3nwb (Final FIP).

Texas's existing ozone season NO$_X$ budget. This budget relies primarily on the amount of NO$_X$ reductions that EPA projects can be achieved by Texas units by conducting "optimization" work on their existing NO$_X$ controls.

5.     As in the proposal, the final FIP also requires significant reductions in Texas's budget beginning in 2026 that are based on the amount of NO$_X$ reductions that EPA projects will be achieved at Texas units by the installation of new and exorbitantly costly selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls. EPA has now divided these further reductions between the 2026 and 2027 budget years to address supply chain constraints and outage scheduling; however, this still results in a 40% reduction from Texas's existing NO$_X$ budget in 2026 and a 56% reduction in 2027.

6.     EPA also maintained the concept of an "assurance level" in the final FIP. EPA made slight revisions to how it defines the "variability limit," now defining it as the higher of 21% of Texas's budget or the percentage by which the State's heat input in a given year exceeds the historical heat input used to calculate that year's budget. Final FIP at 455. Therefore, it is impossible to know the assurance level prior to or even during a given ozone season. Nonetheless, as in the proposal, sources in Texas would be penalized if emissions from the State as a whole exceed the assurance level for the 2023 ozone season, and operators whose sources exceeded their respective

3

share of the assurance level would be penalized and required to surrender three allowances for every one ton emitted above that level.

7.    EPA also finalized the new draconian "enhancements" to its trading program that it had proposed, including unit-specific backstop daily emission rates, a revised emissions budget-setting process (called "Dynamic Budgeting"), secondary emission limits, and an annual recalibration of banked allowances.  EPA made limited refinements to the functionality of these "enhancements," but they all still generally remain applicable and will serve to further limit operations of Texas units and further ratchet down the emissions budget allocated to Texas units.

## EPA'S DISAPPROVAL OF TEXAS'S SIP IS CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF 2023 BUDGET IMPACTS

8.    Under EPA's final FIP, sources in Texas "will begin to participate in the Group 3 trading program as of May 1, 2023, regardless of the rule's effective date[.]" Final FIP at 543.  Although EPA claims it has incorporated "prorating procedures" to "ensure that the transition from the Group 2 trading program to the Group 3 trading program will not substantively affect the sources' requirements prior to the rule's effective date," *id.*, EPA's final FIP does not resolve Luminant's irreparable harms; rather, it confirms the necessity of the actions identified in my prior declaration.  Operators must make irreversible compliance decisions now in preparation for the 2023 ozone season.

4

9.    Notably, EPA continues to identify 14 EGUs at Luminant's facilities that EPA says are able to optimize their SCR, and EPA relies on reductions from these optimizations when establishing Texas's 2023 ozone season $NO_X$ budget. Therefore, Luminant continues to be faced with the choice of "optimizing" its existing emission controls now, purchasing costly allowances (if any are available), reducing operations during the ozone season, or a combination of the three.

10.    The steps and timing necessary to optimize the SCRs for these units have not changed from my prior declaration. And Luminant has already begun making irreversible compliance decisions and spending money that cannot later be recovered. For example, Luminant has already started performing the combustion tuning activities detailed in my prior declaration.

11.    Further, although there is variation in allowance prices, the cost of Group 3 allowances increased significantly after EPA proposed the FIP, as detailed in my prior declaration. EPA acknowledges that this increased price reflects market participants' anticipation of the final FIP. *See* Birnbaum Decl. ¶ 65. And such prices have remained elevated following EPA's finalization of the FIP, as EPA itself explained. Therefore, the cost of complying through the purchase of additional allowances continues to be significantly elevated.

12.    Moreover, although EPA made slight changes to unit-specific allocations, the allocations for Luminant's peaking units remain largely unchanged—two of the

5

units I previously identified received a single ton increase (Lake Hubbard Unit 1 and Graham Unit 2), for a total increase of two allocations at those peaking units. Even considering the "pro-rated" budgets for 2023, these peaking units will run out of allocations well before the end of the 2023 ozone season if they operate similar to their 2022 operations.

13.    Even with a final FIP, operators are faced with the reality of making many irreversible compliance and trading decisions based on incomplete information, as many facets of the Group 3 trading program will not be finalized until after the 2023 ozone season has begun or even after the end of the 2023 ozone season. For example, sources have historically relied on banked allowances from prior ozone seasons to comply with their obligations. Sources may continue to do so under the Group 3 trading program; however, EPA will be converting all Group 2 allowances banked by sources in Texas to Group 3 allowances "as soon as practicable on or after August 1, 2023." Final FIP at 548. EPA has tried to estimate the number of banked Group 3 allowances that will be held by Texas operators in 2023; however, there is significant uncertainty in this calculation. Therefore, it is impossible for Luminant to know how many allowances it will have for compliance for the 2023 ozone season, which begins on May 1, 2023.

14.    This allowance conversion, in conjunction with the continued uncertainty from EPA's "enhancements" and significant budget reductions, creates significant

6

challenges for operational planning. Although EPA made limited adjustments to its "enhancements" and budgets, these adjustments do not remedy the uncertainty in the market, and Luminant must continue to make irreversible trading decisions, as I explained in my prior declaration. EPA itself recognizes that the "allowance price signal" is incentivizing operators to not sell their allowances "in order to maintain or increase the respective amounts of banked allowances they hold." Birnbaum Decl. ¶ 56. Given the continuing uncertainty, Luminant and other Texas generators must prepare for the worst and make immediate and irreparable compliance and trading decisions to ensure their compliance for the 2023 ozone season and beyond.

15.    As I stated previously, if EPA's disapproval of Texas's SIP is not stayed, Luminant must take steps now to achieve the reductions identified by EPA for the 2023 ozone season. Indeed, Luminant has already begun taking those steps. If EPA's SIP disapproval is later vacated by the Court, the cost of this work cannot be recovered from EPA. And, because ERCOT is a deregulated competitive energy market, versus a regulated rate-recovery system, Luminant cannot recover these costs from ratepayers either.

**EPA'S DISAPPROVAL OF TEXAS'S SIP IS ALSO CAUSING IMMEDIATE AND IRREPARABLE HARM TO LUMINANT AS A RESULT OF EVEN MORE STRINGENT BUDGET REDUCTIONS IN 2026 AND 2027**

16.    The immediate and irreparable harms occurring now from future years also remain unchanged based on EPA's final FIP. EPA continues to rely on the

7

installation of SCRs in the future to drive significant budget reductions. Luminant's same five units remain targeted by EPA for SCR installation.

17.  As noted above, EPA has divided the sharp drop-off in Texas's budget between 2026 and 2027, but this does not alleviate the need for operators to make compliance decisions now. Neither the timeline nor the costs for installation of SCR have changed. Based on the available information from EPA, costs for installation of SCRs on the Luminant units identified by EPA for retrofit, in EPA's own estimation, would exceed one billion dollars.

18.  It is clear that sources cannot wait until litigation over EPA's disapproval of Texas's SIP is resolved before they must begin making costly, unrecoverable compliance decisions. Luminant is taking steps now to comply with near-term and long-term obligations under EPA's FIP, which sources in Texas would not be subject to but for EPA's disapproval of Texas's SIP. Therefore, even if the disapproval of Texas's SIP is ultimately overturned, Luminant faces immediate and irreparable harm, as Luminant will have undertaken significant compliance efforts and costs that cannot later be recovered.

I, Randall J. Talley, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this $\underline{10}$ day of April, 2023.

Randall J. Talley
Vice President, Solid Fuels and
Environmental Trading
Vistra Corp.

9

**Declaration of Jacob Krautsch, Senior Director of Environmental, Energy
Transfer LP (Apr. 10, 2023)**

No. 23-60069

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY,**

Petitioners,

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**

Respondents.

## DECLARATION OF JACOB KRAUTSCH

I, Jacob Krautsch, am the Senior Director of Environmental at Energy Transfer LP[1]. As the Sr. Director of Environmental, I manage the environmental support group for Energy Transfer LP. I am providing this updated declaration, which is filed in support of Texas Industry Petitioners' Reply in Support of Motion to Stay Final Action of the U.S. Environmental Protection Agency (EPA) related to EPA's disapproval of Texas's interstate transport state implementation plan (SIP) for the 2015 ozone National Ambient Air Quality Standards (NAAQS) and implementation of EPA's final federal implementation plan (FIP) in place of the Texas SIP. Energy Transfer is a member of the Texas Oil & Gas Association (TxOGA), one of the Petitioners above. EPA's final

---

[1] This Declaration is provided by me for Energy Transfer LP, on behalf of itself and its subsidiaries and affiliates, collectively referred to herein as Energy Transfer.

Case: 23-60069   Document: 20322   Page: 795   Date Filed: 04/26/2023

FIP includes changes to the proposed FIP which reduce the impact on non-electric generating units (non-EGUs), however, the final FIP will result in irreparable harm to Energy Transfer's operations nonetheless, as set forth below. This declaration is based on my personal knowledge of facts and information available at this time and analysis conducted by me and my staff. I reserve the right to revise or update this declaration should new information become available.

## I.      Company and Assets in Texas

Energy Transfer is, *inter alia*, involved in the "pipeline transportation of natural gas" as addressed in EPA's final FIP, Docket No. EPA-HQ-OAR-2021-0668, FRL 8670-02-OAR (March 15, 2023), addressing regional ozone transport for the 2015 ozone national ambient air quality standards (NAAQS). Energy Transfer's pipeline transportation of natural gas, which places the company within the category of a non-EGU, includes operation of its natural gas fired two stroke lean burn (2SLB), four stroke lean burn (4SLB), and four stroke rich burn (4SRB) spark-ignited reciprocating internal combustion engines (RICE) at pipeline compressor stations in Texas. Although EPA limited applicability of "pipeline transportation of natural gas" in the final FIP specifically to the natural gas transmission and storage segment, *i.e.,* eliminating compressor stations in gathering service, and exempting emergency engines, Energy Transfer is still impacted. As a result, EPA's efforts to disapprove Texas' SIP and institute EPA's FIP directly affects Energy Transfer.

## II.     What Texas SIP Disapproval and Implementation of EPA's FIP Means to non-EGUs

EPA finalized its FIP upon disapproval of Texas's SIP (actions which are being challenged) while continuing to require immediate expenditures, including those related to engineering and financial planning, to meet implementation deadlines. As a result, costs associated with planning, engineering, permitting and procurement of controls and/or engines if EPA's SIP disapproval and/or final FIP is later held invalid will produce irreparable harm associated with compliance that will be suffered immediately by Texas non-EGUs. Such costs are either nonrecoverable or only recoverable through increased customer rates and are irreparable as they are not easily calculable.

## III.    Specific Harm to Energy Transfer, a Texas Non-EGU

To meet the final FIP's NOx emissions reductions for non-EGU sources, it is necessary for Energy Transfer to make expenditures and to begin budgeting, planning, engineering, and construction on controls immediately. For the reasons described herein, full satisfaction of the final FIP's 2026 compliance deadlines will nonetheless remain uncertain even if efforts to comply begin immediately. In addition to the non-recoverability of expended funds should the FIP be held invalid after such expenses are undertaken, the harm caused to Energy Transfer is irreparable in nature due to the monetary harm which cannot be calculated, as set forth here, and the nonmonetary harm as described below.

A.      Control Costs, NOx Performance Testing, and Monitoring are Monetary Harms to Energy Transfer which Cannot be Calculated

1.      Energy Transfer estimates, based on the final FIP, that 22 of its natural gas fired engines in Texas will require additional controls or complete engine replacement.

Although the precise costs associated with the work necessary for these engines cannot be calculated, the estimated cost is $34 million to $40 million, depending on whether the engine technology involved for each engine has available controls or if the engine must be replaced to meet the FIP requirements. This will require an engine-by-engine review and analysis. The cost and timing for completion of work would be further impacted by supply chain concerns discussed below.

2.  In addition to control costs or engine replacement costs, NOx performance testing expenditures will be necessary according to EPA's final FIP for all applicable engines in Texas. Energy Transfer estimates approximately 118 engines will be subject to performance testing, the cost for which is not easily calculable because the engines to be replaced or to which controls must be added cannot be ascertained until an engine-by-engine review and analysis can be completed. As stated above, the costs and timing for completion of such work could also be impacted by supply chain concerns discussed below.

3.  EPA's final FIP also contains requirements related to monitoring engine operation, continuous parametric monitoring systems, recordkeeping, and reporting, which will require additional expenditures. Energy Transfer estimates approximately 118 engines will be subject to the monitoring, recordkeeping, and reporting requirements, the cost for which is not easily calculable and may also be impacted by supply chain concerns.

B.  Implementation, Supply Chain, and Reliability Issues are Non-Monetary Harms to Energy Transfer

1.  Implementation of the changes by 2026 as necessitated by EPA's final FIP for Texas is not feasible. Although the final FIP permits a compliance alternative using facility-wide emissions averaging or, in certain situations, approval of alternative emissions limits, both processes are subject to a case-by-case review and require ultimate approval by EPA before an operator could rely on that which is proposed. Therefore, timing cannot be ascertained, and ultimate approval of such plans is not guaranteed. As a result, Energy Transfer would be required, for each affected engine (of which it has many as set forth above), to proceed with the implementation process which requires budgeting, planning, engineering, and construction (with associated outages) in parallel with its evaluation and proposal of facility-wide emissions averaging and, to the extent applicable, alternative emissions limits.

2.  Further, all impacted companies involved in "pipeline transportation of natural gas" will be vying for the same equipment and contractor resources which were limited at best even prior to EPA's final FIP. These supply chain issues, coupled with the time required to obtain necessary permits which may be triggered after planning and engineering is complete, will likely require a longer lead time than available under the final FIP. The FIP applies to several states, not just Texas, which will further exacerbate supply chain issues while also driving up costs due

to the increased demand created by the 2026 deadline for all applicable sources in each of those states.

3.      Extended outages necessary for installing controls or replacing engines pursuant to EPA's disapproval of the Texas SIP and implementation of EPA's FIP will be unavoidable and thereby reduce throughput throughout Texas, potentially leading to reliability issues which may result from inability to satisfy FERC requirements and/or meet customer delivery obligations.

4.      Lastly, although the final FIP allows for potential compliance alternatives using facility-wide emissions averaging or, in certain situations, alternative emissions limits, there is no guarantee the same will be approved by EPA or that, if approved, it will occur early enough to overcome the challenges identified above. Likewise, although the final FIP allows operators to request an initial compliance extension of one year, such extension is available in limited circumstances and subject to EPA review and approval.

While Energy Transfer cannot calculate the full scale of the impact, it has been able to articulate the above-referenced immediate and irreparable harm to Energy Transfer as a result of EPA's disapproval of the Texas SIP and adoption of EPA's final FIP as it pertains to Energy Transfer's Texas operations. To the extent that a small portion of the harms can be calculated however, the monetary harm resulting from the same is estimated to be between $34 million and $40 million, which will further increase as the evaluation of what is necessary for each applicable engine to come into compliance is complete.

I, Jacob Krautsch, declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of April 2023.

Jacob Krautsch
Sr. Director, Environmental
Energy Transfer

**Declaration of Kevin Pollo, Vice President of Energy Supply & Market Operations, CPS Energy (Apr. 7, 2023)**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| **STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY LLC; COLETO CREEK POWER, LLC; ENNIS POWER COMPANY, LLC; HAYS ENERGY, LLC; MIDLOTHIAN ENERGY, LLC; OAK GROVE MANAGEMENT COMPANY LLC; WISE COUNTY POWER COMPANY, LLC; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION**<br><br>Petitioners,<br><br>v.<br><br>**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency,**<br><br>Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>**Case No. 23-60069** |

<u>**DECLARATION OF KEVIN POLLO**</u>

I, Kevin Pollo, hereby state as follow:

1.     I am the Vice President of Energy Supply & Market Operations at CPS Energy.  I am making this declaration in support of the Texas Industry Petitioners' motion to stay the U.S. Environmental Protection Agency's (EPA's) disapproval of Texas's interstate transport State Implementation Plan (SIP) (the "<u>Texas SIP Disapproval</u>") published in the *Federal Register* on February 13, 2023.[1]  As a result of the Texas SIP Disapproval, EPA has now finalized Federal Implementation Plan (FIP) requirements for Texas and 22 other states to eliminate significant contribution to nonattainment, or interference with maintenance, of the 2015 ozone NAAQS in downwind states (the "<u>Final FIP</u>").

---

[1] *See* Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023).

2.    I am over 18 years of age, of sound mind, and in all respects competent to make this declaration. I have personal knowledge of all facts stated in this declaration and those facts are true and correct.

3.    I have worked at CPS Energy for approximately 17 years, about 10 of which have been in the Energy Supply business group. I graduated from the University of Missouri in 1992 with degrees in electrical and computer engineering.

4.    From my experience and role at CPS Energy, I am familiar with and manage CPS Energy's day-to-day Energy Supply operations and have experience managing capital improvement projects. I also am familiar with various costs incurred by CPS Energy associated with environmental compliance.

5.    Without a stay of the Texas SIP Disapproval, CPS Energy will incur substantial costs to meet EPA's stringent nitrogen oxide (NOx) emissions requirements. Though the requirements of the Final FIP will become effective 60 days after the date of publication in the *Federal Register*, CPS Energy will have to immediately begin taking steps to comply with EPA's significantly reduced state NOx budgets. These costs threaten the continued viability of CPS Energy's coal-fired units which are critical to CPS Energy's transition to alternative energy sources over the next several years, as discussed below.

## CPS Energy's Operations

6.    CPS Energy is the nation's largest municipally owned electric and gas utility, providing service to more than 900,000 electric customers in San Antonio, Texas, substantially all of Bexar County, and portions of several adjoining counties.

7.    CPS Energy owns, operates, and/or has contracted for approximately 8 gigawatts (GW) of nameplate power generation within ERCOT, comprised of a diverse portfolio of coal, natural gas, nuclear, wind, solar, and landfill gas generation assets (as well as battery storage).

8.    CPS Energy is among the top public power wind energy buyers in the nation and a leader in Texas for solar generation. Building upon that foundation, CPS Energy recently reached agreements with three companies, closing out the utility's FlexPOWER Bundle initiative stemming from a 2020 request for proposal. In total, the FlexPOWER Bundle will deliver 580 megawatts (MW) of solar, 50 MW of storage, and 500 MW of natural gas firming capacity. CPS Energy also plans to procure additional renewable generation.

9.    In 2019, CPS Energy's Board of Trustees (the "Board") passed a resolution to support the City of San Antonio's (the "City") Climate Action & Adaptation Plan (CAAP). All the efforts that reduce carbon for the CAAP have the co-benefit of reducing ozone precursors, including NOx emissions. The City's CAAP commitment is to reach carbon neutrality by 2050 with interim emission reduction targets of 41% reduction (compared to 2016) by 2030 and 71% reduction by 2040.

10.   In 2022, CPS Energy partnered with the community to develop a new Power Generation Resource Plan focused on transitioning to low or non-emitting sources of energy by 2030

Page **2** of **8**

while balancing customer affordability and system reliability; and on January 23, 2023, CPS Energy's Board passed a resolution approving the updated generation plan and associated portfolio of power generation resources. As a result, CPS Energy anticipates retiring 859 MW of natural gas-fired generation in 2025 (Braunig Units 1–3), 420 MW of natural gas-fired generation in 2027 (Sommers Unit 1), 560 MW of coal-fired generation by the end of 2028 (Spruce Unit 1), and 410 MW of natural gas-fired generation by the end of 2029 (Sommers Unit 2). CPS Energy also anticipates converting Spruce Unit 2 from coal to natural gas.

11.  Continued operation of the Braunig Units 1–3, Sommers Unit 1, and Spruce Unit 1 until their scheduled retirements is critical to CPS Energy's ability to maintain reliable service for its customers during this transition.

12.  The updated generation plan is projected to result in an over 40% reduction in Carbon Intensity and an almost 80% reduction in overall NOx emissions by 2030 as compared to 2016. In addition to these planned future emission reductions, CPS Energy reduced NOx emissions by nearly 80% from 1997 to 2021 by implementing and operating NOx emission controls on power plants, including low NOx burners, separated overfire air (SOFA), and selective catalytic reduction (SCR) control. CPS Energy also decommissioned the J.T. Deely coal-fired power plant at the end of 2018 resulting in a reduction of approximately 3,000 tons of NOx per year.

13.  Despite the responsible emission reduction efforts noted above, the FIP will challenge CPS Energy's ability to generate sufficient power for its community as early as this summer, particularly if there is a period of extended extreme heat during the summer ozone season (as happened in 2022).

14.  The significant costs that CPS Energy must incur as a result of the Texas SIP Disapproval and the EPA's issuance of the Final FIP are in addition to the many costs CPS Energy has already incurred and the proactive steps CPS Energy has already taken to address the reduction of NOx and other pollutants.

15.  CPS Energy provided comments on the EPA's proposed FIP in June 2022, requesting (i) flexibility in its application to units that have formally initiated or have initiated the process of repowering with natural gas by 2026 and (ii) that the EPA allow coal-fired units and gas-steam units that attest to a reasonable shutdown date to operate beyond the 2026 implementation date without a SCR. The Final FIP, however, does not exempt those with known retirement or conversion dates and still requires those units to meet NOx performance levels that reflect immediate significant costs.

## Impact of EPA's Final Action on CPS Energy's Units

16.  On February 13, 2023, EPA published the Texas SIP Disapproval which allowed the Agency to finalize the Final FIP. It is my understanding that EPA cannot implement a FIP until a SIP disapproval is finalization (*see* 42 U.S.C. § 7410(c)(1)) and, therefore, the Final FIP would not be implemented as to Texas without the Texas SIP Disapproval.

Page **3** of **8**

17.     The Texas SIP Disapproval and the EPA's adoption of the Final FIP will have a significant impact on Texas electric power generating resources, including CPS Energy—whose fossil fuel powered generating assets include Spruce Units 1 & 2 (coal), Sommers Units 1 & 2 (natural gas), Braunig Units 1–3 (natural gas), and natural gas-fired combustion turbines and combined-cycle units at the Leon Creek Station, Braunig Power Station, Rio Nogales Power Plant, and Arthur von Rosenberg (AvR) Power Plant.

18.     It is my understanding the Final FIP reduces Texas's current CSAPR Group 2 ozone season NOx allowance budget from 52,301 tons to 40,134 tons in 2023 (subject to proration) and 2024 under the Final FIP's revised CSAPR Group 3 ozone season NOx trading program, a reduction of 23 percent.  The statewide budget continues to become increasingly more stringent thereafter, with the most significant reductions required in the 2026 and 2027 time frames.  Projected statewide budgets in 2026 and 2027 total 31,123 and 23,009 tons, respectively, reflecting NOx emission reductions of 40% and 56% from Texas's existing CSAPR Group 2 ozone season NOx CSAPR budget.

19.     Because of EPA's assumptions about the installation of post-combustion controls by 2026 and 2027, the Final FIP requires significant emission reductions on units without existing post-combustion NOx controls.

20.     Table 1 provides a comparison of the 2023, 2024, 2025, 2026, and 2027 assumed CPS Energy allocations to the actual 2022 ozone season NOx emissions of 3,403 tons.

Table 1 – Comparison of 2022 Ozone Season
NOx Emissions to the Final FIP Allocations

| Year | Allocations | Percent *Reduction* from 2022 Actual Emission |
|------|-------------|-----------------------------------------------|
| 2023* | 2,570 | 24% |
| 2024 | 2,571 | 24% |
| 2025 | 2,368 | 30% |
| 2026** | 1,864 | 45% |
| 2027** | 1,280 | 62% |

* The 2023 allocations will be prorated based on the percentage of days in the ozone season occurring before the effective date of the Final FIP.

** Note that the 2026 and 2027 allocations are indicative only and were calculated based by applying the percentage reduction in the statewide Texas budget to the CPS Energy Units.

Page **4** of **8**

21.    Table 2 provides a comparison of the estimated Group 2 conversion to Group 3 for CPS Energy's 2023 allocation and CPS Energy's 2024 allocation compared to the actual 2022 ozone season NOx emissions of 3,403 tons.

Table 2 – Comparison of the 2022 Ozone Season
Actual NOx Emissions to the Final FIP Allocations for 2023 and 2024

| Year | Ozone Season FIP Allocations (tons) | Allowance (Deficit) |
|------|------|------|
| 2023 | 2,570* + 544 (Group 2 converted to Group 3) | (288) |
| 2024 | 2,571 | (832) |

* The 2023 allocations will be prorated based on the percentage of days in the ozone season occurring before the effective date of the Final FIP.

22.    CPS Energy expects to have a significant deficit of several hundred allowances in 2023 depending on the effective date of the Final FIP, which would not allow CPS Energy to bank any additional allowances.  If CPS Energy experiences a summer in 2024 similar to the summer in 2022, then we expect a deficit of over 800 allowances in 2024, as shown in Table 2. The Texas SIP Disapproval and the Final FIP will require CPS Energy to take immediate steps to identify and implement plans to comply with the new requirements. The Final FIP requires CPS Energy to achieve significant NOx emission reductions starting in 2023, with additional reductions by the 2026/2027 ozone seasons. To meet its 2023 allowance allocations, CPS Energy must reduce systemwide NOx emissions by approximately 24% from its 2022 actual ozone season emissions (i.e., from 3,403 to approximately 2,570 tons). CPS Energy must achieve additional NOx reductions of approximately 15% in 2026 (from 2025 levels) and 17% in 2027 (from 2026 levels) to continue to meet its allowance obligations.

23.    Additionally, starting with the 2024 control period, EPA will annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding a target bank level, further restricting the amount of allowances available to meet EPA's stringent requirements and likely discouraging near-term management and reduction of emissions.

24.    Given the anticipated shortfall in 2023 allowances and the amount of time needed to install emission controls to meet EPA's assumptions in 2026 and beyond, CPS Energy must immediately take steps and incur costs to meet EPA's allowance reductions.  Specifically, CPS Energy must use its banked CSAPR Group 2 NOx allowances (that EPA is converting to Group 3 allowances at a significantly discounted rate of approximately 6.5 Group 2 allowances for every Group 3 allowance), begin incurring costs to purchase additional Group 3 NOx allowances if available, and/or installing post-combustion controls.

Page **5** of **8**

25. If CPS Energy chooses to install post-combustion controls to mitigate the risk of insufficient allowances, then it must immediately proceed with steps to install retrofit SCR control systems on Spruce Unit 1 and Sommers Units 1 & 2, and compare the economic impact of installing advanced air pollution controls to the economic impact of early unit retirements in the context of meeting its CAAP commitments. SCR is a complex and expensive control system that can take several years to engineer, procure, and install. Because CPS Energy needs to begin the process immediately, the Final FIP will effectively force CPS Energy to use customer funding to drive towards the installation of SCRs for units that will be retired shortly after the SCRs could be installed—an inefficient use of customer funds that CPS Energy has sought and continues to seek to avoid.

26. Figure 1 shows a typical SCR implementation schedule prepared by Sargent & Lundy, LLC showing a 46-month period between the decision to proceed and commercial operation of the control system. The schedule includes durations for initial studies and conceptual design, preparation of control system and balance-of-plant specifications, project award, equipment procurement, and project implementation.

Figure 1. SCR Implementation – Typical Project Schedule

| No. | Description | Months | Year 1 | Year 2 | Year 3 | Year 4 |
|---|---|---|---|---|---|---|
| 1 | Decision to Proceed with SCR | Milestone | ● | | | |
| **Project Development** | | | | | | |
| 2 | Conceptual Studies/Design Basis | 6 months | | | | |
| 3 | Specifications/Awards | 12 months | | | | |
| 4 | Permits | 15 months | | | | |
| **Project Implementation** | | | | | | |
| 5 | Detailed Engineering | 16 months | | | | |
| 6 | Site Work/Mobilization | 4 months | | | | |
| 7 | Construction | 18 months | | | | |
| 8 | Startup and Testing | 3 months | | | | |
| 9 | Commercial Operation | Milestone | | | | ● |

27. The SCR implementation schedule provided in Figure 1 generally aligns with the Final FIP's requirement to reduce NOx emissions to a level commensurate with the installation of SCR by the 2026 or 2027 ozone season. However, even assuming a 42-month project schedule, CPS Energy would have to start that process immediately in order to have any chance of installing the control systems by May 1, 2026, or May 1, 2027, and a decision to install SCR controls would obligate CPS Energy to expend significant funds beginning in 2023, expenditures that would be sunk costs from which CPS Energy and its customers would not benefit if its compliance plans changed.

28. Based on high-level preliminary cost estimates, the total cost to install SCR controls on Spruce Unit 1 and Sommers Units 1 & 2 would be approximately $320 million, and could be significantly higher given the recent escalation in material costs, labor costs, and competition for equipment manufacturers and contractors.

29. Regardless of the final cost, CPS Energy must incur a significant amount of money immediately to have the control systems operational by the 2026/2027 ozone seasons. Figure 2 shows a typical cash flow for the design, specification, procurement, and construction of an SCR control system.

Page **6** of **8**

30.     CPS Energy would immediately incur costs to engineer and design the control system. Process equipment must be procured early in the process to meet an aggressive project schedule, with significant expenditures incurred following approximately 6-months of engineering and design. These costs would represent several million dollars of unrecoverable expenditures to CPS Energy, and once major equipment orders are placed significant cancellation penalties would apply.

<u>Figure 2.  SCR Implementation – Typical Cash Flow</u>



31.     The Final FIP would impose substantial costs on CPS Energy and its customers during the next three years and would threaten the long-term economic viability of several of CPS Energy's electric generating units.  Were CPS Energy to determine that the installation of SCR control systems was not economically viable given the high capital costs and its CAAP Carbon Reduction commitments, the only remaining compliance alternatives would be to purchase Group 3 allowances—if any are available—or retire one or more units prematurely.

32.     The future cost and availability of allowances is not known but fluctuated to as high as $48,000 per ton following the proposal of the FIP.  Should circumstances require that CPS Energy purchase allowances to achieve compliance with the Final FIP, CPS Energy would incur costs between $16.7 to $41.7 million per ozone season based on allowance costs of $20,000 to $50,000 per ton.  However, under such circumstances and in the event Group 3 allowances are unavailable or purchase of additional allowances is not economically feasible, CPS Energy would have to shut down one or more existing units before their scheduled retirement date(s) because they could not operate economically under the rule. Closing these plants would exacerbate potential transmission grid and reliability issues and impose additional significant financial burdens on CPS Energy and its customers.

33. For the reasons described above, CPS Energy would incur imminent and substantial financial harm if the effectiveness of the Texas SIP Disapproval is not stayed.

I, Kevin Pollo, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___7___ day of April 2023.

_Kevin Pollo_

Kevin Pollo