No. 23-60300

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖎𝖋𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY,
*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondents*,

## LOUISIANA PETITIONERS' MOTION TO STAY APPENDIX

JEFF LANDRY
 Attorney General
ELIZABETH B. MURRILL (LA 20685)
 *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
 *Deputy Solicitor General*
LOUISIANA DEPT. OF JUSTICE

909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

Courtney J. Burdette (LA 30564)
  *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

Jeffrey A. Hall
Marcella Burke
BURKE LAW GROUP
1000 Main Street, Suite 2300
Houston, Texas 77002
jeff@burkegroup.law
marcella@burkegroup.law

# TABLE OF CONTENTS

**Exhibit**                                                          **Exhibit Number**

Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States (June 30, 2023) ................................................ 1

Order, Dkt. 269, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (per curiam) ............................................................................... 2

Joseph Goffman, Memorandum, Notice of Forthcoming EPA Action to Address Judicial Stay Orders ............................................... 3

Dkt. 112-1, 112-3, *Texas v. EPA*, No. 23-60069 (5th Cir.) (stay motion and relevant attachments) ................................................ 4

# Exhibit 1

EPA Administrator Michael S. Regan signed the following interim final rule on June 29, 2023, and EPA is submitting it for publication in the Federal Register (FR). While we have taken steps to ensure the accuracy of this Internet version of the rule, it is not the official version. Please refer to the official version in a forthcoming FR publication, which will appear on Regulations.gov (www.regulations.gov) in Docket No. EPA-HQ-OAR-2021-0668 and on the Government Publishing Office's govinfo website (www.govinfo.gov/app/collection/fr).

6560-50-P

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 97**

**[EPA-HQ-OAR-2021-0668; FRL-8670.2-03-OAR]**

**Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking interim final action to stay, for emissions sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas only, the effectiveness of the federal implementation plan (FIP) requirements established to address the obligations of these and other states to mitigate interstate air pollution with respect to the 2015 national ambient air quality standards (NAAQS) for ozone (the Good Neighbor Plan). The EPA is also revising certain other regulations to ensure that sources in these states will continue to be subject to previously established requirements to mitigate interstate air pollution with respect to other ozone NAAQS while the Good Neighbor Plan's requirements are stayed. These revisions will also ensure that the stay is limited to requirements for which the EPA does not currently have authority to implement a FIP pending judicial review. The stay and the associated revisions to other regulations are being issued in response to judicial orders that partially stay, pending judicial review, a separate, earlier EPA action which disapproved certain state implementation plan (SIP) revisions submitted by these and other states. Finally, for states for

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

which the Good Neighbor Plan's requirements are not being stayed, the EPA is revising three near-term deadlines that are incorrect as published in the Good Neighbor Plan.

**DATES:** This interim final rule is effective on August 4, 2023. Comments on this rule must be received on or before **[INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA-HQ-OAR-2021-0668, by any of the following methods:

- Federal eRulemaking portal: *https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.

- Mail: U.S. Environmental Protection Agency, EPA Docket Center, Air and Radiation Docket, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

- Hand delivery or courier: EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operations are 8:30 a.m. – 4:30 p.m., Monday – Friday (except federal holidays).

Comments received may be posted without change to *https://www.regulations.gov*, including any personal information provided. For detailed instructions on sending comments, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

**FOR FURTHER INFORMATION CONTACT:** David Lifland, Clean Air Markets Division, Office of Atmospheric Protection, Office of Air and Radiation, U.S. Environmental Protection Agency, Mail Code 6204A, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone: 202-343-9151; email: *lifland.david@epa.gov*.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**SUPPLEMENTARY INFORMATION:**

**I. General**

*A. Public Participation*

Submit your written comments, identified by Docket ID No. EPA-HQ-OAR-2021-0668, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI), Proprietary Business Information (PBI), or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (i.e., on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI, PBI, or multimedia submissions; and general guidance on making effective comments.

*B. Potentially Affected Entities*

This action revises on an interim basis the Good Neighbor Plan, which applies to electricity generating units (EGUs) and non-EGU industrial sources. This action also revises other allowance trading program regulations that apply to EGUs but not to non-EGU industrial sources. The affected emissions sources are generally in the following industry groups:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

| Industry Group | North American Industry Classification System (NAICS) Code |
|---|---|
| Fossil Fuel Electric Power Generation | 221112 |
| Pipeline Transportation of Natural Gas | 4862 |
| Cement and Concrete Product Manufacturing | 3273 |
| Iron and Steel Mills and Ferroalloy Manufacturing | 3311 |
| Glass and Glass Product Manufacturing | 3272 |
| Basic Chemical Manufacturing | 3251 |
| Petroleum and Coal Products Manufacturing | 3241 |
| Pulp, Paper, and Paperboard Mills | 3221 |
| Metal Ore Mining | 2122 |
| Solid Waste Combustors and Incinerators | 562213 |

The Good Neighbor Plan applies to emissions sources in Alabama, Arkansas, California, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nevada, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Texas, Utah, Virginia, West Virginia, and Wisconsin. The portions of this action staying the Good Neighbor Plan's requirements and revising other allowance trading program regulations apply to sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas. The portions of this action revising certain near-term deadlines under the Good Neighbor Plan apply to emissions sources in the other listed states, for which the Good Neighbor Plan's requirements are not being stayed.

The information provided in this section on potentially affected entities is not intended to be exhaustive. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same Clean Air Act (CAA) provisions that provided authority to issue the regulations being amended: CAA section 110(a) and (c), 42 U.S.C. 7410(a) and (c) (SIP and FIP requirements, including requirements for mitigation of interstate air pollution), and CAA section 301, 42

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

U.S.C. 7601 (general rulemaking authority). Statutory authority for the rulemaking procedures

followed in this action is provided by Administrative Procedure Act (APA) section 553, 5 U.S.C.

553.

## II. Regulatory Revisions

*A. Response to Stay Orders*

1. Background and Summary

CAA section 110(a)(2)(D)(i)(I), also known as the "good neighbor" provision, requires

each state's SIP to include provisions sufficient to "prohibit[ ], consistent with the provisions of

this subchapter, any source or other type of emissions activity within the State from emitting any

air pollutant in amounts which will—(I) contribute significantly to nonattainment in, or interfere

with maintenance by, any other State with respect to any [NAAQS]." The EPA often refers to the

emissions reduction requirements under this provision as "good neighbor obligations" and

submissions addressing these requirements as "good neighbor SIPs."

CAA section 110(c)(1) requires the EPA Administrator to promulgate a FIP at any time

within two years after the Administrator: (i) finds that a state has failed to make a required SIP

submission; (ii) finds a SIP submission to be incomplete pursuant to CAA section 110(k)(1)(C);

or (iii) disapproves a SIP submission. This obligation applies unless the state corrects the

deficiency through a SIP revision that the Administrator approves before the FIP is promulgated.

On February 13, 2023, the EPA published a final action fully or partially disapproving

good neighbor SIPs submitted by 21 states with respect to the 2015 ozone NAAQS (the SIP

Disapproval action).[1] Consistent with the requirements of CAA section 110(c)(1), following the

---

[1] Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 FR 9336 (February 13, 2023).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

SIP Disapproval action, on March 15, 2023, the EPA Administrator signed a separate final action promulgating a FIP, which is referred to here as the "Good Neighbor Plan" or the "Rule."[2] The Good Neighbor Plan requires EGUs and non-EGU industrial sources in the 21 states whose good neighbor SIPs the EPA had disapproved in the SIP Disapproval action (as well as two other states for which the EPA had previously made findings of failure to submit good neighbor SIPs) to reduce their emissions of nitrogen oxides ($NO_X$) during the May-September "ozone season" to address the states' good neighbor obligations with respect to the 2015 ozone NAAQS.[3] The Good Neighbor Plan was published in the *Federal Register* on June 5, 2023, and its requirements will be phased in over several years starting on the Rule's August 4, 2023, effective date.

To implement the required emissions reductions from EGUs, the Good Neighbor Plan uses an emissions allowance trading program. The EPA has previously established three successive allowance trading programs for EGUs' seasonal $NO_X$ emissions to address states' good neighbor obligations with respect to the 1997 and 2008 ozone NAAQS – referred to here as the CSAPR $NO_X$ Ozone Season "Group 1," "Group 2," and "Group 3" trading programs – in the Cross-State Air Pollution Rule (CSAPR),[4] the CSAPR Update,[5] and the Revised CSAPR

---

[2] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023).

[3] *See generally id*. The Good Neighbor Plan's requirements for EGUs apply in 22 of the 23 covered states, while the requirements for non-EGU industrial sources apply in 20 of the 23 covered states.

[4] Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011). CSAPR addressed states' good neighbor obligations with respect to the 1997 ozone NAAQS, as well as the 1997 and 2006 NAAQS for fine particulate matter.

[5] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016). The CSAPR Update addressed states' good neighbor obligations with respect to the 2008 ozone NAAQS.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Update,[6] respectively. The Good Neighbor Plan does not establish a new emissions trading program, but instead modifies the Group 3 trading program initially established in the Revised CSAPR Update and expands the program to apply to EGUs in the additional states included in the Good Neighbor Plan.

In each of the successive rulemakings to address good neighbor obligations with respect to an ozone NAAQS, the EPA has coordinated compliance requirements by allowing the participation of a state's EGUs in the most recent seasonal $NO_X$ trading program to also satisfy any requirements to participate in a previous seasonal $NO_X$ trading program established to address the state's good neighbor obligations with respect to a less protective NAAQS.[7] Because of the EPA's coordination efforts, for 19 of the states covered by the Good Neighbor Plan as signed, including Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas, participation of the state's EGUs in the Group 3 trading program not only serves as the mechanism for partially addressing the states' good neighbor obligations with respect to the 2015 ozone NAAQS, but also serves as the mechanism for addressing the states' good neighbor obligations with respect to the 2008 ozone NAAQS.[8] For eight of the states, including Arkansas, Kentucky, Louisiana, Mississippi, and Missouri, participation of the states' EGUs in the Group 3 trading program serves as the mechanism for addressing the states' good neighbor obligations with respect to the 1997 ozone NAAQS as well.[9]

---

[6] Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021). The Revised CSAPR Update readdressed states' good neighbor obligations with respect to the 2008 ozone NAAQS in response to the remand of the CSAPR Update in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019).

[7] *See, e.g.,* 81 FR 74509; 86 FR 23122.

[8] *See* 88 FR 36844.

[9] *See id*.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Petitioners challenging the SIP Disapproval action have filed motions in several courts for partial stays of that action with respect to the SIPs submitted by particular states. Subsequent to the Good Neighbor Plan's signature date, courts have granted some of these motions. On May 1 and June 8, 2023, the U.S. Court of Appeals for the Fifth Circuit issued orders staying the SIP Disapproval action with respect to Louisiana, Mississippi, and Texas pending judicial review on the merits.[10] On May 25 and 26, 2023, the U.S. Court of Appeals for the Eighth Circuit issued orders staying the SIP Disapproval action with respect to Arkansas and Missouri pending judicial review on the merits.[11] On May 31, 2023, the U.S. Court of Appeals for the Sixth Circuit issued an order administratively staying the SIP Disapproval action with respect to Kentucky pending review of Kentucky's stay motion.[12]

The EPA's authority under CAA section 110(c)(1) to establish the Good Neighbor Plan's FIP requirements for the sources in a given state is triggered by either the EPA's disapproval of the state's good neighbor SIP with respect to the 2015 ozone NAAQS or the EPA's finding of the state's failure to submit such a SIP. Accordingly, as a result of the orders partially staying the SIP Disapproval action, the EPA must act to ensure that the Good Neighbor Plan's requirements that were issued to address good neighbor obligations with respect to the 2015 ozone NAAQS and that apply to either EGUs or non-EGU industrial sources in each of the states for which a stay order has been issued will not take effect while the stay of the SIP Disapproval action as to that state remains in place. To ensure full compliance with the stay orders, the EPA is also

---

[10] Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023). The orders are available in the docket.
[11] Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023); Order, *Union Electric Co. v. EPA*, No. 23-1751 (8th Cir. May 26, 2023). The orders are available in the docket.
[12] Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023), available in the docket.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

staying these requirements for sources in Indian country located within the borders of a state covered by a stay order, including areas of Indian country not subject to the state's SIP authority.[13] However, as noted earlier in this section, the Group 3 trading program is also the mechanism to implement requirements previously established for EGUs in most of the covered states to address the states' good neighbor obligations with respect to the 2008 ozone NAAQS and, in some cases, the 1997 ozone NAAQS. The SIP Disapproval action was not a basis for the authority relied on by the EPA in the previous rulemakings to establish emissions reduction requirements with respect to the 2008 or 1997 ozone NAAQS, and the stay orders do not affect these pre-existing requirements. The EPA's authority for the rulemakings addressing the 2008 and 1997 ozone NAAQS remains in place. Implementing the stay orders therefore requires the EPA not only to stay the new requirements established for EGUs and non-EGU industrial sources in the Good Neighbor Plan to address their states' good neighbor obligations with respect to the 2015 ozone NAAQS, but also to preserve status quo requirements established in previous rulemakings to address their states' good neighbor obligations with respect to the 2008 and 1997 ozone NAAQS.

Thus, the EPA in this action is revising the Good Neighbor Plan FIP requirements and the regulations for the Group 2 trading program to require the EGUs in each state covered by a stay order for the SIP Disapproval action to participate in the Group 2 trading program instead of the

---

[13] For sources in areas of Indian country not subject to the SIP authority of the states within whose borders the areas of Indian country are located, the EPA issued the Good Neighbor Plan's requirements not under authority of CAA section 110(c)(1) but under authority of CAA section 301(d)(4). *See* 88 FR 36690–92. However, because the EPA exercised its authority under CAA section 301(d)(4) only with respect to areas of Indian country within the borders of states for which requirements were being issued under CAA section 110(c)(1), *id*. at 36692, these areas of Indian country are indirectly implicated by the orders partially staying the SIP Disapproval action for the respective states.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Group 3 trading program while the stay for that state remains in place. A small number of conforming revisions are also being made to the regulations for the Group 1 and Group 3 trading programs. Together, the revisions preserve the status quo by making the trading program requirements that will apply to the EGUs in each state for which the SIP Disapproval action has been stayed substantively identical to the trading program requirements that would have applied to the EGUs in that state if the state had not been covered by the Good Neighbor Plan. The revisions to the trading program regulations are summarized in the remainder of this section and are discussed in detail in section II.A.2 of this document.[14]

First, for EGUs in Arkansas, Mississippi, Missouri, and Texas, which before the Good Neighbor Plan were covered by the Group 2 trading program as promulgated in the CSAPR Update rather than the Group 3 trading program, the revisions in this action restore the state emissions budgets, unit-level allowance allocation provisions, and banked allowance holdings that would have been in effect for the EGUs in these states under the Group 2 trading program in the absence of the Good Neighbor Plan.

Second, for EGUs in Kentucky and Louisiana, which before the Good Neighbor Plan were already covered by the Group 3 trading program as promulgated in the Revised CSAPR Update, the revisions in this action modify the Group 2 and Group 3 trading program regulations so as to establish under the Group 2 trading program the state emissions budgets, unit-level allowance allocation provisions, and banked allowance holdings that would have been in effect for the EGUs in these states under the Group 3 trading program in the absence of the Good Neighbor Plan.

---

[14] The EPA has included documents in the docket that show all the regulatory revisions being adopted in this action in redline-strikeout format.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Finally, for EGUs in all states that will now be covered by the Group 2 trading program, the revisions in this action establish two non-interchangeable subtypes of Group 2 allowances: CSAPR $NO_X$ Ozone Season Original Group 2 allowances and CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances.[15] EGUs in Arkansas, Mississippi, Missouri, and Texas, which would have been covered by the Group 2 trading program in the absence of the Good Neighbor Plan, will use Original Group 2 allowances for compliance (as will EGUs in Iowa, Kansas, and Tennessee, which are not covered by the Good Neighbor Plan and remain in the Group 2 trading program). EGUs in Kentucky and Louisiana, which would have been covered by the Group 3 trading program in the absence of the Good Neighbor Plan, will use Expanded Group 2 allowances for compliance. The requirements to use different subtypes of Group 2 allowances will preserve the status quo distinction between these two sets of EGUs that already existed before the Good Neighbor Plan and that continues to exist with the stay of the Good Neighbor Plan as to these states, because the allowances that EGUs in Kentucky and Louisiana have used for compliance under the Group 3 trading program as promulgated in the Revised CSAPR Update are not interchangeable with the allowances that EGUs in the other states have used for compliance under the Group 2 trading program.

The amendments to the regulatory requirements for EGUs and non-EGU industrial sources that the EPA is finalizing in this action in response to the stay orders are being made on an interim basis and will remain in place while the judicial proceedings in which the stay orders were issued remain pending. After the courts have reached final determinations on the merits in

---

[15] The non-interchangeability will be automatically enforced through the use of different codes for the two subtypes of Group 2 allowances in the EPA's Allowance Management System, where all allowance allocations, transfers, and deductions under the Group 2 trading program are recorded.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

those proceedings, the EPA will take further action consistent with the final determinations. At the time of this rulemaking, the EPA cannot predict how the Agency's future action may affect the amendments being finalized in this action.

2. Specific Regulatory Revisions

The regulatory revisions to 40 CFR part 52 that are being adopted in this action to implement the orders staying the SIP Disapproval action for non-EGU industrial sources in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas and Indian country within the borders of those states include the addition of text at § 52.40(c)(4) to stay the effectiveness of the Good Neighbor Plan's requirements for non-EGU industrial sources at §§ 52.41 through 52.46 and the remainder of § 52.40 for states covered by stay orders and the addition of parallel text in the state-specific subparts of part 52 for each of the states.[16]

The regulatory revisions to 40 CFR parts 52 and 97 that are being adopted in this action to implement the orders staying the SIP Disapproval action for EGUs in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas and Indian country within the borders of those states while ensuring continued implementation of requirements established to address good neighbor obligations under rules promulgated before the Good Neighbor Plan include the following:

- The addition of text at § 52.38(b)(2)(iii)(D) to stay the effectiveness of the Good Neighbor Plan's requirements at § 52.38(b)(2)(iii)(A) and (B) for EGUs to participate in the enhanced Group 3 trading program for control periods after 2022 for states covered by stay orders, the addition of text at § 52.38(b)(2)(ii)(D) to require those EGUs to

---

[16] *See* §§ 52.184(b)(2) (Arkansas), 52.940(c)(2) (Kentucky), 52.984(e)(2) (Louisiana), 52.1284(b)(2) (Mississippi), 52.1326(c)(2) (Missouri), and 52.2283(e)(2) (Texas).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

participate in the Group 2 trading program while that stay remains in place, and the addition of parallel text in the state-specific subparts of part 52 for each of the states.[17]

- The revision of text at § 52.38(b)(16)(ii)(B) to provide for continued administration by the EPA after 2022, for states covered by stay orders, of state Group 2 trading programs integrated with the federal Group 2 trading program under approved SIP revisions.[18]

- The revision and addition of text at § 97.802 to define "Original" and "Expanded" subtypes of CSAPR NO$_X$ Ozone Season Group 2 allowances, with conforming revisions and additions at §§ 97.502, 97.1002, 97.811(d) and (e), 97.821(e), 97.526(d) and (e), 97.826(d) through (f), and 52.38(b)(14).

- The revision of text at §§ 97.806(c), 97.824(a) and (d), and 97.825(a) to provide for EGUs in states covered by stay orders and covered by the Group 3 trading program before 2023 to use Expanded Group 2 allowances for compliance and for EGUs in other states covered by the Group 2 trading program to use Original Group 2 allowances for compliance, with conforming revisions at § 52.38(b)(14).

- The revision of text at § 97.810(a) and (b) to provide EGUs in states covered by stay orders the same amounts for state emissions budgets, new unit set-asides, Indian country new unit set-asides, and variability limits that would have applied under the Group 2 trading program or the Group 3 trading program, as applicable for the state, in the absence of the Good Neighbor Plan.

---

[17] *See* §§ 52.184(a)(6) (Arkansas), 52.940(b)(6) (Kentucky), 52.984(d)(6) (Louisiana), 52.1284(a)(6) (Mississippi), 52.1326(b)(6) (Missouri), and 52.2283(d)(6) (Texas).

[18] This revision ensures that Missouri's good neighbor obligations with respect to the 2008 and 1997 NAAQS can continue to be met through the participation of the state's EGUs in the state Group 2 trading program adopted by the state and included in the SIP revision that was approved by the EPA at 84 FR 66316 (December 4, 2019).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

- The revision of text at § 97.811(a)(2) and § 97.821(e) to provide EGUs in states covered by stay orders the same unit-level allocation and recordation provisions that would have applied under the Group 2 trading program or the Group 3 trading program, as applicable for the state, in the absence of the Good Neighbor Plan.[19]

- The revision of text at §§ 97.830(b)(1) and 97.834(d)(2)(i) to provide EGUs in states that were covered by the Group 3 trading program before 2023 the same deadlines for commencement of monitoring and reporting activities that would have applied in the absence of the Good Neighbor Plan.

- The addition of text at § 97.1026(e) to provide for the conversion of banked 2021–2022 Group 3 allowances held by EGUs in states that that were covered by the Group 3 trading program before 2023 into Expanded Group 2 allowances, with conforming revisions at §§ 97.502, 97.802, 97.1002, 97.824(c), and 52.38(b)(14).

- The revision of text at §§ 97.811(e)(1) and 97.826(e)(1) to exclude EGUs in states covered by stay orders from the Good Neighbor Plan's provisions converting banked 2017–2022 Original Group 2 allowances into Group 3 allowances and recalling previously allocated 2023–2024 Original Group 2 allowances.

- The revision of text at §§ 97.816(c), 97.818(f), and 97.820(c)(1)(iv), (c)(2)(iv), and (c)(5)(vi) to include the transition of states from the Group 3 trading program to the

---

[19] For sources in states that were not covered by the Group 3 trading program before the Good Neighbor Plan, the applicable notice of data availability (NODA) referenced in revised § 97.811(a)(2)(i) as identifying the unit-level allocations of Original Group 2 allowances to existing units will be the NODA published at 81 FR 67190 (September 30, 2016) to implement the CSAPR Update. For sources in states that were covered by the Group 3 trading program before the Good Neighbor Plan, the applicable NODA referenced in revised § 97.811(a)(2)(ii) as identifying the unit-level allocations of Expanded Group 2 allowances to existing units will be the NODA published at 86 FR 26719 (May 17, 2021) to implement the Revised CSAPR Update.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Group 2 trading program in the provisions that allow the EPA to treat certain certifications, applications, and notices of delegation as valid despite the use of terminology intended for use under a different trading program.

- The revision of text at §§ 97.526(e) and 97.826(f) and the addition of text at § 97.1026(f) to include the transition of states from the Group 3 trading program to the Group 2 trading program in the provisions that specify when and how an EGU in a state that has moved between trading programs may use allowances from a later trading program to meet surrender requirements for past control periods under a previous trading program, with conforming revisions at § 52.38(b)(14).

- The revision of text at § 97.526(d)(2)(ii) and 97.826(d)(3) to include the conversion of Group 3 allowances to Expanded Group 2 allowances in the provisions that address future conversions of allowances that were allocated for past control periods under a given trading program to an EGU in a state no longer covered by that trading program, where the allowances would have been included in a previous conversion to a different type of allowances if the allocations had been recorded before the previous conversion took place.

*B. Deadline Corrections*

In addition to the regulatory revisions described in section II.A of this document that are being made on an interim basis in response to judicial stay orders, in this action the EPA is also permanently revising three near-term deadlines that are incorrect in the Good Neighbor Plan as published in the *Federal Register*. Unlike the revisions described in section II.A of this document, these revisions apply to emissions sources in the states whose coverage under the Good Neighbor Plan is not affected by a stay order.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The first deadline correction concerns a quarterly reporting deadline applicable to EGUs in states that were already covered by the Group 2 trading program or the Group 3 trading program before the 2023 ozone season. As explained in the Good Neighbor Plan preamble, these EGUs will participate in the revised Group 3 trading program for the entire 2023 ozone season, subject to transitional provisions ensuring that the only substantive new regulatory requirements in 2023 – specifically, the emissions control stringencies reflected in the revised Group 3 trading program's state emissions budgets and assurance levels – will take effect only after the Rule's effective date.[20] The Group 3 trading program's deadline for EGUs to submit quarterly reports of emissions and operating data for the first two months of the May–September ozone season in 2023 would normally have been July 31, 2023 (the first business day at least 30 days after the end of the second calendar quarter), but the timing of publication in the *Federal Register* caused the Good Neighbor Plan's effective date to fall four days after this date, on August 4, 2023. Accordingly, the EPA is extending the deadline in 40 CFR 97.1034(d)(3) by which EGUs subject to the Group 3 trading program must submit quarterly reports for this calendar quarter to August 4, 2023.[21] Further, because the quarterly reports required under the Group 3 trading program are consolidated with the quarterly reports required under several other EPA programs, the EPA is also amending 40 CFR 97.1034(d)(4) to similarly extend these EGUs' reporting deadlines under the other programs.

---

[20] *See* 88 FR 36775–76; 88 FR 36811–13.

[21] All the EGUs that are required under the Good Neighbor Plan to submit quarterly reports for the second calendar quarter of 2023 already participate in either the Group 2 trading program or the Group 3 trading program and therefore have already installed and certified the necessary monitoring systems. The data elements of the quarterly reports that these EGUs are required to submit under the Group 3 trading program for their ozone season emissions in 2023 are identical to the data elements of the quarterly reports that the EGUs were required to submit under the Group 2 trading program or Group 3 trading program for their ozone season emissions in 2022 and previous years.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

The second deadline correction concerns a quarterly reporting deadline applicable to EGUs in states that were not already covered by the Group 2 trading program or the Group 3 trading program before the 2023 ozone season. EGUs in these states will begin to participate in the Group 3 trading program as of the Good Neighbor Plan's effective date, and the regulations as published in the Rule correctly provide that most of these EGUs will be subject to the program's monitoring and reporting requirements for emissions occurring on and after August 4, 2023.[22] However, a separate regulatory provision incorrectly identifies the ending date of the first calendar quarter for which these EGUs must submit quarterly reports under the Group 3 trading program as June 30, 2023. The EPA is amending 40 CFR 97.1034(d)(2)(i)(C) to indicate the correct quarterly ending date of September 30, 2023. The deadline for EGUs to submit quarterly reports for this calendar quarter will be October 30, 2023.

The third deadline correction concerns a deadline for submission of initial notifications applicable to furnaces in the Glass and Glass Product Manufacturing industry that are subject to requirements under the Good Neighbor Plan. Because of a typographical error in the document submitted for publication in the *Federal Register*, the Rule as published incorrectly specifies a submission deadline of June 23, 2023 (the first business day at least 18 days after the Rule's publication date). The EPA is amending 40 CFR 52.44(j)(2) to specify the intended submission

---

[22] *See* 40 CFR 97.1030(b)(1)(iii). Most EGUs covered under the Good Neighbor Plan that do not already participate in the Group 2 trading program or the Group 3 trading program are already subject to closely related monitoring and reporting requirements under other EPA programs and consequently have already installed and certified the monitoring systems necessary to monitor and report under the Group 3 trading program. For the small number of EGUs in these states that have not already been required to install and certify the necessary monitoring systems under another EPA program, the deadline to begin monitoring and reporting under the Group 3 trading program will be either January 31, 2024 (180 days after the Rule's effective date), for units that report on a year-round basis, or May 1, 2024, for units that report on an ozone season-only basis. *See* 40 CFR 97.1030(b)(1)(iv) and (b)(3).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

deadline of December 4, 2023 (the first business day at least *180* days after the Rule's

publication date).

## III. Rulemaking Procedures and Findings of Good Cause

As noted in section I.C of this document, the EPA's authority for the rulemaking

procedures followed in this action is provided by APA section 553.[23] In general, an agency

issuing a rule under the procedures in APA section 553 must provide prior notice and an

opportunity for public comment, but APA section 553(b)(B) includes an exemption from notice-

and-comment requirements "when the agency for good cause finds (and incorporates the finding

and a brief statement of reasons therefor in the rule issued) that notice and public procedure

thereon are impracticable, unnecessary, or contrary to the public interest." This action is being

issued as an interim final rule without prior notice or opportunity for public comment because

the EPA finds that the APA "good cause" exemption from notice-and-comment requirements

applies here.

The EPA finds good cause to forgo notice-and-comment procedures because such

procedures are both impracticable and unnecessary for this action. First, following notice-and-

comment procedures is impracticable for the portions of this action responding to the stay orders

because such procedures would require more time than is available. The earliest stay order to

which the EPA must respond in this action was issued on May 1, 2023, just over three months

before the Good Neighbor Plan's upcoming effective date on August 4, 2023, which is the date

---

[23] Under CAA section 307(d)(1)(B), the EPA's revision of a FIP under CAA section 110(c) would normally be subject to the rulemaking procedural requirements of CAA section 307(d), including notice-and-comment procedures, but CAA section 307(d) does not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]." CAA section 307(d)(1).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

by which this action responding to the stay order must be effective. The most recent of the subsequent stay orders to which the EPA's action must also respond was issued less than two months before the Rule's upcoming effective date. The EPA does not consider even the maximum three-month period sufficient time in which to conduct a notice-and-comment rulemaking encompassing the time to, at a minimum, evaluate possible actions for responding to the stay orders, prepare and publish a proposal describing the action identified through that evaluation, wait for comments on the proposal, review the comments received, and prepare and publish a final rule and response to comments. It is not possible for all of these steps to be completed within a three-month period for this action.

Second, following notice-and-comment procedures is unnecessary for this action. With respect to the portions of this action that respond to the stay orders, the EPA has no discretion as to the regulatory revisions that stay the effectiveness of the Good Neighbor Plan's requirements for sources in the states covered by stay orders. While some superficial discretion exists concerning the specific design of the regulatory revisions that provide an alternate mechanism for EGUs in states covered by the stay orders to continue to address the states' good neighbor obligations with respect to the 2008 and 1997 NAAQS, no discretion exists as to the function of that design, which is to maintain the status quo by implementing requirements that are substantively identical to the pre-existing requirements that would have continued to apply in the absence of the Good Neighbor Plan. The EPA's design for the regulatory revisions in this action accomplishes this function. Taking comment on the portions of the action that respond to the stay orders so as to allow the public to advocate for not staying the Good Neighbor Plan's requirements, not adopting regulatory revisions needed to implement requirements that are substantively identical to the requirements that would have applied in the absence of the Good

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Neighbor Plan, or adopting superficially different regulatory revisions to accomplish the same function would serve no purpose and is therefore unnecessary.[24]

With respect to the portions of this action that correct deadlines, each of the deadlines that is incorrect as published in the Good Neighbor Plan precedes the Rule's actual effective date and therefore could not be implemented as published. In the cases of the two deadlines that were incorrect as published because of the timing of the Rule's publication, the amended deadlines of August 4, 2023, and September 30, 2023, are the earliest possible revised deadlines that are both feasible in light of the Good Neighbor Plan's actual effective date and also consistent with the normal timing and sequence of monitoring and reporting activities under the Group 3 trading program regulations. In the case of the deadline that was incorrect as published because of a typographical error, the amended deadline of December 4, 2023, is the same deadline that has already been published in parallel provisions of the Good Neighbor Plan's regulations for other non-EGU industrial sources.[25] Because both the need for the corrections and the specific corrections that should be made are clear, taking comment to allow the public to advocate for not correcting the deadlines or for making different corrections would serve no purpose and is therefore unnecessary.

The regulatory revisions made in this action will take effect on August 4, 2023, the effective date of the Good Neighbor Plan. In general, an agency issuing a rule under APA section 553 must provide for a period of at least 30 days between the rule's dates of publication and

---

[24] To illustrate, the EPA could in theory preserve the status quo for EGUs in Kentucky and Louisiana by promulgating an entire set of trading program regulations under 40 CFR part 97 replicating the entire set of Group 3 trading program regulations as promulgated in the Revised CSAPR Update without the subsequent revisions promulgated in the Good Neighbor Plan to address states' good neighbor obligations with respect to the 2015 ozone NAAQS. However, the outcome would be substantively identical to the approach the EPA is taking here.

[25] *See* 40 CFR 52.42(g)(2); 40 CFR 52.43(h)(2).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

effectiveness, but APA section 553(d) includes several exceptions. Under APA section

553(d)(1), an exception applies to a rule that "grants or recognizes an exemption or relieves a

restriction." Because the portions of this action that stay the effectiveness of the Good Neighbor

Plan's requirements for the sources in certain states grant an exemption (on an interim basis

while the stay remains in place), the normal 30-day minimum period between this action's dates

of publication and effectiveness is not required. The EPA is making these portions of the action

effective as of the Good Neighbor Plan's effective date to comply with the stay orders.

Under APA section 553(d)(3), the normal 30-day minimum period between a rule's dates

of publication and effectiveness does not apply "as otherwise provided by the agency for good

cause found and published with the rule." With respect to the portions of this action that provide

an alternate mechanism for EGUs in states covered by the stay orders to continue to address the

states' good neighbor obligations under rules issued before the Good Neighbor Plan and the

portions of this action that correct certain deadlines, the EPA finds good cause to make the

regulatory revisions effective on August 4, 2023, the effective date of the Good Neighbor Plan,

even though that date is less than 30 days after the publication date of this action, for the

following reasons. First, the regulatory revisions that facilitate continued implementation of

requirements addressing good neighbor obligations under previous rules benefit the public by

avoiding the possibility that interruption of the requirements would cause air quality degradation.

Second, both these regulatory revisions and the regulatory revisions that correct deadlines benefit

the regulated community by clarifying the regulatory requirements that apply in light of the stay

orders and the timing of publication of the Good Neighbor Plan. Finally, making the regulatory

revisions effective less than 30 days after this action's publication date does not violate the

purpose of the normal requirement for a 30-day minimum period, which is "to give affected

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

parties a reasonable time to adjust their behavior before the final rule takes effect."[26] The regulatory revisions in this action facilitating continued implementation of previously applicable requirements impose no requirements on any source that differ substantively from the requirements that would have applied to that source in the absence of the Good Neighbor Plan, and the deadline corrections in this action extend the deadlines in the Rule as published. Thus, no affected party needs time to adjust its behavior in preparation for these regulatory revisions.

## IV. Request for Comment

As explained in section III of this document, the EPA finds good cause to take this interim final action without prior notice or opportunity for public comment. However, the EPA is providing an opportunity for comment on the content of the amendments. The EPA requests comment on this rule. The EPA is not reopening for comment any provisions of the Good Neighbor Plan, 40 CFR part 52, or 40 CFR part 97 other than the specific provisions that are expressly added or amended in this rule.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at www.epa.gov/laws-regulations/laws-and-executive-orders.

*A. Executive Order 12866: Regulatory Planning and Review, as amended by Executive Order 14094: Modernizing Regulatory Review*

This action is not a significant regulatory action as defined in Executive Order 12866, as amended by Executive Order 14094, and was therefore not subject to a requirement for Executive Order 12866 review.

---

[26] *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*B. Paperwork Reduction Act (PRA)*

This action does not impose any new information collection burden under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq*. The Office of Management and Budget (OMB) has previously approved the information collection activities that will apply to the EGUs affected by this action and has assigned OMB control numbers 2060–0258 and 2060–0667. Additional information collection activities that will apply to EGUs and non-EGU industrial sources under the Good Neighbor Plan have been submitted to OMB for approval in conjunction with that rulemaking. This action makes no changes to the information collection activities under the previously approved information collection requests (ICRs) or the additional information collection activities for which approval has been requested in the Good Neighbor Plan's ICRs.

*C. Regulatory Flexibility Act (RFA)*

This action is not subject to the Regulatory Flexibility Act (RFA), 5.U.S.C. 601–612. The RFA applies only to rules subject to notice-and-comment rulemaking requirements under the Administrative Procedure Act (APA), 5 U.S.C. 553, or any other statute. This rule is not subject to notice-and-comment requirements because the Agency has invoked the APA "good cause" exemption under 5 U.S.C. 553(b).

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in the Unfunded Mandates Reform Act (UMRA), 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local, or tribal governments or the private sector. This action simply stays the effectiveness of certain regulatory requirements for certain sources on an interim basis in response to procedural court orders while ensuring that previously applicable regulatory requirements remain in effect.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination with Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This action simply stays the effectiveness of certain regulatory requirements for certain sources on an interim basis in response to procedural court orders while ensuring that previously applicable regulatory requirements remain in effect. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children from Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2-202 of the Executive Order. This action responds to court orders issued by the U.S. Courts of Appeals for the Fifth, Sixth, and Eighth Circuits and the EPA lacks discretion to deviate from those orders. The EPA's assessment of health and safety risks for the action establishing the requirements that are being stayed is discussed in Chapter 5 of the regulatory impact analysis for the Good Neighbor Plan.[27]

---

[27] *See* Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard (March 2023) at 197–257, available in the docket.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*H. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act (NTTAA)*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or Indigenous peoples) and low-income populations.

This action responds to court orders issued by the U.S. Courts of Appeals for the Fifth, Sixth, and Eighth Circuits and the EPA lacks discretion to deviate from those orders. The EPA's assessment of environmental justice considerations for the action establishing the requirements that are being stayed is discussed in section VII of the Good Neighbor Plan preamble.[28]

*K. Congressional Review Act (CRA)*

This action is subject to the Congressional Review Act (CRA), 5 U.S.C. 801–808, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The CRA allows the issuing agency to make a rule effective sooner than

---

[28] *See* 88 FR 36844–46.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

otherwise provided by the CRA if the agency makes a good cause finding that notice and comment rulemaking procedures are impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this rule as discussed in section III of this document, including the basis for that finding.

*L. Judicial Review*

CAA section 307(b)(1) governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit): (i) when the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion to decide whether to invoke the exception in (ii).[29]

This rulemaking is "nationally applicable" within the meaning of CAA section 307(b)(1). In this action, in response to court orders, the EPA is amending on an interim basis the Good Neighbor Plan,[30] which the EPA developed by applying a uniform legal interpretation and common, nationwide analytical methods to address the requirements of CAA section 110(a)(2)(D)(i)(I) concerning interstate transport of pollution (i.e., "good neighbor" requirements) for the 2015 ozone NAAQS. Based on that nationwide analysis, the Good

---

[29] *Sierra Club v. EPA*, 47 F.4th 738, 745 (D.C. Cir. 2022) ("EPA's decision whether to make and publish a finding of nationwide scope or effect is committed to the agency's discretion and thus is unreviewable"); *Texas v. EPA*, 983 F.3d 826, 834–35 (5th Cir. 2020).

[30] The Good Neighbor Plan is nationally applicable or based on a determination of nationwide scope or effect found and published by the EPA. *See* 88 FR 36859–60.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

Neighbor Plan established FIP requirements for sources in 23 states located across eight EPA Regions and ten federal judicial circuits. Given that this action amends an action implementing the good neighbor requirements of CAA section 110(a)(2)(D)(i)(I) in a large number of states located across the country and given the interdependent nature of interstate pollution transport and the common core of knowledge and analysis involved in promulgating the FIP requirements, this is a "nationally applicable" action within the meaning of CAA section 307(b)(1).

In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). In this action, in response to court orders, the EPA is amending on an interim basis the Good Neighbor Plan, an action in which the EPA interpreted and applied section 110(a)(2)(D)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental United States. Based on that nationwide analysis, the Good Neighbor Plan established FIP requirements for sources in 23 states located across eight EPA Regions and ten federal judicial circuits. This action adjusts temporarily the scope and operation of the Good Neighbor Plan for six states in response to court orders, and also implements necessary measures to ensure the status quo is maintained with respect to existing obligations under previously issued regulations (that were themselves nationally applicable or based on a determination of nationwide scope or effect found and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

published by the EPA[31]). This action also adjusts certain deadlines for all states that remain covered by the Good Neighbor Plan.

The Administrator finds that, like the Good Neighbor Plan which it amends, this action is a matter on which national uniformity in judicial resolution of any petitions for review is desirable, to take advantage of the D.C. Circuit's administrative law expertise, and to facilitate the orderly development of the basic law under the Act. The Administrator also finds that consolidated review of this action in the D.C. Circuit will avoid piecemeal litigation in the regional circuits, further judicial economy, and eliminate the risk of inconsistent results for different states, and that a nationally consistent approach to the CAA's mandate concerning interstate transport of ozone pollution constitutes the best use of Agency resources.

For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and finds that this final action is based on a determination of nationwide scope or effect for purposes of CAA section 307(b)(1) and is publishing that finding in the *Federal Register*. Under CAA section 307(b)(1), petitions for judicial review of this action must be filed in the D.C. Circuit by **[INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN FEDERAL REGISTER]**.

---

[31] *See* 86 FR 23163–64; 81 FR 74585–86.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Administrative practice and procedure, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Particulate matter, Sulfur dioxide.

*40 CFR Part 97*

Environmental protection, Administrative practice and procedure, Air pollution control, Electric power plants, Nitrogen oxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur dioxide.

Michael S. Regan,
Administrator.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

For the reasons stated in the preamble, parts 52 and 97 of title 40 of the Code of Federal Regulations are amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart A—General Provisions

2. Amend § 52.38 by:

a. Adding paragraphs (b)(2)(ii)(D) and (b)(2)(iii)(D);

b. In paragraph (b)(11)(iii)(D), removing "and" after the semicolon;

c. In paragraph (b)(14)(i)(F), removing "and" after the semicolon;

d. Revising paragraph (b)(14)(i)(G);

e. Adding paragraph (b)(14)(i)(H);

f. Revising paragraphs (b)(14)(iii) introductory text and (b)(14)(iii)(B);

g. In paragraph (b)(14)(iii)(C), adding "Original" before "Group 2 allowances" each time it appears; and

h. In paragraph (b)(16)(ii)(B), adding "and not listed in paragraph (b)(2)(ii)(D)(2) of this section" before "and any control period".

The additions and revisions read as follows:

### § 52.38 What are the requirements of the Federal Implementation Plans (FIPs) for the Cross-State Air Pollution Rule (CSAPR) relating to emissions of nitrogen oxides?

\*   \*   \*   \*   \*

(b) \*   \*   \*

(2) \*   \*   \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(ii) *  *  *

(D) Notwithstanding any other provision of this part:

(*1*) While a stay under paragraph (b)(2)(iii)(D)(*1*) of this section is in effect for the sources in a State and Indian country located within the borders of such State with regard to emissions occurring in a control period in a given year—

(*i*) The provisions of subpart EEEEE of part 97 of this chapter (as modified in any approval of a SIP revision for such State by the Administrator under paragraph (b)(8) of this chapter) or the provisions of a SIP revision approved for such State by the Administrator under paragraph (b)(9) of this section, if any, shall apply to the sources in such State and areas of Indian country within the borders of such State subject to the State's SIP authority, and the provisions of subpart EEEEE of part 97 of this chapter shall apply to the sources in areas of Indian country within the borders of such State not subject to the State's SIP authority, with regard to emissions occurring in such control period; and

(*ii*) Such State shall be deemed to be listed in this paragraph (b)(2)(ii)(D)(*1*) for purposes of this part and part 97 of this chapter.

(*2*) While a stay under paragraph (b)(2)(iii)(D)(*2*) of this section is in effect for the sources in a State and Indian country located within the borders of such State with regard to emissions occurring in a control period in a given year—

(*i*) The provisions of subpart EEEEE of part 97 of this chapter (as modified in any approval of a SIP revision for such State by the Administrator under paragraph (b)(8) of this chapter) or the provisions of a SIP revision approved for such State by the Administrator under paragraph (b)(9) of this section, if any, shall apply to the sources in such State and areas of Indian country within the borders of such State subject to the State's SIP authority, and the provisions of subpart

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

EEEEE of part 97 of this chapter shall apply to the sources in areas of Indian country within the borders of such State not subject to the State's SIP authority, with regard to emissions occurring in such control period; and

(*ii*) Such State shall be deemed to be listed in this paragraph (b)(2)(ii)(D)(*2*) for purposes of this part and part 97 of this chapter.

(iii) * * *

(D) Notwithstanding any other provision of this part:

(*1*) The effectiveness of paragraph (b)(2)(iii)(A) of this section is stayed for sources in Kentucky and Louisiana and Indian country located within the borders of such States with regard to emissions occurring in 2023 and thereafter. While a stay under this paragraph (b)(2)(iii)(D)(*1*) is in effect for a State, such State shall be deemed not to be listed in paragraph (b)(2)(iii)(A) of this section for purposes of part 97 of this chapter for a control period after 2022.

(*2*) The effectiveness of paragraph (b)(2)(iii)(B) of this section is stayed for sources in Arkansas, Mississippi, Missouri, and Texas and Indian country located within the borders of such States with regard to emissions occurring in 2023 and thereafter. While a stay under this paragraph (b)(2)(iii)(D)(*2*) is in effect for a State, such State shall be deemed not to be listed in paragraph (b)(2)(iii)(B) of this section for purposes of part 97 of this chapter.

* * * * *

(14) * * *

(i) * * *

(G) The provisions in § 97.526(e) of this chapter or § 97.826(f) of this chapter (concerning the use of CSAPR NO$_X$ Ozone Season Original Group 2 allowances, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, or CSAPR NO$_X$ Ozone Season Group 3 allowances to

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

satisfy requirements to hold CSAPR $NO_X$ Ozone Season Group 1 allowances or the use of

CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances or CSAPR $NO_X$ Ozone Season

Group 3 allowances to satisfy requirements to hold CSAPR $NO_X$ Ozone Season Original Group

2 allowances); and

(H) The provisions in §§ 97.806(c), 97.824(a) and (d), and 97.825(a) of this chapter

(concerning the situations for which compliance requirements are defined in terms of either

CSAPR $NO_X$ Ozone Season Original Group 2 allowances or CSAPR $NO_X$ Ozone Season

Expanded Group 2 allowances).

\*    \*    \*    \*    \*

(iii) Notwithstanding any discontinuation pursuant to paragraph (b)(2)(i)(B), (b)(2)(ii)(B) or

(C), (b)(2)(iii)(D)(*1*), or (b)(13)(i) of this section of the applicability of subpart BBBBB, EEEEE,

or GGGGG of part 97 of this chapter to the sources in a State and areas of Indian country within

the borders of the State subject to the State's SIP authority with regard to emissions occurring in

any control period, the following provisions shall continue to apply with regard to all CSAPR

$NO_X$ Ozone Season Group 1 allowances, CSAPR $NO_X$ Ozone Season Group 2 allowances, and

CSAPR $NO_X$ Ozone Season Group 3 allowances at any time allocated for any control period to

any source or other entity in the State and areas of Indian country within the borders of the State

subject to the State's SIP authority and shall apply to all entities, wherever located, that at any

time held or hold such allowances:

\*    \*    \*    \*    \*

(B) The provisions of §§ 97.526(d), 97.826(d) and (e), and 97.1026(e) of this chapter

(concerning the conversion of unused CSAPR $NO_X$ Ozone Season Group 1 allowances allocated

for specified control periods to different amounts of CSAPR $NO_X$ Ozone Season Original Group

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

2 allowances or CSAPR $NO_X$ Ozone Season Group 3 allowances, the conversion of unused CSAPR $NO_X$ Ozone Season Original Group 2 allowances allocated for specified control periods to different amounts of CSAPR $NO_X$ Ozone Season Group 3 allowances, and the conversion of unused CSAPR $NO_X$ Ozone Season Group 3 allowances allocated for specified control periods to CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances); and

\*    \*    \*    \*    \*

3. Amend § 52.40 by adding paragraph (c)(4) to read as follows:

**§ 52.40 What are the requirements of the Federal Implementation Plans (FIPs) relating to ozone season emissions of nitrogen oxides from sources not subject to the CSAPR ozone season trading program?**

\*    \*    \*    \*    \*

(c) \* \* \*

(4) Notwithstanding any other provision of this part, the effectiveness of paragraphs (a) and (b), (c)(1) through (3), and (d) through (g) of this section and §§ 52.41, 52.42, 52.43, 52.44, 52.45, and 52.46 is stayed for sources located in Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas, including Indian country located within the borders of such States.

\*    \*    \*    \*    \*

**§ 52.44 [Amended]**

4. Amend § 52.44(j)(2) by removing "June 23, 2023" and adding in its place "December 4, 2023".

**Subpart E—Arkansas**

5. Amend § 52.184 by:

a. Adding paragraph (a)(6); and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

b. Redesignating paragraph (b) as paragraph (b)(1) and adding paragraph (b)(2).

The additions read as follows:

## § 52.184 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (a)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (a)(2) of this section shall apply with regard to such emissions.

(b) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(1) of this section is stayed.

## Subpart S—Kentucky

6. Amend § 52.940 by:

a. Adding paragraph (b)(6); and

b. Redesignating paragraph (c) as paragraph (c)(1) and adding paragraph (c)(2).

The additions read as follows:

## § 52.940 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*   *   *   *   *

(b) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

while such stay remains in effect, the provisions of paragraph (b)(2) of this section shall apply with regard to such emissions.

(c) * * *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (c)(1) of this section is stayed.

**Subpart T—Louisiana**

7. Amend § 52.984 by:

a. Adding paragraph (d)(6); and

b. Redesignating paragraph (e) as paragraph (e)(1) and adding paragraph (e)(2).

The additions read as follows:

**§ 52.984 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

* * * * *

(d) * * *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (d)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (d)(2) of this section shall apply with regard to such emissions.

(e) * * *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (e)(1) of this section is stayed.

**Subpart Z—Mississippi**

8. Amend § 52.1284 by:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

a. Adding paragraph (a)(6); and

b. Redesignating paragraph (b) as paragraph (b)(1) and adding paragraph (b)(2).

The additions read as follows:

### § 52.1284 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

(a) *   *   *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (a)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (a)(2) of this section shall apply with regard to such emissions.

(b) *   *   *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(1) of this section is stayed.

### Subpart AA—Missouri

9. Amend § 52.1326 by:

a. Adding paragraph (b)(6); and

b. Redesignating paragraph (c) as paragraph (c)(1) and adding paragraph (c)(2).

The additions read as follows:

### § 52.1326 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?

*   *   *   *   *

(b) *   *   *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (b)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (b)(2) of this section shall apply with regard to such emissions.

(c) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (c)(1) of this section is stayed.

**Subpart SS—Texas**

10. Amend § 52.2283 by:

a. Adding paragraph (d)(6); and

b. Redesignating paragraph (e) as paragraph (e)(1) and adding paragraph (e)(2).

The additions read as follows:

**§ 52.2283 Interstate pollutant transport provisions; What are the FIP requirements for decreases in emissions of nitrogen oxides?**

*  *  *  *  *

(d) *  *  *

(6) Notwithstanding any other provision of this part, the effectiveness of paragraph (d)(3) of this section is stayed with regard to emissions occurring in 2023 and thereafter, provided that while such stay remains in effect, the provisions of paragraph (d)(2) of this section shall apply with regard to such emissions.

(e) *  *  *

(2) Notwithstanding any other provision of this part, the effectiveness of paragraph (e)(1) of this section is stayed.

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**PART 97—FEDERAL NO$_X$ BUDGET TRADING PROGRAM, CAIR NO$_X$ AND SO$_2$ TRADING PROGRAMS, CSAPR NO$_X$ AND SO$_2$ TRADING PROGRAMS, AND TEXAS SO$_2$ TRADING PROGRAM**

11. The authority citation for part 97 continues to read as follows:

**Authority:** 42 U.S.C. 7401, 7403, 7410, 7426, 7491, 7601, and 7651, *et seq.*

**Subpart BBBBB—CSAPR NO$_X$ Ozone Season Group 1 Trading Program**

12. Amend § 97.502 by:

a. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

b. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The revision and additions read as follows:

**§ 97.502 Definitions.**

\*    \*    \*    \*    \*

*CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

\*    \*    \*    \*    \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e), or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the CSAPR NO$_X$ Ozone Season Group 2 Trading Program, where each CSAPR NO$_X$ Ozone Season Group 2 allowance is either a CSAPR NO$_X$ Ozone Season Original Group 2 allowance or a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

*    *    *    *    *

*CSAPR NO$_X$ Ozone Season Original Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance other than a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

*    *    *    *    *

13. Amend § 97.526 by:

a. In paragraphs (d)(1)(iii) and (iv) and (d)(2)(i), adding "Original" before "Group 2 allowances" each time it appears;

b. Redesignating paragraph (d)(2)(ii) as paragraph (d)(2)(ii)(A);

c. In newly redesignated paragraph (d)(2)(ii)(A), removing "After the Administrator" and adding in its place "Except as provided in paragraph (d)(2)(ii)(B) of this section, after the Administrator";

d. Adding paragraph (d)(2)(ii)(B);

e. Revising paragraph (e) introductory text;

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

f. In paragraph (e)(1), adding "Original" before "Group 2 allowances";

g. Redesignating paragraph (e)(2) as paragraph (e)(2)(i);

h. In newly redesignated paragraph (e)(2)(i), removing "After the Administrator" and adding in its place "Except as provided in paragraph (e)(2)(ii) of this section, after the Administrator"; and

i. Adding paragraph (e)(2)(ii).

The additions and revision read as follows:

**§ 97.526 Banking and conversion.**

\*    \*    \*    \*    \*

(d) \*    \*    \*

(2) \*    \*    \*

(ii) \*    \*    \*

(B) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and §§ 97.826(d)(1) and 97.1026(e), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Group 1 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Group 1 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(d)(1)(i)(D).

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

\*    \*    \*    \*    \*

(e) Notwithstanding any other provision of this subpart or any SIP revision approved under § 52.38(b)(4) or (5) of this chapter, CSAPR $NO_X$ Ozone Season Original Group 2 allowances, CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances, or CSAPR $NO_X$ Ozone Season Group 3 allowances may be used to satisfy requirements to hold CSAPR $NO_X$ Ozone Season Group 1 allowances under this subpart as follows, provided that nothing in this paragraph (e) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

\*    \*    \*    \*    \*

(2) \*  \*  \*

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and §§ 97.826(d)(1) and 97.1026(e), the owner or operator of a CSAPR $NO_X$ Ozone Season Group 1 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR $NO_X$ Ozone Season Group 1 allowances for the control period in 2015 or 2016 by holding instead, in a general account established for this sole purpose, an amount of CSAPR $NO_X$ Ozone Season Expanded Group 2 allowances for the control period in 2021 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR $NO_X$ Ozone Season Group 1 allowances divided by the conversion factor determined under paragraph (d)(1)(ii) of this section and further divided by the conversion factor determined under § 97.826(d)(1)(i)(D).

\*    \*    \*    \*    \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**Subpart EEEEE—CSAPR NO$_X$ Ozone Season Group 2 Trading Program**

14. Amend § 97.802 by:

a. In the definition of "Allocate or allocation", removing "§ 97.526(d), and" and adding in its place "§§ 97.526(d), 97.826(d), and 97.1026(e), and";

b. In the definition of "Common designated representative's assurance level", paragraph (2), removing "§ 97.526(d)" and adding in its place "§ 97.526(d), § 97.826(d), or § 97.1026(e)";

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

d. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

e. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The additions and revision read as follows:

**§ 97.802 Definitions.**

\*   \*   \*   \*   \*

*CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under this subpart, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

\*   \*   \*   \*   \*

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under this subpart, § 97.526(d), or § 97.1026(e), or

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

by a State or permitting authority under a SIP revision approved by the Administrator under

§ 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of $NO_X$ during a control period of the

specified calendar year for which the authorization is allocated or auctioned or of any calendar

year thereafter under the CSAPR $NO_X$ Ozone Season Group 2 Trading Program, where each

CSAPR $NO_X$ Ozone Season Group 2 allowance is either a CSAPR $NO_X$ Ozone Season Original

Group 2 allowance or a CSAPR $NO_X$ Ozone Season Expanded Group 2 allowance.

*    *    *    *    *

 *CSAPR NOx Ozone Season Original Group 2 allowance* means a CSAPR $NO_X$ Ozone

Season Group 2 allowance other than a CSAPR $NO_X$ Ozone Season Expanded Group 2

allowance.

*    *    *    *    *

15. Amend § 97.806 by:

 a. In paragraph (c)(1)(i), adding "for such source" after "available for deduction";

 b. In paragraph (c)(2)(i) introductory text, adding "for such group" after "available for

deduction";

 c. In paragraph (c)(4) heading, adding "and type" after "Vintage"; and

 d. Adding paragraphs (c)(4)(iii) and (iv).

 The additions read as follows:

**$ 97.806 Standard requirements.**

*    *    *    *    *

 (c) *    *    *

 (4) *    *    *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(iii) Except as provided in paragraph (c)(4)(iv) of this section, a CSAPR NO$_X$ Ozone Season Group 2 allowance held for compliance with the requirements under paragraphs (c)(1)(i), (c)(1)(ii)(A), and (c)(2)(i) through (iii) of this section must be a CSAPR NO$_X$ Ozone Season Original Group 2 allowance.

(iv) A CSAPR NO$_X$ Ozone Season Group 2 allowance held for compliance with the requirements under paragraphs (c)(1)(i), (c)(1)(ii)(A), and (c)(2)(i) through (iii) of this section for a source or group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (or Indian country within the borders of such a State) for a control period after 2022 must be a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

\*    \*    \*    \*    \*

16. Amend § 97.810 by:

a. In paragraphs (a)(2)(i) and (ii), removing "through 2022" and adding in its place "and thereafter";

b. Adding paragraphs (a)(8)(iv) through (vi) and (a)(9)(iv) through (vi);

c. In paragraphs (a)(12)(i) through (iii), (a)(13)(i) and (ii), (a)(20)(i) through (iii), and (b)(2), removing "through 2022" and adding in its place "and thereafter";

d. Redesignating paragraph (b)(8) as paragraph (b)(8)(i) and adding paragraph (b)(8)(ii);

e. Redesignating paragraph (b)(9) as paragraph (b)(9)(i) and adding paragraph (b)(9)(ii); and

f. In paragraphs (b)(12), (b)(13), and (b)(20), removing "through 2022" and adding in its place "and thereafter".

The additions read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.810 State NO$_X$ Ozone Season Group 2 trading budgets, new unit set-asides, Indian country new unit set-asides, and variability limits.**

(a) *  *  *

(8) *  *  *

(iv) The NO$_X$ Ozone Season Group 2 trading budget for 2023 and thereafter is 14,051 tons.

(v) The new unit set-aside for 2023 and thereafter is 283 tons.

(vi) [Reserved]

(9) *  *  *

(iv) The NO$_X$ Ozone Season Group 2 trading budget for 2023 and thereafter is 14,818 tons.

(v) The new unit set-aside for 2023 and thereafter is 430 tons.

(vi) The Indian country new unit set-aside for 2023 and thereafter is 15 tons.

*  *  *  *  *

(b) *  *  *

(8) *  *  *

(ii) The variability limit for Kentucky for 2023 and thereafter is 2,951 tons.

(9) *  *  *

(ii) The variability limit for Louisiana for 2023 and thereafter is 3,112 tons.

*  *  *  *  *

17. Amend § 97.811 by:

a. Revising paragraph (a)(2);

b. In paragraphs (d)(1), (d)(2)(i), (d)(2)(ii)(A) through (C), (d)(3)(i) through (iii), (d)(3)(iv)(A) through (C), (d)(3)(v)(B) and (C), (d)(4)(i) through (iii), (d)(5) introductory text, (d)(5)(i) and (ii), and (d)(6), adding "Original" before "Group 2" each time it appears;

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

c. In paragraph (e)(1):

i. Adding "and not listed in § 52.38(b)(2)(ii)(D)(*2*) of this chapter" before "(and Indian country"; and

ii. Adding "Original" before "Group 2" each time it appears; and

d. In paragraphs (e)(2)(i), (e)(2)(ii)(A) through (C), (e)(3)(i) through (iii), (e)(3)(iv)(A) through (C), (e)(3)(v)(B) and (C), (e)(4)(i) through (iii), (e)(5) introductory text, (e)(5)(i) and (ii), and (e)(6), adding "Original" before "Group 2" each time it appears.

The revision reads as follows:

**§ 97.811 Timing requirements for CSAPR NO$_X$ Ozone Season Group 2 allowance allocations.**

(a) *   *   *

(2) Notwithstanding paragraph (a)(1) of this section:

(i) If a unit provided an allocation of CSAPR NO$_X$ Ozone Season Original Group 2 allowances in the applicable notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2016, during the control period in two consecutive years, such unit will not be allocated the CSAPR NO$_X$ Ozone Season Original Group 2 allowances provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year.

(ii) If a unit provided an allocation of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances in the applicable notice of data availability issued under paragraph (a)(1) of this section does not operate, starting after 2020, during the control period in two consecutive years, such unit will not be allocated the CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

provided in such notice for the unit for the control periods in the fifth year after the first such year and in each year after that fifth year.

(iii) All CSAPR NO$_X$ Ozone Season Group 2 allowances that would otherwise have been allocated to a unit described in paragraph (a)(2)(i) or (ii) of this section will be allocated to the new unit set-aside for the State where such unit is located and for the respective years involved. If such unit resumes operation, the Administrator will allocate CSAPR NO$_X$ Ozone Season Group 2 allowances to the unit in accordance with paragraph (b) of this section.

*    *    *    *    *

18. Amend § 97.816 by revising paragraph (c) to read as follows:

**§ 97.816 Certificate of representation.**

*    *    *    *    *

(c) A certificate of representation under this section, § 97.516, or § 97.1016 that complies with the provisions of paragraph (a) of this section except that it contains the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3" in place of the phrase "CSAPR NO$_X$ Ozone Season Group 2" in the required certification statements will be considered a complete certificate of representation under this section, and the certification statements included in such certificate of representation will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

19. Amend § 97.818 by redesignating paragraph (f) as paragraph (f)(1) and adding paragraph (f)(2) to read as follows:

**§ 97.818 Delegation by designated representative and alternate designated representative.**

*    *    *    *    *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(f) * * *

(2) A notice of delegation submitted under paragraph (c) of this section or § 97.1018(c) that complies with the provisions of paragraph (c) of this section except that it contains the terms "40 CFR 97.1018(d)" and "40 CFR 97.1018" in place of the terms "40 CFR 97.818(d)" and "40 CFR 97.818", respectively, in the required certification statements will be considered a valid notice of delegation submitted under paragraph (c) of this section, and the certification statements included in such notice of delegation will be interpreted for purposes of this subpart as if the terms "40 CFR 97.818(d)" and "40 CFR 97.818" appeared in place of the terms "40 CFR 97.1018(d)" and "40 CFR 97.1018", respectively.

20. Amend § 97.820 by:

a. Revising paragraphs (c)(1)(iv) and (c)(2)(iv); and

b. Redesignating paragraph (c)(5)(vi) as paragraph (c)(5)(vi)(A) and adding paragraph (c)(5)(vi)(B).

The revisions and addition read as follows:

**§ 97.820 Establishment of compliance accounts, assurance accounts, and general accounts.**

* * * * *

(c) * * *

(1) * * *

(iv) An application for a general account under paragraph (c)(1) of this section, § 97.520(c)(1), or § 97.1020(c)(1) that complies with the provisions of paragraph (c)(1) of this section except that it contains the phrase "TR $NO_X$ Ozone Season" or the phrase "CSAPR $NO_X$ Ozone Season Group 3" in place of the phrase "CSAPR $NO_X$ Ozone Season Group 2" in the required certification statement will be considered a complete application for a general account

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

under paragraph (c)(1) of this section, and the certification statement included in such application for a general account will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

(2) * * *

(iv) A certification statement submitted in accordance with paragraph (c)(2)(ii) of this section that contains the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3" will be interpreted for purposes of this subpart as if the phrase "CSAPR NO$_X$ Ozone Season Group 2" appeared in place of the phrase "TR NO$_X$ Ozone Season" or the phrase "CSAPR NO$_X$ Ozone Season Group 3".

*    *    *    *    *

(5) * * *

(vi) * * *

(B) A notice of delegation submitted under paragraph (c)(5)(iii) of this section or § 97.1020(c)(5)(iii) that complies with the provisions of paragraph (c)(5)(iii) of this section except that it contains the terms "40 CFR 97.1020(c)(5)(iv)" and "40 CFR 97.1020(c)(5)" in place of the terms "40 CFR 97.820(c)(5)(iv)" and "40 CFR 97.820(c)(5)", respectively, in the required certification statements will be considered a valid notice of delegation submitted under paragraph (c)(5)(iii) of this section, and the certification statements included in such notice of delegation will be interpreted for purposes of this subpart as if the terms "40 CFR 97.820(c)(5)(iv)" and "40 CFR 97.820(c)(5)" appeared in place of the terms "40 CFR 97.1020(c)(5)(iv)" and "40 CFR 97.1020(c)(5)", respectively.

*    *    *    *    *

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

21. Amend § 97.821 by:

a. Redesignating paragraph (e) as paragraph (e)(1);

b. In newly redesignated paragraph (e)(1), adding "Original" before "Group 2 allowances" each time it appears; and

c. Adding paragraph (e)(2).

The addition reads as follows:

**§ 97.821 Recordation of CSAPR NO$_X$ Ozone Season Group 2 allowance allocations and auction results.**

*    *    *    *    *

(e) *  *  *

(2) By September 5, 2023, the Administrator will record in each CSAPR NO$_X$ Ozone Season Group 2 source's compliance account the CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances allocated to the CSAPR NO$_X$ Ozone Season Group 2 units at the source in accordance with § 97.811(a) for the control periods in 2023 and 2024.

*    *    *    *    *

22. Amend § 97.824 by:

a. In paragraph (a)(1), removing "and" after the semicolon;

b. Adding paragraphs (a)(3) and (4);

c. In paragraph (c)(2)(ii), removing "§ 97.526(d), in" and adding in its place "§ 97.526(d), § 97.826(d), or § 97.1026(e), in"; and

d. Revising paragraph (d).

The additions and revision read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

### § 97.824 Compliance with CSAPR NO$_X$ Ozone Season Group 2 emissions limitation.

(a) *  *  *

(3) Are CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the deductions are not for compliance with the CSAPR NO$_X$ Ozone Season Group 2 emissions limitation of a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

(4) Are CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the deductions are for compliance with the CSAPR NO$_X$ Ozone Season Group 2 emissions limitation of a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

*   *   *   *   *

(d) *Deductions for excess emissions.* After making the deductions for compliance under paragraph (b) of this section for a control period in a year in which the CSAPR NO$_X$ Ozone Season Group 2 source has excess emissions, the Administrator will deduct from the source's compliance account an amount of CSAPR NO$_X$ Ozone Season Group 2 allowances, allocated or auctioned for a control period in a prior year or the control period in the year of the excess emissions or in the immediately following year, equal to two times the number of tons of the source's excess emissions, provided that—

(1) The allowances deducted shall be CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the excess emissions are not from a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(2) The allowances deducted shall be CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the excess emissions are from a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

*    *    *    *    *

23. Amend § 97.825 by:

a. In paragraph (a)(1), removing "and" after the semicolon; and

b. Adding paragraphs (a)(3) and (4).

The additions read as follows:

### § 97.825 Compliance with CSAPR NO$_X$ Ozone Season Group 2 assurance provisions.

(a) *    *    *

(3) Are CSAPR NO$_X$ Ozone Season Original Group 2 allowances, if the deductions are not for compliance with the CSAPR NO$_X$ Ozone Season Group 2 assurance provisions by the owners and operators of a group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022; and

(4) Are CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances, if the deductions are for compliance with the CSAPR NO$_X$ Ozone Season Group 2 assurance provisions by the owners and operators of a group of sources in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) for a control period after 2022.

*    *    *    *    *

24. Amend § 97.826 by:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

a. In paragraphs (d)(1)(i)(A) and (D), (d)(1)(ii)(A), (d)(1)(iii)(A), (d)(1)(iv)(A) and (B), and (d)(2)(ii), adding "Original" before "Group 2 allowances" each time it appears;

b. Redesignating paragraph (d)(3) as paragraph (d)(3)(i);

c. In newly redesignated paragraph (d)(3)(i):

i. Removing "After the Administrator" and adding in its place "Except as provided in paragraph (d)(3)(ii) of this section, after the Administrator"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears;

d. Adding paragraph (d)(3)(ii);

e. In paragraph (e)(1) introductory text, adding "or (D)" before "of this chapter";

f. In paragraphs (e)(1)(i), (e)(1)(ii)(A), (e)(1)(iii) and (iv), (e)(1)(v)(B), and (e)(2), adding "Original" before "Group 2 allowances" each time it appears;

g. Revising paragraph (f) introductory text;

h. Redesignating paragraph (f)(1) as paragraph (f)(1)(i);

i. In newly redesignated paragraph (f)(1)(i):

i. Removing "After the Administrator" and adding in its place "Except as provided in paragraph (f)(1)(ii) of this section, after the Administrator"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears;

j. Adding paragraph (f)(1)(ii); and

k. In paragraph (f)(2):

i. Adding "and not listed in § 52.38(b)(ii)(D)(*2*) of this chapter" before "(and Indian country"; and

ii. Adding "Original" before "Group 2 allowances" each time it appears.

The additions and revision read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## § 97.826 Banking and conversion.

\*   \*   \*   \*   \*

(d) \*   \*   \*

(3) \*   \*   \*

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.1026(e), upon any determination that would otherwise result in the initial recordation of a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances in the compliance account for a source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State), the Administrator will not record such CSAPR NO$_X$ Ozone Season Original Group 2 allowances but instead will allocate and record in such account an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances divided by the conversion factor determined under paragraph (d)(1)(i)(D) of this section.

\*   \*   \*   \*   \*

(f) Notwithstanding any other provision of this subpart or any SIP revision approved under § 52.38(b)(8) or (9) of this chapter, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances or CSAPR NO$_X$ Ozone Season Group 3 allowances may be used to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Original Group 2 allowances under this subpart as follows, provided that nothing in this paragraph (f) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

(1) \*   \*   \*

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

(ii) After the Administrator has carried out the procedures set forth in paragraph (d)(1) of this section and § 97.1026(e), the owner or operator of a CSAPR NO$_X$ Ozone Season Group 2 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances for a control period in 2017 through 2020 by holding instead, in a general account established for this sole purpose, an amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed) computed as the quotient, rounded up to the nearest allowance, of such given number of CSAPR NO$_X$ Ozone Season Original Group 2 allowances divided by the conversion factor determined under paragraph (d)(1)(i)(D) of this section.

*    *    *    *    *

25. Amend § 97.830 by revising paragraph (b)(1) to read as follows:

**§ 97.830 General monitoring, recordkeeping, and reporting requirements.**

*    *    *    *    *

(b) *  *  *

(1)(i) May 1, 2017, for a unit other than a unit described in paragraph (b)(1)(ii) of this section;

(ii) May 1, 2023, for a unit that did not commence commercial operation at least 180 calendar days before September 30, 2020 and that is located in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State);

*    *    *    *    *

26. Amend § 97.834 by revising paragraph (d)(2)(i) to read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

## § 97.834 Recordkeeping and reporting.

*    *    *    *    *

(d) * * *

(2) * * *

(i)(A) The calendar quarter covering May 1, 2017 through June 30, 2017, for a unit other than a unit described in paragraph (d)(2)(i)(B) of this section;

(B) The calendar quarter covering May 1, 2023 through June 30, 2023, for a unit that did not commence commercial operation at least 180 calendar days before September 30, 2020 and that is located in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State);

*    *    *    *    *

## Subpart GGGGG—CSAPR NO$_X$ Ozone Season Group 3 Trading Program

27. Amend § 97.1002 by:

a. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance";

b. Revising the definition of "CSAPR NO$_X$ Ozone Season Group 2 allowance"; and

c. Adding in alphabetical order a definition of "CSAPR NO$_X$ Ozone Season Original Group 2 allowance".

The additions and revision read as follows:

## § 97.1002 Definitions.

*    *    *    *    *

*CSAPR NOx Ozone Season Expanded Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance allocated for a control period after 2022 under subpart EEEEE of this

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

part, § 97.526(d), or § 97.1026(e) to a unit in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) or allocated or auctioned for a control period after 2022 in accordance with the provisions of a SIP revision approved for such a State by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter.

*       *       *       *       *

*CSAPR NO$_X$ Ozone Season Group 2 allowance* means a limited authorization issued and allocated or auctioned by the Administrator under subpart EEEEE of this part, § 97.526(d), or § 97.1026(e), or by a State or permitting authority under a SIP revision approved by the Administrator under § 52.38(b)(7), (8), or (9) of this chapter, to emit one ton of NO$_X$ during a control period of the specified calendar year for which the authorization is allocated or auctioned or of any calendar year thereafter under the CSAPR NO$_X$ Ozone Season Group 2 Trading Program, where each CSAPR NO$_X$ Ozone Season Group 2 allowance is either a CSAPR NO$_X$ Ozone Season Original Group 2 allowance or a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

*       *       *       *       *

*CSAPR NO$_X$ Ozone Season Original Group 2 allowance* means a CSAPR NO$_X$ Ozone Season Group 2 allowance other than a CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance.

*       *       *       *       *

28. Amend § 97.1026 by:

a. Revising the section heading; and

b. Adding paragraphs (e) and (f).

The revision and additions read as follows:

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

**§ 97.1026 Banking and conversion; bank recalibration.**

\*    \*    \*    \*    \*

(e) Notwithstanding any other provision of this subpart, by September 18, 2023, the Administrator will temporarily suspend acceptance of CSAPR NO$_X$ Ozone Season Group 3 allowance transfers submitted under § 97.1022 and, before resuming acceptance of such transfers, will take the actions in paragraphs (e)(1) and (2) of this section with regard to every compliance account for a CSAPR NO$_x$ Ozone Season Group 3 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State):

(1) The Administrator will deduct all CSAPR NO$_X$ Ozone Season Group 3 allowances allocated for the control periods in 2021 and 2022 from each such compliance account.

(2) For each CSAPR NO$_X$ Ozone Season Group 3 allowance deducted from a given source's compliance account under paragraph (e)(1) of this section, the Administrator will allocate to the source and record in the source's compliance account one CSAPR NO$_X$ Ozone Season Expanded Group 2 allowance for the control period in 2023.

(f) Notwithstanding any other provision of this subpart, CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances may be used to satisfy requirements to hold CSAPR NO$_X$ Ozone Season Group 3 allowances under this subpart as follows, provided that nothing in this paragraph (f) alters the time as of which any such allowance holding requirement must be met or limits any consequence of a failure to timely meet any such allowance holding requirement:

(1) After the Administrator has carried out the procedures set forth in paragraph (e) of this section, the owner or operator of a CSAPR NO$_X$ Ozone Season Group 3 source in a State listed in § 52.38(b)(2)(ii)(D)(*1*) of this chapter (and Indian country within the borders of such a State) may satisfy a requirement to hold a given number of CSAPR NO$_x$ Ozone Season Group 3

This document is a prepublication version of an interim final rule signed by EPA Administrator Michael S. Regan on June 29, 2023. EPA is submitting it for publication in the Federal Register. We have taken steps to ensure the accuracy of this version, but it is not the official version.

allowances for the control period in 2021 or 2022 by holding instead, in a general account established for this sole purpose, an equal amount of CSAPR NO$_X$ Ozone Season Expanded Group 2 allowances for the control period in 2023 (or any later control period for which the allowance transfer deadline defined in § 97.802 has passed).

(2) [Reserved]

29. Amend § 97.1034 by:

a. In paragraph (d)(2)(i)(C), removing "June" and adding in its place "September";

b. In paragraph (d)(3), revising the first sentence; and

c. In paragraph (d)(4), adding a second sentence.

The revision and addition read as follows:

**§ 97.1034 Recordkeeping and reporting.**

\*   \*   \*   \*   \*

(d) \*   \*   \*

(3) The designated representative shall submit each quarterly report to the Administrator within 30 days after the end of the calendar quarter covered by the report, except that quarterly reports required for the calendar quarter covering May 1, 2023, through June 30, 2023, shall be submitted by August 4, 2023. \*   \*   \*

(4) \*   \*   \* Notwithstanding the provisions of §§ 75.64(a), 75.73(f)(1), 97.434(d)(2), 97.634(d)(2), and 97.734(d)(2), the deadline for the designated representative of such a unit to submit the quarterly reports required under such additional programs for the calendar quarter covering May 1, 2023, through June 30, 2023, shall be August 4, 2023.

\*   \*   \*   \*   \*

# Exhibit 2



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

June 1, 2023

OFFICE OF
AIR AND RADIATION

**MEMORANDUM**

**SUBJECT:**   Notice of Forthcoming EPA Action to Address Judicial Stay Orders

**FROM:**   Joseph Goffman
Principal Deputy Assistant Administrator
Office of Air and Radiation

On February 13, 2023, EPA published a final action fully or partially disapproving state implementation plans (SIPs) submitted by 21 states to address the states' obligations under Clean Air Act section 110(a)(2)(D)(i)(I), commonly referred to as the "good neighbor" provision, with respect to the 2015 national ambient air quality standards (NAAQS) for ozone. *See* "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (February 13, 2023). Following that action, on March 15, 2023, EPA signed a separate final action, the "Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," establishing federal implementation plan (FIP) requirements to address the states' good neighbor obligations consistent with EPA's obligation under Clean Air Act section 110(c)(1). A pre-publication version of this rule was made available on EPA's website[1] and the rule will soon publish in the *Federal Register*. The Good Neighbor Plan's requirements are set to take effect 60 days after the date of publication.

In May 2023, the United States Courts of Appeals for the Fifth and Eighth Circuits issued orders staying, pending judicial review, EPA's SIP disapproval action with respect to the SIPs submitted by Arkansas, Louisiana, Missouri, and Texas.[2] The United States Court of Appeals for the Sixth Circuit issued an administrative stay of EPA's SIP disapproval, staying EPA's action with respect to the SIP submitted by Kentucky pending a decision on Kentucky's motion for stay pending judicial review.[3] EPA's authority to establish the Good Neighbor Plan's requirements for sources in Arkansas, Kentucky, Louisiana, Missouri, and Texas stems from the disapproval of the states' SIPs. Accordingly, in recognition of the orders staying the SIP disapproval action as to Arkansas, Kentucky, Louisiana, Missouri, and Texas, EPA will take action in the near future that will ensure the Good Neighbor Plan's requirements issued to implement good neighbor obligations for the 2015 ozone NAAQS as to sources in Arkansas, Kentucky, Louisiana, Missouri and Texas will not take effect while the stays of the SIP disapproval action with respect to those states remain in place. This forthcoming action will become effective by no later than the effective date of the Good Neighbor Plan's requirements for sources in other states.

---

1 *See* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.
2 *See* Unpublished Order, *Texas, et al. v. EPA, et al.*, No. 23-60069 (5th Cir. May 1, 2023) (staying SIP disapprovals for Louisiana and Texas), Unpublished Order, *Arkansas, et al. v. EPA, et al.*, No. 23-1320 (8th Cir. May 25, 2023) (staying SIP disapproval for Arkansas), and Unpublished Order, *Missouri v. EPA, et al.*, No. 23-1719 (8th Cir. May 26, 2023) and Unpublished Order, *Union Elec. Co. d/b/a Ameren Missouri v. EPA, et al.*, No. 23-1751 (8th Cir. May 26, 2023) (staying SIP disapproval for Missouri).
3 *See* Unpublished Order, *Kentucky v. EPA*, No. 23-3216 (6th Cir. May 31, 2023) (administrative stay of SIP disapproval for Kentucky).

# Exhibit 3

# United States Court of Appeals for the Fifth Circuit

---

No. 23-60069

---

STATE OF TEXAS; TEXAS COMMISSION ON ENVIRONMENTAL QUALITY; LUMINANT GENERATION COMPANY, L.L.C.; COLETO CREEK POWER, L.L.C.; ENNIS POWER COMPANY, L.L.C.; HAYS ENERGY, L.L.C.; MIDLOTHIAN ENERGY, L.L.C.; OAK GROVE MANAGEMENT COMPANY, L.L.C.; WISE COUNTY POWER COMPANY, L.L.C.; ASSOCIATION OF ELECTRIC COMPANIES OF TEXAS; BCCA APPEAL GROUP; TEXAS CHEMICAL COUNCIL; TEXAS OIL & GAS ASSOCIATION; PUBLIC UTILITY COMMISSION OF TEXAS; RAILROAD COMMISSION OF TEXAS; STATE OF MISSISSIPPI; MISSISSIPPI DEPARTMENT OF ENVIRONMENTAL QUALITY; MISSISSIPPI POWER COMPANY; STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY; ENTERGY LOUISIANA, L.L.C.; LOUISIANA CHEMICAL ASSOCIATION; MID-CONTINENT OIL AND GAS ASSOCIATION; LOUISIANA ELECTRIC UTILITY ENVIRONMENTAL GROUP, L.L.C.; TEXAS LEHIGH CEMENT COMPANY, LP,

*Petitioners,*

*versus*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL S. REGAN, *Administrator, United States Environmental Protection Agency,*

*Respondents.*

---

Petition for Review of a Final Rule
by the Environmental Protection Agency
88 Fed. Reg. 9336-9384

---

## UNPUBLISHED ORDER

Before Engelhardt, Wilson, and Douglas, *Circuit Judges*.

Per Curiam:

There are five motions before us. The first two concern whether venue should be transferred to the D.C. Circuit. It should not; so, we DENY the motions. The third, fourth, and fifth motions concern whether the case should be stayed pending review of the EPA's disapproval of Texas's and Louisiana's State Implementation Plans. It should; so, we GRANT the three motions.

### I.

We first (A) detail the relevant statutory and regulatory background. Then we (B) describe the factual and procedural background.

### A.

The Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7401 *et seq.*, "establishes a comprehensive program for controlling and improving the nation's air quality." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 821–22 (5th Cir. 2003). But unlike many other federal statutes, the CAA divides enforcement responsibility between the federal and State governments. *See Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) ("*Texas 2016*") ("The Clean Air Act is 'an experiment in cooperative federalism.'" (quoting *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001))); *see also New York v. United States*, 505 U.S. 144, 167–68 (1992) (listing a handful of similar statutes); *Hodel v. Virginia Surface Min. & Reclamation Ass'n*, 452 U.S. 264, 289 & n.30 (1981) (same). Namely, the EPA identifies air pollutants and sets air quality

standards, while the States implement those standards. 42 U.S.C. §§ 7408–10. Though the EPA and the States both have statutory responsibilities under the CAA, Congress gave the States "primary" authority in this context. *Id.* § 7401(a)(3) ("[A]ir pollution prevention . . . and air pollution control at its source is the primary responsibility of States and local governments."); *id.* § 7407(a) ("Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State . . . ."); *see also Texas 2016*, 829 F.3d at 411 ("The structure of the Clean Air Act indicates a congressional preference that [S]tates, not EPA, drive the regulatory process.").

For its part, the EPA is required to set national ambient air quality standards ("NAAQS") for pollutants that "may reasonably be anticipated to endanger public health or welfare." *See* 42 U.S.C. §§ 7408, 7409. "Once a NAAQS has been promulgated, the [EPA] Administrator must [continue to] review the standard (and the criteria on which it is based) 'at five-year intervals' and make 'such revisions . . . as may be appropriate.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 462–63 (2001) (third alteration in original) (quoting 42 U.S.C. § 7409(d)(1)).

After the EPA promulgates or revises a NAAQS, "[e]ach State must submit a State Implementation Plan"—or "SIP"—"within three years of any new or revised NAAQS." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 498 (2014) (citing 42 U.S.C. § 7410(a)(1)). Of course, SIPs need to comply with the CAA generally and the NAAQS specifically. *See* 42 U.S.C. § 7410(a)(2) (listing elements that must be included in all SIPs). But States otherwise have "wide discretion" in formulating their SIPs. *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976); *see also BCCA*, 355 F.3d at 822 ("[S]tates have broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." (citation omitted)). Indeed: "So long as the ultimate effect of a State's choice of

emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever [approach] it deems best suited to its particular situation." *Train v. NRDC*, 421 U.S. 60, 79 (1975).

Next—after States submit their SIPs—the EPA conducts a "limited" review. *Texas v. EPA*, 690 F.3d 670, 675 (5th Cir. 2012) ("*Texas 2012*"). The Agency's review is "limited" in the sense that the CAA "confines the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) ("*Luminant 2012*") (citations omitted); *see also* 42 U.S.C. § 7410(k) (detailing the EPA's timeline for reviewing SIPs). "Thus, if a SIP or a revised SIP meets the statutory criteria of the CAA, then the EPA *must* approve it." *Texas 2012*, 690 F.3d at 676 (emphasis added); *see* 42 U.S.C. § 7410(k)(3) ("[T]he [EPA] Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter." (emphasis added)). But if (and only if) a SIP is inadequate, "the Act requires the Agency to promulgate a Federal Implementation Plan"—or "FIP"—"within two years." *EME Homer*, 572 U.S. at 498 (citation omitted); *see* 42 U.S.C. § 7410(c)(1)(B); *see also Texas 2016*, 829 U.S. at 412 ("Only if the [S]tate has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a state-specific plan."). A FIP "fill[s] all or a portion of . . . an inadequacy in a [SIP]" and binds the State. 42 U.S.C. § 7602(y).

## B.

This case involves the EPA's 2015 revision of the ozone NAAQS. On October 26, 2015, the EPA lowered the allowable concentration of ozone in the ambient air from 75 parts per billion ("ppb") to 70 ppb. Ozone NAAQS, 80 Fed. Reg. 65,292 (Oct. 26, 2015).

That triggered the States' duty to craft SIPs implementing the revised NAAQS—including plans for compliance with the CAA's so-called "Good

No. 23-60069

Neighbor Provision." *See EME Homer*, 572 U.S. at 495–99. Because the wind is "heedless of state boundaries," pollution emitted in upwind States can undermine downwind States' ability to satisfy NAAQS. *Id.* at 495. To address this aspect of national air quality, Congress included the Good Neighbor Provision in the CAA. It requires that, in addition to meeting NAAQS emissions thresholds within a State's borders, SIPs must also "contain adequate provisions" prohibiting emissions in amounts that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I).[1] Although the EPA did not promulgate any regulations regarding the States' Good Neighbor obligations under the 2015 ozone NAAQS, *see* 42 U.S.C. § 7601(a), it did issue various memos designed to help States satisfy the Provision.[2]

---

[1] Areas where concentrations of regulated pollutants satisfy the NAAQS are called "attainment" areas, while those that don't are called "nonattainment" areas. 42 U.S.C. § 7407(d)(1)(A)(i)–(ii).

[2] *See* Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (Mar. 27, 2018) [hereinafter March 2018 Memo]; Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and Standards, *Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards* (Oct. 19, 2018) [hereinafter October 2018 Memo]; *see also* Notice of Availability of the EPA's Preliminary Interstate Ozone Transport Modeling Data for the 2015 Ozone NAAQS, 82 Fed. Reg. 1,733 (Jan. 6, 2017) [hereinafter 2017 Data Announcement]. None, however, was supposed to be binding. *See* October 2018 Memo at 1 ("States may use this information when developing [SIPs] for the 2015 ozone NAAQS addressing the [G]ood [N]eighbor [P]rovision," but "[t]his document . . . does not impose binding, enforceable requirements on any party."); March 2018 Memo at 2–3, 6 (similar); 2017 Data Announcement at 1,735 ("[S]tates may rely on this or other appropriate modeling, data or analyses to develop approvable Good Neighbor SIPs.").

No. 23-60069

After the States submitted their SIPs, the EPA promulgated a final rule on February 13, 2023, disapproving more than 20 States' SIPs for lack of compliance with the Good Neighbor Provision. *See* Interstate Transport of Air Pollution for the 2015 8-Hour Ozone NAAQS, 88 Fed. Reg. 9,336 (Feb. 13, 2023) [hereinafter Final SIP Denial]. Then on March 15, 2023, the EPA signed the Federal Good Neighbor Plan for the 2015 Ozone NAAQS ("Final FIP"), which provides FIPs for 23 upwind States. Three of those States—Louisiana, Mississippi, and Texas, and a variety of other governmental and non-governmental entities therein—petitioned this court for review of the EPA's February 13, 2023 disapproval of their SIPs. *See* 42 U.S.C. § 7607(b).

Our court will consider those petitions in due course. Before us now are five prefatory motions: (1) the EPA's motion to transfer all petitions to the D.C. Circuit; (2) the EPA's motion to dismiss based on improper venue; (3) Texas-based petitioners' two motions to stay the Final SIP Denial as it relates to Texas; and (4) the State of Louisiana's motion to stay the Final SIP Denial as it relates to Louisiana. For the reasons that follow, we DENY the first two motions and GRANT the rest.

## II.

We begin with the EPA's motion to transfer venue to the D.C. Circuit under 42 U.S.C. § 7607(b)(1). We assess the "applicability" of § 7607(b)(1) *de novo* and without deference to the agency. *Texas 2016*, 829 F.3d at 417–21. Section 7607(b)(1) states, in relevant part:

> A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations promulgated, or final action taken, by the Administrator *under this chapter* may be filed only in the United States Court of Appeals for the District of Columbia. A petition

No. 23-60069

for review of the Administrator's action in approving or promulgating any implementation plan . . . or any other final action of the Administrator *under this chapter* . . . which is *locally or regionally applicable* may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is *based on a determination of nationwide scope or effect* and if in taking such action the Administrator *finds and publishes* that such action is based on such a determination.

42 U.S.C. § 7607(b)(1) (emphasis added).

In other words, the CAA's venue statute divides challenges to EPA "actions" into three general categories. First, "nationally applicable" actions—which must be filed in or transferred to the D.C. Circuit. Second, "locally or regionally applicable" actions—which must be filed in or transferred to the appropriate regional circuit. Third, locally or regionally applicable actions that are "based on a determination of nationwide scope or effect" and accompanied by the EPA's published finding to that effect—which must be filed in or transferred to the D.C. Circuit. *See Texas 2016*, 829 F.3d at 419; *see also Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013).

As a preliminary matter, the parties dispute what the relevant "action" is for purposes of § 7607(b)(1). We have said that § 7607(b)(1)'s use of "action" means "the rule or other final action taken by the agency that the petitioner seeks to prevent or overturn." *See Texas 2016*, 829 F.3d at 419.

However, such a broad articulation can be difficult to apply when the Agency takes multiple actions in a single rule. What guides us in those cases?[3]

We look primarily to the text of the statute. *See Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007); *CleanCOALition v. TXU Power*, 536 F.3d 469, 473–74 (5th Cir. 2008). The applicable statute (here the CAA) is the legal source of the agency's (here the EPA's) authority to take the challenged actions (here the SIP denials).[4] And the CAA makes clear that the EPA's relevant actions for purposes of the present litigation are its various SIP denials. Specifically, we consider how the EPA's Final SIP Denial fits into CAA's step-by-step procedure. First, the EPA sets NAAQS. 42 U.S.C. § 7409(b)(1). Next, "each State" submits its own SIP implementing those NAAQS. *Id.* § 7410(a). Then the EPA approves or disapproves *each State's* SIP. *See id.* 7410(k)(1)–(3) ("the State," singular). This final step is the relevant "action," and it is precisely what the EPA did here. As required by § 7410(k)(3), the EPA *separately considered and disapproved* Texas's SIP,

---

[3] The precise contours of the Petitioners' challenges do not define the relevant "action" for § 7607(b)(1)'s purposes. *See, e.g.*, *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) ("The nature of the regulation, not the challenge, controls."). Nor do the "practical effects" of the action. *Am. Rd. & Transp. Builders*, 705 F.3d at 456. Nor does the EPA's chosen method of publishing or labeling the action. *See Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979); *accord Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481 (2d Cir. 1972) ("[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." (citation omitted)). Accordingly, we do not consider these as guidance in deciding the motion before us.

[4] *See* 42 U.S.C. § 7607(b)(1)("final action ... *under this chapter*" (emphasis added)); *ibid.* ("any other final action of the Administrator *under this chapter*" (emphasis added)). The phrase "under this chapter" in § 7607(b)(1) refers to the Chapter 85 of Title 42 (*i.e.*, the Clean Air Act). *See generally* 42 U.S.C. §§ 7501–7671q; 42 U.S.C. Ch. 85: Front Matter, Editorial Note ("Act July 14, 1955, ch. 360, 69 Stat. 322 , as amended, known as the Clean Air Act, which was formerly classified to chapter 15B (§1857 et seq.) of this title, was completely revised by Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 685, and was reclassified to this chapter.").

Louisiana's SIP, and Mississippi's SIP because (in its judgment) each failed to comply with the Good Neighbor Provision. Yes, the EPA packaged these disapprovals together with the disapprovals of eighteen other States in the Final SIP Denial. *See* 88 Fed. Reg. 9,336. But again, the EPA's chosen method of publishing an action isn't controlling. What controls is the CAA. And the CAA is very clear: The relevant unit of administrative action here is the EPA's individual SIP denials.

Having isolated the relevant EPA actions at issue, we next (A) explain why the EPA's SIP denials for Texas, Louisiana, and Mississippi are locally or regionally applicable. Then we (B) reject the EPA's argument that § 7607(b)(1)'s exception applies.

A.

Under § 7607(b)(1), "nationally applicable" actions must be transferred to the D.C. Circuit, whereas "locally or regionally applicable" actions must not.

The question of whether the three EPA SIP disapprovals at issue are "nationally applicable" "turns on the legal impact" of the three SIP disapprovals. *Texas 2016*, 829 F.3d at 419; *see also, e.g.*, *Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. 2011) ("*Texas 2011*") (concluding a nationwide SIP call under 42 U.S.C. § 7410(k)(5) is nationally applicable); *Am. Rd. & Transp. Builders*, 705 F.3d at 455–56 (action disapproving California's SIP is locally applicable and must be filed in the Ninth Circuit); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1199 (10th Cir. 2011) (observing that SIPs are "undisputedly regional action[s]" and "the nature of the regulation . . . controls").

Courts have long held that "SIP rulemakings" are the "prototypical locally or regionally applicable action that may be challenged only in the appropriate regional court of appeals." *Am. Rd. & Transp. Builders*, 705 F.3d

at 455 (quotation and citation omitted); *accord Tex. Mun. Power Agency v. EPA*, 89 F.3d 858, 866 (D.C. Cir. 1996). That is unsurprising: the vast majority of actions involving SIPs are necessarily about individual States and are thus "purely local" and "undisputedly regional." *ATK Launch Sys., Inc.*, 651 F.3d at 1199. Of course, some final actions related to SIPs may be "nationally applicable"—such as when the EPA promulgates regulations that apply to *all* States equally, *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299–300 (1st Cir. 1989), or issues a SIP call, *see* 42 U.S.C. § 7410(k)(5), requiring States to revise their SIPs in light of a new requirement that applies to *all* States, *Texas 2011*, 2011 WL 710598, at *4. In those cases, transfer to the D.C. Circuit is appropriate because the actions uniformly apply to a broad swath of States. *See id.* (concluding that "Congress intended the D.C. Circuit to review matters on which national uniformity is desirable" as a means to take advantage of the D.C. Circuit's "administrative law expertise" and facilitate "the orderly development of the basic law under the Act," and because "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results" (quotations and citations omitted)).

But here, the "legal impact" of the three SIP disapprovals is plainly local or regional. Consider "the location of the persons or enterprises that the action[s] regulate[]." *Texas 2011*, 2011 WL 710598, at *3. The EPA's three SIP disapprovals at issue involve only the regulation of Texas, Louisiana, and Mississippi emission sources and have legal consequences only for Texas, Louisiana, and Mississippi facilities. The EPA doesn't point to a single example of our circuit (or any of our sister circuits) granting a similar motion to transfer a petition challenging a SIP approval/denial to the D.C. Circuit, and for good reason: the *State* Implementation Plans, of course, primarily involve individual *States*. Given that the "legal impact" of the EPA's three SIP disapprovals is in Texas, Louisiana, and Mississippi

No. 23-60069

respectively, we conclude that the EPA's actions at issue in this case are "locally or regionally applicable."

## B.

Next, the § 7601(b)(1) exception. To overcome the "default presumption" that petitions for review of locally or regionally applicable actions "may only be filed in the United States Court of Appeal for the appropriate circuit," *Texas 2016*, 829 F.3d at 419 (quoting 42 U.S.C. § 7607(b)(1)) (internal quotation omitted), the EPA must meet both prongs of the § 7601(b)(1) exception. Because the EPA can't meet the first, we need not consider the second.

To satisfy prong one, the EPA must show that the three SIP disapprovals here were "based on a determination of nationwide scope or effect." 42 U.S.C. § 7607(b)(1). And we must make an "independent assessment of the scope of the determinations." *Texas 2016*, 829 F.3d at 421. The EPA faces a steep hurdle given that SIP disapprovals are usually "highly fact-bound and particular to the individual [S]tate." *Id.* at 421 n.24. That is particularly true here where the EPA itself stated in the Final SIP Denial that each SIP was judged "in light of the *facts and circumstances of each particular state's submission.*" Final SIP Denial at 9,340 (emphasis added).

The EPA cannot meet its burden. Just like the SIP disapprovals at issue in *Texas 2016*, the three SIP disapprovals at issue here were plainly based "on a number of intensely factual determinations" unique to each State. 829 F.3d at 421. Tellingly, the Final Rule's explanations for the Texas, Louisiana, and Mississippi SIP denials rely on the individual EPA *regional* offices' assessments of the unique features of the Texas, Mississippi, and Louisiana SIPs. *See, e.g.*, Final SIP Denial at 9,343; *id.* at 9,354 (disapproving Texas's SIP based on Region 6's evaluation of the "individual" attributes of

No. 23-60069

Texas's SIP). Consider Texas, for example. The EPA's Region 6 determined: that Texas's use of the most recent three-year period (2012–2014) to identify downwind maintenance monitors "is less likely to successfully identify maintenance receptors than the EPA method," EPA Region 6, *2015 8-Hour Ozone Transport SIP Proposal Technical Support Document* 11 (Feb. 2022); that Texas's "modeling underestimates future ozone levels" in 2023, 87 Fed. Reg. at 9,829; and that Texas's multi-factor weight-of-evidence analysis was not sufficiently "compelling" to "counter" "EPA's [one-percent] contribution methodology," *id.* at 9,833–34. These "intensely factual determinations" do not have nationwide scope or effect because they all relate "to the particularities of the emission sources in Texas" and their alleged impact on downwind air quality. *Texas 2016*, 829 F.3d at 421.[5] The same pattern holds true for Louisiana and Mississippi.

---

[5] The dissent acknowledges that "the SIP process is generally highly fact-bound and particular to the individual state." *Post*, at 28 (quoting *Texas 2016*, 829 F.3d at 421 n.24). However, notes the dissent, "EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id.* (quoting *Texas 2016*, 829 F.3d at 421 n.24). True, in *Texas 2016*, we noted that "[a] determination that a national standard satisfies a particular requirement in each state *may* be a determination that has nationwide scope or effect." *Texas 2016*, 829 F.3d at 421 n.24 (emphasis added). But "may" implies the Court's discretion. On the facts before us, the intensely factual determinations do not have nationwide scope or effect.

No. 23-60069

Because the EPA fails to rebut the default presumption that locally or regionally applicable actions must not be transferred to the D.C. Circuit,[6] the EPA's transfer motion[7] is DENIED.[8]

III.

Satisfied that venue is proper, we turn to the stay motions.

The Texas and Louisiana Petitioners ("Stay Petitioners") moved for a stay pending review of the EPA's Final SIP Denial. *See* Fed. R. App. P. 18. To prevail, they must satisfy this familiar four-prong test:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). We consider each prong in turn.

---

[6] The dissent contends that the EPA "*explicitly* chose to make" a published finding that the Final Rule was based on a determination of nationwide scope or effect. *Post*, at 29 (citing Final SIP Denial at 9,380-81). But the EPA's position on the matter is not determinative. "Because 'the determination of our jurisdiction is exclusively for the court to decide,'" we do not defer to the agency when determining venue. *Texas 2016*, 829 F.3d at 417–18 (citations omitted).

[7] The EPA also filed a motion to dismiss based on improper venue. For the reasons set forth above, venue in the Fifth Circuit is proper. Accordingly, the motion to dismiss is DENIED.

[8] Our decision today accords with that of the Eighth Circuit. *See Arkansas v. EPA*, No. 23-1320, ECF No. 5269098 (8th Cir. Apr. 25, 2023) (denying EPA's motion to transfer Arkansas's petition to the D.C. Circuit or dismiss for improper venue); *see also State of Utah v. U.S. Environmental Protection Agency*, No. 23-9509, ECF No. 10110851072 (10th Cir. Apr. 28, 2023) (referring respondents' motions to transfer petitions to the D.C. Circuit or dismiss for improper venue to merits panel).

A.

First, likelihood of success on the merits. To prevail, Stay Petitioners must demonstrate that the EPA likely "acted arbitrarily, capriciously, or unlawfully." *Texas 2016*, 829 F.3d at 424–25; *see also Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 850 (5th Cir. 2013) ("*Luminant 2013*") ("A petition to review the EPA's approval or disapproval of a SIP is governed by the Administrative Procedure Act. *See* 5 U.S.C. § 706.").

Stay Petitioners satisfy their burden in two ways. They (1) make a strong showing that the EPA acted unlawfully by considering factors listed nowhere in the CAA. And they (2) are likely to prevail on the claim that the EPA arbitrarily and capriciously based its Final SIP Denial in part on information only available after Texas and Louisiana had submitted their SIPs.

1.

The EPA exceeded its authority under the CAA by giving undue weight to non-statutory factors when evaluating Stay Petitioners' SIPs. *See* 5 U.S.C. § 706(2)(A), (C) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."); *see also Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ."). Under the CAA's cooperative federalism framework, Congress gave the States "'wide discretion' in formulating their SIPs, including the 'broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements.'" *Luminant 2013*, 714 F.3d 841 at 845 (first quoting *Union Elec.*, 427 U.S. at 250; then quoting *BCCA*, 355 F.3d at 822). The CAA, by contrast, "confines the EPA to the ministerial function

of reviewing SIPs for consistency with the Act's requirements." *Id.* at 846 (citing 42 U.S.C. § 7410(k)(3)).

The EPA exceeded its "ministerial" role. Rather than merely ensuring that Texas's and Louisiana's SIPs complied with the text of the CAA, *see* 42 U.S.C. § 7410(k)(3), the EPA instead subjected Stay Petitioners' submissions to a range of factors "not found in the Act," *Texas 2016*, 829 F.3d at 428. For example, "[t]he EPA used a 4-step interstate transport framework (or 4-step framework) to evaluate each [S]tate's [SIP] addressing the [Good Neighbor] [P]rovision for the 2015 ozone NAAQS." Final SIP Denial at 9,338. In its words:

> [T]he EPA has developed and used the following 4-step interstate transport framework to evaluate a [S]tate's [Good Neighbor] obligations . . . : (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

*Ibid.* This is one "permissible" way to effectuate the CAA's Good Neighbor Provision, *EME Homer*, 572 U.S. at 524 (holding as much in the FIP context), but it is by no means the only way. That is because the EPA's preferred "4-step framework" is nowhere to be found in the Good Neighbor Provision. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (only requiring that SIPs "contain adequate provisions" prohibiting emissions that will "contribute significantly to

nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]").

True, the EPA "recognized" in its Final SIP Denial "that [S]tates may be able to establish alternative approaches to addressing their [Good Neighbor] obligations for the 2015 ozone NAAQS that vary from [the 4-step] framework." Final SIP Denial at 9,340. But the Agency backtracks in the next breath: "deviation from [the 4-step] approach to ozone transport *must be substantially justified* and have a well-documented technical basis." *Ibid.* (emphasis added). Put differently: If a State wants to evaluate its Good Neighbor obligations in any way other than the EPA's 4-step approach, it must first "substantially justif[y]" that decision to the Agency. *Ibid.* If not violative of the CAA itself, this is at least inconsistent with the statute and jurisprudence applying it.

The EPA's approach inverts the CAA and "reflects a misapprehension by the EPA of its authorized role in the SIP-approval process." *Luminant 2012*, 675 F.3d at 928 n.8. The CAA's text and our precedent compel that "the EPA does not possess *any* discretionary authority in th[e] [SIP-approval] process. *Only* the states enjoy discretion in implementing the dictates of the CAA." *Ibid.* (emphasis added) (quotation and citations omitted); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir. 1981) ("The great flexibility accorded the states under the Clean Air Act is further illustrated by the sharply contrasting, narrow role to be played by EPA."). Of course, if the EPA were instead defending a FIP (a *Federal* Implementation Plan) the Agency would be entitled to exercise far more discretion in how to effectuate the Good Neighbor Provision—including by using its preferred 4-step framework. *E.g.*, *EME Homer*, 572 U.S. 489. But unless and until a SIP is lawfully denied, the State remains "primary." *Compare* 42 U.S.C. § 7401(a)(3) ("[A]ir pollution prevention . . . is the primary responsibility of States . . . ."), *and id.* § 7407(a)

("Each State shall have the primary responsibility for assuring air quality
. . . ."), *and Train*, 421 U.S. at 79 ("The Agency is plainly . . . relegated by
the [CAA] to a secondary role . . . ."), *with* Final SIP Denial at 9,367 ("The
EPA does not, however, agree with the comments' characterization of the
EPA's role in the [S]tate-[f]ederal relationship as being 'secondary.'").

The EPA's imposition of its preferred 4-step framework is just one
example of how the Agency "improperly failed to defer to [Stay Petitioners']
application of the [CAA]." *Texas 2016*, 829 F.3d at 428. Others abound—
including the EPA's rejection of "Texas['s] . . . definition of maintenance
receptors" and "Louisiana's . . . application of a higher contribution
threshold than 1 percent of the NAAQS." Final SIP Denial at 9,356, 9,359;
*cf.* 42 U.S.C. § 7410(a)(2)(D)(i)(I) (offering no definition of
"maintenance"); *Texas v. EPA*, 983 F.3d 826, 839 (5th Cir. 2020) ("*Texas
2020*") ("[T]he text of the [CAA] does not require EPA to adopt a one-
percent threshold."). In sum, because the "EPA's lack of deference to the
[S]tate[s] inverts the agency's 'ministerial function' in this system of
'cooperative federalism,'" *Texas 2016*, 829 F.3d at 428 (citation omitted),
Stay Petitioners have made a strong showing that the EPA acted unlawfully.
*See also Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in
federalism, and the EPA may not run roughshod over [it] . . . ." (quotation
omitted)).

2.

The EPA's actions are also constrained by the Administrative
Procedure Act's arbitrary-and-capricious standard. *See* 5 U.S.C.
§ 706(2)(A). When an agency acts, it must "reasonably consider[] the
relevant issues and reasonably explain[]" its actions. *FCC v. Prometheus
Radio Project*, 141 S. Ct. 1150, 1158 (2021) (citations omitted); *see also
Michigan v. EPA*, 576 U.S. 743, 751–52 (2015) ("[A]gency action is lawful

only if it rests on a consideration of the relevant factors" and "important aspect[s] of the problem." (internal quotations and citations omitted)). We cannot "substitute" our "own policy judgment for that of the agency." *Prometheus*, 141 S. Ct. at 1158. But we must still ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision." *Ibid.* The upshot is that we "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

Stay Petitioners have demonstrated a strong likelihood of success on their claim that the EPA acted arbitrarily and capriciously. The EPA likely violated § 706(2)(A) when it based its SIP disapprovals in part on policies and modeling data developed *after* Texas and Louisiana had already submitted their SIPs and *after* the EPA's statutory deadline to act had expired. Two of those decisions are exemplars.

First, the EPA based its disapproval of Texas's SIP in part on policies that the EPA released on October 19, 2018—months after Texas submitted its SIP, and eighteen days after the October 1 deadline for all States to submit theirs. *See* October 2018 Memo; 42 U.S.C. § 7410(a)(1) (SIP deadline). Worse yet, the October 2018 Memo represented a material shift from earlier guidance, because it changed the EPA's previous March 2018 guidance by adding *new* hurdles for States to clear when identifying maintenance receptors—such as by proffering evidence of a downward trend in ozone concentrations at the site since 2011. October 2018 Memo at 4; *cf.* March 2018 Memo at A-2 (no such hurdles). The EPA disapproved Texas's SIP in part because of its failure to abide by the October 2018 Memo—which, to reiterate, was issued *after* the statutory deadline for Texas to submit its SIP.

Final SIP Denial at 9,364 ("[The] [S]tates' submissions did not meet the terms of the . . . October 2018 [Memo] addressing . . . maintenance receptors."); *see also id.* at 9,370 ("EPA evaluated [S]tate's [sic] analyses and found no [S]tate successfully applied the[] criteria [in the October 2018 Memo] to justify the use of one of these alternative approaches."). Such a "[s]udden . . . change" after the SIP submission window was likely arbitrary and capricious. *Smiley v. Citibank*, 517 U.S. 735, 742 (1996). That is particularly true where, as here, the EPA apparently disavowed its initial assurance that its after-the-statutory-deadline memo would "not impose binding, enforceable requirements on any party." October 2018 Memo at 1.

Second, the EPA also acted arbitrarily and capriciously by grounding its Final SIP Denial in modeling data that wasn't available when Louisiana and Texas submitted their SIPs. Louisiana's SIP submission was finalized on November 14, 2019; Texas submitted its SIP on August 17, 2018. Under the CAA, the EPA was required to "act on the submission[s]" by either approving or disapproving them "within 12 months." *See* 42 U.S.C. § 7410(k)(2). The EPA therefore had until November 14, 2020 to render a final decision on Louisiana's submission, and almost a year less for Texas's. Instead of rendering a timely decision, the EPA slow-walked for *years* beyond CAA's statutory deadline—finally acting on *February 13, 2022*. And when it eventually got around to evaluating Stay Petitioners' SIPs, the EPA did not use the modeling data that it had published on the eve of the SIP-submission deadline "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. Instead, it relied upon various significant changes to its modeling data that it adopted long *after* the statutory deadline. *See* Final SIP Denial at 9,366 (the "meteorology and boundary conditions used in modeling" became available in November 2020, the "updated emissions inventory files used in the current modeling were

publicly released" in September 2021, and the modeling software the EPA used was not public until December 2020).

At best, these choices evince a "clear error of judgment" on the EPA's part. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quotation omitted). And at worst they perpetrate a "surprise switcheroo" on both Texas and Louisiana. *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (Sentelle, J.); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) ("surprise switcheroo"). Agencies have wide discretion to deploy their expertise, but they cannot move the administrative goalpost in so doing. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) ("[A]gencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." (quotation and alteration omitted)).

The EPA responds that the "Act does not prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions, even if that data was not available when a state submitted its SIP." *See also* Final SIP Denial at 9,366 ("It can hardly be the case that the EPA is prohibited from taking rulemaking action using the best information available to it at the time it takes such action. Nothing in the CAA suggests that the Agency must deviate from that general principle when acting on SIP submissions."). That response is unavailing for at least two reasons.

First, regardless of whether the CAA "prohibit[s] EPA from using the most accurate, up-to-date data," it was nevertheless arbitrary and capricious of the EPA to do so without giving due consideration to the reliance the EPA itself had engendered by publishing guidance and data that—in its words— was designed "to assist [S]tates' efforts to develop [G]ood [N]eighbor SIPs for the 2015 ozone NAAQS." March 2018 Memo at 1–2. The EPA isn't required to issue such guidance to help States discharge their obligations

under the Good Neighbor Provision. *See EME Homer*, 572 U.S. at 509–10; Final SIP Denial at 9,363–64. But when the EPA *does* issue such guidance and modeling data—like it did in March 2018—it must take due account of the State's "serious reliance interests" before "chang[ing] course." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). The EPA's failure to adequately consider the States' reliance interests before holding them to new guidance and modeling data issued long after the States were statutorily required to submit their SIPs was arbitrary and capricious.

Second, the EPA's decision to consider after-the-statutory-deadline information also "fail[ed] to account for 'relevant factors'"—namely, the CAA's system of cooperative federalism. *Anderson Cancer Ctr.*, 985 F.3d at 475 (quoting *Marsh*, 490 U.S. 360 at 378). Congress decided that the States should "drive the regulatory process." *Texas 2016*, 829 F.3d at 411. This choice is clearly reflected throughout the CAA, such as the provisions cabining the Agency's decisional timeframe, 42 U.S.C. § 7410(k)(1)–(2), and the sections "confin[ing] the EPA to the ministerial function of reviewing SIPs for consistency with the Act's requirements," *Luminant 2012*, 675 F.3d at 921; *e.g.*, 42 U.S.C. § 7410(k)(3) ("shall approve"). Here, however, the EPA ignored its statutory deadline by a measure of *years*; used that extra time to collect more data, issue novel guidance, and develop new modeling; denied Stay Petitioners' SIPs in part based on that new information; then created FIPs imposing the EPA's policy preferences on the States. Even if, as the EPA suggests, the CAA "does not [explicitly] prohibit EPA from using the most accurate, up-to-date data to evaluate Good Neighbor SIP submissions," the EPA must still recognize the tension between what it did and what the Act's system of cooperative federalism requires, then account for that "relevant factor[]," *Marsh*, 490 U.S. 360 at 378. Otherwise, the EPA could easily flout the CAA's deadlines with impunity, then leverage that disregard

to summarily reject SIPs based on the States' failure to consider information that only became available after the SIP-submission deadline.

In so thwarting the CAA, this would also transform the EPA's statutory role from that of a "ministerial" overseer to one of a freewheeling dictatorial regulator. *Luminant 2012*, 675 F.3d at 921; *see also Texas 2016*, 829 F.3d at 430 ("EPA may not use its own delay as an excuse for imposing burdens on [the States] that the [CAA] does not permit."); *Texas 2012*, 690 F.3d at 675 ("The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over [it]." (quotation omitted)). Accordingly, Stay Petitioners have made a strong showing that the EPA "acted arbitrarily, capriciously, [and] unlawfully." *Texas 2016*, 829 F.3d at 424–25.

## B.

The remaining factors likewise favor a stay.

Stay Petitioners "will be irreparably injured absent a stay" of the EPA's Final SIP Denial. *Nken*, 556 U.S. at 426 (quotation omitted). The Final SIP Denial was the statutory prerequisite for the EPA to create the Final FIP and impose its preferred system of emissions controls and reductions on the States. 42 U.S.C. § 7410(c)(1)(B). As Stay Petitioners point out, those changes will soon become operative, including for the 2023 ozone season: "The EPA posted the [F]inal FIP on its website on March 15, 2023 . . . [and] has stated that it expects the FIP to be effective in June or July of 2023." And many regulated entities have already commenced compliance efforts or will soon be required to do so. *See* Final FIP at 420 (providing that certain of Stay Petitioners' facilities "will begin participating in the [FIP's] Group 3 trading program on May 1, 2023, regardless of the rule's effective date"); 87 Fed. Reg. 20,036 (Apr. 6, 2022) ("[Regulated entities] should begin engineering and financial planning *now* to be prepared to meet this

implementation timetable." (emphasis added)). The EPA's Final SIP Denial has thus already caused irreparable injury. Unless stayed, it will do even more harm.

First, "allowing the Final [SIP Denial] to stand pending the appeal would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas 2016*, 829 F.3d at 433.

Second, Stay Petitioners will be forced to spend billions of dollars in compliance costs to achieve the Final FIP's emissions-reduction targets. That includes the costs of buying new equipment and retrofitting existing equipment; installing, operating, and maintaining that machinery; and purchasing allowances (at greater cost) on the emissions-trading market. These harms are undoubtedly irreparable because—as the EPA does not contest—"[n]o mechanism here exists for the [Stay Petitioners] to recover the compliance costs they will incur." *Id.* at 434; *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (quotation and emphasis omitted)); *Texas 2016*, 829 F.3d at 433 ("The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, may also be sufficient to show irreparable injury." (quotation omitted)).

Third, the Final FIP will strain Texas's and Louisiana's power grids. That's particularly true here because the Final FIP will become operative in the middle of the summer 2023 peak load conditions. This simultaneous change to Stay Petitioners' emissions budgets alongside the increased seasonal demand on their power grids will dramatically increase the probability of price spikes and "load-shedding"—*i.e.*, as Stay Petitioners observe, "requir[ing] utilities to disconnect customers from the power grid

to avoid a system-wide blackout." And we have recognized that "the threat of grid instability and potential brownouts alone constitute irreparable injury." *Texas 2016*, 829 F.3d at 434.

Accordingly, Stay Petitioners have made a strong showing of irreparable harm. The EPA, by contrast, has not demonstrated that "issuance of the stay will substantially injure the[m]" or undermine the "public interest." *Nken*, 556 U.S. at 426 (quotation omitted). As Stay Petitioners point out, the EPA's multi-year delay in disapproving Texas's and Louisiana's SIPs undercuts any claim that time is of the essence when it comes to imposing the EPA's Final FIP. But time *is* of the essence with respect to "the public's interest in ready access to affordable electricity," *Texas 2016*, 829 F.3d at 405, and "a steady supply of electricity during the summer months," *Sierra Club v. Ga. Power Co.*, 180 F.3d 1309, 1311 (11th Cir. 1999).

## IV.

For the foregoing reasons, the EPA's motion to transfer all petitions to the D.C. Circuit and motion to dismiss for improper venue are DENIED. Stay Petitioners' three motions to stay the Final SIP Denial as it relates to Texas and Louisiana are GRANTED. Our ruling here concerns only the motion for transfer, the motion to dismiss, and the motions for stay pending review; "our determinations are for that purpose" only "and do not bind the merits panel." *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017).

No. 23-60069

Dana M. Douglas, *Circuit Judge*, dissenting:

The instant matter concerns the EPA's Final Rule of February 13, 2023, disapproving 21 States' SIPs for lack of compliance with the Good Neighbor Provision. 42 U.S.C. § 7607(b)(1) determines the proper venue for petitions for review of a final rule. Under its provisions, petitions for review of actions that are "nationally applicable" or that the EPA found and published based on determinations of "nationwide scope or effect" may be filed only in the D.C. Circuit. Here, the EPA applied a uniform national approach to evaluate state plans and ensure equity among them, making the Final Rule at issue nationally applicable on its face. But even assuming the Final Rule to be regional, the EPA made and published a finding that its Final Rule was based on a determination of "nationwide scope or effect." Because I find venue to be improper in this circuit, I dissent.

In its motion to dismiss or transfer the petitions, the EPA raises the threshold question of whether the petitions are properly adjudicated in this court or whether they belong in the D.C. Circuit under the judicial review provision of the Clean Air Act. *See* 42 U.S.C. § 7607(b)(1). The inquiry begins by determining if the challenged regulation is "nationally applicable" or "locally or regionally applicable." Applicability turns on "the legal impact of the action as a whole." *Texas v. EPA*, 829 F.3d 405, 419 (5th Cir. 2016) (*"Texas 2016"*). Whether an action is "nationally applicable" is based on "the face of the rulemaking, rather than its practical effects." *Texas v. EPA*, 706 F. App'x 159, 163 (5th Cir. 2017) (*"Texas 2017"*) (quoting *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015)).

On its face, the Final Rule is nationally applicable. It applied a

consistent four-step interstate transport framework[9] to evaluate plans submitted by states across the country and disapproved of SIPs from 21 states throughout eight of the ten EPA Regions and ten federal judicial circuits. *See Texas v. EPA*, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011) (transferring petition challenging an EPA action notifying 13 states that their SIPs were inadequate) ("*Texas 2011*"); *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1200 (10th Cir. 2011) (transferring challenge to an action designating portions of 18 states as failing to comply with a NAAQS because it employed a single uniform regulatory approach across states nationwide); *S. Ill. Power Coop v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017) (transferring challenge to an action "of broad geographic scope containing air quality attainment designations covering 61 geographic regions across 24 states," which was "promulgated pursuant to a common, nationwide analytical method").

The face of the Final Rule indicates it is nationally applicable, but I am further convinced by the arguments raised by Petitioners in their motions to stay which clearly show that Petitioners are challenging a nationally applicable aspect of the Final Rule. Naturally, Texas, Louisiana, and Mississippi frame the challenged actions as particularized SIP denials to support their regional venue argument. However, their own briefing indicates that this is not the action the Petitioners are challenging. Instead,

---

[9] The EPA utilized a four-step framework to evaluate compliance with the Good Neighbor Provision for prior ozone NAAQS. The EPA (1) identified nonattainment and maintenance "receptors"; (2) identified upwind states that impact air quality problems in downwind states sufficiently such that the states are considered "linked"; (3) identified any necessary emissions reductions to eliminate each upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopted permanent and enforceable measures needed to achieve those emissions reductions. Final Rule, 88 Fed. Reg. 9336, 9338 (Feb. 13, 2023).

the State Petitioners' Opposed Motion to Stay challenges the Final Rule on a national scale. The State parties argue that the Final Rule is being challenged because "it fails to explain EPA's after-the-fact reversal of prior guidance regarding how States should identify maintenance receptors," and "disregards the Act's cooperative federalism by denying the SIP based on emissions-modeling data available only *after* Texas [or insert any other state] was statutorily required to submit its SIP provisions." (emphasis in original).

Put differently, the State parties are challenging the EPA's actions of reversing a prior policy that applied to and impacted *all* the states and not providing necessary data to *all* the states prior to the statutory deadline to submit SIP revisions. When framed in the context of the State parties' *own* arguments against the agency action, it becomes clear that they are not challenging the denial of their state SIPs such that the legal impact is only felt in this region, but the framework in which the EPA determined denial was necessary to 21 states throughout this country. *See ATK Launch Systems, Inc.*, 651 F.3d at 1199-1200. Accordingly, the nature of Petitioners' challenge is inextricably intertwined with arguments applicable to challenges to *all other* SIP disapprovals in the Final Rule because they were based on a common EPA rationale and methodology that Petitioners now seek to attack.

The D.C. Circuit, then, is the proper venue for such a challenge. This is supported by our circuit's decision in *Texas 2011*. There, Texas argued its challenge to the SIP call implicated a local, rather than national, aspect of the rule. 2011 WL 7140598 at *4. However, our court noted that Texas's "merits argument in its motion to stay the SIP call challenge only national features of the rulemaking" including that the SIP call was procedurally unlawful. *Id*. We stated "[n]one of these issues turn on the particulars of the SIP Call's impact within this Circuit." *Id*. Likewise, here, none of the issues raised by Texas, Louisiana, and Mississippi turn on particulars within this circuit, but instead on EPA determinants of a national scale that should be

considered by the D.C. Circuit. *See also Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299-300 (1st Cir. 1989) (finding EPA regulations to be "nationally applicable" where they applied to any SIP "that ha[d] been disapproved with respect to prevention of significant deterioration of air quality in any portion of any State where the existing air quality is better than the national ambient air quality standards" and the list of states governed by the regulations changed as SIPs were approved and disapproved by the EPA).

Accordingly, I would find that our venue inquiry ends there because the State Petitioners challenge nationally applicable regulations, and thus any challenges should be considered by the D.C. Circuit.

However, for the same reasons, this case satisfies the § 7601(b)(1) exception for actions that have nationwide scope or effect. The exception involves a two-pronged inquiry, and the majority finds that the EPA fails at prong one. The majority relies on the disapprovals being based "on a number of intensely factual determinations" which "do not have nationwide scope or effect" because they relate to particularities of emissions sources. However, as noted, although there may be factual determinations relevant to each state, the challenged action is the *nationally applied framework* in which the EPA reviewed the SIPs of all states and denied 21 of them.

The majority relies on *Texas 2016*, which also provides support for a finding of a nationwide scope or effect under the instant allegations. Specifically, *Texas 2016* provides that "[a]lthough the SIP process is generally highly fact-bound and particular to the individual state, EPA has made determinations in other SIP approvals that may have nationwide scope or effect." *Id.* at 421, fn. 24. Moreover, "[a] determination that a national standard satisfies a particular requirement in each state may be a determination that has nationwide scope or effect." *Id.* That is precisely the case here.

To the second prong, in *Texas 2016*, the EPA explicitly did not make a finding that its Final Rule had a nationwide scope or effect, and thus, our court concluded that this venue was proper.  Here, however, the EPA *explicitly* chose to make this finding, stating that its justification for the Final Rule is based on a determination of nationwide scope or effect.  Final Rule, 88 Fed. Reg. 9,336, 9380-81 (Feb. 13, 2023) ("[T]o the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of 'nationwide scope or effect' within the meaning of CAA section 307(b)(1).").

Finally, it is clear from the briefing that these petitions concern "matters on which national uniformity is desirable" and raise the kinds of issues Congress intended for the D.C. Circuit to decide.  *Texas 2011*, 2011 WL 710598, at *4.  Petitioners here invite multiple circuits to concurrently review the merits of the same legal interpretation, policy decisions, and analytical methodology that the EPA applied consistently in a single agency action to SIPs throughout the United States.  Courts may well reach inconsistent outcomes on matters of interstate pollution, which were clearly meant to be filed and considered together in the D.C. Circuit.  This is not just a hypothetical problem—states in other circuits are bringing practically the same challenges, which are currently before the Eighth and Tenth Circuits.  If this circuit were to determine that the underlying standard utilized by the EPA was wrong, this would impact the EPA's determinations in other states and would gut the underlying policy of the venue provision: uniformity in standards that have national effect and centralization of SIP review.  *See id.* ("Centralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results.").

No. 23-60069

Having determined venue to be improper, I respectfully dissent, not finding it necessary to reach Petitioners' motions to stay.

# Exhibit 4

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, ET AL,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*,

## STATE OF LOUISIANA'S OPPOSED MOTION TO STAY

JEFF LANDRY
 Attorney General
ELIZABETH B. MURRILL (LA 20685)
 *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
 *Deputy Solicitor General*
MACHELLE HALL (LA 31498)
 *Assistant Attorney General*

LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

Courtney J. Burdette (LA 30564)
  *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY

Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov
Counsel for State of Louisiana

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Petitioner is a governmental party and as such does not need to furnish a certificate of interested persons.

/s/ *Joseph S. St. John*
Joseph S. St. John
*Counsel of Record for State of Louisiana*

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ................................................... iii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION...................................................................................2

FACTUAL AND PROCEDURAL BACKGROUND...........................................3

   I.   Statutory and regulatory framework ...........................................3

      A.   The Act's "good neighbor"provision ..................................4

   II.   Procedural History ..................................................................6

      A.   EPA issues guidance for SIP revisions................................6

      B.   Louisiana's State Implementation Plan ...............................7

      C.   EPA's proposed disapproval of Louisiana's SIP ...............8

      D.   EPA Final Rule disapproving Louisiana's SIP..................10

ARGUMENT ......................................................................................10

   I.   PETITIONER IS LIKELY TO SUCCEED ON THE MERITS. ................................10

      A.   EPA's wholesale change in its modeling violated core administrative law principles of fair notice and respecting reliance interests. .........12

      B.   By repeatedly changing the modeling after Louisiana's SIP submission, EPA relied on factors Congress did not intend it to consider and undermined the cooperative federalism inherent in the CAA. ......................................................................................13

   II.   THE OTHER STAY FACTORS ALSO FAVOR A STAY ......................................16

CONCLUSION ...................................................................................17

CERTIFICATE OF SERVICE ............................................................19

CERTIFICATE OF CONFERENCE .................................................20

CERTIFICATE OF COMPLIANCE .................................................21

# TABLE OF AUTHORITIES

## Cases

*Alabama Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2015).............................................................................16

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014)..............................................................12

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2003) .....................................................................3

*Christopher v. Smithkline Beecham Corp.*,
  567 U.S. 142, 132 S. Ct. 2156 (2012)............................................... 11, 12

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020)..............................................................................12

*EPA v. EME Homer City Generation) L.P.*,
  572 U.S. 489 (2014) ...............................................................................4, 12

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021)..............................................................................10

*Fla. Power & Light Co. v. Costle*,
  650 F.2d 579 (5th Cir. 1981) ...................................................................14

*Luminant Generation Co. v. EPA*,
  675 F.3d 917 (5th Cir. 2012) ............................................................ 1, 3, 13

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989)..................................................................................11

*Michigan v. EPA*,
  576 U.S. 743 (2015)..................................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)............................................................................. 11, 15

*Tate Access Floors, Inc. v. Interface Architecture Res. Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002) ............................................................17

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ...............................................................13

*Texas v. EPA*,
  690 F.3d 670 (5th Cir. 2012) .................................................................4

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ................................................. 4, 5, 16, 17

*Train v. Nat. Res. Def. Council, Inc.,*
  421 U.S. 60 (1975) .................................................................................3

*Union Elec. Co. v. EPA,*
  427 U.S. 246 (1976) ...............................................................................3

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health &
  Hum. Servs.*,
  985 F.3d 472 (5th Cir. 2021) ........................................................ 11, 15

*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017) ................................................................17

## Statutes

5 U.S.C. § 706(2)(A) ...................................................................................10

42 U.S.C. § 7410(a)(1) ..................................................................................6

42 U.S.C. § 7410(a)(2)(D)(i) ....................................................................5, 15

42 U.S.C. § 7410(a)(2)(D)(i)(I) .....................................................................5

42 U.S.C. § 7410(c)(1) ...................................................................................4

42 U.S.C. § 7410(k)(2) ...............................................................................4, 14

42 U.S.C. § 7410(k)(3) ...............................................................................4, 14

42 U.S.C. § 7410(k)(1)(B) ..........................................................................4

**Other Authorities**

Air Plan Disapproval; Arkansas, Louisiana, Oklahoma & Texas; Interstate
  Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality
  Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022).........................................................8

Fed. Implementation Plan Addressing Regl. Ozone Transport for the 2015 Ozone
  Nat'l Ambient Air Quality Standard, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022)....5

Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient
  Air Quality Standards," 88 Fed. Reg. 9,336 (Feb. 13, 2023) ................... 1, 2, 12, 17

Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and
  Standards, *Information on the Interstate Transport State Implementation Plan
  Submissions for the 2015 Ozone National Ambient Air Quality Standards under
  Clean Air Act Section 110(a)(2)(D)(i)(I)* at 2 (Mar. 27, 2018)............... 7, 9, 12, 13

Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015)
  ............................................................................................................6

**Rules**

Fed. R. App. P. 18(a)(2)(A)(i)....................................................................1

Fed. R. App. P. 18(a)(2)(C) ......................................................................1

**Regulations**

40 C.F.R. § 52.02(a) ................................................................................4

Pursuant to Rule 18 of the Federal Rules of Appellate Procedure, petitioner the State of Louisiana moves for a stay pending review of the final rule challenged by its petition in this action, the disapproval by the U.S. Environmental Protection Agency ("EPA") of Louisiana's State Implementation Plan ("SIP"), part of "Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9,336 (Feb. 13, 2023) ("Final Rule").[1] Seeking a stay from EPA would be impractical given that EPA has already issued a final Federal Implementation Plan ("FIP") for Louisiana based on the Final Rule on March 15, 2023, which is pending publication in the Federal Register. *See* Fed. R. App. P. 18(a)(2)(A)(i); *infra* Part II. Louisiana's only recourse is with the Court as Louisiana faces irreparable harm if the Final Rule is not immediately stayed. All parties were provided notice of this motion on March 27, 2023—respondents oppose it and intend to file a response; the State of Texas petitioners, the Luminant petitioners, the AECT petitioners, and Mississippi Power take no position; the other petitioners did not respond. *See* Fed. R. App. P. 18(a)(2)(C).

---

[1] A copy of the EPA's Final Rule and supporting exhibits are included in the sequentially-numbered Appendix to this motion, with pinpoint citations ("App. at ##") provided in this motion.

1

## INTRODUCTION

The Final Rule is an arbitrary and capricious exercise of the authority granted to the EPA by the Clean Air Act ("CAA") and should be immediately stayed. Louisiana's SIP met all statutory and regulatory requirements, and EPA was required to approve it under the CAA. Instead, EPA violated basic administrative law principles, including fair notice and reliance interests, by judging the SIP using analysis and models developed long after Louisiana submitted its SIP, and even after EPA was required to act by the CAA. EPA disregarded the basic structure and timelines imposed by the CAA and undermined the cooperative federalism that animates it.

Beyond being likely to succeed on the merits, Louisiana will likely suffer immediate and irreparable harm from EPA's Final Rule. Unless this Court grants a stay, the soon-to-be-published FIP premised on the disapproval of Louisiana's SIP will likely cause electric grid instability, an accelerated loss of electric generation capacity, large jumps in electricity prices, and even load shedding. Finally, the EPA clearly upsets the cooperative federalism framework of the CAA as discussed more fully below. For all these reasons, the balance of harms and public interest also weigh heavily in favor of a stay while the legality of the Final Rule is reviewed by the Court

2

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Statutory and regulatory framework

The Clean Air Act is an "experiment in cooperative federalism" that "establishes a comprehensive program for controlling and improving the nation's air quality through state and federal regulation." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012). While the federal government sets national ambient air quality standards ("NAAQS"),[2] the States "bear 'the primary responsibility' for implementing those standards" by developing and implementing SIPs to enforce the NAAQS. *Id. (quoting BCCA Appeal Grp. v. EPA,* 355 F.3d 817, 821-22 (5th Cir. 2003)).

The CAA gives states "wide discretion in formulating its plan" for achieving the air quality standards set by EPA. *Union Elec. Co. v. EPA,* 427 U.S. 246, 250 (1976). "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the national standards for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train v. Nat. Res. Def. Council, Inc.,* 421 U.S. 60, 79 (1975). Therefore, the EPA's role is largely confined "to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant,* 675 F.3d

---

[2] NAAQS that set maximum allowable concentrations for pollutants that are harmful to public health and welfare. 42 U.S.C. §§ 7408(a), 7409(a). Every five years, EPA must revise each NAAQS as appropriate. *Id.* § 7409(d)(1). An area that meets a NAAQS is called an "attainment" area; an area that does not is a "nonattainment" area. *Id.* § 7407(d)(1)(A)(i)-(ii); *see id.* § 7501(2).

at 921. The CAA mandates that the EPA "shall approve such a [state implementation plan] as a whole if it meets all of the applicable requirements of this chapter." 42 U.S.C. § 7410(k)(3). Stated differently, if a SIP meets the statutory requirements, "EPA *must* approve it." *Texas v. EPA*, 690 F.3d 670, 676 (5th Cir. 2012) (emphasis added); *see* 42 U.S.C. § 7410(k)(3)("the Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of this chapter" (emphasis added)); 40 C.F.R. § 52.02(a). "Only if the state has not complied with the requirements of the [Act] does EPA assume the role of primary regulator by drafting a [FIP]." *Texas*, 829 F.3d at 412; *see* 42 U.S.C. § 7410(c)(1). The EPA's FIP is "to fill all or a portion of a gap…in a State implementation plan." 42 U.S.C. § 7602.

The cooperative federalism of the CAA extends even to timing. The CAA requires the EPA to determine whether a submitted SIP meets the minimum criteria for completeness. 42 U.S.C. § 7410(k)(1)(B). The CAA further provides that once the EPA makes its completeness finding, EPA "shall act" on the SIP within 12 months—either approving or disapproving it. *Id.* § 7410(k)(2)-(3).

## A.     The Act's "good neighbor" provision

The Act enumerates several substantive requirements for SIPs. *Id*. § 7410(a)(2). Relevant here is the Act's "good neighbor" provision, which requires "upwind States to reduce emissions to account for pollution exported beyond their

4

borders." *EPA v. EME Homer City Generation) L.P.*, 572 U.S. 489, 499 (2014). The text of this provision requires that a SIP "contain adequate provisions" prohibiting emissions that "will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]." 42 U.S.C. § 7410(a)(2)(D)(i)(I). The next subsection requires a SIP to prohibit emissions that will "interfere with measures required to be included" in other States' SIPs "to prevent significant deterioration of air quality or to protect visibility." *Id.* § 7410(a)(2)(D)(i)(II); *see Texas*, 829 F.3d at 411 (involving action taken under subsection (a)(2)(D)(i)(II)).

To evaluate whether a SIP satisfies the good-neighbor provision, EPA has created a four-step process through its FIPs. As relevant here, the first step is "[i]dentifying downwind receptors that are expected to have problems attaining the NAAQS (nonattainment receptors) or maintaining the NAAQS (maintenance receptors)." Fed. Implementation Plan Addressing Regl. Ozone Transport for the 2015 Ozone Nat'l Ambient Air Quality Standard, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022) (proposed rule). The process involves gathering historical data from down-wind monitors and using modeling to assess future air-quality problems. *Id.* The second step is "determining which upwind states are 'linked' to these identified down- wind receptors based on a numerical contribution threshold." *Id.* Under EPA's preferred approach, a State that contributes more than one percent of the

NAAQS to a downwind State is "linked" to that State. *Id.* The third step, for any State "linked to downwind air quality problems," is "identifying upwind emissions on a statewide basis that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS, considering cost- and air quality-based factors." *Id.* The fourth step, for any upwind State "found to have emissions that significantly contribute  to nonattainment or interfere with maintenance of the NAAQS in any downwind state," is "implementing the necessary emissions reductions through enforceable measures." *Id.*

## II.    Procedural History

On October 1, 2015, EPA revised the NAAQS for ozone, a ground-level pollutant. Nat'l Ambient Air Quality Standards for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015). It replaced the preexisting ozone NAAQS of 0.075 parts per million (ppm) with a more stringent 0.070 ppm. NAAQS for Ozone. *Id.* at 65,293-65,294. This revision triggered Louisiana's statutory obligation to revise its SIP. 42 U.S.C. § 7410(a)(1).

### A.    EPA issues guidance for SIP revisions

In 2018, EPA issued several guidance memoranda regarding states' SIP revisions.  The March 2018 guidance memorandum was designed to "assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." Memorandum from Peter Tsirigotis, Director, Office of Air Quality Planning and

Standards, *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* at 2 (Mar. 27, 2018) ("March 2018 Memo," attached as **Exhibit A** to the Appendix). The memorandum included "EPA's air quality modeling data" with "newly available contribution modeling results." *Id.* at 1. To carry out the modeling of future ozone emissions, EPA recommended that States use historical data gathered from the years 2009-2013. *Id.* at 6. EPA reassured States that they could "supplement the information provided in this memorandum with any additional information that they believe is relevant" and "choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs." *Id.*

EPA issued additional guidance memoranda in August and October 2018. 88 Fed. Reg. at 9339.

### B.    Louisiana's State Implementation Plan

On November 13, 2019, the Louisiana Department of Environmental Quality ("LDEQ") submitted a SIP addressing the Louisiana's interstate transport of air pollution ("SIP," attached as **Exhibit B** to the Appendix). Louisiana SIP's use a 3-Step alternative framework that covered EPA's first and second steps. SIP at 12. Relying on the March 2018 Memo, Louisiana took up EPA's invitation to "states to use th[at] data to develop SIPs to assure that emissions within their

7

jurisdictions do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone standards in other states." SIP at 5. It also used the EPA's later-provided data for 2014-2016 ozone contributions. *Id.* Louisiana's SIP concluded that the emissions from Louisiana did not contribute significantly to nonattainment or interfere with maintenance of the NAAQs in other states. SIP at 12–14. EPA issued a completeness finding on November 14, 2019.

### C.     EPA's proposed disapproval of Louisiana's SIP

On February 22, 2022, well over a year after EPA was statutorily required to act on Louisiana's SIP, EPA proposed a combined disapproval of Texas's, Oklahoma's, Louisiana's, and Arkansas's SIPs. Air Plan Disapproval; Arkansas, Louisiana, Oklahoma & Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone Nat'l Ambient Air Quality Standards, 87 Fed. Reg. 9,798 (Feb. 22, 2022) (attached as **Exhibit C** to the Appendix). In the interim, EPA had comprehensively changed its modeling:

> The 2016-based meteorology and boundary conditions used in the modeling [were] available through the 2016v1 platform, which was used for the Revised CSAPR Update (proposed in November of 2020, 85 FR 68964). The updated emissions inventory files used in the [2022] modeling were publicly released September 21, 2021, for stakeholder feedback, and have been available on [EPA's] website since that time. The CAMx modeling software that the EPA used . . . was released by the model developer, Ramboll, in December 2020. On January 19, 2022, [EPA] released on [its] website and notified a wide range of stakeholders of the availability of both the modeling results for 2023 and 2026 (including contribution data) along with many key underlying input files.

88 Fed. Reg. at 9,366.

In proposing to reject Louisiana's SIP, EPA relied upon its 2016v2 modeling platform, a refinement of the 2016v1 modeling platform that was also not released until after Louisiana submitted its SIP. 87 Fed. Reg. at 9,800, 9,819. This modeling substantially changed Louisiana's contribution to ozone in Texas. For instance, by the EPA's own calculations, Louisiana's contribution to Brazoria/Galveston non-attainment area went from 3.80 parts per billion (ppb) under the March 2018 Memo to 7.03 ppb under the 2016v2 model. 87 Fed. Reg. at 9,811, 9,813. EPA also criticized Louisiana's SIP for only analyzing "emission reductions where there was a 'consistent and persistent' pattern of contribution" and its air-quality-only analysis in order to refute such a pattern, and EPA determined that Louisiana's SIP failed "to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant." 87 Fed. Reg. at 9,814. EPA concluded that Louisiana's SIP failed "to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with the maintenance of the 2015 ozone NAASQ in any other state." 87 Fed. Reg. at 9,816.

Louisiana submitted comments regarding the proposed disapproval on April 24, 2022. ("Comments," attached as **Exhibit D** to the Appendix). Louisiana pointed out multiple defects, including that the 2016v2 model was not peer-

9

reviewed, was based on modeling done after the SIP deadline, and lead to anomalous results, such as a higher ozone contribution in the future despite ozone precursors dropping. *Id.* at 2.

### D.     **EPA Final Rule**Error! Bookmark not defined. **disapproving Louisiana's SIP**

On February 13, 2023, more than two years after its statutory deadline to act, EPA published a final disapproval of Louisiana's SIP. 88 Fed. Reg. at 9,336. EPA relied upon a further revision of its modeling, 2016v3, in disapproving Louisiana's SIP. 88 Fed. Reg. at 9,356. This model further increased Louisiana's purported ozone contributions—in Brazoria/Galveston, now to 9.51 ppb. 88 Fed. Reg. at 9,353, 9,356. Otherwise, it largely reiterated its prior analysis. *Id.*

## ARGUMENT

In deciding whether to grant a stay, courts are to consider the likelihood that the applicant will succeed on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) the balance of the harms to other parties, and (4) the public interest. Each factor favors a stay here.

## I.     PETITIONER IS LIKELY TO SUCCEED ON THE MERITS.

The EPA's Final Order is reviewed under the Administrative Procedure Act ("APA") and is to be held unlawful or set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A). This standard requires that such an action be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court "must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'" *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see also Michigan v. EPA*, 576 U.S. 743, 750 (2015).

Moreover, agencies must generally give notice of conduct the agency "prohibits or requires" and cannot "surprise" a party by penalizing it for "good-faith reliance" on the agency's prior positions. *Christopher v. Smithkline Beecham Corp.*, 567 U.S. 142, 156–57, 132 S. Ct. 2156, 2167–68 (2012). When an agency changes course, it must take into account "serious reliance interests" its "longstanding policies may have engendered" along with "alternatives that are within the ambit of the existing policy." *Id.* at 1913 (cleaned up).

11

EPA's repeated change in the basic modeling assumptions it used to judge Louisiana's SIP makes its disapproval of the same arbitrary and capricious in several ways.

### A. EPA's wholesale change in its modeling violated core administrative law principles of fair notice and respecting reliance interests.

EPA's March 2018 guidance memorandum included "EPA's air quality modeling data" with the "goal" of "assisting states' efforts to develop good neighbor SIPs." March 2018 Memo at 1–2. Louisiana justifiably relied on this modeling put forward by EPA at the time of its SIP submission. EPA's change to using a completely different modeling platform that was not available at the time of Louisiana's submission to assess Louisiana's SIP, which also nearly tripled Louisiana's purported ozone contribution, is precisely the type of "unfair surprise" that the Supreme Court has repeatedly warned against. *Christopher*, 567 U.S. at 156-57; *see also Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014) (discussing how agencies may not "pull a surprise switcheroo"). EPA was also "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020). EPA did no such thing.

At most, the Final Rule merely hints that no state should have had any reliance interests. It notes that the Supreme Court has held that EPA is not

required to issue guidance to states regarding their good neighbor obligations. 87

Fed. Reg. at 9364 (citing *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489,

508–510). But that says nothing to negate EPA's obligation to analyze reliance

when it *does* issue guidance, as here. The Final Rule also contends that the states

should have been monitoring D.C. Circuit litigation, considering and even

predicting the results, *see id.* at 9364, though it fails to explain why those cases

required any changes in modeling given that EPA ended up using the same 2023

analytic year in the Final Rule as it did in its guidance memoranda, *see id.* at 9341,

9364. Finally, it also asserts that the guidance memoranda "made clear" that SIP

submissions would be "carefully reviewed against" the "technical information

available to the EPA at the time it would take" a final action. *Id.* at 9368. If this is

meant to suggest that the memoranda foreshadowed that the final rulemaking on

the SIPs would use post-submission data, it is wrong—they did no such thing. *See*

March 2018 Memo at 1–2, 6–7. In any event, none of these squarely addresses

Louisiana's reasonable reliance on EPA's guidance. And because EPA did not

even consider reliance interests, its decision is necessarily arbitrary and capricious

because it could not properly weigh them. *Texas v. Biden*, 10 F.4th 538, 555 (5th

Cir. 2021).

> **B. By repeatedly changing the modeling after Louisiana's SIP submission, EPA relied on factors Congress did not intend it to consider and undermined the cooperative federalism inherent in the CAA.**

13

Under the "cooperative federalism" of the CAA, states have "wide discretion in formulating" their SIPs, and EPA is confined "to the ministerial function of reviewing SIPs for consistency with the Act's requirements." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (noting that 42 U.S.C. § 7410(k)(3) mandates that the EPA "shall approve" a SIP "if it meets all of the applicable requirements"); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 587 (5th Cir.1981) ("The great flexibility accorded the states under the Clean Air Act is ... illustrated by the sharply contrasting, narrow role to be played by EPA."). The ministerial nature of EPA's function is reinforced by timing: once EPA determines that a submitted SIP meets the minimum criteria for completeness, EPA "shall act on the submission" (approving or disapproving it) with 12 months. 42 U.S.C. § 7410(k)(2).

This statutory scheme simply does not allow EPA to do what it did. EPA is without statutory authority to delay a decision on a SIP beyond the one year it is allotted for a decision. It is thus certainly without authority to use time beyond that to not only continue to develop criteria for a decision, but also to continue to gather more information that was unavailable to a state when it submitted its SIP to judge the same. Given EPA's determination of completeness for Louisiana's SIP on November 14, 2019, Comments at 1, EPA had until November 14, 2020 to render a final decision. Almost every relevant development of EPAs' model

occurred after that deadline. The "2016-based meteorology and boundary conditions used in the modeling" were available in the 2016v1 platform proposed in November 2020, "updated emissions inventory files used in the current modeling were publicly released" in September 2021, and the modeling software EPA used was not even publicly until December 2020. 88 Fed. Reg. at 9366. The 2016v2 and 2016v3 platforms further followed these developments, and incorporated data as late as 2021.

EPA's only response is incredulity that EPA could be "prohibited from taking rulemaking action using the best information available to it at the time it takes such action." *Id.* Yet that turns the relevant inquiry—whether EPA has "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 4—on its head. If there were any doubt, in defining a specific time period in which to make a decision, Congress clearly cabined EPA's ability to delay its decision making to continuously collect new information and revise its work. EPA has transgressed those hard bounds.

Moreover, EPA's argument is "premised on reasoning that fails to account for 'relevant factors,'" *Univ. of Texas*, 985 F.3d at 475, because it ignores the basic framework of the statute. EPA's role is not to continuously refine its analysis for a point of decision years later. It is simply to ensure that, with regard to the good neighbor obligations, a state's SIP "contain[s] *adequate* provisions" to fulfill

15

those obligations. 42 U.S.C. § 7410(a)(2)(D)(i) (emphasis added). If EPA were allowed to blow past the statutory deadlines, prepare modeling with entirely different information than that available to the states, and then judge their SIPs accordingly, EPA would have essentially arbitrary discretion to reject the states' plans and substitute its own federal plans. That is the opposite of the "ministerial function" Congress has provided.

## II.    THE OTHER STAY FACTORS ALSO FAVOR A STAY

Louisiana will suffer various forms of irreparable injury absent a stay, harming Louisiana's citizens and impairing its economy and sovereignty. As explained above, EPA's disapproval of Louisiana's SIP and its substitution of its own FIP "would disrupt the system of cooperative federalism enshrined in the Clean Air Act," which is an irreparable harm." *Texas v. EPA,* 829 F.3d 405, 433 (5th Cir. 2016). Imposition of the FIP will also likely drastically reduce electrical generation capacity, strain remaining sources, result in large price spikes for electricity, threaten electric grid stability, and increase the need for load shedding. MISO Comments on Proposed FIP at 3–9 (June 21, 2022) (attached as **Exhibit E** to the Appendix). Such "plant closures, the threat of grid instability and potential brownouts" also and "alone constitute irreparable injury." *Texas*, 829 F.3d at 434. "[S]ubstantial financial injury" may also be "sufficient to show irreparable injury," especially when there is "no guarantee of eventual recovery." *Id.*; *see also*

*Alabama Ass'n of Realtors v. HHS,* 141 S. Ct. 2485, 2489 (2015).

By contrast, EPA will suffer no harm if its disapproval of Louisiana's SIP is stayed pending review. EPA's multi-year delay in disapproving Louisiana's SIP belies any claim it may make to urgency. *See Tate Access Floors, Inc. v. Interface Architecture Res. Inc*., 279 F.3d 1357, 1364 (Fed. Cir. 2002) (identifying the absence of a threat to public health as a significant factor favoring a preliminary injunction). And as Louisiana's SIP demonstrated, its emissions do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS. The balance of the harms tips sharply toward entering a stay.

The public interest also favors a stay. When, as here, a state seeks a stay pending appeal, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017)(per curiam). A well-functioning electric grid and "ready access to affordable electricity" is obviously in the public interest, *Texas*, 829 F.3d at 435, moreso than EPA's interest in immediate effect of its disapproval.

## CONCLUSION

The Court should stay the EPA's Final Rule that disapproves Louisiana's SIP, pending an adjudication of the petition for review.

Respectfully Submitted,

**JEFF LANDRY**
  **Attorney General**

/s/ *Joseph S. St. John*

ELIZABETH B. MURRILL (LA 20685)
  *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
 *Deputy Solicitor General*
MACHELLE HALL (LA 31498)
  *Assistant Attorney General*
LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

Courtney J. Burdette (LA 30564)
  *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, a true and correct copy of the foregoing has been served on all parties in accordance with the Appellate Rules of Civil Procedure, via the Court's CM/ECF system.

s/ *Joseph S.  St. John*
Joseph S. St. John

## CERTIFICATE OF CONFERENCE

On Marcy 27, 2023, the undersigned counsel for the State of Louisiana emailed with counsel for respondents. The respondents oppose the relief sought in this motion and intend to file a response.

s/ *Joseph S. St. John*
Joseph S. St. John

**CERTIFICATE OF COMPLIANCE**

This document complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 3,987 words, excluding the parts of the document exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman) using Microsoft Word (the same program used to calculate the word count).

s/ *Joseph S. St. John*
Joseph S. St. John

No. 23-60069

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, ET AL,

*Petitioners*,

*v.*

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, ADMINISTRATOR, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

*Respondents*,

---

**STATE OF LOUISIANA'S OPPOSED MOTION TO STAY APPENDIX – PART II**

---

JEFF LANDRY
  Attorney General
ELIZABETH B. MURRILL (LA 20685)
  *Solicitor General*
JOSEPH S. ST. JOHN (LA 36682)
  *Deputy Solicitor General*
MACHELLE HALL (LA 31498)
  *Assistant Attorney General*

LOUISIANA DEPT. OF JUSTICE
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
hallm@ag.louisiana.gov

1

Courtney J. Burdette (LA 30564)
  *Executive Counsel*
Jill C. Clark, Bar (LA 33050)
  *General Counsel*
LOUISIANA DEPT. OF
 ENVIRONMENTAL QUALITY
Office of the Secretary, Legal Division
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Tel: (225) 219-3985
Courtney.Burdette@la.gov
Jill.Clark@la.gov







NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 02 Oct 16
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
1015
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
10/02
10/01
09/30
Job ID: 126678 Job Start: Fri Nov 8 00:56:55 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Oct 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 08 Jun 17
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
840
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
06/08
06/07
06/06
Job ID: 126561 Job Start: Fri Nov 8 00:54:29 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2017 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 30 Sep 17
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
789
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
09/30
09/29
09/28
Job ID: 127107 Job Start: Fri Nov 8 01:04:31 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 29 Sep 2017 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 18 Oct 17
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
876
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
10/18
10/17
10/16
Job ID: 127323 Job Start: Fri Nov 8 01:09:10 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 25 Jul 18
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
946
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/25 07/24 07/23
Job ID: 127652 Job Start: Fri Nov 8 01:15:14 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 26 Jul 18
GDAS Meteorological Data
Source ★ at 29.52 N 95.39 W
MIXDEPTH
1307
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/26 07/25 07/24
Job ID: 127826 Job Start: Fri Nov 8 01:18:42 UTC 2019
Source 1 lat.: 29.520443 lon.: -95.392509 height: 19 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Sep 16
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156102          Job Start: Fri Nov  1 19:17:40 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Sep 16
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156102        Job Start: Fri Nov  1 19:17:40 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 06 May 17
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156199          Job Start: Fri Nov  1 19:20:18 UTC 2019
Source 1     lat.: 29.670025     lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2000 UTC 02 Sep 17
### GDAS Meteorological Data



Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156242          Job Start: Fri Nov  1 19:21:45 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Sep 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 12 Sep 17
GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156311          Job Start: Fri Nov  1 19:23:16 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 24 Apr 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156423          Job Start: Fri Nov 1 19:26:38 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508   height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Apr 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156535        Job Start: Fri Nov  1 19:29:37 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 07 May 18
GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156627          Job Start: Fri Nov 1 19:31:46 UTC 2019
Source 1    lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

MIXDEPTH

Job ID: 117497        Job Start: Thu Nov  7 19:08:54 UTC 2019
Source 1      lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 26 Jul 18
### GDAS Meteorological Data

Job ID: 117497 Job Start: Thu Nov 7 19:08:54 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

1500
1000
500

0

18   12   06   00   18   12   06   00   18   12   06   00   18
07/26              07/25              07/24

Job ID: 156689          Job Start: Fri Nov  1 19:33:28 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 26 Jul 18
GDAS Meteorological Data

Job ID: 156689 Job Start: Fri Nov 1 19:33:28 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

MIXDEPTH

Job ID: 120468          Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1   lat.: 29.670025   lon.: -95.128508   height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 27 Jul 18
### GDAS Meteorological Data

Job ID: 120468 Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 27 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156724          Job Start: Fri Nov  1 19:34:28 UTC 2019
Source 1     lat.: 29.670025   lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 27 Jul 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156724          Job Start: Fri Nov  1 19:34:28 UTC 2019
Source 1    lat.: 29.670025   lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Aug 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

MIXDEPTH

547

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
      08/23              08/22              08/21

Job ID: 120509          Job Start: Thu Nov  7 20:34:42 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 23 Aug 18
GDAS Meteorological Data

Job ID: 120509 Job Start: Thu Nov 7 20:34:42 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data

Job ID: 156873          Job Start: Fri Nov  1 19:37:51 UTC 2019
Source 1      lat.: 29.670025      lon.: -95.128508      height: 6 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 23 Aug 18
### GDAS Meteorological Data

Job ID: 156873          Job Start: Fri Nov  1 19:37:51 UTC 2019
Source 1      lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 17 Sep 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 156963          Job Start: Fri Nov  1 19:40:22 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508    height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 18 Sep 18
### GDAS Meteorological Data

Source ★ at 29.67 N 95.13 W

Meters AGL

Job ID: 157027          Job Start: Fri Nov  1 19:41:43 UTC 2019
Source 1     lat.: 29.670025    lon.: -95.128508     height: 6 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2018 - GDAS1







NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 26 Jul 18
GDAS Meteorological Data
Source ★ at 29.67 N 95.13 W
MIXDEPTH
1326
3000
2000
1000
07/26
07/25
07/24
Job ID: 117497 Job Start: Thu Nov 7 19:08:54 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 27 Jul 18
GDAS Meteorological Data
Source ★ at 29.67 N 95.13 W
MIXDEPTH
1249
3000
2000
1000
07/27
07/26
07/25
Job ID: 120468 Job Start: Thu Nov 7 20:30:25 UTC 2019
Source 1 lat.: 29.670025 lon.: -95.128508 height: 6 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 08 Jun 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 194242      Job Start: Thu Oct 31 17:54:56 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2016 - GDAS1











# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2000 UTC 09 Jun 16
### GDAS Meteorological Data

Job ID: 194505 Job Start: Thu Oct 31 18:00:07 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL

## Backward trajectories ending at 2200 UTC 10 Jun 16

### GDAS Meteorological Data

Job ID: 194575 Job Start: Thu Oct 31 18:01:29 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 20 Jun 16
### GDAS Meteorological Data

Job ID: 194661 Job Start: Thu Oct 31 18:03:08 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 30 Jun 16
### GDAS Meteorological Data

Job ID: 194755 Job Start: Thu Oct 31 18:04:45 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 29 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 01 Jul 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

936

3000
2000
1000

18          06   00   18   12   06   00   18   12   06   00   18
        07/01                06/30                06/29

Job ID: 120834          Job Start: Thu Nov  7 20:46:46 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 Jul 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 01 Jul 16
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

936

3000
2000
1000

18        06   00        12   06   00        18   12   06   00        18
     07/01          06/30          06/29

Job ID: 120834        Job Start: Thu Nov 7 20:46:46 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Jul 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 01 Jul 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 194836          Job Start: Thu Oct 31 18:06:28 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Jul 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 01 Jul 16
GDAS Meteorological Data

Job ID: 194836          Job Start: Thu Oct 31 18:06:28 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Jul 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 21 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

579

3000
2000
1000

18
09/21
00
06
12
18
00
09/20
06
12
18
00
09/19
18

Job ID: 124199          Job Start: Thu Nov  7 23:56:32 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 21 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

579

3000
2000
1000

18          06    00          18    06    00          18
09/21              09/20              09/19

Job ID: 124199          Job Start: Thu Nov 7 23:56:32 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 21 Sep 16
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 144966          Job Start: Fri Nov 1 13:42:39 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 21 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 144966          Job Start: Fri Nov  1 13:42:39 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

Job ID: 124336          Job Start: Fri Nov  8 00:02:37 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 22 Sep 16
GDAS Meteorological Data

Job ID: 124336 Job Start: Fri Nov 8 00:02:37 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 22 Sep 16
### GDAS Meteorological Data



Job ID: 144929          Job Start: Fri Nov  1 13:41:19 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 22 Sep 16
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 144929        Job Start: Fri Nov  1 13:41:19 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2100 UTC 03 Oct 16
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

18 12 06 00 18 12 06 00 18 12 06 00 18
10/03        10/02        10/01

Job ID: 145060        Job Start: Fri Nov 1 13:47:16 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Oct 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 06 May 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 144436          Job Start: Fri Nov  1 13:18:45 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 07 May 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145082          Job Start: Fri Nov  1 13:49:04 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 31 May 17
### GDAS Meteorological Data

Job ID: 145199 Job Start: Fri Nov 1 13:54:53 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 29 May 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 08 Jun 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

0

18    12    06    00    18    12    06    00    18    12    06    00    18
       06/08                  06/07                  06/06

Job ID: 145236          Job Start: Fri Nov  1 13:56:26 UTC 2019
Source 1      lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Jun 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 24 Jul 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145279          Job Start: Fri Nov  1 13:59:15 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 04 Aug 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145328          Job Start: Fri Nov  1 14:00:55 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 14 Sep 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145365          Job Start: Fri Nov  1 14:02:57 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 18 Sep 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145462          Job Start: Fri Nov 1 14:06:59 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284   height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 19 Oct 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145536          Job Start: Fri Nov 1 14:09:35 UTC 2019
Source 1      lat.: 33.219069    lon.:-97.196284    height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 19 Oct 17
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145536        Job Start: Fri Nov 1 14:09:35 UTC 2019
Source 1     lat.: 33.219069   lon.:-97.196284   height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 15 Oct 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 28 Apr 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 145687          Job Start: Fri Nov 1 14:16:47 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 26 May 18
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

0

18          12          06          00          18          12          06          00          18          12          06          00          18
                    05/26                              05/25                              05/24

Job ID: 146179          Job Start: Fri Nov  1 14:32:40 UTC 2019
Source 1    lat.: 33.219069   lon.: -97.196284   height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 May 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 29 May 18
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

1696

3000
2000
1000

18  12  06  00  18  12  06  00  18  12  06  00  18
     05/29          05/28          05/27

Job ID: 124417          Job Start: Fri Nov 8 00:06:47 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward        Duration: 72 hrs
Vertical Motion Calculation Method:        Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

1696

3000
2000
1000

18    06    00    18    12    06    00    18    12    06    00    18
     05/29              05/28              05/27

Job ID: 124417          Job Start: Fri Nov 8 00:06:47 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146190          Job Start: Fri Nov 1 14:34:35 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 29 May 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

1500
1000
500

18 12 06 00 18 12 06 00 18 12 06 00 18
05/29 05/28 05/27

Job ID: 146190     Job Start: Fri Nov 1 14:34:35 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 05 Jun 18
### GDAS Meteorological Data

Job ID: 124825          Job Start: Fri Nov  8 00:13:54 UTC 2019
Source 1      lat.: 33.219069      lon.: -97.196284      height: 183 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 05 Jun 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

Job ID: 124825          Job Start: Fri Nov  8 00:13:54 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284   height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 05 Jun 18
### GDAS Meteorological Data

Job ID: 146441 Job Start: Fri Nov 1 14:40:27 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 05 Jun 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146441          Job Start: Fri Nov  1 14:40:27 UTC 2019
Source 1    lat.: 33.219069   lon.: -97.196284   height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 25 Jul 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146554          Job Start: Fri Nov 1 14:44:29 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Job ID: 146649        Job Start: Fri Nov  1 14:45:56 UTC 2019
Source 1     lat.: 33.219069    lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 02 Aug 18
GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 146907          Job Start: Fri Nov  1 14:56:06 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

MIXDEPTH

2018

3000
2000
1000

18    12    06    00    18    12    06    00    18    12    06    00    18
08/03              08/02              08/01

Job ID: 125191          Job Start: Fri Nov 8 00:21:19 UTC 2019
Source 1    lat.: 33.219069    lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1





NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 03 Aug 18
GDAS Meteorological Data

Job ID: 125191 Job Start: Fri Nov 8 00:21:19 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 147775          Job Start: Fri Nov  1 15:49:24 UTC 2019
Source 1     lat.: 33.219069   lon.: -97.196284    height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 33.22 N 97.20 W

Meters AGL

Job ID: 147775          Job Start: Fri Nov 1 15:49:24 UTC 2019
Source 1     lat.: 33.219069     lon.: -97.196284     height: 183 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1









NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 01 Jul 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
936
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
07/01 06/30 06/29
Job ID: 120834 Job Start: Thu Nov 7 20:46:46 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jul 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 21 Sep 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
579
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
09/21 09/20 09/19
Job ID: 124199 Job Start: Thu Nov 7 23:56:32 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 Sep 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 22 Sep 16
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
1374
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
09/22 09/21 09/20
Job ID: 124336 Job Start: Fri Nov 8 00:02:37 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Sep 2016 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 29 May 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
1696
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
05/29 05/28 05/27
Job ID: 124417 Job Start: Fri Nov 8 00:06:47 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 29 May 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 05 Jun 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
1385
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
06/05
06/04
06/03
Job ID: 124825 Job Start: Fri Nov 8 00:13:54 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Jun 2018 - GDAS1

NOAA HYSPLIT MODEL
Backward trajectories ending at 2200 UTC 03 Aug 18
GDAS Meteorological Data
Source ★ at 33.22 N 97.20 W
MIXDEPTH
2018
3000
2000
1000
18 12 06 00 18 12 06 00 18 12 06 00 18
08/03
08/02
08/01
Job ID: 125191 Job Start: Fri Nov 8 00:21:19 UTC 2019
Source 1 lat.: 33.219069 lon.: -97.196284 height: 183 m AMSL
Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 07 Jun 16
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

29

18   12   06   00   18   12   06   00   18   12   06   00   18
          06/07              06/06              06/05

Job ID: 153301          Job Start: Fri Nov  1 18:00:00 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Jun 2016 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 29 Jun 16
### GDAS Meteorological Data



Job ID: 153468          Job Start: Fri Nov  1 18:04:26 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 29 Jun 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 26 Jul 16
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153042          Job Start: Fri Nov 1 17:55:22 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2016 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 06 May 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153592        Job Start: Fri Nov  1 18:08:33 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z  1 May 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 08 Jun 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 153706          Job Start: Fri Nov 1 18:12:41 UTC 2019
Source 1    lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 8 Jun 2017 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 23 Jun 17
### GDAS Meteorological Data

Job ID: 153757 Job Start: Fri Nov 1 18:14:23 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2017 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 04 Aug 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18  12  06  00  18  12  06  00  18  12  06  00  18
08/04              08/03              08/02

Job ID: 153852          Job Start: Fri Nov  1 18:17:21 UTC 2019
Source 1    lat.: 32.922474   lon.: -97.282088   height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 01 Sep 17
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500

1000

500

26

18    12    06    00    18    12    06    00    18    12    06    00    18
         09/01              08/31              08/30

Job ID: 153920          Job Start: Fri Nov  1 18:19:32 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Sep 2017 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 13 Sep 17
GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500
1000
500

26

18 12 06 00 18 12 06 00 18 12 06 00 18
09/13 09/12 09/11

Job ID: 154043          Job Start: Fri Nov  1 18:23:38 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  8 Sep 2017 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 24 Apr 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500

1000

500

Job ID: 154165          Job Start: Fri Nov 1 18:27:13 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 28 Apr 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154236        Job Start: Fri Nov  1 18:28:57 UTC 2019
Source 1     lat.: 32.922474   lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Apr 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 17 May 18
### GDAS Meteorological Data

Job ID: 154370 Job Start: Fri Nov 1 18:32:45 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 15 May 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 May 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154422        Job Start: Fri Nov 1 18:34:03 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 May 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0100 UTC 22 Jun 18
### GDAS Meteorological Data

Job ID: 129844 Job Start: Fri Nov 8 02:02:14 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0100 UTC 22 Jun 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

MIXDEPTH

1179

3000
2000
1000

00  18    12   06    00   18   12   06    00   18   12   06    00   18
06/22        06/21        06/20        06/19

Job ID: 129844          Job Start: Fri Nov  8 02:02:14 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0000 UTC 22 Jun 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154558      Job Start: Fri Nov  1 18:37:28 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0000 UTC 22 Jun 18
### GDAS Meteorological Data



Job ID: 154558       Job Start: Fri Nov  1 18:37:28 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jun 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 23 Jul 18
### GDAS Meteorological Data

Job ID: 154713      Job Start: Fri Nov  1 18:40:05 UTC 2019
Source 1      lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 25 Jul 18
### GDAS Meteorological Data

Job ID: 154778     Job Start: Fri Nov  1 18:41:59 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1





# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Job ID: 154857 Job Start: Fri Nov 1 18:43:25 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2300 UTC 26 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154857          Job Start: Fri Nov  1 18:43:25 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 27 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 154976          Job Start: Fri Nov  1 18:46:10 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1

# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 28 Jul 18
### GDAS Meteorological Data



Job ID: 155034          Job Start: Fri Nov  1 18:47:32 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 22 Jul 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 0100 UTC 31 Jul 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

1500

1000

500

Job ID: 155161      Job Start: Fri Nov  1 18:51:16 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward      Duration: 72 hrs
Vertical Motion Calculation Method:      Model Vertical Velocity
Meteorology: 0000Z 29 Jul 2018 - GDAS1



NOAA HYSPLIT MODEL
Backward trajectories ending at 2300 UTC 02 Aug 18
GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 155220          Job Start: Fri Nov 1 18:52:45 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

MIXDEPTH

2132

3000
2000
1000

18   12   06   00   18   12   06   00   18   12   06   00   18
        08/03              08/02              08/01

Job ID: 130005        Job Start: Fri Nov 8 02:05:31 UTC 2019
Source 1    lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward    Duration: 72 hrs
Vertical Motion Calculation Method:    Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2200 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

MIXDEPTH

2132

Job ID: 130005     Job Start: Fri Nov 8 02:05:31 UTC 2019
Source 1     lat.: 32.922474     lon.: -97.282088     height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
### GDAS Meteorological Data

Source ★ at 32.92 N 97.28 W

Meters AGL

Job ID: 155307          Job Start: Fri Nov  1 18:53:54 UTC 2019
Source 1     lat.: 32.922474    lon.: -97.282088    height: 254 m AMSL

Trajectory Direction: Backward     Duration: 72 hrs
Vertical Motion Calculation Method:     Model Vertical Velocity
Meteorology: 0000Z  1 Aug 2018 - GDAS1



# NOAA HYSPLIT MODEL
## Backward trajectories ending at 2100 UTC 03 Aug 18
## GDAS Meteorological Data

Job ID: 155307 Job Start: Fri Nov 1 18:53:54 UTC 2019
Source 1 lat.: 32.922474 lon.: -97.282088 height: 254 m AMSL

Trajectory Direction: Backward Duration: 72 hrs
Vertical Motion Calculation Method: Model Vertical Velocity
Meteorology: 0000Z 1 Aug 2018 - GDAS1

Illustration of Semi-Permanent Global Pressure Systems

Louisiana Department of Environmental Quality





Wind Roses Exhibiting Annual Mean Wind Direction and Speed

Louisiana Department of Environmental Quality

# HOUSTON HOBBY AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**HOUSTON HOBBY AP (TX) - Wind Frequency Table (percentage)**

Latitude : 29.6381
Longitude : -95.2819
Elevation : 44 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 202565 of 262992

Sub Interval Windows
Start End
Date Jan. 1 Dec. 31
Hour 0    23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.5 | 0.4 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 9.0 |
| 4 - 8 | 0.8 | 0.6 | 0.5 | 0.7 | 1.0 | 0.9 | 1.0 | 1.0 | 0.8 | 0.9 | 1.1 | 1.3 | 1.6 | 1.8 | 1.7 | 2.2 | 2.5 | 2.2 | 2.0 | 1.3 | 1.1 | 0.8 | 0.7 | 0.7 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.8 | 34.1 |
| 8 - 13 | 1.6 | 1.3 | 0.8 | 0.9 | 1.5 | 1.1 | 0.9 | 1.0 | 0.9 | 1.0 | 1.4 | 1.6 | 1.4 | 1.5 | 2.4 | 3.5 | 2.9 | 2.4 | 1.6 | 1.0 | 0.7 | 0.6 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.9 | 1.2 | 39.7 |
| 13 - 19 | 1.0 | 0.8 | 0.5 | 0.4 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.3 | 0.4 | 0.8 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.4 | 0.7 | 0.8 | 0.8 | 14.6 |
| 19 - 25 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 2.3 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 2.9 | 2.1 | 2.3 | 3.1 | 2.6 | 2.4 | 2.4 | 2.2 | 2.5 | 3.1 | 3.6 | 4.0 | 4.0 | 4.1 | 6.0 | 7.8 | 6.6 | 5.7 | 3.9 | 2.8 | 2.1 | 1.7 | 1.5 | 1.4 | 1.0 | 0.9 | 0.8 | 0.8 | 0.9 | 1.1 | 1.2 | 1.4 | 1.7 | 2.5 | 3.2 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 11.1 | 11.3 | 10.9 | 9.8 | 9.4 | 8.6 | 8.1 | 8.1 | 8.3 | 8.1 | 8.5 | 8.5 | 8.1 | 7.6 | 8.0 | 8.7 | 9.3 | 9.2 | 8.9 | 8.9 | 8.3 | 8.1 | 7.7 | 7.2 | 7.0 | 7.1 | 7.6 | 8.1 | 8.8 | 9.1 | 10.2 | 11.1 | 11.6 | 11.8 | 11.6 | 11.2 | 9.1 |

# HOUSTON INTERCONT AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**HOUSTON INTERCONT AP (TX) - Wind Frequency Table (percentage)**

| | |
|---|---|
| Latitude : 29.9800<br>Longitude : -95.3600<br>Elevation : 95 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br>ic: # of Days : 10958 of 10958<br># obs : poss : 214570 of 262992 |

Sub Interval Windows
Start   End
Date Jan. 1 Dec. 31
Hour 0      23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 8.3 |
| 4 - 8 | 1.2 | 1.1 | 1.2 | 1.1 | 1.2 | 1.2 | 1.1 | 1.0 | 0.7 | 0.8 | 0.8 | 1.1 | 1.3 | 1.2 | 1.2 | 1.3 | 1.8 | 2.2 | 1.9 | 1.3 | 0.9 | 0.7 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.7 | 0.8 | 0.9 | 1.1 | 1.2 | 34.6 |
| 8 - 13 | 1.4 | 1.2 | 1.1 | 0.9 | 0.9 | 0.9 | 1.1 | 1.0 | 1.0 | 1.2 | 1.3 | 1.8 | 2.6 | 2.6 | 2.3 | 2.1 | 2.9 | 3.0 | 2.1 | 1.2 | 0.8 | 0.7 | 0.5 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.7 | 0.9 | 1.2 | 1.4 | 1.4 | 42.2 |
| 13 - 19 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.9 | 1.2 | 1.1 | 1.0 | 1.2 | 1.0 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.3 | 0.5 | 0.5 | 0.6 | 13.1 |
| 19 - 25 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.0 | 0.1 | 0.1 | 0.1 | 1.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.5 | 3.0 | 2.9 | 2.5 | 2.5 | 2.5 | 2.5 | 2.2 | 2.0 | 2.3 | 2.5 | 3.5 | 5.0 | 5.3 | 5.0 | 4.8 | 6.4 | 6.8 | 5.0 | 3.2 | 2.1 | 1.7 | 1.4 | 1.2 | 1.2 | 0.9 | 0.8 | 0.9 | 1.0 | 1.2 | 1.5 | 1.7 | 2.0 | 2.5 | 3.1 | 3.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.7 | 8.2 | 7.8 | 7.5 | 7.5 | 7.8 | 8.0 | 8.5 | 8.9 | 9.0 | 9.2 | 10.0 | 10.5 | 10.5 | 10.1 | 9.8 | 9.0 | 8.2 | 7.9 | 7.7 | 7.9 | 7.8 | 7.5 | 7.4 | 7.1 | 7.0 | 7.3 | 7.7 | 7.9 | 8.5 | 9.2 | 9.4 | 9.5 | 9.5 | 9.2 | 8.9 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:35:31 AM CDT

# HOUSTON CLOVER FLD (TX) Wind Rose

Jan. 1, 1997 – Dec. 31, 2016
Sub-Interval: Jan. 1 - Dec. 31, 0 - 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

```
HOUSTON CLOVER FLD (TX) - Wind Frequency Table (percentage)
```

| | |
|---|---|
| Latitude : 29.5189<br>Longitude : -95.2417<br>Elevation : 44 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1997<br>End Date : Dec. 31, 2016<br># of Days : 7305 of 7305<br># obs : poss : 93563 of 175320 |

Sub Interval Windows

| | Start | End |
|---|---|---|
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.7 | 0.7 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 11.7 |
| 4 - 8 | 0.8 | 0.9 | 1.0 | 1.1 | 1.2 | 1.0 | 0.9 | 0.8 | 0.9 | 1.0 | 0.9 | 1.1 | 1.3 | 1.8 | 1.7 | 2.2 | 2.5 | 1.9 | 1.7 | 1.2 | 0.8 | 0.4 | 0.3 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.5 | 0.6 | 0.6 | 0.8 | 33.0 |
| 8 - 13 | 1.3 | 1.3 | 1.2 | 1.2 | 1.2 | 1.0 | 0.9 | 1.2 | 1.4 | 1.4 | 1.2 | 1.2 | 1.6 | 2.3 | 3.5 | 4.4 | 3.5 | 2.3 | 1.4 | 0.8 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.5 | 0.6 | 0.8 | 1.0 | 1.4 | | | 42.3 |
| 13 - 19 | 0.5 | 0.4 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.4 | 0.8 | 1.1 | 1.3 | 1.1 | 0.7 | 0.4 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.6 | | 11.7 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 1.2 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.9 | 2.9 | 2.9 | 2.9 | 2.9 | 2.5 | 2.2 | 2.4 | 2.9 | 2.8 | 2.7 | 2.9 | 3.3 | 4.5 | 5.5 | 7.6 | 9.1 | 7.2 | 5.2 | 3.4 | 2.1 | 1.1 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 0.8 | 0.9 | 1.1 | 1.3 | 1.7 | 2.0 | 2.5 | 3.2 | | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.5 | 9.0 | 8.6 | 8.2 | 7.8 | 7.7 | 7.7 | 8.2 | 8.3 | 8.4 | 8.2 | 7.9 | 7.5 | 7.8 | 8.8 | 9.1 | 9.3 | 9.3 | 8.9 | 8.6 | 7.6 | 7.0 | 7.1 | 6.9 | 6.8 | 6.3 | 6.4 | 6.4 | 6.9 | 7.6 | 8.2 | 9.5 | 9.7 | 9.7 | 10.0 | 10.0 | 8.6 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:22:03 AM CDT

# PORT ARTHUR SE TX AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**
- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**PORT ARTHUR SE TX AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 29.9506<br>Longitude : -94.0206<br>Elevation : 16 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 232001 of 262992 | Sub Interval Windows<br>Start  End<br>Date Jan. 1 Dec. 31<br>Hour 0      23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 7.4 |
| 4 - 8 | 1.0 | 1.1 | 1.0 | 1.2 | 1.3 | 1.0 | 0.9 | 0.8 | 0.7 | 0.8 | 0.8 | 0.8 | 0.9 | 0.8 | 0.7 | 0.8 | 1.2 | 1.7 | 1.9 | 1.5 | 1.2 | 1.0 | 0.8 | 0.7 | 0.6 | 0.5 | 0.5 | 0.4 | 0.5 | 0.6 | 0.6 | 0.6 | 0.5 | 0.6 | 0.6 | 31.3 |
| 8 - 13 | 1.5 | 1.6 | 1.6 | 1.5 | 1.4 | 1.3 | 1.1 | 1.1 | 1.0 | 1.3 | 1.3 | 1.5 | 1.9 | 1.7 | 1.2 | 1.4 | 2.3 | 2.8 | 2.6 | 2.1 | 1.6 | 1.0 | 0.6 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.7 | 0.6 | 0.8 | 1.0 | 41.7 |
| 13 - 19 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.7 | 0.9 | 0.8 | 0.8 | 0.9 | 1.3 | 1.3 | 1.1 | 0.8 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 16.6 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 2.7 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.3 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 3.8 | 3.4 | 3.4 | 3.2 | 2.9 | 2.4 | 2.4 | 2.2 | 2.6 | 2.7 | 3.0 | 3.8 | 3.7 | 3.1 | 3.6 | 5.3 | 6.3 | 6.0 | 4.7 | 3.7 | 2.6 | 1.9 | 1.5 | 1.2 | 1.1 | 1.0 | 1.0 | 1.2 | 1.5 | 1.9 | 1.8 | 1.7 | 2.1 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 10.0 | 9.7 | 9.4 | 8.8 | 8.4 | 8.6 | 8.5 | 8.9 | 9.0 | 9.3 | 9.5 | 9.8 | 10.3 | 10.6 | 11.2 | 11.2 | 10.9 | 10.3 | 9.7 | 9.4 | 9.1 | 8.5 | 7.7 | 7.3 | 7.0 | 6.9 | 7.0 | 7.3 | 7.7 | 8.1 | 8.8 | 9.5 | 9.8 | 10.1 | 10.3 | 10.4 | 9.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:54:43 AM CDT

# DENTON MUNI AP (TX) Wind Rose

Jan. 1, 1996 – Dec. 31, 2017
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**DENTON MUNI AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 33.2061<br>Longitude : -97.1989<br>Elevation : 642 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1996<br>End Date : Dec. 31, 2017<br># of Days : 8036 of 8036<br># obs : poss : 150626 of 192864 | Sub Interval Windows<br>Start End<br>Date Jan. 1 Dec. 31<br>Hour 0    23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 7.4 |
| 4 - 8 | 1.1 | 0.8 | 0.6 | 0.7 | 0.7 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.9 | 1.3 | 1.9 | 2.2 | 2.0 | 1.7 | 1.2 | 0.9 | 0.7 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.8 | 0.9 | 1.0 | 1.1 | 28.3 |
| 8 - 13 | 1.5 | 1.2 | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.7 | 0.8 | 1.2 | 2.0 | 2.5 | 3.6 | 4.2 | 3.4 | 2.3 | 1.6 | 1.0 | 0.7 | 0.5 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.7 | 0.8 | 1.0 | 1.3 | | 39.2 |
| 13 - 19 | 0.7 | 0.6 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.7 | 1.6 | 2.6 | 2.9 | 2.1 | 1.2 | 0.6 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.6 | 0.7 | | 19.0 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 | 0.7 | 1.0 | 0.8 | 0.5 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 5.2 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.8 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.7 | 3.1 | 2.4 | 2.1 | 1.9 | 1.6 | 1.3 | 1.2 | 1.2 | 1.3 | 1.6 | 2.1 | 2.9 | 4.6 | 5.9 | 8.0 | 9.6 | 9.0 | 6.4 | 4.2 | 2.6 | 1.6 | 1.1 | 0.7 | 0.7 | 0.6 | 0.7 | 0.8 | 0.9 | 1.2 | 1.5 | 1.8 | 2.4 | 2.8 | 3.1 | 3.6 | 99.9 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.8 | 10.2 | 10.0 | 9.6 | 8.7 | 8.0 | 7.9 | 7.8 | 8.0 | 8.1 | 8.0 | 7.7 | 7.7 | 8.1 | 8.8 | 10.3 | 11.6 | 12.9 | 12.8 | 12.3 | 11.3 | 10.2 | 9.2 | 8.9 | 8.9 | 9.0 | 8.7 | 8.8 | 8.6 | 9.1 | 9.3 | 9.6 | 9.8 | 10.0 | 10.0 | 9.9 | 10.2 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 8:32:10 AM CDT

# FT WORTH ALLIANCE AP (TX) Wind Rose

Jan. 1, 1991 – Dec. 31, 2017
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**FT WORTH ALLIANCE AP (TX) - Wind Frequency Table (percentage)**

Latitude : 32.9733
Longitude : -97.3181
Elevation : 685 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1991
End Date : Dec. 31, 2017
# of Days : 9862 of 9862
# obs : poss : 178484 of 236688

Sub Interval Windows
Start   End
Date Jan. 1  Dec. 31
Hour 0        23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 5.8 |
| 4 - 8 | 0.5 | 0.5 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.7 | 0.5 | 0.6 | 0.6 | 0.7 | 0.9 | 1.0 | 1.1 | 1.2 | 1.7 | 2.3 | 1.9 | 1.1 | 0.9 | 0.7 | 0.6 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.3 | 0.4 | 0.4 | 0.7 | 0.8 | 0.7 | 26.6 |
| 8 - 13 | 1.5 | 1.2 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.7 | 1.1 | 1.6 | 2.0 | 2.5 | 4.1 | 5.0 | 3.9 | 2.4 | 1.6 | 1.0 | 0.7 | 0.5 | 0.4 | 0.3 | 0.2 | 0.3 | 0.3 | 0.5 | 0.6 | 0.7 | 0.9 | 1.1 | 1.3 | 1.3 | 1.5 | 43.5 |
| 13 - 19 | 0.9 | 0.5 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.8 | 1.2 | 2.1 | 2.8 | 2.2 | 1.3 | 0.6 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.6 | 0.6 | 0.8 | 0.8 | 18.7 |
| 19 - 25 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.6 | 0.8 | 0.5 | 0.3 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 4.7 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.2 | 2.4 | 2.2 | 2.0 | 1.9 | 1.6 | 1.4 | 1.4 | 1.1 | 1.3 | 1.3 | 1.7 | 2.3 | 3.2 | 4.2 | 5.4 | 8.8 | 11.3 | 8.9 | 5.4 | 3.4 | 2.2 | 1.8 | 1.4 | 1.1 | 0.9 | 0.7 | 0.8 | 0.8 | 1.2 | 1.4 | 1.8 | 2.2 | 2.7 | 3.3 | 3.3 | 99.9 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.1 |
| Ave Speed | 11.9 | 10.6 | 9.4 | 8.8 | 8.4 | 7.6 | 7.5 | 7.3 | 7.8 | 7.7 | 7.6 | 8.1 | 8.7 | 9.3 | 10.3 | 11.0 | 11.3 | 11.5 | 11.1 | 10.8 | 9.7 | 9.1 | 8.3 | 8.1 | 7.7 | 7.9 | 8.0 | 9.0 | 9.1 | 9.7 | 11.2 | 11.9 | 12.0 | 10.7 | 11.1 | 11.3 | 10.2 |



Click and drag to zoom

**TERRELL MUNI AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 32.7100<br>Longitude : -96.2672<br>Elevation : 475 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1998<br>End Date : Dec. 31, 2017<br># of Days : 7305 of 7305<br># obs : poss : 136422 of 175320 | Sub Interval Windows<br>    Start    End<br>Date Jan. 1 Dec. 31<br>Hour 0        23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.3 | 0.5 | 0.6 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 8.7 |
| 4 - 8 | 1.0 | 1.2 | 1.4 | 1.4 | 1.0 | 0.9 | 0.8 | 0.9 | 1.0 | 1.0 | 1.0 | 1.2 | 1.4 | 1.5 | 1.8 | 2.1 | 2.1 | 1.9 | 2.0 | 1.4 | 0.7 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | 0.5 | 0.6 | 0.7 | 0.7 | 32.7 |
| 8 - 13 | 1.5 | 1.4 | 1.2 | 0.9 | 0.7 | 0.7 | 0.7 | 0.7 | 0.6 | 0.6 | 0.7 | 0.7 | 1.0 | 1.2 | 1.8 | 2.7 | 3.4 | 3.8 | 3.9 | 2.5 | 1.3 | 0.9 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.6 | 0.9 | 1.0 | 1.0 | 1.1 | 1.4 | 40.6 |
| 13 - 19 | 0.5 | 0.5 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.9 | 1.7 | 2.1 | 2.0 | 1.2 | 0.7 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.5 | 0.4 | 0.5 | 14.8 |
| 19 - 25 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 | 0.4 | 0.4 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 2.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.2 | 3.5 | 3.5 | 3.1 | 2.4 | 2.1 | 2.0 | 2.0 | 2.0 | 1.9 | 1.9 | 2.2 | 2.7 | 3.3 | 4.4 | 6.2 | 7.9 | 8.7 | 8.6 | 5.6 | 3.1 | 1.9 | 1.2 | 0.9 | 0.6 | 0.6 | 0.5 | 0.5 | 0.7 | 0.8 | 1.0 | 1.5 | 2.2 | 2.2 | 2.2 | 2.7 | 99.8 |

| Calm (<1.3) | | 0.1 |
|---|---|---|

| Ave Speed | 9.3 | 8.8 | 8.0 | 7.1 | 6.9 | 7.1 | 7.2 | 7.0 | 6.8 | 6.9 | 7.2 | 7.1 | 7.3 | 7.4 | 8.1 | 9.0 | 10.2 | 10.8 | 10.7 | 10.5 | 10.8 | 10.4 | 9.5 | 8.9 | 8.4 | 9.0 | 8.9 | 8.9 | 9.4 | 10.0 | 11.0 | 10.9 | 11.0 | 10.6 | 10.0 | 9.9 | 9.2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:24:11 AM CDT



Click and drag to zoom

**TYLER POUNDS FLD (TX) - Wind Frequency Table (percentage)**

| | |
|---|---|
| Latitude : 32.3542<br>Longitude : -95.4022<br>Elevation : 544 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 191243 of 262992 |

| Sub Interval Windows | | |
|---|---|---|
| | Start | End |
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 6.1 |
| 4 - 8 | 0.9 | 0.8 | 0.8 | 0.8 | 0.8 | 0.9 | 1.0 | 0.9 | 0.7 | 0.7 | 0.7 | 0.9 | 1.2 | 1.6 | 1.9 | 2.2 | 2.1 | 2.3 | 2.1 | 1.5 | 1.0 | 0.8 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.5 | 0.6 | 0.5 | 0.6 | 0.8 | 0.8 | 34.1 |
| 8 - 13 | 1.2 | 1.0 | 0.9 | 0.7 | 0.8 | 0.8 | 0.9 | 0.8 | 0.7 | 0.8 | 0.7 | 0.9 | 1.2 | 1.5 | 2.2 | 2.5 | 2.9 | 3.7 | 3.9 | 3.1 | 2.2 | 1.7 | 1.3 | 0.8 | 0.5 | 0.3 | 0.3 | 0.2 | 0.3 | 0.4 | 0.6 | 0.7 | 0.8 | 1.0 | 1.1 | 1.2 | 44.3 |
| 13 - 19 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.5 | 0.8 | 1.3 | 1.7 | 1.6 | 1.1 | 0.6 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | | 13.5 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.2 | 0.3 | 0.3 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 1.8 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.6 | 2.2 | 1.9 | 1.9 | 2.0 | 2.1 | 2.3 | 2.0 | 1.7 | 1.7 | 1.7 | 2.0 | 2.8 | 3.6 | 4.7 | 5.5 | 6.1 | 7.8 | 8.2 | 6.7 | 4.7 | 3.4 | 2.5 | 1.7 | 1.2 | 0.9 | 0.8 | 0.8 | 0.8 | 1.0 | 1.5 | 1.9 | 2.0 | 2.4 | 2.6 | 2.6 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.6 | 8.2 | 7.7 | 7.8 | 7.6 | 7.7 | 7.9 | 7.8 | 7.9 | 8.3 | 8.1 | 8.1 | 8.1 | 8.3 | 8.5 | 9.1 | 9.8 | 10.4 | 10.9 | 10.9 | 10.2 | 9.1 | 8.2 | 7.8 | 7.7 | 7.8 | 7.9 | 8.0 | 8.6 | 9.5 | 9.8 | 10.3 | 9.9 | 9.5 | 9.3 | 9.1 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:23:08 AM CDT

# LONGVIEW E TX RGNL AP (TX) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LONGVIEW E TX RGNL AP (TX) - Wind Frequency Table (percentage)**

| | | |
|---|---|---|
| Latitude : 32.3847<br>Longitude : -94.7114<br>Elevation : 365 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 169971 of<br>262992 | Sub Interval<br>Windows<br>    Start  End<br>Date Jan. 1 Dec. 31<br>Hour 0      23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 8.0 |
| 4 - 8 | 0.9 | 0.7 | 0.6 | 0.7 | 1.0 | 1.0 | 1.1 | 1.0 | 1.0 | 1.3 | 1.1 | 1.3 | 1.7 | 2.1 | 2.1 | 2.2 | 2.1 | 2.2 | 2.1 | 1.6 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 | 0.4 | 0.4 | 0.5 | 0.5 | 0.6 | 0.9 | 1.0 | 0.9 | 0.8 | 0.8 | 0.8 | 39.4 |
| 8 - 13 | 0.9 | 0.6 | 0.5 | 0.6 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.7 | 0.8 | 1.1 | 1.5 | 1.8 | 2.3 | 2.7 | 2.9 | 3.0 | 2.5 | 1.9 | 1.4 | 1.1 | 0.7 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.5 | 0.7 | 1.1 | 1.1 | 1.1 | 1.1 | 1.1 | 40.3 |
| 13 - 19 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.1 | 0.1 | 0.1 | 0.3 | 0.5 | 0.7 | 1.0 | 1.1 | 1.0 | 0.9 | 0.5 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 | 10.6 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 1.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.2 | 1.6 | 1.4 | 1.7 | 2.1 | 2.0 | 2.2 | 2.1 | 2.1 | 2.5 | 2.1 | 2.4 | 3.2 | 4.1 | 4.5 | 5.4 | 6.0 | 6.7 | 6.9 | 5.6 | 4.2 | 2.9 | 2.3 | 1.6 | 1.2 | 1.0 | 0.9 | 1.0 | 1.0 | 1.5 | 2.2 | 3.1 | 2.8 | 2.7 | 2.5 | 2.3 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 7.9 | 7.7 | 7.6 | 7.5 | 7.5 | 7.2 | 7.0 | 7.0 | 6.8 | 6.9 | 6.9 | 7.1 | 7.2 | 7.3 | 7.7 | 8.3 | 8.8 | 9.1 | 9.6 | 10.0 | 10.2 | 9.7 | 9.2 | 8.7 | 8.1 | 8.1 | 8.3 | 8.1 | 8.2 | 8.9 | 9.0 | 9.6 | 9.8 | 9.9 | 9.3 | 8.7 | 8.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:21:49 AM CDT

# LAKE CHARLES RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LAKE CHARLES RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 30.1247
Longitude : -93.2283
Elevation : 9 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 201506 of 262992

Sub Interval Windows
      Start   End
Date Jan. 1  Dec. 31
Hour 0        23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 10.0 |
| 4 - 8 | 0.8 | 0.9 | 0.9 | 1.1 | 1.4 | 1.9 | 1.7 | 1.7 | 1.4 | 1.3 | 1.2 | 1.3 | 1.3 | 1.4 | 1.4 | 1.1 | 1.1 | 1.6 | 1.7 | 1.2 | 1.0 | 0.9 | 0.8 | 0.7 | 0.5 | 0.4 | 0.3 | 0.4 | 0.3 | 0.4 | 0.5 | 0.5 | 0.6 | 0.5 | 0.6 | 0.7 | 35.6 |
| 8 - 13 | 1.4 | 1.4 | 1.4 | 1.5 | 1.6 | 1.8 | 1.5 | 1.3 | 1.1 | 1.0 | 0.9 | 1.0 | 1.3 | 1.4 | 1.2 | 1.1 | 1.5 | 2.1 | 2.1 | 1.8 | 1.9 | 1.7 | 1.2 | 0.7 | 0.4 | 0.3 | 0.2 | 0.2 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.8 | 1.0 | | 39.6 |
| 13 - 19 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.4 | 0.4 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.4 | 0.4 | 0.4 | 0.5 | 0.8 | 0.8 | 0.7 | 0.6 | 0.5 | 0.4 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.5 | | | 12.7 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | | | 1.9 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.0 |
| Total(%) | 3.2 | 3.2 | 3.3 | 3.4 | 3.9 | 4.6 | 4.0 | 3.6 | 3.1 | 2.7 | 2.6 | 2.9 | 3.4 | 3.7 | 3.6 | 3.2 | 4.0 | 5.0 | 5.1 | 4.0 | 3.7 | 3.3 | 2.5 | 1.8 | 1.2 | 0.9 | 0.7 | 0.8 | 0.8 | 1.0 | 1.2 | 1.2 | 1.7 | 1.8 | 2.0 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 10.0 | 9.9 | 9.8 | 9.3 | 8.7 | 8.2 | 8.0 | 7.7 | 7.4 | 7.5 | 7.3 | 7.5 | 8.3 | 8.4 | 8.6 | 9.4 | 10.3 | 9.4 | 9.1 | 9.2 | 9.3 | 9.1 | 8.4 | 7.9 | 7.6 | 7.1 | 6.8 | 7.1 | 7.1 | 7.5 | 7.7 | 8.6 | 9.5 | 10.0 | 10.0 | 9.9 | 8.8 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:52:35 AM CDT Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:53:22 AM CDT

# SHREVEPORT RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click-and-drag to zoom

**SHREVEPORT RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 32.4469
Longitude : -93.8242
Elevation : 254 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 215641 of 262992

Sub Interval Windows

| | Start | End |
|---|---|---|
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.4 | 0.5 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 7.9 |
| 4 - 8 | 1.1 | 1.0 | 0.9 | 0.7 | 0.5 | 0.6 | 0.8 | 1.0 | 1.0 | 1.0 | 0.9 | 1.3 | 1.8 | 1.7 | 1.8 | 1.7 | 1.6 | 1.8 | 1.8 | 1.4 | 1.3 | 1.1 | 0.9 | 0.8 | 0.8 | 0.6 | 0.5 | 0.4 | 0.4 | 0.6 | 0.7 | 0.7 | 0.5 | 0.5 | 0.6 | 0.8 | 35.7 |
| 8 - 13 | 1.5 | 1.4 | 1.4 | 1.2 | 0.9 | 0.8 | 1.1 | 1.1 | 0.9 | 0.9 | 0.8 | 0.8 | 1.0 | 1.5 | 1.9 | 2.1 | 2.3 | 2.7 | 2.9 | 2.2 | 1.7 | 1.3 | 1.0 | 0.9 | 0.8 | 0.5 | 0.4 | 0.4 | 0.7 | 0.9 | 1.0 | 0.9 | 1.0 | 1.1 | 1.2 | 1.3 | 43.6 |
| 13 - 19 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.7 | 1.0 | 1.0 | 0.6 | 0.4 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.2 | 0.3 | 0.4 | 0.5 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 11.2 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 1.4 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.1 | 2.8 | 2.8 | 2.4 | 1.8 | 1.6 | 2.2 | 2.4 | 2.2 | 2.2 | 2.1 | 2.5 | 3.4 | 3.9 | 4.5 | 4.6 | 5.1 | 6.0 | 6.1 | 4.5 | 3.7 | 2.9 | 2.3 | 2.2 | 2.1 | 1.6 | 1.2 | 1.2 | 1.2 | 1.7 | 2.3 | 2.4 | 2.2 | 2.1 | 2.2 | 2.5 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 8.9 | 8.9 | 9.0 | 9.2 | 9.1 | 8.7 | 8.6 | 8.1 | 7.6 | 7.5 | 7.4 | 7.0 | 6.8 | 7.5 | 8.0 | 8.4 | 9.1 | 9.5 | 9.6 | 9.3 | 8.8 | 8.5 | 8.4 | 8.2 | 8.0 | 7.8 | 8.0 | 8.6 | 9.2 | 9.5 | 10.0 | 10.2 | 10.7 | 10.5 | 9.7 | 9.2 | 8.7 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 11:09:32 AM CDT

# FT POLK AAF (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub–Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**
- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

```
FT POLK AAF (LA) - Wind Frequency Table (percentage)
```

| | |
|---|---|
| Latitude : 31.0500<br>Longitude : -93.1833<br>Elevation : 330 ft.<br>Element : Mean Wind Speed | Start Date : Jan. 1, 1987<br>End Date : Dec. 31, 2016<br># of Days : 10958 of 10958<br># obs : poss : 131562 of 262992 |

Sub Interval Windows
Start End
Date Jan. 1 Dec. 31
Hour 0    23

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.7 | 0.5 | 0.7 | 0.8 | 0.7 | 0.6 | 0.7 | 0.6 | 0.5 | 0.7 | 0.5 | 0.5 | 0.7 | 0.6 | 0.8 | 1.1 | 0.9 | 0.8 | 0.8 | 0.5 | 0.5 | 0.5 | 0.3 | 0.3 | 0.3 | 0.3 | 0.2 | 0.3 | 0.2 | 0.2 | 0.3 | 0.2 | 0.3 | 0.5 | 0.7 | 0.7 | 19.9 |
| 4 - 8 | 1.1 | 1.0 | 1.5 | 1.5 | 1.1 | 1.2 | 1.1 | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 | 1.2 | 1.3 | 1.6 | 1.8 | 1.9 | 1.7 | 1.7 | 1.2 | 1.0 | 0.7 | 0.5 | 0.4 | 0.5 | 0.4 | 0.4 | 0.5 | 0.4 | 0.4 | 0.4 | 0.6 | 0.9 | 1.1 | 0.9 | | 35.3 |
| 8 - 13 | 1.3 | 1.1 | 1.4 | 1.3 | 0.9 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.6 | 0.7 | 1.0 | 1.4 | 1.6 | 1.8 | 2.3 | 2.4 | 2.3 | 1.3 | 1.0 | 0.6 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.7 | 1.0 | 1.2 | 1.1 | | 33.6 |
| 13 - 19 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.3 | 0.5 | 0.7 | 0.6 | 0.5 | 0.2 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.2 | 6.1 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.3 | 2.9 | 3.8 | 3.7 | 2.8 | 2.6 | 2.5 | 2.0 | 2.0 | 2.3 | 2.2 | 2.3 | 3.0 | 3.5 | 4.4 | 5.2 | 5.9 | 5.5 | 5.4 | 3.3 | 2.6 | 1.9 | 1.3 | 1.0 | 1.1 | 1.0 | 0.8 | 1.1 | 1.1 | 1.1 | 1.5 | 1.4 | 1.8 | 2.7 | 3.3 | 3.0 | 95.6 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 4.4 |
| Ave Speed | 7.5 | 7.5 | 7.1 | 6.8 | 6.5 | 6.3 | 6.0 | 5.8 | 6.0 | 5.9 | 6.3 | 6.6 | 6.7 | 7.3 | 7.4 | 7.7 | 8.3 | 8.5 | 8.2 | 7.7 | 7.3 | 6.4 | 6.4 | 6.3 | 6.0 | 6.1 | 6.4 | 6.4 | 7.4 | 8.3 | 8.4 | 9.0 | 8.5 | 7.8 | 7.3 | 7.3 | 7.0 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/6/2018 10:53:44 AM CDT

# LAFAYETTE RGNL AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



**Wind Speed (mph)**

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click and drag to zoom

**LAFAYETTE RGNL AP (LA) - Wind Frequency Table (percentage)**

Latitude : 30.2050
Longitude : -91.9875
Elevation : 38 ft.
Element : Mean Wind Speed

Start Date : Jan. 1, 1987
End Date : Dec. 31, 2016
# of Days : 10958 of 10958
# obs : poss : 191015 of 262992

Sub Interval Windows

| | Start | End |
|---|---|---|
| Date | Jan. 1 | Dec. 31 |
| Hour | 0 | 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.2 | 0.2 | 0.3 | 0.4 | 0.6 | 0.6 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 0.3 | 0.3 | 0.3 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 11.1 |
| 4 - 8 | 0.9 | 1.2 | 1.4 | 1.4 | 1.7 | 1.6 | 1.6 | 1.2 | 1.1 | 1.1 | 1.2 | 1.2 | 1.2 | 1.1 | 1.1 | 1.2 | 1.4 | 1.6 | 1.4 | 1.3 | 1.3 | 1.1 | 0.9 | 0.8 | 0.7 | 0.6 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 | 37.1 |
| 8 - 13 | 1.5 | 2.1 | 2.3 | 1.7 | 1.4 | 1.2 | 1.0 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.9 | 0.9 | 1.2 | 1.6 | 2.2 | 2.1 | 2.0 | 1.4 | 1.0 | 0.9 | 0.8 | 0.7 | 0.5 | 0.5 | 0.4 | 0.4 | 0.4 | 0.5 | 0.5 | 0.7 | 0.8 | 0.9 | 1.0 | 38.0 |
| 13 - 19 | 0.6 | 0.9 | 0.9 | 0.6 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.6 | 1.0 | 1.1 | 0.9 | 0.5 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.3 | 0.3 | 0.4 | 0.4 | 0.4 | 11.8 |
| 19 - 25 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 1.9 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 3.4 | 4.5 | 5.1 | 4.2 | 4.0 | 3.6 | 3.3 | 2.6 | 2.3 | 2.4 | 2.5 | 2.5 | 2.5 | 2.5 | 2.5 | 3.1 | 4.2 | 5.5 | 5.2 | 4.6 | 3.5 | 2.8 | 2.4 | 2.0 | 1.7 | 1.4 | 1.2 | 1.2 | 1.2 | 1.2 | 1.4 | 1.4 | 1.7 | 2.0 | 2.1 | 2.4 | 100.0 |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 9.9 | 10.1 | 9.8 | 8.8 | 7.7 | 7.3 | 6.9 | 6.7 | 6.6 | 6.6 | 6.6 | 6.8 | 6.9 | 7.3 | 7.7 | 8.3 | 9.0 | 9.9 | 10.2 | 9.8 | 9.0 | 8.4 | 8.4 | 8.3 | 8.0 | 7.7 | 7.6 | 7.5 | 7.4 | 7.9 | 8.2 | 8.9 | 9.5 | 9.8 | 9.8 | 9.9 | 8.5 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 10:20:36 AM CDT

# BATON ROUGE RYAN AP (LA) Wind Rose

Jan. 1, 1987 – Dec. 31, 2016
Sub-Interval: Jan. 1 – Dec. 31, 0 – 23



Wind Speed (mph)

- 1.3 – 4
- 4 – 8
- 8 – 13
- 13 – 19
- 19 – 25
- 25 – 32
- 32 – 39
- 39 – 47
- 47 –

Click-and drag to zoom

BATON ROUGE RYAN AP (LA) - Wind Frequency Table (percentage)

| Latitude : 30.5372 | Start Date : Jan. 1, 1987 | Sub Interval Windows |
|---|---|---|
| Longitude : -91.1469 | End Date : Dec. 31, 2016 | Start End |
| Elevation : 64 ft. | # of Days : 10958 of 10958 | Date Jan. Dec. |
| Element : Mean Wind Speed | # obs : poss : 199505 of 262992 | 1 31 |
|  |  | Hour 0 23 |

(Greater than or equal to initial interval value and Less than ending interval value.)

| Range (mph) | 0 | 10 | 20 | 30 | 40 | 50 | 60 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 | 150 | 160 | 170 | 180 | 190 | 200 | 210 | 220 | 230 | 240 | 250 | 260 | 270 | 280 | 290 | 300 | 310 | 320 | 330 | 340 | 350 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1.3 - 4 | 0.4 | 0.4 | 0.6 | 0.8 | 0.9 | 1.0 | 1.0 | 0.9 | 0.8 | 0.6 | 0.5 | 0.4 | 0.4 | 0.3 | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.2 | 0.3 | 0.2 | 0.3 | 0.3 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 13.3 |
| 4 - 8 | 1.0 | 1.0 | 1.1 | 1.4 | 1.7 | 1.9 | 2.0 | 2.0 | 1.8 | 1.8 | 1.7 | 1.9 | 1.6 | 1.2 | 1.1 | 1.0 | 1.0 | 1.0 | 0.9 | 0.6 | 0.5 | 0.4 | 0.6 | 0.8 | 0.9 | 1.0 | 0.9 | 0.9 | 0.8 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.7 | 0.7 | 39.5 |
| 8 - 13 | 1.0 | 0.8 | 0.7 | 0.8 | 0.9 | 1.0 | 1.1 | 1.1 | 1.1 | 1.2 | 1.5 | 1.8 | 1.7 | 1.3 | 1.2 | 1.2 | 1.4 | 1.6 | 1.5 | 1.3 | 1.0 | 0.8 | 1.1 | 1.2 | 1.0 | 0.8 | 0.8 | 0.8 | 0.8 | 0.7 | 0.7 | 0.7 | 0.8 | 0.8 | 0.8 | 0.8 | 37.5 |
| 13 - 19 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 0.6 | 0.7 | 0.6 | 0.4 | 0.4 | 0.3 | 0.2 | 0.1 | 0.1 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 8.5 |
| 19 - 25 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 |
| 25 - 32 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.1 |
| 32 - 39 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 39 - 47 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 47 - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total(%) | 2.6 | 2.3 | 2.5 | 3.1 | 3.6 | 4.0 | 4.1 | 4.2 | 3.8 | 3.7 | 3.9 | 4.3 | 4.0 | 3.1 | 2.9 | 2.8 | 3.1 | 3.4 | 3.3 | 2.7 | 2.0 | 1.8 | 2.2 | 2.3 | 2.2 | 2.2 | 2.0 | 2.1 | 2.0 | 1.8 | 1.9 | 1.9 | 2.0 | 2.1 | 2.0 | 100.0 | |
| Calm (<1.3) | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 |
| Ave Speed | 7.9 | 7.1 | 6.6 | 6.4 | 6.2 | 6.3 | 6.4 | 6.5 | 6.7 | 7.0 | 7.5 | 7.8 | 8.2 | 8.3 | 8.4 | 8.8 | 9.3 | 9.9 | 10.2 | 10.6 | 10.4 | 10.3 | 9.8 | 8.7 | 8.0 | 7.7 | 7.7 | 7.9 | 7.7 | 7.9 | 7.9 | 8.0 | 8.2 | 8.1 | 8.1 | 8.1 | 7.9 |

Midwestern Regional Climate Center cli-MATE: MRCC Application Tools Environment Generated at: 8/7/2018 7:52:35 AM CDT

# HYSPLIT Models for Texas Monitors

Louisiana Department of Environmental Quality

## Hou.DeerPrk2 C35/235/1001/AFH139FP239 (DRPK)

- EPA site number: 48-201-1039
- State: Texas
- County: Harris
- City: Deer Park
- Address: 4514 1/2 Durant St
- Site coordinates:
  - Latitude: 29° 40' 12.09" North (+29.670025°)
  - Longitude: 95° 07' 42.63" West (-95.128508°)
  - Elevation: 6 m (20 ft)
- 2023 Projection: 4.72 ppb





















NOAA HYSPLIT MODEL
Backward trajectory ending at 1500 UTC 08 Sep 11
GDAS Meteorological Data



NOAA HYSPLIT MODEL
Backward trajectory ending at 1300 UTC 22 Sep 11
GDAS Meteorological Data





# Denton Airport South C56/A163/X157 (DENT)

- EPA site number: 48-121-0034
- State: Texas
- County: Denton
- City: Denton
- Address: Denton Airport South
- Site coordinates:
  - Latitude: 33° 13' 8.65" North (+33.219069°)
  - Longitude: 97° 11' 46.62" West (-97.196284°)
  - Elevation: 183 m (600 ft)
- 2023 Projection: 1.92 ppb



























| Site | State | County | 2009-2013 Avg DV | 2009-2013 Max DV | 2023 Avg DV | 2023 Max DV | 2014-2016 DV | In-State Contribution | | Total Contribution from All Upwind States | Total US 2023 Anthropogenic Contribution | Percent of 2023 Avg DV from Upwind States | Percent of Total US Anthropogenic Ozone from Upwind States | | TX | Canada+Mexico | Offshore | Fire | Initial & Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 220150008 | Louisiana | Bossier | 77.3 | 80 | 63.4 | 65.6 | 65 | 19.29 | | 16.33 | 35.62 | 25.8% | 45.8% | | 11.12 | 0.49 | 1.83 | 0.80 | 20.44 | 3.98 |
| 220170001 | Louisiana | Caddo | 74.7 | 76 | 61.0 | 62.0 | 64 | 14.31 | | 17.73 | 32.04 | 29.1% | 55.3% | | 11.55 | 0.60 | 1.24 | 0.91 | 21.27 | 4.72 |
| 220190002 | Louisiana | Calcasieu | 72.7 | 75 | 66.5 | 68.6 | 68 | 17.02 | | 10.60 | 27.62 | 15.9% | 38.4% | | 5.65 | 0.16 | 7.64 | 7.70 | 21.16 | 2.01 |
| 220190008 | Louisiana | Calcasieu | 67.7 | 69 | 61.7 | 62.8 | N/A | 19.24 | | 8.27 | 27.51 | 13.4% | 30.1% | | 5.08 | 0.19 | 6.12 | 6.29 | 19.66 | 1.72 |
| 220190009 | Louisiana | Calcasieu | 72.0 | 74 | 63.6 | 65.4 | 64 | 8.55 | | 17.59 | 26.14 | 27.7% | 67.3% | | 11.31 | 0.37 | 6.51 | 5.19 | 22.25 | 2.92 |

**Appendix C: International Air Pollution Support Documents**



## Table 8.1  Electricity generating capacity, 2000-15 (MW)

| Energy source | 2000 | 2005 | 2010 | 2015 |
|---|---|---|---|---|
| Natural gas | 4 887 | 16 147 | 19 854 | 21 107 |
| Liquid/gas | 6 984 | 10 330 | 11 787 | 12 107 |
| Liquid fuels, including refinery gas | 11 418 | 7 871 | 9 358 | 10 062 |
| Solid/liquid | 410 | 425 | 428 | 575 |
| Coal | 4 700 | 4 700 | 5 440 | 5 474 |
| Other combustible fuels | 42 | 67 | 47 | 96 |
| **Total combustible fuels** | **28 441** | **39 540** | **46 914** | **49 421** |
| Nuclear | 1 365 | 1 365 | 1 365 | 1 510 |
| Hydro | 9 653 | 10 598 | 11 597 | 12 223 |
| Wind | 17 | 18 | 519 | 3 271 |
| Geothermal | 855 | 960 | 965 | 854 |
| Solar photovoltaics (PV) | 14 | 16 | 29 | 54 |
| **Total capacity** | **40 345** | **52 497** | **61 389** | **67 333** |

Note: Some coal-fired power capacity that previously has been reported as *Solid/liquid* is here moved to the *Coal* category for consistency.

Source: IEA (2016b), *Electricity Information 2016*, www.iea.org/statistics/.

# Electricity generation and energy-related $CO_2$ emissions, 1990-2040



Source: IEA (2016c), *World Energy Outlook, Special Report on Mexico*.

Although Mexico reaches (and even surpasses) its clean energy targets in the New Policies Scenario, reaching the overall GHG mitigation goal will be a challenging endeavour. The lower bound of the pledged target requires GHG emissions in total to be reduced to around 760 Mt in 2030. In the New Policies Scenario, energy-related GHG emissions fall modestly to around 460 Mt in 2030, meaning that emissions from other sectors (such as agriculture or waste) would need to roughly stabilise at the present level if the lower end of the GHG target is to be achieved. The higher end of the pledge would require GHG emissions to drop to around 620 Mt in 2030, an emissions budget that, without additional measures, would already be largely absorbed by the energy sector.

Source: IEA (2016c), *World Energy Outlook, Special Report on Mexico*.

# EXHIBIT C

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R06–OAR–2021–0801, EPA–HQ–OAR–2021–0663; FRL–9338–01–R6]**

**Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma and Texas regarding interstate transport for the 2015 8-hour ozone national ambient air quality standard (NAAQS). This provision requires that each state's SIP contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. The "good neighbor" or "interstate transport" requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. This disapproval, if finalized, will establish a 2-year deadline for the EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless the EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** Written comments must be received on or before April 25, 2022.

**ADDRESSES:** You may send comments, identified as Docket No. EPA–R06–OAR–2021–0801, by any of the following methods: Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments or via email to *fuerst.sherry@epa.gov*. Include Docket ID No. EPA–R06–OAR–2021–0801 in the subject line of the message.

*Instructions:* All comments submitted must include the Docket ID No. for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/*, including any

personal information provided. For detailed instructions on sending comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets*.

**FOR FURTHER INFORMATION CONTACT:** Sherry Fuerst, EPA Region 6 Office, AR–SI, 214–665–6454, *fuerst.sherry@epa.gov*. We encourage the public to submit comments via *https://www.regulations.gov*, as there will be a delay in processing mail and no courier or hand deliveries will be accepted. Please call or email the contact above if you need alternative access to material indexed but not provided in the docket.

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket ID No. EPA–R06–OAR–2021–0801, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.*, on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R06–OAR–2021–0801 contains information specific to Arkansas, Louisiana, Oklahoma, and Texas, including the notice of proposed rulemaking, submittals from the states, and the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).

Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action, including Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, and Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R06–OAR–2021–0801. For additional submission methods, please contact Sherry Fuerst, 214–665–6454, *fuerst.sherry@epa.gov*. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets*. Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. Our Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets*.

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our Federal partners so that we can respond rapidly as conditions change regarding COVID–19.

The index to the dockets for this action, Docket No. EPA–R06–OAR–2021–0801 and EPA–HQ–OAR–2021–0663, are available electronically at *https://www.regulations.gov*. While all documents in the docket are listed in the index, some information may not be publicly available due to docket file size restrictions or content (*e.g.*, CBI).

Throughout this document, "we," "us," and "our" means the EPA.

## Table of Contents

I. Background
  A. Description of Statutory Background
  B. Description of the EPA's 4-Step Interstate Transport Regulatory Process
  C. Background on the EPA's Ozone Transport Modeling Information
  D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS
    1. Selection of Analytic Year
    2. Step 1 of the 4-Step Interstate Transport Framework
    3. Step 2 of the 4-Step Interstate Transport Framework

4. Step 3 of the 4-Step Interstate Transport Framework

5. Step 4 of the 4-Step Interstate Transport Framework

II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

B. EPA Evaluation of the ADEQ SIP Submission

1. Evaluation of Information Provided by ADEQ Regarding Step 1

2. Evaluation of Information Provided by ADEQ Regarding Step 2

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas

4. Evaluation of Information Provided by ADEQ Regarding Step 3

5. Evaluation of Information Provided by ADEQ Regarding Step 4

6. Conclusion

III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

B. EPA Evaluation of the LDEQ SIP Submission

1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana

3. Evaluation of Information Provided by LDEQ Regarding Step 3

4. Evaluation of Information Provided by LDEQ Regarding Step 4

5. Conclusion

IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

B. EPA Evaluation of the ODEQ SIP Submission

1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Oklahoma

3. Evaluation of Information Provided by ODEQ Regarding Step 3

4. Evaluation of Information Provided by ODEQ Regarding Step 4

5. Conclusion

C. Impact on Areas of Indian Country

V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

B. EPA Evaluation of the TCEQ SIP Submission

1. Evaluation of Information Provided by TCEQ Regarding Step 1

i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors

ii. Evaluation of the TCEQ Modeling

2. Evaluation of Information Provided by TCEQ Regarding Step 2

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas

4. Evaluation of Information Provided by TCEQ Regarding Step 3

5. Evaluation of Information Provided by TCEQ Regarding Step 4

6. Conclusion

VI. Proposed Action

VII. Statutory and Executive Order Reviews

# I. Background

## A. Description of Statutory Background

On October 1, 2015, the EPA promulgated a revision to the 2015 8-hour ozone NAAQS (2015 ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "interstate transport" or "good neighbor" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two requirements, often referred to as "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). The EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

## B. Description of the EPA's 4-Step Interstate Transport Regulatory Process

The EPA is using the 4-Step interstate transport framework (or 4-Step framework) described in detail below to evaluate states' SIP submittals addressing the interstate transport provision for the 2015 ozone NAAQS. The EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] and the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] the EPA, working in partnership with states, developed the following 4-Step framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (i.e., nonattainment and/or maintenance receptors); (2) identify states that impact those air quality problems in other (i.e., downwind) states sufficiently such that the states are considered "linked" and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

---

[1] "National Ambient Air Quality Standards for Ozone", Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

[3] See North Carolina v. EPA, 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] See "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals", 76 FR 48208 (Aug. 8, 2011).

[5] See "Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS", 81 FR 74504 (Oct. 26, 2016).

[6] In 2019, the D.C. Circuit Court of Appeals remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). Wisconsin v. EPA, 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in Wisconsin and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in New York v. EPA, 781 F. App'x 4 (D.C. Cir. 2019).

[7] In addition to the CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "NOₓ SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

*C. Background on the EPA's Ozone Transport Modeling Information*

In general, the EPA has performed nationwide air quality modeling to project ozone design values (DVs)[8] which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone DVs for the identified downwind nonattainment and maintenance receptors, the EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

The EPA has released several documents containing projected ozone design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 ozone NAAQS. First, on January 6, 2017, the EPA published a notice of data availability (NODA) in which we requested comment on preliminary interstate ozone transport data including projected ozone DVs and interstate contributions for 2023 using a 2011 base year platform.[9] In the NODA, the EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 NAAQS.[10] On October 27, 2017, we released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[11] On March 27,

2018, we issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 ozone NAAQS at Step 1 of the 4-Step framework.[12] The March 2018 memorandum also included the then newly available contribution modeling data to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS under Step 2 of the 4-Step framework.[13] The EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-Step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-Step interstate transport framework.[14]

Since the release of the modeling data shared in the March 2018 memorandum, the EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state

collaborative project.[15] This collaborative project was a multi-year joint effort by the EPA, MJOs, and states to develop a new, more recent emissions platform for use by the EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that the EPA had used to project ozone DVs and contribution data provided in the 2017 and 2018 memoranda. The EPA used the 2016v1 emissions to project ozone DVs and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, the EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[16] *See* 85 FR 68964, 68981. Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected DVs and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 ozone NAAQS.[17]

Following the Revised CSAPR Update final rule, the EPA made further updates to the 2016 emissions platform to include mobile emissions from the EPA's Motor Vehicle Emission Simulator MOVES3 model[18] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Technical Support Document (TSD) Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform, which is included in Docket ID No. EPA–HQ–OAR–2021–0663. The EPA performed air quality modeling of the 2016v2 emissions using the most recent publicly released version of the Comprehensive Air-quality Model with extensions (CAMx) photochemical modeling, version 7.10.[19] The EPA now proposes to rely on the air quality modeling performed using CAMx, version 7.10, and the newly available 2016v2 emissions platform in evaluating states' submissions with respect to Steps

[8] A design value is a statistic that describes the air quality status of a given location relative to the level of the NAAQS. Design values are typically used to designate and classify nonattainment areas, as well as to assess progress towards meeting the NAAQS. *See https://www.epa.gov/air-trends/air-quality-design-values#report.*

[9] *See* ''Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS)'', 82 FR 1733 (January 6, 2017).

[10] 82 FR at 1735.

[11] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', October 27, 2017, (''October 2017 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/*

*interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] *See* EPA memorandum, ''Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act section 110(a)(2)(D)(i)(I)'', March 27, 2018, (''March 2018 memorandum'') available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/ interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[13] The March 2018 memorandum, however, provided, ''While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the interstate transport provision. Any such determination would be made through notice-and-comment rulemaking.''

[14] *See* EPA memorandums, ''Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', August 31, 2018 (''August 2018 memorandum''), and ''Considerations for Identifying Maintenance Receptors for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards'', October 19, 2018 (''October 2018 memorandum''), available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[15] The results of this modeling, as well as the underlying modeling files, are included in Docket ID No. EPA–HQ–OAR–2021–0663.

[16] *See* 85 FR 68964, 68981 (Oct. 30, 2020).

[17] *See* the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, available in Docket ID No. EPA–HQ–OAR–2021–0663 for this action.

[18] Additional details and documentation related to the MOVES3 model can be found at *https:// www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

[19] Ramboll Environment and Health, January 2021, *www.camx.com.*

1 and 2 of the 4-Step framework and generally referenced within this action as 2016v2 modeling for 2023. By using the updated modeling results, the EPA is using the most current and technically appropriate information for this proposed rulemaking. Sections II–V of this action and the Air Quality Modeling TSD for 2015 ozone NAAQS Transport SIP Proposed Actions, included in Docket ID No. EPA–HQ–OAR–2021–0663 for this proposal, contain additional detail on the EPA's 2016v2 modeling. In this action, the EPA is inviting public comment on this updated 2023 modeling, which uses a 2016v2 emissions platform. Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Sections II–V of this action, we evaluate how the states used air quality modeling information in their submissions.

## D. The EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 Ozone NAAQS

The EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 ozone NAAQS. These policy judgments reflect consistency with relevant case law and past agency practice as reflected in the CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the 1998 NOₓ SIP Call [20] have necessitated the application of a uniform framework of policy judgments in order to ensure an "efficient and equitable" approach. See

*EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, the EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 ozone NAAQS that vary from a nationally uniform framework. The EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, the EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential "flexibilities" as may have been identified or suggested in the past, the EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

The EPA notes that certain concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute agency guidance with respect to transport obligations for the 2015 ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[21] However, the EPA made clear in Attachment A that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which the EPA sought "feedback from interested stakeholders." [22] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches." [23] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, the EPA will review the technical and legal justifications for doing so.

The remainder of this section describes the EPA's proposed framework with respect to analytic year,

definition of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy analysis.

### 1. Selection of Analytic Year

In general, the states and the EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA.]" CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[24] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating downwind air quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). 938 F.3d at 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that the EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for the EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). The EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the interstate transport provision, to assess downwind air quality as expeditiously as practicable and no later than the next applicable

---

[20] *See* 63 FR 57356. The NOₓ SIP Call required 22 eastern states and the District of Columbia to submit state implementation plans (SIPs) that set statewide ozone season NOₓ budgets which would reduce emissions of NOₓ.

[21] March 2018 memorandum, Attachment A.
[22] *Id.* at A–1.
[23] *Id.*

[24] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

attainment date,[25] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 ozone NAAQS is August 3, 2024.[26] The EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 ozone NAAQS.

The EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon the EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, the EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, the EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR at 23074; *see also Wisconsin,* 938 F.3d at 322. Consequently, in this proposal the EPA proposes to use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 ozone NAAQS.

## 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, the EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where the EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under the EPA's 4-Step framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, we proceed to the next step of our 4-Step framework by identifying the upwind state's contribution to those receptors.

The EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. The EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA.*[27]

For the purpose of this proposal, the EPA identifies "nonattainment" receptors as those monitoring sites that are projected to have average DVs in 2023 that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored DVs. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where the EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that the EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[28]

In addition, in this proposal, the EPA defines a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in the CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA,* 795 F.3d 118, 136 (D.C. Cir. 2015).[29] Specifically, the EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future DV at each receptor based on a projection of the maximum measured DV over the relevant period. The EPA interprets the projected maximum future DV to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). The EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum DV gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum DV is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, the EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, the EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average DVs above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official DVs. In addition, those monitoring sites with projected average DVs below the NAAQS, but with projected maximum DVs above the NAAQS are also identified as "maintenance only" receptors, even if they are currently measuring nonattainment based on the most recent official DVs.

## 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, the EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 ozone NAAQS), the upwind state is not "linked" to a downwind air quality problem, and the EPA, therefore, concludes that the state does not significantly contribute to

---

[25] We note that the court in *Maryland* did not have occasion to evaluate circumstances in which the EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the 4-Step interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin,* 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[26] *See* CAA section 181(a); 40 CFR 51.1303; "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards", 83 FR 25776 (June 4, 2018, effective Aug. 3, 2018).

[27] *See North Carolina* v. *EPA,* 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that the EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[28] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina,* 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[29] *See* 76 FR 48208 (August 8, 2011). CSAPR Update and Revised CSAPR Update also used this approach. See 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost of controls as part of a multifactor analysis, to determine what, if any, emissions might be deemed ''significant'' and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I). The EPA is proposing to continue to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 ozone NAAQS (*i.e.,* 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that the EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. For ozone, as the EPA found in the Clean Air Interstate Rule (CAIR), CSAPR, and CSAPR Update, a portion of the nonattainment problem from anthropogenic sources in the U.S. results from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of upwind states. The EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows the EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. *See* 81 FR at 74518. *See also* 86 FR at 23085 (reviewing and explaining rationale from CSAPR); 76 FR at 48237–38 (for selection of 1 percent threshold).

The EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at

Step 2 using the alternative threshold, the EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

### 4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with the EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor analysis of potential emissions controls. The EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where the EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by preparing a multifactor assessment that evaluates additional available control opportunities. While the EPA has not prescribed a particular method for this assessment, the EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no additional emissions controls should be required.[30]

### 5. Step 4 of the 4-Step Interstate Transport Framework

In Step 4, states (or the EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary in Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked in Steps 1 and 2 to rely on an emissions control measure in Step 3 to address its interstate transport obligations, that measure must be included in the state's SIP so that it is permanent and federally enforceable. *See* CAA section 110(a)(2)(D) (''Each such [SIP] shall . . . contain adequate provisions. . . .''). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

## II. Arkansas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of ADEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On October 10, 2019, the Arkansas Division of Environmental Quality (ADEQ) of the Arkansas Department of Energy and Environment made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The ADEQ SIP submission provided an analysis of Arkansas's air emissions impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that the State's air emissions will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind monitors projected to be in nonattainment and/or have maintenance issues in 2023 (Step 1), ADEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA modeling results included with the March 2018 memorandum provide: (1) Projected

---

[30] As examples of general approaches for how such an analysis could be conducted for

sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NO$_X$ SIP Call, 63 FR 57356, 57399–405. *See also* Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, the EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

average DV and maximum DV for the future year 2023 (fy 2023) for ozone monitors projected to be potential nonattainment or maintenance receptors in the 48 contiguous States and (2) the expected contribution of State emissions to the projected ozone concentrations at each ozone monitor.

At Step 2, ADEQ identified those states to which Arkansas contributes emissions and then applied a 1 ppb contribution threshold to determine projected nonattainment and/or maintenance receptors in other states that might be significantly impacted by emissions from Arkansas. ADEQ provided three rationales as a basis to support their decision to rely on a 1 ppb contribution threshold. First, ADEQ cited to the August 2018 memorandum [31] that compares the collective contribution captured by

three different contribution thresholds: 1 Percent of the NAAQS, 1 ppb, and 2 ppb. ADEQ summarized the August 2018 memorandum and concluded that the 1 percent and 1 ppb contribution thresholds are generally comparable. Second, ADEQ referenced an April 2018 memorandum [32] in which the EPA examined the use of a significant impact level (SIL) value of 1 ppb for determining whether a proposed prevention of significant deterioration (PSD) source causes or contributes to a violation of the corresponding 2015 ozone NAAQS. Despite recognizing that a contribution threshold is not the same as a significance level, ADEQ claimed that a contribution threshold and significance level are sufficiently analogous to support the use of a 1 ppb contribution threshold. The final

rationale ADEQ provided was based on the consistency with the reported precision of Federal reference monitors for ozone and the rounding requirements found in 40 CFR part 50, Appendix U, Interpretation of the Primary and Secondary National Ambient Air Quality Standards for Ozone. ADEQ noted that the 1 percent contribution threshold of 0.7 ppb is lower than the manufacturer's reported precision of Federal reference monitors for ozone and that the requirements found in Appendix U truncates monitor values of 0.7 ppb to 0 ppb.

As stated previously, ADEQ identified all potential nonattainment and maintenance receptors for fy 2023 showing a contribution of emissions from Arkansas.[33] These receptors are included in Table AR–1.

TABLE AR–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ARKANSAS BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|
| 260050003, Allegan, MI | 69 | 71.7 | 1.64 |
| 482011039, Harris, TX | 71.8 | 73.5 | 0.99 |
| 480391004, Brazoria, TX | 74 | 74.9 | 0.90 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 0.78 |
| 481210034, Denton, TX | 69.7 | 72 | 0.58 |
| 482011034, Harris, TX | 70.8 | 71.6 | 0.54 |
| 551170006, Sheboygan, WI | 72.8 | 75.1 | 0.51 |
| 550790085, Milwaukee, WI | 71.2 | 73 | 0.40 |
| 482010024, Harris, TX | 70.4 | 72.8 | 0.29 |
| 261630019, Wayne, MI | 69 | 71 | 0.27 |
| 240251001, Harford, MD | 70.9 | 73.3 | 0.17 |
| 90019003, Fairfield, CT | 73 | 75.9 | 0.13 |
| 90013007, Fairfield, CT | 71 | 75 | 0.13 |
| 361030002, Suffolk, NY | 74 | 75.5 | 0.12 |
| 360810124, Queens, NY | 70.2 | 72 | 0.09 |
| 90099002, New Haven, CT | 69.9 | 72.6 | 0.08 |
| 90010017, Fairfield, CT | 68.9 | 71.2 | 0.07 |
| 80590006, Jefferson, CO | 71.3 | 73.7 | 0.03 |
| 80590011, Jefferson, CO | 70.9 | 73.9 | 0.02 |
| 81230009, Weld, CO | 70.2 | 71.4 | 0.02 |
| 80350004, Douglas, CO | 71.1 | 73.2 | 0.01 |

Based on a 1 ppb contribution threshold, ADEQ identified only one fy 2023 projected maintenance receptor, Allegan County, MI, and no fy 2023 projected nonattainment receptors linked to Arkansas. ADEQ also cited other modeling performed by TCEQ and Midwest Ozone Group, which showed

that when different modeling protocols were employed, future year DV projections and contributions could differ considerably. ADEQ therefore elected to consider other evidence regarding its linkage to air quality in Allegan County, MI. Specifically, ADEQ analyzed back trajectory information to

infer that there is no consistent or persistent relationship between elevated ozone days in Allegan County, MI and air traveling through Arkansas. ADEQ assessed wind patterns on elevated ozone days—days with a maximum daily average 8-hour ozone (MDA8) greater than 70.9 ppb in Allegan County,

[31] "Analysis of Contribution Thresholds for Use in Clean Air Act section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards", August 31, 2018, available in Docket ID No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs*.

[32] *See* EPA memorandum from Peter Tsirigotis, Director of the Office of Air Quality planning and

Standards, April 17, 2018, "Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program" ("SILs Guidance" or "April 2018 memorandum"), available at: *https://www.epa.gov/sites/default/files/2018-04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf*.

[33] Table AR–1 lists all sites that the EPA projected to have a fy 2023 average DV or fy 2023 maximum DV greater than 70.9 ppb in our March 2018 memorandum. As Arkansas stated in the SIP

submission, the EPA considers sites matching these criteria to be projected nonattainment areas and projected maintenance areas, respectively. ADEQ ranked these sites by Arkansas's potential contribution, which the EPA determined based on the daily eight-hour average contributions on the top ten concentration days in 2023.

MI. ADEQ used the National Oceanic and Atmospheric Administration (NOAA) HYbrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) [34] model to evaluate wind back trajectories from over a 10-year period (2008–2017).[35] Over the course of the 10-year period, ADEQ identified 95 elevated ozone days (MDA8 > 70.9 ppb) for the Allegan County, MI monitor.[36] Next, ADEQ identified the maximum ozone value within these elevated ozone days.[37] Using HYSPLIT, ADEQ ran 72-hour back trajectories using the hour of the maximum ozone value for each elevated day as the back trajectory start time. To consider the effects of vertical variations in wind flows on transport patterns, ADEQ used the following starting heights above ground level: 100m, 500m, 1000m, and 1500m. ADEQ obtained 40 km grid meteorological data for the back trajectory analysis using Eta Data Assimilation System (EDAS) data.[38] In total, ADEQ ran 152 back trajectories for each mixing height.[39] ADEQ filtered the back trajectories to determine whether further analysis is warranted using two criteria. First, ADEQ filtered out back trajectories that had a starting hour mixing height below the back trajectory start height because ADEQ asserted these air parcels would not have reached ambient air [40] at the Allegan County, MI monitor site. Second, ADEQ filtered out any back trajectory that did not have a path through any portion of Arkansas. After ADEQ applied their filter criteria, 41 out of 608 back trajectories (6.74%) remained from 22 out of the 95 elevated ozone days (23%) examined. Of the 10 years examined, ADEQ also found that air passing through Arkansas only reached Allegan County, MI on four or more days in one year: 2012.[41] For 2012, HYSPLIT analyses indicated 14 Arkansas-Allegan County, MI linked back trajectories for 7 days in total in 2012, whereas for 2011, 2013, 2014, and 2016 the HYSPLIT analyses indicated three, two, zero and one days with Arkansas-Allegan County, MI linked back trajectories, respectively. For the 10 years ADEQ's performed HYSPLITs, ADEQ's HYSPLIT analysis indicated on average 2.2 days per year had trajectories with Arkansas-Allegan County, MI linked back trajectories. ADEQ also noted that these trajectories passed through other states and through Metropolitan Statistical Areas (MSAs) [42] both before and after traversing through Arkansas. Specifically, ADEQ stated that 37 trajectories passed through the Chicago-Naperville-Elgin, IL–IN–WI MSA prior to reaching Allegan County, MI. Based on these results, ADEQ concluded that other states and MSAs were more likely to have influenced ozone concentrations at the Allegan County, MI monitor on the days with back trajectories linked to Arkansas.

In Step 3, ADEQ also considered air quality trends in Allegan County, MI, emission trends in other upwind states, relative contribution from other upwind states, and cost factors. ADEQ presented that ozone DVs in Allegan County, MI fluctuated over the 2008–2017 period with higher concentration occurring from 2012 through 2014 but declining since 2014. ADEQ also mentioned that despite the most recent 2017 DV for the Allegan County monitor continuing to show an exceedance of the 2015 ozone NAAQS, the EPA-projected 2023 ozone average DV at the Allegan County, MI monitor, based on data provided in the March 2018 memorandum, is 69.0 ppb, which would be in attainment of the 2015 ozone NAAQS in 2023.

Next, ADEQ included an evaluation of the relative contribution and the emission trends from the eight states [43] with contributions greater than 1 ppb to the Allegan County, MI receptor. The emission trends evaluation examined ozone precursors, nitrogen oxides ($NO_X$) and volatile organic compounds (VOC), from 2011 to 2017 and the model projected fy 2023 emissions level. ADEQ noted that the two states with the highest contributions to Allegan County, MI—Illinois and Indiana—have both experienced year-over-year decreases in $NO_X$ emissions in excess of 20,000 tons of $NO_X$ reduced per year. Arkansas had also experienced decreases in $NO_X$ emissions each evaluated year and emitted less $NO_X$ than any other of the potentially linked states. In addition, ADEQ referenced the EPA projections showing that most potentially linked states will continue to realize reductions in $NO_X$, as well as VOCs, through 2023. ADEQ confirmed that based on this analysis, the overall general trends of $NO_X$ and VOC emissions are declining from Arkansas and the other linked states. The continuation of trends in the emissions reductions observed, particularly from Illinois and Indiana, are anticipated by ADEQ to result in air quality improvements in Allegan County, MI.

In terms of cost analysis, ADEQ focused only on the cost of $NO_X$ controls at electric generating units (EGUs) in the State because EGUs are the largest source of $NO_X$ emissions that ADEQ regulates. In its analysis, ADEQ found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR and selective noncatalytic reduction, SNCR) at EGUs exceed the EPA's cost thresholds used for the CSAPR and CSAPR Update rules.[44] Based on ADEQ's evaluation of the evidence, ADEQ concluded that no additional controls beyond pre-existing

---

[34] HYbrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT) model is a complete system for computing both simple air parcel trajectories and complex dispersion and deposition simulations. The model is designed to support a wide range of simulations related to the atmospheric transport and dispersion of pollutants and hazardous materials to the Earth's surface.

[35] ADEQ analyzed ten years of HYSPLIT back trajectories to examine potential relationships between elevated ozone days at the Allegan County, MI monitor and emissions from Arkansas. In the SIP submission ADEQ stated their rationale for looking at an extended period of time is to gain a more complete picture of how Arkansas's emissions might contribute to elevated ozone in Allegan County, MI, rather than relying entirely on the EPA's modeling simulation, which is based on a single base year.

[36] *See* the AirNow-Tech website at *https://www.airnowtech.org/*. AirNow-Tech is a website for air quality data management analysis, and decision support used by the Federal, State, Tribal, and local air quality organizations.

[37] If the same maximum eight-hour value occurred multiple times a day, ADEQ evaluated all incidences of the value for that day.

[38] EDAS is an intermittent data assimilation system that uses successive three-hour model forecasts to generate gridded meteorological fields that reflect observations covering the continental United States. EDAS is accessible at *https://ready.arl.noaa.gov/edas40.php*.

[39] Mixing heights (m), defined as the height above ground level of the layer adjacent to the ground over which an emitted or entrained inert non-buoyant tracer will be mixed by turbulence.

[40] Ambient air is the "portion of the atmosphere, external to buildings, to which the general public has access." 40 CFR 50.1(e).

[41] The number of days in a given year and the number of consecutive years is of particular relevance for the ozone NAAQS, which is calculated based the annual fourth-highest daily maximum eight-hour concentration averaged over three consecutive years.

[42] MSA is defined as a geographic region with a high population density at its core and close economic ties throughout the area.

[43] The eight linked states include Illinois, 42%; Indiana, 15%; Michigan, 7%; Missouri, 6%; Texas, 5%; Wisconsin, 4%; Oklahoma, 3% and Arkansas, 4%. The remaining contribution is labeled as "Other". The linkages are based on the EPA's modeling results that are attached to the March 2018 memorandum.

[44] The EPA's Revised CSAPR Update, 86 FR 23054 (April 20, 2021) states ". . . EPA adjusted its representative cost for optimizing existing SNCR control to $1,800 per ton in response to comments received on the proposed rule . . . EPA views $1,600 per ton for optimization of existing SCR control and installation of state-of-the are $NO_X$ combustion controls and $1,800 per ton for optimization of existing SNCRs as comparable for policy purposes." ADEQ's screening analysis using the EPA tools (referencing the EPA's Air Pollution Control Cost Estimation Spreadsheet for SCR) shows that cost-effectiveness values for ozone-season operation of SCR and SNCR are: $12,605–$31,580/ton for SCR and $4,221–$45,581 for SNCR. ADEQ notes that any costs imposed to install controls at the examined EGUs would be passed on to Arkansas ratepayers.

state and Federal regulations were warranted for Arkansas sources to satisfy interstate transport obligations for the 2015 ozone NAAQS.

Based on the determinations made by ADEQ at Steps 1 through 3, ADEQ did not include any new control measures in the SIP submission to reduce ozone precursor emissions as part of a Step 4 analysis.

## B. EPA Evaluation of the ADEQ SIP Submission

The EPA is proposing to find that ADEQ's October 10, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework, and the EPA is therefore proposing to disapprove ADEQ's SIP submission.

### 1. Evaluation of Information Provided by ADEQ Regarding Step 1

At Step 1 of the 4-Step framework, ADEQ relied on the EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. As described in Section I of this action, the EPA has recently performed updated modeling using the 2016v2 platform to evaluate interstate transport of ozone for a fy 2023.[45] The EPA proposes to primarily rely on the EPA's modeling using the 2016v2 platform (EPA 2016v2 modeling), to identify projected nonattainment and maintenance receptors in fy 2023. Updating the base period from 2011 (base period used in data included in the March 2018 memorandum) to a more recent year (2016) allows for better projections of which monitors will have problems attaining and/or maintaining the 2015 ozone NAAQS and factors in more recent base year DVs. The EPA notes that with a switch from 2011 base period meteorology to 2016 base period meteorology, it is normal and expected that the potential downwind nonattainment or maintenance receptors would change due to the different weather patterns that occurred in the different base periods, which impacts both the transport of pollutants from upwind sources and what receptors have

higher monitored values within nonattainment/maintenance regions.[46] Modeling using both the 2011 and 2016 based years consistently project that certain areas will have problems attaining and/or maintaining the 2015 ozone NAAQS including receptors in Texas.

### 2. Evaluation of Information Provided by ADEQ Regarding Step 2

As noted earlier, ADEQ utilized a 1 ppb threshold at Step 2 to identify whether the State was "linked" to a projected downwind nonattainment or maintenance receptor. ADEQ identified linkages for Arkansas to one 2023 projected maintenance receptor, Allegan County, MI, and no 2023 projected nonattainment receptors.

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the state's submittal. Instead, ADEQ cited to the EPA's SILs Guidance as a basis to support the use of a 1 ppb threshold; however, ADEQ did not explain the relevance of the SILs Guidance to ADEQ's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the Clean Air Act regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS. The SILs Guidance is not applicable to

the interstate transport provision, which requires states to eliminate significant contribution or interference with maintenance of the NAAQS at known and ongoing air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold. In any case, both the EPA's most recent modeling, EPA 2016v2 modeling, and the modeling relied on by ADEQ in its SIP submittal, indicate that the State is projected to contribute greater than both the 1 percent and alternative 1 ppb thresholds. While the EPA does not, in this action, propose to approve of the State's application of the 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, (as shown in Table AR–2) the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could

---

[45] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[46] We note that ADEQ identified additional modeling performed by TCEQ and Midwest Ozone Group, but simply concluded that different modeling can lead to differences in DV projections and ozone contributions of these two alternative modeling analyses, only TCEQ's modeling using a 2012 base year identified receptors in Texas that projected different DVs for the Texas receptors identified in the EPA's 2011 base year. We discuss the EPA's review of the TCEQ's modeling elsewhere in this action and the Technical Support Document for this action "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801), but we do conclude that TCEQ and recent monitoring data indicate that there are problematic receptors that are expected to be either nonattainment or maintenance receptors in 2023 including the Texas receptors that the EPA identified in our March 2018 memorandum with Arkansas linkages.

support approval.[47] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[48] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant

equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[49] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. Accord 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018

memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

ADEQ included information in its SIP submission regarding back trajectories, emissions trends, and EGU cost controls to conclude that emissions from Arkansas should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a persistent and consistent pattern of contribution from the State. While it is not entirely clear whether ADEQ was analyzing these factors under Step 2 or Step 3, the EPA is evaluating such arguments under Step 3, as we view these statements in the SIP submission to speak to whether or not a contribution is "significant" once a linkage is established.

### 3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Arkansas

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023 (EPA 2016v2 modeling). This data was examined to determine if Arkansas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table AR–2, the data[50] indicate that in 2023, emissions from Arkansas contribute greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas: Denton County (Monitor ID. 481210034), Brazoria County (Monitor ID. 480391004), Harris County (Monitor ID. 482010055, Monitor ID. 482011034,

---

[47] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[48] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[49] See August 2018 memorandum, at page 4.

[50] Design values and contributions at individual monitoring sites nationwide are provided in the file: 2016v2_DVs_state_contributions.xlsx which is included in docket ID No. EPA–HQ–OAR–2021–0663.

and Monitor ID. 482011035).[51][52] Therefore, based on the EPA's evaluation of the information submitted by ADEQ, and based on the EPA model 2016v2 results for 2023, the EPA proposes to find that Arkansas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE AR–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH ARKANSAS LINKAGES IN 2023 BASED ON EPA 2016V2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Arkansas contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 70.4 | 72.2 | 0.76 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 1.39 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 1.00 |
| 482011034, Harris, TX | Maintenance | 70.3 | 71.6 | 1.38 |
| 482011035, Harris, TX | Maintenance | 68.0 | 71.6 | 1.34 |

We recognize that the results of the EPA modeling released in the March 2018 memorandum (2011 base year) and the EPA 2016v2 modeling (2016 base year) identified different receptors and linkages at Steps 1 and 2 of the 4-Step framework. These differing results about receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would struggle with nonattainment or maintenance in the future, and (2) that Arkansas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Arkansas was linked to different receptors in one modeling run versus another). We think this common result indicates that Arkansas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of Arkansas's emissions should be deemed "significant." In doing so, we are not considering our own earlier modeling results included in EPA's March 2018 memorandum to be of equal reliability relative to more recent EPA 2016v2 modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in EPA 2016v2 modeling, that information provides further evidence, not less, in support of a conclusion that the state is required to proceed to Step 3 to further evaluate its emissions.

4. Evaluation of Information Provided by ADEQ Regarding Step 3

At Step 3 of the 4-Step framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

ADEQ included in their SIP submission a further analysis of its modeled linkage to Allegan, MI (the only linked receptor it analyzed, based on its application of a 1 ppb threshold). Arkansas stated that the purpose and its conclusion of this analysis was that it would not contribute significantly to the Allegan, MI monitor because the state's emissions did not result in a consistent and persistent pattern of ozone contribution. As stated earlier, EPA 2016v2 modeling projects that the Allegan County, MI receptor will be attaining and is not expected to have difficulty maintaining the standard in 2023. As such, the EPA is not relying on the comparative analysis of emissions trends that ADEQ provided in order to conclude that Arkansas's emissions do not contribute significantly to a nonattainment or maintenance problem in Allegan, MI. We note however, that ADEQ's SIP submission and response to comments do not clearly define what ADEQ considers to be persistent and consistent pattern of contribution. Rather, the SIP submission simply states that contribution should be deemed "significant" only if there is a persistent and consistent pattern of several days with elevated ozone.

To be clear, the modeling establishing linkages of Arkansas to downwind nonattainment and maintenance receptors already establishes that there is a consistent and persistent pattern of contribution on elevated ozone days from Arkansas to other states. That is because EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor [53] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels (ten days is preferred with a minimum of five days). The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to

[51] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Arkansas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in docket EPA–HQ–OAR–2021–0663.

[52] Allegan County Monitor ID. 260050003 is not a receptor in 2023 in the EPA 2016v2 modeling. 2023 avg DV is 67.3 ppb and 2023 Max. DV is 68.4 ppb, so the Allegan County monitor is not a receptor in 2023 for nonattainment or maintenance.

[53] The relative response factor (RRF) is a ratio developed using the modeled changes between the base case and future case for high ozone modeled days. Typically, the 10 highest MDA8 modeled days in the base case are found and the maximum value from the 3x3 grid centered on the monitor for each day is used to calculate a 10-day average base case

modeled value. Then a similar concentration average is developed for same 10 base case days and the same grid cell that provided the base case concentration to calculate a future year 10-day average modeled value using the future year modeling results. The RRF is then calculated by using this future year 10-day average model value divided by the base case year 10-day average model value to develop a ratio representing the change in modeled ozone. The RRF is then multiplied times the base DV value to result in a projected future year DV.

estimate impacts on the days with highest projected ozone levels. The EPA's approach, as detailed in the Air Quality Modeling Technical Support Document for 2015 Ozone NAAQS Transport SIP Proposed Actions included in Docket ID No. EPA–HQ–OAR–2021–0663, does this by estimating the average fy 2023 impact from an upwind state on the days with the highest projected ozone levels at the downwind nonattainment or maintenance receptor. The days chosen to analyze the future impacts are chosen initially by the selecting the ten highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not ten days above 65 ppb at a potential receptor, the number of days above 65 ppb are used as long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in fy 2023 are not calculated. The base and future year modeling for these five to ten days is then used to project fy 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For the same five to ten days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the five to ten days to result in the average contribution from the upwind area.

As mentioned previously, ADEQ used HYSPLIT back trajectories to assess wind patterns on elevated ozone days in an attempt to demonstrate that there is not persistent and consistent pattern of contribution from Arkansas to the Allegan County, MI receptor. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentration at the end point monitor. The horizontal and vertical areas that potentially contribute to the end point concentration grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT

centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model "linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. Chemical transport models, such as the one relied upon by Arkansas to establish the linkage between Arkansas and those downwind receptors in the first instance, do take these factors into account and therefore provide a more robust assessment of ozone contribution.

During ADEQ's public comment period, the EPA submitted comments noting concerns regarding the methodology ADEQ used in their HYSPLIT back trajectories analysis.[54] While we are not providing a detailed evaluation of ADEQ's HYSPLIT analysis in this rulemaking, we do note that our review identified a number of concerns with how ADEQ screened out a number of back trajectories, which invalidates ADEQ's conclusions.[55] While we disagree with ADEQ's methodologies and conclusions, we note that ADEQ's

HYSPLIT back trajectory information did not show that the base years used in the EPA modeling (2011 and 2016) demonstrated an unusual amount of transport of air parcels from Arkansas to nonattainment or maintenance receptors in downwind states (*i.e.,* the modeling years used by the EPA do not skew the results toward finding linkages).[56] Therefore, although Arkansas asserted that its additional air quality factor analysis using back trajectory analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone," the modeled linkage at Step 2 is a superior approach for assessing the persistence of a state's contribution. It is superior because it is based on the average of the contributions on the five to ten highest ozone days. Considering the form of the standard, this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard. The modeling is also a better method because it accounts for dispersion while back trajectory analysis as performed by Arkansas only shows the centerline of air parcel travel and otherwise will leave out days when Arkansas would have contributed to downwind problems. Finally, because the modeling accounts for dispersion and chemical reactions, it can provide a quantitative estimate of contribution.

ADEQ also contested the significance of its modeled contribution above 1 ppb based on the relatively larger contributions of other upwind states to the receptor to which it was linked. The EPA disagrees that a state's small contribution relative to other upwind states is a permissible basis for finding no obligation under the interstate transport provision. CAA 110(a)(2)(D)(i)(I) requires states and the EPA to address interstate transport of air pollution that *contributes to* downwind states' ability to attain and maintain the NAAQS. Whether emissions from other states also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve

---

[54] The EPA reviewed the ADEQ SIP submission and provided comments during the State's public comment period for the proposed SIP action. The EPA's comment letter and ADEQ's response to comments are included in ADEQ's October 19, 2019, SIP submission, which is available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[55] Concerns included removing of HYSPLIT back trajectories based on start height, the start time that Arkansas used for the back trajectories and removing of back trajectories when the centerline passed near but not through Arkansas because Arkansas has some very large point sources near the Arkansas state line that could be contributing. Texas also screened their HYPSLIT back trajectories similarly to Arkansas and we have further discussed our concerns and why such screening invalidates conclusions from the HYSPLIT back trajectory analyses. *See* EPA's review and conclusions in discussion of TCEQ's HYSPLIT analyses in the "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[56] ADEQ's summary of trajectories indicated that 2011 had three linked back trajectories and 2016 had one linked back trajectories and the EPA calculated the average for 2008–2017 in ADEQ's table was 2.2 linked back trajectories per year.

downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own "significant contribution" or "interference" with the ability of other states to attain or maintain the NAAQS. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3d 303 at 323–324. The court viewed these arguments as essentially an argument "that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d 303 at 324. The court explained that "an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* At 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (D.C. Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County.*"). Therefore, a state is not excused from eliminating its significant contribution on the basis that emissions from other states also contribute some amount of pollution to the same receptors to which the state is linked.

ADEQ did not provide additional analysis for other receptors to which it was linked above 1 percent in the air quality modeling upon which it relied, and to which it continues to be linked in EPA 2016v2 modeling. To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general

approach (*i.e.,* Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. As discussed below, ADEQ did not conduct an adequate analysis in their SIP submission. We therefore propose that ADEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Arkansas failed to adequately do so.

In analyzing potential additional $NO_X$ controls, ADEQ found that additional controls on its EGUs would exceed the cost-effectiveness thresholds identified in the CSAPR and CSAPR Update rules. For the cost analysis, Arkansas only focused on the potential costs of $NO_X$ controls for EGUs. As stated above, Arkansas found that the costs to install additional $NO_X$ controls (selective catalytic reduction, SCR, and selective noncatalytic reduction, SNCR) at electric generating units (EGUs) exceed EPA's cost thresholds used for the CSAPR and CSAPR Update rules. Based on the projected cost of these controls relative to the thresholds used in those two prior EPA rules, Arkansas concluded that no new controls beyond those Federal and State regulations already in existence were cost-effective, especially considering that Allegan County, MI is projected to be in attainment with the 2015 ozone NAAQS

and Arkansas's small contribution relative to other states potentially linked to Allegan County, MI based on EPA's modeling.

Arkansas's analysis is inadequate because its focus is only on EGUs.[57] *See Wisconsin,* 938 F.3d at 318–20. We also find Arkansas's conclusions as to the availability of cost-effective controls for EGUs to be inadequate. Relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the potential air quality impacts of those reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. ADEQ's submission failed to provide a justification for why the $1400/ton threshold used in the CSAPR Update is appropriate to rely on for the 2015 ozone NAAQS. ADEQ's analysis does not consider any air quality impacts of assessed controls at downwind receptors. As stated above, assessing cost-effectiveness in the context of ozone transport requires more than just assessing the cost of controls per ton of $NO_X$ removed. As such, ADEQ's assessment of the cost of controls and reliance on the marginal cost threshold of $1,400/ton used for the CSAPR Update is inadequate. Furthermore, EPA 2016v2 modeling captures all existing CSAPR trading programs in the baseline and confirms that these control programs were not sufficient to eliminate Arkansas's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

---

[57] In 2017, National Emission Inventory (NEI) $NO_X$ emissions from EGU sources represent 56% percent of the total $NO_X$ emissions categories in Arkansas that report emissions to the NEI. *See* AR NOx.xlsx datasheet included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

5. Evaluation of Information Provided by ADEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for the development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. ADEQ's SIP submission, which looked only at additional $NO_X$ controls at EGUs and dismissed such controls as not cost-effective relative to the thresholds established in earlier EPA transport rules, did not constitute an adequate emission reduction analysis at Step 3. Based on its conclusions, ADEQ did not revise its SIP to include any emission reductions. As a result, the EPA proposes to disapprove ADEQ's submittal on the separate, additional basis that Arkansas has not developed or included permanent and enforceable emissions reductions in its SIP necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

6. Conclusion

Based on the EPA's evaluation of ADEQ's SIP submission, the EPA is proposing to find that ADEQ's October 19, 2019, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

## III. Louisiana SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

*A. Summary of LDEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS*

On November 13, 2019, the Louisiana Department of Environmental Quality

(LDEQ) made a SIP submission addressing the State of Louisiana's interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided LDEQ's analysis of Louisiana's impact to downwind states and concluded that emissions from Louisiana will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

The LDEQ's SIP submission provided an analysis of Louisiana's air emissions impact to downwind states using a 3-Step alternative framework similar to the EPA's 4-Step framework. LDEQ's 3-Step alternative framework includes: Step 1: Identify monitors projected to be in nonattainment or have maintenance issues in a future year; Step 2: Identify projected nonattainment and/or maintenance monitors in other states that might be impacted by emissions from Louisiana, tagging them for further review; and, Step 3: Determine if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at the monitors tagged for review in Step 2. LDEQ noted that its Step 1 is identical to the EPA's Step 1, and its Steps 2 and 3 are equivalent to the EPA's Step 2. Louisiana further noted that Steps 3 and 4 of the EPA's 4-Step framework are relevant only if emissions from Louisiana contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state.

LDEQ's Step 1 was to identify downwind monitors projected to be in nonattainment and/or have maintenance issues in future year 2023 (fy 2023). At this step, LDEQ relied on the EPA's interstate transport modeling results that are included as an attachment to the March 2018 memorandum. The EPA March 2018 modeling results provided: (1) Projected average DV and maximum DV for 2023 for the ozone monitors (or "receptors") in the 48 contiguous states and (2) the expected contribution of

state emissions to the projected ozone concentrations at each ozone monitor.

LDEQ used a contribution threshold of 1 ppb in LDEQ's Step 2 to identify projected nonattainment and/or maintenance receptors in other states that might be impacted by emissions from Louisiana and tagged them for further review. To support a 1 ppb contribution threshold, LDEQ's submission stated that a 1 percent threshold is inappropriate because that value is not detectable by a monitor and the value of 1 percent of the 2015 ozone NAAQS would be truncated to zero if calculated in accordance with the method for determining DVs for the ozone NAAQS. LDEQ also stated that the more stringent threshold of 1 percent of the NAAQS (0.7 ppb) is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.[58] Based on LDEQ's approach of evaluating linkages at the 1 ppb threshold, five Texas receptors were identified by Louisiana for analysis. The Texas receptors and corresponding receptor data presented in Louisiana's SIP are summarized further in this notice in Table LA–1.[59] The March 2018 memorandum identified monitors in Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin as potential nonattainment and maintenance-only receptors linked to emissions from Louisiana based on 1 percent of the NAAQS threshold. However, Louisiana did not include the Allegan, Michigan and Milwaukee and Sheboygan, Wisconsin receptors in the State's analysis because the March 2018 memorandum shows that Louisiana's projected modeled contribution values to each receptor is less than 1 ppb.

TABLE LA–1—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY LOUISIANA BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 Average DV (ppb) [60] | 2023 Maximum DV (ppb) [61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 480391004, Brazoria, TX | 74.0 | 74.9 | 3.80 |

[58] The Louisiana SIP submittal did not provide a specific citation to the Simon et al., 2012 reference to support this assertion. However, we believe the reference is associated with the following article: Simon, H., Baker, K.R., Phillips, S., 2012. "Compilation and interpretation of photochemical model performance statistics published between

2006 and 2012". Atmospheric Environment 61, 124–139.

[59] The five potential nonattainment and maintenance receptor monitors identified by LDEQ are from the Dallas-Fort Worth and Houston-Galveston-Brazoria, TX nonattainment areas for the

2015 ozone NAAQS. The Louisiana SIP submittal appears to have inadvertently omitted Harris County, TX Monitor ID No. 482011034 for analysis. EPA's March 2018 memorandum identified this monitor as a maintenance receptor with a contribution of 3.38 ppb from Louisiana emissions.

Table LA–1—Projected Nonattainment and Maintenance Receptors Identified by Louisiana Based on the EPA's March 2018 Memorandum—Continued

| Receptor (site ID, county, state) | 2023 Average DV (ppb) [60] | 2023 Maximum DV (ppb) [61] | Louisiana Contribution (ppb) |
|---|---|---|---|
| 482011039, Harris, TX | 71.8 | 73.5 | 4.72 |
| 484392003, Tarrant, TX | 72.5 | 74.8 | 1.71 |
| 481210034, Denton, TX | 69.7 | 72.0 | 1.92 |
| 482010024, Harris, TX | 70.4 | 72.8 | 4.72 |

For LDEQ's Step 3, Louisiana stated that an air emission contribution from the State should only be considered significant if there is a persistent and consistent pattern of contribution on several days with elevated ozone. In trying to determine whether there is a persistent and consistent pattern of contribution, LDEQ analyzed seasonal weather patterns, surface wind directions, and periodic back trajectories. LDEQ used the National Oceanic and Atmospheric Administration (NOAA) Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) [62] model to perform 99 back trajectories for exceedances from the receptor monitors identified in Table LA–1 for 2016, 2017, and 2018. Based on an analysis of the HYSPLIT results, LDEQ stated that approximately 28% of the trajectories travel in or through Louisiana, and only 8% of those back trajectories originate in the State. The SIP submission also stated that a comparison of the EPA's modeled contribution between Texas and Louisiana monitors indicates that a far greater proportion of the total ozone detected in Louisiana originates in Texas rather than vice versa. Therefore, Louisiana concluded that the impact from the State's air emissions was insignificant to the overall attainment at the receptor monitors identified in Table LA–1 and does not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

*B. EPA Evaluation of the LDEQ SIP Submission*

The EPA is proposing to find that LDEQ's November 13, 2019, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework, and the EPA is therefore proposing to disapprove Louisiana's SIP submission.

1. Evaluation of Information Provided by LDEQ Regarding Steps 1 and 2

At Step 1 of the 4-Step interstate transport framework, LDEQ relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023. At Step 2 of the 4-Step interstate transport framework, LDEQ relied on the EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023. LDEQ additionally utilized a 1 ppb threshold at Step 2 to identify whether the state was "linked" to a projected downwind nonattainment or maintenance receptor. As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. In any case, the State is projected to contribute greater than both the 1 percent and the alternative 1 ppb thresholds to receptors in Texas, regardless of whether we look at LDEQ's analysis (which relied on the EPA's older modeling) or updated modeling the EPA has performed in advance of this proposal. As seen in the tables LA–1 and LA–2, Louisiana contributes nearly five times the 1 ppb threshold to nonattainment or maintenance receptors in Texas. Therefore, while the EPA does not, in this action, approve of the State's application of a 1 ppb threshold, because the State has linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework would not alter our review and proposed disapproval of this SIP submittal.

The EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[63] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[64] The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be

---

[60] Information added from the EPA's March 2018 memorandum.

[61] *Id.*

[62] *See* FN 34.

[63] *See* August 2018 memorandum, at page 4.

[64] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The Agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[65] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is not a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (e.g., roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[66] in the EPA's updated modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. Accord 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not at this time rescinding the August 2018 memorandum. The basis for a proposed disapproval of LDEQ's SIP submission with respect to the Step 2 analysis we believe is warranted under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on public comments received and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

2. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Louisiana

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project DVs and contributions for 2023.[67] This data was examined to determine if Louisiana contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table LA–2, the data [68] indicate that in 2023, emissions from Louisiana contributed greater than 1 percent of the standards to nonattainment or maintenance-only receptors in Texas.[69] Therefore, based on the EPA's evaluation of the information submitted by LDEQ, and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Louisiana is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016V2 MODELING

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 482010024, Harris, TX | Nonattainment | 75.2 | 76.8 | 4.31 |
| 482010055, Harris, TX | Nonattainment | 71.0 | 72.0 | 5.39 |
| 480391004, Brazoria, TX | Maintenance | 70.1 | 72.3 | 7.03 |

[65] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. See CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[66] See August 2018 memorandum, at page 4.

[67] Per the instructions in the Supplementary Information section above, all public comments, including comments on the EPA's air quality

modeling should be submitted in the Regional docket for this action, Docket ID No. EPA–R06–OAR–2021–0801. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

[68] DVs and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[69] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform, which became available

to the public in the fall of 2020 in the Revised CSAPR Update, as noted in Section I of this action. That modeling showed that Louisiana had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR–2021–0663.

TABLE LA–2—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH LOUISIANA LINKAGES BASED ON EPA 2016v2 MODELING—Continued

| Receptor (site ID, county, state) | Nonattainment/ maintenance | 2023 Average DV (ppb) | 2023 Maximum DV (ppb) | Louisiana Contribution (ppb) |
|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 70.4 | 72.2 | 3.22 |
| 482011034, Harris, TX | Maintenance | 70.3 | 71.6 | 4.93 |
| 482011035, Harris, TX | Maintenance | 68.0 | 71.6 | 4.77 |

3. Evaluation of Information Provided by LDEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete an analysis similar to the EPA's (or an alternative approach to defining "significance" that comports with CAA requirements) to determine whether, and to what degree, emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment, or interfere with maintenance of" the NAAQS in any other state. LDEQ did not conduct such

an analysis in their SIP submission. Instead LDEQ interpreted the Act's requirements as only requiring an analysis of emission reductions where there was a "consistent and persistent" pattern of contribution and conducted an air-quality-only analysis in order to refute such a pattern. We propose to find that LDEQ was required to analyze emissions from the sources and other emissions activity from within Louisiana to determine whether its contributions were significant, and we propose to disapprove its submission because LDEQ did not do so.

As noted, LDEQ stated in its SIP submission that emissions from Louisiana should not be considered to contribute significantly to nonattainment or interfere with maintenance of the NAAQS in other states because there is not a "persistent and consistent" pattern of contribution from the State. The SIP submission does not explain what LDEQ considers to be a persistent and consistent pattern of contribution, even after the LDEQ received a comment during its state comment period that requested that the LDEQ define "persistent and consistent" in terms of impacts on downwind states. The LDEQ responded, "Louisiana has defined the pattern and has provided back trajectories on those monitored exceedances for the 2016–2018 ozone seasons, which will show that the definition is applicable to the conclusion." [70] We do not agree that this suffices as an explanation as to why LDEQ does not need to further analyze its potential emission reductions under Step 3 before determining it has no statutory obligation under the interstate transport provision. In the case of Louisiana, modeling in the March 2018 memorandum and the EPA's more recent 2016v2 modeling both project that receptors in the Houston-Galveston-Brazoria (HGB) and Dallas-Fort Worth (DFW) ozone nonattainment areas in Texas will have difficulty attaining or maintaining the 2015 ozone NAAQS, and Louisiana's contribution to these

areas exceed both a 1 percent or a 1 ppb threshold. While linkages to specific receptors may change with updated modeling, both modeling analyses consistently show emissions from Louisiana impact both downwind nonattainment receptors and downwind maintenance receptors in Texas.

The LDEQ SIP submission stated that Louisiana's contribution should be deemed "significant" per CAA section 110(a)(2)(D)(i)(I) only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. LDEQ asserted that its linkages to Texas do not warrant further analysis because, according to LDEQ, emissions from Louisiana do not persistently and consistently contribute on several days of elevated ozone. However, the EPA modeling that LDEQ relied upon to demonstrate linkages in the first instance already establishes that there is a consistent and persistent pattern of contribution from Louisiana to Texas receptors on elevated ozone days. The EPA's methodology for projecting future year ozone concentrations accounts for precisely these concerns—the relative response factor [71] that is applied to historic monitored data to generate projections is calculated by looking only at days with elevated ozone levels. The EPA notes that monitored attainment with the ozone standard is determined by averaging the fourth high value recorded each year for three years. So, the EPA believes it is important to estimate impacts on the days with highest projected ozone levels. The days chosen to analyze the future impacts are chosen initially by the selecting the 10 highest days in the base period modeling that are projected to be above 65 ppb in the base period. If there are not 10 days above 65 ppb at a potential receptor, the number of days above 65 ppb are used so long as there is at least five days above 65 ppb in the base period. If the air quality modeling shows fewer than five days above 65 ppb in the base period, then the data for impacts at that receptor in 2023 are not calculated. The base and future year modeling for these

[70] See LDEQ SIP Submission, Appendix A, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[71] See FN 53.

5–10 days are then used to project 2023 ozone DVs to determine whether it is projected to be a nonattainment or maintenance receptor in 2023. For these same 5–10 days identified, the future year modeling provides the estimated daily contribution at a potential receptor's future year daily MDA8 and these daily contributions are averaged for the 5–10 days to result in the average contribution from the upwind area.

LDEQ's air quality analysis used to dismiss its linkages to Texas receptors as not ''significant'' consists of an evaluation of seasonal weather patterns, surface wind directions, and periodic back trajectories. The State's weather pattern analysis relied on large-scale weather patterns as they relate to commonly observed wind directions rather than weather patterns and conditions that are specifically conducive to ozone formation or tied to specific days when high ozone was monitored in the downwind areas. General weather pattern discussions that are not associated with specific ozone episodes are not generally informative of interstate transport decisions. It is necessary to investigate specific instances of high ozone, because as discussed previously, violations of the ozone standard can be driven by as few as 4 days per year because the compliance with the standard is evaluated based on the average of the fourth high value measured each of three consecutive years.

LDEQ's wind rose analysis is based on surface sites in the Dallas-Fort Worth areas, Houston-Galveston-Brazoria areas, and other areas in Texas and Louisiana, but the analysis does not address transport winds between Louisiana and the Texas areas with receptors on high ozone days at the identified receptors. There are several limitations associated with LDEQ's wind rose analysis: (1) Wind directions measured at the surface are not necessarily good indicators of the wind direction occurring at higher elevations, which tend to have a stronger influence on interstate ozone transport; (2) wind directions change spatially over the range of distance involved in transport from Louisiana to Texas; (3) wind directions change temporally over the range of time involved in ozone transport from Louisiana to Texas; and (4) the wind roses are based on wind data measured throughout the year, not just during either ozone season or monitored ozone episode days. In addition, as discussed previously, LDEQ's wind rose analysis is not limited to the wind conditions that are conducive to high ozone, so it does not

provide information directly pertinent to when ozone is high at areas in Texas and whether Louisiana is a contributing area during those specific times.

LDEQ also included 99 back trajectory analyses during the 2016, 2017, and 2018 years for the dates of ozone exceedances at the monitors referenced in Table LA–1 of this action. HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas for those areas to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model ''linkages.'' Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. LDEQ's HYSPLIT back trajectory analysis for 2016, 2017, and 2018 showed that on high ozone days in Texas at the receptors identified by the EPA in the 2018 memorandum that 28% of the trajectories passed through Louisiana. LDEQ proffered that some of these back trajectories did not pass directly over areas with emissions but did not consider that the back trajectories only represent a centerline and there are areas on either side of the centerline that would be contributing areas. LDEQ's trajectory analysis

confirmed that Louisiana is an upwind area for the receptors in Texas often enough to potentially contribute to nonattainment or interfere with maintenance. The analysis did not provide evidence that was contrary to the conclusions of the EPA's photochemical modeling analyses (i.e., the EPA's modeling results in the March 2018 memorandum and EPA 2016v2 model).

Photochemical modeling simulations for ozone interstate transport assessment is relied upon by the EPA to simulate the formation and fate of oxidant precursors, primary and secondary particulate matter concentrations, and deposition over regional and urban spatial scales. Photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. For the 2015 ozone NAAQS interstate transport analysis, the EPA performed nationwide, state-level ozone source apportionment modeling using CAMx to quantify the contribution of $NO_X$ and VOC emissions from all sources in each state to project 2023 ozone concentrations at ozone monitoring sites. Detailed information for the EPA's modeling may be found in the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663.

LDEQ concluded in the SIP submittal, citing an article[72] published in 2012, that the use of 1 percent of the standard for modeled contribution as the sole definition of significant contribution is inappropriate for the 2015 ozone NAAQS. LDEQ's reasoning for this conclusion is that the more stringent 0.7 ppb threshold ''is an order of magnitude smaller than the biases and errors typically documented for regional photochemical modeling.'' First, the EPA does not use the 1 percent threshold as the sole definition of significant contribution; at Step 2 of the analysis, the 1 percent threshold is used to identify contributions between states and downwind problem areas for further analysis at Step 3. Second, photochemical transport models such as CAMx have been extensively peer reviewed and used to support SIPs and explore relationships between inputs and air quality impacts in the U.S. and beyond. The EPA works to continually develop and update both the guidelines

---

[72] Simon et al., *supra* FN 58.

on using modeling results and the latest versions of photochemical model platforms to support scientific assessments and regulatory determinations. Prior to using photochemical modeling to support a regulatory assessment, a model performance evaluation is completed to establish a benchmark to assess how accurately the model predicts observed concentrations and to identify model limitations. The model performance evaluation provides a better understanding of the model's limitations and biases and serves as a diagnostic evaluation for further model development and improvement. As discussed in Section I of this document and the Air Quality Modeling TSD in Docket No. EPA–HQ–OAR–2021–0663, the EPA follows the most recent established modeling guidance and provides with this action the updated modeling analysis based on the recent CAMx model update. By using the most recent 2016v2 photochemical modeling enhancements (EPA 2016v2 modeling) results are more representative of the projected local and regional air quality as it is based on more recent emission estimates with fewer years between the base case year (2016) and the future year (2023). In addition, to reduce the impact of any potential biases or errors, the EPA uses the modeling results in a relative sense rather than rely on absolute model predictions.[73]

Furthermore, it is not appropriate to compare the bias/error involved in the estimation of total ozone to the potential error in the estimation of the subset of ozone that is contributed by a single state. For example, on a specific day the modeled vs. monitored ozone value may differ by 2 ppb but that is relatively small percentage of the total modeled ozone, which for a receptor of interest would be on the order of 70 ppb. It would be unrealistic to assign all the 2 ppb, in the above example, to the estimated impact from a single state as the 2 ppb error would be the combination of the error from all sources of ozone that contribute to the total, including estimated impacts from other states, the home state of the receptor and natural background emissions.

In sum, the EPA disagrees that the estimates of potential error in the models estimates of total ozone, call into question the use of 1 percent as a threshold for linkage. As noted earlier, in the case of Louisiana, the difference between a 1 percent threshold and a 1 ppb threshold is irrelevant to the decision here because linkages are present at both threshold levels. As to Louisiana's conclusion that the impacts from Louisiana's emissions are not persistent, the contribution analysis is the average impact for at least 5 days and up to 10 days for the 2016 base period which is sufficiently persistent considering the first through fourth highest monitored values set the monitored DV.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results means that the modeling or the EPA or the state's methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Louisiana is linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., Louisiana was linked to a different set of receptors in one modeling run versus another). These results indicates that Louisiana's emissions were substantial enough to generate linkages at Steps 1 and 2 to at least some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

4. Evaluation of Information Provided by LDEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, LDEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at

Step 4. To the extent that LDEQ discussed emissions reductions, the State only provided a summary of existing already implemented enforceable control regulations. The EPA's 2016v2 modeling analyses have already accounted for the implementation of the regulations cited by LDEQ's submission—including the CSAPR rulemakings and prior regional rulemakings—and even with those reductions in place, the modeling results consistently show receptors that are projected to be in nonattainment or to struggle with maintenance, and Louisiana contributing to those receptors. Relying only on the existing enforceable control regulations is insufficient to address the Louisiana air emission contributions to linked downwind air quality problems. As a result, the EPA proposes to disapprove LDEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(D)(i)(I).

5. Conclusion

Based on the EPA's evaluation of LDEQ's SIP submission, the EPA is proposing to find that LDEQ's November 13, 2019, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

## IV. Oklahoma SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

### A. Summary of ODEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

On October 25, 2018, the Oklahoma Department of Environmental Quality (ODEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided ODEQ's analysis of their impact to downwind states using the EPA's 4-Step framework and an analytic year of 2023 and concluded that emissions from Oklahoma will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

To identify downwind air quality problems that are linked to emissions

---

[73] See "Modeling Guidance for Demonstrating Air Quality Goals for Ozone, PM$_{2.5}$ and Regional Haze", Nov. 29, 2018, at 101, available at *https://www.epa.gov/sites/default/files/2020-10/documents/o3-pm-rh-modeling_guidance-2018.pdf* ("2018 Air Quality Modeling Guidance"). *See also* "Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM$_{2.5}$, and Regional Haze", Dec. 3, 2014, at 97–98, available at *https://www.epa.gov/sites/default/files/2020-10/documents/draft-o3-pm-rh-modeling_guidance-2014.pdf* ("2014 Draft Air Quality Modeling Guidance").

from Oklahoma and therefore warrant further review and analysis (Steps 1 and 2), ODEQ used EPA interstate transport modeling results found in the March 2018 memorandum. The EPA modeling results projected: (1) An average DV and a maximum DV for the year 2023 for ozone monitors in the 48 contiguous States and (2) the expected contribution from emissions in each state to the ozone concentrations at each ozone monitor.

ODEQ used the information from the March 2018 EPA memorandum to

identify six downwind nonattainment and maintenance receptors [74] with a contribution from Oklahoma of 1 percent of the 2015 ozone NAAQS (0.70 parts ppb) or greater. ODEQ then applied a 1 ppb threshold to remove from further analysis three receptors with a contribution from Oklahoma of less than 1 ppb. ODEQ noted that the possibility of using an alternative contribution threshold was one of the areas of flexibility identified in the March 2018 EPA memorandum and discussed further in the August 2018

EPA memorandum. To support its alternative contribution threshold, ODEQ referenced an EPA memorandum from April 17, 2018, which recommended a Significant Impact Level (SIL) for ozone of 1.0 ppb for proposed sources subject to the Prevention of Significant Deterioration (PSD) permitting program.[75] Table OK–1 provides information on the six nonattainment and maintenance receptors identified by ODEQ, including the three receptors ODEQ identified for further analysis.

TABLE OK–1—NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY ODEQ BASED ON THE EPA'S MARCH 2018 MEMORANDUM

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) | ODEQ's step 1 and 2 determination |
|---|---|---|---|---|
| 260050003, Allegan, MI .................................. | 69.0 | 71.7 | 1.31 | Maintenance receptor identified for further analysis. |
| 481210034, Denton, TX .................................. | 69.7 | 72.0 | 1.23 | Maintenance receptor identified for further analysis. |
| 484392003, Tarrant, TX .................................. | 72.5 | 74.8 | 1.71 | Nonattainment receptor identified for further analysis. |
| 480391004, Brazoria, TX ................................ | 74.0 | 74.9 | 0.90 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 550790085, Milwaukee, WI ............................. | 71.2 | 73.0 | 0.76 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |
| 551170006, Sheboygan, WI ............................ | 72.8 | 75.1 | 0.95 | Nonattainment receptor with contribution less than 1 ppb; no further analysis. |

ODEQ further evaluated the two Texas receptors (Tarrant County and Denton County) and the receptor in Allegan County, MI. ODEQ did not further evaluate the contribution from Oklahoma to the receptors in Brazoria County, TX, Milwaukee County, WI, and Sheboygan County, WI because the contributions from Oklahoma to these receptors were less than 1 ppb.

For the two remaining Texas receptors, ODEQ returned to Steps 1 and 2 of the 4-Step interstate transport framework using modeling performed by the Texas Commission on Environmental Quality (TCEQ). The TCEQ modeling results are included in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801). ODEQ stated that the primary difference between the EPA modeling and the TCEQ modeling is that the TCEQ modeling used 2012 as the "base year" for assessing interstate transport

of ozone pollution in 2023 whereas the EPA modeling used 2011 as the base year for that assessment. In addition, the ODEQ stated that TCEQ used a method different from the EPA's method to identify whether a monitor would have trouble maintaining the 2015 ozone NAAQS (*i.e.,* a maintenance receptor). To identify maintenance receptors, TCEQ calculated a "maintenance future year (fy) DV" by projecting to 2023 the most recent regulatory DV that contains the base year (*i.e.,* the 2012–2014 DV for a base year of 2012), whereas the EPA's methodology for identifying maintenance receptors uses the maximum DV, which is the highest monitored DV from among the three DVs that contain the base year (*i.e.,* the 2009–2011, 2010–2012 and 2011–2013 DVs for a base year of 2011).

To assess whether Oklahoma is linked to nonattainment of the 2015 ozone standard at the Denton and Tarrant

County sites, ODEQ switched to using the 2023 average DV projected by TCEQ rather than the EPA's projected average DVs. The ODEQ noted that the projected 2023 average DV was 68 ppb for the Denton County site and 66 ppb for the Tarrant County site based on the TCEQ modeling. ODEQ then claimed that these results demonstrate that both of these sites are in attainment in 2023.

To assess whether Oklahoma interferes with maintenance of the 2015 ozone standard at these two sites, ODEQ used (1) the Texas method to calculate a "maintenance future year DV" for 2023 and (2) a maximum DV calculated using the highest of the three base year DVs multiplied by a relative response factor derived from TCEQ's modeling (*i.e.,* EPA's method for identifying maintenance receptors but using TCEQ's modeling rather than EPA's modeling). This assessment is summarized in Table OK–2.

---

[74] Nonattainment receptors are monitoring sites that are anticipated to have problems attaining and maintaining the 2015 ozone NAAQS (*i.e.,* average

projected 2023 DV greater than 70.9 ppb). Maintenance receptors are monitoring sites that are anticipated to have problems maintaining the 2015

ozone NAAQS (*i.e.,* maximum projected 2023 DV greater than 70.9 ppb).

[75] See FN 32.

TABLE OK–2—SUMMARY OF TCEQ MODELING (2012 BASE PERIOD) USED BY ODEQ TO ASSESS MAINTENANCE RECEPTORS

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maximum DV (ppb) (EPA method)* | Maintenance DV (ppb)(TCEQ method) | ODEQ's step 1 and step 2 determination |
|---|---|---|---|---|
| 481210034 Denton, TX ................................. | 68 | 70.7 | 65.9 | Future DVs project no attainment or maintenance problems. |
| 484392003 Tarrant, TX ................................. | 66 | 69.9 | 62.4 | Future DVs project no attainment or maintenance problems. |

\* These values are not based on calculations made by the EPA. ODEQ calculated these values by using the maximum DV for the 2010–2014 5-year period (*i.e.,* the highest of the DVs in 2012, 2013, and 2014) multiplied by relative response factor for the receptor obtained from TCEQ's modeling.

ODEQ noted in their assessment that based on the TCEQ modeling and TCEQ definition of maintenance receptor, it is expected that the Denton and Tarrant sites will not experience nonattainment or maintenance problems in 2023. Because ODEQ claimed that the Denton and Tarrant County sites will not be nonattainment or maintenance receptors in 2023, ODEQ did not analyze potential emissions reductions at Step 3 to address its contribution to these two sites.

With respect to the remaining receptor at Allegan County, MI, ODEQ provided an analysis of projected 2023 DVs for this site and information on emissions trends in Oklahoma to assert that emissions from Oklahoma do not significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at the Allegan County, MI site.

ODEQ noted that (1) the DV for the Allegan County, MI site has had a substantial reduction in the last 6 years from 84 ppb in 2012 to 73 ppb in 2017, a 1.8 ppb per year decrease, on average and (2) the Allegan County, MI site is substantially influenced by mobile sources from the Chicago area and these emissions are expected to be greatly reduced in the near future, by roughly a 1 ppb per year decrease, leading to attainment of the 2015 ozone standard. The ODEQ then calculated a projected 2023 maintenance DV for the Allegan County, MI site using the EPA's method, but assuming that the base year was 2016 rather than 2011, as in the EPA's modeling or 2012 as in the TCEQ modeling. The ODEQ noted that the maximum DV in the 2016-centered base period (*i.e.,* 2014–2016, 2015–2017, and 2016–2018) was 75 ppb at the Allegan County, Michigan site. The ODEQ then calculated the difference between the 2011-centered base period maximum DV of 86 ppb and the 2023 projected maximum DV of 71.7 ppb, using data from the EPA's modeling. The ODEQ calculated a ''ppb per year'' reduction of 1.1917 ppb per year, based on the 14.3

ppb difference between the 2011-centered and 2023 maximum DVs over the 12 years from 2011 to 2023. Finally, ODEQ applied the 1.1917 ppb per year value to the 2016-centered maximum DV of 75 ppb to estimate a 2023 maximum DV of 66.66 ppb.

ODEQ also asserted that the relatively small contribution from Oklahoma (3% of total upwind state contributions) combined with the distance between Oklahoma sources and the Allegan County, Michigan site, warrants a focus on nearby states with greater proportional contributions as the most prudent approach to addressing interstate transport of ozone precursors for this receptor.

The ODEQ also provided the anthropogenic $NO_X$ and VOC data of Oklahoma's emissions from EPA's emission trends and modeling to demonstrate an anticipated substantial reduction of $NO_X$ and VOC from 2011 to 2023: (1) Reductions of $NO_X$ from 405,000 to 235,000 tons per year and (2) reductions of VOC from 414,000 to 295,000 tons per year.[76] ODEQ noted these reductions should result in considerable reductions in ozone concentrations. The ODEQ stated that due to the emissions reductions required by rules like CSAPR, the 2016 CSAPR Update, and the regional haze requirements, the $NO_X$ emissions from electric generation in Oklahoma have dropped significantly during the ozone season from 38,285 tons per year in 2011 to 10,435 tons per year in 2017. ODEQ also stated that changes in the Southwest Power Pool[77], building of

additional windfarms, and electric utilities installing solar generation facilities have led to Oklahoma $NO_X$ emissions reductions; and that any additional $NO_X$ reductions from the electric generation section would require more costly emissions controls. ODEQ concluded that the existing controls in Oklahoma have resulted in significant decreases in ozone DVs in Oklahoma and that additional controls would not be cost-effective. Given their conclusions, ODEQ did not adopt additional controls to reduce ozone precursor emissions (Step 4).

### B. EPA Evaluation of the ODEQ SIP Submission

The EPA is proposing to find that ODEQ's October 25, 2018, SIP submission does not demonstrate that the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state based on the EPA's evaluation of the SIP submission using the 4-Step interstate transport framework have been met. The EPA is therefore proposing to disapprove ODEQ's submission.

### 1. Evaluation of Information Provided by ODEQ Regarding Steps 1 and 2

As noted earlier, ODEQ first used the information from the EPA's March 2018 memorandum to identify nonattainment and maintenance receptors with a contribution from Oklahoma of 0.70 ppb or greater (*i.e.,* ODEQ identified receptors that would be deemed nonattainment and maintenance receptors under the EPA's methodology for Steps 1 and 2). ODEQ then utilized a 1 ppb threshold and elected not to further analyze any receptors to which it did not contribute greater than 1 ppb.

---

[76] ODEQ used the EPA's emissions data shared alongside the October 2018 memorandum, ''state-sector_annual_emissions_data_1.xlsx'' available at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[77] The Southwest Power Pool is a regional electric transmission organization regulated by the Federal Energy Regulatory Commission whose purpose is promoting efficiency and reliability in the operation and planning of the electric transmission grid and ensuring non-discrimination in the provision of electric transmission services. It manages electric

transmission in portions of fourteen states: Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Montana, Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas and Wyoming. *See* 18 CFR 35.34 and *https://www.ferc.gov/electric-power-markets.*

ODEQ provided further evaluation of the State's emissions to those receptors to which Oklahoma contributes greater than 1 ppb (*i.e.,* Allegan County, MI, Denton County, TX and Tarrant County, TX).

As discussed in the EPA's August 2018 memorandum, with appropriate additional analysis it may be reasonable for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold, at Step 2 of the 4-Step interstate transport framework, for the purposes of identifying linkages to downwind receptors. However, the EPA's August 2018 memorandum provided that whether or not a 1 ppb threshold is appropriate must be based on an evaluation of state-specific circumstances, and no such evaluation was included in the ODEQ's submittal. Instead, ODEQ's SIP submission justified the State's use of a 1 ppb threshold based on the threshold's use in the SILs Guidance.[78] ODEQ did not explain the relevance of the SILs Guidance to Oklahoma's statutory obligation under the interstate transport provision. The SILs Guidance relates to a different provision of the CAA regarding implementation of the prevention of significant deterioration (PSD) permitting program, *i.e.,* a program that applies in areas that have been designated attainment of the NAAQS, and it is not applicable to the interstate transport provision, which requires states to eliminate emissions that contribute significantly or interfere with maintenance of the NAAQS at known, ongoing, or projected air quality problem areas in other states. The EPA does not, in this action, agree that the State has justified its application of the 1 ppb threshold.

Additionally, the EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2. (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, the EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 interstate transport SIP submittals

for the 2015 ozone NAAQS, the EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide the EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, the EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[79] It was at the EPA's sole discretion to perform this analysis in support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 ozone NAAQS.

Furthermore, the EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 ozone NAAQS raises substantial policy consistency and practical implementation concerns.[80] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of interstate transport obligations based solely on the strength of a state's SIP submittal at Step 2 of the 4-Step interstate transport framework. From the perspective of ensuring effective regional

implementation of interstate transport obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. The EPA recognized in the August 2018 memorandum that there was some similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, the EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly seven percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[81] in EPA 2016v2 modeling, the amount lost is five percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference of the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of

---

[79] "Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard", 85 FR 12232 (March 2, 2020). The agency received adverse comments on this proposed approval and has not taken final action with respect to this proposal.

[80] We note that Congress has placed on the EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[81] *See* August 2018 memorandum, at page 4.

fully addressing interstate transport. *Accord* 76 FR 48237–38.

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, the EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, the EPA is not, at this time, rescinding the August 2018 memorandum. The basis for the EPA's proposed disapproval of ADEQ's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. The EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. (See Supplementary Information section above for details and docket to submit comments). Depending on public comments received in relation to this action and further evaluation of this issue, the EPA may determine to rescind the 2018 memorandum in the future.

In any case, as discussed in the following subsection, based on the EPA's most recent modeling, the State is projected to contribute greater than both the one percent and alternative 1 ppb thresholds at the Denton County, TX receptor, (Monitor ID. 481210034). Based on the EPA's modeling results included in the March 2018 memorandum, Oklahoma was also projected to contribute 1.23 ppb to the Denton County, TX receptor. (In the EPA 2016v2 modeling the Allegan County, MI and Tarrant County, TX receptors are not projected to have problems attaining or maintaining the 2015 ozone NAAQS. Even under ODEQ's own analysis, the State was linked to receptors with contributions exceeding 1 ppb. Therefore, based on Oklahoma's linkages greater than 1 ppb to projected downwind nonattainment or maintenance receptors, the State's use of this alternative threshold at Step 2 of the 4-Step interstate framework is inconsequential to our proposed action on the state's SIP.

In the remainder of this section, EPA evaluates ODEQ's conclusions that emissions from Oklahoma do not contribute to nonattainment or interfere with maintenance at receptors in Tarrant County, TX (Monitor ID. 484392003) and Denton County, TX (Monitor ID. 481210034). We evaluate ODEQ's conclusions as to the Allegan, MI (Monitor ID. 260050003) in Section IV.B.3 of this action.

With regard to the Denton County and Tarrant County, TX receptors cited in ODEQ's submission, ODEQ chose to rely on the TCEQ's modeling and methodology, instead of the EPA modeling, and trends in ozone DVs and emissions to conclude that these monitoring sites will be in attainment by 2023 and will not have a problem maintaining the 2015 ozone NAAQS. As noted in Section IV.A of this action, ODEQ used modeling results from the TCEQ along with the TCEQ alternative method for identifying maintenance receptors to claim that using the TCEQ modeling and methods, the Denton County and Tarrant County monitors would not have a problem maintaining the NAAQS in 2023. The ODEQ supplemented that analysis by citing the downward trend in $NO_X$ and VOC emissions in Oklahoma. ODEQ also provided TCEQ modeling and emissions data for the Dallas-Fort Worth nonattainment area to show that mobile sources represent the largest emissions category in this area and that emissions from this sector have declined since 2005 and are expected to continue to decline in the future. As described in Table OK–2, ODEQ (1) provided the average 2023 DV for the Denton County, TX receptor from the TCEQ modeling and (2) used TCEQ modeling data with a 2012 base year to calculate a 2023 maintenance DV of 65.9 ppb (using the TCEQ methodology for identifying maintenance receptors) and a 2023 maximum DV of 70.7 ppb (using the EPA methodology for identifying maintenance receptors, combined with TCEQ's modeling results). ODEQ relied on this information, which is based on TCEQ modeling with a 2012 base year, to conclude that the Denton County, TX and Tarrant County, TX monitors would not have problems attaining and maintaining the 2015 ozone NAAQS.

ODEQ's SIP submission (or TCEQ, to the extent that Oklahoma is merely incorporating and relying on Texas' submission) does not adequately explain or justify how relying on TCEQ's method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. EPA proposes to find that ODEQ has provided no sound technical basis (either on its own or through reliance on Texas) for how its chosen methodology gives meaning to the CAA's instruction that states submit interstate transport SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase ''interfere with maintenance'' in the interstate transport provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year, but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did not adequately protect ''[a]reas that find themselves barely meeting attainment.'' *Id.* at 910. Consequently, the EPA has developed a methodology, used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

In order to explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality.

The EPA's air quality modeling guidance has long recommended developing a base DV (*i.e.,* the DV that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[82] The average of these three DVs is then multiplied by a relative response factor [83] to generate an average DV for the future year.[84] If a receptor's average

---

[82] *See* FN 73.

[83] *See* FN 53.

[84] While it is not critical to this discussion, for purposes of explanation, the relative response factor is a fractional change that represents how ozone at a given receptor responds to changes in emissions when all other variables are constant. For more explanation of the RRF, please see 2018 Air Quality Modeling Guidance or 2014 Draft Air Quality Modeling Guidance.

future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average DV (e.g., in the 2011 example, if 2009–2011 had the highest DV of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest DV to generate a projected future maximum DV. Where a receptor's maximum DV exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of variable conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year DV to project a receptor's average DV in the future year. For maintenance receptors, however, TCEQ elected not to examine variability in DVs over a five-year period by using the highest DV of the three DVs making up the base year DV. Instead, TCEQ (and by extension, ODEQ), used only the most recent DV of the three DVs, regardless of whether the most recent DV was highest or lowest. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [85] TCEQ in its submission does not explain why or how this methodology identifies those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS, given meteorological variability. In fact, because TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions, Texas' methodology appears to be aimed at *limiting* receptors which could be identified as maintenance receptors, compared to the EPA's methodology, which was designed to identify those

areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions.

As discussed further in the EPA Region 6 TSD [86] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year center weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (i.e., 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many

receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment method as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. Further, it is unreasonable to have a method that would not identify nonattainment receptors also as maintenance receptors.

Again, EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. Neither TCEQ nor ODEQ addressed in their SIP submissions whether the three years that comprise the most recent DV (i.e., 2012, 2013, and 2014) had meteorological conditions conducive for formation of high ozone concentrations. On the other hand, the EPA methodology can identify variations in ozone levels that might result in difficulty in maintaining the standard over a longer period of time. The TCEQ method will only identify areas that have difficulty maintaining the standard for a single design value period and, as a result, does not address the meteorological variability issue sufficiently.

In its SIP submittal, ODEQ contended that, based on TCEQ's use of a 2012 base year, and using TCEQ's air quality modeling, even if Texas had used the EPA's method of identifying maintenance receptors, the projected maximum DV for the Denton County and Tarrant County receptors would be 70.7 ppb and 69.9 ppb, respectively, which are considered to be in attainment of the 2015 ozone NAAQS in 2023. However, this conclusion relied upon a relative response factor derived from the TCEQ modeling and TCEQ's modeling results, which are discussed in more detail in Section V of this action and in the EPA Region 6 TSD.[87] TCEQ's modeled projections for 2023 including nonattainment and maintenance values (using either TCEQ' or EPA's methodology) are much lower than recent monitored values (2018–2020 DV and preliminary 2019–2021 DVs) [88] for

---

[85] TCEQ submission at 3–39 to 3–40, available in the Regional docket for this action (Docket ID No. EPA–R06–OAR–2021–0801).

[86] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket No. EPA–R06–OAR–2021–0801.

[87] Id.

[88] Monitoring data from the EPA's Air Quality System (AQS) (https://www.epa.gov/aqs). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at
Continued

many monitors and the amount of further DV reductions needed to match TCEQ's modeling is more than is reasonably expected to occur for many monitors/receptors. This underestimation of future DVs results in mis-identifying these two receptors and other receptors as not being nonattainment or maintenance receptors. Specifically, these two receptors would need to have at least a 3–4 ppb decrease in the next 2–3 years just to attain the 2015 Ozone NAAQS in 2023. As discussed in the EPA Region 6 TSD, TCEQ's previous DFW Attainment Demonstration SIP includes long-term DV trends analysis that indicates that DFW DVs decrease approximately 1 ppb per year.[89] Moreover, as discussed in Section IV.B.2 of this action, the EPA's updated modeling, which relies upon more recent data and the latest information on emissions reductions, indicates that the maximum design value in 2023 for the Denton County receptor is 72.2 ppb. Recent monitored air quality data at the Denton receptor are consistent with the EPA's projections that this is an area that will struggle to maintain the 2015 ozone NAAQS in 2023; the 2020 DV for Denton was 72 ppb.[90]

Finally, in its submittal, ODEQ pointed to the significant reductions in emissions that have occurred in the State, but the EPA believes these reductions have already been accounted for in the most recent modeling; therefore, even with these reductions, the Denton County, TX receptor is projected to struggle with maintenance of the 2015 ozone NAAQS in 2023.

2. Results of the EPA's Step 1 and Step 2 Modeling Analysis and Findings for Oklahoma

As described in Section I of this action, the EPA performed air quality modeling using the 2016v2 platform to project DVs and contributions for 2023.

This data was examined to determine if Oklahoma contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table OK–3, the most recent modeling data [91] indicate that in 2023, emissions from Oklahoma contribute greater than one percent of the standard to maintenance-only receptors in Denton County, TX and in Cook County, IL. Oklahoma is not linked to any nonattainment receptors in EPA's most recent modeling (EPA 2016v2 modeling). Therefore, based on the EPA's evaluation of the information submitted by ODEQ and based on the EPA's most recent modeling results for 2023, the EPA proposes to find that Oklahoma is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

TABLE OK–3—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH OKLAHOMA LINKAGES IN 2023 BASED ON EPA 2016V2 MODELING

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2020 DV | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Oklahoma contribution (ppb) |
|---|---|---|---|---|---|
| 481210034, Denton, TX | Maintenance | 72 | 70.4 | 72.2 | 1.19 |
| 170310032, Cook, IL | Maintenance | 74 | 69.8 | 72.4 | 0.75 |

3. Evaluation of Information Provided by ODEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions contribute significantly to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this general approach (i.e., Step 3 of the 4-Step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. at 519. While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. ODEQ did not conduct such an analysis in their SIP submission.

As noted earlier, ODEQ provided some data on emissions and already implemented emissions reductions for sources in Oklahoma and stated that the 2016 CSAPR Update is the only reasonable control warranted based on Oklahoma's limited contributions to the Michigan and Texas receptors. Thus, Oklahoma relied on its EGUs being subject to the CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1400/ton (2011$) for the 2008 ozone NAAQS) to argue that it had already implemented all cost-effective emissions reductions, and had no additional statutory

---

[89] EPA also analyzed trends using AQS data, See EPA Region 6 TSD.

the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

[90] DVs and contributions at individual monitoring sites nationwide are provide in the file: "2016v2_DVs_state_contributions.xlsx" which is included in Docket ID No. EPA–HQ–OAR–2021–0663.

[91] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted above. That modeling showed that Oklahoma had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in "Ozone DVs And Contributions Revised CSAPR Update.xlsx" in Docket ID No. EPA–HQ–OAR–2021–0663.

obligation to prohibit emissions under CAA section 110(a)(2)(D)(i)(I) with respect to the 2015 ozone NAAQS.

The EPA disagrees with ODEQ's conclusions for the following reasons: First, the CSAPR Update did not regulate non-electric generating units, and thus this analysis is incomplete. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem, the total emissions reductions available at several cost thresholds, and the air quality impacts of the reductions at downwind receptors. While the EPA has not established a benchmark cost-effectiveness value for 2015 ozone NAAQS interstate transport obligations, because the 2015 ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ton for the CSAPR Update (which addresses the 2008 ozone NAAQS and is in 2011$) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 ozone NAAQS.

In addition, the most recent EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate Oklahoma's linkage at Steps 1 and 2 under the 2015 ozone NAAQS. The State was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

Finally, relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on FIP measures to meet SIP requirements. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions . . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in the SIP).

In addition, ODEQ's submission included a weight of evidence evaluation of its contribution to the Allegan County, MI receptor to

conclude that it does not contribute significantly to nonattainment or maintenance at the receptor.

The EPA disagrees with respect to ODEQ's assertion regarding the relatively small contribution of emissions from Oklahoma to the Allegan County, MI receptor compared to emissions from other upwind states such as Illinois. Whether emissions from other states or countries also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is contributing significantly to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

Further, the court in *Wisconsin* explained that downwind jurisdictions often may need to heavily rely on emissions reductions from upwind states in order to achieve attainment of the NAAQS, 938 F.3d at 316–17; such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached by the relevant deadline, *Maryland,* 958 F.3d at 1204. Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from interstate transport obligations on the basis that some other sources of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. 938 F.3dat 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind state 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." 938 F.3d at 324. The court explained that "an upwind state can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.*at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss.*

*Comm'n on Envtl. Quality* v. *EPA,*790 F.3d 138, 163 n. 12 (D.C. Cir. 2015) (observing that the argument the "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County*.")). Therefore, a state is not excused from eliminating its significant contribution on the basis that other upwind states also contribute some amount of pollution to the same receptors to which the state is linked.

As explained in Section IV.A of this action, ODEQ's weight of evidence also concluded that the Allegan receptor would be attaining the NAAQS in 2023 based on an analysis that assumed a projection of a linear reduction in DVs across a 12-year period (2011 to projected 2023 values), and then applied that annual reduction (1.1917 ppb/year) to the receptor's 2016-centered base period maximum DV (75 ppb). The EPA does not necessarily agree that the assumptions made in Oklahoma's weight-of-evidence analysis are reasonable; however, because the updated modeling also shows that Allegan County, MI is no longer a receptor in 2023, we propose to find such assumptions are inconsequential to our action on Oklahoma's SIP.

We recognize that the results of the EPA (2011 and 2016 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs all indicated: (1) That there are receptors that would struggle with nonattainment or maintenance in the future; and (2) that Oklahoma was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* Oklahoma was linked to a different set of receptors in one modeling run versus another). These results indicate that emissions from Oklahoma are substantial enough to generate linkages at Steps 1 and 2 to at least some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

We therefore propose that ODEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine

whether its contributions were significant. Because ODEQ failed to perform this analysis, we propose to disapprove its submission.

4. Evaluation of Information Provided by ODEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. As mentioned previously, ODEQ's SIP submission did not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required), thus, no information was provided at Step 4. As a result, EPA proposes to disapprove ODEQ's submittal on the separate, additional basis that the State has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

5. Conclusion

Based on the EPA's evaluation of ODEQ's SIP submission, the EPA is proposing to find that the portion of ODEQ's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions which will interfere with maintenance of the 2015 ozone NAAQS in any other state.

C. Impact on Areas of Indian Country

Following the U.S. Supreme Court decision in *McGirt* v *Oklahoma,* 140 S Ct. 2452 (2020), the Governor of the State of Oklahoma requested approval under Section 10211(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act of 2005: A Legacy for Users, Public Law 109–59, 119 Stat. 1144, 1937 (August 10, 2005) ("SAFETEA"), to administer in certain areas of Indian country (as defined at 18 U.S.C. 1151) the State's environmental regulatory programs that were previously approved by the EPA for areas outside of Indian country. The State's request excluded certain areas of Indian country further described below. In addition, the State only sought approval to the extent that such approval is necessary to administer a program in light of *Oklahoma Dept. of Environmental*

*Quality* v. *EPA,* 740 F.3d 185 (D.C. Cir. 2014).[92]

On October 1, 2020, the EPA approved Oklahoma's SAFETEA request to administer all of the State's EPA-approved environmental regulatory programs, including the Oklahoma SIP, in the requested areas of Indian country. As requested by Oklahoma, the EPA's approval under SAFETEA does not include Indian country lands, including rights-of-way running through the same, that: (1) Qualify as Indian allotments, the Indian titles to which have not been extinguished, under 18 U.S.C. 1151(c); (2) are held in trust by the United States on behalf of an individual Indian or Tribe; or (3) are owned in fee by a Tribe, if the Tribe (a) acquired that fee title to such land, or an area that included such land, in accordance with a treaty with the United States to which such Tribe was a party, and (b) never allotted the land to a member or citizen of the Tribe.

The EPA's approval under SAFETEA expressly provided that to the extent the EPA's prior approvals of Oklahoma's environmental programs excluded Indian country, any such exclusions are superseded for the geographic areas of Indian country covered by the EPA's approval of Oklahoma's SAFETEA request.[93] The approval also provided that future revisions or amendments to Oklahoma's approved environmental regulatory programs would extend to the covered areas of Indian country (without any further need for additional requests under SAFETEA).[94]

---

[92] In *ODEQ* v. *EPA,* the D.C. Circuit held that under the CAA, a state has the authority to implement a SIP in non-reservation areas of Indian country in the state, where there has been no demonstration of tribal jurisdiction. Under the D.C. Circuit's decision, the CAA does not provide authority to states to implement SIPs in Indian reservations. *ODEQ* did not, however, substantively address any request under the separate authority in Indian country provided specifically to Oklahoma under SAFETEA. That separate authority was not invoked until the State submitted its request under SAFETEA, and was not approved until the EPA's decision, described in this section, on October 1, 2020.

[93] The EPA's prior approvals relating to Oklahoma's SIP frequently noted that the SIP was not approved to apply in areas of Indian country (consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA*) located in the state. *See, e.g.,* 85 FR 20178, 20180 (April 10, 2020). Such prior expressed limitations are superseded by the EPA's approval of Oklahoma's SAFETEA request.

[94] On December 22, 2021, the EPA proposed to withdraw and reconsider the October 1, 2020 SAFETEA approval. *See https://www.epa.gov/ok/proposed-withdrawal-and-reconsideration-and-supporting-information.* The EPA is engaging in further consultation with tribal governments and experts to have discussions with the State of Oklahoma as part of this reconsideration. The EPA also notes that the October 1, 2020 approval is the subject of a pending challenge in federal court. *Pawnee Nation of Oklahoma* v *Regan,* No. 20–9635 (10th Cir.). The EPA may make further changes to

As explained earlier, the EPA is proposing to find that the portion of Oklahoma's SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions which will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state. Consistent with the D.C. Circuit's decision in *ODEQ* v. *EPA* and the EPA's October 1, 2020, SAFETEA approval, this disapproval if finalized as proposed will extend to areas of Indian country in Oklahoma where the State has SIP planning authority.

V. Texas SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS and the EPA Evaluation of the SIP Submission

A. Summary of TCEQ SIP Submission Addressing Interstate Transport of Air Pollution for the 2015 Ozone NAAQS

On August 17, 2018, the Texas Commission on Environmental Quality (TCEQ) made a SIP submission addressing interstate transport of air pollution for the 2015 ozone NAAQS. The SIP submission provided TCEQ's analysis of their impact to downwind states using a framework similar to EPA's 4-Step framework and concluded that emissions from Texas will not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states.

In the submittal, TCEQ provided the steps they used to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other States: (1) Identify monitors projected to be in nonattainment or have maintenance issues in future year 2023; (2) identify for further review projected nonattainment and/or maintenance monitors in other states that are impacted by emissions from Texas; and (3) determine if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the monitors identified in TCEQ Step 2. TCEQ stated that their Step 1 is the same as EPA's Step 1 and that their Steps 2 and 3 are equivalent to EPA's Step 2. TCEQ used a

the approval of Oklahoma's program to reflect the outcome of the proposed withdrawal and reconsideration of the October 1, 2020 SAFETEA approval. To the extent any change occurs in the scope of Oklahoma's SIP authority in Indian country before the finalization of this proposed rule, such a change may affect the scope of the EPA's final action on the proposed rule.

contribution threshold of one percent of the NAAQS (0.7 ppb) in their Step 2 analysis to identify nonattainment and/or maintenance monitors in other states that are impacted by emissions from Texas. TCEQ further stated that EPA's Steps 3 and 4 are relevant only if emissions from Texas contribute significantly to nonattainment or interfere with maintenance at downwind monitors in another state. Because Texas TCEQ concluded that it has no such emissions, EPA's Steps 3 and 4 are not addressed in the SIP submission.

To identify monitors projected to be in nonattainment or have maintenance issues in 2023, (EPA Step 1 and TCEQ Step 1), TCEQ conducted its own regional photochemical modeling using a 2012 base year. TCEQ's modeling and EPA's modeling differ in significant respects, which are discussed in detail in the EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document (EPA Region 6 TSD).[95] In particular, TCEQ used a 2012 base year, stating that (1) the year 2012 had above average temperatures across most of the U.S., except in some states in the southeast and (2) the year 2011, (which was used by the EPA in the NODA published on January 6, 2017

and the October 2017 updated modeling data for 2023),[96] was a meteorologically anomalous year for Texas and surrounding states as it was the hottest year on record and the single-worst drought year recorded in Texas since 1895. TCEQ's modeling also used some different emissions estimates for the base year and future year 2023 emissions, including different future year emissions for EGUs. There were also some differences in methods used in the model results analysis and the model performance evaluation. TCEQ also used a different methodology than the EPA to identify monitors projected to be maintenance receptors in 2023. TCEQ used only the most recent DV containing the base year 2012, (*i.e.,* the monitored DV for 2012–2014), to project a 2023 "maintenance DV" for assessing whether a monitor would have maintenance issues. The EPA's methodology uses the maximum of the three consecutive regulatory DVs containing the base year, which is the highest monitored DV from among the three DVs that contain the 2011 base year (*i.e.,* the 2009–2011 DV, 2010–2012 DV or and 2011–2013 DV that all contain modeled base year of 2011), to project a 2023 maximum DV for

assessing whether a monitor would have maintenance issues. Texas explained that it chose to define maintenance receptors in this way to capture more recent emission reductions. The SIP submittal also included a discussion of why TCEQ believes their approach for identifying maintenance receptors is appropriate. The TCEQ modeling and differences with the EPA modeling is discussed in detail in the EPA Region 6 TSD for this action.

Based on their modeling, TCEQ provided: (1) A table of downwind receptors projected to be in nonattainment of the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater and (2) a table of downwind maintenance receptors projected to have problems attaining and maintaining the 2015 ozone NAAQS in 2023 and have a contribution from Texas emissions at a threshold of 0.7 ppb or greater. TCEQ identified these receptors for further analysis. The nonattainment and maintenance receptors provided by TCEQ are listed in Table TX–1. TCEQ noted that except for Arapahoe County, CO (Monitor ID. 80050002) all the maintenance receptors are also nonattainment receptors.

TABLE TX–1—PROJECTED 2023 NONATTAINMENT AND MAINTENANCE RECEPTORS IDENTIFIED BY TCEQ MODELING USING 2012 BASE YEAR

| Receptor (site ID, county, state) | 2023 average DV (ppb) | 2023 maintenance DV (TCEQ method) | Texas contribution (ppb) |
|---|---|---|---|
| 80350004, Douglas, CO | 73 | 72 | 1.42 |
| 80590006, Jefferson, CO | 72 | 73 | 1.26 |
| 80590011, Jefferson, CO | 71 | 71 | 1.26 |
| 80690011, Larimer, CO | 72 | 71 | 1.22 |
| 80050002, Arapahoe, CO | *70 | 71 | 1.15 |
| 40038001, Cochise, AZ | 71 | **69 | 1.06 |
| 60371201, Los Angeles, CA | 80 | 78 | 0.76 |
| 60371701, Los Angeles, CA | 80 | 82 | 0.72 |
| 60376012, Los Angeles, CA | 87 | 86 | 0.9 |
| 60658001, Riverside, CA | 88 | 85 | 0.73 |
| 60658005, Riverside, CA | 84 | 83 | 0.71 |
| 60710001, San Bernardino, CA | 71 | 72 | 0.84 |
| 60710306, San Bernardino, CA | 76 | 77 | 0.81 |
| 60711004, San Bernardino, CA | 91 | 90 | 0.88 |
| 60714001, San Bernardino, CA | 82 | 79 | 0.86 |
| 60714003, San Bernardino, CA | 94 | 91 | 0.74 |

*TCEQ did not include this value in their SIP narrative (this cell was blank). The EPA obtained this value from data that was in TCEQ's spreadsheet of future 2023 DVs with state contributions.

**TCEQ did not provide this calculation. The EPA used TCEQ's modeling information to calculate this value using the Relative Response Factor in TCEQ spreadsheet of future 2023 DVs with state contributions and the monitor's 2012–2014 DV (0.983 X 71 ppb, truncation applied).

TCEQ also noted that in the EPA's 2017 Transport NODA, the EPA's modeling linked Texas to six receptors

based on the receptors being identified as nonattainment or maintenance receptors and based on a 0.7 ppb

contribution threshold. TCEQ provided a table of those monitors along with the EPA and TCEQ modeling results for

[95] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf)

included in Docket ID No. EPA–R06–OAR–2021–0801.

[96] The NODA and the October 2017 modeling are discussed in Section I.C of this action.

those receptors (Table TX–2).[97] TCEQ stated that the differences are due to changes the TCEQ made to modeling inputs (primarily the different base year of 2012 versus the EPA's 2011),

analysis, and methodologies (primarily TCEQ's alternate maintenance receptor methodology), see the EPA Region 6 TSD included in the Regional docket for this action (Docket ID No. EPA–R06–

OAR–2021–0801) for more details. With exception of the Jefferson County, CO receptor (Monitor ID. 80590011) TCEQ did not further review its linkages to any of the receptors in Table TX–2.

TABLE TX–2—TCEQ INFORMATION ON RECEPTORS LINKED TO TEXAS BY EPA MODELING IN THE TRANSPORT NODA PUBLISHED ON JANUARY 6, 2017

| Receptor (site ID, county, state) | EPA 2023 average DV (ppb) | EPA Texas contribution (ppb) | TCEQ 2023 average DV (ppb) | TCEQ Texas contribution (ppb) |
|---|---|---|---|---|
| 260050003, Allegan, MI | 68.8 | 2.49 | 71 | 0.59 |
| 551170006, Sheboygan, WI | 71.0 | 1.92 | 70 | 0.73 |
| 240251001, Harford, MD | 71.3 | 0.91 | 65 | 0.69 |
| 360850067, Richmond, NY | 71.2 | 0.77 | 62 | 0.67 |
| 361030002, Suffolk, NY | 71.3 | 0.71 | 67 | 0.63 |
| 80590011, Jefferson, CO | 69.7 | 1.03 | 71 | 1.26 |

TCEQ then used a weight of evidence approach to assess whether emissions from Texas contribute significantly to nonattainment or interfere with maintenance at the receptors listed in Table TX–1. TCEQ stated that the Texas contribution to a receptor should be deemed "significant" only if there is a persistent and consistent pattern of contribution on several days with elevated ozone. Consideration was given to factors such as DV trends, number of elevated ozone days, back trajectory analysis on elevated ozone days, modeled concentrations on future expected elevated ozone days, total interstate contributions at tagged monitors, and responsiveness of ozone to emissions from Texas. Based on their assessment, TCEQ concluded that emissions from Texas do not contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS at any downwind monitors. Our evaluation of the TCEQ submission is further discussed in Section V.B and in the EPA Region 6 TSD for this action.

*B. EPA Evaluation of the TCEQ SIP Submission*

Based on the EPA's evaluation of the SIP submission, the EPA is proposing to find that TCEQ's August 17, 2018, SIP submission does not meet the State's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

1. Evaluation of Information Provided by TCEQ Regarding Step 1

As explained in Section I of this action, at Step 1 of the 4-Step interstate transport framework, the EPA identifies

monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and maintenance receptors). In executing this step, TCEQ elected to rely on their own modeling and methodology for identifying receptors. The EPA is evaluating the TCEQ's modeling and methodology here at Step 1.

i. Evaluation of TCEQ's Methodology for Identifying Maintenance Receptors

As discussed in Section V.A of this action, in addition to the use of an alternative modeling platform, TCEQ also created its own method for identifying maintenance receptors. TCEQ has not adequately explained or justified how its method for identifying maintenance receptors reasonably identifies areas that will have difficulty maintaining the NAAQS. The EPA proposes to find that TCEQ has not provided a sufficient technical basis for how its chosen methodology gives meaning to the CAA's instruction that states submit good neighbor SIPs that prohibit their states' emissions from interfering with the maintenance of the NAAQS in another state.

In *North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008), the D.C. Circuit rejected the EPA's CAIR on the basis that the EPA had not adequately given meaning to the phrase "interfere with maintenance" in the good neighbor provision. Specifically, North Carolina argued that it had counties that were projected to attain the NAAQS in the future analytic year but were at risk of falling back into nonattainment due to interference from upwind sources, particularly given year-to-year variability in ozone levels. The court agreed, holding that the EPA's rule did

not adequately protect "[a]reas that find themselves barely meeting attainment." *Id.* at 910. Consequently, the EPA has developed a methodology, as described elsewhere in this action and used in its 2011 CSAPR and its 2016 CSAPR Update and Revised CSAPR Update, for identifying areas that may struggle to maintain the NAAQS. *See* 76 FR at 48227–28. The EPA's approach to addressing maintenance receptors was upheld in the *EME Homer City* litigation. *See* 795 F.3d 118, 136–37. It was also upheld in *Wisconsin.* 938 F.3d at 325–26. In *Wisconsin,* the court noted that four upwind states were linked only to maintenance receptors and rejected the argument that application of the same control level as the EPA imposes for those states linked to nonattainment receptors was unreasonable or unlawful absent a particularized showing of overcontrol. *Id.* at 327.

To explain the differences between TCEQ's and the EPA's methodology for identifying maintenance receptors, it is helpful to provide some additional context of how the EPA projects future air quality. The EPA's air quality modeling guidance has long recommended developing a base design value (DV)[98] (*i.e.,* the design value that will be used as a starting point to model and analyze for purposes of projecting future air quality concentrations) that is the average of three DVs spanning a five-year period, centered around one year for which an emissions inventory will be submitted (*e.g.,* if 2011 was the base emissions inventory year, a state would use monitored values from 2009–2011, 2010–2012, 2011–2013 as the starting point for projecting air quality concentrations in future years).[99] The

---

[97] TCEQ SIP Submission, at page 3–49 (Table 3–12).

[98] *See* FN 8.

[99] *See* FN 73.

average of these three DVs is then multiplied by a relative response factor (RRF) [100] to generate an average DV for the future year. If a receptor's average future year DV is greater than or equal to the level of the NAAQS, and the receptor has recent monitored data that violates the NAAQS, that receptor is considered a "nonattainment" receptor at Step 1. To identify maintenance receptors, the EPA's methodology looks to the highest DV of the three DVs used to calculate the 5-year weighted average design value (*e.g.,* in the 2011 example, if 2009–2011 had the highest design value of 2009–2011, 2010–2012, and 2011–2013). The EPA then applies the same relative response factor to that highest design value to generate a projected future maximum design value. Where a receptor's maximum design value exceeds the level of the NAAQS, the EPA has deemed those receptors to be "maintenance" receptors. This methodology was designed to address the D.C. Circuit's holding that the CAA's "interference with maintenance" prong requires states and the EPA to protect areas that may struggle with maintaining the standard in the face of inter-annual variability in ozone-conducive conditions.

In its modeling, TCEQ adopted an identical approach to the EPA's for identifying nonattainment receptors—it looked at three sets of DVs over a five-year period and averaged those DVs to generate a base year DV. TCEQ then applied a relative response factor to that base year design value to project a receptor's average design value in the future year. For its maintenance receptors, however, TCEQ used only the most recent design value of the set of three DVs, regardless of whether the most recent design value was highest or lowest, instead of considering variability in conditions over a five-year period, or using the highest DV of the three DVs making up the base year design value. TCEQ's proffered explanation for using the most recent DV to identify maintenance receptors was that the latest DV "takes into consideration . . . any emissions reductions that might have occurred." [101] However, TCEQ in its submission does not explain how this methodology takes into account meteorological variability in identifying those areas that may be meeting the NAAQS or that may be projected to meet the NAAQS but may nevertheless struggle to maintain the NAAQS.

TCEQ argued that the 3-year DV used includes some meteorological

variability. Unfortunately, the three years of variation that TCEQ accounted for is already built into the structure of the standard. Thus, the TCEQ method gave no consideration to the variability between calculated DVs which provides a direct indication of the difficulty a receptor will have in maintaining the standard. In other words, to determine whether a receptor will have difficulty maintaining the standard, one must consider the variation in the metric that will be used to determine compliance with the standard. An indication of the variability of a metric cannot be determined by only considering a single estimate of that metric.

TCEQ's stated purpose in using the most recent DV was to capture more recent emissions reductions. TCEQ's methodology, however, limits receptors which could be identified as maintenance receptors, compared to the EPA's methodology largely because it only looks at one design value period rather than selecting the maximum of the three DV periods EPA's methodology considers. Thus, TCEQ's methodology greatly reduces the probability that meteorological conditions which make it difficult to maintain the standard will be considered. As discussed further below, the effects of emissions trends are already captured through other aspects of the methodology to identify receptors. So, in trying to give more weight to emission reductions, by selecting only one design value (2012–2014) for its base year, TCEQ's methodology did not give any consideration to interannual variability in ozone-conducive meteorology as does the EPA's method.

The EPA's methodology, using the maximum DV which accounts for the variability in ozone concentrations and DVs due to changes in meteorology over the five years of the base year DV period, was designed to identify those areas that might struggle to maintain the NAAQS in particularly ozone conducive conditions. TCEQ claimed that the EPA's method undervalues changes in air quality due to emission reductions and overvalues changes due to variation in meteorology. TCEQ pointed out that emissions nationwide are generally trending downward as a result of Federal motor vehicle standards and other technological improvements. The EPA agrees that ozone levels generally trend downward, but there is not a steady decline from year to year in ozone concentrations. Rather, ozone levels tend to vary from year to year with some years showing an increase instead of a decrease mainly due to inter-annual variability in ozone-

conducive meteorology. [102] The variation of DVs at individual monitors from year to year can be significant, even where emissions trend downwards. The EPA also assessed a number of monitored DV trends that were provided in TCEQ's SIP submission and previous TCEQ attainment demonstration SIPs indicating that there are at times large annual fluctuations upward from year to year in monitored DVs (sometimes 2–3 ppb increase in one year) that are due to variations in meteorology. [103] This is precisely why it is important to consider highly variable meteorology and its influence on DVs—the issue at the heart of the D.C. Circuit's finding on "interference with maintenance" in *North Carolina.* Areas that are required under the Act to attain by an attainment date may fail to attain because of a combination of both local emissions, upwind emissions, and ozone conducive meteorology, among other factors. The *North Carolina* decision made clear that in interpreting the good neighbor provision, upwind state and the EPA obligations to reduce emissions must account for variable conditions that could cause an area that is sometimes attaining the NAAQS to fall out of attainment. *See also Wisconsin,* 938 F.3d at 327 ("Variations in atmospheric conditions and weather patterns can bring maintenance receptors into nonattainment even *without* elevated emissions.").

In addition, TCEQ claimed that its use of the 2012–2014 DV (*i.e.,* the most recent in the 5-year base period it examined) is more reliable than the EPA's method, because that more recent DV accounts for both emission reductions and because there is a shorter interval between the monitored DV and the projected DV. As we note elsewhere, the TCEQ's base year modeled inventory is 2012 emissions and the TCEQ's model projections for 2023 include the expected emission reductions from 2012 thru 2014 and to 2023. By just using the 2012–2014 DV data, TCEQ claimed they are giving weight to emission reductions during the final base years where EPA's method does not. The effect of emission reductions, however, is already factored in the method since the modeling projection to 2023 is explicitly designed to project the changes in ozone due to emission reductions from the 2012 base year emission levels. So, in fact, the EPA method does give weight to emission reductions. Furthermore, since

---

[100] *See* FN 53.

[101] TCEQ SIP submission at 3–39 to 3–40.

[102] *See* EPA Region 6 TSD, included in Docket ID No. EPA–R06–OAR–2021–0801.

[103] *Id.*

TCEQ agrees that the average of the DVs based on 2010–2014 ozone levels are reliable enough to use in the identification of nonattainment receptors, it is unclear how the 2012–2014 period is deemed more reliable for the maintenance test since the modeled emissions are still for 2012. We also note, as discussed throughout this action, the EPA has updated its modeling to use a 2016 base year—that is, a five year period spanning 2014–2018, and applied its methodology for defining maintenance receptors using that five year base period. Using a more recent base period (EPA's 2016v2) provides the most recent design values, shorter period of projection (2016 to 2023 versus a 2011 or 2012 base year) and a more accurate basis for projections of future air quality. We note that the EPA undertook a large collaborative multi-year effort with states (including TCEQ) and other stakeholders input and review in developing the 2016v2 emission inventories. By virtue of this update, any monitored DV used by the EPA to identify maintenance receptors in this action accounts for more recent emission reductions and provides a shorter interval between base year monitored DV and the projected future analytic year.

As discussed further in the EPA Region 6 TSD [104] for this action, the EPA has reviewed the set of 21 receptors for which Texas had contributions of 0.7 ppb or more in the EPA's 2016 base year modeling analyses, or TCEQ's modeling (2012 base year), and evaluated the results of using TCEQ's alternate maintenance methodology. For these 21 receptors, TCEQ's method resulted in 15 of the 21 2023 maintenance DVs predicted to be lower than the 2023 nonattainment DVs from the nonattainment methodology that uses the 5-year year weighted average. Of these 15 receptors, three receptors have 2023 maintenance DVs that are 3 ppb lower, five receptors have 2023 maintenance DVs that are 2 ppb lower, and seven receptors have 2023 maintenance DVs that are 1 ppb lower. In comparison, using the EPA's maintenance methodology results in all 21 2023 maintenance DVs being equal or up to 4 ppb higher than the 2023 nonattainment DVs. Again, the EPA uses the average of the three DVs that contain the base year modeled for the nonattainment methodology and the

maximum of these three DVs for the maintenance methodology. Because TCEQ's maintenance methodology of just using the most recent DV (2012–2014 DV) often results in maintenance DVs lower than the 2023 nonattainment DVs methodology results, the EPA finds that the TCEQ methodology is not adequately identifying conditions when a receptor would have more difficulty maintaining the standard. In fact, the TCEQ's method also identified one receptor in their SIP submission as a nonattainment receptor in 2023 that would not have been identified as a maintenance receptor, which further highlights the concern that TCEQ's method did not adequately identify areas that may struggle to maintain the standard. TCEQ did not address whether the three years that comprise the most recent design value (*i.e.,* 2012, 2013, and 2014) had meteorological conditions highly conducive for formation of high ozone concentrations and thus would be an appropriate time period to assess whether area could have difficulty maintaining the standard and the EPA's analysis confirms that this time period is not highly conducive to ozone formation, at least for many receptors. The consequence of TCEQ's maintenance method is that it often results in lower DVs than the nonattainment test as demonstrated by our analysis, which indicates that it is often not considering conditions when an area would have difficulty maintaining the standard. It is also unreasonable to have a test that would not identify nonattainment receptors also as maintenance receptors.

TCEQ also made several additional assertions in support of their conclusion that their method for identifying maintenance receptors was the better reading of the CAA, compared to the EPA's. TCEQ claimed that its approach was more consistent with the CAA's concept of maintenance as areas that were formerly nonattainment and that have since attained and will continue to maintain by accounting for: (1) Emissions reductions occurring in the later design values of the base DV period; (2) "commitments regarding contingency measures to address future emission reductions;" and (3) the impact of any maintenance plans that are in place. TCEQ also asserted that the EPA's approach conflates the likelihood of attaining the standard in a future year and the ability of an attainment monitor to maintain that attainment status. Specifically, TCEQ argued that because any remedies devised to address nonattainment monitors would have to apply to maintenance monitors, a

practical consequence of the EPA's approach is that it could lead to over-control and that it might require upwind states to consider or implement controls when the downwind state in which the monitor is located does not have any obligations to control local emissions. TCEQ argued that this "conflation" of nonattainment and maintenance results in there being no independent meaning to "maintenance."

With respect to the first of these assertions from TCEQ, we note that TCEQ's methodology for identifying receptors (like the EPA's) is entirely distinct from ozone designations under the Clean Air Act; neither TCEQ nor the EPA take current or presumed future designations of areas into account, and any implementation requirements like a maintenance plan under CAA section 175A, in identifying receptors. TCEQ's discussion, therefore, of maintenance plan contingency measures or maintenance plans generally is irrelevant and misplaced. None of the areas to which Texas is linked in the EPA 2016v2 modeling has been redesignated to attainment for the 2015 ozone NAAQS, and none of the areas to which Texas is linked in its own modeling has been redesignated to attainment for that NAAQS. We also fail to see how TCEQ's approach to identifying maintenance receptors differs in any relevant respect from the EPA's approach with regard to the alleged "conflation" of projecting attainment in a future year rather than the ability of an attainment receptor to maintain attainment. Both TCEQ and the EPA identify maintenance receptors based on projections of air quality in a future year to determine whether the receptor will have difficulty attaining or maintaining the standard. TCEQ's arguments about overcontrol based on the application of a uniform remedy to states linked to both nonattainment and maintenance receptors were also not germane; in this case, TCEQ had identified *no* remedy to apply whatsoever because it had failed to identify that the emissions from Texas cause a problem in the first instance. The D.C. Circuit has already rejected the idea that the application of a uniform control to both nonattainment and maintenance receptors is on its face overcontrol or impermissible under the interstate transport provision. *See Wisconsin,* 938 F.3d at 327. Based on our evaluation of TCEQ's approach to identify maintenance receptors for 2023, we propose to find the State's approach is inadequate as it does not sufficiently identify maintenance receptors. Further, TCEQ had not explained how its

---

[104] "EPA Region 6 2015 8-Hour Ozone Transport SIP Proposal Technical Support Document" (EPA Region 6 2015 Ozone Transport SIP TSD.pdf) included in Docket ID No. EPA–R06–OAR–2021–0801.

approach meets the statutory requirement to address areas that, even if meeting the NAAQS, may struggle to maintain the standard in years where conditions are conducive to ozone formation. Rather, the TCEQ had created its own approach to identify these areas that they describe as designed to account for the most emission reductions possible—*i.e.*, the most recent DV of the three under analysis; an approach that likely under-identifies areas that will struggle to maintain the NAAQS and that certainly is not designed to capture potential air quality problems.

ii. Evaluation of the TCEQ Modeling

As discussed in Section V.A of this action, TCEQ conducted regional photochemical modeling to identify nonattainment and maintenance receptors in 2023 using a 2012 base year. As discussed further in the EPA Region 6 TSD, we have several concerns with the reliability of TCEQ's modeling results. States are free to develop their own modeling, but that modeling must be technically supportable, and the EPA is obligated to assess and evaluate the reliability of that technical demonstration when determining whether the Act's requirements are met.

The TCEQ's modeling underestimates future ozone levels. When the TCEQ 2023 projected concentrations are compared to 2020 and preliminary 2021 monitor values, it is clear that the TCEQ modeling is projecting an unusual decline in ozone levels without there being an unusual level of emission reductions to support the decline. The EPA compared recent monitoring values and reasonably anticipated decreases in DVs by 2023 both within Texas and in other parts of the country. These underestimations likely result in TCEQ's modeling not adequately identifying nonattainment and/or maintenance receptors in 2023. These underestimations also result in smaller projected contributions from Texas

emissions to downwind states. See EPA Region 6 TSD for full analysis details.

One analysis included in the EPA Region 6 TSD examined the average amount of improvement that would have to occur for the 9 monitors with the highest measured design values in the Dallas-Ft. Worth and Houston-Galveston-Brazoria nonattainment areas (those with an observed 2018–2020 DV of 74 ppb or greater) to reach the level of ozone projected by the TCEQ modeling. The average decrease needed by 2023 to meet TCEQ's 2023 projected DVs is 7.56 ppb. Improvements of this magnitude do not occur in three years unless there is an unusually large change in emissions or a large change in meteorological conduciveness for ozone generation. TCEQ did not identify any large emission reductions not already accounted for in the modeling to be implemented in the 2021–2023 timeframe nor is the EPA aware of such a change. This information supports our finding that that TCEQ's modeling is underestimating future ozone levels in the two nonattainment areas in Texas that make up a large proportion of the total ozone and a large portion of emissions of ozone pre-cursors that transport to downwind areas. This underestimation of future year ozone levels from Texas emissions can cause both an underestimation of ozone in downwind areas and also an underestimation of Texas's impact on downwind State's ozone nonattainment and maintenance receptors.

TCEQ's modeling also underestimates 2023 ozone levels outside of the State of Texas including areas of interest in California, Colorado and the Midwest Region (Illinois, Wisconsin, and Michigan). The EPA discusses this underprediction for all of these areas in the EPA Region 6 TSD. In Table TX–3, we present only the results for the Midwest Region along with the EPA's modeling prediction. We note that TCEQ's 2023 modeled DVs are significantly lower than the EPA's 2023 modeled DVs. The table also provides

recent monitored 2020 DVs and preliminary 2021 DVs, which shows that recent monitored ozone concentrations are significantly higher than TCEQ's modeling projected for 2023. TCEQ's ozone DVs for these receptors would need to drop on the order of 7–15 ppb in two to three years for TCEQ's projections to bear out. As noted previously, this would require an unusual amount of emission reductions without any control measures identified of sufficient magnitude. We note that the EPA's projected 2023 ozone DVs based on EPA 2016v2 modeling show ozone DVs that are also lower than recent monitoring data. However, EPA 2016v2 modeling projections are much closer to anticipated 2023 ozone levels as compared to TCEQ's modeling. This indicates that the EPA's modeling is more accurate in identifying nonattainment and/or maintenance receptors in the Midwest Region. While the TCEQ modeling projects much lower overall ozone levels for the Midwest Region in 2023, the modeling does tend to corroborate the projected amount emissions that Texas may be contributing to projected ozone levels at 5 of the 7 nonattainment and maintenance receptors identified in the EPA's modeling.[105] Thus, despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest Region are greater than 0.7 ppb (*i.e.*, 1 percent of the 2015 ozone NAAQS). Table TX–3 provides information on those receptors, including the amount of contribution attributed to emissions from Texas based on EPA's 2016v2 modeling and TCEQ's modeling. Despite the differences in identification of nonattainment and maintenance receptors, both sets of modeling indicate that Texas's contribution to receptors in the Midwest are greater than 0.7 ppb (*i.e.*, 1 percent of the 2015 ozone NAAQS).

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016V2 MODELING

| Receptor (site ID, county, state) | 2023 nonattainment/maintenance (EPA 2016v2) | EPA: 2023 average DV/maximum DV (ppb) | TCEQ: 2023 average DV/maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6/73.4 | 60/58 | 75/71 | 0.86 | 1.6. |
| 170310032, Cook, IL | Maintenance | 69.8/72.4 | 68/66 | 74/75 | 1.46 | 1.31. |
| 170314201, Cook, IL | Maintenance | 69.9/73.4 | 64/62 | 77/74 | 1.15 | 1.25. |
| 170317002, Cook, IL | Maintenance | 70.1/73.0 | 66/65 | 75/73 | 1.58 | 1.22. |

[105] We note that for two of the Wisconsin receptors, TCEQ's modeling does not provide information to generate 2023 DVs, so only 5 of the 7 monitors can be compared.

TABLE TX–3—EPA AND TCEQ MODELING RESULTS FOR DOWNWIND RECEPTORS IDENTIFIED BY EPA 2016v2 MODELING—Continued

| Receptor (site ID, county, state) | 2023 nonattainment/ maintenance (EPA 2016v2) | EPA: 2023 average DV/ maximum DV (ppb) | TCEQ: 2023 average DV/ maintenance DV (ppb)* | Monitored 2018–2020 DV/preliminary 2019–2021 DV** (ppb) | EPA: Texas contribution (ppb) | TCEQ: Texas contribution (ppb) |
|---|---|---|---|---|---|---|
| 550590019, Kenosha, WI .... | Nonattainment ...................... | 72.8/73.7 | 67/66 ............ | 74/74 | 1.72 | 1.44. |
| 550590025, Kenosha, WI .... | Maintenance ........................ | 69.2/72.3 | No data*** .... | 74/72 | 1.81 | No data.*** |
| 551010020, Racine, WI ....... | Nonattainment ...................... | 71.3/73.2 | No data*** .... | 73/73 | 1.34 | No data.*** |

*TCEQ did not provide sufficient data and analysis of the meteorology for the 2010–2014 period to support their claim that 2012–2014 period was a worst-case combination of meteorology compared to the 2010–2012 and 2011–2013 periods. If the future DV projected from this highest value is below the standard, one can be reasonably certain the receptor will not have difficulty maintaining the standard and, as such, upwind states will not interfere with maintenance in downwind states. Because the TCEQ method only looks at one DV and does not account for the variability in DVs due to meteorological conditions, it is less likely to identify maintenance receptors than the EPA method. *See https://www.epa.gov/air-trends/air-quality-design-values*

**Preliminary 2019–2021 DVs. Monitoring data from the EPA's Air Quality System (AQS) (*https://www.epa.gov/aqs*). 2021 monitoring data is preliminary and still has to undergo Quality Assurance/Quality Control analysis and be certified by the State of Texas, submitted to the EPA, and reviewed and concurred on by EPA. 2018–2020 DVs are 72 ppb and 73 ppb at the Denton County and Tarrant County monitors/receptors respectively. Preliminary 2019–2021 DVs are 74 ppb and 72 ppb at the Denton County and Tarrant County monitors/receptors respectively.

***Kenosha, WI Monitor ID. 550590025 was installed and began operating May 13, 2013, so the first three year DV available is 2013–2015. Racine, WI Monitor ID. 551010020 was installed on April 14, 2014 so the first three year DV available is 2015–2017. TCEQ's modeling used monitored DV data for 2010–2012, 2011–2013, and 2012–2014 to project to the future year. Since these monitors do not have valid DVs for these periods, TCEQ's modeling can't be used to project 2023 values and identify if they would be nonattainment or maintenance receptors.

The EPA investigated TCEQs modeling and the underestimation for the future year. See the EPA Region 6 TSD for further information on our review. Our review indicated some underestimation bias in the base case and general model performance concerns but nothing that was a clear cause of the much lower 2023 DVs that TCEQ's modeling is projecting. For the EPA's 2016 base year modeling, the EPA undertook a large collaborative multi-year effort with states (including Texas) and other stakeholder input in developing the 2016 emission inventories including 2016v2, so that the EPA's modeling would be based on the best data available. Using a 2016 base year also provides a more recent platform that shortens the number of years to project emission changes, reducing uncertainties in the 2023 projection compared to TCEQ's projection from a 2012 base to 2023 or the EPA's earlier 2011 base year modeling. Use of a more recent 2016 base year also allows for the use of monitored DVs from a more recent period. The combination of these and other issues discussed in the EPA Region 6 TSD result in less model uncertainty compared to TCEQ's 2012 base year modeling and has provided a better estimate of 2023 ozone levels and therefore, we believe a more reliable tool for predicting which areas of the country will be nonattainment or have difficulty maintaining the standard as well as assessing contributions from upwind states.

The EPA's modeling using both 2011 and 2016 base year periods identified that Texas was linked to nonattainment and/or maintenance receptors in 2023 in the Midwest Region (Illinois, Wisconsin, and Michigan), while TCEQ's modeling using a 2012 base year indicated only linkages to western receptors. As discussed above and in the EPA Region 6 TSD, the TCEQ's modeling is underestimating projected ozone levels in the Midwest Region for 2023. If TCEQ's 2023 modeled DVs were closer to recent observed monitoring data and anticipated 2023 monitored DVs, TCEQ would likely have also identified nonattainment and/or maintenance receptors in the Midwest Region.

To summarize, TCEQ did its own modeling at Step 1. Our analysis shows that TCEQ's modeling likely underestimates ozone levels at potential receptors and that TCEQ's methodology for identifying maintenance receptors used to identify maintenance receptors fails to reasonably identify areas that will have difficulty maintaining the NAAQS.

2. Evaluation of Information Provided by TCEQ Regarding Step 2

TCEQ, like the EPA, used a 1 percent of the ozone NAAQS (or 0.7 ppb) as the "linkage" threshold to identify states as "linked" for contributions it made to areas with projected air quality problems. Although TCEQ asserted that the EPA treats the 1 percent threshold as the threshold by which the EPA determines "significant contribution" this is in fact incorrect. The EPA, like TCEQ, uses the 1 percent contribution threshold to identify those linkages between a contributing upwind state and a receptor projected to have air quality problems that warrant further review and additional analysis. We therefore endorse TCEQ' use of the 1 percent contribution threshold to identify linkages requiring further analysis. However, because we propose to disapprove TCEQ's identification of nonattainment and/or maintenance receptors (at Step 1) due to underestimations in TCEQ's modeling and their unsupported methodology of identifying maintenance receptors, their submission as to Step 2 is also flawed. We note, however, that even in its own modeling, TCEQ has identified nonattainment or maintenance receptors to which it contributed more than 1 percent of the NAAQS (*i.e.,* identified linkages warranting additional analysis at Step 3).

3. Results of the EPA's Step 1 and Step 2 Modeling and Findings for Texas

As described in Section I and elsewhere in this action, the EPA performed air quality modeling using the 2016v2 emissions platform to project 2023 design values and contributions for 2023. This data was examined to determine if Texas contributes at or above the threshold of 1 percent of the 2015 ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table TX–4, the data [106] indicate that in 2023, emissions from Texas are projected to contribute greater than 1 percent of the standard to both

[106] Design values and contributions at individual monitoring sites nationwide are provided in the file: "2016v2_DVs_state_contributions.xlsx", which is included in docket ID No. EPA–HQ–OAR–2021–0663.

nonattainment and maintenance-only receptors in the Chicago, IL–IN–WI nonattainment area (4 Cook County, IL receptors and 2 Kenosha County, WI receptors) and the Milwaukee, WI nonattainment area (one Racine County receptor).[107]

TABLE TX–4—PROJECTED NONATTAINMENT AND MAINTENANCE RECEPTORS WITH TEXAS LINKAGES BASED ON EPA 2016v2

| Receptor (site ID, county, state) | Nonattainment/maintenance | 2023 average DV (ppb) | 2023 maximum DV (ppb) | Texas contribution (ppb) |
|---|---|---|---|---|
| 170310001, Cook, IL | Maintenance | 69.6 | 73.4 | 0.86 |
| 170310032, Cook, IL | Maintenance | 69.8 | 72.4 | 1.46 |
| 170314201, Cook, IL | Maintenance | 69.9 | 73.4 | 1.15 |
| 170317002, Cook, IL | Maintenance | 70.1 | 73.0 | 1.58 |
| 550590019, Kenosha, WI | Nonattainment | 72.8 | 73.7 | 1.72 |
| 550590025, Kenosha, WI | Maintenance | 69.2 | 72.3 | 1.81 |
| 551010020, Racine, WI | Nonattainment | 71.3 | 73.2 | 1.34 |

We recognize that the results of the EPA (2011 and 2016 base year) and TCEQ (2012 base year) modeling indicated different receptors and linkages at Steps 1 and 2 of the 4-Step interstate transport framework. These differing results regarding receptors and linkages can be affected by the varying meteorology from year to year, but we do not think the differing results mean that the modeling or the EPA or the State's methodology for identifying receptors or linkages is inherently unreliable. Rather, the three separate modeling runs all indicated: (1) There were receptors that would struggle with nonattainment or maintenance in the future; and (2) Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (e.g., a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). These results indicate that emissions from Texas were substantial enough to generate linkages at Steps 1 and 2 to some downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs. Under these circumstances, we think it is appropriate to proceed to a Step 3 analysis to determine what portion of emissions from Texas should be deemed "significant." In doing so, we are not agreeing with the methods and assumptions contained in TCEQ's modeling (see previous discussion and the EPA Region 6 TSD included in the docket for this proposal for further discussion on evaluation of that modeling), or that we consider our own

earlier modeling to be of equal reliability relative to more recent modeling. However, where alternative or older modeling generated linkages, even if those linkages differ from linkages in the EPA's most recent set of modeling (EPA 2016v2), that information provides further evidence, not less, in support of a conclusion that the State is required to proceed to Step 3 to further evaluate its emissions.

Therefore, based on the EPA's evaluation of the information submitted by TCEQ and based on the EPA 2016v2 modeling results for 2023, the EPA proposes to find that Texas is linked at Steps 1 and 2 and has an obligation to assess potential emissions reductions from sources or other emissions activity at Step 3 of the 4-Step framework.

4. Evaluation of Information Provided by TCEQ Regarding Step 3

At Step 3 of the 4-Step interstate transport framework, a state's emissions are further evaluated, considering multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential additional emissions reduction opportunities and resulting downwind air quality improvements. The EPA has consistently applied this approach (i.e., Step 3 of the 4-Step interstate transport

framework) when identifying emissions contributions that the Agency has determined to be "significant" (contribution to nonattainment or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. See EME Homer City, 572 U.S. 489, 519 (2014). While the EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner the EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to the EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any other state. TCEQ did not demonstrate such an analysis in their SIP submission. We therefore propose that TCEQ was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

Instead, as noted in Section V.A of this action, TCEQ interpreted the Act's requirements as only requiring an

---

[107] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised

CSAPR Update, as noted in Section I of this action. That modeling showed that Texas had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in

2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

analysis of emission reductions where "there is a persistent and consistent pattern of contribution on several days with elevated ozone." TCEQ asserted that it would make the determination of whether such pattern existed based on a weight-of-evidence approach that takes into consideration air quality factors such as: Current attainment status of the monitors, design value trends, the meteorological conditions that lead to high ozone formation at the monitor, the number of days with elevated observed ozone, back trajectories, Texas' relative contribution on modeled high ozone days, Texas' contribution as part of the collective interstate contribution to future modeled DVs, alternate contribution method analysis, and model sensitivity runs to reductions of Texas' emissions on receptors. However, TCEQ stated that it did not consider or analyze all factors for every monitor. Thus, different factors were analyzed for the receptors in different regions (Colorado, Arizona, and Southern California). The EPA has reviewed the different factors that TCEQ provided for each of the regions in the EPA Region 6 TSD, but we will provide a brief summary of the evaluation below. TCEQ also asserted that use of the 1 percent threshold as the "sole" definition of significant contribution for the 2015 ozone NAAQS is inappropriate. Based on the application of selected factors for each of the monitors to which TCEQ's modeling found that it was linked, TCEQ concluded that none of its contributions to any other states were significant.

As explained above, TCEQ has mischaracterized the EPA's interpretation of the CAA in stating that the EPA defines significant contribution "solely" using a 1 percent threshold. The EPA, like TCEQ, uses the 1 percent threshold to identify areas for further analysis. The difference is that the EPA in past analyses has examined potential emission reductions in linked upwind states and the air quality impacts at downwind receptors that would result from the implementation of those reductions to assess which contributions are "significant." This interpretation of significant contribution, as discussed above, has been upheld by the Supreme Court and the D.C. Circuit.

As an initial matter, the EPA believes source apportionment modeling, as performed by the EPA and also by TCEQ, to determine which states are linked is an appropriate tool to identify impacts that are persistent enough to impact a downwind receptors ability to attain or maintain the standard. This approach is described in more detail

above in Section II.B.4 of this action, but, in summary, averages the contributions from an upwind state for up to 10 days, which is preferred, (but a minimum 5 days) at a given receptor. Given the ozone standard is an average of the fourth high value from each of three years, the EPA technique, also used by Texas, is appropriate to identify impacts of sufficient persistence to impact a downwind receptor's ability to attain or maintain the standard.

The EPA reviewed TCEQ's evaluation of the current attainment status of the monitors and design value trends, and concludes, as described in more detail in the EPA Region 6 TSD, that the provided information does not support the large decreases in ozone levels that TCEQ's modeling projects will occur by 2023. The analysis for California and Colorado receptors provides evidence that TCEQ's photochemical modeling is overestimating the ozone reductions expected at these receptors between 2012 and 2023 and actually presents evidence that more nonattainment and/or maintenance receptors should have been identified.

The EPA also reviewed the trends in the number of high ozone days per year provided by TCEQ for Colorado and California. While this data supports that the number of ozone exceedance days is improving, neither the analysis of the number of high ozone days in Colorado or California provide any evidence to refute the TCEQ's photochemical modeling results that show these areas should be considered nonattainment and/or maintenance receptors. TCEQs modeling overestimates ozone reductions yet still shows Texas linked to receptors at both nonattainment and maintenance levels in 2023.

The TCEQ cited a conceptual model of ozone formation for areas in Southern California. TCEQ indicated that Southern California is isolated and transport into the basin is unlikely on a frequent basis, but this information does not refute the TCEQ's modeling. As discussed in Section III.B.3 of this action, photochemical modeling is the most sophisticated tool available to estimate future ozone levels and contributions to those modeled future ozone levels. Consideration of the different processes that affect primary and secondary pollutants at the regional scale in different locations is fundamental to understanding and assessing the effects of emissions on air quality concentrations. TCEQ's modeling showed transport at 10 monitors having contributions greater than 0.7 ppb on average for the 5–10 days used in the modeling analyses. Considering the form of the standard,

this is a sufficient number of days to determine if an impact is persistent enough to impact an area's ability to attain or maintain the standard.

TCEQ used the National Oceanic and Atmospheric Administration (NOAA) HYSPLIT [108] model to produce back trajectories for all the monitored ozone exceedance days (2007–2016) for the five receptors in Colorado and 10 receptors in Southern California to evaluate how many of the back trajectories went through Texas. TCEQ also used data from these back trajectories to do an endpoint count analysis. We note that we have several concerns with how TCEQ performed the back trajectories including start time and heights, length (number of hours) of the back trajectory, inappropriate removal of some back trajectories based on start height, center-line height touch down, and trajectory center-line height when over Texas, and inappropriate counting of trajectories by not considering that the center-line represents the centerline of a much wider area of air parcels that could have reached the monitor/receptor. Due to these concerns, as discussed in more detail in the EPA Region 6 TSD, the EPA finds the results of TCEQ's back trajectory and endpoint analysis flawed (underestimates back trajectories that reach Texas) and do not provide evidence that refutes the TCEQ photochemical modeling analysis results.

We note that even valid back trajectories are of limited use as HYSPLIT simply estimates the path a parcel of air backward in hourly steps for a specified length of time. HYSPLIT estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the concentrations at the end point. The horizontal and vertical areas that potentially contribute to concentrations at the endpoint (monitor) grow wider from the centerline the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas, but merely relatively near emission source areas for those areas, to contribute to concentrations at the trajectory endpoint. The EPA relies on back trajectory analysis as a corollary analysis along with observation-based meteorological wind fields at multiple heights to examine the general plausibility of the photochemical model

[108] See FN 34.

"linkages." Since the back trajectory calculations do not account for any air pollution formation, dispersion, transformation, or removal processes as influenced by emissions, chemistry, deposition, etc., the trajectories cannot be used to develop quantitative contributions. Therefore, back trajectories cannot be used to quantitatively evaluate the magnitude of the existing photochemical contributions from upwind states to downwind receptors. It is interesting to note that TCEQ's analysis of the back trajectories indicates that the 2012 meteorology used by TCEQ seemed to yield more back trajectories that reach Texas than most years for many of the Colorado monitors. This seems to be consistent with TCEQ identifying linkages to Colorado when the EPA's modeling of 2016 does not.

TCEQ performed an alternate contribution analysis for the ten California receptors and the five Colorado receptors using all days modeled in 2023 that had values over 70 ppb rather than focus on just the 5–10 highest values under the EPA's technique. Particularly for California, this meant many more days could be included in the average which had the effect of showing a smaller estimated contribution. We believe it is appropriate to focus on the highest values as these are the ones that ultimately will have to be reduced for the standard to be attained. As discussed in the EPA Region 6 TSD, the EPA's review of TCEQ's alternate contribution method analysis for California and Colorado receptors is that it does not provide substantial evidence that refutes the TCEQ's photochemical modeling analysis results, including the contribution analysis using the EPA's contribution methodology.

TCEQ provided an analysis of collective interstate contribution to the 2023 DV for the five Colorado and ten California receptors. The collective interstate contribution at tagged Colorado receptors ranges from 9.32% to 10.27%. The collective interstate contribution at tagged California receptors ranges from 3.2% to 4.58%. TCEQ argues that these are small percentages (Colorado and California) and not as high as the collective interstate contribution percentages the EPA calculated for monitors in Eastern States, which ranged from 17% to 67%. TCEQ also notes that a significant portion of the tagged Colorado monitors' 2023 modeled DVs is due to background emissions (sum of contributions from to biogenic, fires, and boundary conditions). For the California receptors TCEQ argues that these percentages are

small compared to Intra-State contribution.

As an initial matter, the EPA is not solely relying on TCEQ's findings of linkages to Colorado and California but is also relying on its own findings of linkages to areas in the Midwest Region. As such, TCEQ's analysis of relative contributions to Colorado and California does not provide justification for not addressing downwind impacts. Nonetheless, EPA has found in the past that certain California receptors are so heavily impacted by local emissions, and total upwind contribution is so low, that those receptors may not be considered to be affected by interstate ozone transport. *See* 81 FR 15200 (Mar. 22, 2016). However, this is a narrow circumstance that does not apply in the vast majority of cases and has never been applied outside of California. EPA has previously found, for instance, that receptors in Colorado are heavily impacted by upwind-state contribution. *See* 82 FR 9155 (Feb. 3, 2017); 81 FR 71991 (Oct. 19, 2016). EPA need not draw any conclusions here regarding whether the California sites TCEQ identified should or should not be considered receptors for ozone-transport purposes. EPA affirms, contrary to TCEQ's suggestion, that the Colorado receptors TCEQ analyzed are impacted by upwind state contributions. However, the EPA's finding that Texas is linked to receptors in other states is based on still other linkages found in EPA's modeling to receptors in other states, which are clearly impacted by the collective contribution of multiple upwind states, including Texas. Under CAA section 110(a)(2)(D)(i)(I) downwind states are not obligated to reduce emissions on their own to resolve nonattainment or maintenance problems. Rather, states are obligated to eliminate their own significant contribution or interference with the ability of other states to attain or maintain the NAAQS.

TCEQ also performed photochemical modeling analysis using the Direct Decoupled Method (DDM) tool for receptors in Colorado. DDM provides a first derivative of the changes in ozone (linear relationship where the DDM value is the slope of the line for changes in ozone) resulting from changes in $NO_X$ emissions from all Texas' $NO_X$ emissions. The DDM modeling does show some response to Texas $NO_X$ emissions but from the scale it is hard to discern the level of response but it appears to be in the 0–2 ppb range in general with some values in the 0.2 –2 ppb range for modeled values over 60 ppb. Since the modeling has underprediction and underestimation

issues, these values could be higher. Not surprisingly, the DDM tool shows that monitors in Colorado are much more responsive to intra-state reductions than reductions in Texas. That said, the results of the DDM tool showing only a relatively small response to reductions is not inconsistent with the finding that Texas emissions contribute significantly to elevated readings in Colorado. As has been discussed elsewhere, the EPA believes a contribution of 1 percent of the standard is an appropriate threshold such that further analysis is warranted.

Overall, these additional analyses performed by TCEQ do not provide sufficient evidence to refute the modeling results that TCEQ's modeling indicates downwind nonattainment and/or maintenance receptors in Colorado and Southern California are impacted by Texas emissions and Texas' contribution is 0.7 ppb or greater.[109] In fact, the monitored ozone design value trends provide evidence that future year modeled ozone levels are underestimated by TCEQ's modeling and there are likely more receptors that should have been identified with additional potential linkages. Although Texas asserted that its additional air quality factor analysis is a permissible way to interpret which contributions are "significant" because that analysis examines whether there was a "persistent and consistent pattern of contribution on several days with elevated ozone" we find that such pattern is already established by a modeled linkage at Step 2.

In addition, EPA 2016v2 modeling using 2016 base year meteorology indicates linkages from Texas to receptors in the Midwest Region but does not indicate impacts from Texas emissions on the Colorado and other western receptors identified by TCEQ. With a different base period such as TCEQ's 2012 base period meteorology and the EPA's 2016 base period meteorology, it is not uncommon that the potential downwind nonattainment or maintenance receptors could change. These differing results about receptors and linkages can be affected by the varying meteorology from year to year and the selection of different base years, but we do not think the differing results mean that the modeling or the EPA methodology for identifying receptors or linkages is inherently unreliable. Rather, these separate modeling runs indicated (1) that there were receptors that would

---

[109] TCEQ also identified a monitor in Cochise County, Arizona (ID 40038001), but the monitor's recent DVs are below the NAAQS. From AQS, the 2014–2016 and 2015–2017 DVs are each 65 ppb; 2016–2018, 2017–2019, and 2018–2020 DVs are 66 ppb; and preliminary 2019–2021 DV is 66 ppb.

struggle with nonattainment or maintenance in the future, and (2) that Texas was linked to some set of these receptors, even if the receptors and linkages differed from one another in their specifics (*e.g.,* a different set of receptors were identified to have nonattainment or maintenance problems, or Texas was linked to different receptors in one modeling run versus another). We think this common result indicates that Texas's emissions were substantial enough to generate linkages at Steps 1 and 2 to some set of downwind receptors, under varying assumptions and meteorological conditions, even if the precise set of linkages changed between modeling runs.

In sum, the EPA's more recent and robust 2016 base year modeling platform indicates that Texas is linked to several receptors in the Midwest Region as does the EPA's earlier 2011 base year modeling. TCEQ's 2012 base case modeling showed linkages to states in the west. As discussed, the EPA does not find the additional weight of evidence evaluations conducted by TCEQ provide compelling reasons to discount the impacts indicated in Colorado and California by the TCEQ modeling. In fact, we think TCEQ's modeling likely underestimates these issues. We therefore propose that Texas was required to analyze emissions from the sources and other emissions activity from within the State to determine whether its contributions were significant, and we propose to disapprove its submission because Texas failed to do so.

5. Evaluation of Information Provided by TCEQ Regarding Step 4

Step 4 of the 4-Step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. Texas indicated that because a number of counties in its state had been designated nonattainment for the 2015 ozone NAAQS, there could be attainment demonstration and potential controls contemplated in association with those nonattainment designations.[110]

However, the State's interstate transport submission did not revise its SIP to identify any specific emission reductions, nor did it include a revision to its SIP to ensure any such reductions were permanent and enforceable. The other control measures identified in TCEQ's submission are, as noted by TCEQ, already adopted and implemented measures and do not contain an evaluation of additional emission control opportunities (or establish that no additional controls are required). As a result, the EPA proposes to disapprove TCEQ's submittal on the separate, additional basis that the Texas has not included permanent and enforceable emissions reductions in its SIP as necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

6. Conclusion

Based on the EPA's evaluation of TCEQ's SIP submission, the EPA is proposing to find that the Texas August 17, 2018, SIP submission pertaining to interstate transport of air pollution does not meet the State's interstate transport obligations, because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in any other state.

VI. Proposed Action

We are proposing to disapprove the SIP submissions from Arkansas, Louisiana, Oklahoma, and Texas pertaining to interstate transport of air pollution which will significantly contribute to nonattainment or interfere with maintenance of the 2015 ozone NAAQS in other states. Under CAA section 110(c)(1), the disapprovals would establish a 2-year deadline for the EPA to promulgate FIPs for these states to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 ozone NAAQS in other states, unless the EPA approves SIPs that meet these requirements. Disapproval does not start a mandatory sanctions clock for Arkansas, Louisiana, Oklahoma, or Texas.

VII. Statutory and Executive Order Reviews

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget for review

*B. Paperwork Reduction Act (PRA)*

This proposed action does not impose an information collection burden under the PRA because it does not contain any information collection activities

*C. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

*D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

*E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed action disapproving the portion of Oklahoma's SIP submission addressing the State's interstate transport obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS will apply to certain areas of Indian country as discussed in Section IV.C of this action, and, therefore, has tribal implications as specified in E.O. 13175 (65 FR 67249, November 9, 2000). However, this proposed action will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. This proposed action will not impose substantial direct compliance costs on federally recognized tribal governments because no actions will be required of tribal governments. This proposed action will

---

[110] Pointing to anticipated upcoming emission reductions, even if they were not included in the analysis at Steps 1 and 2, is not sufficient as a Step 3 analysis for the reasons discussed in Section V.B.4 of this action. In this section, we explain that to the extent such anticipated reductions are not included in the SIP and rendered permanent and

enforceable, reliance on such anticipated reductions is also insufficient at Step 4.

also not preempt tribal law as no Oklahoma tribe implements a regulatory program under the CAA, and thus does not have applicable or related tribal laws. Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes (May 4, 2011), the EPA will offer consultation to tribal governments whose lands are located within the exterior boundaries of the State of Oklahoma that may be affected by this action.

### G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission as not meeting the CAA.

### H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use

This action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

### I. National Technology Transfer and Advancement Act

This rulemaking does not involve technical standards.

### J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

### K. CAA Section 307(b)(1)

Section 307(b)(1) of the CAA governs judicial review of final actions by the EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to the EPA complete discretion whether to invoke the exception in (ii).[111]

The EPA anticipates that this proposed rulemaking, if finalized, would be "nationally applicable" within the meaning of CAA section 307(b)(1) because it would take final action on SIP submittals for the 2015 ozone NAAQS for four states, which are located in three different Federal judicial circuits. It would apply uniform, nationwide analytical methods, policy judgments, and interpretation with respect to the same CAA obligations, *i.e.,* implementation of interstate transport requirements under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS for states across the country, and final action would be based on this common core of determinations, described in further detail below.

If the EPA takes final action on this proposed rulemaking[, in the alternative,] the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-Step framework for assessing interstate transport obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016 base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of the 4-Step framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-Step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[112] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[113]

### List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

*Authority:* 42 U.S.C. 7401 *et seq.*

Dated: February 1, 2022.

**Earthea Nance,**
*Regional Administrator, Region 6.*

[FR Doc. 2022–02961 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

[111] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[112] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[113] The EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should the EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

# EXHIBIT D



JOHN BEL EDWARDS
GOVERNOR

CHUCK CARR BROWN, PH.D.
SECRETARY

# State of Louisiana
## DEPARTMENT OF ENVIRONMENTAL QUALITY
## OFFICE OF THE SECRETARY

Interstate Transport of Air Pollution for the 2015
8-Hour Ozone National Ambient Air Quality Standards
State of Louisiana

Via: www.regulations.gov: Docket ID No. EPA-R06-OAR-2021-0801

To whom it may concern:

By way of this correspondence, the Louisiana Department of Environmental Quality (LDEQ) respectfully submits comments on the proposed rule "Air Plan Disapproval; Arkansas, Louisiana, Oklahoma and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards" published in the *Federal Register* on February 22, 2022.[1]

The U.S. Environmental Protection Agency (EPA) is proposing to disapprove State Implementation Plan (SIP) submittals from Arkansas, Louisiana, Oklahoma, and Texas regarding interstate transport for the 2015 8-hour Ozone National Ambient Air Quality Standards (NAAQS). This provision requires each state's SIP to contain adequate provisions prohibiting emissions within the state from significantly contributing to other states meeting the NAAQS.

Louisiana submitted the Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards SIP on November 12, 2019, and EPA issued a "completeness finding" on November 14, 2019. According to Federal Clean Air Act (FCAA) §110(k)(2), "within 12 months of a determination…the [EPA] Administrator shall act on the submission in accordance with paragraph (3)." Paragraph three (3) addresses full and partial approval and disapproval. The FCAA is silent on the state's recourse if EPA fails to act, which leads us to the current proposal. In this proposal, EPA presents modeling results that change the predicted impacts on downwind states. It is important to note that EPA's modeling results were not available to states prior to the initial submittal. If the disapproval of the proposed SIP is finalized, EPA has a two-year timeframe to develop a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements. Alternatively, EPA could approve a subsequent SIP submittal that meets these requirements. EPA proposed the FIP on April 6, 2022[2] some 43 days later.

I.)    EPA finds in its proposal that Louisiana's November 2019 submittal does not meet the obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 NAAQS in downwind states based upon EPA's 4-step interstate transport framework.

LDEQ has an established Part 70 air permitting program, approved by EPA. The program's regulations set forth obligations that industry must follow prior to construction. All permit applications must show that their potential to emit emissions meets the prevention of significant deterioration (PSD) or nonattainment new source review requirements (NNSR). To date, there have been no FCAA §126 actions filed against Louisiana. FCAA §126 gives a state the authority to ask EPA to set emissions limits for specific sources of air pollution in other states that significantly contribute to nonattainment or interfere with maintenance of one or more NAAQS in the petitioning state.

Comments: Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality
Standards, State of Louisiana
Page 2

II.)  EPA's discussion of 1% of the standard (or 0.07 ppb) versus 1 part per billion (ppb) is silent
on linkages to Sheboygan WI, which LDEQ used, yet dismisses its use on linkage to other
monitors because the 2016v2 modeling shows increased transport.

This discussion is moot. Use of 1% of the standard is problematic as EPA's own performance specifications
for automated analyzers allow up to 2.5 ppb as "noise" according to Table B-1, Subpart 53.

III.)  Arbitrary and capricious model biases and inequities.

LDEQ submitted the mandatory 2015 8-Hour Ozone Transport SIP on November 12, 2019, based on EPA's
Model 2016v1. However, EPA unjustly and prejudicially based the disapproval on an updated version,
2016v2, which includes refinements that have not been peer reviewed. Furthermore, this modeling was
performed after the SIP deadline.

Significant differences are present in EPA's modeling used for LDEQ's 2019 submittal and the modeling
used to theorize the disapproval proposal. This points to substantial alterations to model input parameters.
LDEQ, as well as the states included in this notice, were not allowed to review or comment on the newer
model and/or inputs prior to use in the disapproval process.

EPA used variable selection and quantile regression, an unproven technique that the states were not afforded
the opportunity to review and provide comment.

IV.)  Measured verifiable data shows that ozone precursor (NOx and VOC) emissions have
decreased, demonstrating that existing regulations are functioning properly to ensure cleaner
air for our citizens, and by extension, our state neighbors. Statewide ozone precursor levels are
as follows:

Louisiana Precursor Emissions 2015-2020

|      | VOC (tpy)   | NOx (tpy)   |
|------|-------------|-------------|
| 2015 | 56443.98481 | 151108.9964 |
| 2016 | 55761.55776 | 143770.0874 |
| 2017 | 55949.0158  | 133811.5786 |
| 2018 | 56993.3932  | 138714.1833 |
| 2019 | 60378.58398 | 134811.2971 |
| 2020 | 52953.43256 | 122208.6137 |

The data unmistakably demonstrates that there is less to transport, yet EPA has determined that Louisiana
will contribute more in the future.

Projected Nonattainment and Maintenance Receptors

| Monitor ID | County | Projected 2017 LA Contribution | Projected 2028 LA Contribution |
|------------|--------|--------------------------------|--------------------------------|
| 480850005  | Collin | 0.97                           | 3.65                           |
| 481210034  | Denton | 1.89                           | 2.89                           |
| 481211032  | Denton | 1.71                           | 3.68                           |

Comments: Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, State of Louisiana
Page 3

| 482010047 | Harris | 3.03 | 4.62 |
|-----------|--------|------|------|
| 482010051 | Harris | 5.01 | 4.92 |
| 482010055 | Harris | 5.07 | 5.34 |
| 482010066 | Harris | 4.61 | 4.04 |
| 484390075 | Tarrant | 2.08 | 0.92 |
| 484393009 | Tarrant | 1.93 | 1.99 |

Additionally, EPA formulated part of their proposed disapproval on results from the journal article, "*Improved estimation of trends in U.S. ozone concentrations adjusted for interannual variability in meteorological conditions,*"[iii] authored by several EPA members/employees and one external author. This article was not peer reviewed, neither is it available without purchase. In the spirit of transparency, this article should be made available in the Docket with other supplementary materials. Moreover, the article includes a disclaimer that states "Although this article has been reviewed by the U.S. EPA and approved for publication, it does not necessarily reflect the U.S. EPA's policies or views." Atypically, the subject matter of the article is accounted for in tweaks to the 2016v2 modeling.

LDEQ requests that EPA rescind their disapproval of and reconsider approval of LDEQ's Interstate Transport State Implementation Plan for the 2015 8-Hour Ozone National Ambient Air Quality Standards based on the parameters that were provided by EPA prior to submittal. Should you have any questions concerning this submittal, please contact Jason Meyers, Administrator, Air Planning and Assessment Division at (225) 219-3408.

Sincerely,

Chuck Carr Brown, Ph.D.
Secretary

4-25-2025

Date

c: Sherry Fuerst

[i] 87 FR 9798
[ii] 87 FR 20036
[iii] Atmospheric Environment 248 (2021) 118234

# EXHIBIT E



One American Square | Suite 2900 | Indianapolis, IN 46282-0200

Chicago  Columbus  DuPage County, Ill.
Indianapolis  New York  Philadelphia  Washington, D.C.

June 21, 2022

WRITER'S DIRECT NUMBER: (317) 236-5893
DIRECT FAX: (317) 592-4225
INTERNET: Freedom.Smith@icemiller.com

**Filed to:**  Docket No. EPA-HQ-OAR-2021-0668
**Email to:**  Regan.Michael@epa.gov; selbst.elizabeth@epa.gov

Michael S. Regan, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

**RE:** **Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard**

Dear Administrator Regan:

Please find attached comments filed on behalf of the Midcontinent Independent System Operator ("MISO")  on the proposal by the U.S. Environmental Protection Agency ("EPA") to promulgate a Federal Implementation Plan ("FIP") Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard ("NAAQS"). 87 Fed. Reg. 20,036 (April 6, 2022). The comment period on this proposal has been extended to June 21, 2022. 87 Fed. Reg. 29,108 (May 12, 2022).    MISO is a not-for-profit, member-based regional transmission organization ("RTO") accepted and supervised by the Federal Energy Regulatory Commission ("FERC") that serves more than 42 million customers.

Respectfully submitted,

Freedom Smith
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, IN  46282-0200

Legal Counsel

Midcontinent Independent System Operator

FSNS/hmsm
Enclosures

**MIDCONTINENT INDEPENDENT SYSTEM OPERATOR (MISO)**

**JUNE 21, 2022, COMMENTS ON PROPOSED FEDERAL**

**IMPLEMENTATION PLAN ADDRESSING REGIONAL OZONE**

**TRANSPORT FOR THE 2015 8-HOUR OZONE NAAQS.**

**Docket ID No. EPA-HQ-OAR-2021-0668**

**87 Federal Register 20,036 (April 6, 2022)**

The Midcontinent Independent System Operator ("MISO") offers these comments on the proposal by the United States Environmental Protection Agency ("EPA") to promulgate a Federal Implementation Plan ("FIP") Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard ("NAAQS"). 87 Fed. Reg. 20,036 (April 6, 2022). The comment period on this proposal has been extended to June 21, 2022. 87 Fed. Reg. 29,108 (May 12, 2022).

By way of background, MISO is a not-for-profit, member-based regional transmission organization ("RTO") accepted and supervised by the Federal Energy Regulatory Commission ("FERC") that serves more than 42 million customers. MISO's footprint ranges from Texas in the south, Montana in the west, and Ohio-Indiana line in the east.



MISO delivers power from the high-voltage transmission grid to local distribution utilities, which then are responsible for delivery to end-use customers. MISO is separate and independent

1

from the companies that own electric generation and transmission facilities, but is authorized to exercise "functional control" over the high voltage transmission system. MISO is authorized by the Federal Energy Regulatory Commission ("FERC") to provide transmission service and otherwise administer the bulk electric system in its region. One of MISO's critical functions is to facilitate and maintain the reliable delivery of electricity to those they serve. MISO acknowledges and appreciates the role of EPA and other state and federal agencies play in addressing air quality matters. Pursuant to the Clean Air Act and its authority EPA can address interstate transport of air pollution that affects downwind states' ability to attain and maintain NAAQS. In this complex environment MISO provides these comments based in its role to provide critical function to maintain reliable service. To MISO this proposed FIP creates significant concerns about MISO's ability to maintain electric reliability. To this end, MISO further incorporates the joint comments of Electric Reliability Council of Texas, Inc. ("ERCOT"), Midcontinent Independent System Operator, Inc. ("MISO"), PJM Interconnection, L.L.C. ("PJM"), and Southwest Power Pool, Inc. ("SPP") as part of its own comments. As will be pointed out in these comments, EPA's proposed FIP/transport rule, if promulgated as drafted, would yield significant, potential adverse impacts associated with grid reliability. Additionally, the EPA has not provided adequate time for thoughtful assessment of this complex, lengthy, multi-source proposal.

## 1.  <u>The comment period is too short to allow review and analysis of the proposed rule.</u>

EPA published the proposed rule on April 6, 2022, and requested comments no later than June 6, 2022. The comment period was subsequently extended by a modest additional 2 weeks to June 21, 2022 (87 Fed. Reg. 29108, May 12, 2022). Although the granted extension is welcome, the extension does not allow sufficient time to develop a technically robust and thorough set of comments on the proposed FIP. EPA has sought comment on 53 specific issues raised in the proposed rule, including an omnibus issue styled "Request for Comment on All Aspects of the Proposal." This is a complex,181-page proposed rule with supplemental docket reports, appendices, etc. A 75 day comment period granted in piecemeal fashion is not sufficient time to analyze and develop meaningful comments.

The proposed rule is broader in scope than the transport rules that have preceded it. The proposed rule would resolve the interstate transport obligations of 26 states under CAA section 110(a)(2)(D)(i)(I), referred to as the "good neighbor provision" or the "interstate transport provision" of the Act, for the 2015 ozone NAAQS and would address nitrogen oxides emissions budgets impacting power plants in 25 states. *87 Fed. Reg. at 20036-38*. Not only does the proposed rule cover a much larger geographic area than prior rules, but it also proposes to impose new control requirements on both Electric Generating Units ("EGUs") and a broad category of industrial sources. The expanded scope of this rule adds yet another significant layer of complexity to the analysis of the proposed rule, making development of comprehensive comments resource intensive and time consuming.

In addition, on February 22, 2022, EPA published eight separate proposed rules that propose to disapprove Good Neighbor State Implementation Plans ("SIPs") impacting 19 states. The 19 state Good Neighbor SIPs are linked with the proposed transport rule because both target the same ambient air quality standard. MISO's technical staff has the ability to assist the EPA and affected stakeholders in reviewing the projected impact of the proposed rule; however, the

limitation of time to do so has introduced risk to a detailed consideration of the impacts of the proposed rule on key elements such as grid reliability and the costs thereof. These risks contribute to MISO's concern that the rule, as drafted, could have significant, potential impacts to grid reliability.

All the issues articulated above illustrate that the extended comment deadline is insufficient to develop an in-depth set of comments on the proposed transport FIP. Notwithstanding these limitations, MISO's review of the proposed FIP has identified a number of immediate areas of concern that require further consideration before implementation in order to ensure continued reliable grid operations, particularly during this time of transition.

### 2. The Proposed FIP threatens the reliability of the electric power grid.

The EPA projected future 2023, 2026, and 2032 baseline EGU emissions using the version 6—Summer 2021 Reference Case of the Integrated Planning Model ("IPM") provides forecasts of least cost capacity expansion, electricity dispatch, and emissions control strategies while meeting energy demand and environmental, transmission, dispatch, and reliability constraints. *87 Fed. Reg. at 20063.* EPA evaluated emissions reduction potential from generation shifting, *i.e.* units with lower NOX rates to increase generation, while units with higher NOX rates reduce generation. *87 Fed. Reg. at 20081.* Combining air quality factors, costs, and emissions reductions, the EPA identified a controls for EGUs that results in substantial air quality improvement from emissions controls that are available in the timeframe for which air quality problems at downwind receptors persist. *87 Fed. Reg. at 20091.* The EPA requested comments on its identified EGU control stringencies, including its consideration of the cost, air quality impacts, and timing of such mitigation strategies. *87 Fed. Reg. at 20096.*

Modifications to the Proposed Rule are needed to address the potential for distinct reliability challenges resulting from the rule's implementation.

### a. EPA has not appropriately considered resource adequacy issues and the most current information.

The proposed FIP does not address the challenge, and impacts, of maintaining resource adequacy for the power grid. Resource adequacy, in general terms, is achieved when the accredited megawatt capacity of the generators in a particular region meets or exceeds the forecasted load, plus reserves, for that region. Different types of resources are accredited, or count, for different amounts capacity depending on how reliable they are to be able to generate at the time they are needed. The traditional dispatchable generators targeted by this Proposed Rule tend to have much higher accredited capacity than the replacement capacity that has been brough online in recent years. MISO is experiencing a trending decline in reserve margin, which is largely the result of the retirement of significant amounts of dispatchable generation. As a result, MISO believes that the Proposed Rule could substantially accelerate that trend at a time when MISO is facing the need for increased reserves resulting from extreme weather, high load conditions, and generator retirements. Replacement of retiring generation with new, mostly non-dispatchable facilities that

are not installed at the same time or valued at the same output presents its own risks.  It will take time to obtain the required regulatory approvals to construct new generation and especially any needed transmission facilities to connect that generation to the grid.  Of course, resource adequacy must be maintained, and NERC reliability standards met during this interim period.  Any final rule, both as to its design and its implementation timing, including dynamic budgeting, needs to take these factors into account.

MISO's analysis of EPA information shows that the proposed rule not only may accelerate planned retirements, but drive additional, unexpected retirements  MISO is concerned that the Proposed Rule could cause generator retirements due to the limitations on operations and/or the cost of installing Selective Catalytic Reduction ("SCR") and other technology improvements that may otherwise be required.  Furthermore, to the extent units do not retire, their ability to operate could be limited by the Proposed Rule, which depending on the region and level of flexibility within the rule, could present a distinct reliability challenge.  The Proposed Rule does not have a glide path or transition plan, and one is necessary.  The compressed timing to start the program and limit emissions in 2026 is anticipated to be a challenge in terms of facilitating replacement capacity with the necessary attributes.

MISO faces increasing challenges to system reliability and the ability to commit sufficient resources to supply electricity to customers within the Midcontinent region.  Our studies indicate that our region needs a certain level of dispatchable and flexible resources to reliably manage the transition to a decarbonized energy future.  MISO is both fuel- and technology-neutral, however MISO needs to preserve the best options to provide these needed resource capabilities and attributes to bridge the gap between retirements and replacement capabilities and attributes. MISO's challenges include declining reserve margins and fewer always-on "baseload" resources, due to retirements of thermal units.  At the same time, the installation of new capacity from other resources is not occurring at the same rate as the baseload retirements and are not always available to provide energy during times of need.  For instance, MISO expressed concern to EPA regarding issues related to the Dalman, Erickson, Meramec, Ottumwa, and Sioux power plants about the result of withdrawal of service by the five generators stating that:

> Such interruptions of service would result in localized impacts but must also be viewed by MISO for their collective effects. This is especially true since the proposed decisions could result in withdrawn generation for plants in close time proximity to one another rather than the more normal situation where generator outages result from individual decisions by their owners.
>
> …
>
> MISO respectfully requests that the EPA consider these Comments regarding the effects of generator closures on the electric transmission system in the MISO footprint. The loss of any significant portion of the 3.1 GW from the five generators considered in the above-captioned cases would push resource adequacy coverage of regional demands into dangerous territory.[1]

---

[1]Comments of Midcontinent Independent System Operator (MISO) related to EPA-HQ-OLEM-2021-0588, EPA-HQ-OLEM-2021-0589, EPA-HQ-OLEM-2021-0592, EPA-HQ-OLEM-2021-0593, and EPA-HQ-

MISO further commented that "[b]ased on the most currently available information . . . there is very little excess generating capacity (or none at all) to cover demand for electricity, plus the required reserve margin, in the immediate future."[2] Additional closures would worsen an already difficult situation.[3] These events, which continue to place MISO in near-emergency or emergency conditions, are the result of the changing resource profile, including a significant number of thermal plant retirements and related increases in planned and unplanned outages.[4] The Proposed Rule only exacerbates these challenges and presents risk.

These transformations in the generating fleet have resulted in numerous new issues and associated risks. The risk of not having enough generation to meet demand shifts from the historic times of peak power demand to other periods, specifically hot summer evenings and cold winter mornings, when low availability of certain resources is coincident with high power demand. And depending on the circumstances, the current transmission infrastructure becomes unable to deliver energy to customers.

To facilitate the residual trading of capacity among its members, and to ensure the availability of sufficient generating capacity to meet the region's needs, every year MISO holds a Planning Resource Auction (PRA). The results of the 2022-2023 PRA were announced on April 14, 2022, and updated on May 3, 2022.[5] The auction results reflected the industry's ongoing shift away from coal-fired generation and increasing reliance on other resources. The results showed capacity shortfalls in MISO North and Central regions to meet the projected load plus required reserves. Clair Moeller, MISO's president and chief operating officer, said that "[t]he reality for the zones that do not have sufficient generation to cover their load plus their required reserves is that they will have increased risk of temporary, controlled outages to maintain system reliability."[6] Moeller said further that customers in those zones "may also face higher costs to procure power when it is scarce."[7] The capacity shortfalls were reflected in the market pricing for the capacity, which is measured in megawatt-days. Clearing prices in zone 5 surged to $236.66 per megawatt-day compared to approximately $5 a year ago.

MISO's 2022/2023 PRA resulted in a capacity shortfall for the MISO North/Central Regions despite the fact that MISO was able to import over 3,000 MW from neighboring regions. While MISO will likely continue to rely on imports from its neighbors to help address system

OLEM-2021-0594, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010.

[2] *Id.* at p. 6, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010

[3] *Id.* at p. 6, *available at* https://www.regulations.gov/comment/EPA-HQ-OLEM-2021-0588-0010

[4] *Id.*

[5] MISO 2022/2023 Planning Resource Auction (PRA) Results, April 14, 2022, *available at* https://cdn.misoenergy.org/2022%20PRA%20Results624053.pdf. *See also* MISO 2022/2023 Planning Resource Auction (PRA) Results, Revised May 3, 2022, *available at* https://cdn.misoenergy.org/20220420%20RASC%20Item%2004b%20PRA%20Results%20Supplemental624128.pdf

[6] MISO Written Statement, *Some parts of region fall short of their Resource Adequacy requirement*s, April 14, 2022, https://www.misoenergy.org/about/media-center/misos-annual-planning-resource-auction-results-underscore-the-reliability-imperative/

[7] *Id.*

reliability concerns in the near term, this is not a sustainable situation for either MISO or its neighbors. As a result, MISO's North/Central Regions will experience a slightly increased risk of needing to implement temporary controlled load sheds.[8] Emergency resources and non-firm energy imports will be needed to maintain system reliability[9]; in other words MISO will need to import power from outside its region. This is further reinforced by NERC, that considers MISO a **high risk** for running short of operating reserves under normal conditions.[10]

MISO is also anticipating a warmer-than-normal-summer and probable capacity shortfalls in June, July and August. In particular, J.T. Smith, MISO's Executive Director – Market Operations noted that the "north and central regions of MISO" are "at increased risk of temporary, controlled outages to preserve the integrity of the bulk electric system[.]"[11] In its Seasonal Readiness Workshop on April 28, 2022, MISO projected the need for increased, non-firm imports and potentially emergency resources to meet the 2022 summer peak demand, because of warmer-than-normal temperatures forecasted throughout the MISO footprint.[12] MISO expects summer demand to increase to 1.7% over last summer, while generation capacity has declined 2.3%. MISO attributes the decline in generation due to fossil-fuel power plant retirements as the generation fleet continues to shift to renewable sources.[13]

The proposed FIP may alter how MISO's members and generation owners offer their resources into our markets (including run time limitations), which may further limit MISO's options when committing and dispatching resources. It is not apparent how EPA's generation shifting assumptions will play out in light of such measures.

While resource adequacy is generally the responsibility of the state regulatory authorities within the Midcontinent region, MISO is in a unique position as the grid operator to inform state and environmental regulators on the regional impact of actions on grid reliability and customer impacts. Given the changes to the generating fleet, and the potential shortfalls in generating capacity, it is imperative that reliable generating resources, like the facilities subject to the Proposed Rule, be recognized for the regional reliability value provided to the region's customers. Given the existing regional supply situation, resources need to remain online and available to provide capacity and transmission grid stability to meet the system's needs until sufficient replacement capability is brought online.

Other RTOs and similar organizations have also issued warnings of high prices and possible blackouts. MISO shares the concerns expressed by other RTO/ISOs like ERCOT, PJM, SPP as well as the concerns raised by others as to these issues. It is essential that in assessing the

---

[8] MISO 2022/2023 Planning Resource Auction (PRA) Results, April 14, 2022.

[9] MISO Summer Readiness Workshop, April 28, 2022.

[10] North American Electric Reliability Corporation (NERC), *2022 Summer Reliability assessment*, May 2022, *available at*
https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_SRA_2022.pdf.

[11] MISO Summer Readiness Workshop Summer 2022, April 28, 2022, *available at*
https://cdn.misoenergy.org/20220428%20Summer%20Readiness%20Workshop%20Recording624371.mp4

[12] MISO Summer Readiness Workshop Summer 2022, April 28, 2022.

[13] MISO Summer Readiness Workshop, April 28, 2022.

final version of this proposal that EPA assure that its rule does not interfere with the reliability of the electric power grid.

     **b.  EPA has not appropriately considered energy adequacy issues.**

MISO has conducted preliminary analysis of the impact of the proposed FIP on the energy adequacy of the system in 2026.  For this analysis, MISO utilized the EPA's forecast of impacted units and conducted hourly energy dispatch using the PROMOD tool.  Actual sub-hourly impacts may be more severe. Hours of energy insufficiency reflect an hour where a sub-region is not able to meet load, given all available generation in that area and importing as much as possible accounting for transmission constraints. This analysis is on-going and may be refined through further discussions with MISO members, states, and EPA.

According to the EPA information[14], coal and gas retirements in the MISO region will be 12,438 MW by 2026, and coal and gas retrofits will be 11,514 MW by 2026.  Based on this information, MISO conducted 3 economic analyses for 2026 – a base case with no retirements or retrofits; a 'retirement + retrofits' case as EPA has suggested; and a 'retire all affected units' case in which the units that EPA has forecasted to retrofit instead retire.  This case is consistent with conversations MISO has had with multiple member utilities based on the economic decision to not make a costly retrofit to a unit that is scheduled to retire before the assumed 20-year payback period.

Results show an increase in the number of hours of energy inadequacy of between 16 times and 80 times the base case due to the Proposed Rule.

| 2026 | | | |
|---|---|---|---|
| | MW of impacted generation | Hours of insufficient generation | Change from Base Case |
| Base Case | | 6 | |
| Retirement + Retrofits | 12,438 | 99 | 16.5 time greater |
| Retire All Affected Units | 12,438+11,514= 23,952 | 477 | 79.5 times greater |

     **c.  EPA's reliance on generation shifting and dynamic budgeting and as a control mechanism is arbitrary and capricious and presents grid reliability issues.**

To implement the required emissions reductions from EGUs, the EPA has proposed generation shifting (*i.e.,* emission reductions anticipated to occur from generation shifting from higher to lower emitting units), dynamic budgeting, and changes to the existing CSAPR NOX Ozone Season Group 3 Trading Program as control mechanisms.  With regard to generation shifting, EPA asserts that managing generation shifting is both technically and legally

---

[14] *See* Analysis of the Proposed Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard | US EPA

authorized under the Clean Air Act as it is a simply a tool for implementing emissions reductions. *87 Fed. Reg. at 20,081.* EPA asserts that "if EPA did not account for generation shifting then it could result in substitution for emission reductions intended through control operations and installation, potentially lessening the implementation of those mitigation strategies." *Id.* EPA offers assurances its generation shifting is constrained, but that the "sector's unusual flexibility with respect to how emissions reductions can be achieved makes" their task difficult particularly relative to trading and generation shifting. *87 Fed. Reg. at 20,105.* Given the significance of generation shifting in affecting state budgets in some states, it is critical that EPA clearly explain how these items are executed.

In addition, EPA proposes to revise the existing CSAPR NOX Ozone Season 3 trading programs established in the Revised CSAPR Update to include a dynamic budgeting procedure. *87 Fed. Reg. at 20,105.* The proposed changes would adjust the overall quantities of allowances available for compliance in the trading program in each control period. *Id.* Starting with the 2024 control period, the EPA proposes to annually recalibrate the quantity of accumulated banked allowances under the program to prevent the quantity of allowances carried over from each control period to the next from exceeding the target bank level, which would be revised to represent 10.5 percent of the sum of the state emissions budgets. *Id.* Furthermore, calculations of emissions budgets for control periods in 2025 and later years based on more current information about the composition and utilization of the EGU fleet, specifically data available from the 2023 ozone season and following (*e.g.,* for 2025, data from 2023; for 2026, data from 2024; etc.). *Id.* EPA states that a dynamic budget approach where emissions budgets starting in the 2025 control period and beyond will be determined through ministerial actions subsequent to the proposed FIP's promulgation and based on a formula set out in the proposed FIP. *87 Fed. Reg. at 20,105 -107.* EPA further states that "[e]mission reductions derived from generation shifting will be captured in the dynamic budgets in all cases. For the pre-set budget years it is estimated and incorporated through an additional calculation step. For dynamic budget years, it is directly incorporated through the inclusion of updated heat input data reflecting observed, compliance period generation shifting." *87 Fed. Reg. at 20108, FN 231.*

EPA's proposed dynamic budgeting does not align with grid reliability practices and will undermine grid reliability as it does not appear to allow MISO or other RTO/ISOs to plan for reliability or to respond to emergency needs as they arise. Moreover, given the significance of generation shifting in affecting budgets in some states, it is critical that EPA clearly explain how this step will be executed. MISO requests a technical analysis of this aspect of the proposed FIP. The Technical Comments note in the state budget setting process, generation shifting is the third and final step in determining state budgets. Generation shifting is quantified by three IPM runs – Base Case, Run 1 and Run 2. It should be noted EPA's description of generation shifting is inadequate and lacks transparency on the steps and data used. EPA has not provided adequate information or time to properly analyze this proposal and its potential impacts.

EPA has also assigned certain idling and generation shifting assumptions to state budgets which are flawed. Underlying these flaws is an agency that has little experience or statutory jurisdiction to manage the dispatch of power through an emissions reduction program. EPA's assumptions concerning idling was raised in the *Wisconsin v. EPA* litigation. In that case,

8

petitioners asserted that the agency use of the IPM model assumed an unrealistic number of imminent unit retirements and circumstances of idling. The court found in the appellate review of the CSAPR rule, EPA had not improperly allowed idling to impact state budget development. Accordingly, the IPM model may not be used to accurately project the flow of short-run supply. Management of generation dispatch, whether shifting or idling, are electric power dispatch issues best left to the jurisdictions of FERC and the states.

### d. The addition of reliability exception or safety valve should be considered in the framework in some manner to allow Resource Adequacy-based decisions

MISO supports including some form of a "Reliability Safety Valve" ("RSV") or other mechanism within the CSAPR/NAAQS regulatory framework by which EPA could provide additional program flexibility which could help to alleviate reliability and adequacy concerns. The RSV would represent certain tools and processes that would be available to address reliability issues that might arise during the implementation of a final rule. The RSV would not be a blanket exemption from compliance; rather it would ensure short-term and seasonal reliability. MISO proposes that EPA create an "opt-out" option for units willing to commit to a short remaining useful life (beyond 2026) in exchange for additional consideration/allowances in setting state NOx budgets. Furthermore, MISO proposes that an RSV be available that would:

1. Permit the operation of affected units beyond the proposed rule's constraints if the ISO/RTO has an applicable and declared emergency condition under its FERC-approved Tariff; and

2. Be available for up to 90 days, Triggering and Notification Criteria are outlined that would reasonably constrain the exemption.

Alternatively, the creation of a bank of emergency reliability allowances available for units to purchase of a bank of allowances could be available for units to purchase at the start of the summer season. The bank would allow e trading program but with more allowances to be made available than the currently proposed trading program as a flexible option in emergency circumstances.

Other mechanisms to alleviate reliability and adequacy concerns could include:

1. EPA revising their proposed dynamic budgeting approach to look back at multiple years of past unit operating data (rather than a single year).

2. EPA revising their proposed dynamic budgeting approach to adjust state budgets less frequently, perhaps every 2 or 3 years rather than annually.

3. EPA retaining retired units in state budgets for a longer period than they have proposed, such that sources that do retire units as part of their CSAPR compliance strategy have more flexibility to utilize the allowances associated with the retired unit to meet their allowance surrender obligations for other units which continue to operate.

4. EPA revising or even eliminating their proposed annual "recalibration" of the number of banked allowances.

MISO also requests that EPA find that the conditions for an energy emergency resulting from a loss of necessary energy supplies under CAA section 110(f) of such severity that a temporary suspension of part of the applicable implementation plan and/or requirements under CAA section 7651j (concerning excess emissions penalties or offsets) is presumed to be necessary AND that there is no other adequate means of responding to the energy emergency would be presumed to exist when the ISO/RTO has an applicable and declared emergency condition under its FERC-approved Tariff.

### e. EPA did not appropriately consider costs related to grid reliability, additional energy usage, and potential environmental justice impacts.

As noted by the courts, the "realities of interstate air pollution ... are not so simple," and EPA faces its share of "thorny ... problem[s]" in regulating it. *EME Homer City Gen., L.P. v. EPA*, 572 U.S. 489, 514–16, 134 S.Ct. 1584 (2014) ("*EME Homer II")*. The Good Neighbor Provision authorizes EPA to regulate emissions that contribute *significantly* to nonattainment." 42 U.S.C. § 7410(a)(2)(D)(i)) (emphasis in original). In *Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000), the court held that EPA may consider costs in determining what contributions are "significant," *id.* at 15 (quoting *Michigan*, 213 F.3d at 675), and endorsed the principle that (in the absence of a clear legislative statement to the contrary) a regulation's benefits must be "at least roughly commensurate with [its] costs," *id.* (quoting *Michigan*, 213 at F.3d 678–79). In *Wisconsin v. EPA*, 938 F.3d 303, (D.C. Cir. 2019), the court noted that EPA

> possesses a measure of latitude in defining which upwind contribution "amounts" count as "significant[ ]" and thus must be abated. *See id.* at 518, 134 S.Ct. 1584; 520 n.21. And the Supreme Court has indicated that EPA can take into account, among other things, "the magnitude of upwind States' contributions and the cost associated with eliminating them." *Id.* at 518, 134 S.Ct. 1584. Additionally, in certain circumstances, EPA can grant one-year extensions of the nonattainment deadlines to downwind States. 42 U.S.C. § 7511(a)(5). EPA grants those extensions fairly commonly. *E.g.*, 84 Fed. Reg. 44238, 44238 (Aug. 23, 2019); 81 Fed. Reg. 26,697, 26,697 (May 4, 2016). And finally, EPA can always attempt to show "impossibility." *Sierra Club*, 719 F.2d at 462.

*State of Wisconsin v. Env't Prot. Agency*, 938 F.3d 303, 320 (D.C. Cir. 2019).

Here, EPA should further analyze whether the environmental benefits of the proposed FIP justified the costs imposed by the FIP. The proposed rule does not explore whether the emissions controls in question would endanger reliability, and the attendant costs associated thereof, or cause the closure of generating capacity. The proposed rule also does not currently contemplate a step for the Regional Transmission Organization ("RTO"), Independent System Operators, or FERC to study reliability impacts. Given the exceptional complexity of grid reliability concerns, it is noteworthy that the proposed rule does not provide a more rigorous exploration of the impact of the rule on grid reliability and the resultant costs from an environmental justice and monetary perspective. MISO also notes that EPA's control cost analysis uses an EGU inventory that is divergent from the inventory of EGUs that exist in the 25 states subject to the proposed transport

rule. All of these issues do not lead to an accurate calculations of costs and this issue needs to be re-examined.

MISO also believes that EPA's proposed backstop daily emission rate penalties, 87 Fed. Reg. at 20,121, are inappropriate because NOx budgets should be set based on achievable rates for controls without penalties for emissions occurring during high demand days when the choice is to maintain system reliability by running units with controls or shut down the units because of the backstop daily rate penalties. EPA has also acknowledged that there is "very little difference" between "NOx rates for EGUs for hours with high energy demand" and "seasonal average NOx rates." 83 Fed. Reg. at 50,466. Moreover, the *Maryland* Court recognized that "there may be valid operational reasons not to operate catalytic controls on particular days, 'e.g., to avoid damaging or plugging of the [control] or taking a forced outage where a breakdown leaves the unit unavailable to produce power.' As a result, that a source ends up emitting above 0.20 lb/mmBtu on a particular day is not necessarily evidence of a failure to optimize."[15]

EPA's operational restriction by imposing a daily limit with a substantial allowance penalty will force decisions that are contrary to the effective management of generation and emissions. Situations that may result in exceeding EPA's proposed daily limit include necessary startup or shutdown of units based on system demand, operation of units at minimum load conditions to meet grid requirements, and even short-term operation of a unit after malfunction of NOx controls. On high demand days, EGU operators and RTOs will face the choice to maintain system reliability by running units with limited NOx control or shut down the units because of the backstop daily rate penalties.

### 3. **Conclusion.**

For the reasons set forth in these comments, MISO's review of the proposed FIP has identified a number of immediate areas of concern that require further consideration before implementation in order to ensure continued reliable grid operations, particularly during this time of transition. Modifications to the Proposed Rule are needed to address the potential for distinct reliability challenges resulting from the rule's implementation.

.

---

[15] *Maryland v. EPA*, 958 F.3d 1185, 1207 (D.C. Cir. 2020).

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2023, a true and correct copy of the foregoing has been served on all parties in accordance with the Appellate Rules of Civil Procedure, via the Court's CM/ECF system.

<div style="text-align: right;">

s/ *Joseph S.  St. John*
Joseph S. St. John

</div>